1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
2                          MARSHALL DIVISION

3

   OPTIS WIRELESS TECHNOLOGY,    )(
4  LLC, ET AL
                                 )(    CIVIL ACTION NO.
5  VS.                                 2:19-CV-66-JRG
                                 )(    MARSHALL, TEXAS
6                                      AUGUST 3, 2020
   APPLE INC.                    )(    9:44 A.M.
7

8                        TRANSCRIPT OF JURY TRIAL

9                          MORNING SESSION

10       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

11                    UNITED STATES DISTRICT JUDGE

12

13 APPEARANCES:

14

   FOR THE PLAINTIFFS:
15

16 SAMUEL F. BAXTER
   JENNIFER TRUELOVE
17 MCKOOL SMITH, P.C.
   104 E. Houston Street
18 Suite 300
   Marshall, TX 75670
19

20
   JASON G. SHEASBY
21 HONG ANNITA ZHONG
   IRELL & MANELLA LLP
22 1800 Avenue of the Stars
   Suite 900
23 Los Angeles, CA 90067

24

25

```
 1  FOR THE PLAINTIFFS:

 2
    STEVEN J. POLLINGER
 3  SETH R. HASENOUR
    MCKOOL SMITH, P.C.
 4  300 W. 6th Street, Suite 1700
    Austin, TX 78701
 5

 6
    JONATHAN YIM
 7  MCKOOL SMITH, P.C.
    One Manhattan West
 8  395 9th Avenue, 50th Floor
    New York, NY 10001
 9

10
    CHRISTOPHER P. MCNETT
11  MCKOOL SMITH, P.C.
    1999 K Street, NW
12  Suite 600
    Washington, DC 20006
13

14
    INGRID PETERSEN
15  KELSEY SCHUETZ
    IRELL & MANELLA LLP
16  840 Newport Center Drive
    Suite 400
17  Newport Beach, CA 92660

18

19

20

21

22

23

24

25
```

```
 1   FOR THE DEFENDANT:

 2
     MR. JOSEPH J. MUELLER
 3   WILMER CUTLER PICKERING
        HALE & DORR, LLP
 4   60 State Street
     Boston, MA 02109
 5

 6
     MR. MICHAEL J. SUMMERSGILL
 7   WILMER CUTLER PICKERING
        HALE & DORR LLP
 8   60 State Street
     Boston, MA 02109
 9

10
     MS. MELISSA R. SMITH
11   GILLAM & SMITH, LLP
     303 South Washington Avenue
12   Marshall, TX 75670

13

14

15
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
16                        Official Court Reporter
                          United States District Court
17                        Eastern District of Texas
                          Marshall Division
18                        100 E. Houston
                          Marshall, Texas  75670
19                        (903) 923-7464

20

21   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
22

23

24

25
```

```
         1              P R O C E E D I N G S
09:27:19 2         (Venire panel in.)
09:27:19 3         COURT SECURITY OFFICER:  All rise.
09:27:20 4         THE COURT:  Thank you.  Be seated, please.
09:44:05 5         Good morning, ladies and gentlemen.  I don't know
09:44:32 6  what those extraneous noises are.  If they continue, I'll
09:44:37 7  stop and get an IT person up here.  Otherwise, we'll
09:44:39 8  continue.
09:44:39 9         Welcome.  Good to have you here this morning.  My
09:44:43 10 name is Rodney Gilstrap, and I am the Chief United States
09:44:47 11 District Judge for the Eastern District of Texas.  I have
09:44:51 12 lived in Marshall since 1981.  I practiced law here for
09:44:56 13 about 30 years.  I've been on the bench in this court since
09:45:02 14 2011.  And I have a confession to make to all of you.  I
09:45:06 15 was not born in Texas, but I got here as quick as I could.
09:45:10 16        I came to Texas to enroll as a freshman at Baylor
09:45:15 17 University in Waco.  I stayed there and completed my
09:45:18 18 undergraduate studies and then attended Baylor Law School.
09:45:21 19        I am married.  I have two grown children.  And my
09:45:26 20 wife owns and operates a retail floral business here in
09:45:30 21 Marshall.
09:45:30 22        Now, I tell you all these things about me because
09:45:33 23 in a few minutes, I'm going to let each of you give me the
09:45:37 24 same kind of information about yourselves, and I think
09:45:39 25 you're entitled to know as much about me as I'm about to
```

09:45:43   1   find out about each of you.

09:45:44   2           We are about to engage in the selection of a jury

09:45:48   3   in a civil case involving allegations of patent

09:45:55   4   infringement.  But before we go any further, I want to

09:45:58   5   briefly mention some of the health -- health and safety

09:46:01   6   precautions that we're going to be taking during this

09:46:04   7   trial.

09:46:04   8           Each of you should have gotten a letter from me

09:46:07   9   attached to your summons when you were notified to appear

09:46:12   10  for jury duty here talking about some of the precautions

09:46:15   11  that the Court is putting in place.  There are some

09:46:17   12  additional safeguards that I'll be implementing as we go

09:46:21   13  forward with jury selection today and then begin with the

09:46:23   14  trial of the case itself, and I will go over these when we

09:46:26   15  get to that part of the process.

09:46:27   16          Also, as to the eight of you that are going to be

09:46:31   17  selected to serve as the jurors in this case, there are a

09:46:34   18  few certain additional steps and procedures that we'll be

09:46:40   19  implementing during the trial of the case itself, and I

09:46:42   20  want to mention a few of these to you now.

09:46:44   21          Each member of the jury, after the jury is

09:46:47   22  selected and we begin the trial, each member of the jury

09:46:49   23  will have their temperature taken, as happened this

09:46:53   24  morning, when you appear at the courthouse for each day's

09:46:57   25  portion of the trial.

09:46:59  1        Once the eight of you are selected and seated in
09:47:03  2   the jury box, then you're going to be given a plastic face
09:47:06  3   shield.  Very simple to use.  And it will provide an
09:47:22  4   additional layer of protection for you as you mingle with
09:47:25  5   each other on the jury.
09:47:26  6        Also, the eight of you will be -- that are
09:47:29  7   selected will be spaced in the jury box so that there are
09:47:32  8   no two of you seated directly next to each other.  And once
09:47:35  9   you're seated in the jury box, I'm going to ask that the
09:47:38  10  eight of you selected as the jury keep those same seats and
09:47:41  11  those same positions throughout the trial of the case.
09:47:43  12       Also, I can tell you that every evening when we
09:47:50  13  recess before the next day of the trial, a special deep
09:47:55  14  cleaning will take place with regard to the jury box, the
09:47:57  15  jury room, and all the restrooms that are available to the
09:48:00  16  jury in the jury room.  That will happen every day.
09:48:03  17       Also, ladies and gentlemen, for the eight of you
09:48:06  18  that are selected to be on the jury, the Court is going to
09:48:11  19  provide you with a separate boxed lunch each day.  You will
09:48:14  20  not leave the courthouse to go to lunch.  You'll have a
09:48:17  21  separate lunch provided to you that you'll enjoy in the
09:48:20  22  jury room so that you won't have to leave and take the
09:48:23  23  time, also risk any possible exposure while you're out
09:48:27  24  looking for lunch.  That won't be necessary.
09:48:30  25       As I've said, there will be perhaps a few other

09:48:37  1  precautions, and I'll mention to you -- those to you as we

09:48:40  2  get to them.  All of these are intended so that we can try

09:48:43  3  this case and have both a fair and impartial and a safe

09:48:47  4  jury trial.

09:48:48  5         Now, if you'll indulge me for a minute, I want to

09:48:52  6  briefly review with the panel as a whole how we came to

09:48:56  7  have our American civil jury trial system.

09:48:58  8         If you go back in ancient history and you look at

09:49:01  9  the Pentateuch, the first five books of the Old Testament,

09:49:05  10  you'll see that the ancient Jewish Nation empaneled juries

09:49:08  11  to decide issues of property value and property ownership.

09:49:12  12         The ancient Greeks began using a jury system about

09:49:16  13  1500 BC.  And the Romans, as they did with many things,

09:49:22  14  they copied the jury system from the Greeks, and it was the

09:49:26  15  Romans that brought the jury system to what we now know as

09:49:30  16  England when they copied that -- when they conquered, I'm

09:49:35  17  sorry, when they conquered that island in the 4th Century

09:49:38  18  AD.

09:49:38  19         So by the 12th century AD jury trials had been a

09:49:42  20  part of everyday life and the ordinary jury system, or

09:49:45  21  judicial system, in England for 800 years.

09:49:48  22         But then in the 12th century AD, a tyrannical king

09:49:53  23  came to the throne of England named King John.  And King

09:49:59  24  John attempted to do away with the jury trial system.

09:50:02  25  King John had many other disputes with his nobles, and

09:50:05   1   those disputes, including his attempts to limit or do away

09:50:09   2   with the jury trial, brought that country to the verge of

09:50:12   3   civil war.

09:50:12   4        But civil war was avoided because the king and his

09:50:16   5   nobles settled their -- settled their disputes and reached

09:50:19   6   an agreement at a place called Runnymede.  And the document

09:50:22   7   that they all signed resolving those disputes and

09:50:26   8   reinstituting and making clear that the jury trial system

09:50:30   9   would be a continuing part of everyday life in England,

09:50:33   10  that document is called the Magna Carta.  I'm sure many of

09:50:37   11  you have heard of that.

09:50:38   12       So you can see, ladies and gentlemen, that the

09:50:42   13  jury trial system was deeply ingrained in our founding

09:50:49   14  fathers when they came to these shores as British colonists

09:50:53   15  years later.

09:50:54   16       I will tell you, ladies and gentlemen, just as an

09:50:56   17  interesting fact, 28 of our 50 United States have adopted

09:51:00   18  the exact language regarding jury trials from the Magna

09:51:05   19  Carta in their state constitutions.

09:51:08   20       But, as I say, our founding fathers were well

09:51:12   21  ingrained with the jury trial system when they came to

09:51:16   22  America as British colonists, and the jury trial system

09:51:20   23  flourished in America for more than a hundred years, until

09:51:24   24  another tyrannical king came to the throne of Great

09:51:29   25  Britain.  And this time his name was King George, the III.

09:51:32   1        And King George, the III, like King John before

09:51:33   2   him, attempted to limit or do away with the system of jury

09:51:36   3   trials.

09:51:37   4        And when Thomas Jefferson sat down to write the

09:51:40   5   document listing all the complaints against the British

09:51:44   6   Crown that would necessitate us seeking our own independent

09:51:48   7   status as an independent country, that document you all

09:51:51   8   know to be the Declaration of Independence, Mr. Jefferson

09:51:57   9   included in the declaration among those disputes a specific

09:52:01   10  provision calling out King George's attempts to limit or do

09:52:04   11  away with the right to trial by jury as one of the reasons

09:52:08   12  necessitating our separation from England and our becoming

09:52:12   13  an independent nation.

09:52:13   14       And once we did become an independent nation,

09:52:18   15  ladies and gentlemen, we adopted the governing document for

09:52:22   16  our country, which is the supreme law of the land, and you

09:52:25   17  all know that to be the United States Constitution.

09:52:28   18       And immediately after the ratification of the

09:52:30   19  Constitution, we added 10 amendments to the constitution.

09:52:36   20  You all know that to be the Bill of Rights.  And in that

09:52:39   21  Bill of Rights, the Seventh Amendment added to the

09:52:42   22  Constitution, guarantees the right to trial by jury in a

09:52:46   23  civil case such as this one.

09:52:48   24       So, as American citizens for more than 200 years,

09:52:52   25  we have had the constitutionally guaranteed right pursuant

09:52:56  1   to the Seventh Amendment to our Constitution to resolve our

09:52:59  2   civil disputes in a form known as trial by jury, just what

09:53:04  3   we are about to engage in in this case.

09:53:06  4       So by being here today, ladies and gentlemen, in a

09:53:14  5   very real way, you are doing your part as good citizens to

09:53:17  6   preserve, protect, and defend the Constitution of the

09:53:20  7   United States, including particularly that

09:53:24  8   constitutionally-guaranteed right to the trial by jury as

09:53:28  9   set out in the Seventh Amendment.

09:53:29  10      I always tell citizens who appear for jury duty,

09:53:33  11  just as you have this morning, that in my personal opinion,

09:53:38  12  jury service is the second highest form of public service

09:53:41  13  that any American citizen can perform.  In my personal

09:53:45  14  opinion, the highest form of public service that any

09:53:48  15  American can perform are those young men and women that

09:53:52  16  serve in our armed forces.

09:53:53  17      Now, later in the process this morning, the

09:54:01  18  lawyers for each of the parties are going to address the

09:54:03  19  jury panel as a whole, and they're going to ask you various

09:54:07  20  questions, ladies and gentlemen.

09:54:09  21      I want you to understand as a part of this process

09:54:12  22  that the lawyers are not seeking to inquire into your

09:54:15  23  private affairs unduly.  In other words, they are not

09:54:20  24  trying to be nosy and delve into your personal business.

09:54:26  25  They are trying to ask questions that will allow them as a

09:54:29   1   part of the process to secure a fair and an impartial jury

09:54:33   2   to hear the evidence in this case.

09:54:40   3          I don't know if it will happen this morning, it

09:54:43   4   rarely does, but I need to tell you that if as a member of

09:54:46   5   the panel you are asked a question that you believe in your

09:54:50   6   own personal view is so personal and so private to you that

09:54:54   7   you're not comfortable answering it in front of everyone

09:54:57   8   else, then you simply have the right to say, I'd like to

09:55:00   9   discuss that with Judge Gilstrap.

09:55:01  10          And if that's your response, I'll make a time and

09:55:03  11   a place for you to answer that question outside of the

09:55:05  12   presence of everyone else on the panel.  But, again, ladies

09:55:08  13   and gentlemen, that rarely comes up.  I do not expect it

09:55:12  14   this morning, but should it come up, you do have that

09:55:16  15   option.

09:55:16  16          One thing that is important for each of you to

09:55:22  17   remember with regard to the questions you will be asked

09:55:25  18   this morning, and that is that you need to give full,

09:55:28  19   complete, and truthful answers to each question.  Remember,

09:55:31  20   ladies and gentlemen, there are no wrong answers to any of

09:55:35  21   the questions you're going to be asked, as long as the

09:55:37  22   answers you give are full, complete, and truthful.

09:55:40  23          Now, as a part of the process, we will select the

09:55:47  24   jury today, and we will then move directly into the trial

09:55:50  25   of this case.  And I expect the trial of this case before

09:55:54   1   the jury to take the remainder of this week, and it's even

09:55:58   2   possible that it may extend over to the beginning, maybe

09:56:02   3   Monday of next week.

09:56:04   4          So today is the 3rd of August, Friday is the 7th

09:56:07   5   of August, and Monday of next week would be the 10th of

09:56:11   6   August.  If there are any of you on the panel who have a

09:56:14   7   surgery procedure scheduled for yourselves or somebody in

09:56:17   8   your immediate family, you have non-refundable airline

09:56:22   9   tickets purchased to go somewhere for business or pleasure

09:56:25  10   you can't get your money back on, if there's some very

09:56:28  11   serious reason why if you were selected you could not be

09:56:31  12   here, let's just say through the beginning of next week,

09:56:36  13   Monday the 10th or thereabouts, and that's my best

09:56:39  14   estimate, ladies and gentlemen, if there are any of you

09:56:41  15   that could not be available during that time period if you

09:56:43  16   were selected, I need you to raise your hands and let me

09:56:47  17   make a note of that.

09:56:50  18          All right.  And you all are a good distance away

09:56:53  19   from me.

09:56:53  20          I see No. 16, sir, and you can put your hand down,

09:56:58  21   Mr. Huddleston.

09:56:59  22          And No. 37 in the back is Ms. Hood.  Thank you.

09:57:03  23          Anybody besides Mr. Huddleston or Ms. Hood?

09:57:08  24          Let me see your number, sir.  27.  All right.

09:57:15  25   Mr. Beasley.

09:57:16    1          Anybody besides those three who could not be here

09:57:19    2    if you were selected?

09:57:21    3          Okay.  Thank you, ladies and gentlemen.

09:57:23    4          Also, ladies and gentlemen, I need to ask you if

09:57:31    5    anyone on the panel may have talked to you or you have any

09:57:36    6    knowledge about a process that might have taken place where

09:57:41    7    people in our area participated in a mock trial or a

09:57:45    8    practice trial session undertaken by either of the parties

09:57:49    9    in this case.

09:57:51   10          And let me explain.  It's not uncommon for lawyers

09:57:54   11    in a case like this to hire local citizens in the area

09:57:58   12    where a jury trial will take place and practice their

09:58:02   13    arguments and their evidence before them and get feedback

09:58:06   14    from those mock jurors or practice jurors about their

09:58:10   15    evidence and about their arguments.  And that may have

09:58:13   16    taken place in this case.

09:58:17   17          So my question is, if there's anyone on the panel

09:58:20   18    who has had anyone talk to you or communicate with you in

09:58:26   19    any way about such a practice trial or a mock trial that

09:58:29   20    might have taken place, whether it's firsthand, secondhand,

09:58:34   21    thirdhand, have any of you heard anything from anybody

09:58:38   22    about a mock trial or a practice trial that would have

09:58:41   23    taken place in regard to this case?  If you have, please

09:58:46   24    raise your hands.

09:58:48   25          And I don't see anybody with a raised hand in the

09:58:51   1   courtroom.  Thank you.

09:58:52   2          Also, kind of in the same vein, ladies and

09:58:54   3   gentlemen, I need to ask if any of you have seen or heard

09:58:58   4   or read anything in newspapers or other media about this

09:59:02   5   case before today.  If you've seen or read anything or

09:59:06   6   heard anything about this case before today, please raise

09:59:09   7   your hand and let me make a note of that.

09:59:14   8          I don't, again, see a single hand in the courtroom

09:59:17   9   going up.  Did I miss anybody?  No, okay.  Then I'll take

09:59:23  10   it no one has seen or heard anything in the media or any

09:59:26  11   newspapers about the case.  Thank you.

09:59:27  12          All right.  At this time, I'm going to call for

09:59:30  13   announcements on the record in the case of Optis Wireless

09:59:34  14   Technology, LLC, Optis Cellular Technology, LLC, PanOptis

09:59:39  15   Patent Management, LLC, and Unwired Planet, LLC, and

09:59:43  16   Unwired Planet International Limited versus Apple Inc.

09:59:49  17   This is Civil Case No. 2:19-CV-66.

09:59:54  18          And, counsel, as you give your announcements, if

09:59:56  19   you'll identify and introduce those at the counsel tables

09:59:59  20   with you.

10:00:00  21          We'll begin with the Plaintiff.  What says the

10:00:03  22   Plaintiff?

10:00:04  23          MR. BAXTER:  Thank you.  Good morning, Your Honor.

10:00:14  24   Sam Baxter from McKool Smith, along with my partner,

10:00:18  25   Jennifer Truelove from McKool Smith and my good friend

10:00:20   1   Jason Sheasby.  And we'll be trying this case, Your Honor.

10:00:23   2        We're ready.

10:00:24   3        THE COURT:  Thank you, Mr. Baxter.

10:00:25   4        What says the Defendant?

10:00:27   5        MS. SMITH:  Good morning, Your Honor, ladies and

10:00:35   6   gentlemen.  Melissa Smith of Gillam & Smith on behalf of

10:00:38   7   Apple.  I'll be trying this case with my good friend,

10:00:42   8   Mr. Joe Mueller, and Ms. Jamie Laird.

10:00:45   9        Your Honor, Apple is ready to proceed.

10:00:47  10        THE COURT:  Thank you, Ms. Smith.

10:00:48  11        And, ladies and gentlemen of the jury, since eight

10:00:51  12   of you are going to be our jury in this case, there are

10:00:53  13   more lawyers than these six involved in this trial.  I've

10:00:56  14   limited the number to three on each side for jury selection

10:01:00  15   purposes so we'd have the ability to space everybody

10:01:05  16   adequately at the counsel tables.

10:01:07  17        But once the trial starts, you'll see more lawyers

10:01:10  18   for both the Plaintiffs and the Defendants in the

10:01:11  19   courtroom.

10:01:12  20        All right.  As I've told you, ladies and

10:01:18  21   gentlemen, this is a civil trial arising under the patent

10:01:21  22   laws of the United States.  What the Plaintiffs are

10:01:23  23   claiming in this case is that patents that they own were

10:01:28  24   infringed by the Defendant, and they're seeking money

10:01:32  25   damages because of that infringement.

10:01:33   1         The Defendant denies that it infringes any of the
10:01:37   2   Plaintiffs' asserted patents, and they contend that those
10:01:41   3   patents are invalid.
10:01:43   4         Now, what I've just told you in a couple of
10:01:45   5   sentences is a very high-level, simple overview of what
10:01:49   6   this is about.  I know each of you on the panel have seen
10:01:52   7   the patent video prepared by the Federal Judicial Center.
10:01:56   8   And having seen that, you know more about patent cases than
10:01:59   9   most people do when they arrive at the courthouse.
10:02:01  10         As I've said, ladies and gentlemen, the lawyers on
10:02:04  11   both sides are about to question the panel to gather
10:02:09  12   information so that they can exercise their strikes and
10:02:12  13   complete the process of securing a fair and an impartial
10:02:16  14   jury to hear the evidence in this case.
10:02:18  15         Again, there are no wrong answers to any of the
10:02:21  16   questions you'll be asked, as long as the answers you give
10:02:25  17   are full, complete, and truthful.
10:02:26  18         As I mentioned, the lawyers are not trying to be
10:02:30  19   nosy.  They're trying to gain useful information to help
10:02:34  20   secure a fair and an impartial jury.
10:02:40  21         If any lawyer should ask a question of anyone on
10:02:43  22   the panel that for any reason I think is improper, I'll
10:02:47  23   certainly stop them, ladies and gentlemen.  But I want you
10:02:49  24   to understand, these are very experienced trial lawyers.  I
10:02:53  25   don't expect that to happen.  They're very familiar with

10:02:56  1   the process, and they're very familiar with the Court --

10:02:58  2   what the Court expects of them during this process today.

10:03:03  3          There is one thing, however, before the lawyers

10:03:06  4   begin their questioning that I do want to call your

10:03:10  5   attention to, because it's quite possible that one or both

10:03:11  6   sides are going to ask you about this when they question

10:03:13  7   the panel, and that is the burden of proof that will be

10:03:16  8   applied in this case.

10:03:18  9          In a patent case such as this, the jury may be

10:03:21  10  called upon to apply two different burdens of proof.  The

10:03:26  11  jury may apply the burden of proof known as the

10:03:29  12  preponderance of the evidence -- and I'll say that again,

10:03:33  13  the preponderance of the evidence -- as well as a second

10:03:37  14  burden of proof known as clear and convincing evidence --

10:03:41  15  and I'll say that again -- clear and convincing evidence.

10:03:46  16         When you're responding to lawyers' questions about

10:03:51  17  the burden of proof that I -- I need to instruct you that

10:03:54  18  when a party has the burden of proof on any claim or

10:03:57  19  defense by a preponderance of the evidence, it means that

10:04:03  20  the jury must be persuaded by the credible and believable

10:04:09  21  evidence that that claim or defense is more probably true

10:04:12  22  than not true.  Let me say that again, more probably true

10:04:17  23  than not true.  This is sometimes talked about as being the

10:04:22  24  greater weight and degree of credible testimony.

10:04:27  25         I think all of you can probably see in front of me

10:04:31    1    and in front of our court reporter, we have a statue in the

10:04:34    2    courtroom of the Lady of Justice.

10:04:36    3         She stands there blindfolded.  In her right hand,

10:04:41    4    she holds lowered at her side the sword of justice.  In her

10:04:45    5    left hand, she holds raised above her the scales of

10:04:49    6    justice.  I'm sure all of you are familiar with the image

10:04:52    7    of the Lady of Justice.

10:04:54    8         Those scales that she holds in her left hand,

10:05:01    9    you'll notice, are exactly equal and balanced, and that's

10:05:05   10    where both of these parties should start out as when we

10:05:07   11    begin this trial, equal, balanced in all respects.

10:05:11   12         After you've heard the evidence in this case,

10:05:16   13    those of you that serve on the jury, I will give you

10:05:20   14    detailed instructions about the law that you're -- that you

10:05:24   15    are to apply, and then you're going to be given a list of

10:05:26   16    questions to answer.

10:05:27   17         This list of questions is called the verdict form.

10:05:29   18    And if a party has the burden of proof by a preponderance

10:05:34   19    of the evidence on any of those questions that are in the

10:05:36   20    verdict form, then that means if you are to -- and think

10:05:42   21    about it this way, ladies and gentlemen.  If you were to

10:05:45   22    take all the evidence that's been presented in the trial,

10:05:48   23    and you put all the evidence the Plaintiffs put on one side

10:05:50   24    of the scales and all the evidence the Defendants presented

10:05:53   25    on the other side of the scales, if those scales tip one

| | |
|---|---|
| 10:05:57 | 1 |
| 10:06:01 | 2 |
| 10:06:03 | 3 |
| 10:06:05 | 4 |
| 10:06:10 | 5 |
| 10:06:13 | 6 |
| 10:06:16 | 7 |
| 10:06:19 | 8 |
| 10:06:23 | 9 |
| 10:06:27 | 10 |

1   way or the other, then that is the party who has prevailed
2   on the burden of proof.
3       If a party has the burden of proof by a
4   preponderance of the evidence and you consider all the
5   evidence placed on either side of the scales by the
6   respective parties and those scales tip in favor of the
7   party who has that burden of proof by a preponderance of
8   the evidence, even if they tip in that party's favor ever
9   so slightly, then that party has met its burden of proof by
10  a preponderance of the evidence.
11      On the other hand, when a party has the burden of
12  proof regarding any defense by clear and convincing
13  evidence, that second burden of proof that I mentioned to
14  you, that means that the jury must have an abiding
15  conviction that the truth of the party's factual
16  contentions are highly probable.  Let me say that again, an
17  abiding conviction that the truth of the party's factual
18  contentions are highly probable.
19      This second standard, ladies and gentlemen, this
20  clear and convincing proof standard is a higher standard of
21  proof, a higher burden of proof than the preponderance of
22  the evidence standard.
23      If you imagine the same example, the Lady of
24  Justice who holds the scales in her left hand, they start
25  out equal and balanced.  If over the course of the trial

10:07:25   1   the Plaintiffs' evidence goes on one side in your mind and

10:07:28   2   the Defendant's evidence goes on the other side of the

10:07:31   3   scales in your mind, then if a party who has the burden of

10:07:35   4   proof on any issue that the jury will decide by the

10:07:39   5   standard of clear and convincing evidence, if those scales

10:07:43   6   tip in that party's favor, and they must tip more than ever

10:07:47   7   so slightly, they must definitely tip in that party's

10:07:50   8   favor, then if they do, that party has met its burden of

10:07:55   9   proof by clear and convincing evidence.

10:07:56   10        Now, neither of these two burdens of proof that

10:08:03   11   I've just told you about should be confused with a third

10:08:06   12   and different burden of proof called beyond a reasonable

10:08:10   13   doubt.  I'm sure you've all heard of beyond a reasonable

10:08:13   14   doubt in movies and television involving criminal cases.

10:08:19   15        Beyond a reasonable doubt has absolutely nothing

10:08:21   16   to do with a civil case such as this, and you should not

10:08:25   17   confuse beyond a reasonable doubt with the standard of

10:08:31   18   clear and convincing evidence.

10:08:33   19        Clear and convincing evidence is not as high a

10:08:36   20   standard as beyond a reasonable doubt, but it is a higher

10:08:40   21   standard of proof than the preponderance of the evidence.

10:08:43   22        Now, I give you these instructions, ladies and

10:08:46   23   gentlemen, in case some of the lawyers for either side asks

10:08:51   24   you about your ability to apply these two burdens of proof

10:08:55   25   fairly to the evidence that you might hear if you're

10:08:58   1   selected as a juror in this case.

10:09:01   2          Now, before I let the lawyers begin with their

10:09:05   3   questions of the jury, you will see, ladies and gentlemen,

10:09:09   4   either in written form or on the screens above you, nine

10:09:13   5   different questions that I'm going to ask each of you to

10:09:16   6   answer.  This is the part of the process where I find out

10:09:19   7   from you the same kind of information I told you about me

10:09:23   8   at the beginning of the process.

10:09:25   9          Also, ladies and gentlemen, before we start this,

10:09:33  10   I want to talk with you briefly about how we're going to do

10:09:36  11   it.

10:09:37  12          We have two Court Security Officers here.  They

10:09:41  13   will be among you in the gallery.  They have two sanitized

10:09:46  14   handheld microphones.  If you're asked a question -- and

10:09:50  15   we'll do it the same way on these nine questions you're

10:09:53  16   about to answer.  When it's your turn, if you will take the

10:09:57  17   handheld microphone and if you will stand up, please, and

10:10:00  18   if you will pull your mask down and hold that microphone

10:10:03  19   where you can use it and answer those nine questions, it

10:10:07  20   will be very helpful.

10:10:09  21          It's a big courtroom, and because of social

10:10:11  22   distancing, we have people all the way against the back

10:10:18  23   wall in the courtroom.  It's a long way, and it's important

10:10:21  24   that the lawyers and the Court be able to see you and hear

10:10:23  25   you answer these questions.

10:10:26  1          It's also important that I be able to see these

10:10:29  2   numbers that you have and the lawyers see the numbers that

10:10:31  3   you have so that we know exactly who answered which

10:10:34  4   questions which way.

10:10:35  5          These handheld microphones will be used in the

10:10:38  6   same way when we get to specific questions that are asked

10:10:42  7   of you by the lawyers when they address the panel.  So

10:10:45  8   we'll do it the same way for these nine questions you're

10:10:48  9   about to answer as when we get to the specific questions

10:10:52 10   the lawyers will ask you.

10:10:53 11          We have two of these microphones, and our Court

10:10:57 12   Security Officers will wipe them down with sanitizing

10:11:00 13   cloths and sanitize each one after it's used so that nobody

10:11:03 14   is going to be handed a handheld microphone that's not been

10:11:07 15   disinfected before it gets to you.

10:11:09 16          But when you're asked specific questions by the

10:11:12 17   lawyers in the case, if you'll do it in just the same way.

10:11:16 18   If you'll stand, if you'll lower your mask, if you'll use

10:11:19 19   the handheld microphone, answer the question, pass the

10:11:22 20   microphone back to the Court Security Officer, raise your

10:11:24 21   mask back up, and have a seat, that will be the way we'll

10:11:27 22   do it both now and when the lawyers ask you the questions

10:11:30 23   in a minute.

10:11:30 24          All right.  We'll begin with the nine questions

10:11:36 25   you have before you.  And as soon as our Court Security

| | | |
|---|---|---|
| 10:11:41 | 1 | Officers get back into the gallery, we'll begin with Panel |
| 10:11:46 | 2 | Member No. 1, all the way against the wall on the left, and |
| 10:11:49 | 3 | that's Mr. Young, I believe. |
| 10:11:53 | 4 | And let me ask everybody to hold the microphones |
| 10:12:02 | 5 | close.  I have a lot of jurors -- or prospective jurors who |
| 10:12:06 | 6 | show up, and the microphone is in the middle of the chest |
| 10:12:09 | 7 | or it's down at your belt.  It won't -- it won't help us if |
| 10:12:12 | 8 | it's that far away from your mouth.  You need to keep it up |
| 10:12:15 | 9 | close.  Please go ahead. |
| 10:12:15 | 10 | JUROR YOUNG:  How is this? |
| 10:12:17 | 11 | THE COURT:  That's great. |
| 10:12:18 | 12 | JUROR YOUNG:  How about that? |
| 10:12:19 | 13 | THE COURT:  Go ahead -- go ahead, Mr. Young.  Go |
| 10:12:22 | 14 | ahead, please. |
| 10:12:22 | 15 | JUROR YOUNG:  All right.  My name is Roger Young. |
| 10:12:24 | 16 | I'm from Queen City, Texas.  I have two full-grown kids |
| 10:12:28 | 17 | that are out of the house. |
| 10:12:29 | 18 | I work out at Red River for a contractor called |
| 10:12:33 | 19 | Amentum.  I've been out there since 2008. |
| 10:12:38 | 20 | Just a high school graduate. |
| 10:12:40 | 21 | I'm divorced.  And -- |
| 10:12:47 | 22 | THE COURT:  What about prior -- |
| 10:12:48 | 23 | JUROR YOUNG:  I was -- I was a juror several years |
| 10:12:50 | 24 | ago.  It ended up in a mistrial. |
| 10:12:52 | 25 | THE COURT:  Was that a civil case or a criminal |

```
10:12:54   1   case?
10:12:55   2           JUROR YOUNG:  Civil case.
10:12:57   3           THE COURT:  Civil case.  And where was that, sir?
10:13:00   4           JUROR YOUNG:  New Boston.
10:13:01   5           THE COURT:  All right.  In state court?
10:13:03   6           JUROR YOUNG:  Yes.
10:13:04   7           THE COURT:  Thank you very much, Mr. Young.
10:13:05   8   Please have a seat.
10:13:06   9           Next is No. 2, Ms. Blum.
10:13:10  10           JUROR BLUM:  My name is Kassie Blum.  I live in
10:13:14  11   Naples.  I have no kids.  I work as a host at Silver Star
10:13:19  12   in Texarkana.  I've worked there since February of 2020.
10:13:24  13           I graduated high school.  I'm currently in
10:13:27  14   college.
10:13:29  15           And I have not served on a jury before.
10:13:32  16           THE COURT:  Tell us what Silver Star is briefly.
10:13:38  17           JUROR BLUM:  It's a smokehouse, and we serve
10:13:41  18   barbecue and steak.
10:13:44  19           THE COURT:  And where are you in college, ma'am?
10:13:46  20           JUROR BLUM:  Texarkana College for nursing.
10:13:48  21           THE COURT:  All right.  Thank you very much.
10:13:48  22   Please have a seat.
10:13:49  23           Next is No. 3, Ms. Alexander.
10:13:52  24           JUROR ALEXANDER:  My name is Jami Alexander.  I
10:13:55  25   live in Marshall, Texas.  I have two children, one grown,
```

| | | |
|---|---|---|
| 10:13:59 | 1 | one still at home.  I -- I work from home as a customer |
| 10:14:02 | 2 | service representative for a company called |
| 10:14:05 | 3 | Teleperformance.  I take phone calls for various companies |
| 10:14:10 | 4 | that hire my company to do so.  I've worked there for a |
| 10:14:13 | 5 | year.  I've worked from home doing various work like that |
| 10:14:16 | 6 | for eight years. |
| 10:14:17 | 7 | I have a Bachelor's degree in psychology from |
| 10:14:21 | 8 | Texas A&M Commerce that I received in 2011. |
| 10:14:25 | 9 | I am recently married.  My husband's name is Ken |
| 10:14:32 | 10 | Alexander.  He drives a cement truck for a living, and he's |
| 10:14:35 | 11 | done that for eight years here in Marshall. |
| 10:14:37 | 12 | And I've never served on a jury. |
| 10:14:38 | 13 | THE COURT:  And who does your husband work for |
| 10:14:41 | 14 | driving a cement truck? |
| 10:14:41 | 15 | JUROR ALEXANDER:  He works for Martin Marietta |
| 10:14:44 | 16 | Materials here in Marshall. |
| 10:14:44 | 17 | THE COURT:  Thank you, ma'am.  Please have a seat. |
| 10:14:46 | 18 | Next is No. 4.  That's Ms. Cannon. |
| 10:14:50 | 19 | JUROR CANNON:  Good morning.  I'm Debbie Cannon. |
| 10:14:53 | 20 | I currently reside in Gilmer, Texas.  I have two adult |
| 10:14:57 | 21 | children.  I have worked for over 30 years as a high school |
| 10:15:02 | 22 | math teacher.  I've retired, but been recalled at least |
| 10:15:08 | 23 | four times, and I'm waiting to see what's going to occur in |
| 10:15:11 | 24 | the next week or so. |
| 10:15:14 | 25 | Along with that, I have sat -- I do private |

10:15:17   1   sitting with a friend who is a stroke victim and has acute

10:15:23   2   COPD.  I've worked for her about three years, and I just

10:15:28   3   work part time.  And currently I work about three nights a

10:15:31   4   week.

