03:21:21

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
 2                           MARSHALL DIVISION

 3
    OPTIS WIRELESS TECHNOLOGY,    )(   CIVIL ACTION NO.
 4  LLC, OPTIS CELLULAR           )(   2:19-CV-66-JRG
    TECHNOLOGY, LLC, PANOPTIS     )(
 5  PATENT MANAGEMENT, LLC,       )(
    UNWIRED PLANET, LLC, UNWIRED  )(
 6  PLANET INTERNATIONAL LIMITED, )(
         PLAINTIFFS,              )(
 7                               )(
    VS.                          )(
 8                               )(   MARSHALL, TEXAS
                                 )(   AUGUST 3, 2020
 9  APPLE INC.,                  )(   3:47 P.M.
         DEFENDANTS.             )(

10

11                TRANSCRIPT OF JURY TRIAL

12                   AFTERNOON SESSION

13        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14            UNITED STATES CHIEF DISTRICT JUDGE

15
    APPEARANCES:
16

17  FOR THE PLAINTIFFS:

18
    MR. SAMUEL F. BAXTER
19  MS. JENNIFER TRUELOVE
    MCKOOL SMITH, P.C.
20  104 E. Houston Street
    Suite 300
21  Marshall, TX 75670

22
    MR. JASON G. SHEASBY
23  MS. ANNITA ZHONG
    IRELL & MANELLA LLP
24  1800 Avenue of the Stars
    Suite 900
25  Los Angeles, CA 90067
```

```
 1   FOR THE PLAINTIFFS:

 2
     MR. STEVEN J. POLLINGER
 3   MR. SETH R. HASENOUR
     MCKOOL SMITH, P.C.
 4   300 W. 6th Street
     Suite 1700
 5   Austin, TX 78701

 6
     MR. JONATHAN YIM
 7   MCKOOL SMITH, P.C.
     One Manhattan West
 8   395 9th Avenue
     50th Floor
 9   New York, NY 10001

10
     MR. CHRISTOPHER P. MCNETT
11   MCKOOL SMITH, P.C.
     1999 K Street, NW
12   Suite 600
     Washington, DC 20006
13

14   MS. INGRID PETERSEN
     MS. KELSEY SCHUETZ
15   IRELL & MANELLA LLP
     840 Newport Center Drive
16   Suite 400
     Newport Beach, CA 92660
17

18   FOR THE DEFENDANT:

19
     MR. JOSEPH J. MUELLER
20   WILMER CUTLER PICKERING
     HALE & DORR, LLP
21   60 State Street
     Boston, MA 02109
22

23   MR. MICHAEL J. SUMMERSGILL
     WILMER CUTLER PICKERING
24   HALE & DORR, LLP
     60 State Street
25   Boston, MA 02109
```

```
1   FOR THE DEFENDANT:

2
    MS. MELISSA R. SMITH
3   GILLAM & SMITH, LLP
    303 South Washington Avenue
4   Marshall, TX 75670

5

6

7

8   COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
9                        United States District Court
                         Eastern District of Texas
10                       Marshall Division
                         100 E. Houston
11                       Marshall, Texas  75670
                         (903) 923-7464
12

13
    (Proceedings recorded by mechanical stenography, transcript
14  produced on a CAT system.)

15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | P R O C E E D I N G S                                  |
| 03:25:40 | 2  | (Jury out.)                                         |
| 03:25:40 | 3  | COURT SECURITY OFFICER:  All rise.                 |
| 03:25:41 | 4  | THE COURT:  Be seated, please.                     |
| 03:47:22 | 5  | Counsel, to briefly follow up on the discussions   |
| 03:47:48 | 6  | we had in chambers regarding disputed demonstratives for |
| 03:47:53 | 7  | opening statements, I raised a question with you about |
| 03:47:59 | 8  | Plaintiffs' Demonstrative 1.13, which had a representation |
| 03:48:05 | 9  | of PX-1612 on it.                                  |
| 03:48:07 | 10 | And there was a question about whether the         |
| 03:48:09 | 11 | language on that section of PX-1612 was actually there or |
| 03:48:15 | 12 | whether it had been added.  Did you satisfy yourselves |
| 03:48:17 | 13 | about the original status of PTX-1612?             |
| 03:48:21 | 14 | MR. MUELLER:  Your Honor, we haven't had a chance  |
| 03:48:23 | 15 | to check, but we'll withdraw the objection to streamline |
| 03:48:26 | 16 | this.                                              |
| 03:48:26 | 17 | THE COURT:  All right.  Then that demonstrative is |
| 03:48:28 | 18 | acceptable.                                        |
| 03:48:29 | 19 | With regard to the three different demonstratives  |
| 03:48:31 | 20 | that relate to prior deposition testimony from Ms. Heather |
| 03:48:38 | 21 | Mewes, two of them appear to be the identical slide.  One |
| 03:48:48 | 22 | is PDX-1.35, one is PDX-1.23, and those two appear to me to |
| 03:49:17 | 23 | be verbatim the same thing.                        |
| 03:49:19 | 24 | And then one is PDX-1.34.  PDX-1.34 that refers    |
| 03:49:29 | 25 | specifically to June of 2017 is out.  PDX-1.23 and 1.35, |

| | | |
|---|---|---|
| 03:49:37 | 1 | which does not reference a specific date other than 2018, |
| 03:49:42 | 2 | those are acceptable for opening statement purposes. |
| 03:49:47 | 3 | All right.  Before I bring the jury in, counsel, |
| 03:49:54 | 4 | is there anything else before we proceed with my |
| 03:49:56 | 5 | preliminary instructions and your opening statements to the |
| 03:50:00 | 6 | jury that needs to be taken up? |
| 03:50:02 | 7 | MR. MUELLER:  No, Your Honor. |
| 03:50:04 | 8 | MR. SHEASBY:  Your Honor, they raised an objection |
| 03:50:05 | 9 | to another slide that they hadn't objected to previously |
| 03:50:10 | 10 | that they're now objecting to because it's similar -- |
| 03:50:14 | 11 | similar but different than a slide they did object to.  In |
| 03:50:18 | 12 | the excess of caution, I would seek permission to show |
| 03:50:21 | 13 | Your Honor so you can -- they just told me they're |
| 03:50:24 | 14 | objecting to it now. |
| 03:50:25 | 15 | MR. MUELLER:  This is not -- |
| 03:50:26 | 16 | THE COURT:  Well, I met with counsel for both |
| 03:50:29 | 17 | parties for at least 40 minutes in chambers.  We went over |
| 03:50:34 | 18 | all these disputes.  This is something that was not raised |
| 03:50:37 | 19 | then, and you're telling me, Mr. Sheasby, that after |
| 03:50:40 | 20 | counsel returned to the courtroom and before I entered |
| 03:50:44 | 21 | this -- it was a late-breaking dispute that had not |
| 03:50:47 | 22 | otherwise been raised? |
| 03:50:48 | 23 | MR. SHEASBY:  Yeah, they're now saying they object |
| 03:50:51 | 24 | to this slide. |
| 03:50:52 | 25 | MR. MUELLER:  Your Honor, the truth is Mr. Sheasby |

| | | |
|---|---|---|
| 03:50:55 | 1 | showed me the slide after you left the courtroom.  It's |
| 03:50:57 | 2 | precisely what Your Honor ruled on with respect -- when you |
| 03:50:57 | 3 | see the slide, you'll understand -- |
| 03:50:58 | 4 | THE COURT:  Put the slide on the overhead |
| 03:51:01 | 5 | projector, please, Mr. Sheasby. |
| 03:51:03 | 6 | MR. SHEASBY:  So this is not a slide they |
| 03:51:05 | 7 | object -- it's Slide 35, Your Honor. |
| 03:51:06 | 8 | THE COURT:  Well, I want to see what the objection |
| 03:51:08 | 9 | is. |
| 03:51:09 | 10 | MR. SHEASBY:  So this is -- this is not a slide |
| 03:51:14 | 11 | they objected to.  Separate patentability is relevant to |
| 03:51:18 | 12 | Doctrine of Equivalents and equivalents.  The fact that |
| 03:51:22 | 13 | they couldn't find any different way of doing -- patented |
| 03:51:25 | 14 | any different way of doing it is -- is relevant to the |
| 03:51:27 | 15 | Federal Circuit. |
| 03:51:28 | 16 | They didn't object to it I think because they were |
| 03:51:30 | 17 | successful on the other one which related to the question |
| 03:51:33 | 18 | of whether Apple had any LTE patents.  They felt that there |
| 03:51:36 | 19 | may be -- I'm not going to characterize why -- but this is |
| 03:51:40 | 20 | a different issue.  This goes to separate patentability |
| 03:51:44 | 21 | which is relevant to equivalents, Your Honor. |
| 03:51:44 | 22 | THE COURT:  Mr. Mueller, what's your response? |
| 03:51:45 | 23 | MR. MUELLER:  Your Honor, I thought this was |
| 03:51:46 | 24 | exactly what Your Honor had dealt with, that there was no |
| 03:51:49 | 25 | reason for these technical experts to be offering opinions |

03:51:51  1  on Apple patents that they hadn't gotten into the reports.

03:51:55  2  I'm surprised to hear that this was not already resolved.

03:51:55  3          MR. SHEASBY:  Your Honor, there's no objection to

03:51:56  4  this slide in the papers.

03:51:57  5          THE COURT:  This slide is excluded.

03:52:53  6          All right.  Let's bring in the jury, please.

03:52:55  7          COURT SECURITY OFFICER:  All rise.

03:52:57  8          (Jury in.)

03:54:01  9          THE COURT:  Be seated, please.

03:54:02  10         I'm sorry, ladies and gentlemen.  If I had known

03:54:49  11  these were still out here, I would have had the clerk's

03:54:52  12  office bring them to you.  Take a moment.  Be sure to get

03:54:57  13  that protective film off.

03:55:00  14         I want to welcome you back from lunch, ladies and

03:55:31  15  gentlemen.  Thank you for being available and prompt.

03:55:34  16  We're going to try to keep this case running, as I

03:55:37  17  indicated earlier, so we can keep to the time schedule I

03:55:42  18  had visited with you about during jury selection.

03:55:44  19         However, I now have some preliminary instructions

03:55:48  20  that I need to give you on the record before we start with

03:55:52  21  opening statements from the lawyers and then get on to the

03:55:54  22  witnesses and their evidence.

03:55:56  23         You've been sworn as the jurors in this case, and

03:55:58  24  as the jury, you are the sole judges of the facts, and as

03:56:03  25  such, you will decide and determine what all the facts are

03:56:07   1   in this case.

03:56:08   2          As the judge, I will give you instructions on the

03:56:10   3   law.  I will decide questions of law that arise during the

03:56:13   4   trial.  I will handle matters related to evidence and

03:56:16   5   procedure.  I am responsible for managing the flow of the

03:56:21   6   trial and maintaining the decorum of the courtroom.

03:56:24   7          At the end of the evidence, I'll give you detailed

03:56:27   8   instructions about the law to apply in deciding this case,

03:56:31   9   and I'll give you a list of questions that you are then to

03:56:34  10   answer.

03:56:35  11          As I told you, this list of questions is called

03:56:37  12   the verdict form.  Your answers to those questions will

03:56:42  13   need to be unanimous, and those unanimous answers will

03:56:46  14   constitute the verdict in this case.

03:56:48  15          Now, I want to briefly tell you what this case is

03:56:52  16   about.  As you know, it involves a dispute regarding

03:56:57  17   certain United States patents.  I know that each of you saw

03:57:00  18   the video this morning produced by the Federal Judicial

03:57:05  19   Center, but I need to give you some instructions now and on

03:57:07  20   the record about a patent and how one is obtained.

03:57:10  21          Patents are granted or denied by the United States

03:57:13  22   Patent and Trademark Office, often referred to, for short,

03:57:16  23   simply as the PTO.

03:57:17  24          A valid United States patent gives the

03:57:21  25   patentholder the right for up to 20 years from the date the

03:57:25  1  patent application is filed to prevent others from making,

03:57:30  2  using, offering to sell, or selling the patented invention

03:57:33  3  within the United States or from importing it into the

03:57:37  4  United States without the patentholder's permission.

03:57:41  5       A patent is a form of property called intellectual

03:57:43  6  property.  And like other forms of property, a patent can

03:57:48  7  be bought or sold.

03:57:49  8       A violation of a patentholder's rights is called

03:57:53  9  infringement.  A patentholder may try to enforce a patent

03:57:57  10  against persons it believes to be infringers by filing a

03:58:01  11  lawsuit in federal court, and that's what we have in the

03:58:03  12  case before us.

03:58:04  13       The process of obtaining a patent is called patent

03:58:08  14  prosecution.  To obtain a patent, one must first file an

03:58:13  15  application with the United States Patent and Trademark

03:58:15  16  Office.

03:58:17  17       The PTO is an agency of the United States

03:58:21  18  Government that employs -- employs trained examiners who

03:58:25  19  review patents or patent applications.  The application

03:58:29  20  includes what's called a specification.

03:58:32  21       The specification within a patent application

03:58:36  22  contains a written description of what the claim -- what is

03:58:40  23  the claimed invention telling what it is, how it works, how

03:58:44  24  to make it, and how to use it.

03:58:46  25       The specification concludes, or ends, with one or

03:58:50   1   more numbered sentences.  These numbered sentences are

03:58:53   2   called the patent claims.

03:58:55   3        When a patent is granted by the PTO, it's the

03:58:59   4   claims that define the boundaries of its protection and

03:59:03   5   give notice to the public of those boundaries.

03:59:06   6        Patent claims, ladies and gentlemen, may exist in

03:59:08   7   two forms referred to as independent claims and dependent

03:59:12   8   claims.

03:59:14   9        An independent claim does not refer to any other

03:59:17  10   claim in the patent.  It is independent.  It's not

03:59:21  11   necessary to look at any other claim to determine what an

03:59:25  12   independent claim covers.

03:59:26  13        However, a dependent claim refers to at least one

03:59:31  14   other claim in the patent.  A dependent claim includes each

03:59:36  15   of the elements or limitations of that other claim or

03:59:40  16   claims to which it refers or, as we sometimes say, from

03:59:46  17   which it depends, as well as the additional limitations

03:59:50  18   recited within the dependent claim itself.

03:59:51  19        Therefore, to determine what a dependent claim

03:59:55  20   covers, it's necessary to look at both the dependent claim

03:59:58  21   itself and the independent claim or claims from which it

04:00:02  22   refers or from which it depends.

04:00:05  23        The claims of the patents-in-suit use the word

04:00:10  24   comprising.  Comprising means including or containing.  A

04:00:15  25   claim that includes the word comprising is not limited to

04:00:19   1   the methods or devices having only the elements that are

04:00:23   2   recited in the claim but also covers other methods or

04:00:26   3   devices that add additional elements.

04:00:29   4        Let me give you an example.  If you take, for

04:00:32   5   example, a claim that covers a table, the claim recites a

04:00:37   6   table comprising a tabletop, four legs, and glue, that

04:00:42   7   claim will cover any table that contains a tabletop, four

04:00:47   8   legs, and glue, even if it contains other structures such

04:00:51   9   as wheels that go on the end of the legs or leaves that go

04:00:54  10   in the tabletop.

