08:31:58

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3
    OPTIS WIRELESS TECHNOLOGY,     )(   CIVIL ACTION NO.
 4  LLC, OPTIS CELLULAR            )(   2:19-CV-66-JRG
    TECHNOLOGY, LLC, PANOPTIS      )(
 5  PATENT MANAGEMENT, LLC,        )(
    UNWIRED PLANET, LLC, UNWIRED   )(
 6  PLANET INTERNATIONAL LIMITED,  )(
          PLAINTIFFS,              )(
 7                                 )(
    VS.                            )(
 8                                 )(   MARSHALL, TEXAS
                                   )(   AUGUST 6, 2020
 9  APPLE INC.,                    )(   8:31 A.M.
          DEFENDANTS.              )(

10

11                 TRANSCRIPT OF JURY TRIAL

12                     MORNING SESSION

13      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14         UNITED STATES CHIEF DISTRICT JUDGE

15
    APPEARANCES:
16

17  FOR THE PLAINTIFFS:

18
    MR. SAMUEL F. BAXTER
19  MS. JENNIFER TRUELOVE
    MCKOOL SMITH, P.C.
20  104 E. Houston Street
    Suite 300
21  Marshall, TX 75670

22
    MR. JASON G. SHEASBY
23  MS. ANNITA ZHONG
    IRELL & MANELLA LLP
24  1800 Avenue of the Stars
    Suite 900
25  Los Angeles, CA 90067
```

```
 1    FOR THE PLAINTIFFS:

 2
      MR. STEVEN J. POLLINGER
 3    MR. SETH R. HASENOUR
      MCKOOL SMITH, P.C.
 4    300 W. 6th Street
      Suite 1700
 5    Austin, TX 78701

 6
      MR. JONATHAN YIM
 7    MCKOOL SMITH, P.C.
      One Manhattan West
 8    395 9th Avenue
      50th Floor
 9    New York, NY 10001

10
      MR. CHRISTOPHER P. MCNETT
11    MCKOOL SMITH, P.C.
      1999 K Street, NW
12    Suite 600
      Washington, DC 20006
13

14    MS. INGRID PETERSEN
      MS. KELSEY SCHUETZ
15    IRELL & MANELLA LLP
      840 Newport Center Drive
16    Suite 400
      Newport Beach, CA 92660
17

18    FOR THE DEFENDANT:

19
      MR. JOSEPH J. MUELLER
20    WILMER CUTLER PICKERING
      HALE & DORR, LLP
21    60 State Street
      Boston, MA 02109
22

23    MR. MICHAEL J. SUMMERSGILL
      WILMER CUTLER PICKERING
24    HALE & DORR, LLP
      60 State Street
25    Boston, MA 02109
```

```
 1   FOR THE DEFENDANT:

 2
     MS. MELISSA R. SMITH
 3   GILLAM & SMITH, LLP
     303 South Washington Avenue
 4   Marshall, TX 75670

 5

 6

 7

 8   COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
 9                        United States District Court
                          Eastern District of Texas
10                        Marshall Division
                          100 E. Houston
11                        Marshall, Texas  75670
                          (903) 923-7464
12

13
     (Proceedings recorded by mechanical stenography, transcript
14   produced on a CAT system.)

