```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3
   OPTIS WIRELESS TECHNOLOGY,    )(  CIVIL ACTION NO.
 4 LLC, OPTIS CELLULAR           )(  2:19-CV-66-JRG
   TECHNOLOGY, LLC, PANOPTIS     )(
 5 PATENT MANAGEMENT, LLC,       )(
   UNWIRED PLANET, LLC, UNWIRED  )(
 6 PLANET INTERNATIONAL LIMITED, )(
        PLAINTIFFS,              )(
 7                               )(
   VS.                           )(
 8                               )(  MARSHALL, TEXAS
                                 )(  AUGUST 6, 2020
 9 APPLE INC.,                   )(  1:03 P.M.
        DEFENDANTS.              )(
10

11              TRANSCRIPT OF JURY TRIAL

12                 AFTERNOON SESSION

13      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14         UNITED STATES CHIEF DISTRICT JUDGE

15
   APPEARANCES:
16

17 FOR THE PLAINTIFFS:

18
   MR. SAMUEL F. BAXTER
19 MS. JENNIFER TRUELOVE
   MCKOOL SMITH, P.C.
20 104 E. Houston Street
   Suite 300
21 Marshall, TX 75670

22
   MR. JASON G. SHEASBY
23 MS. ANNITA ZHONG
   IRELL & MANELLA LLP
24 1800 Avenue of the Stars
   Suite 900
25 Los Angeles, CA 90067
```

```
 1   FOR THE PLAINTIFFS:

 2
     MR. STEVEN J. POLLINGER
 3   MR. SETH R. HASENOUR
     MCKOOL SMITH, P.C.
 4   300 W. 6th Street
     Suite 1700
 5   Austin, TX 78701

 6
     MR. JONATHAN YIM
 7   MCKOOL SMITH, P.C.
     One Manhattan West
 8   395 9th Avenue
     50th Floor
 9   New York, NY 10001

10
     MR. CHRISTOPHER P. MCNETT
11   MCKOOL SMITH, P.C.
     1999 K Street, NW
12   Suite 600
     Washington, DC 20006
13

14   MS. INGRID PETERSEN
     MS. KELSEY SCHUETZ
15   IRELL & MANELLA LLP
     840 Newport Center Drive
16   Suite 400
     Newport Beach, CA 92660
17

18   FOR THE DEFENDANT:

19
     MR. JOSEPH J. MUELLER
20   WILMER CUTLER PICKERING
     HALE & DORR, LLP
21   60 State Street
     Boston, MA 02109
22

23   MR. MICHAEL J. SUMMERSGILL
     WILMER CUTLER PICKERING
24   HALE & DORR, LLP
     60 State Street
25   Boston, MA 02109
```

1   FOR THE DEFENDANT:

2

    MS. MELISSA R. SMITH
3   GILLAM & SMITH, LLP
    303 South Washington Avenue
4   Marshall, TX 75670

5

6

7

8   COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
9                         United States District Court
                          Eastern District of Texas
10                        Marshall Division
                          100 E. Houston
11                        Marshall, Texas  75670
                          (903) 923-7464
12

13
    (Proceedings recorded by mechanical stenography, transcript
14  produced on a CAT system.)

15

16

17

18

19

20

21

22

23

24

25

```
01:03:44    1                    P R O C E E D I N G S
01:03:44    2              (Jury out.)
01:03:44    3              COURT SECURITY OFFICER:  All rise.
01:03:45    4              THE COURT:   Be seated, please.
01:07:15    5              Mr. Mueller, are you prepared to call your next
01:07:24    6    witness?
01:07:24    7              MR. MUELLER:  We are, Your Honor.
01:07:25    8              THE COURT:  All right.  Is there anything we need
01:07:27    9    to take up, counsel, before I ask the jury to return to the
01:07:29   10    courtroom?
01:07:30   11              MR. MUELLER:  Not for Apple, Your Honor.
01:07:33   12              MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.
01:07:36   13              THE COURT:  Let's bring in the jury, please,
01:07:38   14    Mr. Elliott.
01:07:43   15              COURT SECURITY OFFICER:  All rise.
01:07:59   16              (Jury in.)
01:08:00   17              THE COURT:  Welcome back from lunch, ladies and
01:08:02   18    gentlemen.  Please have a seat.
01:08:03   19              Defendant, call your next witness.
01:08:06   20              MR. MUELLER:  Thank you, Your Honor.  Apple calls
01:08:10   21    Dr. Kaushik Josiam, and Mr. Summersgill will do the
01:08:13   22    examination.
01:08:13   23              THE COURT:  All right.  If the witness will come
01:08:17   24    forward and be sworn, please.
01:08:18   25              (Witness sworn.)
```

01:08:28   1          THE COURT:  Please come around, sir, have a seat

01:08:30   2   at the witness stand.

01:08:32   3          All right.  Mr. Summersgill, you may proceed.

01:08:48   4          MR. SUMMERSGILL:  Thank you, Your Honor.

01:08:48   5          KAUSHIK JOSIAM, DEFENDANT'S WITNESS, SWORN

01:08:48   6                    DIRECT EXAMINATION

01:08:50   7   BY MR. SUMMERSGILL:

01:08:50   8   Q.  Good afternoon.  Could you please introduce yourself to

01:08:53   9   the jury and tell them a little bit about yourself?

01:08:55   10  A.  My name is Kaushik Josiam.  I'm married to my beautiful

01:09:00   11  wife, Arbi, for the past 10 years, and I have a

01:09:06   12  three-year-old son, Ari, at home.

01:09:09   13  Q.  And what is your educational background?

01:09:10   14  A.  I received my Bachelor's in electronics and

01:09:18   15  communications engineering from Bangalore University in

01:09:21   16  India.

01:09:21   17         And after I got my Master's degree, I came here to

01:09:25   18  the United States to pursue my graduate studies.  I got my

01:09:30   19  Master's and Ph.D., both in electrical engineering, from

01:09:34   20  Southern Methodist University.

01:09:35   21  Q.  And where did you live when you attended SMU?

01:09:38   22  A.  I lived in Dallas, Texas.

01:09:40   23  Q.  How long did you live in the Dallas area?

01:09:42   24  A.  I would say I lived about 13 years in Dallas area.

01:09:47   25  Q.  And where do you live now, Dr. Josiam?

01:09:50  1   A.  I live now in San Diego, California.

01:09:53  2   Q.  Where do you work, Dr. Josiam?

01:09:56  3   A.  I work at Apple.

01:09:57  4   Q.  What's your position at Apple?

01:10:00  5   A.  I am a wireless systems engineer in Apple.  What I do

01:10:05  6   is I design baseband chips that connect our devices to the

01:10:12  7   cellular network.

01:10:13  8   Q.  And what is a baseband chip?

01:10:17  9   A.  The baseband chip is a computer on the phone that

01:10:23  10  enables the phone to connect to the cellular network

01:10:29  11  wirelessly.

01:10:30  12  Q.  And what are your responsibilities as an engineer in

01:10:36  13  the group that designs these baseband chips?

01:10:37  14  A.  My responsibilities are to work with hardware designers

01:10:45  15  to design the circuitry that make up the baseband chip, and

01:10:49  16  I also work with the software engineers who write the

01:10:53  17  software that goes -- that runs on the baseband chip.

01:10:55  18  Q.  Now, what companies designed the baseband chips that

01:11:00  19  are in the Apple products at issue?

01:11:02  20  A.  Well, I -- I worked for Intel, which supplied baseband

01:11:09  21  chips that went into the Apple devices, which made those

01:11:14  22  baseband chips, and I believe Qualcomm also supplied those

01:11:19  23  chips into the Apple devices.

01:11:20  24  Q.  And what is Intel?

01:11:22  25  A.  Intel is this pioneering computer company that makes --

01:11:32   1   that has made many, many generations of these computer

01:11:35   2   chips.

01:11:38   3          Their chips -- computer processors, or chips as we

01:11:41   4   call them, go into 80 -- 85 percent of all devices, all

01:11:45   5   laptops, computers worldwide.  And they had a division that

01:11:51   6   designed baseband chips, and I worked at that division.

01:11:55   7   Q.  And were you at Intel just before your time at Apple?

01:11:58   8   A.  Yes, sir.

01:11:58   9   Q.  And what specifically did you do while you were at

01:12:02  10   Intel?

01:12:03  11   A.  My job was to design these baseband chips that --

01:12:11  12   that -- that kind of help connects the devices to the

01:12:14  13   cellular network.

01:12:15  14   Q.  Now, what is the reason that you came over from Apple

01:12:19  15   to Intel?

01:12:20  16   A.  Well, about a year ago, Intel sold their division that

01:12:25  17   makes the baseband chip to Apple, and it was at that time

01:12:31  18   that I thought it was a great opportunity for me to come to

01:12:36  19   Apple and to continue my work designing baseband chips, and

01:12:40  20   also work at a company that makes these amazing products

01:12:45  21   that people enjoy using world over.

01:12:48  22   Q.  And how many other baseband chip engineers came over

01:12:51  23   from Intel to Apple?

01:12:54  24   A.  I would say about 2,000 engineers came -- came over

01:12:59  25   from Intel to Apple.

684

01:13:00   1   Q.   And where did you work before Intel?

01:13:04   2   A.   I worked at Samsung.

01:13:08   3   Q.   And what work did you do at Samsung?

01:13:09   4   A.   I worked as a researcher in the -- in the research and

01:13:18   5   development unit in -- in Samsung.

01:13:20   6   Q.   Now, Dr. Josiam, how long have you worked, in total,

01:13:24   7   designing baseband chips?

01:13:26   8   A.   Well, even when I was working in Samsung -- even -- I

01:13:31   9   was doing research, but -- so it was related to the

01:13:35   10  baseband chip development, and to get -- that would be all

01:13:39   11  my career, working life, that would be 13 years now.

01:13:43   12  Q.   Now, you have received any patents for your work

01:13:46   13  designing baseband chips?

01:13:47   14  A.   Yes, sir.  I have lost count.  I think I would have

01:13:51   15  about a little more than 40 patents, if I'm not wrong.

01:13:55   16  Q.   Dr. Josiam, may I ask you some questions about your

01:13:59   17  work designing the Intel chips that are in the Apple

01:14:04   18  products at issue?

01:14:05   19  A.   Yes.

01:14:05   20  Q.   What Apple products contained the baseband chips, the

01:14:08   21  Intel baseband chips at issue?

01:14:11   22  A.   These are products that help the devices connect the

01:14:16   23  phone to the cellular network.  That would be the iPhone,

01:14:21   24  the iPad, and the Apple Watch.

01:14:24   25  Q.   And where are the technologies that you've designed

01:14:28   1   located within the Apple products?

01:14:31   2   A.  They would be inside -- in the -- inside the products

01:14:36   3   in the baseband chips.

01:14:38   4        MR. SUMMERSGILL:  Your Honor, may I approach the

01:14:40   5   witness?

01:14:41   6        THE COURT:  You may.

01:14:43   7   Q.  (By Mr. Summersgill)  Dr. Josiam, I've handed you

01:14:53   8   what's been marked DDX-42 and DDX-43.

01:14:58   9        And I'll start with DDX-42.  Could you tell us

01:15:04  10   what that is?

01:15:05  11   A.  This is an iPhone, iPhone 11.

01:15:11  12   Q.  And, Dr. Josiam, where in the iPhone 11 would I find

01:15:15  13   the baseband chip?

01:15:16  14   A.  This will be inside of the iPhone.

01:15:20  15   Q.  And using that iPhone, could you show the jury where

01:15:24  16   the baseband chip is?

01:15:25  17   A.  Yes, I can.  The iPhone here has the screen slightly

01:15:36  18   removed, so I'm able to remove the screen.

01:15:38  19        And once I remove the screen, I see a lot of

01:15:42  20   components.  There is -- there is a battery, and there is

01:15:44  21   this chip -- there's a first circuit board that contains

01:15:47  22   the main processor, and then, right at the bottom, if I can

01:15:52  23   get this off, I have -- I have this other circuit board,

01:15:59  24   and the baseband chip is this black rectangle here that you

01:16:03  25   see on the circuit board.

01:16:06  1  Q.  Now -- and what is DDX-43?

01:16:10  2  A.  Okay.  This is the baseband chip that was on that

01:16:20  3  circuit board.

01:16:21  4  Q.  Now, what is a cellular -- what did you mean by

01:16:25  5  cellular network?

01:16:27  6  A.  Cellular network is -- is a network that is being

01:16:35  7  deployed that allows devices to be able to communicate

01:16:39  8  wirelessly.  They don't have to be connected to a wire.  So

01:16:43  9  you can be completely wireless, you can be on the move, you

01:16:47  10  can make phone calls, send messages, do everything that you

01:16:51  11  do on a computer, except not connected to a wire.

01:16:56  12         And -- and the -- the network enables that

01:16:59  13  connection with the Internet for -- from the computer and

01:17:04  14  carries wireless phone -- wireless as well.

01:17:09  15  Q.  And what makes up the cellular -- or a cellular

01:17:12  16  network?

01:17:13  17  A.  A cellular network is -- is -- is a -- it contain --

01:17:19  18  the phone connects to something called the base station,

01:17:23  19  and after -- from the base station, everything is a wired

01:17:26  20  network that goes on the background network.  And, yeah, so

01:17:29  21  there are many such base stations around the -- around the

01:17:34  22  world, and they help connect the phones to the cellular

01:17:37  23  network.

01:17:38  24  Q.  Now, Dr. Josiam, using your monitor in front of you,

01:17:43  25  could you explain at a high level what happens when the

01:17:47   1   Apple products send and receive messages over the cellular

01:17:52   2   network?

01:17:53   3   A.  Yes, I can.

01:17:54   4        Okay.  Yeah.  So let's say I'm here in Texas today

01:18:04   5   and I want to make a phone call to my wife, and I'll open

01:18:09   6   up my device and dial her number.

01:18:12   7        When I do that, what happens is the signals from

01:18:15   8   my phone wirelessly travel over-the-air and con -- and are

01:18:24   9   transmitted to a node nearby called the base station.  This

01:18:28   10  is the cell tower that our phones connect to.

01:18:32   11       And once the signal arrives at the base station,

01:18:34   12  it is then forwarded to wires to a network, which is --

01:18:40   13  which connect -- which figures out where my wife's phone is

01:18:44   14  in California and forwards the signal to the base

01:18:52   15  station -- over wire to the base station to which it's

01:18:55   16  connected.

01:18:56   17       And once the signal gets there, it's then

01:18:58   18  transmitted wirelessly to her phone, which then rings.  And

01:19:03   19  once she picks up, this connection is established, and we

01:19:07   20  can have a conversation.

01:19:08   21       And this is at the heart of everything -- every

01:19:11   22  communication that goes on from the device to the cellular

01:19:13   23  network.

01:19:13   24  Q.  Now, how many operations do the baseband chips need to

01:19:19   25  be able to perform so that the Apple products can do what

01:19:22    1   you just demonstrated?

01:19:23    2   A.  The baseband chips perform many, many functionalities.

01:19:29    3   And to perform those functionalities, they do millions of

01:19:34    4   calculations every second.

01:19:36    5   Q.  Now, what are the specific functionalities of the Intel

01:19:40    6   baseband chips that you've worked on that are at issue in

01:19:43    7   this case?

01:19:43    8   A.  There are three -- three issues.

01:19:48    9        The first one is transmitting data and control

01:19:53   10   information over something called a PUSCH channel, the

01:20:01   11   PUSCH channel.

01:20:02   12        The second one is transmitting -- is interpreting

01:20:06   13   the fields of control information that is received at the

01:20:11   14   phone from the base station on something called the PDCCH

01:20:17   15   control channel.

01:20:17   16        And the third one is transmitting a sequence from

01:20:22   17   the phone to the base station on something called the RACH,

01:20:28   18   the random access channel.

01:20:34   19   Q.  Now, where would you look to see how those

01:20:36   20   functionalities work within the baseband chips?

01:20:38   21   A.  You would have to look at the source code, sir.

01:20:40   22   Q.  And what is source code?

01:20:42   23   A.  Source code is -- is a computer program.  It is -- it

01:20:48   24   is a set of instruction that is tells the -- that tells the

01:20:52   25   baseband chip, the computer in this case, to -- to what --

01:20:56  1  what -- what it needs to do to be able to connect -- to

01:21:00  2  able to connect and operate with a cellular network.

01:21:03  3  Q.  And where does that source code run?

01:21:06  4  A.  The source code runs on the baseband chip.

01:21:09  5  Q.  Now, Dr. Josiam, what generations of cellular

01:21:14  6  technologies do the Intel baseband chips that you've worked

01:21:17  7  on support?

01:21:18  8  A.  The -- the -- the Intel baseband chips support all

01:21:24  9  generations of cellular technologies that have been

01:21:28  10  deployed, which would mean we support GSM, which was the

01:21:32  11  first generation that carried voice, and then EDGE, all the

01:21:36  12  way up to 2G, 3G, 4G/LTE -- LTE networks.  And I'm right

01:21:45  13  now working on the 5th generation of cellular networks.

01:21:49  14  Q.  Now, does your work involve the LTE standard?

01:21:55  15  A.  Yes, sir.

01:21:56  16  Q.  And how has your work involved the LTE standard?

01:22:01  17  A.  The LTE standard has -- is -- is essentially a set of

01:22:08  18  documents -- a set of specifications that tell the phone

01:22:13  19  what to do, what it -- what it needs to do in order to

01:22:19  20  operate with the cellular network.

01:22:22  21       And in designing the -- in designing the baseband

01:22:25  22  chips, I need to know what -- what the LTE standard is.

01:22:30  23  That's how it's informed.

01:22:32  24  Q.  And what is your goal when you're designing a chip that

01:22:35  25  can operate on the LTE standard?

01:22:36  1  A.  The -- the LTE standard tells us what the baseband chip

01:22:47  2  needs to do in order to connect and operate with a

01:22:50  3  cellular -- LTE network, cellular network.  But it doesn't

01:22:53  4  tell us how we must do it.

01:22:57  5       And we -- so we don't -- we -- it -- it doesn't

01:23:02  6  tell us how we must do it, so it is up to us as baseband

01:23:09  7  engineers to be able to come up with various matters, use

01:23:15  8  our experience and -- and also -- and also -- use our

01:23:21  9  experience and also come up with our own ideas that --

01:23:24  10  that -- to ensure that our baseband chips operate in the

01:23:28  11  most efficient way with the LTE network.

01:23:31  12  Q.  Now, Dr. Josiam, who designed the Intel baseband chips

01:23:35  13  that are used in the Apple products?

01:23:39  14  A.  Well, the -- designing baseband chips is a team sport.

01:23:46  15  And, although I'm the only person present here, there are

01:23:50  16  thousands of engineers, like me, working back in designing

01:23:55  17  these chips.

01:23:55  18  Q.  And -- and what has been your role in designing and

01:23:59  19  working on the Intel baseband chips used in the Apple

01:24:02  20  products?

01:24:03  21  A.  My role has been to design -- is to -- is to -- is to

01:24:09  22  star -- design the baseband chip from the ground up, which

01:24:13  23  means I work with hardware engineers to build the circuits

01:24:18  24  that make up the baseband chip, and I also work with

01:24:22  25  software engineers that write the code -- source code that

01:24:27  1  runs the baseband chips.

01:24:28  2      So I -- I do -- I -- I basically worked with all

01:24:34  3  other engineers to get this baseband chip running.

01:24:37  4  Q.  And how many other baseband chip engineers were

01:24:40  5  involved in designing these chips, besides yourself?

01:24:44  6  A.  There are -- yeah, I mean, the -- in designing the

01:24:48  7  baseband chips, like I said, it's a team sport.  We have

01:24:53  8  thousands of engineers.  And -- and it goes from concept

01:25:01  9  to -- to testing, and literally thousands of engineers are

01:25:06  10  basically working on this --

01:25:07  11  Q.  And could you --

01:25:08  12  A.  -- to get this working.

01:25:09  13  Q.  And could you please describe the process of designing

01:25:13  14  a baseband chip?

01:25:13  15  A.  Sure, I can.  So what -- in designing a baseband chip,

01:25:21  16  the LTE standard tells us what -- what -- what the baseband

01:25:27  17  chip needs to be able to do in order to connect and operate

01:25:29  18  with the network, but it doesn't tell us how.

01:25:31  19      So -- and then we have our own set of

01:25:36  20  requirements.  Requirements are determined by -- there are

01:25:39  21  three major requirements that drive us.  We want to be able

01:25:43  22  to operate with the smallest amount of power, which means

01:25:47  23  that it enables a really long battery life for all our

01:25:52  24  customers.

01:25:52  25      The second one is we want to occupy the smallest

692

01:25:56  1   amount of area in the phone.

