```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3
   OPTIS WIRELESS TECHNOLOGY,    )(  CIVIL ACTION NO.
 4 LLC, OPTIS CELLULAR           )(  2:19-CV-66-JRG
   TECHNOLOGY, LLC, PANOPTIS     )(
 5 PATENT MANAGEMENT, LLC,       )(
   UNWIRED PLANET, LLC, UNWIRED  )(
 6 PLANET INTERNATIONAL LIMITED, )(
        PLAINTIFFS,              )(
 7                               )(
   VS.                           )(
 8                               )(  MARSHALL, TEXAS
                                 )(  AUGUST 7, 2020
 9 APPLE INC.,                   )(  8:22 A.M.
        DEFENDANTS.              )(

10

11             TRANSCRIPT OF JURY TRIAL

12                  MORNING SESSION

13      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14          UNITED STATES CHIEF DISTRICT JUDGE

15
   APPEARANCES:
16

17 FOR THE PLAINTIFFS:

18
   MR. SAMUEL F. BAXTER
19 MS. JENNIFER TRUELOVE
   MCKOOL SMITH, P.C.
20 104 E. Houston Street
   Suite 300
21 Marshall, TX 75670

22
   MR. JASON G. SHEASBY
23 MS. ANNITA ZHONG
   IRELL & MANELLA LLP
24 1800 Avenue of the Stars
   Suite 900
25 Los Angeles, CA 90067
```

```
 1   FOR THE PLAINTIFFS:

 2
     MR. STEVEN J. POLLINGER
 3   MR. SETH R. HASENOUR
     MCKOOL SMITH, P.C.
 4   300 W. 6th Street
     Suite 1700
 5   Austin, TX 78701

 6
     MR. JONATHAN YIM
 7   MCKOOL SMITH, P.C.
     One Manhattan West
 8   395 9th Avenue
     50th Floor
 9   New York, NY 10001

10
     MR. CHRISTOPHER P. MCNETT
11   MCKOOL SMITH, P.C.
     1999 K Street, NW
12   Suite 600
     Washington, DC 20006
13

14   MS. INGRID PETERSEN
     MS. KELSEY SCHUETZ
15   IRELL & MANELLA LLP
     840 Newport Center Drive
16   Suite 400
     Newport Beach, CA 92660
17

18   FOR THE DEFENDANT:

19
     MR. JOSEPH J. MUELLER
20   WILMER CUTLER PICKERING
     HALE & DORR, LLP
21   60 State Street
     Boston, MA 02109
22

23   MR. MICHAEL J. SUMMERSGILL
     WILMER CUTLER PICKERING
24   HALE & DORR, LLP
     60 State Street
25   Boston, MA 02109
```

```
 1  FOR THE DEFENDANT:

 2
    MS. MELISSA R. SMITH
 3  GILLAM & SMITH, LLP
    303 South Washington Avenue
 4  Marshall, TX 75670

 5

 6

 7

 8  COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
 9                       United States District Court
                         Eastern District of Texas
10                       Marshall Division
                         100 E. Houston
11                       Marshall, Texas  75670
                         (903) 923-7464
12

13
    (Proceedings recorded by mechanical stenography, transcript
14  produced on a CAT system.)

15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | P R O C E E D I N G S                                        |
| 08:22:33 | 2  | (Jury out.)                                               |
| 08:22:33 | 3  | COURT SECURITY OFFICER:  All rise.                        |
| 08:22:34 | 4  | THE COURT:  Be seated, please.                           |
| 08:27:49 | 5  | Are the parties prepared to read into the record         |
| 08:27:57 | 6  | those items from the list of pre-admitted exhibits used  |
| 08:28:01 | 7  | during yesterday's portion of the trial?                 |
| 08:28:05 | 8  | MR. MUELLER:  Yes, we are, Your Honor.                    |
| 08:28:07 | 9  | MS. SCHUETZ:  Yes, Your Honor.                            |
| 08:28:08 | 10 | THE COURT:  Please proceed.                               |
| 08:28:09 | 11 | MS. SCHUETZ:  Good morning, Your Honor.                   |
| 08:28:12 | 12 | Plaintiffs yesterday did not use any additional          |
| 08:28:15 | 13 | exhibits from the pre-admitted list.  However, we do have |
| 08:28:19 | 14 | one transcription error to correct, and that is on --    |
| 08:28:25 | 15 | PX-5289a is in the transcript, but it should be PX-5279a. |
| 08:28:31 | 16 | THE COURT:  Do Defendants agree with that?               |
| 08:28:32 | 17 | MR. MUELLER:  That's fine, Your Honor.                    |
| 08:28:34 | 18 | THE COURT:  Then I'll take it that there's no            |
| 08:28:36 | 19 | objection, and I'll order the correction.                |
| 08:28:39 | 20 | MS. SCHUETZ:  That's all from Plaintiffs.                 |
| 08:28:41 | 21 | THE COURT:  Let me hear from Defendant, please.          |
| 08:28:44 | 22 | MR. MUELLER:  Thank you, Your Honor.  Our list           |
| 08:28:46 | 23 | today is DTX-26, DTX-82, DTX-83, DTX-102, DTX-106, DTX-115, |
| 08:28:59 | 24 | DTX-119, DTX-154, DTX-171, DTX-417, DX-428, DTX-633,      |
| 08:29:19 | 25 | DTX-1047, DTX-1717, DTX-1904, DTX-1924, DTX-1931, DTX-1932, |

08:29:34   1   DTX-1947, PX-63, PX-1571, and PX-1990.

08:29:48   2        THE COURT:  All right.  Is there an objection to

08:29:49   3   that rendition from the Plaintiffs?

08:29:52   4        MS. SCHUETZ:  Your Honor, there were a few

08:29:54   5   exhibits that he listed that we did not have on our list as

08:29:58   6   being agreed to.  I don't know if this is because they were

08:30:01   7   already pre-admitted and read into the record yesterday or

08:30:03   8   the day before or if there is a dispute that I was not

08:30:06   9   aware of.

08:30:06   10       THE COURT:  Why do you not know?  Why have you not

08:30:10   11  discussed it with the other side?  Why am I hearing about

08:30:13   12  this from the podium for the first time in the courtroom?

08:30:16   13       MS. SCHUETZ:  We have a list of exhibits that were

08:30:19   14  agreed to between the parties -- yeah.  Okay.  So he is

08:30:21   15  nodding now that they were already admitted and read into

08:30:24   16  the record yesterday so --

08:30:25   17       THE COURT:  All right.  Then I gather we don't

08:30:28   18  have any objection.

08:30:28   19       MS. SCHUETZ:  No objection, Your Honor.

08:30:29   20       THE COURT:  All right.  Thank you.

08:30:30   21       All right.  We ended yesterday with Dr. Buehrer.

08:30:36   22  And who will Defendants' next witness be?

08:30:39   23       MR. MUELLER:  Dr. Jonathan Wells, Your Honor.

08:30:42   24       THE COURT:  And are you prepared to call Dr. Wells

08:30:46   25  at this time?

08:30:46  1          MR. MUELLER:  We are, Your Honor.

08:30:47  2          THE COURT:  Then would you please bring in the

08:30:49  3  jury, Mr. Elliott?

08:30:51  4          COURT SECURITY OFFICER:  All rise.

08:31:10  5          (Jury in.)

08:31:12  6          THE COURT:  Welcome back, ladies and gentlemen.

08:31:15  7  Please have a seat.

08:31:16  8          If you'll notice the clock in the courtroom, it is

08:31:21  9  exactly 8:30, so it took me a week to get there.

08:31:23  10         All right.  We'll proceed with the Defendant's

08:31:26  11  case-in-chief.

08:31:26  12         Defendants, call your next witness.

08:31:30  13         MR. MUELLER:  Your Honor, we call Dr. Jonathan

08:31:32  14  Wells to the stand.

08:31:33  15         THE COURT:  All right.  Dr. Wells, if you'll come

08:31:37  16  forward and be sworn, please.

08:31:41  17         (Witness sworn.)

08:31:42  18         THE COURT:  Please come around, sir.  Have a seat

08:31:51  19  on the witness stand.

08:31:55  20         All right.  Mr. Mueller, you may begin with your

08:32:11  21  direct examination.

08:32:12  22         MR. MUELLER:  Thank you, Your Honor.

08:32:14  23         Good morning, ladies and gentlemen.

         24

         25

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 08:32:14 | 1  | JONATHAN WELLS, PH.D., DEFENDANT'S WITNESS, SWORN        |
| 08:32:14 | 2  | DIRECT EXAMINATION                                        |
| 08:32:14 | 3  | BY MR. MUELLER:                                           |
| 08:32:16 | 4  | Q.  And good morning, Dr. Wells.                          |
| 08:32:18 | 5  | A.  Good morning, Mr. Mueller.                            |
| 08:32:20 | 6  | Q.  Sir, could you please introduce yourself to the jury? |
| 08:32:23 | 7  | A.  Certainly, yes.                                       |
| 08:32:24 | 8  | Good morning, everybody.  My name is Jonathan            |
| 08:32:26 | 9  | Wells.  I'm a wireless communications consultant.  I've  |
| 08:32:30 | 10 | been happily married for 22 years.  I live in California |
| 08:32:32 | 11 | with my wife and two teenage daughters.                  |
| 08:32:36 | 12 | THE COURT:  Dr. Wells, pull the microphone a            |
| 08:32:38 | 13 | little closer to you, please, sir.                       |
| 08:32:40 | 14 | THE WITNESS:  Yes, Your Honor.                          |
| 08:32:41 | 15 | THE COURT:  Thank you.                                   |
| 08:32:41 | 16 | Q.  (By Mr. Mueller)  Dr. Wells, what do you do for a    |
| 08:32:45 | 17 | living?                                                   |
| 08:32:46 | 18 | A.  So I have my own consulting company.  I'm a wireless |
| 08:32:50 | 19 | communications consultant.                               |
| 08:32:51 | 20 | Q.  And what type of consulting do you do?               |
| 08:32:52 | 21 | A.  So I work in the area of wireless communications,    |
| 08:32:56 | 22 | cellular communications, WiFi communications, but I do a |
| 08:32:59 | 23 | lot of work on LTE.                                       |
| 08:33:00 | 24 | MR. MUELLER:  And if we could please pull up            |
| 08:33:03 | 25 | DDX-6.2.                                                  |

08:33:04  1  Q.  (By Mr. Mueller)  And, sir, could you tell us a bit

08:33:07  2  about your background?

08:33:08  3  A.  Yes, certainly.  So -- excuse me.

08:33:12  4      This slide gives a little bit of background, a

08:33:15  5  little bit of overview to myself.

08:33:17  6  Q.  And why don't you tell us your educational background,

08:33:20  7  if you could, sir?

08:33:20  8  A.  So I have a Bachelor of Science and a Ph.D., both from

08:33:25  9  the University of Bath in England.  I then have an MBA

08:33:28  10  degree, as well -- that's a business degree -- which I got

08:33:32  11  when I was living in New Zealand.

08:33:34  12  Q.  And, sir, what did you do after you went to college and

08:33:38  13  earned your Ph.D.?

08:33:39  14  A.  So after my Ph.D., I spent about two and a half years

08:33:43  15  at the University of Bath.  I was teaching.  I was doing

08:33:45  16  research.  I was on the path to becoming a lecturer,

08:33:49  17  becoming a professor.

08:33:50  18      But I realized I liked making things, I liked

08:33:53  19  doing things, and so I made the conscious decision to leave

08:33:56  20  university and to go out into industry.

08:33:58  21  Q.  And what did you do in the industry?

08:34:00  22  A.  So I worked for a variety of companies in England, New

08:34:04  23  Zealand, and in the United States, as well.  I came to the

08:34:07  24  States in 1998.  I worked for a variety of small/medium

08:34:10  25  size companies.  Some of them grew quite large, but they

08:34:14   1   were always in the area of wireless communications.

08:34:16   2   Q.  And could you give us a couple of examples?

08:34:20   3   A.  Yes, certainly.  So one of the reasons I moved to New

08:34:22   4   Zealand was there was a very small startup company there

08:34:26   5   called MAS Technology.  And we grew very large.  We did a

08:34:27   6   NASDAQ IPO, and we were eventually acquired by a large

08:34:30   7   company in the U.S.

08:34:31   8          And then actually after that, I got transferred

08:34:33   9   out to the U.S. here, and I started working here in the

08:34:36   10  U.S. in 1998.

08:34:37   11  Q.  Now, have you designed or built any products over the

08:34:42   12  years?

08:34:43   13  A.  I -- I have.  I've -- I've been building products now

08:34:46   14  for 30 years.  I've built a variety of wireless products,

08:34:50   15  and -- and many of my products have actually been used in

08:34:53   16  the LTE systems.

08:34:54   17  Q.  Have you written any books or publications?

08:34:57   18  A.  I have.  I have about 40 publications, conference

08:35:01   19  presentations, all in the area of wireless communications.

08:35:03   20  I've also written a textbook on high data rate millimeter

08:35:08   21  wave communications.  This is basically -- you may have

08:35:10   22  heard the term "5G" --

08:35:10   23          THE COURT:  Dr. Wells, could you slow down just a

08:35:13   24  little bit, please?

08:35:14   25          THE WITNESS:  I apologize, Your Honor.

08:35:14   1          THE COURT:  Please try to speak slower.

08:35:17   2          THE WITNESS:  Certainly, Your Honor.

08:35:19   3   A.  I was just going to say this that this is the basis of

08:35:22   4   5th generation of cell phones.  I wrote a textbook about

08:35:26   5   that.

08:35:27   6   Q.  (By Mr. Mueller)  Are you a named inventor on any

08:35:28   7   patents?

08:35:29   8   A.  I am.  I have a number of patents.  I think it's five

08:35:33   9   patents and patent applications that have my name on them.

08:35:36   10  Q.  And are you a member of any professional organizations?

08:35:40   11  A.  I am.  I'm a member of the IEEE.  That's the Institute

08:35:44   12  of Electrical and Electronics Engineers.  I was elected a

08:35:47   13  senior member back in 1999.

08:35:48   14  Q.  And, sir, have you received any awards from the IEEE?

08:35:51   15  A.  Yes.  Yes, I have.  Last -- last year, the Santa Clara

08:35:56   16  Valley -- basically the Silicon Valley group of the IEEE,

08:36:00   17  they awarded me their 2019 Engineer of the Year award.

08:36:04   18  Q.  Now, sir, have you participated in any

08:36:08   19  standards-setting organizations?

08:36:09   20  A.  Yes, yes, I -- I have.  I've been a member of both 3GPP

08:36:14   21  and ETSI.  I've actually been to a number of ETSI meetings.

08:36:21   22  I've written contributions for ETSI.  I've helped write

08:36:26   23  ETSI specifications.  These were all for the

08:36:31   24  telecommunication space.  So I've had a lot of experience

08:36:33   25  with ETSI.

08:36:33   1   Q.  And you're familiar with ETSI's practices and

08:36:36   2   procedures?

08:36:36   3   A.  I am, through not only my actual -- going to these

08:36:40   4   meetings but through reading their minutes and working

08:36:45   5   closely with their specifications.

08:36:46   6   Q.  Now, are you also familiar with an organization called

08:36:49   7   3GPP?

08:36:49   8   A.  Yes, I am.

08:36:51   9   Q.  What is that?

08:36:52   10  A.  So 3GPP is the Third Generation Partnership Project.

08:36:58   11  I've been a member of 3GPP.  I've never actually gone to

08:37:01   12  any of their meetings, but I use their specifications every

08:37:04   13  day in my -- my work.

08:37:05   14  Q.  And what materials are generated as part of the 3GPP

08:37:10   15  process?

08:37:10   16  A.  There's -- there's a lot of information generated at

08:37:16   17  these meetings which are held about once every month.

08:37:20   18  There's a lot of contributions, technical contributions.

08:37:23   19  These -- these are discussed at the meetings.  Minutes are

08:37:28   20  kept.  The emails between members are all kept, and all of

08:37:33   21  these are published.  They're all online, available to

08:37:35   22  download free of charge, not even password protected.

08:37:38   23       So there's a lot of 3GPP information, in addition

08:37:42   24  to the specifications that we've been talking about here.

08:37:44   25  Q.  Now, sir, we've heard a lot at this trial about LTE.

08:37:48  1   What is your experience with the LTE standard?

08:37:53  2   A.  So with the LTE standard and the specifications around

08:37:55  3   it, I -- I use them every day in my job.  I've been using

08:37:59  4   them for a number of years now.  As a consultant in this

08:38:03  5   area, this is really my -- my bible, if you like.  This is

08:38:06  6   what I -- I use in my work every day.

08:38:10  7           MR. MUELLER:  Your Honor, at this point, we ask

08:38:13  8   that Dr. Wells be recognized as an expert in wireless

08:38:17  9   technology, standard-setting practicing -- practices and

08:38:21  10  procedures, including in the context of ETSI and 3GPP.

08:38:25  11          THE COURT:  Is there objection?

08:38:25  12          MR. SHEASBY:  No objection, Your Honor.

08:38:27  13          THE COURT:  Then without objection, the Court will

08:38:29  14  recognize this witness as an expert in those designated

08:38:32  15  fields.

08:38:32  16          Please continue.

08:38:34  17          MR. MUELLER:  Thank you, Your Honor.

08:38:34  18  Q.  (By Mr. Mueller)  Dr. Wells, what have you been asked

08:38:36  19  to do in this case?

08:38:37  20  A.  So I've been asked to look at two patents in this case,

08:38:41  21  what's called the '774 and the '558 patent and '553 patent,

08:38:47  22  and I've been asked to form an opinion as to whether the

08:38:50  23  Apple products infringe these patents and whether these

08:38:53  24  patents are valid or not.

