REDACTED BY ORDER OF THE COURT

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3

OPTIS WIRELESS TECHNOLOGY,    )(   CIVIL ACTION NO.
4  LLC, OPTIS CELLULAR         )(   2:19-CV-66-JRG
TECHNOLOGY, LLC, PANOPTIS     )(
5  PATENT MANAGEMENT, LLC,     )(
UNWIRED PLANET, LLC, UNWIRED  )(
6  PLANET INTERNATIONAL LIMITED, )(
        PLAINTIFFS,            )(
7                              )(
VS.                           )(
8                              )(   MARSHALL, TEXAS
                               )(   AUGUST 10, 2020
9  APPLE INC.,                 )(   9:52 A.M.
        DEFENDANTS.            )(
10

11           TRANSCRIPT OF JURY TRIAL

12                   ALL DAY

13     BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14        UNITED STATES CHIEF DISTRICT JUDGE

15

APPEARANCES:
16

17  FOR THE PLAINTIFFS:

18

MR. SAMUEL F. BAXTER
19  MS. JENNIFER TRUELOVE
MCKOOL SMITH, P.C.
20  104 E. Houston Street
Suite 300
21  Marshall, TX 75670

22

MR. JASON G. SHEASBY
23  MS. ANNITA ZHONG
IRELL & MANELLA LLP
24  1800 Avenue of the Stars
Suite 900
25  Los Angeles, CA 90067

```
 1   FOR THE PLAINTIFFS:

 2
     MR. STEVEN J. POLLINGER
 3   MR. SETH R. HASENOUR
     MCKOOL SMITH, P.C.
 4   300 W. 6th Street
     Suite 1700
 5   Austin, TX 78701

 6
     MR. JONATHAN YIM
 7   MCKOOL SMITH, P.C.
     One Manhattan West
 8   395 9th Avenue
     50th Floor
 9   New York, NY 10001

10
     MR. CHRISTOPHER P. MCNETT
11   MCKOOL SMITH, P.C.
     1999 K Street, NW
12   Suite 600
     Washington, DC 20006
13

14   MS. INGRID PETERSEN
     MS. KELSEY SCHUETZ
15   IRELL & MANELLA LLP
     840 Newport Center Drive
16   Suite 400
     Newport Beach, CA 92660
17

18   FOR THE DEFENDANT:

19
     MR. JOSEPH J. MUELLER
20   WILMER CUTLER PICKERING
     HALE & DORR, LLP
21   60 State Street
     Boston, MA 02109
22

23   MR. MICHAEL J. SUMMERSGILL
     WILMER CUTLER PICKERING
24   HALE & DORR, LLP
     60 State Street
25   Boston, MA 02109
```

```
1   FOR THE DEFENDANT:

2

    MS. MELISSA R. SMITH
3   GILLAM & SMITH, LLP
    303 South Washington Avenue
4   Marshall, TX 75670

5

6

7

8   COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
9                        United States District Court
                         Eastern District of Texas
10                       Marshall Division
                         100 E. Houston
11                       Marshall, Texas  75670
                         (903) 923-7464
12

13
    (Proceedings recorded by mechanical stenography, transcript
14  produced on a CAT system.)

15

16

17

18

19

20

21

22

23

24

25
```

```
               1              P R O C E E D I N G S
08:31:33       2         (Jury out.)
08:31:33       3         COURT SECURITY OFFICER:  All rise.
08:31:34       4         THE COURT:  Be seated, please.
09:52:23       5         All right.  Counsel, before we proceed any
09:55:54       6    further, I'll ask if the parties are prepared to read into
09:55:58       7    the record those items from the list of pre-admitted
09:56:01       8    exhibits presented and published as a part of the trial on
09:56:09       9    the preceding Friday in this case, which would have been, I
09:56:13      10    believe, the 7th of August.
09:56:15      11         MS. SCHUETZ:  Yes, Your Honor.  Plaintiffs are
09:56:17      12    prepared.
09:56:17      13         THE COURT:  Let me hear from you at this time,
09:56:17      14    please.
09:56:24      15         MS. SCHUETZ:  Plaintiffs admitted the following
09:56:25      16    list of exhibits:  PX-1716, PX-1720, 1756, 1757, 1758,
09:56:41      17    1759, 1768, 1769, and PX-1883.
09:56:52      18         THE COURT:  Is there an objection from the
09:56:53      19    Defendants?
09:56:54      20         MR. SELWYN:  No, Your Honor, we have some
09:56:56      21    additional ones on behalf of Apple.
09:56:58      22         THE COURT:  Let me hear the additional ones on
09:57:00      23    behalf of the Defendant, please.
09:57:00      24         MR. SELWYN:  I apologize in advance if I repeat
09:57:03      25    some of the same based upon the way my list is ordered, and
```

```
09:57:05   1   it's -- it's a lengthy list.  So I apologize for the time
09:57:07   2   it will require --
09:57:07   3            THE COURT:  Better to list them twice than to
09:57:12   4   leave them out.
09:57:13   5            MR. SELWYN:  Exactly, Your Honor.
09:57:14   6            PX-1756, PX-1757, PX-1758, PX-1759, PX-1883,
09:57:24   7   PX-2308, PX-1716, PX-1720, PX-1768, PX-1769, DTX-0319,
09:57:41   8   DTX-0340, DTX-1724, DTX-1746, PX-0120, PX-005, PX-0009,
09:57:57   9   PX-2822, DTX-0012, DTX-0024, DTX-0027, DTX-0071, DTX-0160,
09:58:13  10   DTX-0167, DTX-0191, DTX-0192, DTX-0194, DTX-0213, DTX-0256,
09:58:31  11   DTX-0296, DTX-0297, DTX-0403, DTX-0404, DTX-0416, DTX-0419,
09:58:48  12   DTX-0423, DTX-431, DTX-0432, DTX-0457, DTX-458, DTX-00 --
09:59:05  13   pardon me, DTX-0520, DTX-0521, DTX-0522, DTX-0523,
09:59:16  14   DTX-0593, DTX-0663, DTX-0671 --
09:59:20  15            THE COURT:  Could you slow down a little bit,
09:59:22  16   Mr. Selwyn?
09:59:22  17            MR. SELWYN:  Yes, sir.
09:59:24  18            DTX-0672, DTX-0782, DTX-0852, DTX-0853, DTX-0855,
09:59:36  19   DTX-0858, DTX-0859, DTX-0887, DTX-0898, DTX-0901, DTX-0917,
09:59:55  20   DTX-0918, DTX-0926, DTX-1063, DTX-1064, DTX-1066, DTX-1069,
10:00:11  21   DTX-1071, DTX-1072, DTX-1074, DTX-1075, DTX-1076, DTX-1077,
10:00:26  22   DTX-1078, DTX-1080, DTX-1082, DTX-1083, DTX-1898, DTX-1901,
10:00:42  23   DTX-1902, DTX -- pardon me, DTX-2018, DTX-2077, DTX-2083,
10:00:58  24   DTX-2106, DTX-2116, DTX-2120, DTX-2121, and last PX-0008.
10:01:09  25            THE COURT:  Any objection to that rendition?
```

10:01:16  1           MS. SCHUETZ:  No objection, Your Honor.

10:01:17  2           THE COURT:  All right.  Thank you, counsel.

10:01:19  3           Next we will proceed to take up -- the Court will

10:01:21  4  proceed to take up motions by both parties or all parties

10:01:24  5  regarding matters raised under Federal Rule of Civil

10:01:29  6  Procedure 50(a).

10:01:30  7           As counsel will recall, last Friday, the Court

10:01:34  8  instructed the parties to reduce their positions under

10:01:41  9  Rule 50(a) to written motions to be filed not later than

10:01:46 10  noon on Sunday.  Those were filed.  The Court's reviewed

10:01:49 11  them, considered them, and, consequently, I'm prepared to

10:01:53 12  take up the various competing motions under 50(a) between

10:01:57 13  the parties at issue here at this time.  Many of these are

10:02:02 14  direct opposites of each other, which is typical.

10:02:07 15           The purpose of the Court ordering you to reduce

10:02:10 16  your positions to writing so that I could review them in

10:02:13 17  advance was to streamline the process this morning.

10:02:18 18           Based on what we discussed in chambers before the

10:02:21 19  Court came on the bench this morning, I believe it's my

10:02:25 20  understanding that both sides are agreed to submit their

10:02:30 21  positions under Rule 50(a) on the papers that have been

10:02:33 22  filed with perhaps one or two slight variations on that.

10:02:37 23           What is -- what is Plaintiffs' position with

10:02:40 24  regard to how we should go forward on these matters raised

10:02:43 25  under Rule 50(a) and briefed over the weekend?

10:02:46 1          MR. WELLS:  Your Honor, Crawford Maclain Wells for

10:02:50 2   Plaintiffs.

10:02:50 3          Plaintiffs, as detailed in their papers on their

10:02:53 4   motions for judgment as a matter of law, and that's

10:02:57 5   Docket No. 478 and 480, rest on those papers but would like

10:03:02 6   brief argument on obviousness with regard to the '833, '774

10:03:09 7   and '284 patents.

10:03:10 8          THE COURT:  All right.  What's Defendant's

10:03:12 9   position on these matters?

10:03:16 10          MR. SELWYN:  Your Honor, Apple is also prepared to

10:03:19 11   rest on its written submissions, although we'd like to

10:03:24 12   argue very briefly a point on Doctrine of Equivalents and

10:03:25 13   contributory infringement.

10:03:27 14          THE COURT:  All right.  And let me ask this of

10:03:31 15   both of you:  Over the weekend, there were various

10:03:36 16   communications exchanged by email, and some of those were

10:03:42 17   forwarded to the Court.

10:03:43 18          My understanding, based on what I've seen over the

10:03:48 19   weekend, is that both sides now take the position that

10:03:51 20   anticipate -- anticipation is not in the case, should not

10:03:54 21   be charged to the jury, and I assume both sides are in

10:03:58 22   agreement that the Court should grant Plaintiffs' motion to

10:04:03 23   strike or delete anticipation as a defense of the Defendant

10:04:09 24   under Rule 50(a); is that correct?

10:04:11 25          MR. WELLS:  Yes, Your Honor.

10:04:14   1          THE COURT:  How about from Apple, Mr. Selwyn?

10:04:17   2          MR. SELWYN:  It is correct, Your Honor.

10:04:18   3          THE COURT:  All right.  Then based on that and

10:04:20   4   without objection, the Court will grant judgment as a

10:04:24   5   matter of law that the defense of anticipation under

10:04:27   6   Section 102 is not an operative part of this case and will

10:04:32   7   not be submitted to the jury.

10:04:33   8          All right.  Let me -- in light of what you've told

10:04:40   9   me, let me hear argument from Plaintiff first on the

10:04:44  10   obviousness issue that they care to hear -- or they care to

10:04:49  11   raise argument on.  I'll hear a response from Apple, and

10:04:52  12   then I'll take up Apple's argument, as they've requested,

10:04:56  13   on contributory infringement and Doctrine of Equivalents.

10:04:59  14          Let me hear from Plaintiff first.

10:05:01  15          MR. WELLS:  Thank you, Your Honor.

10:05:02  16          With regard to the '833 patent, the '284 patent,

10:05:05  17   and the '774 patent, this is not an issue where there is

10:05:10  18   insufficient evidence.  This is an issue where there is no

10:05:14  19   evidence in the record whatsoever regarding a motivation to

10:05:18  20   combine references for the purpose of obviousness or a

10:05:23  21   motivation to modify those references.

10:05:26  22          There was no expert testimony whatsoever from

10:05:30  23   Dr. Buehrer on the '284 patent regarding combining

10:05:32  24   references and the motivation to do so, and Dr. Wells on

10:05:36  25   the '774 patent and the '833 patent regarding the same

922

| | | |
|---|---|---|
| 10:05:43 | 1 | subject.  So it is a complete lack of proof. |
| 10:05:45 | 2 | And I would challenge that -- we've looked at the |
| 10:05:47 | 3 | record.  There's not any testimony whatsoever. |
| 10:05:50 | 4 | Now, on the '833 patent, Dr. Wells discussed the |
| 10:05:54 | 5 | substance of his validity opinion at 827, 5 through 14. |
| 10:06:01 | 6 | And if it's helpful to Your Honor, I actually have the |
| 10:06:05 | 7 | pages in hard copy if you would like those.  But otherwise |
| 10:06:10 | 8 | if you would like to look at the electronic copy. |
| 10:06:16 | 9 | THE COURT:  I've heard your argument.  Let me hear |
| 10:06:18 | 10 | Apple's response to it. |
| 10:06:20 | 11 | MR. SELWYN:  Your Honor, Dr. Buehrer and Dr. Wells |
| 10:06:23 | 12 | did present sufficient evidence for this to go to the jury |
| 10:06:26 | 13 | on obviousness for all three. |
| 10:06:28 | 14 | They presented evidence regarding the similarity |
| 10:06:32 | 15 | of the references.  They explained how they were directed |
| 10:06:35 | 16 | to similar problems.  And they further described why they |
| 10:06:38 | 17 | were directed towards similar problems. |
| 10:06:40 | 18 | A reasonable jury can infer from all of the |
| 10:06:44 | 19 | evidence that was presented on those three patents that |
| 10:06:47 | 20 | there is a motivation to combine, and for the reasons that |
| 10:06:50 | 21 | were expressed by the experts, also a reasonable |
| 10:06:53 | 22 | expectation of success in that combination as well. |
| 10:06:58 | 23 | The suggestion seems to be that some magic words |
| 10:07:01 | 24 | were not stated by the experts, but they all presented |
| 10:07:01 | 25 | underlying evidence from which, consistent with Your |

| | |
|---|---|
| 10:07:05 | 1 |

Honor's instructions, the jury could infer both a

motivation to combine expectation of success as supported

by all the predicate testimony offered by Dr. Wells and

Dr. Buehrer on the '774, '284, and '833 patents.

THE COURT:  All right.

MR. WELLS:  May I respond quickly, Your Honor?

THE COURT:  Briefly.

MR. WELLS:  Dr. Wells's analysis on the '833

patent was a total of nine lines of testimony.  He was

asked by Mr. Mueller:  Have you considered Dr. Madisetti's

infringement theory at -- at each one of the claim

limitations?

His answer:  Yes, I have.

What's your conclusion?

Dr. Madisetti's opinion where the row-by-row

doesn't need to be row-by-row then these four pieces of

prior art would render this -- this claim invalid.

That's it.  That's his analysis.  There's no

discussion of the content of the art or how to combine the

four references.

With regard to the '774 patent, there's two

references.  He mentioned Hottinen in the second reference

and said that Hottinen had a gain, and this is at 816, 15

through 24.  That's it.  No discussion of how you would

combine these references whatsoever.

10:08:24   1          '284 patent, he's combining three references, and
10:08:28   2     that's the transcript at 741, 15 through 18.
10:08:33   3          How do these two documents relate to your analysis
10:08:37   4     requirements 1, 2, and 3?
10:08:39   5          These two documents together disclose all three
10:08:41   6     elements 1, 2 and 3 --
10:08:41   7          THE COURT:  Please slow down.
10:08:42   8          MR. WELLS:  Sorry.  As well as the preamble.
10:08:45   9          That's it.
10:08:46  10          THE COURT:  Okay.
10:08:48  11          MR. WELLS:  That's his in-depth discussion.  No
10:08:52  12     discussion of combinations.
10:08:53  13          THE COURT:  Anything further from Defendant,
10:08:55  14     Mr. Selwyn, on this issue?
10:08:57  15          MR. SELWYN:  Your Honor, very briefly, because I
10:09:00  16     believe that is an incomplete recitation of the evidence on
10:09:01  17     these patents.
10:09:01  18          On the '833 patent, Dr. Wells testified at
10:09:04  19     Page 826 about three of the four documents being Qualcomm
10:09:09  20     documents, the other being a 3 -- 3GPP/Samsung technical
10:09:15  21     document.  Thus, all of them having a reason to combine.
10:09:19  22          There's also a reason to combine those references
10:09:21  23     because they're all about LTE, from which the jury can
10:09:25  24     easily infer from the base of the references.
10:09:27  25          On the '284 patents, the obviousness combination

10:09:30  1   was based upon DTX-0102 and 0106, which are both early

10:09:37  2   versions of the specifications of the LTE standards.

10:09:41  3          And the third reference in the combination is a

10:09:44  4   Samsung Tdoc.

10:09:45  5          So all three references are proposals or adopted

10:09:48  6   proposals for cellular standards derived from the very same

10:09:52  7   process as the LTE standard, again, supporting a reason for

10:09:57  8   motivation to combine, which the jury could easily infer.

10:10:01  9          And the last with respect to the '774 patent, both

10:10:05  10  Murakami and Hottinen could be combined based on the face

10:10:08  11  of the references and the testimony of Dr. Buehrer who

10:10:11  12  explain that both relate to multi-antenna cellular

10:10:15  13  communication and on Dr. Mahon's testimony that they both

10:10:19  14  relate to CDMA.

10:10:19  15         THE COURT:  All right.  I've heard enough argument

10:10:22  16  on this, counsel.

10:10:24  17         Let's move to Defendant's request to present

10:10:27  18  targeted argument regarding contributory infringement and

10:10:30  19  Doctrine of Equivalents.

10:10:30  20         Mr. Selwyn, let me hear from you, please.

10:10:34  21         MR. SELWYN:  Thank you.

10:10:35  22         Your Honor, first, with respect to Doctrine of

10:10:36  23  Equivalents, Plaintiffs didn't offer any DOE opinion for

10:10:40  24  the '284 patent, Claims 1, 14, and 27, or for the '833

10:10:45  25  patent, Claim 8, or for the '332 patent, Claim 6 or 7.

10:10:52   1          And in view of the absence of any evidence or

10:10:55   2    suggestion or theory under the Doctrine of Equivalents,

10:10:58   3    Apple is entitled to judgment of no infringement under the

10:11:02   4    DOE for those claims.

10:11:03   5          With respect to Claim 6 of the '774 patent and

10:11:08   6    Claims 1 and 10 of the '557 patent, the testimony offered

10:11:12   7    by the Plaintiffs was entirely conclusory from -- and

10:11:20   8    insufficient to support infringement under the Doctrine of

10:11:22   9    Equivalents.

10:11:23  10          Dr. Wells and Mr. Lanning both explained why that

10:11:25  11    evidence doesn't support the arguments, and, therefore,

10:11:28  12    Apple is also entitled to judgment of no infringement for

10:11:31  13    those claims.

10:11:32  14          With respect to contributory infringement, as an

10:11:35  15    initial matter, the Plaintiffs didn't present sufficient

10:11:38  16    evidence to prove contributory evidence -- contributory

10:11:42  17    infringement because they didn't prove direct infringement

10:11:44  18    of any asserted claim, but, moreover, they also failed to

10:11:48  19    present any evidence that the chipset issue in the accused

10:11:52  20    products have no substantial infringing use or that Apple

10:11:55  21    knew that the combination for which its components were

10:11:59  22    especially made were both patented and infringing as

10:12:02  23    Section 271(c) require.

10:12:04  24          THE COURT:  All right.  Let me hear a response

10:12:08  25    from Plaintiff.

| | | |
|---|---|---|
| 10:12:09 | 1 | MR. WELLS:  Thank you, Your Honor. |
| 10:12:14 | 2 | I'll take the easier issue up first, contributory |
| 10:12:17 | 3 | infringement. |
| 10:12:17 | 4 | The parties haven't suggested a jury instruction |
| 10:12:20 | 5 | on this issue.  So this is not an issue that's going to go |
| 10:12:24 | 6 | to the -- the jury.  And the parties, I believe, are agreed |
| 10:12:26 | 7 | on that. |
| 10:12:28 | 8 | THE COURT:  All right.  What about on the Doctrine |
| 10:12:30 | 9 | of Equivalents? |
| 10:12:31 | 10 | MR. WELLS:  Dr. Mahon and Dr. Madisetti both |
| 10:12:33 | 11 | presented their DOE opinions regarding the '557 and '774 |
| 10:12:38 | 12 | patents, respectively.  And Dr. Mahon also -- Mahon, sorry, |
| 10:12:42 | 13 | also provided his opinions regarding the '284 patent |
| 10:12:45 | 14 | equivalence under the mean-plus-function claim. |
| 10:12:49 | 15 | We have dueling experts on this issue.  They have |
| 10:12:52 | 16 | different opinions.  It's not a basis for judgment as a |
| 10:12:54 | 17 | matter of law on those issues. |
| 10:12:56 | 18 | THE COURT:  All right.  Thank you. |
| 10:12:57 | 19 | Let me also ask for some clarification on one of |
| 10:13:02 | 20 | the issues, counsel, that I didn't raise earlier.  There |
| 10:13:07 | 21 | seems to be part of the Plaintiffs' moving papers under |
| 10:13:12 | 22 | Rule 50(a) addressed to the topic of patent exhaustion. |
| 10:13:15 | 23 | And there seems to be a dispute between the parties as to |
| 10:13:19 | 24 | whether this is an issue for the jury trial or the bench |
| 10:13:21 | 25 | trial that will follow. |

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
| 10:13:22 | 1  | The pre-trial order in the case seems to indicate                   |
| 10:13:26 | 2  | it's a bench trial issue.  But Plaintiff seems to feel              |
| 10:13:31 | 3  | compelled to move on it under Rule 50(a), which would only          |
| 10:13:35 | 4  | relate to matters fully heard before the jury regarding the         |
| 10:13:41 | 5  | '774 patent, I believe.                                             |
| 10:13:43 | 6  | What is the part -- what are the parties'                           |
| 10:13:46 | 7  | positions with regard to the exhaustion issue?                      |
| 10:13:48 | 8  | MR. WELLS:  May I approach the podium?                              |
| 10:13:51 | 9  | THE COURT:  Please, Mr. Wells.                                      |
| 10:13:52 | 10 | MR. WELLS:  Your Honor, Defendant was required to                  |
| 10:14:00 | 11 | present evidence of exhaustion in its case-in-chief per the         |
| 10:14:05 | 12 | Court's rulings on the pre-trial proceedings at the                 |
| 10:14:08 | 13 | pre-trial conference.                                               |
| 10:14:09 | 14 | The Court stated:  I do not intend to have a                        |
| 10:14:12 | 15 | separate evidence -- to have separate evidence produced             |
| 10:14:15 | 16 | during the bench trial that's not produced at the jury              |
| 10:14:17 | 17 | trial.  The witnesses are going to be -- put up the                 |
| 10:14:19 | 18 | entirety of the evidence during the jury portion of the             |
| 10:14:22 | 19 | trial, with the exception of the equitable issue -- issues          |
| 10:14:25 | 20 | regarding FRAND and the late disclosure to ETSI, which              |
| 10:14:29 | 21 | would go to the bench only.                                         |
| 10:14:32 | 22 | Exhaustion evidence was supposed to be put forward              |
| 10:14:34 | 23 | here, and then any issues addressed later.  There is no             |
| 10:14:37 | 24 | evidence in the record of the exhaustion issue.                     |
| 10:14:40 | 25 | THE COURT:  What's Apple's posture on this,                         |

929

| | | |
|---|---|---|
| 10:14:43 | 1 | Mr. Selwyn? |
| 10:14:44 | 2 | MR. SELWYN:  Your Honor, as you'll recall, Apple |
| 10:14:49 | 3 | moved for summary judgment on its patent exhaustion |
| 10:14:53 | 4 | defense.  That was denied.  We maintain all the positions |
| 10:14:57 | 5 | that were stated in our summary judgment motion for |
| 10:15:01 | 6 | purposes of appeal.  That is our position. |
| 10:15:07 | 7 | THE COURT:  All right.  Well, with regard to the |
| 10:15:32 | 8 | motions urged by both Plaintiffs and Defendant under |
| 10:15:39 | 9 | Federal Rule of Civil Procedure 50(a), I remind the parties |
| 10:15:43 | 10 | of the language of the rule itself, which states:  If a |
| 10:15:45 | 11 | party has been fully heard on an issue during a jury trial |
| 10:15:49 | 12 | and the Court finds that a reasonable jury would not have a |
| 10:15:54 | 13 | legally sufficient evidentiary basis to find for the party |
| 10:15:57 | 14 | on that issue, the Court may grant a motion for judgment as |
| 10:16:07 | 15 | a matter of law. |
| 10:16:07 | 16 | You'll note that the rule does not say the Court |
| 10:16:10 | 17 | shall grant a motion for judgment as a matter of law. |
| 10:16:14 | 18 | But, in my view, having read your briefing, having |
| 10:16:19 | 19 | heard your argument, I will grant Plaintiffs' motion, |
| 10:16:23 | 20 | without objection from Defendant, that any defense of |
| 10:16:26 | 21 | anticipation under Section 102 is not a part of this case |
| 10:16:30 | 22 | and is not an operative defense for Apple. |
| 10:16:35 | 23 | With regard to the various other matters urged |
| 10:16:39 | 24 | under Rule 50(a) by both Plaintiff and Defendant, which |
| 10:16:44 | 25 | would include the obviousness issues that we heard argument |

| | | |
|---|---|---|
| 10:16:47 | 1 | on, there is a motion for judgment as a matter of law by |
| 10:16:52 | 2 | Plaintiff regarding Section 101 as to the '332 patent. |
| 10:16:58 | 3 | I've heard the parties' positions on exhaustion |
| 10:17:02 | 4 | regarding the '774. |
| 10:17:03 | 5 | The Plaintiff has moved for judgment as a matter |
| 10:17:05 | 6 | of law on all claims asserted under all patents-in-suit |
| 10:17:11 | 7 | that infringement has been established as a matter of law. |
| 10:17:14 | 8 | Consequently, and correspondingly, Defendants |
| 10:17:17 | 9 | moved for just the opposite, that there's been an |
| 10:17:21 | 10 | establishment as -- should be judgment as a matter of law |
| 10:17:24 | 11 | establishing that there's no infringement on any claims of |
| 10:17:27 | 12 | any of the patents-in-suit. |
| 10:17:31 | 13 | Plaintiff has moved for judgment as a matter of |
| 10:17:33 | 14 | law that infringement by the Defendant is willful. |
| 10:17:37 | 15 | Defendant has moved correspondingly that any |
| 10:17:42 | 16 | infringement would not be willful as a matter of law. |
| 10:17:46 | 17 | Plaintiff has moved for judgment as a matter of |
| 10:17:48 | 18 | law on the damages issue, establishing its damages request |
| 10:17:54 | 19 | to the jury of $506 million as a matter of law. |
| 10:17:59 | 20 | Defendant has moved that there are no damages that |
| 10:18:01 | 21 | should be awarded, in corresponding oppositeness to the |
| 10:18:09 | 22 | Plaintiffs' position. |
| 10:18:13 | 23 | We've heard argument on contributory and -- |
| 10:18:15 | 24 | contributory infringement and DOE.  Defendants also moved |
| 10:18:19 | 25 | for judgment as a matter of law on induced infringement and |

10:18:21   1   direct infringement.  I've mentioned its position on

10:18:26   2   willfulness and damages.

10:18:30   3          Defendant's moved that all the patents-in-suit are

10:18:33   4   invalid as a matter of law under Rule 50(a), and Defendant

10:18:38   5   has moved for judgment as a matter of law under Rule 50(a)

10:18:42   6   regarding no pre-suit damages concerning particularly the

10:18:48   7   actual notice issue related to the correspondence that's

10:18:53   8   been presented to the jury, the Innography evidence, and

10:18:58   9   the ETSI evidence.

10:18:59  10          I believe those are all the matters raised by the

10:19:02  11   respective parties in the briefing filed over the weekend.

10:19:06  12   Having heard your arguments, I'll grant judgment as a

10:19:10  13   matter of law on the anticipation issue, as I've mentioned.

10:19:13  14          All other matters urged by both Plaintiffs and

10:19:17  15   Defendant seeking judgment as a matter of law under 50 --

10:19:21  16   under Rule 50(a) are denied.

10:19:22  17          All right.  Counsel, it's 20 minutes after 10:00.

