REDACTED BY ORDER OF THE COURT

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                    MARSHALL DIVISION

3

OPTIS WIRELESS TECHNOLOGY,      )(  CIVIL ACTION NO.
4 LLC, OPTIS CELLULAR            )(  2:19-CV-66-JRG
TECHNOLOGY, LLC, PANOPTIS       )(
5 PATENT MANAGEMENT, LLC,        )(
UNWIRED PLANET, LLC, UNWIRED    )(
6 PLANET INTERNATIONAL LIMITED,  )(
        PLAINTIFFS,              )(
7                                )(
VS.                             )(
8                                )(  MARSHALL, TEXAS
                                )(  AUGUST 11, 2020
9 APPLE INC.,                    )(  8:32 A.M.
        DEFENDANTS.              )(
10

11              TRANSCRIPT OF BENCH TRIAL

12      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13         UNITED STATES CHIEF DISTRICT JUDGE

14

APPEARANCES:
15

16 FOR THE PLAINTIFFS:

17

MR. SAMUEL F. BAXTER
18 MS. JENNIFER TRUELOVE
MCKOOL SMITH, P.C.
19 104 E. Houston Street
Suite 300
20 Marshall, TX 75670

21

MR. JASON G. SHEASBY
22 MS. ANNITA ZHONG
IRELL & MANELLA LLP
23 1800 Avenue of the Stars
Suite 900
24 Los Angeles, CA 90067

25 FOR THE PLAINTIFFS:

```
 1
    MR. STEVEN J. POLLINGER
 2  MR. SETH R. HASENOUR
    MCKOOL SMITH, P.C.
 3  300 W. 6th Street
    Suite 1700
 4  Austin, TX 78701

 5
    MR. JONATHAN YIM
 6  MCKOOL SMITH, P.C.
    One Manhattan West
 7  395 9th Avenue
    50th Floor
 8  New York, NY 10001

 9
    MR. CHRISTOPHER P. MCNETT
10  MCKOOL SMITH, P.C.
    1999 K Street, NW
11  Suite 600
    Washington, DC 20006
12

13  MS. INGRID PETERSEN
    MS. KELSEY SCHUETZ
14  IRELL & MANELLA LLP
    840 Newport Center Drive
15  Suite 400
    Newport Beach, CA 92660
16

17  FOR THE DEFENDANT:

18
    MR. MARK D. SELWYN
19  WILMER CUTLER PICKERING
    HALE & DORR, LLP
20  950 Page Mill Road
    Palo Alto, CA 94304
21

22  MR. TIMOTHY D. SYRETT
    WILMER CUTLER PICKERING
23  HALE & DORR, LLP
    60 State Street
24  Boston, MA 02109

25  FOR THE DEFENDANT:
```

```
 1
      MS. BRITTANY AMADI
 2    WILMER CUTLER PICKERING
      HALE & DORR LLP
 3    1875 Pennsylvania Avenue, NW
      Washington, DC 20006
 4


 5
      MS. MARY (MINDY) V. SOOTER
 6    WILMER CUTLER PICKERING
      HALE & DORR LLP
 7    1225 17th Street, Suite 2600
      Denver, CO 80202
 8


 9


10


11


12


13    COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
14                        United States District Court
                          Eastern District of Texas
15                        Marshall Division
                          100 E. Houston
16                        Marshall, Texas  75670
                          (903) 923-7464
17


18
      (Proceedings recorded by mechanical stenography, transcript
19    produced on a CAT system.)

20


21


22


23


24


25
```

| | | |
|---|---|---|
| 08:11:33 | 1 | P R O C E E D I N G S |
| 08:32:36 | 2 | COURT SECURITY OFFICER:  All rise. |
| 08:32:37 | 3 | THE COURT:  Be seated, please. |
| 08:46:40 | 4 | All right.  Counsel, as you're aware, the jury is |
| 08:48:19 | 5 | deliberating with regard to the jury portion of this |
| 08:48:23 | 6 | proceeding, and we will proceed with the bench trial, |
| 08:48:29 | 7 | taking up Count 8 of the Plaintiffs' last amended |
| 08:48:34 | 8 | complaint, as well as the specific equitable affirmative |
| 08:48:37 | 9 | defenses asserted by Defendant, Apple. |
| 08:48:40 | 10 | I've indicated to you that the Court would be open |
| 08:48:43 | 11 | to a very short and targeted opening statement of not more |
| 08:48:48 | 12 | than 10 minutes per side. |
| 08:48:50 | 13 | Does either party wish to offer such an opening |
| 08:48:54 | 14 | statement? |
| 08:48:54 | 15 | MR. SELWYN:  Yes, Your Honor. |
| 08:48:55 | 16 | THE COURT:  All right.  Mr. Selwyn, please proceed |
| 08:48:57 | 17 | to do so from the podium. |
| 08:48:59 | 18 | And also, it's my understanding, counsel, that you |
| 08:49:01 | 19 | have agreed that, notwithstanding arguments about burden of |
| 08:49:05 | 20 | proof, that Apple will go first with the presentation of |
| 08:49:08 | 21 | evidence during the bench trial, and Optis will go second; |
| 08:49:12 | 22 | is that correct? |
| 08:49:12 | 23 | MR. SELWYN:  That's right, Your Honor.  On -- on |
| 08:49:14 | 24 | that issue, Apple has the burden on the affirmative defense |
| 08:49:18 | 25 | of waiver. |

08:49:19  1        The parties have agreed that Apple will present

08:49:22  2   first also on the declaratory judgment claim as a matter of

08:49:28  3   convenience and efficiency without admitting who has the

08:49:31  4   burden on that particular claim of which I suspect there's

08:49:34  5   a dispute.

08:49:34  6        THE COURT:  All right.  You specifically mentioned

08:49:36  7   waiver.  Is that the only equitable defense that Apple's

08:49:41  8   affirmatively going forward on today, or are there other

08:49:44  9   equitable defenses?

08:49:46  10        MR. SELWYN:  It will be waiver alone.

08:49:48  11        THE COURT:  All right.  Any other equitable

08:49:50  12   defenses raised in the pleadings I then can consider have

08:49:54  13   been dropped, correct?

08:49:55  14        MR. SELWYN:  That's right, Your Honor.

08:49:55  15        THE COURT:  All right.  With all that, let me hear

08:49:57  16   your opening statement.

08:49:58  17        MR. SELWYN:  Good morning, Your Honor, Mark Selwyn

08:50:01  18   for Apple, along -- together with my colleagues, Mindy

08:50:05  19   Sooter, Brittany Amadi and Tim Syrett, we will be

08:50:05  20   presenting evidence today on two issues:

08:50:12  21        First, Apple's waiver claims that the

08:50:14  22   patents-in-suit are unenforceable based on the failure of

08:50:18  23   their original owners to comply with the ETSI IPR policy.

08:50:21  24        And, second, Plaintiffs' claim for declaratory

08:50:25  25   judgment that they have not violated their contractual

08:50:28    1    FRAND obligations.

08:50:28    2            I'll begin my opening statement by addressing the

08:50:32    3    first issue of unenforceability.

08:50:34    4            In its 2018 decision in Core Wireless against

08:50:38    5    Apple, the Federal Circuit provided the legal framework for

08:50:41    6    how to analyze whether the right to assert an infringement

08:50:43    7    claim based on a patent declared essential to a standard

08:50:50    8    has been waived by a patentee's failure to make timely

08:50:50    9    disclosure of IPR rights.

08:50:52   10            The applicable legal doctrine is implied waiver.

08:50:57   11    Under that legal framework, the accused infringer must

08:51:00   12    show, first, that the patentee had a duty of disclosure to

08:51:06   13    the standard-setting organization; second, there must be a

08:51:09   14    breach of that duty; and, finally, the accused infringer

08:51:13   15    must show that the late disclosure resulted in unjust

08:51:14   16    benefit or that egregious conduct was involved.

08:51:16   17            Here we will show that these requirements are met

08:51:19   18    based on facts that closely mirror those at issue in Core

08:51:23   19    Wireless.

08:51:23   20            Our expert on the subject of the ETSI IPR policy

08:51:26   21    is Friedholm Rodermund, who will testify by video from

08:51:30   22    Brussels.  Mr. Rodermund has more than two decades of

08:51:34   23    experience with ETSI and at 3GPP.

08:51:37   24            Since 2017, he has been a member of the ETSI IPR

08:51:41   25    special committee, which is responsible for the ETSI IPR

08:51:44  1   policy.

08:51:45  2         Mr. Rodermund will explain that the source for an

08:51:50  3   ETSI member's duty of disclosure is Section 4.1 of the

08:51:54  4   ETSI -- ETSI IPR policy, which is on the screen, and states

08:51:57  5   that an ETSI member, quote, submitting a technical proposal

08:52:01  6   for a standard or a technical specification shall, on a

08:52:05  7   bona fide basis, draw the attention of ETSI to any of that

08:52:11  8   member's IPR which might be essential if that proposal is

08:52:14  9   adopted.

08:52:14  10        And in Core Wireless, the Federal Circuit examined

08:52:17  11  the same IPR policy that is at issue here under similar

08:52:22  12  circumstances, and held there is a bright-line duty on the

08:52:25  13  part of parties making technical proposals to ETSI, and

08:52:28  14  that bright-line duty requires ETSI members to disclose any

08:52:33  15  applicable intellectual property, including patent

08:52:35  16  applications, before the relevant section of the standard

08:52:39  17  is adopted.  That's the identical contractual duty as is at

08:52:43  18  issue here.

08:52:44  19        The evidence will show that the owners of the five

08:52:47  20  asserted patents breached that obligation.  They filed

08:52:51  21  patent applications, they made proposals to ETSI, and then

08:52:53  22  they failed to timely disclose their intellectual property

08:52:57  23  rights to ETSI in accordance with the ETSI IPR policy.

08:53:02  24        These facts are largely not in dispute.  Indeed,

08:53:05  25  Plaintiffs put much of this evidence before the jury last

08:53:08  1  week in an effort to support their own infringement claims.

08:53:12  2       As this chart shows, for all the patents-in-suit,

08:53:16  3  the original owners not only failed to disclose their IP

08:53:20  4  rights when they made their technical proposals, but they

08:53:24  5  failed to disclose their patent rights at all until after

08:53:26  6  the freeze date for the standard.

08:53:28  7       And only then did the patent owners declare the

08:53:31  8  patents as essential, and Plaintiffs relied last week on

08:53:35  9  the same claims of essentiality in an attempt to prove

08:53:39  10  infringement.

08:53:40  11       That brings us to the final step in the implied

08:53:44  12  waiver analysis which determine whether the patentee's

08:53:47  13  breach of the duty of disclosure resulted in an unjust

08:53:50  14  benefit to the patentee or to a subsequent owner of the

08:53:53  15  patent or, alternatively, whether the patentee's misconduct

08:53:56  16  was sufficiently egregious to justify a finding of

08:54:01  17  unenforceability.

08:54:02  18       As this timeline shows, the length of time the

08:54:06  19  original owners delayed before disclosing their patents was

08:54:09  20  egregious.  But we will show that for each patent-in-suit,

08:54:12  21  both the original owner and the Plaintiffs obtained a

08:54:15  22  substantial unjust benefit.

08:54:17  23       In particular, they were able to obtain fees from

08:54:20  24  licensing or revenue from the sale of the patents that they

08:54:23  25  would have been unable to obtain had the patents not been

08:54:27   1   purportedly standard essential.

08:54:28   2          To give the Court just one example, and we'll see

08:54:31   3   many more, one of the provisional applications to which the

08:54:35   4   '774 patent claims priority expressly provided that if

08:54:38   5   Samsung's technology, quote, is adopted in the standards,

08:54:43   6   Samsung will benefit from collecting royalty and/or

08:54:47   7   cross-licensing from the patent.

08:54:47   8          The original owners and the Plaintiffs took

08:54:50   9   deliberate steps to tout the purported essentiality of the

08:54:53  10   patents as a way to promote their value.  Indeed, the

08:54:57  11   Plaintiffs did that constantly throughout the jury trial.

08:55:00  12          Accordingly, for all the patents-in-suit, the

08:55:03  13   evidence is overwhelming that the original owners both

08:55:07  14   breached their duty of disclosure and obtained an unjust

08:55:10  15   benefit.

08:55:10  16          I'll turn now to Count 8 of the complaint.

08:55:14  17          PanOptis argues that it met its FRAND obligations

08:55:18  18   to Apple or apparently an alternative that it may revoke

08:55:22  19   its FRAND obligations due to Apple's conduct during license

08:55:26  20   negotiations.

08:55:26  21          The evidence will show that PanOptis did not meet

08:55:28  22   its FRAND obligations and that its licensing proposals were

08:55:33  23   unreasonable under any standard.

08:55:34  24          Further, PanOptis cannot satisfy its burden of

08:55:40  25   showing that Apple's conduct somehow entitled PanOptis to

08:55:40   1   revoke its FRAND obligation.

08:55:43   2          The FRAND commitment is expressly irrevocable, and

08:55:47   3   PanOptis can point to no legal theory that allows it now to

08:55:50   4   revoke an irrevocable commitment.

08:55:55   5          PanOptis first approached Apple about licensing

08:55:57   6   the Optis patent, the Optis Wireless, Optis Cellular, and

08:56:02   7   Unwired Planet portfolios in January of 2017.

08:56:05   8          Apple responded within days, negotiated and

08:56:08   9   entered into an NDA, and began discussions with PanOptis.

08:56:11   10          As you will hear shortly from Heather Mewes, the

08:56:13   11   Apple licensing attorney who led the negotiations

08:56:16   12   throughout, PanOptis did not provide FRAND offers.  Whereas

08:56:21   13   as Apple's engagement with PanOptis was consistent, it was

08:56:26   14   dedicated, and it was sincere.

08:56:28   15          Apple had dozens of communications with PanOptis

08:56:31   16   over this period, including many in-person meetings.  Apple

08:56:34   17   tried to reach a deal and was open and transparent with

08:56:38   18   PanOptis.

08:56:38   19          Apple provided detailed written explanations to

08:56:41   20   PanOptis about how Apple approached the determination of

08:56:44   21   the royalty and why its proposals were consistent with

08:56:49   22   FRAND.

08:56:50   23          And Apple pursued licensing discussions with

08:56:52   24   PanOptis with the same seriousness, with the same intensity

08:56:55   25   that Apple pursued discussions over the same period of time

08:56:59   1   with multiple other parties, including LG Electronics,

08:57:03   2   which is one of the prior owners of many of the patents in

08:57:06   3   the Plaintiffs' portfolio.

08:57:08   4        Apple's discussions with those other parties

08:57:11   5   resulted in completed portfolio license agreements.  Its

08:57:13   6   discussions with PanOptis, however, did not.

08:57:15   7        So why were Apple's simultaneous discussions with

08:57:19   8   sophisticated parties like LG Electronics successful, while

08:57:24   9   its discussions with PanOptis were not?  Well, the answer,

08:57:26   10  Your Honor, is that PanOptis pursued an inflexible

08:57:30   11  licensing approach that deviated sharply from FRAND.

08:57:33   12  PanOptis's approach has no support in U.S. law, and

08:57:37   13  PanOptis acknowledges that.

08:57:40   14       PanOptis demanded a royalty and claimed to base

08:57:43   15  its royalty methodology on Justice Birss's decision in the

08:57:49   16  UK in Unwired Planet against Huawei which applied UK law to

08:57:49   17  patents different from those at issue here.

08:57:56   18       And when Apple asked how PanOptis had applied that

08:58:01   19  decision to reach its numbers, PanOptis would not or could

08:58:04   20  not say that was not reasonable.

08:58:06   21       PanOptis made three different formal licensing

08:58:08   22  offers to Apple, and each time PanOptis increased its

08:58:13   23  offer.  Its second offer was nearly 50 percent higher than

08:58:17   24  its first.  Its third offer was nearly a hundred percent

08:58:21   25  higher than its second.

08:58:22   1         You cannot satisfy FRAND by making a proposal that
08:58:26   2   is not FRAND and then making subsequent proposals that are
08:58:29   3   even less grounded in FRAND principles.  None of PanOptis's
08:58:33   4   demands was anywhere near what Apple has paid for
08:58:38   5   license-declared SEPs.
08:58:39   6         You'll hear shortly from Dr. Perryman.  He will
08:58:43   7   explain how PanOptis's last demand to Apple was
08:58:47   8   substantially more than Apple has paid other sophisticated
08:58:51   9   licensors.
08:58:52  10         In other words, PanOptis sought from Apple an
08:58:54  11   amount far, far higher per unit for far, far fewer patents
08:59:00  12   than Apple has successfully licensed from others, including
08:59:02  13   the prior owners of the patents-in-suit.
08:59:04  14         The fact is that Apple made a licensing proposal
08:59:09  15   that was, if anything, far more generous than the royalty
08:59:13  16   rates that Apple has successfully negotiated with other
08:59:17  17   parties contemporaneous with negotiations with PanOptis.
08:59:20  18   And you will hear shortly, and we'll close the courtroom --
08:59:23  19   or ask to close the courtroom for what Apple's offer was.
08:59:27  20         And it was an amount that was at least comparable
08:59:30  21   to, if not higher than, licenses that Apple has entered
08:59:34  22   contemporaneously with other SEP licensors.  That was good
08:59:38  23   faith.
08:59:39  24         And in multiple letters Apple provided detail both
08:59:43  25   as to the legal basis under U.S. law and the math.  That

08:59:47   1   was good faith.  And it cannot become bad faith simply

08:59:52   2   because PanOptis rejected it.

08:59:54   3           So nothing about PanOptis's conduct suggests it

08:59:57   4   was negotiating in good faith under FRAND.

08:59:59   5           It purported to model its licensing demand on a UK

09:00:03   6   decision without regard to U.S. law.  It made demands that

09:00:07   7   it could not justify or did not try to justify even under

09:00:10   8   its own licenses.  And instead of trying to compromise, it

09:00:14   9   kept increasing its demand, moving farther and farther from

09:00:18   10  anything that could be considered FRAND.

09:00:21   11          Those are hallmarks, Your Honor, of a lack of

09:00:24   12  reasonableness.

09:00:25   13          Thank you.

09:00:25   14          THE COURT:  Does Optis have a similar opening

09:00:31   15  statement to make?

09:00:31   16          MR. SHEASBY:  Yes, Your Honor.

09:00:32   17          THE COURT:  Please proceed.

09:00:33   18          MR. SHEASBY:  May it please the Court.

09:00:36   19          One of the most striking aspects of our legal

09:00:47   20  profession is the malleability of lawyer's positions.

09:00:55   21          In Apple's original verified interrogatory

09:00:58   22  response, they said the end date for disclosures relating

09:01:03   23  to Release 8, which is the Release at issue, was 3/12/2019.

09:01:08   24  And they said everything after that disclosure was late.

09:01:14   25          And we don't agree with that, but that's what's in

| | |
|---|---|
| 09:01:16 | 1 |
| 09:01:18 | 2 |

a verified interrogatory response that they presented in
this case.

When we pointed out to them that that means they
have no waiver argument whatsoever on three of the five
patents, they did something that I've actually never seen
in my career.  They just changed the date of what should be
the end date for disclosure.

A verified interrogatory response, under oath, had
the end date at 3/12/2009 [sic].  When we pointed out to
them what the consequences were that -- for that defense,
they just changed the end date.  It is as if a verification
and a statement under oath has no meaning whatsoever in
this court.

The reality is, is that Apple complied -- the
reality is that PanOptis complied with the -- all the
obligations presented by the industry.

Under Apple's theory of the deadline, Apple and
most of the industry was late over 90 percent of the time.

The course of dealing, the custom in the industry
has interpreted the ETSI obligation to make clear that
Apple's interpretation of what is required has no
connection to reality.

Contracts, in the course of dealing and custom
associated with those contracts, is a powerful tool under
French law to interpret obligations.  This is a contract

09:02:47  1  under French law.

09:02:48  2          Professor Borghetti is the only French law expert

09:02:51  3  who has presented an analysis to this issue and has

09:02:55  4  presented to Your Honor the fact that this information is

09:02:57  5  powerful, powerful information about how the contract

09:03:00  6  should be construed.

09:03:01  7          This is not information that was present before

09:03:04  8  the Court in Core Wireless.  This is not information or

09:03:08  9  evidence that was ever considered.

09:03:09  10         Apple's own conduct renders it impossible for it

09:03:16  11  to show a -- a waiver in this case.  And the reason for

09:03:20  12  that is that we have -- we will establish factually that

09:03:25  13  Apple has consistently not complied with its own standard

09:03:29  14  of practices presented in this case in actual events.

09:03:33  15         If -- if Apple's interpretation of the contract

09:03:36  16  is, in fact, correct, Apple is right now asserting and

09:03:40  17  licensing patents that are unenforceable, rendering itself

09:03:45  18  unclean and unable to accept equity in this case.

09:03:48  19         And the last point is that a distinction needs to

09:03:52  20  be drawn between a benefit and an inequitable benefit or

09:03:56  21  egregious conduct.  And what's remarkable is that counsel

09:04:00  22  seemed to -- seemed to think that the mere fact that a

09:04:02  23  royalty was -- could be obtained in a patent was egregious

09:04:05  24  misconduct or an inequitable benefit.

09:04:09  25         But the record will show that there was no

09:04:11  1  material other alternative to the patents-in-suit that were

09:04:13  2  provided the same performance and that would have been

09:04:16  3  acceptable to the industry.  And -- and the record will

09:04:19  4  also show that industry does not make decisions based on

09:04:22  5  IPR.

09:04:23  6          And as a result of that, there is no inequitable

09:04:27  7  benefit.

09:04:27  8          I now want to turn to the Count 8.  And the large

09:04:37  9  portion of Apple's opening was spent discussing how

09:04:45  10 PanOptis's offers were not FRAND.

09:04:48  11         Well, the ship has sailed on that argument.

09:04:51  12 There's no counter-claim in this case that we breached our

09:04:55  13 FRAND obligation.  There was no opening report presented by

09:04:58  14 Apple that we breached our FRAND obligation.

09:05:01  15         Mr. Mueller went to great lengths to say that he

09:05:04  16 was not going to present an argument that our damages claim

09:05:08  17 was not FRAND.  In fact, he strategically did it to keep

09:05:12  18 out damaging information.

09:05:14  19         The time for Apple to dispute whether our rights

09:05:16  20 were FRAND has passed.  It passed when they failed to file

09:05:21  21 a counter-claim.  It passed when the opening report

09:05:25  22 deadline came and went with no analysis of our conduct.

09:05:29  23         The only live issue on Count 8 that is before

09:05:31  24 you -- before the jury is whether Apple made material

09:05:36  25 representations in bad faith.

```
09:05:39   1          Mr. Mueller, in oral argument during the motions
09:05:42   2   in limine stage, represented to this Court that Apple
09:05:44   3   recognizes no obligation whatsoever in terms of how it
09:05:48   4   conducts its obligations.
09:05:50   5          The option to take a license is governed by French
09:05:54   6   law.  Professor Borghetti has made clear that under French
09:05:58   7   law, a party that seeks to enter into contractual
09:06:02   8   negotiations has obligations, very strict obligations.
09:06:05   9          Professor Palmer, Apple's expert, says the same
09:06:07  10   thing.  This is an issue that has never been decided by a
09:06:11  11   United States federal court as far as I can tell.
09:06:14  12          Your Honor, this will be an issue of first
09:06:17  13   impression for your -- for -- for this Court.  And what the
09:06:20  14   record will show is that there were repeated, repeated
09:06:24  15   material misrepresentations made by Apple.  Apple told
09:06:28  16   PanOptis that $5.00 was the cap on all cellular royalties.
09:06:32  17   They said it in writing.
```

REDACTED BY ORDER OF THE COURT

```
09:06:34  18   ███████████████████████████████████████████████
09:06:38  19   ████████████████████████████████████████████████
09:06:44  20   ███████████████████████████   ███████████████████
09:06:49  21   █████████████████████████████████   █████████████
09:06:57  22   ███████████████████████████████████████████████
09:07:00  23   ████████   █████████████████████████████████████
09:07:05  24   cannot lie to a party during a negotiation.
09:07:10  25          MR. SELWYN:  Your Honor, I'm sorry to interrupt,
```

09:07:14  1   but this is confidential information.  If it's going to be

09:07:16  2   presented, I think we have to seal the courtroom.

09:07:18  3          MR. SHEASBY:  Well, I'll move on, Your Honor.

09:07:20  4          THE COURT:  Well, let me know before we get to

09:07:23  5   anything else that would be confidential so I can seal the

09:07:25  6   courtroom.

09:07:25  7          MR. SHEASBY:  Sure.  The --

09:07:26  8          THE COURT:  And, Mr. Selwyn, I will look favorably

09:07:29  9   upon a motion to redact any specific numbers that may have

09:07:32  10  come in without the courtroom being sealed.

09:07:34  11         MR. SELWYN:  Thank you, Your Honor.  These slides,

09:07:35  12  we have not seen before.  Otherwise, we would have raised

09:07:39  13  the issue.

09:07:39  14         MR. SHEASBY:  All of these slides were in slides

09:07:42  15  that they approved last night, Your Honor.

09:07:43  16         THE COURT:  Let's -- let's continue.

09:07:44  17         MR. SHEASBY:  The next issue is that Apple

09:07:47  18  represented that the average sales price of a chip is --

09:07:56  19  average sales price of a phone is never used to base a

09:07:56  20  license.

09:08:01  21         And, in fact, Apple has represented that it has

09:08:03  22  successfully completed agreements where people had agreed

09:08:07  23  to -- to calculate value based on -- based on the baseband

09:08:11  24  chip.

09:08:11  25         But under oath, Apple's corporate representative,

09:08:13   1   Ms. Mewes, testified that she could not find one agreement

09:08:17   2   that actually evidenced that structure or expressly stated

09:08:21   3   that the baseband was the proper basis for royalties.

09:08:24   4          And the final point is, is that Ms. Mewes under

09:08:29   5   oath testified as Apple corporate representative that there

09:08:31   6   is no meeting of the minds regarding what FRAND is.  That

09:08:36   7   is Apple's corporate presenta -- corporate position, and we

09:08:39   8   intend to hold Apple to its corporate position in

09:08:44   9   Ms. Mewes's direct examination and cross-examination.

09:08:47  10          At -- at -- at deposition she said there's no such

09:08:49  11   thing -- we don't know if there's a meeting of the minds on

09:08:52  12   what FRAND is under ETSI doctrine.  And for her to say

09:08:55  13   anything else at this point would be another example of the

09:09:00  14   utter malleability of legal -- of -- of lawyers to make

09:09:04  15   opportunistic arguments that aren't connected to reality.

09:09:10  16          May it please the Court.

09:09:10  17          THE COURT:  Thank you.

09:09:11  18          All right.  That will complete the opening

09:09:14  19   statements from the parties.

09:09:14  20          Based on the parties' prior agreement, Apple may

09:09:17  21   proceed with its evidence to offer to the bench.

09:09:20  22          I assume Mr. Rodermund is going to be the first

09:09:23  23   witness.

09:09:23  24          MR. SELWYN:  He will, Your Honor, and Ms. Sooter

09:09:26  25   will present him.

09:09:27   1        THE COURT:  All right.  Do we have the witness

09:09:30   2   available where he can hear us and we can hear him?

09:09:33   3        MR. SHEASBY:  Your Honor, we wish to invoke the

09:09:35   4   Rule.

09:09:38   5        THE COURT:  All right.  Before we proceed with the

09:09:41   6   witness, I'll apply the Rule as invoked.

09:09:46   7        But -- I can see the witness.  I want to make sure

09:10:00   8   I can hear him and he can hear me.  I know this was muted

09:10:04   9   while we did opening statements --

09:10:16  10        MR. SHEASBY:  Your Honor, may I be heard on the --

09:10:18  11        THE COURT:  What's the problem, Mr. Sheasby?

09:10:20  12        MR. SHEASBY:  The problem is that he has audio

09:10:23  13   both -- on the computer and the speaker, I believe.  Two

09:10:33  14   separate sound bites arriving at the same time.

09:10:38  15        THE COURT:  All right.  Have a seat.

09:10:38  16        THE WITNESS:  There's still a very strong echo.

09:10:49  17   Now it's gone, I think.  Can you hear me?

09:10:49  18        MS. SOOTER:  We can hear you.

09:10:53  19        THE WITNESS:  Okay.  Excellent.  Just to

09:10:57  20   mention -- hello, everybody -- mention that this line --

09:10:57  21        THE COURT:  Just -- just a minute.  Just a minute.

09:11:01  22        THE WITNESS:  So I have a bit of a problem --

09:11:04  23        THE COURT:  Mr. Rodermund?

09:11:13  24        All right.  Let's go off the record until we get

09:11:15  25   this IT situation straight.

```
09:11:19   1              (Off-the-record discussion.)

09:11:57   2              THE COURT:  Let's go back on the record.

09:11:59   3              Mr. Rodermund, I'm going to ask you to take the

09:12:02   4   oath as a witness, and my courtroom deputy will administer

09:12:06   5   the oath to you.  Would you raise your right hand, please?

09:12:09   6              (Witness sworn.)

09:12:11   7              THE COURT:  All right.  Counsel, you may proceed

09:12:57   8   with your direct examination.

09:12:59   9              Let's try to go slowly, given the restraints that

09:13:03  10   we're dealing with so we make sure I can hear what he has

09:13:06  11   to say.

09:13:07  12              MS. SOOTER:  Thank you, Your Honor.

09:13:07  13         FRIEDHELM RODERMUND, DEFENDANT'S WITNESS, SWORN

09:13:07  14                        DIRECT EXAMINATION

09:13:09  15   BY MS. SOOTER:

09:13:09  16   Q.  Good day, Mr. Rodermund.

09:13:11  17   A.  Hello.

09:13:14  18   Q.  Can you please tell me if you can't hear me or if you'd

09:13:17  19   like for me to ask a question again today?

09:13:22  20   A.  Okay.

09:13:24  21   Q.  Can you please introduce yourself to the Court?

09:13:27  22   A.  My name is Friedholm Rodermund.

09:13:32  23   Q.  Where do you live?

09:13:35  24   A.  I live in Koblenz, Germany.

09:13:41  25   Q.  And where are you testifying from today?
```

| | | |
|---|---|---|
| 09:13:44 | 1 | A.   From Strasbourg, Belgium. |
| 09:13:51 | 2 | Q.   Mr. Rodermund, what is your educational background? |
| 09:13:54 | 3 | A.   I have a Master's degree in telecommunications |
| 09:14:02 | 4 | engineering from the Technical University in Aachen -- |
| 09:14:07 | 5 | Aachen, Germany, and Trondheim, Norway. |
| 09:14:09 | 6 | Q.   What has been the focus of your professional career? |
| 09:14:13 | 7 | A.   My focus has been working with technical standards |
| 09:14:19 | 8 | related to cellular telecommunications and the latest |
| 09:14:25 | 9 | patent. |
| 09:14:25 | 10 | Q.   Have you prepared a set of slides to help you with your |
| 09:14:28 | 11 | testimony today? |
| 09:14:29 | 12 | A.   Yes, I have. |
| 09:14:32 | 13 | Q.   Can you see those slides in front of you? |
| 09:14:35 | 14 | A.   Yes, I can. |
| 09:14:45 | 15 | Q.   If we can turn to Slide 2 which shows DTX-2061. |
| 09:14:51 | 16 | What is this document on the left? |
| 09:14:53 | 17 | A.   On the left, you can see my CV. |
| 09:15:01 | 18 | Q.   Can you please describe your experience with ETSI and |
| 09:15:06 | 19 | 3GPP? |
| 09:15:06 | 20 | A.   Yes.  My first involvement with ETSI was back in 1996 |
| 09:15:14 | 21 | when I attended my first ETSI meeting.  At that time, I was |
| 09:15:18 | 22 | working for a German cellular operator.  From '98 to 2004, |
| 09:15:25 | 23 | I worked for ETSI as a project manager. |
| 09:15:32 | 24 | Can you hear me? |
| 09:15:33 | 25 | Q.   Yes. |

| | | |
|---|---|---|
| 09:15:36 | 1 | A.  Okay.  Because I can't see you anymore. |
| 09:15:40 | 2 | I worked as an ETSI project manager where I was |
| 09:15:43 | 3 | responsible for several technical working groups on 3GPP. |
| 09:15:49 | 4 | And -- and then from 2005 to 2014, I worked with |
| 09:15:54 | 5 | Vodafone, and I was a local operator where I continued to |
| 09:15:59 | 6 | be engaged and involved in standardization, including ETSI |
| 09:16:05 | 7 | and 3GPP. |
| 09:16:05 | 8 | By the end of 2014, I became an independent |
| 09:16:10 | 9 | consultant, working on cellular communications and |
| 09:16:15 | 10 | Internet of Things standard and the patent.  And during |
| 09:16:20 | 11 | that time to now, I'm still following ETSI 3GPP activity. |
| 09:16:27 | 12 | Q.  Do you have experience with ETSI's intellectual |
| 09:16:29 | 13 | property rights policy? |
| 09:16:33 | 14 | A.  Yes, I have. |
| 09:16:34 | 15 | THE COURT:  All right.  Let's -- let's stop a |
| 09:16:36 | 16 | minute. |
| 09:16:37 | 17 | I want to make sure we do what we can to improve |
| 09:16:41 | 18 | the sound on this end.  With the lag given the |
| 09:16:47 | 19 | international distance that has to be covered, it's |
| 09:16:50 | 20 | extremely difficult for me to hear clearly, and I think |
| 09:16:55 | 21 | it's difficult for the court reporter to take down what the |
| 09:16:57 | 22 | witness says. |
| 09:16:58 | 23 | I'm going to ask that the IT staff come in, and |
| 09:17:03 | 24 | we're going to double-check this off the record, and then |
| 09:17:05 | 25 | we'll come back on the record and proceed. |

09:17:07   1          We're off the record.

09:17:09   2          (Recess.)

09:22:25   3          THE COURT:   All right.  We're going to take a

09:30:45   4   short recess while the IT staff works on this issue.

