# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| OPTIS WIRELESS TECHNOLOGY, LLC, OPTIS CELLULAR TECHNOLOGY, LLC, PANOPTIS PATENT MANAGEMENT, LLC, UNWIRED PLANET, LLC, UNWIRED PLANET INTERNATIONAL LIMITED, | § § § § § § § | |
| | § | CIVIL ACTION NO.  2:19-CV-00066-JRG |
| *Plaintiffs*, | § § § | **FILED UNDER SEAL** |
| v. | § § | |
| APPLE INC., | § § | |
| *Defendant*. | § § | |

## OPINION AND ORDER AS TO BENCH TRIAL TOGETHER WITH SUPPORTING FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a jury trial in the above-captioned patent infringement case from August 3, 2020 through August 11, 2020.  (Dkt. Nos. 460, 461, 466, 474, 482, 485, 486.)  The jury delivered a verdict that Defendant Apple Inc. ("Apple" or "Defendant") willfully infringed the asserted patents on August 11, 2020.  (Dkt. No. 483.)

Following the jury trial, the Court conducted a bench trial on the issues of  Count VIII by Plaintiffs Optis Wireless Technology, LLC ("Optis Wireless"); Optis Cellular Technology, LLC ("Optis Cellular"); PanOptis Patent Management, LLC ("PanOptis"); Unwired Planet, LLC ("Unwired Planet"); and Unwired Planet International Limited ("UPIL") (collectively, "Optis" or "Plaintiffs") and Apple's waiver defense on August 11, 2020.  (Dkt. No. 487.)  The parties submitted proposed findings of fact and conclusions of law as to these two claims.  (Dkt. No. 528, 533.)  Pursuant to Federal Rule of Civil Procedure 52, the Court issues its Findings of Fact and

Conclusions of Law as set forth below to support its ruling herein as to these remaining claims which have been tried to the bench.

## FINDINGS OF FACT ("FF")

### a. Procedural History

[FF1]        Optis filed the above-captioned case against Apple on February 25, 2019, asserting infringement of seven patents under the laws of the United States.  (Dkt. No. 1 ¶ 1.) Plaintiffs filed a First Amended Complaint on May 13, 2019.  (Dkt. No. 26.)

[FF2]        Plaintiffs allege "[t]here is a dispute between the Plaintiffs and Apple concerning whether the Plaintiffs' history of offers to Apple for a global license to the Plaintiffs' essential patents complies with the Plaintiffs' commitment to license their essential patents on FRAND terms and conditions pursuant to ETSI and ETSI's IPR Policy."  (*Id.* ¶ 143.)  To that end, Plaintiffs noted:

> The Plaintiffs are seeking relief in the United Kingdom ("UK") (more precisely, in the High Court of England and Wales, which has already determined FRAND terms including royalty rates for part of the Plaintiffs' patents with respect to another company) in respect of Apple's infringement of certain UK patents. As part of those proceedings the Plaintiffs have requested the UK Court to make a determination as to the FRAND license terms in respect of the Plaintiffs' worldwide portfolio (the "UK FRAND Proceedings"). Accordingly, the UK FRAND Proceedings will determine FRAND terms for Plaintiffs' worldwide portfolios.

(*Id.* ¶ 144.)

[FF3]        Accordingly, "[t]o the extent necessary beyond the UK FRAND Proceedings, the Plaintiffs request a declaratory judgment in this Court that negotiations toward a FRAND license with Apple were conducted in good faith, comply [*sic*] with the ETSI IPR Policy, and were consistent with competition law requirements."  (*Id.* ¶ 145.)  Optis requests such relief

in Count VIII, which requests a declaratory judgment that the plaintiffs have not violated FRAND or competition law.  (*Id.* ¶¶ 140–146.)

### b. Standards Setting Organizations and Standards Essentiality

[FF4]     The European Telecommunications Standard Institute, or ETSI, is a standard-setting organization based in France.  (Dkt. No. 178-02 ¶ 14.)  ETSI has adopted an Intellectual Property Rights ("IPR") Policy that sets out rules and obligations for ETSI members. (Dkt. No. 508 at 28:3–9; DTX-0068; Dkt. No. 509 at 81:7–10, 91:1–8.)  The ETSI IPR Policy defines an IPR as follows:

> **"IPR"** shall mean any intellectual property right conferred by statute law including applications therefor other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

(DTX-0068 at 6; Dkt. No. 508 at 28:4–29:21.)

[FF5]     ETSI members are obligated to follow the ETSI IPR Policy.  (Dkt. No. 508 at 28:14–17, 158:14–21; Dkt. No. 528-1 at 89:20–23; Dkt. No. 509 at 69:13–14, 141:19–25.)  As discussed below, the ETSI IPR Policy sets out terms with which participants must comply, including a commitment to timely disclose IPR to ETSI and a commitment to license IPR on fair, reasonable, and non-discriminatory ("FRAND") terms.

### 1.    FRAND

[FF6]     The ETSI IPR Policy addresses the availability of licenses on FRAND terms:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

(DTX-0068 at § 6.1.)

