```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   OPTIS WIRELESS TECHNOLOGY,     (  CAUSE NO. 2:19-CV-066-JRG
     LLC., et al,                   )
 4           Plaintiffs,            (
                                    )
 5   vs.                            (
                                    )
 6   APPLE, INC.,                   (  AUGUST 10, 2021
                                    )  MARSHALL, TEXAS
 7           Defendant.             (  9:00 A.M.

 8   _____

 9

10

11                          VOLUME 1

12

13   _____

14                     TRIAL ON THE MERITS

15            BEFORE THE HONORABLE RODNEY GILSTRAP
               UNITED STATES CHIEF DISTRICT JUDGE
16                          and a jury
     _____

17

18

19

20

21              SHAWN M. McROBERTS, RMR, CRR
                   100 E. HOUSTON STREET
22               MARSHALL, TEXAS  75670
                      (903) 237-7464
23           shawn_mcroberts@txed.uscourts.gov

24

25
```

<u>A P P E A R A N C E S</u>

```
FOR PLAINTIFFS:        IRELL & MANELLA, LLP -
                       LOS ANGELES
                       1800 AVENUE OF THE STARS
                       SUITE 900
                       LOS ANGELES, CA 90067-4276
                       (310) 277-1010
                       BY:  MR. JASON SHEASBY

                       McKOOL SMITH, P.C. - MARSHALL
                       104 EAST HOUSTON ST., STE. 300
                       MARSHALL, TEXAS  75670
                       (903) 923-9000
                       BY:  MS. JENNIFER TRUELOVE
                            MR. SAM BAXTER

FOR DEFENDANT:         WILMER HALE - BOSTON
                       60 STATE STREET
                       BOSTON, MA  02109
                       (617) 526-6000
                       BY:  MR. JOSEPH MUELLER


                       GILLAM & SMITH, LLP
                       303 SOUTH WASHINGTON AVENUE
                       MARSHALL, TEXAS  75670
                       (903) 934-8450
                       BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS  75670
                       (903) 923-7464
```

<u>**INDEX**</u>

**EXAMINATION**

**Witness Name**                                                                                              **Page**
BRIAN BLASIUS
     Direct By MR. SHEASBY ........................................... 164
     Cross By MS. SMITH ............................................. 184
     Recross By MS. SMITH ........................................... 227
MARK MAHON, PhD
     Direct By MR. SHEASBY ........................................... 230
     Cross By MR. MUELLER ........................................... 258
     Redirect By MR. SHEASBY ........................................ 284
     Recross By MR. MUELLER ......................................... 286
     Redirect By MR. SHEASBY ........................................ 288

```
1              THE COURT:  Thank you.  Be seated, please.
2         Good morning, ladies and gentlemen.  Thank you for being
3    here.
4         My name is Rodney Gilstrap, and I am the chief United
5    States District Judge for the United States District Court for
6    the Eastern District of Texas.
7         I've lived in Marshall since 1981.  I practiced law in
8    this area in East Texas for 30 years, and in 2011 I was
9    appointed and confirmed as judge in this court and have been
10   on the bench here since 2011.
11        Let me make a small confession.  I was not born in Texas.
12   I was born in Florida, but I got here as quick as I could.  I
13   came to Texas at the ripe old age of 18 to attend college and
14   then law school at Baylor University.
15        I am married, and I have two grown children, and my wife
16   owns and operates a retail floral business here in Marshall.
17        Now, I tell you all these things about myself because in
18   a few minutes I'm going ask each of you to give me the same
19   kind of information about each of you, and I think you're
20   entitled to know as much about me as I'm about to find out
21   about each of you-all.
22        Let me mention early in the process this morning that
23   we're going to observe certain public health protocols through
24   this trial.  Everyone in the gallery is going to remain masked
25   throughout the entire trial whether they've been vaccinated or
```

1   not.

2       Those of you that are selected to serve on the jury --

3   we're going to select and seat eight jurors this morning to

4   hear the evidence in this case.  Once those jurors are

5   selected and sworn and seated and we begin the trial, I'm

6   going to ask those eight individuals to remove their mask and

7   put on a plastic face shield like this in lieu of the mask.

8   It's just practically impossible to try a jury trial if you

9   can't see the faces of the jury.  So that's what we're going

10  to do there.

11      Also, ladies and gentlemen, you probably don't see them,

12  but on both sides of the courtroom there are new industrial

13  air filtration units that are running at all times.  The air

14  in this room is filtered constantly.

15      Also, those of you that are selected on the jury are

16  going to have lunch provided for you each day by the court,

17  which means you will not be coming and going from the building

18  out into the community to find your own lunch and then

19  returning.  You'll be here in the building from the time you

20  arrive in the morning until we recess for the evening and you

21  go home to your respective places each evening.

22      There may be some other precautions that I'll mention to

23  you as we go forward, but I want you to be aware of those now

24  at the beginning of the process.

25      Also, if you'll indulge me for a minute, I'd like to

1    review briefly with you why we came to have our American civil

2    jury system that you're all here for this morning.

3         If you go back in ancient history and if you begin with

4    the first five books of the Old Testament, called the

5    Pentateuch, you find the ancient Hebrew nation impaneled

6    juries to decide issues of property ownership and property

7    value.

8         The ancient Greeks began using a jury system about

9    1500BC.  The Romans, as they did with many things, copied the

10   jury system from the Greeks, and it was the ancient Romans

11   that brought what we know to be the jury trial system to

12   England when they crossed the English Channel and conquered

13   that island in the fourth century AD.

14        And the jury trial system came with the Romans and was in

15   place in what we now know to be Great Britain until about the

16   12th century AD when a rather tyrannical king came to the

17   throne of Britain, King John.  And King John became embroiled

18   in a series of serious arguments and disputes with his nobles,

19   one of which was the king's effort to curtail the right to

20   trial by jury.

21        Those disputes almost led to civil war, but civil war was

22   avoided by a resolution of their disputes at a place called

23   Runnymede, and the document that was generated and signed by

24   the king and his nobles that solved those disputes and were

25   stored in writing the right to trial by a jury in England

 1    you've all heard of before:  It's called the Magna Carta.

 2        In fact, ladies and gentlemen, 28 of our United States

 3    have adopted the language verbatim from the Magna Carta

 4    guaranteeing the right to trial by jury in their own state

 5    constitutions.

 6        So you can see that the right to trial by jury was well

 7    engrained in our founding fathers when they came to this

 8    continent as British colonists, and the right to trial by jury

 9    flourished in colonial America for over a hundred years until

10    another tyrannical king came to the throne of Great Britain.

11    This time his name was King George, the III.

12        And King George, the III, as we all know from our history

13    courses in the past, became embroiled with various disputes

14    with his colonists here in North America.  One of those

15    disputes was King George's efforts to curtail the right to

16    trial by jury.

17        As a matter of fact, when Thomas Jefferson sat down to

18    write the Declaration of Independence, setting forth in

19    writing the various reasons and issues that necessitated us

20    separating from England and becoming our own independent

21    nation, spelled out in the Declaration of the Independence is

22    the king's attempt to curtail the right to trial by jury as

23    one of the reasons why we must and felt compelled to become

24    our own independent nation.

25        As a matter of fact, we did, as you well know, become our

1    own independent nation after the Revolution, and shortly

2    thereafter we adopted the governing document for our country,

3    the supreme law of the land, you all know to be the

4    Constitution of the United States.

5         And shortly after the Constitution was ratified, Congress

6    immediately moved to amend the Constitution and add 10

7    amendments.  You know those 10 amendments from your days in

8    school as the Bill of Rights.  And those 10 amendments were

9    ratified and added to the Constitution in 1791.

10        One of those first 10 amendments, the Seventh Amendment

11   to the U.S. Constitution, guarantees the right to have civil

12   disputes resolved by a jury of your peers, a civil jury trial.

13        So, ladies and gentlemen, since 1791, every American

14   citizen has had a constitutionally guaranteed right to have

15   their civil disputes resolved through trial by jury.

16        I always tell citizens such as yourselves who appear for

17   jury duty like you have this morning that in my personal

18   opinion jury service is the second highest form of public

19   service any American can perform.  In my personal view, the

20   highest form of public service for any American are those

21   young men and women that serve in our armed forces.

22        Now, the lawyers are going to address you later this

23   morning, and they're going to ask you various questions.  And

24   I want you to understand that they are not seeking to inquire

25   unduly into your personal affairs.  Let me say that another

1    way.  They're not trying to be nosey, to pry into your

2    personal business.  They're simply asking relevant questions

3    to help secure a fair and an impartial jury to hear the

4    evidence in this case.

5         The important thing for each of you to remember, ladies

6    and gentlemen, is that when those questions are asked, as long

7    as your answers are fair -- excuse me, full, complete, and

8    truthful, there are no wrong answers.  You can't give a wrong

9    answer as long as your response is full, complete, and

10   truthful.

11        Now, I don't know if it will happen this morning, it

12   rarely does, but it's possible so I want to mention this to

13   you.  If there's any question that you're asked as a part of

14   jury selection that you believe is so personal and private

15   that you're not comfortable answering it in front of everyone

16   else on the panel, you always have the option to say, I'd like

17   to talk about that with Judge Gilstrap.  And if that's your

18   response, I'll provide an opportunity where you can answer

19   that outside of the presence of the rest of the members of the

20   panel.  However, that doesn't come up very often.  I'll be

21   surprised if it does this morning, but I want you to know that

22   you have that option.

23        Now, the trial in this case is going to begin later

24   today, as soon as the jury's selected, and I expect that it

25   will run in all likelihood through the end of this week.

1    There is a small chance that it could actually extend over to

2    Monday of next week.  I don't anticipate it would go further

3    than that under any scenario that I can envision, but I want

4    you to have an idea of what the timeline is for those of you

5    that would be selected to serve on this jury.

6         If there are any of you on the panel that, if you were

7    selected, either have a surgical procedure scheduled through

8    the remainder of this week or into Monday or there's some

9    other very serious impediment to you being available to be

10   here, that's something I need to know about.

11        If there's anybody that falls in that category, would you

12   raise your hand and let me make a note of it.  Okay.  Panel

13   Member No. 4 and Panel Member No. 14.  Do I see any other

14   hands?  No. 24.  Thank you, sir.  Anybody else?  No. 7.

15        4, 7, 14, and 24.  All right.  Thank you, ladies and

16   gentlemen.

17        Now, at this time I'm going to call for announcements in

18   the case of Optis Technology, LLC, et al. versus Apple, Inc.

19   This is civil Case No. 2:19-CV-066.

20        Counsel, as you give your announcements on the record,

21   please identify those of your trial team that are with you and

22   any corporate representatives you may have in the courtroom at

23   this time.

24        We'll begin with the Plaintiff.  What says the Plaintiff?

25             MR. BAXTER:  Good morning, Your Honor.  I'm Sam

1   Baxter from McKool Smith, along with my law partner, Jennifer

2   Truelove, and my co-counsel, Mr. Jason Sheasby.

3       And we're ready, Your Honor.

4           THE COURT:  Thank you.

5       What says the Defendant?

6           MR. MUELLER:  Good morning, Your Honor, and good

7   morning, ladies and gentlemen.

8       Joe Mueller, on behalf of Apple.  And with me today are

9   Ms. Melissa Smith, Ms. Mindy Sooter, Mr. Mark Selwyn.  With us

10  this morning is another member of our team Jamie Laird and

11  finally, Your Honor, representative of Apple, Ms. Heather

12  Mewes.

13      We are ready to proceed, Your Honor.

14          THE COURT:  Thank you, counsel.  As I've told you,

15  ladies and gentlemen, this is a patent case arising under the

16  patent laws of the United States.  I want you to understand

17  that in a previous trial between these same parties, it's

18  already been established that the Defendant Apple, Inc.,

19  infringes certain claims of the Plaintiff's patents.  It's

20  also been established in that earlier proceeding that those

21  claims are valid, or said in a more technically correct way,

22  it's been determined that the Plaintiff's claims are not

23  invalid.

24      However, the issue of what money damages are due to the

25  Plaintiff as compensation for that infringement remains yet to

1    be resolved.  And that's why you are here.  The jury selected

2    in this case will have the responsibility for setting and

3    awarding a fair and reasonable compensation to the Plaintiff

4    Optis in the form of a reasonable royalty for that previously

5    established infringement.

6         Now, having seen the patent video film, which I know

7    you-all saw prepared by the Federal Judicial Center this

8    morning, you already know more about patent litigation than

9    most citizens do when they appear for jury duty.  However,

10   during this trial it's likely that you're going to hear about

11   something that's not mentioned in the patent video, and that's

12   that the patents in this suit are referred to as standard and

13   essential patents.  And they are sometimes called SEPS.  That

14   stands for standard essential patents.

15        SEPS are patents that have been declared to be a part of

16   a standard in a certain field.  This standard is set and

17   maintained by a global body to ensure that certain processes

18   and devices operate and work in the same way anywhere in the

19   world.

20        For example, it would be counterproductive, wouldn't make

21   much sense, if the cell phone that you have in here in America

22   only worked in America such that if you got on a plane and

23   flew to London, England, when you got off the plane, your cell

24   phone wouldn't work.

25        To prevent this, standard technologies are created such

1   that communication devices like cell phones interwork across

2   different places in the world and across different brands of

3   devices.  Patents relating to such a common and standard

4   technology are recognized as impacting that standard

5   technology and are contributed to and declared by their owners

6   to be essential to that standard.  These are called standard

7   essential patents.

8        In this case, the five patents at issue, the asserted

9   patents, have been declared by their owners to be SEPs,

10  standard essential patents, related to the field of wireless

11  communications.  In this case one of the groups or global

12  bodies that oversees and maintains this standard is called the

13  European Telecommunications Standards Institute, or ETSI,

14  which you'll hear referred to throughout the trial as ETSI.

15       Since the asserted patents have been declared to be

16  standard essential patents, you'll hear about the standard,

17  the contributions of these patents to the standard, and the

18  work of the governing body, ETSI, in regulating and relating

19  to that standard.  That's all as a part of the trial that will

20  take place in this case.

21       Now, as I mentioned earlier, the lawyers for both sides

22  are about to question members of the panel to gather

23  information so that they can exercise their prerogatives and

24  help complete the process of securing eight fair and impartial

25  jurors to hear the evidence in this case.  Again, there are no

1    wrong answers to any questions you'll be asked as long as the

2    answers you give are full, complete, and truthful responses.

3         As I mentioned, the lawyers are entitled to ask the

4    questions that they'll ask to help secure a fair and impartial

5    jury.  I want you to understand, ladies and gentlemen, if for

6    any reason I think a question asked by any of the lawyers is

7    not proper in any way, I will certainly stop them.  But I want

8    you to understand, these are extremely skilled trial lawyers

9    on both sides of this case, and I really don't expect that to

10   happen at all.

11        Now, one thing I want to call your attention to before

12   the lawyers begin with their questions, because it's possible

13   that they're going to ask you about your ability to apply this

14   if you're selected as a juror, is the burden of proof.  In a

15   patent case, the jury's called upon to apply a burden of

16   proof.  In this particular case, the jury will apply one

17   specific burden of proof, and that's the burden of proof known

18   as the preponderance of the evidence.

19        Now, when responding to lawyers' questions about the

20   burden of proof, I need to instruct you that when a party has

21   a burden of proof on any claim or defense by a preponderance

22   of the evidence, it means that the jury must be persuaded by

23   the credible or believable evidence that that claim or defense

24   is more probably true than not true.  Let me say that again:

25   More probably true than not true.  Sometimes this is talked

1    about as being the greater weight and degree of credible

2    testimony.

3         Let me give you an example that I hope will be helpful in

4    this regard.  If you look in front of our court reporter, you

5    will see that there is a statue of the Lady of Justice.  She

6    is blindfolded.  She holds in her right hand, lowered at her

7    right side, the unsheathed sword of justice.  She holds in her

8    left hand above her the equal and balanced scales of justice.

9         When you think about the burden of proof in this case,

10   the preponderance of the evidence, think about those scales.

11   Both the Plaintiff and the Defendant start out equal.  Those

12   scales are balanced.  Over the course of this trial, the

13   Plaintiff's going to put their evidence on one side of those

14   scales, the Defendant's going to put their evidence on the

15   other side of the scales.

16        And when all the evidence has been presented and is on

17   one side or the other of those scales, the party who has the

18   burden of proof by a preponderance of the evidence will look

19   at those scales, and if those scales tip in favor of that

20   party who has the burden of proof by a preponderance of the

21   evidence, even if they tip ever so slightly in that party's

22   favor, then that party has met its burden of a preponderance

23   of the evidence.

24        Now, this burden of proof, the preponderance of the

25   evidence that I've just explained to you, it should have no

1    relation and should not be in any way confused by any of you

2    with a separate and different burden of proof that I'm sure

3    you've all heard about in the media and movies and television

4    called beyond a reasonable doubt.

5         Beyond a reasonable doubt is the burden of proof applied

6    in a criminal case.  It has absolutely no application

7    whatsoever in a civil case like this.  Preponderance of the

8    evidence is not as high a burden of proof as beyond a

9    reasonable doubt.  And please keep that in mind as we go

10   through the trial.

11        As I say, I wanted to explain this to you and give you

12   these instructions because I think it's likely that one or

13   more of the lawyers in this case will ask you about your

14   ability to apply that burden of proof to the evidence if

15   you're selected to serve on this jury.

16        Now, before the lawyers address the panel and ask their

17   questions, I'm going to ask each of you to give me the same

18   information about you that I gave you about me when I came out

19   this morning.

20        You should see on the screens in front of you, and you

21   have printed copies, nine specific questions.  I'm going to

22   ask each member of the panel one at a time to stand and answer

23   those questions.

24        And this is how we're going to do it, ladies and

25   gentlemen.  We have two of our court security officers in the

 1    courtroom, and they have two separate hand-held microphones.

 2    We're going to begin the process with Panel Member No. 1, Ms.

 3    Ross.

 4         And when it's that time, Ms. Ross, one of these court

 5    security officers will bring you a hand-held microphone.  At

 6    that time, I'm going to ask you to stand up, I'm going to ask

 7    you to take off your mask, use the microphone, give us the

 8    answers to those nine questions, hand the microphone back to

 9    the court security officer, put your mask back on, and have a

10    seat.

11         And that's how we'll do it with each member of the panel,

12    beginning with Panel Member No. 1 and going through the end of

13    our group.  When it's your turn, please stand, wait for the

14    microphone, pull your mask off so that we can see your face as

15    you give the answers, give the answers, put the mask back on,

16    and then have a seat, return the microphone to the court

17    security officer.

18         And later in the process, if you are asked individual

19    questions by the lawyers, you should follow the same

20    process--wait until you get the microphone, stand up, and give

21    us your answers without your mask on, and then put it back on

22    and have a seat.

23         And let me just mention, ladies and gentlemen, this is a

24    big room, we've got a lot of people in here.  Many of you are

25    not used to speaking into a microphone.  Every time I do this,

1    I have somebody and they hold the microphone out here and I

2    can't hear a word they say.  So please hold the microphone

3    close enough so that it will amplify your voice so that

4    everybody in the courtroom can hear your answers to those nine

5    questions and your answers to any other questions that you're

6    asked this morning.

7         So at this time, we'll begin with Panel Member No. 1, Ms.

8    Ross.  If you'll stand and give us your answers to those nine

9    questions, please.

10             THE PANEL MEMBER:  My name is Vicki Ross.  I live in

11   Jefferson.  I have no children.  I'm not employed.  I don't --

12   No. 4 don't apply.  I have a GED.  I don't have a spouse.  And

13   I worked on a DWI.

14             THE COURT:  A criminal case, you were on a jury?

15             THE PANEL MEMBER:  Yes, sir.

16             THE COURT:  How long ago was that?

17             THE PANEL MEMBER:  Oh, a long time ago.

18             THE COURT:  All right.  Now, you said you're not

19   employed.  Have you ever worked outside of the home, and if

20   so, what kind of work?

21             THE PANEL MEMBER:  House cleaning, and I worked as

22   an election judge.

23             THE COURT:  All right.  Thank you, ma'am.

24        Next is Panel Member No. 2.

25             THE PANEL MEMBER:  Hello.  My name is Richard Jirka.

```
 1    I am from Lone Star, Texas.  I am currently retired.  I worked
 2    in the business equipment field for Ricoh USA as a technical
 3    trainer.  I worked for Ricoh for 20 years, but was in the
 4    industry for 41 years.  I have an electronic technician
 5    diploma from the Ohio Institute of Technology.
 6         My wife's name is Helen Jirka.  She is a housewife for
 7    the last 41 years.
 8         And this is my first jury time.
 9              THE COURT:  Thank you, sir.
10    Next is Panel Member No. 3, Mr. Anderson.
11              THE PANEL MEMBER:  My name is J.C. Anderson.  I live
12    in Naples, Texas.  I work for the city of Hughes Springs, been
13    there 21 years.  I have a high school degree.
14         My wife's name is Jenny Anderson.  She works for Express
15    Employment, and she's been there 20 years.
16         And I have been on one civil trial.
17              THE COURT:  When was that civil trial and where was
18    it?
19              THE PANEL MEMBER:  I would say it was 30 years ago,
20    and it was Morris County.
21              THE COURT:  All right.  And what do you do for the
22    city of Hughes Springs?
23              THE PANEL MEMBER:  I am the road person, animal
24    control, and code enforcement.
25              THE COURT:  All right, sir.  Thank you very much.
```

```
 1          Next is Panel Member No. 4, Ms. Hamilton.
 2              THE PANEL MEMBER:  My name is Tina Hamilton.  I live
 3     in Linden.  I have three children.  They are all grown.  I am
 4     currently the court coordinator for Judge Bill Miller and Don
 5     Dowd, and I've worked there almost eight years.  I have a high
 6     school diploma.
 7          My husband's name is Kenny Hamilton.  He is semiretired,
 8     works for a bank, City National Bank out of Sulphur Springs,
 9     and he's only been there about three years.
10          I served on a criminal case probably 40 years ago in Cass
11     County.
12              THE COURT:  And court coordinator, is that the state
13     district court in Cass County?
14              THE PANEL MEMBER:  The district court, yes, sir,
15     Judge Bill Miller, and then County Court at Law, Judge Don
16     Dowd.
17              THE COURT:  Thank you, ma'am.
18          Next is No. 5, Ms. Chapman.
19              THE PANEL MEMBER:  Good morning.  I'm Steffani
20     Chapman, and I live a half mile right outside of Gilmer,
21     Texas, in Upshur County.  I have three grown children and one
22     grown stepdaughter.
23          I served the United Methodist Church as a pastor for
24     almost 30 years.  I've been retired for three.  I have an AA
25     from the University of Houston course of study program for
```

```
 1    Perkins School of Theology at SMU.
 2         My husband's name is Albert Chapman.  He works for BMC
 3    Software.  He's been there 27 years.
 4         And I served on a criminal drug case in Harris County in
 5    the early '80s.
 6              THE COURT:  Thank you, ma'am.
 7              THE PANEL MEMBER:  Uh-huh.
 8         Next is Panel Member No. 6, Ms. Hilton.
 9              THE PANEL MEMBER:  Yes.  My name is Judy Hilton.  I
10    live in Atlanta, Texas.  I have two grown children.
11         I work for the City of Texarkana, Texas, the health
12    department.  I am an LVN there in the WIC department there.
13    I've been there about 11 years.  I have graduated from the
14    vocational school in Bastrop, Louisiana, in 1990 with a
15    practical nursing degree.
16         My husband's name is Jerry.  He works at Graphic
17    Packaging there in Domino.  He has worked for that company
18    about four years.  It was originally International Paper.  And
19    he has been with Graphic Packaging about -- I think about four
20    years.
21         And I've never served on a jury before.
22              THE COURT:  Thank you, ma'am.
23         Next is No. 7, Mr. Woods.
24              THE PANEL MEMBER:  My name is Mickey Woods.  I have
25    three kids.  I work for Texas Utility.  I'm retired from Texas
```

```
 1    Utility, worked there 42 years, worked in maintenance for
 2    30-something years and then safety department.  And I
 3    graduated from Johns Christian College.
 4        I have a wife named Mary Woods.  She worked for the
 5    Daingerfield Independent School District.  She is also
 6    retired.  And I think she worked there 32 years.
 7        And I have never been on a civil case or criminal case.
 8            THE COURT:  Thank you, Mr. Woods.
 9        Next is No. 8, Mr. Phelps.
10            THE PANEL MEMBER:  My name is Phillip Phelps, and I
11    live in Gladewater, Texas.  I have two adult daughters.
12        I am self-employed three ways right now.  I am a piano
13    tuner, and I own a business -- co-own along with my wife a
14    business in downtown Gladewater, and I'm also a minister.  I
15    have done piano tuning about 30 years, have done the store
16    about two and a half years, and ministry for probably about 30
17    years as well.
18        I was -- I'm a graduated -- freshman in college is the
19    highest education.
20        My spouse's name is Rene, and she is co-owner of the
21    business and co-orderer of my life.  And how long has she
22    worked there?  For 42 years.  That's how long we've been
23    married.
24        Prior jury service, I was on a criminal trial,
25    misdemeanor theft in Dallas.
```

```
 1              THE COURT:  What kind of store do you have in
 2    Gladewater, sir?
 3              THE PANEL MEMBER:  It's a vintage antiques, gifts,
 4    collectables type store.
 5              THE COURT:  Thank you very much, sir.
 6         Next is Panel Member No. 9, Ms. King.
 7              THE PANEL MEMBER:  Good morning.  My name is Gloria
 8    King.  I live in Gilmer, Texas.  I have no children.
 9         My place of employment was for Gilmer ISD.  I am a
10    retired teacher of 41 and a half years, serving in my 20th
11    year on the school board there.  My educational background is
12    high school, college, and postgraduate.  Also have a Master's
13    degree.  I mostly taught math and science for fifth graders.
14         My spouse is deceased.  His name was Anderson King, and
15    he worked at USI Industries in Longview for about 30 years.
16         I was called to serve on jury duty.  This has been
17    several years ago.  I don't remember what year.  But, anyway,
18    it was settled out of court so it never had a chance to serve.
19    I wasn't called for jury duty most of the time because I was
20    on that grand jury commission where we nominated people to
21    serve on the grand jury and, therefore, I wasn't going to be
22    called on the regular active or the other juries.
23         Thank you very much.
24              THE COURT:  Thank you, Ms. King.
25         Next is No. 10, Mr. Goodjoint.
```

 1                    THE PANEL MEMBER:  Hi, I'm Steredrick Goodjoint.  I
 2      live in Gilmer, Texas.  I have two grown kids.
 3          My place of employment is Union Hill ISD.  I'm the
 4      maintenance and transportation and custodial director there.
 5      I've been there 10 years.  My education is a high school
 6      education.
 7          My spouse, Rimanda Goodjoint.  We've been married 29
 8      years.  She has a daycare, home daycare.  She's been doing
 9      about 12 years.
10          And I've served on a criminal case about 15 years ago.
11                    THE COURT:  Never a civil case?
12                    THE PANEL MEMBER:  No.
13                    THE COURT:  Thank you, sir.
14          Next is No. 11, Ms. George.
15                    THE PANEL MEMBER:  I am Nancy George, and I live in
16      Marshall.  I have seven kids--one birth, six guardianships.
17      I am employed at the Harrison County courthouse.  I am justice
18      of the peace.  I'm starting my 21st year as justice of the
19      peace, and I was 14 years as court clerk.  I have a high
20      school education and some at Kilgore.  I'm not married.  Seven
21      kids.
22          I have also served on civil and criminal, but it's been
23      25 years since I served on those.
24                    THE COURT:  Thank you very much.
25          Next is No. 12, Ms. Jordan.

```
 1              THE PANEL MEMBER:  Good morning.  My name is Tonya
 2    Jordan.  I live here in Marshall, Texas.  I have two adult
 3    children.
 4       I'm employed by Marshall Independent School District as a
 5    teacher.  I also co-own Lewis Funeral Home here in Marshall.
 6    I've worked at Marshall Independent School District for about
 7    21 years.  I attended Wyley College.
 8       My spouse's name is Billy Jordan.  He is retired from
 9    Texas Eastman Industries, and he also worked at the
10    funeral home.  He's disabled at this time.
11       I have served for a criminal case about 10 years ago.  I
12    was selected for a civil case, and they settled out of court.
13    And I've also served as a grand -- on the grand jury.
14              THE COURT:  Thank you, ma'am.
15       Next is No. 13.
16              THE PANEL MEMBER:  My name is Ramon Gutierrez.  I
17    live here in Marshall.  I don't have any children.
18       I work for Gecko Pest Control.  I do pest control routes
19    when techs are out, and I also work at scheduling in the
20    office.  I've been there for about four and a half years.  I
21    am a high school graduate, a couple of years of college.
22       My wife's name is Cherokee Norvell.  She works for the
23    kitchen for the Marshall school district.  She's been there a
24    year now.
25       And I have never been a juror before.
```

1          THE COURT:  Thank you, sir.

2      Next is No. 14, Ms. Berryman.

3          THE PANEL MEMBER:  Good morning.  My name is Andrea

4  Berryman.  I live in Longview, Texas.  I have three kids.  One

5  of my kids are disabled.

6      I work at Christus Good Shepherd in Longview, been there

7  for 23 years, never been married.

8      I never served on a jury before.

9          THE COURT:  And what do you do at Christus Good

10  Shepherd?

11          THE PANEL MEMBER:  I work the front desk in

12  radiology.

13          THE COURT:  Thank you, ma'am.

14      Next is No. 15, Mr. Emerson.

15          THE PANEL MEMBER:  Yes.  My name is Richard Emerson.

16  I have two children.

17      My place of employment is First Christian Church in

18  Longview.  I've been there starting my 16th year.  I have a

19  Doctorate of Ministry from TCU.

20      My spouse's name is Kimberly.  She is retired, if you

21  will, but she was an educator in Harrison County-Hallsville as

22  well as East Texas Charter High School as a front desk person.

23  She was there probably for three years, I believe.

24      And I was never on a criminal, but a civil case across

25  the street that really I don't think went anywhere.  I didn't

```
 1    get this far in the process when I did the civil.

 2             THE COURT:  All right, sir.  Thank you very much.

 3             THE PANEL MEMBER:  Thank you.

 4             THE COURT:  No. 16 is next, Ms. Nixon.

 5             THE PANEL MEMBER:  My name is Brittany Nixon.  I

 6    have one child.

 7         I work at First National Bank of Hughes Springs.  I've

 8    been there 10 years.  I'm a loan processor.  I've got a high

 9    school diploma.

10         My spouse is Fred Nixon, and he works at Komatsu,

11    Longview, as an electrician.  He's probably been there about

12    10 years.

13         And I served a civil jury here five years ago.

14             THE COURT:  In this courtroom?

15             THE PANEL MEMBER:  Yes, sir.

16             THE COURT:  Do you remember what kind of case it

17    was?

18             THE PANEL MEMBER:  It was a cell phone company

19    infringed on another one.

20             THE COURT:  A patent case?

21             THE PANEL MEMBER:  Yes.

22             THE COURT:  All right.  Thank you, ma'am.

23         No. 17 is next, Ms. Hale.

24             THE PANEL MEMBER:  My name is Sandra Hale, and I

25    live in Atlanta, Texas.  I have two adult children.
```

```
 1              I am retired at the moment, and my previous employment

 2       was with -- well, I started with the savings and loan and

 3       ended up with a bank.  And I was -- my tenure there was 29

 4       years.  How long -- I worked there for 29 years.  My

 5       educational background was high school.

 6              My spouse's name is Jeffrey Hale, and he was employed by

 7       Southwestern Electric Power Company for over 33 years, and he

 8       retired.  And now he is a supervisor for the security

 9       department at the Christus St. Michael's in Atlanta, and he's

10       been there nine years.

11              And, yes, I have served on a civil and a criminal case.

12                   THE COURT:  Tell us when and where that was, please.

13                   THE PANEL MEMBER:  Pardon me?

14                   THE COURT:  When and where did you serve on a civil

15       jury before?

16                   THE PANEL MEMBER:  In New Boston, Texas.

17                   THE COURT:  How long ago, ma'am?  How long ago has

18       that been, ma'am?

19                   THE PANEL MEMBER:  It has been probably about 15, 20

20       years ago.

21                   THE COURT:  All right.  Thank you very much.

22                   THE PANEL MEMBER:  I lived in Texarkana then.

23                   THE COURT:  Thank you, ma'am.

24            Next is No. 18, Ms. McDonald.

25                   THE PANEL MEMBER:  Hello.  My name is Tammy
```

1   McDonald.  I live here in Marshall, Texas.  I have two grown

2   children, one here on earth, one in heaven.

3       I work at shoe department, Encore.  I've been there two

4   years.  High school education.

5       My husband's name is Calvin McDonald.  He works for

6   Partner Industrial at the Eastman plant in Longview, Texas.

7   He's been there about 17 years.

8       And I've never served on a jury.

9           THE COURT:  Thank you, ma'am.

10      Next is No. 19.

11          THE PANEL MEMBER:  Good morning.  My name is Andreas

12  Floyd.  I live in Gladewater.  I have one child.  I work for

13  High Touch Delivery, been there for like three years.  My

14  highest education is some college.

15      And I've never provided any jury services.

16          THE COURT:  And you're not married.  Is that right,

17  sir?

18          THE PANEL MEMBER:  No, sir.

19          THE COURT:  Thank you very much.

20      No. 20 is next, Ms. Hudgins?

21          THE PANEL MEMBER:  My name is Tina Hudgins.  I have

22  two children, 10 and 9.  I work at Hallsville ISD as a third

23  grade teacher.  I'm starting my fifth year there.  I have a

24  Bachelor's degree in elementary education.

25      My husband's name is Michael Hudgins.  He works at Texas

```
 1    Oncology, Longview Cancer Center, as a pharmacist.  He's
 2    worked there for 11 years.
 3         And I have never been -- served on a jury.
 4              THE COURT:  Thank you, ma'am.
 5         No. 21 is next, Ms. Graham.
 6              THE PANEL MEMBER:  Good morning.  My name is Vicki
 7    Graham.  I live in Pittsburg, Texas.  I have two grown
 8    children.
 9         I'm retired from CB&I in Tyler, Texas.  I worked there
10    for 11 and a half years.  I have an associate's degree from
11    Tyler Junior College.
12         My spouse is deceased, and I have never served on a jury.
13              THE COURT:  And tell me what you did at CB&I in
14    Tyler.
15              THE PANEL MEMBER:  I worked in the materials
16    department as a clerical work.
17              THE COURT:  All right.  Thank you very much, ma'am.
18         No. 22 is next, Mr. Fenton.
19              THE PANEL MEMBER:  I'm Ernest Fenton.  I have five
20    boys.  I live in Gilmer.  I'm retired from Crosby Lebus
21    (phon.).  I work now at the Gilmer ISD as a custodian.  I've
22    been there going on three years.  I have a high school
23    education.
24         My spouse is Kathy.  She's a stay-at-home mom, has been
25    for 37 years.
```

1      And my previous jury duty is I served on an Upshur County

2  grand jury, and this has been probably about 10 to 12 years

3  ago.

4            THE COURT:  All right, sir.  Thank you very much.

5      No. 23 is next, Mr. Givens?

6            THE PANEL MEMBER:  Yes.  My name is John Givens.  I

7  live in Jefferson, Texas.  I have two children.

8      I am the senior pastor at New Prospect Baptist Church for

9  the past two years.  Also the director of sales and business

10  development for Heritage Home Health and Hospice, and director

11  of IT.  I've been there five years.  I have a degree in

12  nursing and pursuing a degree in theology.

13      My spouse's name is Karen Givens.  She's been a homemaker

14  for 22 years.

15      And I never served on a jury.

16            THE COURT:  All right, sir.  Thank you very much.

17      Next is Panel Member No. 24, Mr. James.

18            THE PANEL MEMBER:  My name is Jerold James.  I live

19  in Atlanta, Texas.  No children.  Red River Army Depot,

20  retired 33 years.

21            THE COURT:  Mr. James, hold that microphone a little

22  closer, please, sir, and tell me again what your work

23  employment history was.

24            THE PANEL MEMBER:  Red River Army Depot, retired 33

25  years.

1          THE COURT:  Thank you, sir.  What about your

2    education?

3          THE PANEL MEMBER:  High school.  Not married.

4          THE COURT:  What's your spouse's name and does she

5    work outside the home?

6          THE PANEL MEMBER:  Don't have one.

7          THE COURT:  Don't have one.  Any prior jury duty?

8          THE PANEL MEMBER:  Civil in Atlanta, Texas.

9          THE COURT:  How long ago was that, sir?

10          THE PANEL MEMBER:  Twenty years.

11          THE COURT:  Okay.  Thank you very much, Mr. James.

12     Next is Panel Member No. 25, Mr. Arnold.

13          THE PANEL MEMBER:  My name is Brian Arnold.  I live

14    in Hallsville, Texas.  I have two boys.  I work at North

15    Cylinder, been there about eight years.  I do industrial

16    maintenance.  I got a GED.

17        My wife's name is Maria.  She is a housewife.

18        And I've never served on a jury trial.

19          THE COURT:  Thank you, sir.

20        No. 26, Mr. Cobb, is next.

21          THE PANEL MEMBER:  My name is Tyler Cobb.  I don't

22    have any children.  I live in Naples, Texas.  I work at Papa

23    Nacho.  It's a Mexican restaurant.  I've waited tables for

24    about four years.  My education is a high school diploma.

25        I have no spouse, and I've never done jury service.

1          THE COURT:  All right.  Thank you very much.

2     No. 27 is next, Mr. Oney.

3          THE PANEL MEMBER:  Willard Oney.  Live in Marshall,

4     Texas.  I have two grown children.  I work for Fluid Disposal

5     Specialties.  I'm a shop superintendent.  I've been there for

6     about 15 years.  I got a high school diploma.

7          My wife is Seeny Oney.  She works for Fluid Disposal.

8     She does the time, and she's been there about 13 years.

9          And I was on a grand jury about five years ago.

10         THE COURT:  All right.  Thank you very much.

11         No. 28 is next, Ms. Brewer.

12         THE PANEL MEMBER:  My name is Laura Brewer, and I

13     live in East Mountain, Texas.  I have two grown children.

14         And I work at Spring Hill ISD.  I've been there two

15     weeks, left Union Grove ISD after 21 years as a

16     paraprofessional in the special education department.  I have

17     a high school diploma.

18         My spouse's name is Terry Brewer.  He works at Texas

19     Eastman, and we also own Brewer Auto Sales and Body Shop and

20     Brewer Feed and Hay Sales.  We've lived -- he's been at Texas

21     Eastman for 10 years.

22         And I have no prior jury service.

23         THE COURT:  Thank you, ma'am.

24         Thank you, ladies and gentlemen.  Now, I need to say a

25     couple of more things to you before I turn the questioning

1    over to the lawyers.

2        The jurors that are actually selected in this case will

3    serve in the role as the judges of the facts, and the jurors

4    selected will make the sole determination about what the facts

5    are in this case.

6        Now, my job as the judge is to rule on questions of law,

7    evidence, and procedure that might arise during the trial, to

8    maintain the decorum of the courtroom, and to oversee an

9    efficient flow of the evidence and the trial process.

10        Also I want to say a couple of things to you about our

11    judicial system that hopefully will put things in a proper

12    perspective for everyone.

13        In every jury trial, besides the parties themselves,

14    there are always three participants--the jury, the judge, and

15    the lawyers.  Now, with regard to the lawyers, I think it's

16    important for each of you to understand that our judicial

17    system in this country is an adversary system, which simply

18    means that during the course of the trial each of the parties

19    through their counsel will seek to present their respective

20    cases to the jury in the very best light possible.

21        Now, it's no surprise to any of you that lawyers are

22    sometimes criticized in the media, but the Court's observed

23    that some of that criticism results from a basic

24    misunderstanding of our adversary system in which the lawyers

25    act as advocates for the competing parties.  And as an

1    advocate, a lawyer is ethically and legally obligated to

2    zealously assert his or her client's position under the rules

3    of our adversary system.

4        And by presenting the best case possible on behalf of

5    their clients, the lawyers hopefully will enable the jury to

6    better weigh the relevant evidence, to determine the truth,

7    and to arrive at a just verdict based on that evidence.  This

8    system, this adversary system of justice, has served our

9    nation well for 200 years and longer, and our lawyers in this

10   country have and will be in the future an integral part of the

11   process.

12       So as we go forward, even though it's possible that over

13   the course of the trial I might frown or roll my eyes from

14   time to time at the lawyers, I'm simply trying to make sure

15   that their advocacy doesn't get outside of the bounds of our

16   adversary system.  But I think it's important for each of you

17   to understand this and to keep it in mind as we go forward.

18       Also, ladies and gentlemen, those of you that are

19   selected to serve on this jury, I want you to understand that

20   during the course of the trial I am going to do my very best

21   to make sure that no one on the jury knows what I think about

22   the evidence in this case because determining the facts based

23   on the evidence is the jury's job.  It is not my job.

24       Therefore, those of you selected on the jury should not

25   take anything you hear or see or think you hear or see as

1    coming from me as something to consider in determining what

2    the ultimate facts are in this case.

3         All right.  At this time the lawyers for the parties are

4    going to address the venire panel.

5         Mr. Baxter, you may address the panel on behalf of

6    Plaintiff.  Would you like a warning on your time, sir?

7              MR. BAXTER:  I would, Your Honor.  If you could call

8    me after five and one minute remaining.

9              THE COURT:  Five minutes remaining and one minute

10   remaining.

11             MR. BAXTER:  Yes, Your Honor, if the Court please.

12             THE COURT:  Proceed when you are ready, sir.

13             MR. BAXTER:  Thank you.

14        Thank you, Your Honor.  May it please the Court.

15        Good morning, ladies and gentlemen.  As I told you, my

16   name is Sam Baxter.  I practice law here in Marshall, Texas.

17   I've been here for 51 years in the legal business.  I work for

18   a law firm called McKool Smith.  We're headquartered next door

19   in, oddly enough, the Baxter Building.

20        I am married.  My wife's name is Lauren Parish, or Judge

21   Lauren Parish.  We have four children, the oldest of which is

22   from Brazil.  Andrew works here in town.  Matthew, who is from

23   Thailand, and lives in the Fort Worth area.  Sophie, who is

24   from India and who lives in Thailand right now.  And Keyton

25   Boggs, who is my stepson, who is the -- one of the band

1    directors at the Hallsville band situation.

2        So the first thing I've got to do is talk to some of you

3    that live in Upshur County or Marion County and ask, how many

4    of you know my wife, Judge Lauren Parish?  All right.

5        Any of you that have been in Judge Parish's courtroom

6    have anything that would affect you in this case?  I happen to

7    know that she's a very good judge and was very friendly with

8    the jurors, but every once in a while there was a criminal

9    case where there probably wasn't a good outcome for the

10   defendant.  Does that pose a problem for anyone?

11       No. 9, Ms. King, did you serve in Judge Parish's court?

12            THE PANEL MEMBER:  I was called to serve on the

13   grand jury team to select grand jurors.

14            MR. BAXTER:  You were a commissioner.

15            THE PANEL MEMBER:  I was on the commission.

16            MR. BAXTER:  Yes, ma'am?

17            THE PANEL MEMBER:  That we selected people to serve

18   on the grand jury.

19            MR. BAXTER:  How was she as a judge?

20            THE PANEL MEMBER:  I really never sat in her

21   court --

22            MR. BAXTER:  Okay?

23            THE PANEL MEMBER:  -- at any time.

24            MR. BAXTER:  All right.

25            THE PANEL MEMBER:  I will confess, this is not a

```
1    biased statement, I was her sixth grade science teacher.  So
2    what you do --
3              MR. BAXTER:  How did she do in the sixth grade?
4              THE PANEL MEMBER:  Of course.  But, yeah, that
5    doesn't affect my outcome.
6              MR. BAXTER:  Did you know her father, Wilbur Parish?
7              THE PANEL MEMBER:  Yes, I knew him, but I never
8    served in his court, either.
9              MR. BAXTER:  Yes, ma'am.  Thank you very much, Ms.
10   King.
11       Who else had the opportunity to meet Judge Parish in the
12   court setting?  Back here behind you, yes, sir.  No. 22, Mr.
13   Fell ton?
14             THE PANEL MEMBER:  I did serve on the grand jury,
15   but I'm not sure if she was the judge or not.
16             MR. BAXTER:  How long ago?
17             THE PANEL MEMBER:  This was probably about 15 years
18   ago or 12 years ago.
19             MR. BAXTER:  Yes, sir.  I will assure you, she was
20   the judge.  She sat there for 24 years.
21             THE PANEL MEMBER:  All right.  She also -- my
22   adoption for my two boys, she conducted that.
23             MR. BAXTER:  Did she do a good job on that?
24             THE PANEL MEMBER:  Excellent.
25             MR. BAXTER:  Thank you very much.  I appreciate it.
```

```
 1          Who else knows Judge Parish?  Anyone else?  No. 5.  I'm
 2     sorry.  I skipped you, Ms. Chapman -- Reverend Chapman, I
 3     should say.
 4               THE PANEL MEMBER:  I did not know her as a judge.  I
 5     knew her as -- through a church relationship.
 6               MR. BAXTER:   All right.  Anything about that's a
 7     problem, Ms. Chapman?
 8               THE PANEL MEMBER:  Not at all.
 9               MR. BAXTER:  Okay.  Thank you very much.
10          And those -- the most frequently asked question I have
11     about Her Honor is, do I have to stand up when she comes in
12     the courtroom?  And the answer is yes.  If she comes in the
13     living room, I stand up.
14          Judge Gilstrap has said that we have a very brief period
15     of time to talk a little bit about the case, and as he told
16     you, this is a damages only case.  There won't be any other
17     issues in this case.
18          But let me talk to you about my client PanOptis just a
19     moment.  PanOptis is headquartered in Plano, Texas, and it was
20     formed because a consortium of tech companies, and you see
21     them here on the screen, Ericsson, Samsung, Panasonic, and LG,
22     had a whole bunch of patents involving LTE, which is a phone
23     system that, if you look on your phone, sometimes it will say
24     LTE on it.  And it stands for long-term evolution.  And they
25     dedicated patents, some more than others, to Panasonic for
```

1    Panasonic to monetize their patents.

2         If I can see the next slide.

3         The Patents-in-Suit, five of them, basically have to do

4    with stabilization of the LTE network and increasing speed of

5    uploads and downloads.  And you're going to hear about that if

6    you are on the jury.

7         It also turns out, if I can see the next one, please, as

8    Judge Gilstrap told you, these patents are known as SEP

9    patents, which stands for standard essential patents.  And

10   you're going to hear a lot about the standard in this case,

11   how it got set, how important it is.  But these patents are

12   all standard essential patents, and I don't think anyone will

13   contradict that in this case.

14        Now, on the other side is Apple, and the Apple lawyers,

15   as you saw, the ones that you might know is Melissa Smith.

16   Ms. Smith practices law here in Marshall and in Tyler; joe

17   Mueller, who is from Boston; and Mr. Mark Selwyn, who is from

18   California.

19        Anybody know Ms. Smith or perchance any of the other

20   lawyers?  You do, ma'am?  Okay.  Anybody know Ms. Smith?  You

21   do, No. 11.  Oh, you know, Judge, with that mask on, you look

22   different.

23        Judge, I think I can say this without contradiction,

24   without the exception of His Honor, the most important and

25   powerful judge in Harrison County because you deal with

```
 1    speeding tickets for my children.  Anything about that, Judge,

 2    that I've got to pay the price for today?

 3              THE PANEL MEMBER:  No, sir.

 4              MR. BAXTER:  All right.  You know Ms. Smith?

 5              THE PANEL MEMBER:  I know Ms. Smith just casually.

 6              MR. BAXTER:  Yes, ma'am.  Anything about that that's

 7    an issue, Judge?

 8              THE PANEL MEMBER:  No, sir.

 9              MR. BAXTER:  Thank you.

10       Who's got an iPhone on the jury panel?  Can I see your

11    hands?  Now, we think iPhones are great.  Of course, one of

12    reasons we may think are great is because of the technology.

13       But is there anybody that feels like that Apple is such a

14    big company and a good company, that you simply couldn't be

15    fair in this case, that Apple somehow has a leg up?  Anybody

16    feel that way?

17       No. 13, Mr. Gutierrez, tell me what you feel about that,

18    sir.

19              THE PANEL MEMBER:  Just what you mentioned, that I

20    think Apple is a very big company, trillion-dollar company,

21    and it's just difficult to fight battles with them.

22              MR. BAXTER:  Anything about that, Mr. Gutierrez,

23    that would cause you any problem on sitting on this jury?

24              THE PANEL MEMBER:  No, sir.

25              MR. BAXTER:  Okay.  All right.  I know I've got one
```

```
 1    juror, Ms. Hudgins, No. 20?  Ms. Hudgins, I read your

 2    questionnaire, which we appreciate y'all filling out for us,

 3    and I noticed that you said that, while you use a Samsung

 4    phone, that you feel very positive about Apple.  Is that

 5    right?

 6                THE PANEL MEMBER:  I don't have a Samsung phone.  I

 7    do have an iPhone.

 8                MR. BAXTER:  Okay.

 9                THE PANEL MEMBER:  We have other Samsung

10    products--refrigerator, stove, things like that.

11                MR. BAXTER:  Yes, ma'am.  Anything about being

12    positive for Apple, would you be leaning toward Apple's side

13    if you sat on this jury?

14                THE PANEL MEMBER:  No, sir.

15                MR. BAXTER:  Nothing about that would cause you any

16    problem?

17                THE PANEL MEMBER:  No, sir.

18                MR. BAXTER:  Okay.  Thank you very much.

19          Who's got an iPad or an iWatch?  Anybody?  Everybody

20    happy with those products?

21          Now, the inventors of these patents work for the various

22    technology companies that you saw listed earlier.  Is there

23    anything with a company owning patents that somebody else

24    developed, does someone think, well, only the inventor can

25    really have anything to do with those patents, and if you buy
```

```
 1    a patent, and patents are a fungible entity, they are for sale

 2    like property and they can change hands, is there anybody who

 3    thinks there's a problem that PanOptis didn't actually develop

 4    those products but are in the business of licensing those

 5    products to other companies?  Anybody think that's a problem?

 6         Anybody here able to work on computers or can write

 7    computer code or has anything to do in the computer business?

 8         Yes, sir.  Mr. Givens?

 9              THE PANEL MEMBER:  Yes, sir.

10              MR. BAXTER:  I understand, sir, you are an IT

11    director?

12              THE PANEL MEMBER:  I'm also the director of IT for

13    my company.

14              MR. BAXTER:  Tell me what you do about that.

15              THE PANEL MEMBER:  We actually have, I call it, a

16    fleet.  We have -- we use iPads for documentation in the

17    field.  We also have some Android devices.  We use charting

18    software, logistical software, tracking software, and I manage

19    all of that.

20              MR. BAXTER:  Do you understand anything about phone

21    networks, Mr. Givens?

22              THE PANEL MEMBER:  Yes, sir.

23              MR. BAXTER:  Okay.  You know about LTE?

24              THE PANEL MEMBER:  Yes, sir.

25              MR. BAXTER:  What experience have you had working
```

1   with LTE?

2           THE PANEL MEMBER:  Just with signal strength and

3   increased ability.  A lot of our nurses are working in rural

4   environments, and they need access to patients' information,

5   patients' records.

6           MR. BAXTER:  Is that information then uploaded or

7   downloaded or whichever way that goes?

8           THE PANEL MEMBER:  Correct, yes, sir.

9           MR. BAXTER:  Do you count on the system being fast

10  and stable that does that for you?

11          THE PANEL MEMBER:  Yes, sir.

12          MR. BAXTER:  Is that important for you?

13          THE PANEL MEMBER:  Yes, sir.

14          MR. BAXTER:  If the documents won't load or they sit

15  there and spin, is that a problem for your medical

16  professionals out in the field?

17          THE PANEL MEMBER:  Of course, because they wouldn't

18  have access to the patients' records.

19          MR. BAXTER:  And you want that to move as fast as it

20  can?

21          THE PANEL MEMBER:  Certainly.

22          MR. BAXTER:  Does anybody feel different than Mr.

23  Givens does, that it's important that uploads and downloads

24  move smoothly, they move quickly, and they are dependable?

25  Anybody disagree with that, that that's an important feature

 1    of whatever phone you have that's on the LTE network?

 2         Thank you, Mr. Givens.  I appreciate it.

 3         Is there anybody on the panel that's ever applied for a

 4    patent?  Back here, No. 28.  Ms. Brewer?

 5              THE PANEL MEMBER:  Yes.

 6              MR. BAXTER:  What's your experience with patents?

 7              THE PANEL MEMBER:  My husband applied for a patent

 8    this past year, and we have a patent pending.

 9              MR. BAXTER:  Okay.  Did you hire a law firm to help

10    you with that?

11              THE PANEL MEMBER:  Yes, sir, one out of Dallas.

12              MR. BAXTER:  Has it been an interesting process?

13              THE PANEL MEMBER:  Pretty interesting, long, slow

14    process.

15              MR. BAXTER:  Anything about that, Ms. Brewer, that

16    you think would come to bear in this case?

17              THE PANEL MEMBER:  No.

18              MR. BAXTER:  Thank you, ma'am.  Anybody who works

19    for a company that has intellectual property, has patents or

20    trade secrets or copyrights or anything of that sort?  Anybody

21    at all?

22              UNIDENTIFIED PANEL MEMBER:  I'm sure --

23              MR. BAXTER:  And remind me, again, who you work for?

24              THE PANEL MEMBER:  I used to work for Ricoh USA.

25              MR. BAXTER:  The copying company?

```
 1              THE PANEL MEMBER:  And I am sure there are many

 2    patents they own at this point.

 3              MR. BAXTER:  Do you know if they tried to enforce

 4    their patents if they own them?

 5              THE PANEL MEMBER:  I have no idea.  It was outside

 6    my role.

 7              MR. BAXTER:  I appreciate that.

 8         Anybody else work for a company, Texas Eastman or anyone

 9    else that has patents?

10         If someone has a dispute in the patent area, does anybody

11    think it would be wrong to come to court to get that dispute

12    resolved?

13         Is there anybody that is a member of any group that is

14    opposed to lawsuits?  Anybody at all?  Different question.

15    How many people think there are too many lawsuits?  Anybody at

16    all?  No?  Good.

17         Who on the panel uses their phone to browse the internet?

18    How about looking at YouTube, downloading YouTube videos?  Who

19    does that?  If you're doing that, do you hope that your phone

20    doesn't freeze up?  How many are excited when the phone

21    freezes up?  Anybody at all?  All right.

22         Now, Judge Gilstrap talked to you about the burden of

23    proof, and he told you that the burden in this case over

24    damages is by a preponderance of the evidence.  But when we

25    start out, everybody's equal.  You haven't heard any evidence
```

 1    yesterday, you won't hear any this morning, and so everybody

 2    starts off on an even footing.

 3         But it turns out that in this case, as in all civil

 4    cases, the plaintiff has the burden of proof going forward and

 5    proving its case.  In this case it's going to be talking to

 6    you about damages and proving to you what the damage number

 7    ought to be that Apple owes PanOptis.

 8         That burden is by a preponderance of the evidence, and as

 9    Judge Gilstrap said, if you looked at the scales of justice,

10    they are equal.  But if you were to stack evidence on one side

11    or the other and, one side had just a fraction more evidence,

12    it tilts the scales, as he put it, ever so slightly, then that

13    is the burden of proof that we have.  It's by a preponderance

14    of the evidence.

15         And so as we go forward in thinking about damages, it is

16    in the context of, has the Plaintiff proved its case by that

17    one more BB, that one more piece of evidence.

18         If I can see the next slide, please.

19         This is what I believe Judge Gilstrap just read to you,

20    and I'm confident he will read this to you again, that

21    preponderance of the evidence means you must be persuaded by

22    the evidence that the claim or affirmative defense is more

23    probably true than not.

24         Is there anybody that has a problem with that, that you

25    think in a damage case somehow the burden ought to be higher,

 1      that it ought to be that beyond a reasonable doubt or some

 2      other burden of proof?

 3          Does anybody feel like they could not follow Judge

 4      Gilstrap's charge to you on the law, and if he tells you more

 5      probably true than not, is there anybody that couldn't follow

 6      that?  Anybody at all?

 7          Now, in speaking of damages, one of the things that came

 8      to mind was if someone took some of your property and you find

 9      out who it is, and let's suppose it's a gun, they took a

10      rifle, and they said, well, I sold the rifle and I only got

11      $10 for it, so here I'm going to give you the $10 and we'll

12      call it even.  Now, how many people think that's fair?

13          How many people think that if the person that took the

14      property said, well, I'll give you 50 percent of the value

15      but, you know, it was old, it probably wasn't very good, and

16      so you're only going to get 50 percent, how many people think

17      that's fair?

18          How many people think that if someone takes your property

19      and you find out who it is, that you either get to recover

20      your property or they have to pay you for it and they have to

21      pay full damages?  Is there anybody that has a problem with

22      that?

23          If you don't, if you think full damages are the measure

24      that someone ought to pay if they take someone's property,

25      raise your hand for me.  Is there anybody who thinks it ought

1      to be less than full damages?  If it is full damages, raise

2      your hand for me.  All right.

3          Now, in this case --

4          If I can see the next slide, please.

5          In this case there is going to be some evidence that

6      you're going to hear, Judge Gilstrap's going to instruct you

7      about it, called a hypothetical negotiation.  And you're going

8      to hear damage experts talk about that the law requires damage

9      experts to construct a hypothetical negotiation between the

10     parties, and there are 14 or 15 factors you're going to hear

11     about those.

12         The negotiation didn't actually take place.  It is

13     required by the law for damage experts to consider these

14     factors as they reach their damage number.  They will tell you

15     there are three things that are important.  One is the parties

16     have to reach an agreement.  They can't walk away.  Number

17     two, the patents are valid and infringed.  And, number three,

18     all the parties have all the relevant knowledge, both in the

19     past and in the future.  It's called the book of wisdom, and

20     so all the documents that people have and whatever evidence

21     there is, that is known at this hypothetical negotiation.

22         In this case, because that negotiation will take place in

23     2012, it will be between Apple and the owners at that time of

24     the patents, which are the technology companies.

25         Does anybody have a problem with that--that PanOptis will

1    not be at that table but, rather, the royalties negotiated

2    would be in the -- and the damages negotiated would be between

3    the tech companies and Apple.  Anybody got a problem with

4    that?

5         Let's see the next slide if we could, please.

6         Now, there is a statute that Judge Gilstrap's going to

7    tell you about, and this is from United States Code, and it

8    says, upon finding for the claimant, this is in a patent case,

9    the court shall award the claimant damages adequate to

10   compensate for the infringement, but in no event less than a

11   reasonable royalty for the use made of the invention.

12        This is what's known as the reasonable royalty

13   calculation.  If Judge Gilstrap tells you that that's how you

14   determine damages, that the person that owns the patent gets

15   paid in no event less than a reasonable royalty, does anybody

16   have any trouble with that?  Anybody at all?

17        Let me see the next slide, if I could, please.

18        On top of that, you are going to hear a concept known as

19   FRAND.

20        If I can see the next slide.

21        And that stands for fair, reasonable, and

22   nondiscriminatory.  And that is because these patents are

23   standard essential patents and they've been dedicated to what

24   Judge Gilstrap described to you as a standard setting body

25   known as ETSI.  And if you dedicate the patents to ETSI, and

 1    these patents have all been dedicated to ETSI, then the damage

 2    number has to be fair, reasonable, and nondiscriminatory.  And

 3    you are going to hear a lot of evidence about that in this

 4    case about what the rate ought to be.

 5        But is there anybody that has ever heard of FRAND, knows

 6    anything about FRAND, or has any problems with applying the

 7    standard of fair, reasonable, and nondiscriminatory when

 8    figuring out what a reasonable royalty ought to be?  Anybody

 9    at all?

10        Let me see the next slide, if I could, please, Ms.

11    Truelove.

12        This is the amount of damages that we believe that Apple

13    owes PanOptis in this case for the five patents:  $506

14    million.  And that's a lot of money.  As you can tell, this is

15    a big, important case.

16        Now, I'm not going to ask you if you can or will give

17    PanOptis that much money at the end of this trial.  All I want

18    to know is, because you now haven't heard any evidence, is

19    there anybody that sees that number and says, nope, can't do

20    that, not going to do it, too much money?  Anybody at all?

21        Can I get everyone to tell me if in fact -- that if the

22    evidence by a preponderance of the evidence points toward this

23    being the fair and reasonable number for the royalty in this

24    case, does anybody have any hesitation of writing that number

25    down on the jury form?  Anybody at all?

 1          Mr. Anderson, how about you, sir?  You're sitting there

 2    on the front row.  You get on this jury and you see numbers

 3    thrown about in the hundreds of millions of dollars, is that a

 4    problem?

 5               THE PANEL MEMBER:  Not to me.

 6               MR. BAXTER:  All right.  If the evidence pointed to

 7    that, can you say, yep, that's the number that it ought to be?

 8               THE PANEL MEMBER:  Yes, sir.

 9               MR. BAXTER:  Okay.  All right.

10          Reverend Chapman, I don't want to say this is like

11    passing the collection plate, but it is something you are

12    familiar with of the value of things.  Tell me if that number

13    is a problem for you.

14               THE PANEL MEMBER:  No, it's not.

15               MR. BAXTER:  If the evidence by a preponderance says

16    that is the right number, would you vote to put that down on

17    the verdict form?

18               THE PANEL MEMBER:  Yes, I could do that.

19               MR. BAXTER:  All right.  Is there anybody that has a

20    problem with that?

21          No. 15, Reverend Emerson, I'm going to put you in the

22    same boat as Ms. Chapman.  Is that number a problem for you?

23               THE PANEL MEMBER:  No, it is not.  But I will

24    honestly say 10 percent, that could do a lot of good for the

25    church.

1            MR. BAXTER:  I'm going to talk to my client about

2    that.

3            THE PANEL MEMBER:  So I do not have a problem with

4    that, sir.

5            MR. BAXTER:  Okay.  Not anything that says, no, no,

6    too much money?

7            THE PANEL MEMBER:  I will personally say that's a

8    lot of money.

9            MR. BAXTER:  It is a lot of money.

10           THE PANEL MEMBER:  It's a lot of money.  If the case

11   states that that's the right number without a preponderance, I

12   have no problem with it.

13           MR. BAXTER:  So if the experts or the technical

14   people or the representative from PanOptis convince you by

15   that preponderance of the evidence that is the right number,

16   no problem with you.

17           THE PANEL MEMBER:  No problem.

18           MR. BAXTER:  No problem?

19           THE PANEL MEMBER:  No, sir.

20           MR. BAXTER:  Thank you, Reverend.  Is there

21   anybody -- now that you've seen the number for a little while,

22   and it's a lot of money, is there anybody that's got a problem

23   with it?  Not whether you will commit to give it to me today

24   because you haven't heard any evidence.

25           THE COURT:  You have five minutes remaining.

 1          MR. BAXTER:  Thank you, Your Honor.

 2      But you can tell me that if the evidence by a

 3  preponderance, by that one more BB, says that's the right

 4  number, is there anybody that couldn't write it down, wouldn't

 5  write it down on the basis that it's too much money?  Anybody

 6  at all?  All right.  Thank you.

 7      If I can see the next slide, please.

 8      The judge has also talked to you about this, and I think

 9  this is going to be very important in this case.  And he told

10  you that if you're on this jury, you are the sole judge of the

11  credibility of the witnesses--that is, you are going to

12  determine if that witness has been forthright with you,

13  answered the questions that they were asked, and answered them

14  in a forthright manner, and that their testimony was

15  believable.

16      You're going to hear a lot of experts in this case, some

17  on technical issues, some on damage issues, and I will tell

18  you that sometimes that testimony can get a little convoluted,

19  and it can be difficult.

20      What I'm asking you, is there anybody that thinks that at

21  the end of the day you couldn't sit in the jury box and listen

22  to and watch an expert and, either through the consistency of

23  what they say or their body language or the method in which

24  they answered the questions or how forthright they appear to

25  be coming, is there anybody that says, well, really I

```
1    shouldn't judge their credibility, I can't tell?

2         Is there anybody that has any hesitation about judging

3    the credibility of the witnesses?  Anybody at all?

4         Is there anybody that has any reservation about serving

5    on this jury?  I know there are four of you that may have some

6    conflicts, and I'm not talking about that.  I'm talking about

7    whether or not just being on the jury, you feel like, well, I

8    shouldn't do it.  Is there some reason that you feel like you

9    couldn't serve on this jury?  Anybody at all?

10        Ms. Jordan, you've got a new school, do you?  Are you

11   going to a new school.  Are you going to William E. Travis?

12             THE PANEL MEMBER:  Yes.

13             MR. BAXTER:  You're out there with Ms. Johnson?

14             THE PANEL MEMBER:  Yes.

15             MR. BAXTER:  The best principal in Marshall?

16             THE PANEL MEMBER:  Of course.

17             MR. BAXTER:  What are you going to teach out there,

18   Ms. Jordan?

19             THE PANEL MEMBER:  This year I'm moving to math

20   interventionist.

21             MR. BAXTER:  And tell me what that is.

22             THE PANEL MEMBER:  This year is my first year.  I

23   will be doing pull out once we get the assessments done, and I

24   will be serving small groups of students who need additional

25   assistance in math to pull them up to grade level.
```

```
 1                    MR. BAXTER:  Do you know about Saturday school out
 2      at William B. Travis?
 3                    THE PANEL MEMBER:  Yes.
 4                    MR. BAXTER:  Do you plan on being involved in that?
 5                    THE PANEL MEMBER:  Yes, I do.
 6                    MR. BAXTER:  Just for the education of the panel,
 7      tell them what Saturday school is.
 8                    THE PANEL MEMBER:  Saturday school is when we come
 9      out and -- bring the students who need the additional
10      assistance, and the teachers come out and assist those
11      students.  And we do things that are not traditional in the
12      classroom to give them different opportunities to learn in
13      multiple ways.
14                    MR. BAXTER:  Okay.  Thank you, ma'am.
15          I appreciate it.  Is there anybody that knows any reason
16      why they could not be a fair and impartial jury in this case?
17      Anybody at all?  Because of the money?  Because it's a damages
18      only trial?  Anything of the sort?  Or you just don't like the
19      judicial system for whatever reason?  Don't like lawsuits,
20      don't like being here, whatever it is.  Is there anybody that
21      has any issue whatsoever?
22          If not, Your Honor, I thank you very much for your time.
23                    THE COURT:  All right.  Ms. Smith, you may address
24      the panel on behalf of the Defendant.  Would you like a
25      warning on your time?
```

 1          MS. SMITH:  I would, Your Honor, five minutes,

 2   please.

 3          THE COURT:  All right.  I'll warn you when you have

 4   five minutes remaining.

 5          MS. SMITH:  Thank you.

 6          THE COURT:  You may proceed when you are ready.

 7          MS. SMITH:  May it please the Court.

 8      Good morning, everybody.  Again, my name is Melissa

 9   Smith, and I'm here today to represent Apple along with Mr.

10   Mueller.

11      I will start this morning with the most important thing

12   that I'll do all day, and that's to thank you.  I know when

13   you get a jury summons in the mail, it's probably not good

14   news.  I know that you have many obligations, and every minute

15   that you spend here is a minute that you don't have for your

16   family, your friends, your work.

17      I also know that some of you started your service last

18   week when you took time to fill out this jury questionnaire.

19   And so we appreciate -- on behalf of Apple, we appreciate your

20   time today and preparation for today.

21      Now, I'll do as His Honor and the other lawyers have

22   done, I'll tell you a little bit about myself.  I went to the

23   University of Texas undergrad, and then as Judge Gilstrap did,

24   I went to Baylor Law School.  That's been 24 years ago.

25      I moved -- I went straight from Baylor to Jefferson,

 1     Texas, and I took a job here with a firm in Marshall.  The

 2     gentleman that hired me, his name is Gil Gillam.  He has been

 3     my partner.  At some point I convinced him that I should be

 4     his partner rather than his associate, and we've been partners

 5     for the last 24 years.

 6          We have a firm called Gillam & Smith.  I'm the Smith.

 7     And some of you probably drove by it this morning on the way

 8     to the courthouse, it sits right behind this courthouse.

 9          Personally, I'm married.  My husband's name is Steven.

10     He used to be a police officer, but now he's a reserve officer

11     in Marion County.  We have two kids.  We have an

12     eight-year-old girl and a 10-year-old boy.  So when I'm not in

13     the courtroom, my little girl, or our little girl, spends her

14     time on a pony running the barrels, and our boy is getting

15     ready to play flag football this year.  So that's what keeps

16     me busy out of the courtroom.

17          Now, for those of you lucky enough to be chosen for this

18     panel, Mr. Mueller is going to tell you a little bit more

19     about himself in opening statement.

20          Now, you heard a little bit already about how Mr. Baxter

21     and the Plaintiffs view this case.  And as His Honor has told

22     you, this is a case -- it's easy in some respects because you

23     as jurors would be doing one task, and that's setting a FRAND

24     royalty rate for five patents.

25          Your Honor, may I use your document camera?

1          THE COURT:  You may.

2          MS. SMITH:  Thank you.

3      Now, we see that same language that Mr. Baxter referred

4  you to, and I'm going to -- for those of you that serve on

5  this panel, we are going to wear you out.  You are going to

6  hear a lot about FRAND because, again, that's the only issue

7  in the case.

8      So fair -- the F starts us off, and F stands for fair.  R

9  is reasonable.  We see And, and ND for nondiscriminatory.

10     Now, I'm sure that all of you in your own lives want to

11 be treated fairly.  You want to be treated reasonably.  No one

12 wants to be treated unreasonably.  You don't want to be

13 singled out for what you are or who you are, and you don't

14 want to be discriminated against.  And that's exactly what

15 Apple is asking for in this courtroom.  We want to be treated

16 fair, reasonably, and we don't want to be discriminated

17 against.

18     Now, you're going to learn that the five patents, and

19 we're talking about five patents in this case, are all subject

20 to an actual requirement.  It's a requirement that the owners

21 of the patents allow others, anyone in the world, to use their

22 patents if you pay fair, reasonable, and nondiscriminatory

23 terms.

24     And this is where it gets a little bit interesting and

25 jurors are sometimes surprised.  To do your task as a juror in

1    this case, you have to go back to 2012 and at a negotiating

2    table.  And I've got a little picture here.  See our

3    negotiating table here.  And this is a hypothetical

4    negotiation.

5         So it's a negotiation that didn't actually happen, but

6    it's what would have happened between the owners of these

7    patents, the original owners of the patents that aren't in the

8    courtroom today.  So it's going to be a negotiation between

9    Apple on one side and Panasonic, Samsung, and LG, the

10   inventors, the original inventors and owners on the other

11   side.

12        So what I'm going to use my precious little time to visit

13   with you about today is your views on how you might approach

14   taking a look at this type of negotiation.

15        Now, I want to start out by talking to you about Apple.

16   Mr. Baxter already asked you, and I saw maybe a showing of

17   hands, who owns an Apple product?  All right.  Might be easier

18   to say, who does not own -- who has never owned an Apple

19   product?  Juror No. 3; 7; 14; Mr. Phelps, who's No. 8; and

20   Juror No. 21.  All right.

21        For those of you that have owned Apple products, I'm

22   interested in your experience with the products.  Anybody have

23   any unfortunate experience with an Apple product you own, any

24   problems, troubles with it?

25        Juror No. 13.  I thought you might say that.  Tell me

1    about that, sir, Mr. Gutierrez.

2              THE PANEL MEMBER:  My problem is Apple's supposition

3    to right to repair.  iPad, my iPhone screen broke.  I cannot

4    find parts, and I do not want to pay $400 for the company to

5    repair it for me when I can just do it easily at home.

6         And once I did get a part, it disabled every display

7    feature in it and it only left me with a blank display.  It

8    worked.  It just disabled Truetone and other things like the

9    cameras and things like that.  And I just believe that it's

10   not right.

11             MS. SMITH:  And I'm going to keep you up, please,

12   for a moment.  And I appreciate your honesty, and that's

13   exactly what we're looking for in this exercise.

14        Now, as Apple's lawyer, I probably have a reason to be a

15   little bit concerned about you, do I not?

16             THE PANEL MEMBER:  You may.

17             MS. SMITH:  Okay.  All right.  Well, given your

18   experience with Apple and your frustrations that you shared

19   with me, I can tell you if you do not serve on this jury,

20   there will be -- judge Gilstrap will give you another

21   opportunity.  So do you think you might be a better fit for a

22   different jury that Apple's not involved in?

23             THE PANEL MEMBER:  Well, I don't think so because

24   this has really nothing to do with the situation that I had

25   problems with.  I just -- I don't know what the situation is

```
 1    yet, so --

 2               MS. SMITH:  So both sides are starting out equally,

 3    sir?

 4               THE PANEL MEMBER:  Yes.

 5               MS. SMITH:  Thank you.

 6               THE PANEL MEMBER:  Any problem I may have with

 7    Apple, I still haven't heard anything about the case.

 8               MS. SMITH:  I appreciate that.  Thank you, sir.

 9         All right.  Any other Apple product owners that have had

10    an issue with an Apple product?  All right.

11         Does anybody have a negative view of Apple generally?

12    You know, my kids are always interested in what I'm doing at

13    work, and I tell my little boy that I was going to go work on

14    an Apple case.  And he said, gosh, I saw way too many Apple

15    commercials interrupting the Olympics, because we've been

16    watching a lot of Olympics.

17         So for any reason, you know, any reason somebody thinks

18    that maybe Apple isn't starting off on the same place or you

19    have generally a negative view of Apple?  Yes.  Juror No. 23,

20    Mr. Givens.  Tell me about that.

21               THE PANEL MEMBER:  Honestly, from a standard of

22    business practice foundation, I mean, I could tell you a story

23    if you'd like.  There's really no need in it.

24               MS. SMITH:  Okay.

25               THE PANEL MEMBER:  But, I mean, I just don't prefer
```

```
 1     Apple -- I don't prefer Apple products.  They are impossible

 2     to work on.  I use Android, and Android devices are easier to

 3     work on, easier to program.  I mean --

 4              MS. SMITH:  I appreciate your honesty.  Thank you,

 5     sir.

 6          All right.  A little bit different question.  Mr. Baxter

 7     put up a slide that told you-all that they're going to be

 8     asking Apple to pay, he said, $506 million, but I believe over

 9     a half billion, billion dollars, in this case.

10          Is there anybody sitting there right now that says, you

11     know, Apple can pay, Apple may be able to pay that, it's a big

12     company, so they should pay.

13          Mr. Gutierrez, I see you are shaking your head a little.

14     I've already spoken with you.

15          Is there anyone else that might have that feeling?  Thank

16     you.

17          Is there anyone out there that thinks, well, you know,

18     it's not easy, you know, it takes a while to get to the

19     courthouse.  You know, this case has made it all the way to

20     the courthouse so the Plaintiffs deserve that kind of money.

21     Anybody have that feeling just by virtue of making it this far

22     to trial?

23          Now, looking back at the screen again, we're going to be

24     talking about this negotiation between Apple and Panasonic and

25     Samsung and LG.  And is there anyone who hasn't heard of
```

1    Panasonic, Samsung, and LG?  Those are household names.  We've

2    all heard of those.  Okay.  Shaking your heads.

3        Now, Samsung and LG are Korean companies.  Has anybody

4    ever lived in Korea?  A show of hands.  Okay.

5        And Panasonic is a Japanese company.  Has anybody ever

6    lived over in Japan?  Okay.  I see no hands.

7        Let's talk a little bit about folks that own Samsung, LG,

8    and Panasonic products.  A showing of hands if you own

9    products by any of these folks, any of these companies on the

10   right-hand side of the screen?

11       I knew you were going to raise your hand, Mr. Gutierrez.

12       If you would keep your hands up.  All right.

13       Let me talk to Juror No. 4.  Ms. Hamilton, what do you

14   own?

15               THE PANEL MEMBER:  A Samsung TV?

16               MS. SMITH:  All right.  You've had that for a while,

17   you're happy with it?

18               THE PANEL MEMBER:  Yeah.

19               MS. SMITH:  Okay.  There are some people that, you

20   know, buy a TV, they're are happy with it.  And then there are

21   some people that are really, really loyal, brand loyalists,

22   they have eight Samsung TVs in their house or a refrigerator,

23   something like that.  Does that describe you?

24               THE PANEL MEMBER:  No.  We just buy whatever looks

25   appealing at the time or whatever meets our need at the time.

```
 1                   MS. SMITH:  Okay.

 2                   THE PANEL MEMBER:  It's not one product or another.

 3                   MS. SMITH:  I appreciate that, ma'am.  Thank you.

 4            Now, anybody else had raised their hand that owns these

 5     Panasonic, Samsung, and LG products that is what I call kind

 6     of a brand loyalist, it's all you buy, all you've ever bought,

 7     and are really loyal to one of these three brands?

 8            Juror No. 6, I believe you raised your hand.  What kind

 9     of products do you own?

10                   THE PANEL MEMBER:  Television.

11                   THE COURT:  Okay.  Any problem with the fact that

12     you own -- is it Samsung?

13                   THE PANEL MEMBER:  Yes.

14                   MS. SMITH:  A Samsung TV, and there is going to be

15     this negotiation between Apple and Samsung, does that start

16     you leaning one way or the other?

17                   THE PANEL MEMBER:  No, it does not.

18                   MS. SMITH:  Thank you, ma'am.  I appreciate that.

19            All right.  Before I go further down the road, I want to

20     talk about the folks seated over here at the table with Mr.

21     Baxter.  Mr. Baxter mentioned his wife, and we talked about

22     Judge Parish.  Judge Parish is married to Todd Parish.  Does

23     anyone know Todd Parish?

24                   THE PANEL MEMBER:  I sort of resent that.

25                   MS. SMITH:  Oh, I'm sorry.  I'm sorry.  Todd Parish
```

1    is Mr. Baxter's brother-in-law --

2              MR. BAXTER:  That's correct.

3              MS. SMITH:  -- married to his sister.  I didn't mean

4    to insinuate anything.  Mr. Baxter is married to Todd's -- to

5    Lauren Parish, and Todd Parish is his sister --

6    brother-in-law.

7         There's a lot of Parishes.  I'm struggling here.  That's

8    probably a better question because my next question is going

9    to be about Welby Parish.  Who knows a Parish beyond Judge

10   Parish in the room?

11        Ms. King, did you teach them all?

12             THE PANEL MEMBER:  I did not teach them all.  I did

13   know Will Parish, and I do know Todd, and I knew the baby

14   girl, too.  However, I didn't even put him with Lauren Parish

15   until he mentioned it himself.

16             MS. SMITH:  I think they're newly married, and he's

17   a new resident of Gilmer, I believe.

18             THE PANEL MEMBER:  Right.  Okay.  So, in other

19   words, I didn't even associate him at all with Lauren.

20             MS. SMITH:  Ms. King, now that you have associated

21   him with Judge Parish, do I have anything to worry about, that

22   Mr. Baxter is sitting over here on one side and I'm on the

23   other side of the courtroom?

24             THE PANEL MEMBER:  God knows that you don't let one

25   person influence your feelings about another person --

```
 1              MS. SMITH:  Thank you.

 2              THE PANEL MEMBER:  -- that I know how to sort and

 3    separate.  I wouldn't have been successful in a classroom for

 4    41 and a half years if I didn't know how to put everything in

 5    its own place and its own time and not be prejudiced at any

 6    time with anyone, for or against.

 7              MS. SMITH:  Thank you.

 8              THE PANEL MEMBER:  My honest opinion is I'm waiting

 9    to see the facts, and I don't prejudge anyone or anything.

10              MS. SMITH:  Thank you, ma'am.  And that's exactly

11    what Apple is asking for in this case.  We appreciate it.

12         Reverend Chapman, you said that you knew Judge Parish

13    from church?  All right.  Anything about that relationship

14    that I should have to worry about?

15              THE PANEL MEMBER:  Absolutely not.

16              MS. SMITH:  All right.  Do you know any of the other

17    Parishes?

18              THE PANEL MEMBER:  No.

19              MS. SMITH:  They don't show up at church on Sunday?

20    What about --

21              THE COURT:  Sit down, Mr. Baxter.

22              MS. SMITH:  I actually did mean to insinuate that,

23    Your Honor.

24         All right.  Thank you, Reverend.  I appreciate it.

25         Other folks that are seated at the table, Ms. Truelove,
```

```
 1    Ms. Truelove has a husband, Curt Truelove.  He practices law

 2    in town here.  Anyone know the Trueloves?

 3         Judge George, casual acquaintance or something I should

 4    worry about?

 5              THE PANEL MEMBER:  Definitely casual acquaintance.

 6              MS. SMITH:  Okay.  But you have something else to

 7    tell me about that, Judge?

 8              THE PANEL MEMBER:  Oh, no.

 9              MS. SMITH:  All right.  Other folks that work with

10    Mr. Baxter, JoAnn Garrett?  Judge George, I knew you were

11    going to raise your hand on that one.  All right.

12         All right.  We see up here my three companies over here,

13    Panasonic, Samsung, and LG, and we see Apple on the other

14    side.  Who thinks competition is a good thing generally?  We

15    all agree competition is a good thing?

16         No. 7, you are shaking your head yes.

17         All right.  So let me choose someone.  How about Juror

18    No. 2, Mr. Jirka?

19              THE PANEL MEMBER:  Yes.

20              MS. SMITH:  All right.  I'm going to give you a

21    hypothetical.  We've got Ford Motor on one side, we've got

22    Toyota Nissan and Hyundai on the other side.  They are

23    negotiating a deal.  Do you think those three automakers,

24    Toyota, Nissan, and Hyundai, when they're against Ford, do you

25    think they might be motivated to give Ford a fair and a
```

1   reasonable deal?

2           THE PANEL MEMBER:  Depends on what they're

3   negotiating for and what Ford is willing to give Toyota and

4   the other three as well.

5           MS. SMITH:  Okay.  What if -- do you think that

6   Nissan and Hyundai and Toyota would want to get the absolute

7   most money out of Ford regardless of the facts because it

8   would further their interests?

9           THE PANEL MEMBER:  Yeah, definitely.  I mean, that's

10  the job of the negotiator.

11          MS. SMITH:  Thank you, sir.

12       All right.  Let's take it a step further.  Is there

13  anybody that would agree -- and you can sit down, sir.

14       Is there anybody that would agree?  And we haven't heard

15  from Juror No. 14, Ms. Berryman.  Do you think big companies

16  can do whatever it takes to win a competition even if it means

17  not being fair or being reasonable?

18          THE PANEL MEMBER:  No, to be truthful.

19          MS. SMITH:  Do you think companies should play by

20  the rules just like individuals do?

21          THE PANEL MEMBER:  Yes.

22          MS. SMITH:  Okay.  Do you also think companies, if

23  they make a deal, kind of like when you make a deal, a deal's

24  a deal and they have to stick to it?

25          THE PANEL MEMBER:  Yes, ma'am.

```
 1              MS. SMITH:  All right.  Thank you, ma'am.

 2         Is there anyone that would agree with the statement that

 3    it's okay to file a lawsuit to get ahead in competition?

 4    Anybody agree with that statement?

 5         All right.  Did any -- has anybody ever heard of the five

 6    companies that are Plaintiffs in this suit, the Optis

 7    companies?  I don't think they make a product or sell a

 8    product, but had anybody heart of the Optis companies before

 9    coming into court today?  I see a lot of head nods no.

10         Now let's see who I'm going to call on next.  How about

11    Juror No. 3, Mr. Anderson?  Have you ever bought a car, Mr.

12    Anderson?

13              THE PANEL MEMBER:  Ma'am?

14              MS. SMITH:  You purchased some cars throughout life

15    I assume?

16              THE PANEL MEMBER:  Yes.

17              MS. SMITH:  All right.  Let's say you're going out

18    and you're going to buy a car.  What kind of a car do you want

19    to buy?  A truck?

20              THE PANEL MEMBER:  A Toyota.

21              MS. SMITH:  Okay.  I'm with you.  You're going to go

22    buy a Toyota, and one of the first things you might do, you

23    know, is look around and see what model you like and

24    comparison shop, maybe online or dealerships.  Is that

25    correct?
```

```
1              THE PANEL MEMBER:  Yes, ma'am.

2              MS. SMITH:  Okay.  So you've got your eye on a

3    Toyota.  And your neighbor buys that same Toyota, and they

4    come to you and say, well, I bought this Toyota at this

5    dealership yesterday for $35,000.

6         And you said, well, that sounds pretty good.  And you go

7    to the dealership the next day and you go to the salesman, and

8    you say, I'll give you $35,000 for that Toyota.  Okay?

9         And he says, well, no, that was yesterday.  Today that

10   same Toyota is worth $50,000.

11        Do you buy that Toyota?

12             THE PANEL MEMBER:  No.  I'm cheap.  I go for the

13   used.

14             MS. SMITH:  Okay.  Just keep with me, though.  Keep

15   with me.  Okay?

16        So you go to lunch, you go to lunch, and you shake your

17   head, and you say, well, you know, maybe I heard that wrong.

18   Maybe I heard that wrong.  So you give them the benefit of the

19   doubt.  You seem like a reasonable guy.  You give them the

20   benefit of the doubt.  You go back after lunch, and you say,

21   well, let's talk about that Toyota again.

22        And he says, well, it's a hundred thousand.

23             THE PANEL MEMBER:  That would be my luck.

24             MS. SMITH:  Well, we're not going to talk about luck

25   in this lawsuit, but we are going to talk about negotiations
```

 1    and what's reasonable.  Do you think that's a reasonable way

 2    to negotiate?

 3              THE PANEL MEMBER:  No, ma'am.

 4              MS. SMITH:  Okay.  Do you think if that salesman, in

 5    between the time he first met you and the next day when you

 6    came back, if he saw that you lived in a big house and you had

 7    lots of money, do you think if he took that into account and

 8    raised that price, that would be fair?

 9              THE PANEL MEMBER:  No.

10              MS. SMITH:  All right.  Thank you, sir.

11         I assume I have agreement if I asked you-all the same

12    question by raising your hands, that wouldn't be a fair way to

13    negotiate, would it?  That's not the negotiation we're all

14    used to where the price just escalates and keeps going up.  Is

15    that right?  All right.

16         Now, one of the ways I get to know you guys in these

17    exercises is kind of listening to how you would -- how would

18    you describe yourselves.  So the first group of people I want

19    to hear from with the raise of hands are those that would

20    describe themselves as the type that make quick decisions.

21         Do I have any quick decision makers on the panel?  Not a

22    single person?

23         Okay.  Ms. Ross, how would you categorize yourself?

24    Would you categorize yourself as a quick decision maker or

25    someone that takes time and gives thoughtful consideration to

1   every decision?

2           THE PANEL MEMBER:  I take a little time before I do

3   anything.

4           MS. SMITH:  Okay.  And here's where I'm going with

5   this, because in this case, as you've already seen, the

6   Plaintiff is going to stand up and they get to go first, and

7   then Apple is always going to go second.  So you're going to

8   hear from Mr. Baxter, and it may be a day or two before you

9   hear from Apple.

10      And so what's important for me to know is that

11  everybody's going to wait until you hear the whole story

12  before you make up your mind.  I see some head nods.

13      By a showing of hands, can I have an agreement that

14  everyone will wait?

15      I know, Ms. King, you will certainly because you told us

16  that earlier.

17      Showing of hands?  Juror No. 7, I see your head shaking.

18      All right.  A little bit different question.  Some folks

19  tend to make up their mind on their own.  They don't want any

20  outside influence.  They don't want anybody whispering in

21  their ear.  Other folks, they tend to rely upon others for

22  advice at times, whether it be experts or manuals or YouTube

23  videos.

24      Who are the folks that are kind of my lone wolfs that

25  like to make up their mind on their own without any outside

1    intervention and input?  Raise your hand.

2        Ms. King.  Judge George.  Juror No. 7, I haven't spoken

3    to you.  Mr. Woods, why do you put yourself in that category.

4            THE COURT:  Mr. Woods, wait until you get the

5    microphone, sir.

6            THE PANEL MEMBER:  Sorry.

7            THE COURT:  Thank you.

8            THE PANEL MEMBER:  I would like to hear all the

9    facts to make sure that I understand exactly what's going on.

10           MS. SMITH:  Okay.  And more often than not, after

11   you hear all the facts, you don't need anyone to help you make

12   a decision, you are confident making it on your own?

13           THE PANEL MEMBER:  Correct.

14           MS. SMITH:  Okay.  And not often after you make a

15   decision, do you get a little bit stubborn about that decision

16   and you don't want to change your mind?

17           THE PANEL MEMBER:  Usually if I make a decision, I

18   usually stick with it.

19           MS. SMITH:  Okay.  Thank you, sir.

20           THE COURT:  You have five minutes remaining,

21   counsel.

22           MS. SMITH:  Thank you, Your Honor.

23       Now, I think for those of you that end up serving, you're

24   going to hear that this case is not about punishment.  There

25   is no amount of money that anyone's going to ask for to punish

1    Apple or anyone else in the case.

2        But at times, you know, some folks get kind of emotional

3    about these cases, and they say, well, even if Judge Gilstrap

4    gives me that instruction, you know, I heard some testimony

5    from a witness and it made me mad, or that lawyer is really

6    aggravating me, and it's really more important for juries to

7    do justice rather than follow the law or the Judge's

8    instructions.

9        Does anyone believe that, have that belief in your heart

10   of hearts, that at times it's just more important for juries

11   to do justice than follow the law?  All right.

12       Mr. Baxter asked you some questions about the

13   half-billion dollar number he put up on the screen.  Here's a

14   different question.  Does anyone think -- we all read about

15   cases in the newspaper.  Does anyone think in the last few

16   years, you know, the money damages in lawsuits are too low?

17   You see a case and you think, I would have given more money

18   than that had I been on that jury.

19       Anyone have that thought?

20       Had anybody heard anything about this case prior to

21   coming to the courthouse today?  Anybody read anything online,

22   in the paper, anything like that?

23       Had anybody read anything about patent cases in East

24   Texas before coming to the courthouse today?  Anybody read

25   anything about patent cases in East Texas?  First time

1   anyone's heard about them?

2       Now, I'm going to end with probably the similar question

3   that Mr. Baxter ended with.  As lawyers, you know, we

4   can't -- you're sitting out there, and we're trying to get to

5   know you, and we can't know all the right questions to ask.  I

6   certainly don't know all the right questions to ask.

7       So is there somebody sitting there thinking, gosh, if Ms.

8   Smith would have just asked me this question, I would have

9   told her that I wouldn't be the best juror for this case?

10  Anyone have that thought?  All right.

11      Well, I will end where I started, and that's by thanking

12  you, thanking you for showing up, and thanks to you that are

13  lucky enough to be chosen to serve.

14      Thank you, Your Honor.

15          THE COURT:  Counsel, approach the bench, please.

16      (The following was had at the bench.)

17          THE COURT:  Mr. Baxter, does the Plaintiff have any

18  challenges for cause?

19          MR. BAXTER:  No, Your Honor.

20          THE COURT:  Ms. Smith, does the Defendant have

21  challenges for cause?

22          MS. SMITH:  No. 13 and 23.

23          THE COURT:  All right.  No. 4 and No. 7 and No. 14

24  have all indicated they may have a scheduling problem.  No.

25  13's been challenged for cause.  The next venire member who's

1    had anything raised regarding them is 23, Mr. Givens.  We're

2    going to seat eight jurors, and each side's going to get four

3    strikes.  That's a total of 16.

4        If, hypothetically, I were to release the three that have

5    indicated a scheduling problem, 4, 7, and 14, and if I were to

6    grant the challenge for cause on 13, hypothetically, that

7    still gives us more than enough jurors to seat a jury before

8    getting to 23.  Do you-all agree with that?

9                MR. BAXTER:  Yes, Your Honor.

10               MS. SMITH:  Yes.

11               THE COURT:  So I'm going to recess the jury panel

12   and hold back 4, 7, 13, and 14.  And even though Ms. Smith's

13   challenged 23 for cause and No. 24 has indicated a scheduling

14   issue, I see no reason to bring them to the bench if we can

15   seat a jury without having to get that far.  Does everybody

16   agree?

17               MS. SMITH:  Agree.

18               MR. BAXTER:  Yes, Your Honor.

19               THE COURT:  All right.  If you will take your places

20   at counsel table, I will bring you back up after I recess the

21   jury.

22               (The following was had in the presence and hearing

23               of the jury panel.)

24               THE COURT:  Ladies and gentlemen, I'm about to

25   excuse those of you on the venire panel for a recess.  And in

 1    just a minute when you recess, ladies and gentlemen, if you'll

 2    exit through the double doors in the back of the courtroom.

 3    As you go out those double doors, if you take a left and go

 4    around the corner, you'll find two important things--the water

 5    fountain and the bathrooms.  Feel free to take advantage of

 6    either or both during this recess.

 7        Also, I'm going to ask you to stay in the building, don't

 8    go outside, but you'll be outside of the courtroom during this

 9    recess.

10        Also, ladies and gentlemen, don't hesitate to be friendly

11    or have a conversation with anybody else that you'd like to on

12    the venire panel.

13        I often get lawyers who ask the question, is there

14    anybody on the panel that knows anybody else on the panel.

15    Maybe some of you know one or two other members that are here

16    today.  If you'd like to speak and have a conversation, that's

17    fine, but don't discuss anything that's happened in the

18    courtroom this morning.  Don't discuss anything you've heard

19    in the courtroom this morning.

20        And let me remind you of this.  You have heard absolutely

21    no evidence in this case; none whatsoever.  So talk about the

22    August weather in Texas, talk about how many Parishes you can

23    count, talk about the Big 12 and what a fiasco that is going

24    to be for football in Texas, talk about whatever you want to

25    talk about, but don't talk about anything that's happened in

1    the courtroom this morning or that you've heard since you've

2    been in the courtroom this morning.

3         Also, there are just a couple of you that I'm going to

4    ask to stay behind and not leave the courtroom during this

5    recess so that I can have an opportunity to talk to you

6    privately here at the bench.  And those are No. 4, Ms.

7    Hamilton; No. 7, Mr. Woods; No. 13, Mr. Gutierrez; and No. 14,

8    Ms. Berryman.  If you four will simply let those around you

9    slip by you when they recess and stay in your seats, I'll

10   visit with you one at a time here at the bench.

11        All right, ladies and gentlemen.  Those of you on the

12   panel except those four that identified are excused for recess

13   at this time.

14             (Whereupon, the jury panel left the courtroom.)

15             THE COURT:  Please be seated.

16        Counsel, approach the bench, please.

17             (The following was had at the bench.)

18             THE COURT:  Ms. Hamilton, will you come up here and

19   join us, please?

20        Good morning.

21             THE PANEL MEMBER:  Good morning.

22             THE COURT:  This is our microphone.  We are going to

23   talk quietly here at the bench.  The lawyers are going to

24   listen in.

25        When we began this morning, I indicated that this trial

1    is probably going to go through Friday or maybe even Monday of

2    next week, and I asked if there was anybody that had a serious

3    hardship about being able to be present during that time if

4    they were selected.  And you raised your hand.  So tell me

5    about that, please.

6              THE PANEL MEMBER:  My husband is sick.  He is

7    scheduled for surgery tomorrow, but now they realized that

8    there may be some complications with his medication.  So

9    they're talking like it may be moved to next week, but at this

10   point we don't know.

11             THE COURT:  Okay.  And I don't want to pry into his

12   or her -- your personal affairs, but is this day surgery where

13   you come in and leave the same day?  Do they put you in the

14   hospital and keep you?

15             THE PANEL MEMBER:  No, he has to stay overnight.

16             THE COURT:  Where is this scheduled to happen?

17             THE PANEL MEMBER:  Texarkana at St. Michael's.

18             THE COURT:  All right.  Mr. Baxter, any questions

19   you have of Ms. Hamilton?

20             MR. BAXTER:  No, Judge.

21             THE COURT:  Ms. Smith?

22             MS. SMITH:  No, Your Honor.

23             THE COURT:  All right.  Ms. Hamilton, I'm going to

24   let you join the rest of the panel outside.  Just don't

25   discuss anything we talked about in here.

```
 1                THE PANEL MEMBER:  All right.  Thank you.

 2                THE COURT:  Thank you, ma'am.

 3                (The panel member left the courtroom.)

 4                THE COURT:  I'm going to excuse Ms. Hamilton.

 5        Mr. Woods, would you come join us, sir?

 6        Good morning, Mr. Woods.

 7                THE PANEL MEMBER:  Good morning, sir.

 8                THE COURT:  This is our microphone.  We are just

 9      going to talk quietly here.

10          This morning when we started, you indicated that you

11      might have a scheduling problem about being here through the

12      trial if you were selected.  You raised your hand when I asked

13      if anybody had a reason why they might not be able to be here

14      through Friday or even Monday of next week?

15                THE PANEL MEMBER:  Yes, sir.

16                THE COURT:  Tell me what that is please.

17                THE PANEL MEMBER:  My daughter flew in from Maryland

18      yesterday.  Her brother is on life support, and so we -- this

19      morning when she called, they said they didn't know how long

20      he was going to make it.

21                THE COURT:  Now, it's her brother, is that --

22                THE PANEL MEMBER:  It's her half brother.

23                THE COURT:  And how is the person on life support

24      related to you?

25                THE PANEL MEMBER:  He's not related to me.  He's
```

1    just related to my daughter.

2           THE COURT:  Okay.  It's your daughter's half

3    sibling?

4           THE PANEL MEMBER:  Half brother, yes, sir.

5           THE COURT:  But you are not his father?

6           THE PANEL MEMBER:  No, sir.

7           THE COURT:  Okay.  And where is he in the hospital?

8           THE PANEL MEMBER:  In Paris -- in Plano, Texas --

9           THE COURT:  Okay.

10          THE PANEL MEMBER:  -- which is not a big problem if

11   he passes, you know, I would hate to not be there for her.

12          THE COURT:  Okay.  So he's --

13          THE PANEL MEMBER:  Having heart failure.

14          THE COURT:  All right, sir.  I know all things being

15   considered, you'd like to be there with your daughter.

16          THE PANEL MEMBER:  Yes, sir.

17          THE COURT:  But given that this gentleman is no

18   relation to you --

19          THE PANEL MEMBER:  Right.

20          THE COURT:  -- is it something you feel like you

21   really have to do, or are you going to -- is your daughter

22   going to be very, very upset with you if you're not there to

23   hold her hand while she sits there in the hospital?  Tell me

24   the situation.

25          THE PANEL MEMBER:  No.  I'm just talking about if he

```
 1   died -- she's at the hospital with him.  She's spending the

 2   night with him.  It's not -- I am saying if he should pass.

 3            THE COURT:  Now, is he from the Plano area or if he

 4   should pass away --

 5            THE PANEL MEMBER:  He's from Paris.

 6            THE COURT:  Paris, Texas?

 7            THE PANEL MEMBER:  Yes.

 8            THE COURT:  And if there were a funeral or

 9   something, that's where it would be?

10            THE PANEL MEMBER:  It would be in Paris.

11            THE COURT:  Okay.  And what's the most current

12   information you've been told about whether he's going to be

13   here days or weeks or how long is it going to be?

14            THE PANEL MEMBER:  Well, she said the cardiologist

15   said they just don't know because his heart is only pumping

16   about six percent.

17            THE COURT:  Okay.  All right.  Is there anything

18   else about you being available to serve on this jury if you

19   were selected that we haven't talked about?

20            THE PANEL MEMBER:  No, sir.

21            THE COURT:  Okay.  All right.  Mr. Woods, I'm going

22   to ask you to join the rest of the panel outside --

23            THE PANEL MEMBER:  Okay.

24            THE COURT:  -- for recess.  Just don't discuss

25   anything we talked about in here.
```

```
 1                 THE PANEL MEMBER:  Okay.

 2                 THE COURT:  Thank you.

 3                 (The panel member left the courtroom.)

 4                 THE COURT:  Mr. Baxter, Ms. Smith, clearly Mr.

 5     Woods, at least as I understand it, doesn't really have a

 6     problem with serving; he's just concerned about the

 7     possibility that his daughter's half sibling would pass away

 8     and he would need to be included at a funeral somewhere.

 9          And there is no way to know whether this individual is

10     going to be living days, weeks, or months from now, or if

11     he'll die in the next 30 minutes.

12          I'd hate to take him on this jury and then the death

13     occurs and he feels compelled to attend a service with his

14     daughter.  But as sure as I don't take him, the gentleman in

15     the hospital will be here two weeks from now or longer.  I

16     would welcome any input from either party.

17                 MR. BAXTER:  I don't want to be hardhearted about

18     it, Judge, but we'd like to him.

19                 THE COURT:  Ms. Smith, what's the Defendant's view

20     on this?

21                 MS. SMITH:  You know, I'm kind of soft, Your Honor.

22     If I were in his shoes, I would want to be able to attend a

23     funeral, and he sounded very convincing that that might be a

24     reality this week.

25                 THE COURT:  Well, it's an unknown, and that's the
```

1    problem.

2            MS. SMITH:  Yes, Your Honor.  I'll tell you, I'd

3    like to proceed with eight jurors.  If we got the situation

4    where he asked to be excused, I would like to proceed with

5    eight.

6            THE COURT:  I don't want to go into this trial

7    thinking we are not going to be keeping eight jurors.  I could

8    seat up to 12.  I am going to seat eight.  There are always

9    things that can come up that you have no prior expectation at

10   all that might make you have to release somebody.

11        I'm going to excuse Mr. Woods.

12           MS. SMITH:  Thank you.

13           THE COURT:  Mr. Gutierrez, would you join us,

14   please, sir?

15        Good morning.

16           THE PANEL MEMBER:  Good morning.

17           THE COURT:  This is our microphone.  We're just

18   going to talk quietly here.

19           THE PANEL MEMBER:  Yes, sir.

20           THE COURT:  Mr. Gutierrez, during the questioning

21   this morning, you talked a good bit about Apple, that you

22   didn't like their absence of repair parts and the cost of the

23   parts.  You said it's difficult to fight a trillion-dollar

24   company like Apple.  Although when you were asked if you could

25   be fair, you said you hadn't heard any evidence and you'd wait

1    to hear the evidence.

2        I guess my question is, you obviously have some prior

3    experience with the Defendant, it's not positive.  Can you

4    assure me that if you're on this jury, you will completely and

5    totally set that aside and only let the evidence that's

6    produced in this case weigh on your mind as to what a result

7    should be, or is there any chance in your mind you're going to

8    be influenced by those prior experiences despite your best

9    efforts and not be able to completely set that aside?

10       That's what I need to know.

11           THE PANEL MEMBER:  I can be impartial.  Like I said,

12   as I mentioned before, I haven't heard anything about this

13   case.  Regardless of whatever problems I may have with the

14   right to repair things, that really -- this has nothing to do

15   with that.  So unless I really know what the evidence on both

16   sides, I can't say one place is --

17           THE COURT:  All right.  And I'll be candid with you,

18   sir.  Your comment during the questioning this morning that

19   it's difficult to fight a trillion-dollar company really is a

20   little more concerning to me than the comment about parts and

21   repairs.

22       Is it your view that Apple is so big and so wealthy and

23   so powerful that they have an outsized or an unfair advantage

24   here, and are you going to go into this case if you're on the

25   jury thinking that?  Or is that something that you can tell me

```
1    will not influence your participation in this trial if you're

2    on the jury?

3              THE PANEL MEMBER:  Well, I don't think it's

4    impossible, but I certainly do think it's difficult.  But I

5    don't --

6              THE COURT:  You think what's difficult?

7              THE PANEL MEMBER:  Just battling a company with so

8    much money.

9              THE COURT:  Okay.  All right.

10        Ms. Smith, do you have questions for Mr. Gutierrez?

11             MS. SMITH:  Mr. Gutierrez, you said on your

12   questionnaire that you were against Apple.  Is that correct?

13             THE PANEL MEMBER:  Against Apple because of the

14   right to repair, not specifically.  I actually do like the

15   products.  It's just the fact that you can't repair them.

16             MS. SMITH:  Okay.  And that's not an isolated

17   incident you had with a single product.  That's a long-held

18   belief and experience across many Apple products.  Correct?

19             THE PANEL MEMBER:  I have had a Mac book.  I have

20   had a couple of iPhones.

21             MS. SMITH:  Okay.  And regardless of the facts of

22   this case, the Judge can instruct you to forget about that

23   bias you have, you'll still have a bias against Apple.  Is

24   that separate and apart from the facts of this case?

25             THE PANEL MEMBER:  Well, I mean, like I said, it's
```

1    not related to the case here, but I still would have my

2    opinion of the right to repair.

3              MS. SMITH:  Absolutely.  So unrelated to the facts

4    in this case, you have that bias generally against Apple.

5              THE PANEL MEMBER:  I suppose so, yeah.

6              MS. SMITH:  Okay.  And you said, while it wouldn't

7    be impossible to be up against a company like Apple, you said

8    it would be difficult, which means that certainly the scales

9    aren't starting out exactly even, are they?

10             THE PANEL MEMBER:  Well, like I said, no evidence

11   has been given and in my opinion, my judgment, I haven't seen

12   anything really to say either side is right or wrong.

13             MS. SMITH:  And you made the comment in open court

14   that Apple is a trillion-dollar company.  That's something

15   that you would feel free to share if you were on a jury and

16   you were deliberating about monetary damages with Apple.  Is

17   that correct, even if it wasn't evidence in the case?

18             THE PANEL MEMBER:  Sorry?

19             MS. SMITH:  You followed the net worth of Apple

20   being a trillion-dollar company, you said?

21             THE PANEL MEMBER:  Uh-huh.

22             MS. SMITH:  And that's something that you take back

23   in your deliberations when discussing damages in an Apple

24   case.  You'd have that knowledge and you'd share that

25   knowledge with others even if it wasn't evidence in this case?

```
 1              THE PANEL MEMBER:  I'm not understanding.  The

 2   company does have a lot of money, but regardless, I mean, the

 3   damages haven't been -- I'm really not understanding what

 4   the --

 5              MS. SMITH:  Okay.  Okay.  Thank you, sir.

 6              THE COURT:  Mr. Baxter, do you have any questions.

 7              MR. BAXTER:  I think you told the judge that you

 8   don't know any facts in this case, but the scales start out

 9   exactly equal.

10              THE COURT:  You're going to have to say yes or no,

11   Mr. Gutierrez.

12              THE PANEL MEMBER:  Yes, sir.

13              MR. BAXTER:  We're not ahead, Apple's not behind?

14              THE PANEL MEMBER:  Not in my opinion.

15              MR. BAXTER:  You could listen to the evidence and

16   make up your mind and maybe you rule for Plaintiff, maybe you

17   rule for Apple, but that's to be determined.  Is that right?

18              THE PANEL MEMBER:  Yes, sir.

19              THE COURT:  Mr. Gutierrez, let me just ask it one

20   more time.  Can you treat both of these companies fairly and

21   impartially and go into this with them in the same position

22   and let only the evidence in the case determine which one you

23   decide for later on?

24              THE PANEL MEMBER:  Yes, sir.

25              THE COURT:  Okay.  I'm going the let you join the
```

```
 1    rest of the panel outside.  Just don't discuss anything we

 2    talked about in here.

 3              THE PANEL MEMBER:  Yes, sir.

 4              THE COURT:  Thank you.

 5              (The panel member left the courtroom.)

 6              THE COURT:  I'm going to deny the Defendant's

 7    challenge for cause as to Mr. Gutierrez.

 8              MS. SMITH:  Thank you, Your Honor.

 9              THE COURT:  Ms. Berryman, would you come up, please?

10        Good morning, Ms. Berryman.

11              THE PANEL MEMBER:  Good morning.

12              THE COURT:  If you'll come up and take your mask

13    down.  This is our microphone.  We're going to talk quietly

14    here.

15        When we started this morning, I indicated I thought the

16    trial would go through this Friday and maybe go into Monday of

17    next week.  And I asked if there were any reasons why, if

18    somebody on the panel couldn't be here that entire time, to

19    let me know and you raised your hand.  Tell me what was on

20    your mind what you were thinking about that.

21              THE PANEL MEMBER:  Oh, I have a daughter that has

22    lupus, and she has a doctor's appointment Thursday morning at

23    9:30.

24              THE COURT:  Okay.

25              THE PANEL MEMBER:  And she can't drive.  I'm her
```

 1    only transportation.

 2              THE COURT:  All right.  Now, I don't want to pry

 3    into your daughter's medical condition, but is this a routine

 4    appointment that could be rescheduled?

 5              THE PANEL MEMBER:  This is a rescheduled one,

 6    because my son was supposed to have took her on her

 7    appointment last month and he ended up being called -- it was

 8    his off day.  He ended up being called for work, and --

 9              THE COURT:  He wasn't able to take her?

10              THE PANEL MEMBER:  Yeah.  So we rescheduled

11    for -- she rescheduled it for Thursday, and I took off work so

12    I can take her.

13              THE COURT:  I understand.

14              THE PANEL MEMBER:  Because she's in like kidney

15    failure and heart failure.

16              THE COURT:  Okay.  That's what I'm trying to

17    determine.  Is this just a simple follow-up appointment where

18    a doctor's going to look at her for 10 or 15 minutes and send

19    her home?

20              THE PANEL MEMBER:  Oh, yeah.

21              THE COURT:  Or does she have a serious problem that

22    she may be going into the hospital?

23              THE PANEL MEMBER:  She's not going into the

24    hospital, but she can't afford to be missing appointments

25    because when the pandemic was going on, we missed her doctor's

```
 1    appointment and you had to make another appointment like three
 2    months later.  And then my daughter ended up in the hospital
 3    with kidney and heart failure.  I don't want to miss another
 4    appointment.  That was scary.
 5              THE COURT:  All right.  Where is her doctor's
 6    appointment?
 7              THE PANEL MEMBER:  It's in Longview.
 8              THE COURT:  Okay.
 9              THE PANEL MEMBER:  She goes to Longview and she goes
10    to Dallas.
11              THE COURT:  And is there anybody else that you know
12    of that could take her if you were on this jury?
13              THE PANEL MEMBER:  No, because my daughter -- she
14    just started working at Christians Gift Shop.  So just my son,
15    me, my daughter.
16              THE COURT:  And your son couldn't take her?
17              THE PANEL MEMBER:  No.  He's working.
18              THE COURT:  Okay.  Is there anything else about this
19    situation that you haven't told me I need to know about?
20              THE PANEL MEMBER:  That's it.
21              THE COURT:  Okay.
22              THE PANEL MEMBER:  Just my daughter, got to go to
23    the doctor, and I don't want her being upset because she
24    already missed one appointment and she knows this is her life,
25    so she was super close to being on dialysis, so we can't
```

1    afford, you know --

2              THE COURT:  Ms. Berryman, I'm going to let you join

3    the rest of the panel for recess outside the courtroom.  Just

4    don't discuss anything we talked about in here.

5         Thank you, ma'am.

6              THE PANEL MEMBER:  Thank you.

7              (The panel member left the courtroom.)

8              THE COURT:  I'm going to excuse Ms. Berryman.

9         All right.  I've excused Ms. Hamilton, Mr. Woods, and Ms.

10   Berryman, but not Mr. Gutierrez.  That means three have been

11   excused.  That means you strike through 19.  Does everybody

12   agree with that?  Anybody disagree?

13        It's 11:30.  I'll give you until a quarter until 12:00 to

14   turn in your strike list to the courtroom deputy.  All right?

15             MR. BAXTER:  Through 19, Judge.

16             THE COURT:  That's my calculation.  Ms. Truelove is

17   nodding her head up and down.

18        All right.  Well, while counsel exercise their peremptory

19   challenges, the Court will stand in recess.

20                       (Brief recess.)

21             THE COURT:  Be seated, please.

22        Ladies and gentlemen, if you will listen when your name

23   is called and come forward and take your place in the jury

24   box, we're going to seat eight jurors total.  I'd like the

25   first four to position yourselves on the front row of the jury

```
 1    box and the second four, 5, 6, 7, and 8, to position

 2    yourselves on the second row of the jury box.

 3         Whoever is called as Juror No. 1, when you go to the

 4    front row of the jury box, if you will go all the way to the

 5    end and stand in front of the last chair.  Juror No. 2, you go

 6    to the front row of the jury box, go to the third chair from

 7    the end and stand in front of the third chair.  Leave an empty

 8    chair between Juror 1 and Juror 2.  The rest of the jurors do

 9    the same thing--leave an empty chair between you and the next

10    person in the jury box.

11         And then when Juror No. 5 goes in, the first person on

12    the second row, stand behind the first person on the first

13    row, and everybody will follow suit, and we'll end up with

14    four on the front row, four on the back row, and an empty seat

15    between everybody.  And that will be your assigned seat, for

16    lack of a better word, throughout the rest of the trial.

17         With that, I'm going to ask our Courtroom Deputy,

18    Ms. Brunson, to call the names of the eight of you that

19    have been selected as jurors in this case.

20         THE CLERK:  Vicki Ross, Steffani Chapman, Judy

21    Hilton, Gloria King, Steredrick Goodjoint, Nancy George, Tonya

22    Jordan, Andreas Floyd.

23         THE COURT:  Please be seated.

24    Those of you that were not selected to serve on this

25    jury, I am about to excuse you at this time, but I want to
```

 1    excuse you with the sincere thanks and gratitude of the Court

 2    for being here.

 3          Every one of you who appeared this morning for jury duty,

 4    even though you weren't selected, you have performed a very

 5    real and important and valuable public service by being here.

 6    Every one of you who showed up this morning had other places

 7    to be, other things to do that were important in your lives.

 8    You set those aside and you made a very real and tangible

 9    sacrifice as good citizens to appear and present yourselves

10    for jury duty in this case.

11          And even though you weren't selected, you've been an

12    integral part of the process, essential to the Court

13    discharging its obligation under the Constitution.  And I

14    cannot thank you enough for having made that sacrifice and

15    having been here and presented yourself as you did this

16    morning.

17          And even though you weren't selected, that in no way

18    takes away from what you've done, the importance of it, the

19    value of it, and the significance of it, and the Court thanks

20    you.  I speak for myself, I speak for these parties, I speak

21    for the lawyers, everyone on this side of the bar appreciates

22    and values what you've done by being here this morning.

23          As you leave the courtroom, if you'll exit through the

24    double doors and go to the right, you'll pass by the Clerk's

25    Office.  Ms. Clendening and her staff will be there.  She's

```
 1    going to want to recover these laminated numbers that you-all

 2    have clipped to your clothing.  She will be available to

 3    answer any questions you have about having been here this

 4    morning.

 5         If you need any documentation for an employer verifying

 6    where you've been and why you didn't show up for work this

 7    morning, she'll help you with that.  She'll address any

 8    questions or concerns that you have.

 9         Again, ladies and gentlemen, thank you so very much for

10    what you've done.  It's been very important and very

11    significant, and the Court thanks you again.

12         With that, those not selected to serve on this jury are

13    excused.

14              (Whereupon, the jury panel left the courtroom.)

15              THE COURT:  Everyone except the members of the jury,

16    please be seated.

17         Members of the jury, I'm going to ask Ms. Brunson, our

18    Courtroom Deputy, to administer the oath to you at this time.

19    If you'll raise your right hands.

20              (Whereupon, the oath was administered by the Clerk.)

21              THE COURT:  Please be seated.

22         Ladies and gentlemen, I told you this morning that as a

23    part of this process, lunch would be provided to you each day,

24    and I'm about to excuse you for lunch, which will be available

25    to you in the jury room.  But before I do, I have a couple of
```

1    important instructions I need to give you.

2         Do not discuss this case with anyone.  And when I say do

3    not discuss the case, I mean do not communicate about it in

4    any way with anyone.  One of the foundational principles of

5    the jury trial system is that the jury must have before it,

6    when it makes its decision and answers the questions that will

7    be put forth in the verdict form that you will receive and

8    consider after you have heard all the evidence, the sole

9    universe of the evidence and information that you have before

10   you when you answer those questions must be limited to the

11   evidence that comes in during this trial and the testimony

12   from the witnesses under oath and subject to

13   cross-examination, as well as any documents and exhibits that

14   the Court has admitted into evidence.

15        The evidence--the testimony of the witnesses, the

16   exhibits that the Court has admitted--that must constitute the

17   entirety of the material and the information that you draw

18   upon to answer the questions you're going to be asked at the

19   end of this trial.

20        You must not have any outside influences.  You must not

21   have any information of any kind from any source that comes

22   from anywhere other than the witnesses in this trial and the

23   exhibits that I have admitted into evidence.

24        Therefore, it is absolutely essential that you not

25   discuss or communicate about this case with anyone, because if

1    you do, you will be receiving information that did not come in

2    during the trial and it will call into question the entirety

3    of this process and could potentially require us to start over

4    with a new jury, and all the time and all the money and all

5    the resources and all the effort that has gone into this so

6    far could be in jeopardy.  So it is a very, very important

7    instruction that I give you when I say do not communicate

8    about this case with anyone in any way.

9        And, ladies and gentlemen, when I say that, that includes

10   the eight of you.  You are not to discuss this case among

11   yourselves in any way until you've heard all the evidence,

12   until I've given you my final instructions on the law that you

13   are to apply, and until counsel for the parties have presented

14   their closing arguments.

15       When that has happened, at that point I will instruct you

16   to retire to the jury room and to deliberate on your verdict.

17   At that point, ladies and gentlemen, it's like somebody has

18   flicked a light switch.  At that point you go from not being

19   able to discuss the case among yourselves to being required to

20   discuss the case among yourselves during your deliberations in

21   an effort to reach a unanimous decision about the questions

22   you're going to be asked to answer in the verdict form.

23       So until that point, until you've heard all the evidence,

24   you've heard my final charge on the law, and counsel have

25   presented their closing arguments and I have sent you to the

1    jury room to deliberate on the verdict, until that time, you

2    must not discuss or communicate about the case among

3    yourselves, as well as anybody else.

4        And when I say don't communicate about the case, that's

5    not just limited to oral conversation.  That's communication

6    of any type--oral, written, electronic, digital.  Those of you

7    on the jury that are active users of social media, don't post

8    anything on Facebook, don't tweet on Twitter, don't use

9    Instagram, don't use any social media platform to communicate

10   about this case in any way.

11       Don't do any research.  Don't go online at night and do a

12   search about any of the issues in this case, the lawyers in

13   this case, the parties in this case, the witnesses in this

14   case.  Don't do any outside research of any kind, whether it's

15   an online computer search or an encyclopedia pulled off a

16   shelf doing it the old-school way.  Don't do any research of

17   any kind.

18       And let me just say this.  Unless you live alone, when

19   you get home tonight, wherever that is, the first thing you

20   are going to hear when you walk through the door is, Tell me

21   what happened in federal court in Marshall today.  Don't even

22   try to answer that question, because if you even try to answer

23   that question, you're going to violate this very important

24   instruction that I'm giving you.

25       When you get that question, just simply smile and say,

 1    That very stern federal judge told me not to talk about this

 2    case with anyone, and I'm going to do that.  When the case is

 3    over and when I've been released as a juror, then I'll be able

 4    to talk with you about it.  But until then, I am not going to

 5    discuss this case with you or anybody else.

 6         So blame it on me, ladies and gentlemen, but don't even

 7    try to answer that question which, as I say, unless you live

 8    alone and unless your canary can't talk, you are going to get

 9    that question when you come through the door this evening.

10         Also, I don't think it's likely to happen, but I can't

11    tell you that this is beyond the realm of possibility, and

12    that is, it is possible that some outside third party might

13    try to contact you during this trial and communicate with you

14    and influence any decision that you ultimately are going to

15    make.  I don't think that's likely, but there are no

16    unimportant cases that get to a jury trial in federal court.

17    And this is an important case, and it is possible that some

18    outside party may try to improperly communicate with you or

19    influence you in some way.

20         If there is any kind of an overture made to you by anyone

21    that you feel is improper or out of order in any way, then you

22    should notify Ms. Clendening, she will let the Court know, and

23    the Court will deal with it.  Again, I don't think it's

24    likely, but I need you to know that it's not outside the realm

25    of possibility.

1        Also, ladies and gentlemen, over the course of this

2    trial, as you come in the mornings and leave in the evenings,

3    it's going to be inevitable that you are going to pass by

4    certain members of these two trial teams.  You're going to

5    walk by witnesses on the sidewalk.  You're going to walk by

6    lawyers in the hallways.  You're going to be in close contact

7    with the people involved in the trial of this case.  And I

8    want you to understand when that happens, they're not going to

9    speak to you.  They're not going to say, Good morning, how are

10   you today.  They're not going to be friendly and outgoing like

11   we all generally are in East Texas.

12       That's because I've instructed them not to be that way,

13   that's because I've instructed them not to speak to you or

14   communicate with you, and that's because the sole source of

15   the information you must have before you when this trial is at

16   an end and you are deliberating on your verdict must be only

17   the testimony given under oath and subject to

18   cross-examination from the witness stand and the exhibits that

19   the Court has admitted into evidence and have been presented

20   to you by the parties during the trial.  That must be all and

21   only the information that you have before you.

22       So when that happens, don't hold it against anybody,

23   either the Plaintiff's side, the Defendant's side, or anyone

24   else, when they're not friendly, when they're not gregarious

25   and engaging, when they don't speak to you and say, Good

1    morning, how are you today.  They're simply doing what the

2    Court has instructed them to do, and you need to keep that in

3    mind.

4        During the course of the trial -- we live in interesting

5    times, ladies and gentlemen.  During the course of the trial

6    if you have any physical problems, if any member of your

7    family has symptoms that indicate any possible exposure to

8    this pandemic, you need to let Ms. Clendening know and she'll

9    advise me and we will take it up and deal with it then.

10       I hope that's not going to happen, I think it's unlikely,

11   but you need to let us know if you or any family member you're

12   responsible for has a problem related to this current public

13   health emergency that we're dealing with.

14       Also, while you're on your lunch recess, which is going

15   to start in just a few seconds, please make an opportunity to

16   let Ms. Clendening's office have a good working cell phone

17   number for you.  It is possible that we might need to get in

18   touch with you over an evening or during a time when you're

19   not already here at the courthouse, and we would need a good

20   working cell phone number for each of you.  So simply try to

21   make that available to Ms. Clendening while you're at lunch

22   today.

23       And when we speak about cell phones, I'm going to ask

24   each of you, if you have a cell phone, a tablet, a smart

25   device of any kind, leave it in the jury room for the rest of

1    today.  And when you come back tomorrow, leave it in your car

2    or leave it at home.  Those kind of smart devices, as you well

3    know, do a lot more than tell time.  They do a lot more than

4    make a phone call.  They are basically mini computers, and the

5    temptation to search outside sources or information regarding

6    the case or the lawyers or the parties is just too tempting to

7    have those devices right there at the tip of your fingers.

8        So I'm going to ask you, starting tomorrow, not to bring

9    your smartphones or tablets or smart devices of any kind to

10   the courthouse.  If you're expecting an important email

11   regarding to your work or your business, there will be breaks

12   where you can go to your car and check that, but otherwise,

13   don't bring those devices into the courtroom because of the

14   temptation to violate my instructions and to look for outside

15   sources of information.

16       Now, you're going to see, over the course of the trial,

17   the lawyers have those kind of tablets and smart devices.

18   Those are tools of the trade these days for practicing law,

19   and they're under strict instructions from me to keep them

20   silent so they don't sound or ring or disrupt this trial in

21   any way, but they are entitled to use them.  And don't feel

22   badly toward them if you see them using them and you had to

23   leave yours at home or in your car.  But I'm going to ask you

24   to do that.

25       Also, ladies and gentlemen, while you're over the lunch

1    break, you're going to find in the jury room these plastic

2    see-through face shields that I mentioned to you earlier.

3    Please replace your face masks with a see-through face shield

4    and wear it when you come back into the courtroom, and wear it

5    through the rest of the trial whether you are vaccinated or

6    not vaccinated.

7         As I said, it's almost practically impossible to try a

8    jury trial without being able to see the complete faces, the

9    expressions, and read the faces of the jury.  So that will

10   accomplish that fact and it will still provide a level of

11   protection for everybody.

12        Now, it is almost 20 minutes after 12:00.  Lunch is in

13   the jury room waiting on you.  We'll try to reconvene as close

14   to 1:00 as possible.

15        With those instructions, ladies and gentlemen, you're

16   excused for lunch at this time.

17             (Whereupon, the jury left the courtroom.)

18             THE COURT:  Counsel, not to go terribly far over the

19   lunch break, I may want to see you in chambers before 1:00 to

20   pick up where we left off on some overnight disputes.

21   Otherwise, at least for the next 30 minutes, you're excused

22   for recess.

23        Court stands in recess.

24                  (Lunch recess.)

25             THE COURT:  Be seated, please.

Counsel, based on our discussions in chambers, I understand there are one or two matters you'd like to bring up with the Court before I bring in the jury.

Let me hear from you at this time.

MR. SHEASBY: Jason Sheasby for the Plaintiffs, Your Honor. Plaintiffs would like confirmation the Court has ruled that negotiation history can come in in front of the jury and has withdrawn its MIL on that subject.

THE COURT: That's my understanding. Does Defendant have anything different on that?

MR. MUELLER: Joe Mueller for the Defendant, Your Honor.

That's correct. We understand that to be Your Honor's ruling. And so I think the parties are in agreement that Your Honor has so ruled.

And if I could, Your Honor, if I could just take a moment to just very briefly preserve our own positions on these issues. We've done our best to memorialize in Docket No. 666 various rulings that Your Honor has made on issues in this case, including over the last couple of days.

We don't want to keep getting up to interrupt the proceedings, Your Honor. So we respectfully request the running objection with respect to those issues, for example, the admissibility of the Qualcomm agreement. So we respectfully request that that standing running objection as

1    opposed to interrupting the proceedings, Your Honor.

2             THE COURT:  I have no problem with the Defendants

3    having a running objection as outlined.

4             MR. MUELLER:  Thank you, Your Honor.  The final

5    issue is just, we understood, I just wanted to state on the

6    record, that your *Daubert* rulings are definitive.  We will, of

7    course, strictly comply with them, and we understand that we

8    do not need to repeatedly object to the relevant expert

9    opinions that were briefed in *Daubert*.

10            THE COURT:  That is my understanding, and that is

11   certainly my preference.  I want as few interruptions or

12   disruptions during the trial as possible, and at the same time

13   I don't intend to be an impediment to anybody preserving a

14   point that they believe they need to be preserved.

15            MR. MUELLER:  Thank you, Your Honor.

16       Finally, Mr. Sheasby and I conferred on the break that we

17   think, again, in the interest of avoiding interrupting the

18   proceedings, that we should seal the opening statements.

19   There's going to be some discussion of license negotiations

20   and certain agreements.  That has not only confidential

21   information of the parties but certain third parties.  And so

22   we would ask that the opening statements be sealed.

23       For Mr. Sheasby's opening statement, I believe he's going

24   to get into some information that Mr. Blasius cannot see.

25   It's third-party confidential.  Mr. Blasius can see my entire

```
 1    opening statement.  He's the corporate representative for

 2    Plaintiffs.

 3              THE COURT:  What's your understanding on that, Mr.

 4    Sheasby?

 5              MR. SHEASBY:  Your Honor, that is correct.  We are

 6    going to show some Qualcomm highly confidential information.

 7    There are two ways of doing it.  One, we can seal the entire

 8    opening.  Two, we can just seal -- we can go into seal when I

 9    show those slides.  I'll only do it once.

10       The issue is, is that I'm very tight on 30 minutes, and I

11    don't think I can both keep it at 30 minutes and seal in the

12    middle of it.

13              THE COURT:  I'll seal the entirety of Plaintiff's

14    opening statement as requested by both sides.

15              MR. SHEASBY:  And, Your Honor, I just want to be

16    clear on something.  On the withdrawal of the motion in limine

17    on licensed negotiations, my understanding is that Apple --

18    it's not a ruling over the opposition of Apple, it's just for

19    the purposes of appeal, that Apple invited licensing

20    negotiation history to come into the record.

21       And I'm a little troubled by the fact that Apple is

22    referring to this as your ruling, and the record is not clear

23    that it was a ruling requested by Apple.  And I just wanted to

24    make that record clear.

25              THE COURT:  Well, whatever the ways or means, I
```

```
 1    think it's clear at this point that neither side believes it's

 2    improper to go into that.

 3              MR. MUELLER:  Your Honor, I have to be correct on

 4    this stuff.  We did object.  Your Honor overruled the

 5    objection.  We're not withdrawing the MIL.

 6              THE COURT:  Okay.  We know where we stand now.  The

 7    record speaks for itself.

 8              MR. MUELLER:  Thank you, Your Honor.

 9              THE COURT:  All right.  Anything else before I bring

10    in the jury?

11              MR. MUELLER:  No, Your Honor.

12              MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

13              THE COURT:  All right.  Let's bring in the jury,

14    please.

15              (Whereupon, the jury entered the courtroom.)

16              THE COURT:  Please be seated, ladies and gentlemen.

17         Welcome back, members of the jury.  I now have some

18    preliminary instructions that I need to give you on the record

19    before we start with the opening statements from the attorneys

20    and then get on to the evidence.

21         You've now been sworn as the jurors in this case, and as

22    the jury, you are the sole judges of the facts.  As such, you

23    will decide and determine what all the facts are in this case.

24    As the Judge, I will give you instructions on the law; I will

25    decide issues of law, evidence, and procedure that arise
```

1    during the trial; I will oversee the conduct of the trial and

2    maintain the decorum of the courtroom.

3        At the end of the evidence, I'll give you detailed

4    instructions about the law that you are to apply in deciding

5    this case.  And at that time, I'll give you a list of

6    questions that you are then to answer.  This list of

7    questions, ladies and gentlemen, is called the verdict form,

8    and your answers to those questions will need to be unanimous,

9    and those unanimous answers to those questions will constitute

10   the jury's verdict in this case.

11       Now let me briefly tell you what's involved in this case.

12   I know you've all seen the patent film produced by the Federal

13   Judicial Center, but I need to give you some additional

14   instructions now and on the record.

15       Patents are granted or denied by the United States Patent

16   and Trademark Office, sometimes called the Patent Office,

17   sometimes simply called the PTO.  A valid United States patent

18   gives the holder, the patentholder, the right for up to 20

19   years from the date the application is filed to prevent others

20   from making, using, offering to sell, or selling the patented

21   invention within the United States, or importing it into the

22   United States without the patentholder's permission.

23       A patent is a form of property called an intellectual

24   property.  And like all other forms of property, a patent may

25   be bought or sold.  The process of obtaining a patent is

 1    called patent prosecution.  And to obtain a patent, one must

 2    first file an application with the PTO, the United States

 3    Patent and Trademark Office.  The PTO, ladies and gentlemen,

 4    is an agency of the United States government, and it employs

 5    trained examiners who review applications for patents.

 6         As I told you -- let me tell you that this process of

 7    evaluating patent applications goes back and forth between the

 8    examiner and the applicant for some time until the examiner is

 9    satisfied that the application meets all the requirements for

10    a patent.  And in that case the application issues as a United

11    States patent.  In the alternative, if the examiner ultimately

12    concludes that the application should be rejected, then no

13    patent issues.

14         Now, to help you follow the evidence, I'll give you a

15    brief summary of the positions of the two parties.  As you're

16    all aware, the party that brings a lawsuit is called the

17    plaintiff.  If there's more than one plaintiff, they are the

18    plaintiffs.  The plaintiffs, and there are more than one in

19    this case, are Optis Wireless Technology, LLC; Optis Cellular

20    Technology, LLC; PanOptis Patent Management, LLC; Unwired

21    Planet, LLC; and Unwired Planet International Limited, which

22    you're going to hear referred to throughout the trial,

23    collectively, either as Plaintiffs, Optis, or PanOptis.  Any

24    of those terms refer to these designated Plaintiffs in the

25    case.

1          And as you well know, the party against whom a lawsuit is

2     brought is called the defendant, and in this case the

3     Defendant is Apple, Inc., who you'll referred to simply as the

4     Defendant or as Apple.

5          Now, as I told you during jury selection, this is a case

6     to set a fair and reasonable damages award for already

7     established patent infringement.  There are five separate

8     United States patents that you're going to hear about during

9     this trial.

10         The first is U.S. Patent No. 8,019,332.  And as I'm sure

11    you know, patents are commonly referred to by their last three

12    digits, the last three digits of the patent number.  So in

13    this case, Patent No. 8,019,332 will be referred to as the

14    '332 patent.

15         The second is 8,385,284, which you'll hear referred to as

16    the '284 or the '284 Patent.

17         The third U.S. patent at issue is United States Patent

18    No. 8,411,557, which you'll hear referred to as the '557

19    Patent.

20         The fourth U.S. patent is United States Patent No.

21    8,102,833, which you'll hear called the '833 or the '833

22    patent.

23         And the fifth and final U.S. patent is United States

24    Patent No. 9,001,774, which you'll here called the '774

25    Patent, or the '774 Patent.

 1          These patents collectively may be referred to at various

 2     times in the case as the Patents-in-Suit.  You may also hear

 3     them referred to collectively as the asserted patents.  And

 4     these patents generally relate to cell phone technology.

 5          It's already been decided that certain Apple products

 6     infringe one or more claims of the asserted patent and the

 7     claims that the asserted patents are not invalid.  As a

 8     result, this trial is solely about setting a fair and

 9     reasonable compensation for that infringement.  This trial

10     will only be concerned with this issue.

11          Your job as the jury, ladies and gentlemen, is to

12     determine the amount of monetary damages to be awarded to the

13     Plaintiff as compensation for Apple's previously established

14     infringement.

15          Now, during the trial it's likely that you're going to

16     hear the Patents-in-Suit, the five patents I just mentioned,

17     being referred to as standard essential patents, or SEPs.

18     Standard essential patents, as I've mentioned, are patents

19     that have been declared to be part of a standard in a certain

20     field.  And this standard is set and maintained by a global

21     body to ensure that certain processes and devices operate and

22     work in the same way anywhere in the world.

23          Earlier, I gave you the example of a cell phone that

24     works in the United States, and if you fly across the Atlantic

25     ocean to London, England, when you get off of the airplane in

1    London, England, the same cell phone works there just like it

2    did in the United States.

3         Now, patents relating to such a common and standard

4    technology are recognized as impacting that standard

5    technology, and are contributed to and declared by their

6    owners to be essential to that standard.  These are called, as

7    I mentioned, standard essential patents.  And in this case the

8    five Patents-in-Suit have been declared by their owners to be

9    standard essential patents in the field of wireless

10   communications.

11        And in this case one of the global bodies that oversees

12   and maintains this standard is called the European

13   Telecommunications Standards Institute, or ETSI, which you'll

14   hear referred to throughout the case by those fourth letters

15   being pronounced ETSI.

16        Since the asserted patents are standard essential

17   patents, you're going to hear about the standard, and the

18   contribution of these patents to the standard, and the work of

19   ETSI regarding the standard, all as a part of this trial.  And

20   I'll give you more detailed instructions on this at the end of

21   the trial.

22        The Plaintiff, Optis, has agreed to license the

23   Patents-in-Suit as a part of one of these standards that I

24   mentioned on RAND, R-A-N-D, terms.  RAND stands for reasonable

25   and nondiscriminatory.  And the standard setting organizations

1    often require members to license to others to use standard

2    essential patents on these RAND, reasonable and

3    nondiscriminatory, terms.  Sometimes these terms are also

4    referred to as FRAND, fair, reasonable, and nondiscriminatory.

5    And I'll give you more detailed instructions on these matters

6    at the end of the trial.

7         Now, ladies and gentlemen, I know that there are a lot of

8    new words and new concepts that have been thrown at you since

9    you arrived here for jury duty this morning.  I'm going to

10   define a lot of these words and concepts for you as we go

11   through my instructions.  The attorneys are going to discuss

12   them with you in their opening statements.  The witnesses are

13   going to help you through their testimony to understand these

14   concepts and terms.

15        So, please, do not feel overwhelmed at this point.  I

16   promise you it will all come together as we go through the

17   trial.

18        Now, your job in this case is to decide what amount of

19   money damages, if any, to be awarded to the Plaintiffs as

20   compensation for the infringement of their five patents.  My

21   job in this case is to tell you what the law is, handle

22   rulings on evidence and procedure, and to oversee the trial as

23   efficiently and effectively as possible.

24        In deciding the issues that are before you, you will be

25   asked to consider specifically the rules, and I'll give you an

1    overview of those rules now, and then at the conclusion of the

2    case I'll give you more detailed instructions.

3         The first and only issue that you're going to be asked to

4    decide in this case is what amount of money damages should be

5    awarded to the Plaintiffs Optis to compensate it for Apple's

6    previously established infringement.

7         A damages award, ladies and gentlemen, must be adequate

8    to compensate the patentholder for the infringement, and in no

9    event may a damage award be less than what the patentholder

10   would have received had it been paid a reasonable royalty for

11   the use of its patents.

12        However, the damages that you award, if any, are meant to

13   compensate the patentholder and they are not meant to punish

14   the Defendant.  You may not include in any damages award an

15   additional amount as a fine or a penalty above what is

16   necessary to fully compensate the patentholder for the

17   infringement.

18        Additionally, damages cannot be speculative, and the

19   Plaintiffs in this case, Optis, must prove the amount of their

20   damages to you for this infringement by a preponderance of the

21   evidence.

22        In this case, the Plaintiffs are seeking damages for the

23   period from February the 25th, 2019, to August the 3rd, 2020.

24   February the 25th, 2019, to August the 3rd, 2020.  And I'll

25   give you more detailed instructions about the calculation of

1    damages at the conclusion of the trial, including giving you

2    specific instructions with regard to the calculation of a

3    reasonable royalty.

4         Now, you're going to be hearing from a number of

5    witnesses over the course of the trial, ladies and gentlemen,

6    and I want you to keep an open mind while you're listening to

7    the evidence and not decide any of the facts until you've

8    heard all of the evidence.  This is important.

9         While the witnesses are testifying during the trial,

10   remember you, the jury, will have to decide the degree of

11   credibility and believability to allocate to each of the

12   witnesses and to all of the evidence.

13        So while the witnesses are testifying, you should be

14   asking yourselves things like this:  Does the witness impress

15   you as being truthful?  Does he or she have a reason not to

16   tell the truth?  Does he or she have any personal interest in

17   the outcome of the case?  Does the witness seem to have a good

18   memory?  Did he or she have the opportunity and ability to

19   observe accurately the things that they testified about?  Did

20   the witness appear to understand the questions clearly and

21   answer them directly?  And, of course, does the witness'

22   testimony differ from the testimony of other witnesses.  And

23   if it does, how does it differ?

24        These are some of the kinds of things you should be

25   thinking about while you're listening to each witness over the

1    course of this trial.

2         Also, I want to talk to you briefly about expert

3    witnesses.  When knowledge of a technical subject may be

4    helpful to the jury, a person who has special training and

5    experience in that particular field, we call them an expert

6    witness, is permitted to testify to the jury about his or her

7    opinions on those technical matters.

8         However, ladies and gentlemen, you're not to required to

9    accept an expert witness or any witness' opinions at all.

10   It's up to you to decide who to believe and who not to believe

11   and whether a witness is telling you what is correct or

12   incorrect.

13        Now, I anticipate that over the course of this trial

14   there will be expert witnesses testifying in support of each

15   side of this case.  But when that happens, it will be up to

16   you to listen to their qualifications.  And when they give you

17   an opinion and explain the basis for that opinion, you will

18   have to evaluate what they say, whether you believe it, and to

19   what degree, if any, that you want to give it weight.

20        Remember, ladies and gentlemen, judging and evaluating

21   the credibility and believability of each and every witness is

22   an important part of your job as jurors.

23        Now, during the course of the trial, it's possible that

24   there will be testimony from one or more witnesses that are

25   going to be presented to you through what's called a

1    deposition.  In trials like this, it's very difficult to get

2    every witness here at the same time.  So before the trial

3    begins, the lawyers for both sides take the depositions of the

4    witnesses in advance of the trial.

5         In a deposition, the witness is present, they are sworn

6    and placed under oath, a court reporter is present, and the

7    witness is asked questions by counsel for the parties, and the

8    witness answers those questions, and both the questions asked

9    and the answers given are taken down and recorded.  They are

10   often recorded by video-recording equipment.

11        Portions of those recordings of those questions and their

12   answers may be played back to you as part of this trial so

13   that you can see the witness and hear their testimony.  This

14   deposition testimony is entitled to the same consideration

15   insofar as possible, and needs to be judged by you as to the

16   credibility, weight, and otherwise considered in the same way

17   as if the witness had been physically present and given their

18   testimony from the witness stand during the course of this

19   trial.

20        Now, during the course of the trial, it's possible that

21   the lawyers are going to raise certain objections.  And when

22   they make objections, I will issue rulings on those

23   objections.  It's the duty of an attorney on each side of the

24   case to object when the other side offers testimony or other

25   evidence that the attorney believes is not proper.

1          Also, upon allowing the testimony or other evidence to be

2     introduced over the objection of an attorney, the Court does

3     not, unless expressly stated, indicate any opinion about the

4     weight or the effect of such evidence.  As I've said, ladies

5     and gentlemen, you, the jury, are the sole judges of the

6     credibility and believability of all the witnesses and the

7     weight and effect to give to all the evidence.

8          Now, I want to compliment the parties in this case

9     because up until today, they have worked with the Court very

10    diligently to go through many, many exhibits and documents.

11    And the exhibits and documents that you're going to see in the

12    course of this trial have already been considered by the

13    Court, I've considered any objections that have been made,

14    I've heard the arguments from the objecting parties, I've

15    heard responses from the offering party, and I have issued

16    rulings on what's admissible and proper to present to the jury

17    during the course of this trial.

18         And by doing that with the diligent hard work of the

19    lawyers for both sides, I promise you, ladies and gentlemen,

20    we have saved you many, many hours of having to sit here and

21    listen to all that during the course of the trial.  And both

22    sides are to be complimented for the way they've worked with

23    the Court in streamlining this process.

24         Even so, it's still possible that objections will arise

25    over the course of the trial.  If I should sustain an

1     objection to a question addressed to a witness, then you must

2     disregard the question entirely and you may draw no inference

3     from its wordings, and you may not speculate about what the

4     witness would have said if I had permitted them to answer the

5     question.

6          If I should overrule an objection, on the other hand,

7     then you should consider the answer and the question just as

8     if no objection had been made in the first place.

9          And you should know, ladies and gentlemen that the law of

10    the United States permits a judge to comment to the jury

11    regarding the evidence in a case, but such comments from the

12    judge on the evidence are only an expression of the judge's

13    opinion and the jury may disregard those comments entirely

14    because, as I've told you, you, the jury, are the sole judges

15    of the facts, you are the sole judges of the credibility of

16    the witnesses and how much weight to give to the testimony

17    that's presented during this trial.

18         And even though the law permits me to comment on the

19    evidence to you over the course of this trial, as I indicated

20    earlier, I am going to work very hard not to comment on any of

21    the evidence, not the communicate to you how I feel about any

22    of the testimony or of the evidence during the course of the

23    trial, because it's your job and your job alone to determine

24    the facts of this case from evaluating and considering all of

25    the testimony and evidence in this case.

```
 1           Now, Mr. McRoberts, our court reporter in front of me, is
 2   taking down everything that's said during the course of the
 3   trial.  But the transcript, the written version of everything
 4   that's said during this trial, is not going to be available to
 5   you to take with you during to the jury room and review during
 6   your deliberations.  That means, ladies and gentlemen, you're
 7   going to have to rely on your memory of the testimony and the
 8   evidence over the course of this trial.
 9           In a moment we are going to have juror notebooks to pass
10   out to you, although I understand they are yet to be brought
11   into the courtroom, and they should be on their way here any
12   minute.  As soon as I get them, I will have them passed out to
13   you.
14               THE COURT SECURITY OFFICER:  Your Honor, I believe
15   we have them now.
16               THE COURT:  We have them now?
17               THE COURT SECURITY OFFICER:  Yes, sir.
18               THE COURT:  All right.  Then, if you will, please
19   pass them out to the jury.  Thank you.  I didn't see them over
20   there.
21           As you get these notebooks, ladies and gentlemen, you'll
22   notice that in the front of them, you each have a copy of each
23   of the five Patents-in-Suit, the asserted patents in this
24   case.
25               You'll also see that you have a section of pages for
```

     1    witnesses where each person who may testify in the trial has a

     2    page with their photograph superimposed at the top of the page

     3    and their name underneath.  The Court's found over the course

     4    of many years that being able -- or for the jury, rather,

     5    being able to go back and look at a picture of each person who

     6    testifies is helpful during the time that you deliberate and

     7    attempt to reach your unanimous verdict.

     8         Also, you'll find in there a brand new legal pad for

     9    note-taking over the course of the trial, and you should find

    10    a pen in the front flap of each notebook for additional

    11    note-taking if you choose to do that.

    12         It's going to be up to each of you to decide whether you

    13    want to take notes during the course of the trial, and if you

    14    do, how detailed you want those notes to be.

    15         These notebooks, ladies and gentlemen, should be in your

    16    possession at all times.  If you're not in the courtroom, they

    17    should be in the jury room on the table, and that's where you

    18    should leave them overnight when we finish each day's portion

    19    of the trial.  If you're in the courtroom, they should be in

    20    your own physical possession.

    21         Now, the one exception to that is, there may be times

    22    when we will take a short recess, and you're only going to be

    23    out of the courtroom a short period of time, in which case I

    24    may say to you, ladies and gentlemen, you may simply close and

    25    leave your notebooks in your chairs.  And if that's the case

 1    and if I say that, simply close them and leave them in the

 2    chair that you're sitting in.  It will be there when you

 3    return.

 4         But if we're going to be out of the courtroom any length

 5    of time, I'll ask you to take those with you and keep them in

 6    your possession.

 7         Now, in a moment we're going to get on to the lawyers'

 8    opening statements.  These opening statements by the lawyers

 9    for the parties are designed to give you a road map of what

10    each side expects to offer by way of evidence.  And you should

11    remember, ladies and gentlemen, throughout this trial that

12    what the lawyers tell you is not evidence.  The evidence is

13    the sworn testimony that you'll hear from the witnesses from

14    the witness stand, under oath and subject to

15    cross-examination, as well as the exhibits and other documents

16    that the Court has already admitted into evidence as exhibits

17    and that are presented to you over the course of the trial.

18    That's the evidence in this case.

19         What the lawyers tell you is not evidence.  What the

20    lawyers tell you is simply their impression of what the

21    evidence is.  And they have a duty to point out to you what

22    they believe the evidence shows.  But, remember, what the

23    lawyers tell you is not evidence.

24         And what the lawyers tell you is not or are not

25    instructions on the law.  The only instructions on the law

1    that you will receive will come directly from me to you over

2    the course of this trial.

3         Now after the opening statements are presented by both

4    sides, the Plaintiffs will have an opportunity to call their

5    witnesses and present their evidence.  That's called the

6    Plaintiffs' case in chief.  Once the Plaintiff has called all

7    their witnesses and they've been examined and cross-examined,

8    then the Plaintiff will rest its case in chief.

9         When the Plaintiff rests its case in chief, then the

10   Defendant will put on its case in chief.  The Defendant will

11   call its witnesses, they'll be examined and cross-examined.

12   And when all of the Defendant's witnesses have been presented,

13   the Defendant will rest its case in chief.

14        At that moment, the Plaintiff will have an opportunity,

15   if it chooses to, to call rebuttal witnesses to rebut what's

16   been put on by the Defendants.  The Plaintiff's not required

17   to do that; the Plaintiff may elect not to do that.  We will

18   find out when the Defendant rests its case in chief if the

19   Plaintiff intends to recall rebuttal witnesses.

20        If the Plaintiff calls rebuttal witnesses, then when

21   those witnesses, whether it's one or more than one, when those

22   witnesses have testified, then the Plaintiff will rest its

23   rebuttal case.

24        When the Plaintiff rests its rebuttal case, then you will

25   have heard all the evidence in this trial, and at that time I

1    will give you instructions on the law that you are to apply in

2    deciding the questions you are asked to answer.

3        After I've given you my final instructions, which are

4    sometimes called, and I'm sure you've heard this term before,

5    the Court's charge to the jury, once I have given you my final

6    instructions, the Court's charge to the jury, then counsel for

7    the Plaintiff and the Defendant will present their closing

8    arguments.

9        When you have heard closing arguments from both Plaintiff

10   and Defendant, then I will instruct you to retire to the jury

11   room and to deliberate on your verdict.  And that's the

12   moment, as I mentioned earlier, ladies and gentlemen, when you

13   go from being prohibited from discussing the evidence in this

14   case among the eight of you to being required to discuss the

15   evidence in this case among the eight of you in an attempt to

16   answer the questions in the verdict form unanimously.

17       Let me repeat my earlier instruction to you that you are

18   not to communicate or discuss anything about this case in any

19   way with anyone, including the eight of yourselves.

20       Let me also remind you of my instruction earlier that if

21   during the course of this trial you come in close contact with

22   anybody associated with one side or the other, they're not

23   going to speak, they're not going to be engaging, they're not

24   going to be friendly.  That's simply because they're following

25   the instructions I've given them.

1      So when that happens, don't hold it against them.  Don't

2   think they're being rude or unfriendly.  Just understand that

3   they're following the instructions that the Court has given

4   them.

5      All right.  At this time, we will hear opening statements

6   from the parties.

7      Plaintiff, you may present your opening statement to the

8   jury.

9          MR. BAXTER:  Your Honor, could we approach the bench

10  for just one brief moment?

11         THE COURT:  Approach the bench, counsel.

12         MR. BAXTER:  Thank you, Your Honor.

13         (The following was had outside the hearing of the

14         jury.)

15         THE COURT:  What's up?

16         MR. BAXTER:  I think we want to back up, Judge, and

17  have Mr. Blasius in the courtroom until such time as it needs

18  to be sealed, at which time we will notify the Court it needs

19  to be sealed and he could leave.  But if he could hear the

20  first part, we would appreciate it.  We would like to change

21  our mind on that.

22         THE COURT:  All right.  As long as there's a request

23  to seal the courtroom before anything confidential is put

24  forward.

25         MR. BAXTER:  We will, Your Honor.

1          THE COURT:  We'll do it that way.

2          MR. BAXTER:  Thank you, Judge.

3          (The following was had in the presence and hearing

4          of the jury.)

5          THE COURT:  All right.  We'll proceed with opening

6   statements from the parties.

7      Plaintiff, you may present your opening statement to the

8   jury.  Would you like a warning on your time, Mr. Sheasby?

9          MR. SHEASBY:  Yes, Your Honor.  If I could have a

10  warning at 15 minutes and at five minutes.

11         THE COURT:  When you have 15 minutes and five

12  minutes remaining, I will warn you.  You may proceed.

13         MR. SHEASBY:  Your Honor, may it please the Court.

14     Ladies and gentlemen of the jury, my name is Jason

15  Sheasby, and I've been asked to represent the Optis entities

16  in this litigation.  I was borne in California.  I spent my

17  whole life in California.  I'm married my wife, and I have two

18  children, and we also raise a niece and nephew.

19         THE COURT:  Mr. Sheasby, pull the microphone close

20  to you, please.

21         MR. SHEASBY:  I want to begin by doing what Judge

22  Gilstrap did which is thanking you for your service.  And one

23  of the interesting things about the right to a trial by jury,

24  it's in the Bill of Rights, is a lot of us think that the

25  right to a trial by jury is the right for Apple and for

 1    PanOptis to have a jury.  It's actually not what the founders

 2    meant.

 3         When the founders passed the right to trial by jury, the

 4    idea was that the citizens of our country decide the most

 5    important issues, the citizens decide the most important

 6    issues.  The right to trial by jury is your right.  It's your

 7    right as citizens because the founders placed the power in

 8    your hands.

 9         Now, in 2005, a group of the leading cellular

10    telecommunications companies in the world came together to

11    design the next generation cellular network.  And in 2005

12    there actually was not a lot of data usage.  It was before the

13    smartphone revolution.  There were some smartphones, but there

14    was not a mass amount of data.

15         And the way it worked is the technology companies came

16    together, and they actually reviewed proposals by other

17    companies to pick ones that they thought would work in the new

18    telecommunications system they were creating.  That new

19    telecommunications system was called LTE.  LTE stands for

20    long-term evolution.

21         And the design of this system was for year after year

22    after year, it would be stable and be able to handle the mass

23    amounts of data that these companies predicted would be going

24    across the networks in later years.

25         There were three companies that had a very significant

1    role in that process that are at issue today.  Those companies

2    were Samsung, LG, and Panasonic.  They made a huge risk.  In

3    2008 alone, while they were building this next generation

4    network, they spent $14 billion in a single year on R and D.

5    They made a huge risk investing in long-term evolution.

6        The community identified five of their technologies that

7    are absolutely crucial to long-term evolution.  In fact,

8    they're essential to long-term evolution.  Those five

9    technologies were recognized by the United States government

10   with five patents.  Those five patents are the patents in this

11   case.

12       Now, LG, Panasonic, and Samsung, and Ericsson, PanOptis

13   holds the patent rights of those companies.  And the reason it

14   holds those patent rights is because it has been selected by

15   LG, Panasonic, and Ericsson to protect their intellectual

16   property, to focus on the fact that there were individuals who

17   invested heavily, heavily, into the creation of a long-term

18   evolution.

19       And then there were individuals who just took it and did

20   not invest heavily in long-term evolution.  One of the

21   entities that took and did not invest in long-term evolution

22   is Apple.  Apple played no meaningful role in the creation of

23   long-term evolution.  Apple has reaped significant profits

24   from the use of long-term evolution.

25       The sole issue that is to be cited in this proceeding is

1        the damages that we've paid on those five essential patents.

2            We spoke about the fact that the right to trial by jury

3        is a constitutional right.  Patents are actually in the

4        Constitution.  Our founders 230 years ago, 230 years and

5        counting years ago, actually realized the importance of

6        innovation in our country, and they had an idea.  They wanted

7        everyone from throughout the world to bring the best ideas to

8        our country and to file patents on them.  And by doing so, we

9        could improve our economy and improve creation and improve

10       innovation.

11           And the Congress actually had a very important insight.

12       In order to attract the best innovation to our country, they

13       were going to grant patent rights.  The patent right is a

14       property right.  It's just as sacred as the right to our

15       house.  It's just as sacred as the right to our homestead.  It

16       cannot be violated without permission.  This court is designed

17       to determine what the damages are for the use of these five

18       patents.

19           We spoke about LTE, long-term evolution.  From 2012 to

20       2020, the best technology Apple had for its cell phones was

21       long-term evolution.  That's all they had.  They had nothing

22       better.  And they used it every single year.  Every single

23       year between 2012 and 2020, Apple used the technology

24       reflected in the five patents at issue in this case.

25           This is PanOptis.  PanOptis was created to protect the

1    innovations of Panasonic, LG, and Ericsson.  It also holds

2    patents from Samsung.  And its obligation is to ensure takers

3    pay a fair and reasonable and nondiscriminatory rate for the

4    use of our technology.

5         The patent statute makes clear that the assessment of

6    damages relates to the use of the invention made by Apple.

7    That's what Congress requires to assess the use of the

8    invention made by Apple.

9         Now, you're going to hear from Apple's counsel, and Judge

10   Gilstrap made clear that attorney argument is not evidence,

11   but ask yourself if Apple shows you any data on the use it

12   makes of long-term evolution, of the use it makes of these

13   five patents in its opening.

14        These are the five patents.  We refer to them by the last

15   three numbers.  So, for example, we refer to the Samsung

16   patent as the '774 Patent.  Each of these patents are

17   essential.  This is the history of LTE, and you see this

18   massive explosion in 2010, this massive use of data.  And

19   Apple gained market share and began to dominate the cell phone

20   industry as LTE was exploding, as the use of cellular data was

21   exploding.

22        We're going to talk about three issues in this trial.

23   First, we're going to talk about the technical importance of

24   the patents.  Second, we're going to talk about the use of the

25   patents by Apple because that's what Congress requires.  The

1    statute passed by the United States Congress makes clear that

2    the focus of damages is based on the use of the technology by

3    Apple.  And the third thing we're going to discuss is, what

4    the fair, reasonable, and nondiscriminatory rate that Apple is

5    obligated to pay it.

6        We talked about LTE.  LTE involved engineers coming

7    together to select designs that would work for this long-term

8    system.  And you know what's neat?  This is actually a picture

9    from a meeting of the engineers.  And you see right in the

10   corner, you see whose symbol is there?  It's Samsung.

11   Samsung, LG, Ericsson, Panasonic were crucial contributors to

12   the construction of long-term evolution.

13       The first step in our analysis is the technical analysis

14   of the value of the patents.  PanOptis has asked two

15   independent experts who are experts in the field of cellular

16   technology, Professor Mahon and Professor Madisetti.

17   Professor Mahon designed cellular systems for the Central

18   Intelligence Agency in various Department of Defense entities

19   for a number of years.  Professor Madisetti is a researcher

20   who does significant work with the Defendant of Defense.  And

21   I'd like them both to stand right now.  Thank you very much.

22       Professors Mahon and Madisetti actually worked with a

23   group of elite technologists to design nationwide studies to

24   calculate and assess the amount of use of Apple's -- of

25   PanOptis' patents based on Apple's technology across the

1    nation to do this with these elite technologists.

2         They also worked to design specialized simulations to

3    assess the value of the patents, the technical improvement in

4    the value of the patents.  And based on their analysis, they

5    concluded that the five patents in this case improved the

6    performance of Apple's devices by 25 percent.  Twenty-five

7    percent.

8         Now, this is a very important case and you'll hear Apple

9    will tell you this is a very important case to them.  There is

10   only one party who did nationwide testing to assess the use of

11   these patents.  There was only one party that designed

12   specialized simulation to assess the importance of these

13   patents.  That is PanOptis.

14        You will hear no evidence from Apple about simulation or

15   testing.  None.  They have no simulation or testing data that

16   they performed to dispute the analysis of Professors Mahon and

17   Madisetti.  Now, why would a company like Apple with vast

18   access to technologists not have its own nationwide

19   independent testing and nationwide simulations?

20        The second issue we're going to discuss is use of the

21   patents, long-term evolution.  And you'll see between 2005 and

22   2008, LG, Panasonic, and Samsung filed these patent

23   applications and then presented them to the body that

24   constructed LTE, not the patent applications but the designs.

25   And those -- that body accepted these designs.  In 2010 and

1    2011, both Samsung and LG launched LTE phones.

2         Here's an interesting fact.  Between 2008 and 2010 when

3    long-term evolution was being created, in 2008 when Samsung,

4    Panasonic, and LG spent $14 billion in R and D, Apple was

5    selling a 2G smartphone.  At the same time Panasonic, Samsung,

6    and LG were creating long-term evolution and spending billions

7    and billions, Apple was selling 2G and was not investing in

8    communications technology.

9         In terms of communications technology, Apple fell

10   significantly behind.

11        In September of 2012, Apple realized it had to launch its

12   own LTE phone, and it did so.  And between 2012 and August

13   2020, the period of damages in this case, every single LTE

14   smartphone, LTE tablet, and LTE watch that Apple sells, which

15   is to say all their cellular products, used long-term

16   evolution and they use the five technologies that are at issue

17   in this case.

18        Apple has never found anything better; they've never been

19   able to do anything different.  This is the technology they

20   use.

21        To give you the scale of Apple's use of the technology,

22   between 2012 and August 2020, Apple sold 575 million products

23   that use PanOptis' technology.  575 million products.

24        PanOptis received patents from LG, Samsung, and

25   Panasonic, and its obligation is to protect those patents and

1    to make sure that takers pay a fair and reasonable amount for

2    them.

3            And LG, Samsung, and Panasonic were not quiet about the

4    importance of these patents.  Just the opposite.  Between 2008

5    and 2010, they made public announcements that these patents,

6    they believe, were essential and they made clear to the public

7    that folks could use this technology because they recognized

8    how important it was, but folks would be obligated to pay

9    fair, reasonable, and nondiscriminatory royalties.  They made

10   that clear, explicit, and public.

11           In 2014 through 2017, PanOptis did the same.  PanOptis

12   carefully analyzed the patents that it received for

13   protection, and it is well, publicly announced the patents are

14   essential, and made clear that folks could use the technology,

15   but they were obligated to pay a fair, reasonable, and

16   nondiscriminatory license fees in exchange for use of that

17   technology.

18           You heard reference by Judge Gilstrap to ETSI, the

19   European Telecommunications Standards Institute.  And let me

20   describe briefly what that is.

21           The organization that creates LTE, that chooses what

22   technology received the honor of being part of LTE, is called

23   3GPP.  ETSI is a European organization that validates that

24   process and collects the statements by companies who believe

25   they may have patents that are essential and statements by

1    companies that they will license those patents but folks have

2    to pay fair, reasonable, and nondiscriminatory rates.  ETSI is

3    the clearing house that you go to for patents information.

4         Now, ETSI has made a very important instruction about

5    what it means to be entitled to a fair, reasonable, and

6    nondiscriminatory royalty.  They make clear that

7    patentholders, IPR holders, IPR is the European word for

8    patent, should be adequately and fairly rewarded.  Our patents

9    were declared to ETSI.  As a result of that, we are entitled

10   to a fair, reasonable, and nondiscriminatory royalty for their

11   use by Apple.  We are entitled to be adequately and fairly

12   rewarded.

13        The next issue to focus on is what is the value of the

14   patented technology to Apple.  Well, we actually have some

15   information on this.

16             THE COURT:  You have 15 minutes remaining.

17             MR. SHEASBY:  We know that Apple charges

18   extraordinary amounts of money for the use of long-term

19   evolution.  You can buy an iPad Pro without cellular

20   technology.  You can buy an iPad Pro with cellular technology.

21   Apple will charge you $150 just for the access to cellular

22   technology.  And you'll hear that the vast majority of

23   cellular technology, cellular usage is long-term evolution.

24        Let me give you another example.  Apple sells an iPod

25   Touch, which is basically a fancy phone without cellular

 1    service.  And you can compare that to the price of an iPhone

 2    5s.  They were both marketed at the same time.  The only

 3    functional difference between these two products is cellular,

 4    and Apple charges $350 for access to cellular.

 5         Let me give you another example.  An Apple Watch without

 6    cellular sells for $199.  An Apple Watch with cellular sells

 7    for $299.  Apple charges $100 extra for cellular, for

 8    long-term evolution.

 9         This is objective evidence about the importance of this

10    technology.

11         We also know about the extraordinary use that Apple makes

12    of long-term evolution.  In 2012, Apple launched its first LTE

13    phone, and it touted that it was able to ship 100 megabits per

14    second of data.  But as Apple built its phones, as Apple made

15    them more complex, as Apple made them more valuable, it needed

16    something.  It needed more and more long-term evolution.

17         The last cell phone that it launched during the period of

18    damages in this case was the iPhone 11, and they touted that

19    it used 10 times more LTE than the one in 2012.  It's not just

20    that from 2012 to 2020 Apple sold 500 million iPhones,

21    tablets, and watches that used LTE.  Apple used more and more

22    and more LTE.  It depended on LTE.  Its business was built on

23    fast access to cellular technology.

24         In order to quantify the amount of revenue that Apple

25    generates from the 25 percent speed increase, PanOptis

1    actually asked an independent economist who specialized in the

2    creation of surveys, who was trained by an economist in the

3    Federal Trade Commission, to quantify exactly how much damages

4    Apple makes from its products.  And I'd like her to stand now.

5    Her name is Dr. Rebecca Reed-Arthurs.

6         Thank you, Doctor Arthurs.

7         Between February of 2019 and August of 2020, solely from

8    the use of these five patents, Apple has generated $868

9    million in profits.  I want to be clear.  That's not the total

10   amount of profits Apple has made on its cellular products.

11   That is solely, solely, for the use of these patents.  From a

12   period of 16 months, it generated $868 million.  You can

13   understand the extraordinary importance and value of this

14   technology to Apple.

15        In addition to Ms. Reed-Arthurs, we've also asked an

16   independent damages expert to speak.  His name is David

17   Kennedy.  I'd like Mr. Kennedy to stand.

18        Thank you, Mr. Kennedy.

19        Mr. Kennedy has negotiated over 200 license agreements.

20   In fact, he's the only independent expert you will hear from

21   who has actually negotiated FRAND royalties on agreements.

22   Apple has a damages expert.  But for reasons that are unclear,

23   Apple chose not to bring someone who has any expertise

24   negotiating FRAND license agreements.

25        And what Mr. Kennedy will establish is that for each

1    iPhone that Apple sells, solely from the use of the technology

2    Apple makes $8.79 in profits.  And to put this in context,

3    Apple is proposing that it pay essentially a cent for every

4    cell phone it sells.  I want to be clear about that.  We are

5    in the litigation today because Apple makes $8.75 per iPhone

6    from the use of the technology, and Apple wants to pay a tenth

7    of a cent.

8         Ultimately, based on an analysis by Mr. Kennedy in a

9    hypothetical negotiation where both parties have to give

10   something up, Mr. Kennedy concludes that PanOptis would allow

11   Apple to keep $360 million of the profits it obtains solely

12   from the use of these patents, and PanOptis would take $506

13   million.

14        Mr. Huynh, can I have slide No. 17, please?

15        In 2017, PanOptis approached Apple and asked Apple to

16   take a license to its portfolio of patents.  And between 2017

17   and February of 2019, PanOptis repeatedly, repeatedly,

18   repeatedly asked Apple to take a license for the LTE

19   technology that PanOptis held.  Apple declined.  In fact,

20   Apple repeatedly told Mr. Blasius, our corporate

21   representative, we don't use your patents and your patents are

22   invalid.  Repeatedly.

23        PanOptis made reasonable offers.  In fact, its first

24   offer to Apple was approximately $500 million.  You will

25   recognize that number because it's the number that we are

1    asking for damages today, and it's been validated by Mr.

2    Kennedy, the only licensing expert in this case.  Ultimately,

3    Mr. Blasius will testify that Apple said, we want litigation.

4        Your Honor, at this time I request that the courtroom be

5    sealed.

6              THE COURT:  Based on counsel's request, I'll order

7    the courtroom sealed.  If you're present and not subject to

8    the protective order that's been entered in this case, you

9    should exit the courtroom and are to remain outside until the

10   courtroom is reopened and unsealed.

11             (The courtroom was closed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10          THE COURT:  All right, counsel.

11      At this time I am going to order the courtroom unsealed,

12  and I will direct the Court Security Officer to invite the

13  public to return.

14      Mr. Mueller, you need to take down these demonstratives

15  and turn the chart to a blank sheet, please.

16          MR. MUELLER:  Yes, Your Honor.  Thank you.

17          THE COURT:  Counsel, let me inquire, does either

18  party wish to invoke the Rule?

19          MR. MUELLER:  Yes, Your Honor.

20          THE COURT:  Invoke the Rule including or excluding

21  experts?

22          MR. MUELLER:  Excluding experts, and excluding

23  corporate representatives as well, Your Honor.

24          THE COURT:  All right.  The Rule has been invoked.

25  That means if you are a fact witness or you are not a

1    designated representative for one of the parties, then you

2    must excuse yourself and remain outside the courtroom until

3    you are called to testify.

4         And, counsel, I'll trust each side will monitor the

5    contents of the gallery and let me know if there's anybody

6    that is not outside the courtroom that should be.

7         If you're a fact witness and not an expert witness and

8    you're going to testify in this case, you should remain

9    outside the courtroom until you are called to give testimony.

10        Ladies and gentlemen, it's been an hour and 40 minutes

11   since we came back from lunch.  We're going to take a short

12   recess.  When we return, we will begin with the Plaintiff's

13   first witness.

14        This is one of those times when you can simply close your

15   notebooks and leave them in your chairs.

16        Please follow all my instructions, including not to

17   discuss the case with each other.  And we will be back shortly

18   to begin with Plaintiff's first witness.

19        The jury is excused for recess.

20             (Whereupon, the jury left the courtroom.)

21             THE COURT:  Let me see lead and local counsel in

22   chambers.

23        The Court will stand in recess.

24                        (Brief recess.)

25             THE COURT:  Be seated, please.

```
 1          Plaintiff, are you prepared to call your first witness?
 2               MR. SHEASBY:  Plaintiff is prepared to call its
 3     first witness, Your Honor.
 4               THE COURT:  Let's bring in the jury, please.
 5               (Whereupon, the jury entered the courtroom.)
 6               THE COURT:  Please be seated, ladies and gentlemen.
 7          Plaintiff, call your first witness.
 8               MR. SHEASBY:  Your Honor, Plaintiffs call our CEO,
 9     Mr. Brian Blasius.
10               THE COURT:  Mr. Blasius, please come forward and be
11     sworn by our courtroom deputy.
12               (Whereupon, the oath was administered by the Clerk.)
13               THE COURT:  Please come around, have a seat here at
14     the witness stand.
15          Feel free to pour yourself a grass of water if you'd
16     like.
17          All right, counsel.  You may proceed with direct
18     examination.
19                         BRIAN BLASIUS,
20     testified under oath as follows:
21                       DIRECT EXAMINATION
22     BY MR. SHEASBY:
23     Q.   Good afternoon, Mr. Blasius.  Can you state your name,
24     please?
25     A.   Good afternoon.  My name is Brian Blasius.
```

```
1    Q.   And can you introduce your position?

2    A.   Yes.  I am the president and CEO of PanOptis.

3    Q.   Can you tell us a bit about yourself?

4    A.   Sure.  I was born and raised in the suburbs outside of

5    Chicago.  I am married to my wife Julie for the last 24 years.

6    She had worked for a while and then stayed home to help raise

7    our kids.  And then she went back to work where she's now a

8    special education teacher with the local school district.

9         We have three children.  My daughter is 20 years old.

10   She attends college.  And I have two boys ages 18 and 15, and

11   my oldest is going to be going to college in a few weeks.

12   Q.   What do you do with your free time?

13   A.   Well, when my children were growing up, they were very

14   active in sports.  I spent a lot of time volunteering and

15   coaching for a variety of their sporting initiatives,

16   especially in baseball and football.  I continue to volunteer

17   with the high school football team today.

18   Q.   Can you tell us about your education?

19   A.   I received my Bachelor's in finance from Northern

20   Illinois University in 1993.  And then while I was working at

21   Motorola, I ended up going back to school at night and I

22   received my MBA from Northwestern University in 2002.

23   Q.   Can you tell us what PanOptis is?

24   A.   PanOptis was a company that was formed to help protect

25   the innovations of some of the major contributors to today's
```

```
 1    modern-day cellular communications networks.

 2    Q.   What companies are these?

 3    A.   Those companies include LG, Panasonic, and Samsung, who

 4    are some of the major contributors to the cellular

 5    communications industry and specifically LTE technology.

 6    Q.   You said Samsung as a founder of the company.  Would

 7    you --

 8    A.   Oh, excuse me.  LG, Panasonic, and Ericsson, excuse me,

 9    that were -- helped create PanOptis.

10    Q.   Who worked with these companies to create PanOptis?

11    A.   Those companies ended up working with a group of patent

12    lawyers and patent attorneys and technologists out of Plano,

13    Texas.

14    Q.   Does PanOptis own patents from any other source besides

15    Ericsson, LG, and Panasonic?

16    A.   Yes.  We actually own patents from Samsung.

17    Q.   How did the patents become part of the PanOptis?  How did

18    the Samsung patents become part of PanOptis?

19    A.   Well, Samsung had approached PanOptis in 2016 to help

20    solve some issues they were having with a company called

21    Unwired Planet.  As part of that resolution, we actually

22    acquired the company.  Samsung took a license to the patents

23    and ended up transferring a number of patents from their

24    portfolio to our program.

25    Q.   How does PanOptis relate to the other Plaintiffs in this
```

1    lawsuit?

2    A.   Well, when PanOptis was created, the founders actually

3    set up companies to hold the patents that it acquired from the

4    original contributors.   In this case, we have Optis Wireless,

5    Optis Cellular, Unwired Planet, and Unwired Planet

6    International Limited.   Those companies were set up to hold

7    the patents.

8        And PanOptis Patent Management was the entity that was

9    created to help protect those patents, manage the licensing

10   activities, and then ultimately has the employees that work

11   for the company.   We have approximately 12 to 15 employees and

12   contractors.   They actually were employed by an entity called

13   HillCo and were contracted out to the company to manage those

14   licensing efforts.

15   Q.   You referred a license.   What is a patent license?

16   A.   A patent license is really a right to actually use the

17   patent in exchange for a payment.   So if you think about it, a

18   patent is a property right.   So much like a house or a car,

19   you may allow others to use that house or car, but in exchange

20   they would pay you a lease payment or a rent payment.

21   Q.   How long have you -- how can PanOptis hold the patents

22   that are invented by others?

23   A.   Again, as I referred to a patent as a property right,

24   those can be transferred to others.   Think about a land right

25   or a mineral right.   You can transfer that to others for their

```
 1    use.
 2    Q.    Do Panasonic, LG, and Ericsson have an economic interest
 3    in Panasonic -- in PanOptis?
 4    A.    Yes, they do.
 5    Q.    How significant is that economic interest?
 6    A.    They actually receive a substantial portion of our
 7    revenues.
 8    Q.    How long have you spent in the cellular licensing
 9    industry?
10    A.    Approximately twenty years.
11    Q.    Are there any other companies that perform the same role
12    as PanOptis performs?
13    A.    Yes, there are.  There is companies like Via Licensing
14    and MPEG LA that are actually set up to acquire patents and
15    patent rights from companies that were innovators in their
16    field, and then those companies actually license those patents
17    to companies in the industry that use the underlying
18    technologies.
19    Q.    Are you familiar with similar business structures that
20    Apple has used in the past in this industry?
21    A.    Yes.
22    Q.    Has Apple invested in companies like PanOptis in the
23    past?
24    A.    Yes, it has.
25    Q.    Can you give us an example?
```

```
 1    A.    There's a company called Rockstar.

 2    Q.    What is the history of Rockstar?

 3    A.    Rockstar was formed when Apple, along with a consortium

 4    of other companies, actually acquired a large number of

 5    patents from a company called Nortel.  They actually set up

 6    Rockstar to own those patents, and then Rockstar licensed

 7    these patents to the industry.

 8    Q.    And Apple retained an interest in Rockstar?

 9    A.    Yes, they did.

10    Q.    And is that the same model -- how does that relate to the

11    model of PanOptis?

12    A.    It's very similar to the model.  Rockstar owns patents

13    from the original innovator, in this case Nortel, and then

14    licenses those patents to the industry.

15    Q.    As part of your job, do you follow important events

16    within the cellular industry?

17    A.    Yes, I do.

18    Q.    From a business standpoint, what is the brief history of

19    cellular technology?

20              MR. SHEASBY:  Mr. Huynh, can we have slide 4,

21    please?

22              THE WITNESS:  Well, if you look at this slide, the

23    left-hand side, cellular actually got its start in the early

24    1980s.  And for much of the first few decades, there wasn't a

25    lot of data being transmitted across those cellular networks.
```

```
 1            In the mid 2000s, a group of engineers and companies got

 2     together and recognized that there was going to be a massive

 3     amount of data that was going to be transmitted across the

 4     next cellular network.  They ended up meeting to address that

 5     by building the next network called LTE, or long-term

 6     evolution.  It's really the backbone of all cellular

 7     communication traffic.

 8     Q.   (BY MR. SHEASBY)  Are Samsung, LG, and Panasonic the only

 9     entities that helped create LTE?

10     A.   No, they're not.

11     Q.   Did they play a significant role in the creation of LTE?

12     A.   Yes, they did.

13     Q.   Do you have an understanding of what caused the massive

14     increase in data?

15     A.   It was really the expectation -- yes, I do.

16     Q.   What is that?

17     A.   It was really the future smartphone revolution that was

18     starting to come about in the middle of the 2000s.

19     Q.   In what specifically does this case relate to?

20     A.   This case relates to LTE communications and specifically

21     the patents that LG, Samsung, and Panasonic invented and

22     contributed to the industry and are essential to the LTE

23     standard.

24     Q.   Have PanOptis contributors commercialized LTE cellular

25     technology?
```

```
1    A.    Yes, they have.

2    Q.    Can you give me some examples?

3    A.    Sure.  LG and Samsung have both launched cellular

4    communication devices around LTE technology.

5    Q.    And when did they do that?

6    A.    They did that about -- in 2010 for Samsung, and LG was

7    shortly thereafter.

8    Q.    And how does that relate to Apple's launch of LTE?

9    A.    It was approximately one to two years before Apple

10   actually launched its cell phone for LTE in late 2012.

11   Q.    Are you familiar with the scale of investment made by

12   Panasonic, LG, and Samsung in research?

13   A.    Yes, I am.

14   Q.    Can you give us an example of that?

15   A.    Well, in 2008, which was at the time that the standards

16   were being created, the combined R and D spend for those three

17   companies was approximately $14 billion.

18   Q.    As part of your job, have you gained an understanding of

19   the importance of LTE from a business standpoint?

20          THE COURT:  Mr. Sheasby, could you slow down as you

21   read those questions?

22          MR. SHEASBY:  Yes, Your Honor.

23          THE COURT:  Please do.

24   Q.    (BY MR. SHEASBY)  As part of your job, have you gained an

25   understanding of the importance of LTE from a business
```

 1    standpoint?

 2    A.   Yes, I have.  It's very important.

 3    Q.   Can you give us an example of that?

 4    A.   Sure.  In 2020, you think about what we do with our

 5    phones today.  We watch YouTube, we download Netflix, watch

 6    streaming movies, we share photos.  All of that has to go over

 7    the cellular networks.  So in that time frame, there was 43

 8    billion megabytes of data being transmitted across those

 9    networks each and every day.

10    Q.   How do innovators address this massive data problem?

11    A.   Well, they've recognized that even a small incremental

12    improvement in the transmission across the networks would lead

13    to a large benefit.  Think about the size of the U.S. economy.

14    It's a very large number.  An incremental improvement in that

15    is a large number.

16    Q.   What is the dominant cellular network as of 2020?

17    A.   It's LTE.

18    Q.   And what percentage of the cellular technology do you

19    realize in LTE?

20    A.   83 percent of all data communication traffic is done

21    through LTE.

22    Q.   Do PanOptis contributors continue to remain ahead of

23    Apple in cellular technology?

24    A.   Yes, they do.

25    Q.   Can you give us some examples?

1    A.   Yes.  Well, you've heard of 5G and Panasonic and Ericsson

2    have both launched 5G networks.  Samsung and LG -- Samsung has

3    launched 5G phones into the marketplace.

4    Q.   During the damages period in this case, did Apple have a

5    5G phone?

6    A.   No, it did not.

7            MR. SHEASBY:  Mr. Huynh, can we have the

8    demonstrative that Mr. Mueller used in my slide deck, please,

9    with the phones?  I believe it's the next slide.

10   Q.   (BY MR. SHEASBY)  Were you present in opening when

11   Apple's lead counsel showed this slide?

12   A.   Yes, I was.

13   Q.   From a business standpoint, is LTE the same in each of

14   these phones?

15   A.   No, it's not.

16   Q.   Why do you say that?

17   A.   Well, if you look at the phone on the left, the Doro

18   phone, that's actually what we call a feature phone within the

19   industry.  Those were available in the late 1990s, early

20   2000s.  And it -- the BLU phone as well, both of those phones

21   on the left have one-tenth of the ability to transmit data

22   compared to the iPhone 11.

23   Q.   Does the Doro allow for the downloading of applications

24   or videos?

25   A.   No, it does not.  It doesn't allow for either of those

```
 1    download capabilities.
 2    Q.   Do you believe this is a fair comparison to make between
 3    the Doro and BLU phone and a phone such as the iPhone 11 Pro
 4    Max?
 5    A.   No, I do no.
 6    Q.   Do you have any personal experience at the companies you
 7    work with with the importance of high speed bandwidth to phone
 8    manufacturers?
 9    A.   Yes, I do.
10    Q.   Can you give us some examples?
11    A.   Sure.  In -- while I was at Motorola, they actually set
12    up its own cellular service where they acquired air time and
13    bandwidth from major cellular communications providers,
14    network providers, and packaged that together to be able to
15    sell premier service to its customers.
16         And then while I was at Google, they actually set up the
17    same process where they acquired network capacity to be able
18    to provide high class service to its customers.  They
19    purchased that capacity from the network suppliers, and it's
20    called Google Fox.
21    Q.   How did the smartphone industry expand while you were at
22    Motorola?
23    A.   Well, the smartphone industry actually started in the
24    early 2000s.  And then as the data capacity became available,
25    it attracted a lot of new entrants into the marketplace.
```

```
 1    Apple, a number of other computer companies, and a number of

 2    Chinese smartphone manufacturers decided to enter the market.

 3    They didn't really have much involvement in developing the

 4    underlying standards around LTE connectivity, and then they

 5    ended up developing products and taking market share from the

 6    innovators.

 7    Q.   When did Samsung release its first cell phone?

 8    A.   In 1988.

 9    Q.   When did Apple release its first cell phone?

10    A.   In 2007.

11    Q.   When LG, Samsung, and Panasonic were helping to build

12    LTE, what cellular telecommunications technology was Apple

13    offering?

14    A.   It was 2G GSM technology.

15    Q.   Have you come to understand the role that Apple played in

16    the creation of LTE?

17    A.   Yes, I have.

18    Q.   What was Apple's role?

19    A.   It had no meaningful role at all in the creation of LTE.

20    Q.   Mr. Mueller at break referred to -- in his opening

21    referred to something he called 5G.  Do you remember that?

22    A.   Yes.

23    Q.   What is the relationship between LTE and 5G?

24    A.   Well -- between LTE and 5G?

25    Q.   Yes.
```

```
1    A.    Well, 5G is really a form of LTE.

2    Q.    Do PanOptis contributors continue to remain ahead of

3    Apple in cellular technology?

4    A.    Yes, they do.

5    Q.    When you said that LTE is a form of 5G, can you explain

6    that a bit more?

7    A.    Well, excuse me.  The LTE is a form of -- 5G.

8    Q.    You said 5G is a form of LTE.  Can you explain that a

9    little bit more?

10   A.    Sure.  It's long-term evolution.  So basically with

11   long-term evolution, 5G was really built on top of 4G.  4G, or

12   LTE, is the underlying technology that really supports the

13   ability for 5G transmission.

14   Q.    All right.

15             MR. SHEASBY:  Can we have PX 9.7, Mr. Huynh?  Slide

16   7.  One more.

17   Q.    (BY MR. SHEASBY)  Did the original owners of the patents

18   inform the industry about the importance of them?

19   A.    Yes, they did.

20   Q.    How did they do that?

21   A.    They did that through a declaration process and -- when

22   they informed the industry.  That declaration process is a

23   process where they declare their patents essential to a

24   particular standard.  They do that to a body called ETSI.  And

25   in that declaration process, they end up informing people that
```

```
1    they're willing -- that they were willing to grant irrevocable

2    licenses with the expectation that they would receive a fair,

3    reasonable, and nondiscriminatory rate.

4    Q.   Did these innovators commit to provide licenses to their

5    patents?

6    A.   Yes, they did.

7    Q.   On what terms did they agree to provide licenses to these

8    patents?

9    A.   On fair, reasonable, and nondiscriminatory terms.

10   Q.   Did PanOptis do anything to identify the importance of

11   these patents?

12   A.   Yes.  In fact, PanOptis did a couple of things.  First,

13   they ended up actually checking the essentiality of these

14   patents to verify in fact that they were truly essential.  And

15   then they reaffirmed those commitments by saying it was

16   prepared and -- declared to the standards body that it was

17   prepared to grant irrevocable licenses with the expectation

18   that it would be fairly rewarded.

19   Q.   How does PanOptis manage its relationship with ETSI?

20   A.   We actually have a gentleman on staff named James Warden,

21   who is a technologist by trade.  He's actually participated in

22   the standards bodies' meetings, went and helped form the

23   standard through his decades of experience at Motorola and

24   BlackBerry.

25   Q.   Has PanOptis approached Apple about licensing its
```

1   patents?

2   A.   Yes, we have.

3   Q.   When was the first event?

4   A.   The first event was in January of 2017.

5   Q.   And what did that involve?

6   A.   That involved a letter that then Tom Miller, who was the

7   head of licensing for PanOptis, sent a letter to Bruce Sewall,

8   the general counsel of Apple.

9   Q.   As part of your role as CEO of PanOptis, did you

10  familiarize yourself with the Apple negotiations?

11  A.   Yes, I did.

12  Q.   Can you give me -- was there a meeting in February?

13  A.   Yes, there was.

14  Q.   What happened at that meeting?

15  A.   At that meeting, Tom Miller, along with Ray Warren, who

16  was the director of licensing at PanOptis, ended up -- ended

17  up informing Apple that they were still willing to enter into

18  licenses and discuss their SEP holdings.

19  Q.   What was Apple's position on whether it needed PanOptis'

20  patents?

21  A.   They informed us that they did not want to take a

22  license.

23  Q.   Did they take a position on whether the patents were

24  infringed and invalid?

25  A.   Yes.   They ultimately determined from their perspective

1    that they claimed that they were invalid and that the patents

2    were not infringed.

3    Q.    And they said that for all of PanOptis' patents?

4    A.    Yes, they did.

5    Q.    How many times did they say that in your estimation?

6    A.    Multiple occasions, at least three times that I can

7    recall.

8    Q.    To you directly?

9    A.    To me directly, they said it twice.

10   Q.    Did you make offers to Apple?

11   A.    Yes, we did.

12   Q.    Did the offers change over time?

13   A.    Yes, the offers did change over time.

14   Q.    Why did they change?

15   A.    They changed over time because we learned more

16   information about this portfolio, number one.  We had patents

17   that were actually found to be valid and essential to the

18   standard.

19       We actually ended up doing additional work on our patents

20   to determine how many patents that we had that were really

21   applicable to these discussions and were absolutely essential

22   to the standard, and then we had some information from Apple

23   about some claimed licenses that they had that ended up not to

24   be true.

25   Q.    Apple claimed they had a license to some of your patents?

```
 1   A.    Yes, they did.

 2   Q.    And what was the ultimate conclusion?

 3   A.    That that was incorrect.

 4   Q.    When you were making offers to Apple, did they dispute

 5   infringement and validity of your patents?

 6   A.    Yes, they did.

 7   Q.    And after they disputed validity and infringement of your

 8   patents, did Apple make an offer?

 9   A.    Yes, they did.

10   Q.    So to be clear, Apple said none of PanOptis' patents are

11   valid or infringed and --

12             MS. SMITH:  Your Honor, may we approach?

13             THE COURT:  Approach the bench.

14             (The following was had outside the hearing of the

15             jury.)

16             MS. SMITH:  I gave Mr. Sheasby a little leeway on

17   saying that the communications that they're not valid, they're

18   not infringed.  But he is going on and on about infringement

19   and invalidity, which you've said, Your Honor, is not part of

20   this case.

21             MR. SHEASBY:  Your Honor, I'm not talking about

22   these specific patents.  I'm talking about the negotiations.

23   I laid the foundation that during these negotiations, they

24   repeatedly said PanOptis' patents were invalid and not

25   infringed.
```

```
 1            The door has been opened to the negotiation.  I was very

 2   clear about that.  I'm not asking about what is happening in

 3   the lawsuit.  I am talking specifically about the negotiations

 4   that occurred.

 5            THE COURT:  Well, you mentioned it enough.  You

 6   don't need to dwell on infringement or invalidity going

 7   forward.

 8            MR. SHEASBY:  Sure.

 9            THE COURT:  All right.

10            MS. SMITH:  Thank you, Your Honor.

11            (The following was had in the presence and hearing

12            of the jury.)

13            THE COURT:  Let's proceed.

14   Q.   (BY MR. SHEASBY)  During this time with PanOptis, did

15   Apple make offering offers to PanOptis?

16   A.   Yes.

17   Q.   The first offer that Apple -- that PanOptis made to Apple

18   in 2017, about how much was that for in terms of past damages

19   in the U.S.?

20   A.   Approximately $500 million.

21   Q.    When you made the decision to initiate this lawsuit

22   against Apple, who determined what patents to use?

23   A.    We had a team of technologists and patent lawyers on

24   staff that determined which patents to use.

25   Q.    Who's going to teach the jury about the patents?
```

1    A.    We actually have Professors Mahon and Madisetti, who are

2    the world experts in this field to help teach the jury.

3    Q.    Did you sit with them?

4    A.    Yes, I did.

5    Q.    Now, are you able to read and understand the patents on

6    your own?

7    A.    No, not on my own.  It's very technical documents.

8    Q.    How did you learn them?

9    A.    I actually spent time with Professors Mahon and Madisetti

10   and participated in Zoom calls, phone calls, and in-person

11   meetings to try to understand the underlying technology in the

12   patents.

13   Q.    Did LG, Panasonic, and Samsung provide information on

14   these five patents when PanOptis took responsibility for

15   protecting them?

16   A.    Yes, they did.

17   Q.    What did LG and Panasonic do?

18   A.    LG and Panasonic actually supplied documents when they

19   transferred the patents to us that designated whether or not

20   the patents were actually essential to the -- declared

21   essential to the LTE standard.  It wasn't every patent, but it

22   was a subset of the patents they transferred to us.

23         And then they actually went a further step and identified

24   specified patents and, again, a subset of those declared

25   patents that they confirmed were actually essential and had

```
 1    claim charts that they believed were essential to the standard
 2    for those specific patents.
 3    Q.    Ericsson check the analysis of LG and Panasonic?
 4    A.    Yes, it did in that process.
 5    Q.    And did Samsung identify the Patents-in-Suit?
 6    A.    Yes, it did.
 7    Q.    How did it do that?
 8    A.    In our contract with Samsung, they actually provided a
 9    list of patents as well and identified a certain subset of
10    those patents that were essential to the standards.
11    Q.    Does PanOptis use internal or external experts to
12    determine the speed increase attributable to the patents?
13    A.    In cases like these, we use external experts.  They are
14    the most appropriate.
15    Q.    Does PanOptis use internal or external experts to set
16    FRAND damages in cases like these?
17    A.    Again, in cases like these, we use external experts.
18    They are the most appropriate.
19    Q.    Have you contacted Apple since filing suit?
20    A.    Yes, we have.
21    Q.    What did Apple respond?
22    A.    Well, they initially in their response said that they
23    didn't infringe the patents, that they believed them to be
24    invalid, and then said they welcomed to come to court.
25    Q.    When you -- are you familiar with how much money PanOptis
```

1   has invested in its business today?

2   A.   Yes, I am.

3   Q.   How much?

4   A.   It is approximately $450 million through August of 2020

5   with a substantial portion of that going back to the original

6   innovating companies.

7   Q.   Thank you, Mr. Blasius.

8          MR. SHEASBY:  Your Honor, I pass the witness.

9          THE COURT:  Cross-examination by the Defendant?

10         MS. SMITH:  Yes, Your Honor.

11         THE COURT:  What are you doing, Mr. Sheasby?

12         MR. SHEASBY:  I was handing the binders to

13  Mr. Blasius.

14         THE COURT:  All right.  Proceed.  I just would like

15  to know what you're doing and what you've got in your hand

16  before you start walking around the courtroom.

17         MR. SHEASBY:  I understand, Your Honor.

18         THE COURT:  All right.  Let's proceed, Ms. Smith.

19         MS. SMITH:  Thank you, Your Honor.

20                    CROSS EXAMINATION

21  BY MS. SMITH:

22  Q.   Good afternoon, Mr. Blasius.

23  A.   Good afternoon.

24  Q.   My name is Melissa Smith, and I represent Apple.  Nice to

25  meet you.

1    A.    Nice to meet you.

2    Q.    Mr. Blasius, you were here when the Judge read his

3    preliminary instructions to the jury.  Correct?  You were

4    seated at that table?

5    A.    Yes.

6    Q.    All right.  You understand that the issue for the jury

7    here is to decide what a FRAND royalty would be for

8    Plaintiffs' five patents.  Is that correct?

9    A.    Yes.

10            MS. SMITH:  Your Honor, may I approach this flip

11   chart?

12            THE COURT:  You may.

13   Q.    (BY MS. SMITH)  And as you heard I believe from both

14   sides in opening, FRAND stands for fair, reasonable, and

15   nondiscriminatory, and you have no dispute with that, do you?

16   A.    No, I do not.

17   Q.    All right.  And each of the five patents here are

18   committed to be licensed on FRAND terms and conditions.

19   A.    That's correct.

20   Q.    And Samsung, Panasonic, and LG each committed that they

21   license the five Patents-in-Suit on FRAND terms.  Correct?

22   A.    Correct.

23   Q.    And then following along when Plaintiffs acquired the

24   five patents at issue here, they also made that FRAND

25   commitment.  Is that correct?

1    A.    Yes.

2    Q.    And that FRAND commitment is an irrevocable commitment.

3    You can't take it back, can you?

4    A.    Correct.

5    Q.    Now, Mr. Blasius, you understand that the Plaintiffs here

6    don't get to come to court -- you don't get to come to court

7    for this trial and break those FRAND commitments.  You

8    understand that?

9    A.    Yes.

10   Q.    Okay.  You're bound to them?

11   A.    Yes, we are.

12   Q.    And you take those commitments seriously.

13   A.    Yes.

14   Q.    And you understand the jurors here can hold you to those

15   commitments.

16   A.    Yes.

17   Q.    Okay.  You were also here when Judge Gilstrap gave his

18   preliminary instructions and talked about this case not being

19   punitive.  Did you hear the Judge say that?

20   A.    Yes.

21   Q.    And so you'd agree that this case is not a case where

22   you're asking the jury to punish Apple.  Is that correct?

23   A.    Correct.

24   Q.    You'd agree the jury's task is not the punish Apple.

25   Correct?

```
 1    A.   Correct.
 2    Q.   Because the jury's only task is to determine what's fair,
 3    reasonable, and nondiscriminatory.  Correct?
 4    A.   Yes, correct.
 5    Q.   Okay.  So if somebody came to you and said, you know, I
 6    want to punish Apple with a royalty rate that's higher than
 7    FRAND because Apple is a successful company, you'd say that
 8    would be the wrong thing to do.  Correct?
 9    A.   Correct.
10    Q.   And Samsung, LG, and Panasonic, they are all big
11    companies, aren't they, sir?
12    A.   Yes.
13    Q.   And so if somebody was to say, well, you know what?  I
14    think I want to discriminate against Apple because it's a big
15    company, that would be the wrong thing to do, wouldn't it,
16    sir?
17    A.   You could characterize it that way.
18    Q.   Okay.  Now, you visited with your attorney about the
19    relationship between the Plaintiffs and Panasonic, LG, and
20    Samsung.  Now, Panasonic, LG, and Samsung, they've got some
21    continuing arrangements with the Plaintiffs, do they not?
22    A.   Yes, that's correct.
23    Q.   They're continuing contractual arrangements.
24    A.   Yes.
25    Q.   So Plaintiffs have an ongoing obligation to share their
```

 1    licensing revenues with -- with LG and Panasonic.  Is that

 2    correct?

 3    A.   Correct.

 4    Q.   And so LG and Panasonic will receive a portion of any

 5    damages awarded in this case.  That would be Optis' revenue.

 6    Correct?

 7    A.   Yes.

 8    Q.   So LG and Panasonic have a direct financial interest in

 9    what the jurors decide here.  Is that correct?

10    A.   Yes.

11    Q.   And LG and Panasonic sell products in the marketplace

12    along with Apple.  Correct?

13    A.   Can you define products?

14    Q.   Electronic products?

15    A.   Electronic products?

16    Q.   Yes.

17    A.   Yes.

18    Q.   All right.  And Samsung certainly sells electronic

19    products and handsets along with Apple in the marketplace.  Is

20    that correct?

21    A.   That's correct.

22    Q.   The truth is actually Samsung sells more phones than

23    Apple.  Correct?

24    A.   I don't know.

25    Q.   All right.  Well, let's go back in 2012 first.  Back in

```
 1    2012, do you know whether or not Samsung was selling a lot
 2    more phones than Apple?
 3    A.    I don't recall the specific number at that time.
 4    Q.    Okay.
 5              MS. SMITH:  Mr. Lee, if we could take a look at the
 6    Defense demonstrative, the Gartner exhibit, which is at tab 10
 7    please.
 8    Q.    (BY MS. SMITH)  Mr. Blasius, are you familiar with
 9    Gartner Marketing Research as a member of the licensing
10    community?
11              MR. SHEASBY:  Your Honor, I object.  This is not in
12    evidence.  This was not preadmitted.  It's a demonstrative.
13    Counsel can refresh Mr. Blasius's recollection with this
14    document, but it shouldn't be published to the jury.
15              MS. SMITH:  Your Honor, we didn't have an agreement.
16    I'm not entering it into evidence as an exhibit.  It is a
17    demonstrative, and there was no agreement to exchange
18    demonstratives.  So this can't be considered some type of a
19    surprise, and it's marketing research.  He's been in marketing
20    for 25 years.  I assume he's familiar with it.
21              THE COURT:  If he has personal knowledge, he can
22    testify within his personal knowledge.  Overruled.  If he
23    doesn't have personal knowledge, he's not going to speculate
24    about what it is.
25              Let's proceed.
```

 1              MS. SMITH:  Of course.

 2    Q.   (BY MS. SMITH)  Mr. Blasius, you have been -- how long

 3    have you been doing licensing?

 4    A.   Approximately twenty years.

 5    Q.   All right.  And you keep track of what's going on in the

 6    market with various electronics companies that you're familiar

 7    with--Samsung, Apple, LG, Panasonic, companies like that?

 8    A.   Yes.

 9    Q.   I'm going to show you what has been put on the screen.

10              MS. SMITH:  And if we could go to table 1, Mr. Lee.

11    Thank you.  And if we could cull out -- highlight the Samsung

12    and Apple.

13              MR. SHEASBY:  Your Honor, I continue to object.

14    This is not evidence.  The witness can be refreshed by looking

15    at his binder.  We don't publish non-evidence to jurors.

16              MS. SMITH:  I'm going to ask if he's familiar with

17    these numbers, if these look appropriate based upon the

18    experience that he just testified to.  It's a demonstrative.

19              THE COURT:  If he has personal knowledge, he can

20    testify to it.  If he doesn't know this level of detail, he'll

21    have to say he doesn't know this level of detail.

22         Let's proceed.

23    Q.   (BY MS. SMITH)  Sir, do you have any recollection of the

24    number of Samsung handsets sold back in 2012 versus the number

25    of Apple handsets sold back in 2012?

```
1    A.    I don't recall the specific numbers.

2    Q.    So I'll make my question a little more broad.  Do you

3    recall that Samsung, not asking you for specific numbers, do

4    you recall that Samsung sold more phones than Apple in 2012,

5    give or take 50,000 or 70,000?

6    A.    I don't recall the specific numbers.

7    Q.    Okay.  Thank you, sir.

8          MS. SMITH:  Mr. Lee, you can take that down.

9    Q.    (BY MS. SMITH)  Now, we've talked about that ongoing

10   revenue relationship between PanOptis and LG and Panasonic.  I

11   want to talk about Samsung.

12        Now, Samsung approached PanOptis about a business deal, I

13   recall you telling Mr. Sheasby.  Is that correct?

14   A.    Yes.

15   Q.    And Samsung approached PanOptis and proposed that it

16   would pay for the acquisition of Unwired Planet.  Is that

17   correct?

18   A.    That's incorrect.

19   Q.    All right.  Well, as part of the deal, Samsung

20   transferred patents to Plaintiffs, including the 774.  Can we

21   agree on that?

22   A.    That's correct.

23   Q.    Okay.  Thank you, sir.

24          MS. SMITH:  Now, Mr. Lee, if you could put up DDX

25   53.4.
```

```
1    Q.    (BY MS. SMITH)  I've been stumbling over some of the

2    entities.  There are five Plaintiffs in this case.  Correct,

3    Mr. Blasius?

4    A.    Yes.

5    Q.    So we've got PanOptis Management up top here or kind of

6    in the middle of the screen.  Is that correct?

7    A.    Yes.

8    Q.    And PanOptis Management actually doesn't own any patents.

9    Is that correct?

10   A.    Correct.

11   Q.    Then we've got --

12              MS. SMITH:  Mr. Lee, if you'd pop up Optis Wireless

13   Technology.

14   Q.    (BY MS. SMITH)  Is that correct?  That's one of the

15   Plaintiffs in this case?

16   A.    Yes.

17   Q.    And we've got Unwired Planet, LLC.  Another Plaintiff in

18   this case?

19   A.    Yes.

20   Q.    Unwired Planet International is also a Plaintiff in this

21   case.  Is that correct?

22   A.    Yes.

23   Q.    And then you mentioned to Mr. Sheasby, I believe, that

24   even though you are up top here as the president and CEO of

25   these five companies, you're not actually employed by any of
```

```
 1    the Optis entities, but you're employed by Hilco Global.  Is

 2    that correct?

 3    A.   I wouldn't characterize it that way.

 4    Q.   Would you -- would it be appropriate to say you are paid

 5    by Hilco Global or your compensation comes from Hilco Global?

 6    A.   Yes.

 7    Q.   And you're designated by Hilco to be the president, the

 8    designated president and CEO of the Plaintiffs.

 9    A.   Yes.

10    Q.   You're the one who authorized the filing of the lawsuit.

11    Is that correct?

12    A.   Yes.

13    Q.   And over on the right, I'm going to add Samsung,

14    Panasonic, and LG.  Those are the entities that you would

15    agree chose to transfer their cellular patents to Plaintiff.

16    Is that correct?

17    A.   Yes, that's correct.

18    Q.   So is this a fair description of your corporate structure

19    for purposes of this lawsuit?

20    A.   It's not entirely accurate.

21    Q.   All right.  Is it a fair description of the five

22    Plaintiffs in this lawsuit?

23    A.   Yes.

24    Q.   Thank you.

25         Now, none of the five plaintiffs that we're looking at
```

```
 1   produce any actual cellular products themselves, do they?

 2   A.    No, they do not.

 3   Q.    Okay.  And none of the five Plaintiffs that we see on the

 4   screen sell any baseband chips, do they?

 5   A.    No.

 6   Q.    So Plaintiffs can never use a supply of products or a

 7   supply of baseband chips as leverage in a patent negotiation,

 8   could they?

 9   A.    No.

10   Q.    Plaintiffs don't have their own research and development

11   departments, do they?

12   A.    No.

13   Q.    You did say something.  I believe you said that Optis had

14   spent -- or the Panasonic-Lg entities had spent, did you say,

15   $450 million on research and development when you were

16   visiting with Mr. Sheasby?

17   A.    No, that was -- that's incorrect.

18   Q.    All right.  You're correct.  I'm sorry, Mr. Blasius.

19         So the former owners we see here, they chose to work with

20   Optis entities to license some of their cellular patents.

21   Correct?

22   A.    Correct.

23   Q.    Okay.  And as we've discussed, LG, Panasonic, and Samsung

24   all have some incentive for you to succeed in this case.  Is

25   that correct?
```

```
1    A.    That's not entirely correct.

2    Q.    Okay.  Well, you certainly don't dispute that LG and

3    Panasonic have an incentive for Plaintiffs to succeed here.

4    Correct?

5    A.    Yes.

6    Q.    Okay.  Is your position that Samsung has no incentive for

7    Plaintiffs to succeed here?

8    A.    Yes, that's accurate.

9    Q.    Okay.  Now, these companies that transferred the patents

10   to PanOptis, they could have helped you out by providing you

11   with information about performance benefits.  Correct?

12   A.    Could have helped us out?

13   Q.    If they had information about the performance benefits of

14   the patents that they owned and gave to you, they could have

15   provided you -- nothing prevented them from providing you that

16   information.  Is that correct?

17   A.    I don't know.

18   Q.    Did you ask for it?

19   A.    Not that I recall.

20   Q.    And you certainly didn't present any evidence of that

21   when you were testifying to this jury, did you?

22   A.    Correct.

23   Q.    Now, Plaintiffs are seeking a royalty of $4.22 per iPhone

24   for the five asserted patents in this case.  Is that correct?

25   A.    Yes.
```

1   Q.   And that is for a period of 18 months.  Did I get that

2   right?

3   A.   Correct.

4   Q.   So at that per unit rate that the Plaintiffs are

5   requesting, that could add up to far more than a half billion.

6   It could be billions.  Is that correct?

7   A.   It depends on the time period.

8   Q.   Well, to be clear, the $506 million that you're asking

9   the jury for is just for the time period between February of

10  2019 through August of 2020.  Is that correct?

11  A.   Yes.

12  Q.   And Plaintiffs are going to ask this jury for that same

13  $4.22 for an iPhone period from August '20 beyond through the

14  expiration of the patents in a running royalty.  Isn't that

15  correct?

16  A.   That's correct.

17  Q.   And these five patents aren't going to expire for many,

18  many years.  Correct?

19  A.   That's correct.

20  Q.   So what you're asking for the jury for is actually

21  billions of dollars, sir.  Is that correct?

22          MR. SHEASBY:  Your Honor, I object.  As a matter of

23  law, running royalty is not decided by this jury.  On a

24  royalty basis --

25          THE COURT:  I can't hear you, Mr. Sheasby.

1          MR. SHEASBY:  Your Honor, I object.  This is a

2     mischaracterization of the law.  Running royalty applicability

3     of damages is decided by the Court, not the jury, and counsel

4     should not be mischaracterizing the role between the jury and

5     the Court.

6          MS. SMITH:  Your Honor, I believe this plaintiff

7     wants an option, a running royalty option for this jury to

8     decide, and that's what I'm addressing now.  If they're

9     withdrawing that, I'll withdraw my questions.

10         MR. SHEASBY:  Your Honor, the problem is the

11    suggestion that the jury will decide the future royalty as

12    opposed to the Court.

13         THE COURT:  Ms. Smith, this is the corporate

14    representative of the Plaintiff.  You can ask him if the

15    corporation is seeking a running royalty, whether it's from

16    the jury or some other source.  You don't need to go beyond

17    are they or are they not seeking that running royalty over the

18    life of the remaining life of the patents.

19         MS. SMITH:  Understood, Your Honor.

20         THE COURT:  All right.  Let's proceed.

21    Q.   (BY MS. SMITH)  So, Mr. Blasius, you're seeking -- in

22    addition to the half billion, you're also seeking a running

23    royalty going forward through the life of the patents.  Is

24    that correct?

25    A.   I wouldn't characterize it that way.  We're seeking a

1    running royalty.

2    Q.   Now, working just with that $506 million or half-billion

3    dollar number, you'd agree that Samsung, Panasonic, and LG as

4    competitors of Apple, they wouldn't be too upset if Apple had

5    to pay those royalties, would they?

6    A.   I don't know what their position would be.

7    Q.   Well, do you think Samsung, Panasonic, and LG might sell

8    more of their own products if Apple is having to pay a half

9    billion dollars out in royalties like that?

10        MR. SHEASBY:  Your Honor, I object.  This is a

11   violation of Ericsson.  This is completely contrary to the

12   hypothetical negotiation.  It has nothing to do with

13   hypothetical negotiation in this case.  Ericsson is directly

14   on point.  The question should be stricken.

15        THE COURT:  It calls for speculation.  This witness

16   can't testify about what Samsung, Panasonic, or LG might

17   think.  I'll sustain the objection.

18        MS. SMITH:  Understood, Your Honor.  And I'm

19   actually going to move along now, and I need to seal the

20   courtroom, Your Honor, if you'll allow me, because I'm going

21   to talk about Plaintiffs' confidential information.

22        THE COURT:  That's fine.  Based on counsel's

23   request, I'll order the courtroom sealed.

24        Those present not subject to the protective order that's

25   been entered in this case should excuse themselves until the

1    courtroom's reopened and unsealed.

2              MS. SMITH:  At the same time, Your Honor, may I

3    approach and put a board on the easel, please?

4              THE COURT:  You may.

5              MS. SMITH:  Thank you.

6              THE COURT:  Let's go off the record a minute.

7         (A discussion was held off the record.)

8         (The courtroom was closed.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6          THE COURT:  You may step down, Mr. Blasius.

7      I'll order the courtroom unsealed at this time.  I will

8  ask the courtroom security officer to invite the public to

9  return.

10          MR. SHEASBY:  Your Honor, may I approach and

11  retrieve the binders?

12          THE COURT:  Yes, you may.

13          MS. SMITH:  Your Honor, may I approach to take this

14  down?

15          THE COURT:  Yes, please do.

16          MS. SMITH:  Thank you.  And I'll also flip that

17  over.

18      May I approach?

19          THE COURT:  You may.

20          MS. SMITH:  Thank you.

21          THE COURT:  Plaintiff, call your next witness.

22          MR. SHEASBY:  Your Honor, Plaintiffs call Professor

23  Mark Mahon.

24          THE COURT:  All right.  Professor Mahon, if you'll

25  come forward and be sworn, please.

```
 1              MR. SHEASBY:  Your Honor, may I approach and hand
 2    binders?
 3              THE COURT:  You may distribute binders.
 4              (Whereupon, the oath was administered by the Clerk.)
 5              THE COURT:  Please come around and have a seat on
 6    the witness stand.
 7         All right, Mr. Sheasby.  You may proceed with direct
 8    examination.
 9              MR. SHEASBY:  Your Honor, with your permission, may
10    Professor Mahon use a remote to advance the demonstratives
11    that he's prepared.
12              THE COURT:  That's not a problem.  Hand it to the
13    Court Security Officer and he will hand it to the witness.
14         All right.  Let's proceed with direct examination.
15                       MARK MAHON, PhD,
16    testified under oath as follows:
17                       DIRECT EXAMINATION
18    BY MR. SHEASBY:
19    Q.   Good afternoon, Professor.
20    A.   Good afternoon.
21    Q.   Can you please introduce yourself?
22    A.   Yes.  My name is Mark Mahon.  I'm employed by Penn State
23    University as a professor in the school of electrical
24    engineering and computer science.
25    Q.   Can you tell us a little bit about yourself?
```

1    A.    Yes.   I'm married.   We're going to be celebrating their

2    33rd wedding anniversary are in two months.   I have two

3    daughters.   My oldest daughter is a physician associate in

4    Milwaukee, and she just had our first grandchild; and my

5    younger daughter works as a healthcare consultant in

6    Philadelphia.

7    Q.    What is your education background?

8    A.    I received my Master of Science and PhD from Penn State

9    University.   My PhD was in acoustics.   My Master of Science

10   was in electrical engineering.   Acoustics is a combination of

11   electrical engineering and physics.   For example, I took the

12   same communications theory, signal processing theory, and

13   antenna theory courses that an electrical engineering student

14   would take in addition to additional physics classes.

15        I was also a research faculty member for 25 years at Penn

16   State University, and currently I am a professor for the last

17   six years teaching graduate and undergraduate classes in

18   wireless and mobile networks.

19   Q.    Altogether, how long have you been working in the

20   cellular telecommunications field?

21   A.    I've been working in the cellular telecommunications area

22   for 33 years.   Right out of college, I was recruited by the

23   Central Intelligence Agency to work on classified programs in

24   the area of cellular comms--communications.

25        I then went, as I said, to work for the Applied Research

 1    Lab at Penn State University for 25 years.  During that time,

 2    I worked on 2G, 2 and a half G, 3G, and LTE systems.

 3          Now, I also did classified work for the Department of

 4    Defense, and I can't tell you much about that, but one thing I

 5    can tell you about is the National Reconnaissance Office had a

 6    problem in the late '90s, and they were being told the problem

 7    could not be solved.  I came up with a solution.  I built a

 8    system, and we took it out to the desert and we tested it, and

 9    it worked.  And they were so pleased with the results, they

10    renamed the program Desert Gold.  That led to $12 million

11    additional research funding over the next 15 years.

12    Q.   Can you tell us a little bit more about Desert Gold?

13    A.   Yes.  Desert Gold -- the result of Desert Gold we used to

14    develop equipment that was then deployed to Iraq and

15    Afghanistan to help protect our troops against improvised

16    explosive devices.  IEDs can be set off by wireless signals,

17    including cellular signals, and our equipment helped protect

18    our troops in the theater.

19    Q.   Have you ever received commendations for your work?

20    A.   Yes, I have.  The National Reconnaissance Office awarded

21    me two commendation letters.

22    Q.   I would like you to show those to the jury.

23          MR. SHEASBY:  Would you please do so?

24    Q.   (BY MR. SHEASBY)  What are these commendations for?

25    A.   These two commendation letters are from the National

1    Reconnaissance Office for my work in the telecommunications

2    area.

3    Q.   And when it says "Mark is the genius behind the Bella

4    software algorithms," is that you?

5    A.   That is me.

6    Q.   Are you being compensated for your work in this case?

7    A.   Yes I am, sir; at $400 an hour, which is my standard

8    consulting rate for this type of work.

9    Q.   About how many hours have you worked on this case?

10   A.   Approximately 550.

11   Q.   What is your compensation based on?

12   A.   The actual hours I work on the case.

13   Q.   Have you ever worked for PanOptis before this litigation?

14   A.   I have not.

15   Q.   Have you ever investigated Apple's conduct before this

16   litigation?

17   A.   I was involved in one other case against Apple.

18          MR. SHEASBY:  Your Honor, we would like to offer

19   Professor Mahon as an expert on cellular telecommunication

20   systems.

21          THE COURT:  Is there an objection?

22          MR. MUELLER:  No objection Your Honor.

23          THE COURT:  Without objection, the Court will

24   recognize this witness.

25          Let's continue.

234

```
 1              MR. SHEASBY:  Thank you, Your Honor.
 2    Q.   (BY MR. SHEASBY)  Professor, what will you testify about
 3    today?
 4    A.   I'm going to be testifying about the technical value to
 5    Apple for two patents, Patent No. 9,001,774, which I would
 6    refer to as the '774 Patent today, and Patent No. 8,385,284,
 7    which I will refer to as the '284 Patent.
 8    Q.   What technology area are the '774 and '284 patents
 9    related to?
10    A.   High speed LTE communications.
11    Q.   And what is LTE?
12    A.   LTE stands for long term evolution.  A group of leading
13    technology companies in the world who got together to create
14    the next generation network, including LG, Samsung, Panasonic,
15    and Ericsson, and they wanted to build a network that could
16    evolve over time by increasing its capabilities to deliver
17    high-speed data and massive amounts of data.
18    Q.   What materials did you consider as part of your analysis?
19    A.   I considered many materials that I list here on the
20    slide.  Most importantly, what I'm going to talk about today
21    is the source code--that is, what actually is running on the
22    phones and devices--and also testing data.  The source code
23    tells me what the device could do; the testing data tells me
24    what the device actually does.
25    Q.   What Apple products use the '774 and '284 Patent
```

```
 1    technology?

 2    A.    All Apple products that include the LTE functionality.

 3    On this slide I show you the iPhones and iPads offered to the

 4    public since 2012 and iWatches offered to the public since

 5    2015.  All these devices, based on my analysis, operate in the

 6    same way in relevant part.

 7              MR. MUELLER:  And, Your Honor, I just want to move

 8    to strike to the extent there is any suggestion that the

 9    period at issue before the jury is anything other than the

10    period from 2019 to 2020, as instructed by Your Honor.

11              THE COURT:  You can certainly clarify that on cross

12    examination.  He's not precluded from offering whatever

13    testimony he wants to.

14              MR. MUELLER:  Thank you, Your Honor.

15              THE COURT:  That request is overruled.  You'll deal

16    with it on cross.

17         Let's continue, Mr. Sheasby.

18    Q.    (BY MR. SHEASBY)  Did you analyze source code as part of

19    your investigation?

20    A.    Yes, I did, sir.

21    Q.    Have you seen any evidence that Apple advertises the

22    speed of its LTE products?

23    A.    Yes, I have.  So this is a great example of how the

24    network designers for LTE understood that while their network

25    evolved over time, device manufacturers' devices would evolve
```

1    over time to be able to get faster and better.  So on this

2    slide I show an example of how the iPhone 5, first release for

3    LTE functionality, has evolved through the iPhone 11.  And

4    Apple advertised in the beginning iPhone 5's blazing fast LTE

5    speeds, and you can see on the right I highlight that their

6    advertising for the iPhone 11 gigabit class LTE.  That's

7    really, really fast.

8    Q.    And this is Exhibit PX 2129?

9    A.    That is correct.

10   Q.    What claim of the '774 Patent is used in Apple's LTE

11   products?

12   A.    So claim 6 on this slide, on the left I show you the text

13   from claim 6.  The '774 Patent was invented by a gentleman by

14   the name of Dr. Farooq Khan of Samsung.

15                MR. SHEASBY:  Can we have the next demonstrative,

16   please, Mr. Huynh?

17   Q.    (BY MR. SHEASBY)  Do you recognize the document on the

18   left-hand side of the slide?

19   A.    Yes, I do.  That's an Apple document.

20   Q.    And what is it identifying about Samsung, Panasonic, and

21   LG portfolios?

22   A.    It's showing you that these three companies have a much

23   larger portfolio than the companies that are listed on the

24   right.

25   Q.    Let me stop you right there.  I apologize.

```
 1   A.    I'm sorry, sir.

 2   Q.    This is an Apple document that shows Samsung, Panasonic,

 3   and LG leading in the creation of patented technology.  Is

 4   that correct?

 5   A.    That is correct.

 6   Q.    How does the industry view Samsung's level of innovation?

 7              MR. MUELLER:  I object, Your Honor; lack of

 8   foundation as to who he's referring to, and hearsay.  The

 9   question was how does the --

10              THE COURT:  I heard the question, counsel.

11        Is this not addressed in the expert's report?

12              MR. SHEASBY:  It is, Your Honor.

13              THE COURT:  Overruled.

14   Q.    (BY MR. SHEASBY)  How does the industry view Samsung's

15   level of innovation?

16   A.    So industry views Samsung as a leader in innovation in

17   the area of electronics and telecommunications.

18   Q.    What LTE design does the '774 Patent relate to?

19   A.    Okay.  So the '774 Patent is a great example again of

20   this evolutionary process.  So if you remember back in the

21   day, we used to have phones and you'd pull out a whip antenna,

22   a single antenna on top of your phone, or you would have a

23   little stub on top of your phone.  So your phone had a single

24   antenna.  And a base station would typically talk to that

25   single antenna on that phone with one antenna so they can send
```

1    data back and forth.

2              THE COURT:  Doctor Mahon, can you speak a little

3    slower, please?

4              THE WITNESS:  Yes, Your Honor.  I will try.

5              THE COURT:  That would be helpful.

6              THE WITNESS:  So the insight of the '774 is that

7    they realize the devices were evolving and that they would

8    have multiple antennas.  So now you could have two antennas in

9    your phone talking to two antennas in the base station, so

10   theoretically you could have twice the data throughput.

11        So the '774 Patent that I show you -- the technology base

12   that I show you on this slide, if you look on the right-hand

13   side of the slide, you see a base station and I have arrows

14   pointing to two antennas.  On the left I have highlighted

15   portions of schematics from Apple devices, and I have

16   highlighted an upper and lower antenna showing you the device

17   had two antennas.

18   Q.   What are the challenges with multiple antenna systems?

19   A.   So it sounds real easy, but it's actually pretty

20   complicated.  So let's take a step back and look at this

21   slide.

22        So at the slide, again, I'm showing you a base station on

23   the right sending two waves.  That's the green and the red

24   wave to the phone.  Okay?  So it's two data streams.  Now, it

25   might seem easy that the phone can just receive those signals;

1    however, it turns out that those waves have to be synchronized

2    properly to be able to receive that data so that if they

3    interfere with each other, you don't get the double capacity.

4         Now, what makes that a problem -- so the challenge, if

5    you're sitting in your home with your phone, you're in one

6    environment and the path between the base station and your

7    phone is pretty steady.  If you're walking down the street

8    carrying your phone, you're in a different environment and the

9    signals between the base station and your phone are changing

10   as you're walking.  It's also reflecting off of things like

11   cars and buildings.  If you're sitting in a car going 60 miles

12   an hour as a passenger and you're looking at your phone, the

13   environment is changing very fast.  The base station has no

14   idea about the local environment for your phone, so the base

15   station cannot synchronize those waves so your phone can

16   receive them in the most optimal fashion.

17   Q.   Can you illustrate what would happen if the waves used to

18   send data are not synchronized according to the patent?

19   A.   Yes.  So on this animation I have for you, a base station

20   sending two streams of data.  I'm representing the data as one

21   set is red one set is green.  Those little square boxes you

22   can think of as a data packet.  So if the waves aren't

23   synchronized, they interfere.  And you see some of those

24   packets flying off representing errors in the system, meaning

25   you're not receiving the data as fast as you could, and that's

```
 1    because they're interfering with each other.  And it's

 2    possible that if there's enough interference, you could

 3    actually be back to the single antenna case where your speeds

 4    are as slow as using a single antenna.

 5    Q.   How does the '774 Patent address this challenge?

 6    A.   So the inventor of the '774 Patent had a great insight.

 7    He realized that if you can take -- if your phone can take a

 8    measurement of your local environment and send that

 9    information to the base station--we're calling it a processing

10    parameter here; again, a measurement of the local environment

11    for your phone in the car, down the street, sitting in your

12    house--the base station can use that information to optimize

13    the signals, customize the signals it's sending to your phone.

14        Now, the base station could choose also to use other

15    parameters.  So in addition to this, the base station is going

16    to send customized control information to your phone to tell

17    you how it did the customization of the signals.  That way

18    when your phone receives that information, it can coherently

19    receive those waves and optimize the data throughput.

20    Q.   What steps did you take to investigate the scale of use

21    of the '774 technology?

22    A.   So what I did is I looked at the source code, so we

23    talked about that; but to actually see the use, I had to look

24    at data.  So I analyzed two data sets.  The first, as I show

25    on the slide on top, was taken by a team of independent
```

1    engineers that are experienced in the area of basically data

2    collection for wireless systems.  The second set of data I

3    looked at was Apple internal data on the technology that I'm

4    going to be talking about that I can consider to be associated

5    with the '774 Patent.

6    Q.    When is the '774 Patent technology used?

7    A.    So referring to that top data set, that independent data

8    set, based on my analysis any time something is called --

9    something called transmission mode 4 is seen in the data, my

10   analysis shows that it's also associated with a data format

11   that is linked to the '774 Patent.

12        Now, if you remember, those two steps in the '774 Patent,

13   step 1 and step 2, I'm going to refer to that as a closed loop

14   feedback.  So any time I say closed loop feedback or closed

15   loop spatial multiplexing, I'm referring to the '774

16   technology.  And based on my analysis of the independent data,

17   when I see transmission mode 4, I know the '774 technology is

18   used because I saw that spatial multiplexing -- closed loop

19   spacial multiplexing was associated with it.

20   Q.    How often is transmission 4 mode used in the United

21   States, according to Apple's data?

22   A.    So this data was taken from actual Apple users, and you

23   notice it was sampled across the entire U.S. 650,000 cells

24   across the U.S., and you can see that, based on my analysis

25   that transmission mode 4 represents the '774 technology, it's

1    used nearly 72 percent of the time.

2    Q.   Was independent testing also performed?

3    A.   Yes, it was.  So I worked with a team of engineers that I

4    mentioned from a company called TechPats, and they were

5    supervised by a gentleman by the name of Mr. Claude Royer who

6    has 30 years of experience.  He was a director at

7    RIM--BlackBerry.

8    Q.   Doctor Mahon, I'm sorry for interpreting you.  Let me ask

9    you a slightly different question.

10        Did you analyze the data that was generated by TechPats?

11   A.   Yes, I did.

12   Q.   Did you discuss the methodology that TechPats employed in

13   some of its testing?

14   A.   Yes, I did.

15   Q.   Are you confident with the methodology that they used?

16   A.   Yes, I am.  I spent many years doing testing, and through

17   my discussions with the engineers I am very confident in their

18   technical approach.

19   Q.   What was the scope of the testing?

20   A.   The scope of the testing, which I show on this slide, is

21   that they did data analysis from data they collected from 2012

22   through 2019.  They tested across 24 cities and, as I show,

23   eight states, against all four major LTE network carriers

24   Verizon, AT&T, T-Mobile, and Sprint.

25             THE COURT:  Let me interrupt at this point.

```
 1          Ladies and gentlemen, it's been right at two hours since
 2    we've had a recess.  This testimony is expected to go for some
 3    considerable length.  Let's take a short recess at this time.
 4    We'll come back and continue with the direct examination of
 5    Doctor Mahon by the Plaintiff.
 6          Just simply close your notebooks and leave them in your
 7    chairs, if you will.  Follow all my instructions, including
 8    not to discuss the case among yourselves.  Use this
 9    opportunity to stretch your legs and get a drink of water, and
10    we'll be back here shortly to continue.
11          The jury is excused for recess.
12              (Whereupon, the jury left the courtroom.)
13              THE COURT:  While we're on recess, Doctor Mahon,
14    practice speaking slower.  All right.
15              THE WITNESS:  Yes, Your Honor.
16              THE COURT:  Court stands in recess.
17                      (Brief recess.)
18              THE COURT:  Be seated, please.
19          Mr. Sheasby, you are going to have to be louder so that
20    we can all hear you.
21              MR. SHEASBY:  Yes, Your Honor.
22              THE COURT:  My court reporter is having trouble
23    hearing you and he's much too young to have hearing problems,
24    and I'm having trouble hearing you and I'm much too young to
25    have hearing problems.  You are going to have to speak up.
```

1    The lawyer that can't make himself heard's got a problem.

2            MR. SHEASBY:  Yes, Your Honor.

3            THE COURT:  And are you going to slow down for me,

4    Doctor Mahon?

5            THE WITNESS:  I am, Your Honor.

6            THE COURT:  Okay.  Let's bring in the jury.

7            (Whereupon, the jury entered the courtroom.)

8            THE COURT:  Please be seated, ladies and gentlemen.

9        We'll continue with the direct examination of the witness

10   by the Plaintiff.

11       Mr. Sheasby you may proceed.

12            MR. SHEASBY:  Thank you, Your Honor.

13   Q.   (BY MR. SHEASBY)  Can you talk about the independent

14   testing that was performed on the use of the '774 Patent?

15   A.   Yes.  This slide shows you two unique testing

16   configurations that were designed by the company TechPats.  On

17   the left you see something called a wave judge.  So the

18   apparatus on the left was built around the wave judge.  What

19   the wave judge does it's like a vacuum cleaner.  It sucks up

20   all the wireless signals in a given area over a short period

21   of time.  That allowed them to see what transmission modes,

22   for example, were in the area.

23       On the right you see something called Accuver.  That's

24   software that you connect to the phone that's under testing to

25   see what messages and what data is being sent to the phone so

1    you can see what transmission modes and what formats -- data

2    formats are being seen by the phone.  These two configurations

3    allowed me to see the data that was being shown to the devices

4    under test.

5    Q.    Does it matter whether TechPats ran these tests with

6    Android phones or Apple phones?

7    A.    No, because the network determines the transmission mode

8    and the data format, so the presence of either an iPhone or an

9    Android phone wouldn't change what transmission mode and data

10   format was used.

11   Q.    Is the testing specific for the use of the '774 Patent?

12   A.    Yes, it is.  Again, based on my analysis, every time

13   based on this data we were able to see -- I was able to see

14   the relationship between something called transmission mode 4

15   and the data format associated with the '774 technology, that

16   closed loop feedback.

17   Q.    What trend of usage does TechPats data show?

18   A.    So over the entire data set from 2012 to 2019, it shows

19   an increasing use of TM4, the mode associated with the '774

20   technology, so over time the networks were using that

21   transmission mode, that technology more and more.

22   Q.    Were there any limits on the 2019 testing?

23   A.    Yes.  There were several test sets taken at the end of

24   2019.  However, due to COVID restrictions, we weren't able to

25   take additional data in 2020, so for my analysis I included

```
 1    -- went back to 2015, because that's the date that the '774

 2    Patent was granted, and I analyzed the data from 2015 to 2019.

 3    Q.    How often is TM4 used in the damages period?

 4    A.    So the damages period, which is February 2019 to August

 5    2020, the '774 mode is used 100 percent of the time.

 6    Q.    From 2015 to 2019, how often is the '774 Patent mode

 7    used?

 8    A.    It's used -- I found it to be used 64 percent of the

 9    time, so to do my analysis and to be very conservative, to

10    give Apple the benefit of the doubt, from my analysis going

11    forward I used the 64 percent number.

12    Q.    How often is the '774 Patent used by Apple, based on your

13    analysis?

14    A.    So, again, thinking back to the Apple data, they said

15    it's used 72 percent of the time.  The independent testing

16    said between 64 and 100 percent.  So again, to be very, very

17    conservative, I used the 64 percent number.

18    Q.    How did you quantify the technical value of the '774

19    Patent?

20    A.    What I wanted to do is I wanted to see what incremental

21    value the '774 technology added to the Apple device, not any

22    value associated with it being standardized.

23    Q.    To do this, what did you compare it to?

24    A.    So what I did is I compared the '774 mode to something

25    called transmit diversity, and by comparing the performance of
```

1    the '774 technology to the closest alternative that I could

2    find, transmit diversity, I would be able to quantify the

3    difference in the -- using the '774 technology.

4    Q.    Is your analysis an analysis of the incremental benefit

5    provided by the '774 Patent over the alternatives available to

6    Apple?

7    A.    Yes, it is.  Again, I wanted to focus on what incremental

8    improvement that the '774 technology brought to the Apple

9    device compared to the baseline of the next closest

10   alternative, which was transmit diversity, in my opinion.

11   Q.    How does transmit diversity differ from the '774 Patent?

12   A.    So in this animation I show you an animation of the

13   transmit diversity mode.  Transmit diversity consists of

14   taking one data set, so one color there, using two antennas,

15   so you see two data streams; however, there's no closed loop

16   feedback in the system, so you might end up with a little bit

17   of error but, in general, transmit diversity is kind of slow

18   and steady.  It's a nice solid technology.

19   Q.    And how does that differ from the '774 Patent?

20   A.    So as we saw before, the '774 technology includes that

21   closed loop feedback where the phone is taking measurements

22   and sending those to the base station.

23   Q.    Did you analyze potential -- other potential alternatives

24   that could have been used?

25   A.    Yes, I did, and there were no good alternatives.  All the

```
 1    other alternatives were performing much worse or, as I show on

 2    this slide, they would also be covered by the use of the

 3    Plaintiffs' patents or they were rejected by the LTE

 4    standards.

 5    Q.    How much faster is the '774 Patent solution than the

 6    closest alternative?

 7    A.    So based on my analysis, the '774 Patent is 14 percent

 8    faster than the next closest alternative.

 9    Q.    Has Apple argued that there was another alternative it

10    could have used?

11    A.    Yes.  They claim using something called open loop spatial

12    multiplexing could be used.

13    Q.    Is open loop spatial multiplexing an acceptable

14    alternative?

15    A.    No, it isn't, because it's also covered by a patent of

16    the Plaintiff.

17    Q.    Have you seen any data on the usage of open loop spatial

18    multiplexing compared to the '774 Patent technology?

19    A.    Yes, I have.  The open loop spatial multiplexing is

20    associated with something called transmission mode 3.  So the

21    '774 is transmission mode 4.  So Apple's own data showed me if

22    I can find it -- can we bring up the demonstrative --

23          MR. SHEASBY:  I think it's slide 29, Mr. Huynh.

24          THE WITNESS:  So here's the open loop mode

25    transmission mode 3, and here is the '774 mode based on my
```

1    analysis.  And you can see that the open loop mode is used

2    much less often than the closed loop mode associated with the

3    '774 Patent.

4    Q.   (BY MR. SHEASBY)  And this is PX 0020?

5    A.   Correct.

6    Q.   What is your final conclusion regarding the benefit

7    provided by the '774 Patent?

8    A.   My final conclusion is that the '774 Patent provides at

9    least 14 percent benefit, and then if I discount that by the

10   conservative estimate of its usage of 64 percent, to Apple the

11   next closest alternative that they could use would make their

12   device 8.3 percent slower than if they used the '774

13   technology.

14   Q.   What claims of the '284 Patent are at issue?

15   A.   Claims 1, 14, and 27.  I show text from claim 1 on the

16   left.

17   Q.   Who invented the '284 Patent?

18   A.   The '284 Patent was invented by several engineers from

19   Panasonic.  All of them were prolific inventors.

20   Q.   What is the industry's view of Panasonic's record of

21   innovation?

22   A.   Again, we've seen this slide before, but if you look at

23   the slide you'll see that Panasonic was viewed as an innovator

24   due to their holdings in the patent area.

25   Q.   And what is the source of this slide?

```
 1    A.    This is from Apple.   This is an Apple document.

 2    Q.    What problem does the '284 Patent address?

 3    A.    Okay.   So LTE communications involve sending data packets

 4    from the base station to the phone and from the phone to the

 5    base station.   Well, those packets contain two things,

 6    actually--control information and data.   The '284 Patent is

 7    directed to reducing the amount of control information in that

 8    packet without adding additional errors into the system.   So I

 9    have highlighted on the slide that they're focused on reducing

10    the amount of bits in that data packet.   A bit is the 1 or 0

11    used to send information in communication systems.   And you

12    notice they say they do not introduce additional errors into

13    the system.

14    Q.    Why is there a need to reduce the number of bits for a

15    control signal?

16    A.    So if you look at this slide, on the left I show in

17    orange control information, and then in blue you see data, and

18    this square is the data packet I've been talking about.

19          Now, if you could reduce the amount of control

20    information, you could actually have more data in that packet.

21    So reducing the amount of control information is a very

22    important goal if you want to send additional data through

23    your network.

24    Q.    Is there a risk of reducing control information?

25    A.    Yes, there sure is.   If you notice on the slide, I call
```

1    the control information 'assembly instructions', because that

2    tells the phone how to read data sent by the base station or

3    how to format data to send it up to the base station.  And if

4    that's not done right, there's errors in the system, your

5    video will hang up, your text message won't go through, your

6    call will drop.

7    Q.   How many bits would the '284 Patent save?

8    A.   The '284 Patent saves two bits overall.  Now, that

9    doesn't sound like a lot of data; however, these packets are

10   flowing hundreds and millions of times a second.  The slide in

11   front of you -- I'm sorry.

12            MR. SHEASBY:  Can we advance the next slide,

13   Mr. Huynh?

14   Q.   (BY MR. SHEASBY)  When is the '284 --

15            MR. SHEASBY:  Slide 37.

16   Q.   (BY MR. SHEASBY)  When is the '284 Patent used by Apple?

17   A.   The '284 Patent is used any time the device needs to send

18   data up to the network.  So if your phone has data to send, it

19   has to use the '284 technology to send that data.

20   Q.   Is there objective evidence that the industry recognize

21   the importance of this solution?

22   A.   Yes, there is.  3GPP, that's THE standard body made up of

23   engineers from leading technology corporations around the

24   world, would get together and choose which proposed

25   technologies were superior and to include into the LTE

 1    standard.  Panasonic competed against other companies and

 2    their proposal won out.

 3    Q.   What other options did the LTE body consider before

 4    adopting the '284 solution?

 5    A.   So on the slide I show you three examples of other

 6    solutions considered by 3GPP, and they rejected them in favor

 7    of Panasonic's proposal.

 8    Q.   How did you analyze the technical value of the Panasonic

 9    invention which won out in LTE?

10    A.   First I compared it to the next best available

11    alternatives, noninfringing alternative, and I did a

12    performance analysis of the impact of not using the '284

13    technology.

14    Q.   Were there any good alternatives available?

15    A.   There were no good alternatives available because the

16    available other alternatives, as I indicate here, were either

17    rejected by 3GPP because they added error to the system, or

18    they were much less efficient, or they still used '284

19    technology.

20    Q.   Based on your technical analysis, what is the closest

21    alternative to Apple?

22    A.   Something called the separate field approach, which is

23    the first row on that table.

24    Q.   Why is separate field the closest alternative?

25    A.   Because it does not add additional errors into the

 1    system.

 2    Q.    Did you quantify the performance improvement of the '284

 3    Patent over the separate field approach?

 4    A.    Yes, I did.  So the analysis I summarize here is actually

 5    fairly complex.  What I had to do is I had to average the

 6    impact of the '284 technology over time and also over

 7    something called resource blocks, which are involved in the

 8    telecommunications network.

 9         Now, the first bullet shows you that I took into account

10    the two-bit savings.  The next two bullets show you that I

11    took into account how often those two-bit savings would be

12    used or sent in the network.  And then the last bullet, I took

13    into account how often Apple's device would be using that

14    particular piece of information.

15    Q.    Can speed also be understood in terms of increased

16    network capacity?

17    A.    So network capacity you can think of as how much either

18    data you can send or how many users you can support.  Now, if

19    you have a fixed network capacity, and let's just say the

20    resources that the network could use are bits, if you take

21    away some of those bits--right?--the download speeds would

22    slow down.  So you can compensate by that if you added

23    additional network resources meaning, say, another base

24    station.  So you can actually -- there's a direct general

25    relationship between network capacity and upload and download

1    speeds.

2    Q.   How does the savings in network capacity affect download

3    speed in this case?

4    A.   So in this case, based on my analysis, I came to the

5    conclusion that the '284 technology saves between .19 percent

6    and .35 percent of network capacity.  It increases the

7    capacity by that amount.

8        Now, taking the relationship into account I just talked

9    about, you could also consider that as if you -- if you're not

10   using the '284 technology, that would be the direct equivalent

11   between a .19 and a .35 percent slow-down in the network if

12   you're not using the technology.

13   Q.   Can you think about the '284 Patent in terms of savings

14   of cellular data?

15   A.   Yes.  Again, this calculation is fairly complicated, but

16   I took into account how often the average user is using the

17   phone to send data; how many packets are sent per

18   millisecond--a thousand packets a second; how often that

19   control information is sent by the network--30 percent at a

20   time; how many bits are saved over the three-year life span of

21   the phone; and I concluded that per day per device it saves

22   900,000 bytes or 900 megabytes over the life of the phone, a

23   single phone in a single cell.  We have 650 cells in the U.S.

24   and there is hundreds of millions of phones.

25   Q.   Is there evidence that cellular providers care

1    particularly about the '284 Patent technology?

2    A.   Yes.  This document is from a network operator named

3    T-Mobile.  This document shows you that they require any

4    device manufacturer to support three particular 3GPP

5    standards, 36.211, 36.212, and 36.213, which are directly

6    related to the '284 technology.  They also require,

7    approximately, a small number of additional specs, 25 or so,

8    and they require adherence to TS 36.321 and TS 36.311 -- 331.

9    Q.   What part of the Apple device is -- that's Exhibit

10   PX 2055.  Is that correct?

11   A.   That is correct.

12   Q.   What part of the Apple device is involved in the use of

13   the '774 and '284 Patents?

14   A.   Yes.  As Apple's own representative testified, that every

15   part of the device is involved in transmissions, and he

16   testified that in order to send and receive data, every part

17   of the iPhone is used.  And I agree with this in particular

18   because the baseband processor has to interact with all the

19   other components on the device.

20   Q.   Can you show some examples of the components needed to

21   practice the '774 and '284 Patents?

22   A.   Yes.  This is a circuit board from the iPhone X.  It

23   shows transceivers, amplifiers, antennas -- pointing out the

24   antennas, but there's also things such as filters on there,

25   too, and all these elements are involved in practicing or

1      implementing technology.  And I also have here a circuit board

2      from the iPhone 11 Pro Max also illustrating all the

3      components in the phone that interact to be able to implement

4      the technology of the '284 and the '774 Patents.

5      Q.   Were you here when Apple's counsel in opening suggested

6      that all of the operation of the patents occurs in something

7      called the baseband chip?

8      A.   I was, yes.

9      Q.   Is that an accurate statement?

10     A.   No, not in my opinion and my experience.  I've done data

11     analysis with cell devices and software analysis, and I've

12     built devices based on cell technology over the last few

13     decades, and the baseband processor definitely has to interact

14     be able to implement LTE or other generation technologies.

15     Q.   We discussed the Qualcomm-Apple settlement agreement?

16     A.   Yes, I was.

17     Q.   And that was the agreement that had a very large number

18     associated with it.  Correct?

19     A.   Yes, it did.

20     Q.   Did you analyze the patents that were involved in that

21     agreement?

22     A.   Yes, I did.

23     Q.   What was your conclusion?

24     A.   My conclusion was the patents were directed to the same

25     general area as the '284 and the '774 Patents because they

1    dealt with efficiencies and signaling in LTE systems.

2    Q.    Does Apple identify the Qualcomm patents as something it

3    could use as an alternative to the Patents-in-Suit?

4    A.    They do not.

5    Q.    Can you please summarize your findings on the technical

6    value of the patents you analyzed?

7    A.    Yes.  Based on my technical analysis of the incremental

8    benefits that these patents provide to the devices and that

9    included how often the patent technology was used in the Apple

10   products, the extent of the use in the networks for the '774

11   technology, my analysis showed that if they didn't use that

12   technology, it would result in a reduction in speed of 8.3

13   percent.

14        For the '284 technology, my analysis showed that if they

15   did not use that and they used the next closest alternative,

16   it would result in a between .19 and.35 percent reduction in

17   speed.

18   Q.    Thank you, Professor Mahan.

19             MR. SHEASBY:  Your Honor, I pass the witness.

20             THE COURT:  Cross examination by the Defendant?

21             MR. MUELLER:  Your Honor, may we pass out some

22   binders?

23             THE COURT:  You may.  Give them to the Court

24   Security Officer.  You don't need to approach the witness

25   directly.

 1              MR. MUELLER:  May I proceed Your Honor.

 2              THE COURT:  You may proceed.

 3                         CROSS EXAMINATION

 4    BY MR. MUELLER:

 5    Q.   Good afternoon, Doctor Mahon.

 6    A.   Good afternoon.

 7    Q.   It's good to see you.

 8    A.   It's good to see you, too.

 9    Q.   Now, I'd like to ask you a few questions, if I could,

10    about your role in this case.   Okay?

11    A.   Yes, sir.

12    Q.   You understand that this particular trial is a trial in

13    which the ladies and gentlemen of the jury are charged with

14    setting a fair, reasonable, and nondiscriminatory royalty for

15    the five patents in this case.

16    A.   Yes, I do.

17    Q.   And you're here to testify about two of them.   Correct?

18    A.   Yes, I am.

19    Q.   Now, to be clear, you're not here to actually offer a

20    royalty rate that you're advocating to the jury.   Correct?

21    A.   No, I'm not.

22    Q.   You're here on some technical issues, sir.   Is that

23    right?

24    A.   Absolutely, yes.

25    Q.   Now, the technical issues in this case relate to

1    standards.  Correct?

2    A.    The technical issues relate to how the standards are

3    implemented and whether the technology is in those standards.

4    Q.    And the particular standard for these five patents, the

5    two that you looked at and the three others, is LTE.  Correct?

6    A.    That is correct.

7    Q.    And we're going to come back to that.

8          But there's other standards in everyday life.  Right?

9    A.    I'm not sure what you're referring to.

10   Q.    Let me give you one example.  You were here for the

11   opening statements?

12   A.    Yes, I was.

13   Q.    And did you hear me refer to the standard on plugs,

14   electrical plugs?

15   A.    Yes, I did.

16   Q.    And that is, in fact, a standard.  Plugs are

17   standardized.  Correct?

18   A.    That is true, yes.

19   Q.    And the purpose of that is that no matter who makes a

20   particular device, the plug will fit into the wall in a given

21   place.  Correct?

22   A.    In general, yes.

23   Q.    So here in the U.S., we have an American standard for

24   plugs.  Correct?

25   A.    That's correct.

```
1    Q.   And if you traveled to certain different countries, it's

2    possible they might have a different plug design there.

3    Right?

4    A.   Correct.

5    Q.   But here we want to make sure everyone's using the same

6    electrical plug.  Correct?

7    A.   Ideally, yes.

8    Q.   Now, with that plug design, different companies can add

9    their own innovations on top of the plug.  Right?

10   A.   They can manufacture the devices to use the electricity

11   to do whatever they want.

12   Q.   So let me give you an example, if I could, sir.

13        You are, of course, familiar with televisions.

14   A.   Yes.

15   Q.   And there's a huge variety of televisions out there in

16   the world.  Right?

17   A.   Yes, there are.

18   Q.   There are some very simple ones.  Fair?

19   A.   In terms of complexity?

20   Q.   Just lower costs or a simpler televisions.  Those are out

21   there.

22   A.   There are cheaper televisions and more expensive ones,

23   yes.

24   Q.   And then there are some high-end fancy televisions as

25   well.  Correct?
```

1    A.   Yes, there are.

2    Q.   Now, Samsung, for example, makes televisions.  Right?

3    A.   Yes, they do.

4    Q.   And they make some very good ones, don't they?

5    A.   I believe so, yes.

6    Q.   The Samsung high-end televisions use the same plug as the

7    simple low-cost televisions.  Correct?

8    A.   That's correct.

9    Q.   Now, Samsung has done a lot of hard work and probably put

10   a lot of engineers to work designing all of the innovations

11   that go into their high-end televisions.  Correct?

12   A.   I'm sure they have.

13   Q.   And they've achieved quite a bit of success as a result.

14   Right?

15   A.   They are a well-known technology company.

16   Q.   And Samsung has a pretty decent segment of the television

17   market, the best of your knowledge.  Correct?

18   A.   I really don't know, but I believe that's the case.

19   Q.   If we go to an electronics store, we're likely to see

20   some pretty fancy Samsung TVs offered for sale.  Correct?

21   A.   Most likely, yes.

22   Q.   Now, sir, from a technical perspective, a technical

23   perspective, if somebody who had a patent on part of the plug

24   went to Samsung and said, You've been awfully successful

25   selling your fancy TVs and I want you to pay me a huge royalty

1    as a result, would that seem fair?

2    A.    That analogy doesn't work to the patents under --

3    Q.    Sir, not my question.  In my hypothetical, would that --

4              THE COURT:  Counsel, if you think the witness is

5    non-responsive, don't instruct the witness.  Take it up with

6    the Court.

7              MR. MUELLER:  Thank you, Your Honor.

8         I would move to strike that answer as non-responsive.

9              THE COURT:  I'll sustain that objection.

10   Q.    (BY MR. MUELLER) Doctor Mahon, in my hypothetical from a

11   technical perspective, would that be fair?

12   A.    Could you repeat the question, please?

13   Q.    Sure, absolutely.  If a person or company that had a

14   patent on a part of the electrical plug went to Samsung and

15   said, I see you've been very successful with your fancy

16   televisions and I want you to pay me a huge royalty because of

17   your success, I hold a patent on part of the plug, would that

18   seem fair?

19   A.    Well, if the TV was a doorstop without it, I would think

20   so, yes.

21   Q.    Well, sir, no TV is going to work without electricity.

22   Right?

23   A.    That is correct.

24   Q.    But the electricity is not what made that Samsung TV

25   special, is it, sir.

```
 1    A.    I wouldn't speculate on that.

 2    Q.    What made that TV special was all of the hard work the

 3    Samsung engineers did to add their own features and

 4    innovations on top of the plug.  Correct?

 5    A.    I wouldn't speculate on that.

 6    Q.    Let's take a look at the slide I showed in my opening

 7    statement, if we could.

 8    A.    Sure.

 9    Q.    And Doctor Mahon, you saw this.  Right?

10    A.    I did.

11    Q.    Whole bunch of different ways to design devices that have

12    plugs.  Correct?

13    A.    Agreed.

14    Q.    The plug remains constant.  Correct?

15    A.    The format of the plug, you mean?

16    Q.    The format of the plug remains constant.

17    A.    Yes.

18    Q.    That's the whole point of the standard--to make sure

19    everyone has the same plug.  Correct?

20    A.    For electrical appliances like the blender, yes.

21    Q.    And then on top of that, all of these companies can

22    compete to add their own features and innovations and their

23    own hard work.  Correct?

24    A.    They're free to do with the electricity what they want

25    to.
```

```
 1    Q.    Now, let's talk about cellular standards.

 2    A.    Please.

 3    Q.    LTE is one example of cellular standards.  Correct?

 4    A.    Correct.

 5    Q.    And they're available for everyone to use.  Right?

 6    A.    Any device manufacturer that wants to develop a device,

 7    and if they adhere to the LTE standards and they go through

 8    the conformance testing, they can interoperate with the

 9    networks.

10    Q.    So let's pull another slide I used in my opening

11    statement.  This is DTX 5.15.

12              MR. MUELLER:  I'm sorry, Mr. Lee.  It's the one --

13    the various types of phones with LTE.  I may have the number

14    wrong.  I apologize.

15    Q.    (BY MR. MUELLER)  Doctor Mahon, you saw when I discussed

16    this slide in my opening statement?

17    A.    Yes, I did.

18    Q.    And did you hear me say that all of these different

19    phones support LTE?  Correct?

20    A.    I did hear you say that.

21    Q.    So all of these different phones get to use the LTE

22    standard.  Right?

23    A.    It's my understanding that they are all LTE phones.

24    Q.    Just like all the different TVs get to use the plug.

25    Correct?
```

```
 1    A.    Correct.

 2    Q.    Now, on top of the standard, different companies have

 3    chosen to make different phone designs.  Right?

 4    A.    In terms of implementation?

 5    Q.    In terms of the features they've added to the device

 6    beyond LTE.  Correct, sir?

 7    A.    You mean like the screen or the battery size.

 8    Q.    Those are good examples, sir.

 9    A.    Sure.

10    Q.    And we have here on the left-hand side a relatively

11    inexpensive Doro phone.  Correct?

12    A.    I'm not aware of the cost, but it looks inexpensive.

13    Q.    Fair enough.  But it's a relatively simple phone.

14    Correct?

15    A.    It appears to be.

16    Q.    And it supports LTE.  Right?

17    A.    It's my understanding it does.

18    Q.    And, in fact, you would agree, sir, from a technical

19    perspective, someone can buy a phone that fully practices LTE

20    for a very small amount of money these days.  Right?

21    A.    Could you define 'fully practicing LTE'?

22    Q.    It supports the LTE standard.  I can call someone over

23    the LTE network --

24          THE COURT:  One at a time, please.

25          Go ahead and answer.
```

```
 1              THE WITNESS:  Meaning you can make a call?  Yes.
 2   Q.   (BY MR. MUELLER)  Now, as you move across the screen, we
 3   see some phones that are a little bit fancier.  Correct?
 4   A.   Yes.
 5   Q.   It's a very fancy Samsung phone right there called the
 6   Galaxy Fold.  Is that correct?
 7   A.   That is correct.
 8   Q.   That phone actually has a folding screen.  Right?
 9   A.   It appears to, yes.
10   Q.   Now, that screen reflects the hard work of the Samsung
11   engineers.  Correct?
12   A.   I don't know if Samsung developed the screen or not.
13   Q.   Well, Samsung has some of the most sophisticated high-end
14   phones in the world, don't they?
15   A.   They compete in the phone market, yes.
16   Q.   Not just in the phone market.  They compete at the upper
17   echelon of the phone market--Samsung.
18   A.   They are a leading technology company.
19   Q.   And the iPhone here is on the right as well.  Correct?
20   A.   Yes, it is.
21   Q.   Now, that also supports LTE.  Right?
22   A.   Yes, it does.
23   Q.   And Doctor Mahon, you're not here to say the Apple
24   engineers have not done a lot of hard work of their own that
25   went into the iPhone.  Correct?
```

1    A.   I made no such statement.

2    Q.   And there's a lot of features and innovations and

3    technologies that resulted from Apple's own hard work.

4    Correct?

5    A.   Apple is known for innovations in the software area and

6    in the screen area particularly.

7    Q.   Now, there were some references -- and I'm not going to

8    get into the numbers with you, but there were some references

9    with the last witness.  You were there for that?

10    A.   I was here for most of it.

11    Q.   To Apple being successful from a profit perspective.  And

12    I'm not going to get into the numbers right now, but did you

13    hear that testimony?

14    A.   I believe I did.

15    Q.   And, sir, you'd agree from a technical perspective,

16    technological perspective, there's a whole bunch of reasons

17    for Apple's success beyond LTE.

18    A.   You can think of Apple as a very sophisticated phone.

19    Q.   Sir, my question is, from a technical perspective there's

20    a whole bunch of reasons for Apple's success beyond LTE.

21    A.   Well, I quibble with you a little bit there.

22    Q.   Sir, if just practicing LTE made a company successful,

23    everyone would do it.  Right?

24    A.   So anyone who would meet the LTE standards could sell a

25    phone.

```
 1    Q.   Sir, if achieving the success of Apple just required LTE,
 2    everyone would do it.  Right?
 3    A.   I don't understand what you're asking.
 4    Q.   Sir, the reason why Apple's been so successful is because
 5    they don't just have LTE; they have an enormous assortment of
 6    features and technologies that they came up with through their
 7    own hard work.  Correct?
 8    A.   So not associated with the signaling technology, yes.
 9    Q.   You agree with me, sir.  Right?
10    A.   Their screens are great.
11    Q.   A lot more than just the screens being great.  You're not
12    here to denigrate the work of the Apple engineers, are you?
13    A.   Not at all.
14    Q.   Okay.  Now, if we look at an Apple iPhone and just look
15    at it from the outside and then go in -- would you be able to
16    do that with me just for a few steps?
17    A.   Sure.
18    Q.   Okay.  So if we start on the outside, there's a glass
19    case.  Correct?
20    A.   Yes, a composite, yes.
21    Q.   And if we were to crack open that glass case and look
22    inside, there's going to be several hundred, if not thousands,
23    of components.  Right?
24    A.   There is many components.
25    Q.   And even on the glass screen, if you look right behind
```

```
 1    it, there's a very sophisticated touch interface.  Right?

 2    A.   Yes.

 3    Q.   There's a very nice camera?

 4    A.   Typically, yes.

 5    Q.   There's multiple computer chips inside this device.

 6    Right?

 7    A.   Correct.

 8    Q.   And it would be true for a high-end Samsung phone as

 9    well.  Those also have lots of components within them.

10    Correct?

11    A.   They would have a lot of components, yes.

12    Q.   Now, if we make our way down, we would eventually arrive

13    at something called the baseband chip set.  Correct?

14    A.   Correct.

15    Q.   That includes not only a baseband chip but something

16    called a power management chip.

17    A.   Yes.

18    Q.   And a transceiver.

19    A.   Yes, indeed.

20    Q.   Now, the baseband chip is a special type of computer

21    chip.  Correct, sir?

22    A.   Yes.  It's optimized for processing.

23    Q.   And it's optimized for processing a very specific

24    thing--cellular communications information.  Right?

25    A.   Yes, such as we talked about today.
```

1  Q.   Now, you reviewed some source code in this case, didn't

2  you?

3  A.   Yes, I did.

4  Q.   What source code did you review?  Where was it running?

5  A.   I reviewed baseband processor code for Qualcomm and Intel

6  chips.

7  Q.   And that was the most relevant source code you could look

8  at.  Correct?

9  A.   That was the source code I could look at to see if the

10  technologies were being practiced.

11  Q.   But to be very clear, it was running on a baseband chip.

12  Right?

13  A.   It was running on the chip which interacts with other

14  components, yes.

15  Q.   And that would do the processing for all of the cellular

16  standards that a device supports.  Correct?

17  A.   No, I'd have to disagree with you there.

18  Q.   It would run the code -- for example, LTE specification

19  code would run on that baseband chip.  Right?

20  A.   There are also other parts of the standard that run on,

21  for example, the general processor, such as the TCP/IP stack.

22  Q.   Sir,  true or false, there is LTE code running on the

23  baseband chip.

24  A.   That's true.

25  Q.   Now, the LTE standard was developed by an organization

1    called the European Telecommunications Standards Institute

2    Correct?

3    A.    That was one organization, yes.

4    Q.    And a whole bunch of folks went to meetings at that

5    organization to create the standard.  Right?

6    A.    Yes.  I had to follow their meetings very closely for

7    decades.

8    Q.    And you know from your close following of those meetings

9    that there were dozens of companies that went.  Right?

10   A.    There were many companies involved in the process.

11   Q.    It wasn't just Samsung, Panasonic, and LG.  Correct?

12   A.    Attending the meetings, you mean?

13   Q.    Attending the meetings; making proposals.

14   A.    Well, in general there are many, many companies

15   participating, but very limited companies actually making

16   major contributions.

17   Q.    Sir, Panasonic, Samsung, and LG were not the only

18   companies making contributions.  Correct?

19   A.    There were a few others.

20   Q.    Qualcomm?

21   A.    Qualcomm, yes.

22   Q.    Intel went as well?

23   A.    Intel was there, too, yes.

24   Q.    And Qualcomm and Intel make baseband chips, or have

25   historically.  Correct?

1    A.    Correct.

2    Q.    Now, the size of the LTE standard, we're talking about a

3    pretty large document.  Correct?

4    A.    Define the standard.

5    Q.    The LTE standard technical specifications that have been

6    promulgated by ETSI.

7    A.    So TS documents that we're talking about and we're

8    talking about documents pertinent to LTE.

9    Q.    And those are thousands of pages long.  Correct?

10   A.    Well, certain documents are limited to 70, 80, 100 pages;

11   other documents are like 800 pages long.

12   Q.    And if you add them up, thousands.

13          MR. SHEASBY:  Your Honor, I object as absolutely

14   irrelevant--the lengths of the LTE specification.  There is no

15   relevance whatsoever.

16          THE COURT:  Overruled.

17   Q.    (BY MR. MUELLER)  Within that specification, Doctor

18   Mahon, you believe the two patents that you looked at, '284

19   and the '774, related to particular sections within LTE.

20   Right?

21   A.    Yes, it does.

22   Q.    And I think you told the ladies and gentlemen of the jury

23   a few of them, but let's just make sure we know all of them.

24   These sections go by TS codes.  Is that right, sir?

25   A.    Yes.  TS means technical specification.

```
1    Q.   Now, for the '774 Patent, you believe it's relevant to

2    TS 36.201.  Correct?

3    A.   Not 201, no.

4    Q.   36.211?

5    A.   211, yes.

6    Q.   36.212?

7    A.   Correct.

8    Q.   36.213?

9    A.   Correct.

10   Q.   36.300?

11   A.   No.

12   Q.   36.331?

13   A.   No.

14   Q.   Okay.  But we can agree on -- why don't you give me the

15   list of the ones you agree on?

16   A.   211, 212, and 213.

17   Q.   Thank you, sir.

18        Now, for the '284 Patent, do you believe it's relevant to

19   TS 36.201?

20   A.   No.

21   Q.   36.212?

22   A.   Yes.

23   Q.   36.213?

24   A.   Yes.

25   Q.   And 36.321?
```

1    A.    No.

2    Q.    Okay.  So give me the list of the ones you do agree with.

3    A.    211, 212, and 213.

4    Q.    Now, for those particular sections in the standard, other

5    companies have also declared patents as essential.  Correct?

6    A.    I'm not aware of any.

7    Q.    You do understand, sir, that the five patents in this

8    case are not the only patents that have been declared

9    essential for LTE.  Right?

10   A.    That's outside my area of expertise.

11   Q.    Fair enough.  Fair enough.

12         Now, the sections that you've just described, of course,

13   are available for use by the world on a fair, reasonable and

14   nondiscriminatory basis.  Correct?

15   A.    Again, I'm not into licensing.  I don't know that.

16   Q.    Let me ask you this, sir.  When you spoke with

17   Mr. Sheasby about the testing that you relied on, he asked you

18   the question if it mattered whether the testing were Android

19   phones or Apple phones.  Do you recall those questions?

20   A.    I do.

21   Q.    And you said it didn't matter.  Right?

22   A.    For the testing we were talking about, it didn't impact.

23   Q.    Because, in your view, all of those different phones were

24   using the same sections of the standard.  Correct?

25   A.    No, that's incorrect.

```
 1    Q.   Sir, you did rely on testing of a variety of different

 2    phones.  Correct?

 3    A.   Yes, I did.

 4    Q.   And you treated that as relevant to the value of the

 5    standard to Apple.  Fair?

 6    A.   Yes.

 7    Q.   Now, let's talk a bit more about the technologies and

 8    whether they are similar or dissimilar.  Do you have that

 9    subject in mind?

10    A.   Yes.

11    Q.   So let me start you off with an analogy.

12              MR. MUELLER:  If we could pull up DDX 54.5.

13    Q.   (BY MR. MUELLER)  I'm going to ask you some questions

14    about an analogy in which you're interested in buying a new

15    truck.  Okay?

16    A.   Okay.

17    Q.   So let's assume you're interested in buying that truck on

18    the left.  I think it's a Ford F150, and that's the one you

19    are interested in.  Are you still with me?

20    A.   I see, yes.

21    Q.   Now, if you were interested in buying that vehicle, would

22    you look at the prices of a Ferrari from a technological

23    perspective to try to figure out what a fair price would be

24    for the truck?

25              MR. SHEASBY:  Your Honor, I object.  This is
```

1    completely unrelated to the technological analysis that

2    Professor Mahon did.

3              THE COURT:  He is entitled to ask this kind of

4    question.  It's a hypothetical.

5         Go ahead, counsel.  Overruled.

6              MR. MUELLER:  Thank you, Your Honor.

7              THE WITNESS:  So I wouldn't speculate because the

8    Ferrari and, quite frankly, the F150 have a lot of different

9    technology components to them, and I'd have to see what

10   components we are talking about.

11   Q.   (BY MR. MUELLER)  Fair enough.

12             MR. MUELLER:  Let's go to the next slide, if we

13   could.

14   Q.   (BY MR. MUELLER)  What if we had a broken down vehicle

15   that's pretty old.  Would you consider the price of that

16   vehicle from a technological perspective to be relevant to the

17   price of the truck?

18   A.   I wouldn't speculate in that area.  It's not my field.

19   Q.   So you can't tell me one way or the other if you would

20   look at the price of the vehicle on the right and find that

21   that would be relevant to the vehicle on the left?

22   A.   Again, I'm not a mechanic.  I don't make those kind of

23   decisions in my technical work.

24   Q.   All right.  Let's look at the next one.

25             What if you have a very similar but not quite identical

```
1    truck.  Would you consider that to be relevant from a
2    technological perspective to your truck purchase?
3    A.   Again, it would depend on the chip sets and the
4    technology in the particular vehicles whether they were
5    technologically relevant.
6    Q.   What if it were the exact same truck, if we go to the
7    next slide, but a different color.  Technologically would you
8    consider that to be relevant to your purchase?
9    A.   My favorite color is red, so I prefer that one.
10   Q.   So you'd actually put a higher value than the one on the
11   right.  Do I have that?
12   A.   Well, I'm not sure how I would be able to -- if it's the
13   exact same technology in two vehicles, I don't think it would
14   matter.
15   Q.   Let's go one more.  What if it's the exact same truck
16   from a technological perspective.  Will you be interested in
17   knowing the price of precisely the same vehicle, same trim
18   level, everything, but one is offered down the street, one's
19   offered up the street?  Would you do some comparison shopping
20   in that circumstance, sir?
21   A.   I do comparative shopping.
22   Q.   So in that case, you'd want to know what the two dealers
23   have as a price to make sure they were in the same ballpark
24   before you buy.
25   A.   Well, I want the best price.
```

```
 1    Q.   All right.  Let's talk about LTE.
 2              MR. MUELLER:  And if we can go to the next slide.
 3    Q.   (BY MR. MUELLER)  If you were trying to figure out the
 4    value of an LTE patent from a technological perspective, would
 5    you look to a license covering patents for electrical plugs?
 6    A.   I see no relationship.
 7              MR. MUELLER:  Let's go to the next slide.
 8    Q.   (BY MR. MUELLER)  You're familiar with the VCRs.  We all
 9    had one at one point.
10    A.   Yes.
11    Q.   And those actually had a standard, too.  In some VCRs it
12    was called VHS.  That was the standard for the format of the
13    videotape?
14    A.   Yes.
15    Q.   If you were interested in a license to LTE patents, would
16    you consider from a technological perspective the VHS
17    technology or a license to VHS technology?
18    A.   I guess I can't understand the question because I don't
19    see the connection between the two.
20    Q.   Too far afield?
21    A.   I don't see the connection.
22              MR. MUELLER:  All right.  Let's go to the next
23    slide.
24    Q.   (BY MR. MUELLER)  What if we were looking at a license to
25    5G cellular?  Is that close enough?  Would you consider that
```

```
 1    to be a relevant data point for LTE?

 2    A.   I don't deal with licensing issues.

 3    Q.   Sir, I'm asking you from a technological perspective.

 4    That's what your expertise is.  Correct?

 5    A.   Correct.

 6    Q.   And from a technological perspective, would you consider

 7    a license on 5G to be relevant to a license on 4G?

 8    A.   Again, that's outside my areas of expertise.  I do not do

 9    licensing.

10    Q.   So you can't offer this jury any opinion on the

11    technological similarity or dissimilarity on that

12    circumstance?

13    A.   I can talk to the technology all day.  I cannot talk to

14    licensing.

15    Q.   Okay.  Just a couple of more for you, sir, if you would

16    indulge me.

17         What if we were to compare a license to LTE with a

18    license to LTE.  We can certainly agree in that

19    circumstance--same standard, it's relevant.  Correct.

20    A.   I understand what you're saying, but again, this is

21    outside my area of expertise.

22    Q.   Sir, from a technological perspective, LTE is LTE.  Is

23    that correct?

24    A.   That is a correct statement.

25    Q.   All right.  Let's go one more.  What about a license to
```

```
 1    the particular subsections of LTE that are at issue in my

 2    hypothetical and the particular subsections of LTE that are

 3    covered by another license.  That would be very relevant.

 4    Correct?

 5    A.    Again, I wouldn't speculate on licensing issues.

 6    Q.    But, sir, I'm just saying from a technological

 7    perspective, the subsections are exactly the same.  Right?

 8    A.    A TS 36.211 is a TS 36.211.

 9    Q.    The last few questions I have for you, Doctor Mahon.

10          You spoke to the ladies and gentlemen of the jury about

11    some performance testing.  Correct?

12    A.    Yes.

13    Q.    And you made some estimates as to the performance

14    benefits of practicing the '284 and '774 patents.  Right?

15    A.    Yes, I did.

16    Q.    Now, to be clear, Doctor Mahon, you yourself did not do

17    that testing.  Correct?

18    A.    So I worked with, as I mentioned, a company for the '774

19    to do the data collection.  I did the data analysis.  The

20    '284, that was my math.

21    Q.    Sir, I'm just saying, for the actual testing itself, you

22    didn't do it.  Correct?  You say you did some analysis, but

23    you didn't do actual testing yourself.  Correct?

24    A.    I spoke to the engineers to make sure that I knew what

25    they were going to do, and we designed the test together and
```

 1    they executed the tests.

 2    Q.   Now, the question I'm about to ask is not meant to get

 3    criticism, but you have been compensated for your time on this

 4    case.  Correct?

 5    A.   Yes, I have.

 6    Q.   You've been paid at this point over -- well over a

 7    hundred thousand dollars.  Is that right?

 8    A.   Yes.

 9    Q.   Okay.  But you didn't do this particular testing

10    yourself.  Right?

11    A.   That's correct.

12    Q.   Now, you relied on an organization called TechPats.

13    Correct?

14    A.   Yes, I did.

15    Q.   And if we could pull up the slide where you referred to

16    their independent testing.  Here we go.

17         You described this:  Independent testing using

18    specialized equipment.  Right?

19    A.   That is correct.

20    Q.   Now, TechPats, what do you know about them?

21    A.   I know they've been around for a number of years.  Their

22    employees are engineers that have been working in the field

23    for at least a decade or so.

24              MR. MUELLER:  If we could cull out as a

25    demonstrative the TechPats web page.

```
1    Q.    (BY MR. MUELLER)   Let me focus your attention if we
2    could, sir, a little further down where it says, "When looking
3    for patent litigation support services."   It says, "When
4    looking for patent litigation support services"--right in the
5    middle there--"you want a silent partner behind your patent
6    litigation efforts who exemplifies expertise in intellectual
7    property."
8          Do you see that, sir?
9    A.    Yes, I do.
10   Q.    Silent partner.  Do you see that, sir?
11   A.    I do see those words.
12   Q.    And they're offering themselves out as a silent partner,
13   not an independent testing facility.  Correct?
14   A.    Well, I disagree based on my interactions with them.
15   Q.    Sir, the words are not independent here.  It says silent
16   partner.  Correct?
17   A.    Incorrect.  That doesn't imply lack of independence.
18   Q.    Sir, listen to my question.  The words silent partner are
19   right here.  Correct?
20   A.    That is correct.
21   Q.    And above that, if we look at the paragraph right above,
22   it talks about empowering you to achieve a favorable outcome
23   for your case.  Do you see that?
24   A.    I do see that.
25   Q.    And that's what they're offering.  Right?
```

```
 1    A.    Those words are on the page.

 2    Q.    It doesn't talk about independence, but talks about

 3    helping you achieve a favorable outcome for your case.

 4    Correct?

 5    A.    It does, but that does not exclude independence.

 6    Q.    And this set of services they are offering are in the

 7    service of monetizing patents, and they describe that right

 8    here--monetized intellectual property patents.  Do you see

 9    that, sir?

10    A.    No, I don't.

11    Q.    Let's find the line here to make sure we are on the same

12    page.  It's near the bottom, actually.  In fact, it talks

13    about protecting my -- I'm sorry.

14              MR. MUELLER:  If you go a little further up.

15    Q.    (BY MR. MUELLER)  We'll come back to this, sir.

16          But it certainly talks about helping you achieve the best

17    outcomes in court through the help of the silent partner.

18    Right, sir.

19    A.    The words are there.  I worked with engineers.  That's

20    all I can say.

21    Q.    Thank you, sir.  I have no further questions.

22              THE COURT:  You pass the witness, counsel.

23              MR. MUELLER:  I do, Your Honor.  I apologize.

24              THE COURT:  Is there redirect?

25              MR. SHEASBY:  Yes, Your Honor.
```

1          THE COURT:  Proceed with redirect.

2                    REDIRECT EXAMINATION

3     BY MR. SHEASBY:

4     Q.   Professor Mahon, does this case have anything whatsoever

5     to do with electrical plugs?

6     A.   Absolutely not.  The complexity between the analogy used

7     for the electrical plug and the LTE standards, which I spent

8     decades studying in detail and sweating over, there is -- it

9     has nothing to do with the two.

10          THE COURT:  Doctor Mahon, you answered the question

11    fully when you said "absolutely not."  If counsel had wanted

12    you to explain further, he'd ask you to.  Please try to limit

13    your answers to the questions asked.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  All right.  Next question, Mr. Sheasby.

16    Q.   (BY MR. SHEASBY)  What is unique about the data sets that

17    TechPats had available?

18    A.   The data sets that TechPats had available offered me a

19    view of how the network technology evolved over time.

20    Q.   Who showed more use of the '774 Patent--the TechPats data

21    or Apple's own internal data?

22    A.   Apple's own internal data actually showed greater use of

23    the transmission mode associated with the '774 technology than

24    the TechPats data.

25    Q.   What number did you choose--the higher number or the

1    lower number?

2    A.   I used the lower number in my analysis.

3         MR. SHEASBY:  Can we have DDX 51.15?  Or Mr. Huynh,

4    if you are in control, that would be Mr. Blasius' slide five.

5    Q.   (BY MR. SHEASBY)  Do you remember this slide that was

6    shown to you by counsel?

7    A.   Yes, I do.

8    Q.   Do you know what the LTE download speed is of these

9    phones?

10   A.   I don't off the top of my head, but I think it's around

11   100 megabits per second.

12   Q.   So the LTE speed for these phones is about a hundred

13   megabits per second.

14   A.   That is based on my recollection, yes.

15   Q.   Do you know what the LTE download speed is of the iPhone

16   11 Pro Max?

17   A.   Yes, I do.

18   Q.   What is it?

19   A.   1.6 gigabytes per second.

20   Q.   How much more capacity -- how much more LTE does the

21   iPhone 11 Pro Max use than the Doro and BLU phone?

22   A.   So if you do the math, it's a factor of 16.

23         MR. SHEASBY:  Pass the witness, Your Honor.

24         THE COURT:  Is there additional cross?

25         MR. MUELLER:  Yes, Your Honor, briefly.

```
 1              THE COURT:  All right.  Proceed with additional

 2     cross, Mr. Mueller.

 3              MR. MUELLER:  Thank you, Your Honor.

 4                     RECROSS EXAMINATION

 5     BY MR. MUELLER:

 6     Q.   Just a few final questions for you, Doctor Mahon.

 7          In addition to TechPats, you also relied on a Doctor

 8     Royer.  Do I have that right?

 9     A.   There is a Mr. Royer that supervised the testing, and I

10     relied on his tests -- I'm sorry.  His report and the data.

11     Q.   Mr. Royer.  Is that right, sir?

12     A.   Mr. Royer, yes.

13     Q.   Do you know that Mr. Royer didn't keep all the data?

14     A.   That would not surprise me because it's typical in a

15     testing scenario.

16     Q.   Sir, he didn't keep all the data, did he?

17     A.   I would not be surprised because I do that all the time.

18     When I'm setting my test up, I get rid of data.

19     Q.   I'm not if you are surprised.  He didn't keep all the

20     data, did he?

21     A.   I haven't been informed whether he did or he didn't.

22              MR. MUELLER:  Pull up the demonstrative from just

23     now one last time, the various phones.

24     Q.   (BY MR. MUELLER)  Mr. Sheasby focused your attention on

25     the low cost phones on the left-hand side.  Right, sir?
```

```
 1    A.    We looked at three of the phones on this slide.

 2    Q.    And he compared those to the iPhone.  Right?

 3    A.    We did a speed comparison.

 4    Q.    Sir, there's actually another phone on the screen.

 5    Correct?

 6    A.    Yes.

 7    Q.    It's a Samsung phone.  Right?

 8    A.    Yes, it is.

 9    Q.    And that's an awfully fancy, powerful, high-speed Samsung

10    phone.  Correct?

11    A.    I know the display technology is very expensive.

12    Q.    Sir, that is a high-end, high-performance Samsung phone.

13    Correct?

14    A.    To my knowledge, yes.

15    Q.    And, sir, you understand from the testimony in this case

16    that Samsung has a license to the very same five patents at

17    issue in this case.  You know that, sir.  Right?

18    A.    Again, licensing isn't my area.

19    Q.    Sir, did you hear the testimony that Samsung has a

20    license to these five patents?

21    A.    I was in the room during licensing discussions.

22    Q.    Doctor Mahon --

23          THE COURT:  Wait a minute.  Did you hear it or not

24    hear it?  Answer the question.

25          THE WITNESS:  Yes, I did.
```

1    Q.   (BY MR. MUELLER)  And Doctor Mahon, you understand that

2    the five patents, for which the ladies and gentlemen of the

3    jury need to set a FRAND rate, from a technological

4    perspective are the identical five patents within the Samsung

5    licenses.  Correct?

6    A.   I believe -- to my knowledge, that seems correct, but I

7    didn't exactly pay attention to the details.

8    Q.   Let's put it this way.  His Honor has instructed the jury

9    these are standard essential patents.  Correct?

10   A.   Correct.

11   Q.   That means they are essential to the standard that

12   everybody uses.  Correct?

13   A.   Correct.

14   Q.   Apple doesn't get a different version of those patents.

15   Correct?

16   A.   Not that I'm aware of, no.

17   Q.   They get the same version from a technological

18   perspective that Samsung got.  Correct?

19   A.   It's my understanding a patent is a patent, yes.

20   Q.   Thank you, sir.  Nothing further.

21        MR. MUELLER:  No further questions, Your Honor.

22        THE COURT:  Additional direct?

23     Go ahead, Mr. Sheasby.

24                    REDIRECT EXAMINATION

25   BY MR. SHEASBY:

 1   Q.   Do you know what the LTE download capacity of the Samsung

 2   Galaxy Fold?

 3   A.   I would be speculating.  I know it's above a gigabyte,

 4   but I don't know exactly what the speed is.

 5   Q.   Before counsel was speaking about saving data, tell me

 6   why data is not often saved in testing?

 7   A.   So when you go to do a field test, you set up your

 8   equipment and you check it out to bring out any errors or

 9   problems, cabling issues, antenna problems, data collection

10   issues, and you collect data, you analyze it to see if the

11   system is working, and then you flush all of that because you

12   want to keep careful records of the system configuration and

13   what you're collecting from that point forward, so it's

14   typical to get rid of that kind of data, setup data.

15   Q.   Did you examine the actual data sets used by TechPats?

16   A.   Yes, I did.

17   Q.   Are you satisfied with their integrity?

18   A.   Yes, I am.

19        MR. SHEASBY:  Pass the witness, Your Honor.

20        THE COURT:  Additional cross examination?

21        MR. MUELLER:  I have nothing further for Doctor

22   Mahon, Your Honor.

23        THE COURT:  All right.  Doctor Mahon, you my step

24   down.

25        THE WITNESS:  Thank you, sir, Your Honor.

1          THE COURT:  You're welcome.

2      Ladies and gentlemen of the jury, we're going to recess

3  for the evening.

4      I'm going to ask you to take your notebooks to the jury

5  room when you leave the courtroom.  Leave them closed on the

6  table there.  Please travel safely to your homes overnight.

7      Let me remind you that we're going to try to start

8  promptly at 8:30 in the morning.  Try to arrange your travel

9  wherever you're coming from so that you can be here in advance

10  of that time and we can start at 8:30.  I might also remind

11  you that, in addition to the weather, check your local school

12  district.  There are a lot of kids starting school in the next

13  couple of days that may put school busses and other vehicles

14  on the road, so take all those factors into account.

15      Please follow all my instructions, including among them

16  not to communicate about this case with anyone in any way.

17  Have a good evening, and you are excused until tomorrow

18  morning.

19          (Whereupon, the jury left the courtroom.)

20          THE COURT:  Counsel, be seated, please.

21      For your information, we've used a total of two hours and

22  43 minutes of allocated trial time today.  Plaintiff has used

23  an hour and 25 minutes and the Defendant has used an hour and

24  17 minutes.

25      Let me also remind you to follow my clear instructions on

```
 1    meeting and conferring overnight and reporting to the Court

 2    any disputes that can't be resolved through your strenuous

 3    meet and confer efforts.  I'll be available in chambers by

 4    7:30 tomorrow morning if we need to meet and take anything up.

 5         Are there any issues either party needs to raise before

 6    we recess for the evening?

 7              MR. BAXTER:  Can Doctor Mahon be excused if he needs

 8    to be?

 9              THE COURT:  I see no reason why not.

10         Is there any objection?

11              MR. MUELLER:  No, Your Honor.

12              THE COURT:  Doctor Mahon, you are excused.

13         Anything from Defendant?

14              MR. MUELLER:  Just one, Your Honor.  And I don't

15    want to belabor this now, but I will come back to Your Honor

16    if we keep hearing language like 'takers'.  I think that runs

17    afoul of the MIL on hold out inflammatory language.  I didn't

18    want to interrupt today, but I would ask that we --

19              THE COURT:  Don't tell me what you're going to do.

20    If you think there's been a MIL violation, you are entitled to

21    raise an objection and I will deal with it when you raise it.

22              MR. MUELLER:  I do object to the language 'taker'.

23              THE COURT:  Well, raise it when a violation takes

24    place and then I will consider it a timely objection.

25              MR. MUELLER:  Understood.  Thank you, Your Honor.
```

1              THE COURT:  All right.  We stand in recess until

2    tomorrow morning.

3              (The proceedings were concluded at 6:15 p.m.)

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts                    08/10/2021

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR
11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25