IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OPTIS WIRELESS TECHNOLOGY, LLC., et al, Plaintiffs, | ( ) ( ) | CAUSE NO. 2:19-CV-066-JRG |
| vs. | ( ) | |
| APPLE, INC., Defendant. | ( ) ( | AUGUST 11, 2021 MARSHALL, TEXAS 8:30 A.M. |

VOLUME 2

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 237-7464
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR PLAINTIFFS:

IRELL & MANELLA, LLP - LOS ANGELES
1800 AVENUE OF THE STARS
SUITE 900
LOS ANGELES, CA 90067-4276
(310) 277-1010
BY: MR. JASON SHEASBY

McKOOL SMITH, P.C. - MARSHALL
104 EAST HOUSTON ST., STE. 300
MARSHALL, TEXAS 75670
(903) 923-9000
BY: MS. JENNIFER TRUELOVE
MR. SAM BAXTER

FOR DEFENDANT:

WILMER HALE - BOSTON
60 STATE STREET
BOSTON, MA 02109
(617) 526-6000
BY: MR. JOSEPH MUELLER

GILLAM & SMITH, LLP
303 SOUTH WASHINGTON AVENUE
MARSHALL, TEXAS 75670
(903) 934-8450
BY: MS. MELISSA SMITH

OFFICIAL REPORTER:

SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-7464

# INDEX

## EXAMINATION


| Witness Name | Page |
|---|---|
| VIJAY MADISETTI, PhD | |
| Direct By MR. POLLINGER | 9 |
| Cross By MR. MUELLER | 47 |
| Redirect By MR. POLLINGER | 76 |
| Recross By MR. MUELLER | 79 |
| REBECCA REED-ARTHURS, PhD | |
| Direct By MS. TRUELOVE | 84 |
| Cross By MS. SMITH | 111 |
| Redirect By MS. TRUELOVE | 119 |
| Recross By MS. SMITH | 124 |
| Redirect By MS. TRUELOVE | 125 |
| DAVID KENNEDY | |
| Direct By MR. BAXTER | 131 |
| Cross By MR. MUELLER | 183 |
| Redirect By MR. BAXTER | 233 |
| Recross By MR. MUELLER | 242 |
| Redirect By MR. BAXTER | 247 |
| HEATHER MEWES | |
| Direct By MR. MUELLER | 260 |

THE COURT: Please be seated.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. SHEASBY: Your Honor, we are. But there's one significant issue that I needed to address with the Court.

THE COURT: Why don't you read into the record anything that there's not any objection to or problem with, and then we'll take up any area.

MR. SHEASBY: It doesn't have to do with the exhibits. It has to do with the discussion we just had. I think it's very important, if I may just have one minute.

THE COURT: Go to the podium, Mr. Sheasby.

MR. SHEASBY: Your Honor, you let in all of the deposition designations over each party's objections. The Jayna Whitt designations were done very early in the case before your Court's ruling on that Apple document about D value. And it's -- the document and the examination on it is in her designated deposition designations. It's not fair to the Defendants, after you ruled, that it should come out for it to be in the designations. And so I think at least their objections as to Whitt need to be heard.

THE COURT: Let me say this, Mr. Sheasby. In chambers this morning, I reviewed with the parties their failure to comply with my clear written instructions with

regard to presenting deposition designation and counterdesignation disputes to the Court in advance of when those deposition witnesses would be called.

Both parties have violated clearly the Court's clear instructions on that. As a result, I have determined that those objections are waived. That does not waive or set aside any of the prior guidance or directives that I've given you about evidence in this case or demonstratives to be used before the jury, and I otherwise expect both sides to not take that waiver as some kind of back-door blank check to do something that I previously made clear they should not do.

So, in that regard, what you're raising is something that clearly should not be done, but not because of my ruling on a waiver of the deposition objections, but because of my prior instructions and guidance to the parties that you are both aware of.

MR. SHEASBY: And that's my point. So we are not going to play Whitt.

THE COURT: That's fine. That's what you should do.

MR. SHEASBY: Yes.

THE COURT: Let's read the items into the record from yesterday -- used yesterday before the jury from the list of preadmitted exhibits.

MS. TRUELOVE: Good morning, Your Honor. Jennifer Truelove for Plaintiffs.

Plaintiffs used the following exhibits yesterday in trial: PX 3, PX 5, PX 20, PX 63, PX 125, PX 126, PX 506, PX 580, PX 601, PX 603, PX 2048, PX 2049, PX 2050, PX 2051, PX 2052, PX 2053, PX 2054, PX 2055, PX 2056, PX 2064, PX 2079, PX 2082, PX 2083, PX 2084, PX 2105, PX 2129, PX 2134, PX 2142, and the following two DTX exhibits, DTX 0119 and DTX 0524.

THE COURT: All right. Is there any objection to that rendition from the Defendant?

MS. SMITH: No objection, Your Honor.

THE COURT: Does Defendant have a similar rendition to read into the record?

MS. SMITH: Yes, Your Honor.

THE COURT: Please proceed.

MS. SMITH: Yesterday Defendants used PX 580, PX 506, PX 505, pX 510, PX 512, and PX 511. And that completes our offer.

THE COURT: Any objection from Plaintiff?

MS. TRUELOVE: None, Your Honor.

THE COURT: All right. Thank you, counsel.

Mr. Sheasby earlier mentioned the Court's instruction to counsel in chambers regarding deposition designations and disputes as to designations and counterdesignations. I mentioned to counsel this morning in chambers that I will clearly state into the record the Court's position on that, and I'm going to do that at this time.

I'm also ordering that the email instructions sent to counsel in advance of the trial with regard to how these disputes should be presented to the Court, those emails are going to be recorded in the record of this case so there's no doubt about those instructions.

The parties have repeatedly failed to comply with the Court's orders and instructions with regard to objections related to deposition designations, witness demonstratives, and exhibits.

The Court's trial information emails have clearly instructed the parties to disclose to the other side deposition designations and to submit to the Court any objections thereto by the day or before the day the deposition is to be played in the trial.

The Court's instructions call for disputes to be summarized in a nightly email to the court staff no later than 10:00 p.m. The Court's instructions clearly state that, quote, the joint email shall include a brief paragraph stating each party's position on each dispute, close quote.

On Monday, August the 9th, the parties submitted relevant deposition designation excerpts with relevant highlighting. However, this was submitted after the 10:00 p.m. deadline set by the Court.

In addition, the parties' submission did not contain any summary of the parties' position regarding the objections to

deposition designations. Not until the next morning on August the 10th did the Court receive any position statements from the parties on the issues surrounding deposition designations. This failure is a clear violation of the Court's orders and instructions.

The Court's procedures help ensure timely notice and resolution of all disputes related to witness testimony, and these procedures are intended to benefit the parties as well as the Court. Timely resolution of deposition designations allows the parties to recut deposition designations which are limited in part as the Court's rulings to such objections.

Failure to comply with the Court's rules and directives risk interrupting and delaying the timely flow and ultimate completion of the trial.

The parties have previously been put on notice that any disputes not timely and properly submitted to the Court pursuant to its instructions are to be considered waived. Accordingly, the disputes related to the deposition testimony Of Mr. Zhang, Z-H-A-N-G; Ms. Whitt, W-H-I-T-T; Ms. Vrzic, V-R-Z-I-C; Mr. Royer, R-O-Y-E-R; Mr. Ware, W-A-R-E; Mr. Warren, W-A-R-R-E-N; Mr. Born, B-O-R-N; and Mr. Misiag, M-I-S-I-A-G, are considered waived. All objections are overruled on that basis.

Do either Plaintiff or Defendant disagree or have any dispute with what I've just read into the record?

MR. SHEASBY: Nothing from Plaintiffs, Your Honor.

MR. MUELLER: No, Your Honor.

THE COURT: All right. Is Plaintiff prepared to call their next witness?

MR. POLLINGER: Yes, Your Honor.

THE COURT: Let's bring in the jury, please, Mr. Johnson.

(Whereupon, the jury entered the courtroom.)

THE COURT: Good morning and welcome back, ladies and gentlemen of the jury. Please be seated.

Plaintiffs, call your next witness.

MR. POLLINGER: Thank you, Your Honor. Plaintiffs call Professor V.J. Madisetti.

THE COURT: If you'll come forward, Mr. Madisetti, and be sworn.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir. Have a seat at the witness stand.

THE WITNESS: Good morning, Your Honor.

THE COURT: Good morning.

Mr. Pollinger, you may proceed with direct examination.

MR. POLLINGER: Thank you.

Mr. Lee, could you have the presentation, please?

VIJAY MADISETTI, PhD,

testified under oath as follows:

DIRECT EXAMINATION

By MR. POLLINGER:

Q. Good morning, Professor Madisetti.

A. Good morning, sir.

Q. Could you please introduce yourself to the jury?

A. My name is Vijay Madisetti. I am a professor at Georgia Tech.

MR. POLLINGER: Mr. Huynh, do we have the presentations?

Q. (BY MR. POLLINGER) And how long have you been teaching at Georgia Tech?

A. For nearly 30 years.

Q. And do you have a PhD?

A. Yes. I got my PhD. from the University of California at Berkeley.

Q. Do you have a family?

A. Yes. I'm married to Anita and have a son who is a senior at Georgia Tech.

Q. And where do you live, Professor Madisetti?

A. I live in Atlanta, Georgia.

Q. Is your son in college?

A. Yes. He's a senior at Georgia Tech.

Q. Professor Madisetti, who hired you for this case?

A. The counsel for PanOptis.

Q. And what is your role here today?

A. I am here to explain the incremental technical benefits of the LG and Panasonic '833, '332, and the '557 Patents or competing alternatives.
Q. And Professor Mahon addressed the other two patents at issue in this case in a similar manner?
A. Yes. He did it yesterday.
Q. And what is your understanding as to why you're providing an incremental technical value of the patent from a technical standpoint?
A. I analyzed the incremental benefits from a technical point of view, and then I hand over my analysis to the -- to Mr. Kennedy and Ms. Arthurs-Reed, who will be doing the economic and damages analysis.
Q. Professor Madisetti, let's go over some of your qualifications. Could you tell the jury what you do at Georgia Tech as a professor?
A. As a professor, I teach. I do research. I write books. I advise students.
Q. Do we see some of the books here that you've authored on the screen?
A. Yes. I've been quite active in the area of writing book. My first book was in 1995. The most recent book is in 2019.
Q. And on the writing inside, I see what appear to be two plaques. What are those?
A. Those are some medals that I received from both for

teaching as well as from the professional societies.

Q. Professor Madisetti, this case concerns cellular communication technologies. Have you written any articles on that?

A. Yes. I've been very active in this area for the past 30 years, and here is an example of an article that I wrote on next generation applications that was published in 2012 in the proceedings of IEEE.

Q. As a technologist, have you founded any companies?

A. I created some start-ups along the way over the years, and some of them are listed here--VP Technologies and Soft Networks, for example.

Q. Any of them involves some interesting technology that you would like to tell us about?

A. Yes. VP Technologies did a lot of work for the Defense, so developed chips sets for the use in helicopters. And Soft Networks developed a lot of software for cellular phones for Sony, Ericsson, and Cisco.

Q. Mr. Madisetti, have you provided any consulting work on patent matters like in this case for other companies?

A. Yes, I did. And in this demonstrative, there are some of the examples--for example, for AT&T, for Motorola, for Google, and others.

Q. Have you provided any consulting work on a patent matter before for the Plaintiff in this case, PanOptis?

A. Yes, I believe once.
Q. Professor, how are you getting paid for your work in this case?
A. I get paid for my time.
Q. At what rate?
A. It's $500 an hour.
Q. And approximately how many hours have you put into this case?
A. On the three patents, approximately 200 to 250 hours per patent over the last couple of years.
Q. Does your pay depend in any way on your opinion or the outcome of this case?
A. No, it does not. I'm an independent consultant, and I am paid just for my time, not for my opinions.
Q. Are you providing your objective, unbiased opinion in this case?
A. Yes.
Q. As we have heard, there are cellular standards at issue in this case. Have you done any work with regard to that?
A. Yes. I worked on several standards myself. I've also been an official representative with Georgia Tech to the 3GPP, which is the standard that creates the standards and subjects them to ETSI. And so I have also authored a standard myself.
Q. Professor Madisetti, what materials have you reviewed to assess the technical benefit of the three patents that you

were addressing?

A. I looked at the products themselves, the source code, the different technical documents, the deposition testimony. I also looked at the patents, the standards, different alternatives proposed by Apple and otherwise, as well as did some testing and also detailed simulations.

MR. POLLINGER: Your Honor, I tender Professor Madisetti as a technical expert as relates to the technical benefits of the three patents he's addressing.

THE COURT: Is there objection?

MR. MUELLER: No objection, Your Honor.

THE COURT: Without objection, the Court will recognize this witness as an expert in those designated areas.

MR. POLLINGER: Thank you, Your Honor.

THE COURT: Please continue, Mr. Pollinger.

Q. (BY MR. POLLINGER) Professor Madisetti, could you provide the jury an introductory summary of your opinions in this case?

A. Yes. Based on my analysis of the three patents, it is my opinion that the patents provide incremental technical benefits to Apple's products. Specifically, the '833 provides 10.7 percent speed benefit, the '332 provides a 4.6 to 8 percent speed benefit, and the Panasonic '557 provides a .135 percent to .445 percent speed benefit.

Q. Your opinion on those benefits of each of the patents, do

those apply to the Apple products at issue in this case?
A. Yes. PX 2735 applies to some of the Apple products, and they range primarily from iPhone 5 to iPhone 11 as well as the iPads third generation to the seventh generation, and Apple Watch series 3 to series 5.
Q. And the speed benefit that you've summarized for us, does that apply to LTE communications with these products?
A. Yes.
Q. And are the LTE speeds important to the Apple products at issue in this case?
A. Yes, very important because of the various applications that use these LTE standards. So, for example, applications such as FaceTime and others on Apple phones use the LTE and LTE bandwidth that it provides significantly.
Q. Have you seen any testimony from Apple's corporate representative, Mr. Blevins, regarding this?
A. Yes. Mr. Blevins, who is shown here the corporate Apple's representative, in his deposition described the importance of Apple download speeds to Apple for LTE. And as a part of the launch events for iPhone 10S and iPhone 11, Apple emphasized the importance of LTE download speeds.
Q. And from a technical standpoint, how does the speed of LTE affect the user interaction or the user experience with the Apple products?
A. The users get significant benefit just as the products as

you have high speeds, you are able to do more image and video, you're able to do social networking, you're able to upload images, you're able to do a variety of business and personal productive services on the phone.

Q. Professor Madisetti, what is the first patent that you will address here?

A. The first patent is the LG 8,102,833. It's the '833 patent. I will be addressing claim 8.

Q. And what exhibit number is this?

A. It is PX 6.

Q. And where did this patent come from?

A. This came from the leading company, LG.

Q. And do you have a road map for us of your analysis?

A. Yes. For each patent, I briefly describe what the patent is and what problem it's solving. Then I will analyze the technical benefit for each patent. So we do that for three patents.

Q. What problem is the '833 invention directed at?

A. The problem that it's solving is how to send the control signals shown on the -- yeah, the mouse -- one second. It show -- it is the control signals in the red box on the left and send them from the Apple product on the left to the base station on the right.

So that's the problem it's solving, how to send control signals and data from the base -- from the Apple product on

the left to the base station efficiently.
Q. And that's in the uplink?
A. Yes.
Q. Does that signal in the uplink affect the download speed?
A. Yes. These control signals are very important because they affect the download speeds directly. So there are two types of control signals here. One is the channel quality index, the CQI indicator. So it tells the base station how the connections trend is. And based on the connections trend, it can receive data at high speed or low speed.
The second type of control signal is an important signal. It's called the ACK/NACK. So it tells the base station -- the Apple product tells the base station that it has received a the message correctly, then it sends an ACK. If it doesn't receive the message correctly, it sends a NACK, and the base station has to resend the entire message until it receives an ACK. So that makes its slower.
Q. Professor Madisetti, is there a particular question that the '833 invention seeks to address in this regard?
A. Yes. The key is how best to send this control information as well as the other signals like reference and data on the uplink. So how to double up a two-dimensional map that can be used to send the signal. So it's a two-dimensional map that is in time and frequency.
Q. And how does the '833 invention do this?

A. The '833 invention in its specification, Figure 6, shows an innovative technique of sending the signals. So here is the two-dimensional map shown on the right. The control signals, such as CQI, are sent according to this map, and in this map they are shown in green.

The blue information is the data that is shown in blue. And then the ACK/NACK are sent in -- placed in this map in a particular area which is beside the reference signal in orange. So these particular signals sit beside in the map in the -- beside the reference signal.

Q. And does this somehow increase the likelihood of the control signal in green and the ACK/NACKs in purple get up to the base station properly?

A. Yes. This is important because the reference signals are sort of tuning signals between the product and the base station. So sending the signal beside the reference signal makes sure it is received correctly and efficiently. So you place the ACKs beside the reference signal, and you make sure the ACKs are far off from the green so that they both can be sent efficiently and separately without interfering with each other.

Q. Do you have an animation for the jury to show how this works?

A. Yes. So in this demonstrative, I will show on the left is a first part, which are the control signals which are the

channel connection signals in green, followed by the blue data signals. And on this yellow square is the two-dimensional map that is created, and this two-dimensional map is organized in time along the horizontal axis and frequency in the vertical axis.

So what happens now is that we will clear this map in a particular way row by row. So you will see the green ones come on the top, followed by the blue, and then the ACKs are very carefully placed beside the reference signal in yellow. So this is exactly how it works and this is exactly how it is done.

Q. This process that you've animated for the jury, does it happen very often?

A. Yes, it happens a thousand times a second. So each product will be doing this thousand times per second.

Q. Can you give us an example of what type of apps that would be happening in?

A. This could happen in all the apps that are sitting on the phone. This could be, for example, a FaceTime or maps or any other type of apps that play music or video.

Q. In your road map here, what are you turning to next?

A. The next is the technical value of this particular invention.

Q. And how did you go out -- how did you set out to analyze the technical benefit of the patent?

A. I compared the invention of the '833 claim with the next -- with the incremental benefit over the next closest alternative that Apple products could have used.
Q. And how did you go about determining the closest alternative?
A. Yes. I looked at all the competing proposals that were put out there by leading companies in the world. These companies include household names such as Samsung, Ericsson, Qualcomm. And then I also listed the prior version of the standard, which is version 8. So it's PX 937, PX 1747, PX 1742, and PX 1745, for example.
Q. Did the '833 invention compete against these for adoption in the LTE standard?
A. Yes. And it actually won. It was selected over all these competing proposals.
Q. Did you choose one of these as the closest noninfringing alternative?
A. Yes.
Q. Which one?
A. I chose the prior version of the standard, which is exhibit PX 937, and that is the version 8.0 that existed prior to the invention of the '833.
Q. Why did you not choose one of the competing proposals?
A. I evaluated all the alternatives, including those alleged for Apple. And here is a table that I created based on my

analysis.

I list the alternatives in the first column, which included the proposals reviewed by the committee, and also evaluated them in terms of performance, whether they were covered by patents by other companies and whether there was enough detail for them to be viable in terms of implementation.

So based on my analysis I reviewed, I performed this sort of analysis that shows that many of these alternatives had very poor performance, all were covered by patents, or didn't have sufficient detail and were incomplete. Therefore, the alternative that I chose was the closest one.

Q. Professor Madisetti, how does the '833 invention differ from the closest alternative that you identified?

A. As I described, the closest alternative is the prior version of the LTE standard from 2007, version 8. And in this particular version, as described in Section 5.2.5.6, the control is mapped to the sources around the middle of the slot.

So this solution has a problem in that the purple ACK/NACK signals can override the green, and as a result you can lose some of the CQI, or the connection channel quality information, and this can cause a severe impairment in terms of download speeds.

Q. And what exhibit is this on the right?

A. It's exhibit PX 937.
Q. The incremental value analysis that you've conducted, does that give value to the fact that this is part of the standard?
A. It does not. I did not give any weightage to the fact that any of these are part of the standard or not.
Q. Is that true of all three patents that you analyzed?
A. Yes. In all my analysis, I did not give any weight. I just looked at incremental technical value or closest noninfringing alternative.
Q. How did you compare the '833 invention to the closest alternative quantitatively?
A. Yes. So I did an analysis. I did it based on several factors. I did a simulation. I compared it with other published papers, other peer-reviewed documents, that indicate the type of efficiencies and improvements that can occur for downloads.
Q. Is there a particular -- well, what is a simulation?
A. A simulation is an analysis that's based on actual use of the computer that models the real life U.S. network because --
Q. Are -- I'm sorry. Excuse me, Professor.
A. Because you cannot go and actually modify an existing live network, you assimilate it using industry standard simulators that are used. And this approach is used routinely by all the large companies as well as universities. So this

is a standard, reliable way of analyzing algorithms and solutions.

Q. Is this an accepted practice in engineering?

A. Yes, it is.

Q. Did you specify the computer simulation setup?

A. Yes. I worked with Professor Antonio Virdis, who is a leader in this area in Italy, and used and customized his environment for the U.S. network.

Q. Do you show the U.S. environment that you simulated here?

A. Yes. I was simulating a network of three cells because that's how networks are. You have almost 600,000 cells in the U.S. So these are three cells with three base stations, and these blue icons are the different Apple products in that particular base station. So I model the behavior of download speeds for these products in the U.S. network.

Q. For this computer analysis, did you specify the number of users, the number of cell phones?

A. Yes, I did. I customized it so that, for example, it reflects real U.S. environments. So, for example, here is a paper from Bell Labs and Alcatel Lucent that prescribes how many active users are in a cell. It typically ranges from 20 to 90. And this is Exhibit PX 169.

Q. Did you specify the other simulations or the other input data for the computer simulations?

A. Yes. Based on my knowledge, experience, based on my

review of existing publications and documents and standards, I specified for this simulation the parameters that are necessary to realistically model the U.S. LTE network.

This includes the parameters in table 1 of my report Exhibit H, it includes the number of users, 20, 40, 60; whether the users are mobile or stationary, the type of load, traffic load, three files that were downloaded over a period of 150 seconds, and so on.

Q. Professor, what are the colored lines at the top here?

A. So in my analysis, I was looking at the number of active users that were being over time in a particular cell. The lowest line in blue or purple reflects 10 users, the topmost line reflects 60 users. So I analyzed the network over a wide variety in terms of the number of users to come up with a particular set of results. And I monitored the loss of those green CQI information as having no loss, which is the invention of the '833, 50 percent loss, and 70 percent loss, to evaluate the performance of the next closest alternative, which is the previous version of the standard.

Q. Do you have results of your computer analysis to show us?

A. Yes.

Q. What do you show us here?

A. So here is one of the results, and here you can see that I have three sets of results--for 20 users, for 40 users, and 60 users.

The blue line represents the file download time for the '833 invention. The red and the green represent the file download times for the next closest alternative for 50 percent and 70 percent CQS operation.

As you can see, the blue line is always less and smaller in size, which means smaller amount of time for that file download than the competing alternatives.

And based on this analysis, it is my opinion that based on the simulation that in this particular set of results, there is an improvement in the sense that the closest alternative is 10.7 to 37 percent slower download than the invention of the '833.

Q. This is for a fast variation environment?

A. Yeah. This is called a fast variation environment. This is more typical of a city or an urban environment where things change quickly.

Q. Do you have more simulation results to show us?

A. Yes.

Q. What do you show us here?

A. I also have a slow variation environment, which is more typical of non-city or rural environment. Here, again, you can see the blue lines, which represent the '833 invention, are smaller than the red and the green lines. As a result, even in a rural environment, there's a 6 to 25 percent benefit over the closest alternative as I show here.

Q. Professor Madisetti, did you consider any independent research to check the validity of these computer results here?
A. Yes. I also relied on additional support for my opinions. In addition to my simulation, I also relied on other independently published studies that show, for example, in this particular paper published in 2015, this particular article confirms what I said in terms of the drop in download speeds. As you can see, as the amount of CQI is lost because of delay, the download speeds get slower, and this is a 12 to 15 percent reduction.
Q. What exhibit number is this, Professor?
A. This is Exhibit PX 162.
Q. Did you check further research?
A. Yes.
Q. What do we see here in that regard?
A. This is other independent study that provides additional support for my analysis. It is a paper from 2012, again by peer-reviewed published paper, Exhibit PX 161, that also shows that, as you lose information, the CQI information, due to delay, you have a 13 to 24 percent reduction in -- or slower download speeds, 13 to 24 percent.
Q. And what exhibit is this?
A. This is Exhibit PX 161. And these are all for LTE as well.
Q. Did you reach a conclusion with regard to the incremental

technical benefit of the '833 invention?
A. Yes. Based on my simulations, based on my analysis of other publications, based on my own knowledge and experience, it is my opinion that the alternative has a 6 to 37 percent slower download speed. To be conservative, I chose a value that is at the lower end, which is 10.7 percent, as the speed benefit.
Q. Professor Madisetti, where did you get the 10.7 percent from?
A. The 10.7 percent comes from the fast variation or for the city environment. It was the lowest amount of improvement for the city or the fast variation environment that I discussed earlier.
MR. POLLINGER: Mr. Huynh, can we go to 48, please?
Q. (BY MR. POLLINGER) Do we see that here?
A. Yes. It's the lowest one. So I was conservative. I didn't pick the maximum, 37, but I picked the smallest for city, which is 10.7 percent.
Q. That percent slower speed, from a technical standpoint would the user notice that?
A. Yes, because as you have a lot of applications on your product, you -- especially with respect to high resolution video running different applications in the phone, it causes significant impairment in user experience as well as in the operation of the products.

MR. POLLINGER: Mr. Huynh, can we please go to 55?
Q. (BY MR. POLLINGER) Professor Madisetti, what patent are you turning to next?
A. I will do the same analysis for the next two patents, and this is the LG 8,019,332 with respect to claim 6 and 7. I would call this the '332 Patent.
Q. And what exhibit is this?
A. This is PX 2.
Q. And this patent comes from where?
A. It comes from LG, again the leader in electronics.
Q. And in terms of your road map, what will you do?
A. I will again, like I did before, give you a brief overview of the solution, and then I will analyze it over the closest alternative.
Q. Professor Madisetti, what problem does the '332 invention address?
A. Yes. The '332 is again related to download speeds from the base station to the Apple product, and here I give an example. So what happens is each product, each Apple product, monitors a particular location called a container for its download. So when you receive a message from the base station, it is sent to the container and you look for it in the container.
What happened in the past is that these products, they chose containers in an inefficient manner. For example, four

products chose container 1, and six products chose container two. Containers three and four were not chosen while only two containers chose -- only two Apple products chose container five.

So if you have five messages to send to these phones, you have an unequal or non-random distribution of how these products choose their containers. So what the '332 did is in the next slide.

Q. Well, first, Professor, the problem that you just described, does that affect the download?

A. Yes. As I show in the next slide, supposing you had five messages to send. The message for 3 is received. However, messages for 6, 8, and 10, they collide because phones 6, 8, and 10 have all chosen 2.

As a result, only 6 can get its download while 8 and 10 are stuck waiting in queue. And that means they have a slower download speed, and the containers 3 and 4 are not used at all and container 5 is fine. Phone 12 receives its message.

So as a result, you can see that the download speeds for the products on the left are impaired because they cannot choose the container efficiently enough.

Q. In this illustration here, the messages for phones 8 and 10 that are crossed through, will those ever be received?

A. They will be received later on the next try or the following try and so on. So they will not be received right

away, and that means that your photo download or your image download or your video will be slow and choppy.
Q. What does the '332 invention do to address this problem?
A. The '332 allows these products to choose these containers so that there is a more optimal choosing where there are effectively a uniform number or roughly an equal number of phones that choose a particular container.
So this results in more useful and efficient usage, and all the file messages that are shown are actually received by the phone. So there's no phone that waits for its image or video, and as a result you have smooth experience for these products.
Q. And in this illustration here, what happened to messages to the messages for phones 8 and 10?
A. 8 and 10 in this case were smart to choose the '332 algorithm and picked containers 3 and 4. As a result, they did not have to wait. They got their messages right away on time, improving their download speeds.
Q. This '332 invention, is it used very often in LTE communications?
A. Yes. This is also used a thousand times per second per product.
Q. And does that apply to the Apple apps in these products?
A. Yes. The apps and the phones use it thousands of times per second per product.

Q. Where are you now on your road map?
A. So now that I've given an introduction to the solution of the '332, I will describe its incremental technical value over the next closest alternative.
Q. How did you go about the incremental technical value?
A. Like before, I looked at all the competing proposals that were presented to the board of standards. These, again, are from household names like Phillips and Motorola and Samsung, and I show these on this demonstrative.
Q. Was the '332 invention selected over this competition for LTE?
A. Yes, it was. It was selected over all these technical, high-quality proposals from competitors.
Q. Did you select one of these competing proposals as the closest noninfringing alternative?
A. Yes. I selected the Samsung proposal, which is Exhibit PX 1754, as the closest competing proposal that Apple's products could have used.
Q. Why didn't you select one of the other competing proposals?
A. Based on my analysis, I analyzed all the alternatives alleged by Apple, and I analyzed them, for example, in my reports, and through this table I list the competing proposals as well as the Apple's alleged alternatives in the first column.

I studied them for performance, whether they are covered by patents, and whether they had enough detail, and presented my results that many of these had much poorer performance, they were also covered by patents by Optis and others, and also some of them had insufficient detail to be viable.

Q. Professor, how does the '332 invention differ from this closest noninfringing alternative from Samsung?

A. As described in the '332, you have a number of limitations. As described in the closest alternative from Samsung, you again have a description here, but the main -- one of the big differences is that the Samsung proposal uses this DCI location, these sort of CC aggregation levels in a different manner that make it less efficient.

And you can see here that the way the Samsung proposal allows phones to choose the containers as a part of this process of decoding is different and it is inefficient.

Q. How did you go about quantifying the '332 invention from a benefits standpoint relative to the closest alternative?

A. Yes, I performed an analysis. I looked at the LG electronics proposal, which describes the invention of the '332 Patent, and provides a Figure 6 in that document, which is Exhibit PX 1760.

As you can see in Figure 6, the green is the closest alternative from Samsung. The blue is the '332 invention. And the '332 invention has a lower probability of collision

than the green closest alternative, which has a probability of 70 percent of collision compared to 30 percent for the blue line.

So, therefore, there is an improvement in terms of having less collisions for the '332. If you have less collisions for the containers, you have faster downloads.

Q. The blue line here, is it materially the same as the claimed invention?

A. Yes, it is.

Q. Did you just take this graph or did you have to do more to compute with the technical benefit?

A. I confirmed that this graph is applicable to the U.S. networks, and I carried out an analysis further to confirm that Figure 6 was reliable and correct to use.

Q. How did you confirm that this was applicable?

A. I did some -- I had some network testing done and to confirm that the assumptions made in creation of Figure 6 were valid for the major U.S. networks, which included Verizon, AT&T, and others.

Q. How did you then quantify the '332 technical benefit over the closest alternative?

A. As I show in the next slide, I applied these probabilities for two different cases--one with 20 active users in a cell and one with 40 active users in the cell.

And in the case of 20 active users, I found that the

collision delay when using the '332 Patent was 65 milliseconds. However, the collision delay of the Samsung alternative was almost twice that of 128 milliseconds.

So when I add the time to download a five-megabyte photograph, it would come to around 1315 milliseconds for the '332 Patent and 1378 milliseconds for the next closest alternative. So if Apple used an alternative, they would see a 4.6 drop in download speed even if there were only 20 users in one technical cell. There are typically a larger number of users.

So when I go to the next simulation and analysis, I looked at 40 active users. And in this case the collision delay is larger. For the '332, the collision delay is 115 milliseconds. For the Samsung alternative, it is twice that or a little more than twice, 240 milliseconds.

And when you add that to the time for downloading a typical five-megabyte photograph on an LTE network, the closest alternative would see an eight percent drop in download speed, primarily as a result of this increased collision delay.

Q. Professor Madisetti, what do we see in the upper right corner here?

A. The upper -- some of the analysis that I did to analyze specifically how these probabilities can be used to identify the number of collisions in a typical frame, which is over 10

milliseconds. And then I generalized that to analyze the overall delay.

Q. What did you conclude is the incremental technical benefit of the '332 Patent?

A. As a result of this technical analysis, the incremental technical benefit is this 4.6 to 8 percent speed benefit that Apple products derive over the next closest alternative compared -- as a -- when using the invention of '332 Patent.

Q. Professor Madisetti, what is the last patent that you address here?

A. The last patent is the Panasonic 8,411,557, specifically claims 1 and 10.

Q. What exhibit is this is?

A. It's PX 4.

Q. Will you first give us an overview of the patent?

A. Yes. Like I did with the other two, I will describe the solution of the '557, and then I will provide an analysis of its technical value.

Q. What problem is the '557 Patent directed at?

A. The '557 is specifically addressing something called a random access channel, or a RACH. So when you switch on your phone, when your phone goes from an active state to an idle state, when you move -- when you are driving to a new cell, your phone sends a hello to the base station. Lots of phones send hellos to the base station, and that's called an emission

submission.

And the phone has to then decide who it's going to serve and whose calls it's going to let through. So currently it's a very limited number of options that the base station has to receive these hellos from various Apple products.

It -- also, these hellos cannot provide an indication to the base station whether you are just idle or have a very little use or you have a bad connection or you have a good connection and you want to download something big. All it currently can do is just a hello.

So this creates an inefficiency that you have to have following steps that tell additional information to the base station, saying, hi, I'm so-and-so phone, I would like to download video. So if there's a way to combine all these into one signature, that would result in a much more efficient system.

Q. How does the '557 invention address this problem?

A. The '557 addresses this problem in this way. It provides two or more groups of signatures. For example, the phone number one has a high connection strength or a good connection quality and wants to download a lot of data. It sends a green signature or a signature in the high demand group.

The other phones, phones 2, 3, and 4, they do not have good connection strength or they don't require much services, they simply use a low demand signature, saying, hi, I'm

just -- I don't need much.

So the base station can then prioritize and handle these messages effectively because it knows who wants more, who wants less, and can do all that. And the products, therefore, can benefit from much improved service.

Q. Does this signaling that the '557 Patent addresses happen very often?

A. It happens quite often. It happens 250 times per cell per second.

Q. And where did you find that?

A. This, again, is from peer-reviewed published information from the IEEE, which is the professional society. It is from PX 122.

Q. Where are we on your road map?

A. Next, given the problem and the solution, I am now discussing the incremental technical value this solution of the '557 provides to Apple's products.

Q. Did you consider the competing proposals in that regard?

A. Yes. As before, I construed the competing proposals from the leading companies in this area from Toshiba from LG from few Fujitsu as well as Texas Instruments and others.

Q. Was the '557 invention selected over this competition for LTE?

A. Yes. It was found far superior to these from a technical point of view.

Q. Did you select any of these for the closest noninfringing alternative?

A. No. But I evaluated all the proposals that were present and included those that Apple alleged as alternatives as well. And in this table, I describe my analysis for all the different alternatives that I analyzed. And I analyzed them again from performance point of view and whether they were covered by patents. And based on my analysis, I find that most of them had very high degree of collisions. As a result, they were would impair download speeds.

So I picked the one that I felt was the closest alternative from a technical point of view as I describe in my next slide.

Q. Did you consider all the alternatives alleged by Apple and its experts?

A. Yes.

Q. Does that apply to all three of the patents you've addressed?

A. That's right. For each of these three patents, I looked at all of the alternatives alleged and proposed by Apple through its experts.

Q. For this '557 Patent, what did you select as the closest noninfringing alternative?

A. I selected as closest alternative an approach that does not associate the groups with any connection quality or demand

in terms of bandwidth or data. So this approach was proposed in Apple's response, PX 2735.
Q. Did you perform a computational analysis to compute the technical benefit of the '557 Patent over this closest noninfringing alternative?
A. Yes.
Q. Did you conduct any network testing in that regard?
A. Yes. I conducted -- I had under my direction network testing done to convert these numbers to numbers that were applicable to LTE U.S. networks to evaluate the precise technical improvements, the incremental technical improvements.
Q. And where was this testing performed?
A. This testing was performed by TechPats in Philadelphia.
Q. Elsewhere also?
A. Yes, in some other locations, but it was done for the major networks.
Q. The -- was there any limitation on where in the U.S. testing could be performed at the time?
A. No. Philadelphia is a major city and there is a representative of how the large major networks would behave.
Q. And what did you find from this network testing?
A. From this network testing, I confirmed that the major carriers allocate almost a quarter of their resources to this high demand signatures, group B.

Further, I also confirmed that they use a particular parameter called indicator TBS, or indicator transport block size, of 5, compared to an indicator transport block size of 3 for the low demand signature. So this tells me how much more data you could send if you use this high demand signature that the '557 taught.

Q. Did the COVID pandemic put any restrictions on where in the U.S. testing was performed?

A. That's my understanding, that there were some restrictions on some certain type of tests and the mobility of the testing personnel themselves due to the pandemic.

Q. But in your opinion, is this testing representative of the U.S. networks?

A. Yes, it is, because it covers the major U.S. networks, and it also covers a major city, and it is consistent with my analysis as well as my review of technical documents that show these numbers are in conformance with other documents I reviewed.

Q. And which carriers did you see using the '557 invention?

A. In this particular test, I confirmed that AT&T, Sprint, and Verizon were using the '557 technology.

Q. What about T-Mobile?

A. T-Mobile did not appear to use this technology in Philadelphia in this test.

Q. Have you seen any evidence of Apple testing with regard

to the '557 Patent?
A. Yes.
Q. And what have you seen in that regard?
MR. MUELLER: I object to the question as phrased, Your Honor. The question was Apple testing the '557 Patent. Of course there's no such testing. I think Mr. Pollinger is referring to the functionalities that Doctor Madisetti described. I request the question be rephrased.
THE COURT: That's not a proper objection, counsel. I mean, you can certainly take it up with the witness on cross-examination, but you're not going to interrupt the direct examination because you don't like the way they phrased the question. You'll have to do it on cross-examination.
MR. MUELLER: Sure enough. Thank you, Your Honor.
THE COURT: Let's proceed.
Q. (BY MR. POLLINGER) Professor Madisetti, did you see any evidence of Apple testing related to the technology of the '557 Patent?
A. Yes. As we see in Exhibit 69, PX 69, Apple conducts tests in the U.S. And this is a section on test results, 3.12. 3GPP TS 36.523.1, this is Section 7.1.2.3 that covers testing of the RACH, or the random access channel, which I discussed which is the signature channel.
And as you heard yesterday from -- in the testimony of Professor Mahon that T-Mobile requires testing of various

standards, which include technical specification 36.321 and 36.331, and other such standards that he mentioned. All these correspond to these sections that test.

So this confirms that Apple products are -- have tested this functionality that it discussed with respect to the '557 Patent.

Q. Professor Madisetti, did you compute the relative technical benefit of the '557 Patent to this closest alternative that you analyzed?

A. Yes. I looked at three different scenarios, all of which used a modest number, a conservative number, of 250 preambles per second per cell. Some studies talk about much higher numbers like 900, but I chose 250.

Then I looked at the number of RACH preambles per frame and the number of group B, or high demand RACH preambles. As you saw from the network testing, the number of RACH preambles that were high demand could be as high as 25 percent or higher.

I chose three different values 10, 20, and 30. And for each of these, I calculated the improvement in the network capacity as a result of using the invention of the '557 and in my opinion have not -- not using the invention of the '557 would result in a slower upload speed of .135 percent to .445 percent. These are smaller numbers, but it's an uplink channel which is already very small.

Q. This slow-down here, does it impact the cellular network capacity?
A. Yes, it directly impacts the cellular network capacity.
Q. In the same percentages approximately?
A. Yes. With respect to the radio network, which primarily deals with uploads and downloads, it would impact it directly and proportionally.
Q. Is this true in general of cellular networks?
A. Yes.
Q. Professor Madisetti, what is your conclusion on the technical benefit of the '557 Patent?
A. To summarize, as I discussed with the other patents, the '557 has a technical benefit over its closest alternative that was attributed to Apple of .135 percent to .445 percent speed benefit for upload.
Q. Professor Madisetti, the benefits of these three patents, do they enhance the performance of Apple's devices overall?
A. Yes.
Q. Do these inventions go only to the baseband processor in terms of benefit?
A. No. The baseband processor is a small portion that works with the RF, or the radio frequency, portions. It works with the application processor. So the core excuse all over the phone, the applications recited on the application processor that are sending data, sending control signals to the baseband

processor which in turn sends control signals to the radio frequency portions. So it's all in tracking through the entire Apple product and device, not just the baseband processor.

THE COURT: You're going to need to speak up, Doctor Madisetti.

THE WITNESS: Sorry, Your Honor.

Q. (BY MR. POLLINGER) And does Apple's corporate representative agree or disagree in that regard?

A. Apple's corporate representative agrees with me, Mr. Tony Blevins. In his deposition testimony, he confirms that these are specific features with respect to their asserted patents; they deal with upload and download speeds, which is transmission and receipt; and, further, he confirms that every part of the iPhone is in more, including the battery and the display.

Q. Have you heard reference to a baseband processor in this trial?

A. Yes.

Q. Do the claims that you've analyzed in these three patents claim just a baseband processor?

A. No. As I describe here for the '833, for the '557, and for the '332, the claims describe a mobile station, a mobile station, and user equipment, or UE. They refer to the entire device or the entire product. They don't refer or claim a

particular smaller chip set or a baseband processor.

Q. Professor Madisetti, in your expert report, have you reviewed a Qualcomm Apple patent license agreement?

A. Yes, I did.

Q. Did you review the patents at issue in that agreement?

A. Yes. There were over 40 patents out of which I reviewed them all important and relevant ones, were about 14 in number, and they dealt with both LTE as well as some 3G patents as well, which were the older technology, and I evaluated those patents as a part of my analysis.

Q. Did you analyze whether those patents are comparable to those at issue in this case?

A. Yes. I found they were technically comparable because they dealt with the same type of control channels, uploads and downloads. They also dealt with similar low level protocols that were similar to those used in the inventions of the '833, '557, and the '332 inventions.

Q. Do you understand why you were asked to analyze that agreement, in particular the patents in that agreement?

A. Yes. I was asked by Mr. Kennedy, who is going to provide a detailed analysis of the business side or the monetary damages, and Mr. Kennedy asked me to evaluate the agreement to see if it was technically comparable to the patents at issue, which were the three patents I discussed.

Q. Professor Madisetti, could you provide us a summary of

your opinions in this case?
A. Yes. To summarize, I evaluated three patents, the '833, the '332, and the '557, and then I provided a detailed incremental value as per the percentages that I described.
MR. POLLINGER: Mr. Huynh, would you mind pulling up slide 110, please?
THE WITNESS: And as I presented to you the invention as well as the technical benefit to summarize that, the benefits were 10.7 percent speed benefit for the '833, 4.6 percent rate versus speed benefit for the '332, and .135 to .445 speed benefit for the '557, and these impact download and upload speeds.
Q. (BY MR. POLLINGER) Professor Madisetti, are you confident in your technical benefit analysis here?
A. Yes. I used my knowledge, experience, reliable methods, simulations, additional documentation, and other information, and analyzed it, and I am confident that this is a robust and reliable approach.
Q. Thank you.
MR. POLLINGER: Your Honor, I pass the witness.
THE COURT: Cross-examination by the Defendant?
MR. MUELLER: Your Honor, may we pass out some binders and set up a placard?
THE COURT: You may.
MR. MUELLER: Thank you, Your Honor.

MR. SHEASBY: Your Honor, may I approach again.

THE COURT: You may. Hand it to the Court Security Officer.

All right. Counsel, you may proceed with cross-examination.

MR. MUELLER: Thank you, Your Honor.

Good morning, ladies and gentlemen.

CROSS EXAMINATION

BY MR. MUELLER:

Q. And good morning, Doctor Madisetti. My name is Joe Mueller. It's nice to meet you.

A. Good morning, sir.

Q. Doctor Madisetti, I want to pick up on one issue that Mr. Pollinger asked you about, and that's your analysis of the Qualcomm agreement. Do you have that in mind, sir?

A. Yes, I do.

Q. Now, I believe you testified that you analyzed a portion of the patents covered by that agreement. Correct?

A. Yes. I looked at all the patents and then found that a subset, 14 of them, were more relevant to the patents at issue and more important.

MR. MUELLER: Your Honor, may I approach the easel?

THE COURT: You may.

Q. (BY MR. MUELLER) Let's make sure we have the math right, sir. You looked at how many total?

A. Forty.
Q. Forty. And of those, you found how many to be particularly significant to your analysis?
A. 14, I believe.
Q. 14. Is that right, sir?
A. Yes.
Q. And in this case there is five at issue. Right?
A. Yes.
Q. Now, sir, you understand the Qualcomm agreement actually covers in total well over 100,000 patents. Do you understand that, sir?
A. I'm not aware of that.
Q. Well, we can agree on this. You did not review all of the 100,000-plus patents covered by that agreement. Correct?
A. Again, as I said, I did not know. I'm not aware. I did not review 100,000.
Q. You did not review a hundred thousand patents.
A. I did not review a hundred thousand.
Q. You just reviewed a subset of 40. Correct?
A. I reviewed 40 and identified a subset of 14.
Q. Not the rest.
A. Not the rest.
THE COURT: Please remember to speak up, Doctor Madisetti?
THE WITNESS: Yes, Your Honor.

Q. (BY MR. MUELLER) Now, let's try to make sure we get on the same page on terms of what you're here for, Doctor Madisetti. Okay? You are here to offer opinions on the technical value of three of the Patents-in-Suit. Correct?
A. Yes. The incremental technical value.
Q. And you understand that His Honor is going to instruct the ladies and gentlemen of the jury as to how to assess the economic value of these particular patents. Right?
A. Yes, at a high level.
MR. MUELLER: And, Your Honor, may I approach the easel again?
THE COURT: You may. Mr. Mueller, you are welcome to move the easel forward no further than the podium.
MR. MUELLER: Thank you. I appreciate it.
THE COURT: You can get it out of that corner if you'd like to.
MR. MUELLER: That would be terrific.
Q. (BY MR. MUELLER) Doctor Madisetti, can you see this?
A. I can.
Q. Okay. So let's just make sure we can put in context the Patents-in-Suit. Okay? We have here -- and excuse my drawing which is not terrific, but let's call this a phone. Okay?
A. Okay.
Q. And it has a screen if it's a smartphone or it might have buttons on it, but we'll call this a phone. Okay?

A. Okay.
Q. Now, any phone is going to have a number of components in the exterior of the phone. Correct?
A. Yes.
Q. So, for example, glass or plastic?
A. Yes.
Q. The case?
A. Yes.
Q. And then if we were to crack that open and go inside, there's a whole variety of components. Right?
A. Yes.
Q. There's various forms of computer chips. Right, sir?
A. Yes.
Q. Most modern phones also have a camera. Is that right?
A. Yes.
Q. And there are also cellular communications chips inside these phones. Right?
A. Yes.
Q. Now, cellular chips are sometimes called modems. Correct?
A. Yes, in some cases, yes.
Q. And sometimes called baseband chips.
A. Sometimes, yes.
Q. Now, there's also a whole bunch of other things like batteries. Correct?

A. Yes.
Q. And various other forms of components. Right, sir?
A. Yes.
Q. Now, the five patents in this case His Honor has instructed to the jury are standard essential patents. Correct?
A. Yes, as per His Honor's instruction.
Q. Now, I want to zoom in on exactly what we're talking about. It's the LTE standard. Correct?
A. Yes.
Q. There were cellular standards before LTE. Right, sir?
A. Yes.
Q. And those included 3G. Correct?
A. Yes.
Q. As well as 2-and-a-half G. Right?
A. Yes.
Q. And 2G. Correct?
A. Yes.
Q. Now, it turns out that LTE phones even today still have the older cellular standards as well. Correct?
A. Some of them do, yes.
Q. And when you're traveling into certain areas where LTE is not available, your phone will use the earlier standards. Correct?
A. Sometimes if it's available.

Q. Now, we're not talking about Apple products with 5G, but there is a 5G cellular standard as well. Correct?
A. Yes. It's based on LTE.
Q. Sir, LTE is the fourth generation standard. Right?
A. LTE is sometimes called the fourth generation, but as I said, 5G is based on LTE.
MR. MUELLER: Your Honor, I move to strike the answer after LTE is 4G.
THE COURT: Overruled. I think he's responding to your question.
MR. MUELLER: Thank you, Your Honor.
Q. (BY MR. MUELLER) So we have all of these different generations of cellular standards. Correct?
A. Yes.
Q. Now, within LTE, we have various technical specifications. Right, sir?
A. Yes.
Q. And you're familiar with some of these technical specifications. Correct?
A. Yes.
Q. Those are sometimes abbreviated TS for technical specification?
A. That's right.
Q. Okay. And the three patents that you've looked at, the three of the five in this case, you believe those relate to

certain of the technical specifications in LTE. Right?
A. Yes.
Q. Now, of course, there's other technical specifications beyond the ones that you think these patents relate to. Right?
A. There are, but the ones that I referred to are the most important.
Q. Sir, my question is simply, there are other ones beyond those. Right?
A. Yes.
Q. And, in fact, there's a whole variety of technical specifications that you are not contending these patents cover. Correct?
A. Yes.
MR. MUELLER: Mr. Lee, if we could pull up the slide from the opening statement that shows the companies that came together to create the Plaintiffs.
Q. (BY MR. MUELLER) You were here for the opening statement, Doctor Madisetti, that Mr. Sheasby gave?
A. Yes.
Q. And did you see the slide during the opening that Mr. Sheasby gave?
A. Yes.
Q. And it shows these various companies that transferred patents to the entities that Mr. Sheasby represents. Correct?

A. Yes, at a high level.
Q. And I won't go through all these companies because we spent some time on them yesterday, but Samsung is one of them. Correct?
A. Yes.
Q. And Samsung is, of course, a major supplier of phones, including in the U.S. Correct?
A. Yes.
Q. Now, one company that we did not spend much time on yesterday was Ericsson. Are you familiar with Ericsson, sir?
A. Yes.
Q. Ericsson has been in the cellular industry for quite some time. Correct?
A. Yes.
Q. And at one time they actually sold phones. Right?
A. A long time ago.
Q. Do you know if they sold phones in 2012?
A. I'm not sure.
Q. One thing they sell even today is infrastructure equipment. Correct?
A. Yes.
Q. And those would include those big cell towers that we see on the side of the roads on highways sometimes?
A. Yes.
Q. And, in fact, Ericsson sells network infrastructure for

use in the U.S., correct, among other places?
A. That's my understanding. I don't have detailed business information, but at a high level, yes.
Q. All right. Now, you understand that in this case the ladies and gentlemen of the jury are trying to analyze what would have happened in a negotiation between Panasonic, Samsung, and LG, on the one hand, and Apple, on the other hand back in 2012. Right, sir?
A. Again, this is not my area, but I will take your representation.
Q. Well, to be clear, your role in this case is to help the jury assess the technical value of what would have been on the table, so-to-speak, in that negotiation. Right?
A. Yes. I was asked by Mr. Kennedy, who is the damages expert.
THE COURT: Doctor Madisetti, you answered the question when you said yes.
THE WITNESS: Okay.
THE COURT: You need to limit your answers to the questions asked.
THE WITNESS: Okay.
THE COURT: Let's continue.
Q. (BY MR. MUELLER) And I want to just again make sure we're very clear about what would have been on the table in this negotiation and what would not have been on the table in

this negotiation. Okay, sir?

You believe the '833 patent is relevant to technical specification 36.201 in the LTE standard. Correct?

A. It's relevant to a number of specifications that I outline in my report, not just the 201, the 211, 212, 213.

Q. I'll get to them.

MR. MUELLER: In fact, let's pull up DDX 55.3.

And, Your Honor, may I approach the easel one more time?

THE COURT: You may.

Q. (BY MR. MUELLER) Just so we're clear what we're talking about, we're talking about technical specifications within the technical specifications within LTE. Do you have that subject in mind?

A. Yes, sir.

Q. Now, within the larger set of technical specifications for LTE, you believe the '833 patent is relevant to the ones that we see here on the screen, and I'm just going to read them for the record: TS 336.201, TS 36.211, TS 36.212, TS 36.213, and TS 36.300. Correct, sir?

A. Yes.

Q. Okay. And if we go to DDX 55.4, I'm going to switch to the '557 Patent. Are you with me, sir?

A. Yes.

Q. For the '557 Patent, you believe that patent is relevant to the following technical specifications: TS 36.201, TS

36.211, TS 36.213, TS 36.300, TS 36.321, and TS 36.331. Correct, sir?

A. Yes.

Q. All right. And then, finally, let's turn to DDX 55.5. This is the '332 Patent. Do you have that one in mind, sir?

A. Yes.

Q. And you believe the '332 Patent is relevant to TS 36.201, and TS 36.213. Correct?

A. Yes. Could we go back to the '557 for a second?

Q. Sure.

A. Yes. These are the ones, yes.

Q. Okay. Thank you, sir.

Now, you understand that we have an expert in this case, Doctor Perryman, who's going to be testifying to the ladies and gentlemen of the jury?

A. Yes.

Q. And I'm going to show you a DDX 55.13. Doctor Perryman has listed some technical specifications allegedly covered by the Patents-in-Suit. And for the three patents that you've looked at, the ones that you've looked at, can you just confirm for me that Doctor Perryman has it right?

A. Again, these look right, but I would defer to my report for the details.

Q. But sitting here right now, there's nothing you see that's wrong. Right, sir?

A. That's right.

MR. MUELLER: We can take that down.

Q. (BY MR. MUELLER) Now, you understand that Doctor Perryman has identified some licenses where he has found patents that were declared essential for those very same technical specifications. Do you understand that, sir?

A. I don't.

Q. Well, let's put it this way. You're not here to dispute the patents in those licenses are comparable to the patents the jury is looking at in this case. Right, sir?

A. My opinion is that I do not offer an opinion at all.

Q. Sir, you're not offering any opinion in contradiction to Doctor Perryman on that issue. Correct?

A. That's correct. I don't offer an opinion.

Q. Now, you testified to the ladies and gentlemen of the jury that the three patents that you looked at are particularly important for download speeds. Correct?

A. Download and upload speeds.

Q. Download and upload. And I think you gave the example of high resolution video files as the sort of application where a user might appreciate those types of performance benefits. Correct?

A. Yes. That's one of the applications.

Q. Now, sir --

MR. MUELLER: Your Honor, may I approach the easel?

THE COURT: You may. Turn it slightly so I can see it --

MR. MUELLER: Oh, sure.

THE COURT: -- and make sure you are not writing down national security secrets.

MR. MUELLER: Absolutely.

Q. (BY MR. MUELLER) Let's go back to my phone. Now, let's assume this is an iPhone. The iPhone, of course, has glass. Right?

A. Yes.

Q. Has the case. Correct?

A. Yes.

Q. Has various computer chips and a camera inside. Right, sir?

A. Yes.

Q. And it has these cellular chips, the baseband chip. Correct?

A. Yes, in some cases.

Q. Now, when a user of the iPhone is downloading a video file, for example, they may not be using the cellular chip at all. Isn't that true, sir?

A. Could you be more specific?

Q. Well, there's a term that I don't think you used with Mr. Pollinger. It's another standard. It's called WiFi. You didn't testify about WiFi today, did you, sir?

A. I did not.
Q. Now, WiFi is another form of standard. Correct?
A. Yes.
Q. WiFi is used for transmission of data over WiFi networks. Correct?
A. Yes, it can be used for that.
Q. WiFi is used in many folks' homes these days. Right, sir?
A. Yes, it can be.
Q. It's also used in many hot spots at coffee shops and restaurants and airports and so on. Right, sir?
A. Yes.
Q. Hotel rooms?
A. Yes.
Q. And, in fact, WiFi is used for high speed data transmission by the iPhone whenever WiFi is available. Isn't that right, sir?
A. I don't know. You have to have access to the WiFi, and certainly for a phone mobility, LTE is more convenient.
Q. Sir, if the iPhone is in range of WiFi, didn't you know that the iPhone uses WiFi for high speed data transmission?
A. Again, it depends on whether it's accessible or not. I have not looked into that issue.
Q. You have not looked into that issue.
A. No, sir.

Q. And so in assessing the value of the download speed of these patents, you didn't look into WiFi, did you?
A. I did not opine on WiFi.
Q. Now, for the technical specifications that you have addressed this morning, you understand that there's been, thousands of patents declared essential to those particular portions of LTE. Correct?
A. Again, I don't -- I don't have that information.
Q. Sir, you understand there are thousands of patents related to technical aspects of mobile devices. Correct?
A. Again, I have not studied that issue. It's possible.
Q. Let's take a look at your deposition, sir, just to set the stage. You gave a deposition in this case. Correct?
A. Yes.
Q. And let's explain to the ladies and gentlemen of the jury what that is. You sat and answered questions under oath. Right, sir?
A. Yes.
Q. And you swore to tell the truth?
A. Yes.
Q. And you did. Right?
A. Yes.
Q. Now, I won't publish it to the jury yet, but if you can open your binder that you have before you to tab 1, and please turn, sir, if you could to page 36, and I'd like you to read

just to yourself right now lines 13 through 17.
A. You said tab 36?
Q. I'm sorry. Tab 1, the very first tab, but page 36. And take your time and let me know when you're there, sir.
A. I'm on page 36. And which --
Q. Lines 13 through 17, sir?
A. Yes. I'm reading lines 13 through 17.
Q. And were you asked that question and did you give that answer?
A. I believe I was asked a different question.
MR. MUELLER: Your Honor, at this point I'd like to publish this to the jury. It's the same question I just asked Doctor Madisetti.
THE COURT: Re-ask your question and have him answer first.
MR. MUELLER: Sure.
Q. (BY MR. MUELLER) Doctor Madisetti, there are thousands of patents related to technical aspects of mobile devices. Correct?
A. The answer is, yes, as I said before. I was thinking you were referring to the standard.
Q. So there are. You agree now there are thousands of patents related to the technical aspects of mobile devices. Correct?
A. Yes, with respect to mobile devices.

Q. And, in fact, sir, there are thousands of patents directed to technology used in cellular networks. Correct?
A. Yes, at a high level related to cellular networks.
Q. Now, I want to talk about the testing that you presented to the jury. Do you have that subject in mind, sir?
A. Yes, sir.
Q. Now, you have been compensated for your work in this case. Correct?
A. Yes.
Q. And you've been paid several hundred thousands of dollars. Right?
A. Yes, a few hundred hours, yes.
Q. Now, you yourself did not do the testing that you relied on in this case. Correct?
A. I directed the testing. I did not do it myself.
Q. Now, if you had been asked to do the testing, you could have. Right?
A. Yes.
Q. But you didn't.
A. I did not, because I didn't have time for that.
MR. MUELLER: Now, let's pull up, if we could, a slide that you showed to the jury. This is PDX 2.44.
Q. (BY MR. MUELLER) You showed the ladies and gentlemen of the jury this slide. Right, sir?
A. Yes, I did.

Q. And you talked about constructing a real world U.S. network environment. Right?
A. Yes.
Q. Now, I want to go back to the companies that helped to form PanOptis, and we just talked about them a little while ago. Samsung sells phones, real world phones, used in the U.S. Correct?
A. At a high level, yes.
Q. Ericsson, as you agreed, sells network infrastructure for the U.S. Correct?
A. Again, at a high level, yes.
Q. So to construct a real world U.S. network environment, you or Mr. Sheasby's clients here could have asked Samsung and Ericsson for help with real world phones and real world network towers in the U.S. Correct?
A. We did not need to. We did something better.
Q. You said you did something better, but just for right now, sir, stay with my question. You didn't go to Samsung for real world U.S. phones and you didn't go to Ericsson for real world U.S. network equipment, did you?
A. I did not, because that's not the right way.
THE COURT: Doctor Madisetti, you answered it when you said, I did not. He didn't ask you why you did not.
THE WITNESS: Okay, sir. I'm sorry.
THE COURT: Limit your answers to the questions

asked.

THE WITNESS: I'm sorry, Your Honor.

THE COURT: Mr. Pollinger is going to get to ask follow-up questions on redirect if he wants to.

Let's proceed.

MR. MUELLER: Thank you, Your Honor.

Q. (BY MR. MUELLER) Now, you relied on a gentleman named Mr. Royer. Correct?
A. Yes.
Q. And Mr. Royer didn't perform these tests by himself, either, did he?
A. That's right.
Q. Now, he had a company called TechPats help him. Right, sir?
A. Yes.
Q. And were you here for Doctor Mahon's testimony yesterday?
A. Yes.
Q. And did you hear me ask him some questions about TechPats?
A. I did.
Q. And that's the very same organization that Mr. Royer relied on in the work that you're relying on here. Right, sir?
A. Yes.
Q. So let's pull up the TechPats website one more time. We

looked at this yesterday. Right, sir?
A. Yes.
Q. And I want to focus on the paragraph that says, when looking for patent litigation support services. Do you see that, sir?
A. Yes.
Q. It says, you want a silent partner. Do you see that?
A. Yes, that's what the website says.
Q. That's what the TechPats website describes itself as. Correct?
A. Yes.
Q. And then if we go a little bit further, do you see the reference in that very same paragraph to, this degree of support ensures you are taking the most efficient path to defend and monetize your intellectual property patents. Do you see that, sir?
A. I see that as part of website.
Q. And, again, it's not offering itself up as an independent unbiased testing resource. Correct?
A. I disagree.
Q. It's offering itself up as a silent partner to help monetize patents. Correct?
A. As I said, I disagree with that interpretation. I directed them and directed them in a manner that it was independent.

Q. Sir, you can't disagree the words 'silent partner' appear in black and white, or actually red, but they're right there. Correct?
A. I do not disagree with the words.
Q. And you don't disagree the words 'monetize your intellectual property' are on the TechPats' website. Correct?
A. I do not disagree that those words appear on the website.
MR. MUELLER: Now, we can take this down.
Q. (BY MR. MUELLER) Mr. Royer is affiliated with TechPats. Is that right, sir?
A. I don't know the exact relationship, but there is some connection.
Q. And he used them for his work on this case. Right?
A. Yes.
Q. Now, Mr. Royer, with the help of TechPats, put together a data set. Correct?
A. Yes.
Q. And there was what's called pretest data. Is that right, sir?
A. Yes.
Q. And what is pretest data used for?
A. It's just used as a -- for example, it's used as a warm-up.
Q. It's a way to calibrate the equipment. Isn't that right, sir?

A. It's like a warm-up.
Q. Sir, it's a way to calibrate the equipment, isn't it?
A. It can be, but I see that as a warm-up.
Q. You may call it a warm-up, but calibration is very important, isn't it, sir?
A. I disagree. I believe it is -- it depends on the context.
Q. Sir, yes or no, do you think it's important to calibrate testing equipment?
A. Yes, it's important in certain contexts.
Q. And just to give a simple example, if I have a scale at home for seeing how much I weigh, if the scale is off, if it's not calibrated, it's not going to give me the proper weight. Correct?
A. Yes.
Q. And for the type of testing equipment that we're looking at here, if the equipment is not calibrated correctly, you might get bad results. Right, sir?
A. It's possible.
Q. Now, we don't have all of the presuit data that Mr. Royer and TechPats collected, do we?
A. You mean presuite or presuit?
Q. Pretest. We don't have -- we don't have all of the pretest data that Mr. Royer and TechPats collected, do we?
A. I'm not sure, but I don't believe that's important. I'm

not sure.
Q. I'm not asking if it's important. Mr. Royer didn't save it, did he?
A. I don't know specifically.
Q. So you don't know whether, one way or the other, whether he destroyed the calibration data. You don't know.
A. I don't have firsthand knowledge of that.
Q. Now, in the testing data that you showed the jury, you showed them a location in Pennsylvania. Correct?
A. Yes.
Q. And it was a location in Newtown, Pennsylvania. Right?
A. Yes.
Q. And the exact location is actually 23 Cypress Place. Right, sir?
A. I believe so.
MR. MUELLER: Now, let's pull up DDX 55.12.
Q. (BY MR. MUELLER) This is just a Google maps public search for the same address. Do you see it here, someone's home?
A. Yes. It's Scott Demarest. He is an employee of TechPats.
Q. Now, it's actually the home of an employee from TechPats, isn't it?
A. Yes.
Q. And you just gave his name. His name is Scott Demarest.

Do I have that right?
A. That's right.
Q. D-E-M-A-R-E-S-T. Right, sir?
A. Yes.
Q. Now, let me show you Mr. Demarest's LinkedIn page. This is Mr. Demarest. Right, sir?
A. I believe so.
MR. MUELLER: Let's scroll down a little.
Q. (BY MR. MUELLER) The first paragraph here, the second sentence, "When you partner with TechPats, we put our expertise, experience, and resources to work, helping you protect and profit from your intellectual property."
Do you see that, sir?
A. I see that on his LinkedIn page.
Q. And so the test that you showed the ladies and gentlemen of the jury were conducted at the home of one of the TechPats employees who is offering himself up as a partner to help folks profit from intellectual property. Do I have that right?
A. I would disagree with that characterization.
Q. Well, we can agree on this. He talked on his own LinkedIn page about partnering up -- folks partnering up with TechPats. Right?
A. Yes. His page speaks for itself.
Q. And his page says, profit from your intellectual

property. Correct?
A. That's what his page says.
Q. We can also agree on this: It doesn't say independent unbiased testing services. Correct?
A. Again, I've not looked at the whole page, but based on my own experience, I would disagree. I consider them as independent.
Q. So let's go back to the image of the home, if we could. Sir, you don't know where the test equipment was set up in this home, do you?
A. I believe it was set up -- I don't recall the specifics, but I discussed that it was set up in a couple of locations.
Q. You don't know if it was a living room, basement, attic, kitchen. You don't know.
A. I don't specifically recall.
Q. And you made no effort to figure out how strong the LTE cellular coverage happened to be at Mr. Demarest's home. Correct?
A. I believe it was in the logs, but I don't recall.
Q. And you didn't check to see if, for example, the cell coverage was less in the basement versus the attic versus the kitchen. You didn't check. Right?
A. That information is in the logs. I don't recall specifics.
Q. Now, have you been to Newtown, Pennsylvania, before, sir?

A. No.
Q. Do you know if it's rural or urban?
A. No, I don't.
Q. Do you know if it's flat or hilly?
A. That portion, no.
Q. And, sir, that's the only location you showed the jury this morning. Isn't that right, sir?
A. I didn't show the location.
Q. You didn't make any effort to show the jury the similarity between Mr. Demarest's home and, for example, Marshall, Texas, did you, sir?
A. I did not show that.
Q. Or anywhere else in the country. Right, sir?
A. I did not.
Q. Isn't it true there's more than 300,000 cellular-cells across the United States?
A. I don't know the exact number, but that's possible.
Q. And those cells vary in an unbelievably wide variety of ways. Right, sir?
A. I disagree with that. They are well known scientific models for characterizing wireless cells.
Q. There's cells in cities like Houston or Dallas. Right, sir?
A. Yes.
Q. There's cells out in the countryside. Right, sir?

A. Yes.
Q. There's cells in parts of the country that have desert landscapes. Right, sir?
A. Yes.
Q. There is cells in parts of the country that are right on the ocean. Right, sir?
A. Yes.
Q. And on and on. Right?
A. Yes.
Q. And you chose Mr. Demarest's home. Correct?
A. Yes.
Q. Now, let's talk about the testing for the '833 patent. Do you have that in mind?
A. Yes.
Q. This was done by a gentleman named Dr. Antonio Virdis. Correct?
A. Yes, that's one of the pieces of evidence I relied upon.
MR. MUELLER: And let's go back to PDX 2.44.
Q. (BY MR. MUELLER) Again, you said that he constructed a real world U.S. network environment. Do I have that right?
A. I did. I directed him to construct. He didn't.
Q. So you directed him to construct a real world U.S. environment. Right?
A. I did, yes.
Q. And if he followed your directions, then that's what he

did--he constructed a real world U.S. environment according to you. Do we have that right?
A. Yes, a model of it, yes.
Q. You said a model of it.
A. Yes.
Q. Now, in fact, in fact, sir, Doctor Virdis did not use any Apple products that existed in 2012, the year of the hypothetical negotiation, did he?
A. He modeled them at my direction. He didn't use them.
Q. He didn't use any actual real world Apple products, did he?
A. He did not use real world Apple products.
Q. He did not use any real world Intel or Qualcomm baseband chips, did he?
A. He did not use the real Intel or Qualcomm base chips.
Q. His simulations did not involve sending or receiving actual signals on a real cellular network. Correct?
A. That's right.
Q. In fact, he just performed simulations on a computer. Isn't that right, sir?
A. Yes, at my direction.
Q. So when you described to the ladies and gentlemen of the jury constructing a real world U.S. network environment, what you really meant was Doctor Virdis put together a simulation on his computer. Do I have that right?

A. At my direction, yes.
Q. Without any actual real world equipment of any type. Correct?
A. Without real world equipment, that's right.
Q. Now, the slide also says U.S. Right, sir?
A. Yes.
Q. Doctor Virdis is not even familiar with real world conditions for LTE networks in the U.S., is he?
A. He's not, but I directed him to -- to that.
Q. Well, in fact, sir, Doctor Virdis is over in Italy. Right?
A. Yes.
Q. And, in fact, sir, Doctor Virdis has never once been to the United States. Correct?
A. I don't know about that.
Q. Thank you, sir.
MR. MUELLER: I have no further questions.
THE COURT: You pass the witness, counsel?
MR. MUELLER: Yes, I pass the witness, Your Honor. I apologize.
THE COURT: Is there redirect, Mr. Pollinger?
MR. POLLINGER: Yes, Your Honor.
THE COURT: All right. Mr. Mueller, you need to turn the chart back --
MR. MUELLER: Yes.

THE COURT: -- and turn it to a claim page and take your board down.

Mr. Sheasby, they've got plenty of people on their side of the case to do that. You don't need to take it down for them.

All right. Let's proceed with cross-examination -- I'm sorry, redirect.

MR. POLLINGER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. POLLINGER:

Q. Professor Madisetti, you were asked a few questions about the Qualcomm-Apple agreement involving the patent license. Do you recall that?

A. Yes.

Q. Did Apple's technical experts in this case identify any Qualcomm patent as essential to LTE?

A. I don't think so.

Q. Professor Madisetti, you were asked some questions about WiFi versus cellular networks. Do you recall that?

A. I do.

Q. Could you describe for the jury when someone uses WiFi and when someone uses LTE cellular network so there's no confusion on this?

A. Yeah. WiFi is something you use at home or in a cafe. But when you are driving, when you are walking around, when

you are traveling, when you are roaming from one network to another, you are only using LTE. You don't have access to WiFi.

THE COURT: Please speak up, Doctor Madisetti.

THE WITNESS: Yes. WiFi is usually used only when you are about 30 feet from a WiFi access point in your house or in a cafe. Most of the time when you are walking around like in the courtroom or elsewhere outside, you don't have access to WiFi. So you use only LTE, and that's the main advantage of LTE, that it's connected everywhere throughout the world.

Q. (BY MR. POLLINGER) Professor Madisetti, you were asked a number of questions regarding the testing and the computer analysis that you had done and conducted with regard to your technical benefit analysis.

Apple's technical experts in this case, did they perform any testing?

A. No. I provided my detailed testing to Apple and its experts. They did not provide any testing to rebut those results.

Q. Regardless of rebutting, did they perform any testing?

A. None.

Q. Did they perform any computer quantitative analysis?

A. None.

Q. Did they perform any simulation?

A. None.
Q. With regard to the computer simulation analysis that you performed, again did you confirm the results with any independent research?
MR. POLLINGER: If you can go to slide 50, please.
THE WITNESS: Yes. My results were confirmed with other industry accepted publications such as those in PX 162. My results are very similar, even more conservative than these publications. I said eight to 10 percent, and these are actually saying much more, 12 to 15 percent reduction. So these are some examples of how I confirmed my own results and analysis with third-party documents.
Q. (BY MR. POLLINGER) Professor Madisetti, from a technical standpoint, is there -- have you heard any reason from a technical standpoint to question the testing that you had conducted with regard to your analysis?
A. None at all. I directed it; I made sure that it's robust, reputable, and reliable; I provided the parameters; I made it customizable to the U.S. network; and, in fact, companies like Intel and Qualcomm use the very same simulation environment that I used.
Q. From a technical standpoint, have you heard any reason to question the computer simulation that you conducted?
A. Not at all. It was validated.
Q. From a technical standpoint, have you heard any reason to

question the testing site in Philadelphia?
A. No. It was a major metropolis, it was Philadelphia, it has all the major networks, and it was served by all the major carriers, so it's representative of the U.S. network at large, in my opinion.
Q. Have Apple's experts presented any data to contradict your conclusions?
A. None.
MR. POLLINGER: Your Honor, I pass the witness.
THE COURT: All right. Further cross examination?
MR. MUELLER: May I proceed, Your Honor?
THE COURT: Yes.

RECROSS EXAMINATION

BY MR. MUELLER:
Q. Doctor Madisetti, just a few more questions.
You understand in this trial it's the obligation of the entities that Mr. Sheasby represents, it's their burden of proof to prove the value of these patents. You understand that, sir?
A. Again, it's -- I'm a technical guy, so I'm not sure as to the legal aspects.
Q. I'll represent to you it's their burden of proof. Do you have that representation in mind, sir?
A. Yes.
Q. Now, if the ladies and gentlemen of the jury decide that

the testing that you did, Mr. Royer did, TechPats did, Doctor Virdis did, is suspect for certain reasons, they are entitled to disregard it. You understand that. Right, sir?
A. I trust the wisdom of the jury.
Q. And it's not our obligation to put on testing ourselves; it's their burden. Is that right, sir?
A. I don't know, sir.
Q. Now, the testing that you described to the ladies and gentlemen of the jury and the theories you offered are what you say would be the technical benefits that flow from using the three patents that you studied. Correct?
A. That's one of my opinions, yes.
Q. And you looked at it by analyzing the sections of the standard that you say these patents cover. Correct, sir?
A. Among other things.
Q. And then you did tests to model what you say is the value of using those portions of the standard. Right, sir?
A. That's not my opinion. My opinion is I modeled the exact claims at issue, which was the three different patents, the '833, the '332, and the '557 claims that I identified.
Q. Doctor Madisetti, we went through this a little while ago. You say those claims relate to particular technical specifications in the LTE standard. Correct?
A. Yes, but I modeled the claims themselves.
Q. Sir, stay with my question. The claims relate to

particular technical specifications. Correct?
A. Yes.
Q. Anyone in the world can use those particular portions of the technical specifications. Right? If they pay FRAND compensation. Right?
A. Again, I don't know, sir.
Q. You've been here for the entire trial. Right?
A. Yes.
Q. You know Samsung has a license to those very same patents. Correct?
A. I don't know.
Q. As a technical matter, sir, as a technical matter, Samsung -- let me withdraw the question.
I will represent to you that Samsung has a license to these patents for the purpose of the question I'm about to ask. Do you have that representation in mind?
A. Yes.
Q. With that representation in mind, sir, as a technical matter, Samsung has the right to use the very same performance benefits, whatever they are, that you described to the jury today. Correct?
A. I don't know. I have not done that analysis.
Q. Sir, the patent is the patent no matter who takes a license to it. Correct?
A. Again, the way -- I would disagree with that. The way I

would say it is that, for example, you -- certain products can take more use of the patent, because a low-end product could use only two of the 10 features; a high-end product could use all 10 and get much more benefit.

Q. Well, then last question, sir. Samsung sells high-end products. Correct?

A. I believe it does sell some high-end products.

Q. Sells some of the highest-end products. Right, sir?

A. Again, I don't know. I didn't look into that.

MR. MUELLER: Nothing further, Your Honor. I pass the witness.

THE COURT: All right. Further redirect?

MR. POLLINGER: No questions, Your Honor. Thank you.

THE COURT: All right. Doctor Madisetti, you may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

Ladies and gentlemen we're going to take a short recess before the next witness is called. You may simply close your notebooks and leave them in your chairs. Don't discuss anything about the case with each other, follow all my other instructions, and we'll have you back here shortly to continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

Counsel, the Court has determined that it would benefit by an updated and revised joint submission from the parties with regard to the final jury instructions and verdict. Therefore, I direct that you meet and confer and submit a joint and updated revised proposed final jury instruction and verdict form by 8:00 p.m. this evening.

With that, we'll take a short recess.

The Court stands in recess.

(Brief recess.)

THE COURT: Be seated, please.

Plaintiffs, are you prepared to call your next witness?

MS. TRUELOVE: Yes, we are, Your Honor.

THE COURT: Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Please be seated.

Plaintiffs, call your next witness, please.

MS. TRUELOVE: Yes, Your Honor. Jennifer Truelove for Plaintiff. Plaintiff's next witness that we will call is Dr. Rebecca Reed-Arthurs.

THE COURT: Doctor Reed-Arthurs, if you will come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, have a seat at the witness stand.

All right. Ms. Truelove, you may proceed with direct examination.

MS. TRUELOVE: Thank you, Your Honor.

REBECCA REED-ARTHURS, PhD,

testified under oath as follows:

DIRECT EXAMINATION

BY MS. TRUELOVE:

Q. Good morning.

A. Good morning.

Q. Would you please state your name and introduce yourself to the jury?

A. My name is Rebecca Reed-Arthurs.

Q. Why are you here today, Doctor Reed-Arthurs?

A. I designed and analyzed the survey to measure how much the incremental improvement in the LTE upload and download speeds associated with the Patents-in-Suit is worth to smartphone buyers and to Apple.

Q. And what did you ultimately determine from the survey that you designed and analyzed?

A. The survey showed that people do want faster LTE speeds, and that will influence both their smartphone buying decisions and ultimately Apple's products.

Q. We're going to talk at length about your survey, but why

don't we start with having you tell the jury a little bit about yourself?
A. I live in Hilliard, California, with my husband. We are actually college sweethearts. We've been together for 21 years now.
I am an economist by trade. He and his brother have a small family business selling auto and ATV parts.
In our spare time, we love hiking, kayakking, and watching our three-year-old nephew grow up.
Q. You mentioned you're an economist by trade. What is it that you do for a living, Doctor?
A. For the last 10 years, I worked at Berkeley Research Group, where I analyze economic issues, I calculate economic damages, and I use surveys to estimate the value of patented technology like I'm doing today.
THE COURT: Doctor Reed-Arthurs, if you would slow down just a little bit, it would be helpful. And since you're turning to address the jury, which is perfectly fine, please adjust the microphone so we hear you better.
THE WITNESS: Thank you, Your Honor.
THE COURT: Let's proceed, counsel.
Q. (BY MS. TRUELOVE) Doctor, could you tell the jury a little about your educational background and training in economics?
A. I have a Bachelor's degree in economics from UC-Berkeley

and Master's and Ph.D. degrees in economics from US-Davis. My fields of study were industrialization, which was how firms compete, and public economics, which relate to taxation, regulation, and public policy.

Q. What specific experience do you have with surveys?

A. I've designed and analyzed numerous surveys, both myself and while working with other economists. I've spent thousands of hours designing, analyzing, conducting, and presenting my findings related to surveys.

Q. Can you give us an example of the types of surveys you've designed?

A. I recently designed a survey to measure how much an improvement in camera technology would be worth in smartphones.

I've also worked with renowned economists like Professor Jeffrey Prince, from the FCC, he's the chief economist there, to conduct surveys to measure the value of cellular time speeds in smartphones, kind of like we're dealing with today.

Q. What other survey experience do you have?

A. Well, my dissertation included studying issues of question framing in surveys. I've published survey issues and valuing intellectual property in industrial -- sorry, in the handbook of marketing analytics and industrial intellectual asset management in magazines. And I've also presented or testified in court as an expert in survey design, analysis,

and economics.
Q. How are you being compensated for your work on this case?
A. Berkeley Research Group, my employer, is being paid $550 an hour for my time.
Q. Have you ever worked on a case against Apple before?
A. I have.
Q. Have you ever worked for PanOptis before?
A. I have.
Q. And how long do you believe you spent in hours working on this particular matter?
A. Over 300 hours.
Q. Does what this jury ultimately decides have anything to do with whether or not you get paid in this case?
A. No, it doesn't.
MS. TRUELOVE: Your Honor, at this time we would offer Doctor Reed-Arthurs as an expert on surveys and economics?
THE COURT: Is there objection?
MS. SMITH: No, Your Honor.
THE COURT: Then the Court will recognize this witness as an expert in those designated fields.
Please continue.
MS. TRUELOVE: Thank you, Your Honor.
Q. (BY MS. TRUELOVE) What kind of survey did you design for this case to measure how much consumers and Apple value

improvement in LTE download and upload speeds?
A. I designed what's known as a choice based conjoint, or a CBC survey.
Q. What is a choice base conjoint, or CBC survey?
A. In a CBC survey, you present the survey taker with a group of products, like for smartphones that are each going to vary based on certain features like brand and screen size and price, and you ask them which phone they'd be most likely to buy.
Q. Who uses CBC surveys?
A. CBC surveys are standard in both business and economics.
Q. Why would businesses use a CBC survey?
A. They can use them to help design new products or price existing products.
Q. And why do economists like yourself use CBC surveys?
A. Well, in one way, to value patented technology like I'm doing here.
Q. Are you aware of whether Apple has ever used a CBC survey?
A. They have.
Q. And how has Apple used CBC surveys before?
A. Professor John Hauser from MIT --
MS. SMITH: Your Honor, may we approach, please?
THE COURT: Approach the bench.
(The following was had outside the hearing of the

jury.)

MS. SMITH: Your Honor, Defendants MIL one, plaintiffs are precluded from making reference to evidence from other litigation. The Hauser survey that she's about to talk about from Apple versus Samsung.

MS. TRUELOVE: She's not going to indicate, Your Honor, that it has anything to do with a case with Samsung or with litigation. She is simply going to say she knows Apple has done surveys before, and Hauser did it for them. And that goes directly to the point they didn't do a survey in the case when they could have, that we are not bringing up the --

THE COURT: As long as there's no reference to the prior litigation, the fact that it might have existed or been used in the prior litigation does not disqualify.

MS. SMITH: Okay. Can we talk about the fact that her company has used conjoint surveys against Apple in this very courtroom?

THE COURT: You can certainly cross-examine her on any bias she might have.

MS. SMITH: Okay. Thank you.

THE COURT: Can you get her to slow down?

MS. TRUELOVE: I'm trying.

THE COURT: Keep trying.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.
MS. TRUELOVE: Thank you, Your Honor.
Q. (BY MS. TRUELOVE) Let me repeat my question. I asked you whether Apple had ever used a CBC survey and you indicated they had. Can you tell the jury how Apple has used CBC surveys before?
A. In the past, Apple has used CBC surveys by having a professor from MIT design them and use them to measure consumer demand for patented features, including for smartphones.
Q. Did Apple survey expert in this case, Doctor Perryman, conduct a CBC survey?
A. No, he didn't.
Q. Why is it necessary to conduct a CBC survey when you're trying to determine how much a particular feature is worth in the marketplace?
A. With a CBC survey, I can calculate how much consumers are willing to pay, their willingness to pay for a particular feature separate and apart from all of the other features in the smartphone.
Q. What do you mean by willingness to pay?
A. That's just the maximum amount that someone's willing to pay for something in dollars and cents.
Q. So why did you need to use a CBC survey to measure willingness to pay for LTE speed?

A. In the real world, smartphone makers will often change many different features of the phone at the same time as they change LTE speeds. For example, they might change the processor power or the screen size.

Using a CBC survey, I can actually vary the LTE speeds independently and I can tease out the value just of a change in LTE speeds separate and apart from all of the other features.

Q. And can you give us an example related to Apple?

A. I can. So we can see on this next slide here, which is PX 0051, this is an example of Apple's pricing over time. And you can see that when they release or launch a new phone, they generally launch it at the same price as the old phone and then they drop the price of the older slower phone. So if you can see on the left-hand side of the screen here when they released the iPhone 5, which had LTE, they dropped the price of the iPhone 4S which didn't have LTE by $100.

Q. Does the fact that Apple released the iPhone 5 at the same price as the 4S indicate anything about -- indicate that the increase in LTE speed has no value?

A. No, absolutely not.

Q. Why not?

A. You need to compare the prices of phones at the same time, because the features available on the market are going to change and people's demand for those features can change.

Q. Can you just look at that $100 difference in price and determine willingness to pay?
A. No, you can't.
Q. How come?
A. Because Apple changed the screen size and the processor power and they added the whole LTE standard. They didn't just change a fraction of the speed. Using a CBC survey, I can actually tease out just the incremental value of LTE speed associated with the Patents-in-Suit as opposed to the value of the standard or any of the other features that changed.
THE COURT: Let me interrupt just a minute.
Let me remind our guests in the gallery that everyone in the gallery is required to be masked throughout the trial.
Let's continue.
MS. TRUELOVE: Thank you, Your Honor.
Q. (BY MS. TRUELOVE) Has Apple done its own marketing surveys regarding consumers' opinions on an improvement of LTE speed?
A. They have.
Q. And have you reviewed those?
A. Yes, I did.
MS. TRUELOVE: Your Honor, this is an internal Apple document I'm going to show. If there is a request by Apple that we seal the courtroom, I would need to do that now.
MS. SMITH: Please, Ms. Truelove.

THE COURT: All right. Then based on counsel's request, I'll order the courtroom sealed.

Those of you who are present who are not subject to the protective order that's been entered in this case should excuse yourselves while the courtroom is sealed and not return until it's reopened and unsealed.

(The courtroom was closed.)

MS. TRUELOVE: Your Honor, at this time we can unseal the courtroom.

THE COURT: All right. Based on that representation, I'll order the courtroom reopened and unsealed, and I'll direct the Court Security Officer to invite the public to return.

MS. TRUELOVE: May I proceed, Your Honor?

THE COURT: Let's wait until the public returns.

MS. TRUELOVE: Thank you, Your Honor.

(The courtroom was opened.)

THE COURT: All right. You may proceed, Ms. Truelove.

MS. TRUELOVE: Thank you, Your Honor.
Q. (BY MS. TRUELOVE) So turning our attention to the survey that you designed in this case, can you explain to the jury the types of choices that you included in your survey?
A. Yes. You'll actually see on this an illustrative choice of the style of choice that I gave people.
Q. And looking at the choice set on this slide, what is it that you are trying to accomplish?
A. I'm trying to roughly recreate the experience you would have if you walked into, say, the AT&T store in Marshall and wanted to buy a new phone.
Q. How does this choice set replicate that shopping experience of walking into the AT&T store?
A. Well, you go into the store, you are going to see a number of different phones that have different features, and you're going to choose which one you like the best.
Q. Are there any standards for how these choices should look when you design a CBC survey?
A. Yes.
Q. What are those standards?
A. First, you generally include six or seven different features and ask people to hold all the other features constant, and then you vary those features based on three to five levels with price sometimes taking a few more.
Q. Why would you only include a handful of product features

when we've heard in this trial and we all understand that smartphones have dozens and dozens of features?

A. It's actually more reliable. You give too many features, survey takers can get overwhelmed or fatigued or start taking short cuts.

Q. What features did you include in the survey that you designed?

A. You can see on the left, I had brand; price; screen size; camera resolution for the front and back cameras; LTE speed, both upload and download; storage; and battery life.

Q. And what levels did you allow these features to take?

A. You can see some examples in the body of the table.

Q. Why did you choose these specific levels for the features that you used?

A. I wanted them to be representative of what somebody might see in the market, and to scan the range and be reflective of the features in Apple's accused products and also competing products for the relevant time period in this case.

Q. And where did you find the people to take your survey?

A. I reached out to an experienced firm called Prodigy MR to recreate the sample.

Q. How many people did you ultimately survey?

A. 1512. And these are all folks who had purchased a smartphone in the several years prior to the survey.

Q. Is that enough people to say something about smartphone

owners in general?
A. Yes, absolutely. It's really common practice to draw conclusions about broader populations using a representative sample.
Q. How do you make sure that these 1512 people who took your survey were representative of real world smartphone purchasers?
A. Prodigy made sure that the people who started the survey matched the general regional and demographic characteristics of the U.S. population. And then once I had all the survey data, I compared the characteristics of those folks to what I know about U.S. smartphone owners.
Q. What did each of the survey takers have to do in taking your survey?
A. So first they answered some background questions, and they read descriptions of each of the features in the survey.
Q. And what did they do next?
A. Then they worked through 10 different choice questions where in each choice question they had to choose between four phones.
Q. And do they ultimately indicate their choice on each of those 10 questions?
A. Yes, they do.
Q. How did the choice sets look on the survey that you designed, the actual survey that the survey takers took?

A. So this is a picture from the actual survey, and it's PX 2821. And so you can see here that I have four different phones that are varying based on this seven features, and I'm asking people at the top to hold other things constant and that I'm asking them to mark or choose, you know, which phone they would like the best.
Q. Okay. Were the four choices included in each of the 10 questions the same for every person who took the survey?
A. No, they're not.
Q. Why not?
A. So it's standard conjoint design technique process to create thousands of different combinations of the features. By using a lot of different combinations, I can actually calculate more precise results.
Q. Is it necessary that you create these feature combinations that exactly mimic or correspond to phones that you would actually find in the marketplace?
A. No, it's not.
Q. Why not?
A. The whole point of doing the survey is because in the real world marketplace, phones vary a lot of features at the same time consistently. And so by doing the survey, I can vary just LTE speeds separate and apart from all of these other features.
Q. Did you do anything to make sure that your survey takers

understood what you meant when you referenced these features?
A. Yes, I did.
Q. What did you do?
A. So first, as I mentioned before, I gave them a description of what each of the features looked like and kind of, you know, I described the terms.
Q. And did you do that for all those seven features?
A. Yes.
Q. Let's look at the LTE description that you used is this the description in PX 2821.
A. It is, yes.
Q. And what did you focus on in this particular description for LTE speed?
A. So first I made sure that we were talking just about LTE speeds and not about WiFi or other cellular speeds.
Q. And what else did you focus on in this description?
A. I also wanted to give people real world examples to help them translate their real world experiences to speeds in terms of megabits per second. So you can see here I had an example of how long it would take to upload a four-megabyte photo to Facebook or to download a hundred-megabyte file to your phone over LTE.
Q. And, again, why did you distinguish between the different 2G, 3G, and WiFi download capabilities?
A. I just wanted to make it crystal clear that we're dealing

with LTE speeds and not to any other way to transfer data.
Q. And what did you consider as you were designing the description here regarding LTE speed for upload and download?
A. I started by reviewing Apple's marketing materials.
Q. Is this an example of marketing the material of Apple that you reviewed?
A. Yes, it is.
Q. And how is this informative to how you came up with your description of LTE speed?
A. You can see here that Apple will sometimes describe faster LTE speeds in terms of the maximum theoretical speed that their phones can support. So here we have 150 Mbps. However, in the real world, phones rarely, if ever, hit these maximum theoretical speeds.
Q. Did you look at anything other than Apple's marketing materials?
A. I did.
Q. And what did you look at?
A. I looked at third-party reviews of smartphones. And you can see here that third-party reviewers will have to focus on the average LTE speeds that phones can achieve. So, for example, on this table, you can see that open signal determined the average LTE download speed for Apple's phones.
Q. And how did that inform your description of LTE speed for your survey?

A. So I decided that it was going to be more relevant to people to present things in terms of actual averages that people would experience as opposed to the theoretical maximums.

Q. And did you leave it at just looking at Apple material and third-party material, or did you do anything else to ensure that the feature descriptions that you provided in this case were understood by your survey takers?

A. I also conducted a focus group.

Q. What's a focus group?

A. A focus group is just when you bring in a small group of people to take the survey, and then we talk about how they interpreted the different features, whether anything could be clearer, and whether there's anything that could be improved. And here you can actually see a few notes from my focus group.

Q. So a focus group, you're sitting down with them personally and having a back-and-forth discussion to make sure that they're understanding the description.

A. Exactly.

Q. Is it necessary that all your survey takers know what their LTE speed is at any given second on their phone in order to answer your survey questions?

A. No, it's not.

Q. Why not?

A. So I provided the example to help them translate real

world experiences to numbers to give people a better understanding of the speeds that they experience.

Q. What if one of your survey takers doesn't care about LTE speed?

A. They can completely ignore the feature, and that's perfectly fine.

Q. And what if they're like me and they get annoyed when their phone isn't downloading fast enough?

A. Then you can just choose the fastest phone.

Q. So how did the survey taker's choices tell you anything about willingness to pay?

A. This next slide is going to illustrate an example. So here we have two phones that are identical except for screen size and price. If somebody chooses the first phone, you know that they're willing to pay at least $200, that's the difference in the prices there, to go from a screen size of 4 inches to 5.5 inches.

Q. So at the conclusion of your survey, you've got 10 choices made by 1512 people. What do you do with that information?

A. Each one of those choices is going to be similar to this except some of the other features will be varying, too. I can take all of that data and then load it into a computer and, using standard statistical and economic techniques, I can calculate an equation that shows the phone that people are

most likely to buy based on the features and the price of the phones.

Q. Have you provided a kind of simplified explanation that you can give to the jury of what it is that computer is doing?

A. I have.

Q. Can you walk them through that, please?

A. On this next slide, you can imagine that each of these data points is somebody's phone choice. What I'm doing is trying to find the equation or line that best fits the data.

Here the green and red lines don't fit very well. I'm looking for the line of best fit or this blue line. Once I have the equation of that line, I can use that to figure out how much people are willing to pay for LTE speeds.

Q. And did you apply this methodology to all five patents in this case?

A. I did, yes.

Q. And in particular in regarding the '833 patent, what did you determine?

A. So we heard earlier from Professor Madisetti that the '833 patent was associated with a 10.7 percent change in download speed. Using this approach, I can find that people are willing to pay $6.03 for that 10.7 percent change.

Q. How do you know that all 1512 people took your survey seriously?

A. So sometimes people will occasionally take less time and

attention than I would like. So I went through and I dropped any survey respondent who answered all As or all Bs or all Cs, and I also excluded people who either completed the survey really fast compared to everybody else or really slowly compared to everybody else. Once I dropped those folks, I call that my baseline sample.
Q. So once you had your baseline sample, what did you do?
A. I reran my analysis, and the willingness to pay dropped by a few cents.
Q. Do you just use that as your willingness to pay then or did you do anything else?
A. I did do a few other things.
Q. What did you do?
A. First, so far we've been talking about the average willingness to pay of everybody in the market who bought a smartphone, but the people that are going to be most relevant to Apple's pricing decisions are going to be the people who are right on the edge of purchasing their phone or not. They're called the marginal consumer.
Q. What is a marginal consumer?
A. A marginal consumer is just someone who is right on the border between choosing the phone that they actually want besides choosing a different phone.
Q. Why do you want to look at them as opposed to just the baseline sample?

A. They are going to be more relevant for Apple's pricing and product decisions because those are going to be the people who are most likely to change based on the small change in features or price.
Q. So what did you determine or how, rather, did you determine who the marginal consumer survey takers were in your survey?
A. I asked people if they still would have purchased their current smartphone if the price had been 10 percent higher. If they said no, or I don't know, then they're more likely to be a marginal consumer.
Q. So what did you do with the marginal consumer survey taker information?
A. I reran my analysis again just using those folks and that dropped willingness to pay a bit more.
Q. Is there any way that you can go about checking your survey results against data in the real world, real world market prices?
A. Yes, there is.
Q. And how do you do that?
A. In the smartphone market, smartphone companies will charge a different amount just for storage. You can buy the same exact phone except with slightly higher storage, and on average Samsung and Apple charge about $82 to double storage.
Q. So how does knowing this amount that they charge

independently for storage let you kind of check your survey results to make sure they're in line?

A. When I designed my survey, I also included storage as one of the features, and so I was able to calculate that people were willing to pay about a little less than a hundred dollars to double storage on their phone, so the numbers were fairly close to the real world market values.

Q. Did you make any adjustments to your survey results based on the storage information you got?

A. I did. Because willingness to pay was a little higher, I scaled everything down by that ratio.

Q. Did you make any other adjustments to the willingness to pay?

A. Yes; one more.

Q. What was that?

A. Apple will often sell its phones to carriers like Verizon or AT&T at a discount, and so I adjusted for that wholesale-to-retail price discount.

Q. And what are we looking at here?

A. This summarizes all of the adjustments that I made, and I found that that original $6.03 from the '833 Patent translates to $3.98 change in willingness to pay.

Q. Is that all you're trying to do here is try to determine willingness to pay?

A. No.

Q. What else do you need to do for your analysis?
A. Mr. Kennedy, PanOptis' damages expert, asked me to calculate how much Apple's profit would change as a result of these changes in willingness to pay.
Q. How do you calculate a change in profit?
A. I started by reviewing Apple's actual financial data and how it competes in the market. I found that it's able to offer a differentiated product, which means Apple's phones aren't perfect substitutes for other phones and vice versa; that and some other information means that they face a downward sloping demand curve. Using that and how Apple prices its products, I selected a microeconomic model to translate this willingness to pay into a change in profit.
Q. And did you, again, create kind of an example to explain what this process is that you can explain to the jury?
A. Yes.
Q. Can you walk the jury through this intuition regarding Apple's change in profit due to the change in willingness to pay?
A. Yes. So this is something I would teach my undergrad students. Here you can see that you have a downward sloping line D here. That's what's known as the inverse demand curve. That represents the distribution of people's willingness to pay for a product.
The marginal revenue, or MR, curve there, that's how much

additional amount Apple makes when it sells one more unit. MC is how much an additional unit costs Apple to make. And you can see this blue rectangle here is Apple's profit.
Q. So how does this let you calculate a change in profit?
A. So the change in willingness to pay is just a shift downward in the demand curve. Using that shift downward, I can calculate the area of Apple's new profit, which you'll see in a second is this red rectangle. I can look at the difference in the size of the two rectangles to figure out the change in Apple's profits.
Q. What was the change in Apple's profits?
A. For the '833 Patent, that $3.98 translated to a change in $3.97.
Q. Did you do this same analysis for each of the percentage changes in LTE download and upload speed for all the patented technology?
A. Yes.
Q. We see that here in this slide?
A. Yes. You can see the '833 and the $3.97 at the top.
Q. Are these the same improvements in LTE speeds that Professors Madisetti and Mahon discussed in their testimony?
A. They are the lower bounds of the ranges, yes.
Q. Did you stop there or did you perform any other analysis?
A. So I did two additional things.
Q. And what was that?

A. First, I looked at a study conducted by Professor Prince on willingness to pay for cellular data speeds back in 2013. His numbers were actually more than double mine. I also looked at a paper by two economists, and they studied actual market pricing for smartphones and they looked at the theoretical maximum LTE speeds. They found numbers that were, again, higher than mine.

Q. And what does that -- or how does that inform your analysis in your ultimate conclusions?

A. I concluded that my results were both reasonable and conservative.

Q. Doctor Reed-Arthurs, do you remember Apple putting up a slide with the four different phones on it--the Doro, the BLU, the Samsung, and the iPhone?

A. I do.

Q. And you remember Professor Mahon testifying to the speed of those phones?

A. Yes, he did.

Q. And what did he say?

A. For example, that the speed of that BLU phone was much, much lower, many times lower, than the speed of, for example, the iPhone.

Q. And what, if anything, does your analysis imply about the willingness to pay for LTE speeds on those phones in that slide?

A. People are going to be willing to pay for more -- the faster LTE speeds on the iPhones than, for example, these BLU phones.
Q. So in conclusion, Doctor Reed-Arthurs, can you tell the jury what your opinion is regarding the change in Apple's profits from the patented technology?
A. Yes. So this summarizes my conclusions. For the incremental speed improvement due to the patented technology for the '833, that results in a change of profit of $3.97. For the '332, that results in a change of $1.66. For the '774, it results in a change of $3.04. For the '557, it results in a change of 5 cents. For the '284, it results in a change of 7 cents.
Q. Thank you very much.
MS. TRUELOVE: I pass the witness, Your Honor.
THE COURT: Cross-examination by the Defendant?
MS. SMITH: Please, Your Honor.
THE COURT: Are there notebooks to distribute, counsel?
MS. SMITH: I believe we do have some, Your Honor.
THE COURT: Let's distribute them.
MS. SMITH: Thank you.
THE COURT: All right, Ms. Smith. You may proceed with cross-examination.
MS. SMITH: Thank you, Your Honor.

May it please the Court.

CROSS EXAMINATION

BY MS. SMITH:

Q. Good morning, Doctor. My name is Melissa Smith. We've met before. Is that correct?

A. We have. It's good to see you again.

Q. Nice to see you again.

Now, Doctor, this is not the first case you've worked on opposite Apple. Is that correct?

A. That is correct.

Q. And, in fact, you spent a fair amount of time working on cases opposite Apple. Is that correct?

A. Yes, it is.

Q. Okay. And you and your firm, Berkeley Research Group, have billed several million dollars for work against Apple in the last few years. Correct?

A. We have worked a lot of hours, and it's a big place, so yeah, that's about right.

Q. You've also done some work for Samsung in the past. Correct?

A. I have.

Q. Now, you heard Mr. Mueller visit with Mr. Mahon. You've been in the courtroom each day of trial, have you not?

A. Yes.

Q. And you heard Mr. Mueller visit with Mr. Mahon about

comparables. Did you hear that testimony?
A. I did.
MS. SMITH: Okay. Mr. Lee, if we could see the picture of the older vehicle and the truck, please. It's DDX 54.6.
Q. (BY MS. SMITH) Now, Mr. Mueller and Doctor Mahon had a discussion about whether or not the price of the older car that you see on the right here would be relevant or comparable to the new F150. Do you recall that testimony?
A. I do.
Q. And Doctor Mahon said that he just couldn't speculate on that. Do you recall that?
A. I do.
Q. Okay. Now, Mr. Mueller --
MS. SMITH: If I could see, Mr. Lee, the slide with the two trucks.
Q. (BY MS. SMITH) Mr. Mueller also asked Doctor Mahon about two F150s. Do you remember that testimony?
A. I do, yes.
Q. We saw these trucks on the screen?
A. Yes.
Q. And, again, Doctor Mahon said he just wasn't comfortable making comparisons. Do you recall that testimony?
A. I think he might have said he liked the red one better.
Q. In addition to liking the red one, he wasn't comfortable

making comparisons.
A. I think so, yes.
Q. But as an economist by trade, you'd agree that using comparable licenses can be a reasonable approach to value intellectual property in patents.
A. Sure, when you can find sufficient comparables.
MS. SMITH: I'll move to strike everything after 'sure', Your Honor.
THE COURT: Sustained.
MS. SMITH: Thank you, Your Honor.
THE COURT: The answer 'sure' is adequate. The rest of it is non-responsive and should be stricken.
MS. SMITH: Thank you, Your Honor.
Q. (BY MS. SMITH) In fact, Doctor, comparable licenses provide a benchmark for what third parties are willing to pay for something similar. Is that fair?
A. They can, yes.
Q. And you would agree that considering the amount paid in a sufficiently close comparable license is an accepted way to value patents. Correct?
A. When it's sufficiently close, yes.
Q. And outside of the courthouse and the context of litigation, you look at comparables to value patents. Correct?
A. To value intellectual property, yes.

Q. And intellectual property includes patents. Is that correct?
A. Yes, that is true.
Q. But in your work for this litigation, you didn't review a single license in trying to value Plaintiffs' patents, did you?
A. No, I didn't.
Q. Instead, you were retained by the McKool Smith law firm. Is that correct?
A. I was.
Q. And you did what you shared with us a few minutes ago--you did this choice based conjoint survey for them. Is that correct?
A. Yes, it is.
Q. And prior to this litigation, you yourself haven't personally used a choice based conjoint to value patents outside of litigation. Is that correct?
A. Yes, that is correct.
Q. Now, in your survey, you just said you were trying to recreate the experience that someone would have if they walked into an AT&T store in Marshall. Correct?
A. Yeah; roughly recreate.
Q. Roughly. But the products in your survey, they were hypothetical products. Correct?
A. Yes, they were.

Q. For example, your survey included an iPhone with a price of $199, did it not?
A. It did, yes.
Q. You included a hypothetical phone in your survey, even though you knew that in the real world at that Marshall AT&T store, there's no iPhone priced at $199.
A. Yes, that is true.
Q. But to check, to check and make sure your work was good, you used a focus group to identify potential problems in that survey of hypothetical problems -- or hypothetical products, did you not?
A. I did conduct a focus group.
Q. And, again, specifically your survey is trying to measure the value of improvements in LTE upload and download speed. Correct?
A. Yes, exactly.
Q. And what we learned from your focus group is that most, most people didn't know exactly what their speed -- what speed their phones even operate at. True?
A. Yes, that's true.
Q. Now, you showed the jury what I'm going to ask Mr. Lee to bring up as PDX 8.5.
All right. And your slide here talks about LTE support. Is that correct?
A. Yes, it does.

Q. All right. Now, there's five patents in this case, aren't there, Doctor?
A. Yes, there are.
Q. And you're not trying to tell the jurors here that the Plaintiffs' five patents cover all of LTE, are you?
A. Not at all.
Q. As we've heard, you've been here every day, again. Correct?
A. Yes.
Q. Yes. And you've heard there are thousands of patents declared essential to this LTE that you reference here. Correct?
A. I have heard that.
Q. And your survey is not about what customers will pay for LTE, is it?
A. No, it's not.
Q. It's about their willingness to pay for improvements. Correct?
A. Improvements in the LTE speed, upload and download.
Q. You didn't in your survey ask anyone what they actually paid for their iPhone because it had faster LTE speed. Correct?
A. No, I didn't.
Q. And you'd agree with me, Doctor, that there's a difference between willingness to pay and actually paying

more. Correct?
A. Sure, of course.
Q. In fact, you showed the jury a slide, I believe, at 8.4, PDX 8.4, with Apple's actual real life pricing. Do you recall this slide?
A. I do.
Q. Okay. And what we see here in the real world is that at launch, Apple's offering an iPhone 5 with LTE at the same price as a non-LTE iPhone 4S at the time of launch. That's correct?
A. Yes, that's absolutely correct.
Q. And in the real world, Apple charged the exact same price for the iPhone 5, the 6, and the 7 at launch even though, according to your research, those had different LTE speeds. Correct?
A. At launch, yes.
Q. Same LTE, though. Using the same LTE standard across those phones. Correct?
A. I wouldn't a hundred percent agree with that.
Q. All right. Now, for these opinions and all this math you did today, you told the jury that you relied upon Doctor Madisetti and Doctor Mahon, their opinions. Is that correct?
A. Yes.
Q. So if Doctor Madisetti and Doctor Mahon's calculations are off, then your calculations of the benefit associated with

the patents, it wouldn't hold, either, would it?
A. Yeah. If their percentages are off, my values would be off.
Q. And so if the jury does not accept Doctor Madisetti's or Doctor Mahon's opinions, they shouldn't accept your opinions. Correct?
A. Yeah, I suppose you can't accept the conclusions based on those changes. That's correct.
Q. Thank you.
So we also heard that Doctor Madisetti and Doctor Mahon, they relied upon some other technical experts. Correct?
A. I did hear that, yes.
Q. Okay. We heard about a Doctor Virdis, and I believe we're going to hear from him shortly. Did you hear mentioned Doctor Virdis?
A. I did hear that.
Q. And you heard them mention Mr. Royer with his TechPats. Is that correct?
A. I also heard that name.
Q. Now, we haven't heard from Mr. Kennedy yet, but he's one of your partners at Berkeley. Correct?
A. He also works at Berkeley.
Q. Okay. And is it doctor or mister?
A. Mr. Kennedy.
Q. Mr. Kennedy. It's Mr. Kennedy?

A. Yes, it is.
Q. Okay. And Mr. Kennedy is going to rely upon your opinions that, in turn, rely upon Doctor Madisetti and Doctor Mahon, Doctor Virdis, and Mr. Royer. Correct?
A. That sounds about right.
Q. Okay. Now, Doctor, have you ever heard of a house of cards?
A. I have heard the phrase.
MS. SMITH: All right. If we could see DDX 56.6. If we could go back one.
Q. (BY MS. SMITH) Now, we have a sketch of what you just outlined, and in this house of cards if one card -- if only one card is off, the whole house comes crashing down, doesn't it?
A. I don't agree with the depiction here. I don't think that's quite right.
Q. Thank you so much, Doctor.
MS. SMITH: I'll pass the witness.
THE COURT: Is there redirect?
MS. TRUELOVE: There is, Your Honor.
THE COURT: Please proceed.
MS. TRUELOVE: Thank you.

REDIRECT EXAMINATION

BY MS. TRUELOVE:
Q. There seems to be, Doctor Reed-Arthurs, a lot of focus by

Apple on real world examples.
A. Yes.
Q. Did you look at any real world examples when you were going back and comparing your results to see if they were, in fact, consistent?
A. I did, yes.
Q. And you mentioned a study. Correct?
A. Yes.
Q. And is this the study that you looked at?
A. It is, yes.
Q. And that's PX 0268. Right?
A. Yes.
Q. Yes. Okay.
Now, tell the jury a little bit about what this study is.
A. That's a study done by two independent academic economists that looked at the market prices in the real world for many different phones in a particular year, and they analyzed the influence of different phone features, including maximum LTE speeds on the market prices.
They actually found that theoretical maximum download speeds for LTE were correlated and statistically significantly correlated--that's a technical term--but they were strongly correlated with the prices that you actually see in the market. So LTE speed is indeed correlated with market prices in the real world.

Q. Thank you. I may have said the wrong PX number. It's PX 0268. Right?
A. Yes.
Q. Okay. And so how does that mean that your results of your survey are consistent with the study of real world market prices that these two economists did?
A. So if you look at, for example, the average maximum speed of Apple's phones -- and not all LTE is the same. They actually have different substandards and they go at different maximum speeds. But if you look at the average maximum speeds across Apple's phones, it's about 400 megabytes per second. If you look at the -- so, for example, 10 percent change, that's 40 megabytes per second.
If you look at the results in that paper, there is a 12-cent change for the maximum theoretical speed. So once you multiply that out, you are getting a change of roughly $5 as compared to the change that I was getting there of roughly $3 or $4. So they are quite similar.
Q. And there was some discussion early on in your cross-examination about comparable licenses. Do you remember that?
A. Yes.
Q. And you seem to indicate, I think you said, as long as they're sufficiently comparable.
A. Yes.

Q. What do you mean by that?
A. It's very important to take into account all of the facts and the circumstances around licenses and whether or not companies are similarly situated. You need to have something that's truly comparable to consider when valuing, for example, intellectual property.
Q. And we talked a little bit about -- or Ms. Smith talked to you a little bit about the fact that, you know, one of the phones that got kind of put together in your survey, an Apple iPhone was priced at $199.
A. Yes.
Q. And she went on to say you would never find that in the marketplace.
A. That is true.
Q. Okay. Remind the jury again why that doesn't affect your survey results.
A. I need to include a wide range of features and prices so I can actually tease out the differences, and it needs to be reflective not just of Apple's prices but of other prices in the market, too.
Q. And she talked to you about your focus group not understanding -- most of them didn't understand what kind of LTE speed they got on their phones. Do you remember that?
A. I do, yes.
Q. And can you remind the jury about your testimony in

regards to why that doesn't impact your survey results?
A. So, again, as we talked about earlier, I provided real world examples. And if all you care about is you want faster, that's fine; and if, you know, you don't care, you can ignore it and that results in a zero, so yeah.
Q. And so another area that she talked to you about was the Apple survey. I'm not going to pull back up because we did seal the courtroom for that. But you know what I'm talking about. Correct?
A. I do.
Q. Okay. And it gave you a percentage that someone would pay for LTE support and that kind of thing?
A. Yes.
Q. Okay. And then she wanted to know why you didn't just ask what they would actually pay for increased LTE speed in your survey. Do you remember that?
A. I think so.
Q. Why didn't you ask what they would be willing to pay for LTE speed?
A. If you just asked people to focus in on one feature and say, Okay, how much are you going to pay for an extra five Mbps, that's going to inflate what you tend to say. It's better to have people make trade-offs, like I did in my survey.
MS. TRUELOVE: That's all I have, Your Honor. Pass

the witness.

THE COURT: Additional cross-examination, Ms. Smith?

MS. SMITH: Briefly, Your Honor.

THE COURT: Please proceed.

RECROSS EXAMINATION

BY MS. SMITH:

Q. Now, Doctor, we had a visit about how comparable licenses can be relevant to intellectual property. Correct?

A. Yes.

Q. To valuing intellectual property?

A. Yes.

Q. Now, did your lawyers tell you Samsung has a license to these patents?

A. I believe I'm aware of that. We talked a bit about that earlier today.

Q. Okay. And Samsung has some of the highest performance products in the market, don't they?

A. They have a wide range of products. A few of them are high performing.

Q. But you ignored that license in doing your work, didn't you?

A. My work did not focus on the licenses, no.

Q. Thank you, Doctor.

THE COURT: You pass the witness, Ms. Smith?

MS. SMITH: I do, Your Honor.

THE COURT: Do you have additional direct, Ms. Truelove?

MS. TRUELOVE: I do, Your Honor.

THE COURT: Please proceed with your additional direct.

REDIRECT EXAMINATION

BY MS. TRUELOVE:

Q. Doctor Reed-Arthurs, did any part of the work that you did require you to look at licenses?

A. No, it did not.

Q. Who is doing that for PanOptis?

A. Mr. Kennedy.

Q. Okay. And just to be clear, did the survey that Apple's survey expert conduct -- provide any, you know, opposite information to what you determined from your survey?

A. They didn't conduct a survey.

Q. Apple did not conduct a survey?

A. No.

MS. TRUELOVE: That's all I have, Your Honor.

THE COURT: Anything further, Ms. Smith?

MS. SMITH: No, Your Honor.

THE COURT: All right. Doctor Reed-Arthurs, you may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT: Plaintiff, you have 4 hours and 24 minutes remaining, and Defendant, you have 5 hours and 22 minutes remaining.

Now, do we have any depositions to play, or are we going to break for lunch at this point?

MR. SHEASBY: The depositions aren't ready yet. Mr. Kennedy is quite long. I would -- I think it would be the best for us to break for lunch, Your Honor.

THE COURT: I don't intend to start another live witness, but if you had a relatively short deposition, I'd proceed with it now. That's what I'm asking.

MR. MUELLER: The problem, Your Honor, is that we had to recut them after this morning to make sure they comply with the MIL. We didn't -- they did, and we have to review them, so we're not quite ready.

THE COURT: In other words, you're not ready.

MR. MUELLER: That's right, Your Honor.

MS. SMITH: We need some time.

THE COURT: Okay. Then we'll break for lunch at this time. Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT. Ladies and gentlemen of the jury, based

on what I'm told our next series of witnesses are going to be, we're going to recess for lunch at this time and not start another witness right now.

Please take your notebooks with you to the jury room. Please follow all my instructions, including not to discuss the case among yourselves. We'll do our best to start back at 12:30. And with that, lunch should be either there or on its way.

You are excused for lunch at this time.

(Whereupon, the jury left the courtroom.)

THE COURT: Counsel, be in chambers in 30 minutes at 12:00, and we'll work the last half hour on outstanding demonstratives and other disputes before we reconvene, but take the next 30 minutes for lunch.

Court stands in recess.

(Lunch recess.)

THE COURT: Be seated, please.

Counsel, it's 20 minutes after 1:00. We recessed for lunch at 11:30. I told the jury that we would be back at 12:30. I told you after the jury left the room that I needed to meet with you about the inordinately high number of demonstrative disputes and other disputes between the parties with regard to Mr. Kennedy.

The time I had set aside this morning to review disputes from overnight was completely consumed by carryover disputes

that you had from the inordinate number of disputes from yesterday regarding Doctor Madisetti and Doctor Reed-Arthurs.

After taking 15 minutes for an abbreviated lunch, I've spent the entire time since 11:30 hurriedly going through the rest of the disputed slides and other demonstratives for Mr. Kennedy, and I've met with you to review my conclusions and give you guidance on those.

And I think it's only appropriate, given this circumstance and the continuing flood of disputes, many of which keep being repeated and repeated and repeated in the slides, demonstratives, and other documentary matters that I'm reviewing for all of your witnesses, I think it's appropriate that the time from 12:30 when I told the jury we would reconvene should be deducted from your trial time.

That intervening 50 minutes from 12:30 to 1:20, I'm going to deduct equally, and I'm going to reduce Plaintiffs' trial time by 25 minutes and Defendant's trial time by 25 minutes.

This delay is caused by your conduct, despite the Court's best efforts to keep this trial on a reasonable time schedule. And I think this is appropriate and fair, and that is simply my decision with regard to the time between 12:30 and 1:20, that intervening 50 minutes.

All right. I understand that Plaintiff intends to next call Mr. Kennedy. Is that correct?

MR. BAXTER: That's correct, Your Honor.

THE COURT: Let's bring in the jury, Mr. Johnson.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, members of the jury. Please have a seat.

I'm sorry it's taken longer to reconvene after lunch than I intended. I had several matters I had to take up with counsel outside of your presence, but we're ready to proceed at this time.

Plaintiff, call your next witness.

MR. BAXTER: Call Mr. David Kennedy, Your Honor.

THE COURT: Mr. Kennedy, if you'll come forward and be sworn by our courtroom deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir, and have a seat on the witness stand.

MR. BAXTER: Your Honor, the one thing that we didn't talk about, as you might imagine, during Mr. Kennedy's testimony there is going to be some dealing with privileged documents or confidential documents. It might be better, Judge, as bad as I hate to say it, to seal all of his testimony rather than jumping in and out.

THE COURT: Well, trials are inherently a public process, and the Court has to balance that obligation against the legitimate needs of the parties to protect confidential and proprietary information.

I have no idea, Mr. Baxter, how much of this testimony would be confidential and would warrant sealing, and I have no idea how it's situated within the overall testimony that you're going to elicit from this witness.

I certainly don't want to exclude the public any more than is absolutely necessary, but quite honestly I have to rely on you for that because you know what I don't know about this testimony and the questions and answers you're going to go into.

I'll rely on your representations, and based on that, I'll order the courtroom sealed for the entirety of this witness' testimony.

Any persons present in the courtroom not subject to the protective order in this case should excuse yourselves and remain outside the courtroom until it's reopened and unsealed.

(The courtroom was closed.)

MR. BAXTER: Your Honor, I pass the witness.

THE COURT: All right. Ladies and gentlemen, before we proceed with Defendant's cross-examination, we are going to take a short recess. If you'll simply close your notebooks and leave them in your chairs, follow all my instructions, including of course not to discuss the case, and we'll be back here shortly.

I'm going to order the courtroom unsealed and direct the court security to invite the public to return.

Ladies and gentlemen of the jury, you are excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: Counsel, take five minutes and let me see you in chambers.

(Brief recess.)

THE COURT: Be seated, please.

Are you prepared to cross-examine the witness, Mr. Mueller?

MR. MUELLER: I am, Your Honor.

THE COURT: Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Please be seated, ladies and gentlemen. We'll proceed with the Defendant's cross-examination of Mr. Kennedy.

Mr. Mueller, you may proceed.

MR. MUELLER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MUELLER:

Q. Good afternoon, Mr. Kennedy.

A. Good afternoon.

MR. MUELLER: Good afternoon, ladies and gentlemen of the jury.

Q. (BY MR. MUELLER) Mr. Kennedy, this is a case about fair, reasonable, and nondiscriminatory royalties. Correct?

A. Yes.

Q. And the task for the ladies and gentlemen of the jury is to decide what a FRAND royalty would be for the five patents in the case. Correct?

A. Yes.

Q. Now, you understand that the ladies and gentlemen of the jury are analyzing a particular, as the law calls it, a

hypothetical negotiation. Right?
A. Yes.
Q. Occurring in 2012. Right, sir?
A. Correct.
Q. And on one side would be Apple. Correct?
A. Yes.
Q. And on the other side Panasonic, Samsung, and LG. Right, sir?
A. Yes.
Q. Now, there were some references in the question and answer that you had with Mr. Baxter about Apple being an 800-pound gorilla. Do you recall that?
A. I think I recall him saying that, yeah.
Q. There's also some reference to mom-and-pop shops, I think, at one point. Right, sir?
A. I do remember that, yes.
Q. Now, let's just be really clear for the ladies and gentlemen of the jury. Panasonic is not a mom-and-pop shop. Right?
A. No.
Q. Nor Samsung?
A. No.
Q. Nor LG.
A. No.
Q. These are some of the largest electronics companies in

the world. Correct?
A. I would agree with that, yes.
Q. Fair to say in the electronics world, these are all 800-pound gorillas. Correct?
A. I don't disagree with it, the fact that they're big. I mean, there is a difference in size between Apple and them, but they're all big companies, too.
Q. They're not just big. They're huge, aren't they, sir?
A. Sure.
Q. Samsung is an absolute goliath in the cellular industry, isn't it?
A. Yeah, I think it's right up there with Apple, yes.
Q. In fact, sir, they sell more phones than Apple does.
A. On a per device, yes.
Q. Sell more tablets, too. Isn't that true?
A. I'll take your word for it. I think so.
Q. And we're not just talking about cheap disposable phones. They sell some of the highest-end phones in the world. Correct?
A. They do have a product line that includes high-end phones, yes.
Q. They also have some lower-end phones as well. Correct?
A. Right.
Q. But Samsung makes some of the most high performance, high end, expensive phones in the world. Correct, sir?

A. Some of the ones, yes.
Q. So you weren't suggesting to the ladies and gentlemen of the jury that Samsung is a small company that doesn't make high-end phones. You are not here to suggest that, are you?
A. No.
Q. Now, fair, reasonable, and nondiscriminatory, each of those are important principles. Correct?
A. Yes.
Q. And they mean something. Right?
A. Yes.
Q. Now, you said to the ladies and gentlemen of the jury that the European Telecommunications Standards Institute had not agreed to a particular way of applying FRAND. Right?
A. That's correct.
Q. That they had not adopted any particular -- I think the word you used was model?
A. Maybe I did, yeah. That's true, though. They have not adopted a particular model.
Q. They had not adopted any particular way of calculating a FRAND royalty. Is that fair, sir?
A. Yes. I think they say they leave it up to the licensee and the licensor.
Q. Now, you said that Apple's -- that Apple had made a proposal for something called a smallest saleable patent practicing unit approach. Right, sir?

A. Yes.
Q. And I believe you said that ETSI did not adopt that approach. Correct?
A. Correct.
Q. But let's be clear. ETSI did not prohibit that approach, did they?
A. They didn't prohibit it. They just rejected it.
Q. When you used the word reject, you didn't mean to suggest to the ladies and gentlemen of the jury that ETSI said, you can't do that. They never said that, did they?
A. Yeah. The wording, I guess, was -- it wasn't consistent with their policy. So I -- it may be in between the two.
Q. Well, sir, you told us just a few moments ago ETSI doesn't prescribe any particular model. Right?
A. Right.
Q. It doesn't say you can't use the smallest saleable patent practicing unit model. The rules don't say that, do they?
A. Yeah, I don't know if I would agree with that just based on the fact that they specifically responded to that particular model and said, that's not consistent with our policy.
Q. Sir, in fact, you never -- you showed the jury a statement by one person. Correct?
A. Their, is it, chief counsel, I believe? Yeah.

Q. And, sir, you never showed the jury a rule of ETSI that says, ETSI participants are barred or prohibited from considering the smallest saleable patent practicing unit. That just never happened. Right, sir?
A. I did not see a rule. I saw his statement that said it's not consistent with the policies.
Q. Well, in fact, Apple didn't just make up the idea of considering the smallest saleable patent practicing unit, did they?
A. No.
Q. In fact, that's a principle in the law. Right, sir?
A. Yes.
Q. And Apple's not the only company that thinks it's an appropriate thing to do when you're calculating a FRAND royalty. Isn't that right?
A. Yes. It's -- if you do it right, you can do it that way.
Q. Oh, so you can use the smallest saleable patent practicing unit to calculate a FRAND royalty. Isn't that true?
A. Well, you can't here on the iPhone because -- well, with this technology.
Q. With this technology, you don't think it would work.
A. Because the technology operates throughout the phone according to Professor Madisetti and Professor Mahon.
MR. MUELLER: Let's take a look at DDX 3.2.

Q. (BY MR. MUELLER) Samsung has taken the view on this issue, haven't they, sir?
A. It's a little fuzzy.
Q. Well, let me try to remind you. If you look at the top bullet point --
MR. BAXTER: Your Honor, I'm going to object unless he wants to show him a document to that effect.
THE COURT: He's showing him a document right now, Mr. Baxter.
MR. BAXTER: Oh, good. Then he can look at all the pages, Your Honor. Thank you.
THE WITNESS: I can't -- it's a little fuzzy on my screen.
MR. MUELLER: Why don't we try to blow up the first part, if we could.
Q. (BY MR. MUELLER) This is a Samsung submission. It says, the value that the functionality of the claimed invention in a given SEP--SEP stands for standard essential patent. Right?
A. Correct.
Q. -- contributes to the value of the relevant functionality of the smallest saleable unit that practices the claims of the SEP. Do you see that, sir?
A. Yes.
Q. Now, you spent quite some time with Mr. Baxter talking about Apple's references to smallest saleable unit being

rejected by ETSI. Right, sir?
A. Yes.
Q. And it was a criticism of Apple, wasn't it?
A. The -- not specifically the SSU, but the SSU being the baseband chip was the criticism and the $5.
Q. Sir, the truth of the matter is, truth of the matter is, Samsung has said precisely the same thing. Isn't that true?
A. You can use the smallest -- they've said that you can use SSU.
Q. All right.
A. Not -- I'm sorry. Go ahead.
Q. All right. I'm sorry. I didn't mean to interrupt you. Is your answer finished?
A. They said you can use SSU, but they're not saying it's $5 for all patentholders.
Q. Sir, what they said is, you can use the smallest saleable unit to calculate a FRAND royalty. Correct?
A. And I agree with that.
Q. All right. Now, let's --
MR. MUELLER: Your Honor, can I use the easel?
THE COURT: You may.
MR. MUELLER: Can I pull it forward a bit, Your Honor?
THE COURT: You may.
Q. (BY MR. MUELLER) Let's try to explain to the

jury -- let's try to organize what they've heard about and what they will hear about. Okay, sir? Are you with me?
A. Sure.
Q. Now, the question for the jury is, what rate would have been negotiated at that table that we see on that placard right there in 2012. Correct?
A. Yes.
Q. And what's on the table, so to speak, and I may go back to the placard for the moment, is five patents. Correct?
A. Yes.
Q. So that's what they're negotiating over--five patents. Right, sir?
A. Yes.
Q. Now, the Plaintiffs in this case have presented a series of witnesses, and you're the last one for what's called the case in chief. Right, sir?
A. I believe that's what it's referred to, yes.
Q. And you were here when Ms. Smith cross-examined Doctor Reed-Arthurs?
A. Right.
Q. By the way, she's a colleague of yours?
A. Yes. We work in Berkeley Research together.
Q. You work at Berkeley Research, and as Doctor Reed-Arthurs told us, that company has done work against Apple over the years. Correct?

A. Yes.
Q. Not going to ask you about the particulars, but in total, your firm Doctor Reed-Arthurs and your firm has been paid millions of dollars to work against Apple. Correct?
A. I'm not sure about the exact number, but I wouldn't disagree with that. It's -- I think it's been disclosed.
Q. Now, in this case --
MR. MUELLER: If you could pull up the slide that Ms. Smith used on the expert roster for the Plaintiffs.
Q. (BY MR. MUELLER) You, Mr. Kennedy, are relying on Doctor Reed-Arthurs. Correct?
A. Yes.
Q. Both of you, in turn, are relying on a Doctor Mahon and Doctor Madisetti. Right?
A. That's correct.
Q. And they, in turn, are relying on Doctor Virdis and Mr. Royer. Correct?
A. I don't know how to characterize it, if it's rely on or they used them to do certain tasks.
Q. And Mr. Royer is affiliated with that organization TechPats. Correct?
A. Yes.
Q. Now, you would agree with me that to the extent that Doctor Mahon and Doctor Madisetti and Doctor Virdis and Mr. Royer, if the jury don't credit what they heard from them,

your opinions and Doctor Reed-Arthurs' opinions would fall apart. Correct?
A. Yeah. That's -- we base it on the increase in speed calculated by Doctor Mahon and Doctor Madisetti.
Q. And you're referring to the testing that we heard about over the last two days. Right?
A. Testing and calculations, yes.
Q. Now, the opinions that you're offering to the ladies and gentlemen of the jury, you have a survey-based opinion. Correct?
A. Yes.
Q. Which still relies on that testing we heard about from Doctor Madisetti and Doctor Mahon. Right?
A. Correct.
Q. Then you also have a network infrastructure opinion. And I apologize for my handwriting. But is that right, sir?
A. Correct.
Q. Now, in addition to these two opinions, you talked about some other data points like the Qualcomm-Apple agreement. Right?
A. Right.
Q. But that's not actually part of the theories that you're offering from a numerical perspective. Correct?
A. Well, I had a calculation that I was -- that was done based on one of Apple's experts --

Q. I'll just write --
A. -- that was numerical.
Q. I'm just going to write down Qualcomm here. We'll come back to that.
A. Okay.
Q. Okay? But, again, both the survey and the network infrastructure approach are based on that testing. Right, sir?
A. Yes.
Q. Now, you would agree with me that it is possible to calculate a FRAND royalty, that there are methodologies that are out there that do not rely on testing. Correct?
A. You can probably find other ways to value the technology.
Q. So let me give you one. Doctor Perryman used something called a comparable license approach. And you're quite familiar with that. Right, sir?
A. Yes.
Q. You've used it before?
A. Yes.
Q. And you don't need to do performance testing to do a comparable license approach. Correct?
A. That's correct.
Q. Now, he also did an approach with the baseband chip, smallest saleable -- in his view, smallest saleable patent practice unit, SSPPU, where he looked at the total number of

patents for the chip and tried to figure out an appropriate price for the five in this case as compared to all the rest. Right, sir?

A. Yes, I believe he --

MR. MUELLER: Do we take a break, Your Honor, or I'm happy to take a break, Your Honor.

THE COURT: Let's go off the record.

(Off the record.)

THE COURT: All right. Let's go back on the record. Continue, please, counsel.

Q. (BY MR. MUELLER) Okay. So the second approach that Doctor Perryman used was the baseband or smallest saleable patent practice unit approach. Is that right, sir?

A. That was a factor in his calculation.

Q. Now, you don't need to do testing for that type of model, either, do you?

A. No, to -- to do that division that math, you don't.

Q. And that's the same approach that Samsung advocated in the document that we just looked at. Right, sir?

A. The SSPPU? Yes.

Q. Okay. So you would agree that there are industry-recognized approaches to calculating FRAND royalties, comparable license, smallest saleable unit, that do not require testing. Right?

A. Yes.

Q. Now, in fact -- and these are the two that Doctor Perryman used right here. Is that right, sir?
A. Yes.
Q. And he also looked at some other relevant information as well. Right, sir?
A. Yes.
Q. Now, you would agree with me -- or let me withdraw that question and ask another.
In your opinion, the best methodology for assessing where a license offer specifies FRAND terms and conditions for a license under an SEP portfolio is an analysis of licenses previously granted under the same patent portfolio. Right, sir?
A. Yes. I mean, that in -- definitely if you don't have -- if you can't value the whole portfolio, which is impossible, that is the next best thing is to look at the comparable licenses, if there are any.
Q. But the very best is to look at the prices that were paid for the same patents before. Correct?
A. If the licenses are comparable and it was, you know, using the same assumptions, yes.
Q. In fact, more specifically in your opinion, if the patentowner's prepared to grant a license to a prospective licensee on terms and conditions that are within the range of those previously agreed to by other similarly-situated

companies, patentowner has satisfied its FRAND commitment to the prospective licensee. Correct?
A. I don't disagree with that, depending on the situation and similarly situated is -- if they're truly similarly situated.
Q. Right. And that approach that I've just asked you about doesn't require testing, either. Right, sir?
A. No. Correct.
Q. So, in fact, the very best approach in your view to calculating FRAND royalties does not rely on testing. Right?
A. For a portfolio, not for individual patents. You just can't value each individual patent. So for a portfolio you would have to take a different approach. But for individual patents, the best method in my opinion is to actually value the technology that's covered by the patents.
Q. I see. You treat more than one SEP as different than one. Do I have that right?
A. I'm not sure I understand. What did you say?
Q. Let me withdraw it. Let's try to keep this simple, sir.
You would agree there are recognized, accepted methodologies that you yourself have endorsed for determining FRAND royalties that don't rely on testing. Right?
A. Sure, yes.
Q. Okay. Now, let's talk about what you did do in this case. You did choose to rely on some testing in this case.

Right, sir?
A. Yes.
Q. Now, that testing that you relied on was done for this case. Correct?
A. Yes.
Q. And, in fact, if we go to PDX 5.3, this is a number that's been shown to the jury a few times by you and other folks for the Plaintiffs. Correct?
A. Yes.
Q. There's a lot of big numbers on this slide. Right, sir?
A. Yes.
Q. And let's just go through them one by one. Before this litigation, let's look at the second column. Are you with me? The speed decrease.
A. Yes.
Q. Before this litigation, there was not a shred of paper anywhere in the world that said that these five patents were responsible for speed improvements of the type described here. Correct?
A. Yeah, I'm sure there wasn't because these studies hadn't been done yet.
Q. Right. Panasonic had done no such study for its patents. Correct?
A. Not that I'm aware of, no.
Q. LG had done no such study for its patents. Right?

A. You mean the patents that they -- these patents?
Q. That's correct, sir?
A. Not that I am aware of.
Q. And same for Samsung, the '774 Patent?
A. Not that I'm aware of.
Q. So you haven't shown the ladies and gentlemen of the jury nor has anyone else, a scrap of paper that predates this litigation that substantiates those speed improvements. Right?
A. No. The studies hadn't been done yet.
Q. So the answer to my question is, not a shred of paper from before this litigation. Correct?
A. Yeah, I think that's correct.
Q. Now, these profits per iPhones, let's just be very clear with the ladies and gentlemen of the jury: It wasn't like you got those numbers from internal Apple documents and the like. Right?
A. Right.
Q. Those are numbers that you came up with. Correct?
A. Yes.
Q. And the far right column, those huge numbers that we see there, see those, sir?
A. Yes.
Q. No one, no one on earth, had written those same numbers down before you did for this case. Right?

A. Sure, yeah. They couldn't have.

MR. MUELLER: And let's take this down.

Q. (BY MR. MUELLER) In contrast, sir, with a comparable license approach, you're looking at numbers that do predate the litigation. Correct?

A. Some, yes.

Q. In fact, with a comparable license approach, you're looking at agreements that were negotiated in some cases years before this case began. Right?

A. Correct.

Q. Real world agreements negotiated at arm's length. Correct?

A. Real world agreements, but you have to -- some are not arm's length.

Q. Fair enough. We can come back to that. But these are real world agreements in a comparable license analysis done before a case starts. Right?

A. I'm sorry. Would you repeat?

Q. Sure. I apologize. Let me ask it again, make sure we are on the same page.

When someone does a comparable license analysis, they're looking at licenses that were negotiated historically. Correct.

A. Yes. Historically and sometimes maybe after the date of the hypothetical negotiation, but yes.

Q. Fair enough. But my point is simple, sir. These types of licenses were not created by an expert for a litigation, were they?
A. No. Comparable licenses have to be comparable and applicable to the particular patents in a matter or in a negotiation.
Q. Now, let's go back to FRAND for a moment here. You said that ETSI doesn't require any particular model for calculating FRAND. Correct?
A. Yes.
Q. But we can agree on this. These principles do have meaning. Right?
A. Yes.
Q. It's not anything goes. Correct?
A. Sure.
Q. You got to be fair. Right?
A. That's right.
Q. You need to be reasonable. Correct?
A. Yes.
Q. And you can't discriminate, can you?
A. That's right.
Q. You can't discriminate against somebody because of who they are or what they do for a FRAND license. Right?
A. That's correct.
Q. And you can't discriminate against a company because it

happens to be successful. Correct?
A. That's correct.
Q. In fact, you can't try to punish a company because you might have a gripe with them. Right?
A. I absolutely agree with that.
Q. That's not FRAND, either.
A. That's right.
Q. Now, you know in the hypothetical negotiation the jury is considering these are the three companies. Right?
A. Yes.
Q. You also know -- and I'm not going to get into details because we're in public record, but you do know that Panasonic has a direct stake in this case. Correct?
A. Yes. Well, I don't know the -- whether it's a stake in the case or -- but they're one of the founders of PanOptis. I don't know how that works.
Q. Fair enough. They stand to benefit in some form or fashion. Right?
A. I don't know, but I know that they have an interest in PanOptis. I just don't know the details of that.
Q. And you know that LG has an interest in the entities that Mr. Sheasby represents as well. Right?
A. Yes.
Q. And the fact that those companies have an interest in the entities that Mr. Sheasby represents, that doesn't mean you

can escape FRAND. You still have to be fair, reasonable, and nondiscriminatory. Right?
A. Yes.
Q. And Samsung, just because it competes in the marketplace against Apple, that doesn't come into play here, either, does it?
A. No. Well, not in the way it could in a situation where two competitors are licensing and Samsung could not license to Apple. But in this case that wouldn't be appropriate. I mean, they are still allowed to negotiate the best deal they can.
Q. But, sir, they have to be FRAND, and they can't treat Apple worse because it's a competitor. Correct?
A. That's right.
Q. And they can't treat Apple worse because Apple happens to be doing well in the marketplace. Right?
A. They can't treat them worse because of that, but --
Q. I'm sorry. Did you finish your answer?
A. You can't treat them worse than that, but you do consider the use they are making of the technology and that can lead to being successful and profitable in the industry. So you would consider that, but you don't punish them because of it. But that goes to value.
Q. Right. And you've heard the Plaintiffs at certain points in this trial make references to big profit numbers. Right?

A. Yes.
Q. And you yourself referred to some of them during your direct examination. Correct?
A. The -- yeah, the share of the industry profits.
Q. Right.
A. That is public knowledge anyway.
Q. And you don't get to punish someone or demand nonFRAND rates because they happen to have been successful. Correct?
A. That's correct.
Q. All right. Now, let's just talk about some of the factors that go into a company being successful in this industry. There's a whole bunch of standards that are practiced by these types of devices. Correct?
A. Yes.
Q. There is a variety of cellular standards, not just LTE but others. Correct?
A. Yes.
Q. So, as examples, there's 2G, 3G, LTE. Those are just examples. Right, sir?
A. Yes.
Q. Now, there's something called WiFi, which is a very big deal. Correct?
A. It -- yes, WiFi is on the phone, too.
Q. And there's a bunch of other standards as well. Correct?
A. Yeah, I don't know how many more, but there are others.

Q. Now, there's all the folks who are making phones get to use the standards. Correct?
A. Yes. They have the opportunity to take a license and use it.
Q. That's the whole point is that they're for everyone to use on FRAND terms. Correct?
A. Yes.
Q. Now, on top of the standards, folks can add all sorts of different innovations and features of their own. Correct?
A. Yes.
Q. So you can have a special touch screen. Right?
A. Yes.
Q. You could have a really good camera.
A. Yes.
Q. You can have, you know, perhaps really good speakers and high quality sound. Fair?
A. Yes.
Q. And on and on and on. There's a whole infinite array of features that can be added to the standards. Correct?
A. Sure, yes.
Q. And the standard doesn't tell you how to create a touch screen. Correct?
A. No.
Q. It doesn't tell you how to create the best speakers.
A. You know, this is as a nontechnical person. I'm sure the

standards cover some of how those features operate within a system, but I'm not --

Q. Let's try to reach agreement here: The standards don't prescribe all of the bells and whistles that can go into a modern cell phone. Correct?

A. That's correct.

MR. MUELLER: And if we could pull up the four phones shown to the jury in opening.

Q. (BY MR. MUELLER) These all do LTE. Correct?

A. Different levels of LTE, yes.

Q. So they all have the LTE standard as well as some other cellular standards. Correct?

A. Yes. I don't know what other standards Doro has, but Samsung is more similar, I guess, to the some of the things you mentioned there.

Q. So, sir, the point of this slide is that on top of LTE, folks can choose to add a little or a lot in terms of additional features. Correct?

A. That is correct.

Q. And they get to compete against each other out in the marketplace. Right?

A. Yes.

Q. And let the best phone win. Right?

A. Yes.

Q. And Samsung certainly has some super sophisticated phones

like the one we see right here. Do you see that, sir?
A. I do.
Q. This one actually folds in half, the screen. Right?
A. Yes.
Q. Pretty sophisticated technology. Correct?
A. It -- I don't know that phone, but, yeah, I would not disagree since it's a Galaxy model.
Q. So one thing that Samsung chose to add is a folding screen in certain phone models. Correct?
A. Yes.
Q. That's a good example of something the standard doesn't require, they chose to add it. Right?
A. That's true.
Q. And if people like it, they might buy more of those. Correct?
A. Sure.
Q. And the people who license FRAND patents don't get to go to Samsung and say, hey, I want a piece of your folding screen profits or the success that you had from folding screens. That's not fair, is it?
A. Well, I think if you were going to do -- if you were going to do a valuation on the amount of use that that folding -- I mean, I'm not sure, but if it's folding open to be a bigger screen, it might be because you are using more data for videos and downloads. And if your use of the

technology is more valuable, then that might impact the FRAND negotiations.
Q. Sir, what if I had a phone that had a case made out of gold. Do you have that in mind?
A. Yes.
Q. And it would cost a lot of money if the case was made out of gold. Correct?
A. Yes.
Q. And what if for whatever reason that became really popular? Do you have that in mind?
A. Yes.
Q. Would the gold patentowner, the gold phone owner, I should say, now have to pay more in royalties because people like the gold case?
A. No.
Q. And that's discrimination. Correct?
A. Well, it's -- you -- it's not apportioning the value. You wouldn't pay a royalty on the gold in the way I do -- the way I think about it and the way I do my calculations. I would exclude that or apportion that out.
Q. Let's try to keep it simple and see if we can reach common ground. FRAND means you can't discriminate against a company just because they've done the hard work to add features and technologies that people like.
A. I agree with that.

Q. Let's talk about your theories that you applied in this case, and you have two, the infrastructure theory and the survey theory. Correct?
A. Yes.
Q. Now, for the survey theory, you rely on -- actually let's take the infrastructure theory first. Here we go. Network infrastructure. Right, sir?
A. Yes.
Q. And for that theory you say that these patents, according to the testing results, result in speed improvements, and if you took the patents out, Apple's phones would be slower. That's the gist of this. Right?
A. Yes.
Q. And then you say, well, if that happened, Apple would go to the cellular carriers like AT&T and Verizon and pay them money, Apple would pay them money so they could buy equipment to accommodate networks that are bigger as a result of having to deal with the slower Apple phones. Is that the gist of it?
A. Yes.
Q. So Apple would be giving money to AT&T and Verizon to put up new towers and whatever equipment they need to expand their network. Correct?
A. Yes, or being charged that amount to use the additional bandwidth.
Q. Now, of course, once they had those additional towers,

AT&T, Verizon, Sprint, whoever, could use those for whatever they want. Right?

A. No. The apportioned number only increases it enough to offset Apple's reduced speeds.

Q. Sir, but once they have an antenna, everyone's phones will be calling into the same antenna. Correct? You can't segregate certain phones from the use of an antenna.

A. Yeah. But you can only -- my point is you can only use that antenna for so -- or E-node for so much traffic. And by increasing it 10 percent, you can increase traffic 10 percent, and that 10 percent corresponds, for example, to the '833. So they wouldn't be paying to increase it any larger than what Apple needs, in my calculation.

Q. Sir, if we can just try to say this in plain English to the jury, you're saying Apple would tell AT&T and Verizon, we're going to give you some money to build new cell towers. Right?

A. Or use that amount, that cost amount, which is less than buying bandwidth as a payment to cover that bandwidth.

Q. So Apple would be paying AT&T to put up new towers that AT&T could use for any phone on earth, including Apple's competitors. Correct?

A. Not the way the calculation works. I mean, they would put up enough to cover only Apple's additional needs of bandwidth.

Q. Sir, as a matter of basic science, once a cell tower is up, it's going to receive signals from any phone in the area. Correct?
A. Sure, yeah.
Q. And, in fact, no one has ever done this before what you're describing.
A. Well, I presented the Apple documents showing they were considering doing that or making those payments to the carriers. And then I heard Mr. Blasius' testimony about Google 5, which is basically buying more bandwidth from the carriers.
So people are paying for that extra bandwidth just like I had to do in my deposition.
Q. Well, sir, you didn't speak with anyone at a carrier--AT&T, Verizon, Sprint--to confirm that it could make up for degraded performance in devices by adding network equipment. You didn't do that.
A. I didn't speak to a carrier, no.
Q. You don't know how much unused network capacity there was in the U.S. in the relevant time period. Correct?
A. That is correct, but not relevant.
Q. And, sir, you're not aware of any handset supplier ever paying a network carrier so that the network carrier could buy more network equipment. Correct?
A. Well, I think Google is a handset manufacturer.

Q. Sir, let's take a look at tab 1 of your binder. This is your deposition transcript. And take your time and let me know when you're at page 109.
A. Sure. I am at 109.
Q. And let me direct your attention, sir, to lines 4 through 12 and take your time and read your testimony and let me know when you are done, if you could, please.
A. I'm done.
Q. And were you asked that question and did you give that answer?
A. Yes, I did.
Q. And does that refresh your memory, sir, that you're not aware of any handset supplier ever paying a network carrier so the network carrier could buy more network equipment?
A. Well, I wasn't at that time, but hearing Mr. Blasius testify, that's why I'm mentioning that.
Q. Let's be clear: You didn't rely on Mr. Blasius' testimony in your expert report, did you?
A. No. I relied on the Apple document.
Q. So you're now saying that what Mr. Blasius said this morning is a basis for your opinion?
A. No. That's not the basis. You asked me a specific question.
Q. I didn't mean to interrupt you. You can please finish your answer.

A. You asked me a specific question. I already formed my opinion based on the Apple documents saying that they would make payments to the carrier.
Q. So two things. When you formed your opinions in this case, what Mr. Blasius said this morning had never been said to you. Correct?
A. That's right.
Q. And what you're now referring to is you claim that Apple at some point was willing to buy network equipment. Do I have that right?
A. Well, if you look -- we can pull the document up, but the gist of it was the investments between the carriers and Apple and then Apple paying for that additional capacity.
Q. Sir, that document did not say that Apple was willing to buy a tower, a computer station, or anything else in terms of physical equipment for a carrier. Correct?
A. Yeah, it was saying bandwidth, which you get from that equipment.
Q. Sir, the word you just used was bandwidth which is not the same thing as buying antennas, base station equipment. Correct?
A. Absolutely.
Q. Now, your second theory is the survey theory. Correct?
A. Yes. That's the second damages approach.
Q. You're not an expert in conducting surveys. Correct?

A. I wouldn't say -- I'm not the -- not in conducting them. I have experience designing them and then working with people that have conducted them, asked the questions, and evaluated the results like Doctor Reed-Arthurs.
Q. And you were here when Doctor Reed-Arthurs testified and you are familiar with her work in this case?
A. Yes.
Q. Of course, she's a colleague of yours at your company. Correct?
A. Yes.
Q. Now, you understand that most of the focus group respondents that Doctor Reed-Arthurs spoke to didn't even know exactly what speeds their phones operated at. You heard her say that?
A. Something along those lines, yes.
Q. So we've been given these testing analyses that were created for this litigation. Right?
A. I'm sorry?
Q. The ladies and gentlemen of this jury have been given these testing analyses that were created for this litigation. Correct?
A. Yes.
Q. Doctor Reed-Arthurs tries to tie that to pricing by talking to a focus group. Right?
A. By conducting the survey -- or talking to the focus group

and then conducting the survey, yes.
Q. And the focus group didn't even know what the performance speeds were. Right?
A. Yeah. That's the point of a focus group is to find out what they don't know so you can focus the questions on something that the respondents will know where you can get usable information.
Q. Doctor Reed-Arthurs' survey and focus group work was done for this litigation. Correct?
A. That's correct.
Q. We, of course, have a real world example of the effect of LTE on the pricing of Apple phones. Correct?
A. What are you talking about?
Q. So the Apple -- first Apple iPhone that used LTE was introduced in 2012. Right?
A. Yes.
Q. That was the iPhone 5?
A. Correct.
Q. And the previous generation was the iPhone 4S. Correct?
A. Yes.
Q. That was released the year before?
A. Yes.
Q. In 2011?
A. I believe that's correct.
Q. And so Apple had a price for the iPhone 4S when it was

released in 2011?
A. Yes.
Q. And then one year later, Apple released the iPhone 5. Correct?
A. Yes.
Q. And the price of the iPhone 5 on the date it was released as compared to the price of the iPhone 4S on the date it was released, what was the difference?
A. They were the same price.
Q. There was no difference. Right?
A. Yeah. They weren't the same price at the same time.
Q. Sir, I said on the date they were released --
A. Yes.
Q. -- what was the difference?
A. If you compare the two different dates, they were released at the same price.
Q. So when Apple introduced its very first LTE phone, it did not hike up the price as compared to the phone it released the year before. Correct?
A. That's correct.
Q. It charged the very same price. Correct?
A. Yes.
MR. MUELLER: Your Honor, at this point I'll need to seal the courtroom to go into some Apple confidential information.

THE COURT: All right. Based on counsel's representations, the Court will order the courtroom sealed.

Those of you present not subject to the protective order in this case should excuse yourselves until it is reopened and unsealed.

Mr. Mueller, let me know when you've covered any confidential information, and I can unseal the courtroom.

MR. MUELLER: Will do. Thank you, Your Honor.

(The courtroom was closed.)

THE COURT: Do we need to leave the courtroom sealed for your redirect?

MR. BAXTER: No, Your Honor, we don't.

THE COURT: Then I'll order the courtroom be unsealed and the Court Security Officer to invite the public to return.

(The courtroom was opened.)

THE COURT: Are you going to use any of these boards that are up, Mr. Baxter?

MR. BAXTER: I am, Your Honor.

THE COURT: All right. That's fine.

MR. BAXTER: In fact, I am going to try to get this one back up if I can. May I approach the easel just a second, Your Honor?

THE COURT: You may.

All right. The courtroom is unsealed as is the record.

Let's proceed.

REDIRECT EXAMINATION

BY MR. BAXTER:

Q. Mr. Kennedy, we have finally found out how much these patents really are worth, didn't we? They are worth --

MR. BAXTER: If I can approach, Your Honor?

THE COURT: You may.

Q. (BY MR. BAXTER) -- .000075 points of a dollar. No, of a penny. I'm sorry. Of a penny. And so if Apple had its way,

that would be what they'd pay for these SEP patents that increase their speed 25 percent. Right?
A. That's correct.
Q. Okay. Let me ask you, these hundred thousand fish --
THE COURT: You have to speak up.
Q. (BY MR. BAXTER) -- patents, they weren't at stake in the Qualcomm-Apple litigation, were they?
A. No. It was the 40 I identified.
Q. No one said these were SEPs, did they?
A. No.
Q. In fact, we don't know if they are or not. In fact, we think they're not. Is that right? They got a hundred thousand SEPs?
A. They aren't all SEPs.
Q. All right. Were the hundred thousand even mentioned in any sort of context between Qualcomm or Apple or was that a throw-in after they settled on the 40?
MR. MUELLER: Your Honor, I object to the leading.
THE COURT: Sustained.
Q. (BY MR. BAXTER) Were the hundred thousand at issue?
A. Not that I'm aware of.
Q. Was that something that came along after they settled on the 40?
A. That's my understanding, yes.
Q. And the 40 is what drove the litigation. Right?

MR. MUELLER: Your Honor, again, I object to leading.

THE COURT: Sustained.

Q. (BY MR. BAXTER) What part did the 40 play in the litigation?

A. That was -- the dispute was about those 40 patents.

Q. Did it have anything to do with these?

A. No, sir.

Q. So those fish are all red herrings, all hundred thousand of them?

A. I guess so.

Q. Okay. Now, we put up Ms. Smith's chart here, and I believe you said that you didn't believe any of these were comparable patents. Is that what you said?

A. Yeah, they're not comparable license agreements. Correct.

Q. Is there anybody else in this courtroom that agrees with you about that?

A. Yes.

Q. Who would that be?

A. Apple's expert, Doctor Perryman.

Q. So Doctor Perryman has already examined these and said under oath that they weren't comparable? Is that right?

A. Correct.

Q. Then I guess we'll see if he's going to change his mind.

Is that what counsel indicated?
A. Yeah, I don't know what that meant.
Q. All right. Now, I think you said that ETSI didn't outlaw SSU. Is that right?
A. Didn't outlaw it, yeah. They rejected it.
Q. Rejected it.
A. Yeah.
Q. Is that what they did?
A. Yes.
Q. And these folks over here, Apple, went to them not once but twice and demanded that they say, look, SSU is the way to go. And what happened when they did that?
MR. MUELLER: Your Honor, again, I object to the leading.
THE COURT: Sustained. Mr. Baxter, avoid leading.
Q. (BY MR. BAXTER) What happened when Apple went to ETSI and demanded that they write SSU as the way to negotiate these licenses?
A. ETSI rejected that.
Q. Said no?
A. Said, no, it wouldn't be consistent with their policies.
Q. Okay. Now, counsel asked you about the price of an iPhone 5 when it got introduced and started using LTE, did he not?
A. Yes.

Q. What kind of condition were they in in the phone competition with Samsung using LTE and Apple not having it?
A. I think it was fierce competition at that point in time because Apple was behind Samsung and others that had already introduced LTE.
Q. Any wonder they couldn't come in the market with a higher priced phone than they already had?
A. Well, I'm sure they evaluate the market pressure and, you know, will charge as much as they can, but there is price pressure even if you add features.
Q. And the pressure at that juncture was they were way behind because they didn't have LTE. Is that right?
A. They didn't have LTE. They were a year or two years behind their major competitors.
Q. Is the baseband chip the SSU in this case?
A. No.
Q. Why not?
A. As we heard from Professors Madisetti and Mahon, the LTE functionality of these patents does not all -- is not all contained in the baseband processor. It takes the whole other parts of the phone that includes other parts of the phone to operate and get the advantages, these speed advantages. So the baseband processor cannot be the SSU. It would be the phone that's the SSU.
Q. Isn't that what you made your calculations on?

A. Yes.
Q. All right.
A. I use SSU, but it is the phone that's the smallest thing you can sell that will get that benefit, not the chip that does part of it.
Q. Testing of size, Mr. Kennedy, does the analysis of the Qualcomm agreement back up your calculations for what the royalty ought to be?
MR. MUELLER: Your Honor, I just ask if we can try to avoid any numbers so --
MR. BAXTER: I'm not asking about -- excuse me -- about any numbers, Your Honor. I'm just asking for that conclusion.
THE COURT: Go ahead and answer the question, Mr. Kennedy.
THE WITNESS: Yes, it does.
Q. (BY MR. BAXTER) Now, have you seen any testing from Apple to say that the calculations made by the experts are somehow wrong?
A. No.
Q. Okay. You said there was a cap on the royalties from the original owners. Can you tell us what that is, explain that to us?
A. Sure. The original owners wanted -- agreed -- entered into a FRAND agreement to charge fair, reasonable, and

nondiscriminatory terms, and PanOptis adopted that and agreed to the same. And there were certain limits on certain patents as to how much you could charge.

And I analyzed those and made sure that my numbers did not exceed any of those caps. And that's why on the iPad, I lowered it just a little bit to stay within that agreed-upon limits that PanOptis is honoring.

Q. So you are in the market for one of Apple's golden phones. Would you get paid a royalty based upon the gold?

A. No.

Q. Okay. Now, can you tell me how the patents got selected that went into the Optis companies?

A. Sure. They -- the companies, the contributing companies--Ericsson, Samsung, Panasonic, and LG--basically selected each other's patents, the ones that they thought the other person was holding that they'd like to have a license to and they thought were valuable, and the other parties did that to them.

So you're getting this selection process that is basically you get to pick which ones you want from somebody else's portfolio. So it's a -- it's a very interesting and unique process that they agreed to. But that, you know, causes you to end up with very good assets.

Q. Do you know what ETSI does say about how somebody should be compensated when they've got SEP patents?

A. Yes.
MR. BAXTER: Let me see direct slide 49, if I could, Mr. Huynh.
Q. (BY MR. BAXTER) Do we know what ETSI says how they should be treated if they have an SEP patent?
A. Yes. This is their policy that patentholders should be adequately and fairly rewarded for the use of their patents, IPRs meaning patents.
Q. Do you suppose there had been a time with an SEP patent that the number was .000075 for an SEP?
A. Not for a truly essential SEP. I would be surprised if someone would agree to that.
Q. Okay. If your phone -- you've got one of those fold phones or an iPhone 11, and you've got -- you like to watch movies, you got one of the big screens, you got one of the fancy ones and you like to watch movies, what are you looking for as way as performance for your phone?
A. You have to be able to -- you're looking for speed, the download speed, so you can download those videos or pictures or whatever it is you want to download. You're looking for more capacity, faster phone.
Q. And you want it not to buffer all the time?
A. Right.
Q. You want it to be fast and show it to you?
A. Yes.

Q. All right. I believe there was a question about Doctor Reed-Arthurs' focus group.
MR. BAXTER: And if we could see slide 11 from her presentation, Mr. Huynh.
Q. (BY MR. BAXTER) And I think these were her notes. And so tell me what they knew about LTE?
MR. MUELLER: Your Honor, I'm going to object to the lack of foundation for Mr. Kennedy to talk about the notes that Doctor Reed-Arthurs took at her focus group.
THE COURT: Can you lay a foundation for that, Mr. Baxter?
Q. (BY MR. BAXTER) Did you read her report?
A. Yes.
Q. Did you read her notes?
A. I did.
Q. Did you read what she said about the focus group?
A. I did.
Q. Is this it?
A. It -- yes, that's a portion of it right there.
Q. Tell the jury what she found about LTE in the focus group.
A. So most people didn't know exactly what their speed of their phones operated at. You can get an app that's a little speed meter, it's free, and it will tell you. But I didn't know, either, but I did know that I needed a faster phone for

data. And what they said was they -- that they interpreted these speeds as LTE speeds' experience, not maximum speeds. So... and I won't read the rest of it, but --

Q. All right. Well, did it look like that they understood about speed?

A. Yes. In the focus group, they did know about speed, and their input allowed the survey to be designed to make sure that the respondents would understand what they were asking about speed.

Q. Do you think, Mr. Kennedy, that 75/10,000th of a penny, or whatever that number, is a fair, reasonable, and nondiscriminatory rate?

A. I do not.

Q. Thank you, sir.

MR. BAXTER: I pass the witness, Your Honor.

THE COURT: Additional cross, Mr. Mueller?

MR. MUELLER: Yes, Your Honor.

If we could just put that slide back up for a moment, please.

THE COURT: Proceed with your additional cross.

MR. MUELLER: Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. MUELLER:

Q. Mr. Kennedy, just a few more questions for you. The third bullet points says, most didn't know exactly what speed

their phones operated at. Right?
A. Correct.
Q. But understood that speeds vary based on location and network availability. Right, sir?
A. Yes.
Q. Now, speeds vary based on location and network availability. That's a true statement. Correct?
A. That's correct.
Q. The testing in this case, though, were you here earlier when Doctor Madisetti described the testing he relied on?
A. Yes.
Q. He relied on the gentleman, Mr. Demarest, who did testing in his home. Do you recall that?
A. That is correct.
Q. One location in Pennsylvania. Right?
A. Yes.
Q. And Doctor Madisetti had absolutely no idea what that town was like, what the terrain was like, what the conditions were like in that town. Right?
A. Yeah, whatever he said about that. I know he knew it was a major market. But whatever he said, I'm not disputing it.
Q. So even this focus group knew that speeds vary based on location and network and availability. But the testing that you -- I shouldn't say you, that the Plaintiffs have presented to the jury, was conducted -- part of it was conducted at one

person's home in Pennsylvania, Doctor Madisetti had no idea what the conditions were. Correct?
A. I don't know if he said conditions. But, yeah, I heard him say he wasn't sure if there were hills or whatever to come up with this average speed increase.
Q. And you know who Doctor Antonio Virdis is. Correct?
A. Yes.
Q. He's another part of the testing operation that was done?
A. Correct.
Q. And he did a so-called simulation of U.S. phone use.
A. Yes.
Q. And he did it from Italy. Correct?
A. That's -- well, I'm not sure. I think that's my understanding.
Q. He has not set foot in this country, has he?
A. I don't know one way or the other.
MR. MUELLER: Your Honor, may I approach the easel?
THE COURT: You may.
Q. (BY MR. MUELLER) So, you and Doctor Reed-Arthurs, for your part in this case, have relied on tests like the ones I just described. Correct?
A. Yes, we relied on Professors Madisetti and Mahon's testing.
Q. But you agreed earlier that there's accepted ways of setting FRAND compensation that do not require that sort of

testing. Correct?
A. I would say they are accepted. I just realized I can't agree with the baseband as the SEP. I'm not agreeing that those two --
Q. Sir, we're not going to go back to what we talked about earlier, but you do agree on the basis point that you don't need to do this type of testing to set a FRAND rate. Correct?
A. For a portfolio, you can't. For individual patents, you can.
Q. Sir --
A. But you don't have to.
Q. The question I had is, you don't have to. Correct?
A. That's correct.
Q. There's not any suggestion to the jury that Apple had to do testing in this case to set a FRAND rate. That's just flat not true, is it?
A. It's not true. Yeah, you don't have to do testing to -- if you don't have testing, you can come up with a rate another way, I guess.
Q. Apple didn't have to hire its own silent partner, did it?
A. Did it for what? What do you mean?
Q. You understand TechPats advertises itself as a silent partner for monetizing patents?
A. Yes.
Q. Apple didn't need to hire its own silent partner to talk

to the ladies and gentlemen of the jury about FRAND. Right?
A. No, they didn't.
Q. Last couple of questions, sir. Mr. Baxter asked you about watching movies and wanting fast downloads. Correct?
A. Yes.
Q. And you'd agree, sir, that when folks watch movies, they can watch them over WiFi. Right?
A. Sure.
Q. And WiFi has nothing to do with the five patents in this case. Correct?
A. That's correct.
Q. Last question. With reference to the Qualcomm agreement and the number of patents covered by that agreement, Mr. Baxter asked you some questions. Right?
A. Yes.
Q. And he suggested that my analogy involved some red herrings. Correct?
A. Yes.
Q. Who would know better if the patents covered by the Qualcomm agreement covered other patents declared essential to cellular standards, you or Ms. Mewes?
A. I'm sure Ms. Mewes will tell us her view on it. I know from her testimony and the documents, that's what I base my opinion on.
Q. Thank you, sir. I have no further questions.

MR. MUELLER: I pass the witness, Your Honor.

THE COURT: Additional direct, Mr. Baxter.

MR. BAXTER: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. BAXTER:

Q. Well, Apple didn't have to go hire anybody to do testing. They could do it themselves, can't they?

A. I would not be surprised if they could.

Q. And if they thought they were going to get some different results, you reckon they'd have been in here with them?

A. I was surprised there wasn't alternative testing done.

Q. Didn't see any?

A. No.

Q. They didn't bring anybody in here?

A. No.

Q. They were afraid to do their own testing?

A. I -- I don't know.

Q. Thank you.

MR. MUELLER: I object to that question.

THE COURT: Is there additional cross?

MR. MUELLER: No, Your Honor. No additional cross.

THE COURT: Mr. Kennedy, you may step down, sir.

THE WITNESS: Thank you, Your Honor.

MR. BAXTER: Can he be excused, Your Honor.

THE COURT: I see no reason not to. Is there any

objection?

MR. MUELLER: No objection.

THE COURT: You are excused, Mr. Kennedy. That means you are free to stay, you are free to leave. It's up to you.

THE WITNESS: Thank you, Your Honor.

MR. SHEASBY: Your Honor, may we approach and clear binders?

THE COURT: Yes, let's do that.

Plaintiffs, call your next witness.

MR. SHEASBY: Your Honor, at this time Plaintiffs rest their case in chief.

THE COURT: All right. Plaintiffs have rested their case in chief.

Are the Defendants -- is the Defendant prepared to go forward with its case in chief?

MR. MUELLER: We are, Your Honor. We reserve our Rule 50 rights pursuant to the Court's procedures, and we're ready to proceed.

THE COURT: All right. Call your first witness.

MR. MUELLER: May I first just get a clean sheet of paper here?

THE COURT: Yes.

MR. MUELLER: And, Your Honor, we call as our first witness by videotape, Dr. Antonio Virdis.

THE COURT: All right. Take this chart down behind you.

Proceed with this witness by deposition.

ANTONIO VIRDIS, PhD, BY SWORN VIDEOTAPE DEPOSITION,

Q. Could you please state and spell your full name?
A. Okay. Antonio Virdis, A-N-T-O-N-I-O V-I-R-D-I-S.
Q. So you were hired by the Plaintiffs' attorneys. Is that right?
A. Yes. It was him who contacted me.
Q. You are being paid $150 an hour for your work. Right?
A. Yes.
Q. To be clear, your report describes simulations. Right?
A. My report describes simulation results.
Q. The software you used to do the simulation is an altered version of SimuLTE. Correct?
A. I used the SimuLTE, and I use a custom version, as I wrote in my report, in the sense that I needed to include the CQI suppression mechanism.
Q. There is no real mobile phone used in SimuLTE. Correct?
A. SimuLTE is a simulator. It's a system-level simulator.
Q. My question was, there is no real mobile phones used in SimuLTE. Correct?
A. Correct. My screen saver. Again, SimuLTE is a simulator, so there is no real telephone in it.
Q. And there's no real cell towers or base stations.

Correct?
A. Again, that is a simulator, so it contains software, not real towers.
Q. But there is no actual signals that are transmitted by SimuLTE or received by SimuLTE. Correct?
A. I repeat, being a simulator is just -- it sends modeled version of those signals, not the real ones.
Q. SimuLTE doesn't actually test any of the Apple products, does it?
A. SimuLTE does not test explicitly any Apple product explicitly.
Q. And you never ran any actual tests of Apple products. Correct?
A. I never run a test using the real Apple products.
Q. And you never ran a test using a real Intel baseband chip. Right?
A. I never run test using the real -- those real elements.
Q. And you never ran a test using a real Qualcomm baseband chip. Right?
A. I never run any test using those real elements.
Q. And as part of your work on this case, you never actually tested any of Apple products involved. Correct?
A. I never test any real physical elements of those that you said.
Q. To set up a simulation, you need to make assumptions

about what the conditions will be. Correct?
A. Are you speaking about this case?
Q. I'm just asking generally.
A. In general, when I run simulation, I have to make some assumption on the conditions, on the general conditions.
Q. But if the assumptions aren't realistic, the results won't reflect what is happening in the real world. Right?
A. In that case, the assumption will not be modeling or referring to a realistic scenario.
Q. I asked, the further your assumptions are from real life, the less the simulations predict real life. Is that correct?
A. I have no idea because, as I told you, if you are not modeling real life, the results you will obtain, they will not be related to real life.
Q. Where did you get the assumptions that you used to perform the simulations for this case?
A. These assumptions were requested to me by Doctor Madisetti.
Q. Have you ever seen Doctor Madisetti's May 6, 2020, report?
A. Never.
Q. So you didn't have a chance to provide any feedback to Doctor Madisetti whether his analysis or conclusions were right or wrong. Correct?
A. I don't remember talking about his report.

Q. Besides you, who has used an altered version of SimuLTE that you used in this case?
A. Only myself.
Q. For the record, this is U.S. Patent No. 8,102,833. I'll call this the '833 patent. Doctor Virdis, you've never seen this patent before. Correct?
A. Not that I recall.
Q. And so you've never heard of this patent before you were hired to help in this case. Correct?
A. No, I never heard about this paper -- this patent before being hired as an expert.
Q. And you've never read the '833 patent. Correct?
A. I never studied this paper.
Q. And you've never read it, either. Correct?
A. Not that I recall.
Q. And so you have no opinion about the value of the '833 patent. Correct?
A. I was never asked to have an opinion on this paper -- this patent. I never read it. I was only asked to compare two configurations.
Q. Doctor Virdis, can we talk about some of the assumptions you used in this case?
A. Okay.
Q. Do you know what the average population density is of the United States?

A. I have no clue, either.

MR. SHEASBY: Your Honor, I'm going to have to object at this point.

THE COURT: Stop the video. What's the objection?

MR. SHEASBY: This was never cleared with us. Doctor Virdis is not talking about this page of this deposition. This is -- this is completely inappropriate. In other words, I think they turned this into a demonstrative argument. I've never seen this.

THE COURT: Mr. Sheasby, the objections to these depositions have been waived per my prior ruling. You're not going to raise them now.

Let's proceed with the deposition.

Q. And do you know what the average population density is of Texas?

A. I have no clue, either. I would have to look at that information.

Q. But if you were to change those numbers to a rural environment, your simulation results would change. Correct?

A. I would have to rerun those simulations. I have no clue on that.

Q. So is the amount of interference the same then in a city like Dallas, Texas, versus a city like Marshall, Texas?

A. I do not know the characteristics of those cities, so I cannot tell you.

Q. So would the interference in a densely-populated city be the same than a less densely-populated city? They could be different. Right?
A. I have no clue. That can be.
Q. But the intention in your simulation is that all of the users are downloading all three files. Correct?
A. During the duration of the old simulation, my intention is that during that 150 seconds of the simulation duration, those 60 user at the end will download three files. But in order to download those three files, they will download them at the random moments during those 150 simulation -- during those 150 seconds of the simulation duration. And these are realistic condition, in my opinion.
Q. Do you know if this scenario has ever happened in the U.S.?
A. I have no clue.
Q. Do you know whether the assumptions that Doctor Madisetti gave you are representative of real world conditions in the United States?
A. I do not know the real condition of the United States. I'm from Italy.
Q. So let's talk about some of your results from your simulations. Let's talk about scenario one first. That's when there were many users simultaneously downloading three files in the same cell. Right?

A. That is correct.
Q. And so sitting here right now, you don't know how frequently these scenarios happen in real life. Correct?
A. I cannot give you exact figures for this.
Q. Does it reflect real world scenario that a user would download in five-second chunks?
A. It can happen for very short videos.
Q. Do you know if that has ever happened in the United States?
A. I don't know.
Q. So you can't tell me if your video chunk simulation has ever occurred in the United States, can you?
A. I was never asked to document on this. I was asked to execute -- to consider this scenario.
Q. And you don't know if that's ever happened in the United States. Correct?
A. I don't know.
Q. But you can't point to a single example of either scenario happening in the United States. Correct?
A. I was not -- never asked to find a representative cellular for that. I was only asked to do this simulation.
Q. And you don't know if any of your scenarios have ever happened in the United States. Correct?
A. Again, I was asked to run this. I don't know about this.
Q. You agree that there are many factors that can impact

throughput speed from a mobile device. Correct?
A. This sentence is true, in general.
Q. And so cellular coverage can impact throughput speed. Correct?
A. It can impact throughput speed.
Q. Network congestion can affect throughput speed. Correct?
A. Network congestion can impact throughput speed. Right.
Q. And the number of users in a cell can impact throughput speed. Correct?
A. The number of users, if they are active simultaneously, can impact on the throughput speed.
Q. And the speed at which users are traveling in a cell can impact throughput speed. Correct?
A. This sentence is, in general, true as well.
Q. So if I were to invest a dollar into improving LTE infrastructure, would that also equal a dollar improvement in upload and download speeds?
A. Again, this is a very, very general question. And it is -- this is not true, in general.
Q. Why did you use SimuLTE for your simulations in -- that were addressed in your expert report in this case?
A. I used SimuLTE because it is a system-level simulator, and in particular, it is a multi-layer simulator and can be used to capture the effect of lower-level mechanisms to the application layer, so to the user application.

Q. And to summarize, what did Doctor Madisetti ask you to do in this case?
A. I was asked to compare two configurations--one where CQI suppression was occurring and one where -- without CQI suppression, and I was asked to simulate and compare those two configurations.
Q. As a summary, what were your results?
A. The results I obtained showed that when CQI suppression is employed, the performance of the system decrease. And I observed that, in particular, the delays in case of -- the average delays in case of file download increased between 10 and 60 percent, and in case of video streaming, the delays of downloading the video streams increased between roughly 10 and even above a hundred percent.
Q. Did any of Apple's questions today change any of your opinions?
A. No.
Q. Would you have changed anything in your simulation based on Apple's questions today?
A. No, I would not change.
Q. If Apple wanted to perform a simulation on this sort of technology, could Apple have hired an expert to perform a simulation using SimuLTE, like you did?
A. Yes, I believe so. SimuLTE is open source and can be downloaded, and the only modification that I made are related

to adding the CQI suppression mechanism, which is exactly described in my report and that is implementing exactly as I described it.

Q. Is there someone you've spoken to in this case who you would defer to on that topic?

A. I believe Doctor Madisetti would be a good reference in this respect.

MR. MUELLER: Your Honor, that's the end of the clip, and that had three minutes and zero seconds of Optis designations and 11 minutes and 17 seconds of Apple designations.

THE COURT: All right. Before we proceed with the next Defense witness, ladies and gentlemen, we're going to take a short recess. If you'll please close and leave your notebooks in your chairs, follow all my instructions, and we'll be back very shortly to continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: The Court stands in recess.

(Brief recess.)

THE COURT: Be seated, please.

Defendants, are you ready to call your next witness?

MR. MUELLER: We are, Your Honor.

Just very briefly, there was a suggestion that we had doctored a video. That was literally the exact recording of

the remote deposition as it was recorded. I just want to put that on the record.

MR. SHEASBY: And, Your Honor --

THE COURT: Well, the objection's been waived per my earlier ruling and it was inappropriate to interrupt the video in light of that.

MR. SHEASBY: Your Honor, I just want to be clear. We've never seen these videos. We only saw text. And if they are showing images associated with the videos, we are entitled to have that disclosed to us.

THE COURT: Well, if you'll comply with my orders, you'll see them in advance. And if you continue to disregard my orders, your objections will continue to be waived and you won't have the benefit of seeing them in advance.

MR. SHEASBY: I understand, Your Honor. Thank you.

THE COURT: Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Please be seated. Ladies and gentlemen.

Defendant call your next witness.

MR. MUELLER: Thank you, Your Honor. We call Ms. Heather Mewes.

THE COURT: Ms. Mewes, if you will come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, have a seat on the

witness stand.

MR. MUELLER: And, Your Honor, may we pass binders to the Court Security Officer?

THE COURT: You may.

HEATHER MEWES,

testified under oath as follows:

DIRECT EXAMINATION

BY MR. MUELLER:

Q. Good afternoon, Ms. Mewes.

A. Good afternoon.

Q. Ms. Mewes, could you please introduce yourself to the ladies and gentlemen of the jury?

A. Sure. My name is Heather Mewes. I'm from California originally, but I kind of grew up all over. But I came back to California about 20 years, and I've lived there since.

Q. And, Ms. Mewes, where do you work?

A. I work at Apple.

Q. For how long have you worked at Apple?

A. It's been about nine years.

Q. And before you joined Apple, what did you do?

A. I was a partner in a law firm.

Q. Could you tell us a bit about your educational background?

A. Sure. So I went back east to Georgetown for undergrad, and then I did go to the University of California at Berkeley

for law school.
Q. Ms. Mewes, why did you decide to join Apple?
A. It was a chance to shift my career a little bit and focus on licensing, but also a chance and an opportunity to work with some of the best and brightest.
Q. And since you've joined the company, which positions have you held?
A. So I started in the -- what we call the intellectual property and licensing team. So I was responsible for advice with respect to intellectual property, and I did that for about six, seven years. And then about two years ago, I did move to our, what we call, product legal team. So I'm much more involved in the day-to-day commercial agreements, R and D, things like that.
Q. And what's your position today?
A. I'm a senior manager and principal counsel.
Q. When you were in the IP and licensing group, what responsibilities did you hold?
A. So our function was really to deal with any advice needed on intellectual property matters. So that certainly included patent licensing, which we've been talking about here, and that was a major part of that job. But it also included specialized advice with respect to commercial deals, with respect to mergers and acquisitions, and a whole other variety of things.

Q. Now, did part of your experience involve negotiating licenses for standard essential patents?
A. It did, yes.
Q. Including licenses to patents with FRAND or fair, reasonable, and nondiscriminatory commitments?
A. That's correct, yes.
Q. Now, you understand that -- you've been here for the entire trial. Right, Ms. Mewes?
A. Yes.
Q. And you'll be here for the full trial. Correct?
A. That's right.
Q. Now, you understand that the ladies and gentlemen of the jury have the charge of deciding what would be a FRAND rate set in a hypothetical negotiation back in 2012 --
A. I do, yes.
Q. -- with Apple on one side, Samsung, Panasonic, and LG on the other. Right?
A. That's right.
Q. Now, in 2012, were you at Apple?
A. I was, yes.
Q. In 2012, did you have experience with standard essential patents and FRAND?
A. Yes. I was negotiating licenses for Apple at that time.
Q. And you've come to this court to explain to the ladies and gentlemen of the jury how Apple approaches those types of

issues?
A. That's right.
Q. Now, what are the steps involved in negotiating a patent license?
A. There's usually two different parts of the discussion. One is simply understanding what the patents are about, and there's a lot of technical analysis that can go into that, especially for something like what we've been talking about here with standard essential patents. And the other is a business -- what we'll call sometimes a business discussion which is the back and forth about what is the -- the license worth, what are the patents worth.
Q. Does Apple itself own any patents that are essential to the LTE standard?
MR. SHEASBY: Your Honor, I object. This requires an expert opinion. She is not an expert on whether the patents are essential to LTE. She is not being told to answer this question. She can answer the question, does Apple own declared SEPs, but not actual patents. Actual patents require --
THE COURT: I understand your objection, counsel, and technically you're correct. And I'll sustain the objection.
You can rephrase question.
MR. MUELLER: Certainly, Your Honor.

Q. (BY MR. MUELLER) Does Apple own any patents that have been declared essential at the LTE standard?
A. We do.
Q. About how many?
A. With respect to LTE, it's about 7,000, 7500, and then a larger number for cellular standards.
Q. Now, has Apple negotiated licenses to standard essential patents that other companies own?
A. We have, yes.
Q. Including patents declared essential to cellular standards like LTE?
A. That's right.
Q. And just give us a sense for about the number of patents, number of patents, that Apple has licensed that have been declared essential to LTE?
A. Just with respect to declared essential patents, it's over a hundred thousand.
Q. And have you yourself personally negotiated agreements that included patents that have FRAND commitments?
A. Yes.
Q. And how many licenses for FRAND-committed patents have you been personally involved in negotiating?
A. At least 10, 15, something in that range.
Q. Now, tell us a bit about how Apple approaches the question of what is a FRAND rate for a particular license to

standard essential patents.
A. Sure. So Apple's a licensor, as we just talked about, and so we do have a policy on how we approach the valuation of FRAND-committed patents, so our own patents, and we use that framework both as a licensor of patents and as a licensee.
Q. And how long has Apple had this FRAND framework for?
A. We became a FRAND -- a major patentholder around 2011, and so our policy was established and has developed over that period of time.
Q. And does Apple try to consistently apply that to both granting licenses and taking licenses to these types of patents?
A. We do, yes.
Q. So what are the factors that go into a FRAND rate?
A. The way we approach it is two different steps. One is to understand what we call the common royalty base, so what is the total aggregate of royalties that should be due for cellular standards.
And then the second is to address a proportionate royalty with respect to each licensor, so what is the share of each licensor of that total aggregate.
Q. Now, does Apple actually publish this framework on its website?
A. We do, yes.
Q. And if you turn in your binder, there should be a tab for

DTX 2107.
A. I'm there, yes.
Q. Do you recognize this, Ms. Mewes?
A. I do, yes.
Q. And this is -- I've already read it, DTX 2107. What is this?
A. This is the published FRAND licensing policy on Apple's website.
Q. So let's go to page 3. And do you see where it says FRAND royalty base? Do you see that?
A. I do.
Q. And below that, it says there should be a common FRAND royalty base that applies equally to all SEP licensors and SEP licensees. What does that mean?
A. So that means that it's important not to discriminate, and one way to do that is to have a common starting point for people who are using the same patents. And so what we try to do is think about what is common among our products and people like Samsung's, and that is the cellular baseband chip set.
Q. So if we go to the first bullet point, it says the common royalty base for SEPs should be no more than the smallest saleable unit where all or substantially all of the inventive aspects of the SEP are practiced. Do you see that?
A. I do.
Q. And, Ms. Mewes, what is that referring to?

A. So we heard this earlier, the SSPPU. That's what that is, and that's the -- an accepted model for how to value patents.
Q. Now, have you heard over the course of this trial some suggestion that the European Telecommunications Standards Institute rejected this?
A. I did hear that, yes.
Q. Now, to be clear, they haven't adopted this as a binding approach to FRAND. Right?
A. That's right.
Q. But has ETSI ever once said, you cannot use this approach?
A. No, they haven't.
Q. In fact, do other companies other than Apple use it?
A. Yes.
Q. Does that include Samsung?
A. Yes.
Q. If we go to the next bullet point, this base should be further apportioned to isolate the SEP value, separate and apart from prior art, non-patented features, and there's a longer list. Do you see that?
A. I do, yes.
Q. The part I want to focus on, Ms. Mewes, is further apportioned. What does apportionment mean?
A. So apportionment is a really important concept in

damages, which is you really need to identify the value of the patents, and that can be very difficult in a multifunction product. So you have products like Apple's that are really quite complex; they have a lot of different components.

And so it's important first to identify the portion that's relevant, i.e., that practices the patents, and then also to think about, even once you get there, is there further value that's included in that portion that also needs to be taken out.

Q. And if we look at the last bullet point, it says for cellular standards, the smallest saleable unit should be at most the baseband chip. Do you see that, Ms. Mewes?

A. I do.

Q. And what is that referring to?

A. So this is the part of Apple's products that implement the standards. So there's source code effectively sitting on that chip, and that's what's relevant to the standards.

Q. Now, have you heard over the course of this trial that you have to have electricity for the battery, for example, for the phone to work?

A. Yes.

Q. You have to have an antenna and so on. Right?

A. Yes.

Q. Why then does Apple say the smallest saleable unit should be the baseband chip rather than everything?

A. The generally, well-understood way of interpreting this is that there, of course, are other elements that are going to be necessary. You have to plug a toaster into the wall. That doesn't mean that you're supposed to be able to capture the value of the toaster.

So what the SSPPU is designed to do is say, let's look at where the patents are substantially practiced. And so it's very easy to write a claim that says, a mobile phone that in the baseband chip does X. That doesn't mean you now get to say the SSPPU is a mobile phone. It's still a baseband chip.

Q. Ms. Mewes, let me see if I understand this. You were here when I used the electrical plug as an example?

A. Yes.

Q. And there's a standard on electrical plugs. Right?

A. That's right.

Q. If there were a patent on an electrical plug, what would be the smallest saleable unit?

A. It would be, you know, people sell just the plugs that are sold to manufacturers who make toasters and blenders and lots of things. So that would be the SSPPU.

Q. If I had a big fancy TV with a plug, what's the smallest saleable unit there?

A. It's still the plug.

Q. Why is it important to focus on the plug rather than the big fancy TV?

A. Because you could have a big fancy TV or you could have a very basic TV, but it really doesn't change that you're using the standard. The same patents are used, and that's how you can avoid discriminating between people who make very complex and expensive products and people who make simpler products.

Q. But, Ms. Mewes, the TV won't work without the plug. Right?

A. That's absolutely true.

Q. So shouldn't we use the plug to capture the value of the entire TV?

A. What that is it's taking advantage of the value of the standard itself to say, I can now get a royalty on a big fancy TV. And that's not how the valuation works.

MR. MUELLER: If we could just put this down for just a moment, we're going to come back to it, and put the slide up of the four phones I used in opening statement.

Q. (BY MR. MUELLER) Ms. Mewes, could you explain to us how this concept of the smallest saleable unit and the baseband chip relate to the phones we see here?

MR. SHEASBY: Your Honor, I object. A foundation should be laid that she knows the different download speeds of each of these phones and the technical --

THE COURT: Mr. Sheasby, you're going to have to speak up if you want me to hear your objections and rule on them.

MR. SHEASBY: Your Honor, I object. A foundation should be laid that Ms. Mewes knows the different technical specifications and download speeds of these phones before she starts offering opinions about phones that are not Apple phones.

MR. MUELLER: I can ask a few more questions to lay a foundation, Your Honor.

THE COURT: All right. I'll sustain the objection. You can proceed to lay a foundation.

Q. (BY MR. MUELLER) Ms. Mewes, do you know if there is a cell phone anywhere in the world that doesn't have a baseband chip?

A. No. Effectively, I mean, you can call it different things, but it's got a modem or a baseband chip. These are the cellular chip set that goes into smartphone or another phone.

Q. And why does every cellular device in the world have a baseband chip, also called a modem?

A. So that it can use the standards.

Q. So when you talk about standards patents shouldn't be entitled to other value from other features and technologies, how does that relate to what we see here?

A. That we would be looking at the baseband chip, a common base across different devices that use the same patents.

Q. And the baseband chip wouldn't have anything at all to do

with the folding screen in the Samsung Galaxy. Right?
A. No.
Q. So let's go back to the Apple policy. Now I want to focus on the FRAND royalty rate section. Do you see that, Ms. Mewes?
A. I do, yes.
Q. And it says a FRAND royalty rate should be proportional among SEP licensors and comparable among SEP licensees. What does that mean?
A. That we want a fair and reasonable outcome for all the licensors. So someone shouldn't be able to overcompensated and someone shouldn't be undercompensated. It should be a fair approach.
Q. And is this a way of creating fair slices of the overall base?
A. Yeah. When you think about the pie is the royalty base and the share or the pro rata share is the slices that you would start with for determining what the FRAND rate would be.
Q. Ms. Mewes, are you familiar with a concept, something called, royalty stacking?
A. Yes.
Q. And are you personally familiar with that from the work that you yourself have done over the years?
A. Yes.
Q. What's it mean?

MR. SHEASBY: Your Honor, I object. Royalty stacking requires an expert analysis under Federal Circuit precedent. Ms. Mewes is not an independent expert in this case. She should not be discussing a royalty stacking analysis.

THE COURT: What's your response, Mr. Mueller?

MR. MUELLER: It doesn't require an expert opinion. She just testified she's personally familiar with it from her work as a licensing attorney over many years.

MR. SHEASBY: Your Honor, a stacking analysis requires an expert opinion. The fact that she maybe has expertise in that means she should have been disclosed as an expert.

THE COURT: Your objection's overruled. Let's proceed.

Q. (BY MR. MUELLER) Ms. Mewes, what is royalty stacking?

A. So basically it's the notion that we need to account for all the royalties that will stack on top of each other. So if we know that there is a hundred thousand, 200 thousand patents out there, we need to be thinking about when we license some part of them, what that impacts to the others.

So if you're going to license a subset for $4, what does that mean for the other hundred thousand, and could you even sell a phone after you paid all those royalties.

Q. Now, we've used the term 'declared essential' over the

last 10 minutes or so. Right?
A. Yes.
Q. What does declared essential mean?
A. In ETSI, there is a process to -- it's -- Plaintiffs referred to it as announcing the patents. It's actually a piece of paper that you file with ETSI that says you declare that the patent may be essential, and you offer it on FRAND terms.
Q. And were you here in Mr. Sheasby's opening statement when he said the original owners of the patents in this case announced them to the world as important? Do you recall that?
A. I do, yes.
Q. Now, have you personally seen the types of declarations that we're referring to here?
A. Yes.
Q. How many declarations are there like that?
A. I mean, hundreds of thousands. There's -- the number of patents declared to be fair is a hundred thousand for LTE or more than that. The actually number of pieces of paper, they are usually a form and a big list. So there could be lesser number of declarations.
Q. And does filing a declaration like that announce to the world these are really important patents?
A. That they may be essential, for sure, but not calling out any particular patent.

Q. Now, how does Apple use the numbers of declared essential patents in determining a proportional royalty rate?
A. Sure. We talked about the pie and determining what the slices are. The way we try to start in figuring out what the slices are is with the objective data we have, which is the patents that have been declared to cellular standards.
Q. And where is that data available?
A. So ETSI does provide a database that does have this information available.
Q. And have you also used any private resources that have the ETSI data?
A. Yeah. We just take that data into an easier format to look at the share so we can understand it more easily.
Q. And are you familiar with a company called Innography?
A. Yes.
Q. What is that?
A. It's basically like a data information service.
Q. And have they provided any service to Apple with respect to the total number of patents that are out there for a cellular standard?
A. I mean, we've actually commissioned --
MR. SHEASBY: Your Honor, I object. Out there for a cellular standard is vague. If he's referring to declared -- I object to the question as vague.
THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT: Counsel, I'm trying to put my hands on the exact ruling, but we have an order in limine about Innography.

MR. MUELLER: I think you overruled the objection that we made to it, Your Honor.

MR. SHEASBY: No. Actually, Your Honor, you do have -- there was an order in limine. This was part of their -- it goes to willfulness or bad faith conduct of Apple. They took the position that that swept in all these documents. So they've opened the door to Innography, and I agree with you this is a clear violation of the MIL.

MR. MUELLER: It's not a violation, Your Honor.

THE COURT: Just a minute, counsel. I know we had argument on it.

MR. SHEASBY: May I go get my notes? I believe I can assist the Court, Your Honor. I believe it was MIL No. 2 in 2021. Apple MIL No. 2, and No. 4.

THE COURT: All right. I denied Defendants' MIL 17, which was a reference to Innography strength scores, and indicated that the parties -- the experts must limit their testimony to the scope of their reports. I'm not sure how Ms. Mewes is qualified to testify about Innography.

MR. MUELLER: I say two things, Your Honor. First,

I was just accused of violating a motion in limine. In fact, I wasn't.

Second, I was going to ask Ms. Mewes about was her use of the database and to distinguish between the portion that she uses, which has to do with the number -- total number of patents declared essential for a standard, on the one hand, and the strength ratings.

They have disclosed Ms. Dwyer as a rebuttal witness. And I believe under the subjects they want to get into under Ms. Dwyer are the strength ratings. I have no way of seeing their rebuttal case, and so I want to make clear on the record that Apple has never used those strength ratings and Ms. Mewes is a percipient witness to that issue.

Your Honor, again and again I've been accused of things that I didn't do, and that's the latest example. I did not breach any rule. I've observed strict accordance of Your Honor's --

THE COURT: I called you to the bench because I thought there was a MIL problem. I'm not making any accusations.

MR. MUELLER: No. It was Mr. Sheasby.

THE COURT: I understand that.

MR. MUELLER: Yeah.

THE COURT: But he's entitled to the same reaction that I am.

Now, you raised an objection, Mr. Sheasby, before I called you to the bench. Tell me what your objection is again?

MR. SHEASBY: Yes. So what he's trying -- I want him to limit his questions to declared SEPs, which is a factual question, as opposed to actually essentials or vague language that could be referring to the suggestion of actual essentiality. That's my only request.

THE COURT: Well, that's something you can take up with this witness on cross-examination, but I'm not going to circumscribe direct examination.

MR. SHEASBY: I will go into it on cross-examination, Your Honor.

THE COURT: All right. And there's been no objection yet, but if you follow the course you just outlined, I see no substantive problem with it.

MR. MUELLER: Thank you, Your Honor.

THE COURT: Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed, counsel.

Q. (BY MR. MUELLER) Ms. Mewes, the Innography database, do you have that in mind?

A. I do, yes.

Q. And actually there's multiple services that this company

offers. Correct?

A. Yes. There's a general product and then a database that we had them put together.

Q. And what do you rely on?

A. For looking at share, we look at the database with our declared patents in it.

Q. Now, there's something else that Innography offers called strength ratings. Have you heard of those?

A. I have, yes.

Q. Those are generated by some computer algorithm?

A. Yes.

Q. And you don't rely on those, do you?

A. No.

Q. Now, are you familiar with the -- another approach to FRAND licenses involving the use of comparable agreements?

A. I am, yes.

MR. SHEASBY: Your Honor, I object this is expert testimony. Ms. Mewes is not an independent expert. She can answer questions about whether Apple uses comparable agreements.

THE COURT: Overruled, counsel.

Answer the question, Ms. Mewes.

THE WITNESS: Yes, I am.

Q. (BY MR. MUELLER) And have you in fact personally used the comparable license approach in negotiating FRAND patents

in your time at Apple?
A. Yes. These are -- generally we will get them side by side with an SSPPU and a comparable license approach.
Q. So when Apple sets FRAND rates, it's not just using SSPPU and the baseband chip approach?
A. That's right.
Q. Also using comparable licenses?
A. That's correct.
Q. And these are existing agreements to similar technologies?
A. Yes.
Q. So, for example, if you were negotiating a license to an LTE declared essential patent portfolio, you might look to other LTE declared essential patents licenses?
A. That's right.
Q. LTE comparable to LTE?
A. Yes.
Q. Now, are you familiar with the concept of a running royalty?
A. Yes.
Q. What is it?
A. It's where you charge per unit instead of -- in contrast, a lump sum.
Q. And what is a lump sum?
A. It's just a set amount of money that you agree to. It

could be at one time or it could be like a series of payments.

THE COURT: Counsel, she isn't an expert witness. She can testify to what she does for the Defendant Apple, and she can testify to her understanding of a running royalty and her understanding of a lump sum. She can't give absolute definitions as an expert witness would.

MR. MUELLER: Understood. Understood.

THE COURT: All right. Proceed.

Q. (BY MR. MUELLER) In your experience, Ms. Mewes, which approach have you used in the licenses that you have personally helped negotiate?

A. Probably 98 percent of those are lump-sum agreements.

Q. And, Ms. Mewes, why have you yourself used lump sum?

A. It's usually two reasons. One is it's important for the parties to have a set expectation about what they're getting out of the deal, and sometimes with a running royalty expectations can go wrong and that can lead to disputes.

The second thing is that a running royalty does require a whole system to monitor the running royalty, so the --

MR. SHEASBY: Your Honor, I object to this. The process of monitoring running royalties in a hypothetical negotiation is completely irrelevant. This witness is trying to suggest that, because of a burden on a party, there would not be a running royalty in a hypothetical negotiation. That's a completely improper legal analysis.

THE COURT: Overruled, counsel. She's explaining her experience with running royalties as an employee of the Defendant. And as long as she adheres to the line of her experience working for Apple and she answers questions based upon her understanding of what those called for, I'm not going to keep -- I'm not going to sustain these kind of objections. So you're just wasting your time and the jury's time.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: Let's proceed.

Q. (BY MR. MUELLER) Could you finish your answer, Ms. Mewes?

A. Yes. That there are, in fact, both for Apple and, as I've seen from licensors, they have to maintain audit programs and employ people to do these sorts of things.

Q. Now, Ms. Mewes, as a former member of the IPM licensing group who had personally negotiated Apple FRAND licenses, are you familiar with Apple's licenses negotiated in the period from 2012 to 2019?

A. I am, yes.

MR. MUELLER: Your Honor, at this point I ask Your Honor to seal the courtroom. We're going to get into some confidential information.

THE COURT: All right. Based on counsel's representation and to protect confidential information, I'll order the courtroom sealed. Anyone present not subject to the

protective order that's been entered in this case should exit the courtroom and remain outside until it's reopened and unsealed.

You don't need to report compliance, Mr. Sheasby. If you see somebody who shouldn't be here, please tell me; otherwise, I'll assume everybody's left who should leave.

The courtroom is sealed.

(The courtroom was closed.)

THE COURT: Ladies and gentlemen of the jury, this examination has some length to go, and the cross examination will have some length as well. It's after 6:00. I'm not going to hold you any longer for today. We're going to recess for the evening.

At this time I'm going to order the courtroom unsealed. I'll direct the Court Security Officer to invite the public to return.

Ladies and gentlemen of the jury, if you will simply take your notebooks and leave them closed on the table in the jury room. Please be sure that you continue to follow all of my instructions, including, as you would expect me to remind you, not to communicate about the case with anyone in any way. Please travel safely to your homes, and please be back tomorrow morning assembled in the jury room so we can start at or as close as possible to 8:30. You will be here in advance. Have a good evening.

And with that, the jury's excused until tomorrow morning.

(Whereupon, the jury left the courtroom.)

THE COURT: Please be seated.

You can step down, Ms. Mewes.

THE WITNESS: Thank you, sir.

THE COURT: Counsel, according to my records, we have used 7 hours and almost 13 minutes today. The Plaintiff has remaining 2 hours and 20 minutes, and Defendant has

remaining 2 hours and 46 minutes.

I've already received the Plaintiffs' objections to slides that will be used with Doctor Perryman tomorrow. I'll be prepared to discuss those with you first thing in the morning. Should I expect any other disputes that will need to be taken up so that we can be sure and start by 8:30, given that Doctor Perryman is the last designated live witness from the Defendant?

MR. MUELLER: I don't expect any other disputes that should affect the morning at all, Your Honor. I hope the number of total disputes is minimal, but I don't expect any at all that should affect us starting on time.

THE COURT: They've been reduced over what they started out. I will say that.

Mr. Sheasby, can you tell me anything about your intended, if any, rebuttal case?

MR. SHEASBY: Yes, Your Honor. Right now we do reserve the option of recalling Mr. Kennedy and Doctor Madisetti, and perhaps, if we have time, we may play some video clips. And so right now there is still a potential full rebuttal.

THE COURT: That doesn't sound like you are going to leave any time on the table.

MR. SHEASBY: I am not going to leave any time on the table, Your Honor.

THE COURT: All right. Well, we have approximately just over five hours combined of trial time remaining. It's my hope that we can complete the trial time and take up and dispose of any motions under Rule 50(a) and deal with the updated charge I'm going to get this evening by 8:00 so that we could begin the Court's charge with the jury and proceed immediately into closing arguments on Friday morning. That may make for a very long day tomorrow. We'll see how the day goes.

Are there questions from either Plaintiff or Defendant before we recess for the evening?

MR. SHEASBY: Nothing from Plaintiffs, Your Honor.

MR. MUELLER: No, Your Honor.

THE COURT: We stand in recess until tomorrow morning.

(The proceedings were concluded at 6:15 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 08/10/2021

______________________________DATE______________
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER