IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OPTIS WIRELESS TECHNOLOGY, LLC, OPTIS CELLULAR TECHNOLOGY, LLC, PANOPTIS PATENT MANAGEMENT, LLC, UNWIRED PLANET, LLC, UNWIRED PLANET INTERNATIONAL LIMITED, PLAINTIFFS, | )( )( )( )( )( )( )( | CIVIL ACTION NO. 2:19-CV-66-JRG  MARSHALL, TEXAS |
| VS. | )( )( )( )( | |
| APPLE INC., DEFENDANTS. | )( )( | FEBRUARY 12, 2026 8:04 A.M. |

_____

REDACTED VOLUME 5, PAGES 1171 THROUGH 1351

REPORTER'S TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE RODNEY GILSTRAP,

UNITED STATES DISTRICT JUDGE, AND A JURY

_____

FOR THE PLAINTIFFS:         Mr. Jason G. Sheasby
                            Mr. Andrew Strabone
                            Irell & Manella LLP
                            1800 Avenue of the Stars
                            Suite 900
                            Los Angeles, CA 90067

                            Mr. Steven J. Pollinger
                            McKool Smith, PC
                            300 W. 6th Street
                            Suite 1700
                            Austin, TX 78701

                            Mr. Christopher P. Mcnett
                            McKool Smith, PC
                            1999 K Street, NW
                            Suite 600
                            Washington, DC 20006

FOR THE PLAINTIFFS:        Ms. Jennifer Truelove
                           McKool Smith, PC
                           104 E. Houston Street
                           Suite 300
                           Marshall, TX 75670

FOR THE DEFENDANT:         Mr. Joseph J. Mueller
                           Mr. Andrew Danford
                           Wilmer Cutler Pickering
                           Hale & Dorr, LLP
                           60 State Street
                           Boston, MA 02109

                           Mr. Mark D. Selwyn
                           Wilmer Cutler Pickering
                           Hale & Dorr, LLP
                           950 Page Mill Road
                           Palo Alto, CA 94304

                           Ms. Mary (Mindy) V. Sooter
                           Wilmer Cutler Pickering
                           Hale & Dorr LLP
                           1225 17th Street
                           Suite 2600
                           Denver, CO 80202

                           Ms. Brittany Amadi
                           Wilmer Cutler Pickering
                           Hale & Dorr LLP
                           1875 Pennsylvania Avenue, NW
                           Washington, DC 20006

                           Ms. Melissa R. Smith
                           Gillam & Smith, LLP
                           303 South Washington Avenue
                           Marshall, TX 75670

COURT REPORTER:            Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
                           Honorable Robert W. Schroeder III
                           United States District Judge
                           Eastern District of Texas
                           Texarkana Division
                           500 North State Line Avenue
                           Texarkana, TX 75501
                           shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Counsel, as I'm sure you are aware, the Court just emailed a minute or two ago the final jury instructions -- final jury instructions and verdict form to you.  Quite honestly, it took me longer to get it ready than I anticipated, notwithstanding work on it most of last evening and earlier this morning.

My intention -- I don't think you'll have any problem going to the areas where we weren't in agreement earlier -- or you weren't in agreement earlier.  So I'd like to propose that I give you 30 minutes to look at it, and then I'll be back and do the formal charge conference at that point.

Does anybody have a problem with that?

MR. MUELLER:  No, Your Honor.

MR. SHEASBY:  No, Your Honor.

THE COURT:  Okay.  There's one other thing I need to just clear the air and get taken care of while we're here.  Just a second.

All right.  We might as well take care of this while the rest of your trial team is reviewing the charge

and the verdict form.  And if there are any of you in the courtroom that are doing that review and you'd like to step out and do it outside the courtroom, that's fine.  I need to -- we need to have more than one thing going on at the same time.

Now, overnight, there was a filing on the docket with regard to DTX-0888.  Yesterday, with the cross-examination of Ms. Mewes, the Plaintiff attempted to use what looks like Page 1 of -- what's been marked as DTX-888 with Ms. Mewes.  There was an objection raised. The parties came to the bench.

The complaint was that this was a document that included references to Qualcomm and the Qualcomm license agreement with Apple.  There was an effort to redact it by Plaintiff.  The redactions weren't satisfactory to the Defendant.

The Court actually took the magic marker that was used to redact the first reference to Qualcomm and went through and redacted all other references to Qualcomm on that page.

Defendant didn't raise further objection at that point, and the document -- or that single page was then used as a part of Plaintiffs' cross-examination of Ms. Mewes as the corporate representative for Apple.

The filing overnight raises further disputes about

the entirety of the document marked as DTX-888 and how it should or shouldn't be used in closing arguments.

For some reason that I don't have an explanation for, Plaintiff represents that DTX-888 was included on Defendant's list of exhibits where each party is entitled to offer up to 30 exhibits, under the Court's standing order, of their own choosing.

Why Apple would have put this on their exhibit list and then raised the kind of objections to it that they did, I have no idea. But that be as it may, I have ruled consistently throughout this trial and as a part of leading up to this trial that in light of the Circuit Court's description of the Apple/Qualcomm settlement agreement, that I believe the Apple/Qualcomm license agreement was similarly situated and should be excluded from this trial.

The Plaintiff did not offer a damages model that included any comparable license agreements. That was not a part of Mr. Kennedy's approach whatsoever.

The Defendant offered a damages model based on comparable licenses, but they were different comparable licenses. And Dr. Perryman's position and testimony is that there weren't other comparable licenses, i.e., that the Qualcomm/Apple license isn't comparable.

Long story short, there's been no evidence that the Apple/Qualcomm license is comparable in this case. And

I have consistently, long before yesterday's effort by Plaintiff to use the first page of this document with Ms. Mewes on cross-examination, long before that, I have made it clear that the Apple/Qualcomm license was not going to come in as a part of this trial.

I personally view Plaintiff's efforts to use this on cross-examination as an attempt to get that license before the jury. The Plaintiff has made several attempts throughout the trial to get the Qualcomm/Apple license before the jury. I have denied every overt effort to do that brought to my attention.

Notwithstanding that the document has been injected into this case, as I've described. I am excluding DTX-888 from being used during closing argument. I am going to find that the use of the first page of it as redacted yesterday was a demonstrative use only. That it is not a pre-admitted exhibit in the case. It is not an admitted exhibit in the case.

And because it is replete and unavoidably populated with information regarding the Qualcomm/Apple licensing agreement, DTX-888 is out as far as in closing argument, and it is not properly used by either party.

So its use yesterday with Ms. Mewes is only -- I can't -- I can't undo that, and it was -- it was redacted. The problem with the redactions were that the name Qualcomm

was taken out yesterday on the fly in the middle of trial with the flying objections back and forth at the bench. But the numbers included on that page all are composite numbers, where the numbers attributable to Qualcomm are added into and a part of the ultimate totals that are reflected on there.

All of this being the case, the Court's ruling is that the use of the first page of what's been marked as DTX-888 with Ms. Mewes yesterday in redacted form was to be considered and is considered a demonstrative and not an exhibit.  DTX-888 is not an exhibit in this case, and it is not properly useable as a part of closing argument today.

That's the Court's ruling.

MR. SHEASBY:  Your Honor, may I ask two points of clarification?

THE COURT:  You may.

MR. SHEASBY:  I will not be arguing at all.  I accept the Court's ruling completely.

THE COURT:  What are you -- what are your questions, Mr. Sheasby?

MR. SHEASBY:  First, I just wanted to point out that I did seek leave to use the document before I had used it at all.  I didn't try to put it on the screen without first approaching the Court, and I wanted to make that clear on the record.

1178

And so how am I supposed to navigate the use of -- that extensive use of Mr. Kennedy's demonstrative that has the last page of it that doesn't refer to Qualcomm?  May I use the same Kennedy demonstrative?  It just has the totals without any names.

THE COURT:  Do you have that demonstrative that you can exhibit to me?

MR. SHEASBY:  I do, Your Honor.  It will take me one moment.

THE COURT:  That's fine.  Again, we're doing more than one thing at one time.  The review on the charge and the verdict form is ongoing.

MR. SHEASBY:  This is -- this is what was used with Mr. Kennedy.

MR. SELWYN:  Can you take that off of publishing?

MR. SHEASBY:  It's not on public.  They turned off the back screens.

THE COURT:  All right.

MR. SHEASBY:  I can hand it up to Your Honor.

THE COURT:  No.  Leave it on -- leave it on the ELMO.  The monitors in the gallery are off.

What's Defendant's position with regard to this request?

MR. SELWYN:  Your Honor, Mark Selwyn for Apple. We think the entire document should be out.  This second page of the document is inextricably linked to the first page of the document for the same reasons that Your Honor ruled that the portions of the document that don't refer specifically to Qualcomm are inextricably linked and should be out.

So too should the second page be out.  And for all the reasons that are stated in our brief, in addition to that, the transcript reflects that leave was not sought before the document was displayed yesterday.  And the entire document should be out for the reasons that are stated in our brief this morning.

THE COURT:  Do you have something to add, Mr. Sheasby?

MR. SHEASBY:  Yeah, I do.  That is an incorrect statement.  I approached the Court and showed the Court the document that I was going to use because I started asking Ms. Mewes, have you ever settled a case after -- have you ever paid a license after being found to infringe?

I walked up to --

THE COURT:  We're not talking about your cross-examination of Ms. Mewes now.  The point of reference

is your use of this page on the overhead projector with Mr. Kennedy.

MR. SHEASBY: Okay. I'll -- then I'll respond to that.

One, this was on their --

THE COURT: You didn't ask for leave to use this with Mr. Kennedy before you used it, did you?

MR. SHEASBY: I absolutely did, Your Honor. This was in the overnight slides that were sent. You approved its use after argument. It was used extensively with Mr. Kennedy. DTX-888 is on -- they chose DTX-888.

THE COURT: I understand that.

MR. SHEASBY: And the time -- at some level, and I understand the Court's sensitivity, this is a critical piece of evidence, and it doesn't say the number of people.

And so I would say that the idea that a jury -- I mean, this was talked about for, you know, 10 minutes by Mr. Kennedy, this whole -- it was a whole line of examination that he did.  And I don't see how at this point in time they can bar us from talking about evidence that came into the record after an overnight dispute.

I understand Your Honor in the clear light of day would have handled DTX-888 differently.  That is the prerogative of your court to make that decision.  This was the clear light of day.  This was heavily briefed overnight.  Mr. Kennedy talked about it extensively.

And I will note when Mr. Kennedy talked about this, not only was it not -- was it approved by the Court, they did not preserve an objection on this when he talked about it extensively.  There was zero objection to his testimony about the page of this document.

MR. SELWYN:  Your Honor, if I may briefly?

THE COURT:  Go ahead.

MR. SELWYN:  We never made an argument about a cap.  We never suggested there was a cap.  We never presented such an argument.  To the extent this was allowed at all after the chambers conference by the Court, it was because of an anticipation of a potential argument that Apple never made.  We never opened the door to anything about a cap or anything that would permit for this evidence

in DTX-888 in its entirety to come in.

MR. SHEASBY:  And that is once again inaccurate.



MR. MUELLER:  Your Honor, may I say one thing?

THE COURT:  You might as well, Mr. Mueller.

MR. MUELLER:  So I'd just say this.  The letter that Mr. Sheasby just showed on the screen actually has not been shown to the jury once over the course of this trial. We have, in part to stay away from sort of the contested issues in chambers, described the negotiations at a high level.

Yes, the $35 million is referenced actually by Mr. Blasius.  He was asked a question by Plaintiffs' counsel with respect to the amount offered.  We never showed that -- the jury that offer letter once.

As Mr. Selwyn said, we never relied on a cap once. It's essentially setting up a strawman based on a letter that's not been used and then saying here's another document that contradicts an argument we never made.

And what Mr. Sheasby just said is it's been used over and over and over again. The truth is, sir, this has never been used once over the course of this trial. Not over and over, not once.

MR. SHEASBY: So two things, he's a Judge. He's not --

THE COURT: Just a minute.

Mr. Mueller, you're referencing PX-541. Is that what you're referring to, then you say it's not been used once?

MR. MUELLER: Correct, Your Honor. We described the offers in narrative. We did not put the offers in front of the jury. I did not read that exhibit number. It didn't happen once.

MR. SHEASBY: This -- once again, inaccurate. This document was discussed by Mr. Kennedy without objection. They talked about the $35 million in opening.

And they never objected, not once.

MR. MUELLER:  I'll just say one last thing, Your Honor.  Mr. Sheasby keeps saying "they showed."  We did not show this letter to the jury once, not once.

We did not show this paragraph about a royalty cap once, not once.  And so the premise now is they should be allowed to rebut an argument that we have literally not made a single time over the course of the trial, not once.

THE COURT:  All right.  Anything else on this?

MR. SHEASBY:  Yes.  Once again, an inaccuracy.  PTX-541 was admitted without objection by Defendants to the jury yesterday.

MR. STRABONE:  Correction, Your Honor, it was admitted by Plaintiff --

MR. SHEASBY:  The Plaintiffs.

MR. STRABONE:  -- yesterday morning, no objection from Defendants.

THE COURT:  All right.  All right.  Just a moment.

What is it, Mr. Sheasby?

MR. SHEASBY:  Oh, I'm just standing here.  I've got nothing.

THE COURT:  All right.  Well, I guess -- I guess it's true that in a case of this complexity and with as many exhibits and as many disputes and arguments as have been presented, that it's unrealistic to think there will not be some irregularities or misfires that happen.

I've heard everything everybody has had to say. At the end of the day, I come back to the fact that early on in the preparation for this trial and before the jury was selected, I made it clear that the Apple/Qualcomm license agreement was not going to be a part of this trial.

Notwithstanding what's been used or attempted to inject or otherwise connected in some fashion with the evidence in this case, I am -- I am not changing or wavering from the direction that the Apple/Qualcomm license is not proper evidence.  It's not relevant, and it's misleading.

I'm going to exclude the use of DTX-888 as an exhibit.  I can't undo what was done with Ms. Mewes yesterday in a highly redacted form.  I am not going to permit the slide that's on the monitor now to be used in closing.

You can make your argument, but as far as a visual representation to the jury, Document -- DTX-888 or any portion of it is not going to be exhibited during the jury -- to the jury during closing argument.

That's the Court's ruling.

MR. SHEASBY:  Thank you, Your Honor.  I understand

the ruling.

THE COURT:  All right.  I'm going to give the parties another 5 or 10 minutes to continue to review the final jury instruction and verdict form.  And then I'll be back and conduct the formal charge conference.

The Court stands in recess.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

The Court's now prepared to proceed with the formal charge conference.  At the end of the evidence yesterday, the Court heard from both sides in this case with regard to any matters on which they would seek relief under Rule 50(a).

After presentation and argument, the Court ruled on all those matters.  Subsequent to addressing issues under Rule 50(a), the Court then met with counsel for all the parties in chambers informally and thoroughly reviewed the then most current iteration of the final jury instructions and verdict form.

As a part of that, the Court reviewed each of the areas indicated in that iteration where the parties were not in agreement.  The Court fully heard from both sides as to all those issues.  The Court also took that opportunity

to discuss other considerations regarding the style and formatting of the final jury instructions and verdict form with counsel.

In short, there was a fulsome discussion where anyone was fully able and permitted to raise any questions or raise any issues with regard to either the final jury instructions or verdict form.

After that fulsome discussion, the Court excused counsel and took into consideration all the input received, reviewed the various issues in dispute, and spent several hours working on what the Court believed should be the right resolution and presentation for this jury of the final instructions and the verdict.

The Court has subsequently furnished what it believes to be the proper and appropriate final jury instruction and verdict form to counsel.  Counsel have had an opportunity to review the same, and at this juncture, the Court is prepared to go forward with a review of both the final jury instructions and verdict form on the record and entertain any objections from either side.

Is Plaintiff prepared to go forward with the formal charge conference at this juncture?

MR. SHEASBY:  The Plaintiff is prepared, Your Honor.

THE COURT:  Is Defendant prepared to go forward

with the final charge conference?

MR. SELWYN:  Yes, Your Honor.

THE COURT:  All right.  As I think all parties are aware, the Court's usual and typical practice in this regard is to ask each side to provide a single spokesperson for their positions.  Those two counsel should be at the podium together.

The Court will then turn to the final jury instructions and call out each page of that document one page at a time and ask if there are any objections, at which point either party, through their counsel at the podium, can raise any objections they believe are appropriate.

The Court will follow the same practice with regard to the verdict form.  And by reviewing and hearing from the parties on each page of each document, the Court is satisfied that the likelihood of overlooking anything unintentionally is greatly reduced.

So with that, let's turn to the final jury instructions.

And, counsel, why don't you identify yourselves for the record and then we'll begin.

MR. STRABONE:  Thank you, Your Honor.  Andrew Strabone on behalf of the Plaintiffs.

MR. SELWYN:  Your Honor, Mark Selwyn on behalf of

Apple.

THE COURT:  All right.  Turning to the final jury instructions beginning with Page 1, are there objections here from either Plaintiffs or Defendant?

MR. STRABONE:  None from Plaintiffs, Your Honor.

MR. SELWYN:  None for Apple, Your Honor.

THE COURT:  Turning then to Page 2 of the final jury instructions, is there objection here from either side?

MR. STRABONE:  None from Plaintiffs, Your Honor.

MR. SELWYN:  None from Apple, Your Honor.

THE COURT:  Next is Page 3, are there any objections here?

MR. STRABONE:  None from Plaintiffs, Your Honor.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 4, are there any objections here?

MR. STRABONE:  None from Plaintiff, Your Honor.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 5, are there any objections here?

MR. STRABONE:  None from Plaintiff.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 6, are there any objections here?

MR. STRABONE:  None from Plaintiff.

MR. SELWYN:  And none from Apple.

THE COURT:  Turning to Page 7 of the final jury instructions, are there objections here from either party?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  And none from Apple.

THE COURT:  Turning to Page 8, are there any objections here, counsel?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  Your Honor, Apple has two sets of objections.  One related to the issue of willfulness and one issue -- one related to the issue of patent ineligibility.

THE COURT:  State your objections.

MR. SELWYN:  Apple objects to giving the jury an instruction on willfulness.  I'll note that we have stated this objection as to every mention of willfulness in the instructions.  I'll assume Your Honor doesn't want me to reurge this on every page that mentions willfulness.  So with the Court's permission, I would make this an omnibus objection to all mentions of willfulness in the instructions as well as the verdict form.

First, willfulness is moot.  As the Court previously recognized in denying Apple's Rule 50(b) motion following the first trial, quote, the issue of willfulness

is effectively moot because even though the jury found that Defendant's infringement was willful, the Court acting separately has previously declined to enhance damages under 35 U.S.C. 284, negating any tangible impact the Defendant from the jury's willfulness finding, end quote.  That's Docket 667 at 27.

Because willfulness has no practical effect on the relief that Plaintiffs can receive, Apple is unfairly prejudiced by the jury's consideration of willfulness, which may taint the jury's consideration of infringement and damages.

Second, enhancement is also barred by the mandate rule which further renders willfulness moot.  The Court previously determined that an enhancement was not warranted and Plaintiff failed to appeal that ruling.  Accordingly, there is no reason to retry willfulness now that enhancement has been resolved.

And third, the parties' pre-suit discussions are subject to a non-disclosure agreement that prohibits use of those communications, quote, to show notice, knowledge of, induced infringement, or willful infringement of any patent for damages.  That's on the record at Docket 192-3, Paragraph 4.

Because the Plaintiffs are barred by that non-disclosure agreement from using pre-suit communications

for willfulness and Optis has no other evidence that would support a willfulness claim, we would urge the Court not to instruct on that issue.

THE COURT:  Your objection is overruled, as has been the case each time you've raised it, and you've raised it multiple times throughout the trial.  The Court's ruling is the same for the reasons I've previously given.

What's your other objection here, Mr. Selwyn?

MR. SELWYN:  Thank you, Your Honor.

With respect to patent ineligibility, as Mr. Danford explained yesterday, Apple objects to submitting the Alice Step 2 question of patent eligibility to the jury.  Like claim construction under Teva against Sandoz, patent eligibility is a legal issue for the Court even where there are factual disputes.

To the extent the Court submits the Step 2 issue to the jury, we would respectfully ask that it do so on an advisory basis and reserve the ultimate decision to itself under Rule 52.

Your Honor yesterday mentioned the Berkheimer against HP Federal Circuit decision, but Berkheimer itself says, quote, whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts.

Accordingly, we submit that the factual issue,

like factual issues that bear on claim construction, remain for decision by the Court and nothing in Berkheimer would suggest otherwise.

THE COURT: All right. In regard to this objection, the Court has scrupulously attempted to apply the Circuit's guidance set forth on Page 14 of the Optis/Apple opinion rendered on June the 16th, 2025.

Further, the Court has given careful consideration to the guidance set forth in Footnote 11 to that opinion. The Court believes its instructions and verdict form in this regard comport with the guidance from the Federal Circuit, and consequently, your objection is overruled.

Let's continue. Let's turn to Page 9 of the final jury instructions. Are there any objections here from either party?

MR. STRABONE: None from Plaintiffs.

MR. SELWYN: None from Apple.

THE COURT: Turn then to Page 10, are there any objections here?

MR. STRABONE: None from Plaintiffs.

MR. SELWYN: None from Apple.

THE COURT: Next is Page 11, are there any objections here?

MR. STRABONE: None from Plaintiffs.

MR. SELWYN: And none from Apple.

THE COURT:  Next is Page 12, are there any objections here?

MR. STRABONE:  Yes, from Plaintiffs, Your Honor.

THE COURT:  State your objection.

MR. STRABONE:  Your Honor, I have three objections.

One, No. 6, we think that the Court should instruct the jury that the patents are standard essential. This would be consistent with the Court's opening instruction where the Court told the jury that the patents are standard essential.  It would also be consistent with Federal Circuit's ruling in this case on appeal that the patents are standard essential patents.

THE COURT:  That objection is overruled.

MR. STRABONE:  Thank you, Your Honor.

THE COURT:  State your next objection.

MR. STRABONE:  Second objection is that the jury should be informed of the specific ETSI definition of essentiality as set out in our proposed jury instructions, and the specific ETSI explanation -- actually I'll stop there.  That's the second objection, Your Honor.

THE COURT:  That objection is overruled.

MR. STRABONE:  Thank you, Your Honor.

And then third, the jury should be informed of the specific ETSI instruction that the FRAND obligation only

attaches to patents that are, become, and remain essential to the standard.

THE COURT:  That is also overruled.

Anything further on Page 12?

MR. SELWYN:  Nothing from Apple, Your Honor.

MR. STRABONE:  None from Plaintiffs, Your Honor.

THE COURT:  Then we'll turn to Page 13 of the final jury instructions.  Are there any objections here?

MR. STRABONE:  None from Plaintiffs, Your Honor.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 14, are there any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 15, are there any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Turning next to Page 16, are there any objections here, counsel?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 17, any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

1196

THE COURT:  Next is Page 18, are there any objections here?

MR. STRABONE:  Yes, Your Honor, from Plaintiffs.

THE COURT:  State your objection, Plaintiff.

MR. STRABONE:  Your Honor, the jury should be instructed that if an accused product practices the standard, then infringement can be proven by comparing the asserted claims to that standard.

THE COURT:  That objection is overruled.  Anything further?

MR. STRABONE:  None from Plaintiffs, Your Honor.

THE COURT:  Anything from Apple on Page 18?

MR. SELWYN:  No, Your Honor.

THE COURT:  Then we'll turn to Page 19, any objections here, counsel?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 20, any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 21, any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  None from Apple.

THE COURT:  Next is Page 22, any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  Your Honor, Apple has two sets of objections.

THE COURT:  State your objections.

MR. SELWYN:  First relates to the instruction on induced infringement.  Apple objects to any instruction on induced infringement being given.

As Mr. Danford explained yesterday in Apple's motion for judgment as a matter of law under Rule 50(a), Optis has failed to provide any evidence of several elements of an active inducement theory of infringement, including direct infringement by a third party, knowledge of or willful blindness to, the fact that the third-party's actions constitute direct infringement, specific intent to induce such infringement, and any steps taken by Apple to encourage such infringement.  Accordingly, Apple objects to any instruction being given regarding active inducement as unsupported by the evidence.

THE COURT:  That's overruled.

What's your next objection?

MR. SELWYN:  Apple also objects to the Court's failure to instruct the jury that in connection with indirect infringement, the jury must not consider pre-suit discussions.  The parties' pre-suit discussions, as mentioned, are subject to a non-disclosure agreement that prohibits use of those communications, quote, to show

knowledge -- to show notice, knowledge of, induced infringement or willful infringement of any patent or damages. The Plaintiffs' use of the parties' pre-suit discussions to establish knowledge of the patents or the alleged infringement for purposes of induced infringement would violate the NDA as the Court indicated during trial. We refer to transcript Page 529, Lines 5 through 8.

The jury should be told that they cannot use the parties' pre-suit discussions for a purpose that would violate the parties' non-disclosure agreement. This is consistent with the non-disclosure agreements Paragraph 16 which provides that a remedy for the breach of the NDA is specific -- specific performance.

Accordingly, we would respectfully urge that the Court give the jury the following proposed instruction, quote, in evaluating Apple's awareness of the asserted patents and awareness of its alleged infringement for this purpose, you must not consider any evidence about the parties' discussions before Plaintiffs filed this lawsuit on February 25th, 2019.

THE COURT: That objection is overruled.

Anything further from either party on Page 22?

MR. STRABONE: None from Plaintiffs.

MR. SELWYN: And none from Apple.

THE COURT: Then we'll turn to Page 23 of the

final jury instructions.  Are there any objections here?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  Your Honor, we have a similar objection as we just urged, if I may.  As I mentioned in connection with indirect infringement, Apple objects to the failure to instruct the jury that in connection with willfulness, the jury must not consider pre-suit discussions.

The points I made with respect to indirect infringement apply just as much to willfulness because the non-disclosure agreement prohibits use of pre-suit communications under the NDA, quote, to show knowledge -- to show notice, knowledge of, induced infringement, or willful infringement of any patent or damages.

Accordingly, we would respectfully urge the Court to give the jury the following proposed instruction, quote, in evaluating Apple's awareness of the asserted patents and awareness of its alleged infringement for this purpose, you must not consider any evidence about the parties' discussions before Plaintiffs filed this lawsuit on February 25th, 2019.

THE COURT:  Same ruling, overruled.

Anything further on Page 23?

MR. STRABONE:  None from Plaintiffs, Your Honor.

THE COURT:  Anything further from Apple?

MR. SELWYN:  Not on Page 23.

THE COURT:  Then we'll turn to Page 24.  Are there any objections here from either party?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  Apple has an objection, Your Honor.

THE COURT:  State your objection.

MR. SELWYN:  Apple objects to the Court's instruction, quote, knowledge of the existence of a patent or a patent family can be relevant to the question of willful infringement.  For example, if Apple knew of the existence of a patent or subjectively believed that there was a high probability that a patent existed and took deliberate actions to avoid learning of the patent, you may take this into account when considering willfulness.

Apple objects to this instruction because it suggests that willful infringement may be established absent knowledge of the asserted patent and knowledge of the alleged -- knowledge of the alleged infringement and that knowledge of a mere patent family is enough.  This is contrary to controlling Federal Circuit precedent, such as the Bayer Healthcare against Baxalta decision 989 F.3d 964.

This instruction also incorrectly includes the test of willful blindness from the context of active inducement, which is not relevant to the question of willful infringement.

THE COURT:  Your objection is overruled.

Anything further on Page 24?

MR. STRABONE:  None from Plaintiff, Your Honor.

MR. SELWYN:  None from Apple.

THE COURT:  And we'll turn to Page 25.  Any objections here from either party?

MR. STRABONE:  Not an objection, Your Honor, but I believe a correction is needed in the penultimate line.  It says "hypothetical ordinary skill."  I think perhaps hypothetical person of ordinary skill is what was meant there.

THE COURT:  I see that is a suggestion that the Court remove "a hypothetical," so that it would read:  You must consider the level of ordinary skill.

MR. STRABONE:  No objection, Your Honor.

THE COURT:  Apple have any objection to that correction?

MR. SELWYN:  Your Honor, would you mind rereading that, please?

THE COURT:  That would mean with that proposed adjustment at the bottom of Page 25, at the last paragraph, which is a single sentence, would read:  In determining whether a claimed invention is patent ineligible, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the

invention was made or the patent was filed.

MR. SELWYN:  No objection, Your Honor.

THE COURT:  All right.  I'll make that adjustment.

Is there anything else before we move on?

MR. SELWYN:  Not on Page 24 for Apple.

MR. STRABONE:  We're on Page 25.

MR. SELWYN:  Oh, on Page 25 we do have two objections, Your Honor.

THE COURT:  Then state your objections on Page 25, or related to Page 25.

MR. SELWYN:  First, Your Honor, Apple objects to the Court's failure to provide the following instruction to the jury:  You may not consider the additional elements of Claim 7 of the '332 patent in your analysis because the added elements in Claim 7 are abstract ideas.

Apple believes that instruction should be given and objects to the failure to explain clearly for the jury that Claim 7 adds only other abstract ideas and thus shouldn't be considered in the Alice Step 2 inquiry.

Optis acknowledged that the added elements of Claim 7 are a mathematical formula, and we would refer to Docket 777 at Page 1, Paragraphs 1 and 2.  Therefore, the jury's analysis at Alice Step 2 should focus exclusively on Claim 6.  The proposed language is necessary to ensure the jury understands that Claim 7's additional limitations are

themselves abstract and thus cannot be considered in the Alice Step 2 analysis.

Accordingly, we would respectfully ask that the Court instruct the jury, quote, you may not consider the additional elements of Claim 7 of the '332 patent in your analysis because the added elements in Claim 7 are abstract ideas.

THE COURT:  That's overruled.

Anything else here?

MR. SELWYN:  Yes, Your Honor.  In addition, Apple objects to the Court's failure to instruct the jury as follows.  We would respectfully ask that this instruction be given, quote, here the remaining components of Claims 6 and 7, after removing the mathematical formula are, colon, a user equipment for decoding control information, the UE comprising, colon, a receiver for receiving a physical downlink control channel, parentheses, PDCCH, close parentheses, from a base station at subframe k, semicolon, and a decoder for decoding a set of PDCCH candidates within a search space of the PDCCH at the subframe k, comma, wherein each of the set of PDCCH candidates comprises L control channel elements, parentheses, CCES, close parentheses, wherein the -- wherein the LCCEs corresponding to a specific PDCCH candidate among the set of PDCCH candidates of the search space at the subframe k, close

quote.  We would urge that that instruction be given.

THE COURT:  That objection is overruled.  The Court, again, believes and has used its best efforts to fully comply with the guidance provided by the Federal Circuit in Footnote 11 to the Optis versus Apple decision from June the 16th, 2025.

The Court does not believe that the Circuit's guidance requires it to specifically call out what Apple raises -- what Apple raises in this objection.  Consequently, the objection is overruled.

All right.  We're still on Page 25 of the final jury instructions.  Are there any other objections here from either party before we move on?

MR. STRABONE:  None from Plaintiffs.

MR. SELWYN:  Nothing from Apple.

THE COURT:  Then we'll move on to Page 26.  Are there any objections here?

MR. STRABONE:  Yes, Your Honor.  The last sentence in 26, starting "in addition," through the end of the paragraph.  As set out in our proposed jury instructions, we object to this instruction as not being relevant to the facts of this case, and, therefore, being confusing, prejudicial, and irrelevant, and should not be given to the jury.

THE COURT:  And you're talking about that sentence

that ends on the last line of Page 26 and carries over to the first four lines of Page 27?

MR. STRABONE:  Right, that sentence and the one that starts right after it, "likewise merely limiting."  So those two sentences together, Your Honor.

THE COURT:  All right.  That objection is overruled.

MR. STRABONE:  Thank you, Your Honor.

THE COURT:  Anything else on Page 26, counsel?

MR. STRABONE:  Nothing from Plaintiffs.

MR. SELWYN:  Nothing for Apple.

THE COURT:  All right.  Well, turn to Page 27.  Any objections here that haven't already been raised?

MR. STRABONE:  Yes, Your Honor.  In the middle paragraph, the paragraph starts:  If you find that Apple has not infringed.  The second sentence states:  If you find that Apple has only infringed the '332 patent but that both Claim 6 and 7 are unpatentable, then Optis is not entitled to damages.

We think after "damages," it should say "for that patent" or "for the '332 patent."  We just think that would be more clear for the jury that it's specific to that patent.

THE COURT:  I agree with that.  I'm going to grant that objection, and at the end of the second sentence in

the middle paragraph, I'll add after the word "damages,"
"for the '332 patent."

Anything else on Page 27?

MR. STRABONE:  No.  Thank you, Your Honor.

THE COURT:  Any objections on Page 27 from
Defendant?

MR. SELWYN:  No, Your Honor.

THE COURT:  Then we'll turn to Page 28.  Any
objections here from either party?

MR. STRABONE:  Nothing from Plaintiffs.

MR. SELWYN:  Your Honor, Apple does have one
objection.  This is one that we didn't discuss yesterday
because Apple didn't raise it in chambers.  So if you'll
indulge me.  We object to the language at Line 2 that
reads:  In this case, Optis seeks damages in the form of a
reasonable royalty.  We would ask that that be rephrased as
Optis seeks damages in the form of what it claims to be a
reasonable royalty.

THE COURT:  I'm happy to indulge you, Mr. Selwyn.
Your objection is overruled.

Anything else on Page 28?

MR. STRABONE:  Nothing from Plaintiffs, Your
Honor.

MR. SELWYN:  Nothing more from Apple.

THE COURT:  Turn then if you will, counsel, to

Page 29 of the final jury instructions.  Are there any objections here?

MR. STRABONE:  We would just re-raise the objection earlier about the patents being -- the jury being informed that the patents are standard essential patents.

THE COURT:  Same ruling.  That's overruled.

MR. STRABONE:  Thank you, Your Honor.

THE COURT:  Anything from Apple on Page 29?

MR. SELWYN:  Yes, Your Honor.  We have two sets of objections.

THE COURT:  State your objections.

MR. SELWYN:  First, we object to the sentence that reads:  The profits may be considered, but you should not limit or increase the royalty based on the actual profits made.

Apple objects to giving the jury that instruction as a specific callout in isolation from the other Georgia-Pacific factors.  Profits are not an available remedy for utility patent infringement.  The permissible considerations of Apple's profits is adequately addressed in the discussion of the Georgia-Pacific factors.

THE COURT:  That was included to try and balance the equities between the parties and to avoid the jury being misled that the excessively high number shown during the evidence as profits would be disadvantageous to Apple.

But nonetheless, I think it's an appropriate instruction and I'll overrule your objection.

Anything else on Page 29?

MR. SELWYN:  Yes, Your Honor.

With respect to the last paragraph on Page 29, we appreciate that the Court has added the language at the top of Page 30, but with respect, we would suggest that it's not sufficient because it does not fully address what occurred in court.

Apple objects to the omission of an instruction to the jury that the Court has made no finding that Plaintiffs are in compliance with their FRAND obligation.  We believe that that instruction is necessary because Plaintiffs stated in multiple improper speaking objections that Plaintiffs were found to be in compliance with their FRAND obligations.  That's incorrect.

While the Court declined to provide a curative instruction in the moment, the Court indicated that it could address that issue through final jury instructions, and Apple objects to the failure to provide a more express instruction to the jury that the Court made no finding that Plaintiffs are in compliance with their FRAND obligations.

THE COURT:  In other words, you like what I did, you just don't like it enough?

MR. SELWYN:  That's one way of putting it.  We

think that -- we appreciate you having added that, but we think that it's insufficient.

THE COURT:  All right.  Your objection is overruled.

Anything else before we move on?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

MR. SELWYN:  Nothing from Apple.

THE COURT:  Then we'll move to Page 30 of the final jury instructions.  Are there any unenunciated objections here?

MR. STRABONE:  Yes, Your Honor.

THE COURT:  State your objection.

MR. STRABONE:  The very first paragraph starting the issue of whether.  In this case Apple has not alleged that there's a violation of FRAND compliance.  We think that this paragraph is unnecessary.

Alternatively, the jury should be informed that Apple has not alleged that there's been a violation of FRAND compliance by the Plaintiffs.

THE COURT:  That's overruled.  As I have made clear to the parties throughout the trial, there is no allegation of a contractual breach of FRAND between the parties.  However, the jury must still consider whether the negotiations, the offers, the numbers exchanged between the

parties are or are not FRAND, both as put forward by Mr. Kennedy for the Plaintiff and by Dr. Perryman for the Defendant.

I think the instruction is accurate.  Your objection is overruled.

MR. STRABONE:  Thank you, Your Honor.

THE COURT:  Anything further on Page 30?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

THE COURT:  Anything further on Page 30 for Defendant?

MR. SELWYN:  No, Your Honor.

THE COURT:  We'll turn to Page 31.  Any objection here?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

MR. SELWYN:  Nothing from Apple.

THE COURT:  All right.  Anything on Page 32?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

MR. SELWYN:  And nothing from Apple.

THE COURT:  And as you're aware, counsel, Pages 31 and 32 include specific factors from the Georgia-Pacific factors.  I gather by your lack of objection, both parties agree these are the appropriate Georgia-Pacific factors for

use in this case with this jury?

MR. STRABONE:  Plaintiffs agree, Your Honor.

MR. SELWYN:  As does Apple.

THE COURT:  Okay.  Then let's turn to Page 33.
Are there any objections here from either party?

MR. STRABONE:  No objection, Your Honor.

MR. SELWYN:  Your Honor, Apple has an objection
with respect to the comparable license instruction.

THE COURT:  State your objection.

MR. SELWYN:  Apple objects to the Court's not
providing the full instruction that Apple had proposed.
Apple's proposed construction is as follows:  Comparable
license agreements are one factor that may inform your
decision as to the proper amount and form of a reasonable
royalty award similar to the way in which the value of a
house is determined relative to comparable houses sold in
the same neighborhood.

Whether a particular license agreement or other
transaction is comparable to the hypothetical license
depends on many factors, such as whether they involve
comparable technologies, comparable economic circumstances,
comparable structures, and comparable scope.

If there are differences between a license
agreement and the hypothetical license, you must take those
differences into account when you make your reasonable

royalty determination. To the extent that an agreement is not comparable to the hypothetical license to the asserted patent, it should not be used to determine the amount or form of any reasonable royalty award.

If a party relies upon licenses as evidence that licensees paid a particular royalty rate for the licenses to a patent, the licenses individually or in combination must show that licensees were paying a particular rate, agreed to pay a particular rate, or agreed that a particular rate was a reasonable royalty.

We would respectfully ask that that full instruction be given.

THE COURT: All right. Your request and your objection are overruled.

Anything further on Page 33?

MR. STRABONE: Nothing from Plaintiffs.

MR. SELWYN: Nothing from Apple.

THE COURT: Turn, if you will, then to Page 34. Are there any objections here?

MR. STRABONE: Nothing from Plaintiff.

MR. SELWYN: Nothing from Apple.

THE COURT: Turn to Page 35, any objections here?

MR. STRABONE: Nothing from Plaintiff, Your Honor.

MR. SELWYN: Nothing from Apple.

THE COURT: Next is Page 36, any objections here?

1213

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. SELWYN:  Nothing from Apple.

THE COURT:  Next is Page 37, any objection here?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. SELWYN:  And nothing from Apple.

THE COURT:  Next is Page 38, any objection here?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. SELWYN:  Nothing from Apple.

THE COURT:  Lastly is Page 39, any objection here?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. SELWYN:  Nothing from Apple.

THE COURT:  All right.  Counsel, that completes a review of the final jury instructions.

We'll turn next to the verdict form.  We'll follow the same approach.

If you will, look at Page 1 or the cover page to the verdict form, is there any objection here from either party?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

MR. SELWYN:  Your Honor, may Mr. Danford address the verdict form issues?

THE COURT:  That's fine.  I'll allow you to --

MR. SELWYN:  I apologize.

THE COURT:  -- tag out.

MR. SELWYN:  Thank you.

MR. DANFORD:  Nothing from Apple.

THE COURT:  Thank you.

All right.  Turn to Page 2 of the verdict form. Any objections here, counsel?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. DANFORD:  Nothing from Apple.

THE COURT:  Page 3, any objection here?

MR. STRABONE:  Nothing from Plaintiffs.

MR. DANFORD:  Nothing from Apple.

THE COURT:  All right.  Turning to Page 4 where Question 1 is located, any objections here?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. DANFORD:  Your Honor, Apple objects to the failure to break out the infringement question into literal infringement and infringement under the doctrine of equivalents for the '557 and the '774 patents.  Plaintiffs have urged both literal infringement and infringement under the doctrine of equivalents.  Breaking out the two theories is important to ensure the jury communicates which theory, if any, it accepts and will facilitate further review by this Court and on appeal.

THE COURT:  That objection is overruled.

Anything further on Page 4?

MR. DANFORD:  Nothing further.

THE COURT:  All right.  Turning to Page 5, which is the extension of the first question, any objections on Page 5, counsel?

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

MR. DANFORD:  With respect to Page 5, we would reurge the same objection under the doctrine of equivalents, but nothing further.

THE COURT:  All right.  Same ruling there.

Turn to Page 6 where Question 2 is found, are there objections here by either party?

MR. STRABONE:  Nothing from Plaintiff, Your Honor.

MR. DANFORD:  Your Honor, Apple has two objections.  For the reasons stated in connection with the jury instructions, Apple objects to asking the jury to decide Alice Step 2 on anything but on an advisory basis because patent eligibility is a question for the Court.

And the second objection that we have is we believe that the question, as phrased, should state:  The claim elements, after removing the abstract mathematical formula.

As is stated right now, the -- the question does not accurately reflect the question the jury will have to decide because it does not instruct to remove the abstract mathematical formula.

THE COURT:  I think that's a constructive suggestion, Mr. Danford, and I'll add that language to Question 2.

With that suggestion and as modified pursuant to that suggestion, Question 2 would then read:  Has Apple proven by clear and convincing evidence that the claim elements of the asserted claims of the '332 patent, after removing the abstract mathematical formula, when considered individually or as an ordered combination are well-understood, routine, and conventional to a person having ordinary skill in the art.

Does that comport with your suggestion?

MR. DANFORD:  Thank you, Your Honor.  Yes, that resolves our second objection.

THE COURT:  All right.  Is there anything else from either party on Page 6 of the verdict form?

MR. STRABONE:  Nothing from Plaintiffs.

MR. DANFORD:  Nothing further from Apple.

THE COURT:  Let's turn to Page 7 where Question 3 is found.

MR. STRABONE:  Nothing from Plaintiffs, Your Honor.

THE COURT:  I'm sure Apple is going to object as you have consistently.

MR. DANFORD:  For the reasons stated in connection

with the jury instructions, Apple objects to asking the jury to decide willfulness.

THE COURT:  Understood.  Same ruling, your objection is overruled.

Assuming there's nothing further, we'll turn to Page 8 of the verdict form where Question 4 is found.  Are there objections here, counsel?

MR. STRABONE:  Yes, Your Honor.  For Plaintiffs, Plaintiffs believe that at the end of the question, the words for the accused products, should be added.  It'll add clarity to the jury that they are providing damages for the accused products that were discussed in this case, which are iPhones, Apple Watches and iPads sold -- made before 2019.

THE COURT:  All right.  That objection is overruled.

Anything else from either party here?

MR. DANFORD:  Your Honor, Apple has two objections.  First, we believe that the question to the jury on the amount of damages should reference the FRAND royalty and should state:  What sum of money do you find by a preponderance of the evidence would be a fair, reasonable, and non-discriminatory FRAND royalty to be paid by Apple to Optis for the sales beginning February 25th, 2019.  You must answer for each product and also provide a

total below.

THE COURT:  That objection is overruled.

MR. DANFORD:  And the second objection that we have to Question 8 is that the question does not provide a total below, which we think is confusing in the context of the question that follows, which refers to the total.

THE COURT:  That's overruled, as well.

I will tell you, counsel, with regard to Question 4, for some reason in the printing, the answer line for the '332 patent is out of proportion to the other answer lines for the other patents.  I'm going to correct that and make the line for a potential answer on the '332 patent the same.

And then the answer line for the '833 patent somehow seems to have wandered on to the top of the next page, and I'll put all of Question 4, including the instruction to proceed to the next page, within the bounds of Page 8.

If anybody has an objection to that adjustment, let me know.  Otherwise, that's what I intend to do.

MR. STRABONE:  Thank you, Your Honor.

MR. DANFORD:  No objection.

MR. STRABONE:  I do want to clarify a statement I just made on the record.  I referred to specific products made prior to 2019.  I intended to say released prior to

2019.

THE COURT:  All right.  That doesn't change the Court's ruling.

MR. STRABONE:  Thank you, Your Honor.

THE COURT:  All right.  With that, the little bit that's on the top of Page 9 will be incorporated on to Page 8.

So I'll ask you to turn to Page 10 of the verdict form, and I'll ask if there's an objection here regarding Question 5.

MR. STRABONE:  No objection from Plaintiffs, Your Honor.

MR. DANFORD:  Your Honor, Apple's only objection is the corollary to the point I just made that Question 5 refers to the total amount, and as such should have a total amount provided in Question 4.

THE COURT:  I just disagree that it's necessary for the jury to do the addition that you're asking for on Question 4.  It does refer to Question 4 and the total of what was awarded there, I don't think that's necessary.

I don't think what you're suggesting is necessary, and so I'm going to overrule your objection.

All right.  Let's turn to Page 5, which is the final page of the verdict form.  Any objections here from either party?

MR. STRABONE:  No objection from Plaintiffs, Your Honor, on.

MR. DANFORD:  No objection from Apple.

THE COURT:  Thank you, counsel.

That will complete the formal charge conference. I'll make the adjustments as indicated on the record.  I'll print eight copies of the final jury instructions and a single clean copy of the verdict form to deliver to the jury when they retire to deliberate.

Then I will be back on the bench as soon as that's possible, and we'll proceed with bringing in the jury, letting the Court give its final instructions and hearing closing arguments from counsel.

MR. SHEASBY:  Your Honor, there are three issues with the closing demonstratives that I'd like to address.

THE COURT:  I haven't had a chance to look at those.  I'll be back on the bench, and we'll address those before I bring in the jury.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  The Court stands in recess.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Counsel, before we go any further, let me stop and

ask if the parties are prepared to read into the record any exhibits used during yesterday's portion of the trial from the list of pre-admitted exhibits.  If so, let's do that.

MS. TRUELOVE:  Your Honor, we don't have any exhibits to move in from yesterday's portion, we, being Plaintiff.

But in preparation for closing arguments today, we discovered we inadvertently left off three exhibits that were used with Mr. Kennedy.  If it pleases the Court, I would like to read those into the record now.

THE COURT:  Have you disclosed that to Ms. Smith on behalf of Defendant?  Is there any objection?

MS. TRUELOVE:  We did.

MS. SMITH:  No objection, Your Honor.

MS. TRUELOVE:  We did, Your Honor, yes.

THE COURT:  Then let's make a note of that for the record, please, Ms. Truelove.

MS. TRUELOVE:  All right.  It's three exhibits, Your Honor, PX-491, PX-494, and PX-1146.

THE COURT:  All right.  And without objection, those will be admitted.

MS. TRUELOVE:  Thank you, Your Honor.

THE COURT:  Are there any exhibits from the Defendant, Ms. Smith, to read into the record from yesterday's portion of the trial?

MS. SMITH:  Yes, Your Honor.  Your Honor, Apple used DTX-1060, DTX-101, 167, 429, 452, 1931, and 1947.

THE COURT:  All right.  Any objection from Plaintiffs, Ms. Truelove?

MS. TRUELOVE:  There's no objection to that -- to that rendition, Your Honor.

Defendants also used PX-0009 yesterday, and I don't believe there's an objection to that being included in the record either.

MS. SMITH:  No objection, Your Honor.

THE COURT:  All right.  Duly noted.

Thank you, counsel.

Counsel, there apparently have been three demonstrative slides exchanged between the parties that were not used during the trial, and Plaintiffs have raised objections as to three newly created demonstrative slides that apparently Defendant intends to use in its closing argument.

I have each of those three slides.  I've reviewed them.  You've made the Court aware of the parties' respective positions with regard to those slides.  I will simply say in an effort to be efficient and save time, I don't see any compelling merit to the objections raised by the Plaintiffs.  And I'm going to overrule their objections to those three slides.  And I'm going to permit the

Defendant to use them in closing argument.

These are identified in the bottom right-hand corner as DDX-11.2, DDX-11.4, and DDX-11.36.

Any questions?

MR. SHEASBY:  No questions, Your Honor.  Thank you.

MR. MUELLER:  No questions, Your Honor.  We had a few objections to the Plaintiffs' slides that we'd like to raise.  We received about 250 slides this morning.  And we have a handful of objections to raise for Your Honor, and Ms. Sooter can raise those.

THE COURT:  Why have I not seen those slides?  I asked to bring the disputed slides to chambers so that I could review them.  I mean, I got the ones that you objected to from Plaintiff.  Why didn't I get anything else?

MS. SOOTER:  Your Honor, we were working on putting together a joint list for the Plaintiff, but we hadn't heard back yet, so we're happy to address them now or to send them quickly over.  Our list is ready.  We can send it to you.  But I can address it with the ELMO, if you'd like.

THE COURT:  Let me ask you this, Ms. Sooter.  How many proposed -- newly proposed and not used previously demonstratives that you're objecting to?  How many more are

we talking about?

MS. SOOTER:  Of the objections?  So of the 250, we received well over a hundred new slides, probably 200, but we only have objections to maybe 10.  They fall into fewer buckets than that.

THE COURT:  Well --

MS. SOOTER:  So four or five objections.

THE COURT:  -- maybe I'm confused.  I asked my staff to get the disputed new demonstratives from the parties so I could review them when I was in chambers. They brought me back these three that I talked about. These are three that apparently Apple objected to that Plaintiff intended to -- these are three that Apple intended to use that Plaintiff objected to.

Why was I not given slides that Defendant wants to object to?

MR. MUELLER:  Your Honor, I'll just note, we received response to our objections from the Plaintiff -- I'm looking at the email right now -- four minutes ago at 9:39.

MR. SHEASBY:  Your Honor, that's inaccurate.  I sent a response over 20 minutes ago.

MR. MUELLER:  Your Honor, I'm literally reading the email.  It's from Ms. Carson at 9 --

THE COURT:  You know, gentlemen, you have fought

like cats and dogs throughout this entire trial.  You have accused each other of making misrepresentations and telling outright lies back and forth.  I understand there's a lot at stake here.  I understand this is a hard-fought trial.

But it doesn't mean that you have to jettison all pretense at professionalism.  And this kind of back and forth personal attack is distasteful to the Court, and it reflects poorly on our profession as a whole.  And it reflects poorly on each of you individually and your firms.

I have listened to it for a week basically, and it's been replete in every discussion more or less through the entirety of this trial.  At some point, the Court's patience just runs thin.

Apparently, you can't and won't agree with each other that the sun rises in the east and sets in the west. It's ridiculous.

Nonetheless, we need to move this process forward. I have a jury that's been in the jury room since 8:30 this morning.  It's now 9:45.  I need to get them in here, give them my instructions, and hear your closings.

If there are newly produced slides that are in dispute, serious material dispute, let's get it over with as quickly as we can, but I can't rule on what I don't know about.

Now, let me ask this question.  I have the three

slides that Defendant intends to use in closing that Plaintiffs objected to.  I've overruled those objections on those three slides.

Are there any other slides that Defendant intends to use that Plaintiff has additional objections to that I've not seen or heard about?

MR. SHEASBY:  No, Your Honor.

THE COURT:  All right.  How many newly produced demonstrative slides are used in closing by Plaintiff does Defendant have objections to, and how do we get through those expeditiously?

MS. SOOTER:  I'm happy to show them to you on the -- I'm happy to hand them up, Your Honor.

THE COURT:  If you have a copy, why don't you hand them up?

MS. SOOTER:  Yeah, let me just write down the numbers so I can have the electronic copy, and I'll give you the paper copy.  I would put them on the ELMO, but they're -- but they're confidential.

THE COURT:  The monitors are off in the gallery as I understand it.

MS. SOOTER:  Oh, okay.  I'm happy to put them up, then, Your Honor.

THE COURT:  Do you have an extra hard copy that you can hand me?  If you don't, tell me.

MS. SOOTER:  Let me check one second.  Oh --

MR. MUELLER:  May I approach, Your Honor?

THE COURT:  You may.

All right.  Ms. Sooter, I have a binder with a few hundred pages in it.  You want to walk me through what the actual disputes are?

MS. SOOTER:  Yes, Your Honor.

So for PD2.19, this --

THE COURT:  Just a moment.  I'd like to find it in the hard copy, as well.  PD2.19, all right.

MS. SOOTER:  Yes, Your Honor, this comes from a document not in evidence.

MS. CARSON:  May I respond, Your Honor?

THE COURT:  What's your response, Ms. Carson?

MS. CARSON:  This was published to Dr. Rodermund at Transcript cite 860, 10 through 23, during his cross-examination.  Mr. Sheasby asked him some questions about it.

THE COURT:  Just a moment.

My instructions to counsel were that if a demonstrative had been used during the trial with a witness, then there had been an opportunity for the objection to be raised earlier.  There was no need to go through that again for closing arguments.  I instructed that if there were demonstratives newly generated for

closing argument that had not been used with a witness during the trial, then those were subject to objection, and I would consider the objections that arose after you exchanged those newly created demonstratives.

If you're telling me this was used with a witness during the trial, why is it before me now?

MS. SOOTER:  So, Your Honor, this was excluded during opening.  We don't have a copy of any electronic demonstrative that they used, and Mr. Rodermund does not recall it being used with him.

THE COURT:  So we can't agree whether this has been used with the witness or not --

MS. SOOTER:  True.

THE COURT:  -- in keeping with my earlier observation.

Do you have anything else to say about this, Ms. Carson?

MS. CARSON:  Yes, so Your Honor, if we look at Transcript 860, 10 through 23.  I have them on my laptop if you'd like to see.

MR. SHEASBY:  Yeah, show them on the ELMO.

THE COURT:  Counsel, we're not going to take hours to go through this.  I have a jury waiting in the jury room.  This is not going to devolve into a long drawn-out fight back and forth.  I want a concise statement of your

positions, and I'll give you a ruling.

MS. CARSON:  So this is where it was discussed on the record.  It explicitly references this portion, and then Mr. Sheasby asked to publish the document, and the Court allowed it to be published.

THE COURT:  And are you telling me that what was published to the jury with Mr. -- or Dr. Rodermund is exactly what's shown on this slide?

MS. CARSON:  The document as a whole was published with that highlighted, and we created a demonstrative of the portion that was highlighted, which is why we exchanged it.

THE COURT:  So if that's the case, Ms. Sooter, why do you say this is something that's not in evidence or hasn't been used?

MS. SOOTER:  We simply didn't have this slide. This was a newly created slide, and because they had never shown this to us before in this form or -- and Mr. Rodermund as I said, didn't have any recollection of this.

THE COURT:  PD2.19 is permitted.  The objection is overruled.

What's the next issue, Defendant?

MS. SOOTER:  The next one is two slides, 3.134 and 3.135.

THE COURT:  Just a minute.  All right.  I see 134.

This is with Nigel Jones?

MS. SOOTER:  Yes, Your Honor.  This is from -- an excerpt from Mr. Jones's report.  Again, we don't have any record of this being shown to the jury.  If Ms. Carson has a deposition again, since we got 250 slides this morning, if she has a record of it being shown to the jury and hasn't shared that with us before, I'm happy to entertain -- hear that.

MS. CARSON:  So I have emailed the transcript cite to counsel already for this, but it was discussed during Dr. Wells's cross-examination at Transcript pages 1005 to 1016, and these were shown again on the ELMO during the cross-examination.

THE COURT:  I remember these.  These have been used.  These are all right.

MS. SOOTER:  In that case, Your Honor, the next one is -- we believe that it's improper to discuss the --

THE COURT:  Wait a minute, give me a number, please, Ms. Sooter.

MS. SOOTER:  Oh, sorry, it's 2.197.

THE COURT:  Well, let me look -- let me look at the ELMO.  I don't see it in this hard copy.  Go ahead. What's your objection?

MS. SOOTER:  So the objection is it's improper to discuss with the jury the nature of the dispute resolution

in the IP rights policy, including that the national courts of law have the sole authority to resolve IPR disputes.

MS. CARSON:  Your Honor, this was also published during --

THE COURT:  I remember this.  I remember this. This is -- this is all right.

MS. SOOTER:  Okay.  Your Honor, I believe that the rest of the slides that we disputed have been withdrawn by the Plaintiff.  So we're --

THE COURT:  All right.  Are there any other disputes regarding demonstratives for closing arguments that I haven't heard about or ruled on?

(Off-the-record discussion among counsel.)

THE COURT:  All right.  We now have four people at the podium.  We are on the record.  So let me hear from one person.

MR. MUELLER:  While folks were conferring about the draft slides, we had the colloquy with Your Honor with respect to the spreadsheet and the demonstrative that you ruled on earlier this morning.

THE COURT:  Yes, 888.

MR. MUELLER:  So we assume that there will be no reference to those, per Your Honor's ruling.  That was not part of the discussions.

THE COURT:  There will be a problem if there is.

MR. MUELLER:  Understood.  Thank you, Your Honor.

THE COURT:  I think that's understood by Plaintiffs' counsel.

MS. SOOTER:  Thank you, Your Honor.

THE COURT:  What are you doing, Mr. Sheasby?

MR. SHEASBY:  I'm just prepositioning for opening. I'm not doing anything other than that.

THE COURT:  All right.  If you want to put something there you're going to use in your first closing argument, that's fine.

MR. SHEASBY:  Yes.  Thank you, Your Honor.

MR. MUELLER:  And just logistically, Your Honor, I think Mr. Sheasby may be doing the same thing, but we request that the public monitors be off to avoid having to seal the courtroom.

THE COURT:  They're been off, and they'll remain off.

MR. MUELLER:  Understood. Thank you, Your Honor.

THE COURT:  Is there anything else, counsel, that you're aware of that the Court should take up before I bring in the jury and proceed to give them the Court's final instructions?

MR. MUELLER:  Not for Apple.  Thank you, Your Honor.

THE COURT:  How about from Plaintiffs?

MR. SHEASBY:  Not for Plaintiffs, Your Honor.

THE COURT:  All right.  Let me just briefly say to those in the gallery, as well as those inside the bar, the Court considers its final instructions to the jury the most serious part of an inherently serious process.  If anyone in this room has a device that is physically capable of ringing, sounding, or disrupting this proceeding, take it outside the courtroom now or you have it in here at your own peril.  And if it interrupts this proceeding in any way, there will be an appropriate sanction imposed.

If you need to talk to each other, if you need to pass boxes of documents back and forth, if you need to do anything that could disrupt the jury's attention on the Court or on arguing counsel, do it now.  I'm not going to have any disruptions during this proceeding.

Does anybody have any questions?

MR. SHEASBY:  Your Honor, may I just approach to make sure that I -- my buzzer is not on the --

THE COURT:  Yes, you may.

MR. SHEASBY:  Thank you, Your Honor, so much.

Thank you, Your Honor.

THE COURT:  All right.  Mr. Estes, please bring in the jury.

COURT SECURITY OFFICER:  Yes, Your Honor.

All rise.

(Jury in.)

THE COURT:  Good morning, ladies and gentlemen. Please have a seat.

Ladies and gentlemen of the jury, I apologize for keeping you waiting.  There were things that arose that I had to deal with in regard to this case that necessitated me keeping you there later than I intended.  But I appreciate your presence and your cooperation.

Ladies and gentlemen of the jury, you've now heard the evidence in this case, and I'll now instruct you on the law that you must apply.

Each of you are going to have your own printed copy of these final jury instructions to take with you and review during your deliberations in the jury room. Therefore, I'd like you to pay attention as I give them to you orally, as I'm required to do, understanding you'll have your own written copy -- or printed copy to look at later.

It's your duty to follow the law as I give it to you.  On the other hand, ladies and gentlemen, and as I've previously said, you, the jury, are the sole judges of the facts in this case.

Do not consider any statement that I have made over the course of this trial or that I might make during these instructions as an indication that I have any opinion

about the facts in this case.

Now, you're about to hear closing arguments from the attorneys.  Statements and arguments of the attorneys, I remind you, and as I've previously told you, are not evidence, and they are not instructions on the law. They're intended only to assist the jury in understanding the evidence presented during the trial and the parties' competing contentions.

Now, a verdict form has been prepared for you, and I will send this verdict form, and you will take it with you when you retire to the jury room to deliberate.  And when you have reached a unanimous decision or agreement as to your verdict, you'll have your foreperson, which you will select, fill in the blanks in the verdict form reflecting your unanimous decisions.  Have your foreperson then date it, sign it, and advise the Court Security Officer that the jury's reached a verdict.

Answer each question in the verdict form from the facts as you find them to be.  Do not -- ladies and gentlemen, do not decide who you think should win this case and then answer the questions to reach that result.  One more time, your answers to the questions in the verdict form must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed,

consider the testimony of all the witnesses, regardless of who may have called those witnesses.  And you may consider the effect of all the exhibits received and admitted into evidence, regardless of who may have presented or produced those exhibits.

You, the jury, are the sole judges of the credibility and believability of each and every witness, and you are the sole judges of the weight and effect to give to all of the evidence in this case.

Now, during the course of the trial, you may have been shown documents or portions of documents that have been redacted, that is sections of them were blacked out. In those situations where you've been shown documents like that, you should not speculate or guess about what was redacted or why it was redacted.  You should understand those redactions were approved by the Court prior to when the trial began.

Now, as I've told you already, the attorneys in this case are acting as advocates for their competing parties and their competing claims.  And they have a duty to raise objections when they believe evidence is being offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you, the jury, must

disregard that question entirely, and you may not draw any inference from its wording or guess or speculate about what the witness would have said if the Court had permitted them to answer the question.

On the other hand, however, if I overruled an objection to a question addressed to a witness, then you're to treat the answer to that question and the question itself just as if no objection had been made.  That is like any other question and answer during the trial.

Now, at various times during the trial, it's been necessary for the Court to talk to the lawyers outside of your hearing or outside of your presence.  This happens during trials like this, ladies and gentlemen, because there are things that sometimes arise that do not involve the jury.  You should not speculate or guess about what was said during these discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, which is the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.

As a general rule, you should understand that the

law makes no distinction between direct evidence or circumstantial evidence but simply requires that you, the jury, find the facts based on all the evidence presented during the trial, both direct and indirect, that is circumstantial.

Now, the parties may have stipulated or agreed to certain facts in this case.  And when the lawyers from both sides stipulate as to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence and consider the fact proven.

Also, certain testimony over the course of the trial has presented -- has been presented to you through depositions.  A deposition is the sworn, recorded answers to questions asked of a witness in advance of the trial. If a witness cannot be present to testify in person or if the witness's standing allows under the rules for a deposition of that witness to be presented, even though the witness is present, the witness's testimony may be presented under oath in the form of a deposition.

As I mentioned to you, the attorneys representing the parties question these witnesses during depositions when the witness is under oath.  A court reporter is present.  They are -- the witness is asked questions by counsel for the party.  The witnesses give answers under oath, and those questions and those answers are transcribed

or recorded.

Both sides have had an opportunity to contribute portions of that deposition to be presented to you in open court.  Deposition testimony, ladies and gentlemen, is entitled to the same consideration by you, the jury, as testimony given by a witness who appears in person in open court and testifies from the witness stand.  And you should accordingly judge the credibility and the importance of deposition testimony to the best of your ability, just as if the witness had appeared in open court and testified in person from the witness stand.

Now, while you should consider only the evidence in this case, you should understand, ladies and gentlemen, that you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel is justified in the light of common experience.

Let me say that another way.  You, ladies and gentlemen, may make deductions and reach conclusions based on reason and common sense that leads you to draw these from the facts that have been established by the testimony and evidence in this case.

However, you should not base your decision on any evidence not presented by the parties in open court during the course of the trial.

Now, unless I instruct you otherwise, you may

properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence you believe that single witness.

In considering how to weigh the testimony of the witnesses, you should know that every witness is entitled to prepare with counsel to present their testimony.

Also, when knowledge of a technical, financial, or otherwise specialized subject may be helpful to you, the jury, a person who has special training and experience in that particular field is called an expert witness, and those expert witnesses are permitted to state their opinions on those technical matters to the jury.

However, ladies and gentlemen, you're not required to accept any opinions offered by any expert witness.  As with any other witness, it is solely up to you to decide who to believe and who not to believe and whether you want to rely on their testimony or not and if you do rely on it, how much weight to give to that testimony.  Those are issues that are solely up to you.

You should also note, ladies and gentlemen, that fact witnesses who are not designated by the Court as experts cannot offer opinions on patents practicing or relating to the accused products.

1241

Now, certain exhibits have been shown to you over the course of the trial that were simply illustrations.  We call these types of exhibits demonstrative exhibits, or sometimes they're simply referred to as demonstratives for short.  Demonstrative exhibits are a party's depiction, picture, or model to demonstrate or to describe something involved in the trial.

If your recollection differs from the demonstratives, you should rely on your recollection.  You should remember, ladies and gentlemen, demonstrative exhibits are sometimes called jury aids, and they are not evidence.  But the witness's testimony during which a demonstrative is used is evidence.

Now, in any legal action, the facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiffs for some issues and on the Defendant for others.

Now, the Plaintiffs in this case are Optis Wireless Technology, LLC; PanOptis Patent Management, LLC; Optis Cellular Technology, LLC; Unwired Planet, LLC; and Unwired Planet International Limited.  And you've heard those five entities referred to throughout the trial simply as the Plaintiffs or as Optis.  Sometimes they've been called collectively simply PanOptis.

Now, the Plaintiffs -- and these five entities are

the Plaintiffs -- they have the burden of proving patent infringement by a preponderance of the evidence.  These Plaintiffs also have the burden of proving willful patent infringement by a preponderance of the evidence.  And they have the burden of proving damages for any patent infringement by a preponderance of the evidence.

As I've mentioned to you, the preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true, and it's sometimes talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case is Apple Inc., and you've heard referred to them throughout the trial simply as the Defendant or as Apple.  And there is one issue on which Apple has the burden of proof, and it relates solely to the '332 patent.

Apple has the burden of proving that the '332 patent -- that the '332's patent subject matter -- the subject matter of the '332 patent is ineligible for patent protection, and they have that burden of proof by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the parties' factual contentions are highly probable.

Please understand, proof to an absolute certainty

is not required, and the clear and convincing evidence standard does require a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

Let me say this, ladies and gentlemen, if the proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

As I've mentioned before, neither of these two burdens of proof are to be confused with a third and altogether different burden of proof called beyond a reasonable doubt, which is the burden of proof applied in a criminal case and has no application in a civil case like this.

You should not confuse clear and convincing evidence with evidence beyond a reasonable doubt. Clear and convincing evidence is not as high as beyond a reasonable doubt, but it is a higher burden than the preponderance of the evidence.

Now, in determining whether any fact has been proven by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider any stipulations of the parties, the testimony of all the witnesses presented during the trial, regardless of who called them, and all the exhibits produced and admitted

1244

during the course of the trial, regardless of who may have produced them.

Now, as I did at the beginning of the case, I'll give you a summary of each side's contentions, and then I'll provide you with detailed instructions on what each side must prove to win on its contentions.

As I've previously said, this is an action for patent infringement, and this case concerns, as you know, five separate United States patents.

For the record, they are United States Patent No. 8,019,332, which you heard referred to throughout the trial as the '332 patent.

Next they include United States Patent No. 8,385,284, which you've heard referred to as the '284 patent.

Next they include United States Patent No. 8,411,557, which you've heard referred to as the '557 patent.

Next they include U.S. Patent No. 8,102,833, which you've heard referred to as the '833 patent.

And, finally, they include Patent No. 9,001,774, which you've heard referred to as the '774 patent.

And I'll refer to these five patents collectively or together as the patents-in-suit. They may also be referred to in the same way as the asserted patents.

Now, the Plaintiffs, Optis -- I'll call them Optis -- has alleged that certain iPhones, iPads, and Apple Watches directly infringe the asserted claims either literally or through the doctrine of equivalents.

Additionally, Optis has alleged that certain iPhones, iPads, and Apple Watches infringe indirectly and that they indirectly infringe the asserted claims of the patents-in-suit.

Now, sometimes in these instructions, I'll refer to these products in shorthand by just calling them the accused product.

Optis contends that Apple infringes the following claims by way of the sale, offer to sale, use, or importation of the accused products.  And these claims are Claim 6 and 7 of the '332 patent, Claim 14 and Claim 27 of the '284 patent, Claim 10 of the '557 patent, Claim 6 of the '774 patent, and Claim 8 of the '833 patent.

You've heard and you will hear these claims referred to collectively as the asserted claims.

Optis, the Plaintiffs, seek damages in the form of a reasonable royalty for Apple's alleged infringement. Apple disputes that it has infringed any of these five patents.

Apple further denies that it has willfully infringed any claim from these asserted five patents.

Apple also contends that the asserted claims of the '332 patent are not eligible for patent protection, and they are not eligible to be patented.

Apple denies that it owes Optis any damages in this case.

Now, it's your job, ladies and gentlemen, to decide whether the Plaintiffs, Optis, have proven that the Defendant, Apple, has infringed any of the asserted claims from the five asserted patents and whether that infringement, if you find it, is willful or was willful.

If you decide that any of the asserted claims have been infringed, then you're going to need to decide the amount of money damages to be awarded to the Plaintiffs to compensate them for that infringement.

I'll now instruct you on a number of established facts that -- and you must take these facts as true when deciding the issues that are yours to decide in this case.

Number one, the '332 patent was applied for on December the 8th, 2010 and was issued by the Patent Office on September the 13th, 2011.  It was issued by, as I said, the Patent Office, and by that I mean the United States Patent and Trademark Office, which you've heard called during the trial simply the Patent Office or the PTO.  The '332 patent has an effective filing date of March the 7th, 2008.

Number two, the '833 patent was applied for on September the 11th, 2008, and it was issued on January the 24th, 2012 by the Patent Office.  The '833 patent has an effective filing date of November the 13th, 2007.

Number three, the '284 patent was applied for on August the 16th, 2010 and was issued on February the 26th, 2013 by the Patent Office.  The '284 patent has an effective filing date of December the 20th, 2007.

Number four, the '557 patent was applied for on December the 21st, 2011, and it was issued on April the 2nd, 2013.  It was issued by the Patent Office.  The '557 patent has an effective filing date of March the 20th, 2006.

Number five, the '774 patent was applied for on November the 12th, 2013, and it was issued by the Patent Office on April the 7th, 2015.  The '774 patent has an effective filing date of April the 21st, 2005.

Number six, the asserted patents have been declared by Optis or its predecessors in interest to be standard essential patents and have been referred to in this trial as SEPs.

Number seven, when a patent holder contributes their patent to a standard, that patent becomes burdened by a contractual obligation requiring that the patent be licensed to others on fair, reasonable, and

non-discriminatory terms, which you've heard referred to throughout the trial as FRAND terms. If, after the patent's dedication to the standard, it is found that the functionality embodied in that patent is not essential to the standard or any optional part of the standard, then the FRAND obligation is no longer enforceable against the patent. Accordingly, ladies and gentlemen, you must determine whether the FRAND obligation is to be enforced against the asserted patents as part of the hypothetical negotiation between the competing parties based on the facts as you find them to be.

Now, before you can decide the issues in this case, you will need to understand the role of the patent claims. The patent claims, as you've been told, are those numbered sentences at the end of each patent. And as you're aware, you each have a copy of each of these five patents in your juror notebooks, and you may refer to them and everything else in your juror notebooks during your deliberations.

Now, the claims, ladies and gentlemen, are important because it's the words of the claims themselves that define what a patent covers. The figures in the patent and the rest of the text in the patent and everything else are descriptions or examples or they provide a context for the claims. But it is the claims

themselves at the end of the patent that define the breadth of the patent's coverage.

Each claim within a patent is effectively treated as if it were its own separate patent, and each claim may cover more or may cover less than another claim. As a result, what a patent covers collectively depends upon what each of its claims covers.

Now, you'll first need to understand what each claim covers in order to decide whether or not there is infringement of that claim and to decide whether or not -- excuse me, let me say that again. You'll first need to understand what each claim covers in order to decide whether or not there is infringement of that claim. And you'll need to understand what the '332 patent covers and the asserted claims 6 and 7 of it to determine whether that patent and those asserted claims from the '332 patent are patent eligible.

Now, the first -- the first step is to understand the meanings of the words used in the patent claim. The law says it's my role as the judge to define the terms of the claims, but it's your role as the jury to apply my definitions to those issues that you're asked to decide in this case.

Accordingly, and as I've explained at the beginning of the trial, I've already determined the

meanings of certain claim language for you, and I have provided those definitions or constructions to you as a part of your juror notebooks.  You must accept my definitions as to those words in the claims as being correct, and it's your job to take these definitions or constructions, which I have supplied, and apply them to the issues that you are asked to decide, including the issues of infringement and eligibility.

Now, my interpretation of the claim terms should not be taken by you as an indication that I have any view regarding these issues, that is, infringement or eligibility.

Now, the decisions regarding infringement and eligibility are yours, ladies and gentlemen, alone to make.

Now, for any claim language or limitations where I have not furnished you a definition or construction, you're to use and apply the plain and ordinary meaning of that language as understood by one of ordinary skill in the art, which is to say in the field of the technology of the patent at the time of the alleged invention.

The meaning of the words of the patent claims must be the same when deciding the issues of infringement and the issues of eligibility.

Now, I will explain to you how a certain claim to cover -- excuse me.  I'll explain to you how a certain

claim defines what it covers.  A claim sets forth in words a set of requirements.  And each claim sets forth its requirements in a single sentence.  And if a device satisfies each of these requirements in that sentence, then it is covered by and infringes the claim.

Now, there can be several claims in a patent, and a claim may be narrower or broader than another claim by setting forth more or fewer requirements.  The coverage of a patent is assessed, ladies and gentlemen, on a claim-by-claim basis.

Now, in patent law, the requirements of a claim are often referred to as the claim elements, or they're sometimes referred to as the claim limitations.  Claims may describe apparatuses, devices, or products, such as machines, and I will call such claims product claims.

Claims may also describe processes or methods for making or using a product, and I will call those claims method claims.

In this case, the five Plaintiffs have asserted both product claims and method claims regarding the asserted patents.

When a product meets all the requirements of a claim, it is said -- and it's said that it meets all the limitations or elements of that claim, that claim is said to cover that product, and that product is said to fall

within the scope of that claim.  In other words, a claim covers a product where each of the claim elements or limitations is present in that product.

Now, if a product is missing even one limitation or claim -- or, excuse me, one limitation or element of a claim, the product is not covered by that claim.

And infringement in this case can occur either literally or under the doctrine of equivalents.  And for infringement under the doctrine of equivalents, every word of the claim need not be or need not exist identically in the accused products.

Now, with respect to product claims, if the product is not covered by the claim, the product does not infringe the claim.  Similarly, with respect to method claims, if an entity does not perform even one required step of the process, then the entity's actions are not covered by that method claim.  And if the actions are not covered by the method claim, the actions do not infringe the method claim.

Now, this case involves two types of patent claims, independent claims and dependent claims.  An independent claim does not refer to any other claim in the patent.  An independent claim sets forth all the requirements that must be met in order to be covered by the claim.  And as a result, it's not necessary to look at any

1253

other claim within a patent to determine what an independent claim covers.

However, on the other hand, a dependent claim does not by itself recite all of the requirements of the claim but refers to another claim or claims for some of its requirements. In this way, the dependent claim depends from another claim.

A dependent claim incorporates all the requirements of the claim or claims to which it refers, or as we might say, from which it depends, as well as -- as well as those additional claim terms set forth -- those additional elements included in the dependent claim itself.

So to determine what a dependent claim covers, it's necessary to look at both the dependent claim itself and any other claim or claims to which it refers or from which it depends.

Now, a product that meets all the requirements of both the dependent claim and the other claim or claims to which it refers or from which it depends is covered by that dependent claim.

Certain claims within the asserted patents in this case use the word "comprising." Comprising means including or containing. When the word "comprising" is used, a product that includes all the limitations or elements of the claim, as well as the additional elements, is covered

by the claim.

Some of the claims in the -- of the patents-in-suit use the word "including."  In a claim including means comprising.  For example, if you take a claim that covers the invention of a table, if the claim recites a table comprising a tabletop, four legs, and nails that would hold the legs and the tabletop together, then the claim will cover any table that contains these specific structures, even if the table contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the ends of the legs.

Now, that's a simple example using the word "comprising" and what it means.  In other words, ladies and gentlemen, it can have other features in addition to those that are covered by the patent.

Now, if a product is missing even one element or limitation of a claim, it does not meet all the requirements of the claim and is not covered by the claim. And if a product is not covered by a claim, it does not infringe that claim.

Let me now instruct you on infringement in greater detail.  If a person makes, uses, sells, or offers for sale within the United States or imports into the United States what is covered by a patent claim without the patent holder's or owner's permission, that person is said to

infringe the patent.

To determine whether there is infringement, you must compare the asserted claims, as I may have defined them for you, to the accused products or methods.  You should not compare the accused products with any specific example set out in the patent or with other systems, devices, methods, publications, or patents that predate the patent claim at issue -- known as the prior art -- in reaching your decision on infringement.

Again, ladies and gentlemen, the only correct comparison is between the accused product and the language of the claim itself.

Infringement of a standard essential patent can be proven by showing that an accused product practices every possible implementation of that industry standard.  You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the competing parties over the course of the trial.

I'll now instruct you on the specific rules that you must follow to determine whether Optis, the Plaintiffs, have proven that Apple, the Defendant, has infringed one or more of the patent claims involved in this case.

In order to prove infringement of a patent claim,

Optis must show by a preponderance of the evidence that an accused product includes each requirement or limitation of the claim either literally or under the doctrine of equivalents.

The issue of infringement, ladies and gentlemen, is assessed on a claim-by-claim basis within each patent. As a result, there may be infringement of a particular patent as to one claim, even though there is no infringement as to other claims in that patent.

In this case, Optis contends that Apple literally infringes Claims 6 and 7 of the '332 patent, Claims 1, 14, and 27 of the '284 patent; and Claim 8 of the '833 patent. In addition, Optis contends that Apple infringes Claim 10 of the '557 patent and Claim 6 of the '774 patent, both literally and under the doctrine of equivalents.

Now, in order to literally infringe a patent claim, the accused product must include or perform each and every element of the claim. Therefore, in determining whether Apple infringes Optis's asserted claims, you must determine if an accused product contains or performs each and every element recited in the claim of the asserted patent.

A claim element is literally present if it exists in or is performed by an accused product as it is described in the claim language, either as I have explained that

language to you or if I did not explain it or construe it according to the plain and ordinary meaning as understood by one of ordinary skill in the art.

Now, for Claim 10 of the '557 patent and Claim 6 of the '774 patent, if the claims are not literally infringed, there can still be infringement if Optis proves that the claims are satisfied under the doctrine of equivalents.

Under the doctrine of equivalents, Apple, its customers, or an accused product infringes a claim if it performs steps within the United States or contains elements corresponding to each requirement of the claim that are equivalent to, even though not literally met by, the accused product.

You may find that a step or element is equivalent to a requirement of a claim that is not literally met if a person having ordinary skill in the field of the technology of the patent would have considered the differences between them to be insubstantial or would have found that the structures perform substantially the same function in substantially the same way to achieve substantially the same results as the requirements of that claim limitation.

You may not find a step or structure equivalent if doing so would eliminate the claim element entirely.

Consider again an example that I gave you earlier

about a patent claim that recites a table comprising as its elements a tabletop, legs, and nails.  A table that, in fact, contained a tabletop, legs, and nails would literally infringe the patent claim.

However, a table that consisted instead of a tabletop, legs, and screws instead of nails, in other words, if it used screws instead of nails, it might still infringe the same claim under the doctrine of equivalents if the screws, when used to perform substantially the same function as the nails in substantially the same way achieves substantially the same result.

Now, that's an example using the doctrine of equivalents.  In order to prove that an accused product meets a limitation under the doctrine of equivalents, the Plaintiffs, Optis, must prove the equivalency to the claimed element by a preponderance of the evidence.

A patent can be directly infringed even if, ladies and gentlemen, the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it was doing is infringement of a claim.

None of this alters the fact that all the elements of a claim must be present either literally or under the doctrine of equivalents for a claim to be infringed.  If even a single element of a claim is neither literally present in the accused product and is not present under the

doctrine of equivalents, then you must find that the accused product does not infringe that claim.

Optis also alleges in this case that Apple is liable for indirect infringement by actively inducing its users to directly infringe the asserted claims.  As with direct infringement, you must determine whether there has been induced infringement on a claim-by-claim basis.

Apple is liable for induced infringement of a claim only if Optis proves by a preponderance of the evidence the following:

One, the acts have been carried out by Apple's customers and directly infringe the claim;

Two, Apple has taken action intending to cause the infringing acts by its users;

And, three, Apple has been aware of the asserted patents and has known that the acts of its users constitute infringement of the asserted patents or was willfully blind to that infringement.

Now, to establish induced infringement, it's not sufficient that someone else directly infringes a claim nor is it sufficient that the company accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware that the acts of another that allegedly constitute direct infringement, and the mere fact that the company accused of

inducing another's direct infringement had known or should have known that there was a substantial risk that someone else's acts would infringe is not sufficient.

Rather in order to find inducement, you must find that Apple specifically intended to infringe the patent or was willfully blind to that infringement, meaning that Apple believed that there was a high probability of infringement but deliberately avoided learning the nature of those infringing acts.

In this case, Optis also contends that Apple willfully infringed the patents-in-suit.

Now, if you find that Apple has infringed, you must go on and separately address the additional issue of whether or not Apple's infringement was willful.  Optis must prove willfulness by a preponderance of the evidence. In other words, you must determine whether or not it is more likely than not that Apple willfully infringed.

You may not determine that infringement was willful just because Apple knew of the asserted patents and infringed them.  However, you might -- you may find that Apple willfully infringed if you find that it acted egregiously, willfully, or wantonly, and you may find that Apple's actions were egregious, willful, or wanton if it acted in reckless or callous disregard of or with indifference to the rights of Optis.

1261

A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that was known to it or was apparent -- was apparent to a reasonable person in its position.

Your determination, ladies and gentlemen, regarding willfulness should incorporate the totality of the circumstances based on all the evidence that's been presented during the trial.

Also, willfulness can be established by circumstantial evidence.

Now, knowledge of the existence of a patent or a patent family can be relevant to the question of willful infringement. For example, if Apple knew of the existence of a patent or suggest -- subjective -- subjectively -- I'm sorry, subjectively believed that there was a high probability that the patent existed and took deliberate actions to avoid learning of the patent, you may take this into account when considering willfulness.

Now, several times in these instructions I've referred to a person of ordinary skill in the field of the invention. It's up to you, ladies and gentlemen, to decide the level of ordinary skill in the field of the invention.

In deciding what the level of ordinary skill is, you should consider all the evidence introduced during the

trial, including the following:

One, the levels of education and experience of the inventors or other persons working in the field;

Two, the types of problems encountered in the field;

Three, prior art solutions to those problems;

Four, the rapidity with which innovations are made;

And, five, the sophistication of the technology.

A person of ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant prior art at the time of the claimed invention.

Apple contends in this case that the asserted claims of the '332 patent contain subject matter that is ineligible for patent protection.

Patent ineligibility, ladies and gentlemen, is a defense to infringement. Apple has the burden of proving ineligibility by clear and convincing evidence.

I'll now instruct you on the rules that you must follow in deciding whether or not Apple has proven by clear and convincing evidence that the asserted claims of the '332 patent are patent ineligible.

An issued United States patent is accorded a presumption of patent eligibility based on the presumption that the United States Patent and Trademark Office, which

1263

you've heard referred to throughout the trial as the PTO or simply the Patent Office, acted correctly in issuing the patent.

This presumption of patent eligibility extends to all United States patents that are issued by the Patent Office.

In determining whether a claimed invention is patent ineligible, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made or the patent was filed.

It has been determined that the asserted claims of the '332 patent are directed to a mathematical formula, and that mathematical formula by itself cannot contribute to the inventive concept. You, the jury, must, therefore, decide whether Claims 6 and 7 of the '332 patent contain an inventive concept sufficient to transform the patent claims into something more than the mathematical formula.

You may find that Claims 6 and 7 of the '332 patent have an inventive -- inventive concept if the components, other than the ineligible mathematical formula, either individually or as an ordered combination involve more than the performance of well-understood, routine, or conventional activities known to a person of ordinary skill in the art at the time the patent application was filed as

of the effective date of the patent, which for the '332 patent is March the 7th, 2008.

In determining whether those elements were well-understood, routine, and conventional to a person of ordinary skill in the art, you may consider all the evidence presented during the trial, including the testimony of the witnesses, statements made in the patent, as well as evidence of the prior art.

The mere fact that something was known in the art at the time does not necessarily mean that it was well-understood, routine, and conventional.  However, the fact that something was known in the art is relevant to determining whether it was well-understood, routine, and conventional.

In addition, implementing ineligible subject matter using conventional computing components is not sufficient to transform the claims into something significantly more than the ineligible subject matter, even if it was a new idea to do so.

Likewise, merely limiting the -- the ineligible subject matter to a particular technological environment is not sufficient to provide an inventive concept.

I'll now instruct you, ladies and gentlemen, about the measure of damages.  However, by instructing you on damages, I am not suggesting which party should win this

case on any issue.

If you find that Apple has infringed any of the asserted claims, then Optis is not entitled to any damages.

If you find that Apple has only infringed the '332 patent but that both Claims 6 and 7 are unpatentable, then Optis is not entitled to damages for the '332 patent.

However, if you find -- if you otherwise find infringement, then Optis is entitled to damages.

Plaintiffs in this case have the burden to establish the amount of their damages by a preponderance of the evidence.  While Optis is not required to prove the amount of its damages with mathematical precision, it must prove them, ladies and gentlemen, with reasonable certainty.

Optis is not entitled to damages that are remote or only speculative.  Any damages that you award in this case must be adequate to compensate for the infringement you have found.  You must not award Optis more damages than are adequate to compensate for the infringement.  You also must not include in any -- you must also not include any additional amount for the purpose of punishing Apple or for the purpose of setting an example.

The patent laws specifically provide -- provide that damages for infringement may not be less than a reasonable royalty.

In this case, Optis seeks damages in the form of a reasonable royalty.

A royalty, ladies and gentlemen, is a payment made to the patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a particular -- excuse me, that a patent holder and the alleged inventor would have agreed to -- the alleged infringer.

I'll start that sentence over again.

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both sides believe the patents were valid, patent eligible, and infringed, and that both sides were willing to enter into an agreement.  The reasonable royalty that you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that

either side would have preferred.

Evidence of things that happened after the infringement first began may be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from the hypothetical negotiation.

You should determine what a reasonable royalty is based on all the evidence.  The profits may be considered, but you should not limit or increase the royalty based on the actual profits made.

Now, in considering the evidence of a reasonable royalty, you're not required to accept one specific figure or another for the reasonable royalty.  You're entitled to determine what you consider to be a reasonable royalty based on your consideration of all the evidence presented by the parties during the trial whether the evidence is of a specific number or a range of numbers.

Now, you've heard that the asserted patents have been declared to be standard essential patents or SEPs. The original owners of the asserted patents made a commitment to the European Telecommunications Standards Institute, which you've heard referred to as ETSI, E-T-S-I. And they made that commitment to license the asserted patents on fair, reasonable, and non-discriminatory, as you've heard -- or as you've heard it called FRAND terms

and conditions.

Optis has also committed to license the asserted patents on FRAND terms.  The FRAND commitment in this case does not require any specific licensing model to determine a FRAND royalty.  You should determine a FRAND royalty in this case based on the totality of the circumstances.

The issue of whether the parties breached the FRAND commitment is not before you or the Court.  However, you must still determine whether the reasonable royalty amounts asserted by both parties comply with the FRAND commitment.

Now, the law requires that any royalty awarded to the Plaintiffs, Optis, correspond to the value of the patented invention within the accused products as distinct from other unpatented features or other market factors.

Now, this is particularly true where the accused products have multiple features and multiple components not covered by the patents or where the accused products work in conjunction with other non-patented items.  In that situation, you should properly consider the smallest salable patent practicing unit and not the entire device.

If unpatented features contribute to the accused products, then, ladies and gentlemen, you must apportion the value to exclude the value attributable to the unpatented features.  You must determine an appropriate

royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

Now, when dealing with standard essential patents, there are two special apportionment issues that arise. First, the patented features must be apportioned from all of the unpatented features reflected in the standard.

Second, the patentee's royalty must be premised on the value of the patented -- of the patented features, not any added value by the standard's adoption of the patented technology.

You may also consider any evidence of patent royalty stacking. Royalty stacking, as it's called, can arise when a standard implicates multiple patents, perhaps hundreds or even thousands, which would cause a company that is required to pay royalties for all such standard patents to pay royalties that stack on top of each other and may become financially excessive.

Now, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors which you may consider in making your determination are:

One, the royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

Two, the rates paid by the licensee for the use of other patents comparable to the patents-in-suit. Comparable license agreements include those covering the use of the claimed invention or similar technology;

Three, the nature and scope of the license as exclusive or non-exclusive or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

Four, the duration of the patent and the term of the license;

Five, the utility and advantages of the alternatives that could have been used instead of the infringing technology in the period before the standard was adopted;

Six, the nature of the patented invention, the character of the commercial embodiment of it and the benefits to those that have used the invention;

Seven, the extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

Eight, the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

Nine, the opinion and testimony of qualified experts;

And, ten, the amount that a licensor and a licensee would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement.  That is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have -- you may have heard these factors referred to during the trial, ladies and gentlemen, as the Georgia-Pacific factors.  No one of these factors is dispositive, and you can and you should consider the evidence that's been presented to you during this trial on each of these factors.

And you may also consider any other factors which in your minds would have increased or decreased the royalty Apple would have been willing to pay and that the patent owner would have been willing to accept with both acting as normally prudent business people.

Comparable license agreements are one factor that

may inform your decision as to the proper amount and form of the reasonable royalty award.

Now, whether a particular license agreement is comparable to the hypothetical license depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structures, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those differences into account.

Now, for any reasonable royalty damages you award, you must also determine the type of royalty that the patent holder and the infringer would have agreed to as a result of the hypothetical negotiation in 2012.

One type of royalty is a lump-sum royalty.  A lump-sum royalty, ladies and gentlemen, is when the infringer pays a single price for a license to sales -- to sales of the infringing product.  A lump sum constitutes damages both for past infringement, damages during the damages period, and future infringement.

If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate the Plaintiffs for Apple's past and future infringement.

Now, another type of reasonable royalty is a running royalty.  A running royalty is a fee paid for the

right to use the patents that is paid for each unit of the infringing products that have been sold or that may be sold in the future.  If there are additional units sold in the future, any damages for these sales will not be addressed by you.

If you decide that a running royalty is appropriate, then the damages that you award, if any, should reflect the total amount necessary to compensate Optis for Apple's past infringement during the damages period.

Damages for future units produced or sold will be determined outside of this trial.

Now, the starting date from which you should calculate damages is February the 25th, 2019, which is the date that Plaintiffs filed this lawsuit.

Now, with these instructions, ladies and gentlemen, we're ready to hear closing arguments from the attorneys in the case.

Mr. Sheasby, you may present the Plaintiffs' first closing argument to the jury.

Would you like to reserve any of your allocated time?

MR. SHEASBY:  Your Honor, I will be reserving a portion of my time.  I would like a warning, with your permission, at 15 minutes -- when I've used 15 minutes.

THE COURT:  I'll warn you when you've used 15 minutes.  You may proceed at this time.

MR. SHEASBY:  Good late morning, ladies and gentlemen of the jury.

I want to acknowledge that you have honored us with your service over the last five days.  I am acutely aware that you have sat in the jury room for an hour this morning.  You have now heard a very lengthy set of instructions, and you may be asking yourself, why me?

The Constitution of the United States of America made provision for a patent system.  Great ideas, no matter where they are created, come into our country and make us stronger.  But there is a bargain.  When those ideas are granted a patent, you must comply with the United States patent law.

Apple has not complied with the United States patent law.

The answer as to why, ladies and gentlemen of the jury, is the United States Constitution.

I want to thank you for your service.  I want to thank you for your sacrifice.

And I'm going to speak about the facts that are in evidence because remember what Judge Gilstrap -- what the Court said, it is neither what I say nor what opposing counsel says that is evidence.

What is evidence is the documents that are in front of you.

The five patents-in-suit were created by a group of elite engineers, many of which actually participated at the 3GPP process that built the LTE standard.

Now, the facts also showed that there were a very large number of Apple engineers who went to the 3GPP/LTE meetings.

Now, you'll note I said went. I didn't say contribute. You may ask yourself why. Because the record will show that not a single one of these Apple engineers contributed anything, not a line, not a sentence, not a word to the LTE specification. Not a single Apple engineer who attended these LTE meetings contributed anything to the common good or the strength of this country through the patent system.

What they did was they listened, they heard the presentations of the innovators in this case, and they chose to take the technology.

Ask yourself why the paid experts of Apple did not speak to a single one of these Apple engineers who listened so carefully at the 3GPP meetings and contributed nothing.

This is the timeline. These are the patents filed between 2005 and 2008 while the LTE standard was being constructed. Samsung, LG, and Panasonic were years ahead

of Apple.  First modem for 4G/LTE, Samsung.  First LTE phone, Samsung.  One year after that, LG and Panasonic all creating LTE devices.  And Apple years later.  Apple chose fatally not to invest in the LTE technology.  They chose to take the technology in violation of United States patent law.

PX-4820, that is an exhibit that you can request if you write it down in deliberation.  And in this document, Tim Cook, the CEO of Apple, in 2013 is being briefed on the absolute importance of standard essential patents.  He's briefed and says that the iPhone would not exist without guaranteed access to these SEPs.

That's what he said was briefed on in secret conversations that we were able to reveal through the legal process in this case.  And you will hear that these SEPs are not worth anything.  They're worth pennies.  The exact opposite of what was said in the secret conversations that Apple had.

You heard from Dr. Rodermund, Dr. Rodermund was an Apple expert, that under the policy that's in place for SEPs, prior to implementing any SEP contained in the ETSI IPR Database, and every single one of these patents was contained, potential licensees shall always contact the declarant.

That is the rule that must have been followed.

There was no evidence whatsoever that Apple contacted a single one of the declarants. Apple violated its obligations under ETSI. Apple did it because it needed the technology, because it was desperate for the technology, and because it had failed to invest in the technology itself.

PX-1537, this is a year later. We're now in 2014. We have another secret document. Apple kept saying something in the case. They said you need to take these things in context. You need to not take them out of context. Well, we actually know the context of this. This was in a secret document called Cellular SEP Licensing Update. And the strategy that they hatched in that document was to devalue SEPs.

Why does this litigation exist? Why did Apple refuse to take a license on fair and reasonable terms for the last nine years? Because Apple's secret strategy is to devalue SEPs. It needed them for its very existence. That's what Tim Cook was briefed on.

And on the other side, it's chosen to destroy, to damage the value of what was created and protected by the United States government.

PX-1537.

Apple's other strategy, and we heard this from Ms. Mewes on the last day of examination, is they have a

strategy called license to adjudicate.  And that's lawyer euphemism for let them sue us, and the reason why they have that strategy is because it allows them to delay payments. The immense amount of money it has saved with interest over the last nine years in which it has been able to avoid paying a fair and reasonable standard for our patents.

PX-1537.

But there's a consequence to its behavior.  And it actually secretly acknowledged that consequence.  Loss increased exposure rate.  Apple will claim we're being discriminated against, Apple will claim we're being treated unfairly.  Apple chose consciously to launch its scheme of devalue SEPs.  Apple chose consciously to launch its scheme of testing and waiting to delay being -- payment, and Apple must now face the consequences of those actions.

Apple's other strategy is to actually create evidence.  I want to take a step back.  This is a federal court.  Apple is a public company.  We have secret documents and Apple is talking about creating evidence. Evidence is not created for the purpose of litigation. Evidence is truthful and should exist.  It should not be manipulated.

1612.

May 2015.  The contents of their strategy and business plan is to create evidence, and by creating that

1279

evidence, they believe they will save money.

And how are they going to create evidence?  They create evidence by creating agreements that aren't real, agreements for patents that they do not use, and then trying to present them to jurors like yourself to try to get away with their strategy of devaluing SEPs:  That is the context.

PX-570.

The record will show that in 2017, we presented Apple with a chart listing each of the five patents, identifying that they were essential, identifying what sections of the standard they were essential, and doing something very important, saying we had claim charts to prove it.

Now, Apple actually asked for something different. Apple actually put -- sent us a template where they want us to use the weasel word allege infringement.  They said are you alleging infringement?  Alleging is a weasel word.  If we had just alleged that they were infringement, they wouldn't have been on proper notice that they were actually infringing these patents.

What we did instead is we didn't take the bait. We added additional column, a column that they didn't request, a column that they did not want, and in which we said we had claim charts.

And Professor Madisetti spoke about what those claim charts do. Those claim charts prove infringement. Those claim charts show that the standard is necessarily infringed by our patents.

Now, you didn't see those claim charts, but you could expect that if Apple thought those claim charts helped it, if those claim charts did not establish infringement, Apple would have presented them. Apple knew the value of these patents.

I'd like Doctors Madisetti and Mahon to stand right now.

They have spent collectively over 70 years analyzing technology in the telecommunications space, serving the United States government, and actually sitting on the 3GPP committees. And they gave you a very careful analysis.

And you -- gentlemen, you may sit.

And the reason why I pointed that out is they kept saying something, and I don't know if you remember this. Apple made this big deal. You didn't talk to the inventors. You didn't talk to the inventors. Do you remember how many times they said that?

And Doctors Madisetti and Mahon kept pushing back and saying that's not appropriate. That's not how you do the analysis. You do the analysis based on the hard

evidence about what was written at the time.

And PX-1760 is an example of that.

This is not some made-up story. This is not some creation of evidence that Apple secretly does. This is the original documents that were sent to 3GPP establishing the power and importance of this technology. And these exist, or forms like them, for all of the patents-in-suit.

Apple says these patents are no valuable. Apple says, oh, they're not valuable at all. Well, I can tell you, if I was facing a $560 million damages award, I would have done something other than hire three experts who did no testing, performed no experiments, and performed no simulations.

Silence is deafening. Not one experiment, not one simulation, not one test. And the reason for that is because the evidence was rigorous and the testing and simulations would have established exactly what Doctors Mahon and Madisetti have said.

Essentially, Apple is calling Doctors Mahon and Madisetti liars. That's effectively what they're doing when they're saying these are made for litigation studies, these are made for litigation evidence.

Now, what's also striking is you heard from four experts. One was Friedholm Rodermund. He's a very nice man. I liked him so much. He actually was an expert in

3GPP.  Do you remember him telling about all those committees he sat on?  How much time he spent?  He actually worked at ETSI.  He did not analyze a single one of the patents-in-suit for infringement or validity.

And you may ask yourself why.  Why did they hide that from him?  Why did they not let him do the analysis?  And why did they choose instead to do the analysis with three experts who collectively have been paid by Apple over 30 times to testify, and none of whom have a single day of experience with 3GPP.

Dr. Perryman, once again a very nice man.  I liked him so much and a wonderful economist.  But this is a case, Apple contends, about FRAND licensing negotiations.  And Dr. Perryman admitted under oath he had never negotiated an agreement in his life relating to the telecommunication industry.  He had never negotiated a FRAND license agreement.

I have no idea why they did this to Dr. Perryman.  I know he has worked for them for many, many years.  But it was not proper to present his testimony in an area in which he was not fully expertized.

Apple kept saying look at our engineers.  Listen to our engineers.  We brought you our engineers.  And do you remember how we actually examined those engineers at a deposition?  And at that deposition, we showed them code.

We showed them a portion of the specification that says A and D, those critical magic numbers, and we said:  Do you use those numbers?

And the expert -- the Apple engineer, and I don't begrudge him.  It's his company.  He has to do what his company asked him to do.  He said unequivocally:  We don't use those numbers.

Well, we were able to do something more.  We were able to actually look at the source code and find those numbers in the source code.  And I want to show you that.

Ms. Brunson, might I have the ELMO?

This is the actual source code.  This shows the secret numbers.

Now, Apple kept making a big deal when I showed a slide and didn't show all the code on it.  I'm not allowed to show all the code on the slide because it's so secret. I can only show small snippets.  But this is the code for the internal products that actually shows the magic numbers, the numbers the Apple engineer denied existed in its code.

THE COURT:  15 minutes have been used.

MR. SHEASBY:  So the answer to that is a concept called an unreliable narrator.  And what that means by an unreliable narrator is a person who doesn't have the full information given to them, didn't have the code when they

testified under oath, and, in fact, Mr. Lanning admitted that the magic numbers are actually in the source code itself.

This is why we don't rely on statements by interested parties like inventors after the fact or by engineers who work for the company that's facing $560 million.  We rely on the actual hard evidence.

Let's go to the patents.

You may ask what's the distinction between essential and infringed.  Well, the answer is, is that a patent is essential if using the standard infringes it.  And so that was a confusion that Apple tried to show -- sew throughout the case.  But all essentiality means is to implement the standard, you infringe it.

This is the '284 patent.  The '284 patent was presented by Panasonic to 3GPP and was adopted directly.

You can look at that at PX-1990, if you want.

The '284 patent requires a first subset in which transport format is indicated, and a second subset in which -- reserved for indicating redundancy version.

And you'll see in the actual LTE standard that exact design.  The second version which is smaller than the first being reserved for the change of redundancy function.

Now, we did more than just show you the standard.  We actually showed you the source code, the source code

which establishes that that table is in the infringing products.

We also established that Dependent Claim 27, for which there is no dispute, was also infringed.

Let's go to the next patent, the '774 patent.

The '774 patent, we have Apple's own internal data showing 71.73 percent of their communications use the '774 patent. That's PX-20. TM4 is part of the '774 patent.

And I want to stop right here. This is the evidence we actually brought you. And you remember how Judge said -- the Court -- the Court said: Lawyers' statements are not evidence. Well, Apple's lead counsel, in questioning Mr. Blasius in this case, kept trying to insert things, assumptions. He said the truth is the testing the ladies and gentlemen of the jury are going to hear about was generated as part of this litigation.

He's trying to tell you something. What he was trying to tell you was utterly untrue. The testing is Apple's own documents, PX-20.

So let's dig into this patent. The '774 patent relates to being able to send precoding information, in particular processing parameters, to the phone. And we saw the internal code -- we showed you the actual internal source code that shows that the Apple phones receive that precoding information.

Dr. Wells, who spoke in response to this patent, was not able to show you any code and did not show you any code for this patent.

And what that code shows is that the precoding information they received is in 2142 at 52. And they said the content of that precoding information is a gain in phase.

Dr. Wells, Apple's witness, was forced to admit on cross-examination that the gain in phase is in the message and that the content of that message is exactly as set out in the claim.

And Dr. Mahon had this wonderful analogy, an analogy I believe it was 1157, which is the code that is used to tell a dispatcher to dispatch an ambulance in Pennsylvania. They are trying to tell you that 1157 is not telling the dispatcher to dispatch the -- the ambulance simply because this is coded and then subsequently decoded by the phone. But when it's decoded, it shows infringement of the claim.

Dr. Mahon also spoke about the fact that there was a published formal patent. This is PX-2105 that shows the power of the patent -- of the -- an article showing the power of the patent.

PX-2105. Closed-loop spatial multiplexing is our invention. This is not created for litigation. This was

not made up.  This was something that was published in a peer-reviewed journal, carefully vetted by other engineers to show the power of the technology.

And what's striking is once again, Apple's lead counsel telling you none of the testing came from Samsung. He said to you, ladies and gentlemen of the jury, none of the testing came from Samsung.  It's the exact opposite of what the document shows.

Now, the third patent you're going to be asked to focus on is the '332 patent.  Dr. Madisetti spoke about the '332 patent, and the '332 patent was discovered and created by LG.  This is PX-1760.

Now, Apple will claim to you this patent is somehow not patentable, that it's routine and well-known and conventional.  If someone suggests that in the jury room, you take them to PX-1760 and you talk about the fact that the most elite engineers in the world at 3GPP created a system that did not work, and it was only LG that was able to solve that critical problem.

The record will show that there is a particular starting location to search for control information. Remember Dr. Madisetti told you about the fact that historically, people did something called blind decoding where a phone just had to go and search everywhere, a needle in a haystack, for its control information.  I

thought it was a pretty good analogy.  And what this patent does is it says, no, we will give you a specific start location.  And that start location is defined by the code you see right there in the LTE specification.  And that code matches exactly the code in the patent for the start location.

If someone asks you, are you sure, are you sure that code is used, you can ask them for PX-36213, PX-1695, and you can see verbatim the identical code in our patent is used in the LTE specification.

And not only is it used in the LTE specification, it's required for Apple to use it.  You can take and go to the T-Mobile document, which is PX-2052.5 and see that Apple is required to use this equation.  This is 213.  Apple is required to fully support 213.

We heard from Dr. Nigel Jones on the last day.  He had that very pleasant British accent, it was the second-to-last video -- it was in fact the last video you saw.

And what's interesting is Dr. Wells who admitted under oath that he doesn't read code very well.  He said I'm not a source code guy.  He actually relied on Nigel Jones's source code analysis, and Nigel Jones, an expert in source code analysis, such an expert that Apple's own expert, Dr. Wells, relied on him, said that the exact

requirement of the claim is in the patent -- in the code. The floor(N/L) and the way you can see that is by noting that it says modulo C in the claim.  And a modulo C is a percent sign.

Dr. Ramaprasad -- Mr. Ramaprasad was forced to admit that under examination.  And Mark Lanning -- Mr. Lanning was forced to admit it, as well.

The trick that they're saying is we don't do a floor because they're using a percent -- they show a percent sign.  But that's a trick because the percent sign is a modulo.  And they were forced to admit it under oath.

Apple also admits that it does a divide.  If you remember correctly, there's this little dispute right there N/L.  And they're saying, oh, that's a divide.  We do a shift.  That's their primary non-infringement argument. They say we do a divide, not a shift.

But they were forced to admit -- Mr. Ramaprasad was forced to admit that the shift they do is a divide. It's not equivalent to a divide.  It's in a divide. They're trying to lose you in jargon. You're not computer engineers.  They're trying to say we don't do a shift -- we don't do a divide, we do a shift.  And it was a trick.

On cross-examination, they admitted that a shift is a divide.  Ask yourself if counsel for Apple will dispute that a shift is a divide.  He will not.

Now, Claim 7 is striking.  They made this big deal about whether they have the magic numbers, but Mr. -- Mr. Lanning was forced to admit they have the magic numbers.  You can see the fingerprint in the actual code.  And Apple's counsel will not dispute that the numbers occur in the Qualcomm code.

So Claim 6 and 7 are both infringed.

Now, let's go to the '833 patent.  This is the patent that involved protecting the signals, the special signals right around the registration line.  And you'll see that LG's proposal at PX-2038 matches exactly what the LTE standard uses.  PX-2038 and PX-2214.  If anyone asks you are you sure they invented what was in the standard, you can take them to this document, and we can prove it.

Now, you can also prove it by Nigel Jones.  Nigel Jones actually drafted based on the source code what Apple's, Qualcomm, and Intel modems do, and it shows exactly, exactly what was in the proposal and exactly, exactly what is in the LTE specification.

Now, our patent does something called time-first mapping.  And remember Dr. Madisetti told you that time is in the X direction, it's in the row direction.  And going row-by-row means you focus first on what's going in the time direction.  Time-first mapping.

And Apple is going to claim they don't do

time-first mapping.  That's going to be their defense.
They're going to throw in all sort of jargon.  They're
talking about column-by-column, not row-by-row, but they're
disputing that they do time-first mapping, which is what
our patent requires.

But we know they do time-first mapping.  You know
how we know?  Look at Column 5, Lines 37 through 55 of our
patent which talks about time-first mapping.  Then go to
PX-2142 at Page 32, which is the LTE standard which says
that the LTE standard does exactly what our patent does,
time-first mapping.  Time-first mapping.

And then what we have even more powerfully is the
own documentation of the Intel and Qualcomm modems that are
used.  Go to PX-1002 and you'll see that they proceed by
rows, exactly as the claim requires.  And they admit that
they use time-first mapping, that they implement that
Section 5.2.8 -- 5.2.2.8.  It's in the actual documents.

Ask yourself if counsel for Defendant will show
you a page from an actual document that describes their
system.  Proceeding by rows, proceeding by rows, time-first
mapping, exactly what our claim describes, exactly what
Apple's counsel will not show you.

And Qualcomm -- again, the symbols are mapped
across the rows.  The CQI, which is the control signal, is
mapped across the rows.  Counsel will not show you a single

document disputing these facts.

Counsel will claim that LG somehow said this patent wasn't important because it has almost no significant impact on system performance.  Once again, a trick.  And Dr. Madisetti caught them out on the trick.

The issue is that we needed to find a way to protect the critical ACK and NACK signals so they wouldn't get lost.  But remember how important battery life is?  We had to do it in a way that wouldn't increase processing capability.

There was a major flaw with the existence approach.  We caught it, and we were able to save it and stop it without having any impact on system performance.  It was a trick that they were playing with you.  Having no impact on system performance is amazing.  It means we achieved all of this benefit without having to use any additional battery life.

And if I was wrong about that, there's a man named Friedholm Rodermund who was paid by Apple and was an actual expert in 3GPP who would have disputed Dr. Madisetti, and he didn't.

What we did was we showed a simulation that showed a design that's 10.7 percent slower.  That simulation was created by Antonio Virdis.  That same simulation design is used by Intel, the people who make the modems in this case.

He testified under oath it was the real world.  He testified under oath that Apple could have run its own simulation.

If I was facing $200 million in liability, I would not have hired an expert who hasn't spent one day at 3GPP. I would not put my hands in my pockets and shrug.  I would have hired someone who could have done a simulation, except in one circumstance.  If I was Apple, there was one circumstance in which I wouldn't have done my own simulation.  I think we all know what that is.  It's because it would yield the same result.

The last patent, the '557 patent, once again, PX-1722.  We presented it to 3GPP.  It was adopted.  It requires randomly selecting from a group of sequences.  And that's exactly what the document PX-982 shows.  You will not see one document from Apple disputing that, not one document.

And, in fact, what you'll see is that they paid an expert to come in and add language to the claim requiring the sequences to be pre-generated and pre-stored in contradiction of the claim itself.  Column 5, Lines 62, to Column 6, Line 5, is the specification which contemplates that this invention allows for generation on the fly.

And Mr. Lanning, who was paid by Apple, said the opposite.

Ultimately, at the end of the day, ladies and gentlemen of the jury, we will ask you to award not less than $583 million for Apple's use of this technology without authorization.

Thank you very much for your time.

THE COURT:  All right.  Defendant may now present its closing argument to the jury.

MR. MUELLER:  Your Honor, may we approach sidebar?

THE COURT:  Approach the bench, counsel.

MR. MUELLER:  And may we set up while we're sidebar, set up the --

THE COURT:  Your team can assist you.

(Bench conference.)

THE COURT:  What is it, Mr. Mueller?

MR. MUELLER:  Yes, Your Honor, I request curative instructions.

The first one relates to Mr. Sheasby's argument towards the beginning of his closing argument that there was no evidence of Apple contributions or Apple standard essential patents.  I raised this objection, I believe yesterday.  This is not a case about Apple patents.  Apple had no obligation to put on proof of Apple practicing patents, including Apple's standard essential patents.  That's number one.

Number two, Mr. Sheasby said explicitly, and I'll

1295

give you the transcript cite, 11:04:12 through 11:04:35, that Apple violated its obligations to ETSI.  There's no claim in this case that Apple violated its obligations to ETSI.

So I request curative instructions on those two issues.

And the third issue, which is that Mr. Sheasby referred to Apple experts testifying over 30 times for Apple.  It's not in the record.  And if Mr. Sheasby is permitted to do that, I would respectfully request that I be permitted to raise the fact that Dr. Madisetti's been paid millions -- millions, plural, to testify against Apple in various cases over the years.  If extra record evidence of expert engagement is permitted to the Plaintiffs, I'd request the same latitude.

And then the final thing, Your Honor, is -- and I meant to raise this earlier, but I'll raise it now -- I'm concerned that in his rebuttal argument, he's going to refer to Your Honor striking testimony of witnesses.  I had understood and expected that Your Honor would not want us to do that.

But if he's free to do that, then, of course, I would refer to Your Honor striking various witness's testimony, including Mr. Blasius.  And I just want to understand the rules of the road before I have my closing.

1296

THE COURT:  Striking various testimony in what context, Mr. Mueller?

MR. MUELLER:  So we received a slide this morning at 7:00 a.m. that included a quotation from Your Honor striking or directing that the jury disregard certain testimony of Mr. Wells -- Dr. Wells.  Of course, Your Honor had struck testimony of Mr. Blasius on day one.

If Mr. Sheasby is going to refer to Dr. Wells in his rebuttal closing, I'm going to refer to Mr. Blasius in my closing argument.  I just want to know what the rules of the road are on that.

And then as I said, on the expert retention issue, the 30 times or over 30 times is not a fact in the record, and if we're going to be permitted to defer to the expert work that's not in the record, there's plenty of things I can say.

MR. SHEASBY:  Where should I start, Your Honor?

THE COURT:  At the top.

MR. SHEASBY:  Okay.  One --

MR. MUELLER:  I would ask that Mr. Sheasby keep his voice down.

MR. SHEASBY:  One, the first issue is I said Apple didn't make any contributions to the standard.  That's a critical and relevant issue to show that they didn't -- didn't have any value to LTE.  It came into the record

multiple times. It's in evidence. There's no motion in limine that I didn't say it, and I said nothing about there's no evidence that Apple patents -- there's Apple patents that didn't practice the -- there's no Apple patents that practice -- that are implemented in the product. I said nothing about that. Everything I said was what's in evidence in this case.

Number two, there's so many of them -- what was number two? Oh, Number two --

THE COURT: Lower your voice.

MR. SHEASBY: Number two, I didn't say that Apple -- it is absolutely the case that Apple did not approach and did not follow those procedures. And it's a relevant fact for willfulness because they said -- they've always said we don't have to do anything. People can come to us. So I do think it goes to willfulness that they didn't follow the ETSI instructions which is to approach.

The third issue, Your Honor --

MR. MUELLER: Based on that -- Your Honor, I gave you the pin cite. The exact words were Apple violated obligations to ETSI, that's the words. There's no such claim in this case --

MR. SHEASBY: There is -- there's a claim of -- that it's not FRAND. And then number three -- what was number three?

MR. MUELLER:  Three referring to experts --

MR. SHEASBY:  Yeah, that's actually is in evidence.  For reasons that are unknown to me, they elicited from each of their expert witnesses --

MR. MUELLER:  Mr. Sheasby, if you could keep your voice down.  The jury is right there.

MR. SHEASBY:  I'm sorry, Your Honor.  Sometimes I'm told to speak up.  Sometimes I'm told to speak down.

THE COURT:  I'm telling you now to be quiet.  The microphone is right in front of you.  If the court reporter can't pick you up, she will let us know.

MR. SHEASBY:  Number three, that is in evidence.  For reasons that are unclear to me, they elicited a vast number of times each of their experts has worked for Apple, 10 times for Mr. Lanning, four times for Mr. Perryman, 11 times for Mr. -- for Dr. Wells, and three times for Dr. Fuja.

So and the fourth one, what was the fourth one?  The fourth one is I'm not going to talk about the striking of Mr. Wells's testimony.

THE COURT:  Well, I'm not going to allow you to talk about any testimony that's been struck, period.

With regard -- the first one again was what?

MR. MUELLER:  The first one was the suggestion that we had some obligation to put on proof at this trial

with regard to Apple contributions to the standard --

THE COURT:  You're going to have to speak into the microphone, Mr. Mueller.

MR. MUELLER:  Apple contributions to the standard or in Apple patents.  There's no obligation in this trial, which is about these 5 patents for Apple to be presenting --

THE COURT:  You can certainly say that in your closing.  I'm not going to instruct the jury on that.

I am going to instruct the jury that there is no claim of a breach of FRAND between the parties.  I gave that in my final instructions.  I'll reiterate that. You're not to talk about any evidence that's been struck.

If I were to give you leave on the experts and their compensation -- I'm not going to give you a blank check, Mr. Mueller.

MR. MUELLER:  I understand.

THE COURT:  I do think the assertion of over 30 times goes beyond what was in the evidence.  What specifically are you asking for?

MR. MUELLER:  I would say this, I would say that that is an example of people in glass houses throwing rocks.  For example, Dr. Madisetti has testified many times against Apple and been paid millions -- millions of dollars to do so.

MR. SHEASBY:  That's not in evidence that he made millions and millions of dollars.  My 30 was in evidence, I just did math earlier.

MR. MUELLER:  It actually wasn't.

MR. SHEASBY:  Yeah, it is in evidence.  But the first part of it is fine.  That we made millions and millions of dollars is not in evidence.  And it can't be --

MR. MUELLER:  That's not the same issue --

MR. SHEASBY:  I can go back and we can do the count after this trial and it will add up to 30.  Rodermund was five times.

MR. MUELLER:  Mr. Sheasby.

MR. SHEASBY:  Rodermund was five times, Wells was 11, then Perryman was seven --

MR. MUELLER:  Please keep your voice down.

THE COURT:  Just a moment.  I think Mr. Sheasby's opened the door to a very targeted comment by Apple.  If you want to use Dr. Madisetti as your example, I think you can say that he has testified many times for Apple over a period of many years and over those many years, he's been paid in excess of a million dollars.  Okay?

MR. MUELLER:  May I say millions -- not many millions -- but millions, which is true.

THE COURT:  Several million.

MR. MUELLER:  Okay.  Understood.

THE COURT:  All right.  Anything else?

MR. MUELLER:  Nothing else.

THE COURT:  All right.  Just a moment.

Mr. Sheasby, you have 8 minutes and 30 seconds left.

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed.

MR. MUELLER:  May I have a three-minute warning?

THE COURT:  I'll be glad to give you a three-minute warning.  Is that all you want?

MR. MUELLER:  That's perfect.

THE COURT:  Okay.  Let's go.

(Bench conference concluded.)

THE COURT:  All right.  Ladies and gentlemen, we'll proceed with Defendant's closing argument at this time.

MR. MUELLER:  Your Honor, may I proceed?

THE COURT:  You may proceed, counsel.

MR. MUELLER:  Good afternoon, ladies and gentlemen.  Again, my name is Joe Mueller.  Let me start again by thanking you for your time and your careful attention over the last week.  We're grateful.  We're grateful.

Ladies and gentlemen, saying something loudly doesn't make it true.  And what I'm going to do in my

closing argument over the next 45 minutes is to summarize the evidence as best I can, the facts, the evidence, the truth that you saw over the last week.  And let me start with the creation of the Plaintiffs.

As you know, the Plaintiffs, PanOptis, there's actually five companies.  His Honor gave you the list.  And do you know even today what exactly those five companies do, who works there, who other than Mr. Blasius is there on a day-to-day basis, how they differ from each other?  Those questions were unanswered.

But one thing we do know is that they were created by a collection of large electronics companies, Panasonic, LG, Ericsson.

We also know that Samsung contributed patents.  And we know that three of these companies have a direct stake in this lawsuit, and those companies are Panasonic, LG Electronics, and Ericsson.

And when I say a direct stake, I mean that the money demands that are being made by the Plaintiffs are in part on their behalf.  They have a financial interest in the lawsuit.

Now, Mr. Sheasby mentioned a few times about information that the Plaintiffs learned during discovery.  Well, it's absolutely a fact that we produced information during discovery, and so did they.  And through that

process, we learned facts about the creation of the PanOptis companies and who stands to benefit.

And we learned that it turns out that Panasonic, Samsung, and LG --

Your Honor, may I approach the table to get some water real quick?

THE COURT:  You may.

While he's away from the podium, ladies and gentlemen, I want to remind you there is no issue before this Court or this jury on whether there has been a breach of the contract created by the FRAND commitment.  The issue is whether the damages should be FRAND.  And if so, what those FRAND damages should be.  There is not a breach of contract claim between these parties.

Go ahead, counsel.

MR. MUELLER:  Thank you, Your Honor.

And as His Honor just said, Apple has not breached -- is not being asserted to breach any FRAND or ETSI obligation in this case.

Now, let's go here to the slide again, and you can see that these large international consumer electronics companies formed Optis.  And Mr. Blasius candidly acknowledged some of them as the partners -- the partners to the Optis companies.

These -- this is not a case, ladies and gentlemen,

of David versus Goliath.  It's a case of several Goliaths teaming up, forming the Optis companies, and then the Optis companies pursuing this lawsuit in which they have made baseless claims based on patents that Apple doesn't use and ever increasing damages demands.

Now, Apple has the ability and the resources to take a stand against these types of demands, and that's what we've done.  And Apple has had the ability to bring to you witnesses on the stand to come to you in person, to confront cross-examination, to present the facts and the evidence to you.  That's what we did.  Four fact witnesses, two engineers who worked on baseband chips, Ms. Mewes, Mr. Venkatesan, all of them took the stand, took the oath, and told you the truth.

We also brought to you experts, experts on the European Telecommunications Standards Institute, Mr. Rodermund, as well as technical experts highly experienced in understanding standards and analyzing their content. Dr. Wells, Mr. Lanning, Dr. Fuja.

Mr. Sheasby criticized them as hired guns, and they're -- people in glass houses really shouldn't throw stones.  The experts who you heard from on the Plaintiffs' side were all hired, all have testified repeatedly against Apple.  And by way of example, Dr. Madisetti has testified many years, many times against Apple and been paid several

millions -- millions of dollars to do so.

Now, Mr. Blasius testified that the Optis companies were set up by patent lawyers in Dallas, Texas that work with senior executives.  And these are the companies that you see on the screen -- not Samsung actually -- Panasonic, LG, and Ericsson.

Mr. Kennedy told you that FRAND means you can't target a competitor for unfair treatment.  Those companies couldn't do that.  And Optis -- the Optis companies, likewise FRAND principals, are required in assessing the value of the patent portfolio that they hold.

Ms. Mewes has been dealing with the Optis companies for about eight years or so.  And as she told you, eight years ago, Apple made a portfolio offer for the full portfolio, over 2,000 patents, not because Apple was conceding infringement of these five patents or any of the others, but because Apple wanted freedom to operate, freedom from lawsuits, freedom from lawsuits on patents that had come from its competitors.  And they made an offer eight years ago.

And rather than engage in a negotiation that led to a deal, the Optis companies kept making greater and greater demands in those negotiations years ago.  And then you saw precisely the same thing in this courtroom over the last week.

On Friday, you were told that a FRAND award in this case, if you were to reach one, would be in the neighborhood of $400 million.

On Tuesday, just a few days later, you were told that the royalties they were seeking were $583 million on a running royalty basis with more to come as the royalties run.

The damages demand went up $183 million in just a few days. And that mirrors or echoes the conduct of Optis and the negotiations that Ms. Mewes participated in years ago.

Now, we brought Ms. Mewes to you to explain all that. We didn't -- we brought her to you to take that share, take the oath, and to be able to tell you directly precisely what happened.

And over the course of this case, time and time again, we tried to bring you the evidence, the facts, the truth. We tried to do it through witness testimony and through exhibits, as well. We tried to do it in a respectful way. We tried to do it in a respectful way with our witnesses and with the Plaintiffs' witnesses, as well.

Now, in contrast -- in contrast, the Plaintiff put on a case in which accusation -- unfounded accusation after accusation was made day after day in which technical material was raced through at a break-neck pace that was

not intended to teach or explain.  And we just saw it again just now.  Raced through in a way that could not have been intended to explain the position in a clear fashion.

And again and again and again we saw things taken out of context, and we saw it again just now.

And let me give you some examples.  This is the spreadsheet that you've seen a few times over the course of the case that was exchanged between the Optis companies and Ms. Mewes back before this litigation.  Mr. Sheasby showed you this slide right here on the very first day of the case.  And he showed it to Mr. Blasius, and he suggested, as did Mr. Blasius, that this was Optis's way of letting Apple know that Optis thought there was infringement of the five patents in this trial.

Now, there's a few things about this slide that leave out critical information in a frankly misleading fashion.

The first is the actual exhibit looked like this.  There was an entire section that was omitted in what you were shown.  And here's an important fact you learned on the last day of trial when Ms. Mewes took the stand.  She prepared the format and sent it over to Optis and said:  Please fill this out for us.  She said, in assessing the Optis portfolio to understand more about it:  Can you please give us this information?  Can you tell us various

facts about the patents in your portfolio, the over 2,000 patents?  She said:  If you have an allegation of infringement, please tell us yes or no.

Mr. Sheasby described that as a weasel word -- a weasel word.

She said:  Please tell us yes or no, are you alleging infringement?

It wasn't a weasel word.  It was a direct request for information -- a direct request for information.  This is eight years ago.  Okay.  Eight years ago, please tell us.

What happened was this.  Optis sent back the spreadsheet, and it looked like this.  This is the actual exhibit.  This is PX-570.  That's the exhibit.  You might have thought when you first saw Mr. Sheasby's slide on the first day of trial that they had sent over a one-page letter saying there's five patents that you infringe.  This is it.  This is it.  Hundreds and hundreds and hundreds of patents listed.

Now, fair enough, Ms. Mewes had asked for information about the hundreds of patents in the portfolio.  Indeed, there's over 2,000.  So fair enough.  But was there any indication in here for any of the patents that there was an allegation of infringement?  No.  Not one.  Not one.

So eight years ago when Apple said please tell us

do you contend we infringe, they didn't say a word.  They didn't say a word.

Now, they try to justify it now by saying, well, we gave claim charts.  Well, where are they?  Where are they?  You never saw one.

Mr. Sheasby said we should have brought them.  They hold the burden of infringement in this case.  They hold the burden of infringement.

And, ladies and gentlemen, if as you sit here right now you don't quite understand what their technical positions are on certain patents and you don't have the information available to do it, well, ladies and gentlemen, they failed their burden.  They didn't bring you a single one of these claim charts that they contend provide the proof that was necessary to understand infringement.

And if they were sufficient, why didn't they check yes in the column saying alleged allegation of infringement?  Yes/no.  If it were so simple, just check yes.  But they never did it.

Now, again and again over the course of this trial, we saw examples where things were taken out of context.  These rows for the patents were embedded in a document that was hundreds of pages long.

We saw, for example, references to this database we heard about, the Innography database, and strength

scores.  And then we never heard of it again as the trial went along.  And for good reason.  As Dr. Mahon said, he's not taking it into consideration.  Those ratings go up if you file a lawsuit.  They mean nothing.

Here's an example of taking things out of context in a way that really put one of our witnesses in the cross-hairs in a truly unfair fashion.

Mr. Sheasby said in his opening statement that after their engineer denied using the code, we were able to find in the code itself the LG fingerprints matching, matching our patent, exactly what he said was not the case.

Well, let's take a moment and review.

Vivek Ramaprasad was the engineer.  He used to work at Intel.  And remember that, Intel, not Qualcomm.  Just remember for a moment, Intel, not Qualcomm.  Apple has used two sources of chips for the products at issue, baseband chips, Intel in some products, Qualcomm in others.  Mr. Ramaprasad worked at Intel, and he testified at his deposition that this particular number, 65537, was not used.

He stood by his testimony, and he explained why, and he also explained the actual source code.

Mr. Sheasby showed you this slide in his opening statement, and he said, well, there you go, the engineer is clearly lying.  There's a comment in the code that says it

truly represents that number, 65537.

Well, if you look closely, it actually says it's a trick to avoid that number to use instead 65536.

Why does that matter? Well, as Mr. Ramaprasad said, 65537 is an odd number. It's a prime number, meaning it's only -- can be divided by itself and the number 1, and it's sometimes hard to use in code. And so he's avoiding it by using a different number, an even number that ends in 6.

And, Mr. Ramaprasad, if you could please stand up just one time.

He took the stand to defend himself. He took the stand to explain himself to you. And he was asked: Were you here when Plaintiffs' counsel alleged that the source code in the bandwidth chips contradicted your deposition testimony?

He said: Correct. He was here.

Was Plaintiffs' counsel's allegation correct?

No, it's wrong; totally wrong.

Thank you, Mr. Ramaprasad.

And, frankly, on allegation after allegation, they're wrong. They're totally wrong. Once you see the full context, once you see the proof. And saying it loudly to you or to our witnesses doesn't make it true.

So let's talk more about the standards. The

baseband chips are the critical component in the Apple products that help implement the standards.  The standards, as you know, are comprised of dozens and dozens of specifications, and there are thousands of declared essential patents for those standards.

As Dr. Mahon acknowledged, there's tens of thousands just for the three that he focused on, the three specifications.  And because there are so many patents, there's a couple of points that become apparent immediately.

The first thing is if anyone ever paid the types of amounts that Optis is demanding in this case, they would put people out of business because the number of patents in this area is immense.  There's tens of thousands of declared essential patents.

The second point is this.  You can't go call everyone who owns a declared essential patent.  That's not what is done in the industry.  There's no evidence that anyone does that.  It's frankly impractical.  It would take years to finish making the phone calls.

And there's another point that I'd like to flag for you.  Ms. Mewes spoke to Optis.  She spoke to Optis years before this lawsuit was filed.  They had back and forth, and Apple made a portfolio offer for freedom to operate for freedom from lawsuits.  So what are they

suggesting when they suggest that Apple didn't have a conversation?  Of course they did.

Now, there's also been a suggestion, including this morning, that we were somehow obligated in this trial to show you evidence of Apple patents on the standard. It's just not true.  This is a case about their five patents and whether Apple is using them.  And the answer is no.

And there's one final thing about this chart here I'll show you, which is that to figure out if any one of these patents is actually used in the phone, you need to see how it's implemented.  The standard doesn't tell you how it's implemented.  It doesn't tell you how the specifications are actually put into the equipment.  Nor does the standard or the people at the standard setting organization tell you if declared essential patents are actually essential.

Now, here's a slide you've seen a few times.  It shows Tim Cook, and it says:  Apple was able to enter the smartphone market because in part the companies that hold SEPs, standard essential patents, promise to license them to all parties on fair, reasonable, and non-discriminatory terms.

And that's true.

This was shown to you as some sort of scandal.

It's anything but.  It's common sense description of the standards as a whole, these tens of thousands of patents. It has nothing to do with the five patents-at-issue in this case.

Now, again, for the -- for the patents-at-issue in this case, and really for all declared essential patents, the standards leave important aspects of the how to the implementers.  And so when we see something like this, this T-Mobile document --

Your Honor, may I pause for a moment?

THE COURT:  Take a moment.

MR. MUELLER:  May I restart, Your Honor?

THE COURT:  Go ahead.

MR. MUELLER:  Okay.  So here's an example.  You've seen this document, T-Mobile.  It says that this particular standard needs to be fully supported.  That doesn't mean we know how it's being done.

We have to look at how it's being done in the equipment, and if we were not to do that, if we're to treat all of the patents as truly essential, then we would face an enormous problem with respect to royalties being stacked on top of royalties on top of royalties.

Mr. Kennedy, the damages expert in this case, also told us that sometimes damages demands in this area are overinflated.  And you've seen this document.  Mr. Sheasby

showed it to you a few times.  The devalue SEPs quote is from this.

But if you really look at it, if you really read the document, Mr. Kennedy acknowledged that the core principles in here are absolutely reasonable for a company in Apple's position.  Focusing on quality over declaration and this issue of royalty stacking is absolutely reasonable for a company in Apple's position.

And, ladies and gentlemen, you've not heard one word in this case of anyone ever, ever taking a license just to the five patents in this case.  Not for $583 million, not for $5.83.  The licenses that the Plaintiffs have executed are portfolio licenses to their portfolio of thousands of patents, not five.

In fact, the witnesses who you heard from, including by deposition, don't recall the patent -- patents, the five in this case.  You've seen this a few times, references to agreements with ZTE and Kyocera and Huawei.  Well, once again, these are portfolio licenses. They don't tell us about the five patents in this case. And they certainly don't show anyone acknowledging that the five patents in this case are especially valuable, let alone worth $583 million.

In contrast, Mr. Perryman used the real-world comparable approach.  He looked at actual licenses in the

real world.

Now, Mr. Sheasby said something about building licenses, and I think suggested that there were forgeries or inauthentic licenses that you have received. Nothing could be further from the truth. Every agreement you have is an authentic document negotiated at arm's length between sophisticated companies, and Mr. Kennedy never said a word to the contrary.

Here are some agreements that Apple has negotiated over the years. And ladies and gentlemen, take a look at the number of patents in each one of these. And take a look at the lump sum, which is the traditional form for these types of agreements. The lump sum per patent, these lump sum per patent are a fraction, a fraction of what Optis is seeking in this case.

And, ladies and gentlemen, if you could, DTX-12 is one that deserves special consideration because it shows just how overreaching Optis is. This is the portfolio license agreement with Samsung, and you have the numbers on the screen. I'm not going to read them out loud because we're in open court, but this covers a portfolio of patents. You can see the number on the left-hand side. And it's a lump sum.

Now, Samsung is by any definition a competitor of Apple. And one thing FRAND means is you can't economically

discriminate, non-discrimination.  And so if Samsung receives terms like this, it is not FRAND or consistent with FRAND principles to demand far more from Apple.  And to make this more vivid, let's take a look at -- here's the portfolio of patents that Samsung received the license rights to as compared to the five asserted patents in this case.  And let's compare the amount of money that Optis is seeking for the five as compared to the portfolio.

And as you can see, they are seeking far more for five than Samsung paid for a portfolio.  It makes absolutely no sense, and it violates the principles of FRAND in terms of the valuation that's being demanded.

Mr. Kennedy acknowledged that the structure he's recommending to you and what Samsung received from the Plaintiffs are completely different.

And that complete difference between structures for competitors is not FRAND.  It's not fair, it's not reasonable, and it's discriminatory.

Ms. Mewes told you that the traditional approach Apple uses in this area is a lump sum, one time payment. Everyone has certainty as what's being paid and what's being received.

Mr. Ware, the former CEO of Optis, agreed that that lump sum, lump sum format provides advantages for the licensor, meaning certainty of amounts and upfront payment

and it avoids disputes.  It makes sense for the licensor, makes sense for the licensee.

And Dr. Perryman, after considering all the factors, all the factors with his extensive experience, concluded that in the so-called hypothetical negotiation, if the patents were actually being used and were valid and were truly being used in how the standards were being implemented, an appropriate number would be $5.8 million on a lump sum, critically a lump sum basis.

But, ladies and gentlemen, that's only in the hypothetical world.  Here in the real world, these patents are not being used by Apple, not once, not ever.

And all of the evidence to the contrary that you were shown by the Plaintiffs did not withstand scrutiny.

So the technical experts, Dr. Madisetti and Dr. Mahon presented to you various numerical estimates of speed benefits according to them for using these patents. And the first question I'd like you to ask yourselves is if this were true, why did Samsung, LG, and Panasonic transfer these patents?  If these patents were such crown jewels, why did they transfer these patents to the Optis companies?

But the fact is they don't have those types of speed benefits.  And the fact is there's not a shred of paper anywhere in the world that said that these five patents were responsible for speed improvements of the type

described here.

And when I asked Mr. Kennedy before this litigation, there was not a shred of paper anywhere in the world supporting these numbers, he said:  I'm sure there wasn't because these studies hadn't been done yet.

And he was right.

Now, the studies were done during this litigation, and they included Dr. Virdis.  He never ran a test using real Apple products.  He doesn't know the conditions, the cellular conditions in the United States.  He's from Italy and had not been to the U.S.

And Mr. Blasius acknowledged that they never asked LG Electronics for performance testing to show the benefits.  We didn't ask LG that or Panasonic or Samsung. So the companies that helped us set up, set up the Optis companies, the companies that the patents came from where the inventors worked, these folks never reached out to the inventors or those companies for proof to back up the claims they made to you.

And they suggested just now, well, why would we? Well, why would we?  Because the most obvious place to go to back up their -- their claims, which was the value of these patents, would be to go to the folks who created the patents and say can we have the proof?  Can you let us speak to the inventors?  Can you give us the performance

testing that backs up our claims?  And can you let us know whether our paid experts are providing correct opinions to this jury?  And they never did that.  They never did that.  They never did that.

And if they had gone back, what they would have seen are things like this, LG admitting no significant impact to performance.

They have tried to shift the burden to us.  We don't hold the burden to do any testing whatsoever.  And the problem that Mr. Lanning identified is that you can't test the Apple products to show the benefits of these patents because Apple's not using these patents.

How can you test the iPhone and the iPad to show the benefits of patents they're not using?  It makes no sense.

Mr. Sheasby said, well, they didn't do testing.  The Apple products don't use these patents, not once.  They don't use the '557 or the '833 or the other three patents in this case.  So you can't test something to see the benefits of patents that are not in the device.

Now, let's talk about the technical merits some more, and His Honor instructed you this morning that if a product is missing even one limitation or element of a claim, the product is not covered by that claim.

Moreover, His Honor instructed you that Plaintiffs

have the burden of proving patent infringement by a preponderance of the evidence.

So they hold the burden, and to the extent that they have been unable to explain their position carefully to you by racing through material, racing through material. If they haven't explained it, they have failed to meet their burden. It's their burden to explain to you how these patents are actually used. And the reason why they race is because they can't meet their burden.

So let's go through it. '332 patent. Here, this requires the generation of a formula that generates a random number using something called a floor function -- a floor function. And you can see the claim language right there.

It also refers to those two numbers, including the number 6533 -- 65537. That's the number that Mr. Ramaprasad testified is not used in the Intel chips.

Now, did you notice what Mr. Sheasby did in his first closing argument just now? He said, oh, Apple was misleading again. Mr. Ramaprasad said they didn't use the number. And here's Qualcomm code that shows the number.

Well, hold on. Mr. Ramaprasad works on the Intel chips, not the Qualcomm chips.

Mr. Sheasby showed you Qualcomm source code to try to contradict the testimony of an Intel engineer. Just

think about that.  He tried to show you code from the wrong chip to contest the truthfulness of an engineer who worked on the Intel chips.  It's a great example of what's been happening this entire trial.

Every time you hear an allegation, if you really sit down and look at it for more than a minute or two, you realize it's not true.  But there's so many things being thrown at you fast and furious, sometimes hard to keep up with all the allegations that lack merit, but that was a great example.  He accused Mr. Ramaprasad, again, of not being honest by showing you Qualcomm code that has utterly nothing to do with the work he did on the Intel chips.  That's a great example of what's happened this entire trial.

There's no floor function in the Intel or Qualcomm chips, and so, therefore, there's no infringement for this patent, as Mr. Lanning explained.

Now, Mr. Sheasby has said, well, there's some similarities here.  They start at the same point, tried to make it sound like they're pretty close.  Let me tell you one thing right now.  There's no claim of what's known as the doctrine of equivalents for the '332 patent.  There's no claim.  They have to show literal infringement.  Every single word needs to be literally met for the '332 patent, and they can't do it because rather than the floor

function, both the Intel and Qualcomm chips use a shift function.  There's not a shred of evidence they use the floor function in any one of those chips.  And so, therefore, there's no literal infringement, and, therefore, there's no infringement for the '332 patent.

Now, moreover, if you were to go beyond non-infringement, it also turns out that the ideas in that patent were nothing new really.  And you don't have to take it from me, that's from Dae Won Lee, named inventor from LG.  Again, did these folks contact Mr. Lee?  No, no.

But in an email back in 2008 he said nothing new really.  And moreover, he was utilizing an equation that had been around for decades.

And so on the question of whether there's ineligibility for patentability because the concepts were well understood and routine and conventional, well, Mr. Lee himself told us nothing new really.

Let's go to the '833 patent.  Here, the claims require row-by-row mapping for a particular thing -- for a matrix that has symbols -- that has symbols.  So you have to have a matrix for symbols.

Once again, Mr. Sheasby mixed and matched and mixed and matched.  He showed you a matrix that did row-by-row mapping but not for symbols.  And if you look at the one matrix that does row-by-row -- I'm sorry, that does

symbols or is for symbols, it's column-by-column. Column-by-column. The one matrix, the one matrix in the LTE portion of the standard at issue that does -- is for symbols does column-by-column. It's the opposite approach to the patent.

We called Dr. Kaushik Josiam to the stand to explain how column-by-column works, and he did.

And we called Mr. Wells to the stand, and we asked him: Was Mr. Sheasby asking a question about the right matrix or the wrong matrix?

He was asking me questions about the wrong matrix.

Mixing and matching, taking things out of context over and over and over and over again over the course of the last week.

Dr. Madisetti had actually conceded at his deposition that this particular matrix at issue is mapped column-by-column. Well, that's the problem. Because it's column-by-column, there's no infringement.

So let's go to the '774 patent. Here the claims require receiving a processing parameter that includes at least one of a time delay, a phase rotation, and a gain.

So just to be clear, what that means, the phone or the handset needs to receive this information over-the-air from a cell phone tower, a processing parameter that includes at least one of a time delay, a phase rotation,

1325

and a gain.

That's the requirement in the patent, but it turns out the phones that are at issue in this case and the devices at issue in this case just don't do it that way.

Instead, all this information is stored on your phone, and Dr. Mahon acknowledged candidly, question: Where are all these tables stored?

They're stored on your phone.

Mr. Wells explained the implications of that.

What was your conclusion about whether or not the Apple products, including both the Intel and the Qualcomm chips, infringe the '774 patent?

They do not infringe this patent because they don't receive a processing parameter that's one of a gain or a phase or a time delay period.

Let's go to the '557 patent. For the '557 patent, the patent requires randomly selecting a sequence from a plurality of sequences contained in one group of the plurality of groups.

So let's try to put that in a little bit more plain English. You have to take the sequence of information and treat it in a certain way by partitioning or arranging that information.

And you may recall Mr. Lanning told you about the analogy to meal preparation where you're preparing or

arranging meals together as opposed to preparing a meal one-by-one.

Dr. Josiam explained that the Intel chips, which it turns out are similar to the Qualcomm chips in this regard, generate sequences one-by-one. So the Intel chips perform this sequence procedure one-by-one on the fly, the difference being doing it on the fly sequence-by-sequence as opposed to arranging and configuring and partitioning multiple sequences together as a group.

The Intel and Qualcomm chips do it on the fly one-by-one. And that's exactly the opposite approach to the patent.

'284. Second subset bigger than the first patent, and here there's a lot of language here, but the claims require a first subset of data that indicates something called a transport value and a second set of data that indicates something called the redundancy value. And the first set of data needs to be larger than the second set of data.

As Dr. Fuja explained to you, in LTE, the second subset, the redundancy version data, is actually bigger than the first subset. So therefore, it does not infringe.

The claims require that the first subset be bigger than the second. In the actual standard, it's the opposite. The second subset is bigger than the first.

How did the Plaintiffs try to get around this? Well, again, mixing and matching. What they tried to do is to show you figures which are diagrams in some of the patents and compare them to the standard. But His Honor instructed you this morning that to determine whether there's infringement, you must compare the asserted claims, as I've defined each of them, to the accused products or method.

And here's critical language, ladies and gentlemen. The only correct comparison is between the accused product and the language of the claim itself, not -- not between figures and figures. You need to take the claim language methodically and rigorously apply it to the products.

And, ladies and gentlemen, that's what we've been trying to do from the beginning of this case is to focus on the heart of the case. If you have this claim language on the one hand and the Apple products on the other, do the Apple products use the claims? That's the question. Do they use the claims?

And when you carefully scrutinize the actual mechanics of these products, how they work, not just the standards, but how those standards are implemented in the architecture of the chips, in the code that runs on those chips, how the actual products work, again and again, the

claim language is missing.  There's holes, and they can't fill those holes by mixing and matching, and they can't fill those holes by talking loudly.  They can't fill those holes at all.  There's no infringement for these five patents, and there never was.

Now, ladies and gentlemen, you the jurors are the sole judges of the credibility of each and every witness and the weight and effect to be given to all the evidence in this case.  And this is crucial.  One thing that you bring to this case that is absolutely at the heart of your ability to assess who's right and who's wrong is to assess credibility.  The credibility of the witnesses, and frankly the credibility of the parties, the credibility of the parties.

We have been accused of misconduct, big and small, over the course of the last week and come to answer every allegation with evidence.  We called witnesses to take on claims that we were devaluing things or creating evidence, and we showed you that was false.

We brought engineers who worked on the chips at issue, experts to explain it.  And we tried to explain.  We tried our level best to explain what was actually happening in the technology.  Why did we do that, try to explain instead of racing through material at a break-neck pace?  Because, ladies and gentlemen, if you actually understand

what's going on with the technology, you understand there's no infringement.

THE COURT:  Three minutes remaining.

MR. MUELLER:  Thank you, Your Honor.

We did as much as we possibly could over this trial to give you the information to truly understand the functionality at issue.  It's like drinking from a fire hose to be sure, but we tried our best to explain our positions in a clear way, rather than trying to blow one past you.  We tried to explain ourselves clearly and concisely and to make vivid as best we could that the evidence and the facts show there's no infringement of these five patents, and there never was.

Now, ladies and gentlemen, the United States Constitution does indeed enshrine patent rights.  This is a slide that you were shown during Mr. Sheasby's opening statement.  And this is what it says:  The Congress shall have the power to promote the progress of science and the useful arts.

Ladies and gentlemen, this is not a case about promoting progress.  This is a case about the five Plaintiff companies and their partners, LG Electronics, Panasonic, Ericsson, those companies asking you to award them money they don't deserve.  This has nothing to do with progress.

Ladies and gentlemen, this dispute with the Optis companies and their partners has been going on for many years, as you know.  It needs to come to an end.  It needs to come to an end.

What they have been doing -- what those companies, the partners and all the rest have been doing to Apple is just not right.  And Apple came to you, took the stand, and explained the facts to you to show you the truth and to let that truth shine through.

Now, I'm not going to get a chance to answer Mr. Sheasby's final closing argument.  I'd ask you as you hear it, keep in mind the facts that you've learned over the last week.  Put what he says in context.  Put what he says in the context of the facts, the evidence, the truth.

Ladies and gentlemen, this is indeed an important case.  The case and the issue that is before you is whether you're going to reward the behavior of the Plaintiffs or if instead, if instead you will find that this, this is just not the right way to do things.

Ladies and gentlemen, we trust your judgment, and I thank you again for your time and your careful attention.

MR. SHEASBY:  Your Honor, may I approach?

THE COURT:  Counsel, approach the bench.

And Mr. Mueller, either you or somebody on your team need to move this --

MR. MUELLER:  Yes.

THE COURT:  -- demonstrative in front of the podium, as well as the demonstrative on the easel.

(Bench conference.)

THE COURT:  Mr. Sheasby, I paused the clock for 10 seconds because Mr. Mueller choked on his water like I often do.  I've given you 10 seconds additional.  You have 8 minutes and 40 seconds.

MR. SHEASBY:  Thank you.

THE COURT:  What's the issue?

MR. SHEASBY:  Counsel said that if the jury awards this amount, Apple is going to go out of business.  That's a direct quote.  You can search for the words "go out of business."  That's a violation of Court's MIL No. 19.  The parties shall be precluded from introducing evidence, testimony, or argument suggesting that a verdict in one party's favor would have other commercial impacts.

I would respectfully ask that the Court instruct the jury that the statement -- you're not permitted to consider and there is no evidence that this award will have any other commercial impacts.  You can literally search for the word "go out of business."

MR. MUELLER:  I did not say "go out of business," not once.

THE COURT:  What do you believe you said because I

don't have the ability to sit here and do a word search through the whole transcript.

MR. MUELLER:  No.  What I was describing, Your Honor, was royalty stacking which was a topic that was the subject of an intensive discussion.  I did not once say Apple would go out of business.

MR. SHEASBY:  Your Honor, he said the word "going out of business."  He said it.  And if he didn't say it, there'll be no harm to instruct the jury that you should not consider anything about commercial impacts of this case, and you should not consider whether this is any other commercial impacts.  That's utterly irrelevant to any issue you're going to decide.  If he didn't say it, he's got no problem --

MR. MUELLER:  I disagree.

THE COURT:  Well, honestly, Mr. Sheasby, I expected you to raise this limine order when the topic of royalty stacking came up in the first place.  That's usually where -- when Defendant tries to say that they are going to have adverse consequences if they have to pay royalty on royalty on royalty for an immense number of patents.

MR. SHEASBY:  Right.

THE COURT:  And you didn't do that.

MR. SHEASBY:  I didn't because I was concerned

about Federal Circuit appellate practice.  But saying going out of business, I thought they had to let them try it --

THE COURT:  I honestly don't recall the words "go out of business."

MR. SHEASBY:  It was there, Your Honor.

THE COURT:  All right.  I'm not going to give an instruction.

Let's proceed.

(Bench conference concluded.)

THE COURT:  All right.  Plaintiff may present its final closing argument.  You have 8 minutes and 40 seconds remaining, Mr. Sheasby.  Would you like any warning from the Court?

MR. SHEASBY:  I would like a warning at 3 minutes, Your Honor.

THE COURT:  I'll warn you with 3 minutes remaining.  You may proceed.

MR. SHEASBY:  So I think that there is a misunderstanding about the law of infringement.  We have the burden of proof by a preponderance of the evidence.  Which means if one pebble, one single pebble tips farther in our favor than Apple, we absolutely prevail.  We win at 50.00001 percent.  That's all we need to establish.  And that's the law of the United States.

Let's go to Slide 110 -- Slide 110.

This is the formula that is used in Apple's design for the '333 patent -- '332 patent that matches exactly what was used.

There was some suggestion that I didn't show you both the Qualcomm and the Intel source code. This is the Qualcomm and the Intel source code, both showing a mod, and this is the Qualcomm and Intel source code both showing the magic numbers -- the magic numbers for both of them.

How many lines of source code did Apple's counsel show you? If I was facing $560 million in liability, I would have had the respect for you, ladies and gentlemen of the jury, to show you a line of source code. I know Plaintiffs showed you many lines of source code. In fact, in a world where black is white and up is down, we're being criticized for giving you the respect of showing the evidence.

Let's go to Slide 132.

This is the '833 patent, which undisputedly uses time-first mapping, exactly as the patent requires.

And if you go to Slide 137, it says row, which is exactly what the Intel document was. 1002.

How many pieces of evidence did Apple show you on this claim, on this patent? The number is a number of 0, because the evidence shows that they proceed by rows.

And the evidence for Qualcomm's chip shows the

1335

same.  That's the start position, and it goes across in rows.

Not a shred of evidence, not a shred of document was presented to you by Apple.

How many times did they ask you to write down an exhibit number?  The answer is zero.  You know why?  Because they don't want you to look at the evidence because the evidence is damning.

Let's go to Slide 81.

It's the same for all these patents.  The '774 patent, we showed you the source code that the precoder information is going directly to the phone.  And Apple did not dispute that the content of that precoding information is gain and phase.  Not a single document, not a single shred of evidence.

Well-rehearsed, well-practiced was that speech by Apple's counsel but absent in evidence.

Let's go to the '557 patent.  Slide 162.

The actual code, one group of a plurality of groups.  And we literally showed you the code.  This is the actual code that says the two groups in Apple's products.  We showed you the code because if you dedicated five days of your life to this trial, you deserve something more than trust us and 40 minutes without showing you a single line of code or a single piece of evidence.

Let's go to the issue of validity, Slide 180.

Unlike infringement in which a single pebble -- a single pebble allows us to prevail, they must show by clear and convincing evidence that the '332 patent is routine, well-known, and well-understood.  They can't even possibly come close to satisfying that.

This is the study that we did, a transformative study, a study that shows the power of this patent from the time before this lawsuit, that counsel for Defendants utterly refused to engage in his 40 minutes.

Slide 149.

Dr. Madisetti spoke about the fact that it was not conventional and routine.  That being able to select in the needle of haystack where you're going to start and find your control information was not well -- routine -- routine and well-understood, which was the standard.  He spoke about the fact that the decoder was very, very difficult, and that the leading companies in the world failed to provide a decoder.  He described it as a big deal.

And there was some attack on the credibility or the integrity of Dr. Madisetti.

Slide 54, please.

THE COURT:  Three minutes remaining.

MR. SHEASBY:  Dr. Madisetti is an expert in 3GPP.

Slide 1030.  1030.  I'm sorry, 1 -- Slide 30,

excuse me.

Apple admits it was on notice and knew about these patents at the time.

Slide 234.  Excuse me, Slide 234.  You said 236.

232 is the amount of money -- we're having a bit of a technical problem.

232 is -- shows the amount of money we're seeking in damages, a reasonable royalty.

What's their response to that?

Let's go to Slide 212.

The response to that is they showed you this part of a document from the Samsung agreement, but they omitted the truth.  They omitted the fact that Samsung also pays 75 percent of what Apple pays, and the amount we're asking in damages from Apple is effectively the amount that Apple -- that Samsung would have paid when the agreement was signed. They omitted this entire element from the agreement.

They just showed you a slide that their own expert admitted -- omitted evidence.  And the reason for that is because there's a dramatic difference in profitability. Far from discriminating against Apple, we're doing the exact opposite.  We're giving them a better and more favorable deal than Samsung received because we want this to end.

Let's go to Slide 215.

which involve patents that were actually used.  None of which involve patents that have any economic value.  That is their response.  Those agreements were built.  They were comp licenses that were intentionally built to create evidence.

And they asked the question, and it's a good question.  Why didn't Panasonic/LG approach Apple itself?  Well, Apple is a massive supplier of products, and, of course, a supply -- a massive purchaser of supply.  And, of course, their internal records show the undue pressure they put on their own suppliers if they ever have the temerity to ask Apple to comply with the law.

Slide 207.  207.

This is the amount of money they make per patent, $8.79.  This is the amount of money that they've made from 2009 forward, $1.02 billion.  They're asking --

THE COURT:  Mr. Sheasby, your time is expired.  Take a few seconds and finish up.

MR. SHEASBY:  This is not a case about basketballs.  It's not a case about biblical parables.  It's not a case about houses of cards.  This is a case about a jury duly constituted in the United States District Court for the Eastern District of Texas to enforce the law

without fear or favor.  I cannot tell you what to do, but I respectfully ask that you execute your Constitutional duty.

Thank you very much.

THE COURT:  All right.  Ladies and gentlemen, I have just a few very short additional instructions to give you, and then I'm going to direct you to retire and deliberate on your verdict.

You must perform your duty as jurors without bias or prejudice as to any party, and the law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties in this case expect that you will carefully and impartially consider all the evidence, follow the law as the Court has given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form from the facts as you find them to be, following the instructions that the Court and only the Court has given you about the law.  Again, don't decide who you think should win and answer the questions to reach that result.  And, again, I'll remind you that your answers to the questions in the verdict form must be unanimous.

Now, you should consider and decide this case as a dispute between parties of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true in patent cases between corporations,

partnerships, other business organizations, and even individuals. A patent owner is entitled to protect its rights under the laws of the United States, including bringing a suit in the United States District Court for money damages based on allegations of infringement.

And, likewise, by the same token, a Defendant has the right to fully and vigorously defend itself against any such action.

The law, ladies and gentlemen, recognizes no distinctions between types of parties. And all parties stand equal before the law, regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, throughout this trial, I've given you instructions several times about not discussing anything about the case among yourselves. When you retire to the jury room in just a few moments, that's going to change. At that point, not only is it proper for you to discuss the case and the evidence you've heard during this trial among yourselves, it becomes your duty to discuss the evidence and the case that you've heard during this trial among yourselves as you work collectively to reach unanimous decisions as how to answer the questions in the verdict form.

During your deliberations, if you desire to review

any of the exhibits, not the demonstratives, but the exhibits which the Court has admitted into evidence over the course of the trial, then you should advise me by a written note requesting that exhibit or those exhibits, and that note should be signed by your foreperson, dated, and then handed to the Court Security Officer who'll bring it to me.  I'll then send you that exhibit or those exhibits.

Once you retire, you should select your foreperson and then conduct your deliberations.  If you recess during your deliberations, follow -- continue to follow all the instructions the Court has given you about your conduct during the trial.

After you've reached a unanimous verdict, your foreperson is to fill in those unanimous answers to the questions in the verdict form, sign it, date it, and advise the Court Security Officer that you, the jury, have reached a verdict.

You are not to reveal your answers to any questions until such time as you're discharged, unless otherwise directed by me.  And you must never disclose to anybody, ladies and gentlemen, including me, your numerical division on any unanswered question.

Any notes that you've taken over the course of this trial are aids to your memory only.  If your memory should differ from your notes, then you should rely on your

memory and not your notes.  The notes are not evidence. And a juror who has not taken notes or taken very few notes must rely on their own independent recollection of the evidence and not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than your recollection or impression about the testimony.

Now, if during your deliberations you want to communicate with me at any time, you should give a written message or a question to the Court Security Officer.  That should be in writing, dated, and signed by your foreperson.

The Court Security Officer will then bring it to me, and I'll respond to you as promptly as possible. Although I will let you know that will take some time.  I must first disclose the attorneys -- to the attorneys any question you might send me and my proposed response before I respond to any question I might receive.

And I'll respond to any such question either in writing or by having you brought back into the courtroom where I can address you orally, depending on what the question might be.

Now, after you have reached your verdict and the Court has accepted your verdict and discharged you from your duties as jurors, I want you to understand, at that point, ladies and gentlemen, you're not required to speak or to talk with anybody about your service in this case.

But at that point in time, you will be completely free to talk with anybody of your choosing about your experience as a juror in this case.  At that point, the decision will be 100 percent up to you and no one else.

Now, as I told you, I'm now going to hand eight printed copies of the Court's final jury instructions to the Court Security Officer, along with one clean copy of the verdict form, and he'll deliver that to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict.  We await your decision.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

COURT SECURITY OFFICER:  Counsel, you are welcome to wait here in the courtroom or to have a representative wait here in the courtroom.  If you are outside of the courthouse, don't go far so that I can get you back here quickly if we receive note, message, or ultimately receive a verdict.

Awaiting either a message from the jury or the return of their verdict, the Court stands in recess.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Counsel, I've received the following message from the jury.  It's dated today's date, and it says:  We have reached a verdict.

It is signed by Mr. Paul Smith, Juror No. 1, who is identified as the foreperson of the jury.

I'll hand the original note to the courtroom deputy.

And I'm about to bring in the jury and receive their verdict.  Let me make it clear, though I shouldn't have to, that no matter what it is, I don't expect any reactions, verbal, observable, or otherwise.

All right.  Is there anything from either Plaintiffs or Defendant that I should hear before I bring in the jury and receive their verdict?

MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

MR. MUELLER:  Not from Apple, Your Honor.

THE COURT:  All right.  Mr. Barnett, would you please bring in the jury?

COURT SECURITY OFFICER:  Yes, sir.

All rise.

(Jury in.)

THE COURT:  Please be seated, ladies and gentlemen.

Mr. Smith, I understand you're the foreperson of

the jury; is that correct?

THE FOREPERSON:  Yes, Your Honor.

THE COURT:  Has the jury reached a verdict?

THE FOREPERSON:  Yes, we have.

THE COURT:  Would you give the completed verdict form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record.  I'd like each of you to listen particularly closely as I do because after I have announced the verdict into the record, I'm going to poll the members of the jury to ensure that this is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning on Page 4 where Question 1 is found.

Question 1:  Did Optis prove by a preponderance of the evidence that Apple infringed at least one claim from each of the following patents?

For each patent below, answer yes or no.

Below that, what's identified as Question 1A regarding the '332 patent, the jury's answer is no.

Regarding the '284 patent, identified as Question 1B, the jury's answer is no.

Regarding the '557 patent, identified as Question 1C, the answer of the jury is no.

Regarding Question 1D concerning the '774 patent,

the jury's answer is no.

And regarding what's marked as Question 1E and relating to the '833 patent, the jury's answer is no.

The remaining questions within the verdict form, as per the instructions of the Court, are not answered.

The final page of the verdict form, being Page 10, is dated with today's date, February the 12th, 2026, and is signed by Mr. Smith as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to ensure that this verdict, as I've read it into the record, is the unanimous verdict of all eight members of the jury.

If this is your verdict, as I have read it, would you please stand up?

(Jury polled.)

THE COURT:  Thank you, ladies and gentlemen. Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the question from the Court to poll the jury.

I find that this is the unanimous verdict of all eight members of the jury.  Having so found, the Court accepts the jury's verdict, and I'll deliver the original verdict form to the courtroom deputy.

Ladies and gentlemen, this now completes the trial

of this case.  From the very beginning, I have given you extensive instructions about your conduct, what you could say, what you couldn't say, what you could do, what you couldn't do, and you have scrupulously followed my instructions throughout the trial.

Having accepted your verdict, I am now releasing you from your position as jurors, and you are no longer under any of the instructions I have given you.

That means, ladies and gentlemen, if you went home on the first day of this trial last Friday, February the 6th, and if somebody who met you there started out with tell me what happened in federal court in Marshall, you can now tell them what happened in federal court in Marshall, if you want to.  You can have any conversation with anybody of your choosing about your service in this case as a juror.

You are under no obligation to speak with anyone about your service as a juror in this case.  Let me stress, it is completely 100 percent an individual decision for each of the eight of you to make.

Let me also tell you that there has been a practice and a custom and a tradition in this court, to my own personal knowledge for more than 30 years.  And that is, jurors, when they are excused and a verdict is accepted in a case like this, will routinely find on the front steps

and the front sidewalk of this building that when they get there, the lawyers in this case are going to be standing close by. They're going to make it convenient, if you want to stop and have a conversation with them. They cannot and will not initiate a conversation with you. And if you do not want to have a conversation, don't have a conversation. Don't stop. Just walk right by.

If you do want to talk with anyone who participated in this trial about your service as jurors, I promise you, no matter whether they're on the Plaintiffs' side or the Defendant's side, they'll be interested in hearing what you have to say. But, again, ladies and gentlemen, it is 100 percent your decision individually.

As you well know from having been here throughout the week, there's really one way in and one way out, and that's up those front steps or down the front steps at the beginning or the front side of the building. As I've told you, you should expect to see most, if not many, of these lawyers making themselves conveniently placed on that sidewalk out front when you walk down those steps. Be prepared. Think whether you want to stop and talk with them. If you do, it's perfectly fine. If you don't, it's perfectly fine. It is completely and 100 percent up to you.

Now, there is one other thing I want to speak with

you about, and that is I'd like to ask each of you to do me a great honor. And that is, now that this trial is complete and I have released you and discharged you as jurors and I've accepted your verdict, I'd like you in just a minute when you leave the courtroom to go back in the jury room and let me come in the jury room because I want to shake each one of your hands, and I want to look each one of you in the eye and tell you personally how much the Court appreciates the service and the very real sacrifice that each of you have made to serve as a juror in this case. I promise I won't keep you very long, but I would consider it a great personal honor if you would let me do that before you leave the building.

I, as much as anybody in this room, recognize the importance and the significance of your service as jurors. I know that I could not do the job I am required to do under our Constitution if ordinary citizens like yourselves did not come forward and serve when called upon, like you have in this case. And I think that warrants a personal expression of appreciation.

So if you would do me that great honor, I would like to thank you each personally before you leave.

With that, ladies and gentlemen, having accepted your verdict, having released you as jurors in this case, that completes the trial in this matter. And if you'll

meet me in the jury room, I will follow you in in just a second.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Counsel, having accepted the jury's verdict, this completes the trial in this matter.  You are excused, and the Court stands in recess.

MR. SHEASBY:  Thank you.

(Trial concluded at 3:49 p.m.)

CERTIFICATION


          I HEREBY CERTIFY that the foregoing is a true and

correct transcript from the stenographic notes of the

proceedings in the above-entitled matter to the best of my

ability.


 /S/ Shelly Holmes                        2/12/2026
SHELLY HOLMES, CSR, TCRR                  Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027