10:15:31   5          I have a mathematics degree from the University of

10:15:35   6   Texas at Tyler.

10:15:37   7          My husband's name was Billy Cannon, and he is

10:15:41   8   deceased.  He previously worked for Lone Star Steel in the

10:15:45   9   open hearth and for Kelly Moore paint as an inside sales.

10:15:51  10   He worked for those 11 and 12 years.

10:15:56  11          And I have previously served on a crim -- on a

10:15:59  12   civil case in Upshur County.

10:16:02  13          THE COURT:  How long ago was that, Ms. Cannon, the

10:16:05  14   civil case?

10:16:06  15          JUROR CANNON:  I would think 20 years ago.

10:16:09  16          THE COURT:  Long time?

10:16:11  17          JUROR CANNON:  Well, it was before the new

10:16:14  18   courthouse -- the new justice center was built.  So it was

10:16:19  19   in the old court.

10:16:20  20          THE COURT:  Thank you, ma'am.  All right.  Please

10:16:22  21   have a seat.

10:16:22  22          Next is Panel Member No. 5, Ms. Folsom.

10:16:26  23          JUROR FOLSOM:  My name is Andrea Deornellis.  I do

10:16:32  24   not have any kids, but I am pregnant.  I'm employed at

10:16:36  25   Texas Heritage National Bank as a teller.  I have worked

10:16:41  1    there for three months now.

10:16:43  2          I'm a high school graduate.

10:16:46  3          My spouse's name is Dalton Deornellis.  He's

10:16:50  4    employed at Top Hat as a welder.  He actually started there

10:16:57  5    two weeks ago.

10:16:58  6          And I have not served on a jury before.

10:17:02  7          THE COURT:  Thank you very much, ma'am.  Sorry I

10:17:02  8    didn't have your maiden name -- married name written down.

10:17:03  9          No. 6 is next.  Ms. Newsom.

10:17:05  10         JUROR NEWSOM:  My name is Denise Newsom.  I live

10:17:09  11   in Daingerfield, have three grown children.  I am retired

10:17:14  12   from the Daingerfield/Lone Star ISD.  I worked there 34

10:17:19  13   years, 15 as a clerical and instructional aide, grades

10:17:24  14   three through five, and the last 19 as an instructional

10:17:32  15   aide in a special ed resource room for grades kindergarten

10:17:38  16   through second.  Total years worked, 34.  I've been retired

10:17:42  17   since 2013.

10:17:45  18         I graduated from high school, have some college.

10:17:49  19   My husband's name is Danny Joe Newsom.  He worked for T&N

10:17:56  20   Railroad in Lone Star for 49 years.

10:18:01  21         And I have not served on a jury before.

10:18:05  22         THE COURT:  Thank you very much, ma'am.

10:18:07  23         Next is Panel Member No. 7, Mr. Jones.

10:18:13  24         JUROR RICKY JONES:  My name is Ricky Jones.  I

10:18:16  25   live in Douglasville, Texas, Cass County.  I have two grown

10:18:20    1    children.  I retired early from AT&T.  I was a manager of

10:18:25    2    engineering and network services for 26 years.

10:18:28    3            I have -- a high school graduate.

10:18:30    4            My wife's name is Martha Jones, and she retired

10:18:34    5    from Regions Bank as a teller.

10:18:36    6            And I have no prior jury service.

10:18:38    7            THE COURT:  Thank you, sir.  Please have a seat.

10:18:39    8            And we'll go next to Panel Member No. 8,

10:18:43    9    Mr. Bailey.

10:18:44   10            JUROR BAILEY:  My name is Logan Bailey.  I live in

10:18:47   11    Hallsville, Texas.  I don't have any kids.  I work at

10:18:51   12    Peters Chevrolet as a sales consultant.  I've been there

10:18:55   13    three weeks.

10:18:56   14            I have a Bachelor's degree in sociology from

10:18:59   15    Louisiana Tech University.

10:19:02   16            I am not married.

10:19:03   17            And I've never served on a jury.

10:19:05   18            THE COURT:  Thank you very much, sir, if you'll

10:19:08   19    have a seat.

10:19:09   20            We'll go to Panel Member No. 9 next, Ms. McKnight.

10:19:13   21            JUROR MCKNIGHT:  My name is Amanda McKnight.  I

10:19:15   22    live in Avinger.  I have one seven-year-old son.  I work

10:19:19   23    for First National Bank of Hughes Springs as a teller.

10:19:22   24    I've been there for 12 years.

10:19:26   25            I have a high school education.

| | | |
|---|---|---|
| 10:19:27 | 1 | My husband's name is Harris McKnight.  He works |
| 10:19:31 | 2 | for EMC Water as a water operator.  He's been there, I |
| 10:19:35 | 3 | think, about 10 years. |
| 10:19:36 | 4 | And I've never served on a jury. |
| 10:19:38 | 5 | THE COURT:  All right, ma'am.  Thank you very |
| 10:19:39 | 6 | much. |
| 10:19:39 | 7 | Next is Panel Member No. 10, Mr. Snyder. |
| 10:19:43 | 8 | JUROR SNYDER:  My name is Kevin Snyder.  I live in |
| 10:19:46 | 9 | Longview, Texas.  I have five kids, two still at home.  I'm |
| 10:19:50 | 10 | employed by LeTourneau University.  I've been there for 20 |
| 10:19:55 | 11 | years, and I work in the information technology department. |
| 10:19:59 | 12 | I have a high school diploma and two years of |
| 10:20:01 | 13 | college. |
| 10:20:02 | 14 | My wife is named Debbie Snyder.  She is a |
| 10:20:05 | 15 | secondary education teacher, taught for five years but now |
| 10:20:09 | 16 | is a homeschool teacher extraordinaire. |
| 10:20:12 | 17 | And I did serve in a criminal trial for sentencing |
| 10:20:17 | 18 | here in Marshall, probably 12 to 13 years ago. |
| 10:20:20 | 19 | THE COURT:  Do you remember which court that was |
| 10:20:22 | 20 | in? |
| 10:20:24 | 21 | JUROR SNYDER:  I do not.  Across the street. |
| 10:20:25 | 22 | THE COURT:  All right.  Thank you very much, sir. |
| 10:20:28 | 23 | Next is No. 11, Ms. Harley. |
| 10:20:32 | 24 | JUROR HARLEY:  My name is Donna Harley.  I live in |
| 10:20:36 | 25 | Hallsville, Texas.  I have three grown sons, one at home. |

10:20:40  1    I am a retired nurse as of two years ago.  I worked at

10:20:46  2    Diagnostic Clinic for Dr. Clark and Dr. Bianca.  The last

10:20:52  3    13 of that was at Hallsville Independent School District as

10:20:55  4    a school nurse.

10:20:56  5          I am a graduate of Kilgore College.

10:21:00  6          My husband's name is Troy Harley.  He works for

10:21:07  7    XTO Energy, 20-plus years.  I have never worked -- never

10:21:12  8    served on a jury.

10:21:13  9          THE COURT:  What does your husband do for XTO?

10:21:16  10          JUROR HARLEY:  He is a mechanical field

10:21:19  11    supervisor.

10:21:20  12          THE COURT:  Thank you very much, ma'am.

10:21:22  13          No. 12 is next.  Mr. Williams.

10:21:24  14          JUROR WILLIAMS:  David Williams is my name.  I

10:21:27  15    live over in Union Grove.  I have one daughter.  She just

10:21:32  16    graduated college as a dentist.  She's going to Memphis for

10:21:38  17    her orthodontics, started her residency this week.

10:21:42  18          Place of employment, I've been self-employed for

10:21:45  19    30 years, got a small construction company.

10:21:50  20          High school education.

10:21:52  21          My spouse's name is Sherry Williams.  Her place of

10:21:57  22    employment is at ABC Supply.  She's been there 30 years.

10:22:04  23    She's sales -- inside sales manager is what she is.

10:22:07  24          There was -- once there was a jury.  I didn't get

10:22:12  25    selected.

| | | |
|---|---|---|
| 10:22:12 | 1 | THE COURT:  So you've never actually served as a |
| 10:22:15 | 2 | juror? |
| 10:22:15 | 3 | JUROR WILLIAMS:  Yes. |
| 10:22:16 | 4 | THE COURT:  Thank you, sir. |
| 10:22:17 | 5 | JUROR WILLIAMS:  All right. |
| 10:22:18 | 6 | THE COURT:  All right.  Next will be No. 13 on our |
| 10:22:21 | 7 | panel, Ms. Feltner. |
| 10:22:23 | 8 | JUROR WILLIAMS:  My name is Shelley Feltner.  I |
| 10:22:26 | 9 | live here in Marshall, Texas.  I have one grown child, a |
| 10:22:30 | 10 | daughter.  I work for Jefferson Independent School |
| 10:22:37 | 11 | District.  I'm a third grade teacher.  I've worked |
| 10:22:40 | 12 | there for -- I'll be starting my 28th year. |
| 10:22:42 | 13 | I have a Bachelor's degree from University of |
| 10:22:45 | 14 | Texas at Tyler. |
| 10:22:46 | 15 | My husband's name is Bruce Feltner.  He's retired. |
| 10:22:49 | 16 | He was a truck driver for 35 years and worked for various |
| 10:22:52 | 17 | trucking companies. |
| 10:22:55 | 18 | And I served on a jury 15 or 20 years ago.  I |
| 10:23:03 | 19 | think it was a criminal, but I don't -- I don't remember |
| 10:23:06 | 20 | what it was about or -- |
| 10:23:07 | 21 | THE COURT:  Where did it take place, Ms. Feltner? |
| 10:23:10 | 22 | JUROR FELTNER:  Over here at the other courthouse |
| 10:23:12 | 23 | over here. |
| 10:23:12 | 24 | THE COURT:  Harrison County Courthouse? |
| 10:23:15 | 25 | JUROR FELTNER:  Yeah, I think it was a criminal |

```
10:23:16   1    case, but --
10:23:16   2            THE COURT:  It's been a long time ago.
10:23:19   3            JUROR FELTNER:  Many years, yes.
10:23:21   4            THE COURT:  Thank you, ma'am.
10:23:22   5            Next is No. 14, Mr. Achterhof -- Ms. Achterhof,
10:23:28   6    I'm sorry.
10:23:29   7            JUROR ACHTERHOF:  My name is Donna Achterhof.  I
10:23:31   8    have two grown sons.  I work at Christus Good Shepherd in
10:23:35   9    Longview as a medical secretary.  I've worked there for 11
10:23:38  10    years.
10:23:39  11            I have a high school education.
10:23:41  12            My husband's name is Bruce.  He works for East
10:23:44  13    Texas Support Services as a handicap van driver.  He's
10:23:47  14    worked there for two years.
10:23:48  15            And I was on a criminal case about 10 years ago in
10:23:51  16    Jefferson.
10:23:52  17            THE COURT:  All right, ma'am.  Thank you very
10:23:54  18    much.
10:23:54  19            Next is No. 15, Ms. Brian.
10:23:58  20            JUROR BRIAN:  My name is Kristie Brian.  I live in
10:24:05  21    Diana, Texas.  I have two children, 26 and 12.  I -- I
10:24:10  22    actually recently retired from Longview Police Department
10:24:13  23    as a spokesperson for about 10 years.  Worked there for
10:24:17  24    another about seven before that -- before I became the
10:24:21  25    spokesperson.  I retired and opened a Farmers's Insurance
```

10:24:26  1    agency.  So I'm the owner of that agency now since March

10:24:30  2    the 2nd.

10:24:32  3              I have a Bachelor's degree from UT Tyler.

10:24:34  4              My spouse's name is Robert Brian and he is a

10:24:39  5    police officer for Longview PD also, where I still reserve,

10:24:42  6    too, but he's a police officer, and he works at the school

10:24:45  7    as a school resource officer.  He's been a police officer

10:24:48  8    for over 20 years.

10:24:49  9              And I have been called for jury service a couple

10:24:51  10   of times but never gotten picked.

10:24:53  11             THE COURT:  And which school does your husband

10:24:56  12   work at as a security?

10:24:57  13             JUROR BRIAN:  For Foster Middle School in

10:25:01  14   Longview.

10:25:01  15             THE COURT:  Thank you, ma'am.

10:25:02  16             All right.  Next is Mr. Huddleston.

10:25:07  17             JUROR HUDDLESTON:  My name is Dakota Huddleston.

10:25:09  18   I'm from Atlanta, Texas.  I have three kids.  I'm a captain

10:25:15  19   with the Texarkana Texas Fire Department, and I also own

10:25:16  20   and operate a small lawn care business.  I've been at the

10:25:20  21   fire department for 12 years.

10:25:22  22             Have a high school diploma, some college in fire

10:25:25  23   academy.

10:25:25  24             My wife's name is Kirby.  She's a bookkeeper for

10:25:30  25   Spring Creek Enterprise.  She's been there I guess about 10

```
10:25:32   1   years.
10:25:33   2          And I've been summonsed to jury duty but never
10:25:37   3   been picked to serve.
10:25:39   4          THE COURT:  Tell us what Spring Creek Enterprise
10:25:41   5   is.
10:25:41   6          JUROR HUDDLESTON:  It's a business that my
10:25:42   7   brother-in-law has, and he does -- he manages the woodyard
10:25:46   8   for International Paper, or Graphic Packaging now, in
10:25:49   9   Domino.
10:25:49  10          THE COURT:  Okay, sir.  Thank you very much.
10:25:52  11          Next is No. 17, Mr. Gonzalez.
10:25:55  12          JUROR GONZALEZ:  Hello, my name is Robert Paul
10:26:04  13   Gonzalez.  I'm from Big Sandy, Texas, in Upshur.
10:26:08  14          I do not have any children or spouse.
10:26:10  15          I don't have one of those either.
10:26:13  16          I'm a grocery clerk at Brookshire Grocery Company,
10:26:18  17   their store in Hawkins.  It's what, Wood County?  Yeah,
10:26:23  18   Wood County.
10:26:24  19          THE COURT:  What about your education?
10:26:26  20          JUROR GONZALEZ:  I've got an associate's degree in
10:26:31  21   mathematics from Tyler Junior College, qualified for a
10:26:35  22   business administration degree from the same but just don't
10:26:37  23   have the actual degree for it.  I've also completed some
10:26:41  24   classes at UT Tyler towards accounting.  I've actually done
10:26:45  25   a business law class and the business ethics class that's
```

10:26:48  1  been required since the Enron ordeal.

10:26:51  2          THE COURT:  Any prior jury service, sir?

10:26:54  3          JUROR GONZALEZ:  I've been called but never --

10:26:56  4  never chosen.

10:26:57  5          THE COURT:  Never selected.  Thank you very much.

10:26:58  6          Next is -- next is No. 18, Ms. Scott.

10:27:05  7          JUROR SCOTT:  My name is Quintisha Scott.  I'm

10:27:09  8  from Linden, Texas.  I have one child, a son 14.  I work

10:27:13  9  for Linden-Kildare ISD, for 16 years.

10:27:18  10         Graduated from high school, two years of college.

10:27:20  11         My spouse's name is Leonard Williams.  He's a

10:27:24  12 logger.  He's been doing that for the past 20-something

10:27:28  13 years.

10:27:29  14         No for number nine.

10:27:30  15         THE COURT:  You've never had any jury service,

10:27:32  16 ma'am?

10:27:33  17         JUROR SCOTT:  No, I always get out.

10:27:36  18         THE COURT:  Okay.  All right.

10:27:39  19         JUROR SCOTT:  Today -- sorry.

10:27:40  20         THE COURT:  Next is No. 19 on the panel.

10:27:43  21 Mr. Furlow.

10:27:44  22         JUROR FURLOW:  My name is Josh Furlow.  I live in

10:27:47  23 Diana.  I have three kids, 11, 9, and 7.  I work at Ore

10:27:52  24 City.  I'm a teacher and coach there.  I've worked there --

10:27:54  25 it's my second year there, 21st overall in education.

```
10:27:57   1            I got a Bachelor of Behavioral Science at
10:27:57   2   Hardin-Simmons in Abilene.
10:28:02   3            My spouse's name is Julie.  She's also a teacher
10:28:05   4   and coach at Ore City.  This will be her second year --
10:28:08   5   second year there, as well.
10:28:09   6            And I've never served on a jury.
10:28:10   7            THE COURT:  All right, sir.  Thank you very much.
10:28:13   8   If you'll have a seat.
10:28:14   9            Next is Panel Member No. 20, Mr. Doss.
10:28:17  10            JUROR DOSS:  My name is Devonte Doss.  I live in
10:28:23  11   Gilmer, Texas.  No children.  I currently work at Hilton
10:28:26  12   Garden Inn & Conference Center in Longview as a guest
10:28:28  13   service agent.  I've been there since November of last
10:28:30  14   year.
10:28:31  15            THE COURT:  Mr. Doss, would you slow down just a
10:28:34  16   little?
10:28:35  17            JUROR DOSS:  Sorry.  I'm currently in college at
10:28:37  18   Tyler Junior College.
10:28:39  19            No spouse.
10:28:40  20            And I've never been -- no jury service.
10:28:43  21            THE COURT:  All right, sir.  Thank you very much.
10:28:44  22            Next is No. 21, Mr. Powell.
10:28:47  23            JUROR POWELL:  Hi.  My name is Christopher Powell.
10:28:54  24   I live in Jefferson -- I have no kids.
10:28:57  25            THE COURT:  Mr. Powell, could you pull that mask
```

| | | |
|---|---|---|
| 10:28:59 | 1 | down so I can hear you better?  Thank you. |
| 10:29:01 | 2 | JUROR POWELL:  I work for the First National Bank |
| 10:29:03 | 3 | of Hughes Springs.  I guess compliance officer would be the |
| 10:29:08 | 4 | best -- I've worked there for eight years.  I got a |
| 10:29:14 | 5 | Bachelor's degree from ETBU. |
| 10:29:18 | 6 | No spouse. |
| 10:29:19 | 7 | And I've had grand jury selection twice for Marion |
| 10:29:26 | 8 | County, and I've been on two criminal cases in Marion |
| 10:29:29 | 9 | County. |
| 10:29:29 | 10 | THE COURT:  And how long ago were you on those |
| 10:29:31 | 11 | criminal cases? |
| 10:29:32 | 12 | JUROR POWELL:  All of that was in the last five |
| 10:29:34 | 13 | years. |
| 10:29:34 | 14 | THE COURT:  All right, sir.  Thank you very much. |
| 10:29:35 | 15 | Next is Panel Member No. 22, Ms. Berry. |
| 10:29:41 | 16 | JUROR BERRY:  My name is Becky Berry.  I am not |
| 10:29:44 | 17 | married, with no children. |
| 10:29:45 | 18 | I currently work for Texas Bank & Trust in |
| 10:29:48 | 19 | marketing.  I've been there two years this week, so it's |
| 10:29:52 | 20 | almost my anniversary. |
| 10:29:53 | 21 | Graduated from Texas A&M with a Master's degree. |
| 10:29:56 | 22 | And I have served on a jury, but it was probably |
| 10:29:59 | 23 | 20 years ago, and it was in Harrison County. |
| 10:30:02 | 24 | THE COURT:  And are you based in Longview with |
| 10:30:03 | 25 | Texas Bank & Trust or another location? |

| | | |
|---|---|---|
| 10:30:06 | 1 | JUROR BERRY:  Longview, yes, sir. |
| 10:30:08 | 2 | THE COURT:  And what was your Master's degree in? |
| 10:30:10 | 3 | JUROR BERRY:  Agricultural economics. |
| 10:30:12 | 4 | THE COURT:  Okay.  Thank you very much, ma'am. |
| 10:30:14 | 5 | Next is No. 23, Ms. Evans. |
| 10:30:17 | 6 | JUROR EVANS:  My name is Donna Evans.  I have one |
| 10:30:22 | 7 | grown son.  I am -- I'm retired from Centerpoint Energy.  I |
| 10:30:29 | 8 | was a service technician there for 22 years. |
| 10:30:34 | 9 | I am unmarried. |
| 10:30:36 | 10 | And I have served on a criminal case in Harrison |
| 10:30:42 | 11 | County.  It was Judge Bonnie Leggat's court, and that was |
| 10:30:46 | 12 | like 30 years ago. |
| 10:30:47 | 13 | THE COURT:  Yes, ma'am.  Thank you very much. |
| 10:30:50 | 14 | JUROR EVANS:  Thank you. |
| 10:30:50 | 15 | THE COURT:  Next is No. 24, Ms. Haggard. |
| 10:30:54 | 16 | JUROR HAGGARD:  My name is Carla Haggard.  I live |
| 10:31:01 | 17 | in Jefferson.  I have two grown children, one of my own and |
| 10:31:05 | 18 | one stepson I raised.  I worked in banking many years, and |
| 10:31:10 | 19 | then my last place that I worked was Good Shepherd Hospital |
| 10:31:13 | 20 | in the accounting department.  I was there five years. |
| 10:31:16 | 21 | I have 60 hours of college credit. |
| 10:31:20 | 22 | My husband is Charles Haggard.  His last place of |
| 10:31:24 | 23 | employment was also at Good Shepherd.  He worked in the |
| 10:31:27 | 24 | warehouse.  But he owned his business most of his career. |
| 10:31:31 | 25 | He was there about six months. |

| | | |
|---|---|---|
| 10:31:33 | 1 | And I have served on a jury before.  It's been |
| 10:31:36 | 2 | about 20 years.  And I don't remember, I think there was |
| 10:31:39 | 3 | one criminal, but the rest were civil.  And that was in |
| 10:31:42 | 4 | Jefferson. |
| 10:31:43 | 5 | THE COURT:  Yes, ma'am.  You said your husband had |
| 10:31:44 | 6 | a business of his own.  Tell me about that. |
| 10:31:47 | 7 | JUROR HAGGARD:  He did.  He -- he had an auto |
| 10:31:50 | 8 | repair business, and then he went into -- he did a career |
| 10:31:54 | 9 | change.  He sold investments and insurance.  And then the |
| 10:31:57 | 10 | last job he had was in the oilfield supply business.  He |
| 10:32:00 | 11 | was their purchaser, and he was laid off in 2015.  And he |
| 10:32:04 | 12 | went to work in the warehouse in Good Shepherd. |
| 10:32:08 | 13 | THE COURT:  All right, ma'am.  Thank you very |
| 10:32:10 | 14 | much. |
| 10:32:10 | 15 | Next is No. 25, Ms. Wilson. |
| 10:32:13 | 16 | JUROR NATALIE WILSON:  My name is Natalie Wilson. |
| 10:32:16 | 17 | I live here in Marshall.  I have no children.  I'm not |
| 10:32:19 | 18 | employed at the moment.  Educational background is high |
| 10:32:22 | 19 | school.  And I have not served before. |
| 10:32:24 | 20 | THE COURT:  All right.  Thank you very much. |
| 10:32:29 | 21 | That's No. 25. |
| 10:32:29 | 22 | Next is No. 26, Ms. Swierk. |
| 10:32:33 | 23 | JUROR SWIERK:  Hi.  My name is Debra Swierk.  I |
| 10:32:38 | 24 | have four grown sons.  Retired from Texas Home Health |
| 10:32:41 | 25 | since -- well, 2019.  I've worked there for I guess eight |

| | | |
|---|---|---|
| 10:32:48 | 1 | years. |
| 10:32:48 | 2 | I have a GED. |
| 10:32:51 | 3 | Been divorced since 1986. |
| 10:32:53 | 4 | And never served. |
| 10:32:54 | 5 | THE COURT:  All right.  Thank you very much, |
| 10:32:57 | 6 | ma'am. |
| 10:32:57 | 7 | Next is Mr. Beasley, No. 27. |
| 10:33:01 | 8 | JUROR BEASLEY:  My name is Kevin Beasley.  Excuse |
| 10:33:06 | 9 | me.  I live in Diana, Texas.  I have three kids between the |
| 10:33:13 | 10 | ages of 21 and 18.  I'm self-employed, have been for 16 |
| 10:33:20 | 11 | years.  I've worked in various aspects of construction, |
| 10:33:23 | 12 | including excavation.  And I do most of my work as tile, |
| 10:33:27 | 13 | wood, and stone, and mainly showers in new construction. |
| 10:33:32 | 14 | I've graduated from Texas State Technical College |
| 10:33:38 | 15 | with a degree in computer control systems and robotics and |
| 10:33:42 | 16 | instrumentation. |
| 10:33:43 | 17 | My wife's name is Cindy Kay, and she works at |
| 10:33:47 | 18 | Northeast Texas Community College in Mt. Pleasant as an |
| 10:33:51 | 19 | upward bound coordinator and counselor.  And she's been |
| 10:33:54 | 20 | doing that for seven years. |
| 10:33:56 | 21 | And I've never served on a jury before. |
| 10:33:58 | 22 | THE COURT:  Thank you very much, sir.  If you'll |
| 10:34:00 | 23 | have a seat. |
| 10:34:01 | 24 | We'll next go to No. 28, and that is Mr. Suess. |
| 10:34:06 | 25 | JUROR SUESS:  It's actually Suess. |

10:34:10  1          THE COURT:  Suess.

10:34:11  2          JUROR SUESS:  No one ever gets it right.

10:34:13  3          THE COURT:  I'll get it right from now on.  I'm

10:34:15  4  used to having mine -- I'm used to having mine

10:34:19  5  mispronounced, too, so I'm sensitive.

10:34:21  6          JUROR SUESS:  I'm sure.

10:34:21  7          THE COURT:  Go ahead.

10:34:22  8          JUROR SUESS:  So my name is Tom Suess -- Thomas,

10:34:25  9  given name.  I don't have any biological children, but I

10:34:30  10  have three great stepkids -- or two great ones, one

10:34:30  11  challenging, I guess.

10:34:32  12          I work for Community Healthcore.  I'm a facilities

10:34:35  13  manager.  Community Healthcore is a behavioral health unit

10:34:40  14  of local government so we provide substance abuse services,

10:34:42  15  mental health services, and services to people with

10:34:46  16  disabilities.  Worked there for about 12 years, and I'm

10:34:49  17  responsible for about 32 facilities in -- in all of East

10:34:52  18  Texas.

10:34:53  19          I have a Bachelor's degree in psychology.  Been

10:34:58  20  working on my Master's off and on for a few years -- when I

10:35:01  21  get time and money, so...

10:35:04  22          Spouse's name is Jackie Suess.  She's a licensed

10:35:09  23  vocational nurse.  She's works at Whispering Pines in

10:35:14  24  Longview.  She's worked there about a year and several

10:35:16  25  nursing homes over the years in the area.

10:35:17  1          I have served on, I believe, two criminal juries

10:35:21  2   in Denton County, a criminal jury here about four or five

10:35:26  3   years ago.  And in this court actually a couple years

10:35:29  4   ago -- two to three years ago, I believe.

10:35:32  5          THE COURT:  All right, sir.  Thank you very much.

10:35:34  6          Next we'll go to Panel Member No. 29, Mr. Ramsey.

10:35:41  7          JUROR RAMSEY:  My name is Athan Ramsey.  I've

10:35:47  8   lived in Avinger, Texas, for the last 15 years.  Have one

10:35:47  9   grown child.  Work for Crosby Lebus, manufacturing heavy

10:35:52 10   lifting accessories.

10:35:55 11          High school education.

10:35:58 12          My wife works at ABC Auto.  She's a driver.  She's

10:36:01 13   been there eight years.  Her name is Lisa.  And I have no

10:36:05 14   prior selections.

10:36:07 15          THE COURT:  Never served on a jury?

10:36:09 16          JUROR RAMSEY:  No, sir.

10:36:11 17          THE COURT:  Thank you very much, sir.  That

10:36:12 18   completes No. 29.

10:36:13 19          We'll go to No. 30, Ms. Gothard.

10:36:16 20          JUROR GOTHARD:  My name is Teresa Gothard.  I have

10:36:19 21   three grown children, all of which are married.  I have

10:36:23 22   seven grandsons.  I am currently retired as a registered

10:36:26 23   nurse since 2017.  Prior to retirement, I worked for 20

10:36:34 24   years at Good Shepherd Medical Center as a mother/baby

10:36:40 25   nurse.

| | | |
|--|--|--|
| 10:36:41 | 1 | Divorced.  And I have -- oh, I live in Big Sandy, |
| 10:36:44 | 2 | by the way. |
| 10:36:45 | 3 | And I've never served on a case. |
| 10:36:47 | 4 | THE COURT:  All right, ma'am.  Thank you very |
| 10:36:49 | 5 | much. |
| 10:36:49 | 6 | Next is No. 31, Mr. Wilson. |
| 10:36:53 | 7 | JUROR GARY WILSON:  I'm Gary Wilson.  Live in |
| 10:36:55 | 8 | Linden.  Got two grown children, and two step -- grown |
| 10:36:59 | 9 | stepchildren.  I'm retired from AEP SWEPCO.  Served 36 |
| 10:37:03 | 10 | years, three months.  In that time, I also served as an |
| 10:37:10 | 11 | elected officer of the union for 22 years.  And I also |
| 10:37:14 | 12 | served on our negotiating team for our contracts during |
| 10:37:17 | 13 | that period. |
| 10:37:19 | 14 | I graduated high school from Linden. |
| 10:37:23 | 15 | I'm married to Debra Wilson.  My wife's retired |
| 10:37:27 | 16 | from Hallsville Independent School District.  She retired |
| 10:37:30 | 17 | as a special education supervisor there after about 28 |
| 10:37:34 | 18 | years. |
| 10:37:34 | 19 | And I served as an alternate juror one time on a |
| 10:37:40 | 20 | DUI case in Cass County. |
| 10:37:41 | 21 | THE COURT:  How long ago was that, sir? |
| 10:37:44 | 22 | JUROR GARY WILSON:  Probably 25 or 30 years ago. |
| 10:37:46 | 23 | THE COURT:  Okay.  And you mentioned a union.  I |
| 10:37:49 | 24 | assume it's IBEW? |
| 10:37:52 | 25 | JUROR GARY WILSON:  Yes, sir. |

10:37:52   1          THE COURT:  Thank you, Mr. Wilson.

10:37:53   2          Next is No. 32, Ms. Jones.

10:37:56   3          JUROR LADONNA JONES:  I am LaDonna Jones.  I work

10:37:58   4   for Harrison County.  I have three grown children.  I've

10:38:01   5   been at the county for almost 35 years.

10:38:04   6          I have a Bachelor of Science degree in business.

10:38:07   7          I'm married to Ronald, who works for Rushing Pest

10:38:11   8   Control out of Atlanta.

10:38:13   9          And I have served on one felony jury over 20 years

10:38:17   10   ago and two JP juries over 10 years ago.

10:38:21   11          THE COURT:  All those in Harrison County?

10:38:26   12          JUROR LADONNA JONES:  Yes.

10:38:27   13          THE COURT:  Thank you, Ms. Jones.

10:38:28   14          Next is No. 33, Mr. Judd.

10:38:32   15          JUROR JUDD:  My name is Mike Judd.  I live in

10:38:35   16   Gilmer, Texas.  I've got two kids, one in college, one in

10:38:39   17   high school.  I have a landscaping maintenance business in

10:38:39   18   Longview that I've had for 22 years.

10:38:42   19          I have a high school diploma and two years of

10:38:45   20   college.

10:38:46   21          My wife's name is Carrie Judd.  She works at UT

10:38:52   22   Tyler as a nursing instructor.  She's been there eight

10:38:55   23   months.  Before that she was a nurse practitioner at

10:39:00   24   Longview Internal Medicine.

10:39:02   25          I served on the grand jury in Upshur County

| | | |
|---|---|---|
| 10:39:07 | 1 | probably five years ago. |
| 10:39:08 | 2 | THE COURT:  Have you ever served on a petit jury |
| 10:39:11 | 3 | in a civil case? |
| 10:39:11 | 4 | JUROR JUDD:  No, sir. |
| 10:39:12 | 5 | THE COURT:  Okay.  Thank you, Mr. Judd. |
| 10:39:13 | 6 | Next is No. 34, Mr. Trudeau. |
| 10:39:17 | 7 | JUROR TRUDEAU:  My name is Robert Trudeau.  And I |
| 10:39:20 | 8 | live in Linden -- Linden, Texas.  I have no children.  I |
| 10:39:25 | 9 | currently work at Walmart as a sales associate.  I've been |
| 10:39:28 | 10 | there for six and almost a half years at this point. |
| 10:39:32 | 11 | I have a high school diploma. |
| 10:39:35 | 12 | I have no spouse. |
| 10:39:37 | 13 | And no prior jury service. |
| 10:39:38 | 14 | THE COURT:  And the Walmart you work at is in |
| 10:39:40 | 15 | Linden? |
| 10:39:41 | 16 | JUROR TRUDEAU:  It's in Atlanta, Texas. |
| 10:39:42 | 17 | THE COURT:  Atlanta.  Thank you, sir.  That will |
| 10:39:45 | 18 | complete No. 34. |
| 10:39:47 | 19 | And next is No. 35, Mr. Carl. |
| 10:39:51 | 20 | JUROR CARL:  My name is Spencer Carl.  I have no |
| 10:39:56 | 21 | kids.  I did not graduate high school.  I cook barbecue for |
| 10:40:02 | 22 | a living at Stanley's Pit Barbecue in Tyler.  And I have |
| 10:40:07 | 23 | never been on a jury or chosen. |
| 10:40:10 | 24 | THE COURT:  Thank you, sir. |
| 10:40:15 | 25 | Next is No. 36, Ms. Woods. |

10:40:18  1        JUROR WOODS:  My name is LaDonna Woods.  I live
10:40:21  2   here in Marshall, Texas.  I have two grown children.  I
10:40:26  3   work for 1 Call Staffing as the officer manager and
10:40:31  4   contract specialist.  I've worked there almost four years.
10:40:35  5        I have a Bachelor's degree in business from ETBU.
10:40:39  6        My husband is Don Woods, and he owns his own
10:40:43  7   business, Don Woods Electrical service here in Marshall.
10:40:46  8   He's owned it forever.
10:40:51  9        And I have had the honor of serving on both civil
10:40:54  10  and criminal cases, but it's been a number of years ago.
10:40:57  11       THE COURT:  And tell me where those were, please,
10:40:59  12  Ms. Wood.
10:41:00  13       JUROR WOODS:  Both were here in Marshall in
10:41:03  14  Harrison County Court and here in the federal.
10:41:06  15       THE COURT:  And how long has it been since you
10:41:08  16  served as a juror in this court?
10:41:13  17       JUROR WOODS:  It was the early 2000s.
10:41:15  18       THE COURT:  And it was a civil case?
10:41:17  19       JUROR WOODS:  Yes.
10:41:17  20       THE COURT:  Okay.  Do you remember anything about
10:41:20  21  what the case was about?
10:41:22  22       JUROR WOODS:  It had to do with a franchise
10:41:28  23  dealership.
10:41:28  24       THE COURT:  Okay.  All right.  Thank you very
10:41:31  25  much, Ms. Woods.

10:41:34  1        Next is No. 37, Ms. Hood.

10:41:37  2        JUROR HOOD:  My name is Madison Hood.  I live here

10:41:40  3   in Marshall, Texas.  I have three kids all under the age of

10:41:44  4   seven.  I'm the first assistant at the Harrison County

10:41:48  5   District Attorney's Office, and I also do some municipal

10:41:51  6   work for Marshall, Hallsville, Gladewater, and sometimes

10:41:54  7   Big Sandy.  I've worked at this DA's office for almost two

10:41:58  8   years.  Prior to that I was at Gregg County.

10:42:01  9        I went to the University of Texas at Austin and

10:42:05 10   then I went to South Texas College of Law.

10:42:06 11        My husband is Jared Hood.  He's the baseball coach

10:42:09 12   at East Texas Baptist University.  He's been there almost

10:42:14 13   nine years.

10:42:14 14        And I have never been on a jury.

10:42:16 15        THE COURT:  Thank you very much.

10:42:17 16        Next is No. 38, Mr. Smith.

10:42:21 17        JUROR SMITH:  Billy Smith.  Live in Marshall.  I

10:42:25 18   have one six-year-old son.  I work at Railserve in

10:42:29 19   Longview.  We do railcar switching.  Worked there for about

10:42:32 20   a year.

10:42:38 21        High school diploma and some college.

10:42:40 22        Married, Marissa Smith.  She's the chemistry

10:42:44 23   department chair and professor at East Texas Baptist.

10:42:49 24   She's worked there for five years.

10:42:50 25        And never served on a jury.

| | | |
|---|---|---|
| 10:42:51 | 1 | THE COURT:  All right, sir.  Thank you very much. |
| 10:42:53 | 2 | Next is No. 39, Ms. Pope. |
| 10:42:57 | 3 | JUROR POPE:  My name is Sybil Pope.  I live in |
| 10:43:01 | 4 | Marshall, Texas.  I have no children.  I work two jobs. |
| 10:43:06 | 5 | I'm a CSR at Family Dollar in Hallsville, and I also work |
| 10:43:11 | 6 | as a caregiver at Texas Home Health.  I've worked at Family |
| 10:43:16 | 7 | Dollar for a year and a half.  I've worked at Texas Home |
| 10:43:19 | 8 | Health for a couple of years. |
| 10:43:22 | 9 | I'm a high school graduate. |
| 10:43:23 | 10 | And I'm a widow. |
| 10:43:24 | 11 | And I have no jury service. |
| 10:43:25 | 12 | THE COURT:  Thank you very much, ma'am. |
| 10:43:26 | 13 | Next is No. 40, Ms. Vick. |
| 10:43:31 | 14 | JUROR VICK:  My name is Virginia -- I can't say |
| 10:43:43 | 15 | it -- Virginia Vick, aka Kathy is what I go by.  I have two |
| 10:43:49 | 16 | children, nine grandchildren.  I work for Crosby Lebus in |
| 10:43:54 | 17 | maintenance.  And how long have I worked there?  I've been |
| 10:43:57 | 18 | there over nine years. |
| 10:43:59 | 19 | Education, I got a GED. |
| 10:44:02 | 20 | I'm divorced.  How long has it -- |
| 10:44:06 | 21 | THE COURT:  Have you ever served -- |
| 10:44:09 | 22 | JUROR VICK:  And I was on a -- I did serve on a |
| 10:44:10 | 23 | jury and it was in Gilmer, and it was for -- I guess it |
| 10:44:13 | 24 | would be criminal.  It was like workman's comp. |
| 10:44:16 | 25 | THE COURT:  How long ago, ma'am? |

10:44:18   1          JUROR VICK:  Oh, that has been, probably 20 years

10:44:23   2   ago.

10:44:23   3          THE COURT:  And that's the only time you've ever

10:44:24   4   served on a jury?

10:44:27   5          JUROR VICK:  Yes.

10:44:28   6          THE COURT:  Okay.  Thank you very much.

10:44:34   7          All right.  Thank you, ladies and gentlemen.  I do

10:44:38   8   appreciate those responses.

10:44:40   9          Now, I do have a couple of other things I need to

10:44:42   10  go over with you before I turn the questioning over to the

10:44:44   11  lawyers.

10:44:45   12         Those of you that are selected to serve on the

10:44:47   13  jury in this case will serve in the role as the judges of

10:44:52   14  the facts, and the jurors selected to serve in this case

10:44:54   15  will make the sole determination about what the facts are

10:45:00   16  in this case.

10:45:00   17         My job as the judge is to rule on questions of

10:45:03   18  law, evidence, procedure, maintain the decorum of the

10:45:07   19  courtroom, and to oversee an efficient flow of the trial

10:45:10   20  and the evidence.

10:45:10   21         Also, I want to say a couple things to you at this

10:45:14   22  point about our judicial system that hopefully will put

10:45:18   23  things in a proper perspective for you.

10:45:20   24         In any civil jury trial, such as this one, besides

10:45:25   25  the parties themselves, there are always three

10:45:28  1  participants, the jury, the judge, and the lawyers.

10:45:33  2      With regard to the lawyers, I think it's important

10:45:37  3  for each of you to understand that our judicial system is

10:45:42  4  an adversary system, which simply means that during the

10:45:46  5  course of the trial, the parties will seek to present their

10:45:50  6  respective cases through their counsel in the very best

10:45:54  7  light possible.

10:45:54  8      Now, it's no surprise to any of you that lawyers

10:45:59  9  are sometimes criticized in the public and in the media,

10:46:03  10  but the Court has observed that much of this criticism is

10:46:07  11  often the result of a basic mis -- misunderstanding about

10:46:10  12  our adversary system in which the lawyers act as advocates

10:46:16  13  for the competing parties.

10:46:18  14      And as an advocate, ladies and gentlemen, a lawyer

10:46:21  15  is ethically and legally obligated to zealously assert his

10:46:26  16  or her client's position under the rules of our adversary

10:46:31  17  system.  And by presenting the best case possible on behalf

10:46:34  18  of their clients, the lawyers hopefully will enable the

10:46:37  19  jury to better weigh the relevant evidence, to determine

10:46:42  20  the truth and to arrive at a just verdict based on that

10:46:46  21  evidence.

10:46:46  22      This system, this adversary system, has served our

10:46:51  23  nation well for over 200 years, and America's lawyers have

10:46:55  24  been and will be an important part of that as we go

10:46:59  25  forward.

10:46:59   1          So throughout this trial, even though there may be

10:47:02   2   times when I might frown or even grumble at the lawyers

10:47:07   3   from time to time, it's simply because I'm trying to make

10:47:09   4   sure that their advocacy doesn't get outside the boundaries

10:47:14   5   of our adversary system and our rules of procedure.

10:47:17   6          But I want you all to keep in mind that they are

10:47:21   7   just doing their jobs, and I think it's important for you

10:47:23   8   to have that in mind as we go forward.

10:47:26   9          Also, ladies and gentlemen, those of you that are

10:47:29   10   selected on the jury should know that during the trial, I'm

10:47:33   11   going to do my very best to make sure that those of you on

10:47:36   12   the jury have no idea about what I think about the

10:47:41   13   witnesses or their testimony or the evidence, because

10:47:46   14   deciding the facts in this case based on the evidence and

10:47:49   15   the testimony and the witnesses is the jury's job.  It's

10:47:52   16   not my job.

10:47:53   17          So those of you that are selected on the jury

10:47:57   18   should not take any expressions that you see or think you

10:48:02   19   see as coming from me or anything that you think is coming

10:48:06   20   from me as something that you should consider or make a

10:48:08   21   factor in deciding what the ultimate facts are in this

10:48:12   22   case.

10:48:12   23          With that, we'll proceed to let the lawyers

10:48:16   24   address the panel, as I indicated to you earlier.

10:48:21   25          Mr. Baxter, you may address the panel on behalf of

```
10:48:24   1   the Plaintiff.
10:48:25   2          MR. BAXTER:  Thank you, Your Honor.
10:48:25   3          THE COURT:  Would you like a warning on your time?
10:48:29   4          MR. BAXTER:  I would.  Five and one, please?
10:48:32   5   Judge.
10:48:33   6          THE COURT:  I'll warn you when you have five
10:48:35   7   minutes remaining and when you have one minute remaining.
10:48:39   8          MR. BAXTER:  Thank you, Your Honor.
10:48:39   9          THE COURT:  You may proceed.
10:48:41  10          MR. BAXTER:  Thank you.
10:48:42  11          Good morning, ladies and gentlemen.  These are
10:48:43  12   strange times, and I know the judge has already expressed
10:48:47  13   to you his appreciation for you being here.  And on behalf
10:48:50  14   of both parties, I know all the lawyers appreciate your
10:48:54  15   being here.
10:48:54  16          We will try not to waste your time.  We're going
10:48:57  17   to be efficient, and I think you're going to find this to
10:48:59  18   be an interesting case.
10:48:59  19          As you did for us, let me tell you, as I said, my
10:49:06  20   name is Sam Baxter.  I'm married to Judge Lauren Parish,
10:49:13  21   who for 24 years sat in Gilmer and Marion County as a state
10:49:18  22   district judge.
10:49:19  23          We have four children.  One, Keaton, that is a
10:49:22  24   band director at Gilmer High School.  Three adopted
10:49:26  25   children:  Andrew that works at the Boys & Girls Club here,
```

| | | |
|---|---|---|
| 10:49:31 | 1 | he's from Brazil; Matthew, who lives in Arkansas and works |
| 10:49:35 | 2 | for a staffing company there, he's from Thailand; and the |
| 10:49:40 | 3 | precious one, Sophie, who is from India, she's a recent |
| 10:49:44 | 4 | college graduate and working in pre-K actually in Thailand |
| 10:49:49 | 5 | right now. |
| 10:49:50 | 6 | Now, I said I was married to Judge Parish, and |
| 10:49:56 | 7 | that causes me to now ask the panel members who knows Judge |
| 10:50:01 | 8 | Parish?  And for those of you that are asking now, do I |
| 10:50:07 | 9 | have to stand up when she comes in the room, the answer is |
| 10:50:10 | 10 | yes. |
| 10:50:11 | 11 | Now, let me start with No. 15, if I can. |
| 10:50:23 | 12 | THE COURT:  Let's wait until we get the |
| 10:50:25 | 13 | microphones back there. |
| 10:50:27 | 14 | MR. BAXTER:  And I believe, Ms. Brian, at one time |
| 10:50:29 | 15 | you were working in the probation department in Upshur |
| 10:50:34 | 16 | County. |
| 10:50:34 | 17 | JUROR BRIAN:  That's correct. |
| 10:50:36 | 18 | MR. BAXTER:  Did you work for Judge Parish? |
| 10:50:39 | 19 | JUROR BRIAN:  Yes, sir. |
| 10:50:39 | 20 | MR. BAXTER:  I know how she is as a boss.  Why |
| 10:50:42 | 21 | don't you tell me how she was as a boss to you? |
| 10:50:42 | 22 | JUROR BRIAN:  She was nice, but she was very firm. |
| 10:50:44 | 23 | MR. BAXTER:  I found that to be true.  Yes, ma'am, |
| 10:50:46 | 24 | thank you. |
| 10:50:47 | 25 | JUROR BRIAN:  You're welcome. |

| | | |
|---|---|---|
| 10:50:48 | 1 | MR. BAXTER:  Anything about that, Ms. Brian, would |
| 10:50:50 | 2 | be a problem in this case? |
| 10:50:52 | 3 | JUROR BRIAN:  No, that was a long time ago, so... |
| 10:50:55 | 4 | MR. BAXTER:  Yes, ma'am. |
| 10:50:56 | 5 | There was some other hands that know my wife. |
| 10:50:59 | 6 | No. 4. |
| 10:51:04 | 7 | JUROR CANNON:  Yes, sir. |
| 10:51:05 | 8 | MR. BAXTER:  How do you know Laurie? |
| 10:51:07 | 9 | JUROR CANNON:  Lauren was two years younger than |
| 10:51:09 | 10 | I -- I -- with the lady that I sit with, Blynne also sat |
| 10:51:15 | 11 | with her. |
| 10:51:15 | 12 | MR. BAXTER:  Her sister. |
| 10:51:16 | 13 | JUROR CANNON:  Yes, that's the baby sister. |
| 10:51:19 | 14 | MR. BAXTER:  Yes, ma'am. |
| 10:51:20 | 15 | JUROR CANNON:  And I worked also with Betty and |
| 10:51:23 | 16 | have been in the Upshur County Players with Betty. |
| 10:51:26 | 17 | MR. BAXTER:  Okay.  Anything about that, ma'am, |
| 10:51:28 | 18 | that would be of any concern in this case? |
| 10:51:30 | 19 | JUROR CANNON:  No, sir. |
| 10:51:31 | 20 | MR. BAXTER:  All right.  Thank you, Ms. Cannon, I |
| 10:51:33 | 21 | appreciate it. |
| 10:51:34 | 22 | Who else?  Yes, sir.  No. 27? |
| 10:51:42 | 23 | JUROR BEASLEY:  I didn't know your wife |
| 10:51:45 | 24 | personally, but I've been summonsed before her a couple -- |
| 10:51:50 | 25 | well, probably three times actually.  She always treated me |

```
10:51:54   1   very nicely, and I never did get to serve on the jury

10:51:56   2   though.

10:51:56   3          MR. BAXTER:  I trust she summonsed you for jury

10:52:00   4   duty and not anything else.

10:52:03   5          JUROR BEASLEY:  Right, jury duty.

10:52:04   6          MR. BAXTER:  All right.  Thank you, sir.

10:52:05   7          Anybody else?  There's one more.

10:52:07   8          JUROR JUDD:  I served under -- on her District

10:52:10   9   Court on the grand jury.

10:52:11   10          MR. BAXTER:  How was that experience?

10:52:14   11          JUROR JUDD:  It was -- it was good.

10:52:15   12          MR. BAXTER:  Anything about that that gives me a

10:52:17   13   problem?  Did she overwork you or make you stay there too

10:52:21   14   long, anything of the sort?

10:52:23   15          JUROR JUDD:  No, sir, no, sir.

10:52:24   16          MR. BAXTER:  All right.  Thank you very much.

10:52:26   17   Anybody else?  One more.  Ms. Hood, back here behind you --

10:52:30   18   oh, we have one right here, I'm sorry.  No. 24.

10:52:33   19          JUROR HAGGARD:  I know Lauren because she was the

10:52:36   20   Judge in Marion County, and I've had a few brief

10:52:40   21   conversations, but nothing that would affect anything here.

10:52:44   22          MR. BAXTER:  All right.

10:52:50   23          JUROR HAGGARD:  She's a very nice lady.

10:52:50   24          MR. BAXTER:  Thank you, ma'am.

10:52:50   25          Ms. Hood?
```

10:52:52  1         JUROR HOOD:  Judge Parish and my father were in

10:52:56  2  practice prior to her taking the bench -- many, many years

10:52:57  3  ago.

10:52:59  4         MR. BAXTER:  Okay.

10:52:59  5         JUROR HOOD:  I never was under her there in court.

10:52:59  6         MR. BAXTER:  All right.  Thank you, Ms. Hood.

10:53:01  7         Anybody else?

10:53:01  8         The Judge said that we could have a brief period

10:53:04  9  of time to give you a high-level overview of what this case

10:53:10  10  is about.  And let me tell you, this is a patent case, and

10:53:14  11  it's going to involve technology involving what is known as

10:53:19  12  LTE and the LTE standard that we're going to talk about in

10:53:29  13  just a few moments.

10:53:30  14         So it's telephone technology, and it has to do

10:53:32  15  with uploading and downloading data and information from a

10:53:34  16  tower to a phone, from a base station to a phone.

10:53:41  17         And if I can have the first slide, Ms. Truelove.

10:53:48  18         Starting in the early 2000s, there was a phone

10:53:51  19  technology system called 3G.  And the people that are

10:53:53  20  involved that are incredibly smart that deal with all of

10:53:59  21  this telephone communication realized that there was --

10:54:02  22  because the smartphones had gotten so smart, that there was

10:54:06  23  going to be, in effect, a tsunami of data that these

10:54:10  24  telephones and base stations and the system was going to be

10:54:14  25  required to handle.

10:54:19   1          And I put a slide that I hope you can see on the

10:54:21   2   screen here, and it shows the data and what's known as an

10:54:30   3   exabyte.  And that's a 1 and a whole bunch of commas of

10:54:34   4   bits of information that is transmitted across the system.

10:54:35   5          And they realized that the current 3G system

10:54:38   6   wasn't going to be good enough, and so they started working

10:54:41   7   on what came to be known as the 4G system or the LTE

10:54:46   8   system.

10:54:53   9          And the way that that takes place -- if I can see

10:54:56   10   the next slide, Ms. Truelove -- is that there is a group

10:54:59   11   called the 3GPP, and a lot of really smart folks sent

10:55:02   12   delegates to that group.  And they started working on the

10:55:04   13   technical standards that were going to be used in order to

10:55:08   14   get 4G or LTE up and running.

10:55:15   15          And the standard simply means -- if I can have the

10:55:19   16   next slide.  This is nothing we're all familiar with.  It

10:55:22   17   is standardized in the United States what our wall plug

10:55:24   18   looks like.  So no matter where you go, from Oregon to

10:55:28   19   Florida to New York, your plug on your hair dryer or your

10:55:32   20   charging device for your phone is going to fit in that

10:55:35   21   socket.  And that's because of a standard.

10:55:40   22          The same is true for phones.  There is a standard

10:55:42   23   that the phone can be built to, to access the network.

10:55:50   24   Except here, it's worldwide.

10:55:53   25          If I can see the next slide, please, Ms. Truelove.

| | |
|---|---|
| 10:55:56 | 1 |
| 10:56:00 | 2 |
| 10:56:07 | 3 |
| 10:56:10 | 4 |
| 10:56:15 | 5 |
| 10:56:18 | 6 |
| 10:56:25 | 7 |
| 10:56:27 | 8 |
| 10:56:27 | 9 |
| 10:56:36 | 10 |
| 10:56:41 | 11 |
| 10:56:46 | 12 |
| 10:56:57 | 13 |
| 10:57:02 | 14 |
| 10:57:03 | 15 |
| 10:57:05 | 16 |
| 10:57:07 | 17 |
| 10:57:09 | 18 |
| 10:57:12 | 19 |
| 10:57:13 | 20 |
| 10:57:14 | 21 |
| 10:57:14 | 22 |
| 10:57:17 | 23 |
| 10:57:20 | 24 |
| 10:57:20 | 25 |

Companies send delegates to these conferences. They submit proposals, and they submit patents that they think will endeavor that network to work better.

In this case, you're going to see five patents and hear about five patents that are owned by my client, PanOptis, that we say that are infringed by Apple.

And that generally is what this lawsuit is going to be about.

Now, let me ask a few questions of you.  The lawyers for Apple are seated here at the table.  And my friend, Ms. Melissa Smith, is one of them.  She lives in Jefferson.  And does anybody know Ms. Smith?  I have one hand.

JUROR BERRY:  Yes, sir, I do.

MR. BAXTER:  How do you know Ms. Smith?

JUROR BERRY:  We volunteered in a civic organization together probably 15-plus years ago.

MR. BAXTER:  Yes, ma'am.  Are you still in that organization?

JUROR BERRY:  I'm a sustainer in that organization.

MR. BAXTER:  Okay.  Is Ms. Smith still in?

JUROR BERRY:  I'm not real sure.  We have lost contact.

MR. BAXTER:  Anything about that would pose me a

| | | |
|---|---|---|
| 10:57:23 | 1 | problem in this case that I ought to worry about? |
| 10:57:24 | 2 | JUROR BERRY:  No, sir. |
| 10:57:25 | 3 | MR. BAXTER:  Thank you, ma'am. |
| 10:57:26 | 4 | Anybody else? |
| 10:57:26 | 5 | THE COURT:  And that's Ms. Berry, No. 22; am I |
| 10:57:30 | 6 | correct? |
| 10:57:30 | 7 | MR. BAXTER:  Thank you, Your Honor. |
| 10:57:31 | 8 | THE COURT:  Make sure I see that little bitty |
| 10:57:33 | 9 | number from way up here.  Thank you. |
| 10:57:34 | 10 | MR. BAXTER:  Anybody else know Melissa Smith or |
| 10:57:38 | 11 | her law firm, Gillam & Smith.  Her law partner is Gil |
| 10:57:43 | 12 | Gillam. |
| 10:57:44 | 13 | Her colleague here at this trial is going to be |
| 10:57:48 | 14 | Mr. Joe Mueller.  Mr. Mueller, I believe, is from Boston, |
| 10:57:54 | 15 | or in those environs anyway.  I suspect no one knows him, |
| 10:57:56 | 16 | but just on the off chance that you've ever dealt with |
| 10:57:58 | 17 | Mr. Mueller when he's been in court here, anybody know |
| 10:58:02 | 18 | Mr. Mueller? |
| 10:58:02 | 19 | All right.  How many people have an Apple phone? |
| 10:58:09 | 20 | Raise your hand.  Most of you.  You're not going to hear |
| 10:58:13 | 21 | any bad things from us about the Apple phone.  We think |
| 10:58:18 | 22 | it's a great phone.  We think we help make it a better |
| 10:58:21 | 23 | phone. |
| 10:58:22 | 24 | But my real question to you is, for those that |
| 10:58:25 | 25 | either own an Apple phone or simply know about Apple in the |

10:58:30   1    marketplace, how many people are going to feel, well, it's

10:58:35   2    Apple, they're a big company, they put out great products,

10:58:39   3    and surely they would not infringe any patents?  Does

10:58:42   4    anybody feel that way?

10:58:43   5         Does anybody feel like that because they are, in

10:58:50   6    fact, a great company and put out great products, that they

10:58:54   7    shouldn't be hauled into court and ask a jury if, in fact,

10:58:59   8    they infringed somebody else's patents?  Does anybody feel

10:59:03   9    that way?

10:59:04   10        I guess my question is, is that my company,

10:59:08   11   PanOptis, are we going to be on the same or similar footing

10:59:11   12   as Apple is right now?  Can we start out even?  Is there

10:59:15   13   anybody that thinks that that couldn't happen?

10:59:18   14        All right.  Let me tell you a little bit about

10:59:27   15   PanOptis.  We are a company that holds patents.  We hold

10:59:29   16   these five patents.  We own these patents.  We did not

10:59:35   17   develop the patents, and we don't sell a product.  We

10:59:39   18   simply own intellectual property and from time to time ask

10:59:42   19   people to pay money to take a license to our intellectual

10:59:45   20   property.

10:59:46   21        Is there anybody that has a problem with the fact

10:59:50   22   that PanOptis doesn't own anything but patents and they

10:59:56   23   don't have a product, they don't make a product, but they,

11:00:00   24   in fact, own very valuable property?  Does that pose a

11:00:05   25   problem to anyone?  Will we still be on the same footing as

| | | |
|---|---|---|
| 11:00:09 | 1 | Apple?  Anybody at all? |
| 11:00:11 | 2 | Is there anyone here that's ever worked as a |
| 11:00:19 | 3 | computer programmer or can work on computers and has some |
| 11:00:24 | 4 | technical skills in that regard? |
| 11:00:28 | 5 | We have -- yes, sir, No. 10.  And I noticed, |
| 11:00:35 | 6 | Mr. Snyder, that you apparently work at LeTourneau, and |
| 11:00:42 | 7 | you're in charge of their telecom information; is that |
| 11:00:45 | 8 | right? |
| 11:00:46 | 9 | JUROR SNYDER:  That's right. |
| 11:00:46 | 10 | MR. BAXTER:  Can you tell me about what you -- |
| 11:00:48 | 11 | what you do there? |
| 11:00:50 | 12 | JUROR SNYDER:  I manage the internal network as |
| 11:00:52 | 13 | far as the -- the cabling, the infrastructure, layer one |
| 11:00:56 | 14 | across the university, and then also to our remote |
| 11:01:00 | 15 | campuses.  So I also deal with the contracts between |
| 11:01:04 | 16 | Verizon and Sprint and AT&T as far as our connections -- |
| 11:01:07 | 17 | our Internet connections with the local facilities, as |
| 11:01:10 | 18 | well. |
| 11:01:10 | 19 | MR. BAXTER:  If I started -- or not I, if smart |
| 11:01:13 | 20 | lawyers in this case talking to you about uploads and |
| 11:01:18 | 21 | downloads and megabytes, is that going to be right down |
| 11:01:22 | 22 | your alley? |
| 11:01:22 | 23 | JUROR SNYDER:  Probably. |
| 11:01:24 | 24 | MR. BAXTER:  Do you deal with base stations in any |
| 11:01:26 | 25 | way or deal with companies in the base stations in order to |

```
11:01:28   1   get your data spread around your various campuses?

11:01:31   2          JUROR SNYDER:  I don't know if you mean third

11:01:34   3   parties that own the towers?

11:01:35   4          MR. BAXTER:  Yes, sir, right.

11:01:36   5          JUROR SNYDER:  No, I don't deal directly with

11:01:39   6   them.

11:01:39   7          MR. BAXTER:  Okay.  Do you deal with AT&T and

11:01:41   8   Sprint and those companies?

11:01:43   9          JUROR SNYDER:  Yes.

11:01:44  10          MR. BAXTER:  And how do you interact with them,

11:01:46  11   Mr. Snyder?

11:01:47  12          JUROR SNYDER:  I deal in the contracts and then on

11:01:49  13   a customer service basis, as well.

11:01:51  14          MR. BAXTER:  Okay.  Are you familiar with a

11:01:52  15   concept called as Open Source?

11:01:54  16          JUROR SNYDER:  Uh-huh.

11:01:54  17          MR. BAXTER:  Tell me your feelings about --

11:01:54  18          THE COURT:  Just -- just a minute.  Mr. Snyder,

11:01:56  19   you're going to have to answer yes or no.

11:01:58  20          JUROR SNYDER:  Oh, yes.  Yes.  I mean, I work with

11:02:00  21   a lot of smart guys.  I don't consider myself one, but,

11:02:03  22   yes.

11:02:03  23          THE COURT:  Just for your benefit and everybody

11:02:05  24   else's, non-verbal responses like "uh-huh" won't get picked

11:02:10  25   up in the record, so you'll need to say either yes or no.
```

| | | |
|---|---|---|
| 11:02:13 | 1 | Go ahead, counsel. |
| 11:02:14 | 2 | MR. BAXTER:  You and I are in the same boat about |
| 11:02:17 | 3 | that, Mr. Snyder.  But do you have any feeling about Open |
| 11:02:21 | 4 | Source, about whether all code ought to be available? |
| 11:02:24 | 5 | JUROR SNYDER:  I would -- I mean, I think code |
| 11:02:26 | 6 | should be available, but I -- I do believe, obviously, |
| 11:02:29 | 7 | those that -- that create the code should have property or |
| 11:02:33 | 8 | allowances for that, yes. |
| 11:02:34 | 9 | MR. BAXTER:  Are you familiar with upload and |
| 11:02:37 | 10 | download speeds and how they can either go slow or go fast? |
| 11:02:41 | 11 | JUROR SNYDER:  Yes. |
| 11:02:42 | 12 | MR. BAXTER:  If I were to -- to use a term that |
| 11:02:44 | 13 | says 25 megabits per second, would you know what that |
| 11:02:49 | 14 | meant? |
| 11:02:49 | 15 | JUROR SNYDER:  Yes. |
| 11:02:50 | 16 | MR. BAXTER:  Okay.  All right.  Thank you, |
| 11:02:52 | 17 | Mr. Snyder. |
| 11:02:53 | 18 | Was there someone else?  Anybody else that is |
| 11:03:00 | 19 | familiar with this sort of mobile technology?  Anybody at |
| 11:03:03 | 20 | all? |
| 11:03:04 | 21 | Is there anybody that's ever dealt with any sort |
| 11:03:12 | 22 | of standard setting bodies, organizations that set |
| 11:03:19 | 23 | standards that you might use either in technology or that |
| 11:03:21 | 24 | you would use, for example, in school about what the |
| 11:03:24 | 25 | standards ought to be for students passing?  Anybody like |

11:03:29   1   that?

11:03:30   2          We have one right here.  Mr. Young?

11:03:38   3          JUROR YOUNG:  Are you talking about like a

11:03:39   4   national electrical code book?  Is that what you're

11:03:42   5   referring to?

11:03:43   6          MR. BAXTER:  I am, yes, sir.  Do you deal with

11:03:45   7   that?

11:03:45   8          JUROR YOUNG:  I have.

11:03:46   9          MR. BAXTER:  Do you know how those sorts of books

11:03:49   10  get promulgated?  Who makes those rules?

11:03:53   11         JUROR YOUNG:  Yeah, I know who.

11:03:54   12         MR. BAXTER:  All right.  Is it something that if

11:03:55   13  you're in that field, you're expected to follow and want to

11:03:58   14  follow because that's how it works?

11:04:00   15         JUROR YOUNG:  Yes.

11:04:01   16         MR. BAXTER:  Okay.  Anything about that you think

11:04:02   17  would be a problem sitting on this case involving standards

11:04:07   18  for, in effect, telephone service?

11:04:09   19         JUROR YOUNG:  No.

11:04:10   20         MR. BAXTER:  Mobile telephone service?

11:04:16   21         JUROR YOUNG:  No.

11:04:16   22         MR. BAXTER:  All right.  Thank you.

11:04:17   23         Anybody else?

11:04:18   24         How many people -- oh, I'm sorry, yes, ma'am,

11:04:22   25  Ms. Cannon?

| | | |
|---|---|---|
| 11:04:23 | 1 | JUROR CANNON:  By standards, do you mean a set of |
| 11:04:29 | 2 | rules that they are going to live up to to get the |
| 11:04:31 | 3 | particular grade they're going to get? |
| 11:04:33 | 4 | MR. BAXTER:  Well, that would certainly be one |
| 11:04:35 | 5 | example, Ms. Cannon, of standards. |
| 11:04:38 | 6 | JUROR CANNON:  I'm -- I'm a pretty stern rule |
| 11:04:43 | 7 | follower.  If it says don't chew gum, I mean, don't chew |
| 11:04:49 | 8 | gum. |
| 11:04:49 | 9 | MR. BAXTER:  Okay. |
| 11:04:51 | 10 | JUROR CANNON:  But as far as the math TEKS -- |
| 11:04:51 | 11 | MR. BAXTER:  Yes, ma'am. |
| 11:04:53 | 12 | JUROR CANNON:  -- I have sat in on some of the |
| 11:04:56 | 13 | state committees. |
| 11:04:56 | 14 | MR. BAXTER:  Okay.  Anything about that pose a |
| 11:04:58 | 15 | problem in this case, Ms. Cannon? |
| 11:04:58 | 16 | JUROR CANNON:  No, sir. |
| 11:04:59 | 17 | MR. BAXTER:  Did you teach Keaton in -- in high |
| 11:05:01 | 18 | school math? |
| 11:05:01 | 19 | JUROR CANNON:  I watched Keaton's drum line many a |
| 11:05:04 | 20 | time at Buckeye Stadium. |
| 11:05:06 | 21 | MR. BAXTER:  Okay.  Well, he's still at it. |
| 11:05:09 | 22 | JUROR CANNON:  Yes, sir, he is. |
| 11:05:11 | 23 | MR. BAXTER:  Thank you, ma'am.  I appreciate it. |
| 11:05:13 | 24 | How many people here actually own an iPhone?  Let |
| 11:05:19 | 25 | me see your hands. |

11:05:20   1          Maybe it would be better for me to ask how many

11:05:23   2   people don't own an iPhone.

11:05:28   3          Well, it's about 50/50.

11:05:29   4          For those of you that own an iPhone, do you

11:05:34   5   remember that you turn it on, and up in the top left-hand

11:05:37   6   corner, it will probably show you the strength of signal

11:05:41   7   and from time to time will show LTE, which is the sort of

11:05:45   8   network it's operating on?  Does anybody remember that?

11:05:48   9   Anybody ever thought about what LTE meant before today?

11:05:53   10          Which stands, by the way, for Long-Term Evolution.

11:05:57   11   Why they call it that, I don't know.  But that's what LTE

11:06:02   12   standards for, and that's the network over which your phone

11:06:05   13   is operating.

11:06:05   14          Is there anyone here that thinks that speed on a

11:06:11   15   phone is important; that you would like to have your

11:06:14   16   connection fast?  Does everybody think that?  Does anybody

11:06:19   17   not care about their speed?

11:06:21   18          What about having a stable connection; that is,

11:06:24   19   one that doesn't freeze up.  If you download a movie, it

11:06:29   20   sails right through and doesn't freeze up and you're

11:06:33   21   sitting there shaking the phone trying to get it to work?

11:06:36   22   Does everybody think that's important?  If you do, raise

11:06:39   23   your hand.

11:06:40   24          How many people here have ever downloaded a movie

11:06:45   25   on their phone?  Let me see your hands.

| | | |
|---|---|---|
| 11:06:48 | 1 | How many people use their phone to, for example, |
| 11:06:52 | 2 | look at YouTube? |
| 11:06:59 | 3 | How many people get email on their phone? |
| 11:07:01 | 4 | How many people send text messages on their phone? |
| 11:07:05 | 5 | How many people play games on their phone? |
| 11:07:10 | 6 | Is there anybody that doesn't have -- it doesn't |
| 11:07:19 | 7 | have to be an iPhone -- is there anybody that doesn't have |
| 11:07:22 | 8 | a mobile phone, whether it's an iPhone or an Android |
| 11:07:26 | 9 | device? |
| 11:07:27 | 10 | Is there anybody that's not addicted to that |
| 11:07:30 | 11 | phone? |
| 11:07:30 | 12 | All right.  Is there anyone here that's ever |
| 11:07:36 | 13 | applied for a patent, or even know anybody that's applied |
| 11:07:40 | 14 | for a patent? |
| 11:07:41 | 15 | Yes, sir?  No. 10 again. |
| 11:07:45 | 16 | JUROR SNYDER:  My dad -- my dad. |
| 11:07:47 | 17 | MR. BAXTER:  Did he get a patent, Mr. Snyder? |
| 11:07:50 | 18 | JUROR SNYDER:  He does.  He has 21 patents in the |
| 11:07:52 | 19 | oil industry. |
| 11:07:53 | 20 | MR. BAXTER:  Okay.  Is that having to do with, |
| 11:07:55 | 21 | like, fraccing or how to drill or -- |
| 11:07:59 | 22 | JUROR SNYDER:  It's safety relief valves. |
| 11:08:03 | 23 | MR. BAXTER:  Do -- do you know what process he |
| 11:08:04 | 24 | went through to get those patents? |
| 11:08:06 | 25 | JUROR SNYDER:  I do not. |

| | | |
|---|---|---|
| 11:08:07 | 1 | MR. BAXTER:  Do you know if he had to go hire him |
| 11:08:10 | 2 | a lawyer or things of that ilk? |
| 11:08:11 | 3 | JUROR SNYDER:  It was through his business. |
| 11:08:12 | 4 | MR. BAXTER:  His business?  Okay.  All right. |
| 11:08:13 | 5 | Thank you. |
| 11:08:14 | 6 | There was someone else that had -- back here, yes, |
| 11:08:17 | 7 | ma'am? |
| 11:08:17 | 8 | JUROR BERRY:  I worked for a company that had |
| 11:08:20 | 9 | several patents in heavy-duty trucking, Stemco. |
| 11:08:24 | 10 | MR. BAXTER:  Yes, ma'am. |
| 11:08:26 | 11 | JUROR BERRY:  I was never involved in the process |
| 11:08:27 | 12 | but was there when we applied for several. |
| 11:08:30 | 13 | MR. BAXTER:  Okay.  I'm going to get you to stand |
| 11:08:31 | 14 | up just a second longer.  I'm going to ask another question |
| 11:08:36 | 15 | and come back to you if you don't mind. |
| 11:08:38 | 16 | How many people here work for a company that have |
| 11:08:42 | 17 | patents or have intellectual property? |
| 11:08:44 | 18 | Okay.  You said your company Stemco does.  Do you |
| 11:08:49 | 19 | know what they do to protect their intellectual property? |
| 11:08:51 | 20 | JUROR BERRY:  Well, I -- they're part of a big |
| 11:08:55 | 21 | corporation, so they do all they can legally to protect |
| 11:08:58 | 22 | their patents. |
| 11:08:59 | 23 | MR. BAXTER:  If they have patents and it's theirs, |
| 11:09:03 | 24 | they don't want somebody to use it without their |
| 11:09:06 | 25 | permission, do they? |

| | | |
|---|---|---|
| 11:09:07 | 1 | JUROR BERRY:  Correct. |
| 11:09:08 | 2 | MR. BAXTER:  Do you know of anything the company |
| 11:09:09 | 3 | could do -- if somebody does that, if someone takes their |
| 11:09:12 | 4 | property and starts using one of their patents, do you know |
| 11:09:16 | 5 | of anything they can do other than come to a courthouse |
| 11:09:18 | 6 | like this to try to -- |
| 11:09:20 | 7 | JUROR BERRY:  They start with a cease and desist |
| 11:09:23 | 8 | order asking them to cease operations -- |
| 11:09:25 | 9 | MR. BAXTER:  They might very well write them a |
| 11:09:27 | 10 | letter and ask them to.  But if they don't, does anybody |
| 11:09:31 | 11 | know any recourse a company has other than coming to a |
| 11:09:36 | 12 | court like this in front of Judge Gilstrap and ask people |
| 11:09:38 | 13 | to stop or to pay them for what they've used?  Do you know |
| 11:09:41 | 14 | of anything they can do besides come to court? |
| 11:09:45 | 15 | JUROR BERRY:  No, sir, that's beyond my knowledge. |
| 11:09:47 | 16 | MR. BAXTER:  There was somebody in the back that |
| 11:09:49 | 17 | worked for a -- yes, ma'am? |
| 11:09:51 | 18 | JUROR VICK:  Lebus has a patent on their heat |
| 11:09:55 | 19 | treating.  You know, it's a process and they have a patent |
| 11:10:01 | 20 | on it. |
| 11:10:01 | 21 | MR. BAXTER:  Do you know of anything they do to |
| 11:10:03 | 22 | protect their patent so that nobody else uses it or takes |
| 11:10:07 | 23 | it? |
| 11:10:08 | 24 | JUROR VICK:  I'm not sure what they do, but I'm |
| 11:10:10 | 25 | sure they do something. |

11:10:11    1                MR. BAXTER:  It's valuable to them.

11:10:13    2                JUROR VICK:  Yeah, it's very valuable.

11:10:15    3                MR. BAXTER:  And they would like to protect.

11:10:19    4                JUROR VICK:  It's what keeps that company running.

11:10:23    5                MR. BAXTER:  Okay.  Thank you, ma'am.

11:10:25    6           Is there anybody here that is a member of any

11:10:27    7   group that opposes lawsuits?  Anybody at all?

11:10:33    8           Let me ask you a slightly different question.  How

11:10:37    9   many people think there are too many lawsuits that are

11:10:39   10   filed?  Let me see your hands.

11:10:43   11           How many people think there are too many lawyers?

11:10:50   12           We have one brave soul here in the back.

11:10:55   13           For those of you that are worried about too many

11:10:58   14   lawsuits, is there -- anybody think that there are too many

11:11:02   15   patent lawsuits filed?  That's what this case is; that it

11:11:06   16   involves intellectual property and involves a lot of money.

11:11:10   17           Is there anybody that says, well, gosh, they

11:11:13   18   shouldn't be clogging up the courts with those.  They ought

11:11:16   19   to be doing criminal work.  Anybody feel that way?

11:11:19   20           Does anybody have a problem with a company that

11:11:25   21   owns intellectual property coming to court and saying that

11:11:29   22   someone else is using their property, and they ought to pay

11:11:33   23   for it?  Anybody got a problem with that top side or

11:11:36   24   bottom?

11:11:37   25                THE COURT:  Mr. Baxter, be sure you use the

11:11:39  1  microphone, please.

11:11:40  2       MR. BAXTER:  I'm sorry, Your Honor.  I wandered

11:11:42  3  away.  I will.

11:11:42  4       Now, let me ask you a little bit about some of the

11:11:51  5  terms that you're going to hear in -- in this case.

11:11:56  6       And if I could -- if we have a slide on that,

11:11:58  7  Ms. Truelove.  We'll have to find it.

11:12:03  8       But here are some of the terms that you're going

11:12:05  9  to hear, and you've already heard some from Judge Gilstrap.

11:12:10  10      But the first one is infringement.  How many

11:12:12  11 people have heard of that term before?  Most of you have.

11:12:16  12 And so you know, that's when one party says that another

11:12:20  13 person or party is using their patented technology without

11:12:24  14 their permission, and that they are guilty of infringement.

11:12:30  15      The second term is called validity or invalidity.

11:12:35  16 And for -- when you watched that patent video, you found

11:12:40  17 out that there may be a question in a case involving

11:12:44  18 whether a patent is valid or not or if the patent is

11:12:49  19 invalid.  And I'm going to come back to this concept in

11:12:52  20 just a moment.

11:12:54  21      But does everybody understand what that concept

11:12:56  22 is, about the validity of the patent?  Anybody got a

11:13:00  23 problem with that?

11:13:01  24      The next one is prior art, and it's sort of taken

11:13:08  25 me awhile to figure out they weren't talking about

11:13:10  1   Rembrandts.  What they're talking about are technical

11:13:13  2   documents that may have been published in the field that

11:13:16  3   you can look at and the Patent Office does look at before

11:13:19  4   they, in fact, grant a patent.

11:13:21  5        The next term is no less than a reasonable

11:13:25  6   royalty.  And you're going to hear a lot about that in this

11:13:28  7   case because that is the standards sets out by the statute

11:13:34  8   that says if someone uses your technology, they should pay

11:13:37  9   you no less than a reasonable royalty.

11:13:43  10        Would anybody have any problems with that?

11:13:45  11        And the last one is what we talked about, standard

11:13:50  12   essential patents.  And you're going to hear testimony that

11:13:54  13   the five patents that we showed you on the screen just a

11:13:56  14   little while ago Optis says are standard essential patents.

11:14:04  15   In other words, if you're going to practice the LTE

11:14:06  16   standard and you're going to be on the 4G network, you have

11:14:08  17   to use the technology in those five patents.

11:14:11  18        Does that pose a problem for anyone?

11:14:17  19        All right.  So now, Ms. Truelove, if I can get you

11:14:21  20   to go back, and let's look at what Judge Gilstrap has

11:14:23  21   already told you is the burden of proof.

11:14:25  22        And he told you that the first burden that he

11:14:32  23   is -- has instructed you on already and will instruct you

11:14:35  24   on again at the end of this case is something called the

11:14:39  25   preponderance of the evidence.

11:14:42   1          That, ladies and gentlemen, is our burden.  That's

11:14:46   2   the Plaintiffs' burden to show that our patents are

11:14:50   3   infringed.  We have that burden, and we gladly accept it.

11:14:55   4   And the preponderance of the evidence means that you must

11:14:58   5   be persuaded by the evidence that the claim is more

11:15:01   6   probably true than not.

11:15:03   7          And if we could have the slide of the scales.

11:15:06   8          That means that the Scales of Justice that was

11:15:10   9   equal, as Judge Gilstrap told you, is now tilted ever so

11:15:15  10   slightly, that there is one more piece of evidence for the

11:15:18  11   person putting forth that proposition than the other side,

11:15:22  12   and if you find that these patents are infringed by a

11:15:27  13   preponderance of the evidence, then you'll indicate that

11:15:30  14   they are infringed.

11:15:31  15          Does that standard pose a problem to anyone?

11:15:36  16   Anyone at all?

11:15:37  17          Okay.  The next standard that he talked to you

11:15:40  18   about is something called clear and convincing.  Here's

11:15:45  19   where that comes in, and this is a little trickier.  As you

11:15:51  20   learned from the patent video and as we talked about a

11:15:54  21   second ago, one of the issues in a patent case is the

11:15:58  22   validity of the patent.

11:16:01  23          The patent is issued by the PTO, but in a trial

11:16:06  24   like this, the Defendant can say to the jury, well, maybe

11:16:11  25   we use that technology, but the patent is not valid, and

11:16:17  1  that is something that will be presented in this case to

11:16:19  2  the jury because they're going to say that.

11:16:23  3         But the burden of proof is highly different for

11:16:30  4  that concept than there is for us to prove that they

11:16:33  5  infringed the patent, and that concept is something known

11:16:35  6  as clear and convincing evidence.

11:16:38  7         And I think Judge Gilstrap will give you an

11:16:40  8  instruction that reads something like this:  It means you

11:16:44  9  have an abiding conviction that the truth of the party's

11:16:47  10  factual contentions are highly probable.  Such evidence

11:16:52  11  requires a higher standard of proof than proof by a

11:16:55  12  preponderance of the evidence.

11:16:55  13         And if I can see the Scales of Justice.

11:17:00  14         That means you're not tilting it a little bit, but

11:17:03  15  you've got to go like this.

11:17:05  16         Now, is there anybody on the jury panel that would

11:17:07  17  have a problem applying that standard of proof to Apple if

11:17:13  18  they come in here and allege that one or more of our

11:17:16  19  patents are not valid?  Is there anybody that would

11:17:20  20  hesitate to say, I will listen to your evidence, but it's

11:17:23  21  going to have to be clear and convincing before I can

11:17:26  22  decide that?  That pose a problem to anybody?

11:17:29  23         Now, Ms. Hood, let's talk about the one other

11:17:38  24  burden of proof that Judge Gilstrap talked about, and it's

11:17:41  25  something that I assume you deal with every day.  Tell the

| | | |
|---|---|---|
| 11:17:44 | 1 | jury panel what that is. |
| 11:17:45 | 2 | JUROR HOOD:  Beyond a reasonable doubt. |
| 11:17:47 | 3 | MR. BAXTER:  Which means in a criminal case, in |
| 11:17:50 | 4 | order to prove someone's guilt, it's got to be beyond a |
| 11:17:54 | 5 | reasonable doubt. |
| 11:17:54 | 6 | JUROR HOOD:  A reasonable doubt. |
| 11:17:56 | 7 | MR. BAXTER:  Right? |
| 11:17:58 | 8 | JUROR HOOD:  Right. |
| 11:17:58 | 9 | MR. BAXTER:  But that's not so in a civil case, is |
| 11:18:01 | 10 | it? |
| 11:18:01 | 11 | JUROR HOOD:  Correct. |
| 11:18:02 | 12 | MR. BAXTER:  And not so in this case? |
| 11:18:04 | 13 | JUROR HOOD:  Correct. |
| 11:18:04 | 14 | MR. BAXTER:  All right. Thank you. |
| 11:18:04 | 15 | JUROR HOOD:  There's no definition for that. |
| 11:18:06 | 16 | MR. BAXTER:  Yes, ma'am. |
| 11:18:06 | 17 | Who on this panel is pretty good -- and, |
| 11:18:14 | 18 | Mr. Snyder, I'm probably going to get you up again -- is |
| 11:18:18 | 19 | pretty good about either working on computers or more |
| 11:18:23 | 20 | importantly, served as the function of a 14-year-old child |
| 11:18:30 | 21 | that knows how to operate a phone and knows where all the |
| 11:18:32 | 22 | features are and knows how to get it to work and sing and |
| 11:18:37 | 23 | dance?  Is there anybody on the panel that even knows how |
| 11:18:41 | 24 | to work on a phone or at least understands all the |
| 11:18:44 | 25 | functions of a phone so that you can press buttons and |

```
11:18:47   1   things magically appear?
11:18:49   2           All right.  Let me see a show of hands.
11:18:52   3           I know, Mr. Snyder, you're going to.
11:18:55   4           All right.  We're going to go back to Ms. Cannon
11:18:57   5   in just a moment.
11:18:59   6           JUROR CANNON:  I need the question restated.
11:19:02   7           MR. BAXTER:  Yes, the question restated?
11:19:05   8           JUROR CANNON:  Yes, sir.
11:19:05   9           MR. BAXTER:  I want to know who on this panel is
11:19:07  10   sort of a techie geek that knows how to make these things
11:19:12  11   sing and dance and operate on the phones and use all those
11:19:15  12   features.  Is there anybody like that?
11:19:17  13           Yes, ma'am?  Yes, ma'am?
11:19:39  14           JUROR EVANS:  Well, I mean, I know how to work my
11:19:40  15   phone pretty -- pretty good.
11:19:40  16           MR. BAXTER:  Pretty well?
          17           JUROR EVANS:  Yes, sir.
          18           MR. BAXTER:  So when you get it out of the box and
          19   there are no instructions, you know how to turn that rascal
          20   on --
          21           JUROR EVANS:  I can now.
          22           MR. BAXTER:  -- and make it work?
          23           JUROR EVANS:  I did have a teenage son.
          24           MR. BAXTER:  Okay.  And he could do it?
          25           JUROR EVANS:  He certainly could.
```

1          MR. BAXTER:  Or have had teenage children that can
11:19:44    2    really operate these pieces of equipment?  Let me see your
11:19:46    3    hands.  Did you ever have to go to them and say, would you
11:19:49    4    please do that?

11:19:57    5          Now, ladies and gentlemen, as you might imagine,
11:20:03    6    in a lawsuit like this, or almost any lawsuit that you come
11:20:07    7    in contact with, at the end of the day, it's about money,
11:20:15    8    damages.  And this case is no different in that we allege
11:20:19    9    that because we say that Apple infringes our patents and
11:20:23   10    because they have used our technology, that they, in fact,
11:20:28   11    owe us damages for that.

11:20:31   12          Now, is there anybody on the panel that just right
11:20:34   13    upfront says, you know, if I'd known you were talking about
11:20:38   14    money, I'd have said something because I just don't think
11:20:41   15    there ought to be damages assessed in a lawsuit?  Anybody
11:20:47   16    feel that way?

11:20:48   17          Is there anybody -- and I'm going to tell you the
11:20:52   18    number in just a moment because we're not trying to run
11:20:55   19    from the number.  There's going to be expert testimony,
11:20:59   20    damage expert, that you're going to hear about what a
11:21:03   21    reasonable royalty for Apple's use of our five patents is.

11:21:12   22          Apple, as you know, sells lots of phones, because
11:21:15   23    most of you have one.  And so there's going to be testimony
11:21:18   24    about what a per unit royalty ought to be.  And then
11:21:23   25    there's going to be an aggregate number.

11:21:29  1        And the aggregate number in this case, if you can

11:21:32  2   put that up, Ms. Truelove, is $506 million, which is a lot

11:21:35  3   of money.  And you're going to hear testimony about whether

11:21:41  4   or not that is a reasonable royalty or not.

11:21:45  5        Now, is there anybody on the panel that says, I

11:21:48  6   haven't heard any evidence yet, I don't know what the facts

11:21:51  7   are but that's too much money, and you're not going to get

11:21:54  8   it from me?  Is there anybody that feels that way knowing

11:21:57  9   no facts, not knowing how valuable the patents are or

11:22:02  10  aren't, without knowing how much Apple uses the patent, is

11:22:04  11  there anyone that says $506 million is too much money, and

11:22:11  12  I won't even consider it?  Anybody feel that way?

11:22:20  13       Does everybody understand also that the damage

11:22:23  14  number, which will be determined by the jury, is also to be

11:22:26  15  determined under a preponderance of evidence standard?

11:22:31  16  It's not clear and convincing.  It's not beyond a

11:22:34  17  reasonable doubt.  But it is by, did you tilt those scales

11:22:38  18  ever so slightly in order to prove what each of your

11:22:42  19  patents is worth?

11:22:43  20       And I think the Judge is probably going to ask you

11:22:46  21  at the end of the day to give a damage number for each

11:22:49  22  patent.  Does that pose a problem for anyone -- anyone at

11:22:54  23  all?

11:22:54  24       Is there anybody on the panel that has ever taken

11:23:01  25  a survey?  Anybody -- just a...

11:23:08    1            Who has taken a survey on the Internet?

11:23:17    2            All right.  Can I -- can I ask you just a few

11:23:21    3    questions about that, please, ma'am?

11:23:23    4            THE COURT:  Give us a number, Mr. Baxter --

11:23:24    5    which --

11:23:24    6            MR. BAXTER:  No. 3.  I'm sorry.  I wasn't very

11:23:27    7    clear, Your Honor.  Thank you.

11:23:28    8            THE COURT:  You have five minutes left.

11:23:30    9            MR. BAXTER:  Thank you, Your Honor.

11:23:32   10            What kind of survey have you taken, please, ma'am?

11:23:36   11            JUROR ALEXANDER:  I take lots of lifestyle

11:23:39   12    surveys, retail, what kind of games I like to play.  I do a

11:23:43   13    lot of surveys like that.

11:23:43   14            MR. BAXTER:  Are these on the Internet?

11:23:44   15            JUROR ALEXANDER:  Yes, sir.

11:23:45   16            MR. BAXTER:  Have you ever asked to be part of a

11:23:48   17    survey in which they said, if you'll do it, we'll give you

11:23:52   18    a gift card or we'll pay you or anything like that?

11:23:54   19            JUROR ALEXANDER:  Yes, sir.

11:23:54   20            MR. BAXTER:  And how did that take place?

11:23:56   21            JUROR ALEXANDER:  A lot of the surveys pay a very

11:23:57   22    small amount of money.  The more surveys you take, once you

11:23:59   23    hit a limit of like five or $10.00, then you get a

11:24:02   24    PayPal --

11:24:03   25            MR. BAXTER:  Okay.

| | | |
|---|---|---|
| 11:24:05 | 1 | JUROR ALEXANDER:  -- payout. |
| 11:24:08 | 2 | MR. BAXTER:  On those surveys did you try to |
| 11:24:11 | 3 | answer your best? |
| 11:24:12 | 4 | JUROR ALEXANDER:  Always. |
| 11:24:13 | 5 | MR. BAXTER:  Did you try to understand the |
| 11:24:13 | 6 | question and answer it truthfully? |
| 11:24:13 | 7 | JUROR ALEXANDER:  Yes, sir. |
| 11:24:14 | 8 | MR. BAXTER:  And you've done that a lot? |
| 11:24:16 | 9 | JUROR ALEXANDER:  Fairly frequently, yes, sir. |
| 11:24:18 | 10 | MR. BAXTER:  Okay.  All right.  Thank you, ma'am. |
| 11:24:21 | 11 | Who else?  No. 2, maybe.  Did you say you've taken |
| 11:24:24 | 12 | surveys? |
| 11:24:25 | 13 | JUROR BLUM:  Yes, sir. |
| 11:24:26 | 14 | MR. BAXTER:  Ms. Blum, what kind of surveys have |
| 11:24:28 | 15 | you taken? |
| 11:24:29 | 16 | JUROR BLUM:  I've taken surveys for school, for |
| 11:24:32 | 17 | work.  Every time you open an app, occasionally they'll ask |
| 11:24:37 | 18 | you to survey their app or it just pops up on the Internet |
| 11:24:40 | 19 | so you can finish reading an article.  It makes you ask -- |
| 11:24:44 | 20 | or answer a few questions before you can move on. |
| 11:24:47 | 21 | MR. BAXTER:  In those instances, have you tried to |
| 11:24:49 | 22 | answer -- answer truthfully? |
| 11:24:50 | 23 | JUROR BLUM:  Yes. |
| 11:24:51 | 24 | MR. BAXTER:  Take it serious.  They want |
| 11:24:53 | 25 | information, I got it, I'll give it to them? |

11:24:56  1          JUROR BLUM:  Yes.

11:24:57  2          MR. BAXTER:  All right.

11:24:58  3          Who else has taken surveys?  No. 17?

11:25:03  4          THE COURT:  Please use the microphone, Mr. Baxter.

11:25:07  5          MR. BAXTER:  No. 17, Your Honor.

11:25:09  6          Tell -- tell me what kind of surveys you've taken.

11:25:12  7          JUROR GONZALEZ:  Well, every so often I have to

11:25:14  8  take some surveys for work to relate -- of the management,

11:25:22  9  answers like that.  I've had to fill out surveys for even

11:25:28 10  church -- church housing.  It's fairly common.  And some of

11:25:33 11  the -- some of the surveys, once they're completed,

11:25:37 12  especially the online ones -- the online ones, they give

11:25:41 13  you the option to actually take more surveys afterwards

11:25:48 14  because there's money in that, apparently, so...

11:25:50 15          MR. BAXTER:  Did you ever do that?

11:25:52 16          JUROR GONZALEZ:  Not as of yet.

11:25:54 17          MR. BAXTER:  Okay.  All right.  Thank you.

11:25:55 18          Who else has filled out surveys on the Internet?

11:26:02 19          Right here, No. 6?

11:26:09 20          Ms. Newsom, what kind of surveys have you taken,

11:26:13 21  please, ma'am?

11:26:13 22          JUROR NEWSOM:  From -- surveys over different

11:26:15 23  little games I've played or products that I have looked at.

11:26:20 24          MR. BAXTER:  Did you take those surveys seriously?

11:26:22 25          JUROR NEWSOM:  Yes.

11:26:23  1          MR. BAXTER:  And did you try to answer them as

11:26:25  2  best you could?

11:26:26  3          JUROR NEWSOM:  Yes.

11:26:26  4          MR. BAXTER:  Have you ever been paid to take a

11:26:29  5  survey or gotten a prize or a gift card or anything like

11:26:32  6  that?

11:26:33  7          JUROR NEWSOM:  No.  They've offered, but I've

11:26:36  8  always declined.

11:26:37  9          MR. BAXTER:  Okay.  But at least they offered?

11:26:39  10         JUROR NEWSOM:  Sure.

11:26:39  11         MR. BAXTER:  Okay.  Thank you.

11:26:40  12         Who else has taken surveys?

11:26:42  13         All right.  Let me -- let me ask you a slightly

11:26:45  14  different question now.  I want you to -- well, I want to

11:26:48  15  ask one specific question if I can.  There is someone on

11:26:53  16  the panel that I think -- I think it is you, Ms. Harley,

11:26:58  17  that said you had some timber cut.

11:27:02  18         JUROR HARLEY:  Yes.

11:27:02  19         MR. BAXTER:  Can you tell me about that, please,

11:27:04  20  ma'am?

11:27:05  21         JUROR HARLEY:  Well, someone had -- someone came

11:27:07  22  onto our property that was a little ways from us and

11:27:11  23  timbered it, and we did sue them, but -- we won, but then

11:27:16  24  they just changed the name of their company.

11:27:18  25         MR. BAXTER:  All right.  So they came on your

| | | |
|---|---|---|
| 11:27:21 | 1 | property and cut your trees, took your property without |
| 11:27:23 | 2 | your permission? |
| 11:27:25 | 3 | JUROR HARLEY:  Yes. |
| 11:27:26 | 4 | MR. BAXTER:  And you felt strongly enough about it |
| 11:27:28 | 5 | that you sued them? |
| 11:27:29 | 6 | JUROR HARLEY:  Absolutely. |
| 11:27:30 | 7 | MR. BAXTER:  When you sued them, did you sue for |
| 11:27:32 | 8 | the value of just half the timber or a couple of logs, or |
| 11:27:36 | 9 | did you sue them for every tree they cut? |
| 11:27:40 | 10 | JUROR HARLEY:  For every tree they cut. |
| 11:27:41 | 11 | MR. BAXTER:  Did you feel like you were entitled |
| 11:27:43 | 12 | to get damages? |
| 11:27:45 | 13 | JUROR HARLEY:  Absolutely. |
| 11:27:45 | 14 | MR. BAXTER:  Did you feel like you were entitled |
| 11:27:49 | 15 | to get damages for every tree they took? |
| 11:27:51 | 16 | JUROR HARLEY:  Yes, sir. |
| 11:27:51 | 17 | MR. BAXTER:  And the damages they did to -- to |
| 11:27:53 | 18 | your property? |
| 11:27:54 | 19 | JUROR HARLEY:  Yes, sir. |
| 11:27:54 | 20 | MR. BAXTER:  Okay.  In any case, whether it's tree |
| 11:27:59 | 21 | cutting, Ms. Harley, or whether it's infringement of |
| 11:28:03 | 22 | patents, do you -- do you believe at least that if people |
| 11:28:05 | 23 | prove they were injured and they got hurt, that they ought |
| 11:28:08 | 24 | to get full damages? |
| 11:28:10 | 25 | JUROR HARLEY:  Absolutely. |

| | | |
|---|---|---|
| 11:28:10 | 1 | MR. BAXTER:  Okay.  Thank you, ma'am.  I |
| 11:28:12 | 2 | appreciate that. |
| 11:28:12 | 3 | Now, let me pose one more hypothetical to you.  I |
| 11:28:15 | 4 | want you to assume that you were misfortunate enough to |
| 11:28:19 | 5 | have someone take your property -- let's say it's your |
| 11:28:21 | 6 | favorite gun, and it's in the house, and someone steals it |
| 11:28:26 | 7 | and takes it down to the pawnshop and hocks it for |
| 11:28:30 | 8 | 10 percent of its value and they get caught.  How many |
| 11:28:35 | 9 | people think that all they ought to have to pay back -- |
| 11:28:40 | 10 | THE COURT:  You have one minute remaining. |
| 11:28:42 | 11 | MR. BAXTER:  Thank you, Your Honor -- is |
| 11:28:43 | 12 | 10 percent of the value?  How many people think you ought |
| 11:28:46 | 13 | to get full value for what they took? |
| 11:28:49 | 14 | Thank you very much. |
| 11:28:50 | 15 | Your Honor, thank you for your indulgence.  I'm |
| 11:28:53 | 16 | through. |
| 11:28:53 | 17 | THE COURT:  All right.  Ms. Smith, you may address |
| 11:28:55 | 18 | the panel on behalf of the Defendant. |
| 11:29:02 | 19 | Would you like a warning on your time? |
| 11:29:04 | 20 | MS. SMITH:  Your Honor, five and one will be great |
| 11:29:06 | 21 | for me as well. |
| 11:29:07 | 22 | THE COURT:  All right.  I'll warn you with five |
| 11:29:09 | 23 | minutes remaining and one minute remaining. |
| 11:29:11 | 24 | MS. SMITH:  Thank you. |
| 11:29:11 | 25 | THE COURT:  You may proceed. |

11:29:12   1          MS. SMITH:  May it please the Court.

11:29:27   2          Good morning, everyone again.  My name is Melissa

11:29:30   3    Smith, and I represent Apple.

11:29:31   4          The -- the first thing I'm going to do this

11:29:34   5    morning and the most important thing I'll probably do is

11:29:37   6    thank you.

11:29:38   7          I know that as -- as Mr. Baxter said, these are

11:29:42   8    odd times.  Many of you haven't been out of the house much

11:29:45   9    in the last five months.  I know you had -- some of you

11:29:49   10   coming from as far as Big Sandy and Ore City and Gilmer

11:29:55   11   having to get here around 7:45.  You had a very, very early

11:29:58   12   morning drive, and I also know that your work started long

11:30:02   13   before you got to this courthouse.

11:30:03   14         Have faith that all the information that you gave

11:30:05   15   us on the jury questionnaires, that we've poured over that

11:30:09   16   so we could ask far fewer questions this morning.

11:30:12   17         But we appreciate you taking time away from your

11:30:14   18   family and your work and your busy lives to -- to come here

11:30:18   19   today and to fill out those questionnaires and to help us

11:30:21   20   out.  And so on behalf of Apple, thank you.

11:30:23   21         Now, His Honor and -- and Plaintiffs' counsel have

11:30:30   22   asked you a number of questions, and the good news today is

11:30:34   23   I'll be the last one to ask you questions.  The bad news is

11:30:37   24   I have a few more questions.  But as they did before they

11:30:40   25   got started, I'm going to share a little bit of personal

11:30:43  1   information about myself.

11:30:43  2           I went to the University of Texas at undergrad --

11:30:48  3   for undergrad in Austin.  And then, like Judge Gilstrap, I

11:30:52  4   attended the law school at Baylor.

11:30:54  5           Right after that I moved to Jefferson, Texas.  I

11:30:57  6   live not in town but outside of town in Marion County.

11:31:02  7   That was 23 years ago.  So I started practicing --

11:31:06  8   immediately on moving to Jefferson, I started practicing

11:31:08  9   here in Marshall, and I've been practicing here in Marshall

11:31:10 10   for 23 years.

11:31:11 11           I own the law firm that's called Gillam and Smith.

11:31:14 12   It -- I am the Smith and my law partner was Gil Gillam.  He

11:31:19 13   was actually my first boss when I came here 23 years ago.

11:31:22 14           At some point, I convinced him to make me his

11:31:25 15   partner, and we've -- it's pretty -- pretty unusual, and

11:31:28 16   I'm really proud of the fact that we've practiced together

11:31:31 17   each of my 23 years.

11:31:33 18           Our office is in that old yellow house that sits

11:31:36 19   right behind this courthouse.

11:31:37 20           Personally, I'm married.  We have a seven-year-old

11:31:41 21   girl and a nine-year-old boy.  So for the last five months

11:31:46 22   or so, I've been kind of a part-time lawyer and a part-time

11:31:50 23   homeschool teacher.  I see the two teachers, No. 4 and

11:31:54 24   No. 13, shaking your head.  I have new appreciation for --

11:31:57 25   for teaching because I'm frankly not very good at it,

11:32:01  1   especially not -- I had a third grader and math is hard

11:32:05  2   even in third grade.

11:32:06  3        Now, for those of you that are chosen to serve in

11:32:12  4   this case, Mr. Mueller is actually going to do the opening

11:32:15  5   statement in this case, and he's going to give you a proper

11:32:18  6   introduction of himself at that time.

11:32:19  7        His Honor allows us to give a short introduction

11:32:26  8   of the case, and Plaintiffs' counsel gave you some

11:32:30  9   information about how the Plaintiffs see this case.

11:32:32  10        What I want to do before I do anything else is

11:32:36  11   make one thing crystal clear.  Apple's position in this

11:32:43  12   case is that it does not infringe any of Plaintiffs'

11:32:47  13   patents, not now and not ever.

11:32:51  14        Now, the Plaintiffs in this case -- it got a

11:32:57  15   little bit confusing on one of those slides, but the

11:33:00  16   Plaintiffs in this case are five companies that actually

11:33:03  17   bought these patents from other companies.

11:33:06  18        So we saw a slide with some patents on it, and the

11:33:09  19   other companies, they aren't a part of this lawsuit.  So

11:33:13  20   Samsung, when you saw those names on the patents,

11:33:16  21   Panasonic, and LG, they are not parties to this lawsuit.

11:33:20  22        Now, I got a kick out of Ms. Scott, Juror No. 18,

11:33:29  23   saying that she'd always been able to get out of service.

11:33:33  24   But I'm going to tell you, I think this case is going to be

11:33:36  25   really interesting.  I even -- one of the jurors I can't

| | |
|---|---|
| 11:33:39 | 1 |
| 11:33:42 | 2 |
| 11:33:45 | 3 |
| 11:33:48 | 4 |

11:33:39   1   recall said this sounds a little boring.  But what I'll

11:33:42   2   tell you is you're going to get to see in this case kind of

11:33:45   3   under the hood of -- of Apple products, including iPhones.

11:33:48   4   And you'll see the inner workings of these products.

11:33:51   5        So an iPhone contains hundreds of components and a

11:33:56   6   bunch of chips.  And in this case, the features that are

11:34:00   7   being accused are in one of those tiny little chips, and

11:34:04   8   the chip is called a baseband chip.  And a baseband chip is

11:34:08   9   very common.  It's actually in every cell phone in the

11:34:13   10  world now.  And I see -- I see some jurors shaking their

11:34:17   11  heads.

11:34:17   12        Baseband chips basically allow the cell phone to

11:34:22   13  talk with the cellular network, the networks like AT&T and

11:34:22   14  Verizon that Juror No. 10 is familiar with.

11:34:26   15        You're going to learn that over the years, that

11:34:28   16  this little bitty baseband chip, the component part of the

11:34:32   17  phones and products being accused, Apple has been buying

11:34:35   18  those chips from two companies.  There are two companies

11:34:38   19  out in California.  Many of you probably have heard about

11:34:40   20  them, Intel and Qualcomm.

11:34:43   21        We also heard something from Plaintiffs' counsel

11:34:47   22  about the LTE standard, and he had a few questions for some

11:34:51   23  of you about standards.

11:34:52   24        You're not going to be asked in this case to

11:34:56   25  compare Plaintiffs' patents to the standard.  What you will

11:35:03  1   be asked to compare is the patent claims to these little

11:35:06  2   baseband chips that are accused.

11:35:07  3            His Honor played a video about patents, and you

11:35:10  4   heard, to infringe the patent, the Plaintiffs need to have

11:35:14  5   a product or process that meets every requirement or every

11:35:18  6   word of the patent claims.

11:35:23  7            And I'll tell you, for those of you, again, lucky

11:35:27  8   enough to serve, Apple is going to bring both many, many

11:35:30  9   documents and many witnesses from Apple and expert

11:35:34  10  witnesses, as well, to present -- to present you all

11:35:38  11  evidence, that those baseband chips and its products, they

11:35:43  12  use a very -- a very, very different approach than

11:35:45  13  Plaintiffs' patents.

11:35:47  14            Now, anybody can make an accusation, and I'm

11:35:55  15  not -- I'm not -- I'm not picking at that.  They have every

11:35:58  16  right.  And anyone can file a lawsuit.  We've all seen --

11:36:03  17  we've all seen some of that in the news.  But you have to

11:36:07  18  back up your claims.

11:36:08  19            And so I always start when I'm visiting with

11:36:11  20  people in cases like this, I always start with what I call

11:36:14  21  my "where there's smoke, there's fire" question.

11:36:17  22            And I'm going to start with Mr. Young.

11:36:20  23            Mr. Young, do you think that just because -- and

11:36:25  24  I'll represent to you this case has been on file for

11:36:27  25  several months, many months.  Do you think that because a

| | | |
|---|---|---|
| 11:36:31 | 1 | case has been on file for many months and we're all |
| 11:36:34 | 2 | gathered here, there are good lawyers on the Plaintiffs' |
| 11:36:37 | 3 | side, good lawyers on my side, do you think, gosh, you |
| 11:36:41 | 4 | know, where there's smoke there's fire, there must be |
| 11:36:45 | 5 | something to this litigation? |
| 11:36:46 | 6 | JUROR YOUNG:  I'm not even sure yet. |
| 11:36:50 | 7 | MS. SMITH:  Okay. |
| 11:36:51 | 8 | JUROR YOUNG:  You know, I'm just not ready to |
| 11:36:54 | 9 | answer a question like that.  I need to hear a little bit |
| 11:36:56 | 10 | more. |
| 11:36:56 | 11 | MS. SMITH:  You'd need to hear the evidence; is |
| 11:36:58 | 12 | that right? |
| 11:36:59 | 13 | JUROR YOUNG:  Yes. |
| 11:37:00 | 14 | MS. SMITH:  And so you don't come in thinking |
| 11:37:02 | 15 | because I'm the Defendant, that others gosh, there must be |
| 11:37:05 | 16 | something to this? |
| 11:37:06 | 17 | JUROR YOUNG:  I'm saving that for later. |
| 11:37:08 | 18 | MS. SMITH:  Thank you, thank you, sir. |
| 11:37:11 | 19 | Ms. Blum, how do you feel about it?  Do you feel, |
| 11:37:16 | 20 | Ms. Blum, that Apple is here in this courtroom, lots of |
| 11:37:19 | 21 | court staff, lots of lawyers, there must be something to |
| 11:37:22 | 22 | this? |
| 11:37:23 | 23 | JUROR BLUM:  I don't agree with that because |
| 11:37:25 | 24 | everybody can say something, and I relate it to things like |
| 11:37:33 | 25 | in my life.  People can say things, but then when you hear |

| | | |
|---|---|---|
| 11:37:36 | 1 | the other side of the story or both sides of the story, it |
| 11:37:39 | 2 | doesn't add up.  So evidence is very key to your -- get |
| 11:37:42 | 3 | your own opinion. |
| 11:37:43 | 4 | MS. SMITH:  Thank you, Ms. Blum. |
| 11:37:44 | 5 | Ms. Alexander, do you agree with Ms. Blum and |
| 11:37:51 | 6 | Mr. Young? |
| 11:37:53 | 7 | JUROR ALEXANDER:  Yes, I do. |
| 11:37:53 | 8 | MS. SMITH:  Okay.  Anyone on the other -- do you |
| 11:37:55 | 9 | have anything else to say?  Okay.  I apologize. |
| 11:37:57 | 10 | Anyone else on the first row that disagrees with |
| 11:38:00 | 11 | these three jurors, that thinks, well, you know, you know, |
| 11:38:03 | 12 | there must be something to this because it's a big |
| 11:38:05 | 13 | courthouse and the case has been on file for a while, there |
| 11:38:09 | 14 | must be something to it? |
| 11:38:11 | 15 | Ms. Deornellis -- did I get that -- you were |
| 11:38:15 | 16 | Folsom but now you're Deornellis, did I get that correctly? |
| 11:38:17 | 17 | JUROR FOLSOM:  Deornellis. |
| 11:38:19 | 18 | MS. SMITH:  I apologize.  Do you have any thoughts |
| 11:38:20 | 19 | on this issue? |
| 11:38:23 | 20 | JUROR FOLSOM:  I mean, I guess I agree with them. |
| 11:38:26 | 21 | We really need to know what's going on more in depth until |
| 11:38:30 | 22 | we decide anything really, or side, you know. |
| 11:38:33 | 23 | MS. SMITH:  You want to hear the evidence? |
| 11:38:35 | 24 | JUROR FOLSOM:  Yeah. |
| 11:38:36 | 25 | MS. SMITH:  And, Ms. Newsom, do you agree with |

| | | |
|---|---|---|
| 11:38:39 | 1 | Ms. Deornellis, just by raising your hand. |
| 11:38:43 | 2 | JUROR NEWSOM:  Yes. |
| 11:38:44 | 3 | MS. SMITH:  Thank you, ma'am.  Thanks. |
| 11:38:44 | 4 | All right.  Anybody in the other rows, and I'll |
| 11:38:46 | 5 | tell you this morning your likelihood of being chosen as a |
| 11:38:50 | 6 | juror increases the closer you get because we'll have eight |
| 11:38:54 | 7 | jurors, and that's kind of the way the system works.  So |
| 11:38:57 | 8 | I'll be focusing on the first three or four rows today, but |
| 11:39:01 | 9 | I'm anxious to hear from all of you, of course. |
| 11:39:02 | 10 | Is there anyone that disagrees with the folks on |
| 11:39:06 | 11 | the first row that thinks, you know, there's -- I mean, |
| 11:39:08 | 12 | there's got to be something to this case just by virtue of |
| 11:39:12 | 13 | everyone being gathered here in the courthouse?  Raise your |
| 11:39:17 | 14 | hand. |
| 11:39:18 | 15 | All right.  Juror No. 27, Mr. Beasley.  Tell me |
| 11:39:25 | 16 | what's on your mind. |
| 11:39:26 | 17 | JUROR BEASLEY:  I don't necessarily think that one |
| 11:39:28 | 18 | party is guilty or not, but I don't think the Plaintiff |
| 11:39:31 | 19 | would be careless enough to bring the case if they didn't |
| 11:39:35 | 20 | think that something was being infringed upon. |
| 11:39:37 | 21 | MS. SMITH:  Okay.  And, Mr. Beasley, I'm going to |
| 11:39:39 | 22 | ask you to hold the mic still. |
| 11:39:42 | 23 | JUROR BEASLEY:  Okay. |
| 11:39:42 | 24 | MS. SMITH:  You have not heard any of the evidence |
| 11:39:44 | 25 | yet, but you still kind of have that feeling that, you |

| | | |
|---|---|---|
| 11:39:46 | 1 | know, the Defendant is probably starting out a little bit |
| 11:39:50 | 2 | behind the Plaintiff in this case; is that correct? |
| 11:39:53 | 3 | JUROR BEASLEY:  I don't know if I would put it |
| 11:39:54 | 4 | quite like that, but I just -- I don't know, I just look at |
| 11:39:58 | 5 | everybody up there, and I'm pretty sure that they think |
| 11:40:02 | 6 | that something is wrong.  And so that's where I stand on |
| 11:40:04 | 7 | it, too.  Kind of skeptical a little bit. |
| 11:40:07 | 8 | MS. SMITH:  Okay.  Thank you for your honesty, |
| 11:40:09 | 9 | sir.  I appreciate it. |
| 11:40:16 | 10 | Now, I'm going to switch to a different topic. |
| 11:40:21 | 11 | Jury instructions.  So in these patent cases you're going |
| 11:40:24 | 12 | to get some jury instructions at the end of the case from |
| 11:40:26 | 13 | His Honor, and these could be 20 pages or 30 pages long. |
| 11:40:30 | 14 | Sometimes, at the end of the case, Judge will read the jury |
| 11:40:32 | 15 | instructions to you, and it can take him an hour to read |
| 11:40:35 | 16 | them. |
| 11:40:35 | 17 | So -- and he'll, of course, give you your own |
| 11:40:42 | 18 | copy.  I'm interested in putting you guys in two categories |
| 11:40:45 | 19 | of persons.  The first category I'll call detailed |
| 11:40:50 | 20 | oriented.  Those are people that when I just introduced the |
| 11:40:52 | 21 | idea that you're going to get 30 pages of instructions, |
| 11:40:56 | 22 | they say, all right, I'm ready to dive in.  You're a person |
| 11:40:59 | 23 | that buys a product, you read the owner's manual, you read |
| 11:41:02 | 24 | the instructions, things of that nature. |
| 11:41:05 | 25 | Second group of people, big picture people.  May |

11:41:09  1  not always read the manual when you buy a product.  May

11:41:12  2  give it to someone else in the household to take care of,

11:41:12  3  may not read it at all, but you don't sweat the details.

11:41:16  4  You're kind of a big picture person.

11:41:19  5      We need both kinds of people in the world.  If we

11:41:22  6  had all big picture people, we'd miss some of the details,

11:41:27  7  and if we had all detail-oriented people, we wouldn't get a

11:41:31  8  whole lot done.

11:41:33  9      So there's no wrong answer here.  But what I'm

11:41:33  10  going to do is I'm going to go down the rows.  Let's start

11:41:34  11  with Juror No. 7 because I don't think we've heard much

11:41:39  12  from you, sir.  That is Mr. Jones.  And just tell me what

11:41:44  13  category you fall in, are you more detail oriented or big

11:41:49  14  picture?

11:41:50  15      JUROR RICKY JONES:  I believe I'm more detail

11:41:51  16  oriented.  I'm retired from AT&T as an engineer, so I know

11:41:53  17  the rules, I know the schematics, and it needs to fit that

11:41:58  18  criteria.

11:41:59  19      MS. SMITH:  Thank you, sir.

11:42:02  20      Juror No. 8, let's hear from you.  Mr. Bailey?

11:42:06  21      JUROR BAILEY:  I'd say definitely big picture.  I

11:42:09  22  don't read much into the small lines.  If it don't turn

11:42:13  23  out, it just don't work.  I don't really read about it.

11:42:17  24      MS. SMITH:  Thank you, sir.

11:42:18  25      Ms. McKnight?

| | | |
|---|---|---|
| 11:42:20 | 1 | JUROR MCKNIGHT:  I would say I'm more detailed. |
| 11:42:22 | 2 | MS. SMITH:  Okay.  Thank you, ma'am.  You're -- |
| 11:42:24 | 3 | you're one that's going to probably dive into those 30 |
| 11:42:26 | 4 | pages and read them pretty closely? |
| 11:42:28 | 5 | JUROR MCKNIGHT:  Uh-huh. |
| 11:42:29 | 6 | MS. SMITH:  Thank you, ma'am. |
| 11:42:30 | 7 | All right.  We've heard a little bit from |
| 11:42:36 | 8 | Mr. Snyder and Ms. Harley -- Mr. -- let's see, |
| 11:42:40 | 9 | Mr. Williams, which category do you fall in? |
| 11:42:43 | 10 | JUROR WILLIAMS:  I would be a detail guy. |
| 11:42:48 | 11 | MS. SMITH:  Okay.  And is that -- you own a |
| 11:42:51 | 12 | construction company; is that right? |
| 11:42:53 | 13 | JUROR WILLIAMS:  Yes, I do. |
| 11:42:53 | 14 | MS. SMITH:  So you have to pay attention to the |
| 11:42:53 | 15 | details in your work? |
| 11:42:55 | 16 | JUROR WILLIAMS:  But then I look at the big |
| 11:42:57 | 17 | picture, too. |
| 11:42:58 | 18 | MS. SMITH:  Okay.  Okay.  So a little balance |
| 11:43:01 | 19 | of -- a little bit of both? |
| 11:43:02 | 20 | JUROR WILLIAMS:  It's a 50/50 deal. |
| 11:43:06 | 21 | MS. SMITH:  All right.  Thank you, sir. |
| 11:43:07 | 22 | Let's see, I'm having trouble -- may I -- may I |
| 11:43:13 | 23 | look at a number, Your Honor? |
| 11:43:15 | 24 | THE COURT:  Certainly. |
| 11:43:15 | 25 | MS. SMITH:  Thank you. |

```
11:43:16   1              Behind No. 7, ma'am -- I can't see your number, I
11:43:20   2    apologize.
11:43:21   3              JUROR ACHTERHOF:  14.
11:43:22   4              MS. SMITH:  14.  We haven't heard much from you.
11:43:26   5    Which category would you put yourself in?
11:43:28   6              JUROR ACHTERHOF:  Big picture.
11:43:29   7              MS. SMITH:  Big picture.  And why is that?
11:43:32   8              JUROR ACHTERHOF:  You just get bogged down in
11:43:34   9    details a lot of times.  I'd rather just do what I have to
11:43:37  10    do and get it done.
11:43:38  11              MS. SMITH:  Thank you, ma'am.  Appreciate it.
11:43:42  12              Now, for those of you that I didn't individually
11:43:45  13    question, let me have a showing of hands of all the big
11:43:48  14    people in the room.
11:43:50  15              All right.  Juror No. 24, as well.
11:43:53  16              All right.  Thank you.
11:43:54  17              Now, you heard a good bit from Plaintiffs' counsel
11:44:01  18    already and from Judge about the burden of proof in this
11:44:03  19    case.  And Plaintiffs are the ones that are going to have
11:44:08  20    the burden of proof on infringement.  And that means if
11:44:12  21    Plaintiffs don't meet their burden, that Apple doesn't have
11:44:16  22    to do a thing, and it wins.  But I can promise you, Apple
11:44:20  23    is going to do a whole lot.  We're going to bring you
11:44:24  24    witnesses and mountains of evidence.
11:44:25  25              Is there anyone that thinks, you know, as a
```

11:44:30  1  Defendant, Apple should have to have some -- should have

11:44:32  2  that burden?  It's not -- it's not quite fair that the

11:44:37  3  Plaintiff has to have the burden of proof on infringement.

11:44:40  4      Anybody, by a showing of hands, that thinks that

11:44:42  5  that's just not quite fair?

11:44:44  6      Okay.  Does anyone think -- does anyone think, you

11:44:53  7  know, filing this lawsuit -- filing this lawsuit is enough?

11:44:56  8  Plaintiff has put forth its allegations and -- and, you

11:45:00  9  know, now it's Apple's turn to show that they don't

11:45:03  10  infringe?  Anyone have that thought?

11:45:07  11      All right.  Ms. Feltner?

11:45:13  12      JUROR FELTNER:  Uh-huh.

11:45:14  13      MS. SMITH:  Let me hear what you have to say about

11:45:16  14  this question.

11:45:17  15      JUROR FELTNER:  Will you repeat it again?

11:45:21  16      MS. SMITH:  Of -- of course.  Of course.

11:45:22  17      So Plaintiff has the burden of proof in this case

11:45:24  18  to prove infringement.  And if they don't meet their

11:45:27  19  burden, Apple actually doesn't have to do anything, and it

11:45:29  20  would win.  Do you find that to be fair?

11:45:34  21      JUROR FELTNER:  I think you need to hear from both

11:45:37  22  sides and see what each side has to offer or to prove --

11:45:43  23      MS. SMITH:  Of course.

11:45:44  24      JUROR FELTNER:  -- before you can judge one way or

11:45:46  25  the other.

| | | |
|---|---|---|
| 11:45:48 | 1 | MS. SMITH:  Understood.  Understood.  Understand. |
| 11:45:52 | 2 | Now, on that note of meeting their burden on |
| 11:45:57 | 3 | infringement, Plaintiffs are going to have to prove every |
| 11:46:00 | 4 | single requirement of the patent -- of the patent at issue |
| 11:46:06 | 5 | that it's met to find infringement.  And I see this a |
| 11:46:10 | 6 | little bit like a game of bingo sometimes.  If you get |
| 11:46:15 | 7 | b-i-n-g, that doesn't get you there.  You have to get |
| 11:46:18 | 8 | b-i-n-g-o.  Close is not good enough. |
| 11:46:27 | 9 | By a showing of hands, is everybody prepared to |
| 11:46:31 | 10 | hold Plaintiff to its burden to prove that every single |
| 11:46:34 | 11 | requirement of the patents are met?  Is everyone prepared |
| 11:46:37 | 12 | to do that? |
| 11:46:41 | 13 | If you'd keep your hands up, I -- see if I'm |
| 11:46:41 | 14 | missing any. |
| 11:46:47 | 15 | Juror No. 8, you don't have your hand up.  You do |
| 11:46:51 | 16 | now.  Okay.  Okay.  Thank you.  Thank you. |
| 11:46:59 | 17 | I want to talk to you a little bit about a concept |
| 11:47:02 | 18 | called invalidity.  One of the questions, as Plaintiffs' |
| 11:47:05 | 19 | counsel mentioned, that you'll be asked if you serve on |
| 11:47:07 | 20 | this panel is whether the patents Plaintiffs purchased are |
| 11:47:12 | 21 | valid in light of the arguments that they're going to make |
| 11:47:14 | 22 | in this case.  And you heard something about invalidity in |
| 11:47:18 | 23 | His Honor's video. |
| 11:47:18 | 24 | Was anybody out there surprised when you showed up |
| 11:47:22 | 25 | today to learn that as a juror, you'll be asked to |

11:47:27  1  determine if a patent is valid or invalid?

11:47:30  2        Juror No. 3, Ms. Alexander.  Tell me a little bit

11:47:37  3  about that.  Have you ever -- have you ever had any

11:47:40  4  dealings with the Patent and Trademark Office?

11:47:42  5        JUROR ALEXANDER:  I have not, and I know nothing

11:47:44  6  about patents.

11:47:45  7        MS. SMITH:  All right.

11:47:46  8        JUROR ALEXANDER:  So I'm surprised that I get that

11:47:48  9  responsibility.

11:47:48  10        MS. SMITH:  Well, it is a big responsibility, so

11:47:50  11  my next question -- you know it's coming -- how do you feel

11:47:54  12  about that responsibility?

11:47:55  13        JUROR ALEXANDER:  I've taken on lots of

11:47:58  14  responsibilities in my life.  I can take this one on, too.

11:48:00  15        MS. SMITH:  No hesitation and if the evidence

11:48:00  16  supports it, finding a patent invalid?

11:48:07  17        JUROR ALEXANDER:  Yeah, I can do that.

11:48:10  18        MS. SMITH:  Thank you, ma'am.

11:48:12  19        Anyone else in the room -- that was giving some

11:48:14  20  feedback.  Anybody else in the room that was a little bit

11:48:14  21  surprised that it was going to be one of your

11:48:17  22  responsibilities to potentially invalidate a patent --

11:48:22  23  invalidate a patent if the evidence supports it?

11:48:27  24        Juror No. 18, Ms. Scott, did you understand before

11:48:32  25  coming here today and watching the patent video that that

11:48:35  1   would be your role in -- as a juror in a patent case?

11:48:39  2          JUROR SCOTT:  I -- I was kind of figuring it out a

11:48:43  3   little bit.

11:48:43  4          MS. SMITH:  Okay.  And -- and how do you feel

11:48:45  5   about stepping into that role?

11:48:47  6          JUROR SCOTT:  Kind of uncomfortable, to be honest.

11:48:50  7          MS. SMITH:  Okay.  Would you be more comfortable

11:48:54  8   knowing that both sides are -- are going to bring experts

11:48:58  9   and lots of documents and other witnesses to help you do

11:49:02  10  that job?

11:49:04  11         JUROR SCOTT:  A little.

11:49:06  12         MS. SMITH:  Okay.  Thank you, ma'am.

11:49:08  13         Is there anyone else out there that -- that feels

11:49:14  14  like Ms. Scott?  You know, you understand that that would

11:49:17  15  be your role if you serve on this jury, but you're just a

11:49:22  16  little bit uncomfortable?  Some of you said, you know,

11:49:27  17  we're not very tech savvy, you don't know much about how

11:49:31  18  your phone works.  Is there anyone that's just slightly

11:49:34  19  hesitant about sitting on a jury where you may be asked to

11:49:37  20  invalidate a patent?

11:49:40  21         Juror No. 34?

11:49:49  22         JUROR TRUDEAU:  I don't personally know a whole

11:49:52  23  lot about patents and the process.  Basically, what we

11:49:56  24  learned here today is all I know.  And while I personally

11:50:02  25  feel that doing that would require a bit more know-how to

11:50:06   1   be more comfortable in doing that, I'm -- if I'm chosen,

11:50:09   2   I'm still going to do my best to fill the role as well as I

11:50:14   3   can.

11:50:14   4         MS. SMITH:  And we appreciate that.  Thank --

11:50:16   5   thank you, sir.

11:50:17   6         Ms. Harley?

11:50:26   7         JUROR HARLEY:  Yes, ma'am.

11:50:27   8         MS. SMITH:  Now, Plaintiffs' counsel talked to you

11:50:29   9   about the tree cutting that happened on your land.

11:50:31  10         JUROR HARLEY:  Yes.

11:50:32  11         MS. SMITH:  You knew I'd probably come back to you

11:50:36  12   on this one, right?  I actually like that -- I like to talk

11:50:39  13   about this, because this isn't unlike a patent case.

11:50:42  14   Patents have really precise boundaries, just like your

11:50:46  15   property had precise boundaries.  Did you have a -- did you

11:50:50  16   have a fence up on your property?

11:50:51  17         JUROR HARLEY:  It was partially, yes.

11:50:53  18         MS. SMITH:  Okay.  And the part that wasn't

11:50:54  19   fenced, you knew with certainty what was yours and what

11:50:58  20   wasn't?  You knew where your boundaries were, didn't you?

11:51:01  21         JUROR HARLEY:  Oh, absolutely.

11:51:01  22         MS. SMITH:  Okay.  And it wouldn't be right to --

11:51:03  23   after these trees were cut, it wouldn't have been right to

11:51:06  24   try to claim more than what was yours.  You only -- you

11:51:09  25   only claimed what was fenced in, your own boundary?

11:51:13  1            JUROR HARLEY:  Exactly.

11:51:14  2            MS. SMITH:  Okay.  Thank you, ma'am.

11:51:17  3            And what I think we'll see -- we'll talk about

11:51:19  4  more of this concept in this case, but I think you'll see

11:51:20  5  that it's no different in patent cases, that a patent owner

11:51:22  6  can't claim more than they actually own.  And they can't

11:51:29  7  try to stretch their patent to take in things that they

11:51:33  8  don't own.

11:51:34  9            THE COURT:  Let's ask questions.

11:51:36 10            MS. SMITH:  Yes, Your Honor.

11:51:36 11            Let's talk about Apple.  And Plaintiffs' counsel

11:51:43 12  started to -- to get some feedback on Apple earlier.  I --

11:51:48 13  I'll tell you, I was an Apple customer long before this

11:51:50 14  case started.  I've had a really great experience.  The --

11:51:55 15  the times that my experience isn't great is mostly user

11:51:59 16  error.  But I've read your questionnaires, and I know

11:52:01 17  everybody's experience isn't -- isn't exactly like mine.

11:52:05 18            So we'll -- we'll take this in steps.  For those

11:52:09 19  of you that currently own an Apple product, raise your

11:52:13 20  hands.

11:52:13 21            Now, keep your hands up if you currently own a

11:52:16 22  product and have any complaints about the product.

11:52:21 23            All right.  Ms. Blum, tell me a little bit about

11:52:24 24  that.  I'm representing Apple.  And -- and this is an

11:52:27 25  important case, and so any -- any criticism or complaint

11:52:32   1   you have about your product, I'd love to hear it.

11:52:39   2        JUROR BLUM:  I know how it works, but before I had

11:52:41   3   a newer iPhone -- when I had an old iPhone, they had came

11:52:41   4   out with like three different versions after that, and my

11:52:44   5   old iPhone started working because it won't allow you to

11:52:47   6   update to the new -- like the new iOS.  And so then I,

11:52:51   7   like, had to go buy a new phone, so -- and iPhones are

11:52:54   8   expensive, but I also like iPhones, so I wanted to get an

11:52:57   9   iPhone.  So I had to wait until I could afford it.

11:53:01  10        But it just didn't work so I couldn't make calls,

11:53:03  11   I couldn't text after you couldn't update to the new iOS.

11:53:06  12   And so I really just had a phone that didn't do anything

11:53:10  13   but I was still paying a bill.

11:53:12  14        And then I always don't have service, and that's

11:53:14  15   not with Apple, but Apple -- like my grandparents have an

11:53:19  16   Android and I have an Apple, and they get service more

11:53:24  17   places than Apple does.  And I don't know why but they can

11:53:27  18   always call when I can't, so...

11:53:28  19        MS. SMITH:  Well, I feel your pain on the service,

11:53:30  20   because that might not be an Apple issue.  I can't drive

11:53:34  21   from -- from my -- my office to my house in Jefferson and

11:53:37  22   not drop a signal three or four times.

11:53:40  23        But putting a pin in that, knowing that you've had

11:53:44  24   these issues with Apple -- and they sound like real issues

11:53:47  25   that have impacted you financially, as well -- I want to

11:53:50  1  make sure I'm not starting out a little bit behind in this

11:53:53  2  case.  I'm going to stand up and say I represent Apple and

11:53:55  3  this is Apple's position, and every time I do that, I don't

11:53:58  4  want you thinking, gosh, you know, I'm frustrated with

11:54:04  5  them.

11:54:05  6          JUROR BLUM:  No.

11:54:06  7          MS. SMITH:  So I can start out kind of on an even

11:54:09  8  playing field?

11:54:10  9          JUROR BLUM:  Yes.

11:54:11 10          MS. SMITH:  Thank you, Ms. Blum.

11:54:13 11          I had a bunch of hands.  Let's see, who else has

11:54:15 12  an Apple product and may have a complaint about that

11:54:18 13  product?

11:54:18 14          Juror No. 17, Mr. Gonzalez, tell me what's going

11:54:22 15  on with your Apple products.

11:54:24 16          JUROR GONZALEZ:  All right.  Well -- all right.  I

11:54:28 17  don't have an iPhone anymore, and when I did, it wasn't

11:54:32 18  actually hooked up to service.  I was a minor at the time.

11:54:34 19  And that was kind of -- would have been on my parents'

11:54:38 20  bills.  So they really weren't keen on that.

11:54:42 21          What I do have are some Apple iPads, and while I

11:54:45 22  generally like them, there's one thing that I don't

11:54:50 23  particularly like.  I'm very big on reverse compatibility,

11:54:57 24  and there's a -- there's many apps that I found that do not

11:55:02 25  work after updates because they have been updated to the

11:55:06  1   newer system.

11:55:07  2        Meanwhile, like she was talking about how some of

11:55:11  3   them they only get to update so far, which means that

11:55:15  4   they're not forward compatible either.

11:55:18  5        I have actually got three iPads with different

11:55:22  6   generations that I'm kind of holding on to for (a) a little

11:55:25  7   bit more memory, and (b) a little bit of holding on to some

11:55:28  8   of the stuff that I actually used from the past.  But

11:55:31  9   there's also some of that I can't get back because I

11:55:33  10  already updated past that.  I do not like that.  I

11:55:36  11  understand the security measures, I want my stuff back.

11:55:40  12       MS. SMITH:  Well, first of all, I'm glad to hear

11:55:42  13  that you continue buying Apple products.  Thank you for

11:55:46  14  that.

11:55:46  15       Is there anything about those, the reverse

11:55:49  16  compatibility issue or anything you mentioned that might

11:55:53  17  cause Apple to start out a little bit behind in this case

11:55:56  18  because of your frustrations with your Apple's products?

11:55:59  19       JUROR GONZALEZ:  I don't see how the frustrations

11:56:00  20  can connect to patent cases.

11:56:02  21       MS. SMITH:  Thank you, sir.  I appreciate that.

11:56:04  22       All right.  Anybody else on -- on this -- on my

11:56:09  23  right side on this half of the room that has a current

11:56:13  24  Apple product and has a complaint regarding that product?

11:56:16  25       What about the other side of the room?

| | | |
|---|---|---|
| 11:56:18 | 1 | All right.  Second category of people.  Let me |
| 11:56:25 | 2 | see, Ms. Powell, Juror No. 21 -- Mr. Powell, I apologize. |
| 11:56:31 | 3 | Do you currently have an Apple product, or have you had a |
| 11:56:33 | 4 | product in the past? |
| 11:56:35 | 5 | JUROR POWELL:  I haven't owned an Apple product in |
| 11:56:40 | 6 | a decade. |
| 11:56:41 | 7 | MS. SMITH:  Well, you're in the next category of |
| 11:56:44 | 8 | people I'd like to visit with, then.  I read your |
| 11:56:47 | 9 | questionnaire, and it said you're not a fan. |
| 11:56:51 | 10 | JUROR POWELL:  No. |
| 11:56:52 | 11 | MS. SMITH:  Tell me about that. |
| 11:56:54 | 12 | JUROR POWELL:  Between when I did have Apple |
| 11:56:56 | 13 | products, I had to jail break it to use it how I wanted to |
| 11:57:01 | 14 | and which take me probably -- but then, you know, those |
| 11:57:07 | 15 | stuff with Foxconn -- was it Foxconn -- and factories in |
| 11:57:11 | 16 | China and the environment, so morally on that standpoint. |
| 11:57:15 | 17 | And then like the recent rights to repair stuff with Apple |
| 11:57:19 | 18 | and independent technicians that can repair things having |
| 11:57:23 | 19 | to fight Apple to get the prints to fix things. |
| 11:57:28 | 20 | MS. SMITH:  So -- so I am -- I am sorry to hear |
| 11:57:31 | 21 | that.  But what I will -- this is -- this is a -- this |
| 11:57:35 | 22 | sounds like you've had some issues with Apple for quite a |
| 11:57:38 | 23 | few years; is that correct? |
| 11:57:40 | 24 | JUROR POWELL:  That'd be fair to say, yes. |
| 11:57:42 | 25 | MS. SMITH:  Okay.  And you've consistently had |

11:57:45  1  kind of some bad experiences with Apple?

11:57:47  2          JUROR POWELL:  Yes.

11:57:48  3          MS. SMITH:  And so in this case, Apple is the

11:57:50  4  Defendant.  And so in your mind if you were sitting on this

11:57:53  5  case, you might be a juror -- better juror in another type

11:57:57  6  of case; would you agree with that?

11:57:59  7          JUROR POWELL:  Yes.

11:58:00  8          MS. SMITH:  Because you probably, while you're

11:58:02  9  generally no doubt fair in life, you can't be fair to

11:58:06  10  Apple, can you?

11:58:07  11          JUROR POWELL:  That would be -- yeah, that'd be

11:58:10  12  correct, yes.

11:58:10  13          MS. SMITH:  Thank you, sir, I appreciate that.

11:58:12  14          Does anyone else, like Mr. Powell, you don't

11:58:20  15  currently own an Apple product, but you have owned an Apple

11:58:24  16  product in the past?

11:58:28  17          All right.  Mr. Young and Ms. Alexander, do you

11:58:31  18  need to share any -- any issues or complaints with the past

11:58:35  19  ownership with me that you think might affect this lawsuit?

11:58:38  20          Mr. Young, I see you nodding your head no?

11:58:43  21          JUROR YOUNG:  No.

11:58:43  22          MS. SMITH:  And Ms. Alexander?

11:58:46  23          JUROR BLUM:  No.

11:58:46  24          MS. SMITH:  No.  Thank you.

11:58:47  25          Now, Plaintiffs' counsel put up a number,

11:58:51   1   $506 million, and I want to talk to you about that real

11:58:54   2   quick.

11:58:54   3          My son plays chess, and he's really good, but he's

11:59:02   4   not really good at sports.  And so last year he was

11:59:05   5   determined to play football.  We played eight-year-old flag

11:59:09   6   football, and there were -- there were about seven teams,

11:59:12   7   and -- and they came in 7th place.  And we went to Chuck E.

11:59:17   8   Cheese's, and he got a trophy about half my height because

11:59:22   9   everybody got a trophy.

11:59:23   10          And that's fine with eight-year-olds.  But that's

11:59:26   11   not how litigation works.  And so my next question here is

11:59:35   12   this:  Does anyone agree with the statement a party who

11:59:39   13   files a lawsuit is usually entitled to at least some of the

11:59:43   14   money they ask for?

11:59:46   15          Ms. Blum, you're shaking your head no.

11:59:50   16          Ms. Alexander, do you agree with Ms. Blum?

11:59:54   17          JUROR ALEXANDER:  I do.

11:59:55   18          MS. SMITH:  Okay.  Ms. Achterhof?

12:00:02   19          JUROR ACHTERHOF:  Achterhof.

12:00:02   20          MS. SMITH:  Achterhof.  I apologize.  May I hear

12:00:05   21   from you on this?

12:00:05   22          THE COURT:  Let's wait until we get the

12:00:07   23   microphone.

12:00:09   24          JUROR ACHTERHOF:  I think it would all depend on

12:00:15   25   what it was.  Prob -- some people will sue over just

12:00:19  1   nothing, but there's usually something, I would think -- if

12:00:22  2   they're taking on a company as big as Apple, I would say

12:00:25  3   they probably have something.

12:00:26  4           MS. SMITH:  And so you haven't heard any of the

12:00:28  5   evidence in the case yet --

12:00:30  6           JUROR ACHTERHOF:  Huh-uh.

12:00:31  7           MS. SMITH:  -- but you're already starting to kind

12:00:33  8   of lean towards Plaintiffs because you're thinking, well,

12:00:36  9   if they made it this far, you know, they deserve -- maybe

12:00:40  10  not all 506 million, but some money?

12:00:43  11          JUROR ACHTERHOF:  It's possible, I mean, it would

12:00:47  12  depend on the evidence, but I would say that they probably

12:00:49  13  wouldn't be ignorant enough to take on someone like Apple

12:00:54  14  without something to back it up.

12:00:56  15          MS. SMITH:  Thank you, ma'am.  I appreciate that.

12:00:58  16          Ms. Brian, I have not heard a lot from you.  Tell

12:01:02  17  me a little bit about your thoughts on this issue.  Do you

12:01:07  18  think that because -- you know, because someone files a

12:01:09  19  lawsuit, that they might not be entitled to $500 million,

12:01:14  20  but they should get something just for filing a lawsuit?

12:01:17  21          JUROR BRIAN:  Well, with my background, obviously,

12:01:20  22  evidence comes into play a lot.  I -- I am not a fan of

12:01:27  23  technology.

12:01:27  24          MS. SMITH:  Okay.

12:01:29  25          JUROR BRIAN:  It's just -- I don't like video

| | | |
|---|---|---|
| 12:01:31 | 1 | games, I don't -- I don't like any of that stuff.  I've |
| 12:01:34 | 2 | been married to two phones, two Apple phones for about 12 |
| 12:01:39 | 3 | years, and so I get very frustrated a lot. |
| 12:01:42 | 4 | MS. SMITH:  Okay.  Any about that -- anything |
| 12:01:45 | 5 | about that frustration, because I'm standing up in front of |
| 12:01:48 | 6 | you in a suit involving $506 million for -- for the |
| 12:01:52 | 7 | Plaintiffs' side, and you don't necessarily like |
| 12:01:56 | 8 | technology.  Does that cause me to kind of start from |
| 12:01:59 | 9 | behind because I work for a technology company? |
| 12:02:02 | 10 | JUROR BRIAN:  I don't think necessarily behind, |
| 12:02:04 | 11 | but I -- yeah, I mean, I just don't like technology across |
| 12:02:10 | 12 | the board.  I'm just old school, and, I mean, in my office, |
| 12:02:14 | 13 | we do paper, we don't do everything electronically, so... |
| 12:02:18 | 14 | MS. SMITH:  And -- and you talked about your |
| 12:02:20 | 15 | office.  You have an insurance agency; is that correct? |
| 12:02:23 | 16 | JUROR BRIAN:  Yes. |
| 12:02:24 | 17 | MS. SMITH:  And when you worked for Judge Parish, |
| 12:02:29 | 18 | again, tell me the relation?  Did you report directly to |
| 12:02:31 | 19 | her? |
| 12:02:33 | 20 | JUROR BRIAN:  No, I worked for the probation |
| 12:02:35 | 21 | department.  So she was my ultimate boss, but like I had a |
| 12:02:38 | 22 | boss in between her. |
| 12:02:39 | 23 | MS. SMITH:  Okay.  Okay.  And how long did you |
| 12:02:41 | 24 | all -- did you -- how long was she your ultimate boss? |
| 12:02:44 | 25 | JUROR BRIAN:  About seven-and-a-half years. |

12:02:46   1          MS. SMITH:  All right.  Thank you, ma'am,

12:02:51   2   appreciate it.

12:02:51   3          Now, let's see, Mr. Huddleston, we haven't heard

12:03:02   4   much from you today.  Mr. Huddleston, how do you feel about

12:03:06   5   that statement that a party that files a lawsuit should be

12:03:11   6   entitled to at least some money?

12:03:13   7          JUROR HUDDLESTON:  I really don't know.  I will

12:03:16   8   say that -- that I guess they -- they did have enough

12:03:21   9   complaint to file a lawsuit against y'all, but back to one

12:03:24  10   of those other questions on the preponderance of the

12:03:29  11   evidence --

12:03:29  12          MS. SMITH:  Yes, sir.

12:03:30  13          JUROR HUDDLESTON:  -- in my opinion, then they

12:03:32  14   have to bring it to prove -- to get that amount of money.

12:03:35  15          MS. SMITH:  So you'd wait to hear all the evidence

12:03:38  16   before making up your mind?

12:03:40  17          JUROR HUDDLESTON:  Yeah.

12:03:41  18          MS. SMITH:  And you'd make the Plaintiff meet

12:03:43  19   their burden of proof on infringement?

12:03:45  20          JUROR HUDDLESTON:  Uh-huh.

12:03:46  21          MS. SMITH:  Thank you, sir.

12:03:47  22          I think I saw a couple folks on the panel that

12:03:54  23   worked for Lebus.  Okay.  On the back row, Juror No. 29.

12:04:02  24          And did I have somebody else that worked for Lebus

12:04:05  25   in here, over in the corner?

| | | |
|---|---|---|
| 12:04:06 | 1 | Did you two know each other before you came in |
| 12:04:09 | 2 | today. |
| 12:04:10 | 3 | JUROR RAMSEY:  Yes, we work together every day. |
| 12:04:11 | 4 | MS. SMITH:  Okay.  What did -- |
| 12:04:13 | 5 | JUROR RAMSEY:  She works maintenance, I work on |
| 12:04:16 | 6 | the press. |
| 12:04:16 | 7 | MS. SMITH:  Okay.  All right.  How long have you |
| 12:04:18 | 8 | guys been working together? |
| 12:04:20 | 9 | JUROR RAMSEY:  We don't work together.  She works |
| 12:04:22 | 10 | in a different department. |
| 12:04:23 | 11 | MS. SMITH:  Okay.  All right. |
| 12:04:23 | 12 | THE COURT:  You have five minutes remaining. |
| 12:04:25 | 13 | MS. SMITH:  Thank you, Your Honor. |
| 12:04:26 | 14 | Is there anything about that -- that -- that |
| 12:04:28 | 15 | relationship because you know each other from work that if |
| 12:04:31 | 16 | you're two of the eight jurors, you guys would kind of vote |
| 12:04:35 | 17 | together, I would say, just like you work together? |
| 12:04:37 | 18 | JUROR RAMSEY:  No. |
| 12:04:38 | 19 | MS. SMITH:  No? |
| 12:04:39 | 20 | JUROR RAMSEY:  No, ma'am. |
| 12:04:41 | 21 | MS. SMITH:  Okay.  Thank you. |
| 12:04:41 | 22 | Same question for you, ma'am? |
| 12:04:44 | 23 | JUROR VICK:  He has his opinion, I have mine. |
| 12:04:46 | 24 | MS. SMITH:  I'd like to know yours, ma'am. |
| 12:04:49 | 25 | JUROR VICK:  Well, I haven't heard all the -- you |

12:04:52  1  know, to give my opinion, so...

12:04:54  2       MS. SMITH:  Okay.  Okay.  So you can make --

12:04:57  3  you'll have an independent opinion?

12:04:58  4       JUROR VICK:  Yes.

12:04:59  5       MS. SMITH:  I understand now.  Okay.  Thank you.

12:05:01  6       Now, Mr. Baxter introduced himself and we heard a

12:05:07  7  lot about his wife who -- who he -- he has in Gilmer.  He's

12:05:12  8  joined at counsel table by lead counsel for the Plaintiffs,

12:05:16  9  Mr. Jason Sheasby.  I think you're going to hear a lot from

12:05:19  10 Mr. Sheasby in this case, and he's from Los Angeles,

12:05:23  11 California.  He's been to this courthouse before.

12:05:25  12      Is anyone familiar with Mr. Sheasby?

12:05:29  13      Okay.  Mr. Baxter practices at McKool Smith here

12:05:33  14 in town.  His law partner, Ms. Jennifer Truelove, he

12:05:38  15 introduced.  Her husband is also a lawyer here in town.

12:05:43  16 His name is Kurt Truelove.  Does anybody know the

12:05:47  17 Trueloves?

12:05:48  18      All right.  Ms. Hood, you know, I think you're in

12:05:50  19 a lucky spot today.  You might not be reached back there.

12:05:53  20 Thank you, though.

12:05:56  21      Mr. Baxter has a legal assistant, her name is

12:06:08  22 Ms. JoAnne Garrett Bayliss.  Does anybody know Ms. Bayliss?

12:06:10  23      Ms. Baxter -- Mr. Baxter's brother-in-law and

12:06:14  24 Judge Parish's brother is Todd Parish.  Does anybody know a

12:06:20  25 Todd Parish from Gilmer?  I knew that was coming.  Tell me

12:06:24  1  how you know Todd Parish?

12:06:27  2      JUROR CANNON:  Todd Parish graduated -- Todd

12:06:30  3  graduated with one of my sisters, watched him -- watched

12:06:38  4  his son play ball, sit beside in the same area in Buckeye

12:06:42  5  Stadium.  Long time.  Long time.

12:06:45  6      MS. SMITH:  Anything about that relationship that

12:06:48  7  would cause you to kind of lean towards Plaintiffs before

12:06:51  8  you hear the evidence in this case?

12:06:53  9      JUROR CANNON:  I'm glad you revisited me --

12:06:56  10      MS. SMITH:  Okay.

12:06:57  11      JUROR CANNON:  -- because I'm -- I'm -- just

12:07:01  12  truthfully might say that I would think that they would

12:07:04  13  only have taken the case had they thought that they were

12:07:07  14  really going to win and that there was something there.

12:07:10  15      MS. SMITH:  And because you have those feelings

12:07:12  16  long before you've heard the evidence in this case, you'd

12:07:15  17  agree you might be a better fit for a different jury?

12:07:17  18      JUROR CANNON:  I believe I would.

12:07:19  19      MS. SMITH:  And you probably couldn't be fair to

12:07:21  20  Apple on this case?

12:07:25  21      JUROR CANNON:  Restate your question.

12:07:26  22      MS. SMITH:  You might not -- this -- you might not

12:07:30  23  be able to be fair and put Apple starting in the same place

12:07:35  24  as the Plaintiffs in this case?

12:07:36  25      JUROR CANNON:  I would question myself on that.

12:07:38  1        MS. SMITH:  Thank you, ma'am.  I appreciate that.

12:07:40  2        JUROR CANNON:  I'm sorry.

12:07:41  3        MS. SMITH:  I appreciate your honesty.  I -- I

12:07:44  4   appreciate that.

12:07:47  5        All right.  Mr. Snyder, I had a follow-up question

12:07:50  6   for you.  You said your dad owned -- has 21 patents; is

12:07:57  7   that correct?

12:07:57  8        JUROR SNYDER:  (Nods head affirmatively.)

12:08:00  9        MS. SMITH:  All right.  In this case it's a little

12:08:03 10   bit different situation because this company bought its

12:08:05 11   patents.  But because of the history with your father's

12:08:10 12   patents, would you start out leaning a little bit toward

12:08:13 13   the Plaintiffs in this case before you hear any of the

12:08:15 14   evidence?

12:08:16 15        JUROR SNYDER:  I don't think so.  Now, my dad

12:08:18 16   worked in the oil industry and created safety valves and

12:08:21 17   things like that for deep sea oil rigs and things like

12:08:24 18   that, but he worked for a company and then created those

12:08:27 19   patents through the company.  The company actually, you

12:08:30 20   know, owns those patents.

12:08:30 21        THE COURT:  One minute remaining.

12:08:32 22        JUROR SNYDER:  So he has the dollar bill, you

12:08:35 23   know, with the patent itself, but that's it.

12:08:36 24        MS. SMITH:  Okay.  Thank you, sir.

12:08:37 25        Now, Mr. Baxter asked a similar question, and most

12:08:42   1   lawyers end with this question.  We don't always know the

12:08:45   2   right questions to ask, and sometimes we can't begin to

12:08:48   3   guess what you would like to tell us.  So I have had an

12:08:52   4   opportunity to ask you all many, many questions.

12:08:55   5        Is there anybody sitting out there thinking, you

12:08:57   6   know, if she would just ask me this one last question, I

12:09:01   7   would tell her I might not be the best fit in this case,

12:09:06   8   whether it's you don't want to sit on a patent case or you

12:09:09   9   have an issue with the Plaintiffs' companies or Apple, is

12:09:12  10   there anyone that needs to tell me something?

12:09:14  11        Yes, sir?

12:09:17  12        JUROR HUDDLESTON:  I'll be honest with y'all, I --

12:09:20  13   I would be fair if I'm chosen, but this just doesn't

12:09:23  14   interest me at all.  I'm kind of like her, just old school

12:09:29  15   even as young as I am.  Although I have iPhones, the kids

12:09:33  16   have iPads, I still just -- I'm just -- I'm old at heart, I

12:09:37  17   guess.

12:09:37  18        MS. SMITH:  I -- I appreciate your honesty.

12:09:40  19        JUROR HUDDLESTON:  But just to be fair, I -- it

12:09:41  20   doesn't interest me at all.

12:09:42  21        MS. SMITH:  All right, sir.  I appreciate your

12:09:44  22   honesty.

12:09:45  23        And I have two more hands -- three more hands.

12:09:48  24        No. 27?

12:09:50  25        JUROR BEASLEY:  Well, I've never personally owned

12:09:53  1  an Apple product, but my wife has one, my brother has one,

12:09:58  2  and they've always had issues with them.  And I always

12:10:01  3  thought they were overpriced.  And that has always

12:10:03  4  irritated me, and it may skew my judgment.  I mean, I

12:10:08  5  wouldn't want it to.  I wouldn't like to think it would,

12:10:11  6  but it may.

12:10:11  7       MS. SMITH:  Well, you know, do you -- are you

12:10:13  8  telling me you might be a better fit for a case where Apple

12:10:17  9  isn't the Defendant?

12:10:18  10      JUROR BEASLEY:  Yes, possibly.

12:10:19  11      MS. SMITH:  I appreciate that, sir.  Thank you.

12:10:21  12      And I had two final hands up, Your Honor.

12:10:24  13      THE COURT:  Well, our time expired -- your time

12:10:28  14  expired about a minute and a half ago.  But we'll go ahead

12:10:32  15  and get these two answers.

12:10:32  16      MS. SMITH:  Thank you, Your Honor.

12:10:33  17      THE COURT:  And then we're done.

12:10:34  18      MS. SMITH:  Of course, Your Honor.

12:10:36  19      JUROR TRUDEAU:  So I have never personally owned

12:10:38  20  any kind of Apple product in my life, but I have known

12:10:41  21  several people who have.  One of my best friends back in

12:10:45  22  high school got a computer to do schoolwork on, play games

12:10:50  23  and stuff on, and had several issues with it, had to do a

12:10:53  24  lot of work on it just to get it to work the way he wanted

12:10:59  25  it to.

12:11:00  1      And when one of his -- one of our other friends

12:11:04  2  was trying to get to the -- to get something similar, he

12:11:08  3  recommended going to someone else, spent roughly two-thirds

12:11:13  4  of what he had spent, and had something out of the box with

12:11:16  5  roughly the same spec -- specifications that just worked

12:11:20  6  better than even what he had gotten from working on it.

12:11:24  7      MS. SMITH:  Is there anything about that

12:11:26  8  experience -- in your friend's experience that would cause

12:11:28  9  you to -- to maybe think that Apple is starting a little

12:11:32  10  bit behind in this case?

12:11:34  11      JUROR TRUDEAU:  Yes, that, among a lot of the

12:11:36  12  other things I've seen throughout my life.

12:11:39  13      MS. SMITH:  Thank you, sir.

12:11:40  14      I'm not sure if we're going to reach that last

12:11:44  15  juror, Your Honor.

12:11:45  16      THE COURT:  No, I don't think so.

12:11:46  17      MS. SMITH:  Okay.

12:11:46  18      THE COURT:  Thank you, Ms. Smith.

12:11:48  19      MS. SMITH:  I don't think we'll reach you, ma'am.

12:11:50  20      Thank you, Your Honor.

12:11:51  21      Thank you all.

12:11:53  22      THE COURT:  All right.  Ladies and gentlemen,

12:11:54  23  there are certain matters I need to discuss with counsel

12:11:58  24  outside of your presence at this time.  And since I can't

12:12:02  25  ask you to leave the courtroom and maintain appropriate

| | | |
|---|---|---|
| 12:12:05 | 1 | spacing, I'm going to leave the courtroom.  I'm going to |
| 12:12:08 | 2 | retire to the jury room with the court reporter, and I |
| 12:12:13 | 3 | will -- I will have Mr. Baxter and Ms. Smith join me in |
| 12:12:16 | 4 | there.  I will go over those matters that I need to take up |
| 12:12:21 | 5 | outside of your presence, then I'll be back on the bench, |
| 12:12:23 | 6 | and we'll go to the next step. |
| 12:12:24 | 7 |        This is not going to take a lengthy period of |
| 12:12:27 | 8 | time.  I don't expect it to be more than a few minutes.  So |
| 12:12:31 | 9 | I'm going to ask you while I'm out of the courtroom just to |
| 12:12:34 | 10 | maintain your seating where you are, and please just bear |
| 12:12:39 | 11 | with me for a few minutes, and I'll be back as soon as |
| 12:12:42 | 12 | possible so that we can continue with the next portion of |
| 12:12:45 | 13 | the process. |
| 12:12:45 | 14 |        Mr. Baxter, Ms. Smith, if you'll join me with the |
| 12:12:54 | 15 | court reporter in the jury room. |
| 12:12:55 | 16 |        COURT SECURITY OFFICER:  All rise. |
| 12:12:57 | 17 |        (Bench conference outside the courtroom.) |
| 12:15:43 | 18 |        THE COURT:  Mr. Baxter, do you have any challenges |
| 12:15:47 | 19 | for cause?  Or should I say the Plaintiff, does the |
| 12:15:53 | 20 | Plaintiff have any challenges for cause? |
| 12:15:58 | 21 |        MR. BAXTER:  No, Your Honor. |
| 12:15:58 | 22 |        THE COURT:  How about you, Ms. Smith? |
| 12:16:00 | 23 |        MS. SMITH:  Four, 14, and 21, if we get there, |
| 12:16:09 | 24 | which I don't know if we will. |
| 12:16:12 | 25 |        THE COURT:  Four, 14, and 21.  Okay. |

| | | |
|---|---|---|
| 12:16:19 | 1 | MS. SMITH:  Do we have excuses?  How are we |
| 12:16:24 | 2 | handling this? |
| 12:16:25 | 3 | THE COURT:  Excuses? |
| 12:16:26 | 4 | MS. SMITH:  Of the people who raised their hands |
| 12:16:29 | 5 | who said they couldn't come for some -- |
| 12:16:32 | 6 | THE COURT:  If we had scheduling issues.  I marked |
| 12:16:35 | 7 | No. 16 as having a scheduling problem. |
| 12:16:37 | 8 | MS. SMITH:  Right. |
| 12:16:37 | 9 | THE COURT:  And I marked No. 27 as having a |
| 12:16:42 | 10 | scheduling problem, although I don't think we're going to |
| 12:16:45 | 11 | get to 27. |
| 12:16:46 | 12 | MS. SMITH:  Thank you, Your Honor. |
| 12:16:47 | 13 | THE COURT:  And 37, Ms. Hood, had a scheduling |
| 12:16:49 | 14 | problem, just those three. |
| 12:16:51 | 15 | MR. BAXTER:  16? |
| 12:16:53 | 16 | MS. SMITH:  Yes. |
| 12:16:53 | 17 | THE COURT:  16, who has absolutely no interest in |
| 12:16:53 | 18 | what we're doing. |
| 12:16:55 | 19 | MS. SMITH:  I'll agree on him. |
| 12:16:55 | 20 | MR. BAXTER:  I'm for letting him go, Judge -- |
| 12:16:55 | 21 | MS. SMITH:  Yeah. |
| 12:17:00 | 22 | MR. BAXTER:  -- no matter what his excuse is. |
| 12:17:02 | 23 | THE COURT:  Okay.  So Defendant is going to |
| 12:17:04 | 24 | challenge for cause 14 -- |
| 12:17:09 | 25 | MR. BAXTER:  What's the basis on 14? |

```
12:17:11   1            THE COURT:  -- 21 and --
12:17:13   2            MS. SMITH:  Said the Plaintiff should --
12:17:14   3            THE COURT:  -- you said four.
12:17:16   4            MR. BAXTER:  -- get some money even if they don't
12:17:21   5   prove their case.
12:17:22   6            THE COURT:  Okay.  I just want to make sure I've
12:17:22   7   got the right people to bring in here one at a time.  I'm
12:17:22   8   going to bring in No. 4 for Defendant's challenge for
12:17:26   9   cause; No. 14 for challenge for cause; No. 16 for a
12:17:34  10   scheduling problem.
12:17:41  11            Now, the next --
12:17:42  12            MR. BAXTER:  Maybe, Your Honor, we ought to talk
12:17:44  13   to 15, as well, the one that worked for Judge Parish.  I
12:17:49  14   just want to make sure we're all clean on that.
12:17:55  15            THE COURT:  You're talking about the probation --
12:17:58  16   former probation officer?
12:18:01  17            MR. BAXTER:  Yes, No. 15.
12:18:02  18            THE COURT:  You want to challenge her for cause?
12:18:05  19            MR. BAXTER:  Yes, sir.
12:18:05  20            THE COURT:  Okay.  If -- I've got three challenges
12:18:23  21   for cause and one scheduling problem up through No. 20.  If
12:18:27  22   I were to grant all of those, that gives you eight strikes
12:18:32  23   combined and eight jurors.
12:18:34  24            I mean, I can bring No. 21 back who Defendants
12:18:41  25   challenge for cause, but I don't see how we reach 21 even
```

| | | |
|---|---|---|
| 12:18:45 | 1 | if I grant everything you all have raised. |
| 12:18:48 | 2 | MS. SMITH:  That's correct, Your Honor. |
| 12:18:49 | 3 | THE COURT:  Clearly, he ought to be excused.  He |
| 12:18:52 | 4 | was very adamant about his position. |
| 12:18:55 | 5 | MS. SMITH:  Yes.  It's unfortunate.  He was a |
| 12:18:59 | 6 | talker. |
| 12:19:01 | 7 | THE COURT:  Do either of you all see a problem |
| 12:19:04 | 8 | with me bringing back 4, 14, 15, and 16 and stopping it |
| 12:19:09 | 9 | there? |
| 12:19:12 | 10 | MS. SMITH:  No, Your Honor. |
| 12:19:13 | 11 | THE COURT:  I don't. |
| 12:19:14 | 12 | Okay.  We need to go back in the courtroom.  I'm |
| 12:19:17 | 13 | going to tell the panel what I expect of them and tell them |
| 12:19:21 | 14 | that this is going to take a little longer.  I'm going to |
| 12:19:24 | 15 | give them some instructions and the Court Security Officer |
| 12:19:27 | 16 | some instructions.  Then we're going to come back in here, |
| 12:19:30 | 17 | and I want both of you all back in here with me.  And you |
| 12:19:34 | 18 | don't need to wait for somebody to come get you, just |
| 12:19:39 | 19 | follow me back in here. |
| 12:19:40 | 20 | And then I'm going to have the Court Security |
| 12:19:41 | 21 | Officer bring these venire members in one at a time, and |
| 12:19:45 | 22 | we'll address either the challenge for cause or their |
| 12:19:47 | 23 | scheduling issue.  All right? |
| 12:19:48 | 24 | MR. BAXTER:  Yes, Your Honor. |
| 12:19:48 | 25 | MS. SMITH:  Yes, Your Honor. |

12:19:49  1          THE COURT:  And I assume you two are comfortable

12:19:52  2  without the rest of your trial team coming back in here?

12:19:54  3          MR. BAXTER:  Yes, sir.

12:19:55  4          MS. SMITH:  Yes, sir.

12:19:57  5          THE COURT:  Okay.  We'll do it that way then.

12:19:57  6          MR. BAXTER:  They're just in the way.

12:19:57  7          THE COURT:  Sorry?

12:19:57  8          MR. BAXTER:  They're just in the way.

12:19:59  9          Put that in there.

12:20:01  10          THE COURT:  All right.  I'll see you -- well,

12:20:03  11  let's all go back in the courtroom together.

12:20:06  12          (Bench conference concluded.)

12:21:02  13          COURT SECURITY OFFICER:  All rise.

12:21:03  14          THE COURT:  Be seated, please.

12:21:06  15          All right.  Ladies and gentlemen, I told you that

12:21:12  16  wouldn't take too long.  Thank you for bearing with me.

12:21:14  17          I am going to need to talk with a few of you one

12:21:18  18  at a time outside the presence of the rest of the panel.

12:21:21  19          That means I'm going to go back in the jury room

12:21:26  20  in just a minute.  Mr. Baxter, Ms. Smith are going to go

12:21:30  21  with me.  Ms. Holmes, the court reporter, is going to go

12:21:33  22  with me.  And then I'm going to bring the following members

12:21:35  23  of the panel back one at a time.  The Court Security

12:21:38  24  Officer will come and get you and escort you to the jury

12:21:41  25  room where I'll visit with you outside of the presence of

12:21:44   1   the rest of the panel.

12:21:45   2        I'm going to visit with the following folks in the

12:21:49   3   jury room one at a time:  Ms. Cannon, No. 4; Ms. Achterhof,

12:21:58   4   No. 14; Ms. Brian, No. 15; and Mr. Huddleston, No. 16.

12:22:05   5        I don't think I'll need to visit with anybody else

12:22:08   6   on the panel separately, other than those four.  And,

12:22:13   7   again, I'll do that one at a time.

12:22:16   8        Now, while I'm in the jury room with these other

12:22:19   9   people I've mentioned, I'm going to ask that all of you

12:22:23   10  stay seated.  Again, this is part of us maintaining safe

12:22:31   11  distancing.

12:22:31   12       While I'm in the jury room with these folks, the

12:22:35   13  Court Security Officers are going to come and check with

12:22:38   14  you one row at a time about whether you need a restroom

12:22:42   15  break or some water from the water fountain.

12:22:46   16       And if that's the case, they'll take you in and

12:22:48   17  out of the courtroom and bring you back one row at a time.

12:22:52   18  I cannot let 40 people get up and all walk out of this

12:22:57   19  courtroom together as a group.  That will defeat all the

12:22:59   20  effort we've gone to to maintain appropriate spacing, so

12:23:04   21  we're going to do this one row at a time.  The Court

12:23:08   22  Security Officers will handle that.

12:23:09   23       The rest of you, while you're seated in the

12:23:11   24  courtroom waiting for me to come back from the jury room,

12:23:15   25  otherwise, just please be seated.

| | | |
|---|---|---|
| 12:23:16 | 1 | If you'd like to talk quietly with somebody close |
| 12:23:19 | 2 | to you, you can do that.  If you choose to talk to somebody |
| 12:23:24 | 3 | in close proximity, remember you haven't heard any evidence |
| 12:23:29 | 4 | in this case; therefore, you should not attempt to talk |
| 12:23:31 | 5 | about anything that's happened in the courtroom today. |
| 12:23:33 | 6 | Talk about your grandkids, talk about the weather. |
| 12:23:35 | 7 | I would say talk about upcoming football, but I'm not sure |
| 12:23:39 | 8 | we're going to have upcoming football.  Talk about |
| 12:23:42 | 9 | anything, but nothing that's happened in the courtroom |
| 12:23:44 | 10 | today. |
| 12:23:44 | 11 | And if you'd like to just sit there quietly, |
| 12:23:47 | 12 | you're not compelled to visit with anybody.  But, |
| 12:23:50 | 13 | otherwise, sit where you are, remain in place, and the |
| 12:23:53 | 14 | Court Security Officers will check with you individually |
| 12:23:56 | 15 | row-by-row about bathroom breaks, and I will be back from |
| 12:24:00 | 16 | the jury room with counsel and with the court reporter as |
| 12:24:04 | 17 | soon as possible. |
| 12:24:04 | 18 | But this is probably going to take some amount of |
| 12:24:07 | 19 | time, maybe -- and I'm guessing, ladies and gentlemen, but |
| 12:24:11 | 20 | this may take another 20, 25 minutes.  I don't know.  So I |
| 12:24:14 | 21 | just wanted to give you an idea of what's going on and how |
| 12:24:17 | 22 | it's going to work. |
| 12:24:19 | 23 | So at this time, I'm going to ask Mr. Baxter and |
| 12:24:23 | 24 | Ms. Smith, along with the court reporter, to join me in the |
| 12:24:27 | 25 | jury room again. |

| | | |
|---|---|---|
| 12:24:30 | 1 | COURT SECURITY OFFICER:  All rise. |
| 12:24:31 | 2 | (Bench conference outside the courtroom.) |
| 12:26:06 | 3 | THE COURT:  Come in, Ms. Cannon. |
| 12:26:12 | 4 | Would you please have a seat right there? |
| 12:26:16 | 5 | JUROR CANNON:  Yes, sir. |
| 12:26:17 | 6 | THE COURT:  Thank you so much. |
| 12:26:17 | 7 | Ms. Cannon, I saw you through the process this |
| 12:26:20 | 8 | morning, and I want to tell you I'm impressed with the |
| 12:26:24 | 9 | clear seriousness that you've taken everything, and when |
| 12:26:27 | 10 | you said your answer in response to whether you knew Todd |
| 12:26:34 | 11 | Parish and you talked about the family, and then I think |
| 12:26:38 | 12 | you said that in response to Ms. Smith's question that you |
| 12:26:43 | 13 | might be a better fit for another jury, and she asked if |
| 12:26:46 | 14 | you could be fair, and you said I might question whether I |
| 12:26:50 | 15 | could be.  Is that all correct? |
| 12:26:52 | 16 | JUROR CANNON:  I would say I would hate for -- for |
| 12:26:54 | 17 | someone else to -- to infer that I wasn't fair.  I -- my |
| 12:27:01 | 18 | whole life is evaluating whether something is right or |
| 12:27:06 | 19 | wrong, and it makes no difference who your momma is or your |
| 12:27:11 | 20 | daddy. |
| 12:27:11 | 21 | THE COURT:  Right. |
| 12:27:12 | 22 | JUROR CANNON:  So I deal with that all the time -- |
| 12:27:14 | 23 | I just don't want anyone saying, well, since she knew |
| 12:27:18 | 24 | everyone, that she came in in -- in one way or the other. |
| 12:27:23 | 25 | THE COURT:  Well, what I -- I'm not so concerned |

12:27:26  1  about what other people may think.  What I want to know is,

12:27:29  2  to you, within your own mind and your own heart, can you

12:27:32  3  tell me and can you tell these lawyers that you'll be fair

12:27:38  4  and impartial, and you'll treat Apple's side of the case

12:27:43  5  just like the Plaintiff, even though Todd's brother-in-law

12:27:47  6  is Mr. Baxter, and he'll be taking a big part of this

12:27:51  7  trial?  Can you -- can you do that?

12:27:53  8          JUROR CANNON:  I believe I can be fair.

12:27:55  9          THE COURT:  Do you have any doubts about whether

12:27:57  10  you can be fair?

12:27:58  11          JUROR CANNON:  No, sir.  And I don't have any

12:28:00  12  preconceived ideas --

12:28:02  13          THE COURT:  And you could rule against the

12:28:05  14  Plaintiff and not worry about Mr. Baxter or Laurie Parish

12:28:09  15  or Todd Parish or any of these folks you've known so long

12:28:11  16  being upset at you?

12:28:12  17          JUROR CANNON:  I believe they would think that I

12:28:14  18  had done what I was challenged to do, regardless of the

12:28:17  19  outcome.

12:28:17  20          THE COURT:  Okay.  Well, again, I'm not concerned

12:28:20  21  and the law doesn't require me to be concerned about what

12:28:22  22  other people in the room may think.

12:28:25  23          JUROR CANNON:  Okay.

12:28:25  24          THE COURT:  What I need to know is about you

12:28:28  25  yourself, and if you tell me, notwithstanding your broad

| | | |
|---|---|---|
| 12:28:32 | 1 | knowledge of the Parish family, you can be fair and |
| 12:28:35 | 2 | impartial, then I'll believe you. |
| 12:28:37 | 3 | JUROR CANNON:  Yes. |
| 12:28:37 | 4 | THE COURT:  Okay. |
| 12:28:41 | 5 | JUROR CANNON:  I believe I can.  Of course, that's |
| 12:28:43 | 6 | the easy thing to say but, yes, I believe I -- fair, |
| 12:28:46 | 7 | impartial. |
| 12:28:47 | 8 | THE COURT:  Let me ask this, Ms. Smith:  Do you |
| 12:28:50 | 9 | have any questions for Ms. Cannon? |
| 12:28:52 | 10 | MS. SMITH:  Well, Ms. Cannon, first of all, I |
| 12:28:53 | 11 | appreciate your honesty.  I don't know -- I don't know the |
| 12:28:57 | 12 | Parishes like you do, but it's a very important case to |
| 12:29:02 | 13 | Apple.  And so putting yourself in my shoes, I sensed a |
| 12:29:09 | 14 | little bit of hesitancy of your willingness to sit in |
| 12:29:11 | 15 | judgment and to sit in a case where Judge Parish's husband |
| 12:29:16 | 16 | is on the other side.  And I sensed that you questioned |
| 12:29:18 | 17 | whether you could comfortably do that or you might just be |
| 12:29:23 | 18 | a better fit -- they'll call you, again, I guarantee you if |
| 12:29:27 | 19 | you opt out of this litigation, you'll get another |
| 12:29:30 | 20 | opportunity to serve.  But I thought what you were trying |
| 12:29:32 | 21 | to tell me is you might be a better fit for a different |
| 12:29:35 | 22 | case. |
| 12:29:36 | 23 | JUROR CANNON:  I wanted to be honest with you that |
| 12:29:39 | 24 | I do know the Parishes long-standing, long-standing.  But I |
| 12:29:45 | 25 | do believe that I -- I have a very detailed mind and |

12:29:49  1   overview and mathematic mind of how things work.  And if

12:29:55  2   you tell me it has to be a hundred percent, not 80 percent,

12:30:00  3   then I will hold to the 100 percent, and can do that

12:30:03  4   without any reservations.

12:30:04  5        But, you know, know right up, yes, have I known

12:30:09  6   the Parishes, absolutely.  I actually didn't know she had

12:30:13  7   remarried, though.

12:30:15  8        MR. BAXTER:  She tries to keep that a secret.

12:30:21  9        JUROR CANNON:  And then I wondered how you caught

12:30:23  10  her because, you know, she runs all the time.

12:30:25  11       So that is your decision.

12:30:27  12       MR. BAXTER:  Thank you.

12:30:28  13       JUROR CANNON:  Again, I evaluate lots of things

12:30:30  14  with mommas not being -- knowing I've taught people's

12:30:37  15  children I've known forever.  But it's a big case.

12:30:40  16       THE COURT:  Mr. Baxter, do you have any questions

12:30:42  17  for Ms. Cannon?

12:30:43  18       MR. BAXTER:  No, Your Honor.

12:30:44  19       THE COURT:  Okay.  Ms. Cannon, let me try one more

12:30:48  20  question --

12:30:49  21       JUROR CANNON:  Yes, sir.

12:30:49  22       THE COURT:  -- and then we'll finish this up.

12:30:52  23  You're going to hear two different sides -- if you're on

12:30:56  24  the jury, you're going to hear two different sides of a lot

12:30:59  25  of questions, and deciding whether you're on one side or

12:31:01  1   the other which side you believe, a lot of that is going to

12:31:05  2   depend on how much credibility you place in the witnesses

12:31:09  3   and -- and how convincing the lawyers are that are arguing

12:31:15  4   the case.

12:31:15  5          Is it going to impact your ability to make those

12:31:18  6   close calls about whether you're on the left side or the

12:31:21  7   right side of an issue if Laurie Parish's husband is one of

12:31:26  8   the lawyers arguing for one side of that issue?

12:31:29  9          If that's not going to make a difference and

12:31:33  10  you're going to come down whichever way it would be if it

12:31:37  11  was Sam Smith instead of Sam Baxter arguing for the

12:31:39  12  Plaintiff, then I need to know that.

12:31:41  13         But if that's going to impact how you make those

12:31:44  14  close calls based on credibility and believability and

12:31:48  15  effective advocacy, because that's what lawsuits mostly

12:31:53  16  boil down to, if -- if it's going to make any difference, I

12:31:57  17  need to know.  If it's not going to make any difference, I

12:32:00  18  need to know that, too.  That's really the bottom-line

12:32:04  19  question, Ms. Cannon.

12:32:04  20         So if I pose it to you like that and tell you

12:32:09  21  that's the bottom line question, will it make any

12:32:10  22  difference or will it not make any difference?  Within your

12:32:14  23  own mind.

12:32:14  24         JUROR CANNON:  It would not make -- I didn't know

12:32:15  25  Sam Baxter existed.  If it were Laurie Parish trying the

12:32:18   1   case, yes.  But I didn't know there was even a connection

12:32:22   2   at all until I walked in here.

12:32:24   3          THE COURT:  And now knowing about that connection,

12:32:26   4   you're telling me it won't make any difference?

12:32:29   5          JUROR CANNON:  No.

12:32:30   6          THE COURT:  Okay.  Thank you so much.  Ms. Cannon,

12:32:32   7   I'm going to let the Court Security Officer take you back

12:32:34   8   to your seat.

12:32:35   9          JUROR CANNON:  Thank you.

12:32:36   10          THE COURT:  Thank you so much, and we'll be back

12:32:38   11   in there as quickly as we can.

12:32:41   12          JUROR CANNON:  Thank you.

12:32:45   13          (Juror excused to return to courtroom.)

12:32:45   14          THE COURT:  No. 14?

12:32:51   15          I am not going to excuse Ms. Cannon.  I'll deny

12:32:56   16   Defendant's challenge for cause.

12:33:00   17          MS. SMITH:  Thank you, Your Honor.

12:33:09   18          (Juror brought into courtroom.)

12:33:09   19          THE COURT:  Come on back, ma'am.  How are you?

12:33:27   20          JUROR ACHTERHOF:  I'm good.  How are you?

12:33:28   21          THE COURT:  Please have a seat right there.

12:33:32   22          I'm sorry I called you Mr. Achterhof.  I was so

12:33:35   23   concentrating on how to pronounce your last name the right

12:33:35   24   way I forgot to look at the first name.

12:33:35   25          JUROR ACHTERHOF:  That's okay.  I've only had it

12:33:35   1   for 30 years.  It's one of those I'm still trying to get

12:33:35   2   use to it sometimes.

12:33:43   3           THE COURT:  I understand.  What I want to talk to

12:33:44   4   you about is this:  During the questioning that took place

12:33:48   5   this morning, you said something to the effect -- I wrote

12:33:51   6   down in my notes -- you said something to the effect, if

12:33:54   7   the Plaintiff is taking on Apple, they must have something.

12:33:58   8           Now, I heard you also say but it would depend on

12:34:02   9   the evidence.

12:34:03   10          JUROR ACHTERHOF:  Uh-huh.

12:34:04   11          THE COURT:  So what I really need to know is, can

12:34:08   12  you tell me that you will put everything that you know or

12:34:13   13  think you know out of your mind, hear the evidence in this

12:34:18   14  case if you're selected as a juror, and that means the

12:34:21   15  witnesses and their sworn testimony and the documentary

12:34:25   16  evidence that I admit into evidence, that you will listen

12:34:29   17  and -- and review the evidence in this case, and you will

12:34:33   18  make a decision on each question that you might be asked

12:34:38   19  based solely and only on that evidence; that there won't be

12:34:42   20  anything else that contributes to you reaching a decision?

12:34:46   21  That's the real question.

12:34:48   22          Can you -- can you take the notion that, well, if

12:34:51   23  they're suing Apple, there must be something there?  I

12:34:54   24  think Ms. Smith called that her "where there's smoke,

12:34:57   25  there's fire" question.

12:34:59   1          JUROR ACHTERHOF:  Yeah.

12:35:01   2          THE COURT:  Is that going to impact your decision

12:35:03   3   in any way, or can you tell me it won't impact your

12:35:06   4   decision and you'll make your decision based solely and

12:35:09   5   only on the evidence that you haven't heard yet but you

12:35:12   6   will hear if you're a juror?

12:35:14   7          JUROR ACHTERHOF:  To be honest, it might, just

12:35:17   8   going off of big companies and, you know, big companies a

12:35:21   9   lot of times they take advantage of the little guy.

12:35:26   10         THE COURT:  And you're not -- you're not sure that

12:35:29   11  you could keep that from being a factor?

12:35:31   12         JUROR ACHTERHOF:  I'm not.

12:35:32   13         THE COURT:  Okay.  Ms. Smith, do you have any

12:35:34   14  questions for Ms. Achterhof?

12:35:37   15         MS. SMITH:  Yes, ma'am.  I had a lengthy

12:35:39   16  conversation with you and I also took some notes.  I have a

12:35:42   17  different -- different note about your -- your comments.

12:35:45   18         You said that the Plaintiff, I believe, wouldn't

12:35:48   19  be ignorant enough to haul Apple into court if Apple didn't

12:35:55   20  owe some money; is that right?

12:35:56   21         JUROR ACHTERHOF:  Well, it's just from my

12:35:58   22  standpoint, you know, just -- I'm just a regular person.

12:36:01   23  If I was going to take on a company like Apple --

12:36:04   24         MS. SMITH:  Yes, ma'am.

12:36:05   25         JUROR ACHTERHOF:  -- I would be sure in my heart

12:36:07  1  that I had something, you know, because you don't take on

12:36:10  2  something that big -- it'd be like I guess I'm not -- for

12:36:16  3  the -- I don't know.

12:36:18  4       MS. SMITH:  Well -- well -- my second question for

12:36:23  5  you, that's not Apple-specific, but it's a long-held belief

12:36:28  6  you've had about big companies generally?

12:36:31  7       JUROR ACHTERHOF:  Yes.

12:36:32  8       MS. SMITH:  Right.  And prior to hearing any of

12:36:34  9  the evidence in the case, you've determined that Apple,

12:36:36  10  because it's a big company, owed some money?

12:36:39  11       JUROR ACHTERHOF:  I wouldn't say owed some money,

12:36:41  12  but I've worked for big companies, and there's a lot of,

12:36:46  13  you know, tiptoeing around rules a lot of times.

12:36:49  14       MS. SMITH:  Perhaps did something wrong?

12:36:50  15       JUROR ACHTERHOF:  Yeah.

12:36:53  16       MS. SMITH:  Or let me rephrase it, they did

12:36:54  17  something wrong?

12:36:55  18       JUROR ACHTERHOF:  Yeah.

12:36:56  19       MS. SMITH:  Thank you, ma'am.

12:36:56  20       THE COURT:  Mr. Baxter, you have any questions?

12:36:58  21       MR. BAXTER:  No, Your Honor.

12:36:59  22       THE COURT:  So based on all this, Ms. Achterhof,

12:37:02  23  what I'm taking away, and I want you to correct me if I'm

12:37:06  24  wrong, but what I'm getting out of all of this is you'd

12:37:09  25  listen to the evidence, you know you haven't heard any

| | | |
|---|---|---|
| 12:37:11 | 1 | evidence, but you can't tell me that there's not some doubt |
| 12:37:14 | 2 | in your mind that you could take these preconceived notions |
| 12:37:18 | 3 | and completely remove them from the decision-making |
| 12:37:22 | 4 | process? |
| 12:37:25 | 5 | JUROR ACHTERHOF:  I probably could not. |
| 12:37:28 | 6 | THE COURT:  Okay.  All right.  Well, I appreciate |
| 12:37:28 | 7 | your candor.  I'm going to let the Court Security Officer |
| 12:37:31 | 8 | take you back to your seat, and we'll finish this process |
| 12:37:34 | 9 | as quickly as we can. |
| 12:37:37 | 10 | JUROR ACHTERHOF:  All right.  Thank you. |
| 12:37:39 | 11 | THE COURT:  Thank you, ma'am. |
| 12:37:40 | 12 | MS. SMITH:  Thank you. |
| 12:37:41 | 13 | (Juror excused to return to courtroom.) |
| 12:37:41 | 14 | THE COURT:  All right.  I'm going to excuse |
| 12:37:50 | 15 | Ms. Achterhof.  The challenge for cause is granted there. |
| 12:37:52 | 16 | MS. SMITH:  Thank you, Your Honor. |
| 12:37:55 | 17 | THE COURT:  No. 15, please, Mr. Elliott. |
| 12:38:24 | 18 | (Juror brought into jury room.) |
| 12:38:24 | 19 | THE COURT:  Good morning, ma'am.  Would you please |
| 12:38:26 | 20 | come have a seat right here? |
| 12:38:29 | 21 | JUROR BRIAN:  Can I take that mask off and stand |
| 12:38:31 | 22 | right here? |
| 12:38:31 | 23 | THE COURT:  That's fine with me, Ms. Brian.  I |
| 12:38:33 | 24 | don't like wearing them either. |
| 12:38:35 | 25 | Let me ask you a question.  I know you used to |

12:38:37  1   work at the Upshur County probation office.  Believe it or

12:38:42  2   not, in an earlier life, I was the Harrison County Judge,

12:38:46  3   so I know how county government works, and I know the

12:38:49  4   district judge hires and fires the chief probation officer.

12:38:51  5   And I know if there's somebody in the probation office that

12:38:56  6   gets sideways with the state district judge, they're

12:38:58  7   probably not going to survive for very long.

12:39:01  8          JUROR BRIAN:  For sure.

12:39:01  9          THE COURT:  So my question is, is there anything

12:39:03  10  about your prior position as a probation officer -- and I

12:39:08  11  know you're not now -- is there anything about your prior

12:39:11  12  position as a probation officer in Upshur County and Judge

12:39:17  13  Laurie Parish's position as the state district judge there

12:39:19  14  that would impact in any way any decision you might be

12:39:22  15  called on to make if you were selected as a juror?  Or the

12:39:27  16  flip side of that, can you tell me that if you are selected

12:39:30  17  as a juror, when it comes to you answering the questions

12:39:34  18  you'll be asked on the jury to answer, that that prior

12:39:37  19  situation and your interactions, whatever they may have

12:39:42  20  been with Ms. Parish or anything related about your time

12:39:45  21  with the probation office in Upshur County, will not impact

12:39:49  22  the ultimate decisions you make in any way?

12:39:52  23         JUROR BRIAN:  No, I don't -- I don't think so.  I

12:39:55  24  mean, I --

12:39:55  25         THE COURT:  I asked it both ways, so I probably

12:39:58   1   shouldn't have.

12:39:59   2        JUROR BRIAN:  No, I mean, I don't really think so.

12:40:02   3        THE COURT:  Okay.  Is there anything about the

12:40:04   4   fact -- now, you told me now -- is it a Farmers Insurance

12:40:10   5   agency that you run now?

12:40:12   6        JUROR BRIAN:  Yes.

12:40:12   7        THE COURT:  Okay.

12:40:12   8        JUROR BRIAN:  We opened March the 2nd.

12:40:16   9        THE COURT:  Good.  Anything about -- anything

12:40:16  10   about your work in the insurance agency business --

12:40:21  11   insurance industry that you think might impact how you

12:40:24  12   would make a decision in this case?

12:40:25  13        JUROR BRIAN:  I mean, I haven't been there long

12:40:27  14   enough to really, like, figure that part out.  The only

12:40:29  15   thing I'll say is that having been in law enforcement for

12:40:32  16   almost 24 years, it is very difficult for me to -- I mean,

12:40:37  17   I still am very like beyond a reasonable doubt -- I mean,

12:40:45  18   like when I look at things, it's -- it's -- it's very --

12:40:48  19   and don't take this the wrong way on either side, but it's

12:40:52  20   very -- you know, I still look at it from the -- from the

12:40:57  21   law enforcement side.

12:40:57  22        THE COURT:  Are you saying --

12:40:58  23        JUROR BRIAN:  It's hard to distinguish for me

12:41:00  24   because I haven't been out only three -- you know, what,

12:41:04  25   six months total.  It's hard for me to think in line of --

```
12:41:08   1              THE COURT:  Are you saying things are black and
12:41:10   2    white?
12:41:11   3              JUROR BRIAN:  Yes, they are very, but they're
12:41:12   4    not --
12:41:12   5              THE COURT:  There's not much middle ground in the
12:41:15   6    way you look at things?
12:41:16   7              JUROR BRIAN:  Pretty much, yes.  I mean, I -- yes.
12:41:19   8              THE COURT:  Okay.
12:41:20   9              JUROR BRIAN:  I mean, I'm probably -- for me, it
12:41:23   10   would be hard for me to not see the whole -- well, you
12:41:26   11   know, kind of like how -- y'all were talking earlier, the
12:41:29   12   difference of beyond a reasonable doubt and just the -- I
12:41:35   13   forgot what it's even called.
12:41:37   14             THE COURT:  Clear and convincing evidence?
12:41:38   15             JUROR BRIAN:  Yeah.  It would be very difficult
12:41:40   16   for me not to go well --
12:41:41   17             THE COURT:  All the way to clear and -- all the
12:41:43   18   way to beyond a reasonable doubt?
12:41:45   19             JUROR BRIAN:  Yeah.  It would be difficult for me
12:41:47   20   to -- I guess because I've just been on the -- you know, if
12:41:53   21   you get arrested, you probably did something to attract the
12:41:58   22   attention of the police, even if it wasn't necessarily
12:42:00   23   the -- the whole thing.
12:42:00   24             THE COURT:  So does that mean in your mind because
12:42:04   25   Optis sued Apple in this case, Apple must have done
```

12:42:06   1   something?

12:42:07   2        JUROR BRIAN:  I don't think we would be here if

12:42:10   3   there wasn't a discussion about it, yes, sir.

12:42:13   4        THE COURT:  Well, I promise you, we wouldn't be

12:42:18   5   here if there wasn't a dispute.

12:42:20   6        JUROR BRIAN:  Right.

12:42:21   7        THE COURT:  The question is, is it more than a

12:42:26   8   dispute?

12:42:27   9        JUROR BRIAN:  Prob -- maybe -- I mean, I don't

12:42:27  10   know --

12:42:27  11        THE COURT:  Okay.

12:42:27  12        JUROR BRIAN:  -- because I don't know anything

12:42:30  13   about it, other than what we've heard.

12:42:32  14        THE COURT:  And as I told you out there, you

12:42:34  15   haven't heard any of the evidence yet.

12:42:36  16        JUROR BRIAN:  Yeah, so, I mean, I -- I don't know.

12:42:36  17   It would just be really -- I mean, that's -- that would be

12:42:40  18   something I would really have a difficult time deciding one

12:42:41  19   way or -- I'm still going --

12:42:44  20        THE COURT:  So I'm hearing two things from you,

12:42:47  21   and you correct me if I'm wrong.  I'm hearing I might have

12:42:51  22   a hard time putting out of my mind that perhaps Apple must

12:42:54  23   have done something wrong for this lawsuit to have been

12:42:57  24   brought and to have gotten to this point.  I'm hearing

12:43:00  25   that.

12:43:00  1          And I'm also hearing I might have trouble, Judge

12:43:05  2   Gilstrap, following your instructions on the burden of

12:43:08  3   proof because I'm so used to beyond a reasonable doubt in

12:43:13  4   the law enforcement area that I've lived under for decades.

12:43:17  5          Is that -- are both of those true?

12:43:19  6          JUROR BRIAN:  Yes, sir.

12:43:20  7          THE COURT:  Mr. Baxter, do you have questions?

12:43:22  8          MR. BAXTER:  No, Your Honor.

12:43:23  9          THE COURT:  Ms. Smith?

12:43:24  10         MS. SMITH:  No, Your Honor.

12:43:25  11         JUROR BRIAN:  Can I say one more thing?

12:43:26  12         THE COURT:  Yes, ma'am.

12:43:27  13         JUROR BRIAN:  All -- my daughter is out of town

12:43:29  14  and I'm keeping her -- fixing to be two and fixing to be

12:43:33  15  four-year-old kids, and my mom was supposed to keep them

12:43:36  16  this week, but she's gotten sick.

12:43:39  17         THE COURT:  So you've got problems with keeping

12:43:41  18  your family?

12:43:43  19         JUROR BRIAN:  (Nods head affirmatively.)

12:43:45  20         THE COURT:  Okay.  Thank you so much.  I'm going

12:43:47  21  to let the Court Security Officer take you back to your

12:43:49  22  seat.

12:43:50  23         (Juror excused to return to courtroom.)

12:43:50  24         THE COURT:  No. 16, Mr. Elliott.

12:43:59  25         MS. SMITH:  Your Honor, we don't object to

| | | |
|---|---|---|
| 12:44:01 | 1 | Plaintiffs' challenge. |
| 12:44:02 | 2 | THE COURT:  I'm going to release Ms. Brian, |
| 12:44:06 | 3 | both -- both on impartiality grounds and personal family |
| 12:44:13 | 4 | scheduling issues. |
| 12:44:16 | 5 | And, thankfully, we have plenty of people on this |
| 12:44:20 | 6 | panel to get a jury out of. |
| 12:44:22 | 7 | (Juror brought into jury room.) |
| 12:44:38 | 8 | THE COURT:  Hello, Mr. Huddleston.  Come on in, |
| 12:44:41 | 9 | please, sir.  Why don't you just have a seat right there. |
| 12:44:43 | 10 | I had -- I had asked very early today in the |
| 12:44:48 | 11 | process if there were people on the panel who might have |
| 12:44:52 | 12 | problems being here for the entirety of the trial if they |
| 12:44:54 | 13 | were selected.  And I asked folks who might have a |
| 12:44:57 | 14 | scheduling problem to let me know by raising their hands, |
| 12:45:01 | 15 | and I wrote down that you raised your hand. |
| 12:45:04 | 16 | JUROR HUDDLESTON:  Uh-huh. |
| 12:45:05 | 17 | THE COURT:  If you have a scheduling problem with |
| 12:45:08 | 18 | being here this week and maybe a day or two of next week, |
| 12:45:11 | 19 | tell me what those are, please, Mr. Huddleston. |
| 12:45:14 | 20 | JUROR HUDDLESTON:  As I said, I have a little, |
| 12:45:16 | 21 | small lawn care business.  I do two pretty big accounts. |
| 12:45:20 | 22 | One of them is the Bloomburg ISD school, and then another |
| 12:45:24 | 23 | is a -- a church that has a day school.  Well, they're |
| 12:45:27 | 24 | starting school next week, and those -- those lawns need to |
| 12:45:31 | 25 | be cleaned up and looking good for school. |

12:45:34  1          And, also, my father-in-law was diagnosed with

12:45:36  2   cancer here recently, and he's about to start doing

12:45:39  3   treatments and doctors and stuff like that.  And my wife

12:45:43  4   having the more flexible job of her sisters, she would kind

12:45:50  5   of help get him here and there, and then I would kind of

12:45:54  6   have to get my kids here and there.

12:45:57  7          THE COURT:  Okay.  And you're a captain with the

12:46:02  8   Texarkana Fire Department?

12:46:03  9          JUROR HUDDLESTON:  Uh-huh.

12:46:03  10         THE COURT:  And like a lot of people in

12:46:06  11  firefighting and law enforcement, you've got a second

12:46:08  12  job --

12:46:08  13         JUROR HUDDLESTON:  Yes, sir.

12:46:08  14         THE COURT:  -- to make ends meet?

12:46:10  15         JUROR HUDDLESTON:  Yes, sir.

12:46:10  16         THE COURT:  I understand that.

12:46:13  17         Tell me about your father-in-law's cancer

12:46:17  18  treatments.  When will they start?  Where it will be?  Is

12:46:22  19  it radiation?  Is it chemo?  Can you give me more details?

12:46:28  20         JUROR HUDDLESTON:  It's pretty -- pretty early

12:46:30  21  into it.  He had his thyroid removed.  I don't mind telling

12:46:34  22  you, you know, everything.  It's -- it's papillary thyroid

12:46:36  23  carcinoma.  And he's already had this part of his thyroid

12:46:40  24  taken out or part of this one.  And he's going back to the

12:46:43  25  doctor here pretty soon, some time this week or the

12:46:46  1  beginning of next week, I think, to get those stitches out

12:46:50  2  and to try to get -- he's going to tell that surgeon that

12:46:56  3  removed that that he wants to go see an oncologist.

12:47:01  4       THE COURT:  Okay.  Is he in Texarkana or where is

12:47:07  5  he?

12:47:07  6       JUROR HUDDLESTON:  The surgeon is in Texarkana.

12:47:08  7  Somebody told him it's not called Baylor anymore in Dallas

12:47:12  8  in the Metroplex.  It's called something else.

12:47:14  9       THE COURT:  No, it's still called Baylor -- Baylor

12:47:16 10  Scott & White.

12:47:18 11       JUROR HUDDLESTON:  Okay.

12:47:18 12       THE COURT:  It merged with another hospital.

12:47:18 13       JUROR HUDDLESTON:  He wants to go out there.

12:47:20 14       THE COURT:  Okay.  Does your father-in-law live in

12:47:22 15  Texarkana?

12:47:22 16       JUROR HUDDLESTON:  He lives in Atlanta with us.

12:47:25 17       THE COURT:  Atlanta.  Okay.  So if he -- if he

12:47:29 18  needs to travel either to Texarkana or to Dallas because of

12:47:33 19  his medical condition, I understand what you're telling me

12:47:35 20  is the burden of that is going to fall on your wife?

12:47:39 21       JUROR HUDDLESTON:  Uh-huh.

12:47:40 22       THE COURT:  And that's going to leave you to carry

12:47:41 23  the extra burden of dealing with your kids?

12:47:44 24       JUROR HUDDLESTON:  Uh-huh.

12:47:45 25       THE COURT:  And your kids, remind me, are how old,

| | | |
|---|---|---|
| 12:47:47 | 1 | and where are they in school? |
| 12:47:50 | 2 | JUROR HUDDLESTON:  Nine, eight, and three, and |
| 12:47:52 | 3 | they go -- the two girls -- oldest go to Atlanta, and my |
| 12:47:56 | 4 | little boy, that day school that I take care of the yard. |
| 12:48:02 | 5 | He will start there the 10th of August, so next Monday. |
| 12:48:04 | 6 | THE COURT:  Now, assuming all this comes about and |
| 12:48:05 | 7 | you are concerned that it might, is there anybody else |
| 12:48:06 | 8 | besides you that can see about your kids and getting them |
| 12:48:10 | 9 | to and from the places they need to go -- |
| 12:48:13 | 10 | JUROR HUDDLESTON:  Uh-huh -- |
| 12:48:13 | 11 | THE COURT:  -- other than you for the next week |
| 12:48:15 | 12 | and a couple of days? |
| 12:48:17 | 13 | JUROR HUDDLESTON:  Yes, sir. |
| 12:48:17 | 14 | THE COURT:  There is somebody else that can take |
| 12:48:19 | 15 | care of that?  Somebody else in the family can see about |
| 12:48:27 | 16 | your kids? |
| 12:48:27 | 17 | JUROR HUDDLESTON:  My mother and my mother-in-law. |
| 12:48:30 | 18 | She -- my mother-in-law is not really able to drive -- make |
| 12:48:32 | 19 | a long trip because she's had several back surgeries over |
| 12:48:37 | 20 | the years, but she can watch after my kids. |
| 12:48:40 | 21 | THE COURT:  Okay. |
| 12:48:40 | 22 | All right.  Mr. Baxter, do you have any questions |
| 12:48:42 | 23 | of Mr. Huddleston? |
| 12:48:43 | 24 | MR. BAXTER:  No, Your Honor. |
| 12:48:44 | 25 | THE COURT:  Ms. Smith, do you have any questions? |

12:48:46  1            MS. SMITH:  No, Your Honor.

12:48:47  2            THE COURT:  Is there anything else,

12:48:48  3  Mr. Huddleston, that I need to know about?

12:48:50  4            JUROR HUDDLESTON:  No, just I really just --

12:48:52  5            THE COURT:  I heard you tell us that you don't

12:48:54  6  have any interest in the topic.

12:48:55  7            JUROR HUDDLESTON:  Uh-huh.

12:48:56  8            THE COURT:  But, unfortunately, being interested

12:48:58  9  or not interested is not an issue we have to deal with.

12:49:03  10            JUROR HUDDLESTON:  You know, like I said, whether

12:49:04  11  I get picked or not, I'll be fair.  It's just bad timing

12:49:08  12  for me right now.

12:49:09  13            THE COURT:  I understand.  I understand.

12:49:11  14            JUROR HUDDLESTON:  I wouldn't be against at all

12:49:13  15  being summonsed back in a couple months or whenever.

12:49:16  16            THE COURT:  Okay.

12:49:17  17            JUROR HUDDLESTON:  But it's like in that letter,

12:49:18  18  this is just a part of being a citizen, and this is just

12:49:21  19  what we have to do sometimes.

12:49:22  20            THE COURT:  Well, I don't know if you're going to

12:49:24  21  get picked or not, but I guarantee you if you don't get

12:49:28  22  picked, you'll get summonsed back again.

12:49:31  23            JUROR HUDDLESTON:  Yes.

12:49:32  24            THE COURT:  Thank you, Mr. Huddleston.  I'm going

12:49:34  25  to let you go back and have your seat.  The Court Security

12:49:36   1   Officer will escort you back out there.

12:49:40   2            JUROR HUDDLESTON:  Okay.

12:49:41   3            (Juror excused to return to courtroom.)

12:49:41   4            THE COURT:  I'm not going to excuse

12:49:49   5   Mr. Huddleston.

12:49:50   6            MR. BAXTER:  We'll agree to excuse him, Your

12:49:53   7   Honor, if it makes a difference.

12:49:55   8            MS. SMITH:  I'll agree as well.

12:49:57   9            MR. BAXTER:  We've got plenty to go.

12:49:57  10            THE COURT:  Well, having your own private business

12:50:01  11   and being self-employed is not a basis to get out of jury

12:50:03  12   duty.  I've heard that many, many times, and I understand

12:50:05  13   the real-world impact of it because my wife is

12:50:08  14   self-employed.  But --

12:50:11  15            MR. BAXTER:  Coupled with his father-in-law's

12:50:13  16   cancer situation, Your Honor, and I -- we've got lots of

12:50:18  17   jurors.

12:50:19  18            THE COURT:  Okay.  Both sides agree that

12:50:21  19   Mr. Huddleston should be released?

12:50:22  20            MS. SMITH:  Yes, Your Honor.

12:50:23  21            MR. BAXTER:  Yes, Your Honor.

12:50:24  22            THE COURT:  Okay.  Barring that disagreement, I

12:50:26  23   would not have excused him, but based on your agreement, I

12:50:29  24   will excuse him.

12:50:30  25            MS. SMITH:  Thank you, Your Honor.

```
12:50:34    1          THE COURT:  Technically, he's probably not

12:50:38    2    required to be excused, but I understand counsel's concerns

12:50:41    3    about having a disgruntled juror on the jury, and I suspect

12:50:46    4    that's what your concerns are.

12:50:48    5          MR. BAXTER:  It is, Your Honor, plus

12:50:50    6    disinterested.

12:50:51    7          THE COURT:  Okay.  That's -- No. 4 is on the

12:50:55    8    panel.  No. 14 is off the panel.  No. 15 is off.  And

12:51:00    9    No. 16 is off.

12:51:01   10          That means we've got three excused.  We're going

12:51:06   11    to seat eight.  Each side is going to have four challenges

12:51:10   12    for cause -- or excuse me, peremptory challenges.  That

12:51:14   13    means we need to strike through 19; is that correct?

12:51:18   14          MS. SMITH:  That's what I have, Your Honor.

12:51:19   15          MR. BAXTER:  Yes, Your Honor.

12:51:23   16          THE COURT:  Okay.  How long, Mr. Baxter, does the

12:51:26   17    Plaintiff need to strike its list?

12:51:29   18          MR. BAXTER:  You think we could have 20 minutes,

12:51:32   19    Your Honor?

12:51:32   20          THE COURT:  I think 20 minutes is fine.

12:51:34   21          Ms. Smith, does that create any problems for you?

12:51:36   22          MS. SMITH:  None at all.  Thank you, Your Honor.

12:51:38   23          THE COURT:  It's approximately 10 until 1:00.  So

12:51:41   24    let's just say 1:15.

12:51:45   25          MR. BAXTER:  Thank you, Your Honor.
```

12:51:46  1           MS. SMITH:  Thank you, Your Honor.

12:51:46  2           THE COURT:  Okay.  We're going to go back in the

12:51:48  3  courtroom, and then I will tell the panel what's going on,

12:51:53  4  and, at that point, I'll excuse you to leave the courtroom

12:51:56  5  and go meet with your co-counsel and strike your list.

12:51:59  6           MR. BAXTER:  Thank you, Your Honor.

12:52:00  7           MS. SMITH:  Thank you.

12:52:51  8           (Bench conference concluded.)

12:52:51  9           COURT SECURITY OFFICER:  All rise.

12:52:52  10          THE COURT:  Be seated, please.

12:52:55  11          Thank you, ladies and gentlemen, for your

12:53:01  12  patience.  The next step of the process is that the lawyers

12:53:07  13  are going to meet separately and discuss how to exercise

12:53:10  14  what are called their peremptory challenges.  And I've

12:53:15  15  given them until 1:15 to do that.

12:53:19  16          I'm going to leave the bench.  The lawyers are

12:53:22  17  going to leave the courtroom and meet respect -- in their

12:53:26  18  separate groups respectively and complete that process.

12:53:30  19  I'm going to ask that you stay seated where you are.  I'm

12:53:33  20  going to let the court security staff continue to visit

12:53:37  21  with you about bathroom breaks that may be needed.

12:53:41  22          Also, ladies and gentlemen, when the lawyers come

12:53:45  23  back about 1:15 and I'm back on the bench about 1:20, it's

12:53:50  24  probably going to be another 15, 20, 25 minutes before the

12:53:54  25  jury is actually selected and seated.  It may be a little

12:53:57   1   longer.  So we could be pushing 2:00 o'clock before the

12:54:01   2   rest of you that are not selected are released and the jury

12:54:05   3   is selected, sworn, and seated in the jury box.

12:54:08   4        This is the first time I've picked a jury under

12:54:12   5   these public health conditions.  So none of us knew exactly

12:54:17   6   how long this would take.

12:54:19   7        Because I thought there was a reasonable risk that

12:54:21   8   we might go beyond 12:00 noon in doing it -- and obviously

12:54:27   9   we have -- the clerk's office has some snacks and some

12:54:33  10   bottled water, and once I leave the bench and the lawyers

12:54:37  11   are out of the courtroom meeting, as I've indicated, when

12:54:41  12   the Court Security Officers come by to check with you about

12:54:44  13   a bathroom break, if you would like a bottle of water, if

12:54:48  14   you would like a packaged snack here in the courtroom right

12:54:52  15   in your seat, just let the Court Security Officer know

12:54:55  16   you'd like that, and they'll bring that to you.

12:54:57  17        You are the first group of citizens in the history

12:55:01  18   of this court who have ever been allowed to eat in a

12:55:04  19   courtroom.  That is an absolute taboo ordinarily, but we

12:55:10  20   are not in ordinary times, and I don't want anybody who

12:55:13  21   might have low blood sugar or other problems being put in a

12:55:19  22   bad way because we've taken longer than we ordinarily

12:55:23  23   would.

12:55:23  24        So feel free to ask for water or a snack or both

12:55:28  25   while the Court Security Officers see about you while we're

| | | |
|---|---|---|
| 12:55:31 | 1 | out of the courtroom.  And as soon as possible, I'll be |
| 12:55:34 | 2 | back with the lawyers and identify the eight of you that |
| 12:55:38 | 3 | have been selected to serve on our jury. |
| 12:55:40 | 4 | With that, counsel, you're excused to address your |
| 12:55:44 | 5 | strikes. |
| 12:55:44 | 6 | The Court stands in recess. |
| 12:55:46 | 7 | COURT SECURITY OFFICER:  All rise. |
| 01:21:50 | 8 | (Recess.) |
| 01:21:50 | 9 | COURT SECURITY OFFICER:  All rise. |
| 01:21:52 | 10 | THE COURT:  Be seated, please. |
| 01:22:43 | 11 | All right.  Ladies and gentlemen, if you will |
| 01:22:51 | 12 | listen carefully when your name is called, if you'll come |
| 01:22:56 | 13 | forward and take your place in the jury box: |
| 01:23:05 | 14 | When you get to the jury box, ladies and |
| 01:23:12 | 15 | gentlemen, you'll notice that there are plastic face |
| 01:23:17 | 16 | shields in some of the chairs.  If you are the first person |
| 01:23:21 | 17 | called, if you will go to the front row of the jury box, |
| 01:23:26 | 18 | the last chair on the end, stand in front of the chair that |
| 01:23:30 | 19 | doesn't have a face shield sitting in the chair. |
| 01:23:33 | 20 | The first person called should go to the |
| 01:23:36 | 21 | furtherest chair from where I am in the jury box, remain |
| 01:23:40 | 22 | standing.  Second person called will end up in the front of |
| 01:23:44 | 23 | the third row -- excuse me, from the third chair from the |
| 01:23:47 | 24 | end on the first row, and then the third person will be two |
| 01:23:50 | 25 | chairs down, and there will be four people spaced on the |

01:23:54   1   front row of the jury box and four people spaced in the

01:23:57   2   same fashion on the second row of the jury box.

01:23:59   3        And if you will remain standing until all eight of

01:24:04   4   the selected jurors are in the jury box, please.

01:24:06   5        So with that, I'm going to ask Ms. Lockhart, our

01:24:11   6   courtroom deputy, to call the names of the eight members of

01:24:14   7   the panel that have been selected to serve as jurors in

01:24:17   8   this case.

01:24:25   9        COURTROOM DEPUTY:  Roger Young, Kassie Blum, Jamie

01:24:37   10  Alexander, Andrea Folsom, Amanda McKnight, David Williams,

01:25:14   11  Shelley Feltner, and Quintisha Scott.

01:25:49   12       THE COURT:  Please be seated.

01:26:00   13       Ms. McKnight, if you would move down one chair,

01:26:03   14  and then Mr. Williams, and if each of you would move down

01:26:07   15  one, that way we will get Ms. Williams on the same level on

01:26:10   16  the back row, and everybody will have a chair between them.

01:26:13   17  Thank you.

01:26:13   18       And if each of you will keep that same seat that

01:26:16   19  you're in, and when you leave the courtroom and come back,

01:26:19   20  go back to that same seat in the same order throughout the

01:26:22   21  trial, I'd appreciate it.

01:26:24   22       Those of you that were not selected to serve on

01:26:28   23  the jury in this case, I'm about to excuse you at this

01:26:30   24  time.

01:26:32   25       But, ladies and gentlemen, I want to take a moment

01:26:34  1  and express the Court's appreciation, and I know both the

01:26:39  2  Plaintiff and the Defendant join me in this.  We appreciate

01:26:43  3  your willingness to come under these circumstances, to go

01:26:46  4  through the process of presenting yourself to serve as

01:26:49  5  potential jurors in this case.

01:26:51  6          And even though each of you were not selected, you

01:26:55  7  each performed a very real and important public service by

01:26:58  8  being here.  Every one of you had other places to be today,

01:27:02  9  other things to do in your life that were important to you

01:27:05  10  and those that you're close to, and you set those aside to

01:27:09  11  answer the call to jury duty, to appear as directed by the

01:27:13  12  Court, to present yourself openly as a prospective juror in

01:27:19  13  this case, and all of that is very important, all of it is

01:27:24  14  noteworthy, and the Court thinks it's highly appropriate to

01:27:27  15  take notice of it on the record today.

01:27:29  16          We could not function as -- the Court could not

01:27:34  17  function as we're required to under our Constitution

01:27:37  18  without ordinary citizens such as yourselves doing exactly

01:27:42  19  what you've done today and sacrificing in each of your

01:27:46  20  personal lives to things that you would otherwise be doing

01:27:52  21  today and present yourself just as you have done.

01:27:54  22          I know that I speak for everyone on this side of

01:27:57  23  the bar when I say thank you very much for the service

01:27:59  24  you've performed.

01:28:00  25          Now, as you leave, the clerk staff will meet you

01:28:05  1   outside the courtroom.  They're going to want to recover

01:28:07  2   these very expensive laminated numbers that you're wearing

01:28:11  3   on your clothing.  They want to answer any questions you

01:28:13  4   have.

01:28:13  5        If you need any kind of written excuse for your

01:28:16  6   employer to explain where you've been today or if there's

01:28:21  7   anything they can do to help you, they will be more than

01:28:24  8   happy to do it.

01:28:25  9        I'm releasing you, ladies and gentlemen, who were

01:28:28  10  not selected, again, with the thanks of the Court.  And

01:28:33  11  please travel safely to your places of work and to your

01:28:36  12  homes.  I hope to see you sometime in the future with the

01:28:40  13  same positive attitude which you each exhibited today.

01:28:45  14       Those of you not selected on the jury are released

01:28:52  15  for the day.

01:28:54  16       (Unselected venire panel members out.)

01:29:29  17       THE COURT:  Please be seated.

01:29:36  18       Ladies and gentlemen of the jury, I'm going to ask

01:29:46  19  you to stand at this time, and our courtroom deputy,

01:29:49  20  Ms. Lockhart, will administer the oath to you as jurors in

01:29:52  21  this case.

01:29:53  22       (Jurors sworn.)

01:30:00  23       THE COURT:  Please be seated.

01:30:10  24       Ladies and gentlemen, I'm going to excuse you in a

01:30:17  25  few minutes to retire to the jury room and have lunch,

01:30:20   1   which is waiting for you there.  I know it's 1:30 now, but

01:30:24   2   it is there, and it will be available to you in just a few

01:30:27   3   minutes.

01:30:28   4        And as I've said, the Court will provide lunch for

01:30:31   5   you each day as long as you're serving on this jury.

01:30:34   6        However, before I release you to have lunch in the

01:30:37   7   jury room, there are a few instructions that I need to go

01:30:42   8   over with you before I do that.

01:30:43   9        First of all, please make sure sometime today

01:30:48   10  before you leave the courthouse that Ms. Clendening --

01:30:51   11  Ms. Clendening in the clerk's office has a good cell phone

01:30:54   12  number for you.  If there were any reason we needed to

01:30:56   13  reach you before you got here for the next day's jury

01:31:01   14  service, we'd need a phone number where we could reach you

01:31:04   15  by cell phone.

01:31:05   16       So please make sure the Court -- the clerk's

01:31:08   17  office staff has a good cell phone number for you before

01:31:12   18  you leave.

01:31:12   19       With regard to cell phones, too, I'm going to

01:31:15   20  direct that you not bring your cell phones back into the

01:31:19   21  courthouse after today.  You can leave them in your

01:31:23   22  vehicle.  But they often ring when they're not supposed to

01:31:29   23  ring, and when you think they're on silent, they're not on

01:31:32   24  silent.  And they can be very disruptive if they make noise

01:31:37   25  unintentionally.

01:31:38  1        The lawyers in the case have electronic devices

01:31:41  2  with them.  They're under the same constraints not to let

01:31:44  3  them be a disruption in the courtroom, but those are tools

01:31:48  4  of the trade nowadays in practicing law, and they're

01:31:50  5  entitled to have them.

01:31:51  6        Also, one of the things I'm going to tell you in

01:31:55  7  these instructions is that you're not to do any research

01:31:58  8  about this case.  You're not to do any research about the

01:32:01  9  Plaintiffs.  You're not to do any research about the

01:32:04  10  Defendant, Apple.  You're not to do any research about any

01:32:07  11  of the facts and allegations and testimony that you're to

01:32:13  12  hear in this case.

01:32:14  13        You're not to do any research about the witnesses.

01:32:17  14  You're not to do any research of any time -- any kind.

01:32:20  15        And, unfortunately, most cell phones today are

01:32:23  16  small computers, and I find jurors are sometimes tempted

01:32:28  17  when they're on a lunch break or a recess to pull out their

01:32:32  18  smartphone and find out exactly what was meant with what

01:32:35  19  they heard just before the break.

01:32:37  20        So against the prospect you might be tempted to

01:32:41  21  use that device to violate my instructions that you not do

01:32:46  22  any research and against the prospect that it might

01:32:49  23  accidentally disrupt the trial -- and there have been

01:32:52  24  thousands of hours and thousands of dollars put into the

01:32:55  25  preparation of this case for trial, so disruptions are very

01:33:01    1   much to be discouraged -- against those two prospects, I'm

01:33:07    2   going to ask you not to bring your cell phones into the

01:33:09    3   courthouse after today.  If you have them with you, ladies,

01:33:13    4   if you have them in a purse, leave them in the jury room

01:33:16    5   today.

01:33:16    6          But if you come back tomorrow, if you need to

01:33:20    7   check a text message or voicemail or email, there'll be

01:33:26    8   breaks where you can go to your vehicle during the day.

01:33:29    9   But don't bring your cell phones back into the courthouse

01:33:32   10   after today, please.

01:33:33   11          Also, ladies and gentlemen of the jury, do not

01:33:37   12   discuss this case with anyone.  This is an absolutely

01:33:42   13   critical instruction.  As a matter of fact, by the time

01:33:46   14   this trial is over, you're going to be sick and tired of

01:33:49   15   hearing me say don't discuss this case with anyone, but I'm

01:33:53   16   going to continue to say it time after time throughout the

01:33:55   17   trial because it is so very critical, important, and

01:34:00   18   fundamental to the entire trial process.

01:34:03   19          It is absolutely essential that the only

01:34:06   20   information you have before you when it comes time for you

01:34:11   21   to decide how to answer the questions that will be

01:34:13   22   presented to you in the verdict form at the end of the

01:34:18   23   trial, it is critical that the only information you have

01:34:21   24   before you and to draw upon to answer those questions must

01:34:26   25   have come from the testimony given under oath in this

01:34:29   1   courtroom from the witness stand subject to

01:34:32   2   cross-examination and those documents that the Court has

01:34:40   3   reviewed and has determined are fully admissible under the

01:34:43   4   Rules of Evidence.

01:34:44   5        There must be nothing else that enters into your

01:34:46   6   decision.  There must be no other information that you draw

01:34:49   7   upon or call upon to answer those questions except the

01:34:53   8   sworn testimony of the witnesses and the exhibits that the

01:34:56   9   Court's admitted into evidence.  Those are the evidence in

01:34:59   10  the case, and you must base your decisions solely and only

01:35:04   11  on the evidence in this case.

01:35:05   12       That's why you're going to hear me say don't

01:35:10   13  discuss this case with anyone time after time, because I

01:35:14   14  promise you, ladies and gentlemen of the jury, if you even

01:35:17   15  try to mention this to somebody, you're going to violate

01:35:21   16  this instruction.  And in doing that, you will put at risk

01:35:25   17  the entire trial process that might have to potentially be

01:35:30   18  discarded and start over again with a whole new jury.  And

01:35:35   19  that would be a huge waste of time and money and resources.

01:35:38   20       So do not discuss this case with anyone.  And when

01:35:41   21  I say "discuss," I mean in the broadest sense of the term.

01:35:45   22  Don't communicate with anybody about this case, not about

01:35:49   23  the lawyers, not about the parties, not about any of what

01:35:53   24  you hear over the course of this trial.

01:35:55   25       And let me just say this:  Unless you live alone,

01:36:01   1   when you get to wherever you live tonight at the end of the

01:36:04   2   day, the first thing that person or persons are going to

01:36:07   3   ask when you walk through the door is, tell me what

01:36:09   4   happened in federal court in Marshall today.

01:36:12   5        Don't even try to answer that question, because if

01:36:15   6   you do, you will almost certainly violate my instruction.

01:36:20   7   Just simply say -- and blame it on me.  Tell them that very

01:36:25   8   serious, stern federal judge told me to not say anything

01:36:30   9   about what happened in federal court in Marshall today, and

01:36:32   10  I'm not going to violate his instruction.  Just blame it on

01:36:36   11  me, because if you even try to answer that, you're going to

01:36:40   12  violate what I've told you.

01:36:41   13       Again, it is fundamental that the answers you will

01:36:44   14  give to the questions you will be asked at the end of the

01:36:47   15  trial that will be presented to you -- presented to you on

01:36:50   16  the verdict form, that information that you draw upon must

01:36:54   17  be only the evidence presented in open court during this

01:36:59   18  trial, including the testimony from the witnesses under

01:37:02   19  oath and subject to cross-examination and the documents and

01:37:06   20  exhibits that the Court admits into evidence.  That's it,

01:37:10   21  ladies and gentlemen.

01:37:11   22       So, again, this is a fundamentally critical

01:37:16   23  instruction.  So when I say don't communicate, don't

01:37:20   24  discuss, don't talk about this case with anybody, that,

01:37:23   25  again, is in the broadest sense of the term.  You don't --

01:37:26  1   you don't do any research.  You don't go home and get on

01:37:29  2   the Internet and do a search engine search of Apple or

01:37:33  3   PanOptis or Unwired Planet or Sam Baxter or Joe Mueller or

01:37:39  4   anybody or anything related to this case.  Do not do any

01:37:44  5   research of any kind in any way.

01:37:46  6       And when I say don't communicate, that's much more

01:37:51  7   than just verbal talking to somebody.  Don't email about

01:37:55  8   it.  Don't text about it.  Don't tweet on Twitter.  Don't

01:38:01  9   post on Facebook.  Don't use any social media of any kind

01:38:04  10  to communicate with anybody in any way about this lawsuit

01:38:09  11  and about this trial.  That's absolutely fundamental.

01:38:14  12      Also, ladies and gentlemen, I don't think it will

01:38:16  13  happen, but I need to tell you that within the realm of

01:38:19  14  possibility, it is possible that some outside third party

01:38:24  15  might approach you during your service as jurors and try to

01:38:29  16  influence you about the decisions you'll make in this case.

01:38:33  17  There is a lot at stake for both the Plaintiff and the

01:38:36  18  Defendant, and this is a big lawsuit.  It's a big case.

01:38:40  19  Small cases don't get to trial in federal court these days.

01:38:45  20      So if anybody in any way should approach you in

01:38:48  21  any fashion that you feel uncomfortable about in the least

01:38:51  22  little way, then you should immediately advise

01:38:55  23  Ms. Clendening.  She will let me know, and the Court will

01:38:58  24  deal with it.

01:38:59  25      However, again, I don't think it's likely, but, as

01:39:02  1   I say, this is not an insignificant case.  And it is within

01:39:06  2   the realm of possibility, and you at least need to be on

01:39:10  3   notice that it is possible, even though I don't think it's

01:39:13  4   likely to happen.

01:39:14  5          Also, ladies and gentlemen, even though we're

01:39:18  6   practicing social distancing and other things in this

01:39:22  7   trial, during the course of the trial, as you come, as you

01:39:25  8   go, as you have a lunch break, as recesses occur throughout

01:39:30  9   the trial, it's possible -- in fact, it's likely that

01:39:35  10  you're going to meet in one of the common areas either

01:39:39  11  inside the courthouse or outside the courthouse some of

01:39:42  12  these lawyers, some of these witnesses, some of the

01:39:44  13  representatives of the companies that are involved in this

01:39:47  14  lawsuit as parties.

01:39:50  15         When you run into -- and I mean that figuratively,

01:39:54  16  when you come in close proximity to any of these people,

01:39:57  17  they're not going to talk to you.  They're not going to say

01:40:01  18  good morning, how are you?  Did you have a good night last

01:40:07  19  night?  They're not going to be engaging in friendly and

01:40:10  20  gregarious conversation, which is what we typically expect

01:40:13  21  in East Texas.  But they're going to do that because

01:40:16  22  they're under instructions from me not to do that.

01:40:19  23         Again, the only information you should have from

01:40:21  24  any source when you answer any of the questions in this

01:40:27  25  trial must come from the witness stand under oath and the

01:40:32  1   exhibits I've admitted in this trial.

01:40:34  2          So if somebody would have been engaging and

01:40:36  3   friendly and spoken to you and they don't, don't hold that

01:40:39  4   against them.  Don't think they're rude or unfriendly.

01:40:43  5   Don't consider it as a negative in any way.  Just

01:40:48  6   understand that's the Court's instruction to them, and

01:40:51  7   they're following what I expect them to do.

01:40:52  8          Now, each of you should have in the chairs next to

01:40:55  9   you one of these plastic face shields -- just like this.

01:41:03  10  They're in a package.  It opens easily.  And I want to

01:41:06  11  mention something to you, ladies and gentlemen.

01:41:07  12         There's a protective film on the front and on the

01:41:11  13  back.  And you have to peel that thin protective film off

01:41:17  14  of both the front and the back.  Otherwise, it looks like

01:41:20  15  you're looking through a foggy window, and you don't have a

01:41:24  16  very good view of everything.  Once the film is off of both

01:41:30  17  sides, you will have a clear view.  I'm going to ask you

01:41:33  18  when you come back after lunch to put these on and keep

01:41:36  19  them on whenever you're in the courtroom.

01:41:37  20         I'm also going to ask you when you come back from

01:41:40  21  lunch if you would -- if you'd -- unless you feel strongly

01:41:45  22  that you should personally keep your mask on, I'm going to

01:41:47  23  ask you to wear the face shield and not wear the mask.

01:41:52  24         And let me tell you why.  It's very important for

01:41:54  25  the lawyers to be able to see your entire face because

01:41:58   1   throughout this trial, they're going to be watching you

01:42:00   2   just like you're going to be watching them.  And if -- if

01:42:04   3   they have an important point to get across, they need to

01:42:07   4   see your expression and your reaction and your face to know

01:42:11   5   if they've hit the target or if they missed the target.

01:42:14   6          And it's hard to do that when at least half and

01:42:17   7   maybe more than half of your face is covered up with a

01:42:22   8   mask.  I'm not going to require that you take the mask off.

01:42:25   9   If you feel personally for your own well-being you'd be

01:42:29  10   better off if you wear it, I will let you continue to wear

01:42:32  11   it.

01:42:33  12          But I'm going to ask whether you keep the mask or

01:42:35  13   not keep the mask, that you wear the plastic face shield.

01:42:38  14   And with the plastic face shield, and even without the

01:42:41  15   mask, you'll have a certain level of direct personal

01:42:44  16   protection and yet the Court and the lawyers and the

01:42:48  17   participants will be able to see the entirety of your face.

01:42:52  18          You'll notice we've got a Plexiglass shield in

01:42:55  19   front of the witness stand.  The witness is much more than

01:42:58  20   six feet away from the closest jurors.  The lawyers will

01:43:01  21   speak to you from the podium across the room.  The lawyers

01:43:03  22   should never be much closer to you than where that podium

01:43:07  23   is and where they're seated at the counsel table.

01:43:10  24          So we're going to keep an appropriate distance

01:43:13  25   every way we can.  But if you would wear these -- and

01:43:16  1  they're not uncomfortable.  I've -- I've worn it and tried

01:43:20  2  it -- although I'm probably further away from you than

01:43:24  3  anyone else in the courtroom here on the bench.  They're

01:43:27  4  not uncomfortable at all.  If you would please wear that

01:43:30  5  when you come back from lunch.  And unless you feel

01:43:33  6  compelled in your own personal judgment, I'd ask you to

01:43:38  7  wear the face shield and not the mask as we go forward with

01:43:44  8  the process.

01:43:44  9          All right.  Ladies and gentlemen, with those

01:43:45  10  instructions, I'm going to allow you to recess to the jury

01:43:48  11  room.  And, as I say, the clerk's office has provided lunch

01:43:52  12  for you.  It's there.  It's 1:43 by the clock that I have

01:44:01  13  in front of me.  We'll call it a quarter until 2:00.  I

01:44:06  14  know the lunch is already there.  I'm not going to ask you

01:44:09  15  to wait on it.  I'm going to ask you to take 30 to 40

01:44:14  16  minutes to take a lunch, and then I will bring you back

01:44:18  17  out.  I will have some formal instructions to give you on

01:44:21  18  the record at that time.  Then we'll proceed to opening

01:44:24  19  statements from Plaintiff and then opening statements from

01:44:25  20  the Defendant.

01:44:26  21          I do not expect to hear the first witness called

01:44:29  22  until tomorrow, but I do think we'll be able to get through

01:44:33  23  both the Plaintiffs' and the Defendant's opening statements

01:44:35  24  today, so that in the morning, we can start with the first

01:44:41  25  witness for the Plaintiff.

01:44:42  1          Also, so you'll know, my best estimate of how long

01:44:46  2    the trial is going to take is based on my experience for

01:44:50  3    the last nine years since I've had this job as United

01:44:54  4    States District Judge in the Marshall Division of the

01:44:56  5    Eastern District of Texas.  I find, ladies and gentlemen,

01:45:00  6    that folks in East Texas would rather come early and stay

01:45:03  7    late and be gone from their families and their work a fewer

01:45:10  8    number of days than coming mid-morning and leave

01:45:16  9    mid-afternoon and be here 5 or 10 or 15 days.

01:45:19  10         So I'm going to follow that approach in this

01:45:21  11   trial.  When we start each morning, I'm going to ask you to

01:45:25  12   be in the jury room assembled and ready to go by 8:30.  And

01:45:28  13   you'll need to plan your travel accordingly.  That means

01:45:32  14   you'll need to get here not later than 8:15.  And we'll

01:45:36  15   take recesses throughout the day, and we'll, of course,

01:45:40  16   have a similar kind of lunch brought in at a break each day

01:45:46  17   like we're having today.

01:45:47  18         But I don't expect us to leave at 5:00 o'clock.

01:45:50  19   We will probably go at least until 6:00 o'clock each day.

01:45:53  20   And if we start early and we keep the breaks fairly minimum

01:45:56  21   and we take a shorter lunch break because you don't have to

01:46:00  22   go anywhere and lunch is right in the next room and we go

01:46:03  23   until about 6:00 o'clock, depending how the witnesses fall,

01:46:07  24   we can get through with this trial in the time period I've

01:46:10  25   given you.

01:46:11  1          So you need to know going forward my expectation
01:46:15  2   is we'll start early and go late, but we'll finish quicker
01:46:19  3   than we would if we drag this process out.
01:46:23  4          I have lots of friends that are district judges in
01:46:28  5   big areas, and they start at 8:30 and finish about 4:30.
01:46:35  6   With lots of traffic in coming and going, I might do it
01:46:38  7   differently there, but in East Texas, we have the luxury of
01:46:42  8   relatively simple travel.
01:46:44  9          Now, we have distances, but we don't have big
01:46:48  10  traffic jams to deal with like in big urban settings.  So
01:46:54  11  that's really what I'm hoping for -- for a schedule.
01:46:58  12  That's not written in stone, that's just to give you a
01:47:01  13  working idea of what to expect and to let your families and
01:47:05  14  those you live with what to know as when you'll be home at
01:47:11  15  night and so on and so forth.
01:47:13  16         So with those instructions, ladies and gentlemen,
01:47:14  17  I'm going to excuse you to the jury room to have lunch.
01:47:17  18  And we'll meet back in here between 2:15 and 2:30.  With
01:47:23  19  that, the jury is excused for lunch.
01:47:25  20         COURT SECURITY OFFICER:  All rise.
01:48:02  21         (Jury out.)
01:48:07  22         THE COURT:  Be seated.
01:48:08  23         Counsel, I'm going to take a short recess, but
01:48:11  24  somewhere close to 2:00 o'clock, I need to see you in
01:48:14  25  chambers because we have apparently disputes regarding

01:48:18  1  opening demonstratives and things that need to be covered

01:48:21  2  before we can proceed with that portion of the trial.

01:48:22  3       Are there things that either side has that you

01:48:26  4  need to raise with the Court at this juncture?

01:48:28  5       MR. SHEASBY:  Your Honor, based on your

01:48:29  6  instructions this morning, we've prepared a revised version

01:48:33  7  of the slides, it's narrowing your disputes, and with your

01:48:36  8  permission, I'll hand it up.  There's no surprise here I've

01:48:39  9  emailed them.

01:48:39 10       THE COURT:  Have you talked with Mr. Mueller about

01:48:42 11  it?

01:48:42 12       MR. MUELLER:  I know they've been sent over to the

01:48:45 13  team.  I've not seen them.

01:48:47 14       MR. SHEASBY:  I've sent them to the team.

01:48:48 15       THE COURT:  Before you approach, Mr. Sheasby, I'm

01:48:51 16  going to ask you and Mr. Mueller the first few minutes

01:48:55 17  after I recess to sit down and look at those together.  And

01:48:58 18  if there are remaining disputes, I'll have one of my law

01:49:02 19  clerks here, and you can let them know what the remaining

01:49:04 20  disputes are.  But it doesn't do any good for me to look at

01:49:08 21  this until I have reactions from the other side unless I

01:49:12 22  know there are still disputes.

01:49:14 23       You all meet briefly, I'll have my staff meet with

01:49:20 24  you, and shortly right after at 2:00 o'clock, we'll go over

01:49:24 25  whatever disputes regarding demonstratives and other

01:49:28    1    disputes with opening statements that may stand between us

01:49:32    2    and us going forward.

01:49:34    3                All right.  Court stands in recess.

01:49:36    4                COURT SECURITY OFFICER:  All rise.

01:49:37    5                (Recess.)

            6

            7                          CERTIFICATION

            8

            9          I HEREBY CERTIFY that the foregoing is a true and

           10    correct transcript from the stenographic notes of the

           11    proceedings in the above-entitled matter to the best of my

           12    ability.

           13

           14

           15     /S/ Shelly Holmes                         8/3/2020
                 SHELLY HOLMES, CSR, TCRR                  Date
           16    OFFICIAL REPORTER
                 State of Texas No.: 7804
           17    Expiration Date: 12/31/20

           18

           19

           20

           21

           22

           23

           24

           25