04:00:58  11        Now, that's a simple example using the word

04:01:01  12   comprising and what it means.  In other words, ladies and

04:01:04  13   gentlemen, it can have other features in addition to those

04:01:06  14   that are covered by the patent.

04:01:07  15        Now, after an applicant files an application with

04:01:13  16   the PTO, an examiner is assigned by the PTO, and that

04:01:17  17   examiner reviews the application to determine whether or

04:01:19  18   not the claims are patentable, that is to say, appropriate

04:01:23  19   for patent protection, and whether or not the specification

04:01:28  20   adequately describes the invention that's claimed.

04:01:31  21        In examining a patent application, the examiner

04:01:35  22   reviews certain information about the state of the

04:01:38  23   technology at the time the application was filed.  The PTO

04:01:43  24   searches for and reviews this type of information that is

04:01:47  25   publicly available or that was submitted by the applicant.

04:01:52  1  This type of information is called prior art.

04:01:54  2       The examiner reviews this prior art to determine

04:01:59  3  whether or not the invention is truly an advance over the

04:02:02  4  state of the art at the time.

04:02:04  5       Prior art is defined by law, and I'll give you at

04:02:09  6  a later time specific instructions as to what constitutes

04:02:12  7  prior art.  However, in general, prior art includes

04:02:17  8  information that demonstrates the state of the technology

04:02:20  9  that existed before the claimed invention was made or

04:02:25  10  before the application for a patent was filed.

04:02:28  11       Now, a patent contains a certain list of prior art

04:02:32  12  that the examiner has considered.  And the items on this

04:02:37  13  list of prior art, which the examiner has considered, are

04:02:40  14  called the cited references.

04:02:44  15       Now, after the prior art search and an examination

04:02:47  16  of the application, the examiner informs the applicant in

04:02:52  17  writing of what the examiner has found and whether the

04:02:56  18  examiner considers any claim to be patentable, and thus it

04:03:01  19  would be allowed.

04:03:02  20       This writing from the examiner to the applicant is

04:03:06  21  called an Office Action.  Now, if the examiner rejects the

04:03:12  22  claims, the applicant has an opportunity to respond to the

04:03:14  23  examiner to try and persuade the examiner to allow the

04:03:18  24  claims.

04:03:19  25       The applicant also has the chance to change or

04:03:22  1   amend the claims or to submit new claims, and the papers

04:03:25  2   generated during these communications back and forth

04:03:28  3   between the applicant and the examiner are called the

04:03:32  4   prosecution history.

04:03:34  5        And this process -- this prosecution history

04:03:37  6   process may go back and forth between the applicant and the

04:03:42  7   examiner for some time until the examiner is ultimately

04:03:44  8   satisfied that the application meets the requirements for a

04:03:48  9   patent.  And, in that case, the patent is issued as a

04:03:51  10  United States patent, or in the alternative, if the -- if

04:03:56  11  the examiner ultimately concludes that the application

04:03:58  12  should reject -- should be rejected, then no patent is

04:04:01  13  issued.

04:04:02  14       Sometimes patents are issued after appeals within

04:04:06  15  the Patent and Trademark Office or to a court.

04:04:11  16       The fact, ladies and gentlemen, that the PTO

04:04:13  17  grants a patent does not necessarily mean that the

04:04:16  18  invention claimed in the patent, in fact, deserves the

04:04:19  19  protection of a patent.

04:04:21  20       Now, while an issued United States patent is

04:04:24  21  presumed to be valid under the law, a person accused of

04:04:29  22  infringement has the right to argue in federal court that a

04:04:33  23  claimed invention in a patent is invalid.

04:04:36  24       It's your job, ladies and gentlemen, as the jury,

04:04:39  25  to consider the evidence presented by the parties and to

04:04:43  1  determine independently and for yourselves whether or not

04:04:47  2  the Defendant has proven that a patent is invalid.

04:04:50  3       Now, to help you follow the evidence, I'll give

04:04:54  4  you a brief summary of the positions of the two parties.

04:04:57  5       As you know, the party or parties that bring a

04:05:01  6  lawsuit is called the Plaintiff, or if there's more than

04:05:05  7  one, they're called the Plaintiffs.

04:05:07  8       The Plaintiffs in this case are Optis Wireless

04:05:10  9  Technology, LLC; Optis Cellular Technology, LLC; PanOptis

04:05:15  10 Patent Management, LLC; Unwired Planet, LLC; and Unwired

04:05:24  11 Planet International Limited.

04:05:25  12      Now, all of these Plaintiffs collectively you're

04:05:28  13 going to hear referred to throughout the case simply as

04:05:31  14 either the Plaintiffs or you'll hear them referred to as

04:05:36  15 Optis or you may hear them referred to as PanOptis.  If you

04:05:40  16 hear any of those, Optis, PanOptis, or Plaintiffs, it

04:05:44  17 refers to each of these identified companies that stand in

04:05:48  18 the position of being a Plaintiff in this lawsuit.

04:05:50  19      And as you're all aware, the party against whom a

04:05:55  20 lawsuit is filed is called the Defendant.  In this case, we

04:05:59  21 have one Defendant, and that is Apple Inc.  And you'll hear

04:06:02  22 that Defendant referred to simply as Defendant or as Apple

04:06:07  23 throughout the lawsuit.

04:06:08  24      Now, as I mentioned to you during jury selection

04:06:12  25 earlier today, this is a case of alleged patent

04:06:14 1   infringement.  And as I've already mentioned, there are
04:06:18 2   five separate United States patents that have been asserted
04:06:22 3   by the Plaintiffs in this case against the Defendant.
04:06:26 4         The first patent is U.S. Patent No. 8,019,332.
04:06:32 5   And, as you may know, patents are commonly referred to by
04:06:36 6   the last three digits of the patent number.  So this
04:06:40 7   particular patent, Patent No. 8,019,332, will be referred
04:06:45 8   to as the '332 patent or the '332 patent.
04:06:50 9         The second U.S. patent at issue in this case is
04:06:54 10  United States Patent No. 8,385,284, referred to as the '284
04:07:01 11  or the '284 patent.
04:07:02 12        The third U.S. patent at issue in this case is
04:07:05 13  United States Patent No. 8,411,557, which you will hear
04:07:12 14  referred to as the '557 patent, or you may hear it called
04:07:15 15  the '557 patent.
04:07:16 16        The fourth U.S. patent at issue in this case is
04:07:20 17  United States Patent No. 8,102,833, which you'll hear
04:07:26 18  called the '833 or the '833 patent.
04:07:28 19        The fifth and final U.S. patent at issue in this
04:07:32 20  case is United States Patent No. 9,001,774, which you'll
04:07:38 21  hear referred to as the '774 or the '774 patent.
04:07:41 22        Now, these five patents, ladies and gentlemen,
04:07:45 23  collectively, you'll hear referred to at various times
04:07:49 24  throughout this trial as the patents-in-suit.  You may also
04:07:53 25  hear them referred to collectively as the asserted patents.

04:07:57  1          Both of those things mean the same thing -- that

04:08:01  2  is, the five patents I've just identified for you.  And all

04:08:06  3  five of these patents-in-suit, or these asserted patents,

04:08:09  4  generally relate to cell phone technology.

04:08:11  5          Now, the Plaintiffs, Optis, contend that the

04:08:15  6  Defendant, Apple, is willfully infringing certain claims of

04:08:20  7  the patents-in-suit by making, importing, or selling

04:08:25  8  products that include their patented technology.

04:08:27  9          Optis also contends that Apple has induced or

04:08:32  10 contributed to and continues to induce or contribute to

04:08:37  11 infringement by others.  And Optis contends that it's

04:08:41  12 entitled to money damages as a result of that infringement.

04:08:44  13          The Defendant, Apple, denies that it is infringing

04:08:47  14 any of the patents-in-suit asserted by the Plaintiffs, and

04:08:51  15 the Defendant contends that the asserted claims of the

04:08:54  16 patents-in-suit are invalid as either being anticipated or

04:09:00  17 obvious in the light of prior art.

04:09:01  18          Apple also contends that the asserted claims of

04:09:06  19 the patents-in-suit are invalid because the -- the patent

04:09:11  20 specifications do not contain a sufficient written

04:09:15  21 description of the invention and do not enable a person

04:09:19  22 skilled in the art to make and use the invention.

04:09:22  23          Finally, Defendant, Apple, contends that even if

04:09:27  24 it does infringe the asserted patents, any damages awarded

04:09:30  25 to the Plaintiffs should be limited because the Plaintiffs

04:09:35    1    failed to provide Apple with notice of the patents-in-suit

04:09:39    2    required under the patent laws of the United States.

04:09:41    3         Now, during the course of the trial, it's likely

04:09:46    4    that you'll hear refer -- you'll hear the patents-in-suit

04:09:49    5    referred to as standard essential patents, or SEPs.

04:09:56    6         Standard essential patents, ladies and gentlemen,

04:09:57    7    are patents that have been declared to be a part of a

04:10:01    8    standard in a certain field.  This standard is set and

04:10:05    9    maintained by a global body to ensure that certain

04:10:08   10    processes and devices operate and work in the same way

04:10:14   11    anywhere in the world.

04:10:15   12         For example, it would be counterproductive for

04:10:19   13    your cell phone to work only in the United States such that

04:10:22   14    if you got on a plane and flew to London, England, and got

04:10:28   15    off of the airplane, your cell phone that you use every day

04:10:32   16    at your home in Texas wouldn't work in the United Kingdom

04:10:34   17    or in Europe or in Asia or anywhere else on the planet.

04:10:38   18         To prevent this, standard technologies are created

04:10:41   19    such that tele -- telecommunication devices like your cell

04:10:48   20    phones interwork across different places in the world and

04:10:51   21    different brands of devices.  Patents related to such a

04:10:56   22    common and standard technology are recognized as impacting

04:10:58   23    that standard technology and are contributed to and

04:11:03   24    declared by their owner to be essential to that standard.

04:11:07   25         These are called standard essential patents.  In

04:11:11   1   this case, the five patents-in-suit, or the asserted

04:11:16   2   patents, have all been declared by their owner to be

04:11:20   3   standard essential patents related to the field of wireless

04:11:25   4   communications.

04:11:25   5          In this case, one of the groups or global bodies

04:11:29   6   that oversees and maintains this standard is called the

04:11:34   7   European Telecommunications Standards Institute or ETSI.

04:11:41   8   And this is simply referred to, for shorthand, ladies and

04:11:44   9   gentlemen, as ETSI, E-T-S-I.

04:11:45   10          Because the asserted patents here are standard

04:11:51   11   essential patents, you will hear about the standard and the

04:11:53   12   contribution of these patents to the standard and the work

04:11:56   13   of ETSI relating to the standard, all as a part of this

04:12:02   14   trial.  And I'll give you more detailed instructions on

04:12:04   15   these matters at the end of the trial.

04:12:07   16          Now, ladies and gentlemen, I know that there are

04:12:13   17   lots of new words and new concepts that have been thrown at

04:12:16   18   you since you arrived for jury duty this morning.  I'm

04:12:19   19   going to define a lot of these words and concepts for you

04:12:23   20   as we go through these instructions.  The attorneys are

04:12:25   21   going to discuss them in their opening statements.

04:12:28   22          And the witnesses are going to help you by going

04:12:30   23   through their testimony to help understand these words and

04:12:34   24   concepts.

04:12:35   25          So, please, do not feel overwhelmed at this stage.

04:12:39  1  It will all come together as we go through the trial, I
04:12:43  2  promise.
04:12:43  3        Now, one of your jobs in this case is to decide
04:12:52  4  whether or not the asserted claims of the five asserted
04:12:59  5  patents have been infringed and whether they are invalid.
04:13:00  6        If you decide that any claim of the
04:13:02  7  patents-in-suit has been infringed by the Defendant and is
04:13:05  8  not invalid, then you'll need to decide whether or not the
04:13:09  9  infringement by the Defendant has been willful.
04:13:11  10        You will also need to decide what amount of money
04:13:15  11  damages should be awarded to the Plaintiffs as compensation
04:13:19  12  for that infringement that you have found.
04:13:21  13        Now, my job in this case is to tell you what the
04:13:26  14  law is, handle the rulings on evidence and procedure, and
04:13:29  15  to oversee the trial effectively and efficiently.
04:13:32  16        In determining the law, ladies and gentlemen, it
04:13:35  17  is specifically my job to determine the meaning of any
04:13:39  18  claim language from within the asserted patents that needs
04:13:43  19  interpretation.
04:13:44  20        I have already determined the meanings of the
04:13:48  21  claims of the patents-in-suit, and you must accept those
04:13:53  22  meanings or constructions that I give you and use those
04:13:56  23  meanings when you decide whether any particular claim has
04:13:59  24  or has not been infringed and whether -- whether you decide
04:14:03  25  any particular claim is or is not invalid.

04:14:06    1          And you'll be given a document in a moment that
04:14:11    2    reflects these meanings that I've already arrived at.
04:14:15    3          For any claim term which I have not provided you
04:14:19    4    with a specific definition, you should apply the plain and
04:14:22    5    ordinary meaning.
04:14:23    6          If, however, I provided you with a specific
04:14:34    7    definition, you are to apply my definition to those terms
04:14:37    8    throughout the case.
04:14:40    9          However, my interpretation of the language of the
04:14:42   10    claims should not be taken by you as an indication that I
04:14:46   11    have a personal opinion or any opinion regarding issues
04:14:50   12    such as infringement and invalidity.  Those, ladies and
04:14:54   13    gentlemen, are your issues alone to decide.
04:14:56   14          I'll provide you with more detailed instructions
04:15:00   15    on the meaning of the claims before you retire to
04:15:03   16    deliberate and reach your verdict.
04:15:05   17          In deciding the issues that are before you, you'll
04:15:08   18    be asked to consider specific legal rules, and I'll give
04:15:12   19    you an overview of those rules now.  And then at the
04:15:15   20    conclusion of the case, I'll give you much more detailed
04:15:17   21    instructions.
04:15:18   22          The first issue that you're asked to decide is
04:15:22   23    whether the Defendant, Apple, has infringed any of the
04:15:27   24    asserted claims of the patents-in-suit.  Infringement is
04:15:31   25    assessed on a claim-by-claim basis.  And the Plaintiffs,

04:15:37  1    Optis, must show by a preponderance of the evidence that a
04:15:40  2    claim has been infringed.  Therefore, there may be
04:15:46  3    infringement as to one claim but no infringement as to
04:15:49  4    another claim.
04:15:49  5          There are also a few different ways that a patent
04:15:52  6    can be infringed, and I'll explain the requirements for
04:15:57  7    each of these types of infringement to you in detail at the
04:16:01  8    conclusion of the case.
04:16:02  9          But in general, ladies and gentlemen, a Defendant
04:16:04  10   may infringe the asserted patent by making, using, or
04:16:09  11   selling or offering for sale in the United States or
04:16:11  12   importing into the United States a product meeting all the
04:16:16  13   elements or requirements of a claim of the asserted patent.
04:16:20  14         And I'll provide you with more detailed
04:16:23  15   instructions on the requirements for infringement at the
04:16:25  16   conclusion of the case.
04:16:26  17         Now, the second issue that you will be asked to
04:16:29  18   decide is whether any of the asserted patents are invalid.
04:16:35  19         Invalidity is a defense to infringement.
04:16:42  20   Therefore, even though the United States Patent and
04:16:43  21   Trademark Office, or PTO, has allowed the asserted claims
04:16:46  22   and even though a United States patent as issued by the PTO
04:16:50  23   is presumed to be valid, you, the jury, must decide whether
04:16:55  24   those claims are invalid after hearing the evidence
04:16:59  25   presented during the trial of this case.

04:17:01  1        You may find a patent claim to be invalid for a

04:17:06  2  number of reasons, including because it claims subject

04:17:08  3  matter that is not new, not patent eligible, or is obvious.

04:17:15  4        Patents must claim certain patent eligible subject

04:17:20  5  matter.  In general, a patent is directed towards eligible

04:17:25  6  subject matter if it claims a process, a machine,

04:17:28  7  manufacturer, or composition of a matter, or any new or

04:17:32  8  useful improvement thereof.

04:17:34  9        However, if the Court determines that a patent is

04:17:36  10  also directed toward an abstract idea, then the jury must

04:17:40  11  determine whether the patent covers only the activities

04:17:44  12  that are well-understood, routine, and conventional at the

04:17:48  13  time the patent was filed.

04:17:49  14        I'll provide you with more detailed instructions

04:17:52  15  on this question at the conclusion of the trial.

04:17:54  16        For a patent claim to be invalid because it is not

04:17:58  17  new, the Defendants must show -- or the Defendant, I'm

04:18:03  18  sorry, must show by clear and convincing evidence that all

04:18:06  19  of the elements of a claim are sufficiently described in a

04:18:10  20  single previous printed publication or patent, and we call

04:18:15  21  these items prior art.

04:18:16  22        If a claim is not new, ladies and gentlemen, it is

04:18:21  23  said to be anticipated by the prior art.

04:18:23  24        Another way that a claim can be found to be

04:18:26  25  invalid is that it may have been obvious.  Even though a

04:18:31   1   claim is not anticipated because every element of a claim

04:18:34   2   is not shown or sufficiently described in a single piece of

04:18:38   3   prior art, the claim may still be invalid if it would have

04:18:43   4   been obvious to a person of ordinary skill in the field of

04:18:47   5   technology of the patent at the relevant time.

04:18:50   6        Now, you'll need to consider a number of questions

04:18:54   7   when deciding whether the inventions claimed in the

04:18:57   8   asserted patents are obvious, and I'll provide you with

04:19:00   9   more detailed instructions on these questions at the

04:19:03  10   conclusion of the trial.

04:19:04  11        Another way that a claim can be found to be

04:19:08  12   invalid is that there may have been a lack of an adequate

04:19:13  13   written description.  A patent may be invalid if its

04:19:18  14   specification does not describe the claimed invention in

04:19:22  15   sufficient detail so that one skilled in the art can

04:19:26  16   reasonably conclude that the inventor actually had

04:19:29  17   possession of the invention they're claiming.

04:19:31  18        If you decide that any claim of the

04:19:34  19   patents-in-suit has been infringed and is not invalid, then

04:19:39  20   you'll need to decide whether Defendant's infringement has

04:19:43  21   been willful.

04:19:45  22        You'll also need to decide what amount of money

04:19:48  23   damages should be awarded to the Plaintiffs, Optis or

04:19:52  24   PanOptis -- either one refers to the Plaintiffs -- to

04:19:54  25   compensate it for such infringement.

04:19:57    1          A damage award must be adequate to compensate the

04:20:01    2    patentholder for the infringement.  And in no event, ladies

04:20:05    3    and gentlemen, may a damage award be less than what the

04:20:08    4    patentholder would have received had it been paid a

04:20:12    5    reasonable royalty for the use of its patent.

04:20:14    6          However, the damages you award, if any, are meant

04:20:19    7    to compensate the patentholder, and they are not meant to

04:20:22    8    punish the Defendant.  And you may not include in any

04:20:27    9    damages award an additional amount as a fine or a penalty

04:20:30   10    above what is necessary to fully compensate the

04:20:34   11    patentholder for the infringement.

04:20:35   12          Additionally, damages cannot be speculative, and

04:20:41   13    the Plaintiffs must prove the amount of their damages for

04:20:44   14    the alleged infringement by a preponderance of the

04:20:46   15    evidence.

04:20:49   16          Now, under the patent laws, Optis may recover only

04:20:53   17    damages for infringement that occurred after the date that

04:20:56   18    Optis gave notice to Apple that Optis believed Apple was

04:21:01   19    infringing the patents-in-suit.  And it will be up to you

04:21:05   20    to determine when such notice occurred, and I'll give you

04:21:08   21    more detailed instructions on the calculation of damages

04:21:11   22    for the Defendant's alleged infringement of the

04:21:14   23    patents-in-suit at the conclusion of the trial, including

04:21:18   24    by giving you specific instructions with regard to the

04:21:20   25    calculation of a reasonable royalty.

04:21:22   1          However, please be aware that the fact I'm

04:21:28   2   instructing you on damages does not mean that Optis is or

04:21:31   3   is not entitled to recover damages.

04:21:36   4          Now, throughout the trial, ladies and gentlemen,

04:21:38   5   you're going to be hearing from a number of different

04:21:41   6   witnesses in this case, and I want you to keep an open mind

04:21:46   7   while you're listening to the evidence and not decide any

04:21:48   8   of the facts until you've heard all of the evidence.

04:21:53   9          And this is important, while the witnesses are

04:21:55   10  testifying, remember, ladies and gentlemen, that you will

04:21:58   11  have to decide the degree of credibility and believability

04:22:04   12  to allocate to the witness and to the evidence.

04:22:06   13         So while the witnesses are testifying, you should

04:22:09   14  be asking yourselves things like this:  Does the witness

04:22:14   15  impress you as being truthful?  Does he or she have a

04:22:16   16  reason not to tell the truth?  Does he or she have any

04:22:20   17  personal interest in the outcome of the case?  Does the

04:22:23   18  witness seem to have a good memory?  Did he or she have the

04:22:27   19  opportunity and ability to observe accurately the things

04:22:30   20  that they testified about?  Did the witness appear to

04:22:34   21  understand the questions clearly and answer them directly?

04:22:39   22  And, of course, does the witness's testimony differ from

04:22:42   23  the testimony of any other witnesses?  And if it does, how

04:22:46   24  does it differ?

04:22:47   25         These are some of the kinds of things that you

04:22:51   1   should be thinking about while you're listening to each and

04:22:54   2   every witness in this trial.

04:22:55   3        I also want to talk to you briefly, ladies and

04:22:58   4   gentlemen, about expert witnesses.

04:22:59   5        When knowledge of a technical subject may be

04:23:03   6   helpful to you, the jury, a person who has special training

04:23:07   7   and experience in that particular field, we call them an

04:23:10   8   expert witness, is permitted to testify to you about his or

04:23:17   9   her opinions on those technical matters.

04:23:21   10        However, you're not required to accept an expert

04:23:24   11   opinion or any -- an expert witness or any other witness's

04:23:28   12   opinions at all.  It's up to you to decide whether an

04:23:32   13   expert witness is correct or incorrect or whether or not

04:23:36   14   you want to believe what they say.

04:23:38   15        It's also up to you to believe -- to determine

04:23:41   16   whether or not any other witness in the case is correct or

04:23:45   17   incorrect or whether you want to believe what they have to

04:23:48   18   say.  Those kinds of decisions, judging the credibility and

04:23:53   19   believability of every -- each and every witness in the

04:23:56   20   case, are particularly within your area of responsibility

04:23:59   21   as the jury.

04:24:00   22        Now, I anticipate that there will be expert

04:24:07   23   witnesses testifying in support of each side in this case,

04:24:10   24   but it will be up to you to listen to their qualifications,

04:24:14   25   and when they give an opinion and explain the basis for

04:24:16  1   that opinion, you'll have to evaluate what they say,

04:24:18  2   whether you believe it, and to what degree, if any, that

04:24:22  3   you want to give it weight.

04:24:24  4        Remember, judging and evaluating the credibility

04:24:27  5   and believability of each and every witness is an important

04:24:31  6   part of your job as jurors.

04:24:33  7        Now, during the course of the trial, ladies and

04:24:36  8   gentlemen, it's possible that there will be testimony from

04:24:39  9   one or more witnesses that are going to be presented to you

04:24:42  10  through what we call a deposition.

04:24:44  11       In trials such as this, it's tough to get every

04:24:48  12  witness here in person at the same time.  So the lawyers

04:24:51  13  for each of the parties prior to the trial take the

04:24:55  14  depositions of the witnesses.

04:24:57  15       In the deposition, a court reporter is -- is

04:25:01  16  present, the witness is present and sworn and placed under

04:25:04  17  oath, just as if he or she were in open court, and the

04:25:08  18  lawyers for the parties ask those witnesses questions, and

04:25:13  19  those questions and the answers are recorded and taken

04:25:16  20  down.

04:25:16  21       And portions of these recordings, often made as

04:25:20  22  video recordings, of those questions and answers may be

04:25:24  23  played back to you, the jury, as a part of this trial so

04:25:27  24  you can see that witness and hear that testimony even

04:25:30  25  though they're not physically present in the courtroom.

04:25:33  1      That deposition testimony is entitled to the same

04:25:38  2  consideration, insofar as possible, and is to be judged as

04:25:42  3  to the credibility, weight, and otherwise considered by

04:25:46  4  you, the jury, in the same way as if the witness had been

04:25:50  5  present and given that testimony in person from the witness

04:25:53  6  stand in open court.

04:25:54  7      Now, during the trial of the case, ladies and

04:25:59  8  gentlemen, it's possible that the lawyers will make

04:26:01  9  objections.  And if they do, I will give rulings on those

04:26:05  10  objections.

04:26:06  11      It's the duty of an attorney for each side of the

04:26:08  12  case to object when the other side offers testimony or

04:26:15  13  other evidence that the attorney believes is not proper

04:26:19  14  under the orders of the Court or the Rules of Evidence or

04:26:22  15  procedure.

04:26:23  16      Now, upon allowing the testimony or other evidence

04:26:25  17  to be introduced over the objection of an attorney, the

04:26:27  18  Court does not, unless expressly stated, indicate an

04:26:30  19  opinion as to the weight or effect of such evidence.  As

04:26:37  20  I've said before, you, the jury, are the sole judges of the

04:26:42  21  credibility and believability of all the witnesses and the

04:26:45  22  weight and what effect to give to all the evidence.

04:26:46  23      Now, I'd like to compliment the parties in this

04:26:49  24  case, both Plaintiffs and Defendant, because up until

04:26:52  25  today, ladies and gentlemen, they have worked very

04:26:54  1  diligently with the Court to go through all the exhibits

04:26:58  2  that may be shown to you over the course of the trial, and

04:27:01  3  the Court through these pre-trial procedures has already

04:27:04  4  considered the arguments from the parties as to the

04:27:07  5  admissibility of these exhibits, and the Court has ruled on

04:27:13  6  the admissibility of these exhibits.  And I promise you,

04:27:15  7  that has saved you a lot of time now that you are in the

04:27:18  8  jury box as jurors to hear the evidence.

04:27:20  9       There were hundreds and hundreds of exhibits

04:27:23  10  presented, and I have considered and ruled on every one of

04:27:27  11  them, and those have been reduced to a known list of

04:27:32  12  pre-admitted exhibits where the Court has already passed on

04:27:36  13  the admissibility.

04:27:37  14       That means those exhibits can be shown to you over

04:27:40  15  the course of the trial without having to go through a

04:27:43  16  presentation of the basis on which they're admissible, an

04:27:46  17  objection from the other party, and arguments to the Court

04:27:50  18  about which side is right and whether the document is or

04:27:53  19  isn't admissible under the Rules of Evidence and then

04:27:56  20  ultimately the Court reach a conclusion and a ruling.

04:27:59  21       All of that has been done on each of these

04:28:00  22  exhibits before today.  So you don't have to sit there and

04:28:03  23  listen to that process.  And I promise you, it has saved a

04:28:06  24  lot of time going forward as to how we would have to handle

04:28:10  25  it otherwise.  And both sides have worked diligently with

04:28:13   1   the Court to accomplish that process, and both sides are to

04:28:18   2   be complimented for their efforts in that regard.

04:28:21   3          So -- so you should understand through these

04:28:24   4   pre-trial procedures, all the rulings have already been

04:28:27   5   made by the Court about the admissibility of all the

04:28:29   6   exhibits, and this has saved a lot of time.

04:28:34   7          This also means that when the parties show you an

04:28:36   8   exhibit over the course of the trial, if they show it to

04:28:39   9   you, it means I have already ruled on the admissibility of

04:28:41   10  that exhibit.  If I had ruled it wasn't admissible, you

04:28:45   11  would not see it, and it would not be shown to you.

04:28:49   12         And when they offer it, they have the ability to

04:28:51   13  ask questions about it and put it in the proper context for

04:28:54   14  you.

04:28:54   15         I just want you to know, both sides have worked

04:28:57   16  hard with the Court to streamline this process, and this is

04:29:00   17  going to save us a lot of time over the course of the

04:29:03   18  trial.

04:29:03   19         However, it's still possible that objections will

04:29:07   20  arise during the trial.  If I should sustain an objection

04:29:12   21  to a question addressed to a witness, then you must

04:29:16   22  disregard the question entirely, and you may draw no

04:29:20   23  inference from its wording or speculate about what the

04:29:22   24  witness would have said if I had allowed them to answer the

04:29:25   25  question.

04:29:26   1          On the other hand, if I overrule an objection
04:29:30   2   addressed to a question to a witness, then you should
04:29:34   3   consider the question and the witness's answer just as if
04:29:38   4   no objection had ever been made.
04:29:39   5          Now, you should know, ladies and gentlemen, that
04:29:42   6   the law of the United States permits a United States
04:29:46   7   District Judge to comment to the jury regarding the
04:29:49   8   evidence in a case, but those comments from the judge may
04:29:53   9   be disregarded by the jury in their entirety because
04:29:57  10   I've -- as I've told you, it's the jury that is the sole
04:30:00  11   judges of the facts in the case, the credibility of the
04:30:03  12   witnesses, and the amount of weight you want to give to
04:30:05  13   each witness's testimony.
04:30:06  14          And even though the law may permit me to make
04:30:12  15   comments to you about the evidence in this case, as I
04:30:14  16   indicated during jury selection earlier today, it's my
04:30:17  17   intention to try very hard not to comment on any of the
04:30:21  18   evidence or the witnesses throughout the trial because I
04:30:25  19   believe strongly that that is your responsibility, and even
04:30:29  20   though I have the right to comment on them, I'm going to
04:30:32  21   work hard not to.
04:30:33  22          Now, you should also know that the court reporter
04:30:36  23   in front of me, Ms. Holmes, is taking down every word that
04:30:40  24   is said in the courtroom throughout the trial, but the
04:30:43  25   written transcript of all of that is not going to be

04:30:46   1   available to you for you to consider during your

04:30:48   2   deliberations.  That transcript is prepared in case there's

04:30:53   3   an appeal of this case to an appellate court.

04:30:56   4        So that means you're going to have to rely on your

04:31:00   5   memories of the evidence that's developed over the course

04:31:03   6   of the trial.

04:31:03   7        In a moment, each of you are going to be given a

04:31:07   8   juror notebook, and in the back of that notebook, you're

04:31:09   9   going to find a legal pad that you can use to take notes on

04:31:13  10   if you choose -- if you choose to throughout the course of

04:31:16  11   the trial.

04:31:17  12        It will be up to each of you to decide whether or

04:31:20  13   not you want to take notes about the witnesses or anything

04:31:23  14   else regarding the trial and how detailed you want those

04:31:26  15   notes to be if you decide to take notes.

04:31:28  16        But, remember, those notes are for your own

04:31:32  17   personal use.  You still have to rely on your memory of the

04:31:36  18   evidence, which is why you should be paying close attention

04:31:39  19   to the testimony of each and every witness.

04:31:41  20        You should not abandon your own recollection

04:31:46  21   because somebody else's notes indicate something different.

04:31:49  22   Your notes, if you keep them, are to refresh your

04:31:53  23   recollection only, and that's the only reason you should be

04:31:55  24   keeping them.

04:31:56  25        I'm now going to ask our Court Security Officer to

04:31:59  1  pass out these juror notebooks to each of the members of

04:32:02  2  the jury.

04:32:40  3       In these notebooks, ladies and gentlemen, you'll

04:32:43  4  see that you have a copy of each of the five asserted

04:32:46  5  patents that are at issue in this case and that we've

04:32:49  6  talked about.

04:32:49  7       You'll also find in there that you have witness

04:32:52  8  pages for each witness that might testify in the case with

04:32:56  9  a picture of the witness at the top of the page, and the

04:32:59  10  remainder of the page available for note-taking there if

04:33:03  11  you choose to take notes.

04:33:04  12       You'll also see that you have a chart in there

04:33:07  13  identifying the language from the asserted claims where the

04:33:10  14  Court has already construed that language and given you a

04:33:14  15  construction or definition to apply when answering the

04:33:18  16  questions in the verdict form.

04:33:20  17       And, as I've mentioned, in the back, you'll find a

04:33:24  18  legal pad for note-taking.  And in the front pocket, you

04:33:28  19  should find both a highlighter and a pen that you can use

04:33:31  20  for those purposes, as well.

04:33:33  21       Each of these notebooks are just the same.  I

04:33:36  22  would suggest that in the front cover, you write your name

04:33:40  23  so you make sure that you keep yours, and don't get it

04:33:43  24  confused with anybody else's, and they don't need to be

04:33:47  25  passed around by you.  You each need to keep your own

04:33:51   1   notebook in your own possession.

04:33:52   2        And, ladies and gentlemen, in that regard, you

04:33:55   3   should either have that notebook with you in the jury box,

04:33:58   4   just like you do now, or you should have it in the jury

04:34:01   5   room with you.  These are not to be left laying around

04:34:04   6   where someone else can pick them up.  Either have them with

04:34:07   7   you in the jury box, or if you've left for the evening,

04:34:11   8   leave them on the table in the jury room.  You can find

04:34:13   9   your notebook the next morning and have it with you when

04:34:16   10  you come back into the courtroom.

04:34:18   11       Now, having said that, there may be times over the

04:34:21   12  course of the trial where we take a recess or a quick

04:34:24   13  break, and it may be a short recess.  And if it is, I may

04:34:28   14  say, ladies and gentlemen, you can simply close and leave

04:34:31   15  your notebooks in your chair in the jury box.  That means

04:34:35   16  you're not going to be gone very long, and it's fine to

04:34:37   17  leave it there rather than carry it back and forth to the

04:34:40   18  jury room with you.

04:34:42   19       But unless I give you those kind of specific

04:34:44   20  instructions, it should be in your possession whenever

04:34:49   21  you're here in court.  And when you go home in the evening,

04:34:53   22  it should be in the jury room on the table where you can

04:34:55   23  find it the next morning.

04:34:56   24       Now, in a moment, we're going to hear opening

04:34:59   25  statements from the lawyers.  These opening statements are

04:35:03  1  designed to give you a roadmap of what each side expects

04:35:07  2  that the evidence will show in this case.

04:35:11  3          And you should remember throughout the trial,

04:35:13  4  ladies and gentlemen, that what the lawyers tell you is not

04:35:16  5  evidence.  I want to say that again.  What the lawyers tell

04:35:20  6  you is not evidence.

04:35:23  7          The evidence is the sworn testimony that will be

04:35:26  8  presented from the witness stand under oath and subject to

04:35:30  9  cross-examination, whether it's through a live witness or

04:35:35  10  through a deposition witness, as I've already described to

04:35:39  11  you.  And the evidence will include those exhibits which

04:35:42  12  I've already considered and found are admissible under the

04:35:45  13  Rules of Evidence and are an admitted exhibit in this case.

04:35:48  14          That is the totality of the evidence in this case.

04:35:54  15  Again, what the lawyers tell you is not evidence.  What

04:35:59  16  they tell you, in fact, is their impression of what the

04:36:02  17  evidence should be.  And they have a duty to point out to

04:36:07  18  you where they believe the evidence is.  But, remember,

04:36:10  19  what they tell you is not evidence.

04:36:12  20          Now, after the opening statements are given by

04:36:15  21  each side, the Plaintiffs will have the opportunity to call

04:36:19  22  their witnesses and put on their evidence.  This is called

04:36:23  23  the Plaintiffs' case-in-chief.

04:36:25  24          When the Plaintiff has finished putting on its

04:36:28  25  witnesses and evidence, it will rest its case-in-chief, and

04:36:31  1  then the Defendant has the opportunity to call its

04:36:34  2  witnesses and put on its evidence.  And that's called the

04:36:38  3  Defendant's case-in-chief.

04:36:39  4       After the Defendant rests its case-in-chief, then

04:36:44  5  the Plaintiff has the opportunity, if it chooses, to call

04:36:48  6  what are called rebuttal witnesses to address the evidence

04:36:51  7  that the Defendants have put on.

04:36:53  8       After the Plaintiffs put on any rebuttal

04:36:57  9  witnesses, if they choose to, then you will have heard all

04:37:01  10 the evidence in this case.  And when you have heard all the

04:37:05  11 evidence in this case, at that point, I will give you

04:37:09  12 written instructions on the law that we've talked about and

04:37:13  13 that you are to apply to the evidence that you've heard,

04:37:17  14 and you'll have your own written copy -- your own

04:37:20  15 individualized printed copy of those written instructions

04:37:23  16 on the law that I'm going to give -- give you.  And you may

04:37:26  17 take that copy from me with you back to the jury room when

04:37:29  18 you retire to deliberate.

04:37:30  19      These instructions that I'll give you at that

04:37:36  20 point in written form, and I'll give them to you orally, as

04:37:40  21 well, those are called the Court's final instructions to

04:37:44  22 the jury.  And it's also sometimes called by people the

04:37:46  23 Court's charge to the jury.

04:37:48  24      Now, after these instructions are given by me to

04:37:51  25 you, the lawyers will present their closing arguments,

04:37:57  1  which are designed to point out what they believe they've

04:38:00  2  proved over the course of the trial and through the

04:38:02  3  evidence that's come in during the trial.

04:38:04  4       And then once you've heard the lawyers' closing

04:38:08  5  arguments, you'll retire to the jury room to consider the

04:38:11  6  questions in the verdict form and reach a unanimous

04:38:13  7  decision as to those questions.  And those unanimous

04:38:15  8  answers to those questions, as I've told you, will

04:38:20  9  constitute your verdict in this case.

04:38:24  10       Let me repeat my earlier instruction to you.  You

04:38:28  11  are not to discuss this case among yourselves or with

04:38:30  12  anyone else during the trial.  And when I said not discuss

04:38:33  13  the case, I mean not communicate about it in any way.  And

04:38:40  14  that applies to anybody outside this courtroom.

04:38:43  15       And until you've heard all the evidence in this

04:38:44  16  case, ladies and gentlemen, it applies to the eight of you

04:38:47  17  with each other.

04:38:48  18       During the course of the trial, at lunch breaks

04:38:50  19  and recesses, you are not to discuss the evidence among

04:38:55  20  yourselves.  Only when you've heard all the evidence and

04:38:59  21  only when I instruct you to retire to the jury room and

04:39:01  22  deliberate on your verdict after I've given you my final

04:39:05  23  instructions and you've heard closing arguments from the

04:39:08  24  attorneys, then is the first time that you're supposed to

04:39:12  25  discuss the evidence among yourselves.

04:39:14   1          And when you've heard all the evidence and when

04:39:17   2   you retire at my instruction to the jury room to deliberate

04:39:20   3   on the verdict, it becomes your duty to discuss the

04:39:24   4   evidence that's presented over the course of the trial in

04:39:27   5   your effort to reach a unanimous decision as to the

04:39:30   6   questions that are presented in the verdict form.

04:39:31   7          I also want to remind you that over the course of

04:39:37   8   the trial, these lawyers and their staff and the witnesses

04:39:41   9   and the representatives of the competing companies that are

04:39:44   10  the parties are not going to talk to you if they see you in

04:39:48   11  close proximity.

04:39:50   12         If you run into one of them on the front steps

04:39:52   13  coming into the courthouse one morning and they're not

04:39:55   14  friendly and they don't speak, don't consider them to be

04:39:58   15  rude or unfriendly.  Don't hold it against them.  They're

04:40:01   16  simply doing what I've instructed them to do.

04:40:03   17         All right.  With these instructions, we're now

04:40:07   18  going to proceed to hear opening statements from the

04:40:09   19  parties.

04:40:10   20         We'll begin with the Plaintiffs' opening

04:40:13   21  statement.  The Plaintiff may address the jury with its

04:40:16   22  opening statement at this time.

04:40:18   23         Would you like a warning on your time,

04:40:20   24  Mr. Sheasby?

04:40:21   25         MR. SHEASBY:  Yes, Your Honor, 15 minutes, and

04:40:23   1   three minutes.

04:40:24   2        THE COURT:  15 minutes remaining and three minutes

04:40:26   3   remaining.  You may proceed, sir.

04:40:29   4        MR. SHEASBY:  May it please the Court.

04:40:31   5        Good late afternoon, ladies and gentlemen of the

04:40:32   6   jury.  I want to introduce myself.  My name is Jason

04:40:36   7   Sheasby.  I've been asked to speak on behalf of the brother

04:40:41   8   and sister companies that make up PanOptis.

04:40:44   9        I'm married.  My wife and I have two daughters,

04:40:46  10   and we also raise a niece and nephew.  I was born in

04:40:51  11   California, and I've spent my whole life in California.

04:40:53  12        I want to begin by thanking you for your service

04:40:56  13   today.  I know it's an extraordinary sacrifice during

04:41:02  14   extraordinary times.  And Judge Gilstrap referred to it

04:41:05  15   as -- as -- as the right to a trial by jury.

04:41:07  16        And that's something that's interesting to me, and

04:41:10  17   the reason why it's interesting to me is that when I was

04:41:13  18   growing up, I always heard it referred to as jury duty.

04:41:16  19   It's your duty to go to -- to be a juror.  And that's true.

04:41:20  20   It's part of your duty as a citizen.  But it's also a

04:41:23  21   right, a right to a trial by jury.

04:41:25  22        Now, when you think about that, you may think of

04:41:28  23   it as the right to PanOptis or Apple to have a jury.

04:41:33  24   That's actually not what the founders meant.  What the

04:41:35  25   founders meant when they said there's a right to a jury

04:41:38   1   trial is that they meant that the citizens of our country

04:41:42   2   get to decide incredibly important disputes.  The citizens

04:41:46   3   of our country are in control.  That's what the founders

04:41:50   4   meant when they said right to a trial by jury.

04:41:53   5         It's your right to decide, and this is an

04:41:56   6   incredibly important trial and incredibly important

04:42:00   7   question that you have to answer.  The power is yours.

04:42:03   8         PanOptis owns a group of essential patents that

04:42:07   9   are necessary for cellular communications, and those

04:42:12  10   patents were created by LG, Panasonic, and Samsung, which

04:42:16  11   really built, along with a couple of other companies, the

04:42:21  12   worldwide telecommunications network as we know it.  And

04:42:24  13   it's an interesting story.

04:42:26  14         So you may have heard of 2G, you may have heard of

04:42:29  15   3G, and this case is about 4G or LTE.

04:42:32  16         And what happened was in the mid-2000s, a group of

04:42:36  17   companies, including Panasonic, LG, and Samsung, realized

04:42:40  18   something.  They realized that there was going to be a

04:42:42  19   smartphone revolution.  And with that revolution, there was

04:42:44  20   going to be masses and masses of data, oceans of data that

04:42:50  21   would be traveling over the networks.  And something had to

04:42:53  22   be done about that.

04:42:53  23         And so a group of far-seeing companies got

04:42:57  24   together and formed an industry group.  That industry group

04:43:01  25   contributed ideas, contributed inventions, and created the

04:43:06   1    4G/LTE network.

04:43:07   2         Apple is infringing patents that have been awarded

04:43:11   3    to LG, Panasonic, and Samsung based on that labor.

04:43:16   4         LG and Panasonic concluded that they wanted one

04:43:23   5    company to efficiently license and protect their

04:43:27   6    intellectual property.  They wanted one company to ask the

04:43:30   7    phone manufacturers, who didn't meaningfully contribute to

04:43:34   8    the standard, didn't meaningfully contribute to LTE when it

04:43:38   9    was created, but are benefitting from it and using it and

04:43:41   10   making extraordinary profits based on it, to take

04:43:44   11   responsibility.

04:43:45   12        That's the purpose of PanOptis.  And that's

04:43:47   13   actually the fundamental dispute in this case.  It's about

04:43:50   14   responsibility.  Apple needs to take responsibility for the

04:43:54   15   use of its technology.

04:43:55   16        Just like the right to a trial by jury is in the

04:44:05   17   Constitution, the rights to patents are in the

04:44:10   18   Constitution.  Our founders at the creation of our country

04:44:13   19   realized that it was absolutely incredibly important to

04:44:16   20   protect inventions, to treat it as a property right.  No

04:44:20   21   different than your homestead, no different than a piece of

04:44:23   22   land.  It's a sacred property right.

04:44:32   23        Next slide, please.  The other way.

04:44:35   24        PanOptis is created using the inventions of a

04:44:42   25   number of companies, including LG --

| | | |
|---|---|---|
| 04:44:44 | 1 | Next slide, please. |
| 04:44:45 | 2 | -- Panasonic, Samsung, and Ericsson.  They |
| 04:44:52 | 3 | combined together to create LTE. |
| 04:44:54 | 4 | This is the history of wireless technology.  You |
| 04:45:01 | 5 | see 1G, you see 2G, you see 3G, you see 4G, and then |
| 04:45:07 | 6 | suddenly at the time 4G was introduced, you see this |
| 04:45:09 | 7 | explosion of data. |
| 04:45:10 | 8 | Now, there's an interesting story here.  So we |
| 04:45:13 | 9 | think of Apple as a company that makes phones.  But in |
| 04:45:19 | 10 | 2007, for example, when Apple launched its first phone, it |
| 04:45:21 | 11 | was a computer company. |
| 04:45:23 | 12 | In 2007, when Apple launched its first phone, it |
| 04:45:27 | 13 | launched it as 2G.  So the exact time that Samsung, |
| 04:45:32 | 14 | Panasonic, and LG were creating this incredible 4G |
| 04:45:37 | 15 | technology, Apple was stuck at 2G. |
| 04:45:40 | 16 | Now, we think of Apple as an innovative company. |
| 04:45:43 | 17 | We think of it as making beautiful products.  We think of |
| 04:45:46 | 18 | it as making nice products.  And there are areas in which |
| 04:45:51 | 19 | it does innovate. |
| 04:45:52 | 20 | But one area where it chose not to innovate at |
| 04:45:55 | 21 | that time period was with LTE.  It made a business decision |
| 04:45:58 | 22 | not to invest in LTE. |
| 04:45:59 | 23 | There are profound consequences to that business |
| 04:46:05 | 24 | decision.  Those consequences will be decided in this |
| 04:46:08 | 25 | court. |

04:46:09   1            Judge Gilstrap spoke about standards and spoke
04:46:13   2   about 4G/LTE as relating to a standard.  And an easy way to
04:46:18   3   think about a standard is wall plugs.  Anyone can make a
04:46:23   4   wall plug, but the design of the wall plug is the same for
04:46:26   5   each manufacturer so that each of them can plug into a
04:46:29   6   wall.  That's a standard.
04:46:31   7            It's the same way with 4G/LTE.  4G/LTE is a group
04:46:36   8   of manufacturers that got together, members filed patents
04:46:40   9   on their designs, the industry votes to adopt the designs,
04:46:44  10   and then they publish technical specifications, the
04:46:47  11   instructions that are used to implement the standards.
04:46:51  12            And those pictures on the screen, those are
04:46:54  13   actually meetings from the LTE standard.  And do you see
04:46:59  14   whose logo is at the bottom there?  It's Samsung.  They
04:47:03  15   participated.  They crafted.  They created this standard.
04:47:05  16            This is an actual example of what a standard looks
04:47:09  17   like.  It's a detailed technical discussion of requirements
04:47:10  18   that a phone must have, because, of course, there must be a
04:47:14  19   standard design.  That's why a Samsung phone can talk to an
04:47:17  20   Apple phone, and an Apple phone can talk to an LG phone.
04:47:20  21            There are five patents-at-issue in this case.  And
04:47:23  22   those are the five.  They're referred to by the last three
04:47:28  23   digits.  So, for example, we refer to one as the '284, the
04:47:33  24   '774, and those are the companies -- LG, Panasonic, and
04:47:38  25   Samsung -- who created them.

04:47:39  1        Now, the evidence will show, I believe, that these

04:47:42  2   patents have a significant impact on performance.  External

04:47:45  3   independent experts were hired by Panasonic to analyze

04:47:49  4   performance, and they determined that these five patents

04:47:51  5   result in a 24 percent increase in performance to Apple.

04:47:57  6   24 percent.

04:47:57  7        Here is some key dates.  You'll see that the

04:48:04  8   patents-at-issue in this case were all filed between 2005

04:48:08  9   and 2008.  The last one was in 3 of 2008.  To put that in

04:48:13 10   context of how far seeing these companies were, Apple did

04:48:18 11   not launch its first phone, a 2G phone, until the end of

04:48:22 12   2007.

04:48:23 13        The companies were very open about the fact that

04:48:28 14   they believed they may be standard essential.  They

04:48:29 15   declared them to the industry.  And Samsung and LG launched

04:48:35 16   their mobile phones in 2010 and 2011.

04:48:38 17        Many members of the industry have recognized the

04:48:43 18   importance of PanOptis's patents.  HTC, ZTE, Kyocera,

04:48:48 19   BlackBerry, even Huawei has all agreed to take a license

04:48:54 20   and to pay money because they use the LTE standard and

04:49:00 21   PanOptis's patents are essential to the standard.  That's a

04:49:03 22   fact.  That's not an argument.  That's a fact that will be

04:49:06 23   in the record.

04:49:07 24        Now, what's interesting about discover -- about

04:49:11 25   the discovery process is we are allowed to, based on the

04:49:17  1  Court's permission, look at the internal records of Apple.

04:49:20  2  We actually can access documents that are confidential to

04:49:23  3  Apple.

04:49:24  4       And, in fact, counsel for Apple said this really

04:49:29  5  important phrase, which is to say we can look under the

04:49:32  6  hood.  We can.  We can look in the documents, and we can

04:49:35  7  look at what Apple says behind closed doors, which is

04:49:40  8  different from what they say publicly.

04:49:42  9       And you'll see there's an orange or yellow block

04:49:45  10  at the bottom of that page.  That's called an exhibit

04:49:47  11  number.  An exhibit number, you can write down.  And if you

04:49:51  12  think it's important in deliberations, you can ask for it.

04:49:55  13       And so this is PX-1612.  This is a document

04:49:58  14  prepared by Apple's lawyers, and it shows that they were

04:50:01  15  significantly behind Samsung, Panasonic, and LG in

04:50:08  16  innovation.  And that blow-up at the right, that's not my

04:50:12  17  words, that's their own internal analysis.  Apple continues

04:50:16  18  to hold fewer patents than competitors and suppliers.

04:50:20  19       So Apple in its advertisements describes itself as

04:50:24  20  an innovator, but internally it recognizes that it had

04:50:26  21  fallen far behind Samsung, Panasonic, and LG.

04:50:29  22       In fact, Apple did not launch its LTE phone until

04:50:36  23  September 2012.  That was over two years after Samsung.

04:50:40  24  So, in addition to having fallen behind, Apple --

04:50:44  25  Panasonic, Samsung, and LG -- LG in the technology race,

04:50:48   1   they also fell behind in the commercial race.  They didn't

04:50:52   2   have a 4G phone, and they had to make a decision.

04:50:54   3        You will hear from Mr. Tony Blevins, who's the

04:50:58   4   senior executive at Apple, and at his deposition, he

04:51:01   5   testified under oath that when Apple made the decision to

04:51:04   6   launch 4G, it did not investigate whether it was using the

04:51:08   7   patents of others.  It just made the decision because it

04:51:12   8   had to.  It had to have 4G so that it could sustain its

04:51:20   9   market.  It had to have it.

04:51:23   10       This is what the record will also show, that in

04:51:25   11  January of 2007, PanOptis requested that Apple take a

04:51:31   12  license to its patents.  It is over three years later.

04:51:40   13  Apple has chosen to not take a license to the same patents

04:51:44   14  that other members of the industry have.

04:51:45   15       We actually were able to look in Apple's records,

04:51:52   16  and Apple testified under oath that they use something

04:51:54   17  called an Innography database, and in that database that

04:52:00   18  Apple pays for, that Apple uses, that Apple witnesses

04:52:04   19  admitted they accessed to check on PanOptis, there are

04:52:07   20  strength scores for the importance of our patents.

04:52:11   21       This is one of the strength scores, a 90 to 100

04:52:14   22  percentile.  This is the database that Apple's lawyers use.

04:52:22   23  This is what the scores of our patent are.  And, in fact,

04:52:25   24  all the scores are in the top 25 percent of all the

04:52:29   25  patents, and there's millions of them that are listed in

04:52:32   1   the database.   These are what is in Apple's internal

04:52:36   2   records, which we found.

04:52:37   3          As to infringement, on which we bear the burden by

04:52:40   4   a preponderance of the evidence, so if one pebble is on our

04:52:45   5   side, we prevail.   We're going to present two types of

04:52:48   6   analysis.

04:52:49   7          First, we're going to present an analysis that

04:52:51   8   PanOptis's patents are essential to practice the LTE

04:52:54   9   specifications, the standard.   We're going to compare the

04:52:58   10  patents to the standard, the actual standard documents.

04:53:01   11         The second thing we're going to do is we're going

04:53:03   12  to do a detailed source code analysis in which we look at

04:53:05   13  the actual code that is used to implement Apple's LTE.   And

04:53:09   14  we're going to talk to you about experiments, field

04:53:12   15  experiments that were performed under the control of our

04:53:15   16  experts to see how Apple device works.

04:53:17   17         An interesting fact, which is it wasn't just that

04:53:24   18  Kyocera, ZTE, BlackBerry, and Huawei, all of whom sell LTE

04:53:29   19  devices, took a license to our patents, we actually

04:53:32   20  presented to them claim charts on four of the five

04:53:35   21  patents-in-suit.   We showed them in claim charts why these

04:53:39   22  patents are essential to the LTE standard.   And each of

04:53:43   23  them took a license to the patents.

04:53:44   24         As to the source code analysis, we've asked two

04:53:52   25  independent experts, Professor Mahon and Professor

04:53:57   1   Madisetti, to speak about their analysis.

04:54:00   2         Each of them has deep experience with cellular

04:54:02   3   technology.  Each of them performed an independent

04:54:05   4   analysis.  They spent hundreds and hundreds of hours on

04:54:09   5   this analysis.  They've looked through hundreds of

04:54:12   6   thousands of lines of code.  They ran experiments.  They

04:54:14   7   worked with a team to run simulations, all to analyze, all

04:54:19   8   to conclude that these patents were infringed by Apple.

04:54:21   9         In addition to infringement, we also bear the

04:54:29  10   burden on damages.

04:54:32  11         Now, what's interesting about damages is that I

04:54:37  12   believe Apple's going to tell you that LTE is just one of

04:54:43  13   thousands or tens of thousands of features that are used in

04:54:46  14   its phone.  It couldn't possibly be worth that much money.

04:54:52  15         Well, if LTE wasn't so important, why did they

04:54:55  16   start using it in 2012 without asking permission?  And if

04:54:59  17   LTE wasn't so important, why did they charge hundreds of

04:55:04  18   dollars for their devices in order for you to be able to

04:55:07  19   use it on a cellular network?

04:55:09  20         The reality is, is that cellular technology is a

04:55:13  21   crucial part of Apple's profitability and of its products.

04:55:17  22         In fact, we've done analysis, and solely from the

04:55:23  23   initiation of this lawsuit in February of 2019, solely from

04:55:32  24   the initiation of this lawsuit, Apple has generated close

04:55:34  25   to $900 million --

04:55:35  1          THE COURT:  Fifteen minutes remaining, counsel.

04:55:36  2          MR. SHEASBY:  -- in profits from using this

04:55:40  3  technology, $900 million in profits from using this

04:55:43  4  technology.  I think it becomes quite apparent why there's

04:55:47  5  a lawsuit in a federal court.

04:55:49  6          Apple has actually a number of excuses for why it

04:55:57  7  shouldn't have to pay.  Apple's lawyer said, I want to make

04:55:57  8  one thing clear, we don't infringe.  Well, that is one of

04:56:01  9  their arguments, but they have lots more.

04:56:03  10          So one of Apple's arguments is, we didn't know

04:56:06  11  about these patents.  We're shocked that you're accusing us

04:56:10  12  of infringing the patents.

04:56:12  13          But, once again, we were able to look under the

04:56:15  14  hood.  This is an internal Apple document prepared by their

04:56:18  15  lawyers from 2014 in which they acknowledge that they do

04:56:23  16  not have a license to 50 percent of the LTE patents.

04:56:29  17  That's what the document says.  This is an internal

04:56:32  18  document.  This is an internal document prepared by Apple

04:56:37  19  lawyers that we were able to access because of this

04:56:39  20  lawsuit.

04:56:39  21          Their second excuse is, oh, your patents aren't

04:56:43  22  essential.  Oh, they're not really essential for the

04:56:46  23  standard.  So, to be clear, LG, Panasonic, and Samsung, who

04:56:50  24  participated in the creation of those standards, LG,

04:56:53  25  Panasonic, and Samsung patents, which are licensed by

04:56:56   1   essentially every other major LTE phone manufacturer in the

04:57:00   2   United States, LTE patents in which -- which were

04:57:04   3   specifically shown claim charts or analyses to these

04:57:08   4   licensees as to why they're standard and were paid money

04:57:12   5   for, in this courtroom this week Apple is going to tell you

04:57:15   6   they're not essential.

04:57:17   7        But we can actually show that they are essential.

04:57:22   8   So this is the patent claim on the left.  This is the LTE

04:57:27   9   specification on the right.  And you'll see that the LTE

04:57:31  10   specification, the LTE standard is verbatim, verbatim what

04:57:37  11   is present in the patent.

04:57:41  12        And so this is a significant example of the

04:57:43  13   evidence we'll be able to present, and we'll walk through

04:57:48  14   for many of the patents showing that the patents match up

04:57:52  15   exactly to the standard.

04:57:54  16        To be clear, Apple is going to take the position

04:57:57  17   that this patent, the '332 -- the '332 patent, is not

04:58:01  18   essential to the standard, even though the standard uses

04:58:05  19   verbatim what is in the patent.

04:58:07  20        That's what's going to happen this week from the

04:58:11  21   Defendants.

04:58:12  22        The next argument that Defendants make is they

04:58:17  23   say, oh, well, we do it differently from your patents.

04:58:21  24   Even if they are essential, we do it differently.

04:58:26  25        Well, that's an odd argument because if the

04:58:28  1   patents are essential and they do it differently, that

04:58:31  2   would mean that they're not practicing LTE.

04:58:34  3          We actually were able to examine one of their

04:58:37  4   experts in this case.  His name is Friedholm Rodermund.  To

04:58:41  5   give you some context, Friedholm Rodermund was a senior

04:58:44  6   member of ETSI.  Remember, Judge Gilstrap talked about ETSI

04:58:49  7   in his instructions?  ETSI is part of the group that

04:58:54  8   created the LTE standard.  In fact, he is the only Apple

04:58:59  9   expert that participated in the meetings to construct the

04:59:04  10  LTE standard.

04:59:05  11         And what did he say?  He says that Apple's iPhone

04:59:11  12  practices the LTE standard.  He admitted it under oath.

04:59:14  13  And yet Apple is going to suggest, and they did in previous

04:59:17  14  argument, that they do it differently, that there's some

04:59:21  15  different form of LTE.

04:59:22  16         Their next argument is that the patents -- well, I

04:59:29  17  actually want to stop there.

04:59:30  18         If Apple had a different or special way of doing

04:59:37  19  it, don't you think that's something they would advertise?

04:59:43  20  Don't you think that's something they would tout?  We don't

04:59:46  21  use LTE, we use Apple's special secret form of LTE.  They

04:59:52  22  don't do that.  They just use LTE.

04:59:54  23         Now, what's interesting is that they referred to

04:59:57  24  two chip manufacturers who they get pieces of their

05:00:02  25  equipment from.  They referred to Qualcomm and Intel.  They

05:00:05   1   make pieces that are used in LTE.

05:00:08   2          You will not hear one word from a Qualcomm witness

05:00:12   3   disputing that its chips implement the patents-in-suit in

05:00:16   4   this case.  Not one word.

05:00:19   5          Now, the flip side is, you are going to hear words

05:00:22   6   from Apple engineers who used to work at Intel who are

05:00:28   7   going to tell you that Apple does something different, that

05:00:32   8   Apple doesn't infringe the patents.

05:00:35   9          But there's something very important about that

05:00:39   10  testimony.  Those Apple witnesses were shown the

05:00:42   11  patents-in-suit by Apple lawyers over a year after the

05:00:48   12  patents -- this lawsuit was filed.  They were prepared by

05:00:51   13  Apple lawyers, they were prepared to toe the company line.

05:00:55   14         No independent chip manufacturer is going to come

05:00:59   15  to this court and dispute that PanOptis's patents are

05:01:03   16  essential.  The only thing you're going to hear from is

05:01:06   17  people who are prepared to toe the party line by Apple's

05:01:09   18  lawyers.

05:01:10   19         The next issue is that the patents are invalid.

05:01:16   20         Now, our patents have a presumption of validity.

05:01:20   21  They are presumed valid.  Because they are presumed valid,

05:01:24   22  it's a very, very high burden to establish that the patents

05:01:28   23  are invalid.

05:01:29   24         You must do it by clear and convincing evidence.

05:01:33   25  One of the factors you can consider when you analyze

| | | |
|---|---|---|
| 05:01:36 | 1 | validity is what other members of the industry have done. |
| 05:01:40 | 2 | Other members of the industry have taken a license to these |
| 05:01:43 | 3 | patents after them being specifically presented to |
| 05:01:47 | 4 | PanOptis. |
| 05:01:48 | 5 | Apple's last argument is, okay, so even if we did |
| 05:01:53 | 6 | know about it, even if we do infringe it, even if it is |
| 05:01:56 | 7 | essential, it's not worth that much. |
| 05:02:00 | 8 | In fact, they have someone who's going to get on |
| 05:02:02 | 9 | the stand and say we only need to pay PanOptis about |
| 05:02:05 | 10 | one-tenth of a cent for the 24 percent improvement benefit |
| 05:02:09 | 11 | that they achieved from using the technology. |
| 05:02:12 | 12 | $8.79 per phone is what Apple saves or makes by |
| 05:02:20 | 13 | using our technology.  Apple is asking for one-tenth of a |
| 05:02:27 | 14 | cent. |
| 05:02:27 | 15 | The reality is, is that this litigation is part of |
| 05:02:37 | 16 | an internal strategy at Apple.  This is a document that was |
| 05:02:41 | 17 | prepared by Apple's lawyers.  This is PX-1537a.  This was a |
| 05:02:51 | 18 | document that was prepared behind closed doors.  It was a |
| 05:02:54 | 19 | document that was prepared right before, or a few years |
| 05:02:57 | 20 | before, PanOptis approached Apple and asked them to take a |
| 05:03:00 | 21 | license. |
| 05:03:01 | 22 | And what Apple says in this internal document is |
| 05:03:04 | 23 | that they want to devalue SEPs.  They want to devalue |
| 05:03:10 | 24 | standard essential patents.  They want to destroy LTE |
| 05:03:13 | 25 | innovation.  Why do they want to do it?  Money.  Because if |

05:03:17  1  they can destroy the patents of others, then they don't

05:03:20  2  have to pay fair -- fair compensation for them.

05:03:23  3       This is Apple's internal documents stating that

05:03:28  4  its goal is to destroy SEP values.

05:03:32  5       Let's look under the hood this week.  Look

05:03:37  6  carefully under the hood.  Don't trust my argument.  Trust

05:03:41  7  what the documents say, what Apple's internal documents

05:03:45  8  say.

05:03:45  9       This is another element of Apple's strategy.  This

05:03:53  10 is, once again, from an internal Apple document.  Apple

05:03:59  11 talks about a range of approaches, and one of the

05:04:02  12 approaches it likes to use is called license as

05:04:06  13 adjudicated.  This is the plans of Apple's lawyers.

05:04:09  14      And why do they want to say license as

05:04:11  15 adjudicated?  Well, that's a funny word for, let someone

05:04:15  16 sue us.

05:04:16  17      Now, why in the world would you want to wait for

05:04:20  18 someone to sue you for patent infringement?  Well, we

05:04:22  19 actually know the answer to that, because it's in their

05:04:25  20 internal documents.

05:04:26  21      The reason for it is because they want to delay

05:04:30  22 payments.  They want to avoid having paid the money for as

05:04:35  23 long as possible.

05:04:39  24      One of the things that Judge Gilstrap said is that

05:04:42  25 we are advocates, and there is no doubt that I am a strong

05:04:47  1   advocate for PanOptis.  There's also no doubt that the

05:04:53  2   documents written by Apple behind closed doors do not lie.

05:04:58  3   And this is what the documents show.

05:05:01  4        And what's striking about it is they're willing to

05:05:06  5   accept the litigation burden, the burden of being here.

05:05:11  6   They're willing to accept the fact that they can face

05:05:14  7   significant, extraordinary damages in this case.  And the

05:05:17  8   reason for that is because it's part of a strategy, a

05:05:20  9   strategy to delay for as long as possible, doing what?

05:05:26  10  Taking responsibility.  Taking responsibility for their

05:05:31  11  actions.

05:05:31  12       And so what you see in these pieces of evidence,

05:05:38  13  and what I think you'll see at trial, is a company that has

05:05:42  14  consciously chosen to make extraordinary profits, that

05:05:47  15  failed to make a critical decision early in the 2000s to

05:05:53  16  invest heavily in LTE, that recklessly chose to implement

05:05:58  17  LTE technology without even thinking about whether they had

05:06:03  18  the right to on their own, a company that is going to get

05:06:07  19  on the stand and say, we didn't know about your patents,

05:06:11  20  when we sent them a letter in writing in 2017 saying, we

05:06:15  21  have a group of standard essential patents we want to

05:06:18  22  discuss licensing with you.

05:06:20  23       They say, we didn't know about it.  And then when

05:06:22  24  we looked in their internal records, what do we find?  We

05:06:27  25  find a database that has scores of 90 to 100 percent for

```
05:06:31   1   our patents.
05:06:34   2          We look in their internal records after we
05:06:36   3   approached them and asked them to take a license.  What
05:06:40   4   does it show?  It shows that their plan is to destroy our
05:06:45   5   business, to destroy the value of standard essential
05:06:49   6   patents to save money.
05:06:50   7          What does the internal records show?  The internal
05:06:53   8   records show that this is part of a broader plan -- a
05:06:57   9   broader plan to delay making payments.
05:07:00   10         All these arguments about looking under the hood,
05:07:03   11  all these arguments about we're going to show you a
05:07:09   12  mountain of evidence, all these arguments about just give
05:07:12   13  us a chance, just wait until we have to say, you can't run
05:07:15   14  away from the documents.  You can't run away from the plan
05:07:20   15  that they've been implementing since 2014.
05:07:24   16         THE COURT:  Three minutes remaining.
05:07:25   17         MR. SHEASBY:  And so, ultimately, you have to ask
05:07:31   18  a very important question.  You are sacrificing a week of
05:07:37   19  your lives to be here.  Why?  Why?  It's because it's your
05:07:48   20  right.  It's your right to make a decision as to whether
05:07:51   21  Apple's conduct is appropriate or inappropriate, as to
05:07:55   22  whether Apple has the right to take without compensating
05:07:59   23  and to implement an internal strategy to destroy the
05:08:02   24  intellectual property of others.
05:08:03   25         Apple makes great products.  Apple made an
```

05:08:06   1   incredibly bad decision when it chose not to invest in LTE,

05:08:12   2   and it made an incredibly bad decision when it did not

05:08:15   3   accept PanOptis's offer of license.  And today is when the

05:08:20   4   consequences begin.

05:08:21   5        Ladies and gentlemen of the jury, thank you for

05:08:23   6   your time.

05:08:26   7        THE COURT:  All right.  The Defendant may now

05:08:28   8   present its opening statement.

05:08:31   9        Would you like a warning on your time,

05:08:34  10   Mr. Mueller?

05:08:35  11        MR. MUELLER:  Yes, please, Your Honor.  10 minutes

05:08:37  12   and three minutes, please.

05:08:39  13        THE COURT:  10 minutes remaining and three minutes

05:08:40  14   remaining.

05:08:41  15        MR. MUELLER:  Thank you, Your Honor.

05:08:41  16        THE COURT:  You may proceed.

05:08:43  17        MR. MUELLER:  Good morning [sic].  My name is Joe

05:08:49  18   Mueller, and along with my colleagues, I represent Apple in

05:08:52  19   this case.  And we had a chance to hear a little bit about

05:08:55  20   each of you earlier today, so I'll tell you a little bit

05:08:58  21   about myself.

05:08:59  22        Mr. Baxter mentioned that I'm from Massachusetts,

05:09:01  23   and that's -- that's absolutely true.  I live in a small

05:09:04  24   town of about 7,000 people where I grew up.  My wife is

05:09:09  25   from the next town over.  And when we got married, we moved

05:09:14  1  to a few different places, and she was a public school

05:09:17  2  teacher and taught sixth grade.

05:09:20  3          And then eventually once we started having kids,

05:09:26  4  she decided to stay at home with them, and we moved back to

05:09:30  5  my hometown.  We both had family nearby, and we figured it

05:09:33  6  would be a good place to raise kids.

05:09:35  7          Today we have three kids.  My oldest is going to

05:09:39  8  be a senior in high school, and he's trying his best to

05:09:42  9  figure out what he's going to do after he graduates next

05:09:44  10  year.

05:09:45  11          My middle child is going to be a sophomore in high

05:09:48  12  school.  This summer he's playing a lot of baseball on an

05:09:52  13  AAU team, and he's hoping his high school football team

05:09:56  14  will be playing this fall.  He plays wide receiver and

05:10:01  15  linebacker on the football team.

05:10:03  16          And my youngest is my daughter.  She's going into

05:10:03  17  seventh grade, and she has all sorts of hobbies and

05:10:07  18  interests and a very strong personality.  She really sort

05:10:09  19  of lays down the law for her brothers.  They're all back

05:10:13  20  home.

05:10:13  21          But I'm very glad to be here with you for the rest

05:10:17  22  of this week, and if we carry into next week, for that, as

05:10:20  23  well.  And I'm glad to be here with you because it's a real

05:10:23  24  privilege to be able to present evidence and the facts to a

05:10:28  25  fair-minded group of people like yourself.  And we really

05:10:32   1   appreciate the time that you're taking out of your lives to

05:10:35   2   do this.

05:10:37   3          This is indeed an extraordinary time, and it's

05:10:39   4   a -- a difficult time, and we very much appreciate your

05:10:43   5   careful attention to the facts and to the evidence.

05:10:46   6          So I thank you.  Apple thanks you for being here.

05:10:50   7          Now, let me introduce you to the other folks who

05:10:52   8   are going to be examining witnesses for our side over the

05:10:57   9   course of the case.

05:10:58   10          Melissa Smith you met earlier.  And she'll be

05:11:02   11   examining some of the witnesses in the case.

05:11:05   12          And the third lawyer you're going to see is

05:11:07   13   Michael Summersgill, who is right there.

05:11:09   14          The three of us over the course of this week will

05:11:12   15   be examining the witnesses that you're going to hear from.

05:11:16   16          When the Plaintiff offers witnesses, we'll be

05:11:19   17   doing some cross-examination.  And with our own folks,

05:11:22   18   we'll be doing direct examination of those witnesses.

05:11:24   19          Now, there's a fourth person at this table here

05:11:28   20   who I want to introduce you to.

05:11:30   21          And, Mr. Blevins, could you please stand up?

05:11:33   22          This is Tony Blevins.  He's from Apple.  He is the

05:11:36   23   vice president of procurement at Apple, and he's worked

05:11:42   24   there for 20 years.  He's been there since 2000.

05:11:47   25          Mr. Blevins's job at Apple is to help, as the --

05:11:49   1   the job title suggests, procure components that go into all

05:11:54   2   of the different Apple products, the iPhone, the iPad,

05:11:59   3   everything else.  And he's responsible for finding things

05:12:01   4   that range from the glass on the front of the phone to the

05:12:04   5   chips on the inside, and a whole bunch of other stuff, as

05:12:07   6   well.

05:12:10   7        He is here on behalf of the company to be the

05:12:12   8   company's representative.  He's going to be sitting right

05:12:14   9   here every day of the trial, and he's going to testify to

05:12:18  10   you, the ladies and gentlemen of the jury.

05:12:21  11        You may please sit down, Mr. Blevins.

05:12:24  12        Now, the reason why he's here is because Apple

05:12:27  13   considers this an important case.

05:12:29  14        Now, you heard His Honor say it's an important

05:12:32  15   case.  You heard Mr. Sheasby say it's an important case.

05:12:34  16   They're right.  They're right.  It is an important case.

05:12:37  17   But the reason why it's an important case to Apple is

05:12:40  18   because they've been wrongfully accused -- wrongfully

05:12:46  19   accused.

05:12:46  20        Now, if one of you were accused of doing something

05:12:49  21   that you didn't do and doing -- and accused of doing some

05:12:53  22   quite horrible things, as you just heard from Mr. Sheasby,

05:12:56  23   but you didn't do them, you'd be upset.  And you'd consider

05:13:02  24   that an important case to defend your name and to clear

05:13:06  25   your name.  And that's why we're here.

05:13:09   1          It's an important case to Apple because what you

05:13:11   2   just heard for a half-hour is not supported by the

05:13:15   3   evidence.  We're going to show you the evidence in a very

05:13:18   4   careful way over the course of this week.  You're going to

05:13:22   5   hear from Apple witnesses.  You're going to see Apple

05:13:25   6   document after Apple document after Apple document.

05:13:28   7          You're going to see other documents, as well, that

05:13:31   8   relate to the particular components at issue.  We want you

05:13:35   9   to have all the facts, confidential, public, everything in

05:13:40  10   between.

05:13:41  11          There may be some moments where we have to ask His

05:13:44  12   Honor to seal the courtroom because the information is so

05:13:46  13   sensitive, but you will have it.  You will have it.

05:13:49  14          We're not running from a single fact in this case.

05:13:54  15   We want you to have the facts.  We want you to hear

05:13:58  16   firsthand from folks at Apple, not just Mr. Blevins.

05:14:02  17   You're going to hear from chip engineers who work on the

05:14:05  18   engineers -- who work on the chips at issue in this case.

05:14:09  19          Now, if we had something to hide, do you think we

05:14:12  20   would bring the engineers to you?  The answer is no.  We

05:14:16  21   have absolutely nothing to hide.  We want you to know how

05:14:19  22   these products work.  We want you to know how they work in

05:14:23  23   great detail because we are confident -- we are confident

05:14:27  24   that when you have all the facts, when you have the

05:14:29  25   evidence in front of you, you will understand that the

| | | |
|---|---|---|
| 05:14:35 | 1 | accusations you just heard are not true.  They're not true. |
| 05:14:38 | 2 | And that's why this is an important case to us. |
| 05:14:41 | 3 | Now, the theory that you just heard, or a big part |
| 05:14:46 | 4 | of the theory that you just heard, is that the five patents |
| 05:14:50 | 5 | in this case cover something known as LTE and that Apple is |
| 05:14:57 | 6 | infringing those patents by having products that work on |
| 05:15:00 | 7 | LTE networks. |
| 05:15:04 | 8 | So I want to take a couple of minutes and examine |
| 05:15:07 | 9 | that claim and preview for you what I think the evidence |
| 05:15:10 | 10 | will show. |
| 05:15:10 | 11 | So, first of all, what is LTE?  Now, His Honor |
| 05:15:14 | 12 | told you that LTE is an example of what's known as a |
| 05:15:17 | 13 | standard.  And, of course, that's a hundred percent true. |
| 05:15:20 | 14 | Standards are in all parts of life.  There's food safety |
| 05:15:25 | 15 | standards.  There's standards for gas mileage in cars. |
| 05:15:28 | 16 | There's standards for electrical plugs.  There's all sorts |
| 05:15:31 | 17 | of standards. |
| 05:15:32 | 18 | And for cellular devices like cell phones and |
| 05:15:37 | 19 | cellular products like cellular iPads, there are indeed |
| 05:15:41 | 20 | cellular standards, and there's actually several.  There's |
| 05:15:45 | 21 | something called GSM, GPRS, EDGE, UMTS, LTE.  And you don't |
| 05:15:54 | 22 | have to remember all these names right now, but we're going |
| 05:15:56 | 23 | to explain them over the course of this trial.  There's a |
| 05:15:59 | 24 | number of different types of cellular standards, and LTE is |
| 05:16:03 | 25 | certainly one of them. |

05:16:04  1        Now, for products that are capable of cellular

05:16:08  2   communications, these days, most all of them are able to

05:16:10  3   work on LTE networks.

05:16:12  4        I just brought as an example a phone from -- that

05:16:17  5   I picked up at Walmart.  And you can see here it's a 4G/LTE

05:16:21  6   phone.  So if you want to use this to call on a 4G/LTE

05:16:26  7   network, you can do that.  It works.  It works on a 4G/LTE

05:16:30  8   network.

05:16:31  9        And you heard from Mr. Sheasby that there's been

05:16:33  10  testimony about whether Apple complies or practices or

05:16:36  11  implements, or whatever word you want to use, LTE.  And I

05:16:41  12  want to make one thing really clear right now.  Of course,

05:16:45  13  Apple's products work on an LTE network.  That's not in

05:16:49  14  dispute in this case.  It is absolutely not in dispute in

05:16:53  15  this case.

05:16:53  16       This phone that I picked up at Walmart also works

05:16:55  17  on LTE networks, and most phones these days do.  The fact

05:16:59  18  that Apple's products work on an LTE network is not in

05:17:03  19  dispute.

05:17:04  20       Here is what is in dispute:  Are the five patents

05:17:10  21  that the Plaintiffs in this case bought from Samsung, LG,

05:17:18  22  and Panasonic used in the Apple products?  That's the real

05:17:23  23  issue.  Are these five patents used in the Apple products?

05:17:32  24  They don't own LTE.  They don't own the basic idea of LTE.

05:17:36  25  What they own are five patents that they're asserting in

05:17:39  1    this case, and the claim they're making is that the Apple

05:17:42  2    products infringe those five patents.

05:17:47  3            So that's the question we have to look into over

05:17:49  4    the course of the trial.  Are they right?  So how do we

05:17:53  5    figure out the answer to that question?  We take the five

05:17:57  6    patents, we look at them -- and I'm going to show you one

05:18:00  7    in just a few minutes -- and we carefully and methodically

05:18:07  8    compare those five patents to the Apple products in this

05:18:11  9    case.

05:18:11  10           So we have on the one hand the patents, on the

05:18:12  11   other hand the products.  We know what they both are.  And

05:18:13  12   we see if they match.  If they match, there's infringement.

05:18:18  13           But what you're going to see, what the evidence

05:18:21  14   will show is that for each of these five patents, there's

05:18:25  15   important differences between how these products work and

05:18:29  16   the patents.  There is no infringement, and there never was

05:18:34  17   for any one of these five patents.

05:18:36  18           And the fact that they support LTE is not the

05:18:40  19   question.  If that were right, I could just hold up this

05:18:47  20   phone and say, oh, 4G/LTE, it must use these five patents.

05:18:53  21   That's not how it works.  What you would need to do for

05:18:54  22   this phone -- you're not going to have to do this because

05:18:55  23   it's not at issue in this case, but just to illustrate the

05:18:59  24   point, this is 4G/LTE.

05:19:02  25           I'd have to open the box, take it out.  Not just

05:19:05   1   that.  I'd have to unscrew the components, look at the

05:19:09   2   computer code running inside the components, get into the

05:19:12   3   guts of the device to see if it's using these patents.

05:19:18   4        Exactly the same thing is true for the iPhone, and

05:19:20   5   you're going to have the opportunity to learn exactly how

05:19:23   6   these devices work in the guts, in the guts of the device.

05:19:28   7        And you're going to have to consider if you look

05:19:31   8   in the guts of the device, do these products match the five

05:19:38   9   patents in this case?  That's the question.  And you will

05:19:41   10  see, the evidence will show, there is no match for any of

05:19:45   11  the five patents.

05:19:45   12       Now, a few times Mr. Sheasby referred to the

05:19:50   13  patents being declared essential.  And I want to pause on

05:19:53   14  that for a minute because it's an important point that I

05:19:57   15  want to ensure there's no confusion on.

05:20:00   16       The European Telecommunications Standards

05:20:02   17  Institute that His Honor told you about does not check

05:20:06   18  patents one-by-one and say this is essential.  This is not.

05:20:10   19  This is essential.  This is not.  It doesn't work that way.

05:20:15   20       The way ETSI works is, it lets companies declare

05:20:20   21  patents as possibly essential to ETSI, and then it goes

05:20:24   22  into a big database where it records thousands upon

05:20:27   23  thousands of patents that various companies in the industry

05:20:31   24  have declared essential.

05:20:33   25       Now, does the fact that these patents, the five in

05:20:37  1  this case and many others, were declared essential mean

05:20:42  2  they're actually essential or even more used in an iPhone?

05:20:47  3  And the answer is no.  It's just a declaration.

05:20:50  4       I could declare myself an NFL quarterback.  I wish

05:20:57  5  it were true.  It's not.  Okay.  I'm not an NFL

05:21:00  6  quarterback.  I could declare myself eligible for the NBA

05:21:04  7  draft.  I'm not going to get drafted, okay?  I could

05:21:08  8  declare myself ready to be a guitarist in a major rock

05:21:14  9  band.  I should not get ready to go on tour because no band

05:21:18  10  is going to be calling me anytime soon, okay?

05:21:21  11       So you get the point.  The point is, just

05:21:23  12  declaring something, doesn't make it so.  You have to have

05:21:27  13  the evidence and the facts to back up your declaration.

05:21:30  14       So the fact that the Plaintiffs and Samsung and

05:21:33  15  Panasonic and LG had declared these five patents to be

05:21:37  16  essential doesn't mean anything more than they had declared

05:21:42  17  this as possibly essential.  It certainly doesn't mean it's

05:21:49  18  used in the iPhone.

05:21:51  19       The only way to know that is to, as Ms. Smith

05:21:55  20  said, pop the hood on the device, get into the internals,

05:21:59  21  understand how they work, and compare them carefully and

05:22:03  22  methodically to the patents in this case.  That's the only

05:22:07  23  way to do it.

05:22:08  24       You can't just say something.  You got to back it

05:22:10  25  up with proof.  You can't just make accusations.  You got

05:22:14    1   to back it up with evidence.  You can't just say someone is

05:22:17    2   trying to destroy things and engage in some grand

05:22:21    3   conspiracy.  You have to prove your point, the actual

05:22:26    4   evidence, and present it to jurors.  That's what we're

05:22:30    5   going to do this week.

05:22:31    6        We, Apple, are going to present you the facts.

05:22:34    7   We're not going to make wild accusations.  We're going to

05:22:38    8   show you the facts piece-by-piece-by-piece because we trust

05:22:43    9   your judgment.  We know that if you have the evidence,

05:22:46   10   you'll do the right thing.

05:22:53   11        Now, what is the component if you pop the hood

05:22:55   12   that really matters for this particular case?  Because

05:22:58   13   there's a whole bunch of components inside the iPhone.

05:23:01   14   What is the component that really matters?  It's something

05:23:08   15   called a baseband chip.  And I'm holding this right now in

05:23:11   16   a little case.  It's hard to see.

05:23:14   17        Your Honor, may I use the document camera?

05:23:20   18        THE COURT:  You may.

05:23:21   19        MR. MUELLER:  So I don't know if you can see it.

05:23:21   20   I'll try to magnify it just a little bit, kind of hard to

05:23:21   21   make out.

05:23:22   22        That's a computer chip right there.  And it's, you

05:23:30   23   know, smaller than my fingernail, but it's a very powerful

05:23:36   24   computer chip.  And a baseband chip is a special kind of

05:23:40   25   chip that's used for cellular communications.  So if you're

05:23:42   1   talking on your phone, what happens is your voice goes into

05:23:46   2   a microphone, the microphone is connected to tiny wires

05:23:49   3   inside the phone, and, eventually, that signal gets sent to

05:23:54   4   the baseband chip.

05:23:55   5          The baseband chip does certain things to the

05:23:57   6   signal to get it ready to transmit over the air waves using

05:24:04   7   an antenna, and then it gets transmitted over the air waves

05:24:10   8   to an antenna.

05:24:10   9          Where those signals go, they go to something

05:24:13  10   called base stations.  And base stations are those big

05:24:18  11   antennas that you see on the side of the highway or other

05:24:21  12   places.

05:24:21  13          So the phone, through the baseband chip, gets the

05:24:24  14   signal ready to transmit.  It is transmitted over the

05:24:24  15   airway to a base station, and then it's retransmitted to

05:24:28  16   whoever you're talking to, for example.

05:24:30  17          And the same sort of process works if you're using

05:24:33  18   a cellular network to send a text message or use the

05:24:36  19   Internet.  You're going to be accessing the baseband chip

05:24:39  20   at some point to get ready to transmit or receive

05:24:45  21   information.

05:24:45  22          Now, since Apple released the iPhone in 2007, 13

05:24:52  23   years ago, they have used two main suppliers of baseband

05:24:57  24   chips.  One is a company in California, in San Diego,

05:25:03  25   called Qualcomm.  And the second is a company also in

05:25:07    1    California called Intel.

05:25:07    2         Those two companies, Qualcomm or Intel, supplied

05:25:12    3    all of the baseband chips in the products at issue in this

05:25:16    4    case.  So some of the Apple iPhones in this case have Intel

05:25:16    5    chips, some have Qualcomm chips.

05:25:21    6         The same is true for the iPads and the Apple

05:25:23    7    Watches in this case.  But every one of them has one or the

05:25:26    8    other, some form of baseband chip inside those devices.

05:25:29    9         Now, every phone in the world has a baseband chip.

05:25:33   10    This phone I picked up at Walmart also has a baseband chip

05:25:37   11    in it.  But here's the key, not every baseband chip is the

05:25:41   12    same.  Not every baseband chip is the same.  They -- they

05:25:46   13    share certain characteristics in common, but there's

05:25:50   14    differences.

05:25:51   15         Now, why is that true?  Because there's teams of

05:25:57   16    hundreds, if not thousands, of engineers who work on these

05:25:57   17    chips.  They may look small, but a whole bunch of work goes

05:26:01   18    into those; years and years of development.  And the folks

05:26:05   19    at Intel and Qualcomm over the years made certain design

05:26:09   20    choices that are reflected in the baseband chips that they

05:26:11   21    create.

05:26:12   22         So you'd -- you can't tell just by looking at the

05:26:16   23    outside of a package, even if it says LTE, how the chip

05:26:20   24    works.  You got to look at the chip itself.  You have to

05:26:24   25    look at the details of the source code, which is the

05:26:27   1   computer code running on that chip, to make sure you

05:26:32   2   understand exactly how the chip works.

05:26:33   3          So, again, to return to the critical question in

05:26:37   4   this case, it's not whether the Apple products work on an

05:26:40   5   LTE network.  Of course, they do.  Of course, they do.

05:26:42   6          The question is, how -- how do those baseband

05:26:48   7   chips inside of the Apple products work?  And, in

05:26:51   8   particular, the portions of those chips that PanOptis and

05:26:54   9   its other four companies, the five Plaintiffs in this case,

05:26:58  10   the ones that they say infringe, do they really match the

05:27:01  11   patents or not?  That's the question.  We have to get

05:27:04  12   inside the guts of these phones, look at them very

05:27:06  13   carefully, and compare them to the patents in this case to

05:27:10  14   see if they match.

05:27:12  15          Now, I mentioned that you're going to hear from

05:27:19  16   some actual engineers who work on baseband chips, and let

05:27:21  17   me explain why that's possible.

05:27:23  18          Last year, Apple and Intel struck a deal, and

05:27:25  19   under the terms of that deal, a large number, hundreds and

05:27:28  20   hundreds, if not thousands, of engineers joined Apple.

05:27:32  21   They came from Intel to Apple.  And they are some of the

05:27:35  22   folks that work on baseband chips.  Two of those folks are

05:27:39  23   going to be testifying to you, the ladies and gentlemen of

05:27:41  24   the jury.

05:27:41  25          So you're going to get a chance to hear from

05:27:45  1   people who have actually worked on baseband chips.  You're

05:27:48  2   going to get a chance to hear firsthand the types of work

05:27:51  3   that they do when they're making design choices and how

05:27:55  4   that's reflected in how the products actually work.

05:27:57  5         And, again, we want you to have that information

05:27:59  6   because we're not afraid of the facts.  We want you to have

05:28:02  7   the facts.  We're bringing fact witnesses to you because we

05:28:06  8   believe the facts are on our side.  And when you have those

05:28:10  9   facts, you'll see the accusations you heard are just not

05:28:15  10  true.

05:28:15  11        Now, the baseband chips are going to have to be

05:28:21  12  compared to something and, in particular, they're going to

05:28:24  13  have to be compared to the five patents in this case.  And

05:28:27  14  what I want to do right now is to show you how to read

05:28:32  15  these patents.  This will build on what you saw this

05:28:35  16  morning in the patent video and what His Honor has told you

05:28:40  17  in his instructions.

05:28:41  18        So you each have a notebook, and I'm going to ask

05:28:43  19  you, if you could, to please turn to the section that's

05:28:47  20  labeled U.S. Patent 8,385,284.

05:28:50  21        THE COURT:  You have 10 minutes remaining,

05:28:53  22  counsel.

05:28:53  23        MR. MUELLER:  Thank you, Your Honor.

05:28:54  24        So take your time, and if you could just flip to

05:28:59  25  the section for the '284 patent.  We usually refer to

05:29:05   1   patents by the last three numbers.  So this one we call the

05:29:09   2   '284 patent.

05:29:09   3        Now, if you open this up and you turn past the

05:29:12   4   title page, you're going to see a page that kind of looks

05:29:15   5   like this, and there's a lot of information on it.  I

05:29:18   6   apologize, my pen exploded here, but there's a lot of

05:29:22   7   information here about the inventors, the date it was

05:29:26   8   originally filed, the title, there's something called an

05:29:29   9   abstract.  There's a whole bunch of information in this

05:29:32  10   section.

05:29:32  11

05:29:35  12        Then if you keep going, you will see some figures

05:29:37  13   and drawings.  And if you go a bit further in, you will see

05:29:43  14   a section where there's numbers at the top of the page, and

05:29:48  15   it starts with 1 and 2.  We call those the column numbers.

05:29:53  16        And then if you look right down the middle in the

05:29:55  17   center of the page, there's some additional numbers.  We

05:29:58  18   call those the line numbers.  So we have column numbers and

05:30:03  19   line numbers.

05:30:04  20        Now, if I could please ask each of you, if you

05:30:09  21   wouldn't mind, to turn to Column 28, Line 43, and take your

05:30:25  22   time.  But Column 28, Line 43.  And you will see there a

05:30:39  23   section that starts off with the words, the invention

05:30:42  24   claimed is, the invention claimed is, and what continues

05:30:46  25   from there are the language of the claims.

05:30:46   1

05:30:48   2          Now, only some of the claims in this patent and

05:30:51   3   the other patents in this case are at issue, meaning

05:30:53   4   they're only asserting some of them.  But for the ones that

05:30:56   5   they're asserting, you have to look at every word.  If any

05:31:00   6   one of those words is missing in what they're accusing of

05:31:03   7   infringement, there is no infringement.

05:31:06   8          So the reason why I'm asking you to look at this

05:31:09   9   now is because we want you -- we on the Apple side of the

05:31:12  10   table here, we want you to look at the words in the claims

05:31:16  11   and to do so carefully.  We want you to methodically

05:31:22  12   compare those words to the products, because if you do

05:31:26  13   that -- and that's what His Honor will instruct you is

05:31:30  14   required to decide the issues before you, you're going to

05:31:33  15   find they don't match.

05:31:34  16          And I'll give you one example.  If you go to the

05:31:37  17   next page, Column 29, at the very top there, Line 3,

05:31:43  18   there's a phrase:  Wherein the first subset of the values

05:31:47  19   contains more values than the second subset of the values.

05:31:52  20   So that's one of the requirements for this particular

05:31:55  21   claim.  This is Claim 1.  And if you don't have that, you

05:32:00  22   don't infringe Claim 1.

05:32:02  23          Well, you're going to learn in this case that the

05:32:04  24   Apple products don't have that.  That requires a comparison

05:32:08  25   in which one set of information is bigger than the other.

05:32:11  1   You're going to find out that the Apple products is exactly

05:32:13  2   the opposite of what is described right here.  So there's

05:32:17  3   no infringement of that claim.

05:32:19  4        You will learn, and the evidence will show, that

05:32:23  5   for each of the five patents in this case, there's at least

05:32:28  6   one requirement missing from the Apple products, sometimes

05:32:33  7   more than one, but at least one requirement missing if you

05:32:37  8   compare the claim language to the Apple products.

05:32:40  9        And so that's why we want you to be careful and

05:32:43  10  methodical and thorough and to consider the evidence,

05:32:46  11  because we believe that if you do that, you will see the

05:32:50  12  case just doesn't hold together.  There's missing

05:32:55  13  requirements in each and every one of these patents if you

05:33:00  14  compare them to the products.

05:33:01  15       Now, I want to give you two analogies to try to

05:33:06  16  help illustrate what I think is one of the main disputes in

05:33:10  17  this case.

05:33:11  18       The Plaintiffs say Apple has products that work on

05:33:15  19  LTE networks.  They must be using our essential patents.

05:33:20  20  Again, they've just declared them as essential.  They have

05:33:23  21  to prove their case.

05:33:25  22       But there's a couple of analogies that I think

05:33:27  23  help illustrate the fight that's going to here.  The first

05:33:30  24  one is this.  Sometimes you're going someplace by car, and

05:33:34  25  there's multiple possible routes to get there.  So you're

05:33:38   1   going to arrive at a destination, but there's multiple

05:33:42   2   possible routes to get there.  And you might prefer one

05:33:45   3   route if there's traffic on the other or a car accident, or

05:33:48   4   you might have a preference for driving down a scenic road

05:33:53   5   at a certain point in time.  But there's multiple possible

05:33:57   6   ways to get there.

05:33:58   7          If you arrive there, it doesn't mean you

05:34:00   8   necessarily took any one route.  You took whatever you

05:34:04   9   chose to do.

05:34:04   10          The Plaintiffs' claims in this case boil down to

05:34:07   11   the argument that they own a stretch of road somewhere, and

05:34:11   12   they say you have to travel through it to get to LTE.

05:34:16   13   Well, it's just not true.  If you look at these five

05:34:19   14   patents and compare them to the products, which is what you

05:34:21   15   have to do, you're going to see we're not using their road.

05:34:25   16   We're also not cutting down their trees or stealing their

05:34:30   17   guns or anything else that Mr. Baxter mentioned in voir

05:34:34   18   dire.  Those are powerful analogies that talk about clear

05:34:34   19   cutting property that doesn't belong to you.

05:34:34   20          We haven't done anything like that, not once, not

05:34:37   21   ever.  There's been no infringement of these patents at

05:34:39   22   all.

05:34:39   23          And whether it's characterized as cutting down

05:34:43   24   trees or anything else, it just didn't happen, okay?

05:34:48   25          And I'd also say this.  The property analogies you

05:34:51   1   have to keep in mind are the ones that are defined by the

05:34:54   2   claims that we just walked through.  Those set the

05:35:01   3   boundaries on land for patents.  Those claims and those

05:35:06   4   requirements in the claims are the equivalent of a fence

05:35:09   5   line around a property, and you don't get to move your

05:35:11   6   fence line, and you don't get to move your patent lines.

05:35:14   7   You have to live with and be true to and faithful to what

05:35:18   8   the Patent Office issued.

05:35:20   9          And we're going to show you the arguments in this

05:35:23   10  case the Plaintiffs are making are -- are trying to stretch

05:35:26   11  out their lines, to move their fence line into other folks'

05:35:31   12  property that they don't own, and that's just not right.

05:35:33   13  You can't do that with patents.

05:35:35   14         The requirements in the claims, like the ones that

05:35:38   15  we just showed you, in the other four patents, as well,

05:35:42   16  those are the fence line.  You can't move the fence line,

05:35:45   17  and we're not within their fence line.  In fact, we're not

05:35:48   18  even close to their fence line.

05:35:50   19         THE COURT:  Three minutes remaining.

05:35:52   20         MR. MUELLER:  Thank you, Your Honor.

05:35:52   21         The second analogy I want to give you is, say I'm

05:35:58   22  driving a car on the highway.

05:36:00   23         Now, right now for this week, I've rented a Dodge

05:36:05   24  Ram.  And say I'm on the highway, and I press on the

05:36:07   25  accelerator, and I get to 65, and say there are some other

05:36:10  1  cars nearby that are traveling at about the same speed.

05:36:14  2  Does the fact that we're traveling 65 miles an hour, other

05:36:18  3  vehicles, mean that we have the same engine?  No.

05:36:21  4      The Dodge Ram has a different engine than a small

05:36:26  5  sports car.  An 18-wheeler has a different engine than a

05:36:30  6  Dodge Ram, and so on.  If you wanted to know what we were

05:36:32  7  doing, you wouldn't just look at the 65 miles an hour,

05:36:35  8  you'd look at the engine.  You'd get a good mechanic, you'd

05:36:40  9  pop the hood, you'd figure out how that engine works.

05:36:41  10      And that's what you have to do here.  And that's

05:36:43  11  why Ms. Smith talked about popping the hood.  You got to go

05:36:46  12  inside these devices to see how they actually work.  You

05:36:49  13  can't make loose accusations.  You got to prove it by going

05:36:55  14  inside these devices to show how they work.

05:36:57  15      That's why we're bringing you engineers, and we're

05:36:59  16  also going to bring you three extraordinarily experienced

05:37:03  17  technical experts who are going to help explain what

05:37:05  18  happens inside these devices.

05:37:06  19      Now, Mr. Sheasby showed you something that had all

05:37:09  20  these different excuses and sign posts and so on.  Let me

05:37:13  21  be very, very clear.  We're not here to make excuses.

05:37:16  22  We're here to tell you the truth.  We're here to give you

05:37:19  23  the facts, and we're here to show you we do not use these

05:37:23  24  five patents, and we never did.

05:37:25  25      Now, I want to say a few words about the

05:37:27  1   invalidity issues in this case.  We are not going to

05:37:30  2   present any argument to you at this trial that the Patent

05:37:34  3   Office made a mistake.  Not one.

05:37:38  4         What we are going to do in this trial is to look

05:37:42  5   at the way that the Plaintiffs are trying to apply these

05:37:46  6   patents and to see if -- if you stretch them in the way

05:37:50  7   they're trying to stretch them to get to the Apple products

05:37:52  8   what the consequences would be for validity, because it

05:37:56  9   turns out that if you stretch the patents in the way that

05:37:59  10  they're trying to do it, you would sweep in the old ideas

05:38:02  11  of other folks, as well.

05:38:03  12        We're also going to show you that some important

05:38:07  13  information was not in front of the Patent Office for at

05:38:09  14  least one of the patents in this case.  None of that is a

05:38:13  15  criticism of the Patent Office at all.

05:38:15  16        What we would like you to do is to examine the

05:38:17  17  full context and to hold the Plaintiffs, these five

05:38:22  18  companies, faithful to what the claims actually say.  We

05:38:25  19  think that if you do that, you will see there's no

05:38:27  20  infringement.

05:38:28  21        Now, a few final things.  The Plaintiffs, these

05:38:32  22  are five companies.  We'll learn more about them over the

05:38:37  23  course of this case.  But here's who they're not.  They're

05:38:40  24  not Samsung.  They're not Panasonic.  They're not LG.

05:38:43  25  Samsung is not in this case.  LG is not in this case.

05:38:47  1   Panasonic is not in this case.

05:38:49  2         The Plaintiffs are the Plaintiffs.  They're five

05:38:53  3   companies that we'll learn more about, but they are not

05:38:56  4   Samsung, Panasonic, and LG.

05:38:59  5         THE COURT:  Counsel, your time has expired.

05:39:01  6         MR. MUELLER:  Thank you, Your Honor.

05:39:01  7         THE COURT:  Take just a few seconds and finish up.

05:39:04  8         MR. MUELLER:  Sure.

05:39:04  9         The final thing is this.  The truth, which we will

05:39:07 10   try to establish over the course of this case, is that

05:39:09 11   Apple has never used these five patents, not once, not

05:39:14 12   ever.

05:39:14 13         And at the end of the case, I will return to you

05:39:16 14   and respectfully request a verdict in favor of Apple.

05:39:20 15         Thank you very much.

05:39:21 16         THE COURT:  All right.  Ladies and gentlemen of

05:39:25 17   the jury, you've now heard opening statements from both of

05:39:28 18   the competing parties.

05:39:31 19         I'm about to recess for the evening.  We'll begin

05:39:34 20   in the morning with the Plaintiffs' first witness to begin

05:39:37 21   the Plaintiffs' case-in-chief.

05:39:39 22         Let me remind you of what I said earlier.  Unless

05:39:44 23   you live alone, when you get home, whoever meets you there

05:39:48 24   is going to ask -- the first question out of their mouth is

05:39:51 25   going to be, tell me what happened in federal court today.

05:39:54   1         Just don't even try to answer that question.

05:39:57   2   Blame it on me.  Tell them I made it very clear that until

05:40:02   3   I release you from your duty as jurors, you are not to

05:40:05   4   discuss the case with anyone, and that means communicate

05:40:07   5   about it in any way.

05:40:08   6         Please follow all the other instructions I've

05:40:12   7   given you.  Please be back assembled in the jury room

05:40:15   8   between 8:15 and 8:30 so we can start as close to 8:30 in

05:40:22   9   the morning as possible.

05:40:24  10         Please take your notebooks and leave them in the

05:40:25  11   jury room.  You probably want to leave those face shields

05:40:29  12   on top of your respective notebooks so you can keep them

05:40:33  13   straight.

05:40:34  14         Have a good evening, ladies and gentlemen.  You're

05:40:39  15   excused.

05:40:40  16         COURT SECURITY OFFICER:  All rise.

05:40:41  17         (Jury out.)

05:40:42  18         THE COURT:  Be seated, please.

05:41:08  19         Counsel, does either party wish to invoke the

05:41:14  20   Rule?

05:41:15  21         MR. SHEASBY:  Plaintiffs wish to invoke the Rule,

05:41:18  22   Your Honor, as to fact witnesses only.

05:41:20  23         THE COURT:  All right.  The Rule has been invoked

05:41:23  24   as to fact witnesses only.  That means unless you are a

05:41:26  25   party representative or an expert witness in this case, if

05:41:30   1   you're going to testify as a fact witness only, you must

05:41:34   2   remain outside of the courtroom until you're called to

05:41:37   3   testify.

05:41:38   4           Counsel, the Rule has been invoked on that basis.

05:41:41   5   I will trust that you will police it with your respective

05:41:44   6   fact witnesses going forward starting in the morning.

05:41:46   7           We'll begin in the morning with Plaintiffs' first

05:41:50   8   witness now that we've completed opening statements.

05:41:52   9           Also, I remind you to follow the instructions I've

05:41:57  10   given you with regard to any overnight disputes that might

05:42:01  11   develop, to strenuously and candidly meet and confer in an

05:42:05  12   attempt to resolve if not substantially narrow those.

05:42:08  13           I need a report in the manner I've described it to

05:42:11  14   you by 10:00 o'clock this evening by email to my law

05:42:16  15   clerks.  I will look for a follow-up notebook by 7:00

05:42:19  16   o'clock in the morning showing what's been resolved and

05:42:21  17   what remains in dispute.

05:42:23  18           Please follow the format that I discussed with you

05:42:28  19   earlier today about an example of what is in dispute, the

05:42:31  20   objecting party's basis for that objection, and the

05:42:35  21   responding party's basis to respond to those objections

05:42:39  22   segregated between each respective dispute.

05:42:41  23           A collective narrative with an entire slide deck

05:42:45  24   is of no help to the Court.

05:42:48  25           Please adjust your practice accordingly.

| | | |
|---|---|---|
| 05:42:50 | 1 | I will be in chambers no later than 7:30 to meet |
| 05:42:55 | 2 | with you, if necessary, to take up any such disputes.  And |
| 05:42:58 | 3 | I will do all within my power so that we can start as close |
| 05:43:04 | 4 | to 8:30 in the morning as possible. |
| 05:43:05 | 5 | Is there anything else that Plaintiff or Defendant |
| 05:43:08 | 6 | is aware of that needs to be raised with the Court before |
| 05:43:11 | 7 | we recess for the evening? |
| 05:43:12 | 8 | MR. SHEASBY:  Nothing for Plaintiffs, Your Honor. |
| 05:43:15 | 9 | MR. MUELLER:  No for Defendants, Your Honor. |
| 05:43:18 | 10 | Thank you. |
| 05:43:18 | 11 | THE COURT:  All right.  We stand in recess until |
| 05:43:23 | 12 | tomorrow morning. |
| 05:43:25 | 13 | COURT SECURITY OFFICER:  All rise. |
| 05:43:28 | 14 | (Recess.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                    8/3/2020
      SHELLY HOLMES, CSR, TCRR              Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25