15

16

17

18

19

20

21

22

23

24

25
```

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | P R O C E E D I N G S                                    |
| 08:31:58 | 2 | (Jury out.)                                               |
| 08:31:58 | 3 | COURT SECURITY OFFICER:  All rise.                       |
| 08:31:59 | 4 | THE COURT:  Be seated, please.                           |
| 08:32:04 | 5 | All right.  Are the parties prepared to read into        |
| 08:32:10 | 6 | the record those items from the list of pre-admitted     |
| 08:32:12 | 7 | exhibits used during yesterday's portion of the trial?   |
| 08:32:18 | 8 | MR. MUELLER:  We were just having a discussion           |
| 08:32:20 | 9 | about that, Your Honor.                                   |
| 08:32:21 | 10 | MS. SCHUETZ:  Yes, Your Honor.  I'm prepared to         |
| 08:32:23 | 11 | read the exhibits the parties have agreed to.  I'm not   |
| 08:32:28 | 12 | aware of the objections that they -- that we still have to |
| 08:32:29 | 13 | two of the exhibits that were used yesterday.            |
| 08:32:37 | 14 | THE COURT:  I don't understand why there hasn't        |
| 08:32:41 | 15 | been time for you all to fully discuss and resolve this.  I |
| 08:32:45 | 16 | mentioned it before we recessed yesterday evening.  I'm not |
| 08:32:49 | 17 | going to hold up this trial while you all argue about    |
| 08:32:52 | 18 | whether something was or wasn't used before the jury.  I |
| 08:32:56 | 19 | want to hear what you have agreed to, and then tell me what |
| 08:32:58 | 20 | you have not agreed to.                                  |
| 08:33:00 | 21 | MS. SCHUETZ:  Yes, Your Honor.  So there are --        |
| 08:33:07 | 22 | there's one exhibit that Plaintiffs would like to withdraw |
| 08:33:09 | 23 | that was read into the record yesterday that was not used |
| 08:33:12 | 24 | at trial, and that is PX-0136.                            |
| 08:33:17 | 25 | Then there are a number of exhibits that were           |

08:33:24  1  omitted from what was read into the record yesterday, and

08:33:27  2  these will be added to the list that was admitted on Day 2.

08:33:35  3  These are PX-3, 63, 94, 96, 113, 548a, 1525, 1688, 1743,

08:33:48  4  1893, 1990, 1996, 2052, 2074, 2109, 2129, 2362, 2366, 2367,

08:34:07  5  2535, 2551, 2552, 2553, 2554 --

08:34:14  6          THE COURT:  Slow down.

08:34:15  7          MS. SCHUETZ:  -- 2555, 5107, 5262, 5263, and 5265.

08:34:24  8          THE COURT:  And you're telling me all of these

08:34:25  9  should have been read into the record yesterday but somehow

08:34:28  10  they were overlooked?

08:34:29  11          MS. SCHUETZ:  Yes, Your Honor, that's correct.

08:34:30  12  Those were used --

08:34:30  13          THE COURT:  How do you overlook this many?  I

08:34:34  14  mean, this is not two or three; this is maybe 20.  How do

08:34:37  15  you overlook 20 exhibits?

08:34:39  16          MS. SCHUETZ:  Your Honor, they -- they were not on

08:34:40  17  our list to read yesterday.  There was just a mistake that

08:34:44  18  was made, and they weren't included on the list.

08:34:47  19          THE COURT:  Is there an objection to withdrawing

08:34:49  20  PX-0136 and including the additional Plaintiffs' exhibits

08:34:56  21  beginning at PX-3 and having gone through the entire list

08:35:00  22  that was just read?

08:35:01  23          MR. MUELLER:  No objection, Your Honor.

08:35:03  24          THE COURT:  All right.  We'll consider those

08:35:04  25  corrections made.

08:35:05  1          MS. SCHUETZ:  Yes, Your Honor.

08:35:06  2          And now we have the list of exhibits that were

08:35:09  3  used yesterday, at Day 3 of trial; and these are agreed to

08:35:12  4  between the parties.

08:35:13  5          This is PX-4, 22, 69, 935, 937, 940, 1005, 1009,

08:35:28  6  1561, 1722, 1754, 1791, 2015, 2086, 2129, 2551, 2552, 2554,

08:35:47  7  2855, 5137, 1525, 1009, 1791, 1494, 0051, 2821, 0190, 0337,

08:36:09  8  0192, 0360, 0374, 5301, 1537b, 1281, 1175, 0076, 0374,

08:36:28  9  1282, 1290, 497, 1612, 494, 5283, 5284, 5285, 5286, 1405,

08:36:48 10  5278, 5288, 35, 5293, 5294, 0387a, 5281a, 5280a, 5289a,

08:37:08 11  0484a, 1491a, Plaintiffs' Exhibit 2, 84, 85, 86, 90, 91,

08:37:22 12  119, 120, 123, 126, 2015, 548a, 1537a, 1695, 1760, 1965,

08:37:42 13  2142, 2735; and then there are three Defendant's trial

08:37:48 14  exhibits, which are DTX-1931, DTX-1932, and DTX-1947.

08:37:57 15          That is the list.

08:37:57 16          THE COURT:  Are these agreed to?

08:37:59 17          MR. MUELLER:  Yes, Your Honor.

08:38:00 18          THE COURT:  And then I understand there is some

08:38:04 19  universe of other exhibits that are in dispute as to

08:38:07 20  whether they were actually used during yesterday's portion

08:38:10 21  of the trial?

08:38:11 22          MR. MUELLER:  There's -- there's two, Your Honor;

08:38:12 23  and there may be only one.

08:38:13 24          One was -- the first one, which I think is a

08:38:16 25  little bit easier.  PX-1571 is another version of the '833

606

08:38:21  1    patent.  It was on Plaintiffs' pre-admitted exhibit list.

08:38:25  2    The reason why we -- okay.  So there's no objection to

08:38:29  3    that, as I understand it.  That's PX-1571.

08:38:33  4              THE COURT:  All right.

08:38:34  5              MR. MUELLER:  And then the remaining one is

08:38:37  6    DTX-171.

08:38:38  7              Your Honor may recall this is the -- the ETSI --

08:38:47  8    the ETSI working group that Mr. Summersgill used during the

08:38:52  9    cross-examination of Dr. Madisetti.  It discussed Dae Won

08:38:56  10   Lee's proposal to ETSI that was -- one of the subjects of

08:38:59  11   Dr. Madisetti's testimony was that proposal to ETSI.

08:39:01  12             And there was extensive cross-examination about

08:39:05  13   the substance of that document.  There was also redirect

08:39:08  14   testimony on the substance of the exhibit.  This is at 473,

08:39:11  15   Lines 1 through 18.  There's no objection to our use of

08:39:16  16   that exhibit.

08:39:16  17             THE COURT:  Show me what was presented to the

08:39:18  18   jury.  Do you have a slide with this on there?

08:39:25  19             MR. MUELLER:  It's also, I guess, on their exhibit

08:39:27  20   list, PX-1801.  But I can show you on the document.  We did

08:39:27  21   not use it as a slide.

08:39:32  22             Mr. Lee, can you please pull it up?

08:39:33  23             This is it, Your Honor.  You may recall seeing

08:39:36  24   this yesterday.  This is the document that was used with

08:39:38  25   Dr. Madisetti, and the substance of the document was

08:39:41   1   discussed.

08:39:42   2        Now, I'll note that there was discussion at the

08:39:44   3   pre-trial, I believe in the context of one of the motions

08:39:48   4   in limine, about materials --

08:39:48   5        THE COURT:  Slow down, Mr. Mueller.

08:39:50   6        MR. MUELLER:  I'm sorry.

08:39:51   7        -- about materials for standards groups.  And I

08:39:54   8   don't recall precisely what Your Honor said at the end of

08:39:56   9   the colloquy on that, but I think what was the gist of --

08:40:00  10   of Your Honor's ruling is that we would take them as

08:40:03  11   they -- they came, that you weren't going to let in random

08:40:07  12   emails, but if we had something that reflected the actual

08:40:10  13   operations of the working group, that's a different matter.

08:40:14  14        That's what this is.  This is an email --

08:40:16  15        THE COURT:  Let me hear Plaintiffs' response.

08:40:18  16        MS. TRUELOVE:  Your Honor, very simply, our

08:40:20  17   understanding and our takeaway from the pre-trial was that

08:40:22  18   they could use this as a demonstrative.  It was not

08:40:26  19   pre-admitted, that they could put it before the witness,

08:40:28  20   but it wasn't to be admitted into evidence, which is why we

08:40:32  21   didn't -- we didn't lodge an action at that point because

08:40:38  22   our understanding all along is that it should have been

08:40:41  23   only used as a demonstrative.

08:40:42  24        THE COURT:  Scroll to the bottom of the document

08:40:44  25   for me.

08:40:45  1        It's marked as DTX-0171.  And I assume it was so

08:40:50  2    marked when it was used during yesterday's portion of the

08:40:51  3    trial?

08:40:52  4        MR. MUELLER:  That's right, Your Honor.

08:40:55  5        MS. TRUELOVE:  We simply -- we didn't lodge an

08:40:59  6    objection because our understanding all along is that the

08:41:01  7    ruling from the Court is that it could be used as a

08:41:04  8    demonstrative.  I think if Defendants had the impression

08:41:07  9    from the Court that it was subject to a motion in limine, I

08:41:09  10   think they had an obligation to approach prior -- prior to

08:41:13  11   using it.

08:41:16  12       THE COURT:  I remember seeing that marking on it

08:41:18  13   yesterday, Ms. Truelove.  I don't know why being marked as

08:41:24  14   Defendant's Exhibit 171 would comport with you only

08:41:30  15   thinking it was only being used as a demonstrative and then

08:41:33  16   not saying anything about it.

08:41:39  17       It clearly has been used in front of the jury.  It

08:41:42  18   clearly is a pre-admitted exhibit.  It was presented as an

08:41:45  19   exhibit when it was shown to the jury.  I'll consider it

08:41:48  20   part of the record in the case.

08:41:49  21       MS. TRUELOVE:  All right.  Just for the record, I

08:41:52  22   mean, we just view, again, that it was pre-admitted; and

08:41:53  23   our understanding is that it was only to be used as a

08:41:56  24   demonstrative.

08:41:57  25       THE COURT:  All right.  So noted.

| | | |
|---|---|---|
| 08:41:59 | 1 | MR. MUELLER:  That's all we have, Your Honor. |
| 08:42:00 | 2 | THE COURT:  All right.  Is there some desire, |
| 08:42:05 | 3 | Mr. Summersgill, to use the easel with one or more of the |
| 08:42:07 | 4 | witnesses you're going to take?  Tell me about what your |
| 08:42:12 | 5 | request is in that regard. |
| 08:42:13 | 6 | MR. SUMMERSGILL:  Yes, Your Honor.  We'd like to |
| 08:42:15 | 7 | use the whiteboard with Dr. Josiam and Mr. Ramaprasad, the |
| 08:42:21 | 8 | Intel/Apple engineers who designed the products, to explain |
| 08:42:25 | 9 | some aspects of the operation of the Intel. |
| 08:42:25 | 10 | THE COURT:  Tell me what you propose to do it and |
| 08:42:27 | 11 | where you propose to do it. |
| 08:42:30 | 12 | MR. SUMMERSGILL:  We were hoping to put the |
| 08:42:32 | 13 | whiteboard right out in front of the jury, and I'd only ask |
| 08:42:35 | 14 | them to get up once or twice just to explain some -- some |
| 08:42:39 | 15 | of the operation of the Intel products. |
| 08:42:41 | 16 | THE COURT:  Are you going to ask them to draw |
| 08:42:43 | 17 | something?  Are you going to ask them to react to something |
| 08:42:46 | 18 | you're going to have drawn on the chart?  Are you -- |
| 08:42:46 | 19 | MR. SUMMERSGILL:  I'm going to -- |
| 08:42:52 | 20 | THE COURT:  -- going to present some demonstrative |
| 08:42:54 | 21 | that's already prepared and ask them to check a box?  What |
| 08:42:57 | 22 | are you going to do? |
| 08:42:58 | 23 | MR. SUMMERSGILL:  I am going to hand them -- |
| 08:42:58 | 24 | they're going to have a white -- just a blank white board, |
| 08:43:01 | 25 | and I'm going to ask them to draw -- |

08:43:03   1          THE COURT:  When you say "white board," you mean

08:43:05   2    the flip chart that I'm looking at that's in the courtroom?

08:43:07   3          MR. SUMMERSGILL:  Yeah.  We -- we -- we can use

08:43:09   4    this.  And it will be blank, and I'll ask them to draw

08:43:12   5    something to help them explain how the Intel chips in the

08:43:18   6    Apple products operate.

08:43:20   7          THE COURT:  And you expect each of them to make

08:43:22   8    perhaps one trip to this board during their examination?

08:43:26   9          MR. SUMMERSGILL:  Yes, Your Honor.

08:43:26  10          THE COURT:  Is there objection from the Plaintiff?

08:43:28  11          MR. SHEASBY:  So, I think there's two issues.

08:43:31  12    One, I'm not going to be able to see it; and I have

08:43:33  13    eyesight issues.  And, so, would it be -- is there -- can I

08:43:37  14    see over there so I can see them while they're drawing it?

08:43:40  15          THE COURT:  Well, ordinarily, Mr. Sheasby, I

08:43:45  16    wouldn't care where you were, but in today's environment,

08:43:47  17    we are working hard to maintain appropriate spacing.  And

08:43:51  18    I'm afraid with you that close to the jury, it would create

08:43:55  19    some level of discomfort.

08:43:57  20          If -- if it's put no closer -- if it's put

08:44:02  21    directly behind the railing here in front of the statute of

08:44:08  22    the Lady of Justice, if it's pulled up there, and if you

08:44:12  23    stand in the gap to the far side of the jury box in between

08:44:17  24    the front row, can you not see it from there?

08:44:19  25          MR. SHEASBY:  Right here?

08:44:23   1          THE COURT:  Yes, sir.

08:44:24   2          MR. SHEASBY:  And the witness will be within the

08:44:27   3   bar or outside of the bar?

08:44:30   4          THE COURT:  The witness will be between these two

08:44:33   5   railings.  The witness is not going to come around that

08:44:35   6   railing.  The witness can leave the witness chair, walk up

08:44:38   7   to this side of the chart where they won't be between you

08:44:41   8   and the chart at that location; and they can do whatever

08:44:44   9   Mr. Summersgill wants them to do.

08:44:46  10          MR. SHEASBY:  I will be able to see that, but I --

08:44:48  11   that seems to be very close to the witness -- to the jurors

08:44:51  12   for the -- for the --

08:44:52  13          THE COURT:  You will, or you won't be able to

08:44:54  14   see --

08:44:54  15          MR. SHEASBY:  I will be able to see it, but I

08:44:56  16   question whether it's appropriate for the witness to be

08:44:58  17   that close to the jurors.  It seems to me that's creating

08:45:00  18   some sort of -- trying to create some connection by

08:45:04  19   proximity to the jury, and so I would ask that the witness

08:45:08  20   actually be beyond the bar.

08:45:10  21          THE COURT:  All right.  Well, I'm not -- here's

08:45:14  22   what I'll do.  I'll allow Defendant to do that in that way

08:45:21  23   with the understanding that the witness will put a mask on

08:45:25  24   before they step down from the witness stand, and they'll

08:45:28  25   keep the mask on when they're there at the chart, and

08:45:32  1  Mr. Sheasby will put a mask on as he stands over there

08:45:35  2  close to the jury to see it.

08:45:37  3          And if that's acceptable -- and, of course, the

08:45:39  4  witness is going to have to make themselves intelligible

08:45:43  5  with the mask on.  If that's acceptable to Defendant, you

08:45:46  6  can do it that way, but it's going to have to be under

08:45:49  7  those strict guidelines.

08:45:51  8          MR. SUMMERSGILL:  Thank you, Your Honor.

08:45:52  9          MR. SHEASBY:  Thank you, Your Honor.

08:45:52  10          THE COURT:  All right.  What else do we need to

08:45:55  11  take up before we bring in the jury?

08:45:57  12          Mr. Kennedy available to return to the witness

08:45:59  13  stand?

08:46:00  14          MR. BAXTER:  He is, Your Honor.

08:46:02  15          THE COURT:  Please bring him forward.

08:46:15  16          And, Mr. Mueller, you may return to the podium as

08:46:21  17  you continue your cross-examination.

08:46:23  18          MR. MUELLER:  Thank you, Your Honor.

08:46:23  19          THE COURT:  Anything further, counsel?

08:46:25  20          MR. SHEASBY:  Your Honor, I have a copy of the

08:46:27  21  Blevins's bench motion I referenced.  I didn't know if you

08:46:32  22  did get a copy, but I wanted to give it to you if --

08:46:32  23          THE COURT:  I have a copy.

08:46:34  24          MR. SHEASBY:  Thank you, Your Honor.

08:46:34  25          MR. MUELLER:  And one final thing.  I think we had

613

08:46:38  1  the courtroom sealed for Apple confidential --

08:46:40  2          THE COURT:  We did, and I unsealed it for us to

08:46:43  3  recess for evening.  I'll order it resealed.

08:46:46  4          MR. MUELLER:  Thank you, Your Honor.

08:46:47  5          THE COURT:  Let's bring in the jury, please,

08:46:50  6  Mr. Elliott.

08:46:51  7          COURT SECURITY OFFICER:  All rise.

08:47:24  8          (Jury in.)

08:47:25  9          THE COURT:  Good morning, ladies and gentlemen.

08:47:26  10  Welcome back.  It's good to see you.  Please have a seat.

08:47:29  11      We will continue where we left off at the end of

08:47:33  12  the day yesterday.  Mr. David Kennedy, Plaintiffs' expert

08:47:37  13  witness on damages, is being cross-examined by Mr. Mueller

08:47:41  14  on behalf of the Defendant.

08:47:42  15      Mr. Mueller, you may continue with your

08:47:45  16  cross-examination.

08:47:45  17          MR. MUELLER:  And may we seal the courtroom, Your

08:47:48  18  Honor?

08:47:48  19          THE COURT:  Based on counsel's request, I'll order

08:47:50  20  the courtroom sealed.  Those present not subject to the

08:47:53  21  protective order or aligned with Defendant, Apple, should

08:47:57  22  excuse themselves and remain outside until the courtroom is

08:48:04  23  unsealed and the public is invited to return.

08:48:08  24          (Courtroom sealed.)

08:48:08  25          (This portion of the transcript is sealed

08:48:08   1            and filed under separate cover as

08:48:08   2            Sealed Portion No. 9.)

08:48:08   3            (Courtroom unsealed.)

10:01:09   4            THE COURT:  Ladies and gentlemen, we're going to

10:01:11   5    take a brief recess, and when you return, we'll begin with

10:01:14   6    the Defendant's case-in-chief and their first witness.

10:01:18   7            I'll ask you to leave your notebooks closed in

10:01:21   8    your chairs and follow all the instructions I've given you.

10:01:25   9            Of course, you would expect me to say, including

10:01:26  10    not to discuss the case among each other or anyone else.

10:01:30  11    We'll have you back in here shortly after the recess.

10:01:33  12            The jury is excused for recess at this time.

10:01:42  13            COURT SECURITY OFFICER:  All rise.

10:01:44  14            (Jury out.)

10:01:48  15            THE COURT:  Be seated, please.

10:01:54  16            Mr. Summersgill, I've been thinking about your

10:02:01  17    request during the cross and redirect on Mr. Kennedy.  I

10:02:06  18    really don't want the witness leaving the witness stand and

10:02:09  19    standing on the inside of this bar.  I do think that's

10:02:14  20    closer to the jury than they may feel comfortable with.

10:02:18  21            What I'm going to ask you to do is bring the easel

10:02:24  22    with the chart that you're going to use and push it up to

10:02:30  23    this bar, but then the witness will need to come in with a

10:02:35  24    mask, come around the chart, and stand on the inside of the

10:02:39  25    bar to take your questions and mark on the chart.  And have

10:02:43  1   the witness stand on the side of the easel that's towards

10:02:49  2   me so they do not block opposing counsel's view of it.  And

10:02:53  3   that will add a little additional distance and hopefully

10:02:55  4   will avoid any discomfort or unease on the part of the

10:02:59  5   jury.  Is that clear?

10:03:00  6           MR. SUMMERSGILL:  Yes.  Thank you, Your Honor.

10:03:01  7           THE COURT:  All right.  With that change, we'll do

10:03:03  8   it as we previously discussed.

10:03:04  9           All right.  We stand in recess.

10:03:06  10          COURT SECURITY OFFICER:  All rise.

10:03:07  11          (Recess.)

10:20:59  12          (Jury out.)

10:20:59  13          COURT SECURITY OFFICER:  All rise.

10:21:01  14          THE COURT:  Be seated, please.

10:22:03  15          Defendants, are you prepared to call your first

10:22:31  16   witness?

10:22:31  17          MR. MUELLER:  Yes, Your Honor.  Mr. Blevins.

10:22:33  18          THE COURT:  All right.  Let's bring in the jury,

10:22:36  19   please.

10:22:36  20          COURT SECURITY OFFICER:  All rise.

10:22:37  21          (Jury in.)

10:22:38  22          THE COURT:  Please be seated.

10:23:00  23          Just before the recess, the Plaintiff rested its

10:23:07  24   case-in-chief.

10:23:07  25          We'll now proceed with the Defendant's

| | | |
|---|---|---|
| 10:23:10 | 1 | case-in-chief, ladies and gentlemen. |
| 10:23:11 | 2 | Mr. Mueller, call Defendant's first witness. |
| 10:23:14 | 3 | MR. MUELLER:  Thank you, Your Honor.  We call |
| 10:23:16 | 4 | Mr. Tony Blevins. |
| 10:23:17 | 5 | THE COURT:  All right.  Mr. Blevins, if you'll |
| 10:23:19 | 6 | come forward and be sworn, sir. |
| 10:23:23 | 7 | (Witness sworn.) |
| 10:23:24 | 8 | THE COURT:  Please come around, have a seat at the |
| 10:23:34 | 9 | witness stand, sir. |
| 10:23:47 | 10 | MR. MUELLER:  May I proceed, Your Honor? |
| 10:23:48 | 11 | THE COURT:  You may proceed. |
| 10:23:51 | 12 | MR. MUELLER:  Thank you. |
| 10:23:51 | 13 | TONY BLEVINS, DEFENDANT'S WITNESS, SWORN |
| 10:23:51 | 14 | DIRECT EXAMINATION |
| 10:23:53 | 15 | BY MR. MUELLER: |
| 10:23:53 | 16 | Q.  Good morning, Mr. Blevins. |
| 10:23:54 | 17 | A.  Good morning, sir. |
| 10:23:55 | 18 | Q.  Could you please introduce yourself to the ladies and |
| 10:23:57 | 19 | gentlemen of the jury? |
| 10:23:57 | 20 | A.  Yes.  I am Tony Blevins, and I work at our -- at our |
| 10:24:03 | 21 | corporate headquarters in Cupertino, California. |
| 10:24:05 | 22 | Q.  Now, sir, you've been here for each day of the trial? |
| 10:24:09 | 23 | A.  Yes, sir, I have. |
| 10:24:09 | 24 | Q.  And you'll be here for the remainder of the trial? |
| 10:24:12 | 25 | A.  Yes, sir. |

617

10:24:13   1   Q.  Why are you here?

10:24:14   2   A.  In this sense, within Apple, our feeling is that we

10:24:17   3   have essentially been accused of being cheaters, that we

10:24:20   4   feel like that our good name has been tarnished, and we're

10:24:24   5   here to set the record straight.

10:24:25   6   Q.  What is Apple's position as to whether or not it

10:24:28   7   infringes the five patents in this case?

10:24:29   8   A.  Our position is that we do not infringe any of these

10:24:33   9   patents.

10:24:34  10   Q.  Now, sir, may I ask you a few questions about your

10:24:36  11   background?

10:24:37  12   A.  Yes, sir.

10:24:37  13   Q.  Where are you from?

10:24:39  14   A.  I was born in the Blue Ridge Mountains of North

10:24:44  15   Carolina.  It was a very small town called Jefferson, about

10:24:47  16   8,000 people.  My father was a general contractor.  His

10:24:51  17   father was a general contractor.  And my mother was an

10:24:54  18   elementary school teacher for 41 years, now retired.

10:24:59  19   Q.  Where did you go to college?

10:25:00  20   A.  I received a full academic scholarship to North

10:25:08  21   Carolina State University.

10:25:08  22   Q.  And what did you study at North Carolina State?

10:25:09  23   A.  I studied engineering, specifically industrial

10:25:16  24   engineering.

10:25:16  25   Q.  What is industrial engineering?

10:25:16  1   A.  Probably the easiest way to describe it, it's a

10:25:18  2   combination of several engineering disciplines, including

10:25:18  3   mechanical and industrial, also with coursework in finance,

10:25:23  4   accounting, statistics.

10:25:24  5          So the degree is less about research and

10:25:26  6   development and more about, as the name would imply,

10:25:29  7   industrialization or productizing ideas.

10:25:33  8   Q.  And, sir, if you would just slow down a little bit for

10:25:39  9   the -- for all of us just to make sure we hear every word

10:25:39  10  you say.  Okay?

10:25:39  11  A.  Yes, sir.

10:25:39  12  Q.  Now, what did you do after you graduated from college?

10:25:43  13  A.  After college I joined IBM in Research Triangle Park.

10:25:49  14  Q.  And what did you do at IBM?

10:25:51  15  A.  My first job was as a quality engineer.

10:25:54  16  Q.  And for how long were you at IBM?

10:25:56  17  A.  I was at IBM for approximately 12 years.

10:25:58  18  Q.  And that's until about, what, 2000?

10:26:00  19  A.  Yes, approximately the fall of 2000.

10:26:03  20  Q.  And over the years, what other types of positions did

10:26:06  21  you hold at IBM?

10:26:07  22  A.  Within the first year at IBM, I was named to what was

10:26:11  23  known as their executive resource program.  So I was

10:26:13  24  rotated among many jobs, from engineering to production

10:26:17  25  control to finance.

10:26:20  1          The intent was to gain some experience, and so I
10:26:22  2  worked in seven of IBM's nine divisions.  I was stationed
10:26:26  3  in North Carolina; New York; South Florida; Tokyo, Japan;
10:26:34  4  Seoul, Korea.  And then my final assignment there was lab
10:26:38  5  director of IBM in Scotland.
10:26:39  6  Q.  Now, sir, when did you join Apple?
10:26:42  7  A.  I joined Apple in August of 2000.  So I'm approaching
10:26:46  8  my 20th anniversary, very close.
10:26:49  9  Q.  Why did you decide to go to Apple?
10:26:51  10  A.  It was very interesting.  It was probably the biggest
10:26:56  11  risk I'd ever taken in my life because I think IBM is a
10:27:00  12  fantastic company.
10:27:01  13          At that point in time, I think it was known as one
10:27:04  14  of the most respected companies in the world.  My career,
10:27:07  15  in my opinion, was going well.  But as the name would
10:27:10  16  imply, IBM made business machines, International Business
10:27:16  17  Machines, and I would come to work dressed very much like I
10:27:19  18  am now, in a white shirt and a suit.
10:27:21  19          And so when I was persuaded to at least come and
10:27:24  20  take a look at Apple, which I was very reluctant to do,
10:27:29  21  actually, I was taken aback by what I saw at Apple's
10:27:32  22  campus.  Instead of wingtips and suits, what I saw was
10:27:36  23  people in shorts, flip-flops, t-shirts, including the late
10:27:40  24  Steve Jobs.  People rode around on skateboards.
10:27:44  25          And the reason I mentioned it was somewhat of a

620

10:27:49  1   risky decision, that it's -- difficult to remember, but

10:27:51  2   back in 2000, Apple had less than 1 percent market share in

10:27:55  3   computers and no other products, and so we were losing

10:27:58  4   market share each successive quarter.  We were actually

10:28:02  5   losing money that -- there were strong theories that the

10:28:04  6   company was on the verge of bankruptcy.

10:28:07  7         But the reason I joined is that there was such a

10:28:09  8   passion that what I saw initially as being a laid-back

10:28:13  9   environment, what I found was those people were just

10:28:16 10   incredibly creative, innovative, passionate about what they

10:28:20 11   did.  It was all about the products.  It was all about

10:28:22 12   consumers.  It was a totally different feel that I had at

10:28:30 13   IBM.

10:28:30 14         And I recall the mantra at that time was we're

10:28:33 15   going to change the world.  Everyone there had this

10:28:35 16   mindset, we're going to change the world.

10:28:38 17         And so it was quite just an infectious passion

10:28:41 18   they had.  And so I couldn't help myself, but I made the

10:28:44 19   biggest risk in my life and went to Apple, despite my

10:28:49 20   father's advice not to do it.

10:28:51 21   Q.  And, sir, in the 20 years that you've been there, what

10:28:54 22   type of work have you done?

10:28:56 23   A.  My first job at Apple was director of corporate

10:28:59 24   procurement.  So, in simplest terms, I was responsible for

10:29:04 25   procuring the things we needed to run the business, not for

621

10:29:08    1    resale.

10:29:08    2        And so that would include everything from our

10:29:11    3    mainframe computers we needed, to our lab equipment, to the

10:29:15    4    avocados that we needed to stock the cafeteria.  And as it

10:29:19    5    turns out, Californians eat a lot avocado toast.  So that

10:29:23    6    was my first assignment.

10:29:24    7        I was later promoted to run all of iPod

10:29:29    8    operations.  Later, global logistics and distribution were

10:29:32    9    added to my responsibilities.  And then around 2012, I was

10:29:35   10    named vice president of procurement.

10:29:37   11    Q.  And is that your position today?

10:29:38   12    A.  Yes, sir, it is.

10:29:39   13    Q.  What are your duties as the vice president for

10:29:41   14    procurement?

10:29:42   15    A.  Probably the easiest way to describe what I do is Apple

10:29:46   16    designs all of its products in California, something that

10:29:49   17    we're very proud of, and Apple considers itself first and

10:29:53   18    foremost a design company.  We're not a manufacturing

10:29:58   19    company.

10:29:58   20        So, therefore, as we design things, we -- we don't

10:30:01   21    have factories.  We don't have big smokestacks and so

10:30:08   22    forth.  And so my job is to canvas the world to find the

10:30:08   23    people best qualified to make those components and deliver

10:30:13   24    those services we need to make sure that our ideas and

10:30:15   25    designs become products that people can eventually enjoy.

622

| | | |
|---|---|---|
| 10:30:18 | 1 | Q.  Who do you report to? |
| 10:30:19 | 2 | A.  I report to Mr. Jeff Williams. |
| 10:30:22 | 3 | Q.  And who is he? |
| 10:30:23 | 4 | A.  Mr. Williams holds a couple of roles at Apple.  He is |
| 10:30:28 | 5 | our chief operations officer.  He is senior vice president |
| 10:30:31 | 6 | of watch, hardware engineering, and watch software |
| 10:30:36 | 7 | engineering.  And then he also runs our industrial design |
| 10:30:39 | 8 | lab for all products. |
| 10:30:40 | 9 | Q.  And to whom does he report? |
| 10:30:42 | 10 | A.  He reports to Mr. Tim Cook. |
| 10:30:44 | 11 | Q.  And that's the CEO of the whole company? |
| 10:30:46 | 12 | A.  Yes, sir. |
| 10:30:47 | 13 | Q.  So you're two spots away from the CEO? |
| 10:30:49 | 14 | A.  Yes, sir. |
| 10:30:50 | 15 | Q.  And how many folks report to you, Mr. Blevins? |
| 10:30:53 | 16 | A.  Currently, there are approximately 1,200 professionals. |
| 10:30:56 | 17 | Q.  Now, have you been doing any work while you've been |
| 10:31:00 | 18 | here at trial, outside of the courtroom, that is? |
| 10:31:02 | 19 | A.  I have been.  I've been working third shift actually. |
| 10:31:05 | 20 | It's a very, very busy time for us during CD19, and so I've |
| 10:31:10 | 21 | been doing the best I can to keep up a third-shift |
| 10:31:15 | 22 | operation to keep things afloat. |
| 10:31:17 | 23 | Q.  Now, sir, what -- withdrawn. |
| 10:31:18 | 24 |         MR. MUELLER:  Your Honor, may I approach the |
| 10:31:20 | 25 | easel? |

| | | |
|---|---|---|
| 10:31:20 | 1 | THE COURT:  You may. |
| 10:31:22 | 2 | Q.  (By Mr. Mueller)  Mr. Blevins, you are responsible for |
| 10:31:24 | 3 | procuring the components within devices like the iPhone; is |
| 10:31:28 | 4 | that right? |
| 10:31:28 | 5 | A.  All Apple products, including iPhone, that's correct. |
| 10:31:31 | 6 | Q.  So can we take the iPhone as an example? |
| 10:31:34 | 7 | A.  Yes, sir. |
| 10:31:34 | 8 | Q.  So I'm going to draw a very terrible drawing of an |
| 10:31:38 | 9 | iPhone.  Do you see that, sir? |
| 10:31:40 | 10 | A.  Yes. |
| 10:31:40 | 11 | Q.  Now, how many components are within that device? |
| 10:31:43 | 12 | A.  It would depend on the model, but there's approximately |
| 10:31:47 | 13 | 1,000 plus or minus 150. |
| 10:31:50 | 14 | Q.  So if we start on the outside, what are some of the |
| 10:31:52 | 15 | components that you're responsible for procuring? |
| 10:31:55 | 16 | A.  Well, once you pick up the phone, the first thing you |
| 10:31:58 | 17 | may notice at the back of your hand would be the back |
| 10:32:00 | 18 | cover. |
| 10:32:01 | 19 | Where most companies would use some type of cast |
| 10:32:05 | 20 | alloy, Apple uses precision mill stainless steel.  On the |
| 10:32:12 | 21 | front of the unit, the first thing you would touch is |
| 10:32:16 | 22 | glass.  It's something that we call gorilla glass.  So that |
| 10:32:20 | 23 | would be your first interaction with the unit. |
| 10:32:23 | 24 | Q.  So I just wrote steel covering, glass, you said, sir? |
| 10:32:27 | 25 | A.  Yes, sir. |

624

```
10:32:27   1   Q.  And what type of glass is it?
10:32:29   2   A.  As I mentioned, it's known as gorilla glass.  It's
10:32:32   3   something we work on with the Corning Company.  It's
10:32:37   4   manufactured in Bowling Green, Kentucky.  It's known as the
10:32:37   5   world's strongest thin glass, something we're very proud
10:32:40   6   of.
10:32:41   7           Apple goes to the additional step of using what we
10:32:43   8   call ion molecularization.
10:32:48   9           So what that does is, when the unit is dropped,
10:32:53  10   even the strongest glass, just basic physics, will
10:32:55  11   eventually break.  But when our glass breaks, we want to
10:32:58  12   make certain that doesn't shard or create sharp edges.  So
10:33:02  13   if the unit is otherwise useable, you can still touch it
10:33:06  14   with your fingers, you can make a phone call without the
10:33:08  15   user cutting themselves.
10:33:09  16   Q.  Now, sir, if we go inside behind the glass, can you
10:33:12  17   give just us a couple of examples of the components we'd
10:33:16  18   find inside the phone?
10:33:17  19   A.  Yes.  I've heard the term pop the hood many times
10:33:22  20   today.  I won't say that.  Let's say we pop the top module,
10:33:22  21   if you will.
10:33:25  22           So you pop the top module, and the first thing
10:33:25  23   you'll notice is the largest single subsystem you see in
10:33:31  24   the device is actually a battery, and that's our biggest
10:33:33  25   design constraint.
```

10:33:36  1      Interestingly enough, batteries really haven't

10:33:38  2  changed much in the last 60 years.  If you look at an

10:33:42  3  automobile from the 1960s, the size, weight, and

10:33:45  4  performance of that battery is very similar to what you'd

10:33:47  5  see in an automobile today.

10:33:49  6      And the reason that's important for us is that we

10:33:52  7  try to have the smallest, thinnest, lightest device

10:33:56  8  possible, but we also want to have good battery life.

10:34:00  9  That's exceptionally important to consumers.

10:34:02  10      And so, given we have that constraint, that means

10:34:05  11  everything else we have to work really hard to both

10:34:09  12  miniaturize and make certain it's as power efficient as

10:34:12  13  possible because we're left with this battery constraint

10:34:17  14  that's somewhat of an immovable object.  So it's actually

10:34:22  15  the largest single item that you see.

10:34:22  16  Q.  So if we go behind the battery, sir, what will we find?

10:34:25  17  A.  You'll find a number of things.  At the top of the

10:34:28  18  display, I would start there, we have what's called our

10:34:30  19  sensing subsystem.

10:34:32  20      It's a little notch on the top of your unit, for

10:34:36  21  those of you who may have seen an iPhone X or 11.  There

10:34:39  22  are many functions and features going on there, that you

10:34:42  23  have your audio system, your speakers, your microphone.  We

10:34:45  24  have what we call our face ID module.

10:34:47  25      So for those of you who may have used an iPhone,

10:34:51   1    when you bring the unit to your face, the security is done

10:34:53   2    that way.

10:34:55   3          And many people don't know this, but, for example,

10:34:59   4    of -- since you -- the first time you've identified with

10:35:03   5    the unit, if you happen to have gotten a tan or grown a

10:35:07   6    beard or gotten a scar, providing it's not too deep, the

10:35:10   7    unit will still recognize you because it actually analyzes

10:35:14   8    your face several layers deep into the epidermis, for

10:35:19   9    security purposes.

10:35:20   10   Q.  What else would we find?

10:35:21   11   A.  Within that sensing unit you would find a three-axis

10:35:28   12   gyrometer.  And so that will allow the unit to determine

10:35:29   13   its facial positioning.  It can be used for time flight

10:35:32   14   simulation.  It can be used as a remote control for various

10:35:35   15   devices from an Apple TV.  With the right applications, you

10:35:38   16   can start a car with it.

10:35:41   17         Also, something very interesting, the unit itself,

10:35:44   18   based on its 3X Gyrometer, can sense when it's been

10:35:52   19   dropped.  And so when the unit determines it's been dropped

10:35:53   20   with the neural engine and machine learning, it can

10:35:54   21   automatically begin shutting down subsystems to potentially

10:35:58   22   protect them in the case of a drop.

10:36:00   23         THE COURT:  Mr. Blevins, would you pull the

10:36:01   24   microphone a little closer?

10:36:03   25         THE WITNESS:  Yes, sir.

627

| | | |
|---|---|---|
| 10:36:03 | 1 | THE COURT:  And you don't have to get that close. |
| 10:36:06 | 2 | Just a little closer.  And if you would try to slow down a |
| 10:36:10 | 3 | little bit.  These are -- you're using a lot of words we |
| 10:36:13 | 4 | all don't hear every day.  So if you would go a little |
| 10:36:13 | 5 | slower, that would be helpful.  Thank you, sir. |
| 10:36:19 | 6 | Please continue. |
| 10:36:19 | 7 | MR. MUELLER:  Thank you, Your Honor. |
| 10:36:20 | 8 | Q.  (By Mr. Mueller)  Would there be a camera in there |
| 10:36:22 | 9 | somewhere? |
| 10:36:22 | 10 | A.  Yes.  In the case of an iPhone 11, there is actually an |
| 10:36:26 | 11 | iPhone design triple camera system, and unique image |
| 10:36:30 | 12 | sensing processor. |
| 10:36:31 | 13 | Q.  Now, sir, are you familiar with the term central |
| 10:36:36 | 14 | processing unit? |
| 10:36:36 | 15 | A.  Yes, I am. |
| 10:36:37 | 16 | Q.  What does that mean? |
| 10:36:38 | 17 | A.  It goes by several different names.  It's sometimes |
| 10:36:42 | 18 | called the applications processor, it's sometimes called |
| 10:36:44 | 19 | the central processing unit.  The simple way to think of it |
| 10:36:48 | 20 | is it's the brains in an iPhone. |
| 10:36:51 | 21 | In our case, we currently have what we call the |
| 10:36:55 | 22 | 813 bionic chip.  Something that's interesting about that, |
| 10:36:59 | 23 | it's more powerful in terms of processing capability than |
| 10:37:04 | 24 | our fastest Mac only a scant few years back. |
| 10:37:09 | 25 | In fact, it's a four CoreLogic processor, it's a |

10:37:13   1   two Core Graphics processor.  It has over eight billion

10:37:19   2   transistors.  It's quite an amazing Apple-designed device.

10:37:24   3   As I mentioned earlier, it's also equipped with a neural

10:37:27   4   engine so it can do machine learning and artificial

10:37:30   5   intelligence.

10:37:30   6   Q.  Now, you mentioned as powerful as a Mac.  You're

10:37:34   7   referring to a computer, a full computer?

10:37:35   8   A.  Yes, a full computer.

10:37:37   9   Q.  Now, there's a whole bunch of other stuff that we

10:37:40   10  probably don't have time to go through, right?

10:37:42   11  A.  Yes.

10:37:43   12  Q.  And some of these are really small, right, sir?

10:37:45   13  A.  Most are tiny for the reason that I mentioned earlier,

10:37:49   14  that we use a lot of real estate due to the battery, so

10:37:49   15  everything else has to be tiny to compensate for that.

10:37:52   16  Q.  And Mr. Baxter earlier referred to, he said itty-bitty

10:37:56   17  chips.  Do you recall that, sir?

10:37:57   18  A.  Yes, sir.

10:37:57   19  Q.  And they are.  They're itty-bitty, right?

10:37:59   20  A.  That's probably not our technical term, but, yes, I can

10:38:04   21  agree with that.

10:38:04   22  Q.  Okay.  Despite the fact that they're small, does that

10:38:06   23  have anything to do with the power of those chips?

10:38:09   24  A.  The power is amazing in the chips, and even more

10:38:13   25  amazing is the lack of power consumption.  We work really

10:38:17   1   hard on having high-power subsystems that have very

10:38:22   2   low-power consumption.

10:38:23   3   Q.   So, one of these tiny chips in the phone, do you know

10:38:27   4   how many individual circuits are on the chip like that?

10:38:29   5   A.   As I mentioned before, the way we would measure this is

10:38:33   6   an 813 bionic would have 8 billion transistors in an ASIC

10:38:40   7   that's less than 90 square millimeters built on five

10:38:44   8   nanometer technology, to put it into perspective.

10:38:47   9   Q.   Smaller than a fingernail?

10:38:49   10   A.   Much, much smaller.

10:38:50   11   Q.   And has billions of circuits on it?

10:38:52   12   A.   Over eight billion.

10:38:54   13   Q.   Now, sir, is there something in the iPhone called a

10:38:58   14   baseband chip?

10:38:58   15   A.   That actually resides in what we would call the

10:39:03   16   communication subsystem.

10:39:07   17   Q.   What is the communication subsystem?

10:39:08   18   A.   The communication subsystem, you can think of that as

10:39:12   19   how the device communicates with the outside world.   And

10:39:16   20   so, for example, the order of priority is Bluetooth, WiFi,

10:39:23   21   Cellular.

10:39:23   22        And the reason that's the case is your highest

10:39:27   23   output, highest efficiency is Bluetooth.   So if I were to

10:39:31   24   want to stream music to my AirPods, if I were to want to

10:39:35   25   use the device to interact with the radio in my car, the

630

10:39:40  1   unit would default to Bluetooth if it's available.

10:39:43  2        If, for example, I've taken hundreds of photos and

10:39:47  3   I would like to share those quickly and efficiently with

10:39:50  4   Mr. Mueller, I would use AirDrop, and by Bluetooth, I would

10:39:57  5   transfer them immediately.

10:39:58  6        To continue that example, if I had those photos,

10:40:02  7   and let's suppose Mr. Mueller isn't within range of

10:40:05  8   Bluetooth, which is maybe -- preferably within 20 feet,

10:40:09  9   sometimes up to 200 feet, let's suppose he were somewhere

10:40:13  10  else in this building, then the unit would default to WiFi.

10:40:17  11  That would be the best solution for transferring things.

10:40:19  12       If, on the other hand, Mr. Mueller had walked

10:40:22  13  across the street and I still wanted to transfer those

10:40:25  14  photos, then the unit would default to the cellular

10:40:30  15  network.

10:40:30  16       If it could find LTE, it would use that.  If it

10:40:34  17  couldn't, it would then default to 3G.  If not, it would

10:40:37  18  default to 2G and so forth.  And so the unit has a priority

10:40:41  19  order of the most efficient way of transferring data.

10:40:45  20       MR. MUELLER:  Your Honor, may I approach the

10:40:47  21  witness and hand him a physical demonstrative?  This is

10:40:50  22  DDX-42.  And 43 is in here, as well.

10:40:52  23       THE COURT:  You may approach.

10:40:54  24       MR. MUELLER:  Thank you, Your Honor.

10:41:03  25  Q.  (By Mr. Mueller)  Mr. Blevins, if you could open up

631

10:41:05  1   this envelope, please, sir.  And do you see something

10:41:10  2   that's labeled DDX-42, sir?

10:41:12  3   A.  Yes, sir, I do.

10:41:13  4   Q.  What is it?

10:41:14  5   A.  This would be an iPhone 11.

10:41:17  6   Q.  And is this particular one, one that you could open up?

10:41:22  7   A.  Well, fortunately, it's already been opened for me, or

10:41:26  8   I could assure you I couldn't open it on the stand.  It's

10:41:29  9   put together in quite a robust fashion.

10:41:32  10          VR. MUELLER:  And, Your Honor, may Mr. Blevins,

10:41:34  11  just in his seat, hold this up for the jury?

10:41:38  12  Q.  (By Mr. Mueller)  What is that?

10:41:38  13  A.  This is the inside of an iPhone.  And so what you'll

10:41:43  14  notice is the large black device I mentioned, that's

10:41:46  15  actually the battery taking up an inordinate amount of real

10:41:52  16  estate, as I mentioned.  And all of the other subsystems

10:41:55  17  are built around that.

10:41:56  18          And so the very powerful chips that I mentioned, I

10:41:59  19  don't think anyone there could even see, based on the

10:42:04  20  distance that we're talking about.

10:42:05  21  Q.  Thank you, sir.  You can put that down.

10:42:07  22          Now, somewhere within that assembly, there is this

10:42:10  23  communication system you told the jury about; is that

10:42:12  24  right, sir?

10:42:13  25  A.  That's correct, sir.

| | | |
|---|---|---|
| 10:42:14 | 1 | Q.  And within the communication system, we would find this |
| 10:42:17 | 2 | baseband chip, right? |
| 10:42:18 | 3 | A.  Yes. |
| 10:42:18 | 4 | Q.  Now, over the years, historically, has Apple created |
| 10:42:26 | 5 | its own baseband chips or purchased them from other |
| 10:42:30 | 6 | companies? |
| 10:42:30 | 7 | A.  No, those have not been Apple-designed, unlike some of |
| 10:42:34 | 8 | the subsystems are Apple-designed.  In the case of the |
| 10:42:37 | 9 | basebands, we purchase them. |
| 10:42:38 | 10 | Q.  From whom, historically? |
| 10:42:41 | 11 | A.  Historically, we have used two suppliers.  That's been |
| 10:42:44 | 12 | Intel and Qualcomm. |
| 10:42:45 | 13 | Q.  And were you, sir, personally involved in procuring |
| 10:42:49 | 14 | baseband chips from Intel and Qualcomm? |
| 10:42:51 | 15 | A.  Yes, sir, I was involved in each of those reasons from |
| 10:42:53 | 16 | the inception. |
| 10:42:54 | 17 | Q.  And for the products that are at issue in this case, do |
| 10:42:59 | 18 | they all contain either an Intel baseband chip or a |
| 10:43:03 | 19 | Qualcomm baseband chip? |
| 10:43:06 | 20 | A.  That is correct, sir. |
| 10:43:07 | 21 | Q.  Now, recently did Apple and Intel strike a deal? |
| 10:43:09 | 22 | A.  We did.  Approximately 14, 15 months ago now, Apple did |
| 10:43:15 | 23 | strike a deal with Intel. |
| 10:43:16 | 24 | Q.  And what were the terms of that deal, sir? |
| 10:43:19 | 25 | A.  In essence, we purchased what was known as IMC.  That |

10:43:25  1   was Intel Mobility Corporation.  It was a division in Intel

10:43:28  2   that specialized in baseband and only baseband, and so

10:43:32  3   Apple acquired that entire division.

10:43:35  4   Q.  And how much did Apple pay?

10:43:37  5   A.  We paid $1 billion.

10:43:39  6   Q.  What did Apple receive?

10:43:41  7   A.  Well, first and foremost, the thing we were really

10:43:44  8   interested in is the ability to design our own chips.

10:43:47  9            THE COURT:  Yes, sir.

10:43:47  10           MR. SHEASBY:  Objection, Your Honor.  It's

10:43:48  11  referring to an agreement that has not said a comparable

10:43:54  12  agreement.

10:43:54  13           THE COURT:  You're going to have to speak up.  I

10:43:56  14  don't hear you.

10:43:57  15           MR. SHEASBY:  Your Honor, objection.  This is

10:43:59  16  referring to an agreement that is not a comparable

10:44:02  17  agreement.

10:44:07  18           THE COURT:  What's your response, Mr. Mueller?

10:44:08  19           MR. MUELLER:  Two things.  This is not a

10:44:10  20  comparable license analysis I'm trying to do.  I'm trying

10:44:13  21  to establish the facts of the Intel folks joining the

10:44:17  22  company.  We're going to be hearing from two of those Intel

10:44:17  23  folks soon.

10:44:17  24           MR. SHEASBY:  As long as he's referring to only

10:44:20  25  employees, then it would be unobjectionable.

634

| | | |
|---|---|---|
| 10:44:22 | 1 | THE COURT:  This is basically background, in the |
| 10:44:24 | 2 | Court's view, and I'll overrule the objection. |
| 10:44:27 | 3 | Q.  (By Mr. Mueller)  Now, sir, did some folks join Apple |
| 10:44:32 | 4 | as part of that transaction? |
| 10:44:33 | 5 | A.  Yes.  That was our motivation.  We had a desire to |
| 10:44:38 | 6 | build our own baseband chips because there was a lack of |
| 10:44:41 | 7 | competition in the market.  And we knew we needed several |
| 10:44:44 | 8 | thousand very highly-trained, specialized engineers that |
| 10:44:48 | 9 | could have taken decades to build, other than acquiring |
| 10:44:52 | 10 | this unit from Intel, of where we got 2000 of what we |
| 10:44:55 | 11 | considered the best engineers in the world. |
| 10:44:57 | 12 | Q.  And are some of those folks going to be testifying in |
| 10:45:02 | 13 | this case? |
| 10:45:02 | 14 | A.  Yes.  I believe time allowing he will be, sir. |
| 10:45:07 | 15 | Q.  Vivek Ramaprasad? |
| 10:45:12 | 16 | A.  Yes, he is one of the gentlemen that will be |
| 10:45:14 | 17 | testifying, I think. |
| 10:45:18 | 18 | Q.  And Kaushik Josiam; is that right, sir? |
| 10:45:18 | 19 | A.  Dr. Kaushik Josiam, yes, sir. |
| 10:45:18 | 20 | Q.  So these are folks used to work on baseband chips at |
| 10:45:22 | 21 | Intel, and now they're at Apple? |
| 10:45:23 | 22 | A.  That would be correct. |
| 10:45:24 | 23 | Q.  Now, sir, some of the Apple products -- in fact, all |
| 10:45:29 | 24 | the Apple products in this case support the LTE standard, |
| 10:45:33 | 25 | right? |

635

| | | |
|---|---|---|
| 10:45:33 | 1 | A.  Yes, as a matter of fact, they do. |
| 10:45:34 | 2 | Q.  And the LTE standard is a cellular communication |
| 10:45:38 | 3 | standard, correct? |
| 10:45:39 | 4 | A.  Yes, that is the latest standard prior to 5G. |
| 10:45:45 | 5 | Q.  Is it the only cellular standard that's supported by |
| 10:45:49 | 6 | the baseband chips in the Apple products? |
| 10:45:53 | 7 | A.  No, not at all.  Those baseband chips support all |
| 10:45:56 | 8 | available standards. |
| 10:45:57 | 9 | So that would include 4G/LTE.  That would include |
| 10:46:03 | 10 | 3G.  That would include 2G.  That would include EDGE.  They |
| 10:46:07 | 11 | support all available network standards except for 5G, |
| 10:46:10 | 12 | which is emerging. |
| 10:46:11 | 13 | Q.  And even today, Apple's products support 2G, 2.5G, 3G |
| 10:46:17 | 14 | standards? |
| 10:46:17 | 15 | A.  Yes.  In some rural locations in some parts of the |
| 10:46:22 | 16 | world, that's the only network that's available, so the |
| 10:46:24 | 17 | phones are always backwards compatible to the most recent |
| 10:46:28 | 18 | network version. |
| 10:46:29 | 19 | Q.  Now, sir, let's be clear with the ladies and gentlemen |
| 10:46:31 | 20 | of the jury.  Is there any dispute that Apple's products |
| 10:46:33 | 21 | support the LTE standard? |
| 10:46:35 | 22 | A.  No, none at all.  We market our phones as being |
| 10:46:39 | 23 | operable on LTE networks.  So there's no dispute whatsoever |
| 10:46:43 | 24 | about that. |
| 10:46:44 | 25 | Q.  What is the dispute? |

10:46:45   1   A.   The dispute is whether we are infringing five patents

10:46:50   2   in this case specifically.

10:46:53   3   Q.   Now, what is Apple's philosophy when it comes to

10:47:04   4   introducing a product with a new generation of cellular

10:47:08   5   standard?

10:47:08   6   A.   Well, I'll answer the question a bit more generally and

10:47:12   7   then zero into your specific question, if I may.

10:47:15   8          So Apple's product philosophy is to surprise and

10:47:19   9   delight consumers.  So with every successive generation

10:47:23   10  of -- whether it's an iPhone, whether it's an iPad, or

10:47:27   11  whether it's a Mac, with every new introduction, it's our

10:47:29   12  intent to pack in more features, more performance, more

10:47:34   13  things that our consumers will love at the same or lower

10:47:36   14  price.  In current conditions, it's more likely to be the

10:47:41   15  same price, but the objective is to give them more for

10:47:44   16  less.

10:47:44   17  Q.   Now, we hear and there's been some suggestions that in

10:47:47   18  the 2010 range, Apple had fallen behind some of its

10:47:51   19  competitors.  Do you recall that, sir?

10:47:54   20  A.   I heard that.  That stung.

10:47:57   21  Q.   Was it true?

10:47:58   22  A.   It's absolutely untrue, and the reference to -- to

10:48:01   23  Samsung was just a -- a dagger.  I think it's publicly

10:48:05   24  available information that Samsung has copied Apple.

10:48:08   25  Q.   Let's talk about cellular --

10:48:10   1          MR. SHEASBY:  Your Honor, I object.  I move for

10:48:13   2   that to be stricken, and I ask the Court instruct that the

10:48:15   3   witness is not -- the jury not consider that whatsoever.

10:48:18   4          Allegations of copying by Samsung are totally

10:48:21   5   inappropriate in this case, and it's been a subject of

10:48:24   6   previous discussions with Your Honor.

10:48:25   7          THE COURT:  I agree that's not relevant.  It's

10:48:31   8   clearly a matter of importance to this witness, but it's

10:48:35   9   not relevant to this trial.  And I'll order that statement

10:48:37   10   to be struck from the record and for the jury to disregard

10:48:40   11   it.

10:48:42   12   Q.  (By Mr. Mueller)  Mr. Blevins, if you could, let's just

10:48:44   13   focus on cellular functionality.  Are you with me, sir?

10:48:48   14   A.  Yes, sir.

10:48:48   15   Q.  Now, the first Apple LTE phone was introduced in 2012,

10:48:52   16   right?

10:48:52   17   A.  That's correct, yes.

10:48:53   18   Q.  There was a phone the year before, in 2011?

10:48:57   19   A.  That is correct.

10:48:58   20   Q.  Was that a successful phone or an unsuccessful phone in

10:49:02   21   2011?

10:49:02   22   A.  That would have been the iPhone 4S, and it was our most

10:49:08   23   successful phone in terms of both sales and customer

10:49:11   24   satisfaction to date.  It was very successful.

10:49:13   25   Q.  Did it have LTE or not have LTE?

638

| | | |
|---|---|---|
| 10:49:15 | 1 | A.  It did not have LTE.  It was 3G. |
| 10:49:18 | 2 | Q.  And if we go to the year before, in 2010, was that a |
| 10:49:21 | 3 | successful phone that was released that year or an |
| 10:49:24 | 4 | unsuccessful phone? |
| 10:49:25 | 5 | A.  It was very successful.  That would be the iPhone 4 |
| 10:49:30 | 6 | you're referring to, I believe. |
| 10:49:32 | 7 | Q.  And did it have LTE or not have LTE? |
| 10:49:35 | 8 | A.  It did not.  It was 3G. |
| 10:49:37 | 9 | Q.  So the phones that were released before Apple |
| 10:49:41 | 10 | introduced LTE, were they successful or not successful? |
| 10:49:43 | 11 | A.  They were all, in our opinion, very successful.  We |
| 10:49:46 | 12 | were in the process of building a brand, and each |
| 10:49:50 | 13 | successive phone was more successful than its predecessor. |
| 10:49:54 | 14 | Q.  Now, sir, each year or thereabouts Apple releases a few |
| 10:49:57 | 15 | phone; is that right? |
| 10:49:58 | 16 | A.  Our history has been that we'll release one phone per |
| 10:50:01 | 17 | year, yes, generally. |
| 10:50:03 | 18 | Q.  And do you recall which phone was released in 2011? |
| 10:50:06 | 19 | A.  2011 would have been the iPhone 4S, I believe. |
| 10:50:12 | 20 | Q.  In 2012, which model was released? |
| 10:50:15 | 21 | A.  If memory serves me correctly, that would have been the |
| 10:50:19 | 22 | iPhone 5. |
| 10:50:19 | 23 | Q.  And if we take the iPhone 5 on its release date and the |
| 10:50:23 | 24 | iPhone 4S on its release date, what was the price of the |
| 10:50:27 | 25 | two phones as compared to each other? |

| | | |
|---|---|---|
| 10:50:28 | 1 | A.  Despite the fact there was significantly more function |
| 10:50:34 | 2 | in terms of display and processor and other things in the |
| 10:50:38 | 3 | iPhone 5, we released them at the same price. |
| 10:50:41 | 4 | Q.  No increase on the release date for the LTE model? |
| 10:50:44 | 5 | A.  No increase.  They were exactly the same price on the |
| 10:50:48 | 6 | release date. |
| 10:50:49 | 7 | Q.  Now, sir, you've seen some testimony in this case about |
| 10:50:55 | 8 | a document that I'll put on the screen here, PX-1537b.  Do |
| 10:51:01 | 9 | you see this, sir? |
| 10:51:02 | 10 | A.  Yes, sir, I do see it. |
| 10:51:04 | 11 | Q.  This is a February, 2014, document? |
| 10:51:07 | 12 | A.  I see that.  2014, yes. |
| 10:51:10 | 13 | Q.  And were you here in the opening statement -- or were |
| 10:51:14 | 14 | you here for the opening statements? |
| 10:51:16 | 15 | A.  As a matter of fact, I was, sir. |
| 10:51:17 | 16 | Q.  And were you here when the argument was made that this |
| 10:51:20 | 17 | shows, quote, their plan is to destroy our business?  Do |
| 10:51:25 | 18 | you see that, sir? |
| 10:51:26 | 19 | A.  No, I'm sorry, I don't see that. |
| 10:51:29 | 20 | MR. MUELLER:  Let's put the transcript up.  This |
| 10:51:31 | 21 | is Page 223, Lines 2 through 6. |
| 10:51:36 | 22 | Q.  (By Mr. Mueller)  What does it -- |
| 10:51:40 | 23 | A.  Now -- |
| 10:51:41 | 24 | Q.  Let's read real quick here:  What does it show?  It |
| 10:51:43 | 25 | shows that their plan is to destroy our business. |

640

| | | |
|---|---|---|
| 10:51:47 | 1 | Do you see that, sir? |
| 10:51:48 | 2 | A.  Yes.  That wasn't on my screen before.  Apologies.  Now |
| 10:51:52 | 3 | I can see it says:  Their plan is to destroy our business. |
| 10:51:52 | 4 | Q.  Is there anything in PX-1537b that shows a plan to |
| 10:51:56 | 5 | destroy the business of the Plaintiffs? |
| 10:51:57 | 6 | A.  No, far from it.  It was standard licensing -- |
| 10:52:01 | 7 | MR. SHEASBY:  Your Honor, I -- |
| 10:52:02 | 8 | THE COURT:  Just a minute. |
| 10:52:04 | 9 | What's your objection, Mr. Sheasby? |
| 10:52:05 | 10 | MR. SHEASBY:  Your Honor, I object based on Bench |
| 10:52:08 | 11 | Memo Category No. 1. |
| 10:52:09 | 12 | THE COURT:  Mr. Mueller? |
| 10:52:14 | 13 | MR. MUELLER:  Two things, Your Honor.  Ms. Whitt |
| 10:52:16 | 14 | did testify about this document for several minutes |
| 10:52:19 | 15 | yesterday.  I haven't asked any specifics.  I'm asking a |
| 10:52:21 | 16 | question that Ms. Whitt was not asked because she couldn't |
| 10:52:25 | 17 | have been asked. |
| 10:52:25 | 18 | That is to say, the question was never posed to |
| 10:52:28 | 19 | Ms. Whitt:  Is this a document to destroy the Plaintiffs' |
| 10:52:31 | 20 | business?  I'm now posing that question to Mr. Blevins. |
| 10:52:34 | 21 | It's fully consistent to what Ms. Whitt testified at the |
| 10:52:39 | 22 | detail level.  She was not asked that question, and I am |
| 10:52:40 | 23 | asking it now. |
| 10:52:40 | 24 | MR. SHEASBY:  Question:  Why was it prepared? |
| 10:52:43 | 25 | This is Ms. Whitt's testimony. |

641

| | | |
|---|---|---|
| 10:52:44 | 1 | She goes on:  I don't know exactly why it was |
| 10:52:46 | 2 | prepared.  There are probably various reasons, and it may |
| 10:52:49 | 3 | have been used in different matters, but generally these |
| 10:52:52 | 4 | types of documents are prepared to convey a lot of data and |
| 10:52:52 | 5 | contest more for. |
| 10:52:56 | 6 | It's unclear to me what the specific document or |
| 10:52:58 | 7 | version was used for.  I'm not sure what I'm allowed to say |
| 10:53:01 | 8 | in terms of privilege.  I'm not sure whether this |
| 10:53:06 | 9 | individual document was even one that I reviewed. |
| 10:53:07 | 10 | MR. MUELLER:  And I'm not asking why it was |
| 10:53:09 | 11 | prepared.  I'm asking, does this say it's a document to |
| 10:53:14 | 12 | destroy the Plaintiffs' business.  That's all. |
| 10:53:16 | 13 | MR. SHEASBY:  It's clear that Ms. -- that Apple's |
| 10:53:17 | 14 | corporate representative -- |
| 10:53:17 | 15 | THE COURT:  I've heard enough.  This is a matter |
| 10:53:19 | 16 | that Ms. Whitt was queried on.  And consistent with the |
| 10:53:29 | 17 | guidance I've given the parties, she did not profess |
| 10:53:34 | 18 | knowledge as Apple's representative at the time she was |
| 10:53:37 | 19 | deposed, so we're not going to supply that knowledge for |
| 10:53:40 | 20 | the first time through this witness for Apple in the middle |
| 10:53:42 | 21 | of the trial. |
| 10:53:43 | 22 | I'll sustain the objection. |
| 10:53:44 | 23 | MR. MUELLER:  Thank you, Your Honor. |
| 10:53:45 | 24 | Q.  (By Mr. Mueller)  Mr. Blevins, you, yourself, have read |
| 10:53:51 | 25 | the patents in this case, correct? |

| | | |
|---|---|---|
| 10:53:52 | 1 | A.  Yes, of course. |
| 10:53:57 | 2 | Q.  In full? |
| 10:53:58 | 3 | A.  That's the only way to read them, yes. |
| 10:54:00 | 4 | Q.  And have you spoken at any folks at Apple as part of |
| 10:54:04 | 5 | your work to prepare for this trial as the corporate |
| 10:54:06 | 6 | representative? |
| 10:54:06 | 7 | A.  Yes, in fact, I have. |
| 10:54:06 | 8 | Q.  And Mr. Sheasby asked you a whole bunch of questions at |
| 10:54:09 | 9 | your deposition about the investigation you undertook, |
| 10:54:13 | 10 | right? |
| 10:54:13 | 11 | A.  Yes, as I recall, he did. |
| 10:54:14 | 12 | Q.  Sir, based on all the work you did in your full |
| 10:54:18 | 13 | investigation, what is Apple's position as to whether it |
| 10:54:21 | 14 | infringes the five patents in this case? |
| 10:54:23 | 15 | A.  Our position is we clearly do not infringe. |
| 10:54:27 | 16 | Q.  Thank you, sir.  I have no further questions at this |
| 10:54:30 | 17 | time. |
| 10:54:30 | 18 | A.  Thank you, sir. |
| 10:54:32 | 19 |       MR. MUELLER:  I pass the witness, Your Honor. |
| 10:54:34 | 20 |       THE COURT:  All right.  Cross-examination by the |
| 10:54:35 | 21 | Plaintiff. |
| 10:54:35 | 22 |                   CROSS-EXAMINATION |
| 10:54:45 | 23 | BY MR. SHEASBY: |
| 10:54:45 | 24 | Q.  Good morning, Mr. Blevins. |
| 10:54:47 | 25 | A.  Good morning, sir. |

| | | |
|---|---|---|
| 10:54:47 | 1 | Q.  It's nice to see you again. |
| 10:54:49 | 2 | A.  It's very nice to see you, Mr. Sheasby. |
| 10:54:51 | 3 | Q.  We met before, over the Internet. |
| 10:54:53 | 4 | THE COURT:  Let me just stop right now.  Let's |
| 10:54:55 | 5 | make sure that somebody else is not talking when somebody |
| 10:54:58 | 6 | else starts talking.  And let's make sure that we have one |
| 10:55:02 | 7 | person talking at a time. |
| 10:55:04 | 8 | Okay.  Mr. Sheasby, please proceed. |
| 10:55:06 | 9 | Q.  (By Mr. Sheasby)  Mr. Blevins, you know that there are |
| 10:55:08 | 10 | a number of patents that are essential to implementing LTE |
| 10:55:11 | 11 | communication standards, fair? |
| 10:55:12 | 12 | A.  Yes, I believe there are essential patents. |
| 10:55:14 | 13 | Q.  And you, as Apple's corporate representative, don't |
| 10:55:23 | 14 | know whether Apple reached out to the companies that it |
| 10:55:26 | 15 | knew had standard essential patents and asked them for a |
| 10:55:30 | 16 | license when Apple launched LTE, correct? |
| 10:55:32 | 17 | A.  That would be correct.  I don't know the extent of |
| 10:55:35 | 18 | that. |
| 10:55:35 | 19 | Q.  You didn't do anything to investigate it for your |
| 10:55:37 | 20 | testimony as Apple's corporate representative, fair? |
| 10:55:39 | 21 | A.  Correct. |
| 10:55:41 | 22 | Q.  And you certainly didn't do it yourself when you and |
| 10:55:47 | 23 | Mr. Williams made the decision to launch LTE, fair? |
| 10:55:50 | 24 | A.  To clarify, that would have been myself and |
| 10:55:55 | 25 | Mr. Williams.  Apple decided to do that. |

| | | |
|---|---|---|
| 10:55:57 | 1 | Q.  You recommended to Apple that it launch LTE, fair? |
| 10:56:01 | 2 | A.  That's not exactly true. |
| 10:56:02 | 3 | Q.  Jeff -- Jeff Williams, the chief operating officer of |
| 10:56:07 | 4 | Apple and your boss, was very interested in helping Apple |
| 10:56:12 | 5 | introduce an LTE phone, correct? |
| 10:56:13 | 6 | A.  Yes, that's true. |
| 10:56:14 | 7 | Q.  All right.  You never told Jeff Williams, we should |
| 10:56:16 | 8 | really check to see if we have all the intellectual |
| 10:56:19 | 9 | property rights for the LTE standard, correct? |
| 10:56:21 | 10 | A.  No, I don't recall ever doing such a thing. |
| 10:56:23 | 11 | Q.  Now, you -- you actually participate in meetings with |
| 10:56:27 | 12 | very, very senior executives relating to the decision to |
| 10:56:31 | 13 | launch LTE, correct? |
| 10:56:32 | 14 | A.  Yes, I would say that's a fair assessment. |
| 10:56:36 | 15 | Q.  No officer at the company of Apple ever pulled you |
| 10:56:39 | 16 | aside and said, we're thrilled about your -- we're thrilled |
| 10:56:45 | 17 | about this idea of using LTE, but we really need to |
| 10:56:48 | 18 | investigate whether we have all the rights.  No one ever -- |
| 10:56:51 | 19 | no executive ever said that to you, fair? |
| 10:56:53 | 20 | A.  No, I don't recall that ever happening. |
| 10:56:56 | 21 | Q.  All right.  You have no recollection whatsoever of |
| 10:57:00 | 22 | Apple ever reaching out to the companies that contributed |
| 10:57:03 | 23 | to in creating the LTE standard, correct, regarding their |
| 10:57:10 | 24 | patents? |
| 10:57:10 | 25 | A.  I don't specifically know if we did or didn't. |

10:57:15  1  Q.  And you're Apple's corporate representative today,

10:57:17  2  correct?

10:57:17  3  A.  Yes.

10:57:18  4  Q.  But what you do know is -- and you also have no

10:57:21  5  knowledge whatsoever as to whether Apple had any role

10:57:24  6  whatsoever in creating the LTE standard, correct?

10:57:25  7  A.  That's fair.  I don't have knowledge -- I don't think

10:57:31  8  we had very much input.

10:57:33  9  Q.  Would it be fair to say that you had no information to

10:57:36  10 provide the jury whatsoever that Apple had any meaningful

10:57:40  11 contribution whatsoever to LTE?

10:57:42  12 A.  Yes, I think that would be fair.  We weren't a member

10:57:46  13 of the standards body, I would agree with you.

10:57:48  14 Q.  Now, you also are unable to tell this jury that an

10:57:54  15 Apple phone would be commercially viable if LTE was

10:57:57  16 removed, correct?

10:57:57  17 A.  Correct.  That's a hypothetical question I couldn't

10:58:01  18 answer.

10:58:01  19 Q.  Sir, can Apple turn off LTE in its phones when it

10:58:08  20 wants?

10:58:08  21 A.  I've actually never tried it.  I think hypothetically,

10:58:16  22 it would be possible.

10:58:17  23 Q.  So if what PanOptis is asking for is so egregious, so

10:58:22  24 outlandish, why don't you just turn off LTE?

10:58:25  25 A.  Because we don't violate their patents.

10:58:27  1  Q.  And if you do violate their patents, you have to pay

10:58:31  2  damages, correct, sir?

10:58:33  3  A.  If we, in fact, violated their patents, I'm certain

10:58:39  4  there would be a remedy.  But, as I mentioned, we do not.

10:58:42  5        MR. SHEASBY:  I move to strike the last part of

10:58:46  6  his answer, Mr. -- Judge, as non-responsive.

10:58:50  7        THE COURT:  I'll overrule that.  Let's move on.

10:58:53  8  Q.  (By Mr. Sheasby)  Now, Mr. Blevins, you've actually

10:58:57  9  sourced these baseband chips from various companies,

10:59:02  10  Qualcomm, Intel, et cetera, fair?

10:59:04  11  A.  That would be correct, sir.

10:59:05  12  Q.  The price of these baseband chips does not reflect the

10:59:17  13  value of the third-party intellectual property that's

10:59:21  14  present in the LTE standard, fair?

10:59:26  15  A.  I'm not an attorney, but I believe what you're

10:59:29  16  suggesting is correct.  I believe so.

10:59:30  17  Q.  So just to be as precise as we can, we know that

10:59:35  18  there's a set of patents that are essential in implementing

10:59:38  19  the LTE standard, correct?

10:59:39  20  A.  Yes.

10:59:40  21  Q.  Those patents have an economic value, correct?

10:59:43  22  A.  I would assume so, yes.

10:59:45  23  Q.  The price at which you purchased the baseband chip does

10:59:48  24  not reflect the economic value of those patents, fair?

10:59:53  25  A.  I'm hesitating because I know in the case of Intel, we

| | | |
|---|---|---|
| 10:59:57 | 1 | do get significant passthrough of IP rights, but I'm |
| 11:00:01 | 2 | probably not qualified to suggest which is and isn't -- |
| 11:00:07 | 3 | Q.  All right. |
| 11:00:08 | 4 | A.  -- LTE. |
| 11:00:10 | 5 | Q.  Why don't you turn to Tab 1 of your deposition, and |
| 11:00:14 | 6 | it's one of the binders next to you. |
| 11:00:18 | 7 | A.  Is it Volume 1 or Volume 2? |
| 11:00:22 | 8 | Q.  I believe there's a separate binder that just says |
| 11:00:25 | 9 | depositions. |
| 11:00:31 | 10 | A.  I see one -- well, I've got Volume 1 and Volume 2 of |
| 11:00:43 | 11 | Cross-examination and another one that says |
| 11:00:48 | 12 | Cross-examination with no numbers. |
| 11:00:50 | 13 | Q.  Let me get -- let me get -- |
| 11:01:00 | 14 | MR. MUELLER:  May I approach, Your Honor? |
| 11:01:02 | 15 | THE COURT:  Hand it to the Court Security Officer. |
| 11:01:09 | 16 | THE WITNESS:  Thank you, sir. |
| 11:01:10 | 17 | Q.  (By Mr. Sheasby)  So why don't you turn to Tab 1, which |
| 11:01:13 | 18 | is your deposition, and why don't you -- why don't go to |
| 11:01:15 | 19 | Page 130, Lines 7 -- through 7. |
| 11:01:20 | 20 | And before you do that, let me ask the question. |
| 11:01:24 | 21 | Give -- Mr. Blevins, just one moment -- Intel -- you just |
| 11:01:27 | 22 | referenced Intel on passthrough rights or something, you |
| 11:01:30 | 23 | said, correct. |
| 11:01:31 | 24 | A.  Right. |
| 11:01:31 | 25 | Q.  Intel's price does not reflect for Apple the value of |

| | | |
|---|---|---|
| 11:01:35 | 1 | all the intellectual property on standard essential |
| 11:01:37 | 2 | patents, correct? |
| 11:01:37 | 3 | A.   I believe it does not. |
| 11:01:39 | 4 | Q.   In fact, you testified at your deposition that the |
| 11:01:44 | 5 | price of modems that Apple purchases from third parties, |
| 11:01:49 | 6 | the market price, does not reflect the value of third-party |
| 11:01:53 | 7 | intellectual property that's standard essential, correct? |
| 11:01:54 | 8 | A.   Yes.   I know it doesn't entitle us to all of it.   If it |
| 11:02:01 | 9 | entitles us to some, I don't know.   But I'm certain it |
| 11:02:05 | 10 | doesn't entitle us to all of them, if that's the question. |
| 11:02:06 | 11 | Q.   Sir, why don't you turn to your deposition at 129 -- |
| 11:02:10 | 12 | THE COURT:   Say that, again, Mr. Sheasby. |
| 11:02:13 | 13 | MR. SHEASBY:   Blevins deposition at 129, 16 to |
| 11:02:18 | 14 | 132. |
| 11:02:35 | 15 | A.   Apologies.   I'm just orientating myself to the -- how |
| 11:02:39 | 16 | this is organized. |
| 11:02:44 | 17 | THE COURT:   That's perfectly fine, sir.   Take your |
| 11:02:46 | 18 | time. |
| 11:02:48 | 19 | Q.   (By Mr. Sheasby)   Sir, tell me when you're done. |
| 11:03:08 | 20 | A.   Yes, I remember now. |
| 11:03:09 | 21 | Q.   Does this refresh your recollection that you admitted |
| 11:03:12 | 22 | under oath that, when Apple purchases modems from third |
| 11:03:15 | 23 | parties, the price does not reflect the value of all |
| 11:03:19 | 24 | third-party intellectual property that's standard |
| 11:03:21 | 25 | essential? |

| | | |
|---|---|---|
| 11:03:21 | 1 | A.  May I read the answer just below that, starting with |
| 11:03:25 | 2 | Line 9? |
| 11:03:26 | 3 | Q.  Yes. |
| 11:03:28 | 4 | A.  I think it's the opposite.  The price reflects whatever |
| 11:03:32 | 5 | value they offer us, not whatever in there in the universe |
| 11:03:36 | 6 | that was excluded from what they offered.  That's why I'm |
| 11:03:38 | 7 | confused. |
| 11:03:39 | 8 | Q.  The price does not reflect the value of the standard -- |
| 11:03:42 | 9 | all standard essential patents, correct, sir? |
| 11:03:43 | 10 | A.  What I was suggesting is our agreements -- |
| 11:03:43 | 11 | Q.  Stop -- |
| 11:03:47 | 12 | A.  -- are offered -- |
| 11:03:48 | 13 | THE COURT:  Just a minute, gentlemen.  We're not |
| 11:03:52 | 14 | going to have a verbal tug of war here. |
| 11:03:55 | 15 | If he gives you an answer that's non-responsive, |
| 11:03:59 | 16 | Mr. Sheasby, after he's given it, raise it with me, and |
| 11:04:02 | 17 | I'll instruct him to do otherwise, okay?  But don't try to |
| 11:04:06 | 18 | cut him off in the middle of an answer. |
| 11:04:08 | 19 | MR. SHEASBY:  I understand. |
| 11:04:09 | 20 | THE COURT:  Ask your question again, and then |
| 11:04:10 | 21 | we'll ask Mr. Blevins to answer. |
| 11:04:12 | 22 | Q.  (By Mr. Sheasby)  Is the value of all third-party |
| 11:04:15 | 23 | intellectual property that's standard essential reflected |
| 11:04:17 | 24 | in the modems that Apple purchases? |
| 11:04:19 | 25 | A.  I don't know. |

| | | |
|---|---|---|
| 11:04:20 | 1 | Q.  All right.  Why don't you read your deposition |
| 11:04:25 | 2 | transcript 129, 16 to 132. |
| 11:04:32 | 3 | THE COURT:  And you're asking him to read it to |
| 11:04:34 | 4 | himself? |
| 11:04:34 | 5 | MR. SHEASBY:  Right now, and then I'm going to |
| 11:04:36 | 6 | publish it as -- |
| 11:04:38 | 7 | THE COURT:  That's fine.  I just wanted to be |
| 11:04:41 | 8 | clear so he understood that you weren't asking him to read |
| 11:04:44 | 9 | it into the microphone. |
| 11:04:47 | 10 | MR. SHEASBY:  Yes, Your Honor. |
| 11:04:47 | 11 | A.  Sir, that was Line 16 to 32; is that correct? |
| 11:04:52 | 12 | Q.  (By Mr. Sheasby)  16 through -- well, 116, 29 to Lines |
| 11:04:59 | 13 | 32 (sic). |
| 11:05:03 | 14 | A.  I'm sorry, my copy ends at Line 25. |
| 11:05:07 | 15 | Q.  I'll -- I'll withdraw the question, and we'll come back |
| 11:05:09 | 16 | to that. |
| 11:05:09 | 17 | Now, Apple was not the first company to launch LTE |
| 11:05:15 | 18 | in 2012, correct? |
| 11:05:16 | 19 | A.  Yes, that's correct. |
| 11:05:18 | 20 | Q.  All right.  There -- there were a number of companies |
| 11:05:22 | 21 | that had launched LTE before you, correct? |
| 11:05:25 | 22 | A.  Yes, I believe that's correct. |
| 11:05:27 | 23 | Q.  And you and Mr. Williams thought it was important for |
| 11:05:32 | 24 | LTE -- for offer to offer -- for Apple to offer LTE, |
| 11:05:36 | 25 | correct? |

11:05:36  1  A.  More specifically, I think Apple felt it was important,
11:05:39  2  if that's your question, yes.
11:05:41  3  Q.  Apple thought it was important, not just you and
11:05:44  4  Mr. Williams?
11:05:44  5  A.  Yes, sir, that was the clarification I was making.
11:05:48  6  Apple thought it was important.
11:05:50  7  Q.  And, in fact, even you would consider that you were six
11:05:53  8  months to a year behind offering LTE, correct?
11:05:55  9  A.  I don't think of it as being behind.  I do know that we
11:06:01  10  offered it later.  If that's the question, I would agree.
11:06:03  11  Q.  You offered it six -- at least six months, perhaps a
11:06:08  12  year, later than your competitors, correct?
11:06:11  13  A.  That, I would agree with, yes.
11:06:13  14  Q.  One of your competitors was Samsung, correct?
11:06:16  15  A.  Yes, I believe so.
11:06:18  16       MR. SHEASBY:  Let's go to DDX-X.5.
11:06:27  17  Q.  (By Mr. Sheasby)  Now, Mr. Mueller used this slide with
11:06:35  18  Mr. Blasius, correct?
11:06:35  19  A.  Yes, I recall seeing this.
11:06:37  20  Q.  It talks -- Mr. Mueller talked about the design of the
11:06:39  21  various products, correct?
11:06:40  22  A.  Yes, I recall that.
11:06:41  23  Q.  Does this case, LTE, have anything whatsoever to do
11:06:45  24  with design and shapes of products?
11:06:47  25  A.  Not to my knowledge, it doesn't.

| | | |
|---|---|---|
| 11:06:49 | 1 | Q.   It has to do with intense technology that's used for |
| 11:06:53 | 2 | telecommunications, correct? |
| 11:06:54 | 3 | A.   I thought it was about five patents specifically. |
| 11:07:10 | 4 | Q.   LTE relates to technology that's used -- well, two |
| 11:07:18 | 5 | questions.  It's about LTE.  This case is about LTE, |
| 11:07:21 | 6 | correct? |
| 11:07:21 | 7 | A.   My understanding is it's about five specific patents, |
| 11:07:27 | 8 | not the universe of LTE. |
| 11:07:29 | 9 | Q.   The features of Apple products that are being accused |
| 11:07:32 | 10 | of infringement relate to the LTE standards, correct? |
| 11:07:37 | 11 | A.   I thought we were being accused of infringing five |
| 11:07:40 | 12 | specific patents.  That was my understanding. |
| 11:07:41 | 13 | Q.   Okay.  Why don't you go to your deposition at 132, 7 |
| 11:07:47 | 14 | through 19. |
| 11:08:03 | 15 | A.   Yes, sir, I've read it. |
| 11:08:04 | 16 | Q.   Did you give that testimony under oath? |
| 11:08:06 | 17 | A.   Yes. |
| 11:08:10 | 18 | MR. SHEASBY:  I want you, Mr. Huynh, just to pull |
| 11:08:14 | 19 | up lines -- 132, 13 through 19, only that portion. |
| 11:08:19 | 20 | Q.   (By Mr. Sheasby)  Do you know what features are being |
| 11:08:29 | 21 | accused via these patents? |
| 11:08:30 | 22 | I have an understanding, yes. |
| 11:08:32 | 23 | What features are being accused? |
| 11:08:34 | 24 | Features related to the LTE standards. |
| 11:08:37 | 25 | Did you give that testimony under oath, |

653

| | | |
|---|---|---|
| 11:08:39 | 1 | Mr. Blevins? |
| 11:08:39 | 2 | A.  Yes, I believe that to be accurate. |
| 11:08:41 | 3 | Q.  And, in fact, the patents relate to the transmission |
| 11:08:43 | 4 | and receipt of different data and symbols that are |
| 11:08:46 | 5 | necessary to communicate between a base station and a |
| 11:08:51 | 6 | subscriber station, correct, necessary? |
| 11:08:54 | 7 | A.  No, I disagree with that. |
| 11:08:56 | 8 | Q.  Okay.  Why don't you turn to Page 132:20 to 133:1 of |
| 11:09:02 | 9 | your deposition. |
| 11:09:02 | 10 | A.  I'm sorry.  That's page 132 -- |
| 11:09:03 | 11 | Q.  132, Line 20, to 133, Line 1. |
| 11:09:09 | 12 | A.  Yes, I see that. |
| 11:09:18 | 13 | Q.  Did you give that testimony under oath, sir? |
| 11:09:20 | 14 | A.  Yes.  I believe that to be accurate. |
| 11:09:22 | 15 | MR. SHEASBY:  Let's publish it.  Publish the |
| 11:09:38 | 16 | second half, too, Mr. Huynh. |
| 11:09:41 | 17 | Q.  (By Mr. Sheasby)  But what specific features? |
| 11:09:44 | 18 | Well, they vary from patent to patent.  But you |
| 11:09:46 | 19 | could generalize and say that they're related to |
| 11:09:50 | 20 | transmissions and receipt of different data symbols that |
| 11:09:54 | 21 | are, quote, necessary to communicate between a base station |
| 11:09:55 | 22 | and a subscriber station. |
| 11:09:58 | 23 | Those were your words, Mr. Blevins, correct? |
| 11:10:01 | 24 | A.  Yes, that's true. |
| 11:10:02 | 25 | Q.  "Necessary" was the word you used, correct? |

| | | |
|---|---|---|
| 11:10:04 | 1 | A.  The data and symbols are necessary.  There's multiple |
| 11:10:07 | 2 | ways to generate those data and symbols. |
| 11:10:09 | 3 | MR. SHEASBY:  Your Honor, I move to strike the |
| 11:10:11 | 4 | answer as non-responsive. |
| 11:10:13 | 5 | THE COURT:  The data symbols are necessary; that's |
| 11:10:19 | 6 | responsive. |
| 11:10:20 | 7 | The multiple ways to generate those data symbols, |
| 11:10:23 | 8 | that goes beyond the answer to the question.  I'll strike |
| 11:10:26 | 9 | that portion. |
| 11:10:27 | 10 | Let's continue. |
| 11:10:28 | 11 | Q.  (By Mr. Sheasby)  The antenna is involved in the |
| 11:10:30 | 12 | transmission of symbols and data, correct? |
| 11:10:31 | 13 | A.  Yes, I think that's true. |
| 11:10:32 | 14 | Q.  In fact, everything that is part of the iPhone, |
| 11:10:35 | 15 | including the battery and display, are involved in that |
| 11:10:37 | 16 | process, correct? |
| 11:10:38 | 17 | A.  Yes, I think it's fair to say the unit wouldn't |
| 11:10:44 | 18 | function without all the parts. |
| 11:10:46 | 19 | Q.  Sir, can you turn to Paragraph -- Lines -- Page 134, |
| 11:10:51 | 20 | Line 23, to 135, Line 3, of your deposition? |
| 11:10:56 | 21 | A.  I'm sorry.  Can you go just a bit slower, please? |
| 11:11:00 | 22 | Q.  Sure.  134, Line 23, to 135, Line 3. |
| 11:11:11 | 23 | A.  Yes. |
| 11:11:11 | 24 | Q.  Did you give that testimony under oath? |
| 11:11:13 | 25 | A.  Yes, that's accurate. |

655

| 11:11:16 | 1 | MR. SHEASBY:  All right.  Let's publish it for the |
| 11:11:17 | 2 | jury. |

11:11:18  3  Q.  (By Mr. Sheasby)  Question:  Is the antenna involved in

11:11:28  4  the transmission of symbols and data?

11:11:30  5  Answer:  By that definition, every part of the

11:11:34  6  iPhone is involved.  So, yes, every part is involved,

11:11:36  7  including the battery and the display.

11:11:39  8  Do you see that -- did you give this testimony

11:11:42  9  under oath, Mr. Blevins?

11:11:42  10  A.  Yes, sir.

11:11:43  11  Q.  And you say the patents relate to different data and

11:11:47  12  symbols that are necessary to communicate between a base

11:11:50  13  station and a subscriber station, correct?

11:11:55  14  A.  Yes, that's correct.

11:12:02  15  MR. SHEASBY:  Now, let's go back to DDX-X.5.

11:12:13  16  Q.  (By Mr. Sheasby)  And this was the slide that

11:12:15  17  Mr. Mueller was saying related to design, correct?  And he

11:12:19  18  was talking about the -- the -- the little app symbols that

11:12:24  19  you can push on the screen, correct?

11:12:26  20  A.  Yes, I recall that.

11:12:27  21  Q.  Now, you called Apple a design company, fair?

11:12:32  22  A.  Yes.

11:12:33  23  Q.  You don't manufacture anything, fair?

11:12:34  24  A.  We do not.

11:12:35  25  Q.  And, in fact, when you launched the iPhone in 2007,

11:12:40   1   you -- you thought it was a groundbreaking tool, correct?

11:12:43   2   A.  We did.  I think many people thought that.

11:12:47   3   Q.  Who made the -- do you remember when Mr. Mueller was

11:12:49   4   referring to something called a CPU as the brains of the

11:12:53   5   processor?

11:12:54   6   A.  Yes.

11:12:54   7   Q.  Who made the CPU in Apple's 2007 device?

11:12:58   8   A.  It was manufactured by SLSI, which was a division of

11:13:01   9   Samsung.

11:13:01  10   Q.  The brains of Apple's device in 2007 was manufactured

11:13:07  11   by Samsung, correct?

11:13:08  12   A.  Manufactured in their foundry, yes.

11:13:15  13          MR. SHEASBY:  Now, let's turn to PDX-5.30.  PDX,

11:13:28  14   not PX, Mr. Huynh.

11:13:36  15   Q.  (By Mr. Sheasby)  Mr. Blevins, Apple's average profit

11:13:44  16   margin is about 40 or 50 percent; is that fair?

11:13:47  17   A.  I wish it were.  I think that's overstated slightly.

11:13:50  18   Q.  What is it?

11:13:51  19   A.  In our last earnings report, which was I think about

11:13:54  20   two weeks ago, was 38 percent.

11:13:57  21   Q.  Okay.  Now, what would happen to Apple's business,

11:14:01  22   then, if 50 percent of its customers just took its phones

11:14:14  23   year after year after year and never paid for them?  What

11:14:19  24   would happen to Apple's business ultimately?

11:14:25  25   A.  I don't know specifically, but I imagine we'd

11:14:28  1   eventually go out of business.

11:14:29  2       MR. SHEASBY:  So let's go to Slide PX-10.

11:14:32  3       THE COURT:  And, Mr. Blevins, would you try to

11:14:33  4   slow down a little bit, please, sir?  Maybe Mr. Sheasby has

11:14:41  5   and you just seem faster, but try to slow down.

11:14:44  6       THE WITNESS:  I apologize, Your Honor.

11:14:47  7       THE COURT:  Let's continue.

11:14:48  8   Q.  (By Mr. Sheasby)  So this is a slide -- you were here

11:14:53  9   for this slide when Mr. Kennedy noted that Apple represents

11:14:57  10  essentially the vast majority of the portion of the LTE

11:15:00  11  industry that is not licensed to PanOptis's patents, fair?

11:15:04  12  A.  Yes, I was here.

11:15:05  13  Q.  And Apple represents -- you would take my

11:15:10  14  representation -- approximately 80 percent of all the

11:15:14  15  profits that are generated in the LTE industry in the

11:15:19  16  United States, fair?

11:15:19  17  A.  I don't know.

11:15:19  18  Q.  You don't know what percentage of the profits you

11:15:23  19  capture in the industry, sir?

11:15:24  20  A.  I don't know exactly.  I know it varies every week,

11:15:28  21  every month.

11:15:29  22  Q.  It's in that range, though, fair?

11:15:31  23  A.  I don't know.  I can take your word for it, but I

11:15:34  24  simply don't know.

11:15:35  25  Q.  Okay.  So, you're Apple -- you're a vice president of

| | | |
|---|---|---|
| 11:15:36 | 1 | Apple, correct? |
| 11:15:37 | 2 | A.  Yes. |
| 11:15:38 | 3 | Q.  You're Apple's corporate representative, correct? |
| 11:15:39 | 4 | A.  Correct, sir. |
| 11:15:40 | 5 | Q.  And you're saying you don't know what the profits of |
| 11:15:43 | 6 | Apple is vis-a-vis its competitors in the industry, fair? |
| 11:15:47 | 7 | A.  I know what Apple's profits are.  I don't necessarily |
| 11:15:51 | 8 | know what the profits of our competitors are. |
| 11:15:55 | 9 | Q.  Okay.  Now, just for the ladies and gentlemen of the |
| 11:15:57 | 10 | jury, you said your profit margins are in the high 30s, low |
| 11:16:02 | 11 | 40s, fair? |
| 11:16:02 | 12 | A.  I think I said 38 percent, to be specific. |
| 11:16:04 | 13 | Q.  Okay.  And if 50 percent or 40 percent of your |
| 11:16:13 | 14 | customers just said, we're not going to pay you for your |
| 11:16:16 | 15 | phones that we take, you're going to go bankrupt |
| 11:16:20 | 16 | ultimately, fair? |
| 11:16:21 | 17 | A.  It's hypothetical.  It's certainly possible. |
| 11:16:24 | 18 | Q.  Sir, if every year since 2012, 40 percent of your |
| 11:16:29 | 19 | customers took your phones and didn't pay for them, you |
| 11:16:32 | 20 | would ultimately go bankrupt, correct? |
| 11:16:34 | 21 | A.  You would need to be more specific.  It would depend on |
| 11:16:41 | 22 | the profit we made on the 60 percent that did pay, |
| 11:16:44 | 23 | mathematically speaking. |
| 11:16:46 | 24 | Q.  Well, let's say it was 38 percent. |
| 11:16:48 | 25 | A.  Okay. |

659

| | | |
|---|---|---|
| 11:16:48 | 1 | Q.  You'd ultimately go bankrupt, correct? |
| 11:16:52 | 2 | A.  You would lose money, I would agree with that, if |
| 11:16:58 | 3 | that's your point. |
| 11:16:58 | 4 | Q.  Every year since 2012, you would lose money if |
| 11:17:02 | 5 | 40 percent of your customers just stole your phones and |
| 11:17:05 | 6 | didn't pay for them, fair? |
| 11:17:06 | 7 | A.  In your example, you would lose approximately 2 percent |
| 11:17:09 | 8 | a year. |
| 11:17:10 | 9 | Q.  And if you lose year after year after year, you |
| 11:17:14 | 10 | eventually go bankrupt, correct? |
| 11:17:15 | 11 | A.  Hypothetically, I think that's correct. |
| 11:17:17 | 12 | Q.  It destroys your business ultimately, correct? |
| 11:17:20 | 13 | A.  In your hypothetical example, you would lose 2 percent |
| 11:17:25 | 14 | a year unless you otherwise adjusted your price on the ones |
| 11:17:29 | 15 | you did sell. |
| 11:17:31 | 16 | Q.  It would ultimately destroy your business, fair, sir? |
| 11:17:35 | 17 | A.  I disagree with that. |
| 11:17:36 | 18 | Q.  Okay.  So, if people took 40 percent of Apple's phones |
| 11:17:38 | 19 | and didn't pay for them since 2012, you think your business |
| 11:17:39 | 20 | would be just fine? |
| 11:17:41 | 21 | A.  That's not what I said. |
| 11:17:41 | 22 | Q.  It would ultimately destroy your business if 40 percent |
| 11:17:45 | 23 | of people just took your phones since 2012 and didn't pay |
| 11:17:49 | 24 | for them, fair? |
| 11:17:50 | 25 | A.  I don't agree with the way you're characterizing this. |

11:17:54   1    Q.  Okay.  And so it'd be fair to say that when the ladies

11:17:59   2    and gentlemen of the jury return to deliberate, they can

11:18:00   3    consider the fact that you don't know whether if Apple's

11:18:05   4    customers took 40 percent of Apple's phones without paying

11:18:10   5    a dime since 2012, whether Apple would still survive as a

11:18:14   6    company.  You don't know the answer to that, correct, sir?

11:18:18   7    A.  I believe what I've said is clear.

11:18:21   8             THE COURT:  Let me stop everything for a minute.

11:18:23   9             Ladies and gentlemen, I need to take something up

11:18:26  10    outside of your presence with counsel.  I'm going to ask

11:18:31  11    you to step into the jury room.  I appreciate your

11:18:34  12    cooperation, given our social distancing.

11:18:37  13             If you'll just leave your notebooks in your

11:18:40  14    chairs.  Don't discuss the case among yourselves, and this

11:18:44  15    should take very little time.  I hope -- hopefully, we'll

11:18:47  16    have you back in here very shortly.

11:18:49  17             If the jury will retire to the jury room, please.

11:18:52  18             COURT SECURITY OFFICER:  All rise.

11:18:53  19             (Jury out.)

11:19:11  20             THE COURT:  Be seated, please.

11:19:12  21             Counsel, I -- I need some clarification.  We had a

11:19:18  22    big fight in chambers about using the word "bankrupt," and

11:19:22  23    now it seems to be just ubiquitous.

11:19:27  24             Was that all a sham in the -- in chambers about

11:19:31  25    how horribly prejudicial and improper that was, or have we

| | | |
|---|---|---|
| 11:19:35 | 1 | just had temporary amnesia and forgotten about how we went |
| 11:19:40 | 2 | round and round about what we could say and couldn't say |
| 11:19:43 | 3 | and speculating whether the company could sustain these |
| 11:19:46 | 4 | kind of losses? |
| 11:19:47 | 5 | I'll be honest, I'm confused.  Can you clarify for |
| 11:19:50 | 6 | me where we are on the word "bankrupt"?  Because it calls |
| 11:19:53 | 7 | for an economic judgment of insolvency that none of these |
| 11:20:00 | 8 | witnesses are in a position to know or testify about. |
| 11:20:03 | 9 | MR. SHEASBY:  Certainly, Your Honor.  First, I |
| 11:20:04 | 10 | apologize if I've misunderstood something.  I believe the |
| 11:20:06 | 11 | discussion in chambers was about whether the payment of |
| 11:20:10 | 12 | royalties to -- the payment of these -- these royalties |
| 11:20:14 | 13 | would lead to a bankruptcy of Apple.  I'm asking a |
| 11:20:18 | 14 | different question, which is, if Apple's customers failed |
| 11:20:22 | 15 | to -- |
| 11:20:23 | 16 | THE COURT:  I understand your question, |
| 11:20:24 | 17 | Mr. Sheasby, but you're calling for the same kind of an |
| 11:20:28 | 18 | evaluation at the end of a different question. |
| 11:20:31 | 19 | MR. SHEASBY:  I understand Your Honor's concern. |
| 11:20:34 | 20 | There will be no more questions regarding this subject. |
| 11:20:34 | 21 | THE COURT:  All right.  There is clearly an order |
| 11:20:37 | 22 | in limine prohibiting discussion of the financial strength |
| 11:20:39 | 23 | or condition of the parties, and this continued query as to |
| 11:20:44 | 24 | would this bankrupt you or would that bankrupt you seems to |
| 11:20:47 | 25 | me to be testing the limits of that. |

| | | |
|---|---|---|
| 11:20:49 | 1 | So I really am going to have to insist that we not |
| 11:20:54 | 2 | go back to discussions of what is or isn't a |
| 11:20:59 | 3 | bankruptcy-causing event without getting the Court's leave |
| 11:21:01 | 4 | before we do it going forward.  Okay. |
| 11:21:03 | 5 | MR. SHEASBY:  I understand, Your Honor.  I |
| 11:21:04 | 6 | apologize.  I will proceed. |
| 11:21:06 | 7 | MR. MUELLER:  May I raise two issues briefly, |
| 11:21:08 | 8 | Your Honor -- two issues briefly, Your Honor? |
| 11:21:10 | 9 | THE COURT:  Very briefly. |
| 11:21:11 | 10 | MR. MUELLER:  I just want to make sure I have the |
| 11:21:13 | 11 | clear ground rules before the redirect. |
| 11:21:15 | 12 | First, Your Honor, Mr. Sheasby asked a few |
| 11:21:17 | 13 | questions about Mr. Blevins's or others at Apple |
| 11:21:21 | 14 | investigating whether they were using patents before |
| 11:21:23 | 15 | launching LTE and so on. |
| 11:21:25 | 16 | Am I permitted on redirect to ask Mr. Blevins |
| 11:21:27 | 17 | about the fact that Apple has agreements covering cellular |
| 11:21:32 | 18 | standard essential patents?  I won't get into specific |
| 11:21:34 | 19 | terms, but the fact of those agreements.  Because I think |
| 11:21:37 | 20 | the impression is being left that Apple is just out there |
| 11:21:41 | 21 | being completely ignorant of patents, and that's just not |
| 11:21:44 | 22 | true. |
| 11:21:45 | 23 | THE COURT:  So, specifically, what is it you want |
| 11:21:46 | 24 | to ask on re -- on excuse me, redirect? |
| 11:21:50 | 25 | MR. MUELLER:  I would ask, Mr. Blevins -- and |

| | | |
|---|---|---|
| 11:21:52 | 1 | actually may Mr. Blevins step down?  I don't want to |
| 11:21:55 | 2 | pollute his testimony by discussing it in front of him, |
| 11:21:59 | 3 | but -- |
| 11:21:59 | 4 | THE COURT:  I'm not going to send Mr. Blevins out. |
| 11:22:01 | 5 | MR. MUELLER:  Okay.  That's fine.  So the question |
| 11:22:04 | 6 | I would ask, Your Honor, is, Mr. Blevins, you were asked |
| 11:22:08 | 7 | some questions about whether Apple had investigated patents |
| 11:22:10 | 8 | before launching the LTE phones.  Does Apple have patent |
| 11:22:15 | 9 | license agreements covering cellular standard essential |
| 11:22:18 | 10 | patents, including for LTE?  Just a yes or no question. |
| 11:22:21 | 11 | THE COURT:  I don't think that's improper.  He's a |
| 11:22:24 | 12 | corporate representative.  He should know that. |
| 11:22:25 | 13 | MR. MUELLER:  And then the very last thing -- |
| 11:22:27 | 14 | THE COURT:  As long as it's at that high level. |
| 11:22:30 | 15 | MR. MUELLER:  Very high level, Your Honor. |
| 11:22:31 | 16 | And then the last thing is I stopped when asking |
| 11:22:35 | 17 | Mr. Blevins about the Intel acquisition at the historical |
| 11:22:37 | 18 | level.  One of my colleagues has reminded me that |
| 11:22:41 | 19 | Mr. Perryman (sic), our damages expert, does rely on the |
| 11:22:43 | 20 | Intel acquisition as part of his analysis. |
| 11:22:46 | 21 | May I ask Mr. Blevins whether Apple acquired any |
| 11:22:49 | 22 | patents as part of the Intel acquisition, and, if so, how |
| 11:22:56 | 23 | many?  Just those two questions.  And it's in |
| 11:23:04 | 24 | Dr. Perryman's report, Your Honor.  It's an opinion that he |
| 11:23:07 | 25 | confirmed in this case. |

| | | |
|---|---|---|
| 11:23:08 | 1 | MR. SHEASBY:  I can confirm that, Your Honor.  It |
| 11:23:11 | 2 | is in Dr. Perryman's report -- |
| 11:23:12 | 3 | THE COURT:  I don't know why it's appropriate |
| 11:23:12 | 4 | through this witness if it's in Dr. Perryman's report. |
| 11:23:12 | 5 | MR. MUELLER:  Okay.  We can do that through |
| 11:23:12 | 6 | Dr. Perryman, Your Honor.  That's fine. |
| 11:23:19 | 7 | MR. SHEASBY:  Thank you. |
| 11:23:19 | 8 | THE COURT:  All right.  One other thing, we are |
| 11:23:22 | 9 | going to have to talk one at a time, and we are going to |
| 11:23:26 | 10 | have to slow down. |
| 11:23:28 | 11 | And, Mr. Blevins, you may be trying, and I'm sure, |
| 11:23:30 | 12 | sir, you don't testify in court every day, but you are very |
| 11:23:35 | 13 | fast in your answers, and if we don't give the answers so |
| 11:23:40 | 14 | the jury can hear and comprehend them, we're all just |
| 11:23:44 | 15 | wasting our time.  So if you think you've slowed down, |
| 11:23:48 | 16 | multiply it by 10 and try and do it that way, okay? |
| 11:23:52 | 17 | THE WITNESS:  Apologies, Your Honor. |
| 11:23:53 | 18 | THE COURT:  Apologies, Your Honor.  Not, |
| 11:23:57 | 19 | apologies, Your Honor.  Okay.  Does that give you an |
| 11:24:01 | 20 | example? |
| 11:24:02 | 21 | THE WITNESS:  It does.  Thank you very much. |
| 11:24:04 | 22 | MR. SHEASBY:  Your Honor, may I be heard?  On |
| 11:24:05 | 23 | behalf of Mr. Blevins and all speed talkers, we're trying |
| 11:24:11 | 24 | our best, Your Honor. |
| 11:24:11 | 25 | THE COURT:  Well, you're in the same category, |

11:24:15  1  Mr. Sheasby.

11:24:15  2        Let's -- let's bring in the jury.

11:24:46  3        COURT SECURITY OFFICER:  All rise.

11:24:48  4        (Jury in.)

11:24:49  5        THE COURT:  Please be seated.

11:24:50  6        All right.  Mr. Sheasby, you may continue with

11:24:53  7  your cross-examination of Mr. Blevins.

11:24:56  8  Q.  (By Mr. Sheasby)  Now, Mr. Blevins, you were in the

11:24:57  9  courtroom when Apple's corporate -- corporate

11:25:00  10  representative, Ms. Mewes, testified, correct?

11:25:03  11  A.  Yes, sir.

11:25:04  12  Q.  And only -- Apple's position is that only approximately

11:25:07  13  10 percent of declared essential patents are actually

11:25:11  14  essential, fair?

11:25:12  15  A.  Yes, I believe that was confirmed by Ms. Dwyer

11:25:21  16  yesterday as well.

11:25:21  17  Q.  And Apple's position is that there are times when it is

11:25:24  18  appropriate to calculate royalties for a patent based on

11:25:29  19  net sales price, correct?

11:25:30  20  A.  I thought it was sales price of the smallest salable

11:25:34  21  unit.

11:25:35  22  Q.  Okay.

11:25:37  23        MR. SHEASBY:  Well, why don't we go to Ms. Mewes's

11:25:39  24  testimony from yesterday, at Page 140, Lines 15 through 19.

11:25:52  25  Q.  (By Mr. Sheasby)  Question:  So here's what we know:

| | | |
|---|---|---|
| 11:25:54 | 1 | We agree that there are some patents for which it's |
| 11:25:58 | 2 | appropriate to calculate damages based on the net sales |
| 11:26:01 | 3 | price of the device, correct? |
| 11:26:03 | 4 | Answer:  Yes. |
| 11:26:06 | 5 | Do you see that, sir?  It's on your screen. |
| 11:26:08 | 6 | A.  This was Ms. Mewes testimony; is that right? |
| 11:26:20 | 7 | Q.  Yes, sir. |
| 11:26:21 | 8 | A.  I see it. |
| 11:26:22 | 9 | Q.  You sat through it, correct, sir? |
| 11:26:24 | 10 | A.  Yes, I think so. |
| 11:26:24 | 11 | Q.  You didn't stand up and say, no, Ms. Mewes got it all |
| 11:26:29 | 12 | wrong, did you, sir? |
| 11:26:29 | 13 | A.  I didn't think it was appropriate for me to say |
| 11:26:32 | 14 | anything at all. |
| 11:26:33 | 15 | Q.  Did you pull over Ms. Mewes after she gave this |
| 11:26:36 | 16 | testimony under oath, and said, you know what, Ms. Mewes, |
| 11:26:39 | 17 | you're a lawyer for Apple, but you got it wrong, it's |
| 11:26:42 | 18 | always got to be smallest salable patent practicing unit? |
| 11:26:45 | 19 | A.  No, I didn't do that. |
| 11:26:46 | 20 | Q.  Did you -- did you speak to her boss B.J. Watrous and |
| 11:26:52 | 21 | say, Mr. Watrous, you've got to talk to that Ms. Mewes, |
| 11:26:56 | 22 | she's got it all wrong, it's got to be the smallest salable |
| 11:27:00 | 23 | patent practicing unit? |
| 11:27:00 | 24 | A.  No.  And, in fact, B.J. Watrous is not her boss to my |
| 11:27:04 | 25 | knowledge. |

| | | |
|---|---|---|
| 11:27:04 | 1 | Q.  He used to be her boss, correct? |
| 11:27:06 | 2 | A.  That I'm not certain of. |
| 11:27:08 | 3 | Q.  Who's the general counsel of Apple? |
| 11:27:11 | 4 | A.  The general counsel is Ms. Kate Adams. |
| 11:27:14 | 5 | Q.  Did you go to Ms. Adams and say, you know what, |
| 11:27:17 | 6 | Ms. Adams, we've got a big problem?  Our corporate -- our |
| 11:27:20 | 7 | corporate representative under oath in trial said that |
| 11:27:22 | 8 | there are patents for which it's appropriate to calculate |
| 11:27:24 | 9 | damages based on the net sales price of the device? |
| 11:27:27 | 10 | Did you do that? |
| 11:27:28 | 11 | A.  No, I didn't do that. |
| 11:27:29 | 12 | Q.  Now, there's been a relationship between Apple and |
| 11:27:43 | 13 | Qualcomm for a number of years, correct? |
| 11:27:44 | 14 | A.  Yes, I would agree with that. |
| 11:27:46 | 15 | Q.  And one of the discussion points that Apple has had |
| 11:27:52 | 16 | with Qualcomm is that Qualcomm said, if you want to use our |
| 11:27:55 | 17 | chips, you have to pay for our intellectual property, fair? |
| 11:28:00 | 18 | A.  Yes, I'm, in fact, very familiar with that. |
| 11:28:03 | 19 | Q.  Right.  They're saying you have to pay for the value of |
| 11:28:07 | 20 | intellectual property; you can't just have the chip, fair? |
| 11:28:10 | 21 | A.  Yes. |
| 11:28:11 | 22 | Q.  And Apple wanted the chip, it didn't want to pay for |
| 11:28:14 | 23 | the intellectual property.  It was going to deal with that |
| 11:28:16 | 24 | separately, fair? |
| 11:28:18 | 25 | A.  That's incorrect. |

| | | |
|---|---|---|
| 11:28:20 | 1 | Q.  Okay. |
| 11:28:20 | 2 | MR. SHEASBY:  Well, why don't we go, then, to |
| 11:28:22 | 3 | yesterday's deposition testimony from 144, 2 through 8, and |
| 11:28:30 | 4 | let's pull that up. |
| 11:28:32 | 5 | A.  This is Ms. Mewes's testimony? |
| 11:28:34 | 6 | Q.  (By Mr. Sheasby)  Yes. |
| 11:28:37 | 7 | MR. MUELLER:  Your Honor, I object to publishing |
| 11:28:38 | 8 | testimony before there's been any showing of any |
| 11:28:41 | 9 | inconsistency at all. |
| 11:28:42 | 10 | MR. SHEASBY:  Sir -- Your Honor, this is not an |
| 11:28:44 | 11 | inconsistency of yesterday.  I can refer to trial testimony |
| 11:28:47 | 12 | that occurred earlier in -- in this court.  It's perfectly |
| 11:28:50 | 13 | appropriate.  This is not a deposition.  It's not for |
| 11:28:52 | 14 | impeachment.  It's to show -- |
| 11:28:54 | 15 | THE COURT:  Ms. Mewes was a corporate |
| 11:28:55 | 16 | representative of the Defendant, Mr. Blevins is a corporate |
| 11:28:58 | 17 | representative for the Defendant.  I think that's |
| 11:29:02 | 18 | appropriate. |
| 11:29:02 | 19 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:29:03 | 20 | THE COURT:  I'll overrule the objection. |
| 11:29:06 | 21 | Q.  (By Mr. Sheasby)  So what we have here is Ms. -- |
| 11:29:08 | 22 | Ms. Mewes is Apple's corporate representative -- testified |
| 11:29:14 | 23 | that Qualcomm came to Apple, presented 20 claim charts, and |
| 11:29:18 | 24 | Apple said, no, they're all invalid or not infringed, fair? |
| 11:29:23 | 25 | A.  That's what Ms. Mewes said, yes. |

11:29:25  1  Q.  In other words, Qualcomm said, we have 20 patents, you

11:29:29  2  used them.  And Apple said, you know what, we don't use any

11:29:32  3  of them.  Fair?

11:29:33  4  A.  Yes, I believe that's correct.

11:29:34  5  Q.  And you heard Mr. -- Mr. Mueller in opening, correct?

11:29:38  6  A.  Yes, I certainly did.

11:29:39  7  Q.  And he said, we have never, ever used other people's

11:29:44  8  patents.  Did you hear his testimony -- his -- his opening

11:29:49  9  on that subject?

11:29:49  10  A.  I don't recall that specifically.  He may have, but I

11:29:57  11  can't recall him saying that.

11:29:58  12  Q.  All right.  You said -- you told the jury under oath,

11:30:01  13  we do not use any of these patents -- these patents, we do

11:30:06  14  not use them, right?  You were emphatic about that at the

11:30:10  15  beginning of your testimony?

11:30:11  16  A.  These, I was referring to the five patents in this

11:30:14  17  case, not the entire universe of patents.

11:30:17  18         MR. SHEASBY:  Objection.  I move to strike as

11:30:19  19  non-responsive.

11:30:23  20         THE COURT:  I think the witness is trying to

11:30:24  21  respond to your question.  There may be some confusion

11:30:27  22  between the question and the answer, but it's an attempt to

11:30:29  23  be responsive.  And I'll overrule the objection.

11:30:31  24  Q.  (By Mr. Sheasby)  You told the jury under oath that for

11:30:34  25  the five patents-in-suit in this case, we absolutely don't

| | | |
|---|---|---|
| 11:30:37 | 1 | infringe them, correct? |
| 11:30:38 | 2 | A.  Yes, absolutely. |
| 11:30:39 | 3 | Q.  In fact, you turned to them, you looked them straight |
| 11:30:41 | 4 | in the eye, and said, we do not use these patents, fair? |
| 11:30:46 | 5 | A.  That is a fact. |
| 11:30:47 | 6 | MR. SHEASBY:  So let's pull up Ms. Mewes's |
| 11:30:50 | 7 | testimony again. |
| 11:31:03 | 8 | Q.  (By Mr. Sheasby)  And that's the same thing that Apple |
| 11:31:06 | 9 | said to Qualcomm.  Qualcomm presented claim charts, and |
| 11:31:11 | 10 | Apple said, we absolutely do not infringe your patents, |
| 11:31:15 | 11 | correct?  They're either invalid or non-essential, we don't |
| 11:31:18 | 12 | use them? |
| 11:31:19 | 13 | A.  This refers to 20 patents.  I think Qualcomm has about |
| 11:31:24 | 14 | 140,000. |
| 11:31:26 | 15 | MR. SHEASBY:  Objection.  Move to strike as |
| 11:31:28 | 16 | non-responsive. |
| 11:31:44 | 17 | THE COURT:  Sustained. |
| 11:31:46 | 18 | Q.  (By Mr. Sheasby)  Sir, Ms. Mewes looked Qualcomm in the |
| 11:31:51 | 19 | face and said, we absolutely do not use these 20 patents |
| 11:31:54 | 20 | you presented to us, correct? |
| 11:31:55 | 21 | A.  I can't answer that.  I can only tell you what she said |
| 11:32:01 | 22 | in her deposition. |
| 11:32:02 | 23 | Q.  She said Apple took the position that, each of these 20 |
| 11:32:04 | 24 | claim charts, those patents are either invalid or not |
| 11:32:08 | 25 | essential, correct? |

| | | |
|---|---|---|
| 11:32:08 | 1 | A.  Yes, I can't tell from this which 20 patents were being |
| 11:32:13 | 2 | debated. |
| 11:32:13 | 3 | Q.  The 20 patents that Apple -- that Qualcomm presented |
| 11:32:16 | 4 | claim charts on, correct? |
| 11:32:18 | 5 | A.  Yes, I'm suggesting I don't know which 20 that was. |
| 11:32:21 | 6 | Q.  Okay.  But you know there were 20 presented, from |
| 11:32:24 | 7 | Ms. Mewes's testimony, fair? |
| 11:32:25 | 8 | A.  From that testimony, that's what I know, yes. |
| 11:32:27 | 9 | MR. SHEASBY:  And let's pull up PDX-5.52. |
| 11:32:44 | 10 | THE TECHNICIAN:  Which one? |
| 11:32:45 | 11 | MR. SHEASBY:  5.52. |
| 11:32:54 | 12 | Q.  (By Mr. Sheasby)  And this is an internal document from |
| 11:32:56 | 13 | Apple, correct? |
| 11:32:56 | 14 | A.  Yes, I believe it is. |
| 11:32:58 | 15 | Q.  It's PX-1491a, correct? |
| 11:33:02 | 16 | A.  Yes, sir, that's correct. |
| 11:33:03 | 17 | Q.  And it says Apple had the plan to hurt Qualcomm |
| 11:33:06 | 18 | financially and to put Qualcomm's licensing model at risk, |
| 11:33:11 | 19 | correct? |
| 11:33:11 | 20 | A.  Yes, that's what this chart says. |
| 11:33:14 | 21 | Q.  And Qualcomm licenses its SEPs and generates revenue |
| 11:33:18 | 22 | based on them, correct? |
| 11:33:18 | 23 | A.  That's not my understanding of what they do. |
| 11:33:25 | 24 | Q.  You don't know if Qualcomm licenses its standard |
| 11:33:31 | 25 | essential patents? |

11:33:31 1  A.  I'm not aware that they license them separately from

11:33:35 2  their whole portfolio.  That's not the position they took

11:33:37 3  with us.

11:33:38 4  Q.  Well, we'll -- we'll go there in a -- this document

11:33:48 5  says that Apple's plan was to hurt Qualcomm financially and

11:33:51 6  to put Qualcomm's licensing model at risk, correct?

11:33:54 7  A.  That's what this document says, correct.

11:33:54 8            (Transcript sealed.)

11:33:54 9            (This portion of the transcript is sealed

11:33:54 10           and filed under separate cover as

11:33:54 11           Sealed Portion No. 10.)

11:34:16 12           (Transcript unsealed.)

11:34:16 13           MR. MUELLER:  Your Honor, we have to seal the

11:34:17 14  courtroom for this portion of the testimony.  I didn't know

11:34:20 15  this was coming up.  I ask that the question and the answer

11:34:23 16  be sealed, and that the courtroom be sealed if Mr. Sheasby

11:34:25 17  wants to get into this material.

11:34:26 18           MR. SHEASBY:  I'll -- I'll -- I'll -- I will ask

11:34:30 19  it without reference to a number, Your Honor, so we don't

11:34:32 20  have to seal the courtroom.

11:34:34 21           THE COURT:  I'll order the exchange just

11:34:36 22  undertaken where a specific number was used sealed.

11:34:39 23           MR. SHEASBY:  Thank you, Your Honor.

11:34:40 24  Q.  (By Mr. Sheasby)  After Apple said to Qualcomm, we

11:34:44 25  don't infringe the 20 claim charts you gave us, and after

11:34:49    1    Apple had a document about hurting Qualcomm financially and

11:34:51    2    putting Qualcomm's licensing model at risk, what Apple

11:34:57    3    ultimately did was it ultimately paid Qualcomm a

11:35:01    4    significant amount of money, correct?

11:35:03    5    A.  There was a settlement and we transferred money, I

11:35:06    6    agree.

11:35:07    7    Q.  And that was paid to Qualcomm after a number of years

11:35:11    8    of dispute, correct?

11:35:14    9    A.  Yes, I think that's right.

11:35:17   10    Q.  And during those years of dispute, Apple was able to

11:35:20   11    keep that money and not pay it to Qualcomm, correct?

11:35:26   12    A.  Yes.

11:35:30   13    Q.  Now, Qualcomm has historically paid you $7.50 for --

11:35:45   14    has -- has historically charged you a $7.50 percent

11:35:50   15    royalty -- $7.50 royalty, correct?

11:35:53   16         MR. MUELLER:  Again, Your Honor, are we sealing

11:35:55   17    the courtroom for these questions.

11:35:57   18         MR. SHEASBY:  Your Honor, it was -- it was public

11:35:58   19    in a proceeding.

11:36:01   20         MR. MUELLER:  And I'm just not sure where he's

11:36:04   21    going.

11:36:04   22         THE COURT:  I'm going to order the courtroom

11:36:05   23    sealed.  That way we won't have to have these discussions

11:36:09   24    back and forth about whether it should or shouldn't be

11:36:12   25    protected.

| | | |
|---|---|---|
| 11:36:12 | 1 | Those of you present who are not subject to the |
| 11:36:16 | 2 | protective order in this case or are aligned with Defendant |
| 11:36:19 | 3 | Apple should excuse yourselves from the courtroom at this |
| 11:36:27 | 4 | time and remain outside until the courtroom is reopened and |
| 11:36:30 | 5 | the public is invited to return. |
| 11:36:32 | 6 | (Courtroom sealed.) |
| 11:36:32 | 7 | (This portion of the transcript is sealed |
| 11:36:32 | 8 | and filed under separate cover as |
| 11:36:33 | 9 | Sealed Portion No. 11.) |
| 11:58:29 | 10 | (Courtroom unsealed.) |
| 11:58:29 | 11 | THE COURT:  With that, we stand in recess until we |
| 11:58:32 | 12 | return from lunch. |
| 11:58:33 | 13 | COURT SECURITY OFFICER:  All rise. |
| 11:59:03 | 14 | (Jury out.) |
| 11:59:04 | 15 | THE COURT:  Be seated, please. |
| 11:59:06 | 16 | Who do you have next to call, Mr. Mueller? |
| 11:59:09 | 17 | MR. MUELLER:  Your Honor, we'll next call |
| 11:59:11 | 18 | Dr. Kaushik Josiam, one of the chip engineers. |
| 11:59:14 | 19 | THE COURT:  All right.  Let me ask the question a |
| 11:59:16 | 20 | different way.  What do we need to cover as regards |
| 11:59:23 | 21 | disputes between the parties that weren't resolved this |
| 11:59:26 | 22 | morning because the parties failed to follow the Court's |
| 11:59:29 | 23 | instructions about advising the Court in a timely fashion |
| 11:59:35 | 24 | regarding demonstrative disputes and other contested |
| 11:59:37 | 25 | issues? |

11:59:39   1        As I told you in chambers this morning, we covered

11:59:42   2   what we could to get to the lunch hour.  I'm trying to

11:59:45   3   decide how much of the lunch hour I need to work with

11:59:48   4   counsel and how much of the lunch hour I need to observe as

11:59:50   5   a typical lunch hour.  I need some input from you all.

11:59:55   6        MR. SHEASBY:  Your Honor, I have a suggestion.

11:59:56   7        I think you should order Mr. Mueller and I to sit

12:00:02   8   with each other for 10 minutes immediately right now to go

12:00:05   9   through the outstanding disputes, and then come -- and

12:00:07  10   we'll ring the buzzer and tell you -- we'll bring a sheet

12:00:11  11   that has the stuff that's no longer in dispute crossed out.

12:00:14  12   I think that's what we should do.

12:00:16  13        THE COURT:  Mr. Mueller, do you have a problem

12:00:17  14   with that?

12:00:18  15        MR. MUELLER:  No, Your Honor.

12:00:19  16        THE COURT:  All right.  Lead counsel for the

12:00:22  17   parties will meet and confer for the next 10 or 12 minutes.

12:00:25  18        After that, you'll advise the Court as to the

12:00:28  19   extent and particulars with regard to any outstanding

12:00:31  20   disputes that we need to resolve before we can move forward

12:00:35  21   with these witnesses.

12:00:37  22        But as I told you in chambers this morning, your

12:00:40  23   failure to comply with my instructions on how to bring

12:00:43  24   these issues to resolution is not going to delay the

12:00:47  25   ongoing progress of this trial.

| | | |
|---|---|---|
| 12:00:49 | 1 | MR. SHEASBY:  I understand, Your Honor. |
| 12:00:50 | 2 | THE COURT:  Court stands in recess. |
| 12:00:51 | 3 | COURT SECURITY OFFICER:  All rise. |
| 12:00:52 | 4 | (Recess.) |

5

6

7

8                            CERTIFICATION

9

10          I HEREBY CERTIFY that the foregoing is a true and

11     correct transcript from the stenographic notes of the

12     proceedings in the above-entitled matter to the best of my

13     ability.

14

15

16      /S/ Shelly Holmes                    8/6/2020
        SHELLY HOLMES, CSR, TCRR             Date
17     OFFICIAL REPORTER
        State of Texas No.: 7804
18     Expiration Date: 12/31/20

19

20

21

22

23

24

25