01:25:58  2        And the third one is we want to be able to perform

01:26:01  3   in the best possible way.  Our performance has to be the

01:26:06  4   best out in the market.

01:26:08  5        So we have these three requirements, we have the

01:26:11  6   LTE standard, and nobody tells us how to do it.  It's a

01:26:14  7   whiteboard.  And it takes engineers like me working in

01:26:18  8   teams, coming up with multiple ideas, and iterating over a

01:26:24  9   lot of ideas and spending a lot of late nights figuring out

01:26:28  10  the best possible solution, the most efficient solution

01:26:31  11  that goes into the phone.

01:26:32  12        THE COURT:  Dr. Josiam, would you slow down a

01:26:35  13  little bit, please?

01:26:37  14        THE WITNESS:  Sure.

01:26:38  15        THE COURT:  Speak slower, please, sir.

01:26:40  16        THE WITNESS:  Sure.

01:26:41  17        THE COURT:  Thank you.

01:26:41  18  Q.  (By Mr. Summersgill)  And how long does it take to

01:26:43  19  design a baseband chip?

01:26:45  20  A.  It takes three to five years from concept to a

01:26:50  21  completely operational baseband chip that goes into a

01:26:53  22  product.

01:26:54  23  Q.  Now, may I ask you some questions about the first

01:27:02  24  technology area that you told us you worked on in the Intel

01:27:06  25  chips, this process of sending signals on the PUSCH

01:27:10   1   channel?

01:27:12   2   A.   Yes, sir.

01:27:12   3   Q.   First, would you please explain to the jury what PUSCH

01:27:17   4   means?

01:27:18   5   A.   Yes.   PUSCH stands for Physical Uplink Shared Channel.

01:27:25   6   And this is the channel that the phone uses to send signals

01:27:31   7   from the phone, which is a data from the phone, to the base

01:27:35   8   station that it's connected to.

01:27:37   9   Q.   And what kinds of information are sent on the PUSCH

01:27:41   10   channel, the P-U-S-C-H channel, to the Apple products?

01:27:45   11   A.   There -- their -- primarily, PUSCH channel transmits

01:27:54   12   data from our phone.   This would be email, messages.   It

01:27:59   13   could be web browser requests that we sent from the phone

01:28:02   14   or voice calls.   But, additionally, we also send control

01:28:07   15   information from the phone to the base station.

01:28:08   16   Q.   And what is the control information that you mentioned?

01:28:13   17   A.   The control information is -- is the information that

01:28:18   18   allows the base station to send data from the base station

01:28:25   19   on the -- to the phone.   The base station needs to know how

01:28:29   20   good the channel is, what -- so -- so that it can package

01:28:36   21   data in the correct way so that the phone can receive it.

01:28:38   22          So it is these kind of information called the

01:28:43   23   control information that the phone helps the base station

01:28:45   24   to know so that it can send data from the base station to

01:28:47   25   the phone.

01:28:49  1        MR. SUMMERSGILL:  Now, I'll ask that we pull up

01:28:52  2   DTX-82.

01:28:55  3   Q.  (By Mr. Summersgill)  And, Dr. Josiam, it's also at

01:28:58  4   Tab 1 in your binder.

01:29:00  5        MR. SUMMERSGILL:  And if we could turn to Page 32.

01:29:03  6   Q.  (By Mr. Summersgill)  If you could tell me, do you

01:29:04  7   recognize this document?

01:29:07  8   A.  Yes, I do.

01:29:07  9   Q.  And what is this portion of the document?

01:29:09  10  A.  This is the LTE standard, the 3GPP document called

01:29:20  11  36.212, which, among other things, tells us what the

01:29:28  12  baseband chip needs to be able to do to send data from the

01:29:32  13  phone to the baseband -- base station --

01:29:34  14  Q.  And --

01:29:35  15  A.  -- on the PUSCH channel.

01:29:39  16  Q.  And did you help design the Intel chips to operate with

01:29:43  17  this portion of the standard?

01:29:45  18  A.  Yes, sir.

01:29:45  19  Q.  And what did you do?

01:29:46  20  A.  Well, I -- we -- well, we have the standard, and we --

01:29:52  21  we have to send these SC-FDMA symbols from the phone that

01:30:01  22  make up the P-U-S-C-H, PUSCH, channel from the phone to the

01:30:05  23  base station, and we figure out how to send it in the most

01:30:09  24  efficient way possible.

01:30:11  25  Q.  And, first, what is this SC-FDMA symbol?

01:30:17   1    A.  The SC-FDMA symbol is a unit of the PUSCH -- PUSCH

01:30:23   2    channel.  The PUSCH channel is made up of multiple such

01:30:28   3    SC-FDMA symbols, and each SC-FDMA symbol contains data and

01:30:35   4    control -- and/or control information.

01:30:36   5    Q.  And how do the Intel baseband chips that you've worked

01:30:41   6    on and that are now in the Apple products create and send

01:30:46   7    these SC-FDMA symbols over the PUSCH channel?

01:30:50   8    A.  We created one symbol at a time, that is, we take --

01:30:58   9    we -- we -- we -- we map the bits to the SC-FDMA

01:31:08   10   symbol and stream it out.  And we do that for all -- all --

01:31:12   11   for all the bits that symbol and stream them all out before

01:31:17   12   moving to the next SC-FDMA symbol.

01:31:20   13        So in an Intel -- in the baseband chip, we -- we

01:31:24   14   don't have more than one SC-FDMA symbol at any time.  So we

01:31:31   15   just have that one SC-FDMA symbol.  We put all the bits

01:31:35   16   that we need for that SC-FDMA symbol into -- and transmit

01:31:40   17   it out before we move to the next SC-FDMA symbol.

01:31:46   18        MR. SUMMERSGILL:  Your Honor, may the witness

01:31:48   19   approach the flip chart and -- and --

01:31:50   20        THE COURT:  If you'll position it as we discussed

01:31:52   21   earlier.

01:31:53   22        MR. SUMMERSGILL:  Yes, Your Honor.

01:31:56   23        THE COURT:  And he'll need to put a mask on.

01:32:17   24        If you'll come around, sir, and stand on this side

01:32:21   25   of the chart.

01:32:22   1        Mr. Summersgill, you're welcome to go to the other
01:32:25   2   side of the chart and examine him there if you'll speak up.
01:32:31   3        MR. SUMMERSGILL:  Thank you, Your Honor.
01:32:32   4        THE COURT:  And Mr. Sheasby, opposing counsel can
01:32:33   5   position themselves where they can see.
01:32:35   6        MR. SHEASBY:  Thank you, Your Honor.
01:32:37   7   Q.  (By Mr. Summersgill)  Now, Dr. Josiam, using the flip
01:32:41   8   chart, can you please explain how the Intel baseband chips
01:32:44   9   create and send these SC-FDMA symbols?
01:32:48  10   A.  Yes, I can.
01:32:54  11        So -- so we -- let's -- we have an SC-FDMA symbol.
01:33:02  12   So I'm drawing a rectangle that is -- that describes an
01:33:06  13   SC-FDMA symbol.  And we have to place data into the SC-FDMA
01:33:11  14   symbol and transmit it out.
01:33:13  15        So the way the -- the Intel baseband chips do it
01:33:21  16   when -- when they send -- when they assemble the SC-FDMA
01:33:26  17   symbol is that they read these information bits, data and
01:33:32  18   control information bits, and they -- they fill up the
01:33:37  19   SC-FDMA symbol and stream it out.
01:33:41  20        So the filling of the SC-FDMA symbol is happening
01:33:48  21   almost at the same time that we are streaming out the
01:33:50  22   SC-FDMA symbol.
01:33:52  23        So we do this for one SC-FDMA symbol, and then
01:33:58  24   once it's done and it's -- it's over, we go to the next
01:34:03  25   SC-FDMA symbol where we then fill up the data for the

01:34:12   1    SC-FDMA symbol and then stream out the data.

01:34:16   2            So -- so there is -- there is data and control

01:34:22   3    information that is being filled in the SC-FDMA symbol and

01:34:26   4    read out as it's being filled in.

01:34:29   5            So there is no storage of the information at any

01:34:32   6    time into the -- in the -- in the baseband chips that make

01:34:37   7    up the Apple phones from Intel.

01:34:41   8    Q.  And, Dr. Josiam, just one further question.  What --

01:34:46   9    what -- well, looking at the column on the left, what --

01:34:50   10   what do the Intel baseband chips do after you've completed

01:34:54   11   mapping that one column?

01:34:56   12           MR. SHEASBY:  Your Honor, I object to the use of

01:34:59   13   the word "mapping."  He's not an expert.  It's claim

01:35:02   14   language.  It's clearly improper.

01:35:03   15           MR. SUMMERSGILL:  I'm happy to use a different

01:35:05   16   word.

01:35:05   17           THE COURT:  Rephrase the question.  I'll sustain

01:35:08   18   the objection.

01:35:08   19           MR. SUMMERSGILL:  Thank you, Your Honor.

01:35:09   20   Q.  (By Mr. Summersgill)  Dr. Josiam, what happens after

01:35:11   21   you have completed putting all the data into that one

01:35:14   22   column on the left?

01:35:15   23   A.  We -- like I said, we -- we start filling up the data

01:35:21   24   for the SC-FDMA symbol, and we don't wait until we complete

01:35:25   25   putting up -- complete the -- all the bits for that SC-FDMA

01:35:31   1   symbol.  We send it out as soon as we put the -- put the

01:35:34   2   bits.  We know what -- I mean, we calculate the information

01:35:37   3   that needs to go in there.  We --

01:35:38   4          THE COURT:  Slow down, Dr. Josiam.  I'm trying to

01:35:41   5   listen to you from behind with a microphone through a mask

01:35:46   6   and an accent.  So you need to slow down.  That's the only

01:35:49   7   way I'm going to understand what you're saying.  Okay?

01:35:52   8          THE WITNESS:  Sure, sir.

01:35:54   9          THE COURT:  Thank you.

01:35:55   10          THE WITNESS:  Sure, Your Honor.

01:35:56   11   A.  Okay.  Let me start that again.

01:35:59   12          So -- yeah, so there are data and information bits

01:36:01   13   that go into the SC-FDMA symbol.  We do not wait until we

01:36:06   14   fill up all the data bits into the SC-FDMA symbol before we

01:36:12   15   send them out.

01:36:13   16          We have -- we have a logic that reads the bits,

01:36:20   17   and streams them out as they are being read.  So we

01:36:25   18   don't -- so once all the bits for that SC-FDMA symbol are

01:36:31   19   streamed out, we move to the next symbol and -- and then we

01:36:36   20   do it all over again.  And like this, we keep doing it

01:36:42   21   until we have sent all the SC-FDMA symbols that make up the

01:36:49   22   PUSCH channel that we are talking about.

01:36:52   23   Q.  (By Mr. Summersgill)  Dr. Josiam, you may resume your

01:36:54   24   seat.

01:37:08   25          Now, Dr. Josiam, why do the Intel chips create and

01:37:13  1  send the SC-FDMA symbols in the way you've described?

01:37:18  2  A.  The reason we do that is it's just efficient and fast

01:37:25  3  because we don't need to wait for anything.  If we have the

01:37:29  4  SC-FDMA symbol -- the bits ready for that SC-FDMA symbol,

01:37:32  5  we just send it.  So it's both efficient and fast.

01:37:37  6          MR. SUMMERSGILL:  And, Your Honor, may I seal

01:37:39  7  the -- may we seal the courtroom?

01:37:40  8          THE COURT:  All right.  At counsel's request, it

01:37:43  9  appears we're about to cover confidential or proprietary

01:37:47 10  information.  So, as I say, at counsel's request, I'll

01:37:53 11  order the courtroom sealed.

01:37:54 12          Those present not subject to the protective order

01:37:56 13  in this case or aligned with Defendant, Apple, should

01:38:00 14  excuse themselves until the courtroom is unsealed and

01:38:03 15  reopened.

01:38:04 16          (Courtroom sealed.)

01:38:04 17          (This portion of the transcript is sealed

01:38:04 18          and filed under separate cover as

02:46:53 19          Sealed Portion No. 12.)

02:46:53 20          (Courtroom unsealed.)

02:46:56 21          THE COURT:  Ladies and gentlemen, we're going to

02:46:57 22  take a short recess.  If you will leave your notebooks in

02:47:00 23  your chairs.  Don't discuss the case or anything about this

02:47:03 24  trial with each other.  Follow all my instructions, and

02:47:06 25  we'll have you back in here shortly to continue with the

| | | |
|---|---|---|
| 02:47:09 | 1 | next witness. |
| 02:47:10 | 2 | The jury is excused for recess at this time. |
| 02:47:15 | 3 | (Jury out.) |
| 02:47:32 | 4 | THE COURT:  Counsel, during the recess, you need |
| 02:47:34 | 5 | to move that easel and turn it to a clean sheet. |
| 02:47:37 | 6 | Otherwise, we stand in recess. |
| 02:47:39 | 7 | (Recess.) |
| 02:48:45 | 8 | (Jury out.) |
| 02:48:45 | 9 | COURT SECURITY OFFICER:  All rise. |
| 02:48:48 | 10 | THE COURT:  Be seated, please. |
| 03:04:15 | 11 | Defendant, are you prepared to call your next |
| 03:04:36 | 12 | witness? |
| 03:04:36 | 13 | MR. MUELLER:  We are, Your Honor.  I would just |
| 03:04:38 | 14 | like to raise three things very, very briefly. |
| 03:04:41 | 15 | First, may Dr. Josiam be released? |
| 03:04:44 | 16 | THE COURT:  Any objection? |
| 03:04:45 | 17 | MR. SHEASBY:  No objection from Plaintiffs, |
| 03:04:47 | 18 | Your Honor. |
| 03:04:47 | 19 | THE COURT:  Dr. Josiam is released. |
| 03:04:49 | 20 | MR. MUELLER:  Second, Your Honor, Dr. Buehrer is |
| 03:04:51 | 21 | going to take the stand next.  For both Dr. Buehrer and |
| 03:04:55 | 22 | Dr. Wells, if they were to use the placard as Dr. Josiam |
| 03:04:58 | 23 | did, would it be permissible for them to use a face shield |
| 03:05:03 | 24 | rather than a mask?  Whatever Your Honor's preference is, |
| 03:05:04 | 25 | we'll do. |

| | | |
|---|---|---|
| 03:05:04 | 1 | THE COURT:  Is there a reason for that? |
| 03:05:05 | 2 | MR. MUELLER:  Just so the jury can see their faces |
| 03:05:08 | 3 | while they're trying to teach these points, Your Honor. |
| 03:05:10 | 4 | THE COURT:  My main concern is the comfort level |
| 03:05:14 | 5 | of the jury.  I think the shield will be equal to the mask. |
| 03:05:17 | 6 | MR. MUELLER:  Okay. |
| 03:05:18 | 7 | THE COURT:  They don't need to be uncovered in any |
| 03:05:20 | 8 | fashion, though. |
| 03:05:21 | 9 | MR. MUELLER:  Okay.  The mask is sufficient? |
| 03:05:23 | 10 | THE COURT:  The mask is sufficient. |
| 03:05:24 | 11 | MR. MUELLER:  And then the last thing, Your Honor, |
| 03:05:26 | 12 | I would ask that some of the speaking objections be |
| 03:05:29 | 13 | shortened.  We're being accused of quite a number of things |
| 03:05:32 | 14 | at length and we don't have an opportunity to respond. |
| 03:05:35 | 15 | We don't believe these charges are correct, but |
| 03:05:35 | 16 | the jury is hearing things like, we are, quote, laundering |
| 03:05:44 | 17 | things through objections.  The objections have gotten |
| 03:05:47 | 18 | really long, and we'd ask that they be shortened. |
| 03:05:48 | 19 | THE COURT:  I work very hard not to tell lawyers |
| 03:05:48 | 20 | how to try lawsuits and I'm not going to tell Plaintiff how |
| 03:05:48 | 21 | to make their objections. |
| 03:05:53 | 22 | Once they're made, I will certainly rule on them |
| 03:05:56 | 23 | in the same regard to yours.  But if it reaches a point |
| 03:06:02 | 24 | that I think anybody on either side is making a speech to |
| 03:06:05 | 25 | the jury in the guise of an objection, I'll take |

03:06:08   1   appropriate action.  I don't think we've reached that

03:06:10   2   point.

03:06:11   3           MR. MUELLER:  Thank you, Your Honor.

03:06:11   4           THE COURT:  All right.  Let's bring in the jury,

03:06:15   5   please.

03:06:15   6           COURT SECURITY OFFICER:  All rise.

03:06:17   7           (Jury in.)

03:06:17   8           THE COURT:  Please be seated.

03:06:45   9           Defendant, call your next witness.

03:06:48   10          MR. MUELLER:  Your Honor, we call Dr. Michael

03:06:55   11  Buehrer to the stand, please.

03:06:56   12          THE COURT:  All right.  Dr. Buehrer, if you'll

03:06:59   13  come forward and be sworn.

03:07:13   14          (Witness sworn.)

03:07:14   15          THE COURT:  Please come around, sir, have a seat

03:07:16   16  at the witness stand.

03:07:17   17          All right.  Counsel, you may proceed.

03:07:28   18          MR. MUELLER:  Thank you, Your Honor.

03:07:28   19          MIKE BUEHRER, DEFENDANT'S WITNESS, SWORN

03:07:28   20                  DIRECT EXAMINATION

03:07:28   21  BY MR. MUELLER:

03:07:28   22  Q.  Good afternoon, Dr. Buehrer.  Could you please

03:07:31   23  introduce yourself to the ladies and gentlemen of the jury?

03:07:33   24  A.  Sure.  Hi.  My name is Mike Buehrer, and I'm here to

03:07:36   25  talk to you about the '284 patent.

| | | |
|---|---|---|
| 03:07:37 | 1 | Q.  And, sir, could we start by you telling us a little bit |
| 03:07:44 | 2 | about yourself and your background? |
| 03:07:46 | 3 | A.  Sure.  I've been married for about 25 years.  I live in |
| 03:07:49 | 4 | a small town outside -- well, actually, I live just outside |
| 03:07:52 | 5 | a small town in southern Virginia with my wife, and we have |
| 03:07:56 | 6 | six children. |
| 03:07:57 | 7 | And I've lived there for about 20 years where I |
| 03:08:02 | 8 | teach electrical and computer engineering at Virginia Tech. |
| 03:08:04 | 9 | And in my spare time, when I have a little spare |
| 03:08:07 | 10 | time between teaching and doing expert work, I enjoy |
| 03:08:11 | 11 | coaching soccer, which I've also been doing for about 20 |
| 03:08:14 | 12 | years, and teaching -- or leading a youth group with my |
| 03:08:20 | 13 | wife. |
| 03:08:20 | 14 | THE COURT:  Dr. Buehrer, would you slow down, |
| 03:08:24 | 15 | please? |
| 03:08:24 | 16 | THE WITNESS:  Yes, sir. |
| 03:08:24 | 17 | THE COURT:  Talk more slowly? |
| 03:08:24 | 18 | THE WITNESS:  Yes, sir. |
| 03:08:24 | 19 | THE COURT:  Thank you.  Let's continue. |
| 03:08:25 | 20 | MR. MUELLER:  Thank you, Your Honor. |
| 03:08:26 | 21 | Q.  (By Mr. Mueller)  Dr. Buehrer, what is your position at |
| 03:08:32 | 22 | Virginia Tech? |
| 03:08:33 | 23 | A.  I'm a professor of electrical and computer engineering. |
| 03:08:37 | 24 | Q.  And for how long you have worked at Virginia Tech? |
| 03:08:41 | 25 | A.  This will be my 30th year. |

| | | |
|---|---|---|
| 03:08:44 | 1 | Q.  Sir, can you describe your educational background |
| 03:08:47 | 2 | beginning with college? |
| 03:08:49 | 3 | A.  Sure.  I received my Bachelor of Science in electrical |
| 03:08:54 | 4 | engineering from the University of Toledo in 1991.  I |
| 03:08:59 | 5 | attended the University of Toledo after my father had left |
| 03:09:00 | 6 | his sales position to teach at a local community college |
| 03:09:05 | 7 | that allowed me and my four siblings to go to college for |
| 03:09:09 | 8 | free. |
| 03:09:09 | 9 | So I graduated in 1991. |
| 03:09:11 | 10 | I then proceeded to get my Master of -- Master of |
| 03:09:16 | 11 | Science in electrical engineering in 1993 with an emphasis |
| 03:09:21 | 12 | on communication systems. |
| 03:09:23 | 13 | And then in 1996, I received a Ph.D. with an |
| 03:09:29 | 14 | emphasis also in communications systems with a focus on |
| 03:09:34 | 15 | signal processing applied to wireless systems. |
| 03:09:37 | 16 | Q.  And, sir, where did you receive your Ph.D. from? |
| 03:09:39 | 17 | A.  From Virginia Tech. |
| 03:09:42 | 18 | Q.  What did you do after you earned your Ph.D.? |
| 03:09:46 | 19 | A.  After my Ph.D., I took a position with Bell |
| 03:09:52 | 20 | Laboratories in Murray Hill, New Jersey. |
| 03:09:54 | 21 | Q.  What is Bell Laboratories? |
| 03:09:57 | 22 | A.  Bell Laboratories is a research group that does |
| 03:10:00 | 23 | research in communication systems.  It was founded in the |
| 03:10:05 | 24 | 1920s by Alexander Graham Bell to perform research |
| 03:10:12 | 25 | predominantly for communications, but actually they did a |

03:10:15  1   lot of fundamental work there, as well.

03:10:18  2          For example, they invented the laser at Bell Labs.

03:10:21  3   They invented the transistor, which is the dominant

03:10:24  4   component in all computers.  They also invented the

03:10:28  5   cellular concept, as well as communication theory and many

03:10:33  6   other -- other things.

03:10:34  7   Q.  And what did you personally do in your time at Bell

03:10:39  8   Labs?

03:10:39  9   A.  When I was at Bell Labs, my position entailed

03:10:44  10  performing research into advance signal processing

03:10:46  11  techniques that are applied to cellular communications.

03:10:50  12  Q.  And for how long were you there?

03:10:52  13  A.  I was for five years.

03:10:54  14  Q.  What did you do after leaving Bell Labs?

03:10:57  15  A.  After I left Bell Labs, I took a position back at

03:11:06  16  Virginia Tech to teach in electrical and computer

03:11:09  17  engineering.

03:11:10  18  Q.  And why did you decide to join Virginia Tech?

03:11:13  19  A.  Well, I had -- my wife and I had lived in that area

03:11:17  20  previously.  I had always wanted to teach at some point in

03:11:20  21  my career.  I just didn't know when.  And my old advisor

03:11:25  22  had called me up and said, hey, there's a position opening.

03:11:29  23  Would you be interested in applying?  So I decided to

03:11:33  24  apply, and I was blessed to be hired.

03:11:35  25  Q.  And you've been there ever since?

| | | |
|---|---|---|
| 03:11:37 | 1 | A.  Yes, I have. |
| 03:11:37 | 2 | Q.  Now, sir, what do you do day-to-day at Virginia Tech in |
| 03:11:42 | 3 | terms of your responsibilities? |
| 03:11:44 | 4 | A.  My primary responsibilities are teaching and research. |
| 03:11:48 | 5 | Q.  What types of classes do you teach? |
| 03:11:50 | 6 | A.  I teach classes from freshman up through graduate |
| 03:11:55 | 7 | students, but more specifically I teach courses in signals |
| 03:12:02 | 8 | and systems for sophomores, introduction to communications |
| 03:12:06 | 9 | for juniors, and advanced communications systems for |
| 03:12:09 | 10 | seniors, as well as multiple communications courses for |
| 03:12:14 | 11 | graduate students, including classes that cover many of the |
| 03:12:17 | 12 | technologies that are used in modern cellular systems. |
| 03:12:20 | 13 | Q.  What type of research do you do? |
| 03:12:21 | 14 | A.  My research focuses predominantly on wireless |
| 03:12:28 | 15 | communication systems, but also some of it involves |
| 03:12:32 | 16 | geolocation systems and radar systems. |
| 03:12:34 | 17 | Q.  Do any organizations fund any of your research? |
| 03:12:37 | 18 | A.  Yes, they do.  The National Science Foundation funds my |
| 03:12:41 | 19 | research.  The Defense Advanced Research Projects Agency, |
| 03:12:46 | 20 | which is the research arm of the Department of Defense, |
| 03:12:49 | 21 | funds my research, as does the Army Research Lab and the |
| 03:12:53 | 22 | Office of Naval Research, as well as some commercial |
| 03:12:57 | 23 | companies. |
| 03:12:58 | 24 | Q.  Have you published any papers in the field of wireless |
| 03:13:06 | 25 | communications? |

03:13:06  1   A.  Yes, I have.  I've published approximately 250 to 300

03:13:13  2   papers in the leading journals and conferences in my field.

03:13:16  3   Q.  Have you worked on any real-world cellular systems?

03:13:19  4   A.  Yes, I have.

03:13:20  5   Q.  Could you give us an example?

03:13:21  6   A.  Yes.  When I was at Bell Labs, my colleagues and I came

03:13:26  7   up with a -- a technology that we felt could be put into

03:13:34  8   the current -- the cellular standard at that time.  So we

03:13:37  9   participated in 3GPP2 standards meetings and were able to

03:13:42  10  get that idea into the standard.

03:13:45  11  Q.  And which standard are you referring to, sir?

03:13:49  12  A.  That's the 3GPP2 -- that was the 3G standard at the

03:13:52  13  time in North America.

03:13:53  14  Q.  Have you received any patents on cellular technology?

03:13:56  15  A.  Yes, I have.

03:13:57  16  Q.  And about how many patents do you have?

03:13:59  17  A.  I believe it is currently 17 patents.

03:14:02  18  Q.  Have you won any awards for your work in wireless

03:14:05  19  technologies?

03:14:06  20  A.  Yes.  I've won awards from the university.  I've won

03:14:14  21  best paper awards at conferences.  And I was also named an

03:14:20  22  IEEE fellow.  The IEEE is the dominant professional

03:14:23  23  organization in my field, and the grade of --

03:14:23  24  Q.  But what does that stand for, IEEE?

03:14:26  25  A.  I'm sorry, yes.  IEEE stands for the Institute of

03:14:31  1  Electrical and Electronics Engineers, and that is the

03:14:32  2  dominant professional organization in my field.

03:14:35  3  Q.  And I believe you had said you were named a fellow of

03:14:37  4  the IEEE.  What does that mean?

03:14:39  5  A.  That's correct.  I was named a fellow.  The grade of

03:14:46  6  fellow is reserved for less than one-tenth of 1 percent of

03:14:50  7  the overall membership in the IEEE that have made

03:14:55  8  outstanding contributions in the field.

03:14:57  9          MR. MUELLER:  Your Honor, at this point, we offer

03:14:59 10  Dr. Buehrer as an expert in wireless communication systems.

03:15:02 11          THE COURT:  Is there objection?

03:15:03 12          MR. SHEASBY:  No objection, Your Honor.

03:15:05 13          THE COURT:  All right.  Without objection, the

03:15:06 14  Court will recognize this witness as an expert in the

03:15:09 15  designated fields.

03:15:09 16          Please continue.

03:15:11 17          MR. MUELLER:  Thank you, Your Honor.

03:15:12 18  Q.  (By Mr. Mueller)  Dr. Buehrer, what have you been asked

03:15:14 19  to do in this case?

03:15:15 20  A.  So I've been asked to do two things.

03:15:18 21          First, I was asked to look at the asserted claims

03:15:22 22  of the '284 patent and to determine whether the Apple

03:15:26 23  products infringe those claims.

03:15:29 24          Secondly, I was asked to look at the '284 patent

03:15:32 25  and determine whether or not it was valid.

```
03:15:35   1   Q.  Now, sir, what did you do, at a high level, to perform
03:15:40   2   that assignment?
03:15:40   3   A.  To do infringement -- to do the infringement analysis,
03:15:49   4   I -- at a high level, I looked at the patent and
03:15:52   5   particularly the claims of the patent, and compared them
03:15:55   6   to -- first I compared them to LTE, but then more
03:15:59   7   importantly, I compared them to the Apple products.
03:16:01   8   Q.  And what did you do to evaluate invalidity?
03:16:05   9   A.  I looked at the patents -- I looked at the patent and
03:16:11  10   also looked at the prior art.
03:16:14  11   Q.  Now, for your work on this case, are you being
03:16:16  12   compensated at your normal hourly rate for consulting?
03:16:20  13   A.  Yes, I am.
03:16:21  14   Q.  And what is that rate?
03:16:22  15   A.  $450 per hour.
03:16:24  16   Q.  Now, sir, you have been retained by Apple in other
03:16:27  17   projects in the past?
03:16:28  18   A.  Yes, I have.
03:16:29  19   Q.  Is either the money you're being paid for your work on
03:16:34  20   this case or your prior work for Apple -- does that in any
03:16:38  21   way affect your opinions in this case?
03:16:39  22   A.  No, it does not.
03:16:40  23   Q.  Does whether Apple prevails in this case or not affect
03:16:45  24   your compensation in any way whatsoever?
03:16:47  25   A.  No, it does not.
```

03:16:48   1   Q.  Are your opinions independent and your own?

03:16:51   2   A.  Yes, they are.

03:16:52   3   Q.  And what is your conclusion as to whether the Apple

03:16:55   4   products in this case infringe the '284 patent?

03:16:58   5   A.  It's my opinion that the Apple products do not infringe

03:17:04   6   the asserted claims of the '284 patent.

03:17:06   7   Q.  And may we walk through your analysis, sir?

03:17:10   8   A.  Yes, we can.

03:17:11   9   Q.  Now, to begin, when was the first time you heard of the

03:17:14  10   '284 patent?

03:17:14  11   A.  I believe the first time I heard of the '284 patent was

03:17:19  12   when I became involved in this -- in this case.

03:17:22  13          MR. MUELLER:  And if we could please put up

03:17:26  14   DDX-7.04.

03:17:27  15   Q.  (By Mr. Mueller)  What is this, sir?

03:17:28  16   A.  So on the left, that is the front page of the '284

03:17:36  17   patent.  And on the right, we have some excerpts from that

03:17:38  18   page.

03:17:39  19   Q.  And at a high level, sir, what is the subject matter of

03:17:42  20   the '284 patent?

03:17:43  21   A.  The subject matter of the '284 patent is control

03:17:48  22   signaling in a communication system.

03:17:49  23   Q.  What is control signaling?

03:17:52  24   A.  So control signaling is the information that is sent

03:17:57  25   either from the base station to the mobile -- to the phone

03:18:02  1   or from the phone to the base station that helps the other

03:18:06  2   side understand how the data is going to be formatted.

03:18:09  3          MR. MUELLER:  Your Honor, may I approach --

03:18:11  4   Q.  (By Mr. Mueller)  Sorry --

03:18:12  5   A.  I was just going to say there are many ways that the

03:18:15  6   user data can be formatted when it's sent, and so the

03:18:21  7   receiver has to know how it was sent in that particular

03:18:24  8   case.

03:18:24  9          MR. MUELLER:  Your Honor, may I approach the

03:18:25  10  blackboard?

03:18:26  11         THE COURT:  You may use the easel, counsel.

03:18:29  12         MR. MUELLER:  Use the easel.  Thank you.

03:18:32  13  Q.  (By Mr. Mueller)  So Dr. Buehrer, if we have a phone

03:18:34  14  over here and a base station antenna over here, those can

03:18:37  15  communicate with each other.  Do I have that right?

03:18:39  16  A.  Yes, sir.

03:18:39  17  Q.  And you're saying part of what they communicate with

03:18:42  18  each other is control information?

03:18:44  19  A.  That is correct.

03:18:57  20         MR. MUELLER:  Let's put up DDX-7.5 if we could,

03:19:01  21  please.

03:19:01  22  Q.  (By Mr. Mueller)  And what do we see here, Dr. Buehrer?

03:19:04  23  A.  So here we see an example of using control information.

03:19:07  24  So on the left is a base station, and that base station is

03:19:11  25  sending control information to the phone.  The phone then

03:19:17  1  reads that control information and understands how to

03:19:20  2  format the data so that it can be transmitted from the

03:19:24  3  phone to the base station.

03:19:25  4  Q.  What are some examples of control parameters?

03:19:31  5  A.  There are many, many control parameters, but two -- two

03:19:35  6  examples that are important to our case here are the

03:19:38  7  transport format and the redundancy version.

03:19:42  8  Q.  What is the transport format?

03:19:46  9  A.  Well, the transport format can correspond to many

03:19:49  10  different parameter -- or a few different parameters, but

03:19:52  11  they all have to do with how the data is formatted.

03:19:56  12       One important version of the transport format is

03:19:59  13  the transport block size.

03:20:01  14       MR. MUELLER:  So if we could go to DDX-7.6.

03:20:05  15  Q.  (By Mr. Mueller)  And you understand that His Honor has

03:20:08  16  interpreted some of the words of the patents in this case,

03:20:11  17  Dr. Buehrer?

03:20:12  18  A.  Yes, sir.

03:20:13  19  Q.  And, of course, we need to follow what His Honor has

03:20:16  20  given us precisely, right, sir?

03:20:18  21  A.  That is correct.

03:20:19  22  Q.  And have you done that?

03:20:20  23  A.  Yes, sir, I have.

03:20:21  24  Q.  So what do we see here on the screen?

03:20:24  25  A.  This is the definition of "transport format" that I

03:20:28  1    followed in my analysis.

03:20:29  2    Q.  And what is that definition?

03:20:31  3    A.  As we can see, transport format -- transport format

03:20:36  4    means either transport format, transport block size,

03:20:40  5    payload size, or modulation and coding scheme.

03:20:45  6          MR. MUELLER:  If we could go to DDX-7.7, please.

03:20:50  7    Q.  (By Mr. Mueller)  And, Dr. Buehrer, what do we see

03:20:52  8    here?

03:20:52  9    A.  So here we see an example of the use of transport block

03:20:56  10   size.

03:21:00  11         So the base station sends an instruction to the

03:21:02  12   phone that says use the transport block size of 100.  The

03:21:07  13   phone then, when it sends its data back to the base

03:21:10  14   station, it -- it only will send 100 bits at a time or 100

03:21:15  15   pieces of information.

03:21:19  16   Q.  Now, is transport block size sometimes called the

03:21:22  17   payload size?

03:21:23  18   A.  Yes, it is.

03:21:23  19   Q.  And why is that?

03:21:25  20   A.  Because that corresponds to the payload in the

03:21:27  21   transmission, the -- the information that we care about.

03:21:31  22         MR. MUELLER:  So if we go to DDX-7.8.

03:21:35  23   Q.  (By Mr. Mueller)  Dr. Buehrer, what do we see here with

03:21:37  24   respect to redundancy version?

03:21:40  25   A.  So, again, we see an example of the -- of the use of

03:21:46  1   redundancy version.  So what's happening is the base

03:21:49  2   station is sending a message -- a control message to the

03:21:52  3   phone saying use Redundancy Version 0.  The phone then

03:21:57  4   responds by formatting the data by using Redundancy

03:22:01  5   Version 0.

03:22:02  6   Q.  What is redundancy in this context?  What does it mean?

03:22:07  7   A.  So redundancy is extra information that is added to

03:22:12  8   the -- the regular user information in order to protect

03:22:16  9   against errors or to try to make errors less likely.

03:22:19  10  Q.  And -- and -- why is that necessary in this context?

03:22:23  11  A.  Because when we -- when the phone or the base station

03:22:26  12  transmits information to the receiver, there are -- there

03:22:31  13  is interference from other signals.  There might be -- the

03:22:34  14  signal might run into a building, many things can happen,

03:22:40  15  and that will cause the signal to degrade or deteriorate so

03:22:44  16  that at the receiver, we can no longer understand -- the

03:22:47  17  receiver can no longer understand what was sent.

03:22:51  18      MR. MUELLER:  So let's go to DDX-7.91, the one

03:22:56  19  before this one.

03:22:57  20  Q.  (By Mr. Mueller)  And tell us what we see here,

03:22:58  21  Dr. Buehrer.

03:22:59  22  A.  So this is an example of errors.  So, let's say I pick

03:23:03  23  up the phone to call my mom.  I say, hello.  Well, the

03:23:06  24  phone is going to take the word "hello" and it's going to

03:23:06  25  convert it into 1s and 0s and send that up to the base

03:23:10   1   station.

03:23:11   2         Well, along the way, because of interference or

03:23:15   3   other problems, what actually gets received is junk, and

03:23:19   4   it's -- there are errors.  And so the base station --

03:23:22   5   there's a way for the base station to know that it's wrong,

03:23:24   6   and it will say, okay, something went wrong.  I didn't get

03:23:27   7   this right.

03:23:29   8         MR. MUELLER:  So, Your Honor, may I approach the

03:23:31   9   easel?

03:23:31  10         THE COURT:  You may.

03:23:32  11   Q.  (By Mr. Mueller)  So if this phone is sending a signal

03:23:35  12   over-the-air, and there's an actual lightning strike, as an

03:23:39  13   example, what could happen?

03:23:40  14   A.  Well, that could cause electromagnetic interference,

03:23:44  15   which would cause errors to be received at the base

03:23:47  16   station.

03:23:47  17   Q.  And what are some other sources of interference in --

03:23:50  18   in real life?

03:23:51  19   A.  Well, signals from other mobile phones and other net

03:23:56  20   cells could be interference.  It could be -- there could be

03:24:02  21   various signals that are transmitted from various devices

03:24:05  22   that could cause interference in the same frequency band

03:24:08  23   that the cell phone is using.

03:24:11  24         MR. MUELLER:  So if we go to DDX-7.10.

03:24:15  25   Q.  (By Mr. Mueller)  Tell us, Dr. Buehrer, how does

03:24:17   1   redundancy help here?

03:24:19   2   A.   Okay.   So, what happens is, again, what the phone is

03:24:23   3   doing is it's trying to send the same information multiple

03:24:26   4   times so that if there are some errors, it knows how to fix

03:24:29   5   it.

03:24:29   6          So, for example, one way that it could do this is

03:24:32   7   when I say hello, what it actually sends is hello, hello,

03:24:37   8   hello, so it's sending "hello" three times.   But the base

03:24:41   9   station understands that whatever it's sending, it's

03:24:43   10   sending it three times in a row so that it knows how to

03:24:46   11   properly decode that.

03:24:48   12          MR. MUELLER:   If you go to 7 -- DDX-7.11.

03:24:52   13   Q.   (By Mr. Mueller)   Could you please explain what we see

03:24:54   14   here?

03:24:54   15   A.   Sure.   Even when we use the redundancy, it might not

03:24:57   16   work.   So here we see, we sent the "hello" three times, but

03:25:00   17   there was enough interference that what came through still

03:25:04   18   doesn't look like "hello," so the base station still makes

03:25:07   19   a mistake.   But, again, it knows that a mistake has been

03:25:10   20   made, and so it will ask for another transmission.

03:25:14   21          MR. MUELLER:   If we go to DDX-7.12.

03:25:17   22   Q.   (By Mr. Mueller)   What do we see here?

03:25:19   23   A.   So, as I said earlier, there are different ways that

03:25:23   24   the base station can add redundancy.   In fact, there are

03:25:26   25   four different ways that are used in LTE.   So here is a --

03:25:31  1   an example of perhaps what you might do.

03:25:34  2         Instead of sending the word "hello" three times in

03:25:36  3   a row, we send each letter three times in a row.  Again,

03:25:40  4   it's still being repeated, but it's being repeated in a

03:25:44  5   slightly different way.  And, again, the base station has

03:25:46  6   to know that's the way the redundancy was added.

03:25:49  7         MR. MUELLER:  Let's please go to DDX-7.13.

03:25:52  8   Q.  (By Mr. Mueller)  And the term RV, we've seen that a

03:25:59  9   few times over the course of this trial.  What is that

03:26:02  10  referring to?

03:26:02  11  A.  RV means redundancy version.  So what it corresponds to

03:26:06  12  is it tells the phone which way of adding that redundancy

03:26:10  13  should you use during the next transmission.

03:26:14  14        So, for example, in this slide, the base station

03:26:19  15  first tells the phone, use Redundancy Version 0.  It does

03:26:23  16  that.  But let's say there's a lot of interference, and so

03:26:28  17  it doesn't come through.

03:26:29  18        And so then the base station will send another

03:26:31  19  signal to the -- to the phone and say, okay, this time use

03:26:35  20  Redundancy Version 1.  And so then it does that, it uses

03:26:39  21  Redundancy Version 1, and let's say in this example it gets

03:26:41  22  through on the second try.

03:26:43  23  Q.  So Redundancy Version 0 is an actual thing?

03:26:46  24  A.  Yes, it is.  And -- and in this case, 0 doesn't mean

03:26:53  25  nothing.  It means the first one.  Typically, in computer

03:26:56   1   language, 0 means the first one.  So if we were numbering

03:27:01   2   something, instead of numbering 1, 2, 3, we would number 0,

03:27:07   3   1, 2.

03:27:07   4   Q.  And were you here when Dr. Mahon testified?

03:27:10   5   A.  Yes, yes, I was.

03:27:11   6   Q.  And did you hear me ask if I could label

03:27:14   7   Mr. Summersgill lawyer 0 for purposes of my example?

03:27:17   8   A.  Yes, I did.

03:27:18   9   Q.  Well, here he'd be -- we'll call him person 0?

03:27:23  10   A.  Right, sure.

03:27:24  11   Q.  And Mr. Blevins will be person 1?

03:27:26  12   A.  Sure.  That's --

03:27:26  13   Q.  But there's actually two people there?

03:27:27  14   A.  That's right.

03:27:27  15   Q.  Same thing with Redundancy Version 0?

03:27:29  16   A.  That's right.

03:27:29  17   Q.  All right.

03:27:33  18           MR. MUELLER:  Let's go to DDX-7.14.

03:27:36  19   Q.  (By Mr. Mueller)  What do we see here?

03:27:37  20   A.  So, here we see an illustration of the concept of

03:27:41  21   control fields.  So when we send control information, that

03:27:48  22   information is just a string of 1s and 0s.

03:27:53  23           Now, the phone has to know how to interpret those

03:27:56  24   1s and 0s.  So there's a pre-determined pattern, meaning --

03:28:02  25   or way of interpreting it by breaking that group of 1s and

03:28:09  1   0s into multiple pieces that we called fields.

03:28:11  2        So per -- in this example, the phone knows that

03:28:14  3   the first nine bits that are sent correspond to the first

03:28:19  4   field, the next five bits correspond to the second field,

03:28:23  5   and so on.

03:28:25  6   Q.  What are some ways that control parameters can be sent

03:28:29  7   in fields?

03:28:30  8   A.  Well, there are two fundamental ways that we send the

03:28:34  9   control parameters in control fields.

03:28:37  10        One is called separate fields, meaning that we

03:28:41  11   reserve one field for each parameter.

03:28:46  12        The second way is what we call a common field.  In

03:28:50  13   a common field, we will send multiple parameters in the

03:28:54  14   same field.

03:28:57  15        MR. MUELLER:  And if we go to DDX-7.15.

03:29:00  16   Q.  (By Mr. Mueller)  Is that what we see here, sir?

03:29:02  17   A.  That's right.  So in the top illustration, we see that

03:29:08  18   the first field is used for transport format, and the

03:29:14  19   second field is used for redundancy version.

03:29:16  20        In the bottom illustration, we have one common

03:29:18  21   field that is used to -- to transfer both transport format

03:29:24  22   as well as redundancy version.  So both parameters are sent

03:29:28  23   in the same field.

03:29:34  24        MR. MUELLER:  Now, if you go to 7.16.

03:29:36  25   Q.  (By Mr. Mueller)  What were some of the ways or options

03:29:38   1   that were available to the standards setting organization

03:29:44   2   for transmitting a transport block size and redundancy

03:29:46   3   version during the creation of the LTE standard?

03:29:49   4   A.  So here we see three different contributions which were

03:29:55   5   documents that were submitted to the 3GPP standards body by

03:29:59   6   different companies that proposed different ways to send

03:30:05   7   the transport block size and redundancy version.

03:30:08   8          So, for example, Qualcomm submitted a proposal

03:30:12   9   that said we should use separate fields, so transport --

03:30:19  10   the transport block size and redundancy version would be

03:30:20  11   sent in different fields.

03:30:22  12          Samsung said, well, let's not send the redundancy

03:30:25  13   version at all.  Instead, we could just have a predefined

03:30:30  14   sequence, so you would just know based on some other

03:30:34  15   sequence what redundancy version you were going to use each

03:30:36  16   time, but you wouldn't actually have to send that

03:30:38  17   information.

03:30:40  18          The Ericsson proposal proposed something similar.

03:30:44  19          MR. MUELLER:  Now, let's go to DDX-1.19 if my eyes

03:30:50  20   are reading it correctly.  This is Table 8.6.1-1 of the LTE

03:30:57  21   standard.  DDX-7. -- here we go.

03:31:07  22   Q.  (By Mr. Mueller)  Dr. Buehrer, what did the standards

03:31:11  23   setting organization ultimately arrive at?

03:31:12  24   A.  So, for transmitting the transport block size or, in

03:31:14  25   this case, transport block size index and redundancy

03:31:18   1   version, they came up with this table 8.6.1-1.

03:31:23   2   Q.  Does this '284 patent being asserted by the plaintiffs

03:31:28   3   in this case cover this table?

03:31:31   4   A.  No, it does not.

03:31:36   5         MR. MUELLER:  Now, if we could go back to

03:31:40   6   DDX-7.18.

03:31:41   7   Q.  (By Mr. Mueller)  What do we see here, sir?

03:31:42   8   A.  So here are two of the -- two of the asserted claims

03:31:48   9   from the '284 patent.

03:31:50  10   Q.  And I'd like to focus your attention on the bottom of

03:31:54  11   these two claims, the very last piece.  Do you see that,

03:31:57  12   sir?

03:31:57  13   A.  Yes, I do.

03:31:57  14   Q.  Could you read that to us?

03:31:59  15   A.  Sure.  It says:  Wherein the first subset of the values

03:32:03  16   contains more values than the second subset of the values.

03:32:06  17   Q.  And was this a requirement that was added to the patent

03:32:10  18   during the back and forth at the Patent Office?

03:32:12  19         MR. SHEASBY:  Your Honor, I object.

03:32:14  20   A.  Yes, it was.

03:32:15  21         MR. SHEASBY:  Relevance, and the answer should be

03:32:17  22   stricken.

03:32:18  23         THE COURT:  I don't see any relevance.  I'll

03:32:24  24   sustain the objection.

03:32:25  25         MR. MUELLER:  Thank you, Your Honor.  I may bring

03:32:27  1   that up again and ask Your Honor's permission in the

03:32:30  2   validity context, but I can wait until then.

03:32:33  3          THE COURT:  Well, if you can establish some

03:32:34  4   relevance, then you can certainly raise it then.  Let's

03:32:38  5   move along.

03:32:39  6          MR. MUELLER:  Thank you, Your Honor.

03:32:40  7   Q.  (By Mr. Mueller)  So, we're in the first subset of the

03:32:43  8   values contains more values than the second subset of the

03:32:46  9   values.  Do you see that, sir?

03:32:47 10   A.  Yes, I do.

03:32:47 11   Q.  Now --

03:32:47 12          MR. MUELLER:  Your Honor, may we ask permission --

03:32:50 13   may I ask permission now for Dr. Buehrer to come up to the

03:32:53 14   placard that I'm going to put on this easel, and I'll move

03:32:55 15   it over here and Dr. Buehrer can put a face shield on.

03:32:57 16          THE COURT:  We'll do it just like we did with

03:33:00 17   Mr. Summersgill earlier.

03:33:01 18          MR. MUELLER:  Thank you, Your Honor.

03:33:25 19          THE COURT:  Just a minute.  We need a handheld

03:33:28 20   microphone for the witness, please.

03:33:32 21          And then you need to examine him from the other

03:33:34 22   side of the demonstrative, Mr. Mueller.

03:33:36 23          MR. MUELLER:  Thank you -- thank you, Your Honor.

03:34:12 24          May I proceed, Your Honor?

03:34:14 25          THE COURT:  You may proceed.

| | | |
|---|---|---|
| 03:34:15 | 1 | MR. MUELLER:  Thank you. |
| 03:34:16 | 2 | Q.  (By Mr. Mueller)  Dr. Buehrer, you were here when I |
| 03:34:19 | 3 | cross-examined Dr. Mahon, right? |
| 03:34:20 | 4 | A.  Yes, I was. |
| 03:34:21 | 5 | Q.  And you recognize this was a demonstrative they created |
| 03:34:24 | 6 | during the cross-examination of Dr. Mahon? |
| 03:34:26 | 7 | A.  Yes. |
| 03:34:27 | 8 | Q.  And do you see, I underlined some language in Claim 1 |
| 03:34:31 | 9 | of the '284 patent here on the left? |
| 03:34:34 | 10 | A.  Yes, that's correct. |
| 03:34:35 | 11 | Q.  And then I drew some boxes on the right-hand side.  Do |
| 03:34:39 | 12 | you see this, sir? |
| 03:34:40 | 13 | A.  Yes, I do. |
| 03:34:40 | 14 | Q.  And this is the very same table that we were just |
| 03:34:44 | 15 | looking at a moment ago from the LTE standard? |
| 03:34:46 | 16 | A.  Yes, it is. |
| 03:34:47 | 17 | Q.  So I'd like to ask you a few questions about this. |
| 03:34:50 | 18 | A.  Sure. |
| 03:34:50 | 19 | Q.  First, where does the claim require a first subset of |
| 03:34:55 | 20 | values that is reserved for indicating the transport |
| 03:34:59 | 21 | format? |
| 03:34:59 | 22 | A.  We see that right here.  First subset of the values is |
| 03:35:05 | 23 | reserved for indicating the transport format of the |
| 03:35:08 | 24 | protocol data unit. |
| 03:35:09 | 25 | Q.  And what did you do to analyze whether the LTE standard |

| 03:35:14 | 1 | met that requirement? |
| 03:35:15 | 2 | A.  Well, I looked at the -- this table and looked at the |
| 03:35:21 | 3 | MCS indices, go from 0 to 32 -- or 0 to 31, excuse me.  And |
| 03:35:26 | 4 | I determined which of these values is used for indicating |
| 03:35:30 | 5 | the transport block size index. |
| 03:35:34 | 6 | Q.  And, sir, if you could show us on the right-hand side |
| 03:35:38 | 7 | where they are. |
| 03:35:41 | 8 | A.  So these are the transport block size -- transport |
| 03:35:46 | 9 | block size index values that are transmitted, and then |
| 03:35:50 | 10 | these would be the MCS values that are used to indicate -- |
| 03:35:58 | 11 | or reserved to indicate transport format or transport block |
| 03:36:01 | 12 | size index. |
| 03:36:01 | 13 | Q.  And that's that payload size that we referred to |
| 03:36:06 | 14 | earlier? |
| 03:36:07 | 15 | A.  Yes. |
| 03:36:07 | 16 | Q.  Now, could you please label the first subset in the |
| 03:36:11 | 17 | appropriate place on the table? |
| 03:36:31 | 18 | And, sir, how many values are in that first |
| 03:36:34 | 19 | subset? |
| 03:36:35 | 20 | A.  There are 29. |
| 03:36:35 | 21 | Q.  And where are you getting that 29 from? |
| 03:36:37 | 22 | A.  I'm simply counting up the MCS indices that indicate a |
| 03:36:44 | 23 | transport block size index. |
| 03:36:46 | 24 | Q.  Sir, could you write that number at the bottom? |
| 03:36:49 | 25 | A.  Sure. |

03:36:50  1  Q.  Dr. Buehrer, where does the claim require a second

03:36:55  2  subset of the values, different from the first subset,

03:36:59  3  reserved for indicating the redundancy version?

03:37:03  4  A.  We can see this here in the claim right after what we

03:37:07  5  just looked at.  We see -- we see that it says:  A second

03:37:10  6  subset of the values, different from the first subset, that

03:37:14  7  is reserved for indicating the redundancy version.

03:37:17  8  Q.  Now, how did you identify the subset of values that are

03:37:22  9  reserved for indicating the redundancy version in this LTE

03:37:25  10  table over here?

03:37:27  11  A.  Well, again, I simply looked at this table and

03:37:30  12  identified all the MC -- MCS indices that -- that -- that

03:37:35  13  indicate a redundancy version.

03:37:38  14  Q.  And where do we see those?  I'm sorry.

03:37:41  15  A.  That's all right.  It's -- these are the redundancy

03:37:45  16  versions, and the values that indicate them are these.

03:37:52  17  Q.  Could you label those "the second subset"?

03:37:55  18  A.  Sure.

03:38:00  19      MR. SHEASBY:  Your Honor, I object.  This is --

03:38:01  20  this is a leading question at this point.

03:38:12  21      THE COURT:  Well, at this point he has answered

03:38:14  22  the question.  You can certainly raise that objection if

03:38:18  23  there's a future leading question asked.

03:38:20  24      MR. SHEASBY:  Thank you.

03:38:21  25  Q.  (By Mr. Mueller)  Dr. Buehrer, if you could -- what --

| | | |
|---|---|---|
| 03:38:23 | 1 | what is required by that last part of the claim that we see |
| 03:38:26 | 2 | up here on the left? |
| 03:38:28 | 3 | A.  The last requirement of the claim limitation requires |
| 03:38:30 | 4 | that the first subset of values -- |
| 03:38:30 | 5 | Q.  Can you just take it a little slower? |
| 03:38:32 | 6 | A.  Sure.  I'm sorry. |
| 03:38:34 | 7 | This last requirement requires that the first |
| 03:38:38 | 8 | subset of values contain more values than the second subset |
| 03:38:43 | 9 | of values. |
| 03:38:43 | 10 | Q.  How does that requirement compare to the LTE table? |
| 03:38:47 | 11 | A.  Well, obviously, it does not.  The LTE table does not |
| 03:38:51 | 12 | meet this requirement because the LTE table -- there are |
| 03:38:56 | 13 | more values in the second subset than in the first. |
| 03:39:01 | 14 | Q.  So in the claim, what needs to be bigger?  The first |
| 03:39:04 | 15 | subset or the second subset? |
| 03:39:05 | 16 | A.  In the claim, the first subset needs to be better. |
| 03:39:09 | 17 | Q.  And in the real LTE standard, what is bigger? |
| 03:39:12 | 18 | A.  The second subset. |
| 03:39:13 | 19 | Q.  Thank you, sir.  You can return to your witness stand. |
| 03:39:17 | 20 | MR. MUELLER:  Your Honor, may I move this back |
| 03:39:19 | 21 | here? |
| 03:39:19 | 22 | THE COURT:  Yes, please do. |
| 03:39:38 | 23 | All right.  Let's continue. |
| 03:39:40 | 24 | MR. MUELLER:  Thank you, Your Honor. |
| 03:39:42 | 25 | Q.  (By Mr. Mueller)  Now, what is the implication of this |

| | | |
|---|---|---|
| 03:39:49 | 1 | for whether Apple infringes '284, Claim 1? |
| 03:39:55 | 2 | A.  Well, Apple does not infringe Claim 1 of the '284 |
| 03:40:00 | 3 | patent. |
| 03:40:04 | 4 | Q.  And just so we're clear, what redundancy version is |
| 03:40:07 | 5 | indicated by these 0s? |
| 03:40:09 | 6 | A.  I'm sorry, could you repeat that question? |
| 03:40:13 | 7 | Q.  Sure.  These 0s here, what do they indicate? |
| 03:40:16 | 8 | A.  They indicate Redundancy Version 0. |
| 03:40:19 | 9 | Q.  Is that an actual thing? |
| 03:40:20 | 10 | A.  Yes, it is. |
| 03:40:22 | 11 | MR. MUELLER:  Let's go to DDX-7.20. |
| 03:40:25 | 12 | Q.  (By Mr. Mueller)  And what do we see here, sir? |
| 03:40:32 | 13 | A.  So here, we see the three asserted claims of the '284 |
| 03:40:39 | 14 | patent.  It says '283, but it's the '284 patent.  And -- so |
| 03:40:45 | 15 | that's Claims 1, 14, and 27. |
| 03:40:47 | 16 | Q.  And what is your opinion as to whether the Apple |
| 03:40:54 | 17 | products and the Intel and Qualcomm chips within them meet |
| 03:40:57 | 18 | the requirements that we see in yellow here? |
| 03:40:59 | 19 | A.  They do -- they do not meet the requirements seen in |
| 03:41:04 | 20 | yellow. |
| 03:41:05 | 21 | Q.  Why not? |
| 03:41:05 | 22 | A.  Because the first subset is -- the first subset of |
| 03:41:11 | 23 | values is actually smaller than the second subset.  Or, in |
| 03:41:15 | 24 | other words, the first subset of values does not contain |
| 03:41:17 | 25 | more values than the second subset of values. |

03:41:19   1   Q.  Now, if we look at Claim 27, the third claim in this

03:41:25   2   case, do you see it says:  The method according to

03:41:29   3   Claim 14?

03:41:30   4   A.  Yes, I do.

03:41:30   5   Q.  And what is the implication of that for your analysis

03:41:34   6   of whether there's infringement?

03:41:35   7   A.  Well, because Claim 27 depends from Claim 14, since

03:41:42   8   there's no infringement on Claim 14, there's no

03:41:45   9   infringement on Claim 27.

03:41:47  10   Q.  Now, sir, this is a table in the LTE standard, right?

03:41:50  11   A.  Yes, it is.

03:41:51  12   Q.  Have you also considered evidence relating to the

03:41:57  13   actual Intel and Qualcomm baseband chips at issue in this

03:42:00  14   case?

03:42:00  15   A.  Yes, I have.

03:42:01  16   Q.  Were you here when Dr. Josiam testified?

03:42:04  17   A.  Yes, I was.

03:42:05  18   Q.  He testified about how the Intel chips worked.  Do you

03:42:09  19   recall that?

03:42:09  20   A.  Yes, I do.

03:42:10  21   Q.  And did you see him show to the ladies and gentlemen of

03:42:13  22   the jury computer source code from within those Intel

03:42:15  23   chips?

03:42:15  24   A.  Yes.

03:42:16  25   Q.  Do you agree with Dr. Josiam's explanation of the Intel

03:42:22  1  source code?

03:42:22  2  A.  Yes.

03:42:23  3  Q.  You have reviewed that source code yourself?

03:42:25  4  A.  Yes, I have.

03:42:26  5  Q.  And what did that source code tell you about how the

03:42:29  6  Intel baseband chips operated with respect to this LTE

03:42:34  7  table?

03:42:34  8  A.  So as I looked at the Intel source code, the Intel

03:42:41  9  source code follows this table.  And so it determines a

03:42:47  10  transport block index for values 0 through 28, just like we

03:42:52  11  see in the table.  And it determines a redundancy version

03:42:56  12  for all of the values, all the MCS values.

03:43:02  13       And so, again, in the -- in the code, there are

03:43:04  14  more values for indicating the redundancy version than

03:43:08  15  are -- there are for -- than there are values that are

03:43:13  16  reserved for indicating transport format or transport block

03:43:17  17  size index.

03:43:17  18  Q.  So is it consistent or inconsistent with this table?

03:43:20  19  A.  It's consistent with this table.

03:43:24  20       MR. MUELLER:  Your Honor, may I ask to briefly

03:43:26  21  seal the courtroom to discuss some Qualcomm source code?

03:43:30  22  I'm going to have to have ask Mr. Blevins to leave, too.

03:43:35  23       THE COURT:  All right.  At counsel's request, I'll

03:43:37  24  order the courtroom sealed.  Those present not subject to

03:43:40  25  the protective order are directed to excuse themselves and

| | | |
|---|---|---|
| 03:43:43 | 1 | remain outside the courtroom until it's unsealed and the |
| 03:43:46 | 2 | public is invited to return. |
| 03:43:49 | 3 | MR. MUELLER:  Your Honor, may I use the document |
| 03:43:51 | 4 | camera? |
| 03:43:51 | 5 | THE COURT:  Let's wait until the courtroom is |
| 03:43:54 | 6 | sealed, counsel. |
| 03:43:48 | 7 | (Courtroom sealed.) |
| 03:43:48 | 8 | (This portion of the transcript is sealed. |
| 03:43:48 | 9 | and filed under separate cover as |
| 03:43:56 | 10 | Sealed Portion No. 13.) |
| 03:47:28 | 11 | (Courtroom unsealed.) |
| 03:47:50 | 12 | MR. MUELLER:  May I proceed, Your Honor? |
| 03:47:52 | 13 | THE COURT:  Just a moment.  I need to get all my |
| 03:47:57 | 14 | people in their right places. |
| 03:47:58 | 15 | MR. MUELLER:  Understood. |
| 03:48:00 | 16 | THE COURT:  You may proceed, counsel. |
| 03:48:05 | 17 | MR. MUELLER:  Thank you, Your Honor. |
| 03:48:05 | 18 | Q.  (By Mr. Mueller)  Dr. Buehrer, in sum, for your |
| 03:48:07 | 19 | analysis of whether there was any infringement, did you |
| 03:48:11 | 20 | consider the patent itself? |
| 03:48:12 | 21 | A.  Yes, I did. |
| 03:48:13 | 22 | Q.  The LTE standard? |
| 03:48:15 | 23 | A.  Yes, I did. |
| 03:48:16 | 24 | Q.  The Intel baseband chips and the source code on those |
| 03:48:20 | 25 | chips? |

03:48:20   1   A.  Yes, I did.

03:48:22   2   Q.  The Qualcomm baseband chips and the source code on

03:48:25   3   those chips?

03:48:25   4   A.  Yes, I did.

03:48:26   5   Q.  And what is your conclusion as to whether any of the

03:48:30   6   Apple products or any of the Qualcomm or Intel chips use

03:48:35   7   the '284 patent claims?

03:48:38   8   A.  My conclusion is that the Apple products do not

03:48:44   9   infringe the asserted claims of the '284 patent.

03:48:46   10  Q.  Now, did Dr. Mahon offer any theory under the Doctrine

03:48:50   11  of Equivalents for this patent?

03:48:51   12  A.  No, I don't believe he did.

03:48:54   13  Q.  Now, Dr. Mahon testified about Panasonic's proposals to

03:48:58   14  the 3GPP standard-setting organization, right?

03:49:02   15  A.  Yes, he did.

03:49:03   16  Q.  And let's put up a slide that he used.

03:49:07   17          MR. MUELLER:  This is DDX-7.21.

03:49:13   18  Q.  (By Mr. Mueller)  This is Slide 21 from the deck you

03:49:15   19  showed the jury.  And do you see the title here is "LTE

03:49:18   20  Adopts Invention"?

03:49:22   21  A.  Yes, I do.

03:49:22   22  Q.  Do you have an opinion as to whether or not that's

03:49:25   23  correct?

03:49:25   24  A.  Yes.  It's my opinion that that's not what happened

03:49:28   25  here.

03:49:28   1    Q.  Why not?

03:49:30   2    A.  Well, we can see from the Panasonic proposal and what

03:49:33   3    was actually in the LTE standard that they're -- they're

03:49:35   4    different.  And upon examination, we'll find even more

03:49:38   5    differences.

03:49:39   6    Q.  And feel free to -- to write on the screen in front of

03:49:43   7    you.  But could you explain to us what those differences

03:49:45   8    are?

03:49:46   9    A.  Sure.  So, first of all, in the Panasonic proposal, we

03:49:49   10   have this range column.  There is no such range column in

03:49:54   11   the LTE standard.

03:49:56   12          Second, the Pan -- the Panasonic proposal included

03:50:01   13   something called the NDI bit, or new data indicator here.

03:50:07   14   The LTE standard did not include the NDI bit in this chart,

03:50:12   15   in this table.  There is an NDI bit in the standard, but

03:50:16   16   not -- not transmitted using the MCS index.

03:50:21   17          Also, we note that in Panasonic's proposal, they

03:50:27   18   proposed sending the transport block size directly.  So, in

03:50:34   19   other words, each MCS value would correspond to a specific

03:50:39   20   transport block size.  That's not what we find in the LTE

03:50:43   21   standard. In the LTE standard, instead, we have a block

03:50:49   22   size index.

03:50:50   23          Now, the block size index is then used along with

03:50:54   24   other information to obtain the transport block size, but

03:50:59   25   one nice advantage of this approach is that while what we

03:51:02  1  see in the Panasonic proposal, only 29 different transport

03:51:08  2  block sizes could be sent.

03:51:08  3       The way that it's done in LTE, you can actually

03:51:13  4  send hundreds of different values by using the transport

03:51:16  5  block size index, as well as the -- the resource allocation

03:51:23  6  information, which comes in a different message or in a --

03:51:27  7  a different place.

03:51:28  8  Q.  So bottom line, was the Panasonic proposal adopt --

03:51:32  9  adopted as a part of LTE?

03:51:34  10  A.  No, it wasn't.

03:51:36  11  Q.  Is the '284 patent essential to LTE?

03:51:39  12  A.  No, it's not.

03:51:40  13  Q.  And is the '284 patent infringed by Apple?

03:51:42  14  A.  No, it's not.

03:51:45  15       MR. MUELLER:  Now, we can take this down.

03:51:47  16  Q.  (By Mr. Mueller)  You were -- you were here when

03:51:49  17  Dr. Mahon presented his invalidity theory -- I'm sorry, his

03:51:52  18  infringement theory to the jury, right?

03:51:54  19  A.  Yes, I was.

03:51:54  20  Q.  And how do you understand Dr. Mahon's theory to operate

03:52:00  21  with respect to this table?

03:52:02  22  A.  So in the Plaintiffs' -- the Plaintiffs' theory, they

03:52:07  23  ignore RV 0.  So the -- all the RV 0s are ignored when --

03:52:15  24  when determining the second subset.

03:52:17  25  Q.  So when you say RV 0s are ignored, you're referring to

03:52:21  1  these 29 values right here?

03:52:24  2  A.  That is correct.

03:52:24  3  Q.  They're not counted as part of that set?

03:52:27  4  A.  That's right.

03:52:28  5  Q.  Why is that wrong?

03:52:29  6  A.  Because the subsets are defined very clearly in the

03:52:33  7  claim, and we have to look to the claim for understanding

03:52:39  8  how to define the subsets, and -- and the claim says that

03:52:44  9  the second subset are the values that are reserved for

03:52:47  10  indicating the redundancy version.

03:52:50  11  Q.  And redundancy version 0 is a redundancy version?

03:52:53  12  A.  Yes, it is.

03:52:53  13  Q.  Just like person 0 is a real person, Mr. Summersgill,

03:52:58  14  right here?

03:52:58  15  A.  As far as I know.

03:52:59  16  Q.  Okay.  And you think that's right or wrong to ignore

03:53:04  17  the 0s?

03:53:04  18  A.  I believe that's incorrect.

03:53:10  19  Q.  Now, I want you to take Dr. Mahon's infringement theory

03:53:13  20  and explain to the jury what the implications of that

03:53:16  21  theory would be as applied to the prior art, that is to

03:53:21  22  say, what came before the '284 patent.  Do you have that in

03:53:24  23  mind?

03:53:24  24  A.  Yes, I do.

03:53:25  25  Q.  If we took Dr. Mahon's infringement theory and applied

| | | |
|---|---|---|
| 03:53:29 | 1 | it to the prior art, what would the result be? |
| 03:53:32 | 2 | A.  Well, if we -- if we applied the meaning that he's -- |
| 03:53:39 | 3 | he is to the prior art, what would end up happening is that |
| 03:53:45 | 4 | we would find that the -- that the patent -- or the |
| 03:53:49 | 5 | claims -- the asserted claims are invalid because the prior |
| 03:53:51 | 6 | art already teaches what that would imply. |
| 03:53:55 | 7 | Q.  So do you view his theory as consistent with the scope |
| 03:53:58 | 8 | of the claims or broader? |
| 03:54:01 | 9 | A.  It would be broader. |
| 03:54:03 | 10 | Q.  And if we take that broader theory and apply it to the |
| 03:54:06 | 11 | prior art, what's the result? |
| 03:54:08 | 12 | A.  Then if we applied that to the -- if we use that to |
| 03:54:11 | 13 | analyze the prior art, then the patent would be invalid. |
| 03:54:15 | 14 | MR. MUELLER:  Your Honor, may I put a placard -- a |
| 03:54:19 | 15 | new placard up here? |
| 03:54:20 | 16 | THE COURT:  You may use another demonstrative. |
| 03:54:22 | 17 | MR. MUELLER:  Thank you, Your Honor. |
| 03:54:32 | 18 | Q.  (By Mr. Mueller)  So, Dr. Buehrer, what I'd like to do |
| 03:54:36 | 19 | is to go through the requirements of Claim 1 and for you to |
| 03:54:40 | 20 | explain what the implications of Dr. Mahon's infringement |
| 03:54:44 | 21 | theory would be as applied to the prior art.  Do you have |
| 03:54:46 | 22 | that in mind? |
| 03:54:47 | 23 | A.  Yes. |
| 03:54:48 | 24 | Q.  So let's start with the first requirement right here. |
| 03:54:54 | 25 | What do we have? |

03:54:55   1   A.  The first requirement is a mobile terminal for use in a

03:55:01   2   mobile communication system.

03:55:02   3   Q.  And were those known before the '284 patent?

03:55:05   4          MR. SHEASBY:  Your Honor, I object.  This is an

03:55:07   5   improper validity analysis.  The doctor needs to present a

03:55:13   6   reference or a combination of references, find those

03:55:16   7   elements in the reference, and apply them using an

03:55:18   8   obviousness analysis.  Simply saying something was not

03:55:21   9   known in prior art is not a legal obviousness analysis.

03:55:25  10          THE COURT:  Are you telling me the testimony

03:55:28  11   called for and elicited from the witness is outside the

03:55:31  12   scope of his report?

03:55:31  13          MR. SHEASBY:  Yes.  It's outside the scope of his

03:55:34  14   validity opinion, Your Honor.  His validity opinion is

03:55:37  15   based on a combination of references --

03:55:40  16          THE COURT:  You've answered my question.

03:55:42  17          Now, let me ask for a response from Mr. Mueller.

03:55:44  18          MR. MUELLER:  Your Honor, this is the preamble.  I

03:55:47  19   was just trying to check off the box that mobile terminals

03:55:50  20   were known.  I'm happy to refer to a reference.  It doesn't

03:55:54  21   really matter either way.

03:55:55  22          THE COURT:  Then why don't you refer to a

03:55:57  23   reference.

03:55:57  24          MR. MUELLER:  Fair enough, Your Honor.

03:55:59  25   Q.  (By Mr. Mueller)  Sir, you mentioned a few times a

| | |
|---|---|
| 03:56:02 | 1 |
| 03:56:03 | 2 |
| 03:56:04 | 3 |
| 03:56:09 | 4 |
| 03:56:16 | 5 |
| 03:56:18 | 6 |
| 03:56:26 | 7 |
| 03:56:32 | 8 |
| 03:56:35 | 9 |
| 03:56:37 | 10 |
| 03:56:44 | 11 |
| 03:56:49 | 12 |
| 03:56:49 | 13 |
| 03:56:51 | 14 |
| 03:56:53 | 15 |
| 03:56:55 | 16 |
| 03:56:58 | 17 |
| 03:56:58 | 18 |
| 03:57:05 | 19 |
| 03:57:08 | 20 |
| 03:57:10 | 21 |
| 03:57:14 | 22 |
| 03:57:16 | 23 |
| 03:57:18 | 24 |
| 03:57:21 | 25 |

Samsung proposal, right?

A.   Yes.

          MR. MUELLER:   Let's pull up DTX-0417.

Q.   (By Mr. Mueller)   And this is at Tab 5 in your binder.

          Dr. Buehrer, what is this?

A.   So this document is a proposal that Samsung wrote in 2002 as a part of the development of a 3.5G standard knowing as HSDPA.

          MR. MUELLER:   And let's look at the date there and highlight it, if we could, at the top of the screen.

Q.   (By Mr. Mueller)   January 8th through 11th, 2002.   Do I have that right, sir?

A.   Yes, that's correct.

          MR. MUELLER:   And if we could just briefly pull up the cover of the '284 patent.

Q.   (By Mr. Mueller)   And, sir, what's the key date for the '284 patent?

A.   It is December 20th, 2007.

Q.   And is that before or after the Samsung proposal?

A.   It is after the Samsung proposal.

Q.   In fact, it's about five years after, right?

A.   That's right.

Q.   Let's turn back to the Samsung proposal.

          MR. MUELLER:   And if we could please look at Table 3 in this proposal, which spans Pages 3 and 4.

03:57:25  1   Q.  (By Mr. Mueller)  And Dr. Buehrer, let me know when

03:57:27  2   you're there.

03:57:28  3   A.  Okay.  I'm here.

03:57:29  4   Q.  What do we see?

03:57:31  5   A.  So, this Table 3 is a proposal from -- is part of this

03:57:35  6   proposal from Samsung that proposes using a common field to

03:57:43  7   transmit transport block size, as well as redundancy

03:57:50  8   version.  And we can see -- yeah, it's highlighted there.

03:57:55  9   Q.  Now, under Dr. Mahon's infringement theory, do they

03:57:57  10  include or exclude Redundancy Version 0 from the second

03:58:02  11  subset of the values?

03:58:03  12  A.  Well, in -- in the Plaintiffs' infringement theory,

03:58:07  13  they exclude Redundancy Version 0.  So if you exclude

03:58:12  14  Redundancy Version 0, which would be the preset redundancy

03:58:18  15  version that would be used in this case, then what we can

03:58:21  16  see from this table is that for transport block size, they

03:58:26  17  use 6 bits.

03:58:29  18       Those 6 bits can represent 64 different values.

03:58:33  19  So there would be 64 different values that he could

03:58:35  20  represent the transport block size.

03:58:39  21       On the other hand, redundancy version, you can see

03:58:43  22  that only two of the six bits were going to be reserved for

03:58:49  23  redundancy version, so that they would only -- they would

03:58:52  24  only need -- there would only be as many as four different

03:58:56  25  redundancy versions, although, in general, they would only

03:58:58   1   use three of them because one of them would be used with

03:59:01   2   the -- with the initial transport block size.

03:59:03   3          So, again, if you ignore that one, what the

03:59:08   4   transport block size that is sent with the initial

03:59:10   5   transmission as they do -- as the Plaintiffs do, then we

03:59:13   6   can see that there would be as many as 64 transport block

03:59:18   7   sizes and only three or possibly four redundancy versions.

03:59:24   8   Q.  So if we go to the language of Claim 1, again, we're

03:59:27   9   taking Dr. Mahon's infringement theory and applying it to

03:59:29   10  this prior art, right?

03:59:31   11  A.  That's right.

03:59:33   12  Q.  If we do that, does the Samsung proposal meet the

03:59:36   13  second to last and last requirements in Claim 1? Those are

03:59:41   14  the Requirements No. 5 and 6?

03:59:45   15  A.  Yes, it does.

03:59:46   16  Q.  May I check the boxes under that theory?

03:59:49   17  A.  Yes.

03:59:51   18  Q.  Now?

03:59:55   19          MR. MUELLER:  Now, let's go back to DTX-0417 at

04:00:03   20  Page 4, Table 3.

04:00:08   21  Q.  (By Mr. Mueller)  And, sir, if we focus on the fourth

04:00:09   22  requirement in Claim 1, what is your opinion as to whether

04:00:14   23  this Samsung proposal discloses or renders obvious the

04:00:22   24  fourth element?

04:00:22   25  A.  It's my opinion that the Samsung proposal renders

04:00:27   1   obvious the fourth element.  What it discloses is a common

04:00:30   2   field approach known as a shared field.  And a shared field

04:00:34   3   is a slight variation of a -- of joint encoding.  So

04:00:40   4   it's -- it's roughly the same concept.

04:00:43   5          And so, it's my opinion that the disclosure of a

04:00:46   6   com -- I'm sorry -- a shared field renders obvious the

04:00:52   7   joint encoding of those same two parameters.

04:00:55   8   Q.  May I check off Element 4?

04:00:57   9   A.  Yes.

04:00:58   10          MR. SHEASBY:  Your Honor, I move to strike that

04:01:01   11   answer.  There's no such thing as obviousness of an

04:01:05   12   element.  Claims are obvious.

04:01:07   13          THE COURT:  Overruled.

04:01:11   14   Q.  (By Mr. Mueller)  Now, let's look, if we could, at the

04:01:13   15   third requirement, No. 3.  Do you see that, sir?

04:01:17   16   A.  Yes, I do.

04:01:19   17   Q.  Okay.

04:01:19   18          MR. MUELLER:  And let's turn to another document,

04:01:24   19   DTX-0102.

04:01:29   20   Q.  (By Mr. Mueller)  What is this?

04:01:30   21   A.  This is a version -- an earlier version of the 3GPP

04:01:36   22   standard that we've been talking about.  This is 36. -- it

04:01:41   23   is Technical Specification 36.212, Version 8.0.0.  So it

04:01:49   24   describes multiplexing and channel coding in LTE.

04:01:52   25   Q.  And was this before or after the '284 patent?

04:01:55   1   A.   It was before.   We can see that because it is a

04:02:00   2   September 2007 date.

04:02:06   3              MR. MUELLER:   And let's look at DTX-106.   It's

04:02:10   4   also in Tab 4 in your binder.

04:02:12   5   Q.   (By Mr. Mueller)   Sir, what is this?

04:02:13   6   A.   This is Technical Specification 36.321, Version 1.0.0.

04:02:21   7   It is also an earlier version of the -- of a technical

04:02:25   8   specification that's part of the 3GPP LTE standard.

04:02:28   9   Q.   And was this before or after the '284 patent?

04:02:30  10   A.   It was before the '284 patent.

04:02:33  11   Q.   Now, these two documents that we just looked at,

04:02:40  12   DTX-102 and 106, comprise prior art LTE standard

04:02:43  13   specifications?

04:02:44  14   A.   Yes, they do.

04:02:49  15   Q.   Now, how do these two documents relate to your analysis

04:02:52  16   of Requirements 1, 2, and 3?

04:02:54  17   A.   These two documents together disclose all three

04:03:01  18   elements -- 1, 2, and 3 -- as well as the preamble.

04:03:06  19   Q.   May we check off these boxes?

04:03:09  20   A.   Yes.

04:03:10  21   Q.   Now, sir, what is your conclusion -- again, applying

04:03:13  22   Dr. Mahon's infringement theory to the prior art that we've

04:03:16  23   looked at -- with respect to Claim 1?

04:03:20  24   A.   It's my opinion that if we use -- if we apply the

04:03:26  25   claim -- claim limitations in the way that Dr. Mahon did,

04:03:30  1    then the -- then Claim 1 would be invalid.

04:03:33  2            MR. MUELLER:  Let's look at DDX-7.24.

04:03:37  3    Q.  (By Mr. Mueller)  What is your -- this is another

04:03:47  4    summary of Claim 1; is that right, sir?

04:03:49  5    A.  Correct.

04:03:50  6            MR. MUELLER:  Could we go to 7.25?

04:03:52  7    Q.  (By Mr. Mueller)  What do we see here, again, applying

04:03:55  8    Dr. Mahon's infringement theory to the prior art references

04:03:57  9    that we just looked at?

04:03:58 10    A.  Again, if we use that -- that theory, then Claim 14

04:04:03 11    would be obvious for the same reasons that Claim 1 would.

04:04:08 12            MR. MUELLER:  Then, finally, let's look at the

04:04:10 13    next slide, DDX-7.26.

04:04:13 14    Q.  (By Mr. Mueller)  And applying Dr. Mahon's theory to

04:04:15 15    the prior art references that we looked at, what is your

04:04:18 16    opinion with respect to Claim 27 of the '284 patent?

04:04:21 17    A.  Claim 27 would also be invalid.

04:04:26 18    Q.  Now, for all three of the asserted claims, have we

04:04:31 19    looked at each and every one of the limitations?

04:04:33 20    A.  Yes, I did.

04:04:34 21    Q.  Given each and every one of them meaning in your

04:04:37 22    invalidity analysis?

04:04:38 23    A.  I'm sorry.  Say that again.

04:04:39 24    Q.  I'm sorry.  You've given each and every one of them

04:04:44 25    meaning in your analysis?

| | | |
|---|---|---|
| 04:04:45 | 1 | A.  Yes. |
| 04:04:45 | 2 | Q.  And what is your conclusion, applying Dr. Mahon's |
| 04:04:49 | 3 | infringement theory, with respect to the invalidity of the |
| 04:04:52 | 4 | three claims in this case, having done a |
| 04:04:54 | 5 | limitation-by-limitation analysis? |
| 04:04:56 | 6 | A.  That if we used that infringement theory, the three |
| 04:05:00 | 7 | claims would be invalid. |
| 04:05:00 | 8 | Q.  Last couple of questions.  Is that infringement theory, |
| 04:05:05 | 9 | right? |
| 04:05:05 | 10 | A.  No, it's not. |
| 04:05:06 | 11 | Q.  Is it consistent with a proper application of the |
| 04:05:09 | 12 | claims? |
| 04:05:09 | 13 | A.  No, it's not. |
| 04:05:10 | 14 | Q.  Under a proper application of the claims, has Apple |
| 04:05:14 | 15 | ever infringed the '284 patent? |
| 04:05:17 | 16 | A.  No. |
| 04:05:19 | 17 | MR. MUELLER:  Nothing further, Your Honor.  I pass |
| 04:05:20 | 18 | the witness. |
| 04:05:21 | 19 | THE COURT:  All right.  Pull your demonstrative |
| 04:05:22 | 20 | down, counsel. |
| 04:05:32 | 21 | All right.  We'll proceed with cross-examination |
| 04:05:34 | 22 | by the Plaintiff. |
| 04:05:34 | 23 | CROSS-EXAMINATION |
| 04:05:40 | 24 | BY MR. SHEASBY: |
| 04:05:40 | 25 | Q.  Good afternoon, Dr. Buehrer.  It's nice to -- to see |

| | | |
|---|---|---|
| 04:05:43 | 1 | you again. |
| 04:05:44 | 2 | A.  Good afternoon. |
| 04:05:45 | 3 | Q.  We met over the Internet previously? |
| 04:05:50 | 4 | A.  I think that's correct. |
| 04:05:54 | 5 | Q.  Now, sir, you've been a paid expert witness for Apple |
| 04:06:03 | 6 | eight times in the last five years. |
| 04:06:09 | 7 | A.  I don't think that's exactly correct. |
| 04:06:10 | 8 | Q.  Well, why don't we go through it, and we'll count them |
| 04:06:13 | 9 | up? |
| 04:06:14 | 10 | A.  Sure. |
| 04:06:14 | 11 | Q.  So if you go to your binder -- |
| 04:06:22 | 12 | A.  Uh-huh. |
| 04:06:23 | 13 | Q.  -- and you look at Tab 1, and I put a little red flag |
| 04:06:28 | 14 | next to your resume, which says:  Expert witness |
| 04:06:33 | 15 | experience. |
| 04:06:35 | 16 | A.  Which binder? |
| 04:06:38 | 17 | MR. SHEASBY:  Your Honor, may I approach the |
| 04:06:40 | 18 | witness to assist, if I put on a mask? |
| 04:06:46 | 19 | THE WITNESS:  Is this -- here we go. |
| 04:06:48 | 20 | THE COURT:  Give him just a minute. |
| 04:07:00 | 21 | A.  Okay. |
| 04:07:01 | 22 | Q.  (By Mr. Sheasby)  Okay.  So I don't want you to read |
| 04:07:03 | 23 | out any names.  I just want you to count -- count with me. |
| 04:07:07 | 24 | It's on -- |
| 04:07:07 | 25 | A.  Sure. |

| | | |
|---|---|---|
| 04:07:07 | 1 | Q.  -- Page 30 of your CV. |
| 04:07:09 | 2 | A.  Yep. |
| 04:07:10 | 3 | Q.  And let's count the numbers in which you represented |
| 04:07:15 | 4 | Apple over the -- represented Apple.  Go ahead and count |
| 04:07:17 | 5 | them out.  Count them -- say them out loud. |
| 04:07:19 | 6 | A.  Okay.  We have one, two, three, four -- four, five, |
| 04:07:24 | 7 | six, seven, eight, oh, you're right.  I was thinking of |
| 04:07:27 | 8 | this -- there's two Wi-LANs.  I was thinking of those as |
| 04:07:31 | 9 | the same -- as being the same.  But, okay, fair enough. |
| 04:07:35 | 10 | Q.  So over the last five years, you've represented Apple |
| 04:07:39 | 11 | eight times as an expert witness. |
| 04:07:46 | 12 | A.  Over the -- over the last six years, I believe. |
| 04:07:50 | 13 | Q.  Over the last six years, it's actually more than eight. |
| 04:07:56 | 14 | It's nine, right? |
| 04:07:58 | 15 | A.  I don't think so. |
| 04:07:58 | 16 | Q.  Let's count again. |
| 04:07:59 | 17 | A.  All right.  Okay.  My memory might be failing me. |
| 04:08:04 | 18 | THE COURT:  Let's make this distinct questions and |
| 04:08:08 | 19 | answers, not an ongoing mumbling conversation between the |
| 04:08:13 | 20 | two of you, please, okay? |
| 04:08:14 | 21 | MR. SHEASBY:  Yes, Your Honor. |
| 04:08:15 | 22 | THE COURT:  Distinct answers to distinct |
| 04:08:18 | 23 | questions. |
| 04:08:18 | 24 | Q.  (By Mr. Sheasby)  If you could count them out loud. |
| 04:08:20 | 25 | A.  One, two, three, four, five, six, seven, eight. |

| | | |
|---|---|---|
| 04:08:25 | 1 | Q.  Eight over the last five years? |
| 04:08:27 | 2 | A.  Well, it started in May of 2015, so '15, '16, '17, '18, |
| 04:08:38 | 3 | '19, '20, so I would say that's six years.  Eight over the |
| 04:08:50 | 4 | last six years. |
| 04:08:51 | 5 | THE COURT:  It's heartening to see a Ph.D. in |
| 04:08:53 | 6 | science count on his fingers. |
| 04:08:55 | 7 | Q.  (By Mr. Sheasby)  Sir, I think you are right.  I think |
| 04:08:57 | 8 | it is eight times over the last six years, not the last |
| 04:09:00 | 9 | five years. |
| 04:09:01 | 10 | A.  Okay. |
| 04:09:04 | 11 | THE COURT:  Now can we move on? |
| 04:09:06 | 12 | Q.  (By Mr. Sheasby)  Now, over the last six years, you've |
| 04:09:13 | 13 | been paid by Apple more than $760,000, fair? |
| 04:09:17 | 14 | A.  I think that's about right. |
| 04:09:20 | 15 | Q.  Over the last five years, that would approximate the |
| 04:09:27 | 16 | amount of salary you've received from Virginia Tech, fair? |
| 04:09:32 | 17 | A.  I don't think so, not over the last six years. |
| 04:09:37 | 18 | Q.  Sir, you testified that the ballpark range that you |
| 04:09:41 | 19 | received from Virginia Tech is 150 to 170,000 a year? |
| 04:09:47 | 20 | A.  That's about right, yes. |
| 04:09:48 | 21 | Q.  And you've been paid $760,000 by Apple, correct? |
| 04:09:51 | 22 | A.  That's correct. |
| 04:09:52 | 23 | Q.  Now, you described yourself -- and I wrote it down -- |
| 04:10:05 | 24 | as an independent expert, correct? |
| 04:10:08 | 25 | A.  Correct. |

04:10:11   1   Q.   Is it fair for the ladies and gentlemen of the jury,

04:10:15   2   when they retire to deliberate, to consider whether someone

04:10:20   3   who has been paid $760,000 by a company and testified eight

04:10:26   4   times for them in the last six years is independent?  Is it

04:10:30   5   fair for them to consider that?

04:10:31   6   A.   That would be for them to decide.

04:10:33   7   Q.   You have no opinion on the subject?

04:10:35   8   A.   My opinion is that I am independent.

04:10:40   9   Q.   The ladies and gentlemen of the jury, we can agree, can

04:10:44   10  consider that testimony, correct?

04:10:45   11  A.   That is certainly their decision, yes.

04:10:46   12  Q.   Do you know what the median household income is in the

04:10:51   13  United States?

04:10:52   14  A.   I do not.

04:10:52   15  Q.   It's $31,000 a year.

04:10:55   16  A.   Okay.

04:10:56   17  Q.   Did you know that?

04:10:58   18  A.   I'll take your word for it.

04:10:59   19  Q.   And over the last six years, you've been paid $760,000

04:11:04   20  by Apple, fair?

04:11:05   21  A.   Yes.

04:11:05   22  Q.   Now, you said something that was interesting to me.

04:11:11   23  You talked about a 3GPP2 committee.  Remember that?

04:11:15   24  A.   Yes, I do.

04:11:16   25  Q.   Now, when I was first learning about this technology, I

| | | |
|---|---|---|
| 04:11:22 | 1 | thought 3GPP2 and 3GPP were the same.  But they're actually |
| 04:11:27 | 2 | not, correct? |
| 04:11:28 | 3 | A.  That's correct. |
| 04:11:30 | 4 | Q.  The committee that constructed LTE is known as 3GPP, |
| 04:11:40 | 5 | correct? |
| 04:11:40 | 6 | A.  Correct. |
| 04:11:41 | 7 | Q.  3GPP2, the committee you participated in, had no role |
| 04:11:47 | 8 | whatsoever in LTE, fair? |
| 04:11:49 | 9 | A.  Correct. |
| 04:11:50 | 10 | Q.  You have never participated in any 3GPP meetings, |
| 04:11:57 | 11 | correct? |
| 04:11:57 | 12 | A.  That is true. |
| 04:11:58 | 13 | Q.  You've never participated in any technical committee or |
| 04:12:01 | 14 | working group responsible for LTE, correct? |
| 04:12:06 | 15 | A.  That is correct. |
| 04:12:07 | 16 | Q.  You've never made a technical contribution to the LTE |
| 04:12:11 | 17 | standard, correct? |
| 04:12:13 | 18 | A.  That is correct. |
| 04:12:14 | 19 | Q.  You have no patents that are essential to the LTE |
| 04:12:22 | 20 | standard, correct? |
| 04:12:23 | 21 | A.  That is correct. |
| 04:12:24 | 22 | Q.  You have never implemented the LTE standard on any |
| 04:12:29 | 23 | mobile device ever, ever, correct? |
| 04:12:31 | 24 | A.  That is correct. |
| 04:12:34 | 25 | Q.  You have no -- you have no idea whatsoever what role |

| | | |
|---|---|---|
| 04:12:38 | 1 | Apple played in LTE, correct? |
| 04:12:41 | 2 | A.  I'm sorry, could you repeat your question? |
| 04:12:46 | 3 | Q.  You have no role whatsoever -- I withdraw the question, |
| 04:12:49 | 4 | and let me re-ask it. |
| 04:12:50 | 5 | A.  Okay. |
| 04:12:51 | 6 | Q.  You have no idea whatsoever what role Apple played in |
| 04:12:56 | 7 | LTE, correct? |
| 04:12:57 | 8 | A.  What do you mean by "role in LTE," please?  They do |
| 04:13:05 | 9 | sell devices. |
| 04:13:06 | 10 | THE COURT:  If you don't understand the question, |
| 04:13:07 | 11 | say:  I don't understand the question. |
| 04:13:09 | 12 | THE WITNESS:  Thank you, sir. |
| 04:13:10 | 13 | A.  I don't understand the question. |
| 04:13:11 | 14 | Q.  (By Mr. Sheasby)  You don't understand what I mean by |
| 04:13:14 | 15 | "role"? |
| 04:13:14 | 16 | A.  I don't understand what -- I don't understand your |
| 04:13:17 | 17 | question. |
| 04:13:18 | 18 | Q.  You claimed that you did not investigate the role that |
| 04:13:26 | 19 | Apple played in LTE, correct? |
| 04:13:32 | 20 | A.  Are you -- are you referring to the development of the |
| 04:13:35 | 21 | standard? |
| 04:13:40 | 22 | MR. SHEASBY:  Your Honor, I object as |
| 04:13:42 | 23 | non-responsive.  If he says he does not -- |
| 04:13:45 | 24 | A.  I do not understand the question. |
| 04:13:47 | 25 | Q.  (By Mr. Sheasby)  Okay.  Well, let's go to your |

| | | |
|---|---|---|
| 04:13:49 | 1 | deposition, which is Tab 1 in your binder. |
| 04:13:53 | 2 | A.  Okay. |
| 04:13:54 | 3 | Q.  And why don't you turn to Page 81, Lines 13 through 17. |
| 04:14:29 | 4 | Tell me when you're there. |
| 04:14:30 | 5 | A.  Okay.  Lines 13 to 17.  Okay. |
| 04:14:36 | 6 | Q.  Did you give that testimony? |
| 04:14:43 | 7 | A.  Yes, I did. |
| 04:14:44 | 8 | Q.  Was that testimony accurate? |
| 04:14:45 | 9 | A.  Yes, it was. |
| 04:14:48 | 10 | MR. SHEASBY:  Let's publish that. |
| 04:14:50 | 11 | THE WITNESS:  Sure. |
| 04:14:51 | 12 | Q.  (By Mr. Sheasby)  Question:  Did you investigate |
| 04:14:53 | 13 | whether Apple had any meaningful role whatsoever in the |
| 04:14:57 | 14 | release of Version 8 of LTE? |
| 04:14:59 | 15 | Answer:  I did not investigate the role of Apple |
| 04:15:02 | 16 | in the release of Version 8 of LTE. |
| 04:15:05 | 17 | Did you give that testimony? |
| 04:15:07 | 18 | A.  Yes, I did. |
| 04:15:08 | 19 | Q.  And you understood what the word "role" meant when I |
| 04:15:11 | 20 | used it in your deposition, correct? |
| 04:15:13 | 21 | A.  I under that -- I understood what you meant by "role" |
| 04:15:15 | 22 | in that question. |
| 04:15:16 | 23 | Q.  Okay. |
| 04:15:16 | 24 | A.  But -- okay. |
| 04:15:18 | 25 | Q.  Now, you said something in response to a question by |

04:15:39    1    Mr. Mueller.  You said:  I didn't know about these patents

04:15:43    2    before this case.  Fair?

04:15:45    3    A.  Yes.  I don't recall hearing of these patents before

04:15:49    4    this case.

04:15:49    5    Q.  But when engineers talk about standards, they discuss

04:15:53    6    technologies involved as to those specific patents,

04:15:57    7    correct?

04:15:57    8    A.  Generally speaking, that is correct.

04:16:01    9    Q.  And you had no role in the LTE committees in which

04:16:06   10    these technologies were created, correct?

04:16:10   11    A.  That is correct.

04:16:13   12    Q.  The technical specifications -- and let's stop there.

04:16:23   13    I withdraw that question.

04:16:24   14          There's a patent, and a patent has something

04:16:26   15    called a specification, correct?

04:16:27   16    A.  That is correct.

04:16:29   17    Q.  And those are the words that describe the patent and

04:16:32   18    explain it, fair?

04:16:33   19    A.  Yes.

04:16:36   20    Q.  Now, there's something called a technical

04:16:39   21    specification, correct?

04:16:41   22    A.  Correct.

04:16:41   23    Q.  And that's part of the LTE standard, correct?

04:16:44   24    A.  Correct.

04:16:45   25    Q.  And so when -- when we say specification and technical

| | | |
|---|---|---|
| 04:16:49 | 1 | specification, it's actually referring to two different |
| 04:16:53 | 2 | things, just for clarification, fair? |
| 04:16:55 | 3 | A.  That you will -- that's the way you'll refer to them? |
| 04:16:59 | 4 | Q.  Uh-huh. |
| 04:17:02 | 5 | A.  Okay. |
| 04:17:02 | 6 | Q.  Okay.  The technical specifications, which means the |
| 04:17:05 | 7 | standard essentially telling you how to build devices that |
| 04:17:08 | 8 | can talk to each other using the standard, fair? |
| 04:17:12 | 9 | A.  Yes. |
| 04:17:17 | 10 | Q.  Now, you have no understanding of the most |
| 04:17:24 | 11 | technologically significant functions in LTE, correct? |
| 04:17:27 | 12 | A.  I'm not entirely sure what you're asking me. |
| 04:17:38 | 13 | Q.  You have not done any analysis whatsoever -- whatsoever |
| 04:17:42 | 14 | to determine the most significant functions in LTE, |
| 04:17:46 | 15 | correct? |
| 04:17:46 | 16 | A.  I have not done an analysis to determine which are the |
| 04:17:49 | 17 | most significant functions, that is correct. |
| 04:17:51 | 18 | Q.  And so, if Dr. Mahon said that the functions implicated |
| 04:17:58 | 19 | by this patent are some of the most significant in LTE, you |
| 04:18:03 | 20 | would have no response to that, fair, in your report? |
| 04:18:06 | 21 | A.  I don't think that's exactly correct. |
| 04:18:13 | 22 | Q.  Well, didn't you just tell me you did no analysis of |
| 04:18:16 | 23 | what the most important parts of the LTE specification are? |
| 04:18:19 | 24 | A.  Yes, I did. |
| 04:18:19 | 25 | Q.  Now, you've never stated that all that is necessary |

04:18:27   1    for -- let me withdraw the question.

04:18:28   2           You've sat through a lot of the trial, correct?

04:18:31   3    A.  I've sat through some of it, yes.

04:18:33   4    Q.  You heard Apple's lawyers talk about something called

04:18:35   5    the baseband chip, correct?

04:18:36   6    A.  Yes.

04:18:37   7    Q.  Talked about it a significant amount, fair?

04:18:40   8    A.  I don't know how significant, but I have heard them

04:18:46   9    talk about the baseband chip, yes.

04:18:47  10    Q.  You don't know what "significant" means, sir?

04:18:50  11    A.  In your context, no.

04:18:51  12    Q.  So when the ladies and gentlemen of the jury assess

04:18:53  13    credibility, they should consider whether you can actually

04:18:57  14    understand what the word "significant" means, fair?

04:19:00  15           MR. MUELLER:  Your Honor, I object.  That's not

04:19:02  16    what he said.

04:19:03  17           THE COURT:  This is getting argumentative.

04:19:07  18           Let's go on to the next question.

04:19:08  19    Q.  (By Mr. Sheasby)  You have never stated that all that

04:19:16  20    is necessary for LTE communications is the baseband,

04:19:19  21    correct?

04:19:19  22    A.  That's not all that's required, correct.

04:19:25  23    Q.  And you have never stated that the value of LTE

04:19:28  24    communications is represented by the baseband, correct?

04:19:31  25    A.  I'm not -- I'm not sure.  I'm not --

| | | |
|---|---|---|
| 04:19:47 | 1 | Q.  Well -- |
| 04:19:49 | 2 | A.  If you're referring to part of my deposition, I guess |
| 04:19:52 | 3 | we could go there. |
| 04:19:53 | 4 | Q.  Well, sir, if you can answer the -- I withdraw what I |
| 04:19:57 | 5 | just said. |
| 04:19:57 | 6 | Sir, you have never stated that the value of LTE |
| 04:20:01 | 7 | communication is represented by the baseband, correct? |
| 04:20:04 | 8 | A.  I don't think I stated that with respect to this -- |
| 04:20:10 | 9 | with this case, no. |
| 04:20:14 | 10 | MR. SHEASBY:  Well, why don't we go to your |
| 04:20:20 | 11 | deposition at Page 108, Lines 8 through 14? |
| 04:20:48 | 12 | A.  Okay. |
| 04:20:49 | 13 | Q.  (By Mr. Sheasby)  Did you give that testimony? |
| 04:20:51 | 14 | A.  Yes, I did. |
| 04:20:52 | 15 | Q.  Is that testimony accurate? |
| 04:20:54 | 16 | A.  I think it is, yeah. |
| 04:20:57 | 17 | MR. SHEASBY:  Let's publish that. |
| 04:21:00 | 18 | A.  Sure. |
| 04:21:01 | 19 | Q.  (By Mr. Sheasby)  You believe that all the value of LTE |
| 04:21:03 | 20 | communication is represented by the baseband chip, correct? |
| 04:21:10 | 21 | I don't know that I've ever said that. |
| 04:21:14 | 22 | A.  The word "ever" is not there, but I don't believe that |
| 04:21:17 | 23 | I've said that.  Yes, that's what I said. |
| 04:21:19 | 24 | Q.  And that's correct, fair? |
| 04:21:20 | 25 | A.  Yeah, that was correct. |

04:21:21   1   Q.  You understand that Apple's damages case places the

04:21:29   2   value of what's at issue in this case in the baseband chip,

04:21:32   3   correct?

04:21:32   4   A.  I believe that is correct.

04:21:33   5   Q.  You understand that Apple has an expert named

04:21:45   6   Dr. Kennedy -- Perryman who's going to discuss damages,

04:21:49   7   correct?

04:21:49   8   A.  That sounds right.  I'll take your word for it.  Yes, I

04:21:52   9   believe that's correct.

04:21:52   10   Q.  Have you had any discussions with Dr. Perryman ever?

04:21:55   11   A.  I believe that I have.

04:21:57   12   Q.  Did you tell him, hey, Dr. Perryman, you know, there's

04:22:00   13   more value to LTE than the baseband?  Did you ever explain

04:22:05   14   that to him?

04:22:06   15   A.  I don't believe that -- I believe that we talked about

04:22:10   16   specific aspects of LTE, not all of LTE.

04:22:14   17           MR. SHEASBY:  Objection.  Move to strike.

04:22:16   18   Non-responsive.

04:22:20   19           THE COURT:  Overruled.

04:22:21   20   Q.  (By Mr. Sheasby)  Did you tell Dr. Perryman that you

04:22:24   21   have never stated that the value of LTE communications is

04:22:28   22   represented by the baseband?

04:22:29   23   A.  I don't believe I said those specific words, no.

04:22:34   24   Q.  Now, you didn't conduct your own independent

04:22:39   25   investigation as to whether Apple's conduct was willful,

| | | |
|---|---|---|
| 04:22:44 | 1 | correct? |
| 04:22:44 | 2 | A.  I didn't do a specific investigation into -- into that, |
| 04:22:49 | 3 | no. |
| 04:22:49 | 4 | Q.  And you agree that LG, Samsung, and Panasonic launched |
| 04:22:54 | 5 | LTD -- LTE devices before Apple, correct? |
| 04:22:57 | 6 | A.  I'm sorry, could you repeat your question? |
| 04:23:02 | 7 | Q.  LG, Samsung, and Panasonic launched LTE devices before |
| 04:23:07 | 8 | the iPhone 5 LTE device, correct? |
| 04:23:11 | 9 | A.  I believe that is correct. |
| 04:23:12 | 10 | Q.  Samsung launched its first LTE device over 24 months |
| 04:23:16 | 11 | before Apple, correct? |
| 04:23:17 | 12 | A.  That sounds right. |
| 04:23:19 | 13 | Q.  And Panasonic and LG launched their LTE devices |
| 04:23:23 | 14 | approximately 16 months before Apple, correct? |
| 04:23:27 | 15 | A.  That sounds about right. |
| 04:23:29 | 16 | MR. SHEASBY:  Let's pull up the '003 patent.  And |
| 04:23:39 | 17 | if we could have Figure -- let's go to Tables -- is there a |
| 04:23:43 | 18 | PX-0003?  The 0003 patent is not anything.  Let's pull up |
| 04:23:50 | 19 | the '284 patent, PX-003, and let's go to Tables 3 through |
| 04:24:00 | 20 | 8.  Keep going.  So let's pull up some of these tables. |
| 04:24:19 | 21 | We'll do it one at a time.  Table 3. |
| 04:24:22 | 22 | Q.  (By Mr. Sheasby)  So we're looking at the specification |
| 04:24:24 | 23 | of the '284 patent, correct? |
| 04:24:25 | 24 | A.  That is correct. |
| 04:24:25 | 25 | Q.  This is a patent that you've analyzed, correct? |

| | | |
|---|---|---|
| 04:24:27 | 1 | A.  Yes. |
| 04:24:28 | 2 | Q.  Now, you believed that the claims of the '284 patent do |
| 04:24:34 | 3 | not cover what's depicted in Table 3, correct? |
| 04:24:38 | 4 | A.  That is correct. |
| 04:24:39 | 5 | Q.  Okay.  So let me -- we have the specification of the |
| 04:24:45 | 6 | '284 patent, correct? |
| 04:24:47 | 7 | A.  In this -- yes, this is the specification of the '284 |
| 04:24:50 | 8 | patent. |
| 04:24:50 | 9 | Q.  And we talked about earlier how you used the |
| 04:24:53 | 10 | specification to understand the claims, correct? |
| 04:24:56 | 11 | A.  Yes, and the -- and the file history. |
| 04:24:58 | 12 | Q.  And in Table 3, what you see is you see a first set in |
| 04:25:10 | 13 | which the RV is 0, correct? |
| 04:25:18 | 14 | A.  There is a -- there is a -- yes, there is a set where |
| 04:25:21 | 15 | RV is 0. |
| 04:25:24 | 16 | Q.  And there's a second set where RV is a change number, |
| 04:25:29 | 17 | correct? |
| 04:25:29 | 18 | A.  Where RV changes from 0 to 1, 2, and 3. |
| 04:25:35 | 19 | Q.  And you believe that's not covered by the claims of the |
| 04:25:39 | 20 | patents, correct? |
| 04:25:40 | 21 | A.  That's correct. |
| 04:25:41 | 22 | Q.  In fact -- |
| 04:25:42 | 23 |         MR. SHEASBY:  Let's pull that down. |
| 04:25:44 | 24 | Q.  (By Mr. Sheasby)  And -- oh, by the way, if the jury |
| 04:25:47 | 25 | disagrees with you and the jury concludes that Table 3 is |

| | | |
|---|---|---|
| 04:25:51 | 1 | covered by the claims of the patent, then your theory is |
| 04:25:54 | 2 | incorrect, fair? |
| 04:25:55 | 3 | A.  I'm not entirely sure.  It depends on what else they |
| 04:25:59 | 4 | decide, I suppose. |
| 04:26:00 | 5 | Q.  Sir, do you know what the consequences are if the jury |
| 04:26:09 | 6 | determines that Table 3 is covered by the claims? |
| 04:26:11 | 7 | A.  I'd have to know what else the jury decided. |
| 04:26:14 | 8 | Q.  Sir, Table 3 -- |
| 04:26:16 | 9 | MR. SHEASBY:  Let's pull that up again. |
| 04:26:18 | 10 | Q.  (By Mr. Sheasby)  You agree that Table 3 is the same |
| 04:26:21 | 11 | design as -- a similar design to the LTE standard, correct? |
| 04:26:26 | 12 | A.  No. |
| 04:26:27 | 13 | Q.  Oh.  Okay. |
| 04:26:38 | 14 | MR. SHEASBY:  Why don't we turn to PX-3.22? |
| 04:26:51 | 15 | PDX-3.22.  So this is a demonstrative, Mr. Huynh.  Let's go |
| 04:26:53 | 16 | to Page 22. |
| 04:26:56 | 17 | Q.  (By Mr. Sheasby)  So you just told the ladies and |
| 04:26:58 | 18 | gentlemen of the jury that you don't believe the '284 |
| 04:27:00 | 19 | patent has -- has the same design as the LTE standard, |
| 04:27:04 | 20 | Table 3, correct? |
| 04:27:05 | 21 | A.  Correct. |
| 04:27:06 | 22 | Q.  Now, you agree that in the '283 -- '284 patent in |
| 04:27:18 | 23 | Table 3 there's a TF range, correct? |
| 04:27:20 | 24 | A.  In Table 3 there's a TF range. |
| 04:27:23 | 25 | Q.  And in that TF range, RV is always 0, correct? |

| | | |
|---|---|---|
| 04:27:26 | 1 | A.  RV is always 0, that's correct. |
| 04:27:32 | 2 | Q.  And there's a second range in which RV changes, |
| 04:27:38 | 3 | correct? |
| 04:27:38 | 4 | A.  Correct. |
| 04:27:38 | 5 | Q.  And then, in the 3GPP standard, there's a first range |
| 04:27:46 | 6 | in which RV is always 0 correct? |
| 04:27:49 | 7 | A.  Correct. |
| 04:27:49 | 8 | Q.  And there's a second range in which RV changes, |
| 04:27:52 | 9 | correct? |
| 04:27:52 | 10 | A.  Correct. |
| 04:27:52 | 11 | Q.  And the range in which RV is 0 is larger than the range |
| 04:27:58 | 12 | in which RV changes, correct? |
| 04:28:00 | 13 | A.  That is correct. |
| 04:28:01 | 14 | Q.  In fact, you believe -- |
| 04:28:02 | 15 |         MR. SHEASBY:  Let's pull that down. |
| 04:28:03 | 16 | Q.  (By Mr. Sheasby)  If we go to every single table in the |
| 04:28:06 | 17 | patent -- |
| 04:28:07 | 18 |         MR. SHEASBY:  Let's pull up -- let's go back to |
| 04:28:09 | 19 | PX-003.  Let's go to Table 4. |
| 04:28:22 | 20 | Q.  (By Mr. Sheasby)  Your theory is that Table 4 is not |
| 04:28:26 | 21 | described in the claims of the patent, correct? |
| 04:28:27 | 22 | A.  That is correct. |
| 04:28:29 | 23 |         MR. SHEASBY:  Let's go to Table 5 from the patent. |
| 04:28:32 | 24 | Q.  (By Mr. Sheasby)  You believe that Table 5 is not |
| 04:28:44 | 25 | disclosed in the claims of the patent, correct? |

04:28:47   1   A.   Yes, that is correct.

04:28:50   2        MR. SHEASBY:   Let's go to Table 6.

04:28:52   3   Q.   (By Mr. Sheasby)   You believe that Table 6 is not

04:28:57   4   disclosed in the claims of the patent, correct?

04:29:01   5   A.   That's right.

04:29:02   6        MR. SHEASBY:   Let's go to Table 7.

04:29:04   7   Q.   (By Mr. Sheasby)   You believe that Table 7 is not

04:29:10   8   described in the claims of the patent, correct?

04:29:11   9   A.   That is correct.

04:29:18   10       MR. SHEASBY:   Let's go to Table 8.

04:29:19   11  Q.   (By Mr. Sheasby)   You believe that Table 8 is not

04:29:25   12  disclosed in the claims of the patent, correct?

04:29:27   13  A.   That is correct.

04:29:33   14  Q.   And in your testimony, I was listening for it, you

04:29:37   15  don't identify one single table or figure in the patent

04:29:42   16  that depicts your interpretations of the '284 patent, fair?

04:29:47   17  A.   In my testimony, I did not.

04:29:49   18  Q.   Okay.   The jury is allowed to consider that when they

04:29:53   19  think about your credibility in the jury room?

04:29:55   20  A.   Of course.

04:29:57   21       MR. SHEASBY:   Let's go to PDX-3.33.

04:30:05   22  Q.   (By Mr. Sheasby)   Now, in the patent, the patent

04:30:24   23  contemplates a first part that is made up of the TF range,

04:30:28   24  correct?

04:30:28   25  A.   That is right.   It has a first part that is designated

04:30:34  1   TF range.

04:30:34  2   Q.  And the patent contemplates a second range that is made

04:30:38  3   up of -- of the area where the RV range is changing,

04:30:45  4   correct?

04:30:45  5   A.  Well, it specifically contemplates a second part that's

04:30:49  6   denoted the "RV range."

04:30:50  7   Q.  A first part and a second part, correct?

04:30:54  8   A.  Correct.

04:30:54  9   Q.  And the second part is smaller than the first part,

04:30:58  10  correct?

04:30:58  11  A.  That is correct.

04:31:01  12  Q.  And the claims require a first part that is larger than

04:31:05  13  the second part, correct?

04:31:07  14  A.  Incorrect.

04:31:09  15  Q.  The claims don't require a first subset that is larger

04:31:17  16  than the second subset?

04:31:19  17  A.  Subset, yes.

04:31:21  18  Q.  Okay.  So the claims require a first subset that is

04:31:24  19  larger than the second subset, fair?

04:31:26  20  A.  It does, but it requires specific subsets.

04:31:29  21       MR. SHEASBY:  Your Honor, I object to the last

04:31:30  22  portion of the question as non-responsive, and I move it to

04:31:34  23  be stricken.

04:31:45  24       THE COURT:  I'll sustain that.  The answer, "it

04:31:48  25  does," will complete the witness's response.  The remainder

04:31:53  1   is struck -- is stricken.

04:31:58  2   Q.  (By Mr. Sheasby)  Now, you think there's a difference

04:32:00  3   between a part and a subset, correct?

04:32:04  4   A.  Yes.

04:32:08  5   Q.  The jury is allowed to consider that when they think

04:32:13  6   about your credibility in the jury room, correct?

04:32:16  7   A.  Yes, they can.

04:32:25  8   Q.  Now, the patent inventors actually discussed Table 3 in

04:32:40  9   their discussions with the Patent Office, correct?

04:32:42  10          MR. MUELLER:  Your Honor, before the witness

04:32:44  11  answers, I just want to note that Mr. Sheasby objected to

04:32:47  12  my use of the prosecution history.  He's now using the

04:32:50  13  prosecution history.

04:32:50  14          I do intend to get into it, with Your Honor's

04:32:53  15  permission, on redirect for other reasons, but I think this

04:32:58  16  is yet another reason why the prosecution history should be

04:33:04  17  fair game at this point.

04:33:05  18          MR. SHEASBY:  I'm happy to respond, Your Honor.

04:33:05  19  I'm not using the prosecution history to discuss the

04:33:07  20  history of the claims.  I'm using the prosecution history

04:33:09  21  to discuss -- a statement was made regarding the meaning of

04:33:13  22  the claim limitation.

04:33:14  23          THE COURT:  Well, let's do this, gentlemen.

04:33:16  24  Mr. Sheasby is going to go forward with his direct and --

04:33:18  25  or, excuse me, with his cross.  And if Mr. Mueller thinks a

04:33:22  1  door has been opened, when he gets up to redirect, he can

04:33:26  2  raise it with me then.

04:33:27  3            MR. MUELLER:  Thank you, Your Honor.

04:33:28  4            MR. SHEASBY:  I withdraw the question.

04:33:48  5            Now, let's go to Section -- PDX-3.2.1.

04:34:19  6  PX-3.2.1 -- 21.

04:34:22  7  Q.  (By Mr. Sheasby)  Now, you felt that the table that

04:34:32  8  Panasonic proposed to LT -- was different than the table

04:34:37  9  adopted by LTE, correct?

04:34:39  10 A.  Correct.

04:34:39  11 Q.  And one of the things you pointed out was that there's

04:34:48  12 an index used for the TBS, correct?

04:34:50  13 A.  Correct.

04:34:51  14 Q.  Now, did you discuss with the ladies and gentlemen of

04:34:53  15 the jury whether the patent proposes the use of an index

04:34:58  16 associated with TBS?

04:35:00  17 A.  Are you talking about the patent or the --

04:35:04  18 Q.  Yes, sir.

04:35:04  19 A.  -- proposal?

04:35:04  20 Q.  I'm talking about the patent.

04:35:07  21 A.  Oh, the patent.  No, I did not.

04:35:08  22 Q.  The patent actually proposes the use of an index

04:35:14  23 associated with TBS, correct?

04:35:15  24 A.  The patent proposes a formula that uses -- uses TB -- I

04:35:22  25 believe it does.  I believe it does.

| | | |
|---|---|---|
| 04:35:23 | 1 | Q.  The patent literally uses the word "index." |
| 04:35:26 | 2 | A.  Yes, it does. |
| 04:35:27 | 3 | Q.  Okay.  Now, you also said that there was a difference |
| 04:35:37 | 4 | because the Panasonic proposal includes these NDI and |
| 04:35:41 | 5 | ranges, correct? |
| 04:35:41 | 6 | A.  Correct. |
| 04:35:53 | 7 | MR. SHEASBY:  Now, why don't we go to PDX-3.23. |
| 04:35:59 | 8 | Q.  (By Mr. Sheasby)  The patent talks about a TBS range |
| 04:36:08 | 9 | and an RV range, correct? |
| 04:36:09 | 10 | A.  The patent does, yes. |
| 04:36:11 | 11 | Q.  And the patent claim says comprising, correct? |
| 04:36:19 | 12 | A.  Yes, it does. |
| 04:36:20 | 13 | Q.  And "comprising" means that you can have more than |
| 04:36:23 | 14 | what's recited.  You just need to have at least what is |
| 04:36:27 | 15 | recited, fair? |
| 04:36:28 | 16 | A.  Fair. |
| 04:36:30 | 17 | MR. SHEASBY:  And so let's go back to PDX-3.21. |
| 04:36:36 | 18 | Q.  (By Mr. Sheasby)  The patent doesn't exclude the use of |
| 04:36:43 | 19 | an NDI and a range, correct? |
| 04:36:46 | 20 | A.  The patent does not. |
| 04:36:47 | 21 | Q.  The patent emphasizes that what you must have is TF and |
| 04:36:53 | 22 | RV, fair? |
| 04:36:56 | 23 | A.  Correct. |
| 04:36:57 | 24 | Q.  Now, you don't identify any reference or design |
| 04:37:09 | 25 | anywhere in the world that anticipates the '284 patent, |

04:37:12  1   correct?

04:37:12  2   A.  That anticipates?  No.

04:37:14  3   Q.  The patent is entitled to a presumption of validity,

04:37:19  4   correct?

04:37:19  5   A.  It is, correct.

04:37:22  6   Q.  Your burden of proof is clear and convincing evidence,

04:37:26  7   correct?

04:37:26  8   A.  That is correct.

04:37:27  9   Q.  You don't identify any reference anywhere in the world

04:37:31  10  that discloses joint encoding of TF and RV, correct?

04:37:36  11  A.  Today or in my report?

04:37:38  12  Q.  In your report, sir.

04:37:40  13  A.  Yes, I did.

04:37:41  14  Q.  Let me ask it -- let me withdraw the question.

04:37:44  15       In your testimony today under oath before the

04:37:46  16  jury, do you identify any reference that discloses the

04:37:49  17  combination of TF and RV through joint encoding?

04:37:53  18  A.  Not specifically through joint encoding.

04:37:59  19  Q.  So for the ladies and gentlemen of the jury, we agree

04:38:01  20  that one of the limitation in the claim -- it's

04:38:08  21  Limitation 4 --

04:38:09  22       THE COURT:  Slow down, Mr. Sheasby, please.

04:38:11  23       MR. SHEASBY:  Yes.

04:38:12  24  Q.  (By Mr. Sheasby)  One of the limitations in the claim

04:38:17  25  requires joint encoding, correct?

04:38:19  1    A.  That is correct.

04:38:20  2    Q.  You checked the box for joint encoding, correct?

04:38:25  3    A.  Yes, we did.

04:38:26  4    Q.  But the reality is -- is that the references you

04:38:28  5    presented to the jury do not disclose joint encoding of TF

04:38:33  6    and RV, correct?

04:38:34  7    A.  Correct, but I'd like to explain, if I could.

04:38:41  8              THE COURT:  Mr. Mueller will get a chance to ask

04:38:43  9    you follow-up questions later.

04:38:45  10             THE WITNESS:  Okay.

04:38:46  11             THE COURT:  You need to respond to questions asked

04:38:49  12   by Mr. Sheasby at this point.

04:38:50  13             THE WITNESS:  Okay.  Thank you.

04:38:51  14   Q.  (By Mr. Sheasby)  You think it would be obvious to --

04:38:53  15   to jointly encode TF and RV, correct?

04:38:57  16   A.  Correct.

04:38:57  17   Q.  You've never participated in an LTE working group,

04:39:00  18   correct?

04:39:00  19   A.  Correct.

04:39:01  20   Q.  Had no role whatsoever in constructing LTE, correct?

04:39:04  21   A.  That is correct.

04:39:06  22             MR. SHEASBY:  I pass the witness.

04:39:07  23             THE COURT:  Redirect by the Defendant.

04:39:13  24             MR. MUELLER:  Yes, please, Your Honor.

04:39:17  25             THE COURT:  Unless you're going to use that

04:39:19   1   demonstrative in redirect, Mr. Sheasby needs to take it

04:39:23   2   down.

04:39:23   3            MR. MUELLER:  I'll take it down.

04:39:27   4            MR. SHEASBY:  I'm sorry, Mr. Mueller.

04:39:29   5            MR. MUELLER:  That's fine.

04:39:30   6            THE COURT:  All right.  Let's proceed with

04:39:31   7   redirect examination by the Defendant.

04:39:33   8            MR. MUELLER:  Thank you -- thank you, Your Honor.

04:39:33   9                   REDIRECT EXAMINATION

04:39:33  10   BY MR. MUELLER:

04:39:34  11   Q.  Dr. Buehrer?

04:39:35  12   A.  Yes.

04:39:36  13   Q.  First I want to ask you about willfulness, which

04:39:39  14   Mr. Sheasby raised.  Do you recall that?

04:39:40  15   A.  I do.

04:39:41  16   Q.  Now, he mentioned that Samsung, LG, and Panasonic had

04:39:46  17   released LTE devices before Apple.  Do you recall that,

04:39:49  18   sir?

04:39:49  19   A.  Yes, I do.

04:39:50  20   Q.  Have you seen any evidence in this case that Samsung,

04:39:55  21   LG, or Panasonic contacted Apple about these patents?

04:39:59  22            MR. SHEASBY:  Your Honor, objection.  This is

04:40:02  23   subject to a motion in limine.

04:40:04  24            THE COURT:  I understand.  We've discussed this.

04:40:06  25   I've given leave to ask this question.  Your objection is

04:40:09   1   overruled.

04:40:09   2          MR. SHEASBY:  Your Honor, I believe that this was

04:40:11   3   given as to Mr. Blevins, not as to the experts.  This -- he

04:40:15   4   has no personal knowledge of this subject whatsoever.

04:40:17   5          MR. MUELLER:  Your Honor, Mr. Sheasby raised

04:40:19   6   willfulness.  I'm asking whether he's seen any evidence as

04:40:22   7   part of his work on this case.  It's about willfulness.

04:40:25   8   It's a question that goes directly to willfulness, which

04:40:27   9   Mr. Sheasby just raised.

04:40:29   10          MR. SHEASBY:  I believe the Court gave them leave

04:40:31   11   to go into this with Mr. Blevins where I could have

04:40:34   12   examined him.  This witness has no personal knowledge of

04:40:37   13   this whatsoever.

04:40:39   14          MR. MUELLER:  Your Honor, again, this is a subject

04:40:41   15   that --

04:40:42   16          THE COURT:  It was discussed that it was going to

04:40:45   17   be with your corporate representative, Mr. Mueller.

04:40:47   18          MR. MUELLER:  Your Honor, this is the subject that

04:40:50   19   Mr. Sheasby raised and just tried to draw an implication

04:40:54   20   that Samsung, LG, and Panasonic released products earlier

04:40:58   21   and, therefore, Apple is willfully infringing.  It was

04:41:01   22   introduced under the guise of willfulness.

04:41:03   23          Whether they actually contacted Apple is a

04:41:06   24   relevant fact, and Dr. Buehrer has conducted an analysis of

04:41:10   25   willfulness in this case.  I'd like to ask him that one

04:41:12  1  question.

04:41:15  2        MR. SHEASBY:  Your Honor, may I be heard, or have

04:41:17  3  you heard enough?

04:41:18  4        THE COURT:  You're asserting an order in limine,

04:41:21  5  Mr. Sheasby?

04:41:23  6        MR. SHEASBY:  Yes.  It's Motion in Limine No. --

04:41:25  7  it's the last motion in limine on our motions in limine.  I

04:41:28  8  believe it's 14, Your Honor.

04:41:37  9        THE COURT:  Yes.

04:41:42  10        MR. MUELLER:  And, Your Honor, I would say the

04:41:45  11  door, again, is opened by what Mr. Sheasby just did.  Fair

04:41:51  12  rebuttal to his point to the jury is whether those

04:41:54  13  companies actually contacted Apple about these patents.

04:42:06  14        THE COURT:  Well, he's not Apple, Mr. Mueller, and

04:42:09  15  he's not going to know what did or didn't happen with Apple

04:42:13  16  unless somebody at Apple tells him that by way of some

04:42:18  17  hearsay statement.

04:42:18  18        MR. MUELLER:  My only question, Your Honor, would

04:42:20  19  be:  Have you seen any evidence that Panasonic, Samsung,

04:42:22  20  and LG contacted Apple?  Has he seen any evidence is my

04:42:27  21  only question.

04:42:27  22        THE COURT:  In his role as an expert in this case?

04:42:29  23        MR. MUELLER:  Yes.

04:42:30  24        THE COURT:  With that clarification, I'll allow

04:42:32  25  that one question.

04:42:32   1           MR. MUELLER:   Thank you, Your Honor.

04:42:33   2   Q.  (By Mr. Mueller)  Dr. Buehrer, in your role as an

04:42:35   3   expert in this case, have you seen any evidence that

04:42:43   4   Samsung, Panasonic, or LG ever contacted Apple about the

04:42:49   5   patents in this case?

04:42:50   6   A.  No, I have not.

04:42:52   7   Q.  Now, Mr. Sheasby asked you about the tables in the

04:42:58   8   patent, right, sir?

04:42:59   9   A.  Correct.

04:43:00   10   Q.  Those tables, were they in the original patent

04:43:03   11   application or not in the original patent application?

04:43:06   12   A.  They were in the original application.

04:43:08   13   Q.  And so when Samsung -- I'm sorry, Panasonic first

04:43:11   14   applied for the '284 patent, were those tables in the

04:43:15   15   original patent application or not?

04:43:17   16   A.  Yes, they were.

04:43:20   17           MR. MUELLER:   Your Honor, at this point I would

04:43:22   18   request leave to inquire into the prosecution history,

04:43:24   19   which goes to the issue of why the claims that are being

04:43:27   20   asserted don't cover those tables.

04:43:31   21           THE COURT:   What's the Plaintiffs' response?

04:43:33   22           MR. SHEASBY:   Your Honor, first off, this is

04:43:35   23   outside of the scope of -- of cross-examination.  I never

04:43:39   24   referenced whatsoever to these tables.  The tables were in

04:43:43   25   the patents that were discussed in the direct examination.

| | | |
|---|---|---|
| 04:43:45 | 1 | THE COURT:  Rule 40 -- excuse me.  Rule 611 |
| 04:43:48 | 2 | doesn't talk about the scope of cross.  It talks about the |
| 04:43:51 | 3 | scope of direct. |
| 04:43:52 | 4 | MR. SHEASBY:  Your Honor, then it's the same |
| 04:43:53 | 5 | objection.  I believe what he's trying to do is discuss the |
| 04:43:56 | 6 | claim history of the patents, which is a subject for this |
| 04:43:59 | 7 | Court.  It's not a subject for the jury. |
| 04:44:01 | 8 | MR. MUELLER:  That's incorrect, Your Honor.  And |
| 04:44:03 | 9 | the suggestion to the jury was explicitly that they |
| 04:44:06 | 10 | consider Dr. Buehrer to have less credibility.  That was |
| 04:44:09 | 11 | the explicit argument by Mr. Sheasby, because the claims |
| 04:44:12 | 12 | don't cover the tables. |
| 04:44:13 | 13 | The reason they don't cover the tables is because |
| 04:44:16 | 14 | of how the claims were amended during the prosecution |
| 04:44:19 | 15 | history, and that's what I'd like to inquire into. |
| 04:44:22 | 16 | MR. SHEASBY:  Your Honor, that is an absolutely |
| 04:44:24 | 17 | inappropriate use of the prosecution history.  Counsel just |
| 04:44:28 | 18 | tried to get in evidence through his argument that -- |
| 04:44:28 | 19 | THE COURT:  All right.  I've heard enough, |
| 04:44:33 | 20 | gentlemen.  I'm going to sustain this objection.  I don't |
| 04:44:35 | 21 | think the door has been completely opened here. |
| 04:44:38 | 22 | Q.  (By Mr. Mueller) Dr. Buehrer, just focusing on the |
| 04:44:41 | 23 | claims themselves -- |
| 04:44:43 | 24 | MR. MUELLER:  And, Your Honor, can I put the |
| 04:44:46 | 25 | placard up? |

04:44:47    1           THE COURT:  Certainly.

04:44:48    2    Q.  (By Mr. Mueller)   This is Claim 1 in the final

04:44:50    3    as-issued patent, right?

04:44:52    4    A.  Correct.

04:44:52    5    Q.  And just focusing on the claim language in the final

04:44:56    6    as-issued patent, why does this language not cover those

04:45:00    7    tables that Mr. Sheasby took you through?

04:45:03    8    A.  Because -- now, it's important to understand that we

04:45:08    9    have to go by the claims.  The claims require two subsets,

04:45:14   10    and those subsets are very clearly defined.  They're

04:45:19   11    clearly defined as being -- the first subset is a range of

04:45:24   12    values reserved for -- reserved for indicating transport

04:45:28   13    format --

04:45:28   14    Q.  And let me pause you, Dr. Buehrer.

04:45:31   15           MR. MUELLER:  Your Honor, may I switch the

04:45:34   16    placards and put another one up?

04:45:36   17           THE COURT:  You may.

04:45:37   18    Q.  (By Mr. Mueller)   This may be helpful, Dr. Buehrer.

04:45:40   19    Why don't you use this, and please continue.  I'm sorry to

04:45:43   20    interrupt.

04:45:43   21    A.  Okay.  So the claims require two subsets that are

04:45:46   22    specifically defined.  The first subset is a set of values

04:45:49   23    reserved for indicating transport format.  The second

04:45:52   24    subset is a set of values reserved for indicating

04:45:56   25    redundancy version.

| | | |
|---|---|---|
| 04:45:57 | 1 | When we look at the claims -- or when we look at |
| 04:46:01 | 2 | those tables that we were talking about, they don't follow |
| 04:46:04 | 3 | that.  They don't have two subset -- well, I'm sorry -- |
| 04:46:08 | 4 | they do have two subsets that follow that, but when we go |
| 04:46:12 | 5 | to the very last limitation, the size of the first subset |
| 04:46:15 | 6 | is not larger than the size of the second subset. |
| 04:46:20 | 7 | Q.  And so we have the blue here.  Is that the first |
| 04:46:24 | 8 | subset? |
| 04:46:24 | 9 | A.  Correct. |
| 04:46:24 | 10 | Q.  Red is the second subset? |
| 04:46:27 | 11 | A.  Correct. |
| 04:46:27 | 12 | Q.  And this is the actual LTE standard on the right here? |
| 04:46:29 | 13 | A.  Correct. |
| 04:46:31 | 14 | Q.  Not a table from the patent, right? |
| 04:46:34 | 15 | A.  That's right. |
| 04:46:34 | 16 | Q.  How do these two subsets in the actual LTE standard |
| 04:46:38 | 17 | compare to the as-issued claims of the '284 patent? |
| 04:46:41 | 18 | A.  They do not match the requirements of the '284 -- Claim |
| 04:46:48 | 19 | 1 of the '284 patent. |
| 04:46:50 | 20 | Q.  Final few questions, Dr. Buehrer.  Mr. Sheasby asked a |
| 04:46:55 | 21 | few times if the jury could understand some issue with |
| 04:46:57 | 22 | respect to your credibility -- |
| 04:46:57 | 23 | THE COURT:  Slow down, Mr. Mueller. |
| 04:47:01 | 24 | MR. MUELLER:  Apologize, Your Honor. |
| 04:47:02 | 25 | Q.  (By Mr. Mueller)  Mr. Sheasby asked you several times |

| | | |
|---|---|---|
| 04:47:05 | 1 | whether the jury could consider some issue with respect to |
| 04:47:08 | 2 | your credibility.  Do you recall that? |
| 04:47:08 | 3 | A.  I do. |
| 04:47:09 | 4 | Q.  And your independence; do you recall that? |
| 04:47:11 | 5 | A.  I do. |
| 04:47:12 | 6 | Q.  Sir, are you here as an independent expert? |
| 04:47:15 | 7 | A.  I absolutely am. |
| 04:47:16 | 8 | MR. SHEASBY:  Your Honor, objection.  Leading. |
| 04:47:19 | 9 | THE COURT:  It is leading. |
| 04:47:21 | 10 | Restate your question. |
| 04:47:22 | 11 | Q.  (By Mr. Mueller)  Are you here as an independent expert |
| 04:47:25 | 12 | or a non-independent expert? |
| 04:47:26 | 13 | A.  I'm here as an independent expert. |
| 04:47:32 | 14 | Q.  What, in very brief summary, are your qualifications to |
| 04:47:36 | 15 | be an expert in this case with respect to the '284 patent? |
| 04:47:38 | 16 | A.  I have been researching and studying wireless |
| 04:47:41 | 17 | communications for over 25 years.  I have been -- I have |
| 04:47:47 | 18 | studied the LTE standard substantially, and I |
| 04:47:52 | 19 | understand very -- I am an expert in wireless |
| 04:47:54 | 20 | communications. |
| 04:47:55 | 21 | Q.  Now, with respect to invalidity, which Mr. Sheasby |
| 04:47:58 | 22 | asked you about, do you have that subject in mind? |
| 04:48:03 | 23 | A.  Yes. |
| 04:48:03 | 24 | Q.  What were you describing to the jury today? |
| 04:48:04 | 25 | A.  I was describing -- |

04:48:07  1          MR. SHEASBY:  Your Honor, object.  That calls for

04:48:09  2  a narrative.

04:48:10  3          THE COURT:  Overruled.

04:48:14  4          Restate the question, Mr. Mueller.

04:48:18  5          MR. MUELLER:  Yes.

04:48:18  6  Q.  (By Mr. Mueller)  What was the core of the invalidity

04:48:21  7  opinion that you presented to the ladies and gentlemen of

04:48:23  8  the jury today?

04:48:23  9  A.  My opinion is that if you use the infringement theory

04:48:28  10  of the Plaintiffs, then the claims would be invalid.

04:48:32  11  Q.  Now, were you criticizing the Patent Office in that

04:48:36  12  theory?

04:48:36  13  A.  No, I was not.

04:48:37  14  Q.  What were you doing?

04:48:38  15  A.  I was saying -- I was not saying that the patent --

04:48:43  16  that the patent is invalid when properly interpreted -- oh,

04:48:48  17  I'm sorry -- when properly applied, excuse me.

04:48:50  18  Q.  And, sir, when properly applied, is this patent

04:48:55  19  infringed by Apple?

04:48:56  20  A.  No.

04:48:57  21          MR. MUELLER:  No further questions.  I pass the

04:48:59  22  witness, Your Honor.

04:48:59  23          THE COURT:  All right.  Additional

04:49:01  24  cross-examination, Mr. Sheasby?

04:49:03  25          MR. SHEASBY:  Just two questions.

04:49:05    1   Q.   (By Mr. Sheasby)   Mr. Mueller --

04:49:05    2          THE COURT:   Just a minute, let him take the

04:49:07    3   demonstratives down.

04:49:17    4          All right.   Proceed with your cross-examination.

04:49:17    5                  RECROSS-EXAMINATION

04:49:20    6   BY MR. SHEASBY:

04:49:20    7   Q.   Mr. Mueller asked you a question of have you ever --

04:49:23    8   did you know if Samsung, Panasonic, and LG had approached

04:49:29    9   Apple regarding your patents, correct?   Regarding any of

04:49:32   10   these patents, correct?

04:49:34   11   A.   Correct.

04:49:34   12   Q.   How many hours did you spend with Apple's lawyers over

04:49:39   13   the course of this case?

04:49:39   14   A.   I don't believe I met with Apple's -- which -- the --

04:49:47   15   Q.   They're sitting right there, sir.

04:49:49   16   A.   Oh, I don't know how many hours I spent with them.

04:49:52   17   Q.   Give me an estimate.

04:49:55   18   A.   It's not something I track.   I don't -- I couldn't say.

04:49:58   19   Q.   Did you ever say to Apple, you know what, I want to

04:50:01   20   look in your records to see if LG, Panasonic, and Samsung

04:50:05   21   ever approached you?

04:50:06   22   A.   I did not say that.

04:50:08   23   Q.   Did you say, you know what, I want to talk to your

04:50:11   24   licensing executives to see if Samsung, LTE [sic] and

04:50:16   25   Panasonic ever approached you; did you do that?

| | | |
|---|---|---|
| 04:50:19 | 1 | A.  No. |
| 04:50:19 | 2 | Q.  Now, you've worked for Apple eight times over the last |
| 04:50:27 | 3 | six years? |
| 04:50:28 | 4 | A.  Correct. |
| 04:50:28 | 5 | Q.  Are there people with your qualifications that haven't |
| 04:50:33 | 6 | worked for Apple eight times over the last six years and |
| 04:50:35 | 7 | been paid $760,000 who could do the analysis you just did? |
| 04:50:36 | 8 | A.  I suppose there probably are. |
| 04:50:39 | 9 | Q.  Thank you. |
| 04:50:40 | 10 | THE COURT:  You pass the witness, Mr. Sheasby? |
| 04:50:41 | 11 | MR. SHEASBY:  I pass the witness, Your Honor. |
| 04:50:42 | 12 | THE COURT:  Is there redirect, Mr. Mueller? |
| 04:50:44 | 13 | MR. MUELLER:  No, Your Honor.  Thank you. |
| 04:50:46 | 14 | THE COURT:  All right, Dr. Buehrer.  You may step |
| 04:50:48 | 15 | down. |
| 04:50:48 | 16 | THE WITNESS:  Thank you. |
| 04:50:53 | 17 | MR. SHEASBY:  Your Honor, with your permission, |
| 04:50:56 | 18 | may we clear binders before the next witness? |
| 04:50:59 | 19 | THE COURT:  You may clear binders. |
| 04:51:33 | 20 | Ladies and gentlemen of the jury, we're going to |
| 04:51:37 | 21 | stop for the day.  The next witness is going to be lengthy. |
| 04:51:42 | 22 | We're at 5:00 o'clock now, give or take.  And, quite |
| 04:51:47 | 23 | honestly, I think it's appropriate that we use this point |
| 04:51:51 | 24 | in time to recess for the day. |
| 04:51:53 | 25 | So as you leave the courtroom in a minute, take |

04:51:58  1  your notebooks with you and leave them on the table in the

04:52:01  2  jury room.

04:52:02  3       Follow all the instructions that I've given you

04:52:05  4  that I trust you've continued to follow, including not to

04:52:08  5  discuss the case with anyone in any way, including the

04:52:11  6  eight of yourselves.

04:52:13  7       I'd like to start as close to 8:30 as I can in the

04:52:16  8  morning.  One of these days we're going to get to start at

04:52:20  9  8:30, if you'll just continue to try and help me.

04:52:23  10       And have a safe evenings at your homes, travel

04:52:27  11  carefully and safely, and I will see you in the morning.

04:52:31  12  You're excused at this time.

04:52:32  13       COURT SECURITY OFFICER:  All rise.

04:52:43  14       (Jury out.)

04:52:44  15       THE COURT:  Be seated, please.

04:52:56  16       Counsel, according to my calculations, a total of

04:53:09  17  6 hours and 14 minutes and 15 seconds was used in the trial

04:53:16  18  today.

04:53:17  19       The Plaintiff has used 10 hours and 40 minutes,

04:53:24  20  and has 2 hours and 20 minutes remaining.

04:53:28  21       The Defendant has used 9 hours and 46 minutes, and

04:53:32  22  has 3 hours and 14 minutes remaining with regard to

04:53:39  23  allocated time for trial that I gave you at pre-trial.

04:53:42  24       Also, without naming names, there are support

04:53:47  25  staff people who continue to pester my law clerks during

04:53:51   1   recesses about how long was this, how much time did you

04:53:55   2   allocate to this, how did you arrive at this much time for

04:54:00   3   that.

04:54:01   4         I am keeping the time.  I am sure you all have

04:54:03   5   your own timekeepers to check things out there.  But the

04:54:03   6   time I give you is the time that counts.

04:54:08   7         And, you know, you're welcome to periodically

04:54:10   8   check, but I don't need inquiries constantly as to every

04:54:15   9   item in the day as to how it was scored time-wise.  That's

04:54:19   10  not helpful.  So please refrain from that.

04:54:24   11        I will expect you to read into the record tomorrow

04:54:29   12  morning the items from the list of pre-admitted exhibits

04:54:33   13  used during today's portion of the trial.  I will expect

04:54:36   14  you to meet and confer on it overnight.  I will expect you

04:54:38   15  to resolve any disputes about it overnight.

04:54:42   16         If despite Herculean efforts on your part you

04:54:46   17  cannot, then I'll talk with you about it in the morning.  I

04:54:50   18  will be in chambers by 7:30.

04:54:54   19        Again, you are to support the status of any

04:54:56   20  overnight disputes to my staff by email by 10:00 p.m., not

04:55:01   21  11:30, not midnight.  You are to continue to meet and

04:55:05   22  confer on those disputes until you deliver a notebook to

04:55:09   23  chambers at 7:00 a.m. tomorrow morning that has any

04:55:13   24  disputed demonstratives or other tangible documents in it

04:55:17   25  and a succinct paragraph from each side as to that document

04:55:22  1   showing the basis for each party's position.

04:55:25  2         Documents that are not in dispute are not to be

04:55:28  3   included.  And 6-, 8-, or 10-page -- excuse me, inches of

04:55:34  4   paper in a three-ring binder like I got yesterday are no

04:55:39  5   more helpful than the zero I got this morning.

04:55:42  6         You're going to get this process right or, as I

04:55:45  7   told you in chambers, I'm going to sanction you.  It's a

04:55:48  8   waste of my time.  It's a waste of my staff's time.  And it

04:55:54  9   keeps us from starting this trial, as I've told this jury I

04:55:57  10  intend to, by 7:30 -- by 8:30 every morning.

04:56:01  11        I don't know how to make my position any clearer.

04:56:05  12  I'm going to carefully look at what comes in tonight and

04:56:09  13  tomorrow morning.

04:56:10  14        I expect you to comply with the procedures that

04:56:12  15  I've given you.  They're known to you.  They've been used

04:56:16  16  by me for years.

04:56:17  17        Both -- both sides have tried multiple cases

04:56:19  18  before me.  This is no surprise.  This is nothing new.  You

04:56:23  19  are going to do it the way you know you are supposed to do

04:56:27  20  it.

04:56:28  21        Are there questions from either Plaintiff or

04:56:34  22  Defendant at this juncture?

04:56:35  23        MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

04:56:38  24        MR. MUELLER:  No, Your Honor.

04:56:40  25        THE COURT:  All right.  I will see you in the

04:56:42  1    morning.

04:56:42  2            We stand in recess for the evening.

04:56:45  3            COURT SECURITY OFFICER:  All rise.

04:56:46  4            (Recess.)

05:05:54  5

05:05:54  6                        CERTIFICATION

          7

          8        I HEREBY CERTIFY that the foregoing is a true and

          9    correct transcript from the stenographic notes of the

         10    proceedings in the above-entitled matter to the best of my

         11    ability.

         12

         13

         14    _/S/ Shelly Holmes_____               _8/6/2020__
               SHELLY HOLMES, CSR, TCRR                  Date
         15    OFFICIAL REPORTER
               State of Texas No.: 7804
         16    Expiration Date: 12/31/2020

         17

         18

         19

         20

         21

         22

         23

         24

         25