08:38:54  25  Q.  And at a high level, what conclusions have you reached,

08:38:57  1  sir?

08:38:57  2  A.  So my -- my opinion is that for -- for both of these

08:39:00  3  patents, that the Apple products do not infringe the

08:39:05  4  patents and that to the extent that the Plaintiffs have

08:39:09  5  applied the meaning very broadly of these patents, under

08:39:12  6  those conditions the patents would be invalid.

08:39:16  7          MR. MUELLER:  Let's take a look at DDX-6.3,

08:39:20  8  please.

08:39:20  9  Q.  (By Mr. Mueller)  And, sir, what materials have you

08:39:23  10  considered for your work on this case?

08:39:24  11  A.  So I've considered a wide variety of materials, which

08:39:28  12  are listed on this page here.  I won't go through all of

08:39:32  13  them, but I've looked through the patents themselves and

08:39:34  14  their file histories.

08:39:35  15          The file history is really the correspondence that

08:39:38  16  goes on between the people applying for a patent and the

08:39:42  17  Patent Office.

08:39:43  18          I've used the Court's claim construction order.

08:39:45  19  I've looked at Apple technical specifications.  I've

08:39:48  20  listened to deposition testimony and actually talked with

08:39:51  21  Apple engineers.  I've looked at the Qualcomm and Intel

08:39:55  22  source code and documentation in this case, as well, and a

08:39:59  23  variety of other things, including the specifications

08:40:01  24  themselves, licenses, and all sorts of discovery documents

08:40:06  25  that were produced in this case.

08:40:07  1   Q.  Now, sir, for your work on this case, have you been

08:40:11  2   compensated at your normal consulting rate?

08:40:14  3   A.  Yes, I have.

08:40:14  4   Q.  And what is that rate?

08:40:15  5   A.  My rate is $600 an hour.

08:40:17  6   Q.  And, sir, have you ever been retained for any projects

08:40:21  7   by Apple before this case?

08:40:22  8   A.  Yes, I have.

08:40:23  9   Q.  Are you here, sir, as an independent expert?

08:40:25  10  A.  That is correct.  I'm here as an independent expert.

08:40:28  11  Q.  And is any of your compensation tied in any way

08:40:33  12  whatsoever to what the ladies and gentlemen of the jury

08:40:35  13  decide?

08:40:36  14  A.  None whatsoever.

08:40:36  15  Q.  Let's turn to the '774 patent if we could, is that

08:40:42  16  okay, sir?

08:40:42  17  A.  Excuse me.

08:40:43  18  Q.  Take your time.  Dr. Wells, may we turn to the '774

08:40:52  19  patent?

08:40:52  20  A.  Yes, certainly.

08:40:53  21       MR. MUELLER:  Let's go to DDX-6.5, please.

08:40:57  22  Q.  (By Mr. Mueller)  And this is one of the two patents

08:40:59  23  you've worked on for this case, sir?

08:41:01  24  A.  That is correct.

08:41:03  25  Q.  Now, this is a patent that originated with Samsung.  Do

08:41:07  1   I have that right, sir?

08:41:08  2   A.  That is right.

08:41:10  3   Q.  When did you first hear about this patent?

08:41:12  4   A.  The first time -- first time I heard about this patent

08:41:15  5   was when I was engaged by Apple about 14 months ago.

08:41:19  6   Q.  Are you aware of any books or articles or other

08:41:21  7   publications that discuss the substance of this patent?

08:41:24  8   A.  No, I'm not.

08:41:25  9   Q.  Now, at a high level, what does the patent relate to?

08:41:29 10   A.  So the patent relates to receive -- how a -- a base

08:41:35 11   station and a handset operate together, and particularly

08:41:39 12   it's about how a handset receives data from a base station,

08:41:43 13   in particular how it also receives what's called a

08:41:46 14   processing parameter.

08:41:48 15          MR. MUELLER:  Your Honor, may I approach the

08:41:52 16   easel?

08:41:53 17          THE COURT:  You may.

08:41:54 18   Q.  (By Mr. Mueller)  Sir, did you use the term "processing

08:42:09 19   parameter"?

08:42:09 20   A.  Yes, I did.

08:42:10 21   Q.  Now, is that the key concept for the dispute between

08:42:13 22   parties in this case on the '774 patent?

08:42:15 23   A.  Yes, it is.

08:42:16 24   Q.  What is a processing parameter?

08:42:18 25   A.  The patent describes a processing parameter as one of a

08:42:23   1   time delay, a phase change, or a gain.

08:42:32   2   Q.   Now, what Dr. Mahon, who is the Plaintiffs' expert for

08:42:35   3   this patent, accusing in this of infringing the '774

08:42:38   4   patent?

08:42:38   5   A.   So Dr. Mahon accuses what's called receiving a DCI

08:42:44   6   format 2 message.

08:42:45   7           MR. MUELLER:   Let's go to DTX-83.

08:42:49   8   Q.   (By Mr. Mueller)   And, sir, this is also at Tab 2 in

08:42:53   9   your binder, whatever is easier.

08:42:55   10          MR. MUELLER:   But if we could put up DTX-83.

08:42:59   11   Q.   (By Mr. Mueller)   Do you recognize this, sir?

08:43:02   12   A.   Yes.

08:43:02   13   Q.   What is it?

08:43:02   14   A.   So, DTX-83 is one of the 3GPP2 specifications.   This

08:43:07   15   one we refer to its number it at the top.   We call it TS

08:43:13   16   36.213.

08:43:15   17   Q.   And, sir, if we could turn to 7.1.5 in Section 71.

08:43:25   18   What do we see here?

08:43:26   19   A.   So, within the specification here, there's a table of

08:43:28   20   all the DCI formats that are actually used in this case,

08:43:32   21   and you can see that there's a lot of different DCI formats

08:43:39   22   that are allowed within LTE.

08:43:40   23   Q.   And these are alternative formats, sir?

08:43:43   24   A.   Yes, that's right.   The accused is DCI format 2, but

08:43:47   25   there's lots of other alternatives.

08:43:50  1  Q.  What is Dr. Mahon's opinion -- does Dr. Mahon accuse of

08:43:55  2  infringement format 2A, for example?

08:43:58  3  A.  No, he doesn't.  I've highlighted that in yellow.

08:44:03  4  Dr. Mahon doesn't -- does not accusing DCI format 2A of

08:44:08  5  infringing.

08:44:08  6  Q.  And how does format 2A compare to format 2 in terms of

08:44:15  7  performance?

08:44:15  8  A.  It's not too dissimilar.  They're both for what we call

08:44:18  9  spatial multiplexing.  This is a technology whereby you can

08:44:22  10  transmit from multiple antennas.  You can do that in either

08:44:24  11  DCI -- well, you can do that in either Mode 3 which uses

08:44:29  12  DCI format 2A, or you can do it in Mode 4, which uses DCI

08:44:35  13  DCI format 2.

08:44:36  14  Q.  And was this format 2A available as an alternative at

08:44:38  15  the time this standard was created?

08:44:38  16  A.  Yes, that's right.  This is the first release of this

08:44:42  17  specifications that I've shown here.  All of these DCI

08:44:45  18  formats were available at that time.

08:44:47  19  Q.  Now, Dr. Mahon says DCI format 2, as used in the

08:44:52  20  Qualcomm and Intel chips, infringes.  Do I have that right?

08:44:55  21  A.  That's his opinion.

08:44:56  22  Q.  Can we explore your analysis of his opinion?

08:45:01  23  A.  Certainly.

08:45:02  24       MR. MUELLER:  So let's go to DDX-6.7.

08:45:06  25  Q.  (By Mr. Mueller)  And what do we see here?

08:45:08   1   A.   So this is Claim 6, which is the only asserted claim in

08:45:12   2   this patent.   And what I've done is I've highlighted the

08:45:15   3   language "receiving a processing parameter."

08:45:18   4   Q.   Do the Apple products in this case meet the requirement

08:45:23   5   that you've highlighted?

08:45:24   6   A.   No, they don't.

08:45:26   7   Q.   Now, if you could read the full limitation there that

08:45:29   8   starts "receiving a processing parameter" to us.

08:45:32   9   A.   Yes.   So it's -- it's:   Receiving a processing

08:45:35   10  parameter for transmission of data on two antenna ports,

08:45:39   11  the processing parameter including at least one of a time

08:45:43   12  delay, a phase rotation, and a gain determined based on a

08:45:51   13  received uplink signal.

08:45:53   14  Q.   Now, sir --

08:45:54   15       MR. MUELLER:   Your Honor, may I approach the easel

08:45:56   16  again?

08:45:56   17       THE COURT:   You may.

08:45:57   18  Q.   (By Mr. Mueller)   Let's break this down if we could,

08:46:06   19  Dr. Wells.

08:46:06   20       THE COURT:   Can you see that?

08:46:07   21       THE WITNESS:   Yes, yes, I can, Your Honor.   Thank

08:46:10   22  you.

08:46:10   23       THE COURT:   All right.

08:46:10   24  Q.   (By Mr. Mueller)   Sir, here I've just -- I've put an

08:46:13   25  iPhone.   Do you see that, sir?

800

| | | |
|---|---|---|
| 08:46:14 | 1 | A.  Yes, I do. |
| 08:46:15 | 2 | Q.  And here we have the base station.  Do you see that, |
| 08:46:22 | 3 | sir? |
| 08:46:22 | 4 | A.  Correct. |
| 08:46:22 | 5 | Q.  To meet that claim requirement, what needs to be |
| 08:46:25 | 6 | received by the iPhone from the base station? |
| 08:46:30 | 7 | A.  The base station has to send a processing parameter. |
| 08:46:37 | 8 | The receiver, the handset, has to receive the processing |
| 08:46:43 | 9 | parameter as per I've got on the screen here. |
| 08:46:44 | 10 | Q.  So, this processing parameter needs to go from the base |
| 08:46:50 | 11 | station to the phone.  Do I have that right? |
| 08:46:52 | 12 | A.  That's correct.  For the phone to receive the |
| 08:46:55 | 13 | processing parameter, that is correct. |
| 08:46:57 | 14 | Q.  What actually happens in the iPhone? |
| 08:46:59 | 15 | A.  So what actually happens is the iPhone doesn't receive |
| 08:47:02 | 16 | a processing parameter.  In fact, quite the opposite |
| 08:47:05 | 17 | happens.  The iPhone computes a processing parameter |
| 08:47:08 | 18 | itself. |
| 08:47:09 | 19 | Q.  Now, sir, do you have an analogy for the jury to help |
| 08:47:13 | 20 | with how the products work? |
| 08:47:15 | 21 | A.  Yes, I do. |
| 08:47:16 | 22 | Q.  And what is that analogy? |
| 08:47:19 | 23 | A.  So the analogy I'd like to present to you is an analogy |
| 08:47:24 | 24 | with a Lego model.  The analogy that I've got is a child -- |
| 08:47:29 | 25 | this child likes playing with a Lego, it's their birthday, |

08:47:33   1   and what they would like is a Lego house.  Would you like

08:47:37   2   me to play the animation?

08:47:39   3   Q.  Yes, please.  We'll go to the animation in a minute.

08:47:42   4   But if you could just -- again, I want to keep you on the

08:47:45   5   products, not the patent, but the products.  How do the

08:47:48   6   Legos compare to how the Apple products compute a

08:47:51   7   processing parameter?

08:47:52   8   A.  So in the analogy I'm going to show you, the -- the

08:47:58   9   child himself or herself actually constructs the Lego house

08:48:02  10   themselves.  The child builds the Lego house.  And this is

08:48:07  11   how the pro -- this is how the Apple products actually

08:48:09  12   work.  The Apple products themselves compute a processing

08:48:12  13   parameter.  They don't receive it from the base station.

08:48:16  14            MR. MUELLER:  So let's go through this

08:48:18  15   piece-by-piece, and start with DTX-82.

08:48:29  16   Q.  (By Mr. Mueller)  Now, what is this, sir?

08:48:30  17   A.  So here I have another 3GPP specification.  This one we

08:48:34  18   refer to as 36.212.

08:48:37  19   Q.  And this is another portion of the LTE specification

08:48:39  20   that you considered?

08:48:40  21   A.  That's correct.

08:48:41  22            MR. MUELLER:  Let's go to DTX-71.

08:48:47  23   Q.  (By Mr. Mueller)  What is this?

08:48:48  24   A.  This is another LTE specification, 36.211.

08:48:53  25   Q.  And why are these two specifications relevant to your

08:48:56   1   analysis?

08:48:56   2   A.   So these are the two specifications that I used and

08:48:58   3   Dr. Mahon used, but these two actually confirm and lay out

08:49:02   4   the procedure that a device such as an iPhone would have to

08:49:05   5   go through to compute a processing parameter.

08:49:08   6   Q.   Now, sir, did you stop at the specification or did you

08:49:10   7   actually look at the source code on the chips, too?

08:49:12   8   A.   No, I actually looked at the source code that was on

08:49:19   9   the chips.

08:49:19   10   Q.   The Intel chips and the Qualcomm chips?

08:49:22   11   A.   That's correct, for -- for both of those chips.

08:49:25   12        MR. MUELLER:   Let's go to DTX-82 again and look at

08:49:28   13   Section 5.3.1.1 and we can also put up DDX-6.14, if it's

08:49:55   14   easier.

08:49:55   15   Q.   (By Mr. Mueller)   What do we see here?

08:49:56   16   A.   So, the way the Apple products actually work is they go

08:49:58   17   through a five-step procedure to compute the processing

08:50:01   18   parameter.   And this shows the very first step.

08:50:03   19   Q.   What happens in the first step, sir?

08:50:06   20   A.   In the very first step, the base stations sends down

08:50:09   21   what they call a transport block CRC attachment that

08:50:13   22   contains this parameter, the number of transmit antenna

08:50:17   23   ports at the eNodeB.

08:50:19   24        Now, I understand that's rather complex.   What

08:50:23   25   this really means is that the base station sends an

803

08:50:25  1   indication to the phone about the number of transmitter --

08:50:30  2   the number of antennas that it's transmitting.

08:50:33  3           MR. MUELLER:  Let's go to DDX-6.15.

08:50:36  4   Q.  (By Mr. Mueller)  What do we see here?

08:50:42  5   A.  So here is the second step in this five-step process

08:50:45  6   that the Apple products go through, and this is the DCI

08:50:49  7   format 2 message, which you can see at the top.  But the

08:50:52  8   Apple products will extract from that what they call

08:50:55  9   precoding information, which I've highlighted in green at

08:50:58  10  the bottom.

08:50:59  11  Q.  This is the second step?

08:51:02  12  A.  This is the second step.

08:51:04  13          MR. MUELLER:  Sir, let's go to DDX6.16.

08:51:11  14  Q.  (By Mr. Mueller)  And what do we see here?

08:51:12  15  A.  So this is the third step in the five-step process.

08:51:16  16  Again, I'm looking at the DCI format 2 message, but I've

08:51:21  17  highlighted in blue the calculations done third.  There's a

08:51:24  18  number of different information here, modulation and coding

08:51:28  19  scheme, redundancy version.  But essentially the device

08:51:31  20  will take all of this information and it performs a

08:51:34  21  calculation to determine whether there's what we call

08:51:37  22  either one codeword or two codewords.

08:51:40  23  Q.  And, again, remind us which step in the process are we

08:51:45  24  at now?

08:51:45  25  A.  So this is the third.

804

08:51:50    1          MR. MUELLER:  Let's go to DDX-6.17.

08:51:54    2    Q.  (By Mr. Mueller)   What do we see here?

08:51:55    3    A.  So, this -- this is the fourth step it goes through.

08:51:59    4    And what I'd like to show here is the Apple products will

08:52:00    5    actually use the previous three steps.

08:52:02    6          They take the number of antenna ports, which they

08:52:04    7    received in the first step, they take the precoding

08:52:08    8    information, which I've highlighted in green, which they'll

08:52:14    9    extract in the second step.  They then take the number of

08:52:20   10    codewords, which I talked about in the third step.

08:52:24   11          And then from all that information, that then

08:52:26   12    enables them to pick a particular table, such as, for

08:52:30   13    example, this one here, and from all of that, they're able

08:52:34   14    to output two other variables.

08:52:38   15          The first variable, I put in red, is called the

08:52:43   16    number of layers.  And the second variable, which I've put

08:52:46   17    in gray, is called a TPMI.  This is the fourth step in that

08:52:51   18    five-step process.

08:52:52   19          MR. MUELLER:  Let's go to DDX-6.18.

08:52:55   20    Q.  (By Mr. Mueller)   And, sir, what do we see here?

08:52:58   21    A.   So here we see the fifth and final step.  What's

08:53:02   22    happened here is that you take the number of antenna ports,

08:53:09   23    which you received in the first step, you use the codebook

08:53:12   24    index and the number of layers, which you've derived from

08:53:16   25    that fourth step.

08:53:17  1          That enables you to then select a table like this,
08:53:23  2     and then, from within that table, you can pick a
08:53:26  3     particular -- for example, processing parameter.
08:53:28  4     Q.  Now, we're at Step 5; is that right, sir?
08:53:35  5     A.  That is correct.
08:53:36  6     Q.  Are we now at the completion of this process?
08:53:39  7     A.  That's right.  So these are the five steps that the
08:53:42  8     Apple products go through to compute the processing
08:53:45  9     parameter.
08:53:45  10    Q.  Now, sir, you have a green binder in front of you
08:53:48  11    that's labeled source code.  Could you just pull that in
08:53:51  12    front of you if you get a chance?
08:53:53  13    A.  Yes, I have it.
08:53:54  14    Q.  And this includes several exhibits, DTX-1901, DTX-1904,
08:54:03  15    DTX-1902, DTX-1898, and DTX-2018.  Do you see those, sir?
08:54:10  16    A.  Yes, I do.
08:54:11  17    Q.  What are those?
08:54:12  18    A.  These are -- these are the Intel and Qualcomm source
08:54:19  19    code that I analyzed in this case.

REDACTED BY ORDER OF THE COURT

08:54:20  20    Q.  ███████████████████████████████████████████████
08:54:23  21    ████████████████████████████████████████████████████
08:54:27  22    ███████████████████████████████████████████████████
08:54:35  23    █████████████  ████████████████████████████  ████████
08:54:38  24    ████████████████████████████████████████████████
08:54:42  25    ██████████████████████████████████████████████████████

08:54:42   1   ████████████████████

08:54:42   2   Q.  That is Dr. Jones?

08:54:45   3   A.  Mr. Jones, yes.

08:54:46   4   Q.  Mr. Jones.  I'm sorry.  Mr. Jones.

08:54:47   5   A.  Yes.

REDACTED BY ORDER OF THE COURT

08:54:48   6   Q.  ████████████████████████████████████████

08:54:54   7   ████████████████████████████████████████

08:54:57   8   ████████████████████████

08:54:58   9   Q.  Now, sir, let's go back to your analogy.

08:55:03   10          MR. MUELLER: And if we can put on the screen the

08:55:08   11   Legos.

08:55:09   12   Q.  (By Mr. Mueller)  Tell us how this compares to your

08:55:12   13   analogy.

08:55:12   14   A.  Yes, certainly.

08:55:13   15          So in this analogy here, as I said, it's a child's

08:55:14   16   birthday.  They would like a Lego house for their birthday.

08:55:17   17   So they eagerly await -- it's their birthday morning.  They

08:55:21   18   await the arrival of the mailman.  There's a package, and

08:55:26   19   inside it is a number of red bricks, yellow bricks, green

08:55:32   20   bricks.

08:55:32   21          Then what happens, a second truck pulls up.

08:55:32   22   There's a second box delivered.  This contains a variety of

08:55:35   23   blue bricks.

08:55:36   24          Now, if we stop there and think what the child has

08:55:39   25   actually received, have they received a Lego house?  The

08:55:43  1  answer is they haven't received a Lego house.  They've

08:55:47  2  received two boxes that contain red bricks, yellow bricks,

08:55:51  3  blue bricks, green bricks.

08:55:53  4       Now, what can a child do with these -- with these

08:55:56  5  bricks?  Well, the child can take those bricks.  They can

08:55:59  6  put them together, and they can assemble a Lego house.

08:56:03  7       So, once again, has the child received a Lego

08:56:10  8  house?  Has the child -- do the Apple products receive a

08:56:17  9  processing parameter?  No, they don't.  The Apple products

08:56:18  10  actually construct, they compute a processing parameter

08:56:21  11  themselves in the same way that the child would build the

08:56:24  12  house themselves.

08:56:24  13  Q.  Now, could the child use these same Legos for other

08:56:28  14  things?

08:56:29  15  A.  Yes, they can.  And this is the real benefit of doing

08:56:32  16  it the way that Apple does it.

08:56:33  17       If I can take the next slide, please?

08:56:36  18       The child could take those pieces of bricks, and

08:56:39  19  if they're so inclined, they could put them together.  They

08:56:42  20  could build themselves a tree using the same pieces of

08:56:46  21  information.

08:56:46  22       The child can also take these bricks apart and

08:56:49  23  they can use them for something else.  They can build a

08:56:53  24  horse, for example.  So this is really the flexibility of

08:56:56  25  the approach that Apple has taken.

08:56:57  1   Q.  So how does that compare --

08:56:59  2            MR. MUELLER:  Your Honor, can I approach the

08:57:01  3   easel?

08:57:01  4            THE COURT:  You may.

08:57:02  5   Q.  (By Mr. Mueller)  With respect to the information

08:57:04  6   received by the iPhone, what is Apple able to do with that

08:57:07  7   information itself other than the processing parameter?

08:57:08  8   A.  Well -- well, the benefit is because the Apple products

08:57:13  9   receive these multiple pieces of information, it can reuse

08:57:17  10  them for other things.  They can be repurposed or used for

08:57:20  11  other things, as well.  They're not just dedicated to a

08:57:26  12  processing parameter.

08:57:26  13  Q.  Now, sir, you took us through this five-step process,

08:57:31  14  right?

08:57:31  15  A.  Yes.

08:57:32  16  Q.  In Steps 1, 2, 3, and 4, was there a processing

08:57:35  17  parameter?

08:57:35  18  A.  No, there wasn't.

08:57:37  19  Q.  Not until the end?

08:57:40  20  A.  Correct.

08:57:40  21  Q.  What does the patent require with respect to a

08:57:42  22  processing parameter?

08:57:43  23  A.  As I showed you on that earlier claim, the patent

08:57:47  24  requires that you receive a processing parameter, and the

08:57:50  25  Apple products simply don't.

08:57:51  1   Q.  Is the Apple approach more or less efficient?

08:57:55  2   A.  Well, I -- I think it's a lot more efficient because,

08:57:58  3   as I think you can see through that analogy, by having

08:58:02  4   multiple pieces of information, you can reuse them for

08:58:05  5   other purposes.  And that's -- that's what Apple does.

08:58:08  6   Q.  And it -- is it more or less flexible, the Apple

08:58:12  7   approach, as compared to the patent?

08:58:14  8   A.  Well, it's far more flexible, too, because everything

08:58:18  9   can be reused, and you use less bandwidth to download those

08:58:23  10  initial pieces of information.

08:58:24  11        MR. MUELLER:  So if we go back to Claim 6 one more

08:58:27  12  time.

08:58:28  13  Q.  (By Mr. Mueller)  Sir, do the Apple products and the

08:58:37  14  Qualcomm chips within them meet this requirement of

08:58:41  15  receiving a processing parameter for transmission of data

08:58:43  16  on two antenna ports, the processing parameter including at

08:58:47  17  least one of a time delay, a phase rotation, and a gain

08:58:52  18  determined based on a received uplink signal?  Do they meet

08:58:56  19  that requirement?

08:58:56  20  A.  They don't because they don't receive the processing

08:59:02  21  parameter.  They compute it themselves.

08:59:03  22  Q.  Now, sir, were you here when Dr. Mahon testified that

08:59:07  23  Apple's products infringe under something called the

08:59:12  24  Doctrine of Equivalents?

08:59:13  25  A.  Yes, I was.

08:59:13  1  Q.  And what do you understand to be the gist of his

08:59:16  2  opinion on the Doctrine of Equivalents?

08:59:18  3  A.  So Dr. Mahon's opinion was that the Apple's -- the

08:59:25  4  Apple products receive what's called a codebook index and

08:59:29  5  that that is the equivalent to receiving a processing

08:59:32  6  parameter.

08:59:32  7  Q.  Do you agree?

08:59:33  8  A.  I don't.

08:59:33  9  Q.  Why not?

08:59:34  10  A.  Well, as -- as I understand it, the -- the way to

08:59:38  11  test -- the legal way to test what's called a Doctrine of

08:59:41  12  Equivalents is to look at this process, which is called a

08:59:44  13  function-way-result.  Does the equivalent perform

08:59:49  14  substantially the same function in substantially the same

08:59:52  15  way to receive substantially the same result?  I don't

08:59:57  16  believe Dr. Mahon's example does that.

08:59:58  17  Q.  Why is the function of the Apple products different

09:00:01  18  from what's claimed in Claim 6?

09:00:03  19  A.  Well, Dr. Mahon claims that the Apple products receive

09:00:08  20  a codebook index, and that's -- that's a completely

09:00:12  21  different function.  The function in the patent is

09:00:14  22  receiving a processing parameter.  A codebook index is

09:00:18  23  what's generated in the fourth step of that model.  So it's

09:00:21  24  a different function.

09:00:22  25  Q.  And why is the way that the Apple products work

| | | |
|---|---|---|
| 09:00:26 | 1 | different from what's claimed in Claim 6? |
| 09:00:28 | 2 | A.  Well, way is -- is completely different.  The way in |
| 09:00:35 | 3 | which the patents require is -- is to receive bits of |
| 09:00:38 | 4 | information that are a processing parameter. |
| 09:00:41 | 5 | The Apple products do pretty much completely the |
| 09:00:45 | 6 | opposite.  They compute that processing parameter |
| 09:00:47 | 7 | themselves. |
| 09:00:47 | 8 | Q.  Sir, what is your conclusion as to whether there is any |
| 09:00:50 | 9 | infringement under the Doctrine of Equivalents? |
| 09:00:53 | 10 | A.  So -- so my opinion there is there's -- there's not |
| 09:00:57 | 11 | infringement under the Doctrine of Equivalents. |
| 09:00:58 | 12 | Q.  Have the Intel or Qualcomm chips ever, to your |
| 09:01:03 | 13 | knowledge, used the approach of Claim 6 of the '774 patent? |
| 09:01:07 | 14 | A.  No, they haven't. |
| 09:01:09 | 15 | Q.  Sir, I'd like to shift, if we could, to invalidity.  Is |
| 09:01:14 | 16 | that okay? |
| 09:01:15 | 17 | A.  Certainly. |
| 09:01:15 | 18 | Q.  I'd like you to, for purposes of my next few questions, |
| 09:01:19 | 19 | have in mind Dr. Mahon's infringement theory.  Is that |
| 09:01:23 | 20 | okay? |
| 09:01:23 | 21 | A.  Yes. |
| 09:01:24 | 22 | Q.  So we'll be applying his treatment of the Claim 6 for |
| 09:01:30 | 23 | purposes of invalidity. |
| 09:01:31 | 24 | A.  Yes. |
| 09:01:31 | 25 | Q.  And what I'd like you to help -- help all of us with is |

| | | |
|---|---|---|
| 09:01:37 | 1 | whether Dr. Mahon's infringement theory would cover old |
| 09:01:40 | 2 | ideas that predate the patent, okay? |
| 09:01:42 | 3 | A.  Yes. |
| 09:01:43 | 4 | Q.  All right. |
| 09:01:44 | 5 | MR. MUELLER:  Let's go to DDX -- DTX-50 -- 457. |
| 09:01:52 | 6 | Q.  (By Mr. Mueller)  Dr. Wells, do you know what this is? |
| 09:01:58 | 7 | A.  Yes.  This is a -- a patent which we call Murakami. |
| 09:02:06 | 8 | Q.  And that's based on the inventor's name; is that right, |
| 09:02:08 | 9 | sir? |
| 09:02:08 | 10 | A.  Yes, that's right.  The inventor's name being |
| 09:02:12 | 11 | highlighted here is Murakami. |
| 09:02:15 | 12 | Q.  What was the date of publication of Murakami? |
| 09:02:18 | 13 | A.  So this was published in January, 2005, which was |
| 09:02:22 | 14 | several months before the '774 patent was filed. |
| 09:02:24 | 15 | Q.  So it's before the '774 patent? |
| 09:02:27 | 16 | A.  Correct. |
| 09:02:32 | 17 | Q.  Any dispute that this came first? |
| 09:02:35 | 18 | A.  No, I don't believe there is. |
| 09:02:36 | 19 | Q.  Did the Patent Office have Murakami during the |
| 09:02:38 | 20 | application process that led to the '774 patent? |
| 09:02:40 | 21 | A.  No, they didn't. |
| 09:02:41 | 22 | Q.  And what is the relevance of Murakami to this case? |
| 09:02:47 | 23 | A.  So it's my opinion that under the infringement theory |
| 09:02:50 | 24 | that Dr. Mahon has put forward, that this patent here |
| 09:02:54 | 25 | renders the -- the patent obvious, renders the '774 claim |

09:03:00   1   obvious.

09:03:00   2          MR. MUELLER:  So if we could pull up Page 583216.

09:03:07   3   That's the Bates number.  The internal page is 11, of

09:03:13   4   Murakami.  And Zoom in on the second to last paragraph on

09:03:23   5   that page.  It's Page 11.  Here we go.

09:03:30   6   Q.  (By Mr. Mueller)  And we also have Figures 3A and 3B

09:03:33   7   here.

09:03:34   8          So, Dr. Wells, could you tell us what we see here?

09:03:36   9   A.  Yes, certainly.  I'm going to animate this a little

09:03:39   10  bit.

09:03:40   11         This shows in Murakami how this transmission from

09:03:44   12  two antennas -- there's a transmission from one antenna and

09:03:47   13  a second antenna using a first method, and there's

09:03:52   14  transmission from a first antenna and a second antenna

09:03:54   15  using a second method.

09:03:58   16         Now, what Murakami shows, it shows that in each of

09:04:01   17  those transmissions, there's various pieces of information.

09:04:05   18  There's what's called -- there's a -- a -- a first pilot,

09:04:10   19  there's a second pilot, there's a third pilot, there's a

09:04:14   20  fourth pilot, and I know they're pilots because it tells us

09:04:19   21  so underneath.

09:04:20   22         It also sends an indication of what transmission

09:04:24   23  method is being used.  Are we using transmission method X

09:04:30   24  or transmission method Y?  That's shown here.

09:04:33   25         And then also, importantly, this shows the

09:04:35   1   transmission of various symbols, various pieces of data.

09:04:39   2   There's a Symbol A, a Symbol B, repeated here, Symbol C,

09:04:44   3   Symbol D.

09:04:44   4        But some of these symbols have this star or a

09:04:48   5   negative star after them.  That shows what's called a

09:04:51   6   complex conjugate, which is representation --

09:04:55   7   representative of a phase change.

09:04:57   8        And this tells us that the transmission -- the

09:05:05   9   transmission method is transmitted to -- to the

09:05:11  10   communications terminal.  So this essentially teaches a lot

09:05:14  11   of what's in the patent itself.

09:05:16  12   Q.  And under Dr. Mahon's infringement theory, what is the

09:05:19  13   implication of what you've just shown us?

09:05:22  14   A.  So the implication here is that at least the first two

09:05:26  15   limitations of the claim are covered by this.  There's also

09:05:29  16   additional information in here about how these are

09:05:32  17   received, how they're demodulated, how the transmission

09:05:35  18   method and the various pilots are used for the

09:05:38  19   demodulation, as well.  So overall, this renders

09:05:42  20   everything, using Dr. Mahon's theory, as obvious.

09:05:44  21        MR. MUELLER:  Your Honor, may I put a placard up,

09:05:48  22   a demonstrative?

09:05:49  23        THE COURT:  You may.

09:05:56  24   Q.  (By Mr. Mueller)  And, Dr. Wells, can you see this

09:05:59  25   here?

| | | |
|---|---|---|
| 09:05:59 | 1 | A.  Yes, I can. |
| 09:06:00 | 2 | Q.  So I've broken down the claim into three boxes here, |
| 09:06:05 | 3 | requirement A, B, and C.  Do you see that, sir? |
| 09:06:08 | 4 | A.  Yes, I do. |
| 09:06:09 | 5 | Q.  And I'd like you to explain to the jury, in light of |
| 09:06:12 | 6 | the Murakami reference that we've been talking about, |
| 09:06:14 | 7 | whether these requirements were either taught or rendered |
| 09:06:20 | 8 | obvious by Murakami under Dr. Mahon's infringement theory. |
| 09:06:24 | 9 | Do you have that in mind? |
| 09:06:25 | 10 | A.  Yes, I do. |
| 09:06:26 | 11 | Q.  So could you please tell us what your analysis is? |
| 09:06:28 | 12 | MR. SHEASBY:  Your Honor, I object.  There's no |
| 09:06:29 | 13 | single -- single reference in Murakami obviousness analysis |
| 09:06:35 | 14 | submitted in the report.  It is always done with other |
| 09:06:38 | 15 | references. |
| 09:06:38 | 16 | THE COURT:  Response? |
| 09:06:39 | 17 | MR. MUELLER:  Sure.  He's -- I think Dr. Wells is |
| 09:06:41 | 18 | going to explain exactly that as he walks through the |
| 09:06:44 | 19 | limitations, and we can pull up whatever else we need to as |
| 09:06:47 | 20 | we get through it. |
| 09:06:48 | 21 | THE COURT:  All right.  If there's a need to |
| 09:06:50 | 22 | object again, Mr. Sheasby -- |
| 09:06:52 | 23 | MR. SHEASBY:  Thank you, Your Honor. |
| 09:06:52 | 24 | THE COURT:  -- please reurge. |
| 09:06:55 | 25 | Q.  (By Mr. Mueller)  Dr. Wells, could you explain? |

| | | |
|---|---|---|
| 09:06:56 | 1 | A.  Yes, I -- I -- I tried to explain that all just now. |
| 09:07:00 | 2 | So it's my opinion that all of these three limitations are |
| 09:07:04 | 3 | covered by that explanation that I just gave. |
| 09:07:07 | 4 | Q.  Now, you've also looked at some other prior art in this |
| 09:07:11 | 5 | case.  Do I have that right, sir? |
| 09:07:12 | 6 | A.  Yes, I have. |
| 09:07:13 | 7 | Q.  And you've also looked at something called the Hottinen |
| 09:07:20 | 8 | reference.  Do I have that right? |
| 09:07:21 | 9 | A.  That is correct. |
| 09:07:22 | 10 | MR. MUELLER:  Let's pull up the Hottinen |
| 09:07:30 | 11 | reference, if we could. |
| 09:07:32 | 12 | Q.  (By Mr. Mueller)  And this is DTX-458.  Do you see |
| 09:07:37 | 13 | that, sir? |
| 09:07:37 | 14 | A.  Yes, I do. |
| 09:07:38 | 15 | Q.  And is this another patent that was published before |
| 09:07:41 | 16 | the '774 patent? |
| 09:07:42 | 17 | A.  Yes, it was. |
| 09:07:43 | 18 | Q.  And what does this teach? |
| 09:07:49 | 19 | A.  So this teaches the base station sending a gain |
| 09:07:54 | 20 | parameter down to the mobile device. |
| 09:07:55 | 21 | Q.  Now, sir, in light of Murakami, Hottinen, were the |
| 09:08:02 | 22 | limitations of the Claim 6 rendered obvious under |
| 09:08:08 | 23 | Dr. Mahon's infringement theory? |
| 09:08:09 | 24 | A.  Yes, they were. |
| 09:08:10 | 25 | Q.  May I check these boxes? |

09:08:11  1  A.  Yes, you may.

09:08:12  2  Q.  Let's turn to the second patent that you analyzed in

09:08:15  3  this case, the '833.  Do you have that, sir?

09:08:24  4  A.  Yes.

09:08:26  5  Q.  And this is PPX-1571 in your binder, and this is the

09:08:31  6  cover page.  Do I have that right, sir?

09:08:33  7  A.  Yes, you do.  This is the '833 patent.

09:08:34  8  Q.  At a high level, what is the '833 patent about?

09:08:38  9  A.  This is about how you assemble various pieces of

09:08:42  10  information in a mobile device so that you can send them up

09:08:48  11  to a base station.

09:08:49  12  Q.  Now, for this patent as well, the plaintiffs are

09:08:55  13  accusing a portion of the LTE standard as the basis for

09:08:58  14  infringement?

09:08:58  15  A.  That is correct.

09:08:58  16  Q.  Have you looked at the history of that section of the

09:09:01  17  standard?

09:09:01  18  A.  Yes, I have.

09:09:07  19          MR. MUELLER:  Let's pull up DDX-6.53.

09:09:11  20  Q.  (By Mr. Mueller)  And this shows DTX-431 and DTX-432.

09:09:17  21          What do we see here, sir?

09:09:19  22  A.  So these were two alternatives that were proposed to

09:09:26  23  the 3GPP organization prior to the '833 patent being put

09:09:29  24  together -- or being filed.

09:09:32  25  Q.  So let's focus on the '833 patent itself.

09:09:39  1      MR. MUELLER:  And let's go to DDX-6.51.

09:09:43  2  Q.  (By Mr. Mueller)  As background, sir, could you tell

09:09:45  3  us, how does a mobile device send uplink signals?

09:09:50  4  A.  So, a mobile device has various uplink signals.

09:09:55  5  There's what we call data, there's what we call control,

09:09:57  6  and there's what we call ACK/NACK.  And this patent is

09:10:00  7  about how it assembles them in the instances where they

09:10:04  8  occur together so that you can send it to a base station.

09:10:09  9      MR. MUELLER:  Your Honor, may I approach the

09:10:11  10  easel?

09:10:12  11      THE COURT:  You may.

09:10:13  12  Q.  (By Mr. Mueller)  Sir, just to make sure we have that

09:10:18  13  straight, can you list those three types of information one

09:10:21  14  more time, and I'll write them down?

09:10:23  15  A.  Yes.  So the first one is data.

09:10:30  16  Q.  Second one?

09:10:30  17  A.  Second one is control.

09:10:31  18  Q.  And third?

09:10:35  19  A.  And the third one is what we call ACK/NACK.

09:10:37  20  Q.  Now, what does ACK/NACK mean?

09:10:42  21  A.  Well, in the -- in the instance when the base station

09:10:50  22  actually sends information to a handset, the handset has to

09:10:54  23  respond with an acknowledgement.  It's basically a yes or

09:11:00  24  no; yes, I received the information, or, no, I haven't

09:11:03  25  received that information.  We call that an ACK/NACK, an

09:11:08  1  acknowledgement or a non-acknowledgement.

09:11:11  2  Q.  Now, sir, according to the '833 patent, how do these

09:11:14  3  three types of information need to be formatted, according

09:11:16  4  to that patent?

09:11:17  5  A.  So, according to the '833 patent, there's a very

09:11:20  6  specific three-step process that is gone through.  You have

09:11:26  7  to perform Step 1, you have to perform Step 2, you have to

09:11:31  8  perform Step 3, in that order.

09:11:33  9        But the -- the thing I'd like to focus on is this

09:11:37  10  second step, which is about mapping the data and control to

09:11:41  11  a 2D matrix.

09:11:43  12        MR. MUELLER:  So let's go to DDX-6.52.

09:11:47  13  Q.  (By Mr. Mueller)  And this is Claim 8 of the '833

09:11:49  14  patent, right?

09:11:49  15  A.  That's correct.

09:11:49  16  Q.  What does Claim 8 require with respect to row-by-row

09:11:55  17  mapping?

09:11:56  18  A.  So, there's a section I'm going to talk about, which is

09:11:58  19  in here -- whoops -- which talks about how the signals are

09:12:08  20  mapped row-by-row-by-row, into a 2-dimensional resource

09:12:16  21  matrix.

09:12:17  22        MR. MUELLER:  Your Honor, may Dr. Wells leave his

09:12:20  23  seat to approach the demonstrative with a face shield on?

09:12:24  24        THE COURT:  As long as we do it like we did it

09:12:27  25  yesterday.

```
09:12:27   1          MR. MUELLER:  Thank you, Your Honor.
09:12:53   2          THE WITNESS:  May I, Your Honor?
09:12:55   3          THE COURT:  Pull that forward just a little bit,
09:12:56   4   please, sir.  Thank you.
09:13:14   5          Yes, you may approach the demonstrative.
09:13:24   6          And, Mr. Sheasby, you may certainly position
09:13:27   7   yourself where you can see.
09:13:28   8          MR. SHEASBY:  Thank you, Your Honor.
09:13:29   9          THE COURT:  All right.  Mr. Mueller, continue.
09:13:32  10          MR. MUELLER:  Thank you, Your Honor.
09:13:33  11   Q.  (By Mr. Mueller)  Dr. Wells, if you could help us
09:13:36  12   understand what this requirement means.
09:13:38  13   A.  Yes, I can.  So the -- the -- the very last part of
09:13:41  14   that claim --
09:13:41  15          MR. SHEASBY:  Your Honor, I object.  This is just
09:13:43  16   a narrative.
09:13:45  17          THE COURT:  Overruled.
09:13:47  18   A.  The very last part of that claim requires mapping to a
09:13:51  19   2-dimensional matrix.  So what I've done here, I've drawn a
09:13:59  20   2-dimensional matrix.  This matrix has a number of columns,
09:14:06  21   one, two, three, four, and a number of rows, one, two,
09:14:11  22   three, four.
09:14:14  23   Q.  (By Mr. Mueller)  And, sir, let's take this
09:14:16  24   piece-by-piece.  Can you please explain to the ladies and
09:14:20  25   gentlemen of the jury -- I'm going to quote from the claim
```

| | | |
|---|---|---|
| 09:14:21 | 1 | language here -- how the, quote, multiplex signals are |
| 09:14:25 | 2 | mapped from the first column of the first row to the last |
| 09:14:29 | 3 | column of the first row? |
| 09:14:31 | 4 | A.  Yes.  So the -- the first column, first row, is here. |
| 09:14:37 | 5 | And then it's mapped to -- it's the last column of the |
| 09:14:41 | 6 | first row, which is here.  So it means that information is |
| 09:14:46 | 7 | mapped in this order, one, two, three, four. |
| 09:14:51 | 8 | Q.  And if we continue with the claim language, can you |
| 09:14:53 | 9 | please explain how, quote, the first column of the second |
| 09:14:56 | 10 | row to the last column of the second row, how that works? |
| 09:15:01 | 11 | A.  Sir, the first column of the second row is here.  So |
| 09:15:05 | 12 | after four, we place the five in here, and we proceed to |
| 09:15:08 | 13 | here, six, seven, eight. |
| 09:15:11 | 14 | Q.  And it says, quote, and so on, until all the multiplex |
| 09:15:18 | 15 | signals are mapped to the 2-dimensional resource matrix, |
| 09:15:22 | 16 | end quote? |
| 09:15:22 | 17 | A.  So that would mean that this continues by going 9, 10, |
| 09:15:28 | 18 | 11, 12, 13, 14, 15, 16. |
| 09:15:36 | 19 | Q.  And that's the claim of the '833 patent? |
| 09:15:37 | 20 | A.  Correct, that's the claim of the '8 -- of the patent. |
| 09:15:42 | 21 | Q.  How do the Apple products and the Intel and Qualcomm |
| 09:15:47 | 22 | chips within them actually work? |
| 09:15:49 | 23 | A.  So, with this here, the mapping has all been |
| 09:15:58 | 24 | row-by-row-by-row-by-row.  The Apple and Intel products |
| 09:16:06 | 25 | don't work like that.  They map in a different order.  They |

09:16:09  1   map column-by-column.

09:16:10  2   Q.  And could you illustrate on the right-hand side how

09:16:12  3   column-by-column mapping works?

09:16:14  4   A.  Yes, I can.  So the way the Apple -- the Intel products

09:16:20  5   work is, instead of generating a 2-dimensional matrix,

09:16:23  6   there is no concept of that in the code.  Instead, there's

09:16:26  7   just a column, and data is placed into that column in this

09:16:32  8   order here, one, two, three, four.  And then once that

09:16:38  9   column has been assembled, it's sent out, it's passed on to

09:16:43  10  the next step in the processing for transmission.

09:16:45  11        And then, after that, what happens is these have

09:16:49  12  been replaced with numbers 5, 6, 7, and 8.  And then it's

09:16:55  13  passed on to the rest of the circuit for processing until

09:16:59  14  all the 16 have been mapped.

09:17:01  15        And so this is -- as you can see, this is a

09:17:06  16  column-by-column mapping.

09:17:07  17  Q.  How does this approach compare to the claimed approach

09:17:12  18  in terms of the actual performance of the device?

09:17:14  19  A.  This is a far more efficient way of doing it, because

09:17:19  20  you don't have to build up this -- in this case, this

09:17:24  21  16-element matrix.  You just have to deal with the four

09:17:27  22  things that you're interested in, pass them off, and then

09:17:31  23  you start again.

09:17:32  24        Takes a lot less memory, and it's also a lot more

09:17:34  25  efficient because it's faster.

09:17:36  1    Q.  Now, how did you develop this understanding?  What

09:17:38  2    materials did you consider in developing this understanding

09:17:42  3    of the Intel and Qualcomm chips?

09:17:45  4    A.  So I looked at what connotation, I looked at the source

09:17:50  5    code for the Qualcomm and the Intel chips, and for the case

09:17:54  6    of Intel, I talked with Dr. Josiam.

09:17:56  7    Q.  Now, Dr. Josiam testified to the ladies and gentlemen

09:17:58  8    of the jury yesterday?

09:17:58  9    A.  That is correct.

09:17:59  10   Q.  And did you hear him testify about the way the products

09:18:04  11   map to -- map this sort -- sort of information?

09:18:06  12   A.  That's right.  He -- yes, I did.

09:18:09  13   Q.  Was his testimony consistent or inconsistent with your

09:18:12  14   own views?

09:18:13  15   A.  It's consistent with the findings that I have found.

09:18:18  16   So he agreed with me that this is how the products actually

09:18:21  17   worked -- or he confirmed my understanding this is how the

09:18:25  18   products actually work.

09:18:25  19        MR. MUELLER:  Your Honor, may Dr. Wells return to

09:18:28  20   his seat?

09:18:29  21        THE COURT:  Yes, he may.

09:18:32  22        MR. MUELLER:  And I'll eliminate the -- move it

09:18:35  23   over.

09:18:47  24   Q.  (By Mr. Mueller)  Now, if we go back to Claim 8 again,

09:18:55  25   given what we just went through, Dr. Wells, do the Intel

824

09:18:58  1  and Qualcomm chips meet the requirements of Claim 8?

09:19:02  2  A.  No, they don't, because they don't map row-by-row, as

09:19:06  3  is required.

09:19:08  4  Q.  Now, were you here when Dr. Madisetti testified?

09:19:13  5  A.  Yes, I was.

09:19:13  6  Q.  And what did you understand to be the thrust of his

09:19:15  7  opinion on this issue?

09:19:16  8  A.  Well, Dr. Madisetti appeared to disagree with me; that

09:19:23  9  he appeared to claim that somehow row-by-row mapping was

09:19:28  10  column-by-column mapping.

09:19:30  11  Q.  Do you agree with him?

09:19:31  12  A.  No, I don't.

09:19:33  13        MR. MUELLER:  Let's pull up DDX-6.55.

09:19:37  14  Q.  (By Mr. Mueller)  And do you have an analogy to help us

09:19:39  15  with this, sir?

09:19:39  16  A.  Yes, I do.  This analogy -- a different one this time.

09:19:43  17  It involves children.  Imagine children leaving school at

09:19:48  18  the end of the day.  They're all taking the school bus

09:19:51  19  home.

09:19:51  20        Now, what I've shown on the left-hand side is the

09:19:54  21  '833 patent, and here we have a number of school buses all

09:19:57  22  lined up, ready to take the children home.

09:20:00  23        As -- as the kids stream out of school, they start

09:20:03  24  filling up these buses.  They go to the back seats of the

09:20:09  25  bus, and they go across the various buses, buses 1, 2, 3,

825

| | |
|---|---|
| 09:20:14 | 1 |

4, and they fill up the back of the buses going forward

until all the buses are full, and then the buses leave.

     Now, if we look at what happens in the Qualcomm

and Intel code, which I've shown on the right-hand side, a

single bus fills up.  The children get on that bus from the

back of the bus, they fill it up until they get to the

front, and then, once that bus is full, the bus leaves.  A

second bus pulls up, the kids get into this bus, and they

fill it up, and so on until all the children have been

taken home.

Q.  Now, sir, what is the functional difference between

these two approaches that we see?

A.  Well, you can see in this analogy that the way that the

Qualcomm and -- excuse me -- the way the Intel and Qualcomm

engineers have decided to do this is far more efficient.

You don't need a big parking lot to park lots of buses.

You -- the kids in the first buses get home much faster.

It's a much more efficient way of doing -- of taking kids

home from school.

     MR. MUELLER:  Your Honor, may I approach the

easel?

     THE COURT:  You may.

Q.  (By Mr. Mueller)  So, Dr. Wells, so for the '774

patent, the big fight is the processing parameter.  Do I

have that right?

09:21:33  1   A.  That's correct.

09:21:33  2   Q.  So for the '833 -- get a marker that works here -- is

09:21:42  3   it fair to say the big fight is row-by-row versus

09:21:47  4   column-by-column?

09:21:47  5   A.  Yes, it is.  The patent requires row-by-row mapping,

09:21:53  6   and the Intel and Qualcomm chips map column-by-column.

09:21:56  7   Q.  Bottom line, sir, do the Intel and Qualcomm chips and

09:22:03  8   the Apple products that have those chips infringe the '833

09:22:06  9   patent?

09:22:06  10  A.  No, they don't.

09:22:07  11  Q.  Let's turn to invalidity.  And, again, I'm going to ask

09:22:10  12  you, sir, if you could, to have in mind Dr. Madisetti's

09:22:14  13  infringement theory and how that theory would apply to what

09:22:18  14  came before the '833 patent.  Do you have that in mind?

09:22:20  15  A.  Yes, I do.

09:22:21  16          MR. MUELLER:  Let's go to DDX-6.60.

09:22:31  17  Q.  (By Mr. Mueller)  And what do we see here?

09:22:32  18  A.  So I have here four different pieces of prior art.

09:22:36  19  These were all published before the '833 patent.

09:22:38  20          On the left, I've got a Qualcomm document,

09:22:43  21  DTX-416.  Next to that, I've got another Qualcomm patent,

09:22:46  22  DTX-593.  I then have a third Qualcomm patent, DTX-522.

09:22:51  23  And, finally, I have a Samsung document that was submitted

09:22:55  24  to 3GPP.  That's DTX-423.

09:22:58  25  Q.  And all of these came before the '833 patent.  Do I

827

09:23:03   1   have that right?

09:23:04   2   A.  Yes, that's correct.

09:23:07   3        MR. MUELLER:  So if we could go back to Claim 8

09:23:09   4   and just put the language on the screen.

09:23:11   5   Q.  (By Mr. Mueller)  Sir, have you considered whether,

09:23:18   6   under Dr. Madisetti's infringement theory, each and every

09:23:25   7   one of these claim limitations would have been disclosed by

09:23:28   8   that prior art you just showed us?

09:23:30   9   A.  Yes, I have.

09:23:30  10   Q.  What's your conclusion?

09:23:31  11   A.  So under Dr. Madisetti's opinion where the row-by-row

09:23:35  12   doesn't need to be row-by-row, then the -- those four

09:23:40  13   pieces of prior art would render this -- this -- this claim

09:23:43  14   invalid.

09:23:44  15   Q.  Under Dr. Madisetti's infringement theory; do I have

09:23:48  16   that right, sir?

09:23:49  17   A.  Correct.

09:23:50  18   Q.  If Dr. Madisetti were right -- and I understand you

09:23:57  19   think he is wrong -- what would be the implication for this

09:24:00  20   patent?

09:24:00  21   A.  Well, if Dr. Madisetti is correct, this patent would be

09:24:03  22   invalid.

09:24:03  23   Q.  Now, are you criticizing the Patent Office in any way

09:24:10  24   in your invalidity analysis for the '833 or '774?

09:24:12  25   A.  No, I'm not.

09:24:18  1   Q.  Let's go over a few final issues here.

09:24:22  2         MR. MUELLER:  Can we go to DDX-6.61?

09:24:24  3   Q.  (By Mr. Mueller)  Now, we're going to hear from a

09:24:26  4   Dr. Perryman later today, and you know who he is?

09:24:28  5   A.  Yes, I do.

09:24:29  6   Q.  And he's going to respond to some of the damages

09:24:32  7   arguments that the Plaintiffs have made?

09:24:36  8   A.  I believe so.

09:24:37  9   Q.  What do we see here, sir, on DDX-6.61, which is

09:24:42  10  referring to DTX-1755, DTX-1894, and DTX-1897?

09:24:52  11  A.  So I think they're supporting materials to all of these

09:24:55  12  licenses that are shown here that are listed with all these

09:24:58  13  other DTX numbers.

09:25:01  14  Q.  And are these licenses technologically similar to

09:25:04  15  Plaintiffs' patents?

09:25:05  16  A.  Yes, yes, they are.

09:25:09  17        MR. MUELLER:  Your Honor, may I approach the easel

09:25:11  18  one last time?

09:25:15  19        THE COURT:  You may.

09:25:16  20        MR. MUELLER:  Thank you.

09:25:16  21  Q.  (By Mr. Mueller)  If we take that down and -- just a

09:25:20  22  few final questions, Dr. Wells.

09:25:22  23        If you could sum up here, for the '774 patent,

09:25:30  24  what is the big issue in dispute?

09:25:32  25  A.  So the big issue is whether the Apple products receive

09:25:37    1    a processing parameter.

09:25:38    2    Q.  Do they?

09:25:39    3    A.  They don't receive a processing parameter.  They do the

09:25:44    4    opposite; they compute it themselves.

09:25:47    5    Q.  Under a proper application of the claims of the '774

09:25:54    6    patent, is there any infringement?

09:25:55    7    A.  No, there isn't.

09:25:57    8    Q.  And under the broad theory of Dr. Mahon, what would be

09:26:03    9    the validity of this patent?

09:26:04   10    A.  Well, under Dr. Mahon's application where he stretched

09:26:08   11    the meanings of the claim, the patent would be invalid.

09:26:11   12    Q.  '833, what is the big issue in dispute?

09:26:14   13    A.  The big issue is whether there's row-by-row mapping or

09:26:17   14    not.

09:26:17   15    Q.  Is there?

09:26:19   16    A.  No, there isn't.  There's column-by-column mapping.

09:26:22   17    Q.  Is there -- sorry.

09:26:25   18         Is there any infringement of the '833 patent by

09:26:29   19    the Intel and Qualcomm chips?

09:26:30   20    A.  No, there isn't.

09:26:31   21    Q.  Under Dr. Madisetti's broad infringement theory, what

09:26:40   22    would be the validity of his patent?

09:26:42   23    A.  Under Dr. Madisetti's theory, the patent would be

09:26:45   24    invalid.

09:26:45   25    Q.  Thank you, sir.  I have no further questions.

| | | |
|---|---|---|
| 09:26:50 | 1 | MR. MUELLER:  I pass the witness, Your Honor. |
| 09:26:51 | 2 | THE COURT:  Cross-examination by the Plaintiff. |
| 09:26:58 | 3 | Please turn that sheet to a clean page, please. |
| 09:27:21 | 4 | MR. SHEASBY:  May I approach, Your Honor? |
| 09:27:23 | 5 | THE COURT:  You may. |
| 09:27:23 | 6 | MR. SHEASBY:  Thank you, Your Honor. |
| 09:28:00 | 7 | May I proceed, Your Honor? |
| 09:28:02 | 8 | THE COURT:  You may proceed. |
| 09:28:07 | 9 | MR. SHEASBY:  Oh, I forgot one thing. |
| 09:28:09 | 10 | THE COURT:  That's all right. |
| 09:28:09 | 11 | MR. SHEASBY:  Thank you for your indulgence, |
| 09:28:14 | 12 | Your Honor. |
| 09:28:14 | 13 | THE WITNESS:  Thank you. |
| 09:28:15 | 14 | THE COURT:  All right.  Mr. Sheasby, whenever |
| 09:28:16 | 15 | you're ready. |
| 09:28:16 | 16 | CROSS-EXAMINATION |
| 09:28:17 | 17 | BY MR. SHEASBY: |
| 09:28:17 | 18 | Q.  Good morning, Dr. Wells.  It's nice to see you again. |
| 09:28:21 | 19 | A.  Good morning. |
| 09:28:21 | 20 | Q.  We met before, on the Internet? |
| 09:28:25 | 21 | A.  That's correct. |
| 09:28:25 | 22 | Q.  Dr. Wells, you've been a paid expert for Apple 10 times |
| 09:28:31 | 23 | in the last 10 years, correct? |
| 09:28:32 | 24 | A.  I -- I don't think it's that many, no. |
| 09:28:37 | 25 | Q.  Well, I actually have your CV in front of you, and I've |

| | | |
|---|---|---|
| 09:28:41 | 1 | highlighted each example, and so you can count.  And count |
| 09:28:46 | 2 | out loud as you go through them. |
| 09:28:48 | 3 | A.  Well, the ones that you've highlighted, one, two, |
| 09:28:52 | 4 | three, four, five, six, seven, eight, nine. |
| 09:29:05 | 5 | Q.  And, in fact, you're actually doing two cases |
| 09:29:08 | 6 | simultaneously for Apple right now.  So that first one |
| 09:29:12 | 7 | actually constitutes two cases -- two cases, correct, the |
| 09:29:15 | 8 | second one? |
| 09:29:15 | 9 | A.  No, that's not true. |
| 09:29:17 | 10 | Q.  So it's not? |
| 09:29:18 | 11 | A.  Not as far as I know, no. |
| 09:29:20 | 12 | Q.  So you've just counted nine highlighted cases that |
| 09:29:24 | 13 | involve work that have Apple and you've underlined "Apple" |
| 09:29:27 | 14 | in them, correct? |
| 09:29:29 | 15 | A.  Since I've been consulting over 14 years, yes. |
| 09:29:31 | 16 | Q.  And those cases that I highlighted are from the last 10 |
| 09:29:36 | 17 | years, correct? |
| 09:29:36 | 18 | A.  The earliest was 2011.  So yes, that would be 10 years. |
| 09:29:42 | 19 | Q.  Ten years, nine cases for Apple? |
| 09:29:45 | 20 | A.  Yes. |
| 09:29:45 | 21 | Q.  In the last five years, you've billed over 896,000 |
| 09:29:54 | 22 | dollars to Apple, correct? |
| 09:29:56 | 23 | A.  I think that's true. |
| 09:29:57 | 24 | Q.  And at your deposition you testified that Apple was |
| 09:29:59 | 25 | only a small portion of your income, correct? |

09:30:01  1  A.  No.  I didn't quite say that, sir.

09:30:03  2  Q.  Well, you said the amount attributable to Apple over

09:30:07  3  the last 10 years is, quote, not a large amount.

09:30:09  4  A.  And you were asking me in terms of percentages, and

09:30:12  5  that was my answer.

09:30:13  6          MR. SHEASBY:  Your Honor, I move to strike as

09:30:15  7  non-responsive.

09:30:19  8          THE COURT:  Overruled.

09:30:20  9  Q.  (By Mr. Sheasby)  So as a percentage of your income,

09:30:22  10  the $896,000 that you received from Apple over the last ten

09:30:26  11  years is just a small percentage of your income, correct?

09:30:29  12  A.  I don't think that's quite what I said, no.

09:30:31  13  Q.  Now, sir, you showed a set of license agreements to the

09:30:38  14  ladies and gentlemen of the jury, correct?

09:30:38  15  A.  Yes, I did.

09:30:39  16  Q.  You suggested that they were comparable, correct?

09:30:43  17  A.  Yes, that's correct.

09:30:44  18  Q.  You didn't analyze whether a single patent in those

09:30:46  19  license agreements were actually essential to the LTE

09:30:50  20  standard, correct?

09:30:50  21  A.  That wasn't my task.  So, no, I didn't.

09:30:55  22  Q.  You didn't analyze whether a single one of those

09:30:58  23  patents actually related to mobile phones as opposed to

09:31:00  24  base stations, correct?

09:31:01  25  A.  Again, that wasn't my task.  So, no, I didn't.

| | | |
|---|---|---|
| 09:31:05 | 1 | Q.  In fact, you've never attended an LGE -- an LTE meeting |
| 09:31:10 | 2 | at 3GPP, correct? |
| 09:31:11 | 3 | A.  Not at 3GPP, no. |
| 09:31:14 | 4 | Q.  You've never written any of the standards that are used |
| 09:31:18 | 5 | in 3GPP, correct? |
| 09:31:19 | 6 | A.  Not that are used in -- not the way you phrased it, no. |
| 09:31:24 | 7 | Q.  The iPhone 6 practices the LTE standard, correct? |
| 09:31:27 | 8 | A.  Well, if you mean does the iPhone work on LTE, yes, it |
| 09:31:33 | 9 | does. |
| 09:31:34 | 10 | MR. SHEASBY:  Your Honor, I move to strike as |
| 09:31:35 | 11 | non-responsive. |
| 09:31:42 | 12 | THE COURT:  He's attempting to be responsive, |
| 09:31:44 | 13 | Mr. Sheasby.  I'll overrule you.  If you'd like to reurge |
| 09:31:47 | 14 | the question because you don't think he understood it or |
| 09:31:49 | 15 | you want to ask it another way, that's fine. |
| 09:31:50 | 16 | Q.  (By Mr. Sheasby)  Yes or no?  Does the iPhone 6 and |
| 09:31:54 | 17 | later, practice the LTE standard? |
| 09:31:56 | 18 | A.  Well, I don't quite know what you mean by "practice." |
| 09:32:02 | 19 | If you mean does it use the LTE standard, the answer is |
| 09:32:06 | 20 | yes. |
| 09:32:06 | 21 | MR. SHEASBY:  So I move to strike after "I don't |
| 09:32:09 | 22 | quite know what you mean," Your Honor. |
| 09:32:10 | 23 | THE COURT:  All right.  I'll limit the witness's |
| 09:32:14 | 24 | answer by "I don't quite know what you mean by 'practice,'" |
| 09:32:19 | 25 | period. |

| | | |
|---|---|---|
| 09:32:20 | 1 | Q.  (By Mr. Sheasby)  You don't know what I mean by |
| 09:32:21 | 2 | "practicing" the LTE standard, fair? |
| 09:32:23 | 3 | A.  Yes.  If you could be more specific, please. |
| 09:32:26 | 4 | Q.  You've been a consultant for the past 13 years, and you |
| 09:32:30 | 5 | haven't written any source code as part of your consulting |
| 09:32:34 | 6 | work, correct? |
| 09:32:35 | 7 | A.  Not as part of my consulting work.  Correct. |
| 09:32:37 | 8 | Q.  The source code in this case is written in C or Verilog |
| 09:32:43 | 9 | languages, correct? |
| 09:32:43 | 10 | A.  Amongst others as well. |
| 09:32:43 | 11 | Q.  You've never written in C or Verilog, correct? |
| 09:32:44 | 12 | A.  No.  My time writing source code was a long time ago. |
| 09:32:47 | 13 | MR. SHEASBY:  Your Honor, I move to strike as |
| 09:32:49 | 14 | non-responsive, anything after -- |
| 09:32:51 | 15 | THE COURT:  Overruled. |
| 09:32:52 | 16 | Q.  (By Mr. Sheasby)  Sir, you -- |
| 09:32:53 | 17 | THE COURT:  Mr. Sheasby, please slow down. |
| 09:32:57 | 18 | Q.  (By Mr. Sheasby)  Sir, you admit that you're not a |
| 09:32:59 | 19 | source code guy, correct? |
| 09:33:00 | 20 | A.  I'm a wireless engineer.  I would agree with that. |
| 09:33:07 | 21 | Q.  You're not a source code guy, fair? |
| 09:33:08 | 22 | A.  Again, my specialization is wireless communications.  I |
| 09:33:12 | 23 | can read source code, but I'm not a source code guy. |
| 09:33:15 | 24 | Q.  For the ladies and gentlemen of the jury, you're not a |
| 09:33:17 | 25 | source code guy, correct? |

```
09:33:18   1   A.   That's correct.
09:33:19   2   Q.   And this case is about source code, correct?
09:33:21   3   A.   No.   It's about five patents.
09:33:25   4   Q.   This case is not about source code?  Source code is not
09:33:29   5   an important part of this case, sir?
09:33:30   6   A.   Oh, I would agree with that.
09:33:31   7   Q.   You know, what was interesting to me is you talked
09:33:35   8   about the '833 patent today, and you didn't show a single
09:33:38   9   line of source code, did you?
09:33:39  10   A.   No, I didn't.
09:33:41  11   Q.   And it's fair that the jury can take that into account
09:33:47  12   when they think about your credibility, fair?
09:33:50  13   A.   Certainly, yes.
09:33:52  14        MR. SHEASBY:   Let's go to PDX-3.80.
09:33:57  15   Q.   (By Mr. Sheasby)   So this is a slide from Professor
09:34:15  16   Mahon's testimony, correct?
09:34:16  17   A.   I believe so, yes.
09:34:17  18   Q.   You were there for his testimony, correct?
09:34:19  19   A.   I was.
09:34:19  20   Q.   This codebook information is present in the code on the
09:34:23  21   mobile phone, fair?
09:34:24  22   A.   I'm sorry, what are you pointing at?  Oh, this table?
09:34:32  23   Yes, this is the fifth step in that five-step process I
09:34:36  24   talked about.
09:34:36  25   Q.   This table is in the mobile phone, correct?
```

09:34:38    1    A.   Well, a representation of it, yes.

09:34:40    2    Q.   And you don't dispute that that represents gain,

09:34:43    3    correct?

09:34:43    4    A.   That is correct.

09:34:44    5    Q.   And you don't dispute that that represents phase

09:34:48    6    rotation, correct?

09:34:48    7    A.   That is correct.

09:34:50    8             MR. SHEASBY:   Let's go to PDX-3.81.

09:34:56    9    Q.   (By Mr. Sheasby)   This table is the table that's at the

09:35:00   10    base station representing the code that's sent down to the

09:35:05   11    mobile phone, fair?

09:35:06   12    A.   I -- I don't know.   I haven't seen that evidence.

09:35:08   13    Q.   You don't know what is Table 5.3.3.1.5-4?

09:35:15   14    A.   Yes, I do know what the table is.

09:35:17   15    Q.   What is the table?

09:35:18   16    A.   So the table -- this is the fourth step in that

09:35:22   17    five-step process that I talked about.

09:35:23   18    Q.   And this is the bits that are sent down to the mobile

09:35:26   19    phone; is that correct?

09:35:26   20    A.   No.

09:35:27   21    Q.   These are the codewords that are sent down to the

09:35:32   22    mobile phone; is that correct?

09:35:33   23    A.   My understanding is, is that they are part of the DCI

09:35:38   24    format 2 message.

09:35:39   25    Q.   That's sent down to the mobile phone?

| | | |
|---|---|---|
| 09:35:42 | 1 | A.  Yes. |
| 09:35:42 | 2 | Q.  And in that message that's sent down to the mobile |
| 09:35:46 | 3 | phone, you'll see that in this table there's a reference to |
| 09:35:48 | 4 | one-half, correct? |
| 09:35:49 | 5 | A.  In this table, which is derived using those other three |
| 09:35:56 | 6 | steps, yes. |
| 09:35:56 | 7 | MR. SHEASBY:  Your Honor -- |
| 09:35:59 | 8 | Q.  (By Mr. Sheasby)  There's a reference to one-half that |
| 09:36:01 | 9 | is a gain, correct? |
| 09:36:02 | 10 | A.  Correct. |
| 09:36:02 | 11 | Q.  And you don't dispute that's a gain, correct? |
| 09:36:04 | 12 | A.  I don't dispute that. |
| 09:36:05 | 13 | Q.  And there's also a reference to a j, correct? |
| 09:36:08 | 14 | A.  Yes. |
| 09:36:09 | 15 | Q.  You don't dispute that j is phase rotation, correct? |
| 09:36:13 | 16 | A.  Correct, I don't dispute that. |
| 09:36:14 | 17 | Q.  And the claims recite gain and phase rotation, correct? |
| 09:36:17 | 18 | A.  They do. |
| 09:36:22 | 19 | MR. SHEASBY:  Let's go to the '833 patent, and |
| 09:36:25 | 20 | pull up PX-2.128.  I'm sorry, P -- PDX-2.128.  128, |
| 09:36:57 | 21 | Mr. Huynh.  PDX-2.128. |
| 09:37:05 | 22 | Q.  (By Mr. Sheasby)  Okay.  I'm showing this document on |
| 09:37:07 | 23 | the left, which is from Qualcomm, correct? |
| 09:37:09 | 24 | A.  It appears to be, yes. |
| 09:37:12 | 25 | Q.  It literally says Qualcomm, correct? |

| | | |
|---|---|---|
| 09:37:17 | 1 | A.  It says Qualcomm University. |
| 09:37:20 | 2 | Q.  And this document was produced in Apple's records, |
| 09:37:23 | 3 | correct? |
| 09:37:23 | 4 | A.  I don't know.  It has a Plaintiffs' number on it.  I'm |
| 09:37:28 | 5 | not sure. |
| 09:37:28 | 6 | Q.  So you don't know if this was found in Apple's records, |
| 09:37:32 | 7 | sir? |
| 09:37:32 | 8 | A.  Yes, I don't know the answer to that. |
| 09:37:34 | 9 | Q.  You didn't investigate in preparation for your |
| 09:37:38 | 10 | deposition, correct? |
| 09:37:38 | 11 | A.  I did use it because I believed Dr. Madisetti referred |
| 09:37:41 | 12 | to it. |
| 09:37:41 | 13 | Q.  But you didn't know -- you don't know whose records it |
| 09:37:45 | 14 | was in, correct? |
| 09:37:47 | 15 | A.  That's correct. |
| 09:37:47 | 16 | MR. MUELLER:  I'm sorry to interrupt. |
| 09:37:49 | 17 | This is a Qualcomm document, so if Mr. Sheasby is |
| 09:37:51 | 18 | going to get into this, he's going to have to seal the |
| 09:37:54 | 19 | courtroom for Qualcomm information. |
| 09:37:55 | 20 | MR. SHEASBY:  Seal the courtroom. |
| 09:37:57 | 21 | THE COURT:  All right.  At the request of counsel, |
| 09:37:59 | 22 | I will order the courtroom sealed.  Those of you present |
| 09:38:02 | 23 | not subject to the protective order should excuse |
| 09:38:06 | 24 | yourselves until the courtroom is reopened and unsealed. |
| 09:38:09 | 25 | (Courtroom sealed.) |

| | | |
|---|---|---|
| 09:38:09 | 1 | (This portion of the transcript is sealed |
| 09:38:09 | 2 | and filed under separate cover as |
| 09:38:24 | 3 | Sealed Portion No. 14.) |
| 09:38:24 | 4 | (Courtroom unsealed.) |
| 09:45:34 | 5 | THE COURT:  Dr. Wells, you may step down, sir. |
| 09:45:37 | 6 | THE WITNESS:  Thank you. |
| 09:45:38 | 7 | MR. SHEASBY:  Your Honor, may we clear binders? |
| 09:45:40 | 8 | THE COURT:  Please. |
| 09:45:56 | 9 | MR. MUELLER:  Oh, yes.  Your Honor, may Dr. Wells |
| 09:45:58 | 10 | be released? |
| 09:45:59 | 11 | THE COURT:  Any objection from Plaintiff? |
| 09:46:00 | 12 | MR. SHEASBY:  No objection, Your Honor. |
| 09:46:01 | 13 | THE COURT:  The witness is excused. |
| 09:46:20 | 14 | Defendant, who is your next witness? |
| 09:46:23 | 15 | MR. MUELLER:  Your Honor, we call Vivek |
| 09:46:28 | 16 | Ramaprasad, and Mr. Summersgill will conduct the |
| 09:46:32 | 17 | examination. |
| 09:46:32 | 18 | THE COURT:  What is your expected direct, |
| 09:46:36 | 19 | Mr. Summersgill, lengthwise? |
| 09:46:37 | 20 | MR. SUMMERSGILL:  About 15 minutes, Your Honor. |
| 09:46:39 | 21 | THE COURT:  Let's proceed. |
| 09:46:42 | 22 | If the witness will come forward and be sworn, |
| 09:46:47 | 23 | please. |
| 09:46:47 | 24 | (Witness sworn.) |
| 09:47:02 | 25 | THE COURT:  Please come around, sir, have a seat |

09:47:04  1  at the witness stand.

09:47:09  2          All right.  Mr. Summersgill, you may proceed with

09:47:11  3  your direct examination.

09:47:12  4          MR. SUMMERSGILL:  Thank you, Your Honor.

09:47:12  5      VIVEK RAMAPRASAD, DEFENDANT'S WITNESS, SWORN

09:47:12  6                    DIRECT EXAMINATION

09:47:13  7  BY MR. SUMMERSGILL:

09:47:13  8  Q.  Good morning.  Would you please introduce yourself to

09:47:16  9  the jury and tell them your name and where you live?

09:47:19  10 A.  Good morning.  I'm Vivek Ramaprasad.  I live in

09:47:23  11 Southern California, San Diego.

09:47:24  12 Q.  And would you please tell the jury about your

09:47:27  13 educational background?

09:47:27  14 A.  Yeah.  I grew up in India.  I got my undergraduate in

09:47:33  15 electrical engineering in India, and then I came to do my

09:47:36  16 Master's here in University of Missouri, and then I got my

09:47:39  17 MBA from University of Michigan.

09:47:41  18 Q.  And where do you work, Mr. Ramaprasad?

09:47:44  19 A.  I work for Apple.

09:47:44  20 Q.  And how long have you worked for Apple?

09:47:46  21 A.  It's been about a year now.

09:47:49  22 Q.  And what did you do before you joined Apple?

09:47:51  23 A.  Before Apple, I worked for Intel.

09:47:57  24 Q.  And what was Intel's business when you worked there?

09:48:00  25 A.  We specialized in making computer chips.

09:48:03   1   Q.   And what specifically did you work on at Intel?

09:48:06   2   A.   So in the chip-making industry, I was involved in

09:48:10   3   making these baseband modem chips for mobile phones.

09:48:15   4   Q.   And what part of the baseband chip did you focus on at

09:48:18   5   Intel?

09:48:18   6   A.   On the baseband chip, my primary focus was on something

09:48:23   7   called the PDCCH processing.

09:48:25   8   Q.   And how long did you work on -- in the baseband chip

09:48:30   9   unit at Intel?

09:48:30   10   A.   Yeah, that's a long time.  I worked for 21 years.

09:48:34   11   That's close to half my life.

09:48:37   12   Q.   Mr. Ramaprasad, why did you leave Intel to come to

09:48:40   13   Apple?

09:48:40   14   A.   As an electrical engineer, it's always been my passion

09:48:45   15   to build chips, and late last year my division was moved

09:48:53   16   over to Apple, so -- and I continued to pursue my passion.

09:48:56   17   Q.   And what are you working on at Apple now?

09:48:58   18   A.   At Apple I'm continuing to pursue my passion of

09:49:04   19   building great chips.

09:49:05   20   Q.   Now, Mr. Ramaprasad, how long, over the course of your

09:49:09   21   career, have you been working on designing and developing

09:49:13   22   baseband chips?

09:49:13   23   A.   It's 21 years.

09:49:15   24   Q.   And have you received any patents for the work that

09:49:17   25   you've done?

09:49:18  1   A.  Yes, I do have four patents.

09:49:20  2   Q.  Now, Mr. Ramaprasad, what is the technology that you

09:49:25  3   worked on that you understand is at issue in this case?

09:49:27  4   A.  So in this case, it's particularly PDCCH, which belongs

09:49:32  5   to LTE.

09:49:33  6   Q.  And what does "PDCCH" mean?

09:49:35  7   A.  It's a short form for Physical Downlink Control

09:49:43  8   Channel.

09:49:43  9   Q.  And what is the PDCCH channel?

09:49:45  10  A.  So, I mean, we can imagine a channel as -- we know the

09:49:50  11  cell phone tower, and we have our mobile phones, right?  So

09:49:53  12  this is like a wireless channel where the control

09:49:57  13  information is exchanged between the cell phone tower and

09:50:00  14  the mobile phone.

09:50:01  15  Q.  And what is the control information that you just

09:50:03  16  referred to?

09:50:04  17  A.  So it's the information which is important for the

09:50:09  18  mobile phone which tells how much a user can talk, how much

09:50:14  19  of Internet it can download, and things like that.

09:50:15  20  Q.  And at a high level, how does this PDCCH process work?

09:50:20  21  A.  So in very simple terms, the mobile phone needs to look

09:50:26  22  into this wireless channel, and it needs to find this

09:50:30  23  control information.  To find the control information, they

09:50:33  24  need to start searching.  To start searching, they need to

09:50:38  25  find a start position.

09:50:39  1   Q.  And where in the Apple devices does this PDCCH

09:50:44  2   processing occur?

09:50:45  3   A.  So this happens in the tiny mobile chip inside the

09:50:51  4   source code inside the baseband chip.

09:50:53  5   Q.  And how can you figure out how that processing in the

09:50:56  6   baseband chip works?

09:50:57  7   A.  So we write instructions which go into these baseband

09:51:04  8   chip, and we -- it's usually in the form of source code.

09:51:08  9   Q.  And who wrote the source code for the PDCCH processing

09:51:12  10  in the Intel baseband chips?

09:51:14  11  A.  I wrote the source code.

09:51:15  12  Q.  Now, Mr. Ramaprasad, what did you first begin working

09:51:19  13  on PDCH -- PDCCH processing technology in the Intel chips?

09:51:26  14  A.  It was back in August of 2012.

09:51:28  15  Q.  And at a high level, what was Intel's goal with respect

09:51:32  16  to the design of the PDCCH processing?

09:51:35  17  A.  So there are two goals.  One is we had to make things

09:51:40  18  work with the LTE standard.  Then the most important goal

09:51:44  19  is to make it work on the tiniest of chips.

09:51:46  20  Q.  And what did you and the other engineers working on

09:51:49  21  this technology do to develop it?

09:51:51  22  A.  So when we started -- I think it was like a blank

09:51:57  23  slate.  So we had this tiny chip, and to make this tiny

09:52:00  24  chip, what do we need to do is to go build -- look at these

09:52:05  25  complex of problems, break it down into simplest of

844

| | | |
|---|---|---|
| 09:52:11 | 1 | solution. |
| 09:52:11 | 2 | Q.  And how long did it take to design the PDCCH processing |
| 09:52:15 | 3 | technology? |
| 09:52:15 | 4 | A.  It's a very long affair.  It's multiple years. |
| 09:52:18 | 5 | Q.  And can you explain the challenges you faced over those |
| 09:52:21 | 6 | years? |
| 09:52:21 | 7 | A.  It was extremely challenging.  I mean, to start from a |
| 09:52:26 | 8 | blank slate and squeeze everything in these tiniest of |
| 09:52:33 | 9 | chips, it was long nights and weekends and a lot of |
| 09:52:36 | 10 | thinking, especially when you step back, look at a complex |
| 09:52:39 | 11 | problem, find the simplest of solutions.  That's the |
| 09:52:43 | 12 | hardest part. |
| 09:52:44 | 13 | Q.  And what was the result of all that hard work? |
| 09:52:46 | 14 | A.  I can't qualify in words, but what I can say is when I |
| 09:52:51 | 15 | see people walk -- walk around using their phones, talking |
| 09:52:56 | 16 | to their loved ones, it's a really heartening feeling. |
| 09:53:01 | 17 | Q.  Now does your own work involve the LTE standard? |
| 09:53:03 | 18 | A.  Yes. |
| 09:53:03 | 19 | Q.  How has your work involved the LTE standard? |
| 09:53:07 | 20 | A.  So I worked on the LTE standard by writing these |
| 09:53:11 | 21 | instructions which go into many instructions which go into |
| 09:53:14 | 22 | making this chip work on the LTE standard. |
| 09:53:17 | 23 | MR. SUMMERSGILL:  And if we could pull up DTX-8.3, |
| 09:53:30 | 24 | please. |
| 09:53:30 | 25 | Q.  (By Mr. Summersgill)  And turning to Page 64, please, |

09:53:34  1  Mr. Ramaprasad, could you tell us what this is?

09:53:45  2  A.  Yes.  So this is the LTE standard or the specification,

09:53:48  3  and this particular paragraph or the section tells us what

09:53:52  4  needs to be done to find the start position.

09:53:54  5  Q.  And so this portion of the standard relates to PDCCH

09:53:59  6  processing?

09:54:01  7  A.  It's one part of the PDCCH processing.

09:54:04  8  Q.  And did you help to design the Intel chips in order to

09:54:07  9  operate with this portion of the standard?

09:54:09  10  A.  Yes, I did.

09:54:10  11  Q.  What did you do?

09:54:11  12  A.  So -- so this specification talks about what needs to

09:54:16  13  be done.  But as a chip engineer, as I said before, we

09:54:20  14  are --

09:54:21  15      MR. SHEASBY:  Your Honor, I object.  At this point

09:54:24  16  it appears that this witness is attempting to explain

09:54:26  17  whether Intel did something different from the

09:54:30  18  specification or not.  That's an area of expert testimony.

09:54:33  19  I have no objection whatsoever from him describing what

09:54:37  20  his -- what he did do, but comparing what he did do to the

09:54:42  21  standard document, is expert testimony.

09:54:44  22      THE COURT:  Is there a response?

09:54:46  23      MR. SUMMERSGILL:  Your Honor, that's not what

09:54:47  24  we're trying to do, but I can ask another question to make

09:54:50  25  sure that that doesn't happen.

09:54:51   1          THE COURT:  Well, to ensure that there's no risk
09:54:53   2   of that happening, this being a fact witness and not a
09:54:56   3   previously-disclosed expert witness, I'll sustain the
09:54:59   4   objection, but I'll allow you to ask it in a different way.
09:55:03   5          MR. SUMMERSGILL:  Thank you, Your Honor.
09:55:04   6   Q.  (By Mr. Summersgill)  Mr. Ramaprasad, without making
09:55:07   7   any comparison between what the Intel chips do and what the
09:55:10   8   standard does, can you tell us what you did to design the
09:55:16   9   Intel products to operate with this portion of the
09:55:18  10   standard?
09:55:19  11   A.  Sure.  So, as I said, complex of things can be done in
09:55:24  12   simplest of ways.
09:55:25  13          So for this particular section, we used a shift
09:55:28  14   operation, which does it very efficiently, occupying the
09:55:33  15   least amount of space on the chip.
09:55:34  16   Q.  And would you explain what this shift calculation is
09:55:37  17   and how it works?
09:55:38  18   A.  Sure.
09:55:39  19   Q.  And would you like to use your monitor?
09:55:42  20   A.  Yeah.
09:55:48  21          So let's take a No. 4, right?  The No. 4 on a
09:55:54  22   computer chip, we usually represent it in terms of 0s and
09:56:00  23   1s.  It looks like 0100, right?
09:56:04  24          So what we do is we can take these digits, the 0s
09:56:09  25   and 1s, either shift it right or shift it left.  In this

09:56:13   1   case, let's say we shift it right.  So we use this

09:56:18   2   operation, two arrow marks pointing right.  So this bit

09:56:22   3   falls off, this one comes over here, this one comes over

09:56:25   4   here, and this one comes over here.

09:56:30   5        So this is nothing but a 2 on the computer.  So a

09:56:35   6   4, when it's right-shifted by one position, becomes a 2.

09:56:41   7   So that's the simplest of operations we perform.

09:56:44   8   Q.  Now, Mr. Ramaprasad, how do you know that the Intel

09:56:49   9   chips in the Apple products use this shift calculation?

09:56:52   10  A.  I know because I have used it in my source code.

09:56:54   11  Q.  And by "used it" in your source code, you mean you

09:56:58   12  helped to write the source code?

09:56:59   13  A.  Yeah, I did.  That's what I meant, yeah.

09:57:02   14       MR. SUMMERSGILL:  Your Honor, may we seal the

09:57:04   15  courtroom?  And -- and I'm going to present Apple

09:57:07   16  confidential information, so the Apple folks can remain.

09:57:11   17       THE COURT:  All right.  Then based on counsel's

09:57:13   18  request, I'll order the courtroom sealed.  Those persons

09:57:17   19  present not subject to the protective order in this case or

09:57:19   20  aligned with Defendant, Apple, should excuse themselves

09:57:23   21  until the courtroom is reopened and unsealed.

09:57:28   22       MR. SHEASBY:  Your Honor, I see one person who I

09:57:30   23  haven't noticed before.

09:57:31   24       Sir, are you under the protective order?

09:57:34   25       PanOptis is in compliance, Your Honor.

09:57:36  1          THE COURT:  All right.

09:57:37  2          (Courtroom sealed.)

09:57:37  3          (This portion of the transcript is sealed

09:57:37  4          and filed under separate cover as

09:57:39  5          Sealed Portion No. 15.)

09:57:39  6          (Courtroom unsealed.)

10:02:27  7          THE COURT:  Having unsealed the courtroom -- yes,

10:02:30  8  Mr. Mueller.

10:02:30  9          MR. MUELLER:  May Mr. Ramaprasad be released, Your

10:02:34  10  Honor?

10:02:34  11          THE COURT:  Is there any objection?

10:02:35  12          MR. SHEASBY:  No objection at all.

10:02:37  13          THE COURT:  The witness is excused.

10:02:38  14          All right.  Ladies and gentlemen, this is a good

10:02:41  15  place in time for us to take a short recess.  If you will

10:02:44  16  simply close your notebooks and leave them in your chairs.

10:02:47  17  Follow all my instructions, including not to discuss the

10:02:50  18  case among yourself.  And we'll be back shortly to

10:02:54  19  continue.

10:02:54  20          The jury is excused for recess at this time.

10:03:01  21          COURT SECURITY OFFICER:  All rise.

10:03:02  22          (Jury out.)

10:03:25  23          THE COURT:  All right.  Counsel, for your

10:03:26  24  information, it appears that we've used an hour and 26

10:03:30  25  minutes so far today.

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 10:03:35 | 1  | For the entirety of the trial, the Plaintiff has |
| 10:03:38 | 2  | used 10 hours and 54 minutes.  Has 2 hours and 6 minutes |
| 10:03:42 | 3  | remaining. |
| 10:03:43 | 4  | And Defendants used just a couple seconds short of |
| 10:03:48 | 5  | 11 hours, with two hours remaining. |
| 10:03:50 | 6  | We stand in recess. |
| 10:16:40 | 7  | COURT SECURITY OFFICER:  All rise. |
| 10:16:41 | 8  | (Recess.) |
| 10:16:42 | 9  | (Jury out.) |
| 10:16:42 | 10 | COURT SECURITY OFFICER:  All rise. |
| 10:16:43 | 11 | THE COURT:  Be seated, please. |
| 10:41:30 | 12 | All right.  Defendant, are you prepared to call |
| 10:41:34 | 13 | your next witness? |
| 10:41:35 | 14 | MR. MUELLER:  We are, Your Honor.  We're going to |
| 10:41:37 | 15 | call Mr. Mark Lanning, and Mr. Summersgill will do the |
| 10:41:40 | 16 | examination. |
| 10:42:06 | 17 | (Jury in.) |
| 10:42:07 | 18 | THE COURT:  Welcome back, ladies and gentlemen. |
| 10:42:09 | 19 | Please have a seat. |
| 10:42:10 | 20 | Defendant, call your next witness. |
| 10:42:14 | 21 | MR. MUELLER:  Thank you, Your Honor.  We call |
| 10:42:15 | 22 | Mr. Mark Lanning. |
| 10:42:17 | 23 | THE COURT:  All right.  Mr. Lanning, if you'll |
| 10:42:19 | 24 | come forward and be sworn. |
| 10:42:21 | 25 | (Witness sworn.) |

10:42:34  1          THE COURT:  Please come around, sir, have a seat

10:42:39  2  at the witness stand.

10:42:41  3          All right.  Mr. Summersgill, you may proceed with

10:42:56  4  your direct examination.

10:42:58  5          MR. MUELLER:  Thank you, Your Honor.

10:42:58  6          MARK LANNING, DEFENDANT'S WITNESS, SWORN

10:42:58  7                  DIRECT EXAMINATION

10:42:58  8  BY SUMMERSGILL:

10:43:00  9  Q.  Mr. Lanning, could you please introduce yourself, and

10:43:03  10  tell the jury a little bit about yourself?

10:43:05  11  A.  Good morning, ladies and gentlemen.  As you probably

10:43:07  12  just heard, my name is Mark Lanning.  I live with my wife

10:43:12  13  in Greenville, Texas, where we have a ranch called the

10:43:18  14  Twisted L Ranch where we raise Paint and Quarter horses,

10:43:23  15  and we raise Grade 1 cattle and Hereford cattle and cross

10:43:27  16  those two cattle together.  Recently, we also adopted 30

10:43:27  17  wild Mustangs to give them a better home and to keep things

10:43:33  18  interesting at the ranch.

10:43:33  19          THE COURT:  Mr. Lanning, would you pull the

10:43:37  20  microphone closer to you, please, sir?

10:43:37  21          THE WITNESS:  Yes, Your Honor.

10:43:37  22          THE COURT:  Thank you.

10:43:41  23          THE WITNESS:  And I want to say, too, is I realize

10:43:43  24  this is your fifth day here in court, and I promise that I

10:43:46  25  won't take any more of your time today than absolutely

10:43:49   1   necessary to cover the points I need to.

10:43:53   2   Q.  (By Mr. Summersgill)  What do you do for a -- a living,

10:43:56   3   Mr. Lanning?

10:43:56   4   A.  Well, when I don't have my boots on, I do technical

10:44:03   5   work.  I do technical consulting.  A lot of that consulting

10:44:05   6   is in regard to wireless and cellular networks.

10:44:07   7   Q.  And for how long you have been working in the area of

10:44:11   8   wireless communication technologies?

10:44:12   9   A.  I started working in cellular networks over 35 years

10:44:18  10   ago when cellular networks were just invented, the

10:44:20  11   first-generation networks.  For some of you old enough to

10:44:26  12   realize, the phones then were as big as a big purse.  We

10:44:29  13   called it a bag phone.  And all the phone could do was just

10:44:32  14   barely make calls and receive calls.

10:44:35  15        And since then, I've been building products for

10:44:39  16   generation 2 networks, generation 3 cellular networks, and

10:44:43  17   I've also been architect of the largest generation 2

10:44:48  18   cellular network in the world, and -- where we rolled out

10:44:52  19   over a billion dollars worth of cellular equipment to

10:44:55  20   achieve that.

10:44:55  21   Q.  Where did you go to school, Mr. Lanning?

10:44:58  22   A.  I went to school at Southern Methodist University in

10:45:00  23   Dallas.

10:45:02  24   Q.  And tell me, where did you begin your career?

10:45:05  25   A.  I -- I began my -- began my career in 1974 when I

| | | |
|---|---|---|
| 10:45:12 | 1 | joined the U.S. Army Signal Corp.  And I picked something |
| 10:45:17 | 2 | that was a long class that said Fixed Cycling Repair.  I |
| 10:45:25 | 3 | had no idea what that was.  Turns out that it was encrypted |
| 10:45:27 | 4 | communications that the military uses to encrypt all of |
| 10:45:29 | 5 | their data and voice communications between all their |
| 10:45:34 | 6 | different installations and soldiers in the field. |
| 10:45:36 | 7 | Q.  And what did you work on in the Army with relation to |
| 10:45:42 | 8 | the White House? |
| 10:45:42 | 9 | A.  After two years going to intensive classes and |
| 10:45:47 | 10 | achieving the top graduate award in three of these |
| 10:45:50 | 11 | different classes, I was asked to be a member of a small |
| 10:45:52 | 12 | team that was responsible for upgrading the White House |
| 10:45:56 | 13 | communications throughout the world.  And so we upgraded |
| 10:45:59 | 14 | all the communications equipment in the White House for all |
| 10:46:03 | 15 | of their voice and data so that all of that would be |
| 10:46:06 | 16 | secure. |
| 10:46:07 | 17 | Q.  And what did you do after you left the Army, |
| 10:46:10 | 18 | Mr. Lanning? |
| 10:46:10 | 19 | A.  After I left the Army, I -- I took a job with a company |
| 10:46:15 | 20 | called International Telephone and Telegraph where I worked |
| 10:46:18 | 21 | for them full time on the first email system that was |
| 10:46:25 | 22 | built, and I went to school full time, like -- like I said, |
| 10:46:28 | 23 | at SMU in Dallas at that time. |
| 10:46:30 | 24 | Q.  And when did you start consulting? |
| 10:46:32 | 25 | A.  I started consulting in 1991. |

10:46:35  1  Q.  And has all of your consulting involved litigation?

10:46:38  2  A.  No.  For the first 15 years, I did pure consulting for

10:46:47  3  design of software and hardware systems, and the majority

10:46:50  4  of that design was for cellular equipment.

10:46:53  5          After the first 15 years, then I started slowly

10:46:56  6  working into the type of work I'm doing today, which is

10:47:00  7  legal-type expert work.

10:47:02  8  Q.  And have you designed any wireless products?

10:47:05  9  A.  Yes, I've de -- designed many wireless products that

10:47:09  10 are still being used today for cellular networks.  I

10:47:17  11 designed and worked with Motorola on a state-of-the-art

10:47:20  12 base station that they were building that they've sold

10:47:23  13 hundreds of, probably thousands by now, all over the world.

10:47:26  14         I've also co-designed cell phones with Nokia, and

10:47:30  15 a lot of the other cellular equipment that really hadn't --

10:47:33  16 hasn't been addressed in this trial that -- that's in a

10:47:36  17 cellular network.

10:47:37  18 Q.  Do you have any experience with computer code?

10:47:40  19 A.  Yes, I do.  I -- seems like thinking back it was like

10:47:46  20 we were doing it with a stone tablet and a chisel, but I

10:47:50  21 started writing software back in 1975.  It's, again, like

10:47:54  22 many things, a lot different.

10:47:57  23         Since then, I've written over a million lines of

10:48:00  24 software code in various languages.  And some examples are

10:48:04  25 microcode, assembler, Fortran, Pascal, C, C++.  I've also

10:48:12   1   designed hardware using the hardware design language for a

10:48:16   2   computer processor and another chip that's similar to the

10:48:20   3   baseband chips that you've heard of that we call the high

10:48:23   4   speed data rate chip.

10:48:26   5          THE COURT:  Mr. Lanning, I'm going to ask you to

10:48:29   6   limit your answers to the questions asked.  He asked if you

10:48:32   7   had experience with computer code, not about designing

10:48:32   8   hardware, not about all that other stuff.  If he wants to

10:48:35   9   know more than what your -- his question calls for, he'll

10:48:39  10   ask you a second question.  Is that understood, sir?

10:48:42  11          THE WITNESS:  Yes, yes, Your Honor.

10:48:43  12          THE COURT:  Thank you very much.

10:48:44  13          Please continue.

10:48:46  14   Q.  (By Mr. Summersgill)  Mr. Lanning, what experience, if

10:48:48  15   any, do you have with the LTE standard?

10:48:51  16   A.  I have extensive experience with the LTE standard.

10:48:55  17   Q.  And what is that experience, briefly?

10:48:57  18   A.  Well, the LTE standard didn't just start with the blank

10:49:02  19   piece of paper.  As I described, I started with the first

10:49:04  20   generation cellular networks, and I've worked on standards

10:49:07  21   for those networks.

10:49:08  22          I've worked also with the second generation

10:49:10  23   networks and the third generation networks.

10:49:13  24          So a majority of that functionality has been

10:49:15  25   adopted by the fourth generation LTE network.

10:49:19  1          And then I also keep up with the LTE standard

10:49:22  2   because it isn't fixed in place.  There's a new release

10:49:27  3   that comes out typically each year.  So I need to stay up

10:49:31  4   with that.

10:49:31  5   Q.  And for how many different companies would you say that

10:49:33  6   you provided expert consulting services?

10:49:37  7   A.  I've provided expert consulting services for over 60

10:49:42  8   different companies besides Apple.

10:49:45  9   Q.  And have you provided expert consulting services to

10:49:48  10  Apple in the past?

10:49:49  11  A.  Yes, I have.

10:49:50  12  Q.  And how much have you been paid Apple for those

10:49:52  13  services in the last five years, sir?

10:49:54  14  A.  A little under a million dollars.

10:49:57  15  Q.  And what's your hourly rate, Mr. Lanning?

10:49:59  16  A.  $550 an hour.

10:50:01  17  Q.  Now, Mr. Lanning, does your compensation in this case

10:50:05  18  or any of the other cases that you've handled depend in any

10:50:09  19  way on the outcome of the cases?

10:50:10  20  A.  No, it doesn't.  I'm an independent consultant.  I get

10:50:14  21  paid regardless of the outcome of this case.

10:50:21  22          MR. SUMMERSGILL:  Your Honor, we offer Mr. Lanning

10:50:23  23  as an expert in the field of wireless communications

10:50:26  24  technologies.

10:50:26  25          THE COURT:  Is there objection?

10:50:28  1          MR. SHEASBY:  No objection.

10:50:28  2          THE COURT:  Then the Court will recognize this

10:50:31  3  witness as an expert in those designated fields.

10:50:34  4          Please continue, counsel.

10:50:35  5          MR. SUMMERSGILL:  Thank you, Your Honor.

10:50:36  6  Q.  (By Mr. Summersgill)  Mr. Lanning, what were you asked

10:50:37  7  to do in this case?

10:50:39  8  A.  I was asked to provide opinions for two patents that

10:50:43  9  you've already seen.  They are the '557 and the '332

10:50:47 10  patents.  Specifically, my opinions were in regard to

10:50:51 11  Apple's infringement of these patents and also whether

10:50:53 12  these patents were valid or not.

10:50:55 13  Q.  And how did you go about your investigation?

10:50:57 14  A.  I provided many, many hundreds of hours of analysis,

10:51:04 15  and I go about my investigation typically, like this one, I

10:51:07 16  start with the patents.  I start with their file histories.

10:51:10 17  I start with the Court's constructions to make sure I

10:51:14 18  understand how I should read the claims of the patents.

10:51:19 19          Then I look at a lot of different documents and

10:51:21 20  information.  There's Apple documents.  There's many

10:51:26 21  different documents.

10:51:27 22          And then I also spent many hours evaluating the

10:51:32 23  software source code and the hardware source code for the

10:51:38 24  Intel and Qualcomm baseband chips that are used in the

10:51:44 25  Apple products.

10:51:45  1   Q.  And why did you review the source code?

10:51:47  2   A.  Well, the source code -- reviewing the source code for

10:51:50  3   the software and the hardware is the only way you really

10:51:55  4   know what that chip is doing.  The software tells the

10:51:59  5   hardware what to do, and the hardware design document shows

10:52:04  6   how all the circuitry is put together and all the timing

10:52:06  7   for the hardware.

10:52:08  8       So without studying the software code for the --

10:52:14  9   source code for the software and the hardware, one really

10:52:18  10  doesn't know what that chip is doing for sure.

10:52:20  11  Q.  And did you speak to any of the Apple engineers in

10:52:26  12  connection with your analysis?

10:52:27  13  A.  Yes, I did.  And you've heard the two that I spoke to

10:52:32  14  testify, Dr. Josiam and Mr. Ramaprasad, who just finished

10:52:35  15  testifying.

10:52:36  16  Q.  And why did you speak to the two Apple engineers?

10:52:38  17  A.  I performed many hours of analysis, and I wanted to

10:52:42  18  confirm that my understanding of my review of the software

10:52:46  19  source code and the hardware operated the way it did, and I

10:52:49  20  confirmed with them.

10:52:50  21      I also wanted to talk to them to understand some

10:52:53  22  of the reasons why their teams chose to do it the way the

10:52:59  23  chips did.

10:53:00  24  Q.  May I ask now you some questions about your analysis of

10:53:02  25  the '557 patent?

| | | |
|---|---|---|
| 10:53:02 | 1 | A.  Sure. |
| 10:53:03 | 2 | Q.  So at a high level, what's the subject matter of the |
| 10:53:06 | 3 | '557 patent? |
| 10:53:06 | 4 | A.  And you've heard this acronym before.  It's about a |
| 10:53:10 | 5 | part of the random access procedure.  Specifically, what |
| 10:53:13 | 6 | we're talking about this week is the mobile device, like a |
| 10:53:18 | 7 | cell phone, would send a sequence to the base station. |
| 10:53:22 | 8 | It's called a random access procedure because the |
| 10:53:26 | 9 | base station doesn't know the cell phone's in its area |
| 10:53:30 | 10 | until the cell phone contacts it and say:  Hey, I'm here, |
| 10:53:35 | 11 | and I want to establish a connection. |
| 10:53:37 | 12 | Q.  And what is this random access procedure used for? |
| 10:53:40 | 13 | A.  Again, when you turn on a cell phone or if you're on an |
| 10:53:45 | 14 | airplane and take it off of airplane mode, the cell phone |
| 10:53:49 | 15 | needs to find the closest cell that it gets the strongest |
| 10:53:54 | 16 | signal. |
| 10:53:54 | 17 | Now, when it does that, again, the base station |
| 10:53:56 | 18 | doesn't know that cell phone is there.  So the random |
| 10:53:59 | 19 | access procedure is used by the cell phone to contact the |
| 10:54:02 | 20 | base station and see if it can establish a connection with |
| 10:54:06 | 21 | that base station. |
| 10:54:07 | 22 | Q.  Mr. Lanning, have you helped prepare any demonstratives |
| 10:54:10 | 23 | to help explain this random access procedure? |
| 10:54:13 | 24 | A.  Yes, I have. |
| 10:54:14 | 25 | MR. SUMMERSGILL:  Could we please pull up DDX-5 |

10:54:17  1   .3?

10:54:18  2   Q.  (By Mr. Summersgill)  And with reference to that,

10:54:20  3   Mr. Lanning, could you explain to the jury how this process

10:54:23  4   works.

10:54:23  5   A.  What you see on the right is the base station.  And

10:54:28  6   what we refer to a base station, you may see towers like

10:54:32  7   this around, and these are the base station towers.

10:54:34  8           What I'm showing on the left is a typical cell

10:54:37  9   phone.  And the words you see in the cell phone, if you

10:54:40  10  can't read them, say:  Searching for service.

10:54:44  11          Once it finds the signal from the base station, it

10:54:47  12  then sends a sequence -- next slide -- over to the base

10:54:52  13  station.  And what I put in the box is:  Hi, can I make a

10:54:56  14  connection with you?

10:54:56  15          If the base station agrees, then a connection is

10:55:01  16  established.

10:55:02  17          The next step, please.

10:55:03  18          And what I'm showing by this slide is there's a

10:55:08  19  connection established, and when that occurs, typically is

10:55:11  20  when you see those bars of service, the different levels

10:55:14  21  based on the strength of the signal it's receiving.

10:55:17  22  Q.  And what is a sequence?

10:55:19  23  A.  A sequence is a specific order of values, and we refer

10:55:26  24  to them as complex values because they typically refer to

10:55:30  25  different angles.

10:55:32  1    And in this case, for LTE, the sequence is a large

10:55:37  2  number of values, 839, that are sent, and it's a unique

10:55:43  3  order that the base station understands.

10:55:45  4    MR. SUMMERSGILL:  Could we please pull up DDX-5.6?

10:55:50  5  Q.  (By Mr. Summersgill)  And, Mr. Lanning, can you explain

10:55:53  6  what's shown on DDX-5.6?

10:55:56  7  A.  I -- you see the numbers going across.  This represents

10:56:05  8  one sequence.  So the sequence I was referring to, this is

10:56:08  9  what's sent from the mobile device, like a cell phone, to

10:56:11  10  the base station.  And as you see the little circle for

10:56:17  11  degrees, these are all different angles.  And the order of

10:56:21  12  where all these numbers are at is important because that's

10:56:24  13  the value of a specific sequence.

10:56:25  14  Q.  And how many sequences can each base station understand

10:56:30  15  in this process?

10:56:31  16  A.  Each base station in an LTE network uses 64 unique

10:56:37  17  sequences that have -- these sequences of this type that

10:56:42  18  have different patterns or different combinations of these

10:56:46  19  numbers.

10:56:46  20  Q.  And when were random access procedures first developed?

10:56:50  21  A.  Random access procedures have been required in cell

10:56:54  22  phones and cellular networks since cellular networks, for

10:56:57  23  the reasons I stated.

10:57:00  24    So I worked on C -- random -- the random access

10:57:04  25  procedure since the early 1900s, in second-generation

| | | |
|---|---|---|
| 10:57:08 | 1 | cellular networks.  They were needed in third-generation |
| 10:57:12 | 2 | cellular networks.  And, likewise, they're needed in LTE |
| 10:57:18 | 3 | fourth-generation networks. |
| 10:57:19 | 4 | Q.  And how, if at all, did mobile devices generate and use |
| 10:57:24 | 5 | sequences before the '557 patent? |
| 10:57:26 | 6 | A.  There are many different kinds of sequences that have |
| 10:57:28 | 7 | been used by cell phones and different length of sequences |
| 10:57:31 | 8 | that they're generated, and they've been used in different |
| 10:57:34 | 9 | ways for the same type of random access procedure. |
| 10:57:37 | 10 | Q.  Now, what is the '557 patent claim with respect to the |
| 10:57:41 | 11 | use of these sequences in the random access process you -- |
| 10:57:45 | 12 | you described? |
| 10:57:46 | 13 | A.  The '557 patent claims we're going to discuss today |
| 10:57:52 | 14 | require specific things be done for the sequences, that the |
| 10:57:56 | 15 | sequences be generated from a plurality of base sequences, |
| 10:58:03 | 16 | meaning more than one.  And the plurality of sequences need |
| 10:58:07 | 17 | to be generated, which means more of them need to be |
| 10:58:10 | 18 | generated.  And after they're generated, then the cell |
| 10:58:14 | 19 | phone needs to randomly select one of these sequences that |
| 10:58:17 | 20 | it's going to send to the base station. |
| 10:58:20 | 21 | MR. SUMMERSGILL:  Can we please pull up D -- pull |
| 10:58:22 | 22 | up DTX-27? |
| 10:58:26 | 23 | Q.  (By Mr. Summersgill)  What is this, Mr. Lanning? |
| 10:58:28 | 24 | A.  This is the '557 patent, the front page of it. |
| 10:58:30 | 25 | MR. SUMMERSGILL:  And could we turn to Page 18 and |

10:58:32  1   Claim 1?

10:58:33  2   Q.  (By Mr. Summersgill)  Mr. Lanning, what does Claim 1

10:58:35  3   require?

10:58:35  4   A.  You have seen Claim 1 before, and it's got -- it has a

10:58:40  5   lot of words and multiple requirements.  But what I'd like

10:58:45  6   to focus you on today is the second requirement that begins

10:58:49  7   with:  A selecting unit configured to randomly select a

10:58:52  8   sequence from a plurality of sequences contained in one

10:58:57  9   group of a plurality of groups, into which a pre-determined

10:59:03  10  number of sequences that are generated from a plurality of

10:59:11  11  base stations -- sorry -- a plurality of base sequences.

10:59:14  12          MR. SUMMERSGILL:  Now, could we turn to Claim 10

10:59:16  13  of the '557 patent, please?

10:59:18  14  Q.  (By Mr. Summersgill)  And could you explain what

10:59:24  15  Claim 10 requires.

10:59:25  16  A.  Claim 10 is a different type of claim that's referred

10:59:28  17  to as a method claim, but the same requirements I just read

10:59:31  18  you for Claim 1 are also in Claim 10.

10:59:34  19          Specifically, starting with grouping a

10:59:37  20  pre-determined number of sequences that are generated from

10:59:42  21  a plurality of sequences.  And then if I go down to the

10:59:46  22  next requirement, randomly selecting a sequence from a

10:59:52  23  plurality of sequences contained in one group of the

10:59:56  24  plurality of groups.

10:59:56  25  Q.  Now, Mr. Lanning, what part within the Apple products

11:00:02  1  contains the functionality at issue?

11:00:04  2  A.  The Apple products have a specialized piece of hardware

11:00:10  3  in the baseband chip called a sequence generator.

11:00:14  4  Q.  And what do you understand that the Plaintiffs must do

11:00:16  5  to prove infringement?

11:00:17  6  A.  I think you've heard this before, but what is

11:00:23  7  required -- in order for the Plaintiffs to show

11:00:25  8  infringement for the claims that I've just read for the

11:00:29  9  '557 -- or showed you -- they need to show that the Apple

11:00:34  10  products perform each and every requirement or limitation

11:00:37  11  of those claims.

11:00:39  12       And what I mean by that is, if Apple shows you or

11:00:44  13  I show you that one of these requirements is not performed

11:00:48  14  by the Apple products, then the Apple products don't

11:00:51  15  infringe.

11:00:51  16  Q.  And what conclusion did you reach on the issue of

11:00:58  17  infringement of Claims 1 and 10 of the '557 patent?

11:01:01  18  A.  That the Apple products do not infringe Claims 1 and 10

11:01:04  19  of the '557 patent.

11:01:04  20  Q.  And what's the basis for that conclusion?

11:01:06  21  A.  Because the Apple products simply don't do the

11:01:13  22  functionality required by these claims.

11:01:19  23       First, the Apple products don't generate a group

11:01:21  24  of basic -- of sequences from at least two base sequences,

11:01:29  25  like I showed you in the limitation, and they don't select

| | | |
|---|---|---|
| 11:01:32 | 1 | a sequence randomly from those sequences that have been |
| 11:01:34 | 2 | generated because there's no sequences that have been |
| 11:01:36 | 3 | generated. |
| 11:01:37 | 4 | Q.  Now, Mr. Lanning, what is a base sequence? |
| 11:01:39 | 5 | A.  A base sequence is very similar to that -- that whole |
| 11:01:45 | 6 | slide full of values I showed you with the angles, but it |
| 11:01:49 | 7 | has a specific -- specific combination of values so that it |
| 11:01:54 | 8 | can be manipulated, and other sequences can be generated |
| 11:01:58 | 9 | from it. |
| 11:02:01 | 10 | MR. SUMMERSGILL:  And could we please put Claim 1 |
| 11:02:03 | 11 | of the '557 patent back up on the screen. |
| 11:02:06 | 12 | Q.  (By Mr. Summersgill)  How does the claim -- or how do |
| 11:02:08 | 13 | the claims describe that sequences are generated? |
| 11:02:11 | 14 | A.  Well, first, if I could go down to -- I'm looking |
| 11:02:16 | 15 | for -- in the middle where it says a -- which:  A |
| 11:02:23 | 16 | pre-determined number of sequences that are generated from |
| 11:02:25 | 17 | a plurality of base sequences.  So the way these sequences |
| 11:02:33 | 18 | are generated is from at least two base sequences. |
| 11:02:36 | 19 | Q.  Now, where in the Intel and Qualcomm baseband chips is |
| 11:02:40 | 20 | a sequence generated? |
| 11:02:41 | 21 | A.  They're generated in the specific type of hardware in |
| 11:02:51 | 22 | the baseband chip called the sequence generator. |
| 11:02:53 | 23 | Q.  And how does the sequence generator of the Intel and |
| 11:02:56 | 24 | Qualcomm baseband chips generate a sequence? |
| 11:02:58 | 25 | A.  The sequence generator is a specialized piece of |

865

11:03:03   1   hardware that's -- that's very sophisticated, and it

11:03:07   2   receives a value or parameters from the software.

11:03:11   3          Based on the parameters it receives from the

11:03:13   4   software, it does some complex mathematical comp --

11:03:19   5   computations to actually generate each value of the

11:03:22   6   sequence.

11:03:23   7          And as it generates each value of the sequence, it

11:03:26   8   transmits out to the antenna.  And then once that sequence

11:03:30   9   is generated, it's gone, and the hardware waits until the

11:03:34   10  next time it needs to -- to send another sequence.

11:03:36   11  Q.  Now, how does the process of generating a sequence in

11:03:41   12  the Intel and Qualcomm chips compare to Claims 1 and 10 of

11:03:45   13  the '557 patent?

11:03:45   14  A.  Well, the Intel and Qualcomm baseband chips, first, do

11:03:54   15  not generate a plurality of sequences from the base

11:03:57   16  sequences.

11:03:59   17         Next, they don't select a sequence from these

11:04:02   18  generated sequences because if they don't generate them in

11:04:06   19  the first place, there's no sequence to select from.

11:04:09   20  Q.  And have you helped prepare some demonstratives to

11:04:12   21  explain these differences?

11:04:13   22  A.  Yes, I have.

11:04:14   23         MR. SUMMERSGILL:  Can we please pull up DDX-5.7?

11:04:22   24  Q.  (By Mr. Summersgill)  And, Mr. Lanning, with respect to

11:04:24   25  5.7, could you explain what we see here?

11:04:32  1   A.   What I'm showing on this slide is the requirement of

11:04:32  2   the claim that there be a plurality of base sequences, so

11:04:34  3   I'm showing two base sequences here.   On the left is the

11:04:40  4   red base sequence, and on the blue is the right.   And so

11:04:44  5   sequences need to be generated from at least two of these

11:04:47  6   base sequences.

11:04:48  7          So next step.   Next, please.

11:04:55  8          So I'm showing that the -- the '557 patent

11:05:00  9   requires that this first base sequence be manipulated so it

11:05:04  10  generates another sequence.   But another sequence is not

11:05:07  11  enough.   It needs to generate a plurality of sequences.

11:05:11  12         And so what I'm going to show you is that the red

11:05:18  13  base sequence will generate so many sequences until it

11:05:22  14  can't generate any more from that base sequence.   Then it

11:05:25  15  will go over to the blue base sequence and generate the

11:05:28  16  remaining sequences that are required.

11:05:30  17         Go ahead.   Next slide, please.

11:05:32  18         So what you see here on this slide is I have a

11:05:37  19  number of sequences in red on the left that have been

11:05:40  20  generated from the red base sequence, and then the

11:05:46  21  requirement of the '557 is I need to generate sequences

11:05:49  22  from at least another base sequence, and I'm showing you

11:05:53  23  the base sequences on the right.

11:05:55  24         And what I'm showing here is you look, there's a

11:05:58  25  total of 64 base sequences that would be required to do it

| | | |
|---|---|---|
| 11:06:02 | 1 | the way the '557 patent requires in LTE. |
| 11:06:06 | 2 | Q.  And, Mr. Lanning, what you just showed us was on |
| 11:06:13 | 3 | DDX-5.7 to 5.10, right? |
| 11:06:18 | 4 | A.  Yes, sir.  I'm sorry.  I was taking a drink. |
| 11:06:20 | 5 | Q.  Now, you -- you are allowed to drink. |
| 11:06:25 | 6 | What is -- |
| 11:06:27 | 7 | MR. SUMMERSGILL:  Could we put up DDX-5.11, |
| 11:06:33 | 8 | please? |
| 11:06:33 | 9 | Q.  (By Mr. Summersgill)  Mr. Lanning, what does -- what |
| 11:06:34 | 10 | does DDX-5.11 show? |
| 11:06:36 | 11 | A.  Now, I'd like to go down and show you the functionality |
| 11:06:39 | 12 | that occurs, at a high level, in the baseband chips. |
| 11:06:43 | 13 | The next slide, please. |
| 11:06:45 | 14 | What I'm showing you, and you've seen where |
| 11:06:48 | 15 | Dr. Josiam actually showed you an iPhone and where that |
| 11:06:55 | 16 | little baseband chip that does many things is located, and |
| 11:06:57 | 17 | that's what I'm focusing here on the left with the phone. |
| 11:06:59 | 18 | Q.  Mr. Lanning, let me pause you for one second.  You're |
| 11:07:02 | 19 | now talking about the Intel and Qualcomm baseband chips? |
| 11:07:03 | 20 | A.  Yes, this would -- this is the Intel/Qualcomm chips or |
| 11:07:07 | 21 | baseband chips, as I say on the top of this slide.  So that |
| 11:07:11 | 22 | would be the baseband chip, and this is how the Intel and |
| 11:07:16 | 23 | Qualcomm baseband chips were. |
| 11:07:17 | 24 | And I've broken that up into two pieces on the |
| 11:07:20 | 25 | right that I've labeled Software and Hardware, because |

11:07:23   1   there's two different components that are in those chips.

11:07:29   2   The software, which tells the hardware what to do, and then

11:07:33   3   the specialized software.

11:07:35   4          The next step.

11:07:36   5          So what happens in the Intel and Qualcomm baseband

11:07:39   6   chips, they choose a value at random.  I've just chosen a

11:07:45   7   value at random for 37.  And using that value, then the

11:07:49   8   software sends some parameters down to the specialized

11:07:54   9   sequence generator in the hardware, and I'll represent this

11:07:57   10  specialized hardware, you'll see these sprockets turning at

11:08:03   11  the bottom.

11:08:03   12         Next step.

11:08:04   13         And so once that parameter goes down, then the

11:08:09   14  hardware generates each of those different angles for that

11:08:13   15  sequence, and as they're generated, they're transmitted out

11:08:16   16  to the antenna, and the sequence is not stored anywhere.

11:08:19   17  Q.  Now, could you tell the jury why the chips are designed

11:08:22   18  that way?

11:08:22   19  A.  The chips -- the chips are designed that way because

11:08:27   20  it's much more efficient, and there's a lot of pressure on

11:08:30   21  the baseband chips to be as efficient as they can be.

11:08:34   22  Q.  And how do you know that the baseband chips in the

11:08:37   23  Apple products operate in the way you just described?

11:08:39   24  A.  Well, first, I spent many hours evaluating the software

11:08:45   25  part that you see on the top of the screen for both the

| | | |
|---|---|---|
| 11:08:47 | 1 | Intel and Qualcomm baseband chips.  I also spent many hours |
| 11:08:53 | 2 | reviewing the circuitry of the hardware, and specifically |
| 11:08:58 | 3 | this hardware sequence generator of the Intel and Qualcomm |
| 11:09:02 | 4 | chips. |
| 11:09:03 | 5 | And it's like I mentioned before, that's the only |
| 11:09:05 | 6 | way an engineer or anyone else would know how these |
| 11:09:08 | 7 | baseband chips operate. |
| 11:09:09 | 8 | Q.  Now, Mr. Lanning, why specifically did you review the |
| 11:09:13 | 9 | hardware source code? |
| 11:09:15 | 10 | A.  Because I wanted to verify that the hardware wasn't |
| 11:09:20 | 11 | doing any generation of a base sequence, it wasn't |
| 11:09:24 | 12 | generating other sequences from base sequences, and it |
| 11:09:28 | 13 | wasn't randomly selecting a sequence from the -- these |
| 11:09:34 | 14 | plurality or a group of sequences.  Then I confirmed that |
| 11:09:39 | 15 | it -- based on what I would see in the hard -- the |
| 11:09:43 | 16 | software, that's what the hardware was doing. |
| 11:09:44 | 17 | MR. SUMMERSGILL:  Your Honor, may we seal the |
| 11:09:46 | 18 | courtroom? |
| 11:09:46 | 19 | THE COURT:  Based on counsel's request, I'll order |
| 11:09:49 | 20 | the courtroom sealed at this time.  Those present not |
| 11:09:53 | 21 | subject to the protective order that's been entered in this |
| 11:09:57 | 22 | case -- |
| 11:09:58 | 23 | MR. SUMMERSGILL:  And -- and, Your Honor, I will |
| 11:10:00 | 24 | be showing Apple confidential information. |
| 11:10:02 | 25 | THE COURT:  -- or otherwise aligned with Defendant |

11:10:05   1   Apple should excuse themselves until the courtroom is
11:10:09   2   reopened and unsealed.
11:10:14   3              (Courtroom sealed.)
11:10:14   4              (This portion of the transcript is sealed
11:10:14   5              and filed under separate cover as
11:10:14   6              Sealed Portion No. 16.)
12:07:21   7              (Courtroom unsealed.)
12:07:21   8              THE COURT:  Ladies and gentlemen, we're going to
12:07:23   9   recess for lunch at this time.  Please take your notebooks
12:07:25   10  with you to the jury room.  Please enjoy the lunch that's
12:07:28   11  been provided for you there.
12:07:30   12             Please follow all my instructions, including not
12:07:32   13  to discuss the case among yourself or communicate about it
12:07:36   14  in any other way.
12:07:38   15             It's about seven or eight minutes after 12:00.
12:07:41   16  We'll try to convene about that same time after 1:00.
12:07:46   17             With that, the jury is excused for lunch.
12:07:50   18             COURT SECURITY OFFICER:  All rise.
12:07:53   19             (Jury out.)
12:08:11   20             THE COURT:  Be seated.
12:08:12   21             As of right now, according to my calculations, the
12:08:15   22  Plaintiffs have 1 hour and 54 minutes remaining.
12:08:19   23             The Defendant has 51 minutes on your allocated
12:08:22   24  trial time remaining.
12:08:24   25             We'll attempt to reconvene as close to 1:00

| | | |
|---|---|---|
| 12:08:27 | 1 | o'clock as possible. |
| 12:08:28 | 2 | Mr. Mueller, you're on your feet.  Do you have |
| 12:08:30 | 3 | something for the Court? |
| 12:08:32 | 4 | MR. MUELLER:  I do, Your Honor.  May Mr. Lanning |
| 12:08:34 | 5 | be released? |
| 12:08:35 | 6 | THE COURT:  Any objections? |
| 12:08:36 | 7 | MR. SHEASBY:  No objections. |
| 12:08:37 | 8 | THE COURT:  Mr. Lanning is excused. |
| 12:08:39 | 9 | Any further before we recess for lunch? |
| 12:08:42 | 10 | MR. SHEASBY:  Nothing from Plaintiffs, Your Honor. |
| 12:08:45 | 11 | MR. MUELLER:  No, Your Honor. |
| 12:08:45 | 12 | THE COURT:  We stand in recess. |
| 12:08:48 | 13 | COURT SECURITY OFFICER:  All rise. |
| 12:08:48 | 14 | (Recess.) |
| | 15 | |
| | 16 | CERTIFICATION |
| | 17 | I HEREBY CERTIFY that the foregoing is a true and |
| | 18 | correct transcript from the stenographic notes of the |
| | 19 | proceedings in the above-entitled matter to the best of my |
| | 20 | ability. |
| | 21 | |
| | 22 | /S/ Shelly Holmes _____               8/7/2020____ |
| | 23 | SHELLY HOLMES, CSR, TCRR                 Date<br>OFFICIAL REPORTER<br>State of Texas No.: 7804 |
| | 24 | Expiration Date: 12/31/20 |
| | 25 | |