10:19:28  18   I'm going to take a short recess, and at 20 minutes until

10:19:37  19   11:00 -- 20 minutes from now, I'd like to meet with counsel

10:19:42  20   in chambers.

10:19:43  21          And it's my intention, then, to conduct an

10:19:47  22   informal charge conference discussing the parties' latest

10:19:50  23   joint submission regarding the final jury instructions and

10:19:52  24   the verdict form.  I intend to hear fully and informally

10:19:57  25   from all parties.

| | | |
|---|---|---|
| 10:20:02 | 1 | All counsel involved are invited -- if you've made |
| 10:20:07 | 2 | an appearance in the case, you're invited to participate. |
| 10:20:12 | 3 | As I noted earlier, lead counsel that will be |
| 10:20:12 | 4 | presenting closing arguments are not required to be |
| 10:20:16 | 5 | present.  And it's my understanding that neither |
| 10:20:17 | 6 | Mr. Sheasby nor Mr. Mueller will be present for the |
| 10:20:21 | 7 | informal charge conference, but everyone else who has |
| 10:20:23 | 8 | appeared in the case is certainly welcome and invited to be |
| 10:20:27 | 9 | included in the process. |
| 10:20:29 | 10 | I will see those of you participating in the |
| 10:20:32 | 11 | informal charge conference in chambers at 20 minutes until |
| 10:20:38 | 12 | 11:00. |
| 10:20:39 | 13 | Until then, the Court stands in recess. |
| 10:20:41 | 14 | COURT SECURITY OFFICER:  All rise. |
| 10:21:05 | 15 | (Recess.) |
| 10:21:06 | 16 | (Jury out.) |
| 10:21:06 | 17 | COURT SECURITY OFFICER:  All rise. |
| 10:21:07 | 18 | THE COURT:  Be seated, please. |
| 02:07:00 | 19 | As mentioned on the record after we completed |
| 02:07:16 | 20 | argument and action by the Court on motions under Rule |
| 02:07:21 | 21 | 50(a), I have subsequently conducted an informal charge |
| 02:07:26 | 22 | conference with counsel in chambers where we have |
| 02:07:30 | 23 | thoroughly reviewed the parties' previous submissions |
| 02:07:34 | 24 | regarding the final jury instructions and verdict form. |
| 02:07:37 | 25 | There's been a free-flowing exchange of thoughts, |

| | | |
|---|---|---|
| 02:07:40 | 1 | ideas, and information, both with questions from the Court |
| 02:07:44 | 2 | and questions and comments from the parties. |
| 02:07:48 | 3 | And from that informal charge conference and with |
| 02:07:53 | 4 | the benefit of what was explained and shared and discussed |
| 02:07:56 | 5 | therein, the Court has generated what it now believes to be |
| 02:08:00 | 6 | the appropriate final jury instructions and the appropriate |
| 02:08:04 | 7 | verdict form to submit in this case. |
| 02:08:08 | 8 | It's now my intention to conduct a formal charge |
| 02:08:12 | 9 | conference on the record and review with the parties any |
| 02:08:14 | 10 | matters where they have objections with the final jury |
| 02:08:19 | 11 | instructions and verdict form as I have delivered it to |
| 02:08:23 | 12 | them. |
| 02:08:23 | 13 | And I'll note that I've delivered it to them with |
| 02:08:28 | 14 | an opportunity to review it and consider it in light of any |
| 02:08:32 | 15 | changes that may have been made since we concluded the |
| 02:08:34 | 16 | informal charge conference. |
| 02:08:35 | 17 | Counsel, my practice and what I would like in this |
| 02:08:39 | 18 | case is to have one representative of both Plaintiffs and |
| 02:08:42 | 19 | Defendant go to the podium, remain at the podium.  And I |
| 02:08:46 | 20 | intend to go through, first, the final jury instructions |
| 02:08:49 | 21 | page-by-page, and then the verdict form page-by-page. |
| 02:08:53 | 22 | And at any place in that process where you believe |
| 02:08:59 | 23 | an objection should be made both as to something that has |
| 02:09:04 | 24 | been included or something that has been omitted, I'll be |
| 02:09:07 | 25 | happy to hear from you at that juncture. |

02:09:10  1          But doing this beginning at the first page and
02:09:13  2   going to the last page is my way of making sure I don't
02:09:17  3   overlook or fail to consider anything that might be
02:09:22  4   appropriately raised as part of this formal charge
02:09:24  5   conference.
02:09:24  6          So, with that, if I could have Plaintiffs'
02:09:28  7   spokesperson and Defendant's spokesperson go to the podium,
02:09:31  8   please, Ms. Glasser and Mr. Selwyn.  And we'll begin with
02:09:37  9   the final jury instructions.
02:09:41  10         Is there any objection from either party to
02:09:44  11  anything set forth on the first page, being the cover page
02:09:47  12  of the final jury instructions?
02:09:48  13         MS. GLASSER:  No, Your Honor.
02:09:50  14         MR. SELWYN:  No, Your Honor.
02:09:51  15         THE COURT:  Turning then to Page 2 of the final
02:09:54  16  jury instructions, is there objection here from either
02:09:56  17  Plaintiff or Defendant?
02:09:57  18         MS. GLASSER:  No, Your Honor.
02:09:58  19         MR. SELWYN:  No, Your Honor.
02:09:59  20         THE COURT:  Turning to Page 3, is there objection
02:10:01  21  from either party?
02:10:02  22         MS. GLASSER:  No, Your Honor.
02:10:04  23         MR. SELWYN:  No.
02:10:04  24         THE COURT:  Next is Page 4.  Is there objection
02:10:07  25  from either party?

| | |
|---|---|
| 02:10:09 | 1 |

```
02:10:09    1              MS. GLASSER:  No, Your Honor.

02:10:10    2              MR. SELWYN:  None, Your Honor.

02:10:11    3              THE COURT:  Page 5, is there objection from either

02:10:15    4   party?

02:10:17    5              MS. GLASSER:  No, Your Honor.

02:10:18    6              MR. SELWYN:  No objection, Your Honor.

02:10:20    7              THE COURT:  Next is Page 6.  Is there objection

02:10:23    8   from either party?

02:10:24    9              MS. GLASSER:  No, Your Honor.

02:10:26   10              MR. SELWYN:  No objection, Your Honor.

02:10:28   11              THE COURT:  Turning then to Page 7, is there

02:10:30   12   objection from either Plaintiffs or Defendant?

02:10:32   13              MS. GLASSER:  No, Your Honor.

02:10:33   14              MR. SELWYN:  Your Honor, no specific objection.

02:10:36   15   We would just note --

02:10:37   16              THE COURT:  You'll need to speak up, Mr. Selwyn,

02:10:41   17   or pull the microphone a little closer.

02:10:43   18              MR. SELWYN:  Pardon me, Your Honor.  We have

02:10:45   19   nothing specific on this page.  We would note an objection

02:10:47   20   to the Court not instructing the jury separately on method

02:10:51   21   versus apparatus claims, as Apple had proposed in its

02:10:56   22   instructions 10, 14, 17, and 18, for example.

02:10:58   23              THE COURT:  All right.  That objection is

02:10:59   24   overruled.

02:11:00   25              Is there anything further on Page 7?
```

02:11:02   1            If not, I'll turn to Page 8.

02:11:05   2            Is there objection here from either party?

02:11:07   3            MS. GLASSER:  No, Your Honor.

02:11:08   4            MR. SELWYN:  No, Your Honor.

02:11:09   5            THE COURT:  Next is Page 9.

02:11:10   6            Is there objection from either party?

02:11:13   7            MS. GLASSER:  No, Your Honor.

02:11:14   8            MR. SELWYN:  No objection, Your Honor.

02:11:15   9            THE COURT:  Next is Page 10.

02:11:19   10           Is there objection from either party?

02:11:21   11           MS. GLASSER:  No, Your Honor.

02:11:22   12           MR. SELWYN:  Yes, Your Honor.  Apple objects to

02:11:26   13   the sentence that reads:  However, that does not mean that

02:11:29   14   every word of the claim must exist identically in the

02:11:33   15   accused products.

02:11:36   16           Apple suggests that is not a correct statement of

02:11:38   17   law and references, for example, Lemelson against United

02:11:43   18   States, U.S. 7 -- 752 F.2d 1538; Laitram against Rexnord,

02:11:51   19   939 F.2d 1533; and Biodex against Loredan, 946 F.2d 850.

02:11:56   20           THE COURT:  Mr. Selwyn, I'm not able to hear all

02:12:00   21   the detail of what you're saying.  I don't want the two of

02:12:05   22   you to be unacceptably close to each other.  It may be that

02:12:10   23   when one of you needs to speak, the other one should step

02:12:12   24   aside and let the one who's speaking have unfettered

02:12:16   25   access to the microphone.

| | | |
|---|---|---|
| 02:12:17 | 1 | But given where you are and the softness of your |
| 02:12:21 | 2 | voice, I'm concerned that what you're saying is not coming |
| 02:12:25 | 3 | through in the record. |
| 02:12:25 | 4 | MR. SELWYN:  I will try to speak up, Your Honor. |
| 02:12:27 | 5 | Would you like me to repeat what I just said? |
| 02:12:27 | 6 | THE COURT:  Please, just for completeness, please |
| 02:12:30 | 7 | reurge your objection. |
| 02:12:32 | 8 | MR. SELWYN:  Certainly.  With respect to Page 10 |
| 02:12:34 | 9 | of the instructions, Apple objects to the sentence that |
| 02:12:37 | 10 | reads:  However, that does not mean that every word of the |
| 02:12:39 | 11 | claim must exist identically in the accused products. |
| 02:12:44 | 12 | Apple respectfully suggests that's not a correct |
| 02:12:49 | 13 | statement of the law and refers, for example, to the |
| 02:12:51 | 14 | Federal Circuit's decisions in Lemelson, 752 F.2d 1538; |
| 02:12:57 | 15 | Laitram, 939 F.2d 1533; and Biodex, 946 F.2d 850. |
| 02:13:06 | 16 | THE COURT:  All right.  That objection is |
| 02:13:07 | 17 | overruled. |
| 02:13:08 | 18 | Is there anything further from either party on |
| 02:13:10 | 19 | Page 10? |
| 02:13:11 | 20 | MS. GLASSER:  No, Your Honor. |
| 02:13:12 | 21 | MR. SELWYN:  No, Your Honor. |
| 02:13:13 | 22 | THE COURT:  Turning then, counsel, to Page 11 of |
| 02:13:16 | 23 | the final jury instructions, is there objection here from |
| 02:13:21 | 24 | either party? |
| 02:13:22 | 25 | MS. GLASSER:  No, Your Honor. |

02:13:25   1          MR. SELWYN:  None, Your Honor.

02:13:26   2          THE COURT:  Next is Page 12, is there objection

02:13:29   3   from either party?

02:13:30   4          MS. GLASSER:  None, Your Honor.

02:13:32   5          MR. SELWYN:  No objection, Your Honor.

02:13:33   6          THE COURT:  Next is Page 13, is there objection

02:13:36   7   from either party?

02:13:38   8          MS. GLASSER:  Your Honor, there's a suggestion on

02:13:40   9   the term "might" at the bottom of the page at Page -- the

02:13:43  10   second to last line to change the word "might" to "would"

02:13:46  11   to avoid the suggestion that it would be optional to find

02:13:51  12   infringement if the -- substantially the same

02:13:55  13   function-way-result test was found to be met.

02:13:59  14          THE COURT:  All right.  That objection is

02:14:01  15   overruled.

02:14:01  16          Anything further on Page 13?

02:14:03  17          MR. SELWYN:  Nothing, Your Honor.

02:14:05  18          THE COURT:  Turning then to Page 14 of the final

02:14:08  19   jury instructions, is there objection here from either

02:14:10  20   party?

02:14:11  21          MS. GLASSER:  No, Your Honor.

02:14:12  22          MR. SELWYN:  No objection.

02:14:14  23          THE COURT:  Next is Page 15.

02:14:16  24          Any objection?

02:14:19  25          MR. SELWYN:  No objection, Your Honor.

02:14:21   1           MS. GLASSER:  No, Your Honor.

02:14:21   2           THE COURT:  Next is Page 16.

02:14:24   3           Any objection?

02:14:27   4           MS. GLASSER:  No, Your Honor.

02:14:28   5           MR. SELWYN:  Your Honor, on Page 16, Apple objects

02:14:34   6   to the lack of inclusion of its proposed instruction, and

02:14:42   7   in particular the language that Apple had proposed,

02:14:44   8   reading:

02:14:45   9           To determine whether Apple acted willfully,

02:14:48  10   consider all facts.  These may include, but are not limited

02:14:51  11   to, whether or not Apple acted consistently with the

02:14:54  12   standards of behavior for its industry, whether or not

02:14:58  13   Apple reasonably believed it did not infringe or that the

02:15:02  14   patent was invalid, whether or not Apple made a good faith

02:15:07  15   effort to avoid infringing Plaintiffs' asserted patents,

02:15:10  16   for example, whether Apple attempted to design around

02:15:12  17   Plaintiffs' asserted patents, and whether or not Apple

02:15:15  18   tried to cover up its infringement.

02:15:18  19           THE COURT:  All right.  That objection is

02:15:18  20   overruled.

02:15:19  21           Anything further here before we move on?

02:15:22  22           MS. GLASSER:  No, Your Honor.

02:15:23  23           MR. SELWYN:  No, Your Honor.

02:15:24  24           THE COURT:  Then let's turn next to Page 17 of the

02:15:27  25   final jury instructions.

940

02:15:28   1                Is there objection from either party?

02:15:30   2                MS. GLASSER:  No, Your Honor.

02:15:31   3                MR. SELWYN:  No objection, Your Honor.

02:15:33   4                THE COURT:  Next is Page 18.

02:15:35   5                Is there objection?

02:15:36   6                MS. GLASSER:  No, Your Honor.

02:15:43   7                MR. SELWYN:  No objection, Your Honor.

02:15:44   8                THE COURT:  Next is Page 19.

02:15:47   9                Is there objection from either party?

02:15:49   10               MS. GLASSER:  No, Your Honor.

02:15:51   11               MR. SELWYN:  No objection, Your Honor.

02:15:52   12               THE COURT:  Next is Page 20, is there objection

02:15:54   13   from either party?

02:15:56   14               MS. GLASSER:  Yes, Your Honor.

02:15:57   15               Six lines from the bottom of the page, the

02:16:01   16   instruction states:  You must then consider the proper

02:16:04   17   amount of damages, comma, if any, to award to Optis.

02:16:10   18               Plaintiffs request that "if any" be removed since

02:16:13   19   upon a finding that at least one valid claim has been

02:16:16   20   infringed, Section 284 requires at least a reasonable

02:16:19   21   royalty to be awarded.

02:16:24   22               THE COURT:  That's overruled.

02:16:30   23               Anything further on Page 20?

02:16:32   24               MS. GLASSER:  No, Your Honor.

02:16:33   25               MR. SELWYN:  No, Your Honor.

02:16:34  1          THE COURT:  Turning then to Page 21, is there

02:16:38  2  objection here from either party?

02:16:41  3          MS. GLASSER:  Your Honor, there is not a specific

02:16:42  4  objection to this alone.

02:16:46  5          However, in conjunction with the verdict form,

02:16:52  6  Plaintiffs object to the description here of the way in

02:16:55  7  which the evidence was presented on lump sum and running

02:17:00  8  royalties because it -- we believe that on the verdict

02:17:01  9  form, it would not be appropriate for the jury to select

02:17:06  10  lump sum on the basis of the evidence that came in the

02:17:09  11  record, which from both parties was based on a fee paid per

02:17:15  12  unit.  There is not a basis in the record for the jury to

02:17:19  13  properly select that lump sum option on the verdict form.

02:17:22  14          THE COURT:  All right.  That objection is

02:17:23  15  overruled.

02:17:23  16          Anything further on Page 21?

02:17:27  17          MR. SELWYN:  On Page 21, Your Honor, Apple

02:17:29  18  believes that there should be an instruction added two

02:17:35  19  sentences up from the bottom that should indicate that no

02:17:39  20  damages may be awarded prior to at the earliest -- the

02:17:46  21  filing of the -- the service of the complaint because there

02:17:49  22  was no evidence presented of any damages before that period

02:17:52  23  of time.

02:17:55  24          THE COURT:  That objection is overruled.

02:17:57  25          Anything further?

02:17:58    1          MS. GLASSER:  No, Your Honor.

02:18:01    2          THE COURT:  Then let's turn to Page 22 of the

02:18:04    3   proposed final -- of the final jury instructions.

02:18:07    4          Is there objection from either party?

02:18:10    5          MS. GLASSER:  Plaintiffs note for the record the

02:18:12    6   same objection on the fully paid-up lump sum royalty that

02:18:17    7   was stated previously.

02:18:18    8          THE COURT:  Objection is noted and overruled.

02:18:20    9          Anything from Defendant on Page 22?

02:18:23   10          MS. GLASSER:  And I apologize, Your Honor, there

02:18:25   11   was an additional one, as well, at the bottom of the page.

02:18:29   12          A request that in -- before listing out the

02:18:35   13   Georgia-Pacific factors, given that the parties referred to

02:18:38   14   them as the Georgia-Pacific factors through trial, we would

02:18:42   15   respectfully request that the Court clarify that the listed

02:18:47   16   factors are the ones that were referred during the trial to

02:18:51   17   the -- referred to during the trial as the Georgia-Pacific

02:18:53   18   factors.

02:18:59   19          THE COURT:  All right.  That objection is

02:19:00   20   overruled.

02:19:01   21          Anything further on Page 22?

02:19:05   22          MR. SELWYN:  Nothing for Apple, Your Honor.

02:19:07   23          THE COURT:  Anything further for Plaintiff,

02:19:10   24   Ms. Glasser?

02:19:11   25          MS. GLASSER:  No, Your Honor.

943

| | | |
|---|---|---|
| 02:19:11 | 1 | THE COURT:  Then let's turn to Page 23 -- well, 23 |
| 02:19:16 | 2 | is the remainder of the factors. |
| 02:19:18 | 3 | Is there any objection on Page 23? |
| 02:19:21 | 4 | MS. GLASSER:  Not other than the one previously |
| 02:19:24 | 5 | stated, Your Honor. |
| 02:19:25 | 6 | MR. SELWYN:  Your Honor, Apple objects to the |
| 02:19:27 | 7 | Court giving an instruction on the commercial relationship |
| 02:19:30 | 8 | between the licensor and licensee, such as whether they are |
| 02:19:33 | 9 | competitors in the same territory, in the same line of |
| 02:19:36 | 10 | business or whether they are inventor and promoter.  Apple |
| 02:19:42 | 11 | does not believe that should be given. |
| 02:19:51 | 12 | THE COURT:  Mr. Selwyn, I've, as you can see, |
| 02:19:57 | 13 | removed what otherwise would be the numbers from the 15 |
| 02:20:01 | 14 | Georgia-Pacific factors since I am charging, at the |
| 02:20:07 | 15 | parties' request, on less than all of the Georgia-Pacific |
| 02:20:09 | 16 | factors. |
| 02:20:11 | 17 | Can you refresh my recollection as to which |
| 02:20:16 | 18 | numbered factor this would otherwise be? |
| 02:20:19 | 19 | MR. SELWYN:  Factor 5, Your Honor, with a little |
| 02:20:22 | 20 | help from my colleague. |
| 02:20:24 | 21 | THE COURT:  I remember Factor 4 and Factor 6.  I |
| 02:20:27 | 22 | don't remember any discussion of Factor 5.  Have you raised |
| 02:20:30 | 23 | an objection prior to this moment as to Factor 5? |
| 02:20:34 | 24 | MR. SELWYN:  Your Honor, I believe we did in our |
| 02:20:38 | 25 | written submission, Docket No. -- |

02:20:41  1          THE COURT:  Did you raise an objection in the

02:20:43  2  informal charge conference where we met for an hour or so

02:20:46  3  to review all these various matters?

02:20:51  4          MR. SELWYN:  May I have one moment, Your Honor?

02:21:11  5          Your Honor, I don't believe that we discussed or

02:21:13  6  raised it in the informal charge conference.  The reason

02:21:16  7  for us putting it on the record now is in the event that

02:21:20  8  this matter were, I believe, tried with respect to the

02:21:26  9  FRAND issue.

02:21:27  10          THE COURT:  All right.  I'm going to overrule

02:21:36  11  Defendant's objection in this regard on Page 23.

02:21:41  12          Is there anything further from either party on

02:21:44  13  Page 23?

02:21:45  14          MS. GLASSER:  No, Your Honor.

02:21:46  15          THE COURT:  Mr. Selwyn?

02:21:47  16          MR. SELWYN:  Nothing further on Page 23.

02:21:49  17          THE COURT:  Then let's turn to Page 24 of the

02:21:52  18  final jury instructions.

02:21:53  19          Is there objection here from either party?

02:21:55  20          MS. GLASSER:  Yes, Your Honor.  Plaintiffs object

02:21:57  21  to the language discussing the two special apportionment

02:22:02  22  issues and listing out the first and second, on the ground

02:22:05  23  that they improperly suggest that an additional level of

02:22:08  24  apportionment should be performed beyond that already

02:22:13  25  incorporated within the Georgia-Pacific analysis and the

| 02:22:16 | 1 | underlying discussion of directing the value to the |
| 02:22:20 | 2 | patented benefits. |
| 02:22:23 | 3 | THE COURT:  All right.  That objection is |
| 02:22:27 | 4 | overruled. |
| 02:22:27 | 5 | Anything further on Page 24? |
| 02:22:31 | 6 | MR. SELWYN:  Your Honor, may I have one moment? |
| 02:22:59 | 7 | Your Honor, two objections with respect to |
| 02:23:01 | 8 | Page 24. |
| 02:23:02 | 9 | One is on the sentence at the top of the page: |
| 02:23:06 | 10 | Now no one of these factors is dispositive, and you can and |
| 02:23:10 | 11 | should consider the evidence that has been presented to you |
| 02:23:13 | 12 | in this case on each of these factors. |
| 02:23:15 | 13 | Apple objects to the extent that there are factors |
| 02:23:18 | 14 | listed on which Mr. Kennedy has not provided any -- any |
| 02:23:22 | 15 | evidence. |
| 02:23:23 | 16 | And on the bottom of the page, right before the |
| 02:23:27 | 17 | last paragraph, Apple requests inclusion of the remainder |
| 02:23:33 | 18 | of its apportionment instruction with respect to the |
| 02:23:37 | 19 | smallest salable patent practicing unit. |
| 02:23:40 | 20 | THE COURT:  All right.  Well, with regard to |
| 02:23:43 | 21 | Apple's objection as to the remainder of its proposed |
| 02:23:47 | 22 | instruction as to the smallest practicing -- SSPPU, that's |
| 02:23:54 | 23 | overruled. |
| 02:23:56 | 24 | As regards the sentence at the top of Page 24 |
| 02:24:00 | 25 | regarding the Georgia-Pacific factors, Mr. Selwyn, I |

| | | |
|---|---|---|
| 02:24:05 | 1 | deleted every Georgia-Pacific -- factor that the Defendants |
| 02:24:10 | 2 | raised an objection to in the informal charge conference |
| 02:24:14 | 3 | except No. 5, which you didn't object to in the informal |
| 02:24:18 | 4 | charge conference. |
| 02:24:18 | 5 | Are you telling me that there are factors here |
| 02:24:20 | 6 | that you objected to in the informal charge conference that |
| 02:24:25 | 7 | for some reason have survived and are in this document? |
| 02:24:28 | 8 | Because it was my intention to delete each of the factors |
| 02:24:32 | 9 | that the Defendant objected to. |
| 02:24:35 | 10 | MR. SELWYN:  Correct, Your Honor.  I'm not |
| 02:24:36 | 11 | suggesting that. |
| 02:24:37 | 12 | THE COURT:  Okay.  Well, whatever you are |
| 02:24:39 | 13 | suggesting is overruled. |
| 02:24:40 | 14 | All right.  Next is Page 25. |
| 02:24:42 | 15 | Is there objection here from either party? |
| 02:24:44 | 16 | MS. GLASSER:  No, Your Honor. |
| 02:24:45 | 17 | MR. SELWYN:  No, Your Honor. |
| 02:24:46 | 18 | THE COURT:  All right.  Turning to the next page, |
| 02:24:52 | 19 | Page 26, is there objection here from either party? |
| 02:24:54 | 20 | MS. GLASSER:  No, Your Honor. |
| 02:24:57 | 21 | MR. SELWYN:  No objection, Your Honor. |
| 02:24:58 | 22 | THE COURT:  Turning to the final page of the final |
| 02:25:00 | 23 | jury instructions, is there objection from either party? |
| 02:25:02 | 24 | MS. GLASSER:  No, Your Honor. |
| 02:25:04 | 25 | MR. SELWYN:  No objection, Your Honor. |

02:25:05  1          THE COURT:  All right.  Counsel, let's turn then,

02:25:08  2  next, to the verdict form.  This has followed the same path

02:25:13  3  from your last joint submission through discussion in the

02:25:16  4  informal charge conference to generation of what you have

02:25:21  5  before you, and we will address this in the same manner as

02:25:23  6  we did the final jury instructions.

02:25:25  7          With regard to the cover page or the first page of

02:25:29  8  the verdict form, is there objection here from either

02:25:31  9  party?

02:25:32  10          MS. GLASSER:  No, Your Honor.

02:25:33  11          MR. SELWYN:  No objection, Your Honor.

02:25:34  12          THE COURT:  Turning to Page 2, which has certain

02:25:38  13  instructions and identifying information listed on it, is

02:25:41  14  there objection here from either party?

02:25:44  15          MS. GLASSER:  No, Your Honor.

02:25:45  16          MR. SELWYN:  No objection.

02:25:46  17          THE COURT:  Page 3, which includes instructions to

02:25:49  18  the -- to the jury, are there objections to anything on

02:25:51  19  Page 3?

02:25:52  20          MS. GLASSER:  No, Your Honor.

02:25:53  21          MR. SELWYN:  No objection.

02:25:55  22          THE COURT:  Turning to Page 4 of the verdict form

02:25:58  23  where Question 1 is located, is there objection here from

02:26:01  24  either party?

02:26:02  25          MS. GLASSER:  I'll just state for the record the

| | | |
|---|---|---|
| 02:26:05 | 1 | objection raised in chambers regarding the instruction to |
| 02:26:08 | 2 | bypass the validity question if a finding of |
| 02:26:12 | 3 | non-infringement is entered. |
| 02:26:14 | 4 | THE COURT:  All right.  That's overruled. |
| 02:26:16 | 5 | Is there objection here from the Defendant? |
| 02:26:18 | 6 | MR. SELWYN:  Yes.  For the record, Your Honor |
| 02:26:20 | 7 | Apple objects to Question 1 because it does not break out |
| 02:26:24 | 8 | infringement by patent or by literal infringement and |
| 02:26:27 | 9 | infringement under the Doctrine of Equivalents. |
| 02:26:29 | 10 | THE COURT:  That's overruled. |
| 02:26:30 | 11 | I'll turn next to Page 5 where Question 2 to the |
| 02:26:35 | 12 | jury is located. |
| 02:26:37 | 13 | Is there objection here from either party? |
| 02:26:39 | 14 | MS. GLASSER:  No, Your Honor. |
| 02:26:40 | 15 | MR. SELWYN:  No objection, Your Honor. |
| 02:26:44 | 16 | THE COURT:  Turning then to Page 6 where |
| 02:26:48 | 17 | Question 3 to the jury is located, is there objection here |
| 02:26:52 | 18 | from either party? |
| 02:26:53 | 19 | MS. GLASSER:  No, Your Honor. |
| 02:26:56 | 20 | MR. SELWYN:  Your Honor, for the record, Apple |
| 02:26:58 | 21 | objects to Question No. 3, essentially for the same reason |
| 02:27:01 | 22 | as Question 1 -- that is, it does not break out willful |
| 02:27:06 | 23 | infringement by patent or by literal infringement and |
| 02:27:10 | 24 | infringement under the Doctrine of Equivalents. |
| 02:27:11 | 25 | THE COURT:  That's overruled. |

02:27:13   1          Turning next to Page 7 where Question 4A is
02:27:18   2   located, is there objection here?
02:27:20   3          MS. GLASSER:  No, Your Honor.
02:27:27   4          MR. SELWYN:  Your Honor, Apple objects to
02:27:29   5   Question 4 because it does not break out the amount of
02:27:33   6   damages by patent.
02:27:36   7          THE COURT:  All right.  Then we'll turn from
02:27:39   8   Page 7 to Page 8 where Question 4B, being the last question
02:27:43   9   in the verdict form, is located.
02:27:45  10          Is there objection here from either Plaintiffs or
02:27:48  11   Defendant?
02:27:49  12          MS. GLASSER:  Yes, Your Honor.  As mentioned
02:27:52  13   previously, Plaintiffs object on the ground that the only
02:27:54  14   evidence put into the record from either side was based on
02:27:59  15   a fee paid per unit.  And, moreover, that future units are
02:28:03  16   not part of the present trial by the infringement case
02:28:09  17   extended here only to units sold up through the date of
02:28:14  18   trial and the acts of infringement through the date of
02:28:16  19   trial.
02:28:16  20          On those bases, Plaintiffs' position is that there
02:28:19  21   is no basis in the record for the jury to enter a lump-sum
02:28:24  22   checkmark there.  And, furthermore, that the inclusion of
02:28:27  23   that option, coupled with the jury instructions, could
02:28:30  24   confuse and mislead the jury.
02:28:32  25          THE COURT:  All right.  Plaintiffs' objection to

02:28:36  1  Question 4B on Page 8 of the verdict form is overruled.

02:28:39  2  Any objection here from the Defendants?

02:28:42  3  MR. SELWYN:  Apple has no objection to

02:28:45  4  Question 4B.

02:28:45  5  THE COURT:  We'll turn then to Page 9, which is

02:28:48  6  the final page of the verdict form.  Is there objection

02:28:51  7  here from either party?

02:28:52  8  MS. GLASSER:  No, Your Honor.

02:28:53  9  MR. SELWYN:  No, Your Honor.

02:28:56  10  THE COURT:  All right.  That will complete the

02:28:58  11  formal charge conference.

02:29:00  12  Counsel, I don't think there will be any changes

02:29:02  13  needed to these documents, based on what we've just

02:29:05  14  completed.

02:29:06  15  I need to print a couple copies for each side to

02:29:09  16  have in their possession before I bring in the jury and

02:29:14  17  start with the final jury instructions.

02:29:16  18  And I will do that and return to the bench

02:29:20  19  shortly.

02:29:22  20  Are there any other issues or any questions that

02:29:26  21  either Plaintiff or Defendant have that they would like to

02:29:29  22  raise at this point before I make these final copies and

02:29:32  23  then proceed to begin the Court's final jury instructions?

02:29:36  24  MS. GLASSER:  Not with respect to the jury

02:29:37  25  instructions and verdict form.

02:29:38  1          I did just want to confirm for the record, our

02:29:41  2   understanding is that the Plaintiffs will permit the

02:29:45  3   confidential information that is included in the slides

02:29:48  4   that were pre-exchanged to be shown during closing without

02:29:52  5   sealing the courtroom.

02:29:53  6          But given the importance of the issue and the

02:29:55  7   protective order, I wanted to get that on the record and --

02:29:59  8   and make sure that that -- that there was no issue with

02:30:03  9   that.

02:30:03 10          THE COURT:  Well, the parties have met and

02:30:05 11   conferred.  Lead counsel who are going to present closing

02:30:09 12   arguments have met and conferred as to what to expect from

02:30:12 13   each other.  I spent a considerable amount of time early

02:30:15 14   this morning going through disputed demonstrative slides

02:30:18 15   for counsels's closing arguments.

02:30:20 16          With all of that, there should be no question at

02:30:22 17   this point as to whether the Court will or will not need to

02:30:25 18   seal the courtroom during final arguments from the parties.

02:30:28 19          Does either Plaintiff or Defendant wish to seal

02:30:31 20   the courtroom during closing arguments?

02:30:33 21          MR. MUELLER:  No, Your Honor.

02:30:34 22          THE COURT:  Mr. Sheasby?

02:30:35 23          MR. SHEASBY:  No, Your Honor.

02:30:37 24          THE COURT:  Okay.  All right.  With that, I'll --

02:30:43 25   the Court stands in recess briefly.  I'll be back shortly.

02:30:47  1           COURT SECURITY OFFICER:  All rise.

02:30:50  2           (Recess.)

02:30:52  3           (Jury out.)

02:30:53  4           COURT SECURITY OFFICER:  All rise.

02:30:54  5           THE COURT:  Be seated, please.

02:50:32  6           Mr. Sheasby?

02:50:44  7           MR. SHEASBY:  I have a request, Your Honor, if I

02:50:46  8    may.  If I could have a time call at -- at certain points

02:50:51  9    in time.

02:50:52  10          THE COURT:  I'll -- I'll ask for that in just a

02:50:53  11   second.  I'll be happy to do my best to give you whatever

02:50:57  12   warnings you ask for, and the same for Mr. Mueller.

02:51:01  13          I want to briefly address everybody in the

02:51:03  14   courtroom, especially those in the gallery.  I know most of

02:51:06  15   you here are aligned with one of these parties in one

02:51:11  16   fashion or another.  There may be some of you in the

02:51:14  17   gallery who are not affiliated in any way with either

02:51:20  18   party.

02:51:21  19          But regardless of that, I want you to understand

02:51:23  20   that the Court considers its final instructions to the jury

02:51:28  21   and counsels' final arguments as the most serious part of

02:51:33  22   an inherently serious process.

02:51:36  23          Consequently, I don't want any disruptions once I

02:51:37  24   bring the jury in.  I don't want to see people getting up

02:51:38  25   and leaving and hearing the door shut.  I don't want to

02:51:42   1   hear people whispering back and forth.  I don't want to

02:51:46   2   hear papers being rustled.  I certainly don't want to hear

02:51:50   3   any electronic devices making noises.

02:51:55   4        So if any of that is not compatible with who you

02:51:58   5   are, then you need to exit the courtroom right now, because

02:52:03   6   once I bring the jury in, I expect this to be serious,

02:52:05   7   quiet, and respectful in all possible ways.

02:52:12   8        Any questions from counsel before we proceed?

02:52:18   9        MR. MUELLER:  No, Your Honor.

02:52:20  10        THE COURT:  Both of you have 45 minutes to present

02:52:24  11   your final arguments.  And as I get to the point where I

02:52:27  12   call upon you to present your closing arguments, I'll ask

02:52:31  13   you for what time warnings you might want.

02:52:33  14        MR. SHEASBY:  Thank you, Your Honor.

02:52:34  15        THE COURT:  All right.  Let's bring in the jury,

02:52:37  16   please.

02:52:37  17        COURT SECURITY OFFICER:  All rise.

02:52:57  18        (Jury in.)

02:52:59  19        THE COURT:  Welcome back, ladies and gentlemen of

02:53:14  20   the jury.  Please have a seat.

02:53:16  21        I know you've been here since 10:30 this morning.

02:53:22  22   You remember I told you on Friday, it's an art and not a

02:53:26  23   science.  I apologize for the length of time it's taken us

02:53:29  24   to get to this point, but we are at this point ready for me

02:53:32  25   to give you my final instructions and what's often called

02:53:36   1   the Court's charge to the jury.

02:53:37   2          Ladies and gentlemen of the jury, you've now heard

02:53:43   3   all the evidence in this case, and I'll now instruct you on

02:53:48   4   the law that you must apply.

02:53:49   5          Now, each of you are going to have your own

02:53:54   6   printed or written copy of these final jury instructions

02:53:57   7   when you retire to the jury room to deliberate in a few

02:54:01   8   moments.

02:54:01   9          You are welcome to take notes, if you like, but I

02:54:05  10   want you to know you will have your own written copy of

02:54:08  11   these instructions to review when you retire to the jury

02:54:11  12   room.

02:54:11  13          It's your duty to follow the law as I give it to

02:54:14  14   you.  On the other hand, ladies and gentlemen, as I've

02:54:20  15   previously said, you, the jury, are the sole judges of the

02:54:24  16   facts in this case.

02:54:25  17           Do not consider any statement that I have made

02:54:27  18   over the course of the trial or that I make during these

02:54:30  19   instructions as an indication to you that I have any

02:54:34  20   opinion about the facts in this case.

02:54:35  21          You're about to hear closing arguments from the

02:54:43  22   attorneys.  Statements and arguments of the attorneys, I

02:54:45  23   remind you, are not evidence.  And they are not

02:54:48  24   instructions on the law.  They're intended only to assist

02:54:52  25   the jury in understanding the evidence and the parties'

02:54:57   1   competing contentions.

02:54:59   2           A verdict form has been prepared for you.  And you

02:55:02   3   will take this verdict form with you to the jury room.  And

02:55:06   4   when you have reached a unanimous decision or agreement as

02:55:10   5   to the verdict, you'll have -- you'll have your foreperson

02:55:13   6   fill in the blanks in the verdict form reflecting those

02:55:17   7   unanimous agreements, sign it, date it, and then deliver it

02:55:21   8   to the Court Security Officer.

02:55:22   9           Answer each question in the verdict form from the

02:55:27   10  facts as you find them to be.  Do not decide who you think

02:55:31   11  should win this case and then answer the questions to reach

02:55:35   12  that result.  Again, your answers and your verdict in this

02:55:39   13  case, ladies and gentlemen, must be unanimous.

02:55:41   14          In determining whether any fact has been proven in

02:55:46   15  this case, you may, unless otherwise instructed, consider

02:55:50   16  the testimony of all the witnesses, regardless of who may

02:55:55   17  have called them.  And you may consider the effect of all

02:55:57   18  the exhibits received and admitted into evidence,

02:56:02   19  regardless of who may have presented or produced them.

02:56:04   20          You, the jurors, are the sole judges of the

02:56:10   21  credibility of each and every witness and the weight and

02:56:13   22  effect to be given to all the evidence in this case.

02:56:15   23          Now, during the course of the trial, you may have

02:56:19   24  been shown documents with some portions of those documents

02:56:23   25  redacted.  In those situations, you should not speculate

02:56:27  1   about what may have been redacted or why it was redacted.

02:56:31  2   Those redactions, ladies and gentlemen, were approved by

02:56:34  3   the Court prior to when the trial began.

02:56:37  4        As I've previously told you, the attorneys in this

02:56:41  5   case are acting as advocates for their competing parties

02:56:48  6   and their competing claims, and they have a duty to object

02:56:50  7   when they believe evidence is offered that should not be

02:56:53  8   admitted under the rules of the Court.

02:56:56  9        In that case, when the Court has sustained an

02:57:00  10  objection to a question addressed to a witness, you are to

02:57:02  11  disregard the question entirely, and you may not draw any

02:57:06  12  inferences from its wording or speculate about what the

02:57:10  13  witness would have said if I had permitted them to answer

02:57:16  14  that question.

02:57:17  15       However, on the other hand, if I sustain -- excuse

02:57:20  16  me, if I overruled an objection to a question addressed to

02:57:24  17  a witness, then you're to treat the answer to the question

02:57:28  18  and the question itself just as if no objection had been

02:57:32  19  made -- that is, like any other question and answer during

02:57:37  20  the trial.

02:57:37  21       Now, at times during the trial, ladies and

02:57:40  22  gentlemen, it was necessary for the Court to talk to the

02:57:44  23  lawyers outside of your hearing and your presence.  This

02:57:48  24  happens during trials because there are things that

02:57:51  25  sometimes come up that do not involve the jury.

02:57:54   1          You should not speculate, ladies and gentlemen,

02:57:57   2   about what was said during these discussions that took

02:58:00   3   place outside your presence.

02:58:02   4          Now, there are two types of evidence that you may

02:58:07   5   consider in properly finding the truth as to the facts in

02:58:10   6   this case.  One is direct evidence, such as the testimony

02:58:14   7   of an eyewitness.  The other is indirect, or sometimes

02:58:20   8   called circumstantial evidence.  That is the proof of a

02:58:23   9   chain of circumstances that indicates the existence or

02:58:28   10  nonexistence of certain other facts.

02:58:30   11         As a general rule, you should know that the law

02:58:35   12  makes no distinction between direct or circumstantial

02:58:37   13  evidence but simply requires that you, the jury, find the

02:58:42   14  facts based on the evidence presented during the trial,

02:58:46   15  both direct and circumstantial.

02:58:47   16         Now, the parties may have stipulated or agreed to

02:58:52   17  certain facts in this case.  When the lawyers for both

02:58:56   18  sides stipulate as to the existence of a fact, you must,

02:59:00   19  unless otherwise instructed, accept the stipulation as

02:59:04   20  evidence and regard the fact as proven.

02:59:06   21         Certain testimony over the course of the trial has

02:59:11   22  been presented to you through depositions.  A deposition is

02:59:15   23  the sworn, recorded answers to questions asked to a witness

02:59:19   24  in advance of the trial.

02:59:21   25         If a witness cannot be present to testify in

02:59:25   1   person, then the witness's testimony may be presented under

02:59:28   2   oath in the form of a deposition.

02:59:30   3          As I told you earlier, before the trial, the

02:59:34   4   attorneys representing the parties questioned these

02:59:37   5   deposition witnesses under oath.  At that time, a court

02:59:41   6   reporter was present and recorded their sworn testimony.

02:59:45   7          Both sides have had the opportunity to contribute

02:59:48   8   portions of that testimony to be played in open court.

02:59:52   9          Deposition testimony, ladies and gentlemen, is

02:59:56  10   entitled to the same consideration by you, the jury, as

03:00:01  11   testimony given by a witness who appears in person

03:00:04  12   physically from the witness stand.

03:00:07  13          Accordingly, you should judge the credibility and

03:00:12  14   importance of deposition testimony to the best of your

03:00:14  15   ability, just as if the witness had appeared in person and

03:00:16  16   testified before you in open court.

03:00:21  17          Now, while you should consider only the evidence

03:00:23  18   in this case, you should understand, ladies and gentlemen,

03:00:29  19   that you are permitted to draw such reasonable inferences

03:00:32  20   from the testimony and the exhibits as you feel are

03:00:37  21   justified in the light of common experience.

03:00:39  22          In other words, ladies and gentlemen, you may make

03:00:41  23   deductions and reach conclusions based on reason and common

03:00:47  24   sense that leads you to draw these from the facts that have

03:00:52  25   been established by the testimony and the evidence in this

03:00:54   1   case.  However, you should not base your decisions on any

03:00:58   2   evidence not presented by the parties in open -- open court

03:01:02   3   during the course of the trial.

03:01:03   4        Now, unless I instruct you otherwise, you may

03:01:09   5   properly determine that the testimony of a single witness

03:01:11   6   is sufficient to prove any fact, even if a greater number

03:01:16   7   of witnesses may have testified to the contrary, if after

03:01:19   8   considering all the other evidence, you believe that single

03:01:23   9   witness.

03:01:24  10        When knowledge of a technical subject may be

03:01:28  11   helpful to the jury, a person who has special training and

03:01:32  12   experience in that technical field, called an expert

03:01:34  13   witness, is permitted to state his or her opinions on those

03:01:39  14   technical matters to the jury.

03:01:44  15        However, ladies and gentlemen, you're not required

03:01:46  16   to accept those opinions.  As with any other witness, it's

03:01:50  17   solely up to you to decide who you believe and who you

03:01:54  18   don't believe and whether or not you want to rely on their

03:01:57  19   testimony.

03:01:57  20        Now, certain exhibits have been shown to you

03:01:59  21   during the course of the trial that were illustrations.  We

03:02:03  22   call these types of exhibits demonstrative exhibits or

03:02:08  23   sometimes just demonstratives for short.

03:02:10  24        Demonstrative exhibits are a party's description,

03:02:14  25   picture, or model to describe something involved in the

03:02:17  1   trial.  If your recollection differs from the

03:02:22  2   demonstratives, you should rely on your recollection.

03:02:26  3          Remember, demonstrative exhibits, which are

03:02:29  4   sometimes called jury aids, are not evidence, but the

03:02:34  5   witness's testimony during which a demonstrative is used is

03:02:38  6   evidence.

03:02:41  7          In any legal action, facts must be proven by a

03:02:45  8   required amount of evidence known as the burden of proof.

03:02:48  9   The burden of proof in this case is on the Plaintiffs for

03:02:54  10  some issues and on the Defendant for other issues.

03:02:57  11         There are two burdens of proof that you will apply

03:03:00  12  in this case.  One is the preponderance of the evidence.

03:03:04  13  The other is clear and convincing evidence.

03:03:05  14         Now, the Plaintiffs in this case, Optis Wireless

03:03:10  15  Technology, LLC, PanOptis Patent Management, LLC, Optis

03:03:18  16  Cellular Technology, LLC, Unwired Planet, LLC, and Unwired

03:03:28  17  Planet International Limited, who you will hear simply

03:03:31  18  referred to throughout the remainder of these instructions

03:03:33  19  and counsels' arguments as the Plaintiffs.

03:03:37  20         You may hear them collectively referred to as

03:03:40  21  Optis, some may refer to them jointly as PanOptis.  All

03:03:44  22  three of these mean the same thing.  They're the

03:03:47  23  Plaintiffs, and the Plaintiffs have the burden of proving

03:03:50  24  patent infringement by a preponderance of the evidence.

03:03:51  25         Optis also has the burden of proving willful

03:03:56   1   patent infringement by a preponderance of the evidence.

03:03:59   2         And Optis also has the burden of proving damages

03:04:10   3   for patent infringement by a preponderance of the evidence.

03:04:11   4         A preponderance of the evidence means evidence

03:04:13   5   that persuades you that a claim is more probably true than

03:04:17   6   not true.  And this is sometimes talked about as being the

03:04:21   7   greater weight and degree of credible testimony.

03:04:24   8         Now, the Defendant in this case is Apple Inc., who

03:04:30   9   you will hear referred to, and have throughout the trial,

03:04:33   10   either as Defendant or as Apple.  And Apple has the burden

03:04:37   11   of proving patent invalidity by clear and convincing

03:04:41   12   evidence.

03:04:43   13         Clear and convincing evidence means evidence that

03:04:48   14   produces in your mind an abiding conviction that the truth

03:04:52   15   of the party's factual contentions are highly probable.

03:04:56   16         Although proof to an absolute certainty is not

03:04:59   17   required, the clear and convincing evidence standard

03:05:03   18   requires a greater degree of persuasion than is necessary

03:05:07   19   for the preponderance of the evidence standard.

03:05:09   20         If the proof establishes in your mind, ladies and

03:05:13   21   gentlemen, an abiding conviction in the truth of the

03:05:17   22   matter, then the clear and convincing evidence standard has

03:05:21   23   been met.

03:05:22   24         Now, as I told you previously, these burdens of

03:05:27   25   proof, neither one, are to be confused with the burden of

03:05:31  1   proof called beyond a reasonable doubt, which is the burden

03:05:35  2   of proof we apply in criminal cases.

03:05:38  3        The burden of proof, beyond a reasonable doubt,

03:05:40  4   does not apply in this or any other civil case.  You should

03:05:45  5   not confuse clear and convincing evidence with evidence

03:05:49  6   beyond a reasonable doubt.  Clear and convincing evidence

03:05:54  7   is not as high a burden as beyond a reasonable doubt, but

03:05:59  8   it is a higher burden than the preponderance of the

03:06:03  9   evidence.

03:06:03  10        Now, in determining whether any fact has been

03:06:06  11   proved by a preponderance of the evidence or by clear and

03:06:08  12   convincing evidence, you may, unless otherwise instructed,

03:06:13  13   consider the stipulations, the testimony of the witnesses,

03:06:17  14   regardless of who called them, and all the evidence --

03:06:21  15   evidence -- excuse me, all the exhibits received into

03:06:24  16   evidence during the course of the trial, regardless of who

03:06:27  17   may have produced them.

03:06:28  18        Now, as I did at the beginning of the case, I'll

03:06:32  19   give you a summary of each side's contentions, and then

03:06:36  20   I'll provide you with detailed instructions on what each

03:06:40  21   side must prove to win on each of its contentions.

03:06:44  22        As I previously said, this action is one for

03:06:47  23   patent infringement, and this case concerns five separate

03:06:50  24   United States patents.  They are:

03:06:54  25        United States Patent No. 8,019,332, which you've

03:07:01  1   heard referred to throughout the trial as the '332 patent;

03:07:04  2         United States Patent No. 8,385,284, which you've

03:07:11  3   heard to referred to consistently as the '284 patent;

03:07:17  4         United States Patent No. 8,411,557, which you've

03:07:21  5   heard referred to throughout the trial as the '557 patent;

03:07:27  6         United States Patent No. 8,102,833, which you've

03:07:31  7   heard referred to as the '833 patent;

03:07:36  8         And United States patent 9,001,774, which you've

03:07:41  9   heard referred to consistently throughout the trial as the

03:07:48  10  '774 patent.

03:07:48  11        I will refer to these as the patents-in-suit or as

03:07:51  12  the asserted patents, and in so doing, ladies and

03:07:57  13  gentlemen, I'm referring to all five of them collectively.

03:08:00  14        Optis has alleged that certain iPhones, iPads, and

03:08:04  15  Apple Watches directly infringe the asserted claims either

03:08:08  16  literally or through the Doctrine of Equivalents.

03:08:10  17  Additionally, Optis has alleged that certain iPhones,

03:08:16  18  iPads, and Apple Watches indirectly infringe the asserted

03:08:21  19  claims of the asserted patents.

03:08:24  20        Sometimes in these instructions I'll refer to the

03:08:28  21  products -- these products in shorthand by just calling

03:08:31  22  them the accused products.

03:08:32  23        Optis contends that the accused products infringe

03:08:35  24  the following claims:

03:08:39  25        Claims 6 and 7 of the '332 patent;

03:08:42   1            Claims 1, 14, and 27 of the '284 patent;

03:08:46   2            Claims 1 and 10 of the '557 patent;

03:08:51   3            Claim 6 of the '774 patent;

03:08:56   4            And Claim 8 of the '833 patent.

03:08:58   5            These claims are sometimes referred to as the

03:09:07   6   asserted claims, and Optis also alleges that Apple's

03:09:11   7   infringement is and has been willful.  Optis seeks damages

03:09:13   8   in the form of a reasonable royalty for Apple's alleged

03:09:16   9   infringement.

03:09:17  10            Apple denies that the accused products infringe

03:09:22  11   the asserted claims of the asserted patents.  Apple further

03:09:26  12   denies that it willfully infringed any claim of the

03:09:31  13   asserted patents.  Apple also contends that the asserted

03:09:37  14   claims are invalid.  Apple denies that it owes Optis any

03:09:41  15   damages in this case.

03:09:50  16            Now, it's your job, members of the jury, to decide

03:09:53  17   whether Optis has proven that Apple has infringed any of

03:09:57  18   the asserted claims of the asserted patents and whether

03:09:59  19   that infringement was willful.  You must also decide

03:10:02  20   whether Apple has proven that any of the asserted claims of

03:10:06  21   the asserted patents are invalid.

03:10:08  22            If you decide that any of the asserted claims have

03:10:15  23   been infringed and are not invalid, then you will need to

03:10:18  24   decide the amount of money damages to be awarded to Optis

03:10:21  25   to compensate it for that infringement.

03:10:25   1          I'll now instruct you on a number of established

03:10:28   2   facts, and you must take these facts as true when deciding

03:10:31   3   the issues in this case.

03:10:32   4          No. 1.  The '332 patent was filed for on December

03:10:39   5   the 8th, 2010, and was issued on September the 13th, 2011,

03:10:45   6   by the United States Patent and Trademark Office, as you've

03:10:49   7   heard them called the PTO.  The '332 patent has an

03:10:55   8   effective filing date of March the 7th, 2008.

03:10:57   9          2.  The '833 patent was filed for on September the

03:11:03  10   11th, 2008, and issued on January the 24th, 2012, by the

03:11:11  11   PTO.  The '833 patent has an effective filing date of

03:11:15  12   November the 13th, 2007.

03:11:18  13          No. 3.  The '284 patent was filed for on August

03:11:26  14   the 16th, 2010, and issued on February the 26th, 2013, by

03:11:32  15   the PTO.  The '332 patent has the effective filing date of

03:11:43  16   December 20th, 2007.

03:11:45  17          No. 4.  The '557 patent was filed for on December

03:11:49  18   21st, 2011, and issued on April the 2nd, 2013, by the PTO.

03:11:55  19   The '557 patent has an effective filing date of March the

03:11:59  20   20th, 2006.

03:12:00  21          No. 5.  The '774 patent was filed for on November

03:12:07  22   the 12th, 2013, and issued on April the 7th, 2015, by the

03:12:13  23   PTO.  The '774 patent has an effective filing date of April

03:12:18  24   the 21st of 2005.

03:12:21  25          Now, before you decide many of the issues in this

03:12:25    1   case, ladies and gentlemen, you'll need to understand the

03:12:28    2   role of the patent claims.  The claims of a patent are

03:12:32    3   those numbered sentences at the end of the patent.  The

03:12:36    4   claims define the owner's rights under the law.

03:12:39    5          The claims are important, because it's the words

03:12:43    6   of the claims themselves that define what the patent

03:12:48    7   covers.  The figures and the text in the rest of the patent

03:12:51    8   are intended to provide a description or examples of the

03:12:56    9   invention, and they provide a context for the claims, but

03:12:59   10   it is the claims, ladies and gentlemen, that define the

03:13:02   11   breadth of the patent's coverage.

03:13:05   12          Each claim is effectively treated as if it were

03:13:09   13   its own separate patent, and each claim may cover more or

03:13:14   14   cover less than any other claim.  Therefore, what a patent

03:13:17   15   covers collectively or as a whole depends on what each of

03:13:22   16   its claims covers.

03:13:25   17          You'll first need to understand what each claim

03:13:28   18   covers in order to decide whether or not there is

03:13:30   19   infringement of that claim and to decide whether or not the

03:13:34   20   claim is invalid.

03:13:36   21          The first step is to understand the meaning of the

03:13:39   22   words used in the patent claim.

03:13:43   23          Now, the law says that it is my role as the judge

03:13:46   24   to define the terms of the claims, but it's your role as

03:13:51   25   the jury to apply my definitions to the issues that you're

03:13:56   1   asked to decide in this case.

03:13:58   2         So, accordingly, and as I explained at the

03:14:01   3   beginning of the case, I've determined the meaning of

03:14:04   4   certain claim language, and I've provided to you

03:14:06   5   definitions of those claim terms in your juror notebooks.

03:14:10   6         You must accept my definitions of these words in

03:14:14   7   the claims as being correct.  And it's your job to take

03:14:18   8   these definitions that I've supplied and apply them to the

03:14:21   9   issues that you are asked to decide, including the issues

03:14:26   10  of infringement and invalidity.

03:14:29   11        My interpretation of the claim terms should not be

03:14:35   12  taken by you as an indication that I have any view

03:14:39   13  regarding the issues of infringement or invalidity.

03:14:41   14        The decisions regarding these issues, infringement

03:14:46   15  and invalidity, are yours to make, ladies and gentlemen.

03:14:48   16        For claim limitations where I have not

03:14:51   17  construed -- that is, defined or interpreted -- any

03:14:54   18  particular term, you're to use the plain and ordinary

03:15:00   19  meaning of that term as understood by one of ordinary skill

03:15:03   20  in the art, which is to say in the field of technology of

03:15:08   21  the patent at the time of the alleged invention.

03:15:10   22        The meaning of the words of the patent claims must

03:15:13   23  be the same when deciding both the issues of infringement

03:15:22   24  and validity.

03:15:23   25        I'll explain to you how a claim defines what it

03:15:29   1   covers.

03:15:30   2          A claim sets forth in words a set of requirements.

03:15:34   3   Each claim sets forth its requirements in a single

03:15:37   4   sentence.  If a device satisfies each of these requirements

03:15:41   5   in that sentence, then it is covered by and infringes the

03:15:45   6   claim.

03:15:45   7          There can be several claims in a patent.  A claim

03:15:49   8   may be narrower or broader than another claim by setting

03:15:53   9   forth more or fewer requirements.  The coverage of a patent

03:15:57  10   is assessed on a claim-by-claim basis.

03:16:00  11          In patent law, the requirements of a claim are

03:16:04  12   often referred to as the claim elements, or they're

03:16:08  13   sometimes called the claim limitations.

03:16:10  14          When a product meets all of the requirements of a

03:16:13  15   claim, it is said it meets all of its limitations or all of

03:16:18  16   its elements, and the claim is said to cover that product,

03:16:21  17   and that product is said to fall within the scope of that

03:16:25  18   claim.

03:16:25  19          In other words, a claim covers a product where

03:16:29  20   each of the claim elements or limitations is present in

03:16:33  21   that product.

03:16:34  22          If a product is missing even one limitation or

03:16:37  23   element of a claim, the product is not covered by that

03:16:40  24   claim.

03:16:43  25          However, it doesn't mean that every word of the

03:16:45  1  claim must exist identically in the accused products.  If

03:16:51  2  the product is not covered by the claim, the product does

03:16:53  3  not infringe the claim.

03:16:55  4       Now, this case involves two types of patent

03:16:58  5  claims, ladies and gentlemen, independent claims and

03:17:02  6  dependent claims.

03:17:03  7       An independent claim does not refer to any other

03:17:05  8  claim in the patent.  An independent claim sets forth all

03:17:08  9  the requirements that must be met in order to be covered by

03:17:13  10  the claim.  It's not necessary to look to any other claim

03:17:16  11  to determine what an independent claim covers.

03:17:19  12       On the other hand, a dependent claim does not by

03:17:24  13  itself recite all the requirements of the claim but refers

03:17:28  14  to another claim or claims for some of its requirements.

03:17:32  15  In this way, the dependent claim depends on another claim.

03:17:38  16       The law considers a dependent claim to incorporate

03:17:43  17  all the requirements of the claim or claims to which it

03:17:46  18  refers, or as we sometimes say, from which it depends, as

03:17:52  19  well as those additional claim terms set forth -- those

03:17:55  20  additional elements set forth in the dependent claim

03:17:58  21  itself.

03:17:58  22       To determine what a dependent claim covers, it's

03:18:03  23  necessary to look at both the dependent claim itself and

03:18:06  24  any other claim or claims to which it refers or from which

03:18:10  25  it depends.

03:18:10   1          A product that meets all the requirements of both

03:18:13   2   the dependent claim and the claim or claims to which it

03:18:16   3   refers or from which it depends is covered by that

03:18:21   4   dependent claim.

03:18:22   5          Now, certain claims in the asserted patents use

03:18:27   6   the phrase "means for."  This "means for" phrase has a

03:18:34   7   special meaning in patent law.  It's called a

03:18:36   8   mean-plus-function requirement.  It does not cover all of

03:18:42   9   the structures that could perform the function set forth in

03:18:45  10   the claim.

03:18:46  11          Instead, it covers a structure or set of

03:18:49  12   structures that performs that function and that is either

03:18:52  13   identical or equivalent to the structures described in the

03:18:57  14   patent for performing the function.

03:18:59  15          The issue of whether two structures are identical

03:19:02  16   or equivalent is for you to decide.

03:19:04  17          Certain claims in the asserted patents use the

03:19:09  18   word "comprising."  Comprising means including or

03:19:12  19   containing.

03:19:14  20          When the word "comprising" is used, a product that

03:19:17  21   includes all the limitations or elements of the claim, as

03:19:22  22   well as additional elements, is covered by the claim.  Some

03:19:25  23   of the claims of the patents-in-suit use the word

03:19:29  24   "including."  In a claim, "including" means comprising.

03:19:33  25          For example, if you take a claim that covers the

03:19:37  1  invention of a table, if the claim recites a table -- a

03:19:42  2  table comprising a tabletop, four legs, and the nails to

03:19:47  3  hold the legs and the tabletop together, the claim will

03:19:51  4  cover any table that contains these structures, even if the

03:19:55  5  table also contains other structures, such as leaves that

03:20:00  6  would go in the tabletop or wheels that would go on the

03:20:03  7  ends of the legs.

03:20:04  8      Now, that's a simple example using the word

03:20:06  9  "comprising" and what it means.  In other words, ladies and

03:20:09  10  gentlemen, it can have other features in addition to those

03:20:14  11  that are covered by the patent.

03:20:16  12      If a product is missing even one element or

03:20:19  13  limitation of a claim, it does not meet all the

03:20:23  14  requirements of the claim and is not covered by the claim.

03:20:26  15  If a product is not covered by the claim, it does not

03:20:30  16  infringe that claim.

03:20:34  17      I'll now instruct you on infringement in more

03:20:38  18  detail.

03:20:38  19      If a person makes, uses, sells, or offers for sale

03:20:44  20  within the United States or imports into the United States

03:20:48  21  what is covered by a patent claim without the patent

03:20:51  22  owner's permission, that person is said to infringe the

03:20:53  23  patent.

03:20:55  24      To determine whether there is infringement, you

03:20:58  25  must compare the asserted claims, as I've defined each of

03:21:02   1    them, to the accused products.

03:21:04   2            You should not compare the accused products with

03:21:09   3    any specific example set out in the patent or with the

03:21:14   4    prior art in reaching your decision on infringement.  As

03:21:17   5    I've reminded you during the trial, the only correct

03:21:21   6    comparison is between the accused product and the language

03:21:24   7    of the claim itself.

03:21:26   8            You must reach your decision as to each assertion

03:21:30   9    of infringement based on my instructions about the meaning

03:21:33  10    and scope of the claims, the legal requirements for

03:21:39  11    infringement, and the evidence presented to you by both of

03:21:44  12    the parties.

03:21:44  13            I'll now instruct you on the specific rules that

03:21:47  14    you must follow to determine whether Optis has proven that

03:21:50  15    Apple has infringed one or more of the patent claims

03:21:53  16    involved in this case.

03:21:54  17            In order to prove infringement of a patent claim,

03:21:59  18    Optis must show by a preponderance of the evidence that the

03:22:02  19    accused product includes each requirement or limitation of

03:22:07  20    the claim, either literally or under the Doctrine of

03:22:09  21    Equivalents.

03:22:10  22            The issue of infringement, ladies and gentlemen,

03:22:13  23    is assessed on a claim-by-claim basis within each patent.

03:22:18  24    Therefore, there may be infringement of a particular patent

03:22:21  25    as to one claim, even if there is no infringement as to

03:22:24  1  other claims in that patent.

03:22:27  2          In this case, Optis contends that Apple literally

03:22:31  3  infringes Claims 6 and 7 of the '332 patent; Claims 1, 14,

03:22:37  4  and 27 of the '284 patent; Claim 8 of the '833 patent.

03:22:44  5          In addition, Optis contends that Apple infringes

03:22:48  6  Claims 1 and 10 of the '557 patent, and Claim 6 of the '774

03:22:55  7  patent, both literally and under the Doctrine of

03:22:57  8  Equivalents.

03:22:57  9          In order to infringe literally a patent claim --

03:23:05  10  or I should say to literally infringe a patent claim, the

03:23:10  11  accused product must include or perform each and every

03:23:13  12  element of the claim.

03:23:13  13          Thus, in determining whether Apple infringes

03:23:18  14  Optis's asserted claims, you must determine if the accused

03:23:21  15  product contains or performs each and every element recited

03:23:25  16  in the claim of the asserted patent.

03:23:28  17          A claim element is literally present if it exists

03:23:32  18  in or is performed by the accused product as it is

03:23:37  19  described in the claim language, either as I've explained

03:23:40  20  it to you, or if I did not explain it, according to the

03:23:44  21  plain and ordinary meaning as understood by one of ordinary

03:23:47  22  skill in the art.

03:23:47  23          For Claims 1 and 10 of the '557 patent and Claim 6

03:23:54  24  of the '774 patent, if an accused product does not

03:23:58  25  literally infringe the claim, there can still be

03:24:02   1   infringement if Optis proves that the accused product

03:24:05   2   satisfies the claim under the Doctrine of Equivalents.

03:24:09   3        Under the Doctrine of Equivalents, an accused

03:24:14   4   product infringes a claim if it performs steps or contains

03:24:19   5   elements corresponding to each requirement of the claim

03:24:22   6   that are equivalent to, even though not literally met by,

03:24:26   7   the accused product.

03:24:28   8        You may find that a step or element is -- is

03:24:32   9   equivalent to a requirement of a claim that is not

03:24:35   10  literally met if a person having ordinary skill in the

03:24:39   11  field of the technology of the patent would have considered

03:24:42   12  the differences between them to be insubstantial or would

03:24:47   13  have found that the structures perform substantially

03:24:53   14  the same function in substantially the same way to -- to

03:24:58   15  achieve substantially the same results as the requirements

03:25:01   16  of that claim limitation.

03:25:03   17       Going back to an example I gave you earlier about

03:25:12   18  a patent claim that recites a table comprising as its

03:25:17   19  elements, a tabletop, legs, and nails.

03:25:19   20       A table that, in fact, contained a tabletop, legs,

03:25:23   21  and nails would literally infringe the patent claim.

03:25:25   22       However, a table that consisted, instead, of a

03:25:28   23  tabletop, legs, and screws, instead of nails, might still

03:25:34   24  infringe the same claim under the Doctrine of Equivalents

03:25:36   25  if the screws, when used to perform substantially the same

03:25:40  1  function as the nails in substantially the same way

03:25:45  2  achieves substantially the same result.

03:25:47  3       Now, that's an example illustrating the Doctrine

03:25:50  4  of Equivalents.

03:25:50  5       In order to prove that an accused product meets a

03:25:56  6  limitation under the Doctrine of Equivalents, Optis, the

03:25:58  7  Plaintiff, must prove the equivalency to the claim element

03:26:06  8  by a preponderance of the evidence.

03:26:07  9       A patent can be directly infringed even if the

03:26:09  10  alleged infringer did not have knowledge of the patent and

03:26:13  11  without the infringer knowing that what it was doing is

03:26:17  12  infringement of the claim.

03:26:20  13       A patent may also be directly infringed, even

03:26:23  14  though the accused infringer believes in good faith that

03:26:26  15  what it is doing is not infringement of the patent.

03:26:29  16       Now, as I have previously explained, certain

03:26:35  17  claims include requirements that are mean-plus-function

03:26:41  18  forms.

03:26:42  19       A product meets a mean-plus-function requirement

03:26:44  20  of a claim if, one, it has a structure or set of structures

03:26:49  21  that performs the identical function recited in the claim;

03:26:53  22  and, two, that structure or set of structures is either

03:26:56  23  identical or equivalent to one or more of the described

03:27:00  24  structures that I defined earlier as performing the

03:27:04  25  associated function of the claim term.

03:27:08   1          If a product does not perform the specific
03:27:10   2   function recited in the claim, the mean-plus-function
03:27:14   3   requirement is not met, and the product does not directly
03:27:17   4   infringe the claim.
03:27:18   5          Alternatively, even if a product has a structure
03:27:22   6   or set of structures that performs the function recited in
03:27:26   7   the claim but the structure or set of structures is neither
03:27:29   8   identical to nor equivalent to the structure that I defined
03:27:35   9   to you as being described in the patent and performing this
03:27:37  10   function, the product does not directly infringe the
03:27:41  11   asserted claim.
03:27:41  12          None of this alters the fact that all of the
03:27:48  13   elements of a claim must be present, either literally or
03:27:51  14   under the Doctrine of Equivalents, for that claim to be
03:27:55  15   infringed.
03:27:55  16          If even a single element of a claim is neither
03:28:02  17   literally present in the accused product nor present under
03:28:05  18   the Doctrine of Equivalents, then you must find that the
03:28:09  19   accused product does not infringe that claim.
03:28:10  20          Optis also alleges in this case that Apple is
03:28:15  21   liable for indirect infringement by actively inducing its
03:28:20  22   users to directly infringe the asserted claims.  As with
03:28:25  23   direct infringement, you must determine whether there has
03:28:28  24   been induced infringement on a claim-by-claim basis.
03:28:31  25          Apple is liable for induced infringement of a

03:28:35  1  claim only if Optis proves by a preponderance of the

03:28:40  2  evidence that:

03:28:41  3       (1) the acts have been carried out by Apple's

03:28:45  4  users and directly infringe that claim;

03:28:47  5       (2) Apple has taken action intending to cause the

03:28:53  6  infringing acts by its users,

03:28:55  7       And, (3), Apple has been aware of the asserted

03:29:02  8  patents and has known that the acts of its users constitute

03:29:06  9  infringement of the asserted patents or was willfully blind

03:29:09  10  to that infringement.

03:29:10  11       Now, to establish induced infringement, it's not

03:29:16  12  sufficient that someone else directly infringes a claim,

03:29:19  13  nor is it sufficient that the company accused of inducing

03:29:22  14  another's direct infringement merely had knowledge or

03:29:25  15  notice of an asserted patent or had been aware of the acts

03:29:30  16  by another that allegedly constitute direct infringement,

03:29:35  17  and the mere fact that the company accused of inducing

03:29:38  18  another's direct infringement had known or should have

03:29:40  19  known that there was a substantial risk that someone else's

03:29:44  20  acts would infringe is not sufficient.

03:29:47  21       Rather, in order to find inducement, you must find

03:29:54  22  that Apple specifically intended or was willfully blind to

03:29:58  23  that infringement.

03:29:58  24       In this case, Optis also contends that Apple

03:30:06  25  willfully infringed its patents.

03:30:08  1          If you decide that Apple has infringed, you must

03:30:10  2   go on and separately address the additional issue of

03:30:13  3   whether or not Apple's infringement was willful.

03:30:20  4          Optis must prove willfulness by a preponderance of

03:30:23  5   the evidence.  In other words, you must determine whether

03:30:25  6   or not it is more likely than not that Apple willfully

03:30:31  7   infringed.

03:30:31  8          You may not determine that the infringement was

03:30:34  9   willful just because Apple knew of the asserted patents and

03:30:37  10  infringed them.

03:30:42  11         However, you may find that Apple willfully

03:30:44  12  infringed if you find that it acted egregiously, willfully

03:30:51  13  or wantonly.  You may find Apple's action were egregious,

03:30:55  14  willful, or wanton if it acted in reckless or callous

03:30:59  15  disregard of, or with indifference to the rights of Optis.

03:31:01  16         A defendant is indifferent to the rights of

03:31:04  17  another when it proceeds in disregard of a high or

03:31:09  18  excessive danger of infringement that was known to it or

03:31:13  19  was apparent to a reasonable person in its position.

03:31:18  20         You're determine, ladies and gentlemen -- your

03:31:21  21  determination, ladies and gentlemen, of willfulness should

03:31:29  22  incorporate the totality of the circumstances based on all

03:31:30  23  the evidence that's been presented during the trial.  And

03:31:34  24  willfulness can be established by circumstantial evidence.

03:31:36  25         Knowledge of the existence of a patent or a patent

03:31:41   1   family can be relevant to the question of willful

03:31:44   2   infringement.

03:31:45   3           For example, if Apple knew of the -- of the

03:31:47   4   existence of a patent or subjectively believed that there

03:31:52   5   was a high probability that a patent existed and took

03:31:56   6   deliberate actions to avoid learning of the patent, you may

03:31:58   7   take this into account when considering willfulness.  You

03:32:03   8   must -- you may also take into account whether Apple had

03:32:06   9   knowledge of a patent family.

03:32:11   10          I'll now instruct you on the rules that you must

03:32:14   11  follow in deciding whether or not Apple has proven by clear

03:32:21   12  and convincing evidence that the asserted claims of the

03:32:23   13  patents are invalid.

03:32:24   14          An issued United States patent is accorded a

03:32:27   15  presumption of validity based on the presumption that the

03:32:31   16  United States Patent and Trademark Office, which you've

03:32:33   17  heard referred to throughout this trial as the PTO or

03:32:37   18  sometimes just the Patent Office, acted correctly in

03:32:41   19  issuing the patent.  This presumption of validity extends

03:32:45   20  to all United States patents that are issued by the PTO.

03:32:50   21          In order to overcome this presumption, Apple must

03:32:53   22  establish by clear and convincing evidence that the

03:32:58   23  Plaintiffs' patents or any claim in the patent is not

03:33:01   24  valid.

03:33:04   25          The time it took the United States Patent and

03:33:07  1  Trademark Office to examine and grant the patents-in-suit

03:33:09  2  is not relevant to any issue in this case.  Even though the

03:33:15  3  PTO examiner has allowed the claims of a patent, you have

03:33:19  4  the ultimate responsibility for deciding whether the claims

03:33:23  5  of the patent are valid.

03:33:25  6        Like infringement, ladies and gentlemen,

03:33:28  7  invalidity is determined on a claim-by-claim basis.  Claims

03:33:34  8  are construed in the same way for determining infringement

03:33:37  9  as for determining invalidity.

03:33:44  10        You must apply the claim language consistently and

03:33:46  11  in the same manner for issues of infringement and for

03:33:49  12  issues of invalidity.  You must determine separately for

03:33:54  13  each claim whether that claim is invalid.

03:33:55  14        Now, at times, you'll hear me make references to

03:34:00  15  the prior art.  In patent law, a system, device, method,

03:34:06  16  publication, or patent that predated the patent claim at

03:34:11  17  issue is called prior art.

03:34:14  18        For a prior art reference to be considered for the

03:34:17  19  purposes of determining whether or not the claims are

03:34:21  20  invalid, the prior art item or reference must have been

03:34:25  21  made, known, used, filed, or published more than a year

03:34:31  22  before the effective date of the patent, which you've heard

03:34:36  23  referred to at times as the priority date.

03:34:38  24        As I've previously explained to you, to obtain a

03:34:41  25  patent, one must first file an application with the PTO,

03:34:45   1   the United States Patent and Trademark Office.

03:34:49   2         The process of obtaining a patent is called patent

03:34:52   3   prosecution, and the applications submitted to the PTO

03:34:55   4   includes within it what is called the specification.

03:34:59   5         The specification is required to contain a written

03:35:03   6   description of the claimed invention telling what the

03:35:06   7   invention is, how it works, how to make it, and how to use

03:35:10   8   it.

03:35:10   9         Apple contends that all of the patents-in-suit are

03:35:14  10   invalid as being obvious.  Even though an invention may not

03:35:23  11   have been identically disclosed or described before it was

03:35:26  12   made by the inventor in order to be patentable, the

03:35:28  13   invention also must not have been obvious to a person of

03:35:32  14   ordinary skill in the field of technology of the patent at

03:35:37  15   the time the invention was made or before the filing date

03:35:40  16   of the patent.

03:35:40  17         Apple is required to establish that a patent claim

03:35:45  18   is invalid by showing by clear and convincing evidence that

03:35:49  19   the claimed invention would have been obvious to persons

03:35:53  20   having ordinary skill in the art at the time the invention

03:35:58  21   was made or the patent was filed in the field of the

03:36:02  22   invention.

03:36:02  23         In determining whether a claimed invention is

03:36:07  24   obvious, you must consider the level of ordinary skill in

03:36:11  25   the field of the invention that someone would have had at

03:36:15  1   the time the invention was made or the patent was filed,

03:36:19  2   the scope and content of the prior art, and any differences

03:36:24  3   between the prior art and the claimed invention.

03:36:25  4          Keep in mind, ladies and gentlemen, that the

03:36:30  5   existence of each and every element of the claimed

03:36:32  6   invention in the prior art does not necessarily prove

03:36:37  7   obviousness.  Most, if not all, inventions rely on the

03:36:43  8   building blocks of prior art.

03:36:44  9          In considering whether a claimed invention is

03:36:47  10  obvious, you may, but are not required to, find obviousness

03:36:53  11  if you find that at the time of the claimed invention or

03:36:56  12  the patent's filing date there was a reason that would have

03:36:59  13  prompted a person of ordinary skill in the field of the

03:37:03  14  invention to combine the known elements in a way that

03:37:07  15  claimed -- that the claimed invention does, taking to it --

03:37:12  16  into account such factors as:

03:37:14  17         (1) whether the claimed invention was merely the

03:37:18  18  predictable result of using prior art elements according to

03:37:22  19  their known function;

03:37:23  20         (2) whether the claimed invention provides an

03:37:27  21  obvious solution to a known problem in the relevant field;

03:37:30  22         (3) whether the prior art teaches or suggests the

03:37:38  23  desirability of combining elements in the claimed

03:37:41  24  invention, such as where there is a motivation to combine;

03:37:47  25         (4)  whether the prior art teaches away from

03:37:53  1  combining elements in the claimed invention;

03:37:55  2          (5) whether it would have been obvious to try the

03:37:59  3  combination of elements in the claimed invention, although

03:38:04  4  obvious to try is not sufficient in unpredictable

03:38:08  5  technologies; and

03:38:09  6          (6) whether the change resulted more from design

03:38:16  7  incentives or other market forces.

03:38:19  8          To find that it rendered the invention obvious,

03:38:23  9  you must find that the prior art provided a reasonable

03:38:26  10  expectation of success.

03:38:27  11          In determining whether the claimed invention was

03:38:30  12  obvious, consider each claim separately.  Do not use

03:38:34  13  hindsight.  In other words, you should not consider what a

03:38:37  14  person of ordinary skill in the art would know now or what

03:38:40  15  has been learned from the teaching of the asserted patents.

03:38:48  16          In making these assessments, you should take into

03:38:52  17  account any objective evidence, sometimes called secondary

03:38:55  18  considerations, that may shed light on the obviousness or

03:38:58  19  not of the claimed invention, such as:

03:39:01  20          (1) whether the invention was commercially

03:39:05  21  successful;

03:39:06  22          (2) whether the invention satisfied -- satisfied a

03:39:10  23  long-felt need in the art;

03:39:11  24          (3) whether others copied the invention;

03:39:14  25          (4) whether the invention achieved unexpected

03:39:19  1  results;

03:39:19  2          (5) whether others in the field praised the

03:39:24  3  invention; and

03:39:24  4          (6) whether the invention departed from other

03:39:30  5  principles or accepted wisdom of the art.

03:39:33  6          Now, no one factor alone is dispositive, and you

03:39:37  7  must consider the obviousness or non-obviousness of the

03:39:40  8  inventions as a whole.  These factors are relevant only if

03:39:44  9  there is a connection or nexus between the factor and the

03:39:49  10  asserted claims of the asserted patents.

03:39:53  11          Even if you conclude that some of the above

03:39:56  12  indicators have been established, those factors should be

03:40:00  13  considered along with all other evidence in the case in

03:40:04  14  determining whether Apple has proven that the claimed

03:40:08  15  invention would have been obvious.

03:40:09  16          Now, several times in my instructions, ladies and

03:40:14  17  gentlemen, I've referred to a person of ordinary skill in

03:40:18  18  the field of the invention.  It's up to you to decide the

03:40:22  19  level of ordinary skill in the field of the invention.

03:40:25  20          In deciding what the level of ordinary skill is,

03:40:29  21  you should consider all the evidence introduced at the

03:40:32  22  trial including:

03:40:34  23          (1) the levels of education and experience of

03:40:38  24  inventors or other persons working in the field;

03:40:40  25          (2) the types of problems encountered in the

03:40:44  1  field;

03:40:44  2            (3)  prior art solutions to those problems;

03:40:48  3            (4)  rapidity with which innovations are made;  and

03:40:55  4            (5)  the sophistication of the technology.

03:40:59  5        A person of ordinary skill in the art is a

03:41:02  6  hypothetical person who is presumed to be aware of all the

03:41:06  7  relevant prior art at the time of the claimed invention.

03:41:08  8        If you find that Optis has proven that Apple has

03:41:15  9  infringed any of the asserted claims and that Apple has

03:41:18 10  failed to show that the asserted claims are invalid, you

03:41:23 11  must then consider the proper amount of damages, if any, to

03:41:26 12  award to Optis.

03:41:28 13        I'll now instruct you about the measure of

03:41:32 14  damages.  However, ladies and gentlemen, by instructing you

03:41:34 15  on damages, I'm not suggesting which party should win this

03:41:40 16  case on any issue.

03:41:40 17        If you find that Apple has not infringed any of

03:41:43 18  the asserted claims or that all of the asserted -- excuse

03:41:48 19  me, all of the infringed claims are invalid, then Optis is

03:41:51 20  not entitled to any damages.

03:41:54 21        If you award damages, they must be adequate to

03:41:58 22  compensate Optis for any infringement of the asserted

03:42:02 23  claims you may find.  You must not award Optis more damages

03:42:06 24  than are adequate to compensate for the infringement nor

03:42:12 25  should you include any additional amount for the purpose of

03:42:15  1    punishing Apple.

03:42:17  2            The patent laws specifically provide that damages
03:42:20  3    for infringement may not be less than a reasonable royalty.

03:42:25  4            Optis has the burden to establish the amount of
03:42:29  5    its damages by a preponderance of the evidence.  In other
03:42:34  6    words, you should only award those damages that Optis
03:42:39  7    establishes that it more likely than not suffered as a
03:42:42  8    result of Apple's infringement of the asserted claims.

03:42:45  9            Now, while Optis is not required to prove the
03:42:49  10   amount of its damages with mathematical precision, it must
03:42:53  11   prove them with reasonable certainty.  Optis is not
03:42:57  12   entitled to damages that are remote or speculative.

03:43:00  13           A reasonable royalty, ladies and gentlemen, is the
03:43:05  14   amount of royalty payment that a patentholder and the
03:43:09  15   alleged infringer would have agreed to in a hypothetical
03:43:14  16   negotiation taking place at a time immediately prior to
03:43:17  17   when infringement first began.

03:43:19  18           You've heard references throughout this trial for
03:43:25  19   whether Optis should be entitled to a running royalty or a
03:43:28  20   lump-sum royalty.

03:43:29  21           If you find that Optis is entitled to damages, you
03:43:32  22   must decide whether the parties would have agreed to a
03:43:36  23   running royalty or a fully paid-up, lump-sum royalty at the
03:43:42  24   time of the hypothetical negotiation.

03:43:43  25           A running royalty is a fee paid for the right to

03:43:47   1   use the patent that is paid for each unit of the infringing

03:43:52   2   products that have been sold.  If there are additional

03:43:56   3   units sold in the future, any damages for these sales will

03:44:00   4   not be addressed by you.

03:44:01   5        If you decide that a running royalty is

03:44:04   6   appropriate, then the damages that you award, if any,

03:44:08   7   should reflect the total amount necessary to compensate

03:44:11   8   Optis for Apple's past infringement.

03:44:17   9        However, a lump-sum royalty is when the infringer

03:44:19  10   pays a single price for a license covering both past and

03:44:24  11   future infringing sales.

03:44:27  12        If you decide that a lump sum is appropriate, then

03:44:34  13   the damages you award, if any, should reflect the total

03:44:38  14   amount necessary to compensate Optis for Apple's past and

03:44:46  15   future infringement.

03:44:49  16        Now, you've heard throughout the trial references

03:44:53  17   to whether or not the reasonable royalty should be a

03:44:57  18   running royalty or a lump-sum royalty.

03:44:58  19        If you find Optis is entitled to damages, you must

03:45:02  20   decide whether the parties would have agreed to a running

03:45:04  21   royalty or a fully paid-up, lump-sum royalty at the time of

03:45:08  22   the hypothetical negotiation.

03:45:08  23        Now, in considering this hypothetical negotiation,

03:45:11  24   you should focus on what the expectations of the

03:45:16  25   patentholder and the alleged infringer would have been had

03:45:19  1  they entered into an agreement at that time and had they

03:45:22  2  acted reasonably in their negotiations.

03:45:24  3       In determining this, you must assume that both

03:45:26  4  parties believed that the asserted claims were valid and

03:45:30  5  infringed and that both parties were willing to enter into

03:45:36  6  an agreement.

03:45:38  7       The reasonable royalty that you determine must be

03:45:41  8  a royalty that would have resulted from the hypothetical

03:45:43  9  negotiation and not simply a royalty that either party

03:45:44  10  would have preferred.

03:45:45  11       Now, the law requires that any damages awarded to

03:45:50  12  Optis correspond to the value of the alleged inventions

03:45:54  13  within the accused products, as distinct from other

03:45:57  14  unpatented features of the accused product or other factors

03:46:02  15  such as marketing or advertising or Apple's size or market

03:46:06  16  position.

03:46:08  17       This is particularly true where the accused

03:46:11  18  product has multiple features and multiple components not

03:46:14  19  covered by the patent or where the accused product works in

03:46:18  20  conjunction with other non-patented items.

03:46:23  21       Therefore, the amount as you find -- the amount

03:46:25  22  you find as damages must be based on the value attributable

03:46:29  23  to the patented technology alone.

03:46:31  24       In determining a reasonable royalty, you should

03:46:35  25  consider all facts known and available to the parties at

03:46:39  1   the time the infringement began.  You should also consider

03:46:44  2   the following:

03:46:46  3        The royalties received by the patentee for the

03:46:48  4   licensing of the patent-in-suit, proving or tending to

03:46:52  5   prove an established royalty;

03:46:54  6        The rates paid by the licensee for the use of

03:46:59  7   other patents comparable to the patents-in-suit;

03:47:02  8        The nature and scope of the license, as either

03:47:10  9   exclusive or non-exclusive or as restricted or

03:47:13 10   non-restricted in terms of territory or with respect to

03:47:16 11   whom the manufactured product may be sold;

03:47:18 12        The commercial relationship between the licensor

03:47:20 13   and licensee, such as whether they're competitors in the

03:47:26 14   same territory in the same line of business or whether they

03:47:29 15   are inventor and promoter;

03:47:32 16        The duration of the patent and the term of the

03:47:34 17   license;

03:47:34 18        The extent to which the infringer has made use of

03:47:38 19   the invention and any evidence probative of the value of

03:47:41 20   that use;

03:47:41 21        The portion of the realizable profit that should

03:47:47 22   be credited to the invention as distinguished from

03:47:49 23   non-patented elements; the manufacturing process, business

03:47:54 24   risks, or significant features or improvements added by the

03:47:58 25   infringer;

03:47:58  1          The opinion testimony of qualified experts; and

03:48:03  2          The -- the amount that a licensor, such as Optis,

03:48:10  3   and a licensee, such as Apple, would have agreed upon at

03:48:13  4   the time the infringement began if both had been reasonably

03:48:19  5   and voluntarily trying to reach an agreement, that is, the

03:48:23  6   amount which a prudent licensee who desired as a business

03:48:26  7   proposition to obtain a license to manufacture and sell a

03:48:29  8   particular article embodying the patented invention would

03:48:34  9   have been willing to pay as a royalty and yet be able to

03:48:38  10  make a reasonable profit and which amount would have been

03:48:42  11  accepted or acceptable by a prudent patentee who was

03:48:47  12  willing to grant a license.

03:48:49  13          Now, no one of these factors is dispositive,

03:48:52  14  ladies and gentlemen.  And you can and you should consider

03:48:56  15  the evidence that's been presented to you in this case on

03:48:58  16  each of these factors.

03:49:00  17          You may also consider any other factors which in

03:49:03  18  your minds would have increased or decreased the royalty

03:49:08  19  Apple would have been willing to pay and that the patent

03:49:12  20  owner, Optis, would have been willing to accept with both

03:49:16  21  acting as normally prudent business people.

03:49:19  22          In making a reasonable royalty determination, you

03:49:24  23  may also consider evidence concerning the availability, or

03:49:29  24  lack thereof, of non-infringing alternatives to the

03:49:32  25  patented invention.

03:49:35   1          You may compare the patented invention to

03:49:39   2   non-infringing alternatives to determine the value of the

03:49:41   3   patented invention, including the utility and advantages of

03:49:46   4   the patent over the old modes or devices, if any, that had

03:49:50   5   been used to achieve similar results.

03:49:52   6          When dealing with patents claimed to be standard

03:49:57   7   essential, there are two special apportionment issues that

03:50:03   8   arise.

03:50:04   9          First, the patented feature must be apportioned

03:50:07  10   from all the unpatented features reflected in the standard.

03:50:10  11          Second, the patent owner's royalty must be

03:50:14  12   premised on the value of the patented feature, not any

03:50:18  13   value added by the standard's adoption of the patented

03:50:22  14   technology.

03:50:22  15          These steps are necessary to ensure that the

03:50:25  16   royalty award is based on the incremental value of the

03:50:28  17   patented invention -- that -- the incremental value that

03:50:33  18   the patented invention adds to the product, not any value

03:50:36  19   added by the standardization of that technology.  And this

03:50:40  20   is particularly true for patents claimed to be standard

03:50:43  21   essential.

03:50:43  22          As I have already told you, you must not award

03:50:50  23   Optis any additional amount for the purpose of punishing

03:50:54  24   Apple or setting an example.

03:50:56  25          Additionally, you must not consider Optis's

03:50:59  1   allegations of willfulness in considering damages.

03:51:03  2         Consideration of willfulness, ladies and

03:51:06  3   gentlemen, is entirely separate from the question of

03:51:09  4   damages.  And you may not increase damages because you find

03:51:14  5   willfulness or decreased damages because you did not find

03:51:17  6   willfulness.

03:51:18  7         I will take your decision regarding the issue of

03:51:23  8   willfulness into account later.

03:51:25  9         With those instructions, ladies and gentlemen,

03:51:27 10   we're now ready to hear closing arguments from the

03:51:31 11   attorneys in this case.

03:51:32 12         Mr. Sheasby, you may now present the Plaintiffs'

03:51:36 13   first closing argument.  Would you like a warning or

03:51:40 14   warnings on your time?

03:51:41 15         MR. SHEASBY:  Your Honor, we would like warnings

03:51:43 16   on 23 left, 10, and 4 left.

03:51:46 17         And with the Court's permission, Mr. Baxter will

03:51:48 18   present the first part of the closing.

03:51:50 19         THE COURT:  All right.  23 minutes remaining from

03:51:53 20   the total of 45?

03:51:54 21         MR. SHEASBY:  Yes, Your Honor.

03:51:55 22         THE COURT:  23 -- what was the other warning?

03:51:58 23         MR. SHEASBY:  10 and 4.

03:51:59 24         THE COURT:  10 and 4.

03:52:01 25         All right.  Mr. Baxter, you may present the

```
03:52:06   1   Plaintiffs' first closing argument.
03:52:08   2            MR. BAXTER:  Thank you, Your Honor.  May it please
03:52:11   3   the Court.
03:52:11   4            Ladies and gentlemen of the jury, we obviously
03:52:15   5   cannot thank you enough.  It's been a long week.  Seems
03:52:19   6   like it's been longer than a week ago when we picked you,
03:52:24   7   but you've worked hard, and we cannot thank you enough.
03:52:26   8            What I want to do is harken back to what we said,
03:52:30   9   though, on the very first day.  And that is, this case is
03:52:35  10   about responsibility, whether or not Apple is going to take
03:52:39  11   responsibility; and, two, what Apple told you is they
03:52:42  12   wanted to look under the hood.
03:52:44  13            Well, I want to look under the hood with you for
03:52:48  14   just a few minutes.  And let's talk about what we saw when
03:52:51  15   we did that.
03:52:51  16            The very first thing that we found out is that
03:52:54  17   Apple's expert, who you saw by video, admitted that they
03:52:58  18   practice LTE.  And, of course, he had to because that's
03:53:02  19   what they do.
03:53:03  20            They use the LTE network to transmit data and
03:53:07  21   phone conversations and text and videos, and they did it
03:53:11  22   because the 3G that they were using that they got -- they
03:53:15  23   hung with for an extra year was old, it was clunky, your
03:53:19  24   videos stalled, and they simply couldn't compete against
03:53:23  25   Samsung and the other film manufacturers if they kept the
```

03:53:27  1    old technology.

03:53:28  2         So the very first thing we know is that they use

03:53:31  3    the LTE.

03:53:34  4         And, Jan, if you can get me the slide up.

03:53:38  5         Thank you, ma'am.

03:53:46  6         The second thing as we look under the hood, after

03:53:50  7    we found out that they practice LTE, is we brought to you

03:53:55  8    Johanna Dwyer, an expert who testified for the very first

03:54:00  9    time in her life, was as good an expert as I've seen, and

03:54:04  10   who said that she looked at the patents-in-suit that you

03:54:09  11   have before you, and she looked at the standard.

03:54:14  12        And her job for the last 25 years, as she put it,

03:54:17  13   is to be a chart breaker, to try to break the charts to see

03:54:21  14   how it didn't actually fit a product or a standard.

03:54:24  15        And what did she say after she looked at all of

03:54:29  16   it?

03:54:29  17        They were truly standard essential.

03:54:32  18        Now, the first thing I noticed after that is -- is

03:54:35  19   that Apple didn't have anybody that could map the patents

03:54:40  20   to the standard, nor did they try.  There were other

03:54:44  21   experts out there like Ms. Dwyer, not as good, but they

03:54:48  22   could have brought you one.  Nothing.  Silence.  It's not

03:54:52  23   under the hood.

03:54:52  24        But what is under the hood is -- if we can see the

03:54:58  25   next slide -- is the experts they did bring you.  They have

03:55:01    1   combined, represented Apple 24 times.  They've been paid

03:55:05    2   millions of dollars in direct pay from Apple.  They had no

03:55:08    3   data.  They had no experiments.  They had nothing to really

03:55:13    4   help you out.

03:55:14    5          And, of course, they were going to tell you that,

03:55:16    6   oh, these things don't infringe, and they're invalid,

03:55:19    7   because for the last 24 times, that's exactly what they've

03:55:23    8   done.

03:55:23    9          Well, what was the next thing we might look at?

03:55:27   10   And that is, was there a benefit?

03:55:30   11          And you remember we showed you the chart of a

03:55:33   12   10 percent benefit going down to .19, and collectively a 24

03:55:39   13   percent benefit.  And what is it that the experts from

03:55:41   14   Apple said?

03:55:42   15          Well, Mr. Lanning said that he didn't have any

03:55:47   16   data to -- to change that.

03:55:49   17          The next slide.

03:55:50   18          Dr. Buehrer said he didn't have any reason to

03:55:54   19   dispute the speed.

03:55:56   20          And Mr. Wells said exactly the same thing.

03:55:58   21          And so when you look under the hood at the

03:56:00   22   benefits of these patents, nobody from Apple contradicted

03:56:06   23   that they, in fact, increased the speed over the old

03:56:11   24   form -- that is, if Apple couldn't use LTE, how much faster

03:56:15   25   it is.  And it turns out they have absolutely no evidence

03:56:19   1   on that at all.

03:56:20   2          Well, what's the next thing we can look at as we

03:56:24   3   look under the hood?  And that is licenses -- a licensing

03:56:29   4   expert.

03:56:29   5          We brought to you Mr. Kennedy.  He's right out

03:56:32   6   here.  I asked all the experts to stick around because I

03:56:36   7   wanted to point them out.

03:56:37   8          And, Mr. Kennedy, thank you.

03:56:39   9          Mr. Kennedy has negotiated 200 licenses.

03:56:45   10          And Mr. -- Dr. Perryman, the Apple expert, zero,

03:56:49   11   not one -- not the first one, and he had to admit it.

03:56:51   12          And the problem -- one of the problems with

03:56:54   13   Dr. Perryman's testimony was that he said:  Oh, all the

03:56:57   14   patents are the same.  And you heard Mr. Kennedy say that's

03:57:01   15   never appropriate.  You never do it on a patent-by-patent

03:57:05   16   basis that they're all the same.  You've got to look

03:57:09   17   individually about why these are important.

03:57:12   18          Well, what's the next thing we saw under the hood?

03:57:16   19   And that is a consumer survey.

03:57:17   20          Now, we know and you know from the testimony that

03:57:19   21   Apple does consumer surveys all the time.  And they -- we

03:57:23   22   even know the name -- Professor John Hauser who does those

03:57:28   23   Apple surveys for them.

03:57:29   24          If they really thought the technology wasn't

03:57:32   25   important, they would have paraded Dr. Hauser or somebody

03:57:36  1   else up on that witness -- they said, oh, we talked to

03:57:40  2   consumers.  They don't care about speed.  They don't care

03:57:44  3   about reliability.  They wouldn't have cared if we kept

03:57:47  4   that old technology.  It would have been okay.  We would

03:57:51  5   have been just fine.  No survey expert from Apple.

03:57:55  6        What did you see?  Well, you saw Dr. Reed-Arthurs,

03:57:58  7   who's also here.

03:57:59  8        Doctor?

03:58:00  9        And she told you that she surveyed 1,400 people

03:58:07  10  and talked to them about upload and download speeds, and we

03:58:13  11  know from all of her survey work that the customers of

03:58:17  12  Apple, the consumers of cell phones think that the amount

03:58:23  13  of value for that is $8.97.

03:58:28  14       We can see the next slide.

03:58:29  15       Now, here's one of the more interesting things

03:58:36  16  that we saw in this case is that Dr. Perryman got on the

03:58:39  17  stand.  And he's going to talk to you about damages, and I

03:58:41  18  want, when you get into the jury room and you have a chance

03:58:44  19  to look over Judge Gilstrap's charge, to check out Pages 21

03:58:49  20  and 22, because there you're going to find the

03:58:51  21  Georgia-Pacific factors that we talked about.

03:58:53  22       And you will remember that Mr. Kennedy went

03:58:55  23  through them one-by-one, explained what their importance

03:58:59  24  was, explained how he used it to get to a damage

03:59:03  25  calculations, and when we got to Dr. Perryman, here's what

| | | |
|---|---|---|
| 03:59:06 | 1 | he said. |
| 03:59:07 | 2 | Did you in your direct testimony, did you admit |
| 03:59:09 | 3 | that you did not perform a Georgia-Pacific analysis? |
| 03:59:12 | 4 | And he said:  I didn't perform it. |
| 03:59:15 | 5 | Judge Gilstrap has told you in the charge that you |
| 03:59:20 | 6 | are to use the factors that Mr. Kennedy talked to you about |
| 03:59:27 | 7 | that Dr. Perryman didn't breathe a word about, and his |
| 03:59:31 | 8 | testimony is -- is of exactly zero use to you under the |
| 03:59:36 | 9 | analysis that Judge Gilstrap has told you in the charge you |
| 03:59:39 | 10 | need to perform in order to get to damages. |
| 03:59:41 | 11 | Let's look at the next slide. |
| 03:59:44 | 12 | We also heard from Mr. Kennedy that it's been |
| 03:59:48 | 13 | Apple's strategy to delay payments, reduce payments, and |
| 03:59:52 | 14 | devalue patents.  It's all part of their plan. |
| 03:59:54 | 15 | Next slide. |
| 03:59:55 | 16 | There also is the question of something called the |
| 04:00:00 | 17 | SSU, or the smallest salable unit. |
| 04:00:04 | 18 | We got Mr. Blevins to say every part of the iPhone |
| 04:00:08 | 19 | is involved in the use of the iPhone; the battery, the |
| 04:00:13 | 20 | display, whatever. |
| 04:00:14 | 21 | Next slide. |
| 04:00:15 | 22 | We also know from the licenses that there is not |
| 04:00:20 | 23 | REDACTED BY ORDER OF THE COURT |
| 04:00:25 | 24 | |
| 04:00:30 | 25 | that they have, and you didn't see it in the charge.  You |

04:00:33    1    go back through it when you get in there and see if

04:00:36    2    Judge Gilstrap told you anything about that charge.

04:00:38    3            At the end of the day, the only evidence is these

04:00:42    4    patents are incredibly valuable, they're infringed, and

04:00:46    5    they're worth $506 million.

04:00:51    6            Thank you, Your Honor.

04:00:52    7            THE COURT:  All right.  Defendants may now present

04:00:54    8    their closing argument.

04:00:56    9            MR. SHEASBY:  Your Honor, we're going to split the

04:00:58   10    first --

04:00:59   11            THE COURT:  Oh, you're going to split this time?

04:01:01   12    You're going to continue?

04:01:02   13            MR. SHEASBY:  I'm going --

04:01:03   14            THE COURT:  All right.  Then please continue,

04:01:05   15    Mr. Sheasby.

04:01:06   16            MR. SHEASBY:  Good late afternoon, ladies and

04:01:14   17    gentlemen of the jury.  I want to thank you for your

04:01:17   18    patience today, last week.  I hope you understand how

04:01:21   19    important this case is to PanOptis's business, how

04:01:25   20    incredibly important it is.

04:01:26   21            When I spoke to you earlier last week, I talked

04:01:30   22    about four questions you're going to have to answer:

04:01:35   23    Infringement, willful infringement, whether Apple carried

04:01:39   24    its heavy burden to show invalidity, and damages.

04:01:43   25            As to infringement, the standard is our burden,

04:01:47  1   but the burden is that if one pebble, just one pebble falls

04:01:53  2   on PanOptis's side as to infringement, which is slightly

04:01:56  3   stronger than Apple, we prevail on infringement.

04:02:03  4        And there's actually a reason for that, there's a

04:02:06  5   reason in our law and our Constitution, and that is because

04:02:09  6   property rights are sacred.  If one pebble is in our favor,

04:02:14  7   we prevail.

04:02:14  8        The Judge's instructions, if you read them, will

04:02:23  9   make clear that when you analyze infringement, you must

04:02:26  10  look at the entire patent.  You can look at examples in the

04:02:30  11  patent because those are examples of the invention.

04:02:32  12        And you saw Professors Mahon and Madisetti, who

04:02:36  13  stayed for the closing.

04:02:36  14        Professors, if you would stand.

04:02:39  15        How they carefully addressed every single claim

04:02:42  16  and every single element, element-by-element.  At 5:30 at

04:02:46  17  night on Thursday or Wednesday, they didn't let you go

04:02:49  18  home.  They wanted to show you each and every element.

04:02:52  19        The opening by Apple was interesting is because I

04:03:04  20  don't know if you heard this, but they told you that every

04:03:06  21  word of a claim must be present.  That's something they

04:03:08  22  said.  I wrote it down, and I heard it very carefully in

04:03:11  23  their opening.

04:03:12  24        That's actually not the law.  Judge Gilstrap's

04:03:14  25  charge does make clear that each element must be present,

04:03:19  1   but not each word, because, of course, words can be

04:03:23  2   modified and changed; you can play word games.  Apple gave

04:03:28  3   you an inaccurate representation of the law in opening.

04:03:31  4         You will also hear in the instructions about the

04:03:35  5   Doctrine of Equivalents.  An element doesn't need to be

04:03:37  6   literally present.  If its equivalent is present, there is

04:03:42  7   infringement.

04:03:45  8         Now, we presented two types of analysis of

04:03:48  9   infringement.  The first type of analysis involves standard

04:03:55  10  essential patents.

04:03:55  11        And if I can have Slide 14.3, Mr. Huynh.

04:04:03  12        So --

04:04:03  13        14.3, Mr. Huynh.

04:04:06  14        So in Apple's opening they said, we're not going

04:04:11  15  to dispute at all whether we implement the LTE standard.

04:04:15  16  But the words were very studied.  They were very careful.

04:04:19  17  When we asked their experts on the stand whether they

04:04:22  18  practice LTE, they said, oh, I don't know what you mean by

04:04:25  19  practice.

04:04:26  20        But the expert who was in Germany, who we heard

04:04:31  21  from on video, admitted that Apple practices the LTE

04:04:36  22  standard.

04:04:36  23        What's going on with these word games?  Why are

04:04:40  24  these experts who have been retained by Apple collectively

04:04:43  25  24 times trying to deny that they practice the standard

| | | |
|---|---|---|
| 04:04:47 | 1 | when Mr. Rodermund, the only expert with 3GPP ETSI |
| 04:04:54 | 2 | experience, admitted just the opposite? |
| 04:04:56 | 3 | Let's go to Slide 14.25, Mr. Huynh. |
| 04:05:04 | 4 | The reason that Apple's experts ran from |
| 04:05:11 | 5 | Mr. Rodermund's testimony is because of Ms. Dwyer. |
| 04:05:15 | 6 | Ms. Dwyer, would you stand? |
| 04:05:20 | 7 | Ms. Dwyer carefully analyzed each patent and |
| 04:05:23 | 8 | determined that it was essential to the standard.  Apple |
| 04:05:25 | 9 | practices the standard. |
| 04:05:27 | 10 | Ms. Dwyer, who was the only LTE -- LTE 3GPP |
| 04:05:32 | 11 | engineer who actually built the standards, who sat on the |
| 04:05:36 | 12 | committees, looked through the claim charts and analyzed |
| 04:05:40 | 13 | them as essential. |
| 04:05:40 | 14 | Now, Apple will say, oh, well, of course, we |
| 04:05:44 | 15 | practice the standard.  But the parts of the standard these |
| 04:05:48 | 16 | patents cover we don't use. |
| 04:05:49 | 17 | Well, that doesn't make a lot of sense, and I know |
| 04:05:52 | 18 | it doesn't make sense because Mr. Blevins admitted under |
| 04:05:55 | 19 | oath that our patents are the necessary part to communicate |
| 04:05:59 | 20 | between the base station. |
| 04:06:00 | 21 | Ms. Dwyer admitted our patents are essential. |
| 04:06:05 | 22 | Mr. Blevins admitted that our patents are necessary to |
| 04:06:07 | 23 | communicate. |
| 04:06:08 | 24 | We also performed a source code analysis, and we |
| 04:06:13 | 25 | did field experiments to confirm infringement. |

04:06:17  1        I'm going to walk you through each of the five

04:06:19  2   patents, and what's interesting is after the careful

04:06:21  3   analysis of Professors Mahon and Madisetti, there's only a

04:06:26  4   few limitations that Apple tried to dispute.

04:06:29  5        So for the '774 patent, Apple said, the big issue

04:06:34  6   is whether Apple products receive a processing parameter.

04:06:37  7   That's what they said about the '774 patent.

04:06:39  8        Here's the claim limitation.  Receiving a

04:06:43  9   processing parameter that includes a gain.  That's what's

04:06:46  10  in dispute, the sole issue in dispute.

04:06:48  11        Dr. Mahon -- Professor Mahon showed you how this

04:06:54  12  is the code, a 0 or 1, that is sent from the base station

04:06:59  13  to the mobile device.  And he said that code reflects gain

04:07:02  14  information, that one-half is a gain.  He said that.  He

04:07:06  15  gave you that careful analysis.

04:07:08  16        Something important happened on cross-examination

04:07:10  17  of Dr. Wells, Apple's expert.

04:07:15  18        He admitted it, as well.  He admits that the

04:07:20  19  message that is sent down to the mobile phone includes the

04:07:22  20  gain, one-half.  After all that argument, after all that

04:07:26  21  presentation that he gave, so smooth, on cross-examination,

04:07:31  22  he couldn't -- he was forced to admit that a message is

04:07:35  23  sent that includes a gain.

04:07:36  24        The '332 patent is the next patent.  In this case,

04:07:44  25  the only dispute, and I don't know if you heard this, the

04:07:46   1   only dispute was whether N/L, whether a division can be

04:07:51   2   performed using something called a shift.  That was the

04:07:54   3   only question, whether the division could be formed by

04:07:58   4   something called a shift.

04:08:00   5        And what was interesting is Dr. Lanning, so

04:08:04   6   smooth, went through pages and pages of testimony telling

04:08:07   7   you how different a division and a shift is, how Apple does

04:08:12   8   a shift, and how totally different that is from division.

04:08:16   9        And though it was late in the day, on

04:08:18  10   cross-examination, he accepted just the opposite.  He

04:08:23  11   admitted that a shift is a divide.  They spent 45 minutes

04:08:28  12   trying to convince you that the patent wasn't infringed

04:08:32  13   because a division and a shift are different.  In the first

04:08:37  14   15 minutes of his cross-examination, he admitted the exact

04:08:41  15   opposite under oath.

04:08:42  16        The next patent we considered was the '833 patent.

04:08:50  17   The main dispute in the '833 patent is whether you go

04:08:54  18   column-by-column and then row-by-row in preparing your

04:08:58  19   mapping.  That's what Apple said was the key dispute.

04:09:01  20        But we actually showed you the source code, and

04:09:07  21   the source code makes clear that the patent -- that the

04:09:12  22   systems do exactly what the claim says.

04:09:14  23        First, they map within a column-by-column, and

04:09:16  24   they do it row-by-row.  Column-by-column, row-by-row.

04:09:23  25   Exactly what the patent requires.  The source code does not

04:09:26  1   lie.

04:09:30  2        The '284 patent.  The '284 patent is a fascinating

04:09:36  3   patent.  The reason why it's so fascinating is because do

04:09:42  4   you remember the history?  Do you remember how Professor

04:09:46  5   Mahon talked to you about how it was actually presented to

04:09:50  6   the industry and how the industry looked at it and how

04:09:53  7   closely the final table that they adopted matched what was

04:09:57  8   presented to the industry?

04:09:58  9        And the patent requires a first subset, and then

04:10:01  10  it requires a second subset.  And that second subset is

04:10:06  11  reserved for redundancy version.  There's no dispute that

04:10:10  12  Apple implements this table.

04:10:12  13       In fact, if you remember, Professor actually

04:10:15  14  showed you in the code where they reference this table.

04:10:17  15  And so the only dispute is, is there a second subset that

04:10:21  16  is smaller than the first subset that is reserved?  And

04:10:24  17  they're trying to tell you -- they spent 30 minutes trying

04:10:29  18  to tell you from Dr. Buehrer, well, there's not a second

04:10:32  19  subset that's reserved.

04:10:33  20       Look at the table itself.  It says reserved in the

04:10:37  21  bottom three rows.  And what's changing those bottom three

04:10:40  22  rows?  The redundancy version.

04:10:43  23       They brought a professor from Virginia Tech,

04:10:48  24  smooth, talked to you for a long time, trying to convince

04:10:51  25  you that there is a second subset that is larger than the

04:10:54  1   first subset, where if you look at the face of that table,

04:10:57  2   it says the bottom three are reserved.  They're reserved

04:11:00  3   for when the redundancy version changes.  Exactly, exactly,

04:11:04  4   exactly what the claim requires.

04:11:06  5        I'm now going to speak about the '557 patent.  The

04:11:11  6   '557 patent requires a selecting unit in which sequences

04:11:14  7   are generated via that selecting unit.

04:11:19  8        Professor Madisetti talked to you about this at

04:11:24  9   great length.  He talked to you about the fact that when

04:11:26  10  you think about how to generate a sequence, the patent

04:11:30  11  actually teaches two ways of doing it.  And the second way

04:11:35  12  of doing it is to generate a code sequence every selection.

04:11:37  13  Every time you want a code sequence, you generate it.  He

04:11:40  14  spoke about that as an embodiment which teaches how to

04:11:43  15  understand the claim.

04:11:44  16       And if you remember, I showed you Judge Gilstrap's

04:11:47  17  jury instructions where Judge Gilstrap says the same thing.

04:11:51  18  You use the specification to understand the scope of the

04:11:56  19  claims.

04:11:56  20       Generate a code, and from that you -- you -- you

04:12:03  21  select a plurality of signatures.  Exactly what the claim

04:12:09  22  requires.

04:12:09  23       Once again, we had this big debate in which

04:12:13  24  Apple's expert spent all this time in the world, well, we

04:12:16  25  just don't -- we don't -- we don't infringe the claim.  But

04:12:20  1    you heard he ignored this second embodiment, which

04:12:23  2    Judge Gilstrap said must be used to understand the scope of

04:12:25  3    the claims.

04:12:26  4         And when we spoke to the engineer of Apple, Apple

04:12:31  5    admitted that they generate a sequence.

04:12:35  6         These were the only material disputes.  Our

04:12:38  7    experts went through limitation-by-limitation, and you'll

04:12:41  8    see that their defenses to these limitation-by-limitation

04:12:47  9    analysis was word games.  I don't know what you mean by

04:12:50  10   practice.

04:12:51  11        Reserved.  Well, what do you mean by reserved?

04:12:55  12   This case is not about word games.  This case is about

04:12:59  13   fundamental technology that helped to create the 4G/LTE

04:13:02  14   network.

04:13:02  15        The second issue you are going to be asked to

04:13:07  16   decide is willfulness.

04:13:11  17        You can believe that it was just a complete

04:13:15  18   coincidence that Apple infringes five of these patents.

04:13:19  19   It's just happenstance that they do it.  It doesn't matter.

04:13:22  20   They still must pay us full damages.

04:13:27  21        But there is a second question.  And the question

04:13:30  22   is:  Was Apple's conduct willful?

04:13:32  23        I believe the evidence shows that it was.

04:13:40  24        PanOptis sent a letter in 2017 making it clear

04:13:45  25   that we had 4G patents that were essential.  Apple's

04:13:49   1   internal lawyer, who testified by deposition, said that

04:13:53   2   there was no independent investigation done by Apple in

04:13:56   3   response.  She said that under oath.  And when we asked her

04:13:59   4   why, she said:  I wouldn't want to speculate.

04:14:02   5          You can draw an inference as to why Apple didn't

04:14:05   6   present and why -- why Ms. Mewes answered the question the

04:14:10   7   way she did.

04:14:11   8          THE COURT:  23 minutes remaining.

04:14:14   9          MR. SHEASBY:  We heard from two engineers,

04:14:18  10   Mr. Ramaprasad and Dr. Josiam.  But neither of them are

04:14:21  11   experts on infringement.  They are not experts, and they

04:14:24  12   admitted under oath they did not give an infringement or

04:14:28  13   validity opinion.

04:14:35  14          We heard that Apple had accessed our patents in

04:14:37  15   2018.  And then we heard something that Apple asked

04:14:43  16   Mr. Blevins to say on his redirect examination after I

04:14:46  17   crossed him.

04:14:47  18          Mr. Blevins said:  Well, I was asked by my boss,

04:14:50  19   Jeff Williams, to conduct an investigation.

04:14:53  20          But when we cross-examined him, he said he was

04:14:55  21   only given the patents a couple weeks before his

04:14:58  22   deposition.  So Apple is saying we did this whole

04:15:05  23   independent investigation, some lawyers handed him these

04:15:10  24   patents a couple of weeks before his deposition.  They knew

04:15:12  25   about them since 2018.

04:15:12   1          The final issue, invalidity.  Clear and convincing

04:15:14   2   evidence.  There is a presumption of validity of these

04:15:17   3   patents.  And I will submit to you that Apple has not met

04:15:21   4   its burden.

04:15:21   5          Let me give you an example.  Mr. -- Dr. Buehrer

04:15:28   6   talked about how one of the patents required joint

04:15:31   7   encoding.  He couldn't even find a reference that had joint

04:15:33   8   encoding in it.

04:15:35   9          The reality is, is that Apple has not presented

04:15:38  10   any substantial evidence to meet its heavy burden of clear

04:15:47  11   clear and convincing evidence.

04:15:48  12          Thank you, ladies and gentlemen.

04:15:50  13          THE COURT:  Does that complete Plaintiffs' first

04:15:52  14   closing argument?

04:15:53  15          MR. SHEASBY:  Yes, Your Honor.

04:15:54  16          THE COURT:  All right.  Defendant may now present

04:15:56  17   its closing argument to the jury.

04:16:00  18          Would you like a warning on your time,

04:16:03  19   Mr. Mueller?

04:16:03  20          MR. MUELLER:  Yes, Your Honor.  May I please have

04:16:08  21   6 minutes and 3 minutes?

04:16:09  22          THE COURT:   6 minutes remaining and 3 minutes

04:16:12  23   remaining, you may.

04:16:14  24          MR. MUELLER:  May I proceed, Your Honor?

04:16:20  25          THE COURT:  You may proceed with your closing

04:16:22   1   argument.

04:16:22   2            MR. MUELLER:  Thank you, Your Honor.

04:16:22   3            Good afternoon, ladies and gentlemen.  Again, my

04:16:25   4   name is Joe Mueller, and this is my last chance to speak

04:16:29   5   with you.  And I just want to start by saying thank you for

04:16:32   6   the time you've put in over the last week.

04:16:34   7            As I said in my opening statement, it's a real

04:16:37   8   privilege to be able to try a case to a jury of fair-minded

04:16:41   9   fellow citizens.  And it's a particular privilege to

04:16:45  10   present a case to fair-minded folks who have paid such

04:16:49  11   close attention, as you clearly did.  We're grateful.

04:16:51  12            Now, what we tried to do over the last week was to

04:16:54  13   focus on the facts.  We tried to focus on the evidence and

04:16:58  14   not sling mud or throw rocks but focus on the facts the

04:17:03  15   whole way through.  And we did it for two reasons.

04:17:07  16            First, it's just the right thing to do.

04:17:09  17            And the second thing is, the facts in this case we

04:17:13  18   believe firmly support Apple's positions.  And we wanted

04:17:15  19   you to see those facts to see the evidence and to see the

04:17:18  20   truth.

04:17:19  21            And so for my remaining time with you today, I'm

04:17:22  22   going to review those facts and review those evident --

04:17:26  23   review the evidence one last time.

04:17:28  24            And I want to start with a statement that was made

04:17:31  25   in the opening by Plaintiffs' counsel, and the allegation

04:17:36   1   was made that you would see a document suggesting a plan to

04:17:41   2   destroy our business.

04:17:44   3          Well, you've now seen the document.  Here it is.

04:17:47   4   And as His Honor told you in the jury instructions, the

04:17:50   5   redacted material has nothing to do with this case.  But

04:17:52   6   you know what this says.  What this says is a set of

04:17:56   7   licensing principles for dealing with patents in the area

04:17:59   8   of cellular technology.  It doesn't say destroy anyone's

04:18:03   9   business.  There's nothing remotely scandalous about this

04:18:06  10   document.

04:18:07  11          Now, I actually examined Mr. Kennedy, one of

04:18:10  12   Plaintiffs' damages experts, about this.  And he said he

04:18:13  13   disagreed with portions of it, but he acknowledged that

04:18:16  14   portions were quite sensible.

04:18:17  15          And here I was asking him about the line referring

04:18:22  16   to quality over declaration and royalty stacking.  I said:

04:18:28  17   There's nothing troubling about any of that, is there, sir?

04:18:31  18   And he said:  No.

04:18:32  19          Now, it's a document dated from February 2014.

04:18:35  20   And the reason why that's significant is it was three years

04:18:40  21   before the Plaintiffs had actually reached out to Apple by

04:18:43  22   way of letter.

04:18:43  23          So the notion that this document shows some plot

04:18:46  24   to destroy the Plaintiffs' business is contradicted by the

04:18:49  25   date on the document.  It's about three years before the

04:18:51  1  Plaintiffs reached out to Apple.

04:18:54  2       And there's another reason why this allegation,

04:18:58  3  trying to destroy their business doesn't make any sense,

04:19:01  4  and it's this:  What is their business?  What is their

04:19:06  5  business?  Who actually goes to work at these five

04:19:09  6  companies each day?  What do they do when they get there?

04:19:16  7  How do these five companies relate to each other?  And why

04:19:20  8  are there five companies instead of one?  Who stands to

04:19:26  9  benefit from this lawsuit?  And why don't we know the

04:19:29  10  answers to these questions one week into this trial?

04:19:32  11       Now, the one thing we do know is that the one and

04:19:36  12  only one fact witness the Plaintiffs presented is

04:19:41  13  Mr. Blasius right here.  They did also present the front

04:19:44  14  row here, those -- those experts.

04:19:45  15       But the one fact witness -- the one fact witness

04:19:48  16  they presented was Mr. Blasius, the one fact witness who

04:19:54  17  actually took the stand.  And he had not read the patents

04:19:59  18  even as of the day he testified.  He had not read the five

04:20:04  19  patents.

04:20:04  20       Now, he also hadn't spoken to any of the

04:20:09  21  inventors.  He hadn't read the LTE standard.  He hadn't

04:20:13  22  done any of that, and yet that was the one fact witness

04:20:17  23  they called.

04:20:17  24       Now, he told us a bit about these five companies.

04:20:22  25  He told us that four of them operate out of the same office

04:20:26   1   suite.  None of them produce any actual products.  None of

04:20:29   2   them are members of ETSI.  None of them made technical

04:20:34   3   proposals to ETSI.  None of them do that.

04:20:37   4          And as Mr. Kennedy acknowledged, there's no

04:20:46   5   evidence to suggest that any of the named inventors on

04:20:48   6   these patents would receive any compensation from this

04:20:51   7   case.  You've seen not a single document that suggests the

04:20:53   8   inventors who came up with these five patents stand to

04:20:56   9   benefit from this case.

04:20:57  10          Now, you heard just now in the opening statements

04:21:05  11   from the Plaintiffs, again, some suggestions about Apple

04:21:08  12   not only infringing but doing so willfully.  Let's be very,

04:21:13  13   very clear.  There's no infringement, there never was, and

04:21:15  14   I'm going to review all the reasons why.

04:21:17  15          But I want to talk a little bit about how Apple

04:21:19  16   got into the LTE industry.  Apple got into the LTE product

04:21:23  17   industry by reaching agreements with folks who supply

04:21:27  18   chips, the cellular chips that go into cellular devices.

04:21:30  19   Qualcomm and Intel, both companies headquartered in

04:21:34  20   California, both companies that have participated in ETSI

04:21:36  21   meetings, both companies that hold thousands of patents, as

04:21:41  22   you've heard.  Qualcomm has 140,000 patents.  Intel had

04:21:45  23   thousands of patents.

04:21:46  24          These folks supply chips to companies who make

04:21:49  25   cellular devices, and Apple bought those chips -- bought

04:21:52  1  those chips and created products that support cellular

04:21:56  2  functionality.  And there's no dispute that the Apple

04:21:59  3  products work on an LTE network.  They absolutely do.

04:22:03  4       The notion that that's a fight in this case is a

04:22:06  5  red herring.  They work on an LTE network.

04:22:09  6       There's no allegation in this case that Qualcomm

04:22:12  7  and Intel engineers copied these five patents.  As

04:22:15  8  Dr. Mahon said, I am not saying that, no.  And no one else

04:22:19  9  did either.  There's not a shred of evidence that Qualcomm

04:22:21 10  or Intel copied, studied, took anything from these five

04:22:25 11  patents.

04:22:26 12       And here's Mr. Blasius.  He noted that over the

04:22:30 13  years -- when I asked him:  Over the years, Apple has used

04:22:35 14  Qualcomm and Intel as suppliers of baseband chips?

04:22:38 15       Yes.

04:22:39 16       Have your five companies ever contacted Qualcomm

04:22:41 17  or Intel?

04:22:42 18       No.

04:22:43 19       Not once?

04:22:44 20       No.

04:22:44 21       Not once about these five patents?

04:22:47 22       No.

04:22:47 23       So the folks who actually make the chips at issue

04:22:51 24  in this case, the Plaintiffs never contacted them to raise

04:22:54 25  these five patents.  And for good reason, the chips don't

```
04:22:57    1   use those five patents.
04:22:58    2          Dr. Buehrer, I asked him:  Have you ever seen any
04:23:02    3   evidence that Samsung, Panasonic, or LG, the original
04:23:05    4   owners, ever contacted Apple about the patents in this
04:23:08    5   case?
04:23:08    6          No, I have not.
04:23:09    7          And you haven't either.  There's not a shred of
04:23:14    8   evidence that the original owners of these patents,
04:23:17    9   Samsung, Panasonic, LG, ever contacted Apple about any one
04:23:20   10   of the five.
04:23:21   11          The first contact was in January 6th, 2017.
04:23:27   12   That's the letter you've seen.
04:23:29   13          Now, it doesn't actually mention any of the five
04:23:31   14   patents by number.  It's a general invitation to talk.  But
04:23:35   15   that's the first outreach by the five companies in this
04:23:39   16   case.
04:23:39   17          And Blevins told you that Apple responded.  And,
04:23:42   18   of course, they didn't reach any sort of agreement because
04:23:44   19   Apple didn't want to take a license.  And that's why we're
04:23:48   20   here.
04:23:48   21          And Apple's reason for doing so was given to you
04:23:51   22   by Mr. Blevins, the vice president of procurement who has
04:23:56   23   been here every day of this trial.
04:23:57   24          He said:  Our feeling is that we've essentially
04:24:02   25   been accused of being cheaters, that we feel like our good
```

04:24:06  1  name has been tarnished, and we're here to set the record

04:24:08  2  straight.  Our position is that we do not infringe any of

04:24:11  3  these patents.

04:24:12  4       And there's no need to take a license to patents

04:24:15  5  that you don't use.

04:24:17  6       So let's go through the evidence that shows that

04:24:19  7  Apple is not using these five patents.  And to orient

04:24:23  8  ourselves, I want to put on the board here the witnesses

04:24:26  9  and help show you how they fit into the case.

04:24:32  10      So for the '284 patent, we have Mr. Blevins,

04:24:45  11  Ms. Mewes, Dr. Josiam, and Dr. Buehrer.  And let me explain

04:24:56  12  a little bit about why I put the folks where I put them.

04:24:59  13      Every one of the people I have just put on this

04:25:01  14  board either helped to create the chips at issue in this

04:25:04  15  case -- that would be Dr. Josiam and Mr. Ramaprasad, who

04:25:08  16  took the stand and testified to you -- or investigated how

04:25:11  17  those chips work.

04:25:13  18      Mr. Blevins, here he described all the work that

04:25:16  19  he did to investigate how the chips worked.  He talked to

04:25:19  20  Apple's head of software engineering, interviewed

04:25:22  21  engineers, spoke to independent experts.

04:25:24  22      Ms. Mewes, she, in deposition testimony that you

04:25:28  23  heard, described how she talked to three of their engineers

04:25:31  24  who came from Intel, and they explained why they didn't --

04:25:34  25  we didn't practice the patents.

04:25:35   1          And, of course, the experts, Dr. Buehrer,

04:25:39   2   Mr. Lanning, and Dr. Wells, also investigated how the chips

04:25:44   3   worked.

04:25:45   4          So that's what we put on, evidence from folks,

04:25:48   5   testimony from folks who either created the chips, created

04:25:51   6   the chips in the case of Mr. Ramaprasad or Dr. Josiam or

04:25:56   7   investigated how those chips worked.

04:25:58   8          Now, for the Plaintiffs' side of the case, they

04:26:03   9   presented Dr. Madisetti and Dr. Mahon.  Each of them did

04:26:23   10   investigate how the chips worked.  We have a disagreement

04:26:26   11   with them about their analysis, but they did look into the

04:26:28   12   chips.

04:26:30   13          However, Ms. Dwyer did not.  She did not look at a

04:26:33   14   single chip.  She offered an opinion on essentiality, but

04:26:37   15   that's not the issue in this case.  The issue is, do the

04:26:41   16   Intel and Qualcomm chips use the five patents?

04:26:45   17          Ms. Dwyer could have looked at chips but didn't,

04:26:52   18   not one, not a single line of source code, not a single

04:26:56   19   chip in the case.  She never looked at a one.  So her

04:27:01   20   opinions have utterly nothing to do about with whether the

04:27:06   21   chips in the case actually use these five patents.

04:27:09   22          Now, finally, we have Mr. Blasius.  Now, he

04:27:11   23   couldn't look at the chips.  They're confidential.

04:27:14   24   Ms. Dwyer could, but he couldn't.  But he could certainly

04:27:16   25   look at the patents, and he didn't do that either.

04:27:19   1          So the witnesses they offered you are right here.
04:27:22   2   The only folks who both looked at the patents and looked at
04:27:25   3   the chips are Dr. Madisetti and Dr. Mahon.
04:27:27   4          Now, let's talk about the evidence that we
04:27:35   5   presented, and I want to put a special spotlight on
04:27:39   6   Dr. Josiam and Mr. Ramaprasad.  They're the folks who
04:27:42   7   actually helped to create the chips, they wrote the source
04:27:44   8   code on those chips.
04:27:45   9          Now, you've heard over the course of this trial a
04:27:47  10   bit of a dispute as to whether our experts, Dr. Buehrer,
04:27:51  11   Dr. Wells, Mr. Lanning, properly reviewed the source code.
04:27:54  12   And I want to say two things about that.
04:27:56  13          First, the Plaintiffs had retained an expert named
04:27:59  14   Mr. Jones to analyze the source code, and you heard some
04:28:01  15   references to him over the course of the trial.
04:28:06  16          He, as you heard from Dr. Wells, agreed with our
04:28:09  17   experts on how the code worked.  As Dr. Wells said,
04:28:16  18   Mr. Jones agreed with him, agreed with him.
04:28:18  19          But more than that, and this is the second point,
04:28:21  20   who could better explain how the code works than the folks
04:28:26  21   who wrote it?  That's why we brought them to trial so you
04:28:31  22   could hear firsthand from the folks that wrote the code and
04:28:33  23   created the chips about how it works.
04:28:34  24          And Dr. Josiam and Mr. Ramaprasad were not
04:28:38  25   cross-examined on the precise details of the source code by

04:28:42  1    the Plaintiffs.  If they had quibbles with how they were

04:28:46  2    explaining the code, they should have asked them.  They

04:28:49  3    should have asked them.

04:28:50  4        We brought you the folks who had the first-hand

04:28:57  5    knowledge of how that code works, and they explained it to

04:29:01  6    you step-by-step.

04:29:04  7        So what did they tell you and how does it fit into

04:29:04  8    this case?  Well, the key legal issue is the claims, not

04:29:06  9    the rest of these patents.  We certainly want to look at

04:29:08  10   the rest of these patents.  But the claims mark out the

04:29:11  11   fence line, mark out the boundaries that are important.

04:29:14  12       This is what His Honor told you.  The claims

04:29:17  13   define the patent owner's rights under the law.  The claims

04:29:21  14   are important, because it is the words of the claims

04:29:24  15   themselves that define what the patent covers.  His Honor

04:29:27  16   told you that in the jury instructions he provided to you.

04:29:30  17       And Dr. Madisetti recognized that.  He said only

04:29:34  18   the claims matter because claims are what describe and

04:29:37  19   limit the invention.

04:29:39  20       So let's go through it piece-by-piece.

04:29:41  21       '332 patent, here's the claim.  And the claim

04:29:46  22   language that's most significant for the issues you need to

04:29:48  23   decide is highlighted.

04:29:49  24       A modulo C operation wherein 'C' is defined as

04:29:57  25   floor(N/L).  It's a mathematical equation.  It's a

04:30:02  1   requirement.  To infringe this claim, you need to infringe

04:30:06  2   that requirement.

04:30:07  3          So the question is, do the chips have it?  And the

04:30:10  4   answer is they don't.

04:30:12  5          Mr. Ramaprasad came up with a better, simpler, and

04:30:16  6   more efficient approach.  What he did is use a shift

04:30:22  7   function, and this shift function takes one step to do what

04:30:27  8   the equation in the '332 patent requires many steps.  The

04:30:31  9   equation in the '332 patent is actually an old equation.

04:30:34  10          And you don't need to take it from me.  You can

04:30:36  11  take it from the inventor, Dae Won Lee.  This is the email

04:30:39  12  that you've seen in this case where he wrote to the

04:30:45  13  European Telecommunications Standards Institute.  And he

04:30:48  14  said:  I guess what we are proposing is nothing new really.

04:30:51  15  What we are proposing to use what is well-known equation.

04:30:55  16          Remember when Mr. Summersgill held up that

04:30:58  17  textbook from the 1980s during his examination of

04:31:03  18  Mr. Lanning.  It had that equation in it.  It's an old

04:31:03  19  equation, and it didn't work as well as the new approach

04:31:03  20  that Mr. Ramaprasad came up with.

04:31:06  21          Now, Dr. Madisetti said, well, Dr. Lee was just

04:31:12  22  being modest, but it turned out he never asked him what he

04:31:16  23  meant.  He never called him or emailed him to find out what

04:31:20  24  Dr. Lee meant by that email.  And the truth is he wasn't

04:31:23  25  being modest.  He was being honest when he said it's

04:31:23  1    nothing new really.

04:31:27  2          Mr. Ramaprasad described the advantages of his

04:31:30  3    approach.  A shift calculation does something in one step

04:31:34  4    compared to any other operation, which could take multiples

04:31:37  5    or tens of steps.

04:31:38  6          And you saw in this demonstrative how that works.

04:31:41  7    The shift does one step to arrive at the answer.  Meanwhile

04:31:46  8    floor(N/L) is still going, it takes 11 steps.

04:31:49  9          Now, the reason why that's important is because in

04:31:56  10   computer chips you want to do things as efficiently as you

04:31:59  11   possibly can.  And when you have an equation that does it

04:32:01  12   in one step, that's different and that's better.  And

04:32:05  13   Dr. Madisetti, when he was cross-examined by

04:32:08  14   Mr. Summersgill, Mr. Summersgill asked:  We can agree that

04:32:11  15   code that is faster and requires fewer steps, even if it

04:32:14  16   gets the same answer, is better than code that's slower and

04:32:18  17   requires more steps?

04:32:19  18         Dr. Madisetti couldn't provide an answer, he

04:32:22  19   couldn't provide a yes-or-no answer.  And the truth is he

04:32:25  20   couldn't provide any good answer.  It's obvious that a

04:32:26  21   faster, more efficient approach is better, and that's what

04:32:29  22   Mr. Ramaprasad came up with.  It's different and better

04:32:32  23   than the '332 patent.

04:32:33  24         Let's go to the '833.  And, again, we start as we

04:32:36  25   must with the claim language.  Here, the claim language

04:32:40   1   talks about multiplexed signals that are mapped from the

04:32:44   2   first column of the first row to the last column of the

04:32:48   3   first row, the first column of the second row to the last

04:32:53   4   column of the second row, and so on.

04:32:54   5           Well, you know what that means.  It's describing a

04:32:57   6   mapping process where you move from left to right across

04:32:59   7   the row, left to right across the second row, and so on.

04:33:03   8           Dr. Josiam explained that the chips that he helped

04:33:07   9   create do it different.  They do a column-by-column method

04:33:10  10   where you map from the top to the bottom of a column.

04:33:14  11           Here's the difference.  On the left, you have the

04:33:16  12   patent, you're mapping from left to right, row-by-row.

04:33:21  13   Now, it's true you go through columns on your way across

04:33:24  14   the row, but you're still going across the row left to

04:33:28  15   right.

04:33:28  16           It's like when you go to a movie theater, and you

04:33:31  17   go into your row, you're not going down a column, you're

04:33:36  18   going across a row.  That's exactly the same thing here.

04:33:36  19   You're moving from left to right across the row, left to

04:33:40  20   right across the row.

04:33:40  21           Now, those Post-it notes actually came from

04:33:44  22   Mr. Pollinger, one of the Plaintiffs' attorneys, when he

04:33:46  23   was redirecting Dr. Madisetti.  And I think they were

04:33:48  24   trying to show something about the left-hand side of this

04:33:50  25   diagram.

04:33:51  1        But here's the thing, the left-hand side of the

04:33:54  2   diagram is the patent.  The right-hand side are the shifts

04:34:00  3   at issue in this case, top to bottom, down the column.

04:34:03  4   They didn't even touch the right-hand side because it's

04:34:06  5   different.  That's a very different approach.

04:34:08  6        And you can see the benefits.  This is the bus

04:34:15  7   analogy.  In the patent approach where you work across the

04:34:19  8   rows, it takes longer to fill up each of the buses.

04:34:22  9        In the Intel and Qualcomm approach where they work

04:34:25  10  down the column from top to bottom, once that bus is full,

04:34:29  11  it goes.  It doesn't have to wait for the others to get

04:34:32  12  filled up, as well.  It's a faster and more efficient

04:34:35  13  approach, and it's fundamentally different than the

04:34:38  14  row-by-row approach of the '833 patent.

04:34:39  15        Now, Dr. Madisetti was a bit all over the place on

04:34:42  16  this.  In his expert report before trial, he distinguished

04:34:45  17  between mapping signals row-by-row and mapping signals

04:34:49  18  column-by-column.  He admitted that, although he tried to

04:34:51  19  say he was using Dr. Wells, but it was his report.  And

04:34:55  20  then at trial, when asked to concede that row-by-row

04:34:58  21  mapping is different from column-by-column, he said, I

04:35:02  22  disagree.

04:35:03  23        Well, it is, it's a fundamentally different

04:35:06  24  approach.

04:35:06  25        The one on the right, top to bottom is more

04:35:09   1   efficient and fundamentally a faster way to do it than the

04:35:15   2   one on the left.

04:35:17   3           So let's move to the '557.  And, again, we start

04:35:20   4   as we must with the claim language.  The claim language

04:35:22   5   that's most critical from this patent is selecting a

04:35:26   6   sequence from a plurality, which means more than one, of

04:35:29   7   sequences contained in one group of a plurality of groups

04:35:33   8   into which a pre-determined number of sequences that are

04:35:35   9   generated from a plurality of base sequences.  So we're

04:35:39  10   talking about generating sequences and a plurality of

04:35:44  11   sequences.

04:35:45  12           And the same language or similar language appears

04:35:48  13   in the other asserted claim, Claim 10.

04:35:51  14           Now, Dr. Josiam explained how the chips work.  The

04:35:55  15   chips generate one sequence, just one, at the time they

04:35:59  16   need it, as opposed to a plurality of sequences.

04:36:06  17   Generating just one when you need it is a better approach

04:36:08  18   because you're not occupying more space from having

04:36:09  19   multiple sequences.  You only have one, you use it when you

04:36:12  20   need it.

04:36:12  21           Now, Dr. Madisetti conceded that he had not shown

04:36:15  22   you, the ladies and gentlemen of the jury, the hardware

04:36:20  23   source code for sequence generation.  He didn't show you

04:36:23  24   the code that's relevant in this portion of the chips for

04:36:26  25   generating these sequences.

04:36:28   1          Now, Mr. Lanning was asked if that matters, and he
04:36:31   2   said, it sure matters to me, and it would matter to anyone
04:36:34   3   else that truly wanted to understand the way the baseband
04:36:39   4   chips operate.
04:36:40   5          Again, if you don't review the hardware, you don't
04:36:41   6   know of -- anything about this specialized hardware
04:36:45   7   sequence generator.
04:36:46   8          Now, on cross-examination when Mr. Summersgill was
04:36:50   9   questioning Dr. Madisetti about this patent, at one point,
04:36:54  10   Mr. Summersgill said:  So we can agree that the claim
04:36:56  11   requires, quote, sequences that are generated from a
04:37:00  12   plurality of base sequences, right?
04:37:00  13          Now, Mr. Summersgill was literally just reading
04:37:03  14   the claim language, reading it.  And he said, we can at
04:37:07  15   least agree on what the words say.
04:37:10  16          Dr. Madisetti said:  I disagree.  I disagree.
04:37:13  17          Now, eventually he conceded the English language
04:37:18  18   is present in that limitation.  But that's not just the
04:37:21  19   English language, that's the requirement.  We are bound by
04:37:24  20   what the claims say.  Those set the property line for the
04:37:27  21   patents.  We have to go with what the claims say.  And you
04:37:30  22   can't disagree with what they say to try to create an
04:37:33  23   infringement theory.
04:37:34  24          Now, Dr. Madisetti also said one other thing over
04:37:37  25   the course of his testimony about this patent.  He actually

04:37:39  1   said:  Increasing and decreasing mean the same thing.

04:37:42  2          Now, of course, they don't.  They don't.  They

04:37:45  3   mean the opposite.  But it's another example of how far he

04:37:48  4   had to stretch to come up with an infringement theory for

04:37:51  5   this patent.  It just doesn't hold together.  One sequence

04:37:54  6   is not the same as a plurality of sequences.

04:37:57  7          Let's go to the '774.  Now, again, we start with

04:38:00  8   the claim language.  This is a method claim, and it

04:38:03  9   requires receiving a processing parameter, and here the

04:38:10  10  receiving is being done by a mobile device.  It's receiving

04:38:13  11  it from a base station, one of those big antennas.  So the

04:38:15  12  mobile device has to receive the processing parameter as

04:38:18  13  part of a method, which means a process for doing it.

04:38:21  14         So the question is:  Do they do it, the Apple

04:38:26  15  products and the Intel and Qualcomm chips inside those

04:38:29  16  products?

04:38:29  17         And Dr. Wells explained they don't.  The Apple

04:38:33  18  products actually work as they go through a five-step

04:38:36  19  procedure to compute the processing parameter.  They build

04:38:39  20  it.  They construct the processing parameter themselves at

04:38:41  21  the device instead of receiving it from the base station.

04:38:42  22  It's a very different way of doing it.

04:38:44  23         You can either receive it from somebody else

04:38:46  24  creating it for you, or you can construct it yourself, and

04:38:51  25  the way the Apple devices work and the chips in those

04:38:55  1    devices work is they construct it themselves.

04:38:58  2         Now, as he explained in the other steps inside

04:38:58  3    those chips, Steps 1, 2, 3, and 4, there's no processing

04:39:02  4    parameter.  It's not until the end.

04:39:05  5         Now, why is that meaningful?  Well, it's

04:39:09  6    meaningful because within those five steps, the Apple

04:39:13  7    products are receiving different ingredients of information

04:39:16  8    which they use to construct the processing parameter.

04:39:18  9         And as Dr. Wells explained using the Legos

04:39:21  10   analogy, you can take that information and build or

04:39:23  11   construct the processing parameter.  It might be, by

04:39:28  12   analogy, this house here or something else, a tree, a

04:39:33  13   horse.

04:39:34  14        This is an illustration of different types of

04:39:39  15   functionality you can build with the same information, and

04:39:39  16   that's the benefit of doing it yourself, instead of

04:39:42  17   receiving it from someone else.

04:39:43  18        If you receive it from someone else, you just have

04:39:45  19   the processing parameter.  If you build it using different

04:39:48  20   ingredients, you can take those same ingredients, like you

04:39:51  21   take Lego blocks, and turn them into something else.

04:39:54  22        That's how the Apple products work.  It's a more

04:39:56  23   flexible approach than the patent claims.

04:39:58  24        Now, Dr. Mahon, at the end of the day on Friday, I

04:40:01  25   asked him:  Does receiving mean the same thing as

04:40:04  1   constructed?

04:40:05  2          Answer:  Does receiving mean the same thing as

04:40:08  3   constructing?  No.

04:40:10  4          And it doesn't.  Of course, it doesn't.  And

04:40:12  5   that's the end of the story for this patent.  It's a

04:40:15  6   fundamentally different way of doing it.  The Apple

04:40:18  7   products construct it, instead of receiving the processing

04:40:20  8   parameter.

04:40:20  9          And that takes us to the last patent, the '284.

04:40:24  10  And, again, we start as we must with the claims.  The

04:40:26  11  claims require a first subset of values containing more

04:40:32  12  values than the second subset of values.

04:40:33  13         Now, let's be clear on what this means.  The first

04:40:38  14  subset is reserved for indicating the transport format.

04:40:41  15  That's number one.

04:40:42  16         And the second subset is reserved for indicating

04:40:48  17  the redundancy version.  Those are the two things.

04:40:53  18         The first subset is reserved for indicating the

04:40:57  19  transport format.

04:40:58  20         The second subset is reserved for the redundancy

04:41:00  21  version.

04:41:00  22         Now, if we go to -- and you see the same language

04:41:02  23  in Claim 14.

04:41:05  24         If we go to -- and Claim 27, which incorporates

04:41:09  25  Claim 14 by reference.  It has all those requirements, as

04:41:12  1  well.

04:41:13  2          What is accused here is a table in the LTE

04:41:15  3  standard, and there's no dispute that the chips -- the

04:41:18  4  Qualcomm and Intel chips use that table.

04:41:21  5          So the question is, do they contain a first subset

04:41:23  6  and a second subset of values?  And most importantly, is

04:41:28  7  the first subset bigger than the second subset, because

04:41:31  8  that's what the patents require?  And the answer is, no.

04:41:39  9          If you look at this, the first subset is right

04:41:42  10  here.  And if you count them up, there's 29 values.

04:41:45  11          The second subset is right here, and there's 32

04:41:49  12  values.

04:41:49  13          So in the actual products, there's more values in

04:41:52  14  the second subset than the first subset is the opposite of

04:41:55  15  what the patent is describing.

04:41:56  16          Now, what is the benefit of doing it the way the

04:41:59  17  chips do it?  They always send a redundancy version.  All

04:42:02  18  those 0s represent actual redundancy versions.  And by

04:42:06  19  having redundancy, it helps ensure the messages get

04:42:10  20  through.

04:42:10  21          Remember the "hello" example?  Hello, hello, in

04:42:13  22  case a lightning strike knocked out one of the hellos.  By

04:42:19  23  always having a redundancy version, this table approach is

04:42:21  24  better than only sometimes having a redundancy version.

04:42:23  25          Now, what they have tried to do in this case, and

04:42:26  1  you saw it again just now, is to compare a table in the

04:42:29  2  patent, Table 3, to the standard, and say they're the same

04:42:32  3  thing.

04:42:32  4         Well, they're not.  They're not.  And no matter

04:42:35  5  how much they color-code these tables and try to modify

04:42:38  6  them to make them look similar, they're not the same.

04:42:42  7  They're not the same table.  And if you look at them,

04:42:45  8  you'll see that immediately.

04:42:45  9         The second thing is this:  We are bound by the

04:42:48  10  claims.  The claim language governs whether there's

04:42:51  11  infringement or not.  And the claim language does not

04:42:53  12  include -- the claim language does not include their

04:42:55  13  description of the table.

04:42:56  14         Mr. Sheasby just now said the reason why that

04:42:59  15  Table 3 is significant in the patent is that the values

04:43:03  16  change at some point down towards the bottom, and that,

04:43:07  17  therefore, we should focus drawing the boxes around the

04:43:10  18  changed sections.

04:43:11  19         Well, if you look at the claim language, you will

04:43:13  20  not see any reference to changed values.  You just won't

04:43:17  21  see it.  What you will see is a reference to one set of

04:43:20  22  values for indicating transport format, one set of values

04:43:24  23  for indicating redundancy.

04:43:26  24         And if you take the claim language, the claim

04:43:29  25  language, not their modified tables, take the claim

04:43:32  1  language and apply to the LTE standard, it doesn't fit.

04:43:36  2       The LTE standard does exactly the opposite.

04:43:39  3  Rather than having a first subset bigger than a second

04:43:43  4  subset, it has a second subset bigger than a first subset.

04:43:47  5  It's the opposite approach.  There's no infringement.

04:43:51  6       And, again, remember His Honor instructed you the

04:43:54  7  claims, the claims, the claims are important, because it is

04:43:57  8  the words of the claims themselves that define what the

04:44:00  9  patent covers.

04:44:01  10       Now, Dr. Josiam, again, explained that 29 were

04:44:04  11  used for transport block size, 32 were used for redundancy.

04:44:08  12  So the person who actually wrote the code created the

04:44:11  13  chips, confirmed that we're drawing the boxes correctly.

04:44:17  14       And Dr. Mahon on Friday afternoon confirmed, as he

04:44:21  15  must, that the value 32 is bigger than the value of 29,

04:44:25  16  and, therefore, there's no infringement for this patent

04:44:26  17  either.

04:44:27  18       So when Mr. Blevins said our position is we

04:44:29  19  clearly do not infringe, he was right.  If you take the

04:44:33  20  language of the claims and compare them to the chips, the

04:44:36  21  actual chips and how they work, as explained by folks who

04:44:41  22  helped create them, they don't fit.  They just don't fit.

04:44:44  23  There's no infringement, and there never was.

04:44:46  24       Now, I want to say just a few words about

04:44:49  25  invalidity.  And at the beginning of this case, Mr. Baxter

04:44:52   1  gave you an analogy to cutting down trees on someone else's

04:44:57   2  land.  You now know that Apple has never done any such

04:45:01   3  thing.

04:45:02   4         What they did in this case is plant trees, create

04:45:06   5  their own products using chips from Intel and Qualcomm on

04:45:09   6  their own land.  And what happened in this case is the

04:45:12   7  Plaintiffs are trying to move their fence line -- ignore

04:45:15   8  the claim language and move their fence line into Apple's

04:45:17   9  land to capture Apple's trees.  And that's not right.

04:45:20  10         You've got to keep the fence line exactly where it

04:45:23  11  is.  You can't change the claims and stretch them out to

04:45:27  12  try to capture someone else's property.  It's just not

04:45:30  13  right.

04:45:30  14         But there's another problem.  If you let them

04:45:33  15  stretch the claims out in the way that they're trying to

04:45:35  16  do, they cover old ideas, as well.  All of that work that

04:45:39  17  was done in the field in the decades and decades before

04:45:42  18  these patents were filed -- and you see some of it here on

04:45:45  19  the screen -- that work could be covered, as well, if you

04:45:49  20  let them stretch out the claims.

04:45:50  21         So here is what we are asking you now.  Hold them

04:45:53  22  faithful to the lines that are in those patents.  And if

04:45:56  23  you do, there's no infringement.  And if you find no

04:46:00  24  infringement, you will see in the verdict form your work is

04:46:04  25  done.

1033

04:46:06  1       If you check "no" for no infringement, you don't

04:46:09  2  have to answer any other questions on the verdict form.

04:46:14  3  And if you hold them true to your -- to the positions in

04:46:16  4  the claims, that's the only right answer.  There's no

04:46:18  5  infringement.  Your work is done.

04:46:21  6       And to be very clear, in that circumstance, we

04:46:23  7  don't want you to reach invalidity, and you don't have to.

04:46:26  8  But if you let them stretch the claims out to cover Apple's

04:46:26  9  chips or Apple's products and the Intel/Qualcomm chips

04:46:32  10  within those products, then you do have to address

04:46:33  11  invalidity, because at that point, the claims would have

04:46:36  12  been stretched so far that they cover the old work of

04:46:38  13  others.  And you're going to have to get into invalidity.

04:46:41  14       But if you hold them true to the proper boundaries

04:46:44  15  and find no infringement, your work is done.

04:46:47  16       Now, over the course of this case, you've heard a

04:46:50  17  number of distractions by the Plaintiffs.  I'm going to go

04:46:53  18  through four.

04:46:54  19       First, essentiality.  Now, they've mentioned a few

04:46:58  20  times the expert that we retained in this case,

04:47:00  21  Mr. Rodermund, and suggested that he was somehow saying we

04:47:03  22  were using these patents.  He said nothing of the sort.

04:47:07  23  You were never shown a word that suggests that.

04:47:09  24       But I want to show you some testimony that you

04:47:11  25  were shown.  And here's what he said, quote, so a device --

04:47:16  1  certain devices definitely does not have to implement all

04:47:20  2  of the essential patents which are in the LTE standard.

04:47:23  3          Think about that.  Mr. Rodermund, who they're

04:47:25  4  telling you to rely on, said:  Certain devices definitely

04:47:25  5  does not have to implement all essential patents which are

04:47:25  6  in the LTE standard.

04:47:32  7          Ms. Dwyer's opinion on whether these patents are

04:47:35  8  essential is candidly beside the point.  She didn't look at

04:47:38  9  the chips.  The only way to see if the patents are actually

04:47:41  10 being used in the chips is to look at the chips.

04:47:44  11         Dr. Josiam explained to you why being essential is

04:47:46  12 not enough to prove infringement.  The standard tells you

04:47:50  13 what the chip needs to do.  But the engineers -- folks like

04:47:54  14 Dr. Josiam and Mr. Ramaprasad -- figure out how to do it.

04:47:57  15 They -- they design the circuits that actually accomplish

04:48:01  16 what the standard is trying to achieve.  And there's a

04:48:05  17 whole bunch of different ways to do it.

04:48:07  18         If the standard says get to Houston, you figure

04:48:10  19 out, do you walk, take a bike, drive?  There's a whole

04:48:14  20 bunch of ways to travel.  The same thing here.  The

04:48:16  21 standard sets up the objective.  The chip engineers figure

04:48:20  22 out actually how to do it.  And the way they do it is

04:48:23  23 reflected in the chip.  So to figure out if the chip

04:48:25  24 infringes, you have to look at the chip.

04:48:27  25         Dr. Mahon, I asked him:  We need to understand how

1035

04:48:32    1    the Qualcomm and Intel chips work -- for his infringement

04:48:36    2    theory.  And he acknowledged:  To have insight into my

04:48:39    3    infringement theory, yes.  He was right.  You have to look

04:48:41    4    at the chips to figure out if there's actual use of the

04:48:43    5    patents.  You can't just call them essential and leave it

04:48:45    6    at that.  You have to actually focus on the chips.

04:48:49    7         When we talked about under the hood, that was a

04:48:51    8    phrase that Ms. Smith used at the beginning of the trial,

04:48:51    9    this is what we meant.  Look at the chips.

04:48:53   10         Ms. Dwyer:  You never checked the Qualcomm or the

04:48:57   11    Intel chips to see if they actually use the five patents in

04:49:00   12    this case, did you?

04:49:01   13         Answer:  No, I didn't.

04:49:03   14         No. 2, Innography, this database.  Now, they've

04:49:07   15    shown you a few times this testimony from Ms. Mewes, the

04:49:10   16    Apple licensing attorney.  But I want to focus you on what

04:49:14   17    she actually said.  She actually said that she accessed

04:49:16   18    this database in 2018 to identify what portion -- what

04:49:21   19    number of declared patents are owned by PanOptis and its

04:49:26   20    affiliates.  She never said, I looked at the '774 patent or

04:49:30   21    the '284 patent or any one of these patents.  And she

04:49:34   22    certainly never said she looked at these strength ratings.

04:49:37   23         And it would be crazy if she did.  You know how

04:49:37   24    those strength ratings work.  Ms. Dwyer explained it to

04:49:40   25    you.  The strength rating will rise simply because a patent

04:49:43   1   has been asserted in litigation.  And it doesn't even

04:49:46   2   matter if the person who it's being asserted against

04:49:51   3   doesn't use it.

04:49:51   4        You can sue someone for not using a patent -- not

04:49:55   5   using a patent, and your strength rating is going to go up.

04:49:58   6   It's the craziest thing.  It's an incentive for bad

04:50:02   7   behavior where you sue someone who is not infringing, your

04:50:03   8   strength rating goes up, and then you point to the strength

04:50:05   9   rating as evidence of it being a good patent.  It has

04:50:08  10   nothing to do with it being a good patent.

04:50:11  11        There's not a shred of evidence that Ms. Mewes or

04:50:14  12   anyone else ever looked at those strength ratings.  It's

04:50:18  13   total red herring.

04:50:19  14        No. 3, paid experts.  We've heard references to

04:50:21  15   paid expert.  And there's an old expression which we've all

04:50:25  16   heard, people in glass houses shouldn't throw rocks.  We've

04:50:25  17   got right here a whole row of paid experts.

04:50:30  18        Dr. Mahon is a paid expert.  And there's nothing

04:50:32  19   wrong with that.  In litigation, folks who get retained as

04:50:37  20   experts, quite naturally, expect to be paid for the work

04:50:40  21   that they do.  That's what they are.  They're paid experts.

04:50:41  22        The only person they called as a witness to the

04:50:43  23   stand who wasn't a paid expert was Mr. Blasius right here.

04:50:47  24   And not just that.  I don't know if they thought we'd

04:50:52  25   forget, but Dr. Madisetti, out of all the technical

| | |
|---|---|
| 04:50:55 | 1 |
| 04:50:55 | 2 |
| 04:50:59 | 3 |
| 04:51:00 | 4 |

04:50:55  1   experts, has been paid the most for Apple cases.  He's been

04:50:55  2   paid close to a million dollars in cases testifying opposed

04:50:59  3   to Apple over a decade period.

04:51:00  4        Mr. Kennedy and Dr. Reed-Arthurs work at a place

04:51:04  5   called Berkeley Research Group.  That's billed over

04:51:10  6   $4 million for work against Apple.

04:51:12  7        So, again, we didn't come here to sling mud or

04:51:12  8   throw rocks, but if you're going to criticize Dr. Buehrer,

04:51:17  9   Dr. Wells, and Mr. Lanning for being paid experts, you

04:51:18  10  really got to look in the mirror and take a look at the

04:51:21  11  folks who testified as witnesses for them in this case.

04:51:24  12  They only called one fact witness.

04:51:26  13       In contrast, we put on the stand Mr. Blevins and

04:51:30  14  also the folks who created the chips.  They're not paid

04:51:32  15  experts.  They're folks who created the source code,

04:51:37  16  Dr. Josiam, Mr. Ramaprasad.  They came and testified and

04:51:40  17  told you the truth about the facts that they knew.

04:51:42  18       And one last point about the experts, there's been

04:51:45  19  some talk about how our experts didn't contest these

04:51:49  20  testing numbers, the performance testing.  There's nothing

04:51:51  21  to test.  The products don't use the five patents.

04:51:54  22       The premise of the testing is that the chips in

04:51:57  23  the Apple products actually use these five patents.  They

04:52:00  24  don't.  They've never used them, so there's nothing to

04:52:04  25  test.

04:52:05  1          And that takes me to the last distraction, which
04:52:09  2  is the Qualcomm/Apple relationship.  And you've been shown
04:52:12  3  some documents relating to that relationship, which is a
04:52:14  4  complicated relationship.  Apple has received chips from
04:52:18  5  Qualcomm over the years, but Qualcomm has an unusual
04:52:20  6  business policy that require that you take a license to
04:52:23  7  their patent portfolio before they will sell you chips.
04:52:26  8          It's like if you went to an appliance store to buy
04:52:30  9  an oven, and they said, well, before we will even show you
04:52:33  10  the oven, you have to take a license to pay us a royalty
04:52:37  11  every time you cook on it.  Or if you went to buy a car and
04:52:39  12  the car salesman said, you're going to have to pay me a
04:52:43  13  royalty every time you drive it.  Before I sell you the
04:52:47  14  car, you're going to have to sign a license.
04:52:50  15          It's a very unusual policy.  As Mr. Blevins said,
04:52:51  16  he didn't even know what they were talking about the first
04:52:51  17  time he heard about this.  It was totally foreign to him.
04:52:55  18  And it's led to some disputes between the companies.
04:52:57  19          Here's the thing, it has nothing to do with this
04:52:59  20  case, absolutely nothing to do with this case.  It's a
04:53:02  21  distraction and a sideshow meant to get you to take your
04:53:08  22  eye off the ball.
04:53:09  23          Don't take your eye off the ball.  What matters in
04:53:09  24  this case are the claims in the five patents and whether or
04:53:12  25  not they apply to the chips at issue.  That's it.  The rest

04:53:15   1   of this stuff is distractions and red herrings.

04:53:18   2       And it's in the service of a damages request for

04:53:22   3   half a billion dollars for one year.

04:53:25   4       Now, you saw how absurd that is when you look at

04:53:30   5   real-world data, and it's absurd for a couple reasons.

04:53:34   6       One, remember when Ms. Smith drew the chart with

04:53:37   7   Mr. Perryman that compared the Qualcomm/Apple deal, the

04:53:37   8   Intel/Apple deal and what they were requesting, the

04:53:37   9   Plaintiffs in this case.

04:53:37  10       I can't go through all the numbers right now

04:53:44  11   because some of it is confidential, and we'd have to seal

04:53:46  12   the courtroom.  But for Intel, for Intel, you know that

04:53:49  13   Apple got an entire business, and most importantly 2000

04:53:55  14   talented engineers like Dr. Josiam and Mr. Ramaprasad

04:54:00  15   joined the company, joined the company.

04:54:04  16       In addition, they got thousands and thousands of

04:54:05  17   patents, including cellular and LTE patents, all of that

04:54:08  18   for about double what the Plaintiffs are seeking in this

04:54:11  19   case for five patents for one year.  Just think about that.

04:54:15  20   They're seeking for five patents for one year half as much

04:54:18  21   as Apple paid for an entire business with thousands of

04:54:22  22   engineers and thousands of patents.  It makes no sense

04:54:24  23   whatsoever.

04:54:25  24       And you know that there's hundreds of thousands of

04:54:27  25   patents in this area of technology.  So to establish that

04:54:30  1    these patents had that type of value, you would truly have

04:54:35  2    to consider them the golden eggs, the golden eggs as

04:54:39  3    compared to garden variety patents in this area.

04:54:42  4         Dr. Perryman said if that were true, there would

04:54:47  5    be some buzz about them.  And, of course, that's got to be

04:54:50  6    right.  If these were really worth the kind of money

04:54:50  7    Plaintiffs are seeking, folks in the industry would have

04:54:51  8    heard about these patents.

04:54:52  9         Mr. Blasius, LG did not give them any special

04:54:55  10   significance in the agreement with Plaintiffs, the '833 and

04:54:58  11   the '332.  Panasonic, same thing, no special significance

04:55:03  12   to the two Panasonic patents in this case.  Samsung, '774,

04:55:07  13   no special significance to that patent, no buzz, even with

04:55:12  14   respect to the original owners.

04:55:14  15        Well, what about the former head of licensing of

04:55:17  16   the Plaintiffs?  If anyone would know, if anyone would know

04:55:20  17   that these are valuable patents, that these are the golden

04:55:23  18   eggs, these have buzz about them, it'd be the head of

04:55:27  19   licensing for the company.  He hadn't even heard of them.

04:55:30  20   He said, I just don't recollect any knowledge across the

04:55:34  21   boards on these specific patents.

04:55:36  22        THE COURT:  Six minutes remaining.

04:55:39  23        MR. MUELLER:  Thank you, Your Honor.

04:55:39  24        I'm not familiar with the patents, nor do I

04:55:42  25   recollect any specific information with respect to the

04:55:47  1  improvements on these patents.

04:55:49  2          So just think about that for a minute.  We've got

04:55:53  3  Mr. Blasius who hasn't even read them, and then we've got

04:55:56  4  the former head of licensing for this company who hadn't

04:55:59  5  heard of them, couldn't identify any improvements for these

04:56:03  6  patents.

04:56:07  7          Now, if you truly own something that was worth

04:56:09  8  half a billion dollars for one-year's use, you could be

04:56:13  9  assured that the head of licensing would have heard about

04:56:16 10  it.  You could be assured that Mr. Blasius would have read

04:56:20 11  them.

04:56:20 12          And the fact is, the original owners never said

04:56:23 13  one word about these patents being special.  The head of

04:56:26 14  licensing never said one word about these being special.

04:56:30 15  And the CEO, by contract of these five companies, hadn't

04:56:34 16  even read them, hadn't even read them.  There is no

04:56:38 17  indication that these patents are worth anything to

04:56:41 18  anybody.

04:56:42 19          And you can see it in what happened with their

04:56:44 20  licensing efforts.  The Plaintiffs have reached out to

04:56:47 21  company after company after company that makes various

04:56:50 22  types of cellular products, sometimes it's phones,

04:56:53 23  sometimes it's other things.  Walmart, for example,

04:56:55 24  remember, I showed you that Walmart phone, and on and on

04:56:58 25  and on.  This is from the cross-examination that I did of

04:57:02   1   Mr. Blasius.

04:57:03   2          He acknowledged it's a long list, a large list of

04:57:07   3   companies that they've approached.

04:57:08   4          And the vast majority of the companies that you've

04:57:11   5   approached have not taken a license, correct?

04:57:14   6          He acknowledged the answer was:  Yes.

04:57:17   7          Now, in the opening statement, the representation

04:57:22   8   was made that they're licensed by essentially every other

04:57:25   9   major LTE phone manufacturer in the United States.  Now,

04:57:28  10   you've seen that, that's referring in part to the original

04:57:31  11   owners like Samsung and LG.

04:57:32  12          So those are a bit of a different category.  They

04:57:35  13   were the original owners of the patents.  But in terms of

04:57:37  14   other companies that have been approached, you know who

04:57:40  15   signed up as licenses, they were companies that barely sell

04:57:44  16   phones in the U.S.

04:57:45  17          And when I asked Mr. Blasius the following:  Sir,

04:57:49  18   fair to say a very significant number of major phone

04:57:51  19   manufacturers do not -- have not taken a license to these

04:57:55  20   patents, correct?

04:57:56  21          His answer was:  That is correct.

04:57:59  22          And they were right not to take a license to these

04:58:03  23   five patents.  They're not useful for modern phones like

04:58:06  24   the Apple products and the Intel chips and the Qualcomm

04:58:10  25   chips within those products.  They just don't use these

1043

04:58:12   1   types of patents.  They're outdated technologies.  These

04:58:15   2   are the most furtherest thing possible from the golden

04:58:18   3   eggs.

04:58:18   4        Now, Mr. Perryman described how if someone

04:58:23   5   somewhere wanted to take a license to these patents what

04:58:25   6   they would consider.  And as he put it, you'd have to

04:58:28   7   consider the fact that there's hundreds of thousands of

04:58:30   8   patents in this area, and if you pay one person an

04:58:34   9   outlandish royalty, you're going to have folks knocking on

04:58:37   10  your door every day.

04:58:38   11       THE COURT:  Three minutes remaining.

04:58:39   12       MR. MUELLER:  Thank you, Your Honor.

04:58:40   13       So as, he explained to you, a fair lump-sum

04:58:43   14  royalty for these six would be in the neighborhood of

04:58:48   15  $6 million if you were using them, but Apple is not.

04:58:50   16  They're not using these patents, and they never have.  So

04:58:53   17  the right damages number for Apple is zero.

04:58:55   18       Now, this is the end of my time with you, it's the

04:58:58   19  last few things I get a chance to say.  You're going to

04:59:00   20  hear more for the Plaintiffs just now, and I won't have a

04:59:03   21  chance to respond.  So I'm going to ask you to do a couple

04:59:06   22  things for me as you listen to these arguments.

04:59:09   23       First, if you hear a brand new point or brand new

04:59:12   24  argument that I don't have a chance to respond to, ask

04:59:15   25  yourself why are you hearing this now at the end of the

04:59:20  1   trial when Apple doesn't have a chance to respond?

04:59:22  2          Second, for any argument that's made, I'd like you

04:59:26  3   to ask, what would Ms. Smith point me to in terms of

04:59:31  4   evidence or what would Mr. Summersgill point me to or what

04:59:33  5   would I point you to?  What evidence would we show you to

04:59:34  6   demonstrate the argument is wrong?  You know the evidence

04:59:36  7   now and have in mind what it actually shows.

04:59:38  8          And the third and most important thing is, I'd

04:59:42  9   like you to think about whether these arguments help you

04:59:45  10  answer the critical questions before you.  Do the claims

04:59:48  11  cover these chips?  How can it be that 32 is greater than

04:59:51  12  29?  How can it be that a row-by-row mapping patent covers

04:59:55  13  column-by-column?  How can it be that a shift operation

04:59:59  14  would satisfy a requirement for an old, outdated equation?

05:00:02  15  How can it be that one sequence is the same as a plurality

05:00:08  16  of sequences.  And how can be it that constructing a

05:00:12  17  parameter is different -- the same as receiving?  There's

05:00:14  18  no good answers to those questions because the facts don't

05:00:18  19  support them.

05:00:18  20         At the end of this case Mr. Blasius is asking you

05:00:20  21  to cut him a check for a half billion dollars for him and

05:00:24  22  his five companies based on five patents that he never read

05:00:27  23  and Apple never used.  It's just not right.  The right

05:00:31  24  answer, the right result, the true result, the just result

05:00:36  25  in this case is no infringement.

05:00:39   1          I respectfully request that you return a verdict

05:00:45   2   in favor of Apple.  And I thank you for your time.

05:00:48   3          THE COURT:  All right.  Let's take the

05:00:49   4   demonstrative down, and then we'll proceed with Plaintiffs'

05:00:53   5   final closing argument.

05:01:13   6          Mr. Sheasby, you have 21 minutes and 25 seconds

05:01:16   7   remaining.  Would you like some warning on your time?

05:01:19   8          MR. SHEASBY:  Yes, Your Honor.  If I could have

05:01:20   9   warnings at 10 minutes and 4 minutes, I would be grateful.

05:01:24   10          THE COURT:  You may proceed, counsel.

05:01:25   11          MR. SHEASBY:  Legos, school buses, cup holders,

05:01:44   12   basketballs, ways of getting to Marshall.  Counsel for

05:01:51   13   Apple just spoke for 45 minutes.  He did not show you one

05:01:56   14   line of source code.  He did not show you one internal

05:01:59   15   Qualcomm or Intel or Apple document defending their

05:02:04   16   positions.  It's an insult to us and this process.

05:02:07   17          We don't need to hear about Legos, we need to see

05:02:10   18   the evidence.  The lines of source code that we presented

05:02:13   19   to you in our closing, the lines of source code and

05:02:17   20   technical evidence that Apple utterly ignored for the last

05:02:22   21   45 minutes.

05:02:23   22          Can I have Slide 30, Mr. Huynh?

05:02:28   23          Apple kept saying:  We do it differently.  We do

05:02:34   24   it differently.  We do it differently.  Well, you think if

05:02:38   25   they did something different than the standards, they would

1046

05:02:41   1   have filed a patent on it because that's what companies do

05:02:45   2   when they seek important -- when they create important

05:02:47   3   things.   They file patents.

05:02:49   4         Did Mr. -- Dr. Josiam and Mr. Ramaprasad say that

05:02:56   5   they filed one patent on their, quote, different way of

05:03:00   6   doing something?  Of course, they didn't, because there is

05:03:04   7   no different way.

05:03:06   8         Did Dr. -- Dr. Josiam and Mr. Ramaprasad ever say

05:03:09   9   they didn't infringe?  Of course, they didn't, because

05:03:13  10   there is nothing other than practicing the standards.

05:03:15  11         Let's have Slide 149.

05:03:20  12         Apple practices the LTE standard.  Its experts,

05:03:29  13   who've testified 24 times on behalf of Apple, played word

05:03:32  14   games.  Mr. Rodermund admitted it.  That's why Ms. Dwyer's

05:03:36  15   testimony is so important.  They practice the standard.

05:03:40  16         Ms. Dwyer has established that the patents are

05:03:41  17   essential to the standard.  Mr. Blevins has admitted that

05:03:44  18   these specific elements that these patents cover are,

05:03:48  19   quote, necessary for communications.  That's why

05:03:52  20   Ms. Dwyer's testimony is so important.  It's why it's an

05:03:55  21   independent basis to find infringement.

05:03:57  22         Let's go to Slide 32, Mr. Huynh.

05:03:59  23         We're going to talk about the '774 just briefly.

05:04:07  24         Slide 36.

05:04:09  25         Jonathan Wells testified under oath, I'm not a

05:04:17  1  source code guy.  Why would they present someone as an

05:04:20  2  expert witness to you who's, quote, not a source code guy?

05:04:24  3        The reason is because the source code shows

REDACTED BY ORDER OF THE COURT

05:04:29  4  ████████████████████████  ████████████████████████████

05:04:33  5  ██████████████  ███████████████████████  ████████████████

05:04:40  6  ██████████████████████████████████████████████████████████

05:04:42  7  ██████

05:04:44  8        Why aren't they showing you the source code?  Why

05:04:47  9  aren't they showing you the actual technical documents?

05:04:51  10  It's because there is no meaningful defense to

05:04:54  11  infringement.

05:04:55  12        Let's go to the '833 patent -- '332 patent.  Can

05:05:02  13  we have Slide 41, Mr. Huynh.

05:05:05  14        A shift is different from a divide.  A shift is

05:05:08  15  different from a divide.  That is only true in one universe

05:05:12  16  of Apple's lawyers.  Even their own experts who testified

05:05:17  17  time and time and time for Apple could not defend what is

05:05:22  18  frankly an absurd position.  A shift is a divide.

05:05:30  19        Apple didn't invent anything new.  We know that.

05:05:33  20  There's no Apple patent on their new way of dividing.  It

05:05:36  21  doesn't exist.

05:05:36  22        Let's go to Slide 46, Mr. Huynh.

05:05:42  23        The column-by-column analysis of the '883 [sic]

05:05:49  24  patent.

05:05:49  25        Let's go to Slide 53.

05:05:51   1          Mr. Wells took such extreme positions that he --
05:06:02   2   he claimed that Qualcomm's own processor doesn't work the
05:06:07   3   way their internal documents say.
05:06:11   4          One of the most powerful tools that you have
05:06:14   5   available to yourselves is common sense.  It's actually in
05:06:18   6   the Judge's instructions to you, that you are empowered to
05:06:23   7   use common sense.  Think about it.
05:06:25   8          They paid some guy to come here and tell you that
05:06:27   9   Qualcomm chips don't work the way Qualcomm's documents say
05:06:31  10   they work.  Is there any common sense associated with that?
05:06:37  11          Why does he say it?  Because he's not a source
05:06:43  12   code guy.
05:06:44  13          Let's go to Slide 86.
05:06:49  14          I'm particularly disturbed by this slide that was
05:06:52  15   shown to you in which Dr. Madisetti is distinguishing
05:06:55  16   between -- they claim Dr. Madisetti is distinguishing
05:06:58  17   between row-by-row and column-by-column mapping.
05:07:01  18          The reason why I'm disturbed by it is because they
05:07:06  19   cut off the first half of his testimony where he was
05:07:08  20   saying -- he was explaining what Dr. Wells's position was.
05:07:14  21          This type of gamesmanship, we don't know what you
05:07:17  22   mean by practice, cutting off experts' answers halfway
05:07:21  23   through their questioning.  It's an insult.  It's an insult
05:07:26  24   to Professor Madisetti, and it's an insult to this process.
05:07:30  25          Let's go to the '284 patent -- sorry, the '557

05:07:35   1   patent, Slide 70.

05:07:36   2          This idea that you can't create individual

05:07:47   3   sequences is nothing more than Apple trying to write

05:07:51   4   language into the claims.  It has no connection to the

05:07:54   5   claim language, and it has no connection to the

05:07:56   6   specification.  The specification expressly states --

05:08:03   7   expressly states that you can create sequences one at a

05:08:06   8   time.

05:08:06   9          In fact, the specification shows this process of

05:08:13  10   using codes to create sequences one at a time.

05:08:18  11          Let's go to Slide 73.

05:08:22  12          Why are we talking about this Innography database?

05:08:31  13   It's because it's Apple's.  It's because they pay money to

05:08:35  14   use it.  And now they're trying to throw shade at it.  It's

05:08:42  15   their database.  They accessed it in 2018.  And it shows

05:08:48  16   millions and millions of these patents, how high the score

05:08:51  17   is.  This isn't our database.  It's not Ms. Dwyer's

05:08:54  18   database.  It's their database.

05:08:56  19          Use your common sense.  If this wasn't powerful

05:08:58  20   evidence, why would Apple -- a company like Apple use the

05:09:02  21   database?

05:09:03  22          They use the database because it's a good

05:09:07  23   database.  And the database shows that these patents are

05:09:11  24   incredibly important.  And for them to get up here and

05:09:15  25   throw shade at their own documents, their own internal

05:09:19   1   processors, is an insult to this process.

05:09:21   2          Let's go to Slide 76.

05:09:23   3          Apple has a plan.  It's a plan they use with

05:09:33   4   companies that hold standard essential patents.  Qualcomm

05:09:36   5   said:  We have 20 patents, look at them, Apple.  Apple

05:09:41   6   said:  We don't infringe them.  Apple turned to them, just

05:09:44   7   like Mr. Blevins turned to you, and say:  We do not

05:09:48   8   infringe these patents, trust us.

05:09:50   9          During those years and years of disputes, Apple

05:09:53  10   could delay paying Qualcomm what is owed to it.  And what

05:09:59  11   happened in the end?  This slide shows what happened in the

05:10:02  12   end.  Apple made a massive payment because when Apple says

05:10:06  13   they don't infringe, it's part of a plan.  It's part of a

05:10:10  14   game to delay.

05:10:14  15          Dr. Kennedy -- Mr. -- Mr. Kennedy testified to it

05:10:19  16   expressly.  Their plan is to delay payments.  Their plan is

05:10:24  17   to delay as long as possible the consequences of their

05:10:26  18   actions.

05:10:29  19          Mr. Blasius testified that 60 percent -- over 60

05:10:35  20   percent of the worldwide market has licensed our patents.

05:10:42  21   Mr. Blasius, who is not an engineer but cared so deeply

05:10:44  22   about this case, that he sat and had Professors Mahon and

05:10:51  23   Professor Madisetti teach him the technology so that he can

05:10:54  24   understand it, and Apple is insulting him because he could

05:10:59  25   not read it himself, and he needed help.

05:11:00  1        He testified he spent 24 hours learning this
05:11:03  2    technology, and he explained to you what its purpose was,
05:11:07  3    because he cared so deeply.
05:11:10  4        Apple's claim that the industry is not licensed to
05:11:12  5    this technology, LG, Samsung, ZTE, HTC, Huawei, they're all
05:11:18  6    licensed.  The one who is not licensed is Apple.
05:11:24  7        And the suggestion that there's no plan to destroy
05:11:28  8    our business, we asked Mr. Blevins a very simple question:
05:11:34  9    If you have a business and your customer takes your
05:11:38  10   products or takes your labor and then doesn't pay 50
05:11:41  11   percent of the time, what happens to your business?  You go
05:11:45  12   bankrupt.
05:11:49  13       Apple's tactic of delay and fight and fight and
05:11:52  14   fight is designed to destroy our business because this is
05:11:56  15   what our business is, to protect the innovations of LG,
05:12:01  16   Samsung, and Panasonic.
05:12:02  17       Can I have Slide 70 -- can I have Slide 87?
05:12:16  18       Apple doesn't even have the courtesy or the
05:12:18  19   respect for this process to go through an
05:12:21  20   element-by-element analysis to present its invalidity
05:12:24  21   claims.  Who does?  The people who don't even have the
05:12:29  22   burden.  Professor Madisetti and Professor Mahon spent time
05:12:33  23   pointing out to you each limitation that was not present in
05:12:38  24   the claims.  They did it because they care, and they're
05:12:41  25   committed to this process.

05:12:43   1          Apple paid three experts to come, and they didn't

05:12:46   2   even have enough respect for the process of pointing out

05:12:49   3   where each limitation was.

05:12:51   4          Let's go to Slide 90, Mr. Huynh.

05:12:57   5          THE COURT:  You have 10 minutes remaining.

05:13:01   6          MR. SHEASBY:  There is only one expert in this

05:13:05   7   case who has any experience with licensing.  That's

05:13:10   8   Mr. Kennedy.  Why does that matter?  It's because it's a

05:13:13   9   hypothetical negotiation.  It's a license negotiation.

05:13:19   10         Dr. Kennedy [sic] is a fine economics professor,

05:13:22   11  but he is not a license negotiator.  He is not a survey

05:13:26   12  expert.  Apple failed him.  Apple didn't give him any of

05:13:30   13  the tools that you need to conduct a license analysis.

05:13:36   14  They didn't give him any technical analysis.  They didn't

05:13:39   15  give him any licensing expertise.  They didn't give him any

05:13:43   16  survey expertise.  They failed him.  Why?  Because of a

05:13:48   17  lack of respect for the process.

05:13:50   18         Let's go to Slide 92, Mr. Huynh.

05:14:01   19         You will see in Judge's instructions the express

05:14:07   20  reference to the Georgia-Pacific factors.  These are the

05:14:10   21  factors to consider for damages.  These are the factors

05:14:12   22  that Dr. Perryman utterly ignored.  Let me give you an

05:14:19   23  example.

05:14:19   24         Factors 1 and 2, the rates paid by licensees for

05:14:24   25  the use of other patents.  Mr. Kennedy, the only license

| | | |
|---|---|---|
| 05:14:29 | 1 | expert, pointed out that Apple had done a very comparable |

REDACTED BY ORDER OF THE COURT

| | | |
|---|---|---|
| 05:14:32 | 2 | |
| 05:14:36 | 3 | |
| 05:14:43 | 4 | |
| 05:14:48 | 5 | |
| 05:14:52 | 6 | |
| 05:14:54 | 7 | |
| 05:14:59 | 8 | |
| 05:15:05 | 9 | |
| 05:15:06 | 10 | |
| 05:15:09 | 11 | |
| 05:15:16 | 12 | |
| 05:15:16 | 13 | If you follow the Georgia-Pacific factors, if you |
| 05:15:25 | 14 | follow the instructions of His Honor, there is only one |
| 05:15:32 | 15 | conclusion on damages. |
| 05:15:32 | 16 | Can we have Slide -- |
| 05:15:34 | 17 | Apple said -- they never told you who benefitted |
| 05:15:37 | 18 | from this case.  But, of course, we did.  Mr. Blasius said |
| 05:15:41 | 19 | expressly under oath that a substantial portion of the |
| 05:15:44 | 20 | revenues are returned to LG, Panasonic -- he said that |
| 05:15:51 | 21 | under oath and expressly. |
| 05:15:54 | 22 | And why are the revenues returned to them, because |
| 05:15:56 | 23 | in 2008, the year when Apple was still selling a 2G iPhone, |
| 05:16:07 | 24 | Samsung, Panasonic, and LG collectively invested |
| 05:16:13 | 25 | $14 billion in R&D research that led to the LTE standard. |

05:16:15   1         Now, the question you really should ask is, who

05:16:18   2    benefits if Apple gets away with this?  That's what we've

05:16:22   3    never heard about.

05:16:23   4         Let's go to Slide 102, please.

05:16:30   5         Professors Madisetti and Mahon presented a

05:16:38   6    detailed technical analysis of the performance benefits of

05:16:41   7    these patents.  It's the only technical analysis in the

05:16:46   8    record.

05:16:47   9         Apple's experts were utterly silent.  And they

05:16:50   10   could have analyzed the benefits of the feature that is

05:16:54   11   accused of infringement over what came before.  Even

05:16:58   12   without conceding whether it was infringing, they could

05:17:00   13   have done that analysis, and they didn't.

05:17:04   14        Why didn't they do it?  Why didn't they respect

05:17:07   15   this process?

05:17:08   16        Can I have Slide 106, Mr. Huynh?

05:17:12   17        Apple sold over a hundred million devices solely

05:17:19   18   during this infringement period.  That works out to a

05:17:24   19   damages number -- in fact, Apple benefitted $8.00 per

05:17:30   20   iPhone under both of the methodologies presented by

05:17:33   21   Mr. Kennedy, solely from its infringement.  That's what its

05:17:36   22   profits was, solely from -- from infringement.

05:17:40   23        Let's go to Slide 109.

05:17:41   24        We sat through a week of trial for Apple to try to

05:17:52   25   convince us that people don't care about the speed of their

05:17:55  1   service, that people don't care about the speed of their

05:17:55  2   phones.

05:17:56  3          If you walk into an Apple store, they charge you

05:18:00  4   130 bucks for cellular.  And yet we had to sit through a

05:18:03  5   week of people trying to tell us that we don't care about

05:18:07  6   LTE; we don't care about speed.  That has no connection to

05:18:07  7   reality.

05:18:12  8          And the reason why I can say "we" is because a

05:18:12  9   survey of 1400 people was done by Dr. Reed-Arthurs that

05:18:16  10  establishes that fact.

05:18:21  11         Where is the survey from Apple?  Where is the

05:18:23  12  respect?

05:18:24  13         Let's go to Slide 111.

05:18:29  14         This is Mr. Perryman admitting that he did no

05:18:34  15  Georgia-Pacific analysis.

05:18:34  16         Let's go to Slide 114.

05:18:37  17         This is what the only evidence in the record

05:18:43  18  shows.  Performance benefit of 24 percent.  A profit per

05:18:51  19  iPhone that Apple makes of $8.00.  And overall,

05:18:56  20  $868 million in profits from just over a year of

05:19:01  21  infringement.

05:19:01  22         THE COURT:  Four minutes remaining.

05:19:03  23         MR. SHEASBY:  Let's go to Slide 117 -- actually,

05:19:11  24  let's go to Slide 120.

05:19:13  25         This is what we respectfully request that the jury

05:19:15  1   returns.  As to -- was there at least one claim of all

05:19:21  2   these patents that were infringed?  We respectfully request

05:19:25  3   an answer of "yes."

05:19:27  4        Did Apple prove by clear and convincing evidence?

05:19:30  5   Now, this is the opposite question.  For this, the answer

05:19:34  6   is "no," Apple did not meet its heavy burden of proof.  It

05:19:39  7   didn't come close to meeting its heavy burden of proof.

05:19:42  8        Three, is there evidence of willfulness?  We

05:19:44  9   respectfully submit that there is overwhelming evidence of

05:19:48 10   willfulness.

05:19:48 11        And, four, what's the amount of damages?  The only

05:19:52 12   number that is in the record.  The Judge's instructions are

05:19:57 13   clear.  Mr. -- Dr. Perryman's analysis did not follow the

05:20:01 14   rules.  This is the only number in the record.

05:20:05 15        And whether it was a lump sum or a royalty for

05:20:09 16   past sales, we request the exact same treatment that was

05:20:13 17   REDACTED BY ORDER OF THE COURT

05:20:21 18   Qualcomm received and a running royalty of $7.50 in the

05:20:26 19   future.  We request only a royalty for past sales so that

05:20:29 20   we can be treated exactly the same as Qualcomm only for

05:20:33 21   past damages.

05:20:34 22        So when I graduated from law school, the president

05:20:40 23   of the university gives a speech, and part of the speech is

05:20:46 24   given every year to every class.  And it's be given -- it's

05:20:51 25   been given since 1938.  And he says something to the effect

05:20:56  1   that rules are what makes us free, which was a funny thing

05:21:01  2   when I first heard it, that rules make us free.  But they

05:21:04  3   do, right?  Rules protect our property.  Rules protect our

05:21:09  4   businesses.  Rules protect our families.

05:21:10  5        Apple has made an art of not following the rules.

05:21:20  6   In 2008, when LG, Panasonic, and Samsung were investing

05:21:25  7   $14 billion in building LTE and other technologies, Apple

05:21:30  8   was doing nothing.  They just took LTE technology without

05:21:35  9   performing any investigation.

05:21:36 10        In 2017, Apple did nothing when it was approached

05:21:40 11   by PanOptis.  It did no independent investigation.

05:21:46 12   Mr. Blevins testified that he'd only received the patents a

05:21:49 13   few weeks before his deposition.  No survey evidence, not a

05:21:55 14   single line of source code or technical document shown to

05:21:59 15   you in closing.  No Georgia-Pacific analysis.  No analysis

05:22:05 16   performance.

05:22:08 17        What's the purpose of this?  The purpose is to

05:22:12 18   delay payments for as long as possible.

05:22:13 19        The right to a trial by jury is not just

05:22:17 20   PanOptis's right.  It's not Apple's right.  It's your

05:22:20 21   right.  When you were picked for this jury, you may have

05:22:24 22   said, why me?  The answer is, because it's always been you.

05:22:28 23   That's what the founders wanted.  It's you who make

05:22:31 24   important decisions.  And for as long as this republic

05:22:35 25   exists, it will be you who makes these decisions.

05:22:39   1          Ladies and gentlemen of the jury, this case,

05:22:43   2   responsibility, is in your hands.

05:22:45   3          Thank you.

05:22:45   4          THE COURT:  All right.  Ladies and gentlemen, I'd

05:22:53   5   like to now give you a few final instructions before you

05:22:57   6   retire to the jury room and begin your deliberations.

05:23:01   7          You must perform your duty as jurors without bias

05:23:04   8   or prejudice as to any party.  The law does not permit you

05:23:08   9   to be controlled by sympathy, prejudice, or public opinion.

05:23:13  10          All parties expect that you will carefully and

05:23:15  11   impartially consider all the evidence, follow the law as I

05:23:20  12   have given it to you, and reach a just verdict, regardless

05:23:24  13   of the consequences.

05:23:28  14          Answer each question in the verdict form from the

05:23:31  15   facts as you find them to be, following the instructions

05:23:35  16   that the Court has given you about the law.  Again, do not

05:23:39  17   decide who you think should win the case and then answer

05:23:42  18   the questions accordingly.

05:23:45  19          I remind you, ladies and gentlemen, your answers

05:23:48  20   and your verdict in this case must be unanimous.

05:23:52  21          You should consider and decide this case as a

05:23:56  22   dispute between persons of equal standing in the community,

05:24:00  23   of equal worth, and holding the same or similar stations in

05:24:06  24   life.  This is true in patent cases between corporations,

05:24:12  25   partnerships, other business entities and individuals.

05:24:16  1        A patent owner is entitled to protect his rights

05:24:19  2   under the laws of the United States, and that includes

05:24:20  3   bringing a lawsuit in a United States District Court for

05:24:23  4   money damages based on allegations of infringement.

05:24:26  5        The law recognizes no distinction among types of

05:24:32  6   parties.  All corporations, partnerships, other

05:24:38  7   organizations, and individuals stand equal before the law,

05:24:39  8   regardless of their size, regardless of who owns them, and

05:24:44  9   are to be treated by you as members of this jury equally.

05:24:48  10        Throughout this trial, I've given you instructions

05:24:52  11   many, many times about not discussing anything about this

05:24:54  12   case among yourselves.  When you retire to the jury room in

05:24:57  13   a few minutes, that is going to change.

05:25:00  14        At that point, not only is it proper for you to

05:25:04  15   discuss this case among yourselves, it becomes your duty to

05:25:08  16   discuss this case among yourselves in an effort to reach

05:25:15  17   unanimous decisions to the questions in the verdict form.

05:25:19  18        As I've told you, when you retire to the jury

05:25:22  19   room, you're each going to have your own printed copy of

05:25:25  20   these jury instructions that I've given you.

05:25:29  21        If during your deliberations, you desire to review

05:25:32  22   any of the exhibits, not the demonstratives, but the

05:25:35  23   exhibits which the Court has admitted into evidence, then

05:25:38  24   you should advise me by a written note delivered to the

05:25:42  25   Court Security Officer, who will bring it to me.  And in

05:25:44  1  that event, I will send that exhibit or those exhibits to

05:25:47  2  you.

05:25:48  3         Once you retire, you should select your

05:25:52  4  foreperson, and then conduct your deliberations.

05:25:55  5         If you recess during your deliberations, follow

05:25:58  6  all the instructions the Court has given you about your

05:26:01  7  conduct during the course of the trial.

05:26:06  8         I realize that you will be retiring to deliberate

05:26:08  9  after 5:00 p.m. on this evening.  Whether you wish to stay

05:26:13  10  and work later tonight is up to you.  Whether you wish to

05:26:17  11  start over in the morning with a fresh start about 8:30 is

05:26:21  12  up to you.  I expect that Ms. Clendening will check with

05:26:24  13  you shortly after you retire and see what your wishes are.

05:26:28  14         After you have reached a unanimous verdict, your

05:26:34  15  foreperson is to fill out the answers to those questions in

05:26:38  16  the verdict form reflecting your unanimous answers.

05:26:42  17         You are not to reveal your answers until such time

05:26:45  18  as you're discharged unless otherwise directed by me, and

05:26:52  19  you're never to disclose to anyone, not even to me, your

05:26:56  20  numerical division on any question.

05:26:58  21         Any notes that you've taken over the course of the

05:27:00  22  trial are aids to your memory only.  If your memory should

05:27:04  23  differ from your notes, then rely on your memory and not

05:27:08  24  your notes.  The notes are not evidence, ladies and

05:27:11  25  gentlemen, and a juror who has not taken notes should rely

05:27:14   1   on his or her -- his or her own independent recollection

05:27:18   2   and not be unduly influenced by the notes of other jurors.

05:27:22   3   Notes are not entitled to any greater weight than the

05:27:25   4   recollection or impression of each juror about the

05:27:28   5   testimony.

05:27:29   6          If you want to communicate with me at any time

05:27:33   7   during your deliberations, you should give a written

05:27:36   8   message or question to the Court Security Officer, written

05:27:41   9   and signed by your foreperson.

05:27:44   10          The Court Security Officer will then bring it to

05:27:46   11   me.  And I will respond to you as promptly as possible,

05:27:50   12   although, I will tell you, it almost always takes me some

05:27:53   13   time to respond.

05:27:55   14          And I will respond to you either in writing or by

05:27:58   15   having you brought back into the courtroom where I can

05:28:01   16   address you orally.  I will always first disclose to the

05:28:05   17   attorneys in the case your question and my intended

05:28:09   18   response before I answer any question you might send me.

05:28:12   19          After you've reached a verdict and I have

05:28:16   20   discharged you from your duty as jurors in this case, I

05:28:20   21   want you to understand you are not obligated to talk with

05:28:24   22   anyone about your service in the case, but by the same

05:28:29   23   token, once I have discharged you, then you are free, if

05:28:33   24   you choose to, to discuss your service in this case with

05:28:36   25   anyone that you might like to.  That choice at that time,

05:28:39  1  ladies and gentlemen, will be yours and yours alone.

05:28:41  2       I'm now going to hand eight printed copies of

05:28:45  3  these final jury instructions and one clean copy of the

05:28:48  4  verdict form to the Court Security Officer to deliver to

05:28:51  5  you in the jury room.

05:28:53  6       Ladies and gentlemen of the jury, you may now

05:29:01  7  retire to the jury room to deliberate.  We await your

05:29:04  8  verdict.

05:29:05  9       COURT SECURITY OFFICER:  All rise.

05:29:07 10       (Jury out.)

05:29:31 11       THE COURT:  Please be seated.

05:29:32 12       Counsel, I do not intend at 5:30 p.m. to start the

05:29:41 13  bench trial this evening.  I plan to start tomorrow morning

05:29:44 14  at 8:30 sharp.  You've been allotted three hours to each --

05:29:50 15  for each side to put on your evidence for the bench trial.

05:29:53 16       If you wish to reserve any portion of that for a

05:29:57 17  closing argument to me, you need to let me know first thing

05:30:01 18  in the morning.

05:30:02 19       I suspect that Ms. -- I suspect that

05:30:06 20  Ms. Clendening will check with the jury shortly and ask

05:30:10 21  whether they want her to order dinner for them and whether

05:30:14 22  they intend to stay and deliberate tonight or whether

05:30:17 23  they're going to opt to come back and start in the morning.

05:30:21 24       You're welcomed to stay and wait until we have

05:30:23 25  some idea whether the jury is going to continue to

05:30:27   1   deliberate or recess for the evening.  Whether they recess

05:30:31   2   for the evening or not, it's clear that the deliberations

05:30:33   3   are going to continue into tomorrow.

05:30:35   4       While the jury is deliberating and while we're not

05:30:38   5   in the bench trial, you're free to wait here in the

05:30:42   6   courtroom.

05:30:43   7       You're also free to wait in your respective

05:30:46   8   locations outside of the courthouse, but if you choose not

05:30:49   9   to be here in the courtroom where I can find you in the

05:30:52  10   event there is a note or a question from the jury, then you

05:30:56  11   should make sure my law clerks have a working cell phone

05:31:01  12   number for each trial team where you can be reached and you

05:31:04  13   can quickly return to the courtroom if I need you.

05:31:07  14       Are there any questions from either Plaintiff or

05:31:10  15   Defendant at this juncture?

05:31:11  16       MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

05:31:12  17       THE COURT:  Anything from Defendant?

05:31:13  18       MR. MUELLER:  No, Your Honor.

05:31:15  19       THE COURT:  All right.  Awaiting either a note or

05:31:17  20   a verdict from the jury and anticipating a start of the

05:31:21  21   bench trial tomorrow morning, we stand in recess.

05:31:24  22       COURT SECURITY OFFICER:  All rise.

05:31:28  23       MR. SHEASBY:  Thank you, Your Honor.

05:31:29  24       (Recess.)

          25

CERTIFICATION

1

2

3        I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes            8/10/2020
     SHELLY HOLMES, CSR, TCRR              Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25