09:30:48   5   There's no need to make everybody sit in the courtroom.  As

09:30:52   6   soon as it's addressed properly, we'll reconvene and

09:30:56   7   continue.  So don't go far.  But the Court stands in

09:31:00   8   recess.

09:31:01   9          COURT SECURITY OFFICER:  All rise.

09:35:51   10         (Recess.)

09:35:51   11         THE COURT:  I'm going back to the portion of the

10:09:51   12   transcript now that relates to the bench trial.

10:09:53   13         With regard to examining Dr. Rodermund, the small

10:09:58   14   round microphone on the table in front of the courtroom

10:10:00   15   deputy and the court reporter is the microphone that he

10:10:04   16   will be hearing us through.

10:10:06   17         It has about a five-foot radius of effective

10:10:12   18   transmission.  So both Plaintiff and Defendant's counsel

10:10:17   19   examining Dr. Rodermund will need to come to that table,

10:10:21   20   bring your notes, and you'll have to speak from there so

10:10:25   21   that it will pick you up and he can hear you.

10:10:27   22         Any question?  This will only apply for this

10:10:31   23   witness.  The rest of the examinations will take place from

10:10:35   24   the podium.

10:10:36   25         MS. SOOTER:  No questions, Your Honor.

| | | |
|---|---|---|
| 10:10:38 | 1 | THE COURT:  Okay.  If you want to reposition |
| 10:10:40 | 2 | yourself and get prepared, we'll shortly go back on the |
| 10:10:44 | 3 | record with him and continue the examination. |
| 10:10:50 | 4 | All right.  Let's unmute the microphone for |
| 10:10:53 | 5 | Dr. Rodermund. |
| 10:10:53 | 6 | Please proceed, counsel. |
| 10:10:55 | 7 | MS. SOOTER:  Thank you, Your Honor. |
| 10:10:57 | 8 | Q.  (By Ms. Sooter)  Mr. Rodermund, can you hear me? |
| 10:11:00 | 9 | A.  Yes, I can.  Can you hear me? |
| 10:11:02 | 10 | Q.  Yes, thank you. |
| 10:11:03 | 11 | THE COURT:  Ask him to speak slowly and you speak |
| 10:11:06 | 12 | slowly. |
| 10:11:08 | 13 | MS. SOOTER:  Yes, Your Honor. |
| 10:11:10 | 14 | Q.  (By Ms. Sooter)  Mr. Rodermund, we would like for you |
| 10:11:12 | 15 | to speak very slowly so that we can hear you and so the |
| 10:11:18 | 16 | court reporter can take down your words, okay? |
| 10:11:20 | 17 | A.  Okay. |
| 10:11:20 | 18 | Q.  Mr. Rodermund, do you have experience with ETSI's |
| 10:11:26 | 19 | intellectual property rights policy? |
| 10:11:27 | 20 | A.  Yes, I do. |
| 10:11:33 | 21 | Q.  If we could please -- |
| 10:11:36 | 22 | A.  As to the previous slide, yeah. |
| 10:11:42 | 23 | MS. SOOTER:  If we can please turn to Slide 3. |
| 10:11:47 | 24 | Q.  (By Ms. Sooter)  Can you please describe your |
| 10:11:49 | 25 | experience? |

10:11:49  1  A.  Yes.  I've been working with the ETSI IPR policy for

10:11:54  2  more 20 years, starting to get -- to become aware of the

10:11:58  3  policy in '96 when I first participated in ETSI.  Then I

10:12:02  4  started working at ETSI with 3GPP.

10:12:07  5         My roles included guiding the working groups as

10:12:11  6  the chairman on the working process matters of the 3GPP,

10:12:16  7  which was a new organization at that time.  I also had to

10:12:21  8  make sure the delegates were aware of the obligations under

10:12:25  9  the ETSI IPR policy, ensure that the call for IPR was made

10:12:32  10 at every meeting and recorded in the meeting minutes, and

10:12:36  11 when I went to work for Vodafone's organization, I

10:12:44  12 continued to be aware of the policy as a delegator of ETSI

10:12:49  13 and 3GPP.

10:12:50  14        When I became a consultant, I also took

10:12:57  15 consultancy work on patent matters, including IPR policy.

10:13:02  16 I've also been working as an expert in several cases on IPR

10:13:07  17 policy methods.  And since 2017, I'm also following the

10:13:15  18 ETSI IPR special committee which is responsible for the

10:13:18  19 maintenance of the IPR policy.

10:13:21  20 Q.  Are you a member of the ETSI IPR special committee?

10:13:25  21 A.  Yes, I am.

10:13:31  22        MS. SOOTER:  Your Honor, we offer Mr. Rodermund as

10:13:33  23 an expert in the ETSI intellectual property rights policy

10:13:36  24 and its application, including at 3GPP.

10:13:39  25        THE COURT:  Is there objection?

10:13:40  1        MR. SHEASBY:  No objection, Your Honor.

10:13:43  2        THE COURT:  Without objection, the Court will

10:13:46  3   recognize this witness as an expert in those designated

10:13:48  4   fields.

10:13:49  5        Please continue.  Please talk slowly.

10:13:54  6   Q.  (By Ms. Sooter)  Mr. Rodermund, what was your

10:13:56  7   assignment in this case?

10:13:57  8   A.  My assignment was to explain the 3GPP working

10:14:07  9   procedures, to explain the IPR policy obligations,

10:14:13  10  including the disclosure obligations, and to analyze the

10:14:19  11  course of conduct of the prior owner of the patents in this

10:14:23  12  case regarding whether they have met the disclosure

10:14:29  13  obligation.

10:14:30  14  Q.  Did the prior owners of the patents in this case meet

10:14:35  15  their disclosure obligations with regards to the five

10:14:39  16  patents you analyzed?

10:14:40  17  A.  No, they did not.

10:14:45  18  Q.  Mr. Rodermund, what is 3GPP?

10:14:47  19  A.  This is the Third Generation Partnership Project

10:14:55  20  founded in 1998 with regard to develop cellular

10:15:02  21  communication standards.

10:15:03  22  Q.  Does 3GPP have its own IP rights policy?

10:15:07  23  A.  No, it does not.  3GPP member companies are expected to

10:15:15  24  follow the IPR policies of the organizational partner they

10:15:22  25  belong to.

| | | |
|---|---|---|
| 10:15:22 | 1 | Q.  And is ETSI one of those organizational partners? |
| 10:15:26 | 2 | A.  Yes, it is. |
| 10:15:28 | 3 | Q.  Please look at Slide 5.  This slide shows DTX-68. |
| 10:15:38 | 4 | Mr. Rodermund, what is this document? |
| 10:15:40 | 5 | A.  This is the ETSI IPR policy from 2007. |
| 10:15:48 | 6 | Q.  What is the ETSI IPR policy? |
| 10:15:52 | 7 | A.  The ETSI IPR policy sets out several rules and |
| 10:15:59 | 8 | obligations for ETSI members related to standard essential |
| 10:16:05 | 9 | patents. |
| 10:16:05 | 10 | Q.  Were the original owners of the five patents you |
| 10:16:14 | 11 | analyzed in this case, Panasonic, LG, and Samsung, members |
| 10:16:17 | 12 | of ETSI during the time frames you analyzed? |
| 10:16:20 | 13 | A.  Yes. |
| 10:16:21 | 14 | Q.  Were ETSI members obligated to follow the IPR policy of |
| 10:16:29 | 15 | ETSI? |
| 10:16:30 | 16 | A.  Yes, by joining ETSI, they committed to follow the ETSI |
| 10:16:39 | 17 | IPR policy. |
| 10:16:39 | 18 | Q.  Looking at Slide 5, what does Section 4.1 tell us about |
| 10:16:45 | 19 | the ETSI IPR policy? |
| 10:16:48 | 20 | A.  Section 4.1 explains -- or sets the disclosure |
| 10:16:58 | 21 | obligation. |
| 10:16:58 | 22 | Q.  How many requirements are in ETSI's IPR policy? |
| 10:17:06 | 23 | A.  There are two requirements for the disclosure. |
| 10:17:11 | 24 | Q.  Okay.  Can you briefly disclose ETSI's IPR policies' |
| 10:17:17 | 25 | requirements? |

10:17:19  1   A.  Yes.  So the disclosure obligation consists of two

10:17:27  2   parts.  The first one is the generic part where a member

10:17:31  3   becomes aware of any potentially essential IPR, then it has

10:17:36  4   to declare such IPR in a timely fashion.

10:17:41  5         And the second sentence says for the specific case

10:17:45  6   where a member submits a technical contribution, and in

10:17:49  7   that case, it has to declare any IPR which is related to

10:17:54  8   that technical contribution prior to the adoption of a

10:17:58  9   proposal.

10:17:59  10  Q.  Which requirement did you focus on in this case?

10:18:03  11  A.  I focused on the second requirement, because all five

10:18:11  12  patents were related to technical proposals and

10:18:15  13  contributions to 3GPP.

10:18:16  14  Q.  Looking at Section 7, what is ETSI's definition of IPR?

10:18:21  15  A.  IPR shall mean any intellectual property right,

10:18:32  16  including application.

10:18:32  17  Q.  What obligation do ETSI members have to disclose the

10:18:37  18  existence of unpublished patent applications?

10:18:46  19  A.  They have the obligation to also include unpublished

10:18:53  20  applications.  The applications are explicitly mentioned

10:18:57  21  here in the first sentence.

10:18:59  22  Q.  Mr. Rodermund, let's turn to Slide 9, which shows

10:19:04  23  DTX-970.

10:19:04  24        What is this document that you can see on the

10:19:07  25  left?

10:19:07   1   A.   This is a contribution or a document discussed at an

10:19:17   2   ETSI General Assembly meeting in 2005.   It's explaining

10:19:24   3   about -- explaining the result of a discussion which was

10:19:31   4   triggered by the European Commission, suggesting a change

10:19:37   5   of Clause 4.1, the disclosure obligation of the ETSI IPR

10:19:44   6   policy.

10:19:44   7   Q.   What do we see on the right-hand side of this slide?

10:19:47   8   A.   On the right-hand side, we see the cover of a reply

10:19:54   9   letter from ETSI to the Director General-Competition of the

10:20:04   10   European commission.

10:20:05   11   Q.   What does ETSI tell the European Commission in this

10:20:08   12   letter with regard to the IPR policy's timeliness

10:20:12   13   requirements?   And if you'd like, you can look at Slide 10.

10:20:15   14   A.   So it says here in this letter on the left-hand side in

10:20:26   15   the highlighted text, that in the specific case, which is

10:20:29   16   when a member submits a technical proposal, timeliness may

10:20:37   17   additionally be measured from the member's submission of

10:20:41   18   the contribution.

10:20:42   19   Q.   So what is your understanding about the timing

10:20:52   20   requirement for IPR disclosures when a member submits a

10:20:57   21   technical proposal to 3GPP?

10:21:04   22   A.   So the sentence above is related to the second sentence

10:21:12   23   of the IPR policy.   It explains -- in line with the second

10:21:17   24   sentence, and my understanding is that the obligation for

10:21:20   25   disclosure attaches to the submission of a technical

| | | |
|---|---|---|
| 10:21:23 | 1 | contribution. |
| 10:21:25 | 2 | Q.  So does that mean at the time of the technical |
| 10:21:29 | 3 | solution -- submission, sorry? |
| 10:21:32 | 4 | A.  Absolutely, yeah. |
| 10:21:33 | 5 | Q.  And when is the last date that the member can submit |
| 10:21:38 | 6 | the IP rights declaration? |
| 10:21:41 | 7 | A.  So the declaration still happens at the latest -- prior |
| 10:21:49 | 8 | to the adoption of the standard.  And we have several |
| 10:21:57 | 9 | letters of adoption at working group level, which is |
| 10:22:04 | 10 | totally after the contribution was submitted. |
| 10:22:06 | 11 | And the -- the last level of adoption is the |
| 10:22:12 | 12 | Stage 3 case -- the Stage 3 freeze date. |
| 10:22:16 | 13 | Q.  Okay.  Let me see if I can break that down.  Which date |
| 10:22:20 | 14 | do you believe is -- or which date is the date that the |
| 10:22:24 | 15 | standard is adopted? |
| 10:22:25 | 16 | A.  That's the Stage 3 freeze date. |
| 10:22:36 | 17 | Q.  What is the TTCN date? |
| 10:22:39 | 18 | A.  The TTCN freeze date comes after the Stage 3 freeze |
| 10:22:46 | 19 | date, and this is when technical -- where the test |
| 10:22:52 | 20 | specifications are expected to be frozen. |
| 10:22:55 | 21 | Q.  Why is the proper date to use for the adoption the |
| 10:23:01 | 22 | Stage 3 freeze date and not the TTCN freeze date? |
| 10:23:04 | 23 | MR. SHEASBY:  Your Honor, I object.  I do not |
| 10:23:06 | 24 | believe this is in his expert report. |
| 10:23:08 | 25 | THE COURT:  Response? |

10:23:09   1          MS. SOOTER:  Your Honor, this was something that
10:23:13   2   Mr. Sheasby just raised in his opening, and he questioned
10:23:16   3   Mr. Rodermund about this topic extensively during his
10:23:18   4   deposition.
10:23:20   5          THE COURT:  That doesn't mean it's in his report,
10:23:24   6   counsel.  Expert witnesses are limited in their testimony
10:23:29   7   to the confines of their reports.
10:23:32   8          MS. SOOTER:  And he did explain in his report,
10:23:34   9   Your Honor, that he relied on the freeze date, and we're
10:23:36  10   just explaining the details of which freeze date he relied
10:23:43  11   on, based on his deposition questioning and explaining what
10:23:45  12   he wrote in his expert report.
10:23:47  13          THE COURT:  All right.  Is it your position that
10:23:48  14   what you've just gone over with him is or is not included
10:23:52  15   in his written expert report?
10:23:53  16          MS. SOOTER:  The explanation about the freeze date
10:23:58  17   is in his expert report, Your Honor.  He did not note
10:24:02  18   specifically that there was another date, the TTCN freeze
10:24:05  19   date, that he was not using, because he only explained the
10:24:10  20   date he was using.
10:24:11  21          THE COURT:  Does that comport with your
10:24:14  22   understanding, Mr. Sheasby, or do you see this differently?
10:24:15  23          MR. SHEASBY:  He has no discussion of TTCN in his
10:24:18  24   report.  He should be -- he should -- he's not entitled
10:24:21  25   to make any reference to it on his direct examination.

10:24:21   1   He's not entitled to explain why he --

10:24:21   2           THE COURT:  Slow down, Mr. Sheasby.

10:24:22   3           MR. SHEASBY:  Mr. Rodermund makes no reference to

10:24:28   4   the TTCN date in his report.  He provides no explanation as

10:24:33   5   to why he used the date he used, as opposed to TTCN.  He is

10:24:37   6   not entitled to provide any discussion whatsoever of the

10:24:39   7   TTCN date or why he chose another date.  It's not in his

10:24:42   8   report.

10:24:44   9           THE COURT:  It appears, based on this colloquy,

10:24:46  10   that the TTCN date is not in his report.

10:24:54  11           Do you agree with that?

10:24:56  12           MS. SOOTER:  I do agree with that, Your Honor.

10:24:57  13           THE COURT:  All right.  Then I'm going to sustain

10:24:58  14   the objection as to the TTCN date as to what it is or how

10:25:04  15   it applies or anything regarding it since it's not covered

10:25:07  16   in his expert report.

10:25:09  17           All right?  And I will strike the testimony from

10:25:13  18   this portion of the record that relates to the TTCN date.

10:25:19  19           Based on that, you may proceed.

10:25:21  20           MS. SOOTER:  Thank you, Your Honor.

10:25:22  21   Q.  (By Ms. Sooter)  Mr. Rodermund, which freeze date did

10:25:25  22   you rely on for purposes of your opinions?

10:25:28  23   A.  The Stage 3 freeze date.

10:25:31  24   Q.  And do you believe that is a correct freeze date to

10:25:35  25   rely on for purposes of setting the boundaries of the IPR

10:25:38  1  disclosure obligations?

10:25:40  2  A.  Yes, it is.  Because this is the date when the

10:25:47  3  functionality of the standard -- of the release is done, so

10:25:54  4  no new features are added after that.

10:25:56  5  Q.  Mr. Rodermund, if you could look at Slide 11, please.

10:26:06  6  This is DTX-976.

10:26:10  7       What is this document?

10:26:11  8  A.  This is from the 3GPP website showing the call for IPR.

10:26:19  9  Q.  When is the call for IPRs made?

10:26:23  10  A.  It's made at the beginning of every meeting, clearly

10:26:32  11  indicating that IPR disclosure obligation and reminder is

10:26:37  12  related to the ongoing standardization work.

10:26:41  13  Q.  What is an IPR landscape?

10:26:46  14  A.  IPR landscape is later, which is the reading or showing

10:26:55  15  which companies are owning how many patents in a specific

10:27:01  16  technical area.

10:27:03  17  Q.  Is an understanding of the IPR landscape a

10:27:06  18  consideration for why the IPR policy requires disclosure?

10:27:15  19  A.  Absolutely.  The disclosure requirement in Clause 4.1

10:27:22  20  of the ETSI IPR policy.  It's the goal that the delegates

10:27:26  21  are -- have an accurate picture of the IPR landscape when

10:27:32  22  they're deciding on technical proposals.

10:27:34  23  Q.  In your experience, do 3GPP participants take the IPR

10:27:41  24  landscape into account when participating in the standard

10:27:46  25  setting process?

10:27:47  1        MR. SHEASBY:  Objection, Your Honor, out --

10:27:49  2    outside the scope of his report.

10:27:50  3        THE COURT:  Response?

10:27:57  4        MS. SOOTER:  I fully disagree with that,

10:28:00  5    Your Honor.  Mr. Rodermund very much discussed examples of

10:28:03  6    when different IPR participants -- or, sorry, when

10:28:06  7    standard-setting participants took IPR rights and

10:28:08  8    disclosures into account during standard-setting processes.

10:28:13  9        THE COURT:  Well, I don't have his report

10:28:15  10   memorized.  I'm happy to take it up and let you show me the

10:28:15  11   competing proposals where -- or competing sections of the

10:28:20  12   report where you think it covers this.  That's the only way

10:28:21  13   I can deal with this.

10:28:22  14       MR. SHEASBY:  And let me be absolutely precise

10:28:24  15   about my objection so I'm clear about it.  Mr. Rodermund

10:28:27  16   has a section where he relies on a hearsay conversation

10:28:30  17   with -- with Mr. Zhang from Apple and Ms. Mewes from Apple.

10:28:37  18   He has no personal experience on the subject, and he

10:28:40  19   testified to that.

10:28:41  20       I don't think he -- it's improper for him to

10:28:43  21   launder hearsay through Ms. Mewes and Mr. -- Ms. Mewes and

10:28:46  22   Mr. Zhang.  And so because he can't launder that hearsay,

10:28:51  23   she hasn't laid a foundation that he has any personal

10:28:56  24   experience with decision-making on patents in the IPR

10:28:59  25   process.  That's my precise objection.

10:29:02   1          THE COURT:  Would you respond to that for me,

10:29:04   2   please, Ms. Sooter?

10:29:06   3          MS. SOOTER:  Well, two things, Your Honor.  I

10:29:07   4   believe what we just heard Mr. Sheasby saying was that in

10:29:10   5   actuality, this is in his report -- Mr. Rodermund's report.

10:29:13   6   He does address the reliance on IP right disclosures during

10:29:15   7   the standards setting --

10:29:15   8          THE COURT:  The question appears to be:  Does he

10:29:18   9   address it from his own personal knowledge, or does he

10:29:22   10  address it in reliance on others with communications that

10:29:24   11  would be hearsay?

10:29:26   12         MS. SOOTER:  Well, he relies on others, in part,

10:29:29   13  for examples of when this happens, but also his own

10:29:33   14  personal experience that he's just testified about in

10:29:38   15  participating in standard-setting activities.  And, in

10:29:42   16  fact, Your Honor, it's not improper for an expert to take

10:29:45   17  statements of others into account in forming and confirming

10:29:50   18  their opinions.

10:29:51   19         THE COURT:  I'm well aware of that, Ms. Sooter.

10:29:53   20  And an expert witness can certainly include what are

10:29:58   21  otherwise hearsay communications as background in forming

10:30:01   22  their opinions.

10:30:02   23         By the same token, an expert can't merely serve as

10:30:07   24  a mouthpiece to reiterate what's hearsay testimony in the

10:30:10   25  form of their testimony.

| | | |
|---|---|---|
| 10:30:15 | 1 | Here's what I think is appropriate here, counsel: |
| 10:30:16 | 2 | Given that this is before the bench, I think you should |
| 10:30:19 | 3 | identify the sections of his report that cover this |
| 10:30:26 | 4 | discussions -- these discussions with the Apple personnel |
| 10:30:29 | 5 | that you identified, Mr. Sheasby.  And then you should |
| 10:30:33 | 6 | print or itemize that section of the report and give it to |
| 10:30:37 | 7 | me.  I can certainly exclude what's hearsay, and I can |
| 10:30:40 | 8 | certainly consider what's appropriate. |
| 10:30:42 | 9 | MR. SHEASBY:  Thank you, Your Honor. |
| 10:30:43 | 10 | THE COURT:  That's probably the quickest way to |
| 10:30:46 | 11 | cut to the bottom line here. |
| 10:30:47 | 12 | MR. SHEASBY:  Thank you, Your Honor. |
| 10:30:48 | 13 | THE COURT:  So I'll -- I'll overrule the objection |
| 10:30:53 | 14 | for purposes of this, but I'll direct the parties to |
| 10:30:56 | 15 | produce that section of this expert's report that's in |
| 10:30:58 | 16 | question at this point.  And I will read that section of |
| 10:31:04 | 17 | the expert's report with an eye toward what's appropriate |
| 10:31:06 | 18 | for the Court to consider or not consider. |
| 10:31:10 | 19 | MR. SHEASBY:  Thank you, Your Honor. |
| 10:31:11 | 20 | THE COURT:  All right? |
| 10:31:11 | 21 | MS. SOOTER:  Thank you, Your Honor. |
| 10:31:12 | 22 | THE COURT:  Let's proceed. |
| 10:31:16 | 23 | MS. SOOTER:  And to be clear, Your Honor, may I |
| 10:31:18 | 24 | re-ask the question? |
| 10:31:19 | 25 | THE COURT:  If I'm going to read that section and |

10:31:21  1   cover it myself, there's really no need for you to

10:31:24  2   reiterate it.

10:31:25  3              MS. SOOTER:  That makes sense.  Thank you.

10:31:27  4              THE COURT:  Let's move on.

10:31:31  5              MS. SOOTER:  Thank you.

10:31:33  6   Q.  (By Ms. Sooter)  Mr. Rodermund, in your work in this

10:31:38  7   case, what did you assume about the essentiality of the IP

10:31:42  8   rights associated with the patents that you analyzed?

10:31:44  9   A.  I did not perform my own analysis on the essentiality.

10:31:53  10  I took the word of the Plaintiff who claims that these

10:31:58  11  patents are essential, and that was the basis for my

10:32:02  12  analysis.

10:32:03  13  Q.  Mr. Rodermund, can you summarize the purpose of

10:32:12  14  requiring IPR disclosures prior to the adoption of the

10:32:15  15  standard for us, please?

10:32:17  16  A.  Well, with -- in the standard setting process, it's not

10:32:25  17  only technical aspects which are considered when making a

10:32:30  18  selection between several technical proposals, but,

10:32:37  19  obviously, the delegates have to also consider commercial

10:32:40  20  considerations, and that includes intellectual property

10:32:44  21  rights.

10:32:45  22              So the costs are also an important factor when

10:32:51  23  designing standards.  And, therefore, it's important for

10:32:55  24  ETSI members to be able to make informed decisions when

10:33:01  25  deciding on technical proposals, decisions which can also

| 10:33:06 | 1 | take into account IPR-related aspects. |

10:33:06   1   take into account IPR-related aspects.

10:33:13   2   Q.  Mr. Rodermund, if a member of ETSI agrees to abide by

10:33:19   3   FRAND under a general FRAND undertaking, is it still

10:33:23   4   required to disclose its IPR rights to ETSI?

10:33:25   5   A.  Yes, it is.  The FRAND obligation in Clause 6.1 of the

10:33:36   6   ETSI policy is clearly separate to the disclosure

10:33:42   7   obligation of Clause 3.1 and 4.1.

10:33:45   8        And the disclosure obligation is about the

10:33:49   9   requirement to declare individual patents or potentially

10:33:59   10  essential patents to ETSI.

10:34:00   11       And the general undertaking -- general FRAND

10:34:04   12  undertaking does not include such individual patents;

10:34:10   13  therefore, it's still required to follow the disclosure

10:34:13   14  obligations, also because it's important for the

10:34:20   15  delegates -- still important for the delegates to know and

10:34:23   16  have an accurate picture of the patent landscape even if

10:34:27   17  some companies have a general FRAND obligation.

10:34:30   18  Q.  Did you analyze whether the original owners'

10:34:34   19  disclosures of the patents in this suit were timely?

10:34:37   20  A.  Yes, I analyzed that.

10:34:44   21  Q.  Can we please turn to Slide 14?

10:34:47   22       Mr. Rodermund, can you please walk us through the

10:34:55   23  key dates that you analyzed with regard to the '284 patent?

10:35:02   24  A.  Yes.  So the first date is December 20, 2007, which is

10:35:11   25  when Panasonic filed a related patent application.  That

10:35:18  1   can be seen in PX-1846 and DTX-0794.

10:35:28  2          The second date is a date where a 3GPP meeting

10:35:34  3   happened from January 14 to 18, 2008.  This is a meeting

10:35:40  4   here in which Panasonic made a technical contribution

10:35:44  5   related to the '284 patent.  This contribution is in

10:35:53  6   PX-1743 and PX-1990.

10:35:56  7          Third date, February 11 through 15, 2008, is the

10:36:02  8   date of another 3GPP meeting in which Panasonic made

10:36:09  9   another technical proposal related to the patent.  It can

10:36:13  10  be seen in DTX-0120 and DTX-121.

10:36:18  11         Then the next date is the actual freeze date, the

10:36:24  12  Stage 3 freeze date of Release 8 of LTE on December 11,

10:36:31  13  2008, as shown in DTX-0173.

10:36:35  14         And, finally, we have the disclosure date to ETSI

10:36:38  15  on October 25th, 2010, which can be seen in DTX-0036.

10:36:47  16  Q.  Mr. Rodermund, was Panasonic's disclosure of its IP

10:36:52  17  rights related to the '284 patent timely?

10:36:54  18  A.  No, it was not, because it did not make a declaration

10:37:04  19  during the time frame when they submitted these proposals.

10:37:09  20  Instead, they waited for around two and a half years, more

10:37:13  21  than two and a half years until they declared the patent

10:37:18  22  family to ETSI.

10:37:19  23  Q.  If you could please look at Slide 17, which shows

10:37:24  24  PX-1846.

10:37:25  25         What does Panasonic say about the applicability of

```
10:37:34   1   this IP right to LTE?
10:37:37   2   A.  The excerpt of this patent application says that the
10:37:42   3   concept of the invention may be also readily used in the
10:37:50   4   LTE RAN currently discussed by 3GPP.
10:37:54   5   Q.  And what was the date of this patent application?
10:37:56   6   A.  December 20, 2007.
10:38:02   7   Q.  Let's turn to Slide 24.
10:38:13   8           Can you please walk us through the dates you
10:38:18   9   analyzed in connection with the IP rights disclosure
10:38:21  10   relating to the '557 patent?
10:38:27  11   A.  Yes.  On March 20, 2006, Panasonic filed an application
10:38:33  12   in Japan, as can be seen in DTX-1648.  Just one week after,
10:38:41  13   there was a RAN1 meeting 3GPP from March 27 through 31st,
10:38:48  14   2006, during which Panasonic proposed a technical
10:38:51  15   contribution related to the patent, as can be seen in
10:38:57  16   DTX-0211.
10:38:58  17           Then we have, again, the freeze date here,
10:39:02  18   December 11, 2008, again, DTX-0173.
10:39:07  19           And then, finally, the patent family of the '557
10:39:14  20   patent was declared to ETSI on March 16th, 2010, as can be
10:39:20  21   seen by DTX-0035.
10:39:21  22   Q.  Was Panasonic's IPR disclosure in connection with the
10:39:29  23   '557 patent timely?
10:39:30  24   A.  No, it was not, because they did not declare during the
10:39:38  25   time frame -- not even shortly after the time when they
```

10:39:42   1   made technical submissions on these topics, that they

10:39:49   2   waited around four years until they disclosed the patent to

10:39:55   3   ETSI.

10:39:55   4   Q.  If you could look at Slide 25, please.

10:40:06   5        What does Panasonic say about this patent

10:40:10   6   application's applicability to LTE?

10:40:13   7   A.  So it mentions here that this invention can be used in

10:40:23   8   connection with the 3GPP RAN LTE.  So it was clearly titled

10:40:29   9   as the LTE standard.

10:40:30   10   Q.  And is that shown on DTX-1648?

10:40:35   11   A.  Yes.

10:40:35   12   Q.  Can you please turn to Slide 32?

10:40:44   13        And can you please walk us through the dates you

10:40:47   14   considered in connection with the '332 patent?

10:40:49   15   A.  Yes.  The prior owner of the '332 patent filed a

10:40:57   16   related application in -- on March 17th, 2008, as can be

10:41:04   17   seen in DTX-0997.

10:41:08   18        Then just a short time after, there was a RAN1

10:41:13   19   3GPP meeting March 31st to April 4, 2008, during which LGE

10:41:22   20   proposed a technical contribution related to the '332

10:41:27   21   patent, as can be seen in DTX-0994.

10:41:30   22        Then we have the freeze date on December 11, 2008,

10:41:36   23   as can be seen in DTX-0173.

10:41:40   24        And, finally, the '332 patent family was declared

10:41:47   25   essential to ETSI on March 12th, 2009.

| | | |
|---|---|---|
| 10:41:51 | 1 | Q.  Mr. Rodermund, was LGE's disclosure of its IP rights |
| 10:41:57 | 2 | related to the '332 patent, timely? |
| 10:42:01 | 3 | A.  No, it was not timely, given that the -- during the |
| 10:42:08 | 4 | time frame of the patent application filing and the |
| 10:42:12 | 5 | submission of the related contribution, Panasonic did -- |
| 10:42:16 | 6 | sorry, LGE did not declare their potentially essential IPR. |
| 10:42:22 | 7 | Instead, they waited around one year until they made such |
| 10:42:26 | 8 | declaration. |
| 10:42:27 | 9 | Q.  If you could look at Slide 34, which shows DTX-0997. |
| 10:42:34 | 10 | What does LGE say about the relationship of its |
| 10:42:39 | 11 | patent application to LTE? |
| 10:42:43 | 12 | A.  So you can see here in the highlighted part of the |
| 10:42:50 | 13 | application that the related technical field is LTE. |
| 10:42:57 | 14 | Q.  Mr. Rodermund, please turn to Slide 41. |
| 10:43:00 | 15 | And can you please walk us through the dates you |
| 10:43:03 | 16 | considered in connection to the '774 patent? |
| 10:43:10 | 17 | A.  So the first date is April 21st, 2005, which is when |
| 10:43:20 | 18 | Samsung filed the related patent application.  On May 9, |
| 10:43:28 | 19 | 2005, Samsung filed another related patent application, and |
| 10:43:35 | 20 | on August 29 to September 2nd, 2005, a RAN1 3GPP meeting |
| 10:43:44 | 21 | took place, during which Samsung proposed a technical |
| 10:43:48 | 22 | contribution related to the '774 patent. |
| 10:43:54 | 23 | I believe I missed saying the numbers, right.  The |
| 10:44:00 | 24 | first filing was in DTX-1058, the second filing was in |
| 10:44:06 | 25 | DTX-1000, and then the subsequent proposal for 3GPP was in |

10:44:11   1   DTX-0952.

10:44:13   2        The freeze date was the next date I considered,

10:44:20   3   December 11, 2008, as can be seen in DTX-0173.

10:44:25   4        Finally, the '774 patent family was declared as

10:44:34   5   essential on December 30, 2008, which can be seen in

10:44:39   6   DTX-0032.

10:44:39   7   Q.  Mr. Rodermund, was Samsung's disclosure of its IP

10:44:44   8   rights related to the '774 patent, timely?

10:44:47   9   A.  No, it was not, given that the applications were

10:44:54  10   already filed in 2005, during which also a meeting happened

10:44:59  11   and which Samsung made a related contribution.  Instead,

10:45:04  12   after the submission of the contribution, the disclosure

10:45:10  13   happened only -- yes, around three years later.

10:45:15  14   Q.  If you could look at Slide 43, please, which shows

10:45:20  15   DTX-1058.

10:45:21  16        What does Samsung say about the applicability of

10:45:24  17   this patent application to 3GPP standards?

10:45:30  18   A.  So this document can be seen that -- it was anticipated

10:45:42  19   to disclosure -- this invention to a standards body on

10:45:55  20   May 9, 2005, and the standards body 3GPP RAN1.

10:46:01  21   Q.  If you can look at DTX-1000.

10:46:05  22        Can you please tell us what benefit Samsung -- or

10:46:07  23   the relative value that Samsung said related to this patent

10:46:11  24   application?

10:46:11  25   A.  Says here in the highlighted text that if the proposal

10:46:17  1  is adopted in the standards, Samsung will benefit from

10:46:20  2  collecting a royalty and/or cross-licensing from the

10:46:24  3  patent.

10:46:24  4  Q.  And after Samsung said that, if we look back at

10:46:31  5  Slide 50, how long did Samsung wait before declaring its IP

10:46:36  6  rights?

10:46:36  7  A.  Yeah, I don't have this patent right now being shown,

10:46:44  8  but I believe it was around three years.

10:46:56  9  Q.  If we could look at Slide 51, please.

10:47:03  10         Can you please walk us through the dates that you

10:47:07  11  considered in connection with the '833 patent?

10:47:08  12  A.  Sure.  So the first date is September 13th, 2007, when

10:47:15  13  LGE filed its patent application, which can be seen in

10:47:21  14  DTX-0617.

10:47:22  15         Then on November 13th, 2007, LGE filed another

10:47:27  16  patent application, as can be seen in DTX-0618.

10:47:34  17         And then from January 14 to 18, 2008, there was a

10:47:41  18  3GPP RAN1 meeting during which LGE proposed a technical

10:47:46  19  contribution related to the '833 patent, and as can be seen

10:47:53  20  in DTX-0430.

10:47:57  21         Then the next date is the freeze date, again,

10:48:02  22  December 11, 2008, in DTX-0173.

10:48:07  23         And, finally, the '833 patent family was declared

10:48:13  24  as essential to ETSI on March 12th, 2009.

10:48:19  25  Q.  Mr. Rodermund, was LGE's disclosure of its IP rights

| | | |
|---|---|---|
| 10:48:29 | 1 | relating to the '833 patent, timely? |
| 10:48:33 | 2 | A.  No, it was not timely.  As the timeliness -- as I |
| 10:48:42 | 3 | explained earlier, it is measured from the time when |
| 10:48:46 | 4 | resubmitting a related technical proposal. |
| 10:48:52 | 5 | The prior owner of the '833 patent waited 14 |
| 10:48:56 | 6 | months after the submission of the contribution until it |
| 10:49:01 | 7 | disclosed its essentially essential -- patent essential to |
| 10:49:05 | 8 | ETSI. |
| 10:49:05 | 9 | Q.  If we could please turn to Slide 53 showing DTX-617? |
| 10:49:13 | 10 | Mr. Rodermund, what did LGE say about whether or |
| 10:49:16 | 11 | not this patent application was related to LTE? |
| 10:49:20 | 12 | A.  Well, it says here that the related technology field is |
| 10:49:32 | 13 | LTE, showing that also this patent application was clearly |
| 10:49:34 | 14 | targeted at the LTE standard. |
| 10:49:35 | 15 | Q.  So, Mr. Rodermund, for each of the five |
| 10:49:50 | 16 | patents-in-suit, did the original owners fulfill their |
| 10:49:54 | 17 | obligations to timely disclose their IP rights? |
| 10:49:56 | 18 | A.  No, they did not.  All of the five patents were clearly |
| 10:50:04 | 19 | aimed at the LTE standard at the time the applications were |
| 10:50:08 | 20 | filed.  The prior owners submitted related technical |
| 10:50:12 | 21 | contributions and waited around one until sometimes four |
| 10:50:21 | 22 | years until they actually declared these -- their patents |
| 10:50:27 | 23 | as essential to ETSI. |
| 10:50:27 | 24 | Q.  Mr. Rodermund, as part of your analysis, did you |
| 10:50:32 | 25 | consider what the Plaintiffs said in |

| | | |
|---|---|---|
| 10:50:36 | 1 | interrogatories' responses in this case? |
| 10:50:38 | 2 | A.  Yes, I did. |
| 10:50:44 | 3 | MS. SOOTER:  And if we could bring up DTX-2053A, |
| 10:50:56 | 4 | please? |
| 10:50:56 | 5 | Q.  (By Ms. Sooter)  How did these interrogatory responses |
| 10:50:59 | 6 | inform the opinions that you formed in this case? |
| 10:51:04 | 7 | A.  So the responses informed me about technical proposals |
| 10:51:11 | 8 | which were made by prior owner of the five patents, |
| 10:51:16 | 9 | according to Plaintiff, and also about some of the |
| 10:51:22 | 10 | available alternatives which were available at the time |
| 10:51:27 | 11 | when the standard was developed. |
| 10:51:29 | 12 | MR. SHEASBY:  Your Honor, I move to strike the end |
| 10:51:32 | 13 | of his answer.  Mr. Rodermund has no expert opinion on |
| 10:51:37 | 14 | availability of alternatives.  He did no independent |
| 10:51:39 | 15 | analysis himself.  He should not be able to speak about it |
| 10:51:43 | 16 | on direct -- direct examination. |
| 10:51:45 | 17 | THE COURT:  You can cross him on that, |
| 10:51:47 | 18 | Mr. Sheasby.  At this point, I'll overrule the objection. |
| 10:51:51 | 19 | Q.  (By Ms. Sooter)  Mr. Rodermund, if the original owners |
| 10:51:58 | 20 | of this -- these patents had entered into a general FRAND |
| 10:52:04 | 21 | undertaking in connection with their IP rights, would that |
| 10:52:07 | 22 | have relieved them of obligations to disclose their IP |
| 10:52:11 | 23 | rights in a timely fashion? |
| 10:52:14 | 24 | A.  No, it would not.  The FRAND and the disclosure |
| 10:52:21 | 25 | obligations are clearly separate.  So, also the companies |

| | | |
|---|---|---|
| 10:52:25 | 1 | which have a general FRAND undertaking, they are still |
| 10:52:31 | 2 | required to follow the disclosure obligation, and there's |
| 10:52:37 | 3 | also a statement in the ETSI IPR Guide which is underlining |
| 10:52:42 | 4 | this. |
| 10:52:43 | 5 | MS. SOOTER:  I pass the witness. |
| 10:52:45 | 6 | THE COURT:  Cross-examination? |
| 10:52:46 | 7 | MR. SHEASBY:  Yes, Your Honor. |
| 10:52:48 | 8 | (Recess in Bench Trial.) |
| 10:56:35 | 9 | THE COURT:  And we'll go back on the record with |
| 10:56:38 | 10 | regard to the bench portion of the trial. |
| 10:56:39 | 11 | Mr. Sheasby, are you prepared to move forward with |
| 10:56:41 | 12 | cross-examination? |
| 10:56:42 | 13 | MR. SHEASBY:  I am, Your Honor. |
| 10:56:48 | 14 | THE COURT:  All right.  Cross-examination of the |
| 10:56:50 | 15 | witness by Plaintiff. |
| 10:56:50 | 16 | CROSS-EXAMINATION |
| 10:56:52 | 17 | BY MR. SHEASBY: |
| 10:56:52 | 18 | Q.  Good afternoon, Mr. Rodermund. |
| 10:56:56 | 19 | A.  Good afternoon, Mr. Sheasby. |
| 10:56:58 | 20 | Q.  When ETSI adopted Section 4.1, there was no |
| 10:57:05 | 21 | contemplation that it would be used by companies to render |
| 10:57:09 | 22 | unenforceable patent rights, fair? |
| 10:57:11 | 23 | A.  I don't know that. |
| 10:57:18 | 24 | Q.  I'm sorry, sir?  What did you say? |
| 10:57:24 | 25 | A.  And I don't know.  I was not there when Section 4.1 was |

| | | |
|---|---|---|
| 10:57:33 | 1 | initially written. |
| 10:57:34 | 2 | Q.  You don't know if there was any intent -- |
| 10:57:37 | 3 | THE COURT:  Slow down. |
| 10:57:39 | 4 | Q.  (By Mr. Sheasby)  You don't know if there was any |
| 10:57:41 | 5 | intent for it to be used to render patents unenforceable, |
| 10:57:46 | 6 | fair? |
| 10:57:46 | 7 | A.  The rendering of patents as enforceable or |
| 10:57:52 | 8 | unenforceable is not within the agreement of ETSI. |
| 10:57:55 | 9 | MR. SHEASBY:  Move to strike as non-responsive, |
| 10:58:09 | 10 | Your Honor. |
| 10:58:09 | 11 | THE COURT:  Overruled. |
| 10:58:10 | 12 | And, Mr. Sheasby, I want you to slow down. |
| 10:58:16 | 13 | Proceed. |
| 10:58:16 | 14 | Q.  (By Mr. Sheasby)  You have never been involved in the |
| 10:58:22 | 15 | actual disclosure procedures for patents to -- at a |
| 10:58:28 | 16 | company, correct? |
| 10:58:28 | 17 | A.  Correct. |
| 10:58:31 | 18 | Q.  You cannot identify one major technology company that |
| 10:58:42 | 19 | has complied with Section 4.1 as you define it, correct? |
| 10:58:48 | 20 | A.  I have limited my analysis on the five patents in this |
| 10:58:58 | 21 | case.  I have not done any other analysis. |
| 10:59:01 | 22 | MR. SHEASBY:  Objection, move to strike as |
| 10:59:03 | 23 | non-responsive, Your Honor. |
| 10:59:05 | 24 | THE COURT:  I find that that is non-responsive. |
| 10:59:12 | 25 | I'm going to direct you to reask the question. |

| | | |
|---|---|---|
| 10:59:14 | 1 | Q.  (By Mr. Sheasby)  You cannot identify one major |
| 10:59:16 | 2 | technology company that complied with Section 4.1 as you |
| 10:59:21 | 3 | define it in LTE, correct? |
| 10:59:26 | 4 | A.  Correct. |
| 10:59:28 | 5 | Q.  You didn't perform any analysis of the course of |
| 10:59:32 | 6 | dealing of ETSI and 3GPP members regarding Section 4.1, |
| 10:59:41 | 7 | correct? |
| 10:59:41 | 8 | A.  Correct. |
| 10:59:49 | 9 | Q.  You have no personal knowledge of discussions of IP and |
| 10:59:54 | 10 | LTE working groups, correct? |
| 10:59:56 | 11 | A.  Correct. |
| 11:00:00 | 12 | Q.  There is no definition of when the development of a |
| 11:00:12 | 13 | standard ends in the ETSI IPR policy, correct? |
| 11:00:15 | 14 | A.  That's defined in 3GPP, not in ETSI. |
| 11:00:27 | 15 | MR. SHEASBY:  Move to strike as non-responsive, |
| 11:00:30 | 16 | Your Honor. |
| 11:00:30 | 17 | THE COURT:  Overruled. |
| 11:00:31 | 18 | Q.  (By Mr. Sheasby)  Sir, in the ETSI IPR policy itself, |
| 11:00:35 | 19 | does it define the period of what it means to, quote, be in |
| 11:00:40 | 20 | development of the standard? |
| 11:00:41 | 21 | A.  No, it does not. |
| 11:00:46 | 22 | Q.  The ETSI IPR policy itself doesn't provide a definition |
| 11:00:51 | 23 | of the end of the standard -- of the end of the development |
| 11:00:55 | 24 | period of the standard, correct? |
| 11:00:59 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 11:01:00 | 1 | Q.  After 3GPP has completed its work, ETSI then formally |
| 11:01:08 | 2 | adopts the standard, correct? |
| 11:01:12 | 3 | A.  Correct. |
| 11:01:12 | 4 | Q.  Your analysis is not based on the dates on which ETSI |
| 11:01:19 | 5 | formally adopts the standard, correct? |
| 11:01:21 | 6 | A.  Correct, because that is not the relevant date. |
| 11:01:30 | 7 | MR. SHEASBY:  Objection, move to strike anything |
| 11:01:32 | 8 | after "correct," Your Honor. |
| 11:01:33 | 9 | THE COURT:  This is before the Court.  I'll |
| 11:01:40 | 10 | sustain the objection and limit his answer to "correct." |
| 11:01:44 | 11 | But, Mr. Sheasby, this is not like we have a jury |
| 11:01:47 | 12 | in the box.  I -- I can certainly tell what's responsive |
| 11:01:50 | 13 | and what's not. |
| 11:01:50 | 14 | MR. SHEASBY:  I -- |
| 11:01:51 | 15 | THE COURT:  Go ahead. |
| 11:01:51 | 16 | MR. SHEASBY:  -- I understand, Your Honor. |
| 11:01:59 | 17 | I'll be right back. |
| 11:02:21 | 18 | Can we have Dwyer Demonstrative 47, please? |
| 11:02:55 | 19 | Let me know when you're there. |
| 11:02:58 | 20 | Q.  (By Mr. Sheasby)  Do you recognize this statement from |
| 11:03:03 | 21 | PX-1812, Mr. Rodermund? |
| 11:03:04 | 22 | A.  Yes, I do. |
| 11:03:11 | 23 | Q.  You agree that the modification of wording is not |
| 11:03:17 | 24 | intended to place a higher burden of disclosure upon a |
| 11:03:20 | 25 | member, correct? |

```
11:03:25   1   A.  Yes.
11:03:26   2            MR. SHEASBY:  I pass the witness, Your Honor.
11:03:28   3            THE COURT:  Redirect, Ms. Sooter?
11:03:28   4                    REDIRECT EXAMINATION
11:03:32   5   BY MS. SOOTER:
11:03:32   6   Q.  Mr. Rodermund, as part of your analysis, were you asked
11:03:45   7   to analyze other companies' practices with regard to ETSI
11:03:50   8   IPR disclosures?
11:03:53   9   A.  No, I was not.
11:03:54  10   Q.  Which IPR disclosures did you focus on for your
11:03:58  11   analysis in this case?
11:03:59  12   A.  I focused only on the IPR disclosures of the five
11:04:08  13   patents in this case.
11:04:10  14   Q.  Do you recall you were asked by Mr. Sheasby about
11:04:14  15   whether you use the ETSI formal -- formal adoption date as
11:04:22  16   the deadline for IPR disclosures, a moment ago?
11:04:25  17   A.  Yes.
11:04:25  18   Q.  Why is that not the correct date to use?
11:04:28  19            MR. SHEASBY:  Objection, outside of the scope of
11:04:30  20   his report.
11:04:31  21            THE COURT:  Response?
11:04:36  22            MS. SOOTER:  Again, Your Honor, he talked about
11:04:38  23   the date he did use and why he used that date, on direct.
11:04:41  24   And Mr. Sheasby just asked him about another date, implying
11:04:45  25   that it would have been the right date to use instead.  So
```

11:04:48  1  this is his explanation as to Mr. Sheasby's

11:04:49  2  cross-examination question.

11:04:51  3          THE COURT:  Mr. Sheasby, you're going to need to

11:04:53  4  come next to Ms. Sooter or close by.  It's that microphone

11:05:02  5  that's operative.

11:05:02  6          And before I hear from you, Mr. Mueller, if it's

11:05:03  7  at all possible, please refrain from going in and out this

11:05:07  8  side door.  The locking mechanism there makes a tremendous

11:05:13  9  noise that is not made when you go through the double doors

11:05:15  10 at the side -- at the back of the courtroom.  Unless it's

11:05:17  11 absolutely necessary, I'm distracted by that locking

11:05:17  12 mechanism as you come and go, okay?

11:05:17  13         THE COURT:  I apologize, Your Honor.  May I just

11:05:17  14 very briefly -- I apologize for interrupting the bench

11:05:17  15 piece, but I think we have an update for you on the source

11:05:32  16 code.

11:05:32  17         Let me finish this, and I'll come back to you.

11:05:36  18         Mr. Sheasby, what's your reply to Ms. Sooter.

11:05:36  19         MR. SHEASBY:  I simply asked Mr. Rodermund the

11:05:38  20 question of whether ETSI has an end date in its policy.  I

11:05:45  21 did not ask about whether that was appropriate or not

11:05:47  22 appropriate.  I simply asked whether it existed.

11:05:49  23         Mr. Rodermund provides no testimony on the ETSI

11:05:52  24 adoption date in his report or as to why that's an

11:05:55  25 appropriate or inappropriate date.  For him to be

11:05:57  1  addressing that, would go beyond the scope of his report.

11:05:59  2          THE COURT:  And I gather, Ms. Sooter, it's your

11:06:05  3  position that the Plaintiffs opened the door to this?

11:06:07  4          MS. SOOTER:  Yes, Your Honor.

11:06:09  5          THE COURT:  I'll overrule the objection.

11:06:10  6          The witness may answer the question.

11:06:12  7  Q.  (By Ms. Sooter)  Mr. Rodermund, why did you use a

11:06:16  8  Stage 3 freeze date and not the ETSI formal adoption date

11:06:20  9  in your analysis of the deadline for IP right disclosures?

11:06:24  10  A.  The Stage 3 freeze date is the most important date in

11:06:31  11  the standards development process, as that's the date when

11:06:36  12  the functional scope of the standard is frozen.  So no new

11:06:40  13  features are supposed to be added after that.

11:06:43  14          And that gives a clear indication of stability of

11:06:48  15  the standard to the industry to implement this standard.

11:06:51  16          The ETSI adoption date is very irrelevant to the

11:06:56  17  industry.  It's just a formality with the ETSI and the

11:07:00  18  other organization partners.  They adopt a freeze date to

11:07:06  19  make freeze standards, but for the work in the industry,

11:07:10  20  the ETSI adoption date is not relevant at all.

11:07:12  21          And -- yeah, and also I just had a look at the

11:07:18  22  last standards set from June.  It took just one week from

11:07:25  23  the IP approval to the ETSI adoption.  So there's often not

11:07:29  24  even a big time difference.

11:07:34  25          MS. SOOTER:  I pass the witness, Your Honor.

| | | |
|---|---|---|
| 11:07:35 | 1 | THE COURT:  Additional cross-examination? |
| 11:07:37 | 2 | MR. SHEASBY:  No additional cross-examination, |
| 11:07:39 | 3 | Your Honor. |
| 11:07:39 | 4 | THE COURT:  All right.  That will complete the |
| 11:07:41 | 5 | testimony from Dr. Rodermund. |
| 11:07:42 | 6 | THE WITNESS:  Okay.  Thank you. |
| 11:07:43 | 7 | THE COURT:  Thank you. |
| 11:07:43 | 8 | All right.  I'm going to transition from the bench |
| 11:07:49 | 9 | trial to the jury trial. |
| 11:07:51 | 10 | (Recess in Bench Trial.) |
| 11:22:35 | 11 | THE COURT:  Mr. Selwyn, if you would, call your |
| 11:22:38 | 12 | next witness. |
| 11:22:44 | 13 | MR. SELWYN:  Your Honor, Apple's next witness will |
| 11:22:50 | 14 | be Heather Mewes.  And if I could just ask as a |
| 11:22:50 | 15 | housekeeping matter of what you have with time count for |
| 11:22:50 | 16 | the last witness? |
| 11:22:50 | 17 | THE COURT:  We are roughly an hour and a half |
| 11:22:54 | 18 | total.  And at this time in an ordinary day we would be |
| 11:22:55 | 19 | close to three hours, but there have been a lot of |
| 11:22:56 | 20 | interruptions and a lot of downtime that -- while they've |
| 11:22:59 | 21 | been frustrating to the Court, they're not any one person's |
| 11:23:03 | 22 | fault or attributable to anybody.  It's just what we have. |
| 11:23:10 | 23 | But we're about half of where we should be timewise. |
| 11:23:13 | 24 | And just so people involved in the bench trial |
| 11:23:18 | 25 | will know, we're going to finish the bench trial today.  If |

| | | |
|---|---|---|
| 11:23:18 | 1 | that means we're here late, we're going to get all of your |
| 11:23:22 | 2 | time allocated used if you want to use every bit of it, but |
| 11:23:24 | 3 | we're going to get finished today. |
| 11:23:25 | 4 | MR. SELWYN:  Thank you.  Pardon me for following |
| 11:23:27 | 5 | up, but how do you have that hour and a half allocated as |
| 11:23:30 | 6 | between -- |
| 11:23:30 | 7 | THE COURT:  I don't have that right in front of |
| 11:23:32 | 8 | me.  I can get it for you.  I think it's roughly 53 minutes |
| 11:23:38 | 9 | for the Defendant and roughly 20 minutes -- 18 or 20 |
| 11:23:40 | 10 | minutes for the Plaintiff.  That's not an hour and a half. |
| 11:23:44 | 11 | That's even less than an hour and a half.  Once we |
| 11:23:48 | 12 | finish -- how long do you anticipate this witness to be? |
| 11:23:49 | 13 | MR. SELWYN:  Approximately 40 minutes. |
| 11:23:52 | 14 | THE COURT:  Okay.  I will try to get you an exact |
| 11:23:54 | 15 | update by the time we finish Ms. Mewes. |
| 11:23:56 | 16 | MR. SELWYN:  I appreciate it.  Thank you, Your |
| 11:23:57 | 17 | Honor. |
| 11:23:57 | 18 | THE COURT:  Is she going to appear by deposition |
| 11:23:59 | 19 | or live? |
| 11:24:01 | 20 | MR. SELWYN:  No, she'll be here live. |
| 11:24:04 | 21 | THE COURT:  Let's proceed. |
| 11:24:13 | 22 | If you'll come forward, Ms. Mewes, and be sworn. |
| 11:24:34 | 23 | (Witness sworn.) |
| 11:24:35 | 24 | THE COURT:  Please come around, ma'am.  Have a |
| 11:24:37 | 25 | seat here on the witness stand. |

| | | |
|---|---|---|
| 11:24:57 | 1 | MR. SELWYN:  May I proceed, Your Honor? |
| 11:24:58 | 2 | THE COURT:  You may proceed, Mr. Selwyn. |
| 11:24:58 | 3 | HEATHER MEWES, DEFENDANT'S WITNESS, SWORN |
| 11:24:58 | 4 | DIRECT EXAMINATION |
| 11:24:59 | 5 | BY MR. SELWYN: |
| 11:24:59 | 6 | Q.  Good morning.  Could you please introduce yourself to |
| 11:25:02 | 7 | the Court? |
| 11:25:03 | 8 | A.  Certainly.  My name is Heather Mewes.  I grew up in |
| 11:25:07 | 9 | Southern California, but sort of moved around most of my |
| 11:25:10 | 10 | life.  I've been in the Bay Area for about 20 years. |
| 11:25:14 | 11 | Living -- living there now with my mom recently. |
| 11:25:18 | 12 | Q.  Where do you work? |
| 11:25:19 | 13 | A.  I work at Apple. |
| 11:25:20 | 14 | Q.  For how long have you worked at Apple? |
| 11:25:22 | 15 | A.  It's been about eight years. |
| 11:25:23 | 16 | Q.  What positions have you held at Apple? |
| 11:25:25 | 17 | A.  When I first started, I joined the IP transactions team |
| 11:25:30 | 18 | as a -- as a senior counsel.  I advanced in that team to a |
| 11:25:35 | 19 | principal counsel role, and then I recently moved in the |
| 11:25:38 | 20 | last year to senior manager role on the product law team. |
| 11:25:41 | 21 | Q.  For how long were you in the IP transactions team? |
| 11:25:44 | 22 | A.  All told, about seven years. |
| 11:25:47 | 23 | Q.  What were your responsibilities on that team? |
| 11:25:49 | 24 | A.  My responsibilities were to advise on all matters |
| 11:25:53 | 25 | relating to intellectual property, but one of the main |

11:25:58   1   things that we did was respond when patent owners would

11:26:03   2   come to Apple and say, I think you need to take a license.

11:26:06   3   Q.  What experience have you had negotiating patent

11:26:11   4   licenses with Apple?

11:26:12   5   A.  I've negotiated dozens of licenses.

11:26:15   6   Q.  Are you familiar with what are sometimes referred to as

11:26:18   7   SEPs, or standard essential patents?

11:26:19   8   A.  Yes, sir.

11:26:19   9   Q.  What do you understand SEPs to mean?

11:26:21  10   A.  So, generally, that refers to patents that are

11:26:24  11   necessary in order to practice a standard.  More

11:26:30  12   familiarly, sometimes that can be referring to just patents

11:26:34  13   that are declared to be essential which may or may not be

11:26:36  14   essential.

11:26:37  15   Q.  Are you familiar with Apple's policy for declaring

11:26:39  16   patents or patent applications as essential to industry

11:26:44  17   standards?

11:26:44  18   A.  Yes, sir.

11:26:45  19   Q.  What is Apple's policy?

11:26:47  20   A.  That we declare patents that may be essential according

11:26:50  21   to whatever the standard is in the appropriate organization

11:26:52  22   on a timely basis.

11:26:53  23   Q.  Could you please provide an example of a situation

11:26:57  24   where Apple declared patents or patent applications as

11:27:00  25   essential upon becoming aware of potential essentiality?

11:27:07  1    A.  Yes, so there -- we do think there is a heightened
11:27:08  2    standard when you're actually making a proposal, and so we
11:27:11  3    had a case where we were making a proposal for a technology
11:27:14  4    called eSIM, and that's a case --
11:27:16  5              MR. SHEASBY:  Your Honor, objection, hearsay.
11:27:19  6    This is about a witness who was not disclosed to us that we
11:27:23  7    wrote a bench memorandum on this exact issue.
11:27:27  8              THE COURT:  What's your response, Mr. Selwyn?
11:27:29  9              MR. SELWYN:  Your Honor, this is something about
11:27:31  10   which she has knowledge.  She testified at her deposition
11:27:35  11   about it.  She was a 30(b)(6) witness, as well.
11:27:39  12             THE COURT:  I'll overrule the objection.  She's
11:27:42  13   entitled to put forward the position of the company.
11:27:52  14   Q.  (By Mr. Selwyn)  Do you need the question re-asked?
11:27:54  15   A.  I think I can pick it up.  So I think I was mentioning
11:27:57  16   that we had a proposal relating to eSIM technology, and
11:28:00  17   this was a case where we had made the proposal, so we -- we
11:28:03  18   made a -- an out of our normal course, we made a disclosure
11:28:08  19   about it.
11:28:09  20   Q.  What happened after Apple made that declaration?
11:28:12  21   A.  We were, in fact, approached by others who asked us to
11:28:17  22   make our -- in exchange for support, whether we would make
11:28:21  23   our patents available on a royalty-free basis.
11:28:24  24   Q.  And how did Apple respond?
11:28:26  25   A.  We did agree to do that.

11:28:28  1   Q.  Could you provide an example of a situation where Apple

11:28:31  2   declared patents or patent applications after acquiring

11:28:35  3   them?

11:28:35  4   A.  Yes.  So we have acquired two very large portfolios of

11:28:40  5   standard essential patents.  One is a portfolio from

11:28:46  6   Nortel, which I think we completed the acquisition in 2011.

11:28:49  7   And the other very recently, the portfolio of Intel.

11:28:54  8   Q.  Has Apple ever taken licenses to SEPs?

11:28:57  9   A.  Yes.

11:28:57  10  Q.  How many licenses has Apple entered, to patents

11:29:01  11  declared essential to similar standards like LTE?

11:29:04  12  A.  About 30.

11:29:05  13  Q.  How many of those were you involved in negotiating?

11:29:08  14  A.  About a third of those.

11:29:10  15  Q.  In your experience, how long does it generally take to

11:29:12  16  negotiate a license to patents declared essential to

11:29:15  17  cellular standards?

11:29:16  18  A.  It varies quite a bit.  It's not uncommon for it to

11:29:22  19  take two to three years.  But there are a few cases where

11:29:25  20  we've been able to move very quickly and conclude a license

11:29:28  21  in two or three months.

11:29:30  22  Q.  What factors in your experience affect the length of

11:29:35  23  time to negotiate a license?

11:29:36  24  A.  Generally, the size and complexity of the portfolio is

11:29:40  25  a major issue.  If you're going to look at the merits,

| | | |
|---|---|---|
| 11:29:43 | 1 | that's just going to take some time for larger portfolios. |
| 11:29:46 | 2 | Sometimes it has to do with the reasonableness of the |
| 11:29:49 | 3 | parties. |
| 11:29:49 | 4 | Q.  What approach does Apple apply when negotiating |
| 11:29:52 | 5 | licenses to SEPs? |
| 11:29:52 | 6 | A.  So two major policies that we have.  One is that we do |
| 11:30:00 | 7 | want to make sure that we're looking at the merits of the |
| 11:30:03 | 8 | patents when we're licensing them, and, two, we do have a |
| 11:30:06 | 9 | valuation framework that we follow in negotiating licenses |
| 11:30:11 | 10 | for SEPs. |
| 11:30:11 | 11 | Q.  What does Apple call that framework? |
| 11:30:13 | 12 | A.  The FRAND framework or sometimes the cellular framework |
| 11:30:16 | 13 | if we're talking about cellular patents. |
| 11:30:18 | 14 | Q.  For how long has Apple had this FRAND framework? |
| 11:30:22 | 15 | A.  Certainly since I've been at Apple. |
| 11:30:24 | 16 | Q.  Has it remained the same over that period of time? |
| 11:30:26 | 17 | A.  Certainly at a high level.  I would agree it's evolved, |
| 11:30:31 | 18 | as we've seen new decisions out of the courts. |
| 11:30:34 | 19 | Q.  Why did Apple develop this FRAND framework? |
| 11:30:36 | 20 | A.  Apple entered the cellular market in 2007 when we were |
| 11:30:39 | 21 | selling the iPhone, but I think even more significantly, we |
| 11:30:42 | 22 | became a major patentholder of standard essential patents |
| 11:30:46 | 23 | when we acquired the Nortel portfolio. |
| 11:30:49 | 24 | Q.  Is Apple's FRAND framework confidential? |
| 11:30:51 | 25 | A.  No. |

| | | |
|---|---|---|
| 11:30:52 | 1 | Q.  Could you please turn in your binder to DTX-2107.  Tell |
| 11:31:02 | 2 | us when you have that. |
| 11:31:03 | 3 | A.  I have that, yes. |
| 11:31:04 | 4 | Q.  What is that document? |
| 11:31:05 | 5 | A.  It's a copy of Apple's SEP policy. |
| 11:31:08 | 6 | Q.  Do you see on Page 3 the heading that reads FRAND |
| 11:31:12 | 7 | royalty base? |
| 11:31:12 | 8 | A.  Yes. |
| 11:31:12 | 9 | Q.  To what does that refer? |
| 11:31:14 | 10 | A.  This is a reference to the valuation framework that I |
| 11:31:18 | 11 | just mentioned.  And so the first step in that valuation |
| 11:31:23 | 12 | framework is to identify the base. |
| 11:31:25 | 13 | Q.  Can you explain the statement that appears under the |
| 11:31:28 | 14 | heading FRAND royalty base? |
| 11:31:29 | 15 | A.  Yes.  So what this is saying is it's important when you |
| 11:31:34 | 16 | have a standard essential technology that you start from a |
| 11:31:40 | 17 | common base.  And as an example in the cellular space, we |
| 11:31:46 | 18 | have a lot of different cellular devices, but -- and a lot |
| 11:31:52 | 19 | of them are sold at very different price points, but |
| 11:31:55 | 20 | they're all using effectively the same cellular technology, |
| 11:31:59 | 21 | and so they should be treated similarly. |
| 11:32:05 | 22 | Q.  What is the common royalty -- what is the common FRAND |
| 11:32:06 | 23 | royalty base that Apple applies when negotiating licenses |
| 11:32:09 | 24 | to cellular SEPs? |
| 11:32:10 | 25 | A.  So we look at the smallest salable unit, which in the |

11:32:14  1  case of cellular, is the baseband chipset.

11:32:17  2  Q.  Do you see where the section states that the smallest

11:32:21  3  salable unit should be, quote, further apportioned to

11:32:24  4  isolate the SEP value?

11:32:26  5  A.  Yes, I do.

11:32:26  6  Q.  What does that mean?

11:32:27  7  A.  Even once you have the smallest salable unit, it's

11:32:31  8  important to look at that and separate out the non --

11:32:39  9  separate or apportion the value of that.

11:32:41  10         So in the case of cellular -- as an example,

11:32:44  11  there's actually GPS functionality in the cellular

11:32:48  12  chipsets.  So all of the location-based functionality is on

11:32:51  13  the same chipset as the cellular functionality.

11:32:56  14  Q.  Looking a little further down on Page 3, can you

11:33:00  15  explain what is meant by the, quote, FRAND royalty rate?

11:33:02  16  A.  Yes.  So this is the second step in our valuation

11:33:05  17  framework.  Even once you have decided on what the base is,

11:33:08  18  it's important to apportion amongst the SEP holders what

11:33:12  19  their particular rate or share of the base is.

11:33:13  20  Q.  How does Apple determine the royalty rate?

11:33:16  21  A.  So we start from the -- the pro rata share of a -- from

11:33:22  22  the licensor of the declared standard essential patents.

11:33:25  23  Q.  What is a pro rata share?

11:33:27  24  A.  Essentially, it's how many out of the -- the whole pie

11:33:32  25  that a particular licensor owns.

11:33:34   1   Q.  And can you explain why under Apple's FRAND framework
11:33:38   2   Apple uses the patentholder's pro rata share?
11:33:43   3   A.  It's important in this area where there are a lot of
11:33:47   4   holders to treat people fairly.  And there is a problem in
11:33:52   5   the industry of royalty stacking.  If you added up all the
11:33:56   6   people who have come to us and what their demands were, let
11:34:00   7   me tell you, it would add up to more than a hundred
11:34:03   8   percent, for sure.
11:34:04   9   Q.  Why does Apple use the pro rata share of declared SEPs
11:34:08  10   instead of the share of patents that are actually
11:34:12  11   essential?
11:34:12  12   A.  So the -- there is a database of declared SEPs.  So
11:34:17  13   that's sort of an objective fact that is available to
11:34:19  14   everybody.  It is a very difficult undertaking to determine
11:34:25  15   what is actually essential.  And I think when we've seen
11:34:28  16   studies or efforts to do this, you see that no one is very
11:34:32  17   satisfied about the results.
11:34:35  18         And so our approach is to start with the declared
11:34:39  19   SEPs.  People have similar motivations, and we think that
11:34:43  20   at least reflects a fair starting point in our framework.
11:34:47  21   Q.  Does Apple --
11:34:48  22         THE COURT:  Mr. Selwyn, let me interrupt just a,
11:34:51  23   minute.
11:34:51  24         We're going to go off the record as to the bench
11:34:54  25   trial.  We're going to go on the record as to the jury

| | | |
|---|---|---|
| 11:34:57 | 1 | trial. |
| 11:34:58 | 2 | (Recess in Bench Trial.) |
| 11:34:58 | 3 | THE COURT:  All right.  We'll go back on the |
| 11:41:08 | 4 | record as regards the bench trial. |
| 11:41:10 | 5 | Mr. Selwyn, proceed with your direct examination |
| 11:41:13 | 6 | of Ms. Mewes. |
| 11:41:14 | 7 | Q.  (By Mr. Selwyn)  Ms. Mewes, does Apple ever make any |
| 11:41:20 | 8 | adjustments to the royalty rate? |
| 11:41:23 | 9 | A.  Yes, sir. |
| 11:41:23 | 10 | Q.  Can you explain? |
| 11:41:24 | 11 | A.  We certainly take into account the negotiation between |
| 11:41:28 | 12 | the parties.  So we have a reference rate, but we want to |
| 11:41:31 | 13 | take into account the information that was shared with us, |
| 11:41:34 | 14 | the licensing history part of our negotiations, and so |
| 11:41:39 | 15 | it's -- we do make adjustments based on that. |
| 11:41:42 | 16 | Q.  Does Apple consider the merits of the patents? |
| 11:41:45 | 17 | A.  Of course, yes. |
| 11:41:46 | 18 | Q.  Why? |
| 11:41:49 | 19 | A.  As I mentioned, we do think it's important in this |
| 11:41:52 | 20 | context to consider the merits.  It -- our experience has |
| 11:41:57 | 21 | been that many patents that we look at are invalid or |
| 11:42:03 | 22 | non-essential. |
| 11:42:03 | 23 | Q.  Once Apple determines the FRAND base and the FRAND |
| 11:42:08 | 24 | rate, how does it determine how much to offer for a FRAND |
| 11:42:12 | 25 | license to SEPs under Apple's FRAND framework? |

11:42:14   1   A.  So we do look at the past units, and then we look at

11:42:18   2   forecasts that are publicly available for future units.  We

11:42:22   3   have to take into account whether or not some of those

11:42:24   4   units may be licensed, whether in part or in whole.  And

11:42:28   5   then, of course, we do want to -- we're usually offering an

11:42:31   6   upfront lump-sum payment, in which case we do need to

11:42:35   7   account for the discount rate.

11:42:36   8   Q.  Why does Apple typically offer a lump sum?

11:42:39   9   A.  There are administrative efficiencies.  It's actually

11:42:45   10  quite an undertaking to report a royalty accurately.  And

11:42:50   11  you also have to go through audits and things like that.

11:42:53   12         And then, second, I think it -- it actually is

11:42:56   13  helpful just to set the expectations of the parties.  What

11:42:59   14  happens sometimes with running royalties is that

11:43:01   15  expectations are upset by one or the other.  That can lead

11:43:05   16  to future disputes.

11:43:06   17  Q.  Are you aware of any other companies that have a

11:43:10   18  similar framework as Apple's for negotiating licenses to

11:43:14   19  SEPs?

11:43:14   20  A.  Yes.

11:43:14   21  Q.  What companies?

11:43:15   22  A.  Cisco, Intel -- I think there's some others, as well.

11:43:19   23         MR. SHEASBY:  Your Honor, I move to strike as

11:43:21   24  hearsay.

11:43:21   25         THE COURT:  Overruled.

11:43:28  1           MR. SELWYN:  Let's pull up DTX-1047.

11:43:31  2  Q.  (By Mr. Selwyn)  Which is Tab 14 in your folder.

11:43:34  3           Do you recognize this?

11:43:36  4  A.  Yes, I do.

11:43:36  5  Q.  What is it, please?

11:43:38  6  A.  It's actually a statement by Samsung to regulators that

11:43:41  7  was made in 2015.

11:43:42  8           MR. SELWYN:  Could we have Page 11 on the screen?

11:43:45  9  Q.  (By Mr. Selwyn)  What does this indicate about

11:43:48  10  Samsung's approach to negotiating licenses to SEPs?

11:43:51  11  A.  Yes, that it -- it also follows a similar approach

11:43:55  12  of -- of looking at the smallest salable unit.  As you can

11:44:01  13  see in -- I can't tell if it's the third bullet or the

11:44:06  14  second, based on my cut-out.

11:44:09  15           MR. SELWYN:  Your Honor, for this next portion, we

11:44:11  16  request to seal the courtroom, and it's going to include

11:44:14  17  third-party confidential information, so we'll have to ask

11:44:17  18  the PanOptis representatives to leave.

11:44:19  19           THE COURT:  All right.  I'll order the courtroom

11:44:21  20  sealed at this time, based on counsel's request.  Those of

11:44:24  21  you present not subject to the protective order in this

11:44:28  22  case should excuse yourselves and remain outside until the

11:44:32  23  courtroom is unsealed.

11:44:33  24           (Courtroom sealed.)

11:44:33  25           (This portion of the transcript is sealed and

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:44:33 | 1  | filed under separate cover as Bench Trial                |
| 11:44:44 | 2  | Sealed Portion No. 1.)                                    |
| 12:09:35 | 3  | (Courtroom unsealed.)                                     |
| 12:09:36 | 4  | THE COURT:  And we're going to transition from the       |
| 12:09:37 | 5  | bench trial to the jury trial.                           |
| 12:09:39 | 6  | (Recess in Bench Trial.)                                  |
| 12:09:39 | 7  | (Courtroom sealed.)                                       |
| 12:09:39 | 8  | (This portion of the transcript is sealed and            |
| 12:09:39 | 9  | filed under separate cover as Bench Trial                |
| 12:25:33 | 10 | Sealed Portion No. 2.)                                    |
| 12:25:33 | 11 | (Courtroom unsealed.)                                     |
| 12:59:50 | 12 | (Recess.)                                                 |
| 01:17:06 | 13 | THE COURT:  All right.  That completes the jury          |
| 01:17:08 | 14 | trial in this case.  We still have the remainder of the  |
| 01:17:11 | 15 | bench trial to complete.                                  |
| 01:17:13 | 16 | I'll note, counsel, that right before we recessed        |
| 01:17:16 | 17 | for lunch, I gave you some wrong information.  I trust my |
| 01:17:20 | 18 | staff has corrected those time totals for you.  What you've |
| 01:17:23 | 19 | just been updated with from my staff is accurate and what |
| 01:17:28 | 20 | you should rely on.                                       |
| 01:17:29 | 21 | I'd like to take about a 10-minute recess, and           |
| 01:17:33 | 22 | then we'll reconvene, and at that time, Mr. Sheasby --   |
| 01:17:37 | 23 | Sheasby, you may cross-examine Ms. Mewes.                 |
| 01:17:56 | 24 | (Recess.)                                                 |
| 01:35:14 | 25 | COURT SECURITY OFFICER:  All rise.                       |

| | | |
|---|---|---|
| 01:35:16 | 1 | THE COURT:  Be seated, please. |
| 01:36:53 | 2 | We'll continue with the bench trial. |
| 01:36:59 | 3 | Mr. Sheasby, you may cross-examine Ms. Mewes. |
| 01:37:02 | 4 | MR. SHEASBY:  Do we need to wait for Mr. Blevins, |
| 01:37:08 | 5 | the corporate rep, or -- |
| 01:37:08 | 6 | THE COURT:  Mr. Selwyn, what's your position? |
| 01:37:10 | 7 | MR. SELWYN:  You can proceed. |
| 01:37:11 | 8 | MR. SHEASBY:  Okay. |
| 01:37:11 | 9 | CROSS-EXAMINATION |
| 01:37:12 | 10 | BY MR. SHEASBY: |
| 01:37:12 | 11 | Q.  Good afternoon, Ms. Mewes. |
| 01:37:15 | 12 | A.  Good afternoon. |
| 01:37:15 | 13 | Q.  Now, Ms. Mewes, you referred to something called eSIM, |
| 01:37:22 | 14 | and Ms. Workman told you that someone told Ms. Workman that |
| 01:37:25 | 15 | they wanted you to give them a -- they wanted you to make |
| 01:37:28 | 16 | the -- the technology available for free; is that correct? |
| 01:37:30 | 17 | A.  So at the time of my deposition, that was correct, yes. |
| 01:37:34 | 18 | Q.  Now, you didn't have any documents with you to evidence |
| 01:37:40 | 19 | that at your deposition, correct? |
| 01:37:41 | 20 | A.  That's right. |
| 01:37:42 | 21 | Q.  You didn't have any emails or anything from any third |
| 01:37:47 | 22 | party making that ask to offer, correct? |
| 01:37:50 | 23 | A.  Again, not personally, no. |
| 01:37:51 | 24 | Q.  Now, you read the -- Judge Birss's decision or Birss's |
| 01:37:59 | 25 | decision, correct? |

```
01:38:00   1   A.  I did, correct.

01:38:02   2   Q.  You're aware that he has a major market rate, correct?

01:38:05   3   A.  I'm sorry?

01:38:06   4   Q.  A major market rate in the decision?

01:38:09   5   A.  Yes.

01:38:09   6   Q.  He identifies the United States as a major market,

01:38:09   7   correct?

01:38:09   8   A.  He does, yes.

01:38:10   9   Q.  He's got a 2X uplift if you were just to take a single

01:38:14  10   country license, correct?

01:38:15  11   A.  I think that's right.  I don't recall that

01:38:18  12   specifically, but that sounds right.

01:38:19  13          THE COURT:  Let me ask both of you to slow down,

01:38:26  14   please.

01:38:26  15          THE WITNESS:  Yes, sir.

01:38:26  16          THE COURT:  And I mean it.

01:38:28  17          Please continue.

01:38:31  18   Q.  (By Mr. Sheasby)  Mr. -- Justice Birss, in the opinion,

01:38:32  19   has a 2X uplift for a country specific license, fair?

01:38:36  20   A.  I don't recall that specifically, but that sounds about

01:38:39  21   right.

01:38:39  22   Q.  And you read the Birss decision when you were having

01:38:42  23   negotiations with PanOptis, correct?

01:38:44  24   A.  Yes, sir.

01:38:44  25   Q.  You cannot point to a single engineer -- withdraw.
```

01:38:53  1         At your deposition, you could not point to a

01:38:57  2   single engineer at Apple who ever told you it matters in

01:39:00  3   terms of selecting a proposal whether or not it is

01:39:03  4   patented, correct?

01:39:04  5   A.  Sorry, could you repeat your question?

01:39:06  6   Q.  Sure.  At your deposition, you could not point to a

01:39:09  7   single engineer at Apple who ever told you that it matters

01:39:13  8   in terms of selecting a proposal whether or not it is

01:39:16  9   patented, correct?

01:39:18  10  A.  That -- that's right, yes.

01:39:20  11  Q.  You told PanOptis that Apple had entered into many

01:39:29  12  licenses using Apple's framework and consistent with

01:39:31  13  Apple's framework, fair?

01:39:33  14  A.  I think the words I used, that it was consistent with

01:39:36  15  our framework, yes.

01:39:37  16  Q.  You told PanOptis that Apple had entered into many

01:39:40  17  licenses using Apple's framework and consistent with

01:39:44  18  Apple's framework, correct?

01:39:46  19  A.  I think that's what I just said, yes.

01:39:49  20  Q.  You used the word "using" the framework, correct?

01:39:52  21  A.  Yes, sir, that we used the framework, yes.

01:39:55  22  Q.  You have no recollection that Apple ever entered into a

01:39:59  23  license agreement that expressly calculates any payments

01:40:02  24  with reference to a baseband chip, correct?

01:40:05  25  A.  That's correct.  Sorry, that's correct within the four

01:40:09  1  corners of the agreement, I assume that's what you were

01:40:11  2  saying.

01:40:12  3        THE COURT:  Please talk a little slower,

01:40:14  4  Ms. Mewes.

01:40:16  5        THE WITNESS:  Yes, sir, sorry, sir.

01:40:18  6  Q.  (By Mr. Sheasby)  You have no recollection that Apple

01:40:21  7  ever entered into a license agreement that expressly

01:40:23  8  calculates any payment with reference to the baseband chip,

01:40:27  9  correct?

01:40:27  10  A.  That's correct, if by express you mean within the four

01:40:35  11  corners of the agreement.

01:40:35  12  Q.  You claim to have done an investigation as to what

01:40:41  13  Apple was paying per phone for its IP rights relating to

01:40:47  14  what you view as a baseband before you told PanOptis that

01:40:50  15  the cap was $5.00 per Apple device, correct?

01:40:53  16  A.  Not as you've expressed it, no.

01:40:55  17  Q.  Okay.  Why don't we turn to your deposition?

01:40:59  18  A.  Yes.

01:41:01  19        MR. SHEASBY:  Let's turn to 123:29 to 124:10.

01:41:05  20  A.  I'm sorry, I couldn't hear your reference.

01:41:07  21  Q.  Sure.  123:29 to 124:10?

01:41:24  22  A.  I'm sorry, Page 123, and you said --

01:41:27  23  Q.  Line 29 --

01:41:27  24  A.  Okay.

01:41:28  25  Q.  -- to 124, Line 10?

| | | |
|---|---|---|
| 01:41:30 | 1 | A.  Wait, I'm sorry, I thought you said Page 123.  You said |
| 01:41:34 | 2 | Page 129 now? |
| 01:41:35 | 3 | Q.  Page 123, Line 29, to Page 124, Line 10? |
| 01:41:42 | 4 | A.  There is no Line 29, I'm confused. |
| 01:41:45 | 5 | Q.  Why don't you go to Page 123 and go to Line 7. |
| 01:42:06 | 6 | A.  Okay. |
| 01:42:07 | 7 | Q.  Did I read your testimony correctly? |
| 01:42:08 | 8 | A.  I'm not sure. |
| 01:42:10 | 9 | Q.  Did you give that testimony? |
| 01:42:13 | 10 | A.  Yes. |
| 01:42:14 | 11 | Q.  All right. |
| 01:42:15 | 12 | MR. SHEASBY:  Let's publish it. |
| 01:42:17 | 13 | Q.  (By Mr. Sheasby)  Question:  So when you told PanOptis |
| 01:42:23 | 14 | that the cap on -- on all patents for the baseband for |
| 01:42:28 | 15 | telecommunications should be $5.00, did you actually go and |
| 01:42:31 | 16 | investigate what your -- what your effective per-unit |
| 01:42:35 | 17 | royalty rate was for Apple iPhones and iPads? |
| 01:42:39 | 18 | So maybe you're referring to something else.  If |
| 01:42:43 | 19 | you're referring to sort of what the accounting is, if you |
| 01:42:45 | 20 | actually look at the licenses, I'm not sure that it |
| 01:42:47 | 21 | actually totaled over that.  I don't think it was.  I don't |
| 01:42:49 | 22 | think it did. |
| 01:42:50 | 23 | That's what I'm asking.  Did you do the |
| 01:42:52 | 24 | investigation? |
| 01:42:53 | 25 | Answer:  So I'm familiar with numbers. |

| | | |
|---|---|---|
| 01:42:56 | 1 | Question:  So what are -- where are those numbers? |
| 01:42:59 | 2 | What number was it?  How much was Apple paying per phone |
| 01:43:02 | 3 | for its IP rights relating to what you would view as the |
| 01:43:06 | 4 | baseband? |
| 01:43:07 | 5 | Answer:  So you could look at the individual |
| 01:43:09 | 6 | licenses and do an analysis of that, and so we have a |
| 01:43:12 | 7 | general sense of them. |
| 01:43:13 | 8 | Question:  I'm asking whether you investigated -- |
| 01:43:17 | 9 | investigated that before you told PanOptis the cap was |
| 01:43:20 | 10 | $5.00 per Apple device. |
| 01:43:22 | 11 | Answer:  I -- I was aware of that. |
| 01:43:25 | 12 | Did I read your testimony correctly, Ms. Mewes? |
| 01:43:28 | 13 | A.  Yeah. |
| 01:43:31 | 14 | Q.  Now, at your deposition, you claim not to remember |
| 01:43:34 | 15 | precisely what that number was, correct? |
| 01:43:36 | 16 | A.  Yeah, that's right. |
| 01:43:37 | 17 | Q.  The $5.00 cap you placed on royalties relates solely to |
| 01:43:43 | 18 | standard essential patents, and that's what you told |
| 01:43:44 | 19 | PanOptis, correct? |
| 01:43:45 | 20 | A.  So the cap is your -- your question.  That's confusing |
| 01:43:48 | 21 | me because I've never told them there was a cap. |
| 01:43:51 | 22 | MR. SHEASBY:  Your Honor, I move to strike as |
| 01:43:54 | 23 | non-responsive. |
| 01:44:04 | 24 | THE COURT:  I'll sustain that objection. |
| 01:44:07 | 25 | Ms. Mewes, if you don't understand the question, |

| | | |
|---|---|---|
| 01:44:09 | 1 | you're certainly free to say, I don't understand the |
| 01:44:13 | 2 | question. |
| 01:44:13 | 3 | THE WITNESS:  Yes, sir. |
| 01:44:14 | 4 | Q.  (By Mr. Sheasby)  The $5.00 cap you place -- you placed |
| 01:44:17 | 5 | on the royalties related solely to the standard essential |
| 01:44:21 | 6 | patents, and that's what you told PanOptis, correct? |
| 01:44:22 | 7 | A.  No. |
| 01:44:24 | 8 | Q.  Let's turn to your deposition, Page 126, Lines 18, to |
| 01:44:30 | 9 | Line 127, Lines 5. |
| 01:44:43 | 10 | A.  Isn't that what I just said? |
| 01:44:45 | 11 | Q.  Ma'am, the question is:  Would you turn to that place |
| 01:44:50 | 12 | in your deposition -- |
| 01:44:51 | 13 | A.  I'm sorry, I'm there, yes. |
| 01:44:54 | 14 | Q.  -- and please read your testimony? |
| 01:44:54 | 15 | MR. SHEASBY:  All right.  Let's publish that. |
| 01:44:59 | 16 | Q.  (By Mr. Sheasby)  Question:  Now, the $5.00 cap that |
| 01:45:03 | 17 | you placed on the royalties, that was just for standard |
| 01:45:06 | 18 | essential patents -- that was not just for standard |
| 01:45:08 | 19 | essential patents, that was for all patents relating to the |
| 01:45:11 | 20 | telecommunications baseband, correct? |
| 01:45:12 | 21 | Answer:  No. |
| 01:45:13 | 22 | Oh, so it just relates to the standard essential |
| 01:45:17 | 23 | patents?  The five relates solely to standard essential |
| 01:45:21 | 24 | patents? |
| 01:45:21 | 25 | Yes. |

| | | |
|---|---|---|
| 01:45:22 | 1 | Did I read your testimony correctly, ma'am? |
| 01:45:25 | 2 | A.  You did, yes. |
| 01:45:25 | 3 | Q.  You used 26,600 as the denominator in determining the |
| 01:45:36 | 4 | rate you offered to pay PanOptis, correct? |
| 01:45:40 | 5 | A.  That's correct. |
| 01:45:40 | 6 | Q.  You didn't analyze which of those patents were actually |
| 01:45:42 | 7 | essential and valid, correct? |
| 01:45:44 | 8 | A.  That is correct, yes. |
| 01:45:45 | 9 | Q.  In reality, only approximately 10 percent of patents in |
| 01:45:47 | 10 | Apple's experience that are declared essential are actually |
| 01:45:51 | 11 | essential and valid, correct? |
| 01:45:53 | 12 | A.  That's been our experience, yes. |
| 01:45:55 | 13 | Q.  In terms of the denominator that you used, you did not |
| 01:45:59 | 14 | consider merit when assessing the denominator, correct? |
| 01:46:02 | 15 | A.  Yes, we were just using declarations. |
| 01:46:04 | 16 | MR. SHEASBY:  I move to strike anything after |
| 01:46:06 | 17 | "yes," Your Honor. |
| 01:46:06 | 18 | THE COURT:  Sustained. |
| 01:46:13 | 19 | Q.  (By Mr. Sheasby)  You treated 2G patents as equally |
| 01:46:17 | 20 | valuable as each 4G patent, correct? |
| 01:46:26 | 21 | A.  Yes, you could say it that way. |
| 01:46:30 | 22 | Q.  But the most current standard, 4G, is typically |
| 01:46:33 | 23 | considered to be more valuable than 2G, correct? |
| 01:46:37 | 24 | A.  Yes, I agree. |
| 01:46:38 | 25 | Q.  Apple's position is that average sales price and |

01:46:41  1  profitability are relevant for FRAND, correct?

01:46:43  2  A.  Certainly, starting with the average sales price is not

01:46:52  3  correct for FRAND as argued.

01:46:53  4       MR. SHEASBY:  Object -- objection, nonresponsive,

01:46:54  5  move to strike.

01:46:59  6       THE COURT:  Overruled.  I think that's responsive

01:47:13  7  to your question.

01:47:14  8  Q.  (By Mr. Sheasby)  Apple's position is that average

01:47:16  9  sales price and profitability are irrelevant for FRAND,

01:47:22  10 correct?

01:47:22  11 A.  That they're irrelevant as a starting -- as a starting

01:47:26  12 point for FRAND, yes.

01:47:26  13      MR. SHEASBY:  Let's go to your deposition at

01:47:30  14 185:25 to 186:6.

01:47:34  15 A.  Could you read the reference again, sir?

01:47:37  16 Q.  (By Mr. Sheasby)  185:25 to 186:6.

01:47:43  17      THE COURT:  While they're doing that, Mr. Selwyn,

01:47:44  18 can you tell me where your corporate representative is and

01:47:47  19 why he's not been in court representing Apple since we came

01:47:52  20 back from our last recess approximately 10 to 15 minutes

01:47:58  21 ago?  We had a pretty lengthy break after the return of the

01:48:06  22 jury's verdict.  He's expected to be in the courtroom.

01:48:10  23      MR. SELWYN:  We'll get him back, Your Honor.

01:48:11  24      THE COURT:  You need to do so.  I'm not trying to

01:48:14  25 be unreasonable, but Apple is a party in this bench trial.

| | | |
|---|---|---|
| 01:48:18 | 1 | They've chosen him to be their representative here, and he |
| 01:48:22 | 2 | needs to be present just like the other parties' |
| 01:48:28 | 3 | representative is present. |
| 01:48:29 | 4 | All right.  Continue, Mr. Sheasby. |
| 01:48:30 | 5 | Q.  (By Mr. Sheasby)  So you were looking at 185:26 to |
| 01:48:35 | 6 | 186:6. |
| 01:48:35 | 7 | A.  Yes, sir. |
| 01:48:35 | 8 | Q.  Did you give that testimony? |
| 01:48:36 | 9 | A.  I did, yes. |
| 01:48:37 | 10 | MR. SHEASBY:  Let's go ahead and publish that. |
| 01:48:41 | 11 | Q.  (By Mr. Sheasby)  Question:  Average sales price is |
| 01:48:43 | 12 | irrelevant for -- for FRAND under Apple's position, |
| 01:48:46 | 13 | correct? |
| 01:48:46 | 14 | Answer:  That -- that certainly is our view. |
| 01:48:50 | 15 | Profitability is irrelevant for purposes of FRAND. |
| 01:48:56 | 16 | That's Apple's position, correct? |
| 01:48:58 | 17 | Answer:  Yes. |
| 01:49:00 | 18 | Did I read your testimony correctly? |
| 01:49:01 | 19 | A.  You did, yes. |
| 01:49:02 | 20 | Q.  But, in reality, you can see that is not necessarily |
| 01:49:06 | 21 | the case that licensing on any basis other than the profit |
| 01:49:11 | 22 | margin of the baseband -- of an average baseband chip is |
| 01:49:11 | 23 | not FRAND, correct? |
| 01:49:11 | 24 | A.  I'm sorry, I'm going to have to read that again.  That |
| 01:49:14 | 25 | was very fast. |

01:49:15  1   Q.  In reality, you concede that you can license on a basis

01:49:18  2   other than the profit margin of a baseband chip and still

01:49:21  3   be FRAND, correct?

01:49:22  4   A.  I agree with that, yes.

01:49:23  5   Q.  You don't believe that it's necessary to provide a most

01:49:29  6   favored nation's clause to be FRAND, correct?

01:49:33  7   A.  That's my -- my belief, yes.

01:49:34  8   Q.  And you did ask PanOptis for an MFN clause, correct?

01:49:38  9   A.  No.

01:49:39  10  Q.  Let's go to your deposition, 369, Lines 23, to 370,

01:49:44  11  Lines 3.

01:49:51  12  A.  I'm sorry, you said 369?

01:49:53  13  Q.  369, Lines 23, to 370, Lines 3?

01:50:05  14  A.  Okay.  Yeah, I'm there.

01:50:07  15  Q.  Let's go ahead -- did you give that testimony?

01:50:10  16  A.  Yes, I did.

01:50:11  17        MR. SHEASBY:  Let's publish it.

01:50:12  18  Q.  (By Mr. Sheasby)  At any point in time did you request

01:50:14  19  a most favored nation's clause from PanOptis?  Yes or no?

01:50:20  20        Answer:  Yes.  Yes, when they suggested it.

01:50:24  21        Did I read your testimony correctly?

01:50:27  22  A.  You did, yes.

01:50:28  23  Q.  When I asked you at your deposition what the definition

01:50:28  24  of FRAND is under ETSI, you said that had not been defined,

01:50:30  25  correct?

```
01:50:30    1   A.  Yes.
01:50:30    2   Q.  There's no meeting of the minds of ETSI or 3GPP when
01:50:35    3   they agreed to license on FRAND terms, correct?
01:50:37    4   A.  I said that I did not know that.  I wasn't there,
01:50:41    5   obviously, but it's an interesting question.
01:50:46    6   Q.  Let's pull up your deposition testimony -- well, first
01:50:49    7   off, why don't you go to Page 280:17 through 24.
01:50:52    8   A.  Sorry.  You're going to have to say it again.
01:50:54    9   Q.  280:17 through 24.
01:51:07   10        MR. SELWYN:  Your Honor, I -- I'll just object
01:51:08   11   that this is not proper impeachment.
01:51:14   12   Q.  (By Mr. Sheasby)  Let me know when you've read it.
01:51:17   13        THE COURT:  I'll carry your objection until we
01:51:19   14   complete the process.
01:51:19   15        MR. SELWYN:  Thank you, Your Honor.
01:51:20   16   A.  Yes, I'm there.
01:51:21   17   Q.  (By Mr. Sheasby)  Did you give that testimony under
01:51:22   18   oath?
01:51:22   19   A.  I did, yes.
01:51:23   20        MR. SHEASBY:  Let's publish that.
01:51:26   21   Q.  (By Mr. Sheasby)  Question:  Was there a meeting of the
01:51:28   22   minds between the participants in ETSI or 3GPP when they
01:51:32   23   agreed to license on FRAND terms of what that actually
01:51:35   24   requires?
01:51:35   25        Answer:  That's a good question.  I wasn't there,
```

```
01:51:38   1   so I can't -- I can't comment on that, but certainly it's
01:51:42   2   become clear there is no meeting of the minds today.
01:51:44   3             Do you see that, ma'am?
01:51:46   4   A.  Yes.
01:51:46   5   Q.  That's the testimony you gave as Apple's corporate
01:51:50   6   representative, correct?
01:51:50   7   A.  Yes.
01:51:51   8             THE COURT:  I'll overrule the Defendant's
01:51:53   9   objection that I carried.
01:51:54  10   Q.  (By Mr. Sheasby)  You were unable to identify any Apple
01:51:56  11   agreement that is technically comparable to the PanOptis
01:51:58  12   patents in your deposition, correct?
01:51:59  13   A.  I didn't do that analysis, so you're correct.
01:52:05  14   Q.  ████████████████████████████████████████████████████
01:52:09  15   A.  Yes.
01:52:09  16   Q.  ████████████████████████████████████████████████████
01:52:19  17   the merits of the PanOptis portfolio?
01:52:19  18             MR. SELWYN:  Your Honor, if there are going to be
01:52:19  19   questions about this particular agreement, then the
01:52:19  20   PanOptis representatives will --
01:52:20  21             THE COURT:  You're going to have to speak up,
01:52:22  22   Mr. Selwyn.
01:52:22  23             MR. SELWYN:  Your Honor, if there are going to be
01:52:24  24   questions about this agreement, then we'll have to be under
01:52:27  25   seal and PanOptis's representatives will need to leave.
```

On line 14 and 16: REDACTED BY ORDER OF THE COURT

01:52:30   1          MR. SHEASBY:  The question I'm going to ask is

01:52:32   2                    REDACTED BY ORDER OF THE COURT

01:52:35   3

01:52:39   4   question.

01:52:39   5          THE COURT:  Do you believe that requires a

01:52:42   6   sealing, Mr. Selwyn?

01:52:43   7          MR. SELWYN:  The party name itself would be

01:52:46   8   something I would be asking to seal, so, yes.

01:52:47   9          THE COURT:  All right.  Then I'll order the

01:52:49  10   courtroom sealed.  Those present not subject to the

01:52:51  11   protective order in this case should excuse themselves

01:52:54  12   until the courtroom is unsealed.

01:52:54  13          (Courtroom sealed.)

01:52:54  14          (This portion of the transcript is sealed and

01:52:54  15           filed under separate cover as Bench Trial

01:52:56  16           Sealed Portion No. 3.)

01:59:51  17          (Courtroom unsealed.)

01:59:51  18          Dr. Perryman, you may return to the witness stand.

01:59:53  19   I remind you, sir, you remain under oath.

01:59:58  20          THE WITNESS:  Thank you, Your Honor.

01:59:58  21          THE COURT:  You may pass out binders.

02:00:26  22          MR. SELWYN:  May I proceed, Your Honor?

02:00:29  23          THE COURT:  You may proceed, Mr. Selwyn.

02:00:29  24   RAY PERRYMAN, PH.D., DEFENDANT'S WITNESS, PREVIOUSLY SWORN

02:00:29  25                    DIRECT EXAMINATION

| | | |
|---|---|---|
| 02:00:30 | 1 | BY MR. SELWYN: |
| 02:00:30 | 2 | Q.  Good afternoon, Dr. Perryman. |
| 02:00:31 | 3 | A.  Good afternoon. |
| 02:00:31 | 4 | Q.  You discussed your background earlier in this trial, |
| 02:00:35 | 5 | but may I ask you a few further questions regarding your |
| 02:00:38 | 6 | experience and expertise? |
| 02:00:39 | 7 | A.  Yes, sir. |
| 02:00:39 | 8 | Q.  Do you have experience analyzing valuation issues and |
| 02:00:42 | 9 | alleged damages for patents that are subject to a FRAND |
| 02:00:45 | 10 | commitment? |
| 02:00:45 | 11 | A.  Yes, sir, I do. |
| 02:00:47 | 12 | Q.  What experience do you have? |
| 02:00:48 | 13 | A.  I've been involved in about 15 cases that involve FRAND |
| 02:00:56 | 14 | allegations.  I've probably -- probably involving a hundred |
| 02:00:59 | 15 | or so individual patents, and I've testified at trial on |
| 02:01:03 | 16 | several occasions. |
| 02:01:04 | 17 | Q.  What was your assignment regarding the parties' dispute |
| 02:01:07 | 18 | concerning whether their respective offers were FRAND? |
| 02:01:10 | 19 | A.  Well, with regard -- with regard to the FRAND issues, I |
| 02:01:15 | 20 | was asked to just examine the -- the offers and the conduct |
| 02:01:18 | 21 | of the two parties and determine whether or not it |
| 02:01:21 | 22 | comported with FRAND and also look at other licenses. |
| 02:01:23 | 23 | Q.  What are the benefits of industry standards? |
| 02:01:27 | 24 | A.  Well, there's -- as I think has been said here, there's |
| 02:01:35 | 25 | no universally accepted definition of the terms, but I |

02:01:39  1  think people generally understand fair and reasonable to

02:01:41  2  mean that you don't capture the value of the standard.  You

02:01:45  3  try to capture the actual value of the technology itself.

02:01:49  4        That's sometimes done by looking at the value

02:01:51  5  before the standard was adopted and, in particular,

02:01:54  6  focusing on the relative improvement compared to

02:01:57  7  alternatives that were available before the standard was

02:01:59  8  adopted.

02:02:00  9        But the key point is that you capture the value of

02:02:02  10 the technology and not the extra value associated with the

02:02:05  11 standard.

02:02:05  12 Q.  And from an economic perspective, what are the benefits

02:02:08  13 of industry standards?

02:02:09  14 A.  Well, there's a number of benefits.  The short answer I

02:02:15  15 think the economists always gives is it improves economic

02:02:20  16 efficiency and consumer outcomes.

02:02:25  17       But within that, there are a number of things,

02:02:27  18 basically, the interoperability, the fact that you can have

02:02:30  19 different -- different brands of different products.  As

02:02:33  20 long as they operate on a standard, they're -- they can be

02:02:35  21 used in conjunction with one another.  That encourages

02:02:40  22 adoption, it encourages quality, it lowers costs, it gives

02:02:44  23 you direction to encourage innovation.

02:02:46  24       And then from a consumer perspective, it allows

02:02:50  25 you to -- it allows the consumer to compare other aspects

02:02:54  1   of the products knowing that they operate on the standard.

02:02:57  2          And then, also, of course, the consumer benefits

02:02:58  3   from the lower cost and the improved quality and the

02:03:03  4   innovation that it brings.

02:03:04  5   Q.  Are there any drawbacks of the industry standards?

02:03:07  6   A.  Yes, sir.  The primary drawback is obviously when

02:03:10  7   you -- when the technology goes into a standard and that

02:03:12  8   standard is adopted, people are pretty much locked into

02:03:15  9   that standard so it can give market power to the owners of

02:03:18  10  that technology.  It can give them a competitive advantage,

02:03:21  11  not because of the quality of their technology, but because

02:03:25  12  it's been adopted into the standard.

02:03:26  13  Q.  What keeps standard essential patents from owners --

02:03:29  14  owners from demanding more for a license than a patent is

02:03:33  15  worth?

02:03:33  16  A.  Well, the standard-setting organizations always

02:03:36  17  request -- request that when a -- when a patent owner

02:03:39  18  declares a patent to be essential or may be essential to a

02:03:43  19  standard, that in so doing, they agree to -- to license it

02:03:48  20  on fair, reasonable, and non-discriminatory -- or FRAND --

02:03:51  21  terms.

02:03:52  22          MR. SELWYN:  Can we have, please, DDX-15.2?

02:03:57  23  Q.  (By Mr. Selwyn)  Dr. Perryman, what does FRAND mean?

02:03:59  24  A.  Well, as I mentioned a moment ago, there's not a

02:04:02  25  uniform definition, but fair and reasonable, as I just

02:04:06  1  mentioned, kind of has a couple of components to it that --

02:04:10  2  that you value the technology itself, is the key thing, not

02:04:13  3  the standard.

02:04:14  4       One -- one way to look at that is, what was it

02:04:16  5  worth before the standard was adopted?  How did it compare

02:04:19  6  to the alternatives that were available at that time?  And

02:04:23  7  then non-discriminatory, in essence, means that -- that

02:04:27  8  people should be treated in a -- in an equitable manner and

02:04:32  9  that similarly situated companies should be expected to

02:04:34  10  receive similar -- similar terms, and that -- that,

02:04:38  11  basically, you should be able to license anyone in the

02:04:40  12  supply chain that's involved in -- in implementing the

02:04:44  13  standard.

02:04:44  14  Q.  Are FRAND royalties different from patent royalties for

02:04:49  15  non-FRAND committed patents?

02:04:50  16  A.  Yes, sir.

02:04:51  17  Q.  How?

02:04:51  18  A.  Well, if you're not subject to a FRAND commitment,

02:04:56  19  you -- I guess the good news for you is you have freedom to

02:04:59  20  choose who you want to license to, negotiate different

02:05:02  21  deals for different people.  There's no obligation like

02:05:05  22  that.

02:05:05  23       The bad news, I guess, is that you're subject to

02:05:08  24  all the competitive forces of alternative competing

02:05:11  25  technologies out there.

| | | |
|---|---|---|
| 02:05:12 | 1 | Q.  Were any FRAND commitments made for the patents in |
| 02:05:15 | 2 | PanOptis's portfolio? |
| 02:05:16 | 3 | A.  Yes, sir.  All of these patents were subject to FRAND |
| 02:05:20 | 4 | commitments. |
| 02:05:20 | 5 | Q.  How did you go about evaluating Plaintiffs' licensing |
| 02:05:28 | 6 | practices? |
| 02:05:28 | 7 | A.  Well, I -- I just reviewed their licenses and what they |
| 02:05:32 | 8 | reflected in terms of their practices, and then I looked |
| 02:05:34 | 9 | specifically at the situation with regard to Apple, as |
| 02:05:36 | 10 | well. |
| 02:05:36 | 11 | Q.  What did you conclude about whether Plaintiffs' |
| 02:05:39 | 12 | licensing practices were consistent with FRAND? |
| 02:05:42 | 13 | MR. SHEASBY:  Your Honor, I now object to preserve |
| 02:05:44 | 14 | for the record that there was no affirmative claim that |
| 02:05:47 | 15 | PanOptis was acting in a non-FRAND manner in this case. |
| 02:05:51 | 16 | This was -- this -- this is -- this is improper |
| 02:05:54 | 17 | testimony because it should have been in testimony in his |
| 02:05:57 | 18 | opening report, and I move that the Court strike it. |
| 02:06:00 | 19 | THE COURT:  What your response, Mr. Selwyn? |
| 02:06:03 | 20 | MR. SELWYN:  Your Honor, this was an issue |
| 02:06:05 | 21 | addressed in the Daubert process.  Your Honor denied that |
| 02:06:10 | 22 | aspect of the Daubert, if I recall. |
| 02:06:12 | 23 | We are responding to the allegation -- the claim |
| 02:06:16 | 24 | that they have that they are licensing on FRAND terms. |
| 02:06:21 | 25 | THE COURT:  All right.  I'll overrule the |

02:06:23  1   objection.

02:06:24  2        But before you ask your next question, I have a

02:06:26  3   question for the witness.

02:06:27  4        Dr. Perryman, when you say someone's conduct is or

02:06:30  5   is not fair, reasonable, and non-discriminatory, given your

02:06:34  6   background and your field of expertise, should I take that

02:06:39  7   as purely an economic analysis, and from an economic

02:06:44  8   standpoint only, it is or isn't fair, reasonable, and

02:06:48  9   non-discriminatory?  Or are you using a broader inner

02:06:52  10  personal measurement of fairness, reasonableness, and

02:06:59  11  non-discrimination such as what might go on between two

02:07:02  12  people such as you and I in an ordinary transaction?

02:07:06  13       THE WITNESS:  The analysis I would be giving,

02:07:08  14  Your Honor, is from an economic perspective.

02:07:11  15       THE COURT:  Only?

02:07:12  16       THE WITNESS:  Yes, Your Honor.

02:07:12  17       THE COURT:  Okay.  Please continue, Mr. Selwyn.

02:07:14  18  Q.  (By Mr. Selwyn)  Dr. Perryman, what did you conclude

02:07:16  19  that Pan -- strike that.

02:07:16  20       Why did you conclude that Apple's licensing

02:07:21  21  practices were inconsistent with FRAND?

02:07:23  22  A.  Well, several things.

02:07:24  23       First of all, in observing their licenses, I

02:07:28  24  observed that they did not have any licenses to any of the

02:07:28  25  chip suppliers -- that is, they were not licensing

02:07:28    1   throughout the supply chain.

02:07:36    2   Q.  And why is not having licenses with component

02:07:38    3   manufacturers inconsistent with FRAND?

02:07:39    4   A.  Well, one of the -- one of the general things people

02:07:43    5   consider about FRAND is that you do make the license

02:07:45    6   available, and it's -- the commitment you make is to make

02:07:47    7   the licenses available to those who -- who would like to

02:07:50    8   take a license.

02:07:51    9          MR. SELWYN:  Can we have DDX-15.4?

02:07:54   10   Q.  (By Mr. Selwyn)  Dr. Perryman, what is the next reason

02:07:56   11   you found PanOptis's licensing practices to be inconsistent

02:07:59   12   with FRAND?

02:07:59   13   A.  Well, the next thing I noticed was that they -- they

02:08:07   14   typically always tie it to the average sales price or the

02:08:10   15   net sales price of the end product, which makes it easy to

02:08:14   16   capture value that's not associated with the specific

02:08:17   17   technology.

02:08:18   18   Q.  Why is licensing based on the price of the end user

02:08:22   19   device inconsistent with FRAND?

02:08:23   20   A.  Well, what can happen is you can have devices that --

02:08:27   21   that have -- that use the technology in exactly the same

02:08:29   22   way, but because of other features, they sell for different

02:08:34   23   prices, and consequently they could -- they would command a

02:08:36   24   different rate for the same technology and the same

02:08:40   25   functionality.

02:08:40   1          MR. SELWYN:  Your Honor, I'd request for the next
02:08:43   2   series of questions, that the courtroom be sealed, but
02:08:47   3   PanOptis representatives may stay.
02:08:49   4          THE COURT:  Based on counsel's request, I'll order
02:08:51   5   the courtroom sealed.
02:08:52   6          Those present not subject to the protective order
02:08:55   7   that's been entered in this case should excuse themselves
02:08:58   8   and remain outside until the courtroom is unsealed.  That,
02:09:02   9   however, in this case will not apply to PanOptis's
02:09:04  10   representative.
02:09:05  11              (Courtroom sealed.)
02:09:05  12              (This portion of the transcript is sealed and
02:09:05  13               filed under separate cover as Bench Trial
02:09:06  14               Sealed Portion No. 4.)
02:48:06  15              (Courtroom unsealed.)
02:48:06  16          THE COURT:  All right.  Mr. Selwyn, proceed with
02:48:26  17   the next witness by deposition, please.
02:48:27  18          MR. SELWYN:  Apple's next witness by deposition is
02:48:32  19   Mr. Warren.
02:48:35  20              (Videoclip played.)
02:48:36  21          QUESTION:  Seek to license Optis Cellular, Optis
02:48:44  22   Wireless, and Unwired Planet, the entities that are part of
02:48:46  23   that --
02:48:46  24          THE COURT:  Wait a minute.
02:48:47  25              (Clip interrupted.)

02:48:47  1           MR. SELWYN:  I don't think it began at the

02:48:48  2  beginning.

02:48:49  3           THE COURT:  No, it did not.  Let's start over.

02:49:15  4           Do we have a problem with the cutting of the

02:49:17  5  deposition?  I'm asking Mr. Selwyn.  It's his witness.

02:49:20  6           MR. SELWYN:  We apparently do.

02:49:22  7           MR. SHEASBY:  Your Honor, I have a proposal.

02:49:27  8           THE COURT:  Unsolicited, as always, Mr. Sheasby,

02:49:30  9  what is it?

02:49:30  10          MR. SHEASBY:  So I was thinking since we know the

02:49:33  11  time cuts, that if it -- we can't get it to work, we could

02:49:37  12  just give you the cuts and you would know what the time

02:49:40  13  splits would be.  I was just throwing it out there in case

02:49:43  14  it doesn't work.

02:49:44  15          THE COURT:  Do we have Mr. Misiag or Mr. Misiag's

02:49:47  16  deposition ready to go?

02:49:51  17          MR. SELWYN:  Yes, Your Honor.

02:49:52  18          THE COURT:  Let's play that one.  Perhaps we can

02:49:55  19  fix Mr. Warren in the meantime.  Let's proceed with

02:49:59  20  Mr. Misiag.

02:50:00  21          (Videoclip played.)

02:50:00  22          QUESTION:  Could you state and spell your full

02:50:03  23  name for the record, please?

02:50:05  24          ANSWER:  Richard Misiag, R-i-c-h-a-r-d

02:50:09  25  M-i-s-i-a-g.

02:50:16   1          QUESTION:  Let me ask it this way:  While you were

02:50:18   2   PanOptis's head of licensing, did PanOptis have a standard

02:50:22   3   licensing rate?

02:50:22   4          ANSWER:  During my tenure, it was based on the

02:50:25   5   Birss decision, which created our standard rate.

02:50:30   6          QUESTION:  Prior to the Birss decision, did

02:50:40   7   PanOptis ever have a standard licensing rate?

02:50:43   8          ANSWER:  I don't know.

02:50:45   9          QUESTION:  Did you help to evaluate any counter

02:50:48  10   offers made by Apple?

02:50:52  11          ANSWER:  Yes.

02:50:59  12          QUESTION:  What was your role in that evaluation?

02:51:03  13          ANSWER:  It was basically taking a look at what

02:51:07  14   they had countered in determining whether it was within the

02:51:12  15   FRAND construct as dictated by Birss.  Again, I would do

02:51:17  16   that with our legal department.

02:51:19  17          QUESTION:  When you were head of licensing at

02:51:21  18   PanOptis, was it PanOptis's view that the only correct

02:51:26  19   methodology to determine a FRAND royalty is that set forth

02:51:30  20   by Judge Birss in the Unwired Planet versus Huawei UK

02:51:35  21   decision?

02:51:36  22          ANSWER:  During my tenure, I believe that PanOptis

02:51:40  23   believed that that was the only way to -- to calculate a

02:51:46  24   FRAND worldwide royalty rate for an SEP cellular portfolio.

02:51:49  25          QUESTION:  In your view, did you make fair offers

02:51:53  1  to Apple on behalf of PanOptis?

02:51:56  2      ANSWER:  Yeah, I mean, I -- I -- I personally and

02:51:58  3  I think professionally believe that we made fair offers

02:52:01  4  because, again, we were adapting, in my opinion, a decision

02:52:08  5  that was relevant to the industry that we were licensing

02:52:11  6  in, which was the Birss decision.

02:52:13  7      So adapting that model as a third-party assessment

02:52:17  8  of how to calculate royalties for SEPs, we -- I personally

02:52:22  9  and I think professionally believe that it was a reasonable

02:52:26  10  approach, and we were -- we were trying to do things

02:52:30  11  fairly.

02:52:30  12      QUESTION:  Well, I guess, were the offers that you

02:52:36  13  were making, to your knowledge, were they comparable as to

02:52:40  14  what was being done in this cellular industry, or were they

02:52:45  15  out of ordinary in terms of what you were proposing?

02:52:48  16      ANSWER:  I don't believe that they were out of the

02:52:52  17  ordinary.  Structure-wise, everybody is always looking to

02:52:57  18  do a worldwide license for products that may be at risk.

02:53:04  19      Different companies had different approaches.  You

02:53:09  20  know, Ericsson had their approach.  Motorola had their

02:53:12  21  approach.  InterDigital had their approach.

02:53:18  22      But I think for us, we were trying to adapt, you

02:53:23  23  know, something actionable, a decision by a third party --

02:53:26  24  and a judge, for that matter -- to -- to create a licensing

02:53:31  25  program and rates that were considered to be, at least by

02:53:36   1    the UK Court's methodology, FRAND.

02:53:43   2            QUESTION:  So in formulating your licensing

02:53:45   3    proposals to Apple during the time that you were head of

02:53:49   4    licensing at PanOptis, you didn't consider whether the

02:53:52   5    royalty rates that you were proposing to Apple were

02:53:54   6    comparable to rates in any other agreements, correct?

02:53:58   7            ANSWER:  I personally did not -- I do not believe

02:54:03   8    that -- and nor do I have any knowledge personally that

02:54:08   9    that was done.

02:54:08  10            (Videoclip ends.)

02:54:08  11            THE COURT:  That complete this deposition?

02:54:17  12            MR. SELWYN:  It does, Your Honor.

02:54:18  13            THE COURT:  Are we prepared to go forward with

02:54:20  14    Mr. Warren at this time?

02:54:22  15            MR. SELWYN:  We appear to have a technical problem

02:54:26  16    with it.  May we submit it in writing, the excerpts?

02:54:32  17            THE COURT:  As long as you can agree on exactly

02:54:35  18    what's covered, I'll be glad to look at it as a written

02:54:39  19    submission.

02:54:39  20            MR. SELWYN:  The parties did agree on the

02:54:41  21    designations, and there are no objections.

02:54:43  22            THE COURT:  All right.  Then you can submit it in

02:54:45  23    written form, and I'll consider it in that fashion.

02:54:47  24            You have no objection, Mr. Sheasby?

02:54:50  25            MR. SHEASBY:  Not as long as their time is

| | | |
|---|---|---|
| 02:54:53 | 1 | deducted based on the proposed cuts they give. |
| 02:54:58 | 2 | THE COURT:  All right.  Well, I've already |
| 02:55:03 | 3 | factored in the time that you gave me.  So we'll just |
| 02:55:06 | 4 | consider it's been used, and I'll read these at my own |
| 02:55:09 | 5 | leisure some other time. |
| 02:55:10 | 6 | MR. SHEASBY:  Thank you, Your Honor. |
| 02:55:11 | 7 | THE COURT:  All right.  Let's proceed with the |
| 02:55:13 | 8 | next witness. |
| 02:55:13 | 9 | MR. SELWYN:  Your Honor, Apple has finished |
| 02:55:17 | 10 | presenting its witnesses. |
| 02:55:18 | 11 | THE COURT:  All right.  Given that Apple has |
| 02:55:19 | 12 | rested, let me hear the evidence from the Plaintiff. |
| 02:55:24 | 13 | MR. SHEASBY:  Your Honor, Plaintiff will first |
| 02:55:30 | 14 | read in a response to an interrogatory that Apple provided. |
| 02:55:36 | 15 | This is Defendant, Apple, objections and responses |
| 02:55:40 | 16 | to Plaintiffs' first set of interrogatories.  This is |
| 02:55:42 | 17 | response to Interrogatory No. -- No. 9.  On March 12, 2009, |
| 02:55:48 | 18 | Release 8 of the 3GP -- |
| 02:55:51 | 19 | THE COURT:  Just a minute, Mr. Sheasby. |
| 02:55:53 | 20 | Yes, Mr. Selwyn? |
| 02:55:54 | 21 | MR. SELWYN:  And I object because this was not |
| 02:55:56 | 22 | disclosed to us. |
| 02:56:01 | 23 | MR. SHEASBY:  But it's -- we're reading -- I |
| 02:56:04 | 24 | apologize if it wasn't.  But we're reading an interrogatory |
| 02:56:06 | 25 | response, it's -- it's testimony. |

02:56:09  1        MR. SELWYN:  Your Honor, we had a procedure under

02:56:10  2   the joint pre-trial order.  Your Honor has consistently

02:56:14  3   enforced the joint pre-trial order in this matter.  We

02:56:17  4   would object to this being read as it hasn't been

02:56:20  5   disclosed.

02:56:21  6        MR. SHEASBY:  It's not an exhibit.  It's their

02:56:23  7   testimony.  It's their -- you're just supposed to read it

02:56:26  8   into the record when it's an interrogatory response.

02:56:29  9        MR. SELWYN:  The parties disclosed interrogatory

02:56:31  10  responses.

02:56:32  11       THE COURT:  All right.  Not to continue any of the

02:56:36  12  many unexpected delays we've had, I'll allow you to read it

02:56:39  13  into the record.  I'll carry your objection, and I'll

02:56:40  14  consider it as we move forward.

02:56:42  15       MR. SHEASBY:  On March 5th -- March 12th, 2009,

02:56:49  16  Release 8 of the 3GPP technical specification was frozen.

02:56:52  17       That is from the interrogatory response that

02:56:54  18  Apple's first -- Apple's first response to Interrogatory

02:57:01  19  No. 9.

02:57:02  20       Thank you, Your Honor.

02:57:02  21       THE COURT:  All right.

02:57:03  22       MR. SELWYN:  And, Your Honor, may we submit the

02:57:05  23  amended interrogatory response to what Mr. Sheasby just

02:57:10  24  read?

02:57:10  25       THE COURT:  You're telling me that the respondent

02:57:15  1   in that interrogatory modified their answer in some way?

02:57:19  2       MR. SELWYN:  The -- correct, the response was

02:57:21  3   subsequently amended from what had just been read.

02:57:24  4       THE COURT:  I'll consider both of them.  You can

02:57:27  5   certainly submit the other.

02:57:28  6       MR. SELWYN:  Thank you.

02:57:28  7       THE COURT:  Mr. Sheasby, what do you have next?

02:57:32  8       MR. SHEASBY:  Your Honor, Plaintiffs call their

02:57:34  9   next witness, Ms. Johanna Dwyer.  And with your permission,

02:57:39  10  Dr. Annita Zhong will do the examination.

02:57:42  11      THE COURT:  All right.  Ms. Dwyer, if you'll come

02:57:44  12  forward.

02:57:44  13      MR. SELWYN:  And, Your Honor, with your

02:57:46  14  permission, Ms. Amadi will be conducting the

02:57:49  15  cross-examination of --

02:57:51  16      THE COURT:  That's fine.

02:58:00  17      MR. SELWYN:  -- Ms. Dwyer.

02:58:00  18      THE COURT:  Ms. Dwyer, I remind you, you remain

02:58:03  19  under oath.

02:58:04  20      THE WITNESS:  Thank you.

02:58:33  21      MR. SHEASBY:  Your Honor, may I approach?

02:58:34  22      THE COURT:  You may.

02:59:03  23      All right.  Counsel, you may proceed with your

02:59:06  24  direct examination.

02:59:07  25      MS. ZHONG:  Thank you, Your Honor.

02:59:07  1   <u>JOHANNA DWYER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN</u>

02:59:07  2                      <u>DIRECT EXAMINATION</u>

02:59:07  3   BY MS. ZHONG:

02:59:07  4   Q.  Good afternoon.  Can you please reintroduce yourself to

02:59:16  5   the Court?

02:59:17  6   A.  Good afternoon.  My name is Johanna Dwyer.

02:59:20  7   Q.  Ms. Dwyer, can you please remind the Court of your

02:59:22  8   technical background?

02:59:23  9   A.  Yes, I can.  So I have a Bachelor of Science in

02:59:27  10  mathematics and engineering from Queen's University in

02:59:31  11  Canada.  I have Master's in graduate studies in electrical

02:59:35  12  engineering and radio design.  And I have an MBA from MIT.

02:59:39  13       I worked at -- I've worked in radio wireless

02:59:44  14  technology my whole career.  I started working at RIM in

02:59:48  15  2000.  And from 2005 until 2012, I worked in the

02:59:53  16  standardization team at RIM and ultimately led the global

02:59:57  17  radio standards group at RIM.  And I was also responsible

03:00:00  18  for analyzing patents for standards essentiality while I

03:00:05  19  was there.

03:00:06  20  Q.  What experience do you have in 3GPP technical group

03:00:12  21  meetings?

03:00:12  22  A.  When I joined the standards team in 2005, from that

03:00:15  23  point onward, I participated extensively in 3GPP technical

03:00:15  24  meetings as a delegate.

03:00:21  25       In addition, I managed a team of people who also

03:00:23  1  participated in those meetings.

03:00:25  2  Q.  What involvement do you have with ETSI?

03:00:28  3  A.  My company is an ETSI member, and I attend the general

03:00:33  4  assembly meetings.

03:00:35  5        MS. ZHONG:  Your Honor, Plaintiffs will offer

03:00:37  6  Ms. Dwyer as their SEP and ETSI disclosure expert.

03:00:42  7        THE COURT:  Is there objection?

03:00:44  8        MS. AMADI:  No objection, Your Honor.

03:00:46  9        THE COURT:  The witness is recognized as an expert

03:00:48  10  in those designated fields.

03:00:49  11  Q.  (By Ms. Zhong)  Ms. Dwyer, what are you testifying

03:00:53  12  today?

03:00:53  13  A.  Today, I'm going to provide calculations of a royalty

03:00:59  14  range for Plaintiffs' U.S. portfolio using known

03:01:03  15  methodologies and Apple's own information.  And I'm also

03:01:07  16  going to step -- discuss procedures to do with ETSI

03:01:12  17  declarations while participating in 3GPP technical meetings

03:01:18  18  and ETSI's IPR policy in general.

03:01:20  19  Q.  Let's turn to your first topic.

03:01:23  20        MS. AMADI:  Objection, Your Honor.  We believe

03:01:24  21  that Ms. Dwyer's testimony as to royalty rates is within

03:01:29  22  the scope of Your Honor's Daubert ruling, and that

03:01:33  23  Ms. Dwyer has not been offered as an expert on royalty rate

03:01:37  24  calculations.  And, in fact, Your Honor, found that she was

03:01:42  25  not qualified to offer those opinions.  She's not been

03:01:46   1   offered as an expert on determining royalty rates in this

03:01:48   2   case.

03:01:49   3          THE COURT:  Ms. Zhong, what's your response?

03:01:51   4          MS. ZHONG:  On PTC -- Day 2 PTC Transcript No.

03:01:56   5   160:19 through 161:13, Mr. Sheasby and Your Honor had a

03:02:02   6   full-on exchange.

03:02:03   7          So the way Ms. Dwyer structured her report, she

03:02:06   8   has a section that says PanOptis has acted in good faith,

03:02:10   9   and I understand that's been stricken.  That's Mr. Sheasby.

03:02:12  10          Then she has another section where she goes

03:02:15  11   through and just answers four basic questions.  If you

03:02:18  12   apply the fairest method, what the rate would be.  If you

03:02:25  13   applied the Japan Trade Commission, what would the rate be?

03:02:28  14   And I think Your Honor said the -- those particular methods

03:02:31  15   were not stricken.

03:02:32  16          The only thing that's stricken from her report is

03:02:35  17   her ultimate conclusion about whether PanOptis complied

03:02:37  18   with its FRAND obligations.  And today Ms. Dwyer is only

03:02:43  19   going to go through the calculations and the methods that's

03:02:46  20   in her report.

03:02:47  21          THE COURT:  All right.  My recollection is that I

03:02:52  22   struck the ultimate conclusions of Ms. Dwyer with regard to

03:02:56  23   FRAND.  I did not strike the remainder of her analysis,

03:02:59  24   although because she's not going to give me an ultimate

03:03:02  25   conclusion, I don't expect her to testify about FRAND

03:03:08  1  per se, but the rest of her report was not struck, and

03:03:13  2  that's appropriate for her testimony this afternoon.

03:03:16  3          MS. AMADI:  Thank you, Your Honor.

03:03:17  4          THE COURT:  So let's proceed on that basis.

03:03:19  5  Q.  (By Ms. Zhong)  So, Ms. Dwyer, what method did you

03:03:24  6  consider in determining a license rate range for PanOptis

03:03:27  7  U.S. patent portfolio?

03:03:29  8  A.  So, first, I applied the Birss methodology from the

03:03:34  9  Unwired Planet versus Huawei case.

03:03:37  10         Next, I applied a top-down method using an

03:03:41  11  aggregate royalty rate and published information about true

03:03:45  12  SEP percentages.

03:03:46  13         And, last, I made comparisons to rates that Apple

03:03:50  14  has deemed as FRAND.

03:03:52  15  Q.  Now, let's discuss the implication of Justice Birss's

03:03:56  16  methodology.  Why did you choose this particular

03:03:58  17  methodology?

03:03:59  18  A.  I chose this methodology because it is what the

03:04:02  19  Plaintiffs had based their offers on from about September

03:04:07  20  2017 onwards.

03:04:08  21  Q.  And what information did you need to calculate a rate

03:04:14  22  from the Birss methodology?

03:04:15  23  A.  To apply that methodology, what I needed was the true

03:04:19  24  SEP standards essential patent number in the Plaintiffs'

03:04:26  25  portfolio.

03:04:26  1   Q.   Okay.   And how did you go about determining that
03:04:29  2   number?
03:04:29  3   A.   I analyzed 53 claim charts that were provided to me for
03:04:32  4   the Plaintiffs' portfolio.  My colleague, Mr. Nicholas
03:04:37  5   Anderson, analyzed them, as well, and we discussed these
03:04:41  6   with the technical team that produced them.
03:04:43  7          And ultimately, we determined to include 49 of the
03:04:47  8   53 patents as true standards essential patents that were
03:04:52  9   applicable to handsets.
03:04:53  10  Q.   Why did you exclude four patent families?
03:04:56  11  A.   If we could just go to the next slide.  Thank you.
03:04:59  12          So the ML106 patent family had no handset claims,
03:05:04  13  and, therefore, wasn't relevant to this case, so that was
03:05:08  14  excluded.
03:05:08  15          The HP33 family was excluded because of the PTAB
03:05:15  16  decision with respect to validity.
03:05:17  17          The UE219 family, that family we believe to be a
03:05:23  18  standards essential patent; however, the features it
03:05:25  19  covers, it's our understanding they're not used in the
03:05:27  20  U.S., so we excluded that.
03:05:29  21          And then the HP61 family, there's questions about
03:05:32  22  the -- the essentiality valuation just under the Huawei
03:05:37  23  claim construction.  So, to be consistent, we excluded that
03:05:41  24  one, as well.
03:05:42  25  Q.   Okay.  And what did you do next?

| | | |
|---|---|---|
| 03:05:44 | 1 | A.  Sorry, can you just move the slide?  Thank you. |
| 03:05:52 | 2 | So in applying that number, using the Birss |
| 03:05:54 | 3 | methodology, you can see from the slide that the |
| 03:05:56 | 4 | Plaintiffs' true SEPs is 49.  And we applied that to the |
| 03:05:59 | 5 | Birss denominator of 800, which we've already heard about. |
| 03:06:03 | 6 | And then we made an adjustment for multimode |
| 03:06:07 | 7 | phone, which was, again, from the Birss decision, and that |
| 03:06:09 | 8 | provided Plaintiffs' true SEP share for a multimode phone |
| 03:06:13 | 9 | for handsets at 4.29 percent. |
| 03:06:16 | 10 | Q.  And what royalty rate does this weighted share |
| 03:06:22 | 11 | translate to? |
| 03:06:23 | 12 | THE WITNESS:  Next slide, please.  Thank you. |
| 03:06:26 | 13 | A.  So, again, applying the information from the Birss |
| 03:06:28 | 14 | decision, the Unwired Planet benchmark rate was determined |
| 03:06:32 | 15 | to be .062 percent.  And then the ratio of PanOptis's rated |
| 03:06:37 | 16 | share that I just illustrated at 4.29 percent, divided by |
| 03:06:41 | 17 | the .70 percent which was the weighted Unwired Planet |
| 03:06:46 | 18 | share, gives you a benchmark rate of 0.38 percent. |
| 03:06:52 | 19 | Q.  (By Ms. Zhong)  And what further adjustment did you |
| 03:06:54 | 20 | make? |
| 03:06:54 | 21 | A.  So I made a further adjustment for a U.S.-only rate by |
| 03:06:58 | 22 | applying the two times uplift that Justice Birss used. |
| 03:07:02 | 23 | Q.  Okay.  And Justice Birss's methodology is actually |
| 03:07:05 | 24 | based on the 0.8 percent rate for Ericsson portfolio.  Why |
| 03:07:09 | 25 | is it justified to use that approach for Pan -- PanOptis's |

| | | |
|---|---|---|
| 03:07:14 | 1 | portfolio in this case as it consists mostly of |
| 03:07:19 | 2 | non-Ericsson patents? |
| 03:07:20 | 3 | MS. AMADI:  Objection, Your Honor.  This is |
| 03:07:22 | 4 | outside the scope of her report. |
| 03:07:23 | 5 | THE COURT:  You're going to have to speak up, |
| 03:07:26 | 6 | Ms. Amadi. |
| 03:07:27 | 7 | MS. AMADI:  Objection, Your Honor, outside the |
| 03:07:28 | 8 | scope of Ms. Dwyer's report. |
| 03:07:30 | 9 | MS. ZHONG:  This is -- |
| 03:07:30 | 10 | THE COURT:  Response? |
| 03:07:31 | 11 | MS. ZHONG:  -- this was in her report, for |
| 03:07:36 | 12 | example, Paragraphs 60 to 63, where she examined whether |
| 03:07:40 | 13 | the PanOptis portfolio as a whole is at least of average |
| 03:07:45 | 14 | quality as UP which is similar to Ericsson. |
| 03:07:46 | 15 | MS. AMADI:  Your Honor, looking at Paragraphs 60 |
| 03:07:49 | 16 | through 63 of Ms. Dwyer's report, she offers no analysis of |
| 03:07:53 | 17 | the comparison to the rate from Justice Birss's decision. |
| 03:07:58 | 18 | MS. ZHONG:  Sorry.  What Ms. Dwyer does analyze is |
| 03:08:04 | 19 | whether she can apply -- can be sure that the average |
| 03:08:09 | 20 | quality of the PanOptis portfolio is at least the same as |
| 03:08:13 | 21 | UP and Ericsson.  That's why she was looking at the |
| 03:08:17 | 22 | cross-selection process, and she concluded under those |
| 03:08:19 | 23 | selection process -- |
| 03:08:21 | 24 | THE COURT:  What -- what paragraph of the report |
| 03:08:22 | 25 | are you looking at? |

03:08:23  1            MS. ZHONG:  That's the opening report,

03:08:25  2  Paragraph 60.

03:08:30  3            She says:  I will now consider patent quality.

03:08:34  4            THE COURT:  All right.  You don't need to read me

03:08:36  5  the paragraph.

03:08:37  6            Ms. Amadi, do you have that paragraph before you?

03:08:41  7            MS. AMADI:  I do.

03:08:43  8            THE COURT:  Do you believe it addresses this?

03:08:45  9            MS. AMADI:  No, Your Honor.  The question is about

03:08:47  10  the rates from the Ericsson -- from Justice Birss's

03:08:49  11  decision and the Ericsson licenses.  That does not appear

03:08:52  12  in Paragraph 60 or any other paragraph that I'm aware of.

03:09:06  13            THE COURT:  I don't agree that the rates are

03:09:08  14  within the report.  I'm not saying there's not some

03:09:11  15  discussion, but I don't find, based on what I know of the

03:09:14  16  report, that those specific rates are set forth there.

03:09:16  17            MS. ZHONG:  So Ms. Dwyer is not going to discuss

03:09:19  18  the rates.  She's going to say that two -- the quality in

03:09:24  19  those two patent portfolios are comparable or one is better

03:09:28  20  than the other.  So applying the Ericsson rate is

03:09:31  21  justified.  That's what the whole gist of the --

03:09:35  22  Paragraph 60 through 63 analysis is for.

03:09:39  23            MS. AMADI:  And, Your Honor, that opinion does not

03:09:41  24  appear in Ms. Dwyer's report in Paragraphs 60 through 63.

03:09:45  25            At best, she states that -- that the patents are

03:09:48   1   more of an average quality, which she can give that

03:09:51   2   opinion, but comparison to the Ericsson portfolio is not

03:09:54   3   set forth in her report.

03:09:55   4        MS. ZHONG:  So the last -- the last sentence of

03:10:00   5   Paragraph 60 is:  This patent selection process would also

03:10:04   6   ensure that the average quality of selected Panasonic and

03:10:08   7   LG patents are at least on par with those from Ericsson.

03:10:12   8        That's the whole thing -- the whole thing that

03:10:15   9   we're trying to get in.  The two patent portfolios fully

03:10:20   10  are comparable at least.

03:10:21   11       MS. AMADI:  I have no objection to her offering

03:10:24   12  that opinion, but comparison to the rates is not set forth

03:10:28   13  in her report, and she expressly admitted that she did not

03:10:32   14  review any of the licenses.

03:10:34   15       THE COURT:  I'm going to sustain the objection.

03:10:35   16       The sections from the report that you just read

03:10:38   17  are certainly appropriate to be covered, but otherwise I

03:10:41   18  think the objection is well-founded.

03:10:43   19       MS. ZHONG:  Your Honor, I can reask the question.

03:10:44   20       THE COURT:  That would be appropriate.

03:10:47   21  Q.  (By Ms. Zhong)  Ms. Dwyer, did you evaluate the patent

03:10:49   22  quality in PanOptis's portfolio as compared to Ericsson

03:10:54   23  portfolio, in general?

03:10:56   24  A.  So what I did was I considered the way that the

03:10:59   25  portfolio was assembled in the first place, and in

03:11:02    1   specifics, the cross-selection process that was used to

03:11:06    2   choose the Panasonic and the LG assets.

03:11:09    3   Q.  And what is this cross-selection process that you just

03:11:14    4   mentioned?

03:11:15    5   A.  So, essentially, Ericsson chose the Panasonic patents

03:11:20    6   that were going to go into the Optis Wireless portfolio,

03:11:25    7   and LG and Ericsson, they -- they chose each other's assets

03:11:28    8   for the Optis Cellular Technology portfolio, and all the

03:11:32    9   parties have the incentive to make sure that the portfolio

03:11:35   10   is strong.

03:11:37   11        And so in choosing each other's assets, it

03:11:40   12   provides a check and balance to make sure that everybody is

03:11:43   13   putting forth their strongest assets.

03:11:45   14   Q.  And what evidence supports your conclusion that

03:11:49   15   PanOptis's portfolio as a whole is at least as strong as

03:11:52   16   the UP portfolio and Ericsson portfolio?

03:11:55   17   A.  If you could just show the next slide, please.

03:12:00   18   Q.  Sure.

03:12:00   19   A.  So what I did was using the Innography patent strength

03:12:04   20   score, I took PanOptis's patent portfolio with the 49

03:12:08   21   families that I had included, and I calculated the average

03:12:12   22   of the scores given by Innography to be 73.

03:12:15   23        And then I took the Unwired Planet six patents and

03:12:19   24   I calculated their average score to be 64.  And so on that

03:12:23   25   basis, I think that supports my belief that the portfolios

| | | |
|---|---|---|
| 03:12:26 | 1 | are at least of comparable quality to each other. |
| 03:12:30 | 2 | Q.  Did you check whether the rate you just calculated is |
| 03:12:37 | 3 | reasonable? |
| 03:12:37 | 4 | THE WITNESS:  Can you show the next slide, please? |
| 03:12:40 | 5 | A.  So, next, I performed a top-down assessment, which |
| 03:12:48 | 6 | is -- you know, using a different approach to look at what |
| 03:12:50 | 7 | a royalty rate might be for this portfolio. |
| 03:12:53 | 8 | So the first thing I did was I looked at recent |
| 03:12:57 | 9 | ETSI declaration data, and I had a company called Patently, |
| 03:13:02 | 10 | which is a -- a UK patent analytics company, perform |
| 03:13:11 | 11 | basically a data download from the ETSI declarations that |
| 03:13:14 | 12 | included all declarations made up to December 31st, 2019, |
| 03:13:19 | 13 | and then also that were applicable to LTE and the standards |
| 03:13:25 | 14 | associated with LTE. |
| 03:13:26 | 15 | And then that set of data was de-duplicated |
| 03:13:30 | 16 | because there's a lot of duplication in that database. |
| 03:13:33 | 17 | That ended up leaving 6,611 families that were declared to |
| 03:13:40 | 18 | LTE up to that time period. |
| 03:13:44 | 19 | Q.  (By Ms. Zhong)  So what other information did you need |
| 03:13:45 | 20 | for this top-down method? |
| 03:13:50 | 21 | A.  So once I had the declared member of LTE standards |
| 03:13:56 | 22 | essential patents, then I needed to make an adjustment for |
| 03:13:58 | 23 | the fact that we've all talked about, which is that many, |
| 03:14:03 | 24 | and most actually, of declared patents are not truly |
| 03:14:06 | 25 | standards essential patents. |

03:14:06   1        So what I did was I looked at eight different
03:14:09   2   sources that discuss the true essentiality rate, and
03:14:11   3   they're listed here in this slide.
03:14:14   4        Now, some of them included validity, so they would
03:14:17   5   say this is the percentage that is both infringed and
03:14:19   6   valid, and some didn't.  And so I made an adjustment to the
03:14:23   7   ones that talked about infringement only.
03:14:24   8        And what I did there was I looked at the six
03:14:27   9   patents that were in the PanOptis/Huawei case, and in that
03:14:33  10   case, two of them were essentially -- had validity
03:14:38  11   problems, leaving four out of the six that were assumed to
03:14:41  12   be valid.
03:14:42  13        So for the essentiality rates here that did not
03:14:45  14   include a validity assumption, I basically derated them by
03:14:49  15   a third.  And you can see that that gives the right column
03:14:52  16   on the slide.  And when averaged, we get 13-and-a-half
03:14:56  17   percent of the declared standards essential patents for LTE
03:15:00  18   that I'm going to consider as true standards essential
03:15:04  19   patents.
03:15:04  20   Q.  And do you also adjust the number of true SEPs in
03:15:07  21   PanOptis's portfolio with this method?
03:15:10  22   A.  Yes.  So I applied the same assumption in terms of
03:15:14  23   invalidity to PanOptis's portfolio.  So that took the 49
03:15:16  24   that we've just spoken about and ended up with 33.
03:15:21  25   Q.  How did you arrive at a 607 number for PanOptis's U.S.

03:15:29  1  LTE handset standard essential patent families?

03:15:32  2  A.  So when I applied the 13.5 percent to 6,611, I get 892.

03:15:32  3  Now, that's for all LTE SEPs, and it doesn't specify

03:15:41  4  whether or not they're applicable to handsets, and that's

03:15:42  5  all we care about for this case.

03:15:44  6       So what I did is I referred, again, back to the

03:15:47  7  Unwired Planet case.  There were two numbers put forth, one

03:15:52  8  by Huawei and one by Unwired Planet, as to what percentage

03:15:56  9  of LTE standards essential patents have handset claims.

03:16:02  10  And Huawei put forth the percentage of 73 percent, and

03:16:06  11  Unwired Planet put forth 63 percent.

03:16:08  12       So I averaged those and applied 68 percent to the

03:16:12  13  number 892, that you see there, and that's how I ended up

03:16:16  14  with 607 U.S. LTE true handset SEPs.

03:16:21  15  Q.  And what's PanOptis's weighted share of cellular SEPs

03:16:31  16  in this top-down method?

03:16:31  17       THE WITNESS:  If you can switch to the next slide,

03:16:36  18  please.

03:16:36  19  A.  Okay.  So using the same basic table, the percentage of

03:16:37  20  SEPs for 4G/LTE is 5.44.  But we're dealing with a

03:16:39  21  multimode phone.  So I de-rated that to 70 percent because

03:16:43  22  PanOptis's portfolio is entirely 4G/LTE.  So the multimode

03:16:49  23  share, which I'll call the weighted share, is 3.8 percent.

03:16:54  24  Q.  (By Ms. Zhong)  And what royalty rate does that

03:16:56  25  weighted share translate to?

| | | |
|---|---|---|
| 03:16:58 | 1 | THE WITNESS:  Can we go to the next slide? |
| 03:17:00 | 2 | A.  So taking this new weighted share of 3.3 percent, I |
| 03:17:04 | 3 | then applied an 8.8 percent total aggregate royalty rate, |
| 03:17:10 | 4 | and I also applied a two times uplift for the U.S. only |
| 03:17:14 | 5 | rate, and that resulted in a royalty rate using this |
| 03:17:16 | 6 | methodology of .67 percent. |
| 03:17:20 | 7 | Q.  (By Ms. Zhong)  And did you conduct any sensitivity |
| 03:17:22 | 8 | studies? |
| 03:17:22 | 9 | A.  Yes, I did.  So I varied two parameters. |
| 03:17:27 | 10 | First, that true essentiality rate, I varied that |
| 03:17:30 | 11 | from between 10 percent, which is the number that Ms. Mewes |
| 03:17:33 | 12 | discussed, to 16-and-a-half percent in .5 percent steps. |
| 03:17:38 | 13 | And then for the handset family percentage of all |
| 03:17:42 | 14 | the LTE's true standards essential patents, those that had |
| 03:17:47 | 15 | handset claims, I varied that across the whole range that |
| 03:17:51 | 16 | was covered in the Birss report, so from 63 percent up to |
| 03:17:57 | 17 | 73-and-a-half percent. |
| 03:17:57 | 18 | And you can see on this slide this is essentially |
| 03:18:00 | 19 | the range that that encompassed.  So from .51  percent on |
| 03:18:00 | 20 | the low end to .98 percent on the high end and the Birss |
| 03:18:06 | 21 | method calculation that I did first you can see is marked |
| 03:18:09 | 22 | on that range. |
| 03:18:10 | 23 | THE COURT:  Ms. Dwyer, these long answers are hard |
| 03:18:13 | 24 | for me to follow if you're going to talk as fast as you do. |
| 03:18:18 | 25 | Please slow down. |

03:18:18  1            THE WITNESS:  Yes, Your Honor.

03:18:19  2            THE COURT:  Thank you.  Please continue,

03:18:22  3   Ms. Zhong.

03:18:23  4   Q.  (By Ms. Zhong)  Did you perform any other

03:18:24  5   reasonableness check?

03:18:26  6   A.  Yes, I did.  What I did next was I considered Apple's

03:18:29  7   statements and information that Apple itself had provided.

03:18:33  8   So, first, I looked at Apple's statement to the Japanese

03:18:37  9   Federal Trade Commission.

03:18:38  10           MS. AMADI:  Your Honor, we would ask that we seal

03:18:40  11   the courtroom if we're going to get into Apple confidential

03:18:43  12   information.

03:18:44  13           THE COURT:  All right.  Then I'll order the

03:18:46  14   courtroom sealed at counsel's request.  All those present

03:18:50  15   not subject to the protective order in this case should

03:18:52  16   excuse yourselves until the courtroom is reopened and

03:18:55  17   unsealed.

03:18:56  18           (Courtroom sealed.)

03:18:56  19           (This portion of the transcript is sealed and

03:18:56  20            filed under separate cover as Bench Trial

03:18:57  21            Sealed Portion No. 5.)

03:40:44  22           (Courtroom unsealed.)

03:40:45  23           THE COURT:  I have 20 minutes until 4:00.  We're

03:40:48  24   going to take a short recess.  I would hope it would be not

03:40:51  25   more than about 10 minutes.  Then we'll return and continue

03:40:55   1   with this examination.

03:40:56   2          The Court stands in recess.

03:41:01   3          MR. SHEASBY:  Thank you.

03:41:03   4          COURT SECURITY OFFICER:  All rise.

03:41:04   5          (Recess.)

03:41:07   6          COURT SECURITY OFFICER:  All rise.

03:54:34   7          THE COURT:  Be seated, please.

03:54:34   8          All right.  Ms. Zhong, you may continue with your

03:54:43   9   examination of the witness.

03:54:44  10          MS. ZHONG:  Thank you, Your Honor.

03:54:45  11   Q.  (By Ms. Zhong)  Ms. Dwyer, based on your experience,

03:54:49  12   how frequently is IPR a factor when delegates choose a

03:54:56  13   technical solution at 3GPP?

03:54:58  14   A.  So as I mentioned, it is not a factor at all.  And it's

03:55:02  15   my personal experience, it's the experience of my teams,

03:55:06  16   that this is just not something that happens.

03:55:09  17          THE WITNESS:  Can you flip to the next slide,

03:55:11  18   please?

03:55:11  19          THE COURT:  Let me ask you.  We are not sealed at

03:55:15  20   this point.  Is there a need to seal the courtroom?  We

03:55:18  21   have sealed and unsealed so many times I can't keep up with

03:55:21  22   where we are.  I don't want to inadvertently allow

03:55:28  23   confidential information to be disclosed.  Do you need to

03:55:30  24   consult with Mr. Sheasby, Ms. Zhong?

03:55:30  25          MS. ZHONG:  No, Plaintiffs don't believe there is

03:55:35   1   any confidential information.

03:55:35   2          THE COURT:  Does Defendant believe there is a need

03:55:35   3   to seal?

03:55:36   4          MS. AMADI:  I don't believe so, Your Honor.

03:55:38   5          THE COURT:  All right.  I'll trust counsel to

03:55:40   6   advise me when that changes.  We are not sealed and that's

03:55:40   7   clarified for the record.  So please continue.

03:55:42   8   Q.  (By Ms. Zhong)  So, Ms. Dwyer, have you seen any

03:55:45   9   third-party testimony that confirms your experience?

03:55:49   10  A.  Yes.  So here is Mr. Stephen Andrew Howell.  So

03:55:53   11  Mr. Howell has been around ETSI since 1991 and has been in

03:55:59   12  3GPP since it was founded in 1998, has chaired groups and

03:56:05   13  been secretary in groups and has gone to over 400 meetings.

03:56:10   14         Mr. Howell testifies that he is not aware of a

03:56:10   15  single situation where intellectual property was used to

03:56:17   16  tie-break or to choose a technical solution.

03:56:17   17  Q.  Have you seen any other testimony that confirms your

03:56:20   18  experience?

03:56:20   19  A.  I have.  So Ms. Sophie Vrzic, who worked at Nortel

03:56:24   20  Networks and then actually came and worked at RIM when I

03:56:27   21  was there, was also asked the same question.  And she

03:56:30   22  indicated that it just isn't relevant whether a patent

03:56:34   23  application had been filed or not on a technical proposal

03:56:36   24  in terms of the decision that 3GPP makes.

03:56:39   25         THE COURT:  Ms. Zhong, where is your corporate

03:56:42  1    representative?

03:56:43  2            MR. SHEASBY:  He's sitting right outside the door,

03:56:47  3    Your Honor.  He thought it was sealed, and I didn't want to

03:56:51  4    interrupt the examination.

03:56:53  5            THE COURT:  All right.  Well, we're not sealed, so

03:56:55  6    he needs to be in his place.

03:56:57  7            MS. ZHONG:  May I continue?

03:56:58  8            THE COURT:  Let's bring him in first, and then

03:57:01  9    I'll let you know.

03:57:06  10            If you'll have a seat, Mr. Blasius.

03:57:11  11            All right.  Ms. Zhong, please continue.

03:57:15  12    Q.  (By Ms. Zhong)  What's 3GPP's and ETSI's policy on IPR

03:57:20  13    discussions during technical meetings?

03:57:23  14            THE WITNESS:  Next slide, please.

03:57:25  15    A.  So, again, it's clearly stated in the ETSI IPR guide.

03:57:29  16            Now, the IPR guide is part of the ETSI directives,

03:57:33  17    and its purpose is to help interpret the ETSI IPR policy.

03:57:37  18            So right at the start of the guide, Clause 1.1, it

03:57:41  19    clearly says that technical bodies should not become

03:57:45  20    involved in legal discussions on IPR matters.  It's very

03:57:49  21    clear.

03:57:50  22    Q.  (By Ms. Zhong)  Is that policy enforced at 3GPP

03:57:54  23    meetings?

03:57:55  24    A.  Yes, it most definitely is.

03:57:57  25            THE WITNESS:  Next slide.

03:57:58  1          MS. ZHONG:  Slide 32, please.

03:58:02  2   Q.  (By Ms. Zhong)  So, again, Mr. Howell, with his deep

03:58:07  3   experience --

03:58:07  4          MS. AMADI:  Objection, Your Honor.  This is

03:58:10  5   precisely the issue that counsel raised during

03:58:14  6   Mr. Rodermund's testimony about laundering hearsay through

03:58:17  7   the expert witness, and Your Honor sustained that

03:58:20  8   objection.

03:58:22  9          MS. ZHONG:  Mr. Howell --

03:58:23  10         THE COURT:  What do you believe the hearsay

03:58:25  11  information is here, Ms. Amadi?

03:58:28  12         MS. AMADI:  Your Honor, this -- this is a witness

03:58:30  13  whose deposition -- whose testimony has not been played

03:58:33  14  before Your Honor, before the jury.

03:58:39  15         THE COURT:  I mean, I'm looking at the slide.  I

03:58:50  16  assume your objection is based on the slide, and the slide

03:58:54  17  indicates as a part of his personal experience he was at a

03:58:56  18  meeting where this came up one time, and the chair

03:59:01  19  immediately said it's not for us to discuss and move on.

03:59:04  20         That's -- that's his personal perception, having

03:59:10  21  been at that meeting the way it's presented.  How would

03:59:13  22  that be -- how would that be improper?  It's not -- it's

03:59:16  23  not -- it's not explaining the substance of the

03:59:20  24  communication.  It's not a -- it's not repeating something

03:59:23  25  that a third party said outside of court.  He said a

03:59:29  1  delegate did start to say something, and they moved on.

03:59:33  2  How is that hearsay?

03:59:35  3       MS. AMADI:  Your Honor, Mr. Howell's testimony has

03:59:39  4  not been played or admitted before the Court, and so

03:59:43  5  Ms. Dwyer's relying on hearsay --

03:59:43  6       THE COURT:  So you're saying Mr. Howell's

03:59:45  7  testimony is hearsay?  I misunderstood you.

03:59:47  8       MS. AMADI:  Yes, Your Honor.

03:59:48  9       THE COURT:  I thought the statement on the slide

03:59:49  10  that he was making you were challenging as hearsay.  I'm

03:59:52  11  sorry.

03:59:55  12       MS. ZHONG:  May I respond?

03:59:56  13       THE COURT:  Please do.

03:59:57  14       MS. ZHONG:  Mr. Howell's clip will be played after

03:59:59  15  this, so it's just out of sequence right now.

04:00:05  16       MS. AMADI:  Our understanding is that Plaintiffs

04:00:07  17  were not playing any deposition testimony today.  Is

04:00:10  18  that --

04:00:11  19       THE COURT:  Well, let me just say this, ladies:

04:00:13  20  He hasn't been played yet.  This is -- Ms. Amadi is

04:00:16  21  correct, this is the first time it's been presented.

04:00:18  22       I'm happy to hear Ms. Dwyer's testimony from what

04:00:22  23  she knows as an expert in this particular field and what

04:00:26  24  she knows from her own personal knowledge, as long as it's

04:00:30  25  within the confines of a report.

04:00:31    1    And she may well have relied on statements from

04:00:34    2    Mr. Howell in forming her opinions, but that doesn't give

04:00:39    3    her any more license to present those actual statements

04:00:46    4    from outside of court here than it did in the earlier

04:00:50    5    context with Mr. Rodermund.  So I'm not sure, Ms. Zhong,

04:00:54    6    how this is any different.

04:00:56    7            MS. ZHONG:  We'll be playing the clips, so we can

04:01:00    8    skip this portion.

04:01:01    9            THE COURT:  All right.

04:01:02   10            MS. ZHONG:  The evidence will be in the record.

04:01:04   11            THE COURT:  Well, until such time as you call this

04:01:07   12    gentleman to testify, let's move on, and I'll sustain the

04:01:12   13    objection.

04:01:13   14            MS. AMADI:  Thank you, Your Honor.

04:01:14   15    Q.  (By Ms. Zhong) Have you heard -- do you know -- have

04:01:16   16    you heard anything about what Apple's corporate witness

04:01:18   17    said on this topic?

04:01:20   18            THE WITNESS:  Can you move the slide?  Thank you.

04:01:23   19            MS. AMADI:  Your Honor, the same objection to this

04:01:26   20    slide, as well.  Mr. Zhang's testimony has not been

04:01:32   21    admitted into evidence.

04:01:33   22            THE COURT:  Response?

04:01:33   23            MS. ZHONG:  This is Apple's own corporate witness,

04:01:36   24    so it's not really hearsay.  It's against its own interest.

04:01:40   25            THE COURT:  This witness was presented as a

| | | |
|---|---|---|
| 04:01:44 | 1 | 30(b)(6) witness? |
| 04:01:45 | 2 | MS. ZHONG:  Correct.  Also the 3PPG process. |
| 04:01:47 | 3 | THE COURT:  The objection is overruled. |
| 04:01:48 | 4 | A.  So Dr. Zhang had said, apart from that call for IPR |
| 04:01:53 | 5 | that takes at the beginning of each technical meeting which |
| 04:01:55 | 6 | I introduced you to a moment ago, he was asked how often |
| 04:01:59 | 7 | IPR issues are discussed as part of the technical debate. |
| 04:02:06 | 8 | And he acknowledged that it's never discussed and that the |
| 04:02:10 | 9 | only time IPR is mentioned is at the start of the meeting |
| 04:02:13 | 10 | by the chairman. |
| 04:02:14 | 11 | Q.  (By Ms. Zhong)  Was the same policy in place during |
| 04:02:18 | 12 | 2005 and 2012 period when you attended 3GPP meetings? |
| 04:02:21 | 13 | A.  It was most certainly in place when I was attending |
| 04:02:24 | 14 | 3GPP meetings.  It's my understanding that it's always been |
| 04:02:27 | 15 | in place, but definitely during the time I attended it was |
| 04:02:30 | 16 | in place. |
| 04:02:31 | 17 | Q.  Why doesn't IPR matter to 3GPP technical groups when |
| 04:02:35 | 18 | they discuss and agree on proposals? |
| 04:02:37 | 19 | THE WITNESS:  Next slide. |
| 04:02:39 | 20 | A.  So the purpose of the technical group, why 3GPP was |
| 04:02:43 | 21 | formed in the first place, was to have a collaborative |
| 04:02:46 | 22 | technical body that looks at technical inputs, it's |
| 04:02:50 | 23 | contribution-driven, so they discuss what's brought to the |
| 04:02:54 | 24 | meetings, and to decide on solutions that meet technical |
| 04:02:57 | 25 | objectives.  IPR is not part of that discussion.  It was |

04:03:00  1   never to be part of that discussion.

04:03:01  2   Q.  (By Ms. Zhong)  Could IPR be part of the discussion in

04:03:06  3   offline discussions?

04:03:07  4   A.  So there are a number of offline discussions on

04:03:09  5   technical matters.  They can happen over email reflectors

04:03:13  6   or during meetings or between the meetings because there's

04:03:16  7   a lot of technical ground to cover, and there's only so

04:03:19  8   much meeting time.

04:03:20  9         But even in those offline discussions, IPR is not

04:03:23  10  a factor.  What they're trying to do is just progress the

04:03:26  11  agenda when there's a very limited amount of face-to-face

04:03:30  12  time in the meeting room.

04:03:33  13  Q.  If companies get together to block another company's

04:03:36  14  proposal based on that particular company's IP strengths,

04:03:42  15  would that be consistent with ETSI's policies and

04:03:46  16  guidelines?

04:03:47  17         MS. AMADI:  Objection, leading, Your Honor.

04:03:49  18         THE COURT:  Sustained.

04:03:50  19  Q.  (By Ms. Zhong)  Let me re-ask.

04:03:54  20         If companies get together to block companies --

04:03:57  21  another company's proposal based on the particular

04:04:00  22  company's IP strength, what clause would the -- which

04:04:08  23  particular policy would that conduct violate under ETSI

04:04:14  24  directive?

04:04:15  25         MS. AMADI:  Same objection.  Leading, Your Honor.

04:04:19   1          THE COURT:  It calls for -- I mean, it is a

04:04:21   2    leading question, Ms. Zhong.

04:04:23   3          I'll sustain it.

04:04:24   4          You may restate it again if you like.  But it

04:04:28   5    needs to be presented in a non-leading form.

04:04:31   6    Q.  (By Ms. Zhong)  Is there any ETSI guidelines that

04:04:36   7    prohibit the type of conduct we just described, which is to

04:04:48   8    include IP discussions during the technical proposal

04:04:52   9    selection?

04:04:53   10         MS. AMADI:  Same objection, Your Honor, leading.

04:04:58   11         THE COURT:  It's before the Court.  I'll allow the

04:04:59   12    question.

04:05:00   13         You can answer it, Ms. Dwyer.

04:05:03   14         THE WITNESS:  Thank you, Your Honor.

04:05:04   15    A.  Offline discussions or in-meeting discussions, for that

04:05:09   16    matter, if they were taking IPR into account and they were

04:05:12   17    making decisions based on who had IPR in a proposal or

04:05:16   18    which company had IPR in their proposal, it's my belief

04:05:20   19    that that runs afoul of this part of the ETSI directives,

04:05:25   20    which is a guideline on antitrust compliance.

04:05:28   21         And in this, there's a very specific section on

04:05:31   22    boycotts which talks about basically blocking other

04:05:35   23    companies based on their IPR position, which is deemed to

04:05:39   24    be anticompetitive.

04:05:40   25         So I do think that that is actually not in

04:05:44  1   compliance with the ETSI directives.

04:05:47  2   Q.  (By Ms. Zhong)  And that understanding is based on your

04:05:50  3   experience as a head of RIM's radio status group; is that

04:05:54  4   correct?

04:05:54  5   A.  So, I mean, as head of the standards group, I was very

04:05:59  6   aware of these policies, so we definitely stayed within the

04:06:02  7   lines of those.  And I participated myself in many offline

04:06:06  8   discussions.  And from my own personal experience over all

04:06:12  9   that time, this is what happened.

04:06:14  10  Q.  You had examined the data on the timing of IPR

04:06:17  11  declaration for 3GPP technical specifications by ETSI

04:06:21  12  members; is that correct?

04:06:23  13  A.  That's right.

04:06:23  14  Q.  Okay.  What does the data show?

04:06:25  15  A.  So what I did was the ETSI IPR database has over three

04:06:34  16  million records in it.

04:06:35  17        Now, twice a year ETSI publishes a special report,

04:06:38  18  which is essentially a macro-enabled Excel sheet.  It's

04:06:43  19  called Power Excel.  And you can manipulate the data and

04:06:47  20  filter and do searches.  And so that is the source of this

04:06:51  21  slide, is the data directly out of the database as of

04:06:56  22  November of last year.

04:06:58  23        And I think what really stands out to me in this

04:07:00  24  slide is that it's pretty clear that the conduct of the

04:07:04  25  entire population of ETSI is not behaving in a manner that

04:07:08  1   suggests that they've interpreted ETSI's IPR policy as

04:07:13  2   saying that they need to disclose their IPRs prior to the

04:07:17  3   freeze date.

04:07:17  4        And you can see the TTCN freeze date is the first

04:07:20  5   two columns, the Stage 3 is the last two columns.  And, in

04:07:25  6   fact, Apple, more than the rest of ETSI, doesn't comply to

04:07:29  7   their own deadline.

04:07:33  8   Q.  And have you seen any third-party study that confirm

04:07:37  9   your conclusion?

04:07:37 10   A.  I did review a research paper done by the National

04:07:43 11   Research Council in the U.S. that talked about this subject

04:07:50 12   and confirmed what I'm seeing by the data here, which is

04:07:53 13   that it's very common and very typical for declarations to

04:07:58 14   be made after standards are adopted, even if the

04:08:03 15   standard-setting organization has a policy that encourages

04:08:06 16   early declaration.

04:08:08 17   Q.  So the NRC study is PX-1780.  Does ETSI know about this

04:08:18 18   consistent pattern of disclosure at the Stage 3 or TTCN

04:08:21 19   freeze date?

04:08:21 20   A.  Yes, ETSI is very aware of it.  This is data directly

04:08:25 21   out of their database.  And they are the ones that process

04:08:28 22   paper declarations, which are actually still 20 percent of

04:08:31 23   the declarations that are done on paper.  And they're

04:08:34 24   entering that information in.  And so, yes, this is their

04:08:37 25   database.  They're very aware of this data.

04:08:41  1  Q.  Okay.  So let's stay on this slide for a little bit

04:08:44  2  longer.

04:08:45  3        According to your study, what percentage of

04:08:51  4  ETSI -- what percentage of ETSI declarations are after the

04:08:57  5  TTCN freeze date for Release 8?

04:09:01  6  A.  So, as you can see, the population of all of ETSI for

04:09:05  7  Release 8, 94 percent of those declarations came after the

04:09:10  8  TTCN freeze date.

04:09:11  9        So just as a reminder, that date was March 12th,

04:09:15  10 2009.  For Apple, in particular, a hundred percent of the

04:09:19  11 declarations it made were after that date.

04:09:22  12 Q.  What if we use a Stage 3 freeze date for Release 8,

04:09:27  13 what percentage of declarations are made?

04:09:28  14 A.  So, I mean, Apple is still -- a hundred percent after

04:09:32  15 that date, all of ETSI goes up slightly because you are

04:09:37  16 moving that deadline three months earlier.

04:09:40  17 Q.  So that's 96.8 percent of the declarations relate to

04:09:48  18 the freeze date?

04:09:49  19 A.  96.8 percent are after the Stage 3 freeze date,

04:09:56  20 correct.

04:09:56  21 Q.  What about Release 9, if we use the TTCN freeze date,

04:09:57  22 what percentage of ETSI declarations are late, according to

04:09:58  23 Apple's definition?

04:09:59  24 A.  So, I mean, the numbers are very common for almost all

04:10:02  25 of these releases, which is, you know, generally over 95

04:10:05  1   percent of ETSI has made their IPR declarations after these

04:10:10  2   freeze dates.  And Apple's behavior is really not

04:10:13  3   appreciably different from the rest of the ETSI population

04:10:17  4   of companies.

04:10:18  5   Q.  Okay.  And if we use a Stage 3 freeze date, then over

04:10:22  6   99 percent of the ETSI declarations are late for Release 9

04:10:27  7   and 10; is that correct?

04:10:28  8   A.  I mean, I think the data speak for themselves.  There's

04:10:31  9   no manipulation here.  This is purely just data analysis.

04:10:40  10         THE COURT:  So for purposes of this slide, if a

04:10:43  11  party is -- if the freeze date is December the 11th and one

04:10:47  12  party submits to -- or makes a declaration to 3GPP on

04:10:54  13  December the 12th, it's late.  And if another party makes a

04:11:00  14  designation or declaration on June the 12th, six months

04:11:07  15  later, it's equally late.

04:11:09  16         And those two late submissions or declarations are

04:11:12  17  not treated any differently on this slide because of the

04:11:17  18  amount of lateness or the length of time after the date?

04:11:22  19  In other words, this doesn't tell me if these are one

04:11:25  20  minute after the clock strikes or if these are 9, 10, or 11

04:11:31  21  months after the clock strikes, correct?

04:11:33  22         THE WITNESS:  That's exactly correct, Your Honor.

04:11:36  23  And I think that's another indication that such a hard

04:11:39  24  deadline is difficult to appreciate because of that exact

04:11:41  25  issue.

04:11:42  1          THE COURT:  I -- I didn't ask for an opinion.  I

04:11:43  2   just wanted to understand the factual nature of the slide.

04:11:46  3   Thank you.

04:11:46  4          THE WITNESS:  You're welcome.

04:11:48  5          THE COURT:  Let's continue.

04:11:50  6   Q.  (By Ms. Zhong)  Have we seen any evidence that ETSI,

04:11:52  7   knowing of this consistent pattern of disclosure, it has

04:11:57  8   done anything to enforce a specific type of -- specific

04:12:00  9   timing requirement for the IPR disclosure as Apple now

04:12:05  10  urges?

04:12:06  11         MS. AMADI:  Objection, leading.

04:12:08  12         THE COURT:  Sustained.

04:12:11  13  Q.  (By Ms. Zhong)  What evidence is there of ETSI actually

04:12:13  14  enforcing a specific timing requirement for IPR

04:12:17  15  declarations?

04:12:20  16  A.  As I mentioned, this is ETSI's database, and all of

04:12:24  17  these declarations have been made.  ETSI's taken no action

04:12:29  18  whatsoever with respect to the timing of any of these

04:12:34  19  declarations, and that's quite precisely because they don't

04:12:38  20  see it as a problem.

04:12:40  21  Q.  Okay.  I want you now to focus only on objective public

04:12:45  22  evidence that you have examined.

04:12:47  23         What kind of evidence exists of course of dealing

04:12:52  24  by Samsung, Panasonic, and LG that shows the history of

04:12:58  25  FRAND commitment to ETSI?

04:13:02  1   A.  Could you show that slide?

04:13:07  2         Okay.  So what -- this is also derived from the

04:13:10  3   data.  So what we have here is showing when declarations

04:13:13  4   were actually submitted to ETSI by each of these companies.

04:13:18  5         And the reason that this is here is to give a feel

04:13:21  6   of the frequency of declarations.  For one thing, you can

04:13:26  7   see how it varies a lot, even just amongst these companies.

04:13:31  8         The other thing you can notice is that often a

04:13:35  9   yearly cadence is seen here in a few instances here.

04:13:38  10        Now, understanding that technical meetings happen

04:13:40  11  six to eight times a year, not once a year, so you can see

04:13:43  12  pretty clearly that, first of all, there's a variance of

04:13:46  13  patterns.  There's no one thing that everyone is doing.

04:13:49  14  And also that the frequency does not align with the meeting

04:13:53  15  calendar.

04:13:53  16  Q.  How frequently has Samsung, LG, and Panasonic been

04:13:59  17  given their FRAND commitment to ETSI?

04:14:01  18  A.  So to clarify a point first, the declaration includes

04:14:07  19  the spot where the declarant says:  I commit to providing

04:14:13  20  an irrevocable promise essentially to license and make

04:14:17  21  these patents available.

04:14:18  22        So, I mean, clearly, you can go way back to

04:14:22  23  2005 -- this is before LTE was even started -- and you can

04:14:27  24  see that these companies have -- have a history of making

04:14:29  25  these declarations.  And there's no time ever where any of

04:14:34  1    these companies has failed to make that commitment to ETSI.

04:14:38  2    Q.  Again, focusing only on objective public evidence, have

04:14:42  3    you seen anything that indicates conduct by Samsung, LG, or

04:14:47  4    Panasonic could have led to an ETSI member to infer that

04:14:52  5    they did not intend to enforce their declared IPRs?

04:14:58  6          MS. AMADI:  Objection, leading.

04:15:00  7          THE COURT:  Sustained.

04:15:03  8    Q.  (By Ms. Zhong)  What evidence have you seen concerning

04:15:13  9    Samsung, LG, and Panasonic's conduct regarding whether they

04:15:17 10    intend to enforce their -- their IPRs or not?

04:15:22 11          THE WITNESS:  Show the next slide, please.  Okay.

04:15:34 12    Go back, sorry.  Lost track.

04:15:36 13    A.  Essentially, there's -- there's no indication from any

04:15:40 14    of these companies, or the rest of ETSI for that matter,

04:15:43 15    that they believe that if they declare their IPR after

04:15:48 16    these freeze dates, that they're not intending to enforce

04:15:52 17    it.

04:15:53 18          As we've seen, there's a very, very huge

04:15:57 19    investment that these companies have put in to create these

04:16:00 20    future standards for wireless communications that everybody

04:16:05 21    benefits from.  They need that IPR to be compensated for

04:16:07 22    that investment.

04:16:08 23          And so there's -- there's nothing in the data that

04:16:10 24    would indicate that they thought that if they declared

04:16:14 25    after these freeze dates, that they would be waiving the

04:16:19  1    right to recoup that investment by licensing their

04:16:24  2    essential IPR.

04:16:24  3    Q.   (By Ms. Zhong)   Now let's move on to discuss the

04:16:28  4    disclosure dates with the patent families at issue.

04:16:29  5           What are the relevant Release 8 deadlines honored

04:16:33  6    by Apple in this case?

04:16:34  7    A.   So there are two.   The TTCN freeze date is March 12th,

04:16:38  8    2009, and the Stage 3 freeze date is December 11th, 2008.

04:16:49  9    Q.   How long did Apple wait for -- to -- before it moved

04:16:54  10   the goalpost from March 2009 to December 2008?

04:17:05  11          MS. AMADI:   Objection, leading.

04:17:06  12          THE COURT:   Sustained.

04:17:08  13   Q.   (By Ms. Zhong)   How long before Apple changed the March

04:17:11  14   2009 asserted date to December 2008?

04:17:18  15   A.   So this was in the interrogatories, which I helped

04:17:21  16   prepare replies to, and I believe the timing is about five

04:17:26  17   months from the point where -- March 12th was in their

04:17:29  18   response, I think, five times -- to when it became December

04:17:34  19   11, 2008.

04:17:34  20   Q.   Was it reasonable or unreasonable for an ETSI member to

04:17:41  21   regard March 12th, 2009, as the end date for Release 8

04:17:46  22   development work?

04:17:46  23   A.   Well, as we showed earlier, it is what 3GPP calls the

04:17:50  24   end date.   And clearly that -- that whole development of

04:17:54  25   test suites is done in this period of time.   It's still

| | | |
|---|---|---|
| 04:17:58 | 1 | evolving.  Those are done by one of the working groups in |
| 04:18:02 | 2 | RAN -- RAN5 specifically. |
| 04:18:04 | 3 | Q.  Based on your review, what is the industry's view on |
| 04:18:07 | 4 | whether either Release 8's end date or the Stage 3 freeze |
| 04:18:19 | 5 | date should be used as a deadline for IPR disclosure? |
| 04:18:24 | 6 | MS. AMADI:  Objection, leading, and this is |
| 04:18:30 | 7 | outside the scope. |
| 04:18:31 | 8 | THE COURT:  I'll sustain as to leading. |
| 04:18:33 | 9 | Q.  (By Ms. Zhong)  What is the industry's view as to what |
| 04:18:35 | 10 | that -- what that line that should be used for IPR |
| 04:18:41 | 11 | declaration in the Clause 4.1? |
| 04:18:45 | 12 | MS. AMADI:  Objection.  This is outside the scope |
| 04:18:47 | 13 | of her report. |
| 04:18:47 | 14 | THE COURT:  Can you respond to that, Ms. Zhong? |
| 04:18:50 | 15 | MS. ZHONG:  Her entire report is about whether |
| 04:18:52 | 16 | there is even a deadline under the Clause 4.1.  And she has |
| 04:18:56 | 17 | shown that if there is a deadline, the industry doesn't |
| 04:18:59 | 18 | know what that deadline is.  That's in her report, so I |
| 04:19:03 | 19 | don't really know why Apple -- |
| 04:19:11 | 20 | THE COURT:  Well, if her opinion is the industry |
| 04:19:14 | 21 | doesn't know, then your question, what is the industry's |
| 04:19:16 | 22 | view, seems to be disconnected with the conclusion in her |
| 04:19:22 | 23 | report. |
| 04:19:23 | 24 | MS. ZHONG:  Okay.  I will move on. |
| 04:19:25 | 25 | THE COURT:  I mean, if you want to -- if you want |

04:19:27  1  to examine her on her conclusions as to the industry's

04:19:31  2  view, if any, and do they have a view, if you want to cover

04:19:35  3  what her report covers in that regard, and you can do it in

04:19:39  4  an appropriate manner, I don't see a problem with that.

04:19:42  5  Q.  (By Ms. Zhong)  Okay.  So what's the industry view

04:19:44  6  regarding the --

04:19:45  7          THE COURT:  I'll sustain the objection as to

04:19:46  8  outside the scope, but you may -- you may ask additional

04:19:51  9  questions in regard to this area.  I'm not directing that

04:19:54  10  you move on at this time.

04:19:59  11          MS. ZHONG:  I will move on and come back.

04:20:01  12          THE COURT:  Well, that's your choice.

04:20:05  13  Q.  (By Ms. Zhong)  When were the five patent families at

04:20:09  14  issue first declared to ETSI?

04:20:12  15          THE WITNESS:  Back up a slide, please.

04:20:15  16  A.  This slide has all of the declaration dates for the

04:20:18  17  five patents-in-suit.  So we can see the '774 was declared

04:20:25  18  on December 30th, 2008; the '332 and the '833 were declared

04:20:34  19  on March 12, 2009; and the '557 and '284 patents were

04:20:42  20  declared in 2010.

04:20:45  21  Q.  (By Ms. Zhong)  How many patent families were declared

04:20:49  22  on or before March 12th, 2009?

04:20:53  23  A.  So this slides shows that -- so that is the TTCN freeze

04:20:56  24  date for Release 8 or the end date.  And three of the

04:20:59  25  patents, the '774, '332, and '833 were all declared on or

04:21:05  1  before that date.

04:21:07  2  Q.  Okay.  Let's now turn to '284 patent family.  When was

04:21:13  3  the U.S. application for the '284 patent family -- patent

04:21:16  4  first filed?

04:21:17  5       THE WITNESS:  Next slide.

04:21:18  6  A.  So the application that led to the '284 patent was

04:21:23  7  filed on August 16th, 2010.

04:21:26  8  Q.  (By Ms. Zhong)  And so that's about a two-month gap

04:21:35  9  period before -- when it was declared; is that correct?

04:21:38  10  A.  The declaration of the '284 patent was made on October

04:21:42  11  25th of the same year, 2010.

04:21:44  12  Q.  So was a two-month gap reasonable or unreasonable?

04:21:47  13  A.  So, in my personal experience, when I was working at

04:21:51  14  RIM, I mentioned at the start that I spent a good deal of

04:21:55  15  time analyzing patents for essentiality.

04:22:01  16       And, again, from my personal experience, there's a

04:22:03  17  time period when you're trying to do some diligence because

04:22:07  18  ETSI requires that IP declarations are made on a bona fide

04:22:10  19  basis, and that analysis of patent claims or patent

04:22:17  20  application claims versus standards and specifications

04:22:21  21  takes time to do.

04:22:22  22       I don't think that a two-month window from when a

04:22:25  23  patent was filed and the claims were first actually set out

04:22:28  24  to the Patent Office to when it's declared, I don't see

04:22:31  25  that as unreasonable.

04:22:32   1   Q.  And let's now discuss the '557 patent.  When did the
04:22:37   2   changes relevant to the '557 patent make it into the LTE
04:22:41   3   standard?
04:22:42   4   A.  So Mr. Lanning actually covered this, as well.  It
04:22:48   5   wasn't until 2009 that the standard actually included
04:22:53   6   technology that was in the '557 patent.
04:22:57   7           THE WITNESS:  Can you move to the next slide?
04:22:59   8   A.  So here is a representation on our timeline.  The
04:23:05   9   change that went into the standard, that was actually
04:23:08   10  transposed on April 3rd, 2009.
04:23:12   11          So the change didn't get into the standard itself
04:23:15   12  until the specification was frozen.  That patent was --
04:23:20   13  family was then declared March 16th, 2010.
04:23:24   14          This is -- this aligns with what I spoke of
04:23:33   15  earlier with essential correction is that there are
04:23:35   16  material changes made to the specifications after those
04:23:38   17  specifications are frozen.
04:23:40   18          There's a number of reasons why that can be, but
04:23:42   19  the fact remains it is.  So if you have an IPR that's filed
04:23:46   20  or a proposal that is made and it's after the freeze date,
04:23:49   21  even if an IPR declaration is submitted at exactly the same
04:23:52   22  time, it would be late, and that just doesn't align with
04:23:59   23  the policy, and it's incongruent with the data.
04:24:04   24  Q.  (By Ms. Zhong) Has Apple proposed what that line would
04:24:08   25  be in this circumstance?

| | | |
|---|---|---|
| 04:24:10 | 1 | A.  They didn't cover this case, from my recollection. |
| 04:24:14 | 2 | Q.  Now let's discuss the situation if the Stage 3 |
| 04:24:19 | 3 | deadline -- let's discuss whether the '332, '833, and '774 |
| 04:24:28 | 4 | patents, the declaration timing was reasonable with respect |
| 04:24:30 | 5 | to the Stage 3 freeze date. |
| 04:24:34 | 6 | In your opinion, how reasonable or unreasonable is |
| 04:24:38 | 7 | it for a SEP holder to make a declaration three months |
| 04:24:42 | 8 | after the Stage 3 freeze date? |
| 04:24:44 | 9 | A.  I -- well, from my opinion, I'm pretty clear that I |
| 04:24:48 | 10 | don't think there is a deadline.  So, I mean, what we're |
| 04:24:51 | 11 | seeing here is that with respect to the Release 8 version |
| 04:24:55 | 12 | of the specifications, those three patents -- families -- |
| 04:25:00 | 13 | patent families were declared before the end date for those |
| 04:25:05 | 14 | specifications, which is March 12th, 2009. |
| 04:25:10 | 15 | Q.  Do you have an opinion on the industry reliance on |
| 04:25:15 | 16 | Panasonic, Samsung, and LG's disclosure behavior? |
| 04:25:21 | 17 | A.  Could you reword the question?  I'm not sure I |
| 04:25:26 | 18 | understand. |
| 04:25:26 | 19 | MS. ZHONG:  PDX-37, please.  37.  37.  37. |
| 04:26:00 | 20 | THE WITNESS:  I don't think this is the right |
| 04:26:01 | 21 | slide.  Maybe you can reword your question, and I'll try to |
| 04:26:05 | 22 | answer it. |
| 04:26:07 | 23 | MS. ZHONG:  Okay. |
| 04:26:08 | 24 | THE COURT:  Ms. Dwyer, the attorney doesn't need |
| 04:26:11 | 25 | to be coached by the witness, she'll move on if she wants |

04:26:17  1   to or she'll wait until the slide's clarified.  She's

04:26:18  2   running the show.

04:26:18  3            THE WITNESS:  I understand, Your Honor.

04:26:18  4            THE COURT:  All right.  You need to respond to the

04:26:21  5   questions when they're asked to you.

04:26:22  6            Please proceed, Ms. Zhong.

04:26:25  7            MS. ZHONG:  Okay.  It looks like there's some

04:26:27  8   PowerPoint issues.  I will come back to that particular

04:26:31  9   question.

04:26:31  10  Q.  (By Ms. Zhong)  So over the years, what opportunity has

04:26:35  11  ETSI had to clarify the meaning of the term "timely" in

04:26:39  12  ETSI IPR policy clause?

04:26:40  13  A.  The ETSI directives are published yearly, so they're

04:26:47  14  revised yearly.  So, realistically speaking, it could be

04:26:51  15  edited or changed every year, but there's at least two

04:26:54  16  distinct periods of time where this was edited or discussed

04:27:00  17  extensively.

04:27:01  18            The first was in 2003.  The general assembly

04:27:07  19  formed an IPR ad hoc group and tasked them with providing

04:27:11  20  better guidance on how to interpret the ETSI IPR policy.

04:27:15  21  That group met six times that year, and ultimately

04:27:20  22  developed a set of 30 recommendations which was presented

04:27:23  23  to the general assembly meeting in late November that year.

04:27:31  24  Q.  And what was the recommendation in regards to the

04:27:37  25  definition of timeliness?

04:27:38  1  A.  So no change was made to that clause that we just

04:27:42  2  viewed, and, in fact, the group was very clear that there

04:27:44  3  shouldn't be any further definition or clarification on

04:27:47  4  what timely means, as that would constitute a change to the

04:27:52  5  IPR policy.

04:27:52  6  Q.  So after all the discussion, the decision is to let

04:27:56  7  timely remain vague as it was, correct?

04:27:59  8  A.  There was no change to that section of the policy.

04:28:02  9  Q.  What was the second occasion when there was extensive

04:28:09 10  debate regarding the definition of timeliness?

04:28:12 11  A.  In 2005, the Directorate-General of Competition for the

04:28:15 12  European community went to ETSI and asked them to change

04:28:22 13  Section 4.1, and that was primarily related to patent

04:28:27 14  ambush, and they wanted a clearer definition to address

04:28:33 15  that concern.  That was in January 2005.

04:28:35 16        ETSI replied back somewhere late March, early

04:28:40 17  April indicating that they understood the DG Competition's

04:28:45 18  concerns.  But they made the changes that you see here to

04:28:47 19  the policy, which essentially didn't add any clarification

04:28:54 20  to timely or set a firm deadline, but it did appease DG

04:29:01 21  Competition in terms of making sure that it covered the

04:29:03 22  case they felt of patent ambush.

04:29:07 23  Q.  So how has the 2005 amendment changed the ETSI members'

04:29:15 24  disclosure duty?

04:29:16 25  A.  So it was really clear in the letter.  This is from the

04:29:19  1    letter that ETSI sent back to DG Competition that the

04:29:24  2    changes in those clauses that we just saw were not intended

04:29:28  3    to place any higher burden of disclosure on ETSI members or

04:29:32  4    a heightened expectation for them to identify essential

04:29:36  5    IPR.

04:29:37  6    Q.  Has ETSI ever discussed when timing of IPR disclosure

04:29:43  7    could lead to a problem?

04:29:44  8    A.  They do actually.  So Recommendation 7 is one of the 30

04:29:50  9    recommendations that that 2003 ad hoc group presented to

04:29:54  10   the general assembly.  And this pretty much gets to the --

04:30:01  11   to the core of it, which is that ETSI is concerned that

04:30:03  12   there would be a problem with declaration time if licenses

04:30:06  13   for patents disclosed late are not available at all or are

04:30:14  14   not available under FRAND terms.

04:30:17  15   Q.  But this excerpt coming from the 2003 ad hoc meetings;

04:30:23  16   is that correct?

04:30:23  17   A.  It -- that's exactly where it came from.  It is

04:30:26  18   noteworthy that this recommendation is still in the ETSI

04:30:30  19   guide on IPRs, which, as I mentioned, is the guideline

04:30:34  20   that's supposed to be used to interpret the IPR policy.

04:30:40  21   Q.  And this is what you're talking about right now,

04:30:43  22   correct?

04:30:43  23   A.  On the left is the report from the IPR ad hoc group to

04:30:50  24   the general assembly, and on the right is the current

04:30:52  25   version of the ETSI guide for IPRs.  And you can see that

04:30:55  1    that pretty much is transposed, including the notes,

04:31:01  2    exactly that's their -- in today's version.

04:31:03  3    Q.  If the IPRs are not declared timely, would that delay

04:31:08  4    license negotiation and attendant commercialization as some

04:31:13  5    of the 2003 member expressed?

04:31:16  6              MS. AMADI:  Objection, leading.

04:31:17  7              THE COURT:  Sustained.

04:31:19  8              MS. ZHONG:  Okay.

04:31:20  9    Q.  (By Ms. Zhong)  If the IPRs are not declared timely,

04:31:23  10   what effect, if any, would that have on license negotiation

04:31:27  11   and commercialization?

04:31:28  12   A.  I work for a product company.  That's what I did for 12

04:31:33  13   years.  My personal experience in building and releasing

04:31:41  14   standards compliant products is that companies don't

04:31:45  15   proactively go out and seek licenses prior to

04:31:48  16   commercialization.  They wait until someone comes and

04:31:52  17   knocks on their door.

04:31:54  18   Q.  And have you seen any evidence in this case as to how

04:31:58  19   Apple's behavior is consistent or inconsistent with your

04:32:00  20   experience?

04:32:02  21             MS. AMADI:  Objection, leading.

04:32:03  22             THE COURT:  I'll overrule that.

04:32:10  23             You may answer the question, Ms. Dwyer.

04:32:13  24             THE WITNESS:  Thank you, Your Honor.

04:32:14  25   A.  We saw in Apple's case here that they in 2014 were

04:32:22    1   aware that they were more than 50 percent unlicensed to the

04:32:30    2   LTE standards essential patent pool.  That is two years

04:32:33    3   after they had released their LTE product.  So I think that

04:32:36    4   confirms what my assumption is.

04:32:40    5          MS. AMADI:  Your Honor, I would just object to

04:32:42    6   that testimony as outside the scope of her report.  She's

04:32:45    7   not opined on that subject in her report.

04:32:50    8          MS. ZHONG:  Ms. Dwyer actually has -- I'm sorry.

04:32:52    9          THE COURT:  Go ahead.

04:32:53   10          MS. ZHONG:  Ms. Dwyer actually has opined on that

04:32:56   11   particular subject matter, and that's in her -- the last

04:32:59   12   portion of her report, which is called applicant with

04:33:04   13   unclean hands.  And in there she talked about Apple's

04:33:08   14   licensing behavior.

04:33:09   15          THE COURT:  Well, counsel for Apple raised an

04:33:12   16   objection based on form, which I overruled.  She could have

04:33:17   17   and should have perhaps lodged an objection based on

04:33:21   18   substance.  That would have been the time to do it.

04:33:23   19          As long as the answer in response to the question

04:33:25   20   where the objection was overruled is responsive, it's not

04:33:28   21   timely for her to wait until the answer is given and then

04:33:31   22   urge this objection when she could have urged it at the

04:33:36   23   time the question was proffered.

04:33:38   24          I'll overrule the objection.

04:33:40   25   Q.  (By Ms. Zhong)  Ms. Dwyer, if an ETSI member is

04:33:44   1   dissatisfied with the timing of other members' IPR

04:33:49   2   disclosures, what recourse does the ETSI policy provide?

04:33:54   3         THE WITNESS:  Move to the next slide, please.

04:33:57   4   A.  This is another clause in the ETSI IPR policy.  It's

04:34:01   5   Clause 8.2.

04:34:02   6         Now, the purpose of this clause, it's -- it's

04:34:05   7   possible not just to declare your own IPR to ETSI if you

04:34:10   8   become aware of somebody else's IPR, you can also declare

04:34:14   9   that to ETSI.

04:34:14  10         So this clause is basically the procedure where

04:34:19  11   somebody or ETSI becomes aware of a standards essential

04:34:25  12   IPR, and what they will do in that case, because there's

04:34:28  13   not been a disclosure submitted, perhaps because they

04:34:33  14   became aware because somebody else made them aware, the

04:34:37  15   first thing that the director general or the secretary

04:34:40  16   actually will do is approach the IPR holder and ask them to

04:34:47  17   provide that commitment to license that we talked about,

04:34:47  18   the irrevocable commitment.  And they give them three

04:34:53  19   months to do that.

04:34:54  20         Provided that IPR holder gives that commitment,

04:34:58  21   ETSI does nothing more, because all they're looking for is

04:35:01  22   the commitment that they made to publish the standard

04:35:04  23   without the risk of it being blocked.

04:35:06  24         So because this is what the procedure is to

04:35:08  25   basically have a response to IPR that may be declared late,

04:35:16  1  for instance, the -- the remedy for a self-disclosure that

04:35:19  2  is late, I don't understand how that can be harsher than

04:35:25  3  the remedy for a non-disclosure entirely.

04:35:29  4  Q.  (By Ms. Zhong)  Now, how many times in ETSI's history

04:35:33  5  has ETSI had to invoke that nuclear option of

04:35:35  6  destandardization?

04:35:36  7  A.  It's my understanding that they've never had a

04:35:39  8  situation where an IPR holder has failed to give that FRAND

04:35:43  9  commitment, and so they've never had the situation where

04:35:45  10  they had to go back to the specifications, frozen or not,

04:35:51  11  and ask for that technology to be removed because there

04:35:53  12  wasn't a commitment to license.

04:35:55  13  Q.  Besides the procedure outlined in the ETSI IPR policy

04:36:01  14  Clause 8.2, has ETSI considered any other possible remedies

04:36:05  15  for alleged untimely disclosures?

04:36:07  16  A.  So, again, going back to the 2003 ad hoc group, which

04:36:13  17  was probably when the most substantive conversations about

04:36:17  18  this were, there was a survey provided to the small and

04:36:22  19  medium enterprise members of ETSI, the SME members.

04:36:27  20       And in some of the responses that came back from

04:36:30  21  some of the SME members, there was an indication that a

04:36:33  22  possible remedy for late declaration could be essentially

04:36:38  23  rendering that IPR unenforceable.

04:36:40  24       That survey response was considered by the IPR ad

04:36:45  25  hoc group, and it did not make it into the recommendations

04:36:48   1   that went forth to the general assembly.

04:36:51   2           So ETSI essentially had that consideration in

04:36:55   3   front of them, and they rejected it.  And it did not make

04:36:59   4   it into the IPR guide or the recommendations to the general

04:37:02   5   assembly of ETSI.

04:37:05   6   Q.  Okay.  Ms. Dwyer, did you conduct an investigation

04:37:08   7   regarding whether Samsung, LG, or Panasonic gained any

04:37:12   8   undue advantage by declare -- declaring that patents after

04:37:16   9   the Release 8 freeze date?

04:37:20   10  A.  Yes, I did.

04:37:20   11  Q.  What's your conclusion?

04:37:21   12  A.  My conclusion, upon reviewing dozens of non-infringing

04:37:29   13  alternatives, was that the choice of those technologies was

04:37:33   14  made on a technical basis, and they gave no undue advantage

04:37:39   15  through that process.

04:37:41   16  Q.  How many alternatives did you examine altogether?

04:37:46   17  A.  I examined dozens altogether, many that weren't

04:37:50   18  presented in this trial.  But they were in expert reports,

04:37:54   19  for instance, of Dr. Rodermund.

04:37:56   20  Q.  Okay.  And what's your conclusion on those

04:38:00   21  alternatives?

04:38:00   22  A.  So, again, my conclusion is that those alternatives

04:38:07   23  were passed by because they simply were not the best

04:38:09   24  solution to the problem at hand.

04:38:11   25  Q.  Do you recall Dr. Wells's testimony that DCI formats

| | | |
|---|---|---|
| 04:38:20 | 1 | other than DCI format 2 are alternatives to the '774 |
| 04:38:24 | 2 | patent? |
| 04:38:24 | 3 | A.  Yes, I do. |
| 04:38:26 | 4 | Q.  Do you -- |
| 04:38:27 | 5 | A.  Sorry. |
| 04:38:27 | 6 | Q.  Do you agree with that assessment? |
| 04:38:29 | 7 | A.  No, I don't agree.  So DCI formats up to 2A are all |
| 04:38:39 | 8 | valid DCI formats, but what DCI format 2 provides is the |
| 04:38:44 | 9 | ability to use closed-loop spatial multiplexing.  It's also |
| 04:38:51 | 10 | called transmission mode 4. |
| 04:38:53 | 11 | This is a very important mode that was new to LTE, |
| 04:38:55 | 12 | and the data that we've seen in the cases that -- in U.S. |
| 04:38:58 | 13 | networks, it's used more than 65 percent of the time.  That |
| 04:39:02 | 14 | transmission mode is not supported by any of the DCI |
| 04:39:05 | 15 | formats existing prior to this. |
| 04:39:07 | 16 | Q.  Do you recall Mr. Rodermund says that Samsung in |
| 04:39:13 | 17 | September 2005 put forth technical contribution R1-050889? |
| 04:39:25 | 18 | Do you recall that testimony? |
| 04:39:25 | 19 | A.  I do. |
| 04:39:27 | 20 | Q.  What stage was the Release 8 at, at the time? |
| 04:39:32 | 21 | A.  So discussions around LTE began May 11th, 2005.  And |
| 04:39:36 | 22 | there were a couple of ad hoc group meetings that were |
| 04:39:40 | 23 | joint meetings between the RAN1 group and the RAN2 group |
| 04:39:45 | 24 | that took place both in 2005 and in 2006.  And so this was |
| 04:39:49 | 25 | very much at the study phase at that time. |

04:39:51  1        And the standards that we're talking about here,

04:39:57  2    the 36 series standards, many of those weren't even written

04:40:02  3    until late 2006, and some were not first published by ETSI

04:40:07  4    until 2007.

04:40:11  5    Q.  So you reviewed the particular technical contribution

04:40:15  6    R1-050889, correct?

04:40:20  7    A.  I did.

04:40:20  8    Q.  What's your conclusion?  Does it have anything to do

04:40:22  9    with the '774 patent invention?

04:40:23  10   A.  So those -- those contributions were very broadly about

04:40:26  11   something called MIMO, which is Multiple Input Multiple

04:40:34  12   Output, which was a technique that was going to be brought

04:40:36  13   in to the LTE technology.

04:40:37  14        So there were a number of contributions, and that

04:40:39  15   is one of them that broadly talked about the use of that in

04:40:42  16   the LTE context.  It's not specifically related, no.

04:40:45  17   Q.  Let's talk about the alternatives asserted by Dr. Wells

04:40:52  18   for the '833 patent.

04:40:56  19        What evidence shows that the '833 solution was

04:40:58  20   picked for the technical reasons?

04:41:02  21   A.  So there were other alternatives presented for the

04:41:07  22   technology that's in the '833 patent, and there was a lot

04:41:10  23   of discussion on this.

04:41:11  24        But the discussion clearly indicates that the

04:41:15  25   other proposals had a number of issues, not the least of

04:41:18   1   which were complexity in the UE, and signaling

04:41:22   2   requirements.

04:41:23   3          And signaling requirements, I know we've talked

04:41:26   4   about a bit here and a bit there, and it seems like not a

04:41:29   5   big deal, but it is an extremely big deal.  There's a

04:41:32   6   limited amount of bandwidth on the signaling channels, and

04:41:36   7   every bit is precious.  So those are the bases on which

04:41:41   8   these two contributions were *not.

04:41:44   9   Q.  Let's look at the '332.  What evidence shows that the

04:41:49   10   '332 solution was chosen for technical?

04:41:53   11   A.  So the '332 was chosen.  This -- this had extensive

04:41:58   12   discussion in 3GPP.  There was discussion at one meeting

04:42:03   13   and a document called a way forward document was produced.

04:42:06   14          Ericsson was the rapporteur of that group, so

04:42:13   15   they're the author on the document.  But it represented the

04:42:14   16   opinion of the group at that time.

04:42:15   17          And at the bottom of that document, it said that

04:42:18   18   this is still to be verified.  And, well, when companies

04:42:21   19   verified it, they found it had a flaw.  And at least five

04:42:25   20   companies agreed that it had this flaw.  And so the

04:42:27   21   invention in '332 from LG had a way of overcoming that

04:42:33   22   flaw.

04:42:33   23          Now, there was about 20 different proposals on the

04:42:36   24   table, and some companies like Motorola analyzed all of

04:42:39   25   them.  And there was a lot of simulation results that were

04:42:42  1  shown.  And that proposal was chosen because it was the

04:42:47  2  best, and it was by consensus chosen by all the people that

04:42:52  3  had been working on the problem.

04:42:53  4  Q.  And the -- do the alternatives proposed by Mr. Lanning

04:42:57  5  have undeclared IPs on them?

04:43:00  6  A.  They do.  In fact, you can see them listed here on this

04:43:04  7  demonstrative, the IPR associated with those two technical

04:43:07  8  documents.

04:43:09  9  Q.  How usual is that behavior?

04:43:10  10  A.  That's really, really common to file an IPR and then

04:43:16  11  make a proposal to the group.

04:43:22  12  Q.  What about the alternatives asserted against the '557

04:43:24  13  patent?

04:43:24  14  A.  So the '557 patent, you'll recall, is about basically

04:43:31  15  the random access channel, so the mobile announcing itself

04:43:36  16  to the network and asking for resources.

04:43:39  17          So there was a couple of alleged alternatives.

04:43:43  18  The first one by Huawei used something called Hadamard

04:43:50  19  codes and also Gold codes.  This is essentially taking a

04:43:54  20  step back in time to 3G.  And not only is the performance

04:43:58  21  of those codes worse, but there was also no proof that 16

04:44:02  22  sequences was going to be sufficient for the additional

04:44:07  23  capacity of the LTE network.

04:44:09  24          The following one -- this no grouping of

04:44:12  25  sequences -- this, again, didn't address the congestion.

04:44:15   1          You need to understand that that access channel is

04:44:18   2   used by many, many mobile stations because all it's there

04:44:21   3   to do is then move them somewhere else.

04:44:23   4          So collisions is a big deal because it means that

04:44:26   5   you don't get in your bandwidth for a longer period of

04:44:28   6   time.  And it's just not acceptable.

04:44:30   7   Q.  And what about the '284 patent?

04:44:32   8   A.  So the '284 patent, the -- there were some proposals.

04:44:40   9   This is related to something called hybrid ARQ, and it has

04:44:45   10   to do with whether or not the data was received

04:44:51   11   successfully and needs to be transmitted.

04:44:53   12          So there were a couple of things that came up

04:44:55   13   here.  The first was non-adaptive HARQ.  And what this

04:45:01   14   essentially means is that you can't use the benefit of what

04:45:04   15   you've already received to get your correct data with the

04:45:08   16   next transmission.  You're just starting at the beginning

04:45:11   17   every time.  So, clearly, that's not as good as adaptive

04:45:15   18   HARQ, so that can be written off.

04:45:16   19          And then you have the situation where you have an

04:45:19   20   initial transmission and then subsequent transmissions.

04:45:22   21   And at least one of the other proposals didn't take into

04:45:25   22   account that it has to work for both the initial and

04:45:28   23   subsequent, and it was inferior.

04:45:30   24   Q.  What about the alternatives that Apple's technical

04:45:33   25   experts did not specifically examine?  Were any of them

04:45:39  1  viable?

04:45:40  2  A.  I looked at the rest of those alternatives proposed,

04:45:43  3  and there was a -- a couple of different circumstances

04:45:45  4  applicable to that.

04:45:47  5       First, was that some of them were never proposed

04:45:50  6  in 3GPP.  And 3GPP is contribution-driven.  So if the

04:45:58  7  proposal isn't made, it's not selectable.  So that's the

04:46:03  8  reason why those were not something that could be chosen.

04:46:05  9  And many of the other ones are essentially saying this is

04:46:09  10  where we were, and we could use that same technique going

04:46:12  11  forward.  But, clearly, LTE was to be an improvement on

04:46:16  12  what existed.

04:46:17  13       So, again, while, yes, that's a way of doing it,

04:46:19  14  it's not achieving the goal of LTE, which was to provide a

04:46:22  15  faster, better network.

04:46:24  16  Q.  Now we'll come to the last section, Apple came with

04:46:29  17  unclean hands.  Have you examined the timing of Apple's IPR

04:46:33  18  declarations to ETSI?

04:46:35  19  A.  Yes.  So this goes back to the data analysis that I've

04:46:38  20  done.  And you can see, again -- so the form of releases

04:46:44  21  for LTE are Releases 8 through 10.

04:46:46  22       And for those releases a hundred percent of

04:46:51  23  Apple's declarations happened after the TTCN freeze date.

04:46:51  24       But it wasn't just those releases.  It's also

04:46:55  25  going forward, there were other releases where Apple's

04:46:58   1   declarations were after their own deadline and generally

04:47:01   2   later than the rest of ETSI.

04:47:05   3   Q.  Apple made a presentation to Japan -- Japanese FTC in

04:47:13   4   2012, correct?

04:47:14   5          MS. AMADI:  Objection.  If we're going back into

04:47:16   6   confidential information, we'll ask to seal the courtroom.

04:47:20   7          MS. ZHONG:  I will just skip and ask the next

04:47:24   8   question.

04:47:25   9   Q.  (By Ms. Zhong)  Is there any evidence that Apple made

04:47:27  10   an adjustment to the FRAND royalty rate when they made

04:47:32  11   the -- when they made the representation to Japanese FTC?

04:47:37  12          MS. AMADI:  Objection, leading.

04:47:38  13          THE COURT:  Sustained.

04:47:39  14          Is this -- is this something that's been covered,

04:47:44  15   Ms. Zhong?

04:47:44  16          MS. ZHONG:  Not yet.

04:47:45  17          THE COURT:  All right.  Restate your question in a

04:47:48  18   non-leading form.

04:47:49  19          MS. ZHONG:  Okay.

04:47:50  20   Q.  (By Ms. Zhong)  What evidence has you seen as to

04:47:52  21   whether Apple took into account of its late disclosures

04:47:57  22   when it calculated the FRAND rate?

04:48:00  23          MS. AMADI:  Objection, leading.

04:48:09  24          THE COURT:  I'll -- I'll overrule the objection.

04:48:12  25          It's perhaps technically leading, but this is

| | | |
|---|---|---|
| 04:48:17 | 1 | before the Court.  And I'll -- I'll overrule this |
| 04:48:20 | 2 | objection. |
| 04:48:23 | 3 | A.  We saw the numbers presented in terms of Apple's |
| 04:48:27 | 4 | declaration behavior with respect to those freeze dates, |
| 04:48:30 | 5 | which it has purported to be deadlines.  And if declaring |
| 04:48:36 | 6 | after an implied deadline -- |
| 04:48:39 | 7 | THE COURT:  Just a minute. |
| 04:48:40 | 8 | MS. AMADI:  I'm sorry, Your Honor.  If we're going |
| 04:48:41 | 9 | to use Apple confidential information, I'd ask that the |
| 04:48:44 | 10 | courtroom be sealed.  I think the slide was just put up |
| 04:48:47 | 11 | again. |
| 04:48:47 | 12 | MS. ZHONG:  I moved forward. |
| 04:48:49 | 13 | THE COURT:  Well, Ms. Zhong, you're either going |
| 04:48:52 | 14 | to cover this, and I'll seal the courtroom at Ms. Amadi's |
| 04:48:56 | 15 | request because it involves confidential information of her |
| 04:48:58 | 16 | client, or we're not going to keep coming back, and then |
| 04:49:01 | 17 | she stands up and says it's confidential again. |
| 04:49:04 | 18 | So if we're going to move on, let's move on.  If |
| 04:49:06 | 19 | we're not going to move on, I'll seal the courtroom, and |
| 04:49:09 | 20 | we'll cover anything that's confidential. |
| 04:49:12 | 21 | What's your preference? |
| 04:49:12 | 22 | MS. ZHONG:  I would prefer Ms. Dwyer to give the |
| 04:49:15 | 23 | answer. |
| 04:49:16 | 24 | THE COURT:  Well, that's not an option I gave you. |
| 04:49:18 | 25 | Either tell me that this is confidential and I need to seal |

04:49:22   1   the courtroom or tell me you're going to move on to

04:49:24   2   something that's not confidential so that I don't need to

04:49:27   3   seal the courtroom.

04:49:28   4            MS. ZHONG:  I'll move on.

04:49:30   5            THE COURT:  All right.

04:49:32   6   Q.  (By Ms. Zhong)  So does Apple actually practice what it

04:49:37   7   preaches with respect to ETSI IPR disclosure when Apple

04:49:41   8   makes a proposal to 3GPP?

04:49:45   9            MS. AMADI:  Objection, leading.

04:49:47   10           THE COURT:  Sustained.

04:49:50   11           MS. ZHONG:  Slide 61, please?

04:49:52   12  Q.  (By Ms. Zhong)  What is Apple's timing when it actually

04:49:56   13  makes proposal to 3GPP?  When does it disclose its IPRs?

04:50:02   14  A.  Just waiting for the slide to appear.

04:50:05   15           I'll move on.  I'll answer the question.

04:50:11   16           So I analyzed some of ETSI -- or, sorry, Apple's

04:50:18   17  contributions where they actually are making technical

04:50:22   18  proposals to 5G in this case and looked at the timing of

04:50:27   19  their proposal, confirmed that there is an IPR associated

04:50:31   20  with it, and then their declaration timing as -- as respect

04:50:37   21  to that proposal and that IPR.  And there is a definite

04:50:40   22  delay in the timing, and it doesn't conform to their own

04:50:47   23  deadlines.

04:50:48   24  Q.  Do you have specific examples regarding the timing of

04:50:50   25  those disclosures?

| | | |
|---|---|---|
| 04:50:51 | 1 | A.   I do.   They're on the slide that comes and goes. |
| 04:50:58 | 2 | MS. ZHONG:   Slide 63. |
| 04:51:08 | 3 | THE WITNESS:   Thank you. |
| 04:51:08 | 4 | A.   The top two lines of this table are Apple contributions |
| 04:51:12 | 5 | to 3GPP.   You can see that the date of the first |
| 04:51:16 | 6 | presentation of the ideas in these IPR is May 2017 for the |
| 04:51:23 | 7 | top one.   The declaration date of that was November 8th, a |
| 04:51:28 | 8 | full year later, 2018, so not at the same time of the |
| 04:51:32 | 9 | proposal. |
| 04:51:33 | 10 | And the second line, you can see that the |
| 04:51:39 | 11 | proposals were made in February of 2017 and adopted in June |
| 04:51:43 | 12 | of 2017, and the declaration date was in November of 2017. |
| 04:51:47 | 13 | Q.   Apple also recently acquired patents from Intel.   What |
| 04:51:53 | 14 | was the timeliness of the declaration for those SEPs? |
| 04:51:58 | 15 | MS. AMADI:   Objection, Your Honor.   This is |
| 04:52:00 | 16 | outside the scope of her report. |
| 04:52:02 | 17 | MS. ZHONG:   I believe that's Paragraphs 377 and |
| 04:52:05 | 18 | 378. |
| 04:52:10 | 19 | THE COURT:   Take a look at those paragraphs, |
| 04:52:12 | 20 | Ms. Amadi, and then let me hear from you. |
| 04:52:15 | 21 | MS. ZHONG:   Sorry, it's 378 and 379. |
| 04:52:19 | 22 | THE COURT:   Ms. Zhong, how much more direct |
| 04:52:22 | 23 | examination do you anticipate? |
| 04:52:24 | 24 | MS. ZHONG:   Three more questions. |
| 04:52:25 | 25 | THE COURT:   Three more questions. |

153

04:52:26  1            MS. ZHONG:  Sorry.

04:52:29  2            MS. AMADI:  Okay.  Your Honor.  I'll withdraw the

04:52:31  3  objection.

04:52:32  4            THE COURT:  All right.  Let's move on.

04:52:33  5            THE WITNESS:  Thank you.

04:52:34  6  A.  The bottom two lines in this table are two of the

04:52:38  7  standards essential patents that were acquired from Intel.

04:52:42  8  These were actually declared four times each, twice by

04:52:46  9  Intel and twice by Texas Instruments.

04:52:49  10           The declaration date that I've put in the right

04:52:52  11 column is the earliest of those four declarations for each

04:52:55  12 of those patents, and you can see that they were presented

04:52:59  13 in 2007, but the declaration date was November 2011.  So

04:53:03  14 clearly later than anything to do with the release,

04:53:07  15 according to the end date of that release.

04:53:12  16 Q.  (By Ms. Zhong)  Does that mean Apple believes that SEPs

04:53:14  17 have no value?

04:53:15  18 A.  I don't believe that to be true.

04:53:20  19           MS. ZHONG:  Slide 64, please.

04:53:28  20 A.  So this is exhibit PX-114 --

04:53:31  21           THE COURT:  Just a minute, Ms. Dwyer.  She called

04:53:33  22 for a new slide.  She hasn't asked a question yet.

04:53:36  23           THE WITNESS:  Sorry.

04:53:37  24           THE COURT:  You need to wait for a question.

04:53:39  25 Q.  (By Ms. Zhong)  So let me repeat my question, which is,

| | | |
|---|---|---|
| 04:53:42 | 1 | do the data you have just analyzed indicate that Apple |
| 04:53:45 | 2 | actually believe that SEPs have no value? |
| 04:53:48 | 3 | MS. AMADI:  Objection, leading. |
| 04:53:50 | 4 | THE COURT:  Sustained. |
| 04:53:52 | 5 | Q.  (By Ms. Zhong)  What is Apple's view as to the value of |
| 04:53:55 | 6 | SEPs? |
| 04:53:57 | 7 | MS. AMADI:  And, Your Honor, I would ask that we |
| 04:53:58 | 8 | seal the courtroom if we're going to show Apple |
| 04:54:02 | 9 | confidential information again. |
| 04:54:04 | 10 | MS. ZHONG:  That's fine.  Let's seal the |
| 04:54:05 | 11 | courtroom. |
| 04:54:08 | 12 | THE COURT:  All right.  Just a minute. |
| 04:54:14 | 13 | MS. ZHONG:  Sorry. |
| 04:54:18 | 14 | THE COURT:  Do you have an objection to the |
| 04:54:23 | 15 | question, Ms. Amadi?  Other than it may involve |
| 04:54:29 | 16 | confidential information that would require sealing? |
| 04:54:31 | 17 | MS. AMADI:  I do have an objection as to Apple's |
| 04:54:35 | 18 | belief, I think was the question, but -- |
| 04:54:38 | 19 | THE COURT:  What's your objection? |
| 04:54:41 | 20 | MS. AMADI:  Sorry, the witness is speculating as |
| 04:54:44 | 21 | to Apple's belief. |
| 04:54:45 | 22 | MS. ZHONG:  I'll withdraw the question, and I'll |
| 04:54:47 | 23 | move on. |
| 04:54:49 | 24 | THE COURT:  Are you going to cover information, |
| 04:54:51 | 25 | Ms. Zhong, that might require the courtroom to be sealed? |

04:54:54  1           MS. ZHONG:  No.

04:54:55  2           THE COURT:  Then please ask your next question.

04:54:57  3  Q.  (By Ms. Zhong)  Throughout your investigation, have you

04:55:04  4  seen -- what evidence have you seen regarding how Samsung,

04:55:08  5  LG, and Panasonic's disclosure pattern of behavior have

04:55:15  6  caused harm or reliance by others in the industry?

04:55:22  7  A.  The data that was analyzed shows that those three

04:55:25  8  companies, Samsung, LG, and Panasonic, behaved like every

04:55:30  9  other company who are ETSI members, including Apple.

04:55:34  10  There's nothing different or unusual or nefarious about

04:55:39  11  their behavior.  It's just consistent with ETSI members.

04:55:43  12           MS. ZHONG:  I pass the witness.

04:55:44  13           THE COURT:  All right.  Before we proceed with the

04:55:46  14  Defendant's cross-examination, we're going to take a very

04:55:49  15  short recess, and then as soon as we come back, we will

04:55:52  16  proceed with that cross-examination by Apple.

04:55:54  17           The Court stands in recess.

04:55:56  18           COURT SECURITY OFFICER:  All rise.

04:55:57  19           (Recess.)

05:03:57  20           COURT SECURITY OFFICER:  All rise.

05:04:04  21           THE COURT:  Be seated, please.

05:04:04  22           Counsel, is there some request about closing

05:04:21  23  arguments here?

05:04:27  24           MR. SHEASBY:  Your Honor, given the desire of the

05:04:30  25  parties to put evidence into the record, we would request

05:04:34    1    permission to waive oral closing and in lieu of that to do

05:04:40    2    closing via the post-trial briefing.

05:04:43    3            THE COURT:  Well, you're welcome to use the time

05:04:46    4    that I've allocated for a closing argument, you're welcome

05:04:50    5    to use it to put on testimony with witnesses, but I'm not

05:04:55    6    going to allow you to use all of it on witnesses and then

05:04:59    7    give me a lengthy closing argument that would have

05:05:02    8    otherwise used part of your time.  You can use every minute

05:05:05    9    that you have, but I'm not going to extend that which is,

05:05:07   10    in effect, what you're asking me to do.

05:05:09   11            MR. SHEASBY:  No, it's not, Your Honor.  In other

05:05:11   12    words, you've given us each three hours to present our

05:05:15   13    witnesses.  We're both going to do that.  We both jointly

05:05:18   14    agreed to waive oral closing and do it on the papers.

05:05:19   15            THE COURT:  Well, you can waive oral closing and

05:05:21   16    you can use every minute on witnesses, but I'm not then

05:05:25   17    going to consider a lengthy, written closing argument

05:05:28   18    disguised as briefing.

05:05:31   19            So if you want to have a closing argument, use

05:05:34   20    some of this time and give me a closing argument.  If you

05:05:38   21    want to use that time for witnesses, use that time for

05:05:40   22    witnesses.

05:05:40   23            MR. SHEASBY:  I understand that, Your Honor.

05:05:41   24            THE COURT:  All right.  Let's proceed.

05:05:41   25            Are you ready to cross-examine the witness,

| | | |
|---|---|---|
| 05:05:47 | 1 | Ms. Amadi? |
| 05:05:48 | 2 | MS. AMADI:  Yes, Your Honor. |
| 05:05:49 | 3 | THE COURT:  Please proceed. |
| 05:05:49 | 4 | CROSS-EXAMINATION |
| 05:05:51 | 5 | BY MS. AMADI: |
| 05:05:51 | 6 | Q.  Good afternoon, Ms. Dwyer.  Nice to see you again. |
| 05:05:56 | 7 | A.  Good afternoon.  Nice to see you, too. |
| 05:06:00 | 8 | Q.  Now, you gave some opinions in your direct testimony |
| 05:06:02 | 9 | about patent royalty rates, correct? |
| 05:06:04 | 10 | A.  I did calculations. |
| 05:06:04 | 11 | Q.  And to be very clear, you're not a patent licensing |
| 05:06:07 | 12 | expert, correct? |
| 05:06:08 | 13 | A.  No, I'm not. |
| 05:06:09 | 14 | Q.  And you don't have any experience assessing patent |
| 05:06:12 | 15 | licenses, correct? |
| 05:06:14 | 16 | A.  That's correct. |
| 05:06:15 | 17 | Q.  And you haven't reviewed any licenses in this case, |
| 05:06:18 | 18 | correct? |
| 05:06:18 | 19 | A.  That's correct. |
| 05:06:18 | 20 | Q.  And you haven't assessed any patent licenses in any |
| 05:06:23 | 21 | other case; is that correct? |
| 05:06:24 | 22 | A.  Correct. |
| 05:06:24 | 23 | Q.  Now, you also gave some opinions about the ETSI IPR |
| 05:06:27 | 24 | disclosure policy, correct? |
| 05:06:28 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 05:06:30 | 1 | Q.  And you've never worked for 3GPP, correct? |
| 05:06:33 | 2 | A.  No. |
| 05:06:33 | 3 | Q.  You've never worked for ETSI, correct? |
| 05:06:36 | 4 | A.  That's right. |
| 05:06:37 | 5 | Q.  And you've never had any role at all in creating 3GPP |
| 05:06:41 | 6 | policy, correct? |
| 05:06:42 | 7 | A.  Correct. |
| 05:06:42 | 8 | Q.  You've never had any role at all in creating ETSI |
| 05:06:45 | 9 | policy, correct? |
| 05:06:45 | 10 | A.  Correct. |
| 05:06:47 | 11 | Q.  And so you've had no role in creating the ETSI IPR |
| 05:06:52 | 12 | policy; is that correct? |
| 05:06:54 | 13 | A.  That's correct. |
| 05:06:54 | 14 | Q.  And you agree that individual members participating in |
| 05:07:00 | 15 | 3GPP are bound by the IPR policy of their respective |
| 05:07:03 | 16 | organizational partners, correct? |
| 05:07:05 | 17 | A.  That's correct. |
| 05:07:06 | 18 | Q.  And so an ETSI member that participates in 3GPP |
| 05:07:10 | 19 | technical meetings is expected to abide by the ETSI IPR |
| 05:07:15 | 20 | policy, correct? |
| 05:07:16 | 21 | A.  That's correct. |
| 05:07:16 | 22 | Q.  And you don't deny that each of Samsung, LG, and |
| 05:07:21 | 23 | Panasonic are members of ETSI, correct? |
| 05:07:22 | 24 | A.  They are members, correct. |
| 05:07:24 | 25 | Q.  Now, it's your view that the ETSI -- that ETSI has |

| | | |
|---|---|---|
| 05:07:29 | 1 | never indicated that there's a heightened duty or a |
| 05:07:33 | 2 | different IPR disclosure deadline for a member making a |
| 05:07:39 | 3 | technical contribution; is that your opinion? |
| 05:07:41 | 4 | A.  Yes. |
| 05:07:42 | 5 | Q.  And so your opinion is that there's no different duty, |
| 05:07:45 | 6 | regardless of whether or not you're making a contribution; |
| 05:07:49 | 7 | is that correct? |
| 05:07:49 | 8 | A.  Yes. |
| 05:07:49 | 9 | Q.  And you're familiar with the general assembly of ETSI, |
| 05:07:53 | 10 | correct? |
| 05:07:53 | 11 | A.  I am. |
| 05:07:54 | 12 | Q.  The general assembly of ETSI is the highest |
| 05:07:57 | 13 | decision-making body of the organization; is that right? |
| 05:07:59 | 14 | A.  Yes. |
| 05:08:00 | 15 | Q.  And the general assembly is responsible for determining |
| 05:08:04 | 16 | the ETSI overall policy and strategy; is that correct? |
| 05:08:07 | 17 | A.  It's my understanding, yes. |
| 05:08:09 | 18 | Q.  And the general assembly is also responsible for |
| 05:08:11 | 19 | approving any changes to the rules or regulations of ETSI, |
| 05:08:17 | 20 | correct? |
| 05:08:17 | 21 | A.  Correct. |
| 05:08:18 | 22 | Q.  Now, Clause 4.1 of the ETSI IPR policy, as currently |
| 05:08:26 | 23 | constituted, was adopted at the 46th general assembly of |
| 05:08:27 | 24 | ETSI, correct? |
| 05:08:28 | 25 | A.  In 2005, correct. |

05:08:29   1          MS. AMADI:   And Mr. Lee, if we could pull up

05:08:33   2   DTX-970.

05:08:35   3   Q.  (By Ms. Amadi)   Ms. Dwyer, DTX-970 is a record of the

05:08:41   4   45th general assembly meeting, correct?

05:08:43   5   A.   That's correct.

05:08:43   6   Q.   And that was in April of 2005, correct?

05:08:46   7   A.   Yes.

05:08:47   8   Q.   And this is the meeting just before when the ETSI IPR

05:08:50   9   policy was adopted; is that correct?

05:08:52  10   A.   No.

05:08:53  11   Q.   The ETSI IPR policy was adopted at the 46th meeting,

05:09:00  12   correct?

05:09:00  13   A.   No.

05:09:09  14   Q.   If you could turn in your report -- just make sure I

05:09:14  15   have it right.   It's your view that the ETSI IPR policy was

05:09:18  16   not adopted at the 46th ETSI General Assembly meeting; is

05:09:21  17   that your opinion?

05:09:22  18   A.   The policy has been there from the start.

05:09:23  19   Q.   Okay.   If you could turn in your rebuttal report, which

05:09:28  20   is Tab 3 of your binder?

05:09:32  21   A.   Is it the black one, Ms. Amadi?

05:09:36  22   Q.   Yes?

05:09:36  23   A.   Thank you.   Yes.

05:09:43  24   Q.   Have you read that paragraph?

05:09:44  25   A.   Which page?

05:09:46  1   Q.  Oh, I'm sorry, Paragraph 62?

05:09:49  2   A.  Uh-huh.

05:10:03  3   Q.  And you state:  I note that Clause 4.1 and Clause 4.2

05:10:10  4   in their current form were adopted at the 46th ETSI General

05:10:15  5   Assembly held on the 22nd and 23rd of November 2005; is

05:10:20  6   that correct?

05:10:20  7   A.  Yes, those clauses were, correct.

05:10:22  8   Q.  And so Clause 4.1, which is the clause we're addressing

05:10:25  9   in this case, was adopted at the 46th general assembly

05:10:27  10  meeting; is that correct?

05:10:28  11  A.  Just the edits to it, ma'am.

05:10:30  12  Q.  In its current form, correct?

05:10:33  13  A.  That's correct.

05:10:33  14  Q.  And so the 45th meeting is the meeting just before the

05:10:36  15  current form was adopted; is that right?

05:10:38  16  A.  Yes.

05:10:47  17      MS. AMADI:  And if we could pull up Section 2 to

05:10:49  18  this document.

05:10:51  19  Q.  (By Ms. Amadi)  There was a proposed amendment to the

05:10:53  20  ETSI IPR policy made in this 45th general assembly,

05:11:00  21  correct?

05:11:00  22  A.  That's correct.

05:11:02  23      MS. AMADI:  And if we could pull up Section 4.3.

05:11:07  24  Q.  (By Ms. Amadi)  And ETSI actually provided a response

05:11:09  25  to that proposal, correct?

| | | |
|---|---|---|
| 05:11:10 | 1 | A.  They responded to DG Competition, correct? |
| 05:11:14 | 2 | Q.  And if we take a look at Page 3, the first bullet |
| 05:11:19 | 3 | underneath the response, in the last sentence, it states |
| 05:11:30 | 4 | that in contrast, the current text creates an important |
| 05:11:34 | 5 | general ongoing disclosure obligation, as well as an |
| 05:11:36 | 6 | additional specific disclosure obligation when a member |
| 05:11:39 | 7 | contributes to the development of a standard? |
| 05:11:40 | 8 | Do you see that language? |
| 05:11:42 | 9 | A.  I do. |
| 05:11:42 | 10 | Q.  And so in the meeting just before the current version |
| 05:11:46 | 11 | of 4.1 was adopted, ETSI stated that there was a general |
| 05:11:50 | 12 | ongoing disclosure obligation, correct? |
| 05:11:52 | 13 | A.  Yes, there is. |
| 05:11:54 | 14 | Q.  And it also stated that there was an additional |
| 05:11:56 | 15 | specific disclosure obligation when a member contributes to |
| 05:12:00 | 16 | the development of the standard, correct? |
| 05:12:01 | 17 | A.  Yes. |
| 05:12:03 | 18 | Q.  Yet, in your view, ETSI never indicated that there's a |
| 05:12:07 | 19 | heightened duty or a different IPR disclosure deadline |
| 05:12:10 | 20 | imposed on an ETSI member making a technical contribution. |
| 05:12:14 | 21 | That's your opinion, correct? |
| 05:12:15 | 22 | A.  My opinion is there's no deadline at all. |
| 05:12:17 | 23 | Q.  And it's your opinion, as well, that there's no |
| 05:12:21 | 24 | heightened duty of disclosure for a member making a |
| 05:12:24 | 25 | proposal; isn't that correct? |

| | | |
|---|---|---|
| 05:12:25 | 1 | A.  No. |
| 05:12:25 | 2 | Q.  Okay.  Ms. Dwyer, if you could turn to Paragraph 72 in |
| 05:12:32 | 3 | your rebuttal report. |
| 05:12:42 | 4 | A.  I'm there. |
| 05:12:43 | 5 | Q.  So it's your opinion that ETSI has never indicated that |
| 05:12:45 | 6 | there is a heightened duty or a different IPR disclosure |
| 05:12:48 | 7 | deadline imposed on an ETSI member making a technical |
| 05:12:54 | 8 | contribution; isn't that right? |
| 05:12:56 | 9 | A.  No, that's two things that you've asked me.  One is |
| 05:12:59 | 10 | right; one is not. |
| 05:13:00 | 11 | Q.  This language appears in your report, correct? |
| 05:13:02 | 12 | A.  Yes. |
| 05:13:03 | 13 | Q.  And so you disagree with the sentence set forth in your |
| 05:13:07 | 14 | report? |
| 05:13:07 | 15 | A.  May I answer in a sentence? |
| 05:13:09 | 16 | Q.  Yes or no, do you disagree with the sentence set forth |
| 05:13:14 | 17 | in your report? |
| 05:13:14 | 18 | A.  I believe that there is a heightened duty, and I don't |
| 05:13:17 | 19 | believe there's a deadline. |
| 05:13:18 | 20 | Q.  But in your report, you stated that ETSI has never |
| 05:13:23 | 21 | indicated that there's a heightened duty or a different IPR |
| 05:13:26 | 22 | disclosure deadline imposed on an ETSI member making a |
| 05:13:29 | 23 | technical contribution; isn't that right? |
| 05:13:32 | 24 | A.  Yes. |
| 05:13:32 | 25 | Q.  Now, in your direct testimony -- |

05:13:38   1          MS. AMADI:   If we could pull up Plaintiffs'

05:13:41   2   Demonstrative -- Ms. Dwyer's Demonstrative Slide 35.

05:13:46   3   Q.  (By Ms. Amadi)   In your direct testimony, Ms. Dwyer,

05:13:49   4   you showed this chart, correct?

05:13:52   5   A.  Correct.

05:13:52   6   Q.  And you showed that Apple had 100 percent disclosure

05:13:57   7   after the TCTC -- TTCN disclosure deadline, correct?

05:14:03   8   A.  For some releases, yes.

05:14:05   9   Q.  And you didn't do any analysis of whether the patents

05:14:08  10   that you showed in this chart were acquired by Apple,

05:14:11  11   correct?

05:14:11  12   A.  I did, actually.

05:14:12  13   Q.  So you did an analysis of that 100 percent of patents

05:14:19  14   and whether they were acquired by Apple?

05:14:21  15   A.  I did.

05:14:26  16   Q.  And you acknowledge that the patent -- Apple did

05:14:29  17   acquire patents in 2011, correct?

05:14:31  18   A.  Yes, that's right.

05:14:31  19   Q.  And you also acknowledge that Apple did not participate

05:14:34  20   in Release 8 or Release 9, correct?

05:14:37  21   A.  That's correct.

05:14:38  22   Q.  And so Apple didn't submit a technical proposal for

05:14:42  23   Release 8, correct?

05:14:43  24   A.  That's correct.

05:14:43  25   Q.  Or Release 9, correct?

05:14:45   1    A.  Yes.

05:14:46   2    Q.  In fact, it's your view that Apple didn't contribute to

05:14:49   3    the standardization of LTE at all, correct?

05:14:51   4    A.  Not entirely, no.

05:14:53   5    Q.  Well, it's certainly your view that Apple didn't

05:14:58   6    contribute to the standardization of Release 8 or Release

05:15:01   7    9, correct?

05:15:02   8    A.  Correct.

05:15:02   9    Q.  And you have no evidence that Apple has ever asserted

05:15:09  10    any of the patents set forth in your chart in litigation,

05:15:15  11    correct?

05:15:15  12    A.  I don't know that.

05:15:16  13           MS. AMADI:  No further questions.

05:15:19  14           THE COURT:  Is there redirect from the Plaintiff?

05:15:21  15           MS. ZHONG:  No, Your Honor.

05:15:22  16           THE COURT:  Then you may step down, Ms. Dwyer.

05:15:24  17           THE WITNESS:  Thank you, Your Honor.

05:15:25  18           THE COURT:  You're welcome.

05:15:26  19           All right.  Mr. Selwyn, call the Defendant's

05:15:31  20    next -- excuse me, Mr. Sheasby, call the Plaintiffs' next

05:15:34  21    witness.

05:15:35  22           MR. SHEASBY:  Plaintiffs call Mr. Brian Blasius.

05:15:38  23    And with the Court's permission, Ms. Ingrid Petersen will

05:15:40  24    do the examination.

05:15:44  25           THE COURT:  All right.  Mr. Blasius, if you'll

| | | |
|---|---|---|
| 05:15:46 | 1 | come take the witness stand.  I remind you, sir, that you |
| 05:15:50 | 2 | remain under oath. |
| 05:15:51 | 3 | THE WITNESS:  Yes, Your Honor. |
| 05:15:52 | 4 | THE COURT:  Where is Ms. Petersen? |
| 05:16:01 | 5 | MR. SHEASBY:  Your Honor, because of this delay, |
| 05:16:04 | 6 | we'll call Mr. Kennedy so that there's no delay. |
| 05:16:06 | 7 | THE COURT:  Well, let's see if she's right outside |
| 05:16:09 | 8 | the door. |
| 05:16:10 | 9 | MR. SELWYN:  Your Honor, may I raise one issue |
| 05:16:19 | 10 | about the last witness's testimony? |
| 05:16:19 | 11 | THE COURT:  In a moment but not right now. |
| 05:16:23 | 12 | All right.  Mr. Blasius, why don't you return to |
| 05:16:26 | 13 | the counsel table.  Do you want to call Mr. Kennedy, |
| 05:16:29 | 14 | Mr. Sheasby? |
| 05:16:30 | 15 | MR. SHEASBY:  The Plaintiffs call Mr. David |
| 05:16:38 | 16 | Kennedy. |
| 05:16:38 | 17 | We found her. |
| 05:16:40 | 18 | THE COURT:  Which one do you want, Mr. Sheasby? |
| 05:16:43 | 19 | You've got two witnesses halfway to the witness box. |
| 05:16:47 | 20 | MR. SHEASBY:  I'm going to go with Mr. Blasius, |
| 05:16:47 | 21 | with Your Honor's permission. |
| 05:16:47 | 22 | THE COURT:  All right.  Mr. Blasius, if you'll |
| 05:16:47 | 23 | return to the witness stand. |
| 05:16:47 | 24 | And, Ms. Petersen, you may approach the podium. |
| 05:16:52 | 25 | MS. PETERSEN:  Thank you, Your Honor. |

05:16:52   1          THE COURT:  Mr. Selwyn, you have an issue that

05:16:54   2   needs to be raised right now.

05:16:56   3          MR. SELWYN:  I believe so.  It relates to the last

05:16:58   4   witness's testimony --

05:16:59   5          THE COURT:  Yes, sir.

05:17:00   6          MR. SELWYN:  -- which is there was some deposition

05:17:02   7   testimony that Ms. Dwyer discussed on the representation

05:17:05   8   that that deposition testimony would be offered into

05:17:08   9   evidence.

05:17:09  10          I understand that the Plaintiffs will not be

05:17:10  11   offering into evidence because of time issues the

05:17:13  12   deposition testimony they had planned for Mr. Zhang or

05:17:17  13   Mr. Howell.  So given that it's not coming in, we would ask

05:17:22  14   that that testimony from Ms. Dwyer be stricken.

05:17:26  15          THE COURT:  Mr. Sheasby?

05:17:26  16          MR. SHEASBY:  As to Mr. Howell, Your Honor,

05:17:32  17   actually may the slide be taken down so his testimony is

05:17:36  18   not read into the record?

05:17:37  19          As to Mr. Zhang, he was a corporate

05:17:40  20   representative.  His statement is not hearsay, so whether

05:17:43  21   his testimony is played or not, his statement is in the

05:17:45  22   record via the testimony of Ms. Dwyer.

05:17:48  23          THE COURT:  All right.  Mr. Selwyn, if you want to

05:17:51  24   move to strike a portion of the Plaintiffs' testimony, you

05:17:56  25   may file a written motion, and I'll look at it.

05:17:58   1          MR. SELWYN:  Thank you, Your Honor.

05:17:59   2          THE COURT:  Ms. Petersen, if you'll proceed with

05:18:03   3   the direct examination of this witness when you're ready,

05:18:03   4   please.

05:18:03   5          BRIAN BLASIUS, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

05:18:03   6                     DIRECT EXAMINATION

05:18:07   7   BY MS. PETERSEN:

05:18:07   8   Q.  Good afternoon.  Could you please introduce yourself to

05:18:10   9   the Court?

05:18:11  10   A.  Good afternoon.  Yes, my name is Brian Blasius, and I'm

05:18:14  11   president and CEO of PanOptis.

05:18:17  12          MS. PETERSEN:  If we could go to Slide 5.6,

05:18:21  13   please?  The next one, please.

05:18:23  14   Q.  (By Ms. Petersen)  Mr. Blasius, Ms. Mewes was talking

05:18:27  15   about an August 2017 meeting during her testimony.  What

05:18:32  16   were the terms of that meeting?

05:18:34  17          MR. SELWYN:  Objection.

05:18:35  18          THE COURT:  What's your objection?

05:18:36  19          MR. SELWYN:  Lack of personal knowledge.

05:18:43  20          THE COURT:  Can you lay a foundation for this

05:18:45  21   question, Ms. Petersen?

05:18:46  22          MS. PETERSEN:  Yes.  Your Honor, he's also a

05:18:49  23   30(b)(6) witness designated for this topic and was deposed

05:18:52  24   on this information, but I can lay the foundation.

05:18:55  25          THE COURT:  Well, whether he's a corporate

05:18:58   1   representative or not, you're asking him about a meeting in

05:19:01   2   August of 2017.  If you can show me that he was at the

05:19:04   3   meeting or has personal knowledge, that's one thing.  But

05:19:07   4   right now I don't know.

05:19:09   5          MS. PETERSEN:  Okay.

05:19:10   6   Q.  (By Ms. Petersen)  Mr. Blasius, were you present at the

05:19:12   7   meeting on August 16th, 2019?

05:19:18   8   A.  I -- I recall being present at a part -- part of the

05:19:21   9   meeting.

05:19:21  10   Q.  Okay.  And at any point did you review documents in

05:19:25  11   your role as president and CEO of PanOptis regarding

05:19:29  12   negotiations with Apple?

05:19:29  13   A.  Yes, I do.  I --

05:19:31  14   Q.  And at any point were those documents meeting notes?

05:19:36  15   A.  Yes, it was the meeting notes of the Apple --

05:19:39  16   Q.  And were those meeting notes maintained during the

05:19:44  17   regular course and ordinary course of business of PanOptis?

05:19:48  18   A.  Yes, they were maintained in the order -- normal order

05:19:51  19   of business.

05:19:51  20   Q.  And, Mr. Blasius, what were the terms of that offer in

05:19:54  21   August 2019?

05:19:55  22   A.  In the offer that was discussed at that meeting and

05:19:57  23   then reiterated in the September meeting, the terms of the

05:20:02  24   license was an 86 cent per-unit license --

05:20:06  25          THE COURT:  Just a minute, Mr. Blasius.

```
05:20:07   1              Mr. Selwyn, do you have something?
05:20:09   2              MR. SELWYN:  Just for clarification, the slide
05:20:10   3    says 2019 on the top and 2017 on the bottom, and there's
05:20:14   4    been conflicting questions and answers as to the year.
05:20:18   5              THE COURT:  Well, thank you for that observation.
05:20:20   6    If Ms. Petersen wants to address it, she can.  If not, you
05:20:23   7    can address it on cross.  Otherwise, we're going to move
05:20:27   8    on.
05:20:27   9    Q.  (By Ms. Petersen)  Mr. Blasius, what was the date of
05:20:31  10    the meeting in August?
05:20:32  11    A.  It was August 16th, 2017.
05:20:34  12    Q.  Thank you.
05:20:36  13              MR. SELWYN:  Your Honor, we would ask that the
05:20:37  14    courtroom be sealed because this information is covered by
05:20:39  15    the parties' confidentiality agreement.
05:20:41  16              THE COURT:  All right.  Then based on counsel's
05:20:43  17    request, I'll order the courtroom sealed.  Those present
05:20:45  18    not subject to the protective order should excuse
05:20:49  19    themselves until the courtroom is reopened and unsealed.
05:20:49  20              (Courtroom sealed.)
05:20:49  21              (This portion of the transcript is sealed and
05:20:49  22              filed under separate cover as Bench Trial
05:20:52  23              Sealed Portion No. 6.)
06:29:44  24              (Courtroom unsealed.)
06:29:44  25              THE COURT:  Is there anything further that needs
```

06:29:46  1    to be raised with the Court from either party?

06:29:48  2            MR. SELWYN:  Nothing from Apple, Your Honor.  And

06:29:49  3    thank you.

06:29:50  4            MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

06:29:51  5            THE COURT:  Well, it's been an unusual and trying

06:29:53  6    day for everyone.  And I appreciate counsel's efforts and

06:29:58  7    its forbearance with the Court in the challenges that we

06:30:05  8    faced, but we are where we are.

06:30:07  9            I will certainly consider these important matters

06:30:09  10   as a part of the bench trial, and in light of the jury's

06:30:12  11   verdict, to get you rulings on these issues as promptly as

06:30:17  12   my schedule will permit.

06:30:20  13           Thank you, counsel.

06:30:21  14           MR. SHEASBY:  Thank you, Your Honor.

06:30:21  15           THE COURT:  The Court stands in recess.

06:30:24  16           COURT SECURITY OFFICER:  All rise.

          17           (Court adjourned.)

          18

          19

          20

          21

          22

          23

          24

          25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                     8/11/2020
      SHELLY HOLMES, CSR, TCRR              Date
10   OFFICIAL REPORTER
      State of Texas No.: 7804
11   Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25