[FF7]     Clause 6.1 of the ETSI IPR Policy requires owners of intellectual property rights which are essential in relation to a particular standard or technical specification to declare that they are prepared to grant irrevocable licenses on FRAND terms and conditions. (Borghetti Op. Rep. ¶ 12.)   The commitment resulting from a Declaration made pursuant Clause 6.1 is governed by French law and is intended to be legally binding.  (*Id.*)

[FF8]     The ETSI IPR Policy defines ESSENTIAL as follows:

**"ESSENTIAL"** as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(DTX-0068 at 6; Dkt. No. 508 at 28:4–29:21.)

[FF9]     One sub-organization of ETSI responsible for developing cellular standards is the Third Generation Partnership Project, or 3GPP.   (Dkt. No. 509 at 80:21–81:10.)   For example, 3GPP developed the Long Term Evolution ("LTE") standard.   (Dkt. No. 509 at 81:11–82:18.)  3GPP does not have its own IPR Policy; instead, 3GPP participants are expected

to follow the IPR Policies of the organizational partners to which they belong.  (Dkt. No. 508  at 27:22–25, 158:14–21; Dkt. No. 528-1 89:20–23; Dkt. No. 509 at 69:13–14, 141:19–25.)

### 2.    *Procedural History of Count VIII*

[FF10]        Optis filed a First Amended Complaint on May 13, 2019 alleging that "[t]here is a dispute between the Plaintiffs and Apple concerning whether the Plaintiffs' history of offers to Apple for a global license to the Plaintiffs' essential patents complies with Plaintiffs' commitment to license their essential patents on FRAND terms and conditions pursuant to ETSI and ETSI's IPR Policy."  (Dkt. No. 26 ¶ 143.)  Count VIII seeks "[a] declaration that Plaintiffs, in their history of negotiations with Apple in regard to a global license to the Plaintiffs' essential patents, have negotiated in good faith and otherwise complied with FRAND . . . ."  (*Id.* ¶ 109.)

[FF11]        Apple filed a Motion to Dismiss Count VIII of Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction   (Dkt. No. 16), which the Court granted-in-part and denied-in-part.  (Dkt. No. 102.)  The Court dismissed "any portion of Count VIII that seeks a declaration that Plaintiffs have complied with their obligations under foreign laws or as they relate to foreign patents, or that Apple may not raise a FRAND defense in a foreign jurisdiction."  (*Id.* at 6.)  The Court explained that "[l]ike claims for foreign patent infringement, claims asking the Court to pass upon foreign obligations under foreign laws related to foreign patents are best left to the courts of those foreign countries."  (*Id.*)

[FF12]        The motion was denied "as to Plaintiffs' request to declare the parties' rights with respect to U.S. patents or under U.S. state or federal law," which the Court declined to dismiss.  (*Id.* at 9.)   Nevertheless, the Court cautioned that "[w]hether or not Plaintiffs can *prove* these allegations in a manner sufficient to allow this Court to issue declaratory relief is a separate issue more appropriately analyzed under Rule 56 or at trial."  (*Id.* at 8 (emphasis in original).)  The

Court further concluded that it "remains under 'a continuing obligation to examine the basis of [its] jurisdiction' and will not issue an advisory opinion if it becomes clear that there is no justiciable controversy before the Court."  (*Id.* (citation omitted).)

### 3.   *Negotiations Between the Parties*







### 4.    *Late Disclosure*

[FF21]        The ETSI IPR Policy also imposes intellectual property right disclosure requirements on ETSI members:

> [E]ach MEMBER shall use its reasonable endeavours in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitted a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(DTX-0068 at § 4.1; Dkt. No. 508 at 28:4–29:21.)

[FF22]        Clause 4.1 establishes two requirements to disclose relevant IPRs: (1) a general obligation to disclose when a member becomes aware of essential IPRs and (2) a specific obligation to promptly disclose any IPRs that might be essential when a member submits a technical proposal relating to that IPR.  (DTX-0068 at § 4.1; Dkt. No. 508 at 28:22–29:9 ("[T]he disclosure obligation consists of two parts.  The first one is the generic part where a member becomes aware of any potentially essential IPR.  In that case, it has to declare such IPR in a timely fashion.  And the second sentence says for the specific case where a member submits a technical contribution, and in that case, it has to declare any IPR which is related to that technical contribution prior to the adoption of a proposal.").)  IPR is considered disclosed when any patent in the family is disclosed to ETSI.

[FF23]        The ETSI Guide on Intellectual Property Rights explains that "[t]he [ETSI IPR] Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR." (DTX-1640 at 5.)  The Guide further explains:

> *"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures*

9

> *significantly beyond what would be expected from normal considerations of "Timeliness."*
>
> This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential.

(*Id.* at 7-8; *see also id.* at 17 ("Intentional non-disclosure of EIPR [Essential IPR] generally occurs in two instances: 1) when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR, and yet the Member holds back notification; or, 2) when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations.").)

[FF24]        There are myriad deadlines incorporated into the development of technical specifications for standards.  One such deadline was Stage 3 of the LTE specification development cycle, which involved "the actual detailed designs, and that includes the signaling flows and the messages and things that are required for interoperability and compliance."  (Dkt. No. 509 at 82:3–6.)  As listed on the 3GPP website, the Stage 3 freeze date for each of 3GPP TS 36.211, 3GPP TS 36.212, 3GPP TS 36.213, 3GPP TS 36.321, and 3GPP TS 36.331 was December 11, 2008.  (DTX-0173 at 14–15; Dkt. No. 508 at 39:21–42:11.)  There are various groups in 3GPP, and "even when the specifications are completed at the Stage 3 stage, there often needs to be some checks that go back and forth [between the groups] to make sure that they're completely complementary."  (Dkt. No. 509 at 84:19–85:19.)

[FF25]        A subsequent date, the TTCN freeze date, "is essentially the development of test cases and the code for those test cases that runs in test equipment that's used to evaluate products to make sure that they will comply with the standard.  And that's a requirement before those products can go to market."  (*Id.* at 82:7–12.)  The TTCN stage is not optional and technical

items "all have to go through that [TTCN] stage." (*Id.* at 82:19—25.) The 3GPP website describes the TTCN freeze date associated with a release as the "end date" for that release. (*Id.* at 83:1–6; PX2206.)

[FF26]     Corrections are made to standards specifications even after all deadlines and freeze dates. (Dkt. No. 509 at 82:13–18, 83:22–84:18.)

[FF27]     The vast majority of ETSI participants disclose their intellectual property rights after both the Stage 3 and the TTCN freeze dates. (Dkt. No. 521 at 122:10–123:7, 124:1–125:9.) ETSI maintains a database that includes data about this consistent disclosure of IPR by participants after the freeze dates. (*Id.* at 123:17–25, 126:13–20.) Despite the prevalent practice of disclosure of IPR after the freeze dates, ETSI has not changed its policy to require disclosure at a different time. (*Id.* at 51:20–52:1, 126:13–20, 135:10–136:22; PX1838; PX1812.)

### c. The Patents-in-Suit

#### 1.   U.S. Patent No. 8,019,332

[FF20]     U.S. Patent No. 8,019,332 (the "'332 Patent"), titled "Method for Transmitting and Receiving Control Information through PDCCH," issued on September 13, 2011. (Dkt. No. 26 ¶ 14; PX0002.) The '332 Patent was originally owned by LG Electronics, which assigned the patent to Optis Cellular. (DTX-0024.)

[FF21]     The '332 Patent lists Dae Won Lee, Ki Jun Kim, Dong Wook Roh, Yu Jin Noh, Joon Kui Ahn, and Jung Hoon Lee as inventors and LG Electronics Inc. ("LG") as the assignee. (DTX-0024 at 1.) The '332 Patent claims priority to Provisional Application No. 61/037,000, which LG filed on March 17, 2008. (*Id.*; DTX-0997 at 1, 10.)

[FF22]     The '332 Patent application states that the "related technical field" is "LTE." (*Id.*; Dkt. No. 508 at 42:12–43:13.) The application also states that the "organization for

11

standardization" is "3GPP TSG RAN WG1" and that the "conference scheduled for presentation is "3GPP TSG RAN WG1 #52bis."  (DTX-0997 at 10; Dkt. No. 508 at 42:12–43:13.)

[FF23]	LG representatives presented several technical proposals to 3GPP related to the technical solutions described in the '332 Patent family. For example, LG submitted proposal R1-081567, "Randomization Function for PDCCH Search Space."  (DTX-0994; Dkt. No. 508 at 42:12–43:13; DTX-0776 at 29; DTX-2053A at 32.)

[FF24]	LG disclosed the '332 Patent family to ETSI on March 12, 2009. (DTX-0033 at 16–17; Dkt. No. 508 at 42:12–43:13; Dkt. No. 502 at 32:25–33:12; PX1791 at 1, 2, 16–17.)

## 2.  U.S. Patent No. 8,385,284

[FF25]	U.S. Patent No. 8,385,284 (the "'284 Patent"), titled "Control Channel Signaling Using a Common Signaling Field for Transport Format and Redundancy Version," issued on February 26, 2013. (Dkt. No. 26 ¶ 15; PX0003.)  The '284 Patent was originally owned by Panasonic, which assigned the patent to Optis Wireless.  (PX5265.)

[FF26]	The '284 Patent lists Christian Wengerter, Akihiko Nishio, Hidetoshi Suzuki, Joachim Loehr, and Katsuhiko Hiramatsu as inventors and Panasonic Corporation ("Panasonic") as the assignee.  (DTX-0026 at 1.)  The '284 Patent claims priority to EP07024829, which was filed on December 20, 2007.  (*Id.*; PX1846; Dkt. No. 501 at 11:24–25.)

[FF27]	Panasonic was a member of ETSI during the development of the LTE standard.  (Dkt. No. 508 at 28:10–13.)  The earliest-filed application in the '284 Patent family explicitly describes "3GPP specific exemplary embodiments."  (PX1846 at 46.)  The application states that "the concept of the invention may be . . . readily used in the LTE RAN currently discussed by the 3GPP."  (*Id.*; Dkt. No. 508 at 39:21–41:6.)

[FF28]        Panasonic representatives presented several technical proposals to 3GPP related to the technical solutions described in the '284 Patent family. For example, Panasonic disclosed R1-080129, "Joint Transport Format and RV Signaling on PDCCH Uplink Assignments."   (PX1990; DTX-0934.)   Panasonic representatives also submitted proposal R1-080591, "Joint Transport Format and Redundancy Version Signaling with Explicit NDI." (PX1743; Dkt. No. 508 at 39:21–41:6; DTX-2053A at 37.)  Additionally, Mr. Wengerter, a named inventor of the '284 Patent, presented proposal R1-080973, "Joint Transport Format and Redundancy Version Signaling with Explicit NDI."   (Dkt. No. 508 at 39:21–41:6; DTX-0120; DTX-0121 at 19; DTX-2053A at 6–7.)

[FF29]        Panasonic declared the '284 Patent family to ETSI on October 25, 2010, when it declared EP07024829 essential to technical specifications 3GPP TS 36.211, 3GPP TS 36.212, and 3GPP TS 36.213.  (DTX-0036 at 8; Dkt. No. 508 at 39:21–41:6.)

### 3.   U.S. Patent No. 8,411,557

[FF30]        U.S. Patent No. 8,411,557 (the "'557 Patent"), titled "Mobile Station Apparatus and Random Access Method," issued on April 2, 2013.  (Dkt. No. 26 ¶ 16; PX0004.) The '557 Patent was originally owned by Panasonic, which assigned the patent to Optis Wireless. (PX5265.)

[FF31]        The '557 Patent lists Daichi Imamura, Sadaki Futagi, Atsushi Matsumoto, Takashi Iwai, and Tomofumi Takata as inventors and Panasonic Corporation as the assignee. (DTX-0027 at 1.)  The '557 Patent claims priority to JP 2006-076995, which Panasonic filed on March 20, 2006.  (*Id.*; DTX-1648 at 1–2.)  The earliest filed application explicitly states that the technology is related to the Random Access Channel in "3GPP RAN LTE (Long Term Evolution)."  (DTX-1648 at 6; Dkt. No. 508 at 41:7–42:11.)

[FF32]        Panasonic representatives presented several technical proposals to 3GPP related to the technical solutions described in the '557 Patent family. For example, Panasonic submitted proposal R1-060792, "Random access burst evaluation in E-UTRA uplink," to the 3GPP Working Group on the radio access network during the March 27–31, 2006 meeting.  (DTX-0211; Dkt. No. 508 at 41:7–42:11; DTX-0313 at 39; DTX-2053A at 23.)

[FF33]        Panasonic disclosed the '557 Patent family to ETSI on March 16, 2010, when it declared Appl. No. 12/293,530 essential to 3GPP TS 36.321, 3GPP TS 36.211, and 3GPP TS 36.331.  (DTX-0035 at 6–7; Dkt. No. 508 at 41:7–42:11; PX1009 at 1, 2, 6–7.)

### 4.   U.S. Patent No. 9,001,774

[FF34]        U.S. Patent No. 9,001,774 (the "'774 Patent"), titled "System and Method for Channel Estimation in a Delay Diversity Wireless Communication System," issued on April 7, 2015.  (Dkt. No. 26 ¶ 17; PX0005.)  The '774 Patent was originally owned by Samsung Electronics Co., Ltd. ("Samsung"), which assigned the patent to UPIL.  (PX5262.)

[FF35]        The '774 Patent lists Farooq Khan as the inventor and Samsung as the assignee.  (DTX-0028 at 1.)  The '774 Patent claims priority to Provisional Application No. 60/673,574, Provisional Application No. 60/673,674, and Provisional Application No. 60/679,026.  (*Id.*)

[FF36]        Samsung representatives presented technical proposals to 3GPP related to the technical solution described by the '774 Patent family, including submitting proposal R1-050889, "UPC-MIMO: MIMO for Long Term Evolution."  (DTX-1088; DTX-0320 at 43, 55; Dkt. No. 508 at 43:14–45:8.)

[FF37]   Provisional Application 60/673,574 stated that there was an "anticipated disclosure to a standards body or committee" and that the alleged invention would be disclosed to "3GPP TSG RAN WG#1" on May 9, 2005.  (DTX-1058 at 1, 3–4.)

[FF38]   Provisional Application 60/679,026, filed May 9, 2005, states that "[i]f the proposal is adopted in the standards, Samsung will benefit from collecting royalty and/or cross-licensing from the patent."  (DTX-1000 at 16.)

[FF39]   Samsung disclosed the '774 Patent family to ETSI on December 30, 2008, when it declared Application Number 11/390,125 essential to 3GPP TS 36.211.  (DTX-0032; Dkt. No. 508 at 43:14–45:8; PX1893.)

### 5.   U.S. Patent No. 8,102,833

[FF40]   U.S. Patent No. 8,102,833 (the "'833 Patent"), titled "Method for Transmitting Uplink Signals," issued on January 24, 2012.   (Dkt. No. 26 ¶ 18; PX0006.)  The '833 Patent was originally owned by LG, which assigned the patent to Optis Cellular.  (PX5263.)

[FF41]   The '833 Patent lists Dae Won Lee, Bong Hoe Kim, Young Woo Yun, Ki Jun Kim, Dong Wook Roh, Hak Seong Kim, and Hyun Wook Park as inventors and LG Electronics Inc. as the assignee.  (DTX-0025 at 1.)  The '833 Patent claims priority to Provisional Application No. 60/972,244, which LG filed on September 13, 2007.  (*Id.*; DTX-0617.)

[FF42]   LG representatives presented technical proposals to 3GPP related to the technical solution described by the '833 Patent family, including submitting proposal R1-080267, "PUSCH Multiplexing of Data, Control, and ACK/NACK Information."  (DTX-0430; DTX-0934 at 28; DTX-2053A at 33–34.)

[FF43]        LG disclosed the '833 Patent family to ETSI on March 12, 2009, when it declared the application of the '833 Patent essential to 3GPP TS 36.211.  (DTX-0034 at 17; Dkt. No. 508 at 45:9–46:14; PX1791 at 1, 2, 17.)

[FF44]        Optis asserts that the '332 Patent, the '284 Patent, the '557 Patent, the '774 Patent, and the '833 Patent (collectively, the "Asserted Patents") are essential to LTE and are infringed by Apple's practice of the LTE standard.  (Dkt. No. 26.)

## II.        CONCLUSIONS OF LAW ("CL")

### a.        The Court Declines Jurisdiction to Decide Whether Plaintiffs' Offers were Consistent with FRAND.

#### 1. Subject Matter Jurisdiction

[CL1]        A court has subject matter jurisdiction to issue a declaratory judgment if "there is a justiciable case or controversy."  *MedImmune, Inc.  v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007); *see also* 28 U.S.C. § 2201.  A controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Genentech*, 549 U.S. at 127.  A court cannot issue a declaratory judgment to render an advisory opinion on "what the law would be upon a hypothetical set of facts."  *Id.* (internal citation omitted).

[CL2]        The Court has a continuing obligation to examine the basis of its jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

### 2. The Court Has Not Been Presented with Any Evidence by Which it Can Adjudicate whether Optis's Offer was FRAND as to U.S. Patents Only.

[CL3]        Optis's Count VIII requests a declaratory judgment that it has not breached its contractual FRAND obligations.  The Court previously dismissed Optis's Count VIII as to foreign patents, which limits its request for declaratory judgment on FRAND compliance to only U.S. patents.  (Dkt. No. 102; *see supra*.)

[CL4]        The Court, however, has not been presented with sufficient evidence by which it can adjudicate whether Optis's offers were FRAND as to U.S. Patents only.  Optis never made an offer specifically for or limited to its U.S. Patents.  Rather, during negotiations with Apple, Optis consistently and only made offers for a global license, at a global rate.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ During negotiations, Optis never tendered an offer to Apple for a license limited to its U.S. patents.  ██████████████████

[CL5]        At trial, Optis presented what it purported to be a U.S.-only rate by simply applying a "2x uplift" to their previously proposed global rate.  (Dkt. No. 508 at 103:19–22 ("Q. And what further adjustment did you make?  A. So I made a further adjustment for a U.S.-only rate by applying the two times uplift that Justice Birss used.").)  This rate merely extracted the global rate from Optis's final rate calculation and applied a factor of two increase.  The Court was presented with no meaningful analysis that supported this extraction.  Therefore, based on the evidence presented at trial, Optis has not actually made any offer to Apple for only its U.S. patents.

[CL6]        Optis argues that its methodology for extracting a U.S.-only-rate from its proposed global rate—as well as its general methodology for its proposed rates—was taken from

Justice Birss's decision in the *Unwired Planet* case in the UK.[1]  (Dkt. No. 508 at 92:1–93:11; Dkt. No. 509 at 9:1–5, 9:15–19, 9:25–10:4, 10:15–11:24, 12:20–13:1, 15:11–16:6, 17:1–18:3, 20:14–20, 20:25–23:7, 103:12–16; DTX-0004 at 1; DTX-0686 at 1; DTX-1092 at 1, 2–14.)

[CL7]       This Court is neither constrained nor persuaded by Optis's attempted reliance on the *Unwired Planet* case or the methodology it sets out.  Optis's *post hoc* slight of hand as to a US-only rate are insufficient to constitute anything more than "a hypothetical set of facts." *Genentech*, 549 U.S. at 127.  Optis's Count VIII, as it stands in the wake of the Court's direction in its Order dismissing "any portion of Count VIII that seeks a declaration that Plaintiffs have complied with their obligations under foreign laws or as they relate to foreign patents,"  asks the Court to issue a declaration as to whether Optis has complied with their FRAND obligations as to U.S. patents.  (Dkt. No. 102 at 6.)  Since Optis has not presented evidence that it made any offer to Apple for U.S.-only patents, the Court simply cannot determine whether Optis complied with its FRAND obligations as to their U.S. SEPs and Apple.  Any declaration by the Court would amount to merely an advisory opinion, which is disfavored.  Accordingly, the Court declines to issue the declaratory judgment that Optis requests in Count VIII as a matter of discretion.  *See Medimmune*, 549 U.S. at 136 (holding that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").

### 3. No FRAND Defense was Raised.

[CL8]       By failing to raise a commensurate counterclaim or affirmative defense, Apple has waived its ability to challenge the jury verdict as inconsistent with Optis's FRAND

---

[1] In the cited case, Justice Birss adopted a methodology—subsequently affirmed by the Supreme Court of the United Kingdom—to value a portfolio of patents declared to be standards-essential by using different methods that account for actual essentiality, major market rates, and the structure of a license that would be preferred by the parties.  *Unwired Planet Int'l Ltd. v. Huawei Techs. combined with Huawei Techs. and ZTE Corp. v. Conversant Wireless Licensing* (2020) UKSC 37, at ¶¶ 42–48.

obligations.

[CL9]         Though readily available at multiple times in this case, Apple failed to raise any counterclaim as to Optis's FRAND obligations.  A counterclaim is compulsory when it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).  "[A] party that does not assert its compulsory counterclaim in the first proceeding has waived its right to bring the counterclaim and is forever barred from asserting that claim in future litigation."  *Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc*., 347 F.3d 935, 938 (Fed. Cir. 2003).  A party "cannot avoid a declaratory action by refusing to file the counterclaim."  *Capo, Inc. v. Dioptics Med. Prods., Inc*., 387 F.3d 1352, 1356 (Fed. Cir. 2004) ("In an action for declaration of noninfringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived. (internal citation omitted)).

[CL10]         Additionally, Apple failed to raise any affirmative defense as to Optis's FRAND obligations.  Federal Rule of Civil Procedure 8(c)(1) identifies "license," "release," and "waiver" as affirmative defenses.  To the extent that Apple maintains that FRAND places an additional contractual limitation on damages[2] beyond the instructions that the Court provided the jury, Apple should have properly raised that defensive issue and asked the Court for instructions to the jury consistent with that issue.  They did not.  *See DH Tech., Inc. v. Synergystex Intern., Inc.*, 154 F.3d 1333, 1344 (Fed. Cir. 1998) (affirming that accused infringer could not assert the

---

[2] Any claim by Apple as to the protection of the FRAND commitment by Optis and its predecessors would require affirmative findings, including whether ETSI and Samsung, LG, and Panasonic intended for Apple to be a third-party beneficiary to the FRAND commitment. *Cf. First Bank  v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) ("An exception to this general rule" that only a party to a contract can sue for breach "permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary."); *TCT Mobile Europe, et al. v. Koninklijke Philips NV*, 19/02085, 352J-W-B7D-CPCIX (Civil Court of Paris) (Feb. 6, 2020) (noting that a FRAND commitment *may* be viewed as a "stipulation pour autrui," a French law covenant benefiting a third party that could be enforced by the third party.).  Without any affirmative claim for relief by Apple, neither the Court nor the jury performed any analysis as to the issues undergirding the FRAND commitment.

affirmative defense of implied license because it failed to plead it in the responsive pleading or timely raise it); *see also Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("in civil litigation, [an affirmative defense] is forfeited if not raised in a defendant's answer or in an amendment thereto.").

[CL11]        Notably, Apple failed to raise any FRAND issue with the Court at the pretrial conference (Dkt. No. 435 at 64:20) or at the charge conference.  (Dkt. No. 499.)

[CL12]        As a consequence of Apple's failure to seek affirmative FRAND relief, the only constraints of any FRAND obligation which were affirmatively presented in this case appeared via Optis's Count VIII.  Relying on representations by the parties,[3] the Court ruled that Count VIII—and corresponding FRAND issues—would be tried to the bench.[4]  (Dkt. No. 435 at

---

[3] *See, e.g.,* Dkt. No. 360 at 4 ("The issues to be tried to the Court in a bench trial immediately following the jury trial include . . . Plaintiffs' claim for a declaratory judgment . . ."), 18 ("Plaintiffs here seek only a declaration that they have complied with their FRAND obligations and Apple has forfeited any FRAND defense.  Plaintiffs may not parse apart this claim and attempt to have some portions tried to the Court and some portions tried to the jury.  Their claim goes to the Court in its entirety."); Dkt. No. 435 at 54:12–16 ("Your Honor, the issue of bad faith would only be tried to the jury if Apple said we're required to make a FRAND damages request and that our request is not FRAND damages.  Other than that, it would not be tried to a jury.  It'd be tried to the bench."), 54:17–55:3 ("Q: When you filed your most recently amended complaint, you inserted Count 8 that sought declaratory relief to find that Optis had complied with its FRAND obligation and that Apple had acted in bad faith and engaged in holdout.  You sought a declaratory judgment to that effect.  Did you then at the time of that amendment intend to try that issue to the jury or to the bench? A: No, you Honor, it was [Plaintiffs'] expectation that we try it to the bench.").

[4] Although present and before the Court, Apple failed to object to this ruling.  While the Court can only speculate as to Apple's motivation for its failure to seek to put FRAND issues in front of the jury, it is worth noting that Optis's Count VIII intertwined Optis's own purported FRAND compliance with various allegations of bad acts and bad faith by Apple.  Optis itself noted that "the issue of bad faith would only be tried to the jury if Apple said [Optis was] required to make a FRAND damages request and that [Optis's] request is not FRAND damages.  Other than that, it would not be tried to a jury.  It'd be tried to the bench."  (Dkt. No. 435 at 54:12–16.)  By acquiescing in Optis's request that Count VIII be tried to the bench, the serious allegations of bad faith or holdout by Apple would not be presented to the jury.  (*Id.* at 56:25–57:4, 62:8–13.)  Apple's strategic silence at this juncture effectively shielded them from any bad faith evidence being presented to the jury. In light of their silence and failure to oppose Optis's bench trial request, it would be a particularly unfair, given the jury's verdict for Optis, for Apple to now argue that FRAND issues should have been presented to the jury.

56:25–57:9; Dkt. No. 437 at 20:23–21:2.)  Having failed to plead any FRAND counterclaim or defense, Apple foreclosed itself from any relief on the basis of the FRAND obligation.[5]

[CL13]       Indeed, Apple's inability to later raise a FRAND defense to challenge the accepted verdict is akin to an implementer's inability to later challenge a consummated license as inconsistent with FRAND.  *See, e.g.*, *BNA, Patents and Standards: Practice, Policy, and Enforcement* at 11.II.D (noting that "an implementer should not assume that it can both execute a license on agreed terms and then file suit to challenge those terms as inconsistent with the FRAND obligation"); *see also See Unwired Planet Int'l v. Huawei Techs.*, [2017] EWHC (Pat) 711, [155] (UK) ("[T]here is no reason why the [ETSI FRAND] undertaking should entitle either party subsequently to challenge agreed terms as being non-FRAND absent competition law considerations.")

### b.    Apple Has Failed to Show the Asserted Patents are Unenforceable Due to Late Disclosure to ETSI.

#### 1. Legal Standard

[CL14]       "To support a finding of implied waiver in the standard setting organization context, the accused must show by clear and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.'" *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011); *see also Core Wireless Licensing S.A.R.L. v. Apple, Inc.*, 899 F.3d 1356, 1365 (Fed. Cir. 2018) (holding that implied waiver requires a showing that "the patentee's conduct was so inconsistent with an intent to enforce its right as to induce a reasonable belief that such right has been relinquished.").

---

[5] Having silently watched the parade pass it by, Apple cannot now complain that the parade didn't stop on its own to entertain them.

[CL15]     In *Core Wireless*, the Federal Circuit observed that "[a] participant in a standards-setting organization may waive its right to assert infringement claims against products that practice the standard." *Core Wireless*, 899 F.3d at 1365 (citing *Hynix*, 645 F.3d at 1347–48). "Such conduct can be shown where (1) the patentee had a duty of disclosure to the standard setting organization, and (2) the patentee breached that duty." *Id.* (citing *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020–24 (Fed. Cir. 2008).

[CL16]     That the patentee had a duty of disclosure and that they breached that duty must be shown by the accused infringer by clear and convincing evidence. *Conversant Wireless Licensing S.A.R.L. v. Apple, Inc.*, 2019 WL 4038419, at *2 (N.D. Cal. May 10, 2019).  Further:

> Because implied waiver is an equitable defense, however, the doctrine "may only be applied in instances where the patentee's misconduct resulted in [an] unfair benefit." *Core Wireless*, 899 F.3d at 1368 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)). Alternatively, implied waiver may also be found in cases of "egregious misconduct sufficient to justify the sanction of unenforceability of the patent at issue." *Id.*

*Id.*

### 2. There is No Clear and Convincing Evidence that the Original Patent Owners Breached Their Duty to Disclose Their Intellectual Property Rights.

[CL17]     Apple has failed to show, by clear and convincing evidence, that the original patent owners' "conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Hynix*, 645 F.3d at 1348.  Since Apple has not shown that LG, Panasonic, and Samsung breached their duties of disclosure by clear and convincing evidence, waiver does not apply to the Asserted Patents.

[CL18]     The Court must first "determine whether the written IPR policies [of ETSI] impose any disclosure obligations on participants." *Qualcomm*, 548 F.3d at 1012.  Here, the ETSI IPR Policy imposes a duty to disclose IPR in Clause 4.1 by requiring that "each MEMBER shall

22

use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion" and that "a MEMBER submitted a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."  (DTX-0068 at § 4.1.)  The original owners of the patents at issue—Panasonic, LG, and Samsung—were members of ETSI when they owned these patents and incurred the obligation to disclose them. (Dkt. No. 508 at 28:10–13; *see supra*.)

[CL19]　　　Having determined there was a duty to disclose the IPR, the Court must then determine whether the patentees breached their duty of disclosure.  *Core Wireless*, 899 F.3d at 1365.  There has been no presentation by clear and convincing evidence that the patent owners breached their duty to disclose their intellectual property rights to the SSOs.  Rather, the evidence shows that all asserted patent families were disclosed to ETSI.  (*See supra*.)

[CL20]　　　The ETSI IPR Policy specifies that the duty of the patentee is "to inform ETSI of ESSENTIAL IPRs *in a **timely** fashion*."  (DTX-0068 at § 4.1. (emphasis added).)  The parties dispute what constitutes a timely disclosure, and each side submitted competing evidence supporting different "freeze dates" as the purported deadline by which disclosure should have been made.  (*See supra*.)

[CL21]　　　The ETSI IPR Guide elaborates that "[m]embers are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential."  (DTX-1640 at 7–8.)

[CL22]　　　The Guide explains that "[i]ntentional non-disclosure of EIPR generally occurs in two instances: 1) when a representative participating in a Technical Body on behalf of a

23

Member has actual knowledge of EIPR, and yet the Member holds back notification; or, 2) when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations."  (*Id.* at 17.)  Apple presented no evidence that either the original patent owners held back notification to ETSI, nor that the original patent owners fostered an atmosphere of ignorance.  Rather, Apple's allegation is that because Panasonic, LG, and Samsung did not disclose their IPR by the Stage 3 Freeze Date, it was, *ipso facto*, disclosed untimely.

[CL23]      The understanding of ETSI participants as to the meaning of the IPR disclosure policies may inform the waiver analysis.[6]  *Qualcomm*, 548 F.3d at 1012 (explaining that "[t]he existence of a disclosure duty is a legal question with factual underpinnings," including standard-setting organization "participants' understanding of the meaning of the [SSO] IPR policies" (citing *Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1087 n.3 (Fed. Cir. 2003).)

[CL24]      ETSI participants do not understand the organization's IPR Policy to require disclosure before the freeze dates.  The vast majority of ETSI participants disclose their intellectual property rights after both the Stage 3 and the TTCN freeze dates.  (Dkt. No. 521 at 122:10–123:7, 124:1–125:9.)  For example, 94% of all ETSI declarations for Release 8 came after the TTCN

---

[6] This is also true under French law.  Optis' French law expert Professor Borghetti has explained that custom in the industry and course of dealing are relevant tools for interpreting language in French contracts. Borghetti Reb. Rep. ¶ 32 ("It is undisputed in French law that elements beyond the four corners of the contract, such as the behavior or course of dealing of the parties, can be used to shed light on the parties' intention, and thus to interpret the contract.").

Professor Borghetti has also explained that, under French law, "[c]lear and unambiguous terms are not subject to interpretation as doing so risks their distortion."  Borghetti Opening R. ¶ 16.  The Court finds that the ETSI IPR Policy is not clear and unambiguous as to the timing of its disclosure requirement, and thus an analysis of the course of dealing in the industry is appropriate.  Such an analysis is necessary to comply with the "basic rule of contractual interpretation under French law" that "[a] contract is to be interpreted according to the common intention of the parties rather than stopping at the literal meaning of its terms."  Borghetti Op. Rep. ¶ 17 (quoting article 1188 § 1 *code civil*).

freeze date of March 12, 2009; and 96.8% of all ETSI declarations for Release 8 came after the "Stage 3 freeze date." (Dkt. 521 at 124:1-20.)   ETSI is aware of this practice of disclosure and there is no evidence it has taken any action to encourage or enforce earlier disclosure.  (*Id.* at 123:17–25, 126:13–20.)

[CL25]     The Court finds no clear and convincing evidence that Optis has breached its duty to disclose its essential IPR to ETSI; rather, the evidence indicates that Optis and its predecessors-in-interest in the applicable patents timely disclosed their IPR to ETSI in a manner consistent with the SSO's procedures.

### 3. *Apple Has Not Shown Egregious Misconduct Sufficient to Justify the Sanction of Unenforceability.*

[CL26]     Alternative to the structure above, "implied waiver may also be found in cases of egregious misconduct sufficient to justify the sanction of unenforceability of the patent at issue." *Conversant Wireless*, 2019 WL 4038419, at *2 (citing  *Core Wireless*, 899 F.3d at 1368).

[CL27]     Egregiousness is a very high bar, typically saved for only such affirmative acts as "perjury, the manufacture of false evidence, and the suppression of evidence." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (collecting cases).

[CL28]     As explained *supra*, the patentees did not breach a duty to ETSI.  As a result, the Court finds that they have not acted with such egregious misconduct as to justify a finding of unenforceability.

## V.     <u>CONCLUSION</u>

In light of the foregoing the Court: declines to issue a declaratory judgment as to Count VIII of Optis's Amended Complaint (Dkt. No. 26); finds Apple's failure to earlier raise a FRAND defense results in a waiver of its ability to do so at this late date; finds that assertion of the Asserted

Patents were not waived by untimely disclosure; and finds the sanction of unenforceability is not warranted.

**So ORDERED and SIGNED this 22nd day of